## TABLE OF EXHIBITS

1.     **Exhibit A** – Table of Exhibits.

2.     **Exhibit B** – VIP License.

3.     **Composite Exhibit C** – Independent Contractor Agreement and Onboarding Documents.

4.     **Exhibit D** – Deposition of Cruz.

5.     **Exhibit E** – Deposition of Ramirez.

6.     **Exhibit F** – Deposition of McKinnon as Corporate Representative of VIP.

7.     **Exhibit G** – Affidavit of A.G.M.

8.     **Composite Exhibit H** – Fla. Stat. §§ 400.462; 400.506.

9.     **Exhibit I** – FAB.

10.     **Exhibit J** – VIP Broward County Action Complaint.

11.     **Exhibit K** – Broward County Action Substitution of Counsel and Voluntary Dismissal.



LICENSE #: 299995738
CERTIFICATE #: 60922

View current license information at: Floridahealthfinder.gov

# State of Florida

## AGENCY FOR HEALTH CARE ADMINISTRATION
### DIVISION OF HEALTH QUALITY ASSURANCE

# Home Health Agency
## LICENSED

This is to confirm that ALL VIP CARE INC has complied with rules and regulations adopted by the State of Florida, Agency for Health Care Administration, authorized in Chapter 400, Part III, Florida Statutes, and Chapter 59A-8 of the Florida Administrative Code and is authorized to operate the following:

**ALL VIP CARE, INC**
5601 Corporate Wy Ste 204
West Palm Beach, FL 33407



Jason Weida, Secretary

**Service Area:**
Indian River, Martin, Okeechobee, Palm Beach, St. Lucie

**Skilled Services:**

**Other Services:**
Home Health Aide, Certified Nursing Assistant

EFFECTIVE DATE: 02/24/2023

EXPIRATION DATE: 02/23/2025

EXHIBIT
3



Dear Independent Contractor:

Your application for work/assignment is a legal document.

Therefore, falsifying documents is a criminal offense and is considered to be a white-collar crime. This involves altering, changing, modifying, passing or possessing documents for an unlawful purpose. Including putting false information on your application.

This WILL result in immediate termination from All VIP Care, Inc. roster and your certificate/license will be reported to the state/Palm Beach County.

By signing below, you are stating your application is truthful to the best of your knowledge.

_____        5 - 3 - 21
Signature                       Date



All VIP 26 A 000001

## APPLICATION FOR CONTRACT OR EMPLOYMENT WITH THE REGISTRY

### Section 1: Contact Information

| | | |
|---|---|---|
| Last: VALdivieSO | First: CRUZ | MI: |
| Address: 6401 PERRY ST Hollywod | | |
| City: Hollywod | State: | Zip: 33024 |
| Home Phone: | Cell Phone: | |
| Email Address: | | |
| Date of Birth: | Social Security Number: | |

### Section 2: Desired Employment or Contract

| | |
|---|---|
| Position: CHHA | Date Available to Start: IMEdiato |
| Are you currently employed? ___Y  ___N | |
| If employed, may we contact your current employer(s)? ___Y ___N | |
| Have you applied to our nurse registry before? ___Y ___N | |
| If so, when? _____ | |

### Section 3: Education

| Type of School | Name | Address/Location | Years Attended | Date Graduated | Diploma/Degree |
|---|---|---|---|---|---|
| High School | AlARico Gonz | VENEZUCIA | | | |
| College | | | | | |
| Graduate School | | | | | |
| Trade, Business, or Specialty School | | | | | |

### Section 4: Employment/Contractual History *(list in chronological order with last or present employer first)*

| | | | | |
|---|---|---|---|---|
| Employer: SUSA VAREVC | | Job title: | | |
| Address: | | | | |
| Phone: | | Duties: | | |
| Date from: | Date to: | Salary: | Name of Supervisor: | |
| Reason for leaving: | | | | |
| Employer: | | Job title: | | |
| Address: | | | | |
| Phone: | | Duties: | | |
| Date from: | Date to: | Salary: | Name of Supervisor: | |
| Reason for leaving: | | | | |
| Employer: | | Job title: | | |
| Address: | | | | |
| Phone: | | Duties: | | |
| Date from: | Date to: | Salary: | Name of Supervisor: | |

© 2014 Alliance Consulting Services of Florida, Inc.

**Reason for leaving:**

| Employer: | | Job title: |
|---|---|---|
| Address: | | |
| Phone: | Duties: | |
| Date from: | Date to: | Salary: | Name of Supervisor: |

**Reason for leaving:**

| Employer: | | Job title: |
|---|---|---|
| Address: | | |
| Phone: | Duties: | |
| Date from: | Date to: | Salary: | Name of Supervisor: |

**Reason for leaving:**

*If additional space is required, please utilize the back of the application form to list additional past employers.*

**Section 5: Professional License(s), Registration(s), and/or Certification(s)**

| Type | License/Certification # | Date Issued | Expiration/ Renewal Date | State Issued |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**ADDITIONAL INFORMATION:**

Are you eligible to work in the United States? _____ Yes _____ No
If No, why not? _____

Are you willing to work any shift, including nights and weekends? _____ Yes _____ No
Are you willing to accept a live-in assignment? _____ Yes _____ No
How soon following notification can you start? _____

Please indicate days and hours available to work. If you are unavailable on certain days/times, please indicate below as well.
No Preference _____
Monday _____
Tuesday _____
Wednesday _____
Thursday _____
Friday _____
Saturday _____
Sunday _____

Have you ever been convicted of a crime? _____ Yes _____ No
If yes, explain number of conviction(s), nature of offense(s) leading to conviction(s), how recently such offense(s) was/were committed, sentence(s) imposed, and type of rehabilitation:
_____

Have you had a break in providing services under your license or certification for greater than 90 days? _____ Yes _____ No _____ N/A

© 2014 Alliance Consulting Services of Florida, Inc.

Have you maintained continuous U.S. residency for at least five years? ___ Yes ___ No

Do you have a valid driver's license? ___ Yes ___ No ___ N/A

Languages Spoken: _Solo ESPañol_

Languages Read/Written: _____

Additional information/skills/knowledge/license(s) applicable to position you are applying for: _____

_____

_____

**Statement Regarding Application:** The information contained on this application is complete and accurate. I hereby authorize verification of any and all information contained in this application and on my resume, if provided. I certify that such statements are true, and understand that misrepresentation or omission of facts called for in this form, or on any resume provided by me, is cause for termination of employment or contract without notice.

Signature _____   Date _5·3·21_

Printed Name _CRUZ VALdiESO_

*THIS NURSE REGISTRY IS AN EQUAL OPPORTUNITY EMPLOYER. NO PERSON SHALL BE DENIED EMPLOYMENT ON THE BASIS OF RACE, AGE, ETHNICITY, NATIONAL ORIGIN, GENDER, SEXUAL ORIENTATION, RELIGION, CREED, VETERAN STATUS, MARITAL STATUS, DISABILITY OR ANY OTHER LEGALLY PROTECTED STATUS. Employment or contract is contingent upon furnishing evidence of identity, employment eligibility, and qualifications.*

© 2014 Alliance Consulting Services of Florida, Inc.

## ACKNOWLEDGMENT OF
## NURSE REGISTRY POLICY & PROCEDURE

**CONFIDENTIALITY STATEMENT**                                                                                    Initials: _CV_

I understand that the nurse registry abides by all standards set out by state and federal privacy laws (i.e. HIPAA). I have been instructed on maintaining the confidentiality of medical records, the privacy of client's protected health information (PHI), as well as any other proprietary information regarding the nurse registry. I am aware of and understand the nurse registry's policies relating to use, collection, disclosure, storage, and destruction of client's PHI. I understand that medical information regarding the client may only be discussed with authorized individuals. I hereby pledge that I will not access or use client's PHI except as required in the course of my duties and in accordance with applicable legislation and the nurse registry's policies. I will take the appropriate measures to keep confidential all PHI and proprietary information regarding the nurse registry both during my employment and after my employment or association ends with the nurse registry. Nurse registry records, including personnel files and manuals, are deemed privileged and confidential and shall be stored and maintained in such a manner as to maintain their confidentiality. I acknowledge that any unauthorized use or disclosure of a client's health information or breach of confidentiality with the nurse registry will result in disciplinary action up to and including termination of employment or my contract.

**TAX EXEMPT STATUS**                                                                                           Initials: _CV_

I hereby acknowledge that I am an Independent Contractor working for the registry. Therefore, I am responsible for applicable state and federal taxes, such as Social Security. I also acknowledge that I will receive an IRS Form 1099 for each year that I am a subcontractor of the registry. This form will also be sent to the Internal Revenue Service (IRS). As an independent contractor, I further acknowledge that I am not eligible to receive any benefits such as vacations, health insurance, disability, or unemployment and will not be covered by Worker's Compensation or other insurance policies of the registry. I agree to maintain insurance coverage and policies applicable to my profession, if indicated.

**PERFORMANCE REVIEW**                                                                                         Initials: _CV_

I have been informed that my work performance will be evaluated on an ongoing basis and that I will receive a written evaluation of my work performance by each facility to which I am referred for an assignment on an annual basis. I understand that I will also be assessed by the registry for competency as it relates to the performance of my job duties.

**CODE OF CONDUCT**                                                                                            Initials: _CV_

It is the objective of the nurse registry to provide services in accordance with all applicable laws, regulations and statutes. The nurse registry believes that its independent contractors share this objective and wish to perform their jobs in a competent, legal and ethical manner and thus, have established a Code of Conduct as a demonstration of that commitment. I hereby certify that I have received, read and agree to abide by this Code of Conduct. Therefore, I agree to:

- Always perform my duties and responsibilities to the best of my ability.
- Treat all clients with care, courtesy and respect and maintain client confidentiality at all times.
- Protect all client rights and report any failure to observe client rights by any person promptly.
- Always speak truthfully to all persons with whom I have contact in the course of my duties, including clients, family members, other independent contractors and government officials.
- Obey all laws which may apply to the performance of my duties.
- Make sure all documents or records which I prepare contain only accurate and truthful information.
- Observe all other standards of conduct which apply to my position.
- Report any activities that may violate this Code of Conduct to the nurse registry's owner.

© 2014 Alliance Consulting Services of Florida, Inc.

All VIP 26 A 000005

**DRUG AND ALCOHOL SCREENING**                                                    Initials: _____

I understand that the nurse registry is a drug free workplace. I understand that urine and/or blood testing for alcohol and/or drug use may be requested during the course of my contractual relationship with the registry. Such testing may be randomly requested or requested due to the registry's suspicion that I am under the influence of alcohol and/or drugs that have the potential to result in an on-the-job injury or negatively impact the quality of my work and/or the safety and quality of care I provide to nurse registry clients or the facilities with which I work. I authorize that such testing may be requested of me at the discretion of nurse registry management. I accept this as a condition of my contract. I agree to allow such testing to be completed at a time and place to be chosen by registry management. I further authorize the results of such testing to be released to the registry and any facility or business to which I am referred for assignment by the registry.

**APPLICATION FOR CONTRACT REVIEW:**                                              Initials: _____

I certify that the information I have provided during the course of applying for this position and interviewing with the nurse registry is true and correct, including but not limited to the application, my resume, and documentation for my registration folder/personnel file. I authorize the exchange of information required for the nurse registry to complete a thorough investigation of my work history and qualifications. I hereby release from liability all persons who provide information to the nurse registry during the course of any such investigation. I understand that any falsification of information on my behalf may subject me to immediate termination of my contract with the registry.

Should I be offered a contractor position with the nurse registry, I have read and agree to the terms specified in the job description provided. I understand that I may be asked to performed additional responsibilities as applicable to my position with the nurse registry and per the request of management. I agree that, as a requirement of my employment or contract, that I will provide the nurse registry with a 14 day written advance notice of intent to terminate my contract. I agree to comply with OSHA standards under the Occupational Safety and Health Act of 1970 and have been informed of my right to file a complaint with the nearest OSHA office.

**ACCEPTANCE OF CONTRACT**                                                        Initials: _____

I have been informed that the nurse registry is an equal employment opportunity employer that adheres to a policy of making employment and contractual relationship decisions without regard to race, color, sex, religion, national origin, handicap, marital status, or any other legally protected status. The nurse registry will comply, at all times, with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and all requirements imposed pursuant thereto, to the end that no person shall be discriminated against. My opportunity to contract with the nurse registry depends solely upon my qualifications and ability to perform the assigned job duties. The nurse registry's non-discrimination policy applies to clients, healthcare providers, and all personnel and independent contractors.

I understand the nurse registry operates under the principles of affording equal opportunity for qualified handicapped individuals, qualified veterans of the Vietnam era, and qualified disabled veterans. All applicants who believe themselves to be members of one or more of these groups, and who wish to identify themselves as such for the purpose of affirmative action consideration are invited to do so. Submission of this information is voluntary and refusal to provide it will not subject you to discharge or disciplinary treatment. Information obtained concerning individuals shall be kept confidential, expect that (1) supervisors and managers may be informed regarding disabled veterans and handicapped individuals, (2) first aid and safety personnel may be informed as necessary, when and to the extent appropriate, if the condition might required emergency treatment, and (3) government officials investigating compliance will be informed.

I wish to volunteer the following information. I qualify under the following *(check one)*:

☐   I do not qualify
☐   Handicapped

© 2014 Alliance Consulting Services of Florida, Inc.

All VIP 26 A 000006

☐ Vietnam Era Veteran
☒ Disabled Veteran

**RECEIPT OF INFORMATION:**                                                     Initials: _ORV_

I attest that I have been provided with information regarding the operation of this nurse registry applicable to my contractual obligation. This information included a review of daily business operations, policy and procedure, client services, documentation requirements, contractual obligations, and the mission, vision, and values of the nurse registry. I have read and understand the policies and procedures of the nurse registry and have had the opportunity to have all of my concerns and/or questions resolved to my complete satisfaction. I understand that nurse registry policies and procedures, including personnel policies, may be modified and that they are not intended to be a guarantee of my continued contractual relationship with the nurse registry. I will abide by all policies at all times and will not amend or compromise these policies under any circumstances. I understand that failure to comply with nurse registry policy is grounds for termination of my contract with the nurse registry.

**TRANSPORTATION RESPONSIBILITY:**                                              Initials: _ORV_

I attest that I have reliable transportation to be used for travel to and from client assignments. I further understand that I am responsible for maintaining and submitting proof of automobile insurance that minimally meets state requirements for insurance, if I intend to utilize my own vehicle as means for transportation.

**RECEIPT OF PERSONAL PROTECTIVE EQUIPMENT:**                                   Initials: _ORV_

I understand the hazards of my position with the nurse registry. I attest that I have been properly instructed in the use of personal protective equipment (PPE) and that the nurse registry has supplied me with appropriate PPE, as applicable to my position with the nurse registry. I agree that, as a condition of my contract, I am required to follow the established protocols for the use of PPE while providing client care and services.

**STATEMENT OF COMMITMENT:**                                                    Initials: _ORV_

In compliance with the nurse registry's policies and procedures, I agree to abide by the following guidelines:

- I agree to wear my identification during assignment.
- I will carry my professional license or certification with me at all times during working hours at a health care facility and agree to produce such a record for review by the health care facility, upon request.
- I will always maintain professionalism in the home to which I am referred or the facility or business to which I am referred.
- I will contact the nurse registry regarding any areas of discrepancy between the assignment and my ability to carry out that assignment (whether it is in a private home or facility/agency). I will also contact the nurse registry if I identify any discrepancy between the assignment and the care needs of the client.
- I will not accept any money or gifts from the client/caregiver. I will receive payment for services rendered directly from the nurse registry and not from the clients to whom I provide services.
- I will notify the nurse registry if I am unable to arrive for my assignment at the scheduled time or if I am unable to meet my assignment commitment. I understand that the nurse registry will contact the client/caregiver or facility to make alternative arrangements. I also understand that not notifying the nurse registry is grounds for termination of my contract.
- I will not make or accept personal telephone calls at the client's home.
- I will not smoke at the client's home.
- I will not send anyone else to the client's home to complete my assignment and I will not take anyone with me to the client's home to assist me in completing my assignment. I acknowledge that violation of this policy is grounds for termination of my contract.
- I will accept assignments on a case-by-case basis and I may accept or reject any assignment offered by

© 2014 Alliance Consulting Services of Florida, Inc.

the nurse registry. Once I accept an assignment, I am obligated to fulfill that assignment.

- I will provide care in a manner that does not discriminate against clients on the basis of race, color, national origin, handicap, age, or any other legally protected status.
- I will complete and submit all documentation per nurse registry policy. I understand the nurse registry may withhold payment if documentation pertaining to the services I have provided is not accurate and completed in a timely manner.
- I understand that habitual tardiness, excessive cancellations, and failure to report to an assignment are cause for the termination of my contract with the nurse registry.

**VISIT NOTES POLICY:**                                                                        Initials: _CRV_

I understand that it is nurse registry policy for visit notes and all other documentation for a client's file to be written and submitted to the Administrator weekly. I will ensure complete, concise documentation as required per nurse registry policy and procedure and submit my visit notes on a weekly basis and on time. I understand that failure to do so will result in a delay in receiving my paycheck and may result in other disciplinary action, up to and including termination of my contract.

**COVENANT NOT TO COMPETE:**                                                          Initials: _CRV_

During the term of my contract with the nurse registry and for a period of at least one year thereafter, I will not contact a nurse registry client, directly or indirectly, either for his/her own account or otherwise; to be employed by, participate in, consult with, perform services for, or otherwise be connected with any business the same as or similar to the business conducted by the nurse registry. I agree to notify the nurse registry in the event that a client attempts to arrange for services directly with me. I agree not to accept assignment from any client of the nurse registry for a period of at least one year following my separation from the nurse registry and/or termination of my contract. In the event of a breach, a threatened breach, and failure to comply with this section, the nurse registry shall be entitled to obtain an injunction restraining the commitments or continuance of the breach, as well as any other legal or equitable remedies as permitted by law.

**SCHEDULED VISITS:**                                                                           Initials: _CRV_

I have been informed that the continuity of client care is of utmost importance and services must be provided in accordance with a client's plan of care. I acknowledge that I will provide services to clients exactly as they are assigned. I will not let any assignment from this nurse registry overlap with those assigned to me by other facilities or agencies and I will fulfill my responsibilities as directed. I understand that I work for the nurse registry as an independent contractor and that the clients I provide services to belong to the nurse registry or facility to which I am assigned. I acknowledge that I am strictly prohibited from transferring or attempting to transfer any client case to another nurse registry, agency, or facility.

**CONFLICT OF INTEREST:**                                                                     Initials: _CRV_

Elite Senior Management policy prohibits its contractors from engaging in any activity, practice or act which conflicts with or appears to conflict with the interest of the registry. It is impossible to describe all the situations, which may cause or give the appearance of a conflict of interest. Therefore, the prohibitions included here in this policy are not exhaustive of all potential conflicts of interest. It is the obligation of contractors to report any potential conflicts to supervisory staff. Contractors are not to engage in directly or indirectly in any conduct in which is disloyal, disruptive, competitive, or damaging to the registry. Contractors are prohibited from accepting any employment with any organization that does business with the Registry.

© 2014 Alliance Consulting Services of Florida, Inc.

All VIP 26 A 000008

I have read and understand the above information concerning the policies and procedures of the nurse registry. I agree to abide by the policies and procedures of the nurse registry, including personnel policies, and have been informed that failure to do so may result in disciplinary action up to and including termination of my contract.

CRUZ Daicelys VALdiviESO                    5.3.21

Name (Please print)            Signature                    Date

© 2014 Alliance Consulting Services of Florida, Inc.

## INDEPENDENT CONTRACTOR AGREEMENT

This independent contractor agreement (hereinafter referred to as "the Agreement") is made and entered into this day, _5 - 3 - 21_, by and between ALL VIP CARE, INC. a Florida corporation and licensed nurse registry (hereinafter referred to as "Company"), and _CRUZ Dorcelys VALCAGESO_ SS# ▓▓▓▓▓▓▓▓, (hereinafter referred to as "Contractor").

WHEREAS, "Nurse registry," per 400.462(21), F.S., means any person that procures, offers, promises, or attempts to secure healthcare-related contracts for registered nurses, licensed practical nurses, certified nursing assistants, home health aides, companions, or homemakers, who are compensated by fees as independent contractors, including, but not limited to, contracts for the provision of services to clients and contracts to provide private duty or staffing services to health care facilities licensed under chapter 395 or this chapter or other business entities.

WHEREAS, "Staffing services," per 400.462 (29) F.S., means services provided to a health-care facility, school, or other business entity on a temporary or school-year basis pursuant to a written contract by licensed health care personnel and by certified nursing assistants and home health aides who are employed by, or work under the auspices of, a licensed home health agency or who are registered with a licensed nurse registry. WHEREAS, Company desires to contract with said Contractor to perform services in accordance with the terms of this Agreement.

WHEREAS, Company hereby contracts with Contractor to fulfill the following indicated position as an independent contractor of the nurse registry:

____ Registered Nurse
____ Licensed Practical Nurse
__✓_ Home Health Aide
____ Certified Nursing Assistant
____ Homemaker/Companion

NOW, THEREFORE, in consideration of these premises, mutual promises, covenants terms and conditions contained herein, and other good and valuable considerations, the parties acknowledge the receipt and sufficiency of which, the parties agree as follows:

### CONTRACTOR APPOINTMENT

Said duties will be carried out in accordance with all applicable law and regulation as well as applicable nurse registry policy and procedure. Job responsibilities are specified in Contractor's job description for the position indicated above. Contractor must continually meet all personnel qualifications, as set forth in said job description as well as applicable state and federal law and regulation. Contractor does hereby attest that he/she is licensed or certified in the State of Florida (if required for the position) and that he/she shall notify Company of any change, modification, disciplinary action or any event that may otherwise affect the validity, active status, or impair in any manner the underlying license or certification of said Contractor. Contractor hereby accepts such appointment and is willing to perform these services in accordance with the terms hereinafter set forth. Contractor shall provide services to clients in private homes or healthcare facilities, agencies or other organizations to which the registry refers the services of Contractor at such times and at such places specified by Company in its relationships with those individuals or organizations.

© 2014 Alliance Consulting Services of Florida, Inc.

## SERVICES OVERSIGHT—CONTRACTOR AND COMPANY RESPONSIBILITIES

Company will retain and maintain all clinical records of clients to whom services are provided in their private homes. Services to be provided through a contractual relationship with another business entity or healthcare facility will be coordinated between Company and said entity in accordance with registry policy and applicable law and regulation governing the provision of these services. Services will be properly coordinated by Contractor and/or the supervisor or designee. Contractor's services will be provided in accordance with the client's Plan of Care (hereinafter referred to as 'POC') and Company is responsible for the scheduling of home visits and periodic client evaluation according to the client's POC, when applicable. Referrals will be given to Contractor in accordance with the duties Contractor is lawfully allowed and competent to perform and for which the nurse registry is licensed. Contractor is responsible for participating in a client's POC within the scope of his/her practice as defined by law and regulation and in accordance with nurse registry policy and procedure as well as the policies of the entity to which Contractor may be referred. Company will use Contractor when Company deems it necessary and in its sole discretion determines that the skills and qualifications of Contractor are appropriate to meet client care needs and will provide those services according to the schedule set forth and authorized by Company. Both Company and Contractor agree that the Company (in conjunction with healthcare entities to which the Contractor is referred) will also coordinate client assessments, reassessments, formulation and revision of plans and discharge planning, the schedule for home visits, supervision, and case management. Contractor shall participate with Company in these activities as qualified and appropriate to his/her position and professional privileges.

## CONTRACTOR'S REPRESENTATION

Contractor represents to Company that Contractor is, and will continue to be during the term of this Agreement, duly licensed as necessary in the State of Florida to provide the services hereunder, and the execution of this Agreement by the Contractor does not conflict with any other agreement to which the Contractor is a party. Contractor also represents that Contractor will perform hereunder without negligence and in compliance with all applicable laws including, without limitation, professional regulations. Contractor will dress appropriately while providing services and comply with registry policies.

## TAX LIABILITY

Company shall not be liable for withholding any tax, social security taxes, worker's compensation or other expense or liability attributable to an employer/independent contractor relationship. Contractor agrees to accept responsibility for the payment of self-employment taxes, as applicable and in accordance with state and federal law. Contractor accepts responsibility for applicable state and federal taxes, such as Social Security. Contractor also acknowledges that he/she will receive an IRS Form 1099 for each year as a subcontractor of the registry. This form will be sent to the Internal Revenue Service (IRS) as well.

## CIVIL RIGHTS REQUIREMENTS

Pursuant to Chapter 760 F.S., Company is committed to compliance with civil rights requirements. As applicable to operation of the nurse registry, Company complies with the provisions of Florida statutes concerning civil rights and anti-discrimination laws.

Company is an equal employment opportunity employer that adheres to a policy of making employment and contract decisions without regard to race, color, sex, religion, national origin, handicap, marital status, or any other legally protected status. The nurse registry will comply, at all times, with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and all requirements imposed pursuant thereto, to the end that no person shall be discriminated against. Contractor's opportunity to contract with Company depends solely upon his/her qualifications and ability to perform the assigned job duties. Company's non-discrimination policy applies to clients, healthcare providers, and all personnel and independent contractors.

© 2014 Alliance Consulting Services of Florida, Inc.

## RELATIONSHIP BETWEEN PARTIES

Contractor is retained and contracting with Company only for the purposes and to the extent set forth in this Agreement and corresponding job description, and his/her relation to the Company and its subsidiary companies shall, during the period or periods of providing services hereunder, be that of an independent contractor. Contractor shall not be considered as being entitled to participate in any plans, arrangements, or distribution by the Company or its subsidiary companies pertaining to or in connection with any pension, stock, bonus, profit-sharing or similar benefits for their regular independent contractors.

These parties acknowledge that neither Contractor nor Company, or any of their affiliates (including, without limitation, principals, employees, agents, and executive officers, if any) shall be deemed hereunder joint ventures, principals, partners, employees or agents of other party hereto, provided all of the duties, obligations and responsibilities of Contractor, and all activities with respect to the satisfaction of the foregoing, shall be conducted by Contractor of the foregoing, shall be conducted by Contractor independent of Company as an independent contractor. Contractor shall indemnify and hold the Company harmless from any and all claims of every kind and description whatsoever asserted against Company arising out of the performance by Contractor in his/her duties, obligations and responsibilities hereunder. Notwithstanding anything contained herein, Contractor shall not be permitted to delegate any of Contractor's duties hereunder to any employee, agent or other person without the written consent of Company. Contractor shall have general control of Contractor's activities with the right to exercise independent good judgment as to the manner (but only as permitted hereunder) of servicing clients, customers and otherwise carrying out the provisions of this Agreement. In acting as an independent contractor hereunder, Contractor shall be required to make arrangements for insurance, licenses and permits and for the payment of income taxes and social security taxes with regard to any payments received by Contractor and Contractor's services.

Contractor agrees and acknowledges that it will promptly notify Company, in writing, of any inquiries, investigations, complaints, and any disciplinary actions taken by any entity based on Contractor's actions and inactions. Contractor hereby authorizes any entity regulating or supervising Contractor to release to Company all information relating to such complaint or disciplinary action. Contractor also agrees to provide Company access, upon request, to Contractor's books, documents and records to verify the costs and reasonableness of the services furnished.

## PAYMENT FOR SERVICES

Both Company and Contractor agree that the Contractor shall be paid according to the attached, Appendix A. Contractor will submit to Company accurate and complete records of services provided and will be paid every other Friday only if services were provided by Contractor, conditions for payment were met, and payment is due. Documentation pertaining to the services provided must be complete per nurse registry policy, accurately reflect services provided, and be turned into the nurse registry in a timely manner. Contractor acknowledges that payment for services may be withheld if all conditions regarding services and documentation of service provision have not been met in accordance with registry policy. Both Company and Contractor agree not to charge any client for covered services and items and to return money incorrectly collected.

Contractor shall not be entitled to any other compensation, and Contractor shall not be entitled to receive any reimbursements for any costs or expenses incurred by Contractor. In connection with services provided, Contractor shall prepare and provide Company, as may be reasonably requested, all reasonable documentation of such services in order that Company, or any other entity designated by Company, any comply with appropriate Federal and State laws with respect to the reimbursement of Company, or such other entity, of the payments by Company to Contractor as compensation.

© 2014 Alliance Consulting Services of Florida, Inc.

All VIP 26 A 000012

## BACKGROUND SCREENING

All Contractors referred for assignments by nurse registries shall meet state of Florida background screening requirements.

Company must either terminate the employment or contract of any of its personnel found to be in noncompliance with the minimum standards for good moral character contained in this section or place Contractor in a position for which background screening is not required unless the employee is granted an exemption from disqualification pursuant to s. 435.07. Any person who is required to undergo screening and who refuses to cooperate in such screening or refuses to submit the information necessary to complete the screening, including fingerprints when required, shall be disqualified for employment or contract in such position or, if employed, shall be dismissed.

## PROFESSIONAL RESPONSIBILITY

Nothing in this Agreement shall be construed to interfere with or otherwise affect the rendering of services by Contractor in accordance with his/her independent and professional judgment. This Agreement shall be subject to the rules and regulations of any and all professional organizations or associations to which Contractor may from time to time belong and the laws and regulations governing said practice in this State.

Contractor shall be responsible for obtaining and maintaining appropriate levels of professional liability insurance if applicable to cover Contractor's performance hereunder. Contractor is required to provide Company a valid Certificate of Insurance reflecting professional liability insurance coverage immediately upon the request of Company. In addition, Contractor is required to maintain automobile liability and personal injury protection insurance and shall provide proof of such insurance to Company in the event that a personal vehicle is utilized for transportation and whenever requested by Company. Contractor must immediately notify Company if Contractor's professional liability, automobile or PIP insurance is terminated, expires or is reduced, whether the insurance company or Contractor initiated such action.

Both parties agree that Contractor shall submit clinical notes and progress notes to the Administrator of the registry or designee weekly (for services provided in the week prior), and shall conform to the prescribed scheduling of visits and periodic client evaluation. All clients' health information must be maintained according to federal privacy law ('HIPAA') requirements.

Both parties agree that the Company shall request the evaluation of the Contractor's performance on an annual basis. It is an expectation of the nurse registry that Contractor will be competent to perform his/her responsibilities in a safe manner and that skills and education acquired elsewhere transfer competently into a client care setting.

## COVENANT NOT TO COMPETE

During the term of this Agreement and for a period of at least one year thereafter, Contractor shall not contact a Company client, directly or indirectly, either for his/her own account or otherwise; to be employed by, participate in, consult with, perform services for, or otherwise be connected with any business the same as or similar to the business conducted by Company. Contractor agrees to notify Company in the event that a nurse registry client attempts to arrange for services directly with Contractor. Contractor agrees not to accept assignment from any client of the Company for a period of at least one year following Contractor's separation from Company and/or termination of this Agreement. In the event any of the provisions of this section are determined to be invalid by reason of their scope or duration, this section shall be deemed modified to the extent required to cure the invalidity.

© 2014 Alliance Consulting Services of Florida, Inc.

In the event of a breach, a threatened breach, and failure to comply with this section, Company shall be entitled to obtain an injunction restraining the commitments or continuance of the breach, as well as any other legal or equitable remedies as permitted by law.

All statistical, financial and personal data relating to the client which is confidential and which is clearly designated as such will be kept in the strictest of confidence by Contractor and Company. Accordingly, Contractor agrees not to compete with Company for those clients and legal entities Contractor has serviced under this Agreement. Contractor acknowledges and agrees that information concerning the clients, suppliers, office files, procedures and policies and other aspects of the business of the Company is confidential, and in connection therewith, Contractor agrees not to use or disclose any such information at anytime except as permitted under or as otherwise permitted in writing by the Company. Contractor agrees to immediately surrender all such information in the possession or control of Contractor, including all reproductions thereof, upon any termination of this Agreement. Contractor hereby agrees and acknowledges that: (i) This section and each of its provisions are reasonable as they relate to restrictions and limitations upon Contractor; (ii) Neither this Agreement nor this section will operate as a bar to Contractor's sole means of support; (iii) This section may be enforced by Company through the use of an injunction or any other equitable remedy given in the amount of the damages to Company for a breach of this section, in addition to any other remedies Company may have hereunder or under law; (iv) Company shall be entitled to reimbursement from Contractor's legal fees, costs and expenses incurred by Company through all appeals, if any, to enforce this section; (v) This section shall survive any termination of this Agreement; (vi) If any provisions of this section is deemed unenforceable by a court of competent jurisdiction for whatever reason, such term shall be substituted with such term of immediately lesser duration or effect which shall be deemed enforceable.

### SUSPENSION AND TERMINATION

This Agreement shall commence as of the date first written below and shall continue for successive one (1) year terms, unless sooner terminated as follows: (i) This Agreement can be terminated by either party hereto upon thirty (30) days written notice prior to the commencement of the successive one (1) year period; (ii) This Agreement may be terminated by Company at any time without notice in the event Contractor breaches any covenant or representation under this Agreement; (iv) This Agreement may be terminated at any time upon mutual written consent of the parties.

### THIRD PARTY BENEFICIARIES

This Agreement has been entered into solely for the benefit of the parties hereto and in no event whatsoever shall any other party or parties be deemed a third party beneficiary or beneficiaries of the Agreement.

### MISCELLANEOUS

Florida law shall govern this Agreement, with the sole venue for any action, suit or preceding arising hereunder Palm Beach County, Florida. No amendment to or assignment of this Agreement will be valid unless in writing and signed by the parties signing below. This Agreement may not be waived unless such waiver in writing and signed by the waiving party. Each party acknowledges having been represented by independent legal counsel in connection with this Agreement or having waived such right. This Agreement sets forth the entire Agreement of the parties as to the subject hereto and supersedes any prior Agreement. Each party will execute such reasonable documents and take such reasonable action as may be reasonably requested to give effect to this Agreement. All costs and expenses of the parties in connection with this Agreement shall be borne by each such party incurring such costs and expenses. This Agreement may be executed in any number of counterparts.

© 2014 Alliance Consulting Services of Florida, Inc.

**ENTIRE AGREEMENT**

The Agreement (including any attachments and amendments hereto) constitute the entire understanding between the parties hereto and cancels and supersedes all prior negotiations, understandings and agreements, either written or oral, with respect to the subject matter hereof.

Agreement executed as of this day __5 . 3 . 21__

ALL VIP CARE, INC.

_Yanariz Perez_
Signature of Authorized Company Representative

Name: _Yanariz Perez_

Title: _Front Desk_

Date: _5/4/21_

Independent Contractor:

_[signature]_
Signature of Contractor

Name: _CRuz Daiceles Valdivieso_

Title: _HHHA_

Date: _5. 3. 21_

© 2014 Alliance Consulting Services of Florida, Inc.

## APPENDIX A:   INDEPENDENT CONTRACTOR PAYMENT SCHEDULE

**PRIVATE CLIENT HOME—PER VISIT RATE:**

|  | Sign Up/Initial Evaluation Visit | Regular Client Visit | Recertification/ Re-assessment or Discharge |
|---|---|---|---|
| RN |  |  |  |
| LPN |  |  |  |

**REFERRAL TO FACILITY, AGENCY, OR HEALTHCARE ENTITY—PER VISIT RATE:**

|  | Sign Up/Initial Evaluation Visit | Regular Client Visit | Recertification/ Re-assessment or Discharge |
|---|---|---|---|
| RN |  |  |  |
| LPN |  |  |  |

**CLIENT VISITS TO PROVIDE SERVICES—PER HOUR RATE:**

|  | Private Client Home | Referral to Facility, Agency, or Healthcare Entity |
|---|---|---|
| HHA/CNA |  |  |
| Homemaker/Companion |  |  |

*CRUz Daicelys VAldiviese*
Contractor Name (Print)                                    5 - 3 - 21
                                                          Date

Contractor Signature                                      5 - 3 - 21
                                                          Date

Administrator/Designee Signature                          5/4/21
                                                          Date

© 2014 Alliance Consulting Services of Florida, Inc.



# AFFIDAVIT OF COMPLIANCE WITH
## Background Screening Requirements

**Authority:** This form may be used by all employees to comply with:

- the attestation requirements of **section 435.05(2), Florida Statutes**, which state that every employee required to undergo Level 2 background screening must attest, subject to penalty of perjury, to meeting the requirements for qualifying for employment pursuant to this chapter and agreeing to inform the employer immediately if arrested for any of the disqualifying offenses while employed by the employer; **AND**

- the proof of screening within the previous 5 years in **section 408.809(2), Florida Statutes** which requires proof of compliance with level 2 screening standards submitted within the previous 5 years to meet any provider or professional licensure requirements of the Agency, the Department of Health, the Agency for Persons with Disabilities, the Department of Children and Family Services, or the Department of Financial Services for an applicant for a certificate of authority or provisional certificate of authority to operate a continuing care retirement community under chapter 651 if the person has not been unemployed for more than 90 days.

*This form must be maintained in the employee's personnel file.* If this form is used as proof of screening for an administrator or chief financial officer to satisfy the requirements of an **application for a health care provider license**, please attach a copy of the screening results and submit with the licensure application.

| | |
|---|---|
| Employee/Contractor Name: | *CRvz Daieelys Valdivieso* |
| Health Care Provider/ Employer Name: | |
| Address of Health Care Provider: | |

I hereby attest to meeting the requirements for employment and that I have not been arrested for or been found guilty of, regardless of adjudication, or entered a plea of nolo contendere, or guilty to any offense, or have an arrest awaiting a final disposition prohibited under any of the following provisions of the Florida Statutes or under any similar statute of another jurisdiction:

Criminal offenses found in section 435.04, F.S

(a) Section 393.135, relating to sexual misconduct with certain developmentally disabled clients and reporting of such sexual misconduct.

(b) Section 394.4593, relating to sexual misconduct with certain mental health patients and reporting of such sexual misconduct.

(c) Section 415.111, relating to adult abuse, neglect, or exploitation of aged persons or disabled adults.

(d) Section 782.04, relating to murder.

(e) Section 782.07, relating to manslaughter, aggravated manslaughter of an elderly person or disabled adult, or aggravated manslaughter of a child.

(f) Section 782.071, relating to vehicular homicide.

(g) Section 782.09, relating to killing of an unborn quick child by injury to the mother.

(h) Chapter 784, relating to assault, battery, and culpable negligence, if the offense was a felony.

(i) Section 784.011, relating to assault, if the victim of the offense was a minor.

(j) Section 784.03, relating to battery, if the victim of the offense was a minor.

(k) Section 787.01, relating to kidnapping.

(l) Section 787.02, relating to false imprisonment.

(m) Section 787.025, relating to luring or enticing a child.

All VIP 26 A 000017

(n) Section 787.04(2), relating to taking, enticing, or removing a child beyond the state limits with criminal intent pending custody proceedings.

(o) Section 787.04(3), relating to carrying a child beyond the state lines with criminal intent to avoid producing a child at a custody hearing or delivering the child to the designated person.

(p) Section 790.115(1), relating to exhibiting firearms or weapons within 1,000 feet of a school.

(q) Section 790.115(2)(b), relating to possessing an electric weapon or device, destructive device, or other weapon on school property.

(r) Section 794.011, relating to sexual battery.

(s) Former s. 794.041, relating to prohibited acts of persons in familial or custodial authority.

(t) Section 794.05, relating to unlawful sexual activity with certain minors.

(u) Chapter 796, relating to prostitution.

(v) Section 798.02, relating to lewd and lascivious behavior.

(w) Chapter 800, relating to lewdness and indecent exposure.

(x) Section 806.01, relating to arson.

(y) Section 810.02, relating to burglary.

(z) Section 810.14, relating to voyeurism, if the offense is a felony.

(aa) Section 810.145, relating to video voyeurism, if the offense is a felony.

(bb) Chapter 812, relating to theft, robbery, and related crimes, if the offense is a felony.

(cc) Section 817.563, relating to fraudulent sale of controlled substances, only if the offense was a felony.

(dd) Section 825.102, relating to abuse, aggravated abuse, or neglect of an elderly person or disabled adult.

(ee) Section 825.1025, relating to lewd or lascivious offenses committed upon or in the presence of an elderly person or disabled adult.

(ff) Section 825.103, relating to exploitation of an elderly person or disabled adult, if the offense was a felony.

(gg) Section 826.04, relating to incest.

(hh) Section 827.03, relating to child abuse, aggravated child abuse, or neglect of a child.

(ii) Section 827.04, relating to contributing to the delinquency or dependency of a child.

(jj) Former s. 827.05, relating to negligent treatment of children.

(kk) Section 827.071, relating to sexual performance by a child.

(ll) Section 843.01, relating to resisting arrest with violence.

(mm) Section 843.025, relating to depriving a law enforcement, correctional, or correctional probation officer means of protection or communication.

(nn) Section 843.12, relating to aiding in an escape. (oo)(ll).

(oo) Section 843.13, relating to aiding in the escape of juvenile inmates in correctional institutions.

(pp) Chapter 847, relating to obscene literature.

(qq) Section 874.05(1), relating to encouraging or recruiting another to join a criminal gang.

(rr) Chapter 893, relating to drug abuse prevention and control, only if the offense was a felony or if any other person involved in the offense was a minor.

(ss) Section 916.1075, relating to sexual misconduct with certain forensic clients and reporting of such sexual misconduct.

(tt) Section 944.35(3), relating to inflicting cruel or inhuman treatment on an inmate resulting in great bodily harm.

(uu) Section 944.40, relating to escape.

(vv) Section 944.46, relating to harboring, concealing, or aiding an escaped prisoner.

(ww) Section 944.47, relating to introduction of contraband into a correctional facility.

(xx) Section 985.701, relating to sexual misconduct in juvenile justice programs.

(yy) Section 985.711, relating to contraband introduced into detention facilities.

(3) The security background investigations under this section must ensure that no person subject to this section has been found guilty of, regardless of adjudication, or entered a plea of nolo contendere or guilty to, any offense that constitutes domestic violence as defined in s. 741.28, whether such act was committed in this state or in another jurisdiction.

All VIP 26 A 000018

Criminal offenses found in section 408.809(4), F.S

(a) Any authorizing statutes, if the offense was a felony.

(b) This chapter, if the offense was a felony.

(c) Section 409.920, relating to Medicaid provider fraud.

(d) Section 409.9201, relating to Medicaid fraud.

(e) Section 741.28, relating to domestic violence.

(f) Section 817.034, relating to fraudulent acts through mail, wire, radio, electromagnetic, photoelectronic, or photooptical systems.

(g) Section 817.234, relating to false and fraudulent insurance claims.

(h) Section 817.505, relating to patient brokering.

(i) Section 817.568, relating to criminal use of personal identification information.

(j) Section 817.60, relating to obtaining a credit card through fraudulent means.

(k) Section 817.61, relating to fraudulent use of credit cards, if the offense was a felony.

(l) Section 831.01, relating to forgery.

(m) Section 831.02, relating to uttering forged instruments.

(n) Section 831.07, relating to forging bank bills, checks, drafts, or promissory notes.

(o) Section 831.09, relating to uttering forged bank bills, checks, drafts, or promissory notes.

(p) Section 831.30, relating to fraud in obtaining medicinal drugs.

(q) Section 831.31, relating to the sale, manufacture, delivery, or possession with the intent to sell, manufacture, or deliver any counterfeit controlled substance, if the offense was a felony.

---

If you are also using this form to provide evidence of prior Level 2 screening (fingerprinting) in the last 5 years **and** have not been unemployed for more than 90 days, please provide the following information. **A copy of the prior screening results must be attached.**

Purpose of Prior Screening: _____

Screened conducted by:                           Date of Prior Screening: _____

☐ Agency for Health Care Administration
☐ Department of Health
☐ Agency for Persons with Disabilities
☐ Department of Children and Family Services
☐ Department of Financial Services

---

## Affidavit

Under penalty of perjury, I, _____, hereby swear or affirm that I meet the requirements for qualifying for employment in regards to the background screening standards set forth in Chapter 435 and section 408.809, F.S. In addition, I agree to immediately inform my employer if arrested or convicted of any of the disqualifying offenses while employed by any health care provider licensed pursuant to Chapter 408, Part II F.S.

_____          _____          _____
Employee/Contractor Signature                    Title                              Date
                                                  HHA                            5-3-21

All VIP 26 A 000019

| Form **W-9**<br>(Rev. December 2014)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give Form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Cruz Daicelys Valdivieso

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Social security number**

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

**or**

**Employer identification number**

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**   Signature of U.S. person ▶   Date ▶ 5.3.21

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X   Form **W-9** (Rev. 12-2014)

All VIP 26 A 000020

# HOME HEALTH AIDE/CERTIFIED NURSING ASSISTANT
## JOB DESCRIPTION

**REPORTS TO**   Administrator

## QUALIFICATIONS

- Licensed by the Florida Department of Health as a Certified Nursing Assistant, or for home health aides, documentation of successful completion of at least forty hours of training (content must be consistent with Florida regulations specific to home health aide training).
- Individuals who earn their CNA certificate in another state must contact the Florida Certified Nursing Assistant office at the Department of Health to inquire about taking the written examination prior to working as a CNA in Florida.
- Registered nurses and licensed practical nurses who can show proof they are licensed in another state or in Florida can work as a home health aide in Florida.
- Home health aides who complete their training in another state must provide a copy of the course work and a copy of their training documentation to the nurse registry. If the course work is equivalent to Florida's requirements, the nurse registry may refer the home health aide for contract.
- Current CPR certification.
- Evidence of continuing education as required.
- One (1) year experience preferred.

## PRIMARY RESPONSIBILITIES (including but not limited to the following):

- Fulfills assignments delegated by the nurse registry and provides services in accordance with a client's service provision plan.
- Meets all contractual obligations on an ongoing basis.
- Performs all personal care activities contained in a written assignment by a licensed health professional employee or contractor of the home health nurse registry and which includes assisting the client with personal hygiene, ambulation, eating, dressing, shaving, physical transfer, and other duties as assigned.
- Provides assistance with ambulation, limited to providing physical support to enable the client to move about within or outside of the client's place of residence. Physical support includes holding the client's hand, elbow, under the arm, or holding on to a support belt worn by the client to assist in providing stability or direction while the client ambulates.
- Provides assistance with bathing, limited to helping the client in and out of the bathtub or shower, adjusting water temperatures, washing and drying portions of the body which are difficult for the client to reach, and being available while the client is bathing. Can also include washing and drying the client who is bed-bound.
- Provides assistance with dressing, to include helping the client put on and remove clothing.
- Helps the client with shaving and with oral, hair, skin and nail care. (Nail trimming not allowed).
- Assists with toileting, including reminding the client about using the toilet, assisting to the bathroom, helping to undress, positioning on the commode, and helping with related personal hygiene, including assistance with changing of an adult brief. Also includes assisting with positioning the client on the bedpan and helping with related personal hygiene.
- Provides assistance with physical transfer. Providing verbal and physical cueing, physical assistance, or both while the client moves from one position to another, for example between the following: a bed, chair, wheelchair, commode, bathtub or shower, or a standing position. Transfer can also include use of a mechanical lift, if a home health aide or CNA is trained in its

© 2014 Alliance Consulting Services of Florida, Inc.

All VIP 26 A 000021

use.

- Maintains a clean, safe and healthy environment, which may include light cleaning and straightening of the bathroom, straightening the sleeping and living areas, washing the client's dishes or laundry, and such tasks to maintain cleanliness and safety for the client.
- Responsible for observing appearance and gross behavioral changes in the client and reporting these changes to the caregiver and the nurse registry or the registered nurse responsible for assessing the case when giving care in the home or to the responsible facility employee if staffing in a facility.
- Documents services provided to the client or client and for filing said documentation with the nurse registry on a regular basis.
- Performs other activities as taught and documented by a registered nurse, concerning activities for a specific client and restricted to the following:
    - Assisting with the change of a colostomy bag, reinforcement of dressing;
    - Assisting with the use of devices for aid to daily living such as a wheelchair or walker;
    - Assisting with prescribed range of motion exercises;
    - Assisting with prescribed ice cap or collar;
    - Doing simple urine tests for sugar, acetone or albumin;
    - Measuring and preparing special diets;
    - Teaching household routine and skills to well members of the family;
    - Measuring intake and output of fluids;
    - Measuring temperature, pulse, respiration or blood pressure;
    - Keeping records of personal health care activities;
    - Assisting with ADL's and IADL's;
    - Providing nutritional support.
- Provides assistance with a client's self-administration of medication, including the following:
    - Taking the medication in its previously dispensed, properly labeled container, from where it is stored and bringing it to the client.
    - In the presence of the client, reading the label, opening the container, removing a prescribed amount of medication from the container, and closing the container.
    - Placing an oral dosage in the client's hand or placing the dosage in another container and helping the client by lifting the container to his or her mouth.
    - Applying topical medications.
    - Returning the medication container to proper storage.
    - Keeping a record of when a client receives assistance with self-administration of medication.
- Assistance with a client's self-administration of medication does not include the following:
    - Mixing, compounding, converting, or calculating medication doses, except for measuring a prescribed amount of liquid doses, except for measuring a prescribed amount of liquid medication or breaking a scored tablet or crushing a tablet as prescribed.
    - The preparation of syringes for injection or the administration of medications by injectable route.
    - Administration of medications through intermittent positive pressure breathing machines or a nebulizer.
    - Administration of medications by way of a tube inserted in a cavity of the body. (e) Administration of parenteral preparations.
    - Irrigations for debriding agents used in the treatment of a skin condition.
    - Rectal, urethral, or vaginal preparations.

© 2014 Alliance Consulting Services of Florida, Inc.

All VIP 26 A 000022

- ▫ Medications ordered by the physician or health care professional with prescriptive authority to be given "as needed", unless the order is written with specific parameters that preclude independent judgment on the part of the unlicensed person, and at the request of a competent client.
- ▫ Medication for which the time of administration, the amount, the strength of dosage, the method of administration, or the reason for administration requires judgment or discretion on the part of the unlicensed person.
- ▫ The home health aide and CNA may also provide the following assistance with self-administered medication, as needed by the client:
  - ▫ Prepare necessary items such as juice, water, cups, or spoons to assist the client in the self-administration of medication;
  - ▫ Open and close the medication container or tear the foil of prepackaged medications;
  - ▫ Assist the resident in the self-administration process.  Examples of such assistance include the steadying of the arm, hand, or other parts of the client's body so as to allow the self-administration of medication;
  - ▫ Assist the client by placing unused doses of solid medication back into the medication container.
- ▫ The home health aide or CNA may not change sterile dressings, irrigate body cavities such as giving an enema, irrigate a colostomy or wound, perform a gastric irrigation or enteral feeding, catheterize a client, administer medication, apply heat by any method, care for a tracheotomy tube, nor provide any personal health service which has not been included in the service provision plan.
- ▫ Adheres to standard precautions.
- ▫ Additional duties as assigned.
- ▫ Abides by the registry's Code of Conduct.
- ▫ Maintains client confidentiality per registry policy and federal privacy laws regarding the use and disclosure of client's protected health information.

By my signature below, I acknowledge and accept the responsibilities of this position.

Signature _____   Date  5 · 3 · 21

© 2014 Alliance Consulting Services of Florida, Inc.

## WAIVER OF PROFESSIONAL LIABILITY INSURANCE

I,_____, have chosen not to carry a professional liability
        (print name)

insurance policy while working as an independent contractor for the registry, I agree to hold

harmless and indemnify    ALL VIP CARE, INC.    from any and all

claims made against me in the course of performing the professional responsibilities assigned

to me while under contract with the organizations or clients to which I am referred to provide

services. I understand the potential consequences of not carrying a professional liability

insurance policy and agree to notify registry management if I decide to

carry a policy in the future.

Independent Contractor:                    ALL VIP CARE, INC.

_____           _____
Signature of Independent Contractor        Signature of Company Representative

Name: CRuz Daioalys VAldivieso     Name: Yanariz Perez

Title: HHA                          Title: Front Desk

Date: 5 - 3 - 21                    Date: 5/4/21

© 2014 Alliance Consulting Services of Florida, Inc.

All VIP Care, Inc.
"Home Care Begins Here!"

## INDEPENDENT CONTRACTOR
## PROFESSIONAL LIABILITY POLICY

Effective immediately, Independent Contractors on the Agency's roster must carry "Professional Liability." In addition, the Professional Liability must include All VIP Care, Inc. as an additional insured.

The Independent Contractor can call CM&F Group, Inc. at 212/233-8911 to inquire about obtaining a policy and request to add All VIP Care, Inc. as an "Additional Insured." The Independent Contractor has the right to choose their insurance provider.

If the Independent Contractor wants the Agency to purchase the policy, then the contractor must sign this form.

By signing below, I, _CRUZ Daniels VHO@ViP case,_ will carry Professional Liability which is to include All VIP Care, Inc. as an additional insured; and, I will contact the Agency when the policy has expired and/or about to renew.

Furthermore, if the Agency purchases the policy on my behalf, I understand and agree that the cost will be deducted from my first pay-check.


_____
Independent Contractor Signature


_____
All VIP Care, Inc. Representative

C: File



New Policy Effective March 17, 2021
5601 Corporate Way #204
W. Palm Beach, FL 33407
(561) 268-2581 (Office)
(561) 847-1612 (Fax)

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3               CASE NO. 0:22-CV-61553-WPD

 4

 5     CRUZ VALDIVIESO FIGUERA,

 6                Plaintiff,

 7        vs.

 8     ALL VIP CARE, INC., & LIZ
       VELAZQUEZ McKINNON,
 9
                  Defendants.
10     _____/

11

12
           DEPOSITION OF CRUZ DAICELIS VALDIVIESO FIGUERA
13
                    (Videoconference)
14

15                   June 6, 2023
                     11:01 a.m.
16

17

18

19

20

21
       Stenographically Reported By:
22     HALEY DAWN WESTRA, RPR, CRR
       Reporter and Notary Public
23     BAILEY ENTIN REPORTING, LLC
       Fort Lauderdale Office
24     Phone - 954-745-9511

25
```

EXHIBIT

```
 1   APPEARANCES:

 2

     On behalf of the Plaintiff:
 3
          FLORIDA HEALTHCARE LAW FIRM
 4        BY:  Mr. Randy M. Goldberg, Esq.
          151 NW 1st Avenue
 5        Delray Beach, Florida  33444
          randy@randygoldberglaw.com, 754-224-0867
 6

 7   On behalf of the Defendants:

 8        FAIRLAW FIRM
          BY:  Mr. Toussaint Marcus Cummings, Esq.
 9        135 San Lorenzo Avenue, Suite 770
          Coral Gables, Florida  33146
10        toussaint@fairlawattorney.com, 305-230-4884

11

12   Also Present: Ms. Katherine Klejman, Interpreter

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

INDEX

WITNESS                                          PAGE
CRUZ DAICELIS VALDIVIESO FIGUERA
    EXAMINATION BY MR. GOLDBERG          4
    EXAMINATION BY MR. CUMMINGS          45
    FURTHER EXAMINATION BY MR. GOLDBERG  62

        - - -

        E X H I B I T S
        - - -

EXHIBIT          DESCRIPTION          PAGE
Exh. A    Agreement and Signup Documents    29
Exh. B    Patient time sheets          35
Exh. C    Patient Calendar (All VIP)    67
Exh. D    Weekly Pay Stubs             67

Page 4

The following videoconference Zoom deposition was taken before HALEY DAWN WESTRA, Stenographic Reporter, in and for the State of Florida at Large, in the above cause.

        - - -

        KATHERINE KLEJMAN,
an interpreter herein, having been first duly sworn by the Certified Reporter to translate from English to Spanish and Spanish to English to the best of their ability translated as follows:

        CRUZ DAICELIS VALDIVIESO FIGUERA,
a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

        EXAMINATION
BY MR. GOLDBERG:

Q. Good morning, Cruz. My name is Randy Goldberg, and I represent All VIP Care and Liz McKinnon.

    Today is your deposition regarding this lawsuit that you filed against All VIP Care.

A. Okay.

Page 5

Q. And we have a court reporter here -- I'm sorry.

    We have a court reporter here who is going to take down your testimony, so it's important that every answer you give be verbal, such as "yes," "no," or whatever the response is. She cannot take down body movements or motions.

A. Okay.

Q. Thank you.

    Are you under any medication or alcoholic beverages or any drugs that would prevent you from giving your deposition today?

A. No.

Q. If at any time during the deposition today you need to take a break, a restroom break, or for whatever reason, we will be happy to temporarily adjourn the deposition to allow you to take such a break. Okay?

A. Okay.

Q. The only condition I would ask is that a break not be taken in between a question being asked and you providing your answer.

    We would just ask that a question be asked and answered before a break is taken. Okay?

A. Okay.

Page 6

Q. If at any time I ask you a question that you do not understand or is confusing to you, I want you to please ask me to restate the question, and I will be happy to. Okay?

A. Okay.

Q. For the record, what is your full name?

A. For the record, Cruz Daicelis Valdivieso. Cruz Valdivieso.

Q. And what about the name Figuera?

A. Figuera is my second last name.

Q. Okay. But that's part of your formal name; correct?

A. Yes, correct.

Q. As we discussed earlier, and you had no objection to it, I'm going to just refer to you as Cruz today; is that okay?

A. Perfect.

Q. Are you known by any nicknames?

A. Daisy.

Q. Thank you for that.

    Where do you currently reside?

A. I live right now at Day & Davie, 3670 Southwest 60th Avenue, Apartment No. 2, Davie, Florida 33314.

Q. And when did you graduate high school?

**Page 7**

1     A. I didn't graduate. I didn't finish high
2 school.
3     Q. **What is your cell phone number?**
4     A. ▬▬▬▬▬▬
5     Q. **And who is your cell phone provider?**
6     A. T-Mobile.
7     Q. **And what is your email address?**
8     A. ▬▬▬▬▬▬▬▬▬
9 da▬▬▬▬▬▬@▬▬▬▬
10     Q. **Thank you.**
11       **Do you have a personal website?**
12     A. No.
13     Q. **Are you presently married?**
14     A. Yes.
15     Q. **And do you have any children?**
16     A. Yes.
17     Q. **Have you ever been convicted of a crime**
18 **since you turned 18 years of age?**
19     A. Never.
20     Q. **Are you a party to any other litigation at**
21 **this time?**
22     A. Sorry. I didn't understand the question.
23     Q. **Are you a plaintiff or a defendant in any**
24 **other lawsuit that is going on at this time?**
25     A. No.

**Page 8**

1     Q. **Have you ever been a party to any other**
2 lawsuit about besides current lawsuit?
3     A. Yes.
4     Q. **And what was that lawsuit?**
5     A. It was an accident at a park.
6     Q. **So aside from this accident in a park, were**
7 there any other lawsuits that you've been a party to?
8     A. No.
9     Q. **Are you -- have you ever been a party to any**
10 **administrative complaints or filings with any**
11 **governmental agency?**
12     A. No.
13     Q. **Have you ever filed any workers'**
14 **compensation claims?**
15     A. No.
16     Q. **Are you currently employed?**
17     A. Yes.
18     Q. **And who are you currently employed with?**
19     A. With Sininani, S-I-N-I-N-A-N-I.
20     Q. **Sininani?**
21     A. The agency is called Sininani.
22     MR. GOLDBERG: Okay. Can you spell that for
23 me? I didn't catch that, Madam Interpreter.
24     THE VIDEOGRAPHER: The way I caught
25 it...

**Page 9**

1     THE WITNESS: S-I-N-I-N-A-N-I.
2 BY MR. GOLDBERG:
3     Q. **And what does this company do?**
4     A. This company takes care of people with
5 disabilities.
6     Q. **Okay. Is Ms. Cruz reading these answers off**
7 **of some document in front of her?**
8     A. No. I have a paper where I'm writing down
9 how to spell things.
10     Q. **I appreciate that. Thank you for clarifying**
11 **that.**
12       **What role do you serve with Sininani?**
13     A. My job is a caretaker.
14     Q. **Are you working as a home health aide?**
15     A. Yes.
16     Q. **Do you own a business?**
17     A. No.
18     Q. **Do you work for yourself?**
19     A. I'm an independent contractor.
20     Q. **And what does an independent contractor mean**
21 **to you, Cruz?**
22     A. That I make my own schedule.
23     Q. **What else?**
24     MR. CUMMINGS: Objection to form.
25     THE WITNESS: I didn't understand the

**Page 10**

1 question.
2 BY MR. GOLDBERG:
3     Q. **Understood.**
4       **You stated that you work as an independent**
5 **contractor for Sininani. Am I correct in that?**
6     A. Yes.
7     Q. **And what does it mean by you being an**
8 **independent contractor with Sininani?**
9     MR. CUMMINGS: Objection to form.
10     THE WITNESS: I am an independent worker,
11 and I make -- I create my own schedule. I decide if
12 I can work or I can't work that day.
13 BY MR. GOLDBERG:
14     Q. **Who decided your salary with Sininani?**
15     A. They place the salary, and then if it's
16 convenient for me, then I take it.
17     Q. **Understood. Thank you.**
18       **Do you have a written contract with**
19 **Sininani?**
20     A. Yes.
21     Q. **Are you a member of any professional**
22 **associations or clubs?**
23     A. No.
24     Q. **Do you have a Facebook account?**
25     A. Yes.

Page 11

Q. And what is your Facebook name or handle?
A. My Facebook name is Daicelis.
Q. Can you spell --
A. And my username I forgot.
Q. Okay. Can you spell Daicelis for me, please?
A. D-A-I-C-L-I-S [sic].
Q. D-A-I --
MR. GOLDBERG: The rest of it, Madam Interpreter?
THE INTERPRETER: Yeah. So she -- there's a missing letter there, but I have it from the beginning.
It's D-A-I-C-E-L-I-S.
MR. GOLDBERG: Thank you for that.
BY MR. GOLDBERG:
Q. What about Twitter account?
A. No, I don't have a Twitter account.
Q. A neighborhood app account?
A. No.
Q. Instagram?
A. I have it, but I don't use it.
Q. What is her handle on Instagram?
A. I forgot.
Q. What about TikTok?

Page 12

A. No.
Q. Okay. How are you -- well, strike that.
Besides Sininani and All VIP, have you worked as a home health aide for any other agency?
A. No.
Q. When you were working with All VIP --
MR. GOLDBERG: And just for clarification, I'm just going to refer to "All VIP Care" as "VIP," if that's okay with you, Mr. Cummings?
MR. CUMMINGS: Yeah. No -- excuse me. No objection to that.
MR. GOLDBERG: Thank you.
BY MR. GOLDBERG:
Q. When you were working for VIP, were you working for any other nurse registries?
A. No.
Q. So the only time that you've worked as a home health aide has been VIP and/or Sininani; is that correct?
A. Yes.
Q. Thank you.
Is Sininani a nurse registry?
A. I don't know.
Q. You are licensed as a home health aide with the state of Florida; correct?

Page 13

A. Yes.
Q. What about as a certified nursing assistant? Are you certified with the state of Florida?
A. Yes.
Q. Do you hold any other certifications from the state of Florida or licenses?
MR. GOLDBERG: I'm sorry. Madam Interpreter.
THE INTERPRETER: No, no. I caught that. I'm sorry.
THE WITNESS: No, just that.
MR. CUMMINGS: I apologize, Mr. Goldberg.
Your second question before was, was she licensed as a certified nursing assistant?
MR. GOLDBERG: Yes, sir.
MR. CUMMINGS: Okay. Thank you.
MR. GOLDBERG: Are we good, Mr. Cummings?
MR. CUMMINGS: Yeah, I didn't know if I caught the exact terminology. I just wanted to make sure. That's fine. Thanks.
MR. GOLDBERG: No, no. Good. I want to make sure we're all on the same page here.
THE WITNESS: Okay.
BY MR. GOLDBERG:
Q. Cruz, do you know what a nurse registry is?

Page 14

A. Yes.
Q. Okay. What is a nurse registry?
A. It's a registry in which you register with the state as, in this case, Sininani to be an auxiliary for a nurse or a nurse.
Q. Your testimony now is that Sininani is a nurse registry?
A. Yes. In the beginning, when you asked me if Sininani was a nurse registry, I was a bit confused, but yes.
Q. No problem. That's why I want to clarify. I don't want any confusion.
Do you know if VIP is a nurse registry?
A. I started working for VIP as a caretaker or aide, and I had an HHA license, which is you get certified by a school as a nurse aide.
Q. Okay. Now, for clarification, you're using the term "caretaker," and then we're using the term "HHA," which I believe, Cruz, means "home health aide"; is that correct?
THE INTERPRETER: Yeah, let me clarify because when I hear the word in Spanish -- interpreter clarifying here -- when I hear the word "cuidadora" is -- I'm taking it as caretaker. I'm not --

Page 15

1    MR. GOLDBERG: Okay.
2    THE INTERPRETER: It could be "aide"; it
3 could be "caretaker," but let me double-check that
4 with the witness. One second.
5    MR. GOLDBERG: Please do, ma'am.
6    THE INTERPRETER: So because there's a mixup
7 here on the words, I think it's best to just use
8 "HHA," which is "home health aide," if that's okay
9 because --
10    MR. GOLDBERG: That is absolutely --
11    THE INTERPRETER: -- there's a mixup on the
12 Spanish words with "taking care" and being an
13 assistant.
14    So I think it'll -- for the record, it's
15 going to be helpful that way.
16    MR. GOLDBERG: Okay.
17    MR. CUMMINGS: And I'm sorry. Just to
18 clarify, Madam Interpreter.
19    Did Ms. Cruz say that her use of the term --
20 how do you pronounce cui- -- how do you pronounce it
21 "cuidadora"?
22    THE INTERPRETER: Yeah, so "cuidadora,"
23 for me, and my brain just went to caretaker --
24    MR. CUMMINGS: Caretaker?
25    THE INTERPRETER: -- like taking care of

Page 16

1 someone.
2    But I know the medical -- like, we're
3 getting specific with the terminology. I'm trying to
4 keep it exactly to what it is.
5    So now that I know HHA is home health aide,
6 it's -- I mean, "aide" and "cuidadora" are both also
7 the same word.
8    MR. CUMMINGS: Got it.
9    And when you asked her to clarify, what did
10 she say?
11    THE INTERPRETER: She said she doesn't know
12 because she doesn't know English. She -- because I
13 was saying, "In English, when they ask you, you know,
14 like, how do you say it in English?"
15    MR. CUMMINGS: Right.
16    THE INTERPRETER: "Do you say 'caretaker' or
17 do you said 'aide?'"
18    And she said that she doesn't know because she
19 doesn't speak English.
20    So I'm just trying to, yeah, keep it simple
21 for all of us. So maybe just keep it as "aide."
22    MR. CUMMINGS: Okay. Got it.
23    So when she says "cuidadora," we're going to
24 translate that to "aide" now?
25    THE INTERPRETER: Yeah. I think it's easier

Page 17

1 because it's becoming confusing, I think, for the
2 record.
3    MR. CUMMINGS: Okay.
4    THE INTERPRETER: If that's okay. I don't
5 know. I -- I --
6    MR. CUMMINGS: Yeah, I mean, for our
7 purposes, it does have a specific meaning, but I'm
8 not -- you know, I'm going to let Mr. Goldberg
9 conduct his deposition.
10    I just wanted to know what she said because
11 I wasn't sure if you were giving me a -- giving a
12 direct translation of what my client said.
13    THE INTERPRETER: Oh, yeah, I'm giving a
14 direct translation, but if there's two different
15 meanings to one word, which could happen sometimes in
16 Spanish --
17    MR. CUMMINGS: Right.
18    THE INTERPRETER: -- I just want to make
19 sure I pick the right word in English to use.
20    MR. CUMMINGS: Okay. Understood.
21    MR. GOLDBERG: Okay. I don't want to beat a
22 dead horse by any stretch of the imagination, but
23 Mr. Cummings is right. It's important that we
24 understand that home health aide is what Ms. -- what
25 Ms. Cruz is performing services as.

Page 18

1    So when the term "caretaker" has been
2 referenced, where we actually mean home health aide,
3 or HHA, are we all in agreement with that?
4    THE INTERPRETER: Yeah, let's --
5    MR. CUMMINGS: So, I mean, I think for the
6 purposes of the deposition, I don't care as much, but
7 as a -- you know, as a legal term of art,
8 Mr. Goldberg, you understand why I -- we understand
9 why this is important.
10    So I just don't want it to seem that she --
11 and also I don't want to coach here if she's not --
12 we're not translating, so I don't know if she
13 understands what I'm saying.
14    But I don't want it to -- I think maybe you
15 have to ask more questions to see her understanding
16 of it --
17    MR. GOLDBERG: I --
18    MR. CUMMINGS: -- is the legal definition,
19 right.
20    MR. GOLDBERG: I plan to ask a couple of
21 qualifying questions.
22    MR. CUMMINGS: Yeah, yeah. I figured.
23 That's why I said I'm just going to let you conduct
24 your deposition.
25    I don't know if I'm prepared to say that

Page 19

1 when she uses the term "cuidadora" that that means
2 "home health aide," though. That's like a legal
3 definition.
4      I'm not prepared to say that. But if for
5 the purposes of the deposition, fine, you know.
6      MR. GOLDBERG: Okay. Let me -- Madam
7 Interpreter, I want to ask a couple of questions to
8 qualify this is if I may.
9      THE INTERPRETER: Yeah.
10 BY MR. GOLDBERG:
11      Q.  Ms. Cruz, you are a certified home health
12 aide with the state of Florida; correct?
13      A.  Yes.
14      Q.  You are not a certified caretaker by the
15 state of Florida, are you?
16      A.  I don't understand the question.
17      Q.  To the best of your knowledge, you do not
18 have a certification from the state of Florida that
19 certifies you as a, quote/unquote, "caretaker";
20 correct?
21      A.  Yes, I got a certification at a school, and
22 I'm guessing that that school should be certified
23 with the state of Florida.
24      Q.  No, ma'am.  I -- let me restate the
25 question.

Page 20

1      Cruz has a certification by the state of
2 Florida as a home health aide; correct?
3      A.  Yes.
4      Q.  Ms. Cruz does not have a certification title
5 as "caretaker"; correct?
6      A.  My certification does say "taking care of"
7 because that's what I do, is taking care of patients.
8      Q.  But the certification is certifying Cruz as
9 a home health aide; correct?
10      A.  Yes.
11      Q.  When the term "caretaker" has been used in
12 this deposition up until this point, was Cruz meaning
13 to state that she is a home health aide?
14      A.  Yes.
15      Q.  You were employed by VIP as a home health
16 aide; correct?
17      A.  Yes.
18      Q.  And you are employed by Sininani as a home
19 health aide correct?
20      A.  Yes.
21      Q.  All right.  I think we got that clarified.
22      How does a nurse registry work, Ms. Cruz?
23      A.  I don't know.
24      Q.  What is the relationship, if you know,
25 between a nurse registry and the registry's patients

Page 21

1 or clients?
2      A.  I don't know.
3      Q.  What is the relationship between a nurse
4 registry and home health aides, such as yourself,
5 Ms. Cruz?
6      A.  In the nurse registry, you're certified by
7 the state.  And as HHA, you did a course in order to
8 work.
9      Q.  And your relationship with the nurse
10 registry is what?
11      A.  The agency that I work with.
12      Q.  I understand.  Thank you.
13      What are your duties as a home health aide?
14      A.  I do everything that is asked of me, mostly
15 for the quality and betterment of patients.  I take
16 care of cleaning for them and giving them food.
17      Q.  Who determines what your duties for a home
18 health aide are for a patient or client?
19      A.  When you're hired by the agency, you're
20 given the different conditions under which the
21 patient is founded.
22      So, for example, if the person has
23 Alzheimer's, needs to be bathed in bed, needs to be
24 fed, needs their clothes washed, and then you decide
25 whether you want to take this patient on or not or

Page 22

1 just to just be there for company.
2      Q.  So you as the home health aide get to decide
3 the scope of the services that you are willing to
4 provide to these patients; correct?
5      A.  Correct.
6      Q.  Who do you work for as a home health aide,
7 the patient or the nurse registry?
8      A.  I would say I work for both because I work
9 with the patient, and the company pays me.
10      Q.  And what does the company -- when you say
11 "company," you're referring to the nurse registry;
12 correct?
13      A.  That is correct.
14      Q.  Who terminate -- who can terminate the
15 relationship between the home health aide and the
16 patient?
17      A.  Myself.  I determine if I want to continue
18 or not.
19      Q.  And does the patient have the right to end
20 the relationship between the patient and the home
21 health aide as well?
22      A.  Yes, they also have the right.  They decide
23 if they want to be with that person or not.
24      Q.  "That person" being the home health aide;
25 correct?

1   A.  Yes.
2   Q.  What responsibilities, if you know, does the
3   home health agency have over a -- I'm sorry.  Let me
4   strike that.
5       What responsibilities does the nurse
6   registry have in overseeing the duties of a home
7   health aide such as yourself, Ms. Cruz?
8       MR. CUMMINGS:  Objection to the form.
9       THE WITNESS:  They have managers and
10  supervisors, and they -- they communicate with the
11  families, and then the family can also report how
12  well or how not well we do our jobs.
13  BY MR. GOLDBERG:
14  Q.  Who is Diana Ramirez?
15  A.  Diana Ramirez was the VIP manager.
16  Q.  Was she your direct contact at VIP?
17  A.  Yes.
18  Q.  Who is Liz McKinnon?
19  A.  I met her over the phone.  By the way, a
20  very rude person.
21  Q.  And who is your supervisor over at Sininani?
22  A.  Dina Ramirez, D-I-N-A, Ramirez.
23  Q.  Thank you.
24      Did you ever receive a performance review or
25  evaluation from Diana Ramirez?

Page 24

1       THE INTERPRETER:  The interpreter is just
2   going to request clarification on two names that are
3   very similar, so one second.
4       THE WITNESS:  So Dina, D-I-N-A, Ramirez
5   was -- was for Sininani, and we had Diana,
6   D-A-Y-A-N-A [sic], for VIP.
7       And with her, I never got a response from
8   her.  Whenever I called, she said I don't have enough
9   hours and never gave me a response and said, "Call
10  Liz."
11      MR. GOLDBERG:  Thank you for that
12  clarification as to Diana versus Dina.
13  BY MR. GOLDBERG:
14  Q.  In response to what was just stated, did
15  Ms. Cruz -- Ms. Cruz, did you ask Diana for any
16  additional hours?
17  A.  No.  She -- no, never.
18      My hours worked were the same hours given by
19  the agency.  But when it came to payment, the payment
20  always came with less hours.
21      So I would tell Diana about the lack of
22  hours, and she would say, "Next week.  We will give
23  them to you next week."
24      And when the week came by, I wouldn't get
25  paid, and I noticed the payment would come in with

Page 25

1   less hours.  They took out hours.
2   Q.  We'll come back to that issue in a little
3   bit.
4       Going back to the question.
5       Have you ever -- have you ever received any
6   performance evaluations from Diana Ramirez, Liz
7   McKinnon, or any other persons at VIP?
8   A.  From neither of them.
9   Q.  What training was provided to you by VIP in
10  your performance of duties as an HHA?
11  A.  There wasn't any.
12  Q.  Is it correct that -- all of your training
13  as a home health aide, was that pursuant to Florida
14  law?
15      MR. CUMMINGS:  Objection to form.
16      THE WITNESS:  (No verbal response.)
17  BY MR. GOLDBERG:
18  Q.  Ms. Cruz, are you going to answer that
19  question?
20  A.  I didn't understand the question.  I heard
21  "Florida law," and that's all I heard.
22  Q.  No problem.  We'll strike that question.
23      Did anybody at VIP ever tell you how to
24  perform the services that you provided to any of
25  VIP's patients?

Page 26

1   A.  Never.
2   Q.  What equipment did VIP provide you in the
3   performance of your services to the patients?
4   A.  Nothing.  I strongly asked for gloves and
5   masks, but they didn't provide me with anything.
6   Q.  Did you provide your own gloves and masks?
7   A.  I had to purchase my own.
8       Even at that time, during the pandemic,
9   I had a very contaminated patient, and I was told --
10  I called Diana, and I was told that the agency
11  wouldn't provide gloves, that I had to purchase them
12  on my own.
13      THE INTERPRETER:  Interpreter is going to
14  add something else that I didn't catch from
15  Ms. Valdivieso.  One second.
16      Okay.  I can't clarify the exact medical
17  term for a second, but it's a type of -- when you're
18  in bed for too long.
19      So that patient was not only contaminated
20  but had a lot of, I'm guessing, sores.  So I just
21  wanted to add that to that statement.
22      MR. GOLDBERG:  Thank you for that
23  clarification, Madam Interpreter.
24      THE INTERPRETER:  You're welcome.  Thank
25  you.

Page 27

BY MR. GOLDBERG:

Q.  Who determined the amount of hours that you worked for the patients of VIP?

THE INTERPRETER:  I didn't catch the first part of the question, Counsel.

MR. GOLDBERG:  Certainly.

BY MR. GOLDBERG:

Q.  Ms. Cruz, who determined the amount of hours that you provided service to each of the VIP patients?

A.  Diana.

Q.  And you as the HHA had the right to accept or not accept those hours; correct?

A.  Yes.

Q.  Did anybody at VIP ever prevent you from having any other employment or contractual relationships?

A.  No.

Q.  How was your rate of pay determined for each patient, Ms. Cruz?

A.  They would send a case that would -- that would read -- the case would read "There's a Mr. Perez, and this pays $13 an hour"; it would say how many hours, and you would accept it or decide not to accept it.

Page 28

And if they didn't have someone else, they would just send you directly for that job.

Q.  But you had the right to refuse to accept that particular job; correct?

A.  Yes.

Q.  Is it true that if you are caring for several patients of VIP at one time, that you could be earning different hourly rates per patient?

A.  The rate is the same.  It would depend if it was on a weekend.  Because it would be a bit more on the weekends.  But the rate would be the same of $13 an hour.

Q.  Give me a second here.

Did you ever ask anyone at VIP for additional hours or additional clients?

A.  No.

Q.  You started your relationship with VIP on or about May 3rd, 2021; correct?

A.  Yes.

Q.  And your relationship ended in about July of 2022; correct?

A.  Yes.

Q.  Why did that relationship end?

A.  They didn't pay me.

Q.  So is it your testimony that you ended the

Page 29

relationship, or did VIP end the relationship?

THE INTERPRETER:  Interpreter is requesting a repetition because I didn't catch all of the information.

THE WITNESS:  I ended the relationship with them due to payment.

BY MR. GOLDBERG:

Q.  We'll come back to the nonpayment allegation in a little bit.

I want to focus your attention to Exhibit A. I sent a copy to Madam Court Reporter and to Mr. Toussaint.

Exhibit A is a composite exhibit with Bates name -- Bates-numbered All VIP 26 A 1 through 25.

MR. GOLDBERG:  Is it possible, Madam Court Reporter, for this to be uploaded?  I am very computer illiterate, and I apologize for that.

(Discussion off the record.)

BY MR. GOLDBERG:

Q.  Ms. Cruz, I want you to look over this composite document, which coincidentally is an exhibit from a previous deposition that Mr. Cummings took.

It is my Exhibit A, which is your onboarding documents when your relationship with VPI began.

Page 30

Please look over these documents, ma'am, and let me know when you are done with that.

THE INTERPRETER:  Interpreter caught that, but again, reminding witness to keep sentences short. It's impossible to catch all of it.

THE WITNESS:  These documents, I signed them, but I never understood what the documents said.

They were all in English and never in Spanish, and I told them that I only spoke Spanish.

BY MR. GOLDBERG:

Q.  So is it your testimony that you signed these documents without reading and/or understanding the content of these documents?

A.  I told Diana that I didn't speak Spanish, and I -- I signed these documents, but I never understood what they meant.

Q.  So the entire 14 months that you had a relationship with VIP, you never understood these documents?

A.  No.  No.  And it never mattered until now.

Q.  Why did it not matter until now?

A.  Because they never asked anything of me.

Q.  Yet you performed under the terms of these documents; is that correct?

MR. CUMMINGS:  Objection to form.

Page 31

1      THE WITNESS: Yes.
2 BY MR. GOLDBERG:
3     Q. And you were compensated for your services
4 as an HHA under the terms of these documents;
5 correct?
6     A. Yes.
7     Q. And you never had or requested anybody to
8 interpret what these documents that you signed meant?
9     A. They said that they sent -- they gave this
10 to everyone they admitted as HHA, that -- the fact
11 that I didn't know understand English didn't matter,
12 but I myself added to this document that I didn't
13 speak English.
14     Q. And who is the person or the persons that
15 they include?
16     A. The people that hired me, Diana.
17     Q. Nonetheless, the signatures and initials
18 that appear on this composite exhibit, those are your
19 signature and initials; correct?
20     A. Yes.
21     MR. GOLDBERG: We can take this one down,
22 Madam Court Reporter.
23     THE INTERPRETER: Interpreter would like to
24 request a short break, if that's okay.
25     MR. GOLDBERG: No objection here.

Page 32

1     Do you want to take 10 minutes?
2     THE INTERPRETER: Yes, that would be fine.
3     MR. CUMMINGS: Just for ease of time, can we
4 just come back at 11:15?
5     MR. GOLDBERG: 11:15?
6     MR. CUMMINGS: Yeah, because it's 11:04 now,
7 so I mean, yeah, okay.
8     MR. GOLDBERG: 11:15 it is.
9     THE INTERPRETER: Yes, that's fine.
10     (Recess taken from 11:04 a.m. to 11:14 a.m.)
11 BY MR. GOLDBERG:
12     Q. Ms. Cruz, notwithstanding that you testified
13 that you did not understand the documents that you
14 signed with VIP, do you acknowledge that you were an
15 independent contractor with VIP?
16     A. I don't know.
17     Q. What don't you know, ma'am?
18     A. That I don't know if I'm an independent
19 contractor with them.
20     Q. You were paid for and received copies of
21 paycheck stubs; correct?
22     A. My payments were automatic.
23     Q. You received copies of paycheck stubs;
24 correct?
25     A. I never received a copy from them. I have

Page 33

1 copies from the bank.
2     Q. Did you file tax returns for the years 2021
3 and 2022?
4     A. Yes.
5     Q. And you received a 1099 tax form from VIP?
6     A. Yes.
7     Q. And those tax forms identified you as an
8 independent contractor; correct?
9     A. Yes.
10     Q. Is it still your testimony that you do not
11 know if you're an independent contractor or not?
12     A. I got confused with the question, yes.
13     Q. So your testimony is that you were an
14 independent contractor with VIP?
15     A. I am an independent contractor.
16     Q. With VIP?
17     A. Yes.
18     Q. What were the names of the patients that you
19 provided care for during your tenure with VIP?
20     THE INTERPRETER: Interpreter is going to
21 request the third person.
22     THE WITNESS: The first was Gabrielle -- the
23 first person -- no, the first patient was Gabrielle
24 Gonzalez; the second patient was Angela Melendez; and
25 the third patient was Cesar, and last name is

Page 34

1 I-Z-I-Q-U-E; his wife, Yolanda, last name Izique,
2 I-Z-I-Q-U-E.
3 BY MR. GOLDBERG:
4     Q. Okay. So we have Gonzalez, Melendez, and
5 Izique; correct?
6     A. Uh-huh. And, sorry, also Alicia Soto,
7 S-O-T-O.
8     Q. Did you provide care as a home health aide
9 for all of these four patients at the same time or at
10 different times?
11     A. I worked with Cesar, Izique, and Yolanda
12 Izique at the same time, and then also with Angela
13 Melendez. All three of them in the same day.
14     Q. And what about Gonzalez and Soto?
15     A. Gabrielle Gonzalez passed away, and then I
16 was assigned to Alicia Soto on her case.
17     Then I had Cesar and Yolanda as fixed work,
18 fixed patients. And then I was given Angela as fixed
19 as well. All three of them, the same day with
20 different times.
21     Q. Okay. Thank you for clarifying that.
22     Did you complete a time sheet for each
23 patient, for each -- let me rephrase that. Excuse
24 me.
25     For each patient, did you complete a visit

Page 35

1 schedule or time sheet?
2     A.  Time sheet for each patient.
3     Q.  And does each of those time sheets reflect
4 the amount of time that you provided service as an
5 HHA to each of these patients?
6     A.  Yes.
7     Q.  And each of these time sheets is signed by
8 yourself; correct?
9     A.  By myself and the patients.
10     Q.  Now I want to direct your attention to
11 Exhibit B which, again was provided to your counsel
12 and Madam Court Reporter, which is composite exhibit
13 of time sheets with -- I apologize -- with the Bates
14 numbering of VIP.Docs 11 through and including 63.
15         Do you recognize these documents, Ms. Cruz?
16     A.  Yes.
17     Q.  What are these documents, ma'am?
18     A.  This was the document where we would be able
19 to establish the amount of hours worked with the
20 patient and the amount of hours worked.
21     Q.  Do -- are these the complete time records
22 that you generated during your tenure with VIP?
23     A.  Yes.  Yes, you would place all the hours
24 there.
25     Q.  And do these -- does this composite exhibit

Page 36

1 reflect all of the time sheets that you generated
2 during your tenure with VIP?
3     A.  Yes.
4     Q.  And you were to be paid your $13 an hour
5 based on these time sheets; correct?
6     A.  Correct, yes.
7     Q.  Now, is it your testimony that you have not
8 been paid for all of the hours reflected on these
9 time sheets?
10     A.  Yes.
11     Q.  How many hours do you believe that you have
12 not been paid for pursuant to the time sheets and to
13 the payments that were made to you?
14     A.  Right now, at this moment, I can't recall,
15 but they owe me hours.
16     Q.  How many hours do they owe you, ma'am?
17     MR. CUMMINGS:  Objection to form.
18     THE WITNESS:  I don't recall.
19     THE INTERPRETER:  Counsel Cummings, I didn't
20 catch that.  You said "Objection to form"?
21     MR. CUMMINGS:  Right.  Yeah.
22 BY MR. GOLDBERG:
23     Q.  Ms. Cruz, did you provide any services to
24 any VIP clients that are not documented on these time
25 records?

Page 37

1     A.  Never.
2     Q.  Allow me one second, please.
3     Ms. Cruz, are you familiar with the HHA
4 exchange calendaring program?
5     THE INTERPRETER:  Counsel, I didn't catch
6 the word after "exchange."
7     MR. GOLDBERG:  Calendaring.
8     Let me rephrase that.  Let me rephrase that.
9     THE INTERPRETER:  Yes.  Thank you.
10     MR. GOLDBERG:  I apologize.  I'm trying to
11 make things easy for interpretation, but sometimes,
12 I guess, I complicate it even more.
13 BY MR. GOLDBERG:
14     Q.  Ms. Cruz, are you familiar with the HHA
15 exchange program?
16     A.  Do I know the HHA exchange program?  No.
17     Q.  You're not familiar with it?
18     A.  No.
19     Q.  Is it fair to say, then, that you have never
20 used this program?
21     A.  I don't understand.  I don't know.
22     Q.  Was there ever a program that VIP asked you
23 to download onto your cell phone?
24     A.  No.
25     Q.  When you first learned that there were

Page 38

1 some --
2     MR. GOLDBERG:  We can take down the
3 exhibits, Madam Court Reporter.  Thank you.
4 BY MR. GOLDBERG:
5     Q.  Madam -- I'm sorry.
6     Ms. Cruz, when you observed or believed that
7 there was a pay discrepancy between the hours that
8 you provided services as a home health aide to one of
9 the patients, did you address this concern with
10 anybody at VIP?
11     A.  No.
12     Q.  I am confused.  Allow me to try to clarify.
13     You never noticed that there was a
14 discrepancy between the hours that you submitted for
15 payment and the amount of pay that you received from
16 VIP?
17     A.  I didn't understand the question.
18     Q.  You testified that you believe that VIP did
19 not pay you for all of the hours that you were
20 entitled to be paid for; is that correct?
21     A.  Yes.
22     Q.  When you noticed this discrepancy, did you
23 bring it to anybody at VIP's attention, such as Diana
24 Ramirez?
25     A.  Always when I notice irregularities with the

Page 39

1 payment, I told Diana, and she didn't pay attention
2 to me.
3    Q.  So it's your testimony that at no time did
4 VIP cut you an additional check or draft to cover the
5 discrepancy in the payments?
6    A.  One time VIP did pay, and I had to go all
7 the way over to West Palm Beach for a check that
8 week.
9        I did not receive payment.  It was a 2-hour
10 drive to get that check.  And I was mistreated at the
11 office.
12    Q.  How were you mistreated?
13    A.  When I got there at 1:00 p.m. and I had to
14 leave work without barely any gas left, I was
15 received and told that they were going to lunch, and
16 they closed the door on my face until 2:00 p.m., and
17 that's how long I waited to get a check.
18    Q.  Did that check reconcile the payroll
19 discrepancy that you were concerned about?
20    A.  No.  That was just one week's pay.  The --
21 there was still pay regularities left.  They only
22 paid for one week.
23    Q.  But you testified earlier you do not know
24 how many hours are in dispute; correct?
25    A.  I can't recall.  It's been one year since,

Page 40

1 and I can't recall the exact number of hours.
2    Q.  Do you know which patient these hours in
3 dispute are in regards to?
4    A.  Yes.  Cesar -- Cesar and Yolanda Izique,
5 Angela Melendez, and Alicia Soto.
6    Q.  Do you know what time frames these
7 discrepancies occurred within?
8        THE INTERPRETER:  Interpreter requests
9 clarification.  When you say "time frame," Counsel,
10 do you mean month or...
11        MR. GOLDBERG:  When these discrepancies
12 arose, such as a month --
13        THE INTERPRETER:  Can you give me the
14 months?
15        MR. GOLDBERG:  -- or period --
16        THE INTERPRETER:  Oh, yeah, a period of
17 time.
18        MR. GOLDBERG:  The period of time.
19 I apologize.
20        THE INTERPRETER:  No, no.  It's okay.  I'm
21 just -- in Spanish, I'm trying to -- thank you.
22        THE WITNESS:  No.  This was -- not right
23 now.  This was so long ago, but it's all documented.
24 The lawyer has it.
25        I don't know the exact time frame.

Page 41

1 BY MR. GOLDBERG:
2    Q.  When did you begin work with Sininani?
3    A.  I started work with Sininani around August,
4 I believe.  August, yes.  August.
5    Q.  Of 2022?
6    A.  2021, I think.
7    Q.  So you worked for Sininani and VIP at the
8 same time?
9    A.  No.  I can't recall the exact date, but
10 I remember it was August I ended work with VIP, and
11 I started work with Sininani.
12    Q.  Thank you for that clarification.
13        When you went to work for Sininani, did any
14 of VIP's clients that you've identified follow you
15 over to Sininani?
16    A.  Yes, they switched, and I already had an
17 application with Sininani.
18    Q.  Who?  Which clients switched?
19    A.  Cesar and Yolanda Izique.
20    Q.  What about Soto or the Melendez?
21    A.  No.
22    Q.  You stated you already had an application in
23 place.  What do you mean?
24    A.  After I left VIP, I applied for Sininani,
25 and that's where I'm currently working.

Page 42

1    Q.  How did Izique learn that you were going to
2 work for Sininani?
3        THE INTERPRETER:  Counsel, can you repeat
4 the first question?  I didn't hear the first word.
5        MR. GOLDBERG:  I apologize.
6 BY MR. GOLDBERG:
7    Q.  How did the Iziques -- or again, I apologize
8 if I'm messing up their names -- learn that you were
9 going to take employment -- or establish a
10 relationship with Sininani?
11        THE INTERPRETER:  And to clarify, you mean
12 Izique?
13        MR. GOLDBERG:  Izique, yes.
14        THE INTERPRETER:  Interpreter is requesting
15 pause.  So one second.
16        THE WITNESS:  They had -- I had a really
17 good working relationship with them, a very nice
18 relationship, and I told them I had to leave due to
19 the nonpayment.
20        The relationship -- the relationship that
21 I had with the family was great.  They liked my work.
22 I wanted to continue with them, but the agency was
23 not paying me.
24        They said, "We are leaving VIP also, then,
25 because if they don't pay you, then they're not going

Page 43

1  to pay the next people that come and work with us."
2     I left and then applied to a different
3  agency; and then 15 days afterwards, they arrived and
4  requested me. They are my patients currently.
5  BY MR. GOLDBERG:
6    Q. And did you have this discussion with,
7  again, Izique while you were still employed -- I'm
8  sorry, while you still had a relationship with VIP?
9    A. They supported me the entire time because
10  their daughter was always present, and her
11  daughter -- their daughter was also in touch with
12  Diana and knew of the circumstances of me not being
13  paid.
14    She tried to help fix the hours with Diana,
15  but that didn't happen.
16    Q. So these conversations took place while you
17  were still an independent contractor with VIP;
18  correct?
19    A. Yes, always. I never wanted to leave VIP
20  because I appreciated that they spoke my language,
21  but it was due to the fact that I was not getting
22  paid that I decided to leave.
23    Q. Who at VIP spoke your language?
24    A. Diana, Evelyn, all of them. They picked up
25  in Spanish, but they -- they knew of my constant

Page 44

1  worries about the payment, but it just wasn't
2  resolved.
3    Q. So your testimony earlier that you were
4  forced to sign this engage -- these engagement
5  documents, Exhibit A, and nobody could explain them
6  to you, you're now testifying that Diana and others
7  spoke Spanish --
8    MR. CUMMINGS: Objection.
9  BY MR. GOLDBERG:
10    Q. -- and read you the proposal; correct?
11    MR. CUMMINGS: Objection to form.
12    THE INTERPRETER: I didn't catch the last
13  part, but I caught the beginning. So one second,
14  Counsel, for the first part of the question.
15    What was the last part? I didn't catch
16  that, the last part of the question, Counsel
17  Goldberg, after others -- Diana and others spoke
18  Spanish, and I didn't catch the last part.
19    MR. GOLDBERG: "But they were available for
20  you to discuss this onboarding independent agreement
21  with; correct?"
22    THE WITNESS: They never discussed it,
23  and I always asked. They said, "Just sign. Everyone
24  starts the job like that."
25

Page 45

1  BY MR. GOLDBERG:
2    Q. Give me a couple seconds here, please.
3    I believe we're close to wrapping up.
4    When you resigned, according to your
5  testimony, you resigned; you were not fired
6  from VI -- from your relationship with VIP; correct?
7    A. If they don't pay me, what am I going to do?
8  I had to leave.
9    Q. Did VIP ever inform you that they were going
10  to be filing a lawsuit against you for breach of your
11  contract with them?
12    A. No. I can't recall.
13    Q. Give me a second here. I think we're just
14  about done.
15    I believe we're done on my end.
16    Mr. Cummings?
17    MR. CUMMINGS: Yeah I'll do a quick -- well,
18  I don't know how quick it will be, but I'll do some
19  follow-up.
20
21          EXAMINATION
22  BY MR. CUMMINGS:
23    Q. So, Ms. Cruz, do you know what the legal
24  definition of an "independent contractor" is?
25    A. No.

Page 46

1    Q. You do you know what the legal definition of
2  a "nurse registry" is?
3    A. No.
4    Q. Do you know what the legal definition of a
5  "home health aide" is?
6    A. I don't know. That's why the agencies hire
7  us.
8    THE REPORTER: Did you say, "I don't know.
9  The agencies hire us"?
10    THE INTERPRETER: "I don't know. That's why
11  the agencies hire us." Yes.
12  BY MR. CUMMINGS:
13    Q. How did you first hear about All VIP?
14    A. It was recommended by a friend. She gave me
15  the number. I called. They asked for all the
16  documents that -- that were needed to apply, the
17  certifications. I went. I applied. And they gave
18  me work.
19    Q. Do you know who you spoke to when you called
20  before you started working with All VIP?
21    A. I can't recall her name.
22    Q. The woman that you spoke with before you
23  started working with All VIP, did she speak Spanish?
24    A. Yes, she spoke Spanish.
25    Q. Do you remember if that woman --

Deposition of CRUZ DIAGELIS VIVES FIGUEROA
Case 0:22-cv-61553-WRD   Document 56-1   Entered on FLSD Docket 07/14/2023   Page 41 of 144
CRUZ DIAGELIS VIVES FIGUEROA vs MDG POWER, LLC and BEATRIZ VELAZQUEZ LEANNON

Page 47

1    A.   The Spanish she spoke was very minimal, very
2  little Spanish.
3    Q.   And can you say for sure that the woman you
4  spoke to when you first called All VIP was not Diana
5  Ramirez?
6    A.   No, it wasn't Diana Ramirez; it was another
7  woman that helped me fill out the application.
8    Q.   Which office did that woman who you first
9  spoke to work in?
10    A.   Boca Raton.
11    Q.   Which VIP office did you work out of?
12    A.   Boca Raton.
13    Q.   Which VIP office was Diana Ramirez located
14  in -- sorry, located in?
15    A.   Boca Raton.
16    Q.   When did you tell Diana Ramirez that you did
17  not speak English?
18    A.   Since the first time I was given a case that
19  was in Boca Raton, I was sent, and the people I was
20  sent with only spoke -- only spoke English, and Liz
21  intervened and got me out of there.
22    Q.   Mr. Goldberg, the attorney for VIP,
23  previously showed you what he marked as Exhibit A,
24  and I'm going to show you that document again.
25        Where did you fill this document out?

Page 48

1    A.   In Boca Raton.
2    Q.   Did you fill out your employment agreement
3  with VIP at their Boca Raton office?
4    A.   Yes.
5    Q.   Was anybody present with you when you were
6  filling out the agreement?
7    A.   Yes.  The girl that was giving me all the
8  documentation to fill out.
9        When I was filling out, I told her I didn't
10  understand.  She said, "This is where you put your
11  name.  This is where you put this."
12    Q.   That girl that you're referring to, was she
13  speaking to you in English or Spanish?
14    A.   She spoke to me in English and with the
15  translator program into Spanish.
16    Q.   What translator program are you referring
17  to?
18    A.   I have a translation program on my phone.
19  I can't recall the name.  I can't pronounce it.
20    Q.   Please explain to me how this process went.
21        Did you type in words from the application
22  and then translate them over into -- from English to
23  Spanish, or did you -- sorry.  Let me -- scratch that
24  whole question.
25        Who was using the translator program, you or

Page 49

1  the woman that worked at VIP?
2    A.   I used it.  I was using the translation --
3  the translation program.
4    Q.   Did you use the translation program to
5  translate what she was saying to you?
6    A.   Yes.
7    Q.   Did you -- did the program record her voice,
8  or were you typing in what she was saying?
9    A.   It was recording her voice.
10    Q.   Did you -- so looking at this employment
11  agreement in Exhibit A, we can see that it has about
12  one, two, three, four, five, six, seven, eight, nine,
13  ten, eleven -- it's about 25 pages, which is the
14  whole of Exhibit A.
15        Did you type all of the words from this
16  25-page document into your translation program?
17    A.   Yes.  Because no, she would say, "Here.
18  Here are the initials," so I would just translate the
19  beginning, and then the rest was all the same.
20    Q.   So the -- sorry.  Go ahead.
21    A.   Because it was all signature, name, and --
22  it was all "Sign here.  Name here.  Last name here.
23  And signature" throughout the whole document.
24    Q.   Moving over to Exhibit B.
25        You were previously showed these time sheets

Page 50

1  earlier in the deposition.  Do you remember that?
2    A.   Yes.
3    Q.   Does your handwriting appear anywhere on
4  this first time sheet that I'm showing you in Exhibit
5  B?
6    A.   Yes.  Of course.
7    Q.   Where can I find your handwriting on this
8  time sheet?
9    A.   In the hours -- wait a second.  This isn't
10  mine.  It's someone else's.
11        This is Jenny's.  We work together.
12    Q.   What do you mean by that?  This is not your
13  time sheet; this is another person's time sheet who
14  was working with VIP?
15    A.   Exactly.  Exactly.  This is not my time
16  sheet.  This is my coworker Jenny Landa's time sheet.
17  This is not my time sheet.
18    Q.   And just for the record, I'm referring to
19  page 1 of Exhibit B, which is a time sheet from the
20  week of June 13, 2022, through June 17, 2022.
21        Ms. Cruz, do you know where this time sheet
22  for Jenny Landa came from?
23        THE INTERPRETER:  Counsel, I didn't catch
24  the last part of the question.  Can you repeat it?
25        MR. CUMMINGS:  Yeah, I'm just asking her

Page 51

1  does she know where this time sheet that we're
2  looking at here came from, the picture of it.
3      THE WITNESS:  I don't know.  I don't know
4  how that document arrived.  It's not mine.
5  BY MR. CUMMINGS:
6      Q.  Did Jenny Landa also work as a home health
7  aide with the Iziques?
8      A.  Yes, she was working with the Iziques.
9      Q.  At the same time as you or before you?
10     A.  She was working the morning shift, and I was
11 working the night shift.  When I was coming in, she
12 was leaving.
13     Q.  Moving down to page 2 of Exhibit B, I'll
14 make this a little bigger, is -- do you recognize the
15 handwriting on this time sheet?
16     And for the record, this is from June 13th,
17 2022, to June 19, 2022?
18     A.  Yes, I filled that out with the Iziques'
19 daughter.  She spoke with Diana to clarify the
20 discrepancy with the hours; they still didn't pay for
21 those hours.
22     Q.  What part of this time sheet shows me your
23 handwriting?
24     A.  The lower part, the bottom part.
25     Q.  Right now I'm focused on the top.  Can you

Page 52

1  see where the name "Daisy" is?
2      A.  Yes.  On the top left of my screen is
3  "Daisy," yes.
4      Q.  Is that your handwriting, the word "Daisy"?
5      A.  No.  The bottom is where you can find my
6  handwriting.  This is a copy of the corrected hours
7  by Diana, hours that weren't paid.
8      Q.  For this particular week?  Are you saying
9  that these hours written in here are not your
10 handwriting?
11     A.  Because these are the hours that Diana
12 corrected, and there were issues with the schedule.
13     She did this.  I signed it.  And these hours
14 were never paid.
15     Q.  Okay.  So, Ms. Cruz, I'm going to need you
16 to listen to my question very carefully because
17 you're answering a different question from what I'm
18 asking you.
19     The question that I'm asking you requires a
20 yes-or-no answer.
21     Do you see where the hours are on this time
22 sheet?
23     A.  The hours were placed on the bottom.
24 I can't see the total of hours.
25     Q.  Okay.  All right.  On your screen right now,

Page 53

1  do you see a document at the top where it says
2  "6/13"?
3      A.  Yes.  I see the top, but I don't see the
4  bottom, which is where there's the total hours shown.
5      Q.  Yes, because I'm not asking you about the
6  bottom.
7      And for some reason, I think that you're
8  assuming that I'm going to ask you something that I'm
9  not asking you.
10     MR. GOLDBERG:  Object to form.
11 BY MR. CUMMINGS:
12     Q.  And so I would please -- please just answer
13 the question that I'm asking you.
14     Okay.  The handwriting at the top of this
15 page, is any of it your handwriting?
16     A.  No.
17     Q.  Do you know whose handwriting it is?
18     A.  Anna Maria.
19     Q.  Who is Anna Maria?
20     A.  The daughter of the couple.
21     Q.  Okay.  And by "the couple," you mean the
22 Iziques?
23     A.  (No verbal response.)
24     Q.  "Yes"?  Anna Maria is the daughter of the
25 Iziques?

Page 54

1      A.  Yes.
2      Q.  Did Anna Maria always fill out the hours on
3  your time sheets?
4      A.  No.
5      Q.  It just so happens that on this particular
6  time, on page 2 of Exhibit B, that Anna Maria filled
7  out these hours; is that correct?
8      A.  Yes.
9      Q.  Now, moving down to the bottom of this same
10 document, on page 2 of Exhibit B, do you see your
11 handwriting anywhere?
12     A.  Yes.
13     Q.  Okay.  And where is your handwriting?
14     A.  Where you see "Cruz Valdivieso HHA."
15     Q.  Now, you were also explaining that the hours
16 for this particular week were incorrect.
17     Is that what you were trying to tell me
18 before?
19     THE INTERPRETER:  Can the interpreter
20 request of Counsel Cummings to tell the witness, or
21 I will, for the -- that please keep the sentences
22 short so that I'm able to catch everything.  I only
23 caught the beginning, if that's okay.
24     MR. CUMMINGS:  Yeah, you can instruct her.
25 That's fine.

Case 0:22-cv-61553-WRD Document 56-1 Entered on FLSD Docket 07/14/2023 Page 43 of 144

Deposition of GREGORY DAIGLES, WRD INDIVIDUAL FIGUERS         VIP INDIVIDUAL DE MICHELLE GUTIERREZ 07/14/2023 BIZ VIP IZ REZ LANNON

Page 55

BY MR. CUMMINGS:

Q.  Okay.  So now -- go ahead, because you have to interpret.  Go ahead.  Sorry.

A.  Anna Maria helped because she would speak to Diana.  They -- they fixed the schedules.  The hours were correct, but they are were still not paid.

And then when the hours were finally corrected, they said they're going to pay, "just go ahead and send the time sheet," but even though the hours were corrected, Diana still didn't pay for those hours.  I didn't get paid for those hours.

Q.  Are you referring specifically to the hours for this week of June 13, 2022, to June 19, 2022?

A.  No, not just those.  I look at that, and I can remember a little bit, but I can't recall the exact dates.

Q.  Right.

So you're just speaking generally that you were not paid for all of your hours, not about this particular time sheet; is that right?

A.  Correct.

Q.  Previously, VIP's attorney asked you if these were all of the time sheets for all of the time that you worked at VIP.

Do you remember that?

Page 56

A.  Yes.

Q.  And now how do you know that all 53 pages of this Exhibit B document are all of the hours that you worked for VIP?

A.  I can't see all of the Exhibit B you're referring to.  I can't recall that now.  I can't recall.

If I'm able to see all of the pages, then, yes, but I have nothing here with me.

Q.  And have you ever seen all 53 pages of this document before?

A.  No.  I saw the pages after I left, when VIP sent all the documents and all the clauses.

Q.  Before this deposition today, have you ever seen all 53 pages of the document that I am currently showing you on your screen, which is marked as Exhibit B?

A.  Is Exhibit B the time sheets that we filled out with the hours?

Q.  Exhibit B is what I am showing you on your screen right now.

A.  Okay.  Perfect.  Yes.

Q.  What are you answering "yes" to?

A.  That if that is the exhibit that you're asking me, then I do recognize it.

Page 57

Q.  How do you recognize it?

A.  Because those were the papers we filled out in order to get payment each week.

Q.  Yeah.

Do you realize that this particular document that I'm showing you right now has 53 pages?

A.  No.

Q.  But previously, when Mr. Goldberg asked you if these were all of your time sheets, you said yes; is that correct?

A.  Yes, they're talking about this -- I'm going to have to --

MR. CUMMINGS:  You know what?  Scratch it.  Scratch the question and answer.  Let me do this.

BY MR. CUMMINGS:

Q.  On page 1, this is not your time sheet; correct?

A.  These are the -- these are the time sheets that we were -- we would fill out with our hours.

This is not my time sheet.  This is Jenny Landa's time sheet.

Q.  Okay.  On page 3 of this document, is this your time sheet?

You have to let the interpreter finish the interpretation.

Page 58

So I'm going to ask the question again.

On page 3, is this your time sheet?

A.  No, it's not mine.

Q.  On page 5 of Exhibit B, is this your time sheet?

A.  No.

Q.  So all of the time sheets that make up this document do not belong to you; is that right?

A.  No.  In this document, no.

Q.  And can you say that every time sheet that you ever filled out for VIP is contained within this document at Exhibit B?

A.  No.

Q.  If you had to guess, how many time sheets do you think you filled out when you worked for All VIP?

A.  I can't recall.  There were many.  I can't recall.

Q.  Would you say it was more than 20?

A.  Of course.  I was with them for over 2 years.

Q.  Would you say it was more than 100?

A.  I don't know.  I don't know.

Q.  Did you work for All VIP every week over those 2 years?

A.  Yes.  Almost 2 years.

Page 59

1    Q.  And did you fill out a separate time sheet
2 for every patient that you saw?
3    A.  Yes.
4    Q.  And sometimes you saw more than one patient
5 in one day?
6    A.  Yes.  Two patients a day.
7    Q.  And you worked how many days a week for All
8 VIP?
9    A.  I worked all week, about 84 hours plus,
10 100 hours.
11   Q.  When you say "all week," how many days are
12 you referring to?
13   A.  Monday through Sunday.
14   Q.  When did you first --
15   A.  Sorry.  Monday through Saturday.
16   Q.  Okay.  When did you first realize that you
17 were not being paid properly by All VIP?
18   A.  Since I started working for VIP, there had
19 been irregular payments.
20       And then I spoke to Diana, and payments
21 started to come in more on time afterwards.
22       The -- there were some issues with payroll.
23 I don't know what happened with payroll.  Then they
24 just didn't start paying every week.
25   Q.  How did you discover that your payments were

Page 60

1 irregular?
2    A.  Since the beginning, there had been issues
3 with payment.  I would tell Diana, and she would say,
4 "I'll deposit," and she would deposit -- they would
5 deposit, but then each week, it was the same issue.
6       Then it came to a point where I wasn't
7 getting paid.  I complained, but there was no
8 payment.
9       THE INTERPRETER:  Interpreter would like to
10 request a short break if that's okay.
11      MR. CUMMINGS:  Okay.  How long do you need?
12 When do you want to come back?
13      THE INTERPRETER:  Is 10:00 okay?
14      MR. CUMMINGS:  You want to come back at
15 12:40?
16      THE INTERPRETER:  Yes, okay.
17      MR. CUMMINGS:  Okay.  Could you please just
18 let me client know that she can cut her camera and
19 microphone off?
20      THE INTERPRETER:  Yes.
21      (Recess taken from 12:28 p.m. to 12:39 p.m.)
22 BY MR. CUMMINGS:
23   Q.  Did you realize you were not paid correctly
24 because the hours on your time sheet did not match
25 the paychecks you were receiving?

Page 61

1    A.  (No verbal response.)
2       MR. CUMMINGS:  I guess, Interpreter, can you
3 please repeat the question to her so we can get the
4 response?
5       THE WITNESS:  Correct.
6 BY MR. CUMMINGS:
7    Q.  Who did you complain to when the hours on
8 your time sheet did not match the money you received
9 in your paycheck?
10   A.  For the manager, Diana Ramirez, she said
11 she, "I sent the hours to Liz.  I don't understand
12 why they haven't paid them yet."
13   Q.  Okay.  So Diana Ramirez acknowledged that
14 your pay was incorrect sometimes?
15   A.  Yes.
16   Q.  How would Diana Ramirez acknowledge that
17 your pay was incorrect?  Was that through email?  Was
18 that verbally or through text?
19   A.  Text and verbal.
20   Q.  When you had a verbal conversation with
21 Diana Ramirez about incorrect paychecks, was it over
22 the phone or in the office?
23   A.  Phone and text.
24   Q.  How many times did you complain about
25 receiving incorrect payment over the 2 years that you

Page 62

1 worked with VIP?
2    A.  I always complained about the -- the payment
3 inconsistencies, but these were affirmed in March.
4       And in April, when the -- the payments
5 became even more irregular and more inconsistent.
6    Q.  Are you referring to March and April of
7 2022?
8    A.  Yes.
9    Q.  And to this day, you have not received all
10 the money that you're owed for the incorrect
11 payments?
12   A.  I haven't received -- I haven't received the
13 money owed for all the incorrect payments.
14   Q.  Okay.  No further questions.
15
16      FURTHER EXAMINATION
17 BY MR. GOLDBERG:
18   Q.  Okay.  I'll try to make this as brief as
19 possible.
20      Going back to -- and we don't need to bring
21 it up, but Exhibit B, which was the time sheets,
22 Ms. Cruz, is it true that the only time sheets that
23 apply to your claims in this lawsuit are the ones
24 that you signed for; correct?
25   A.  That confuses me.  The talk about exhibit

**Page 63**

1 this, Exhibit B confuses me.
2  I would like to know if I have a
3 representative representing me during this
4 deposition.
5  MR. GOLDBERG: Mr. Cummings, do you want to
6 acknowledge that?
7  MR. CUMMINGS: I'm sorry. I actually didn't
8 catch everything she said.
9  She said she was confused about -- could you
10 repeat it, Madam Interpreter?
11  THE INTERPRETER: "That confuses me. The
12 exhibit that, Exhibit B confuses me.
13 I'd like to know, do I have a representative here for
14 me during this deposition."
15  MR. CUMMINGS: Oh, okay. Yeah, I'm your
16 attorney, Ms. Cruz, so I'm the representative here.
17  I can't give you advice in the deposition.
18  THE INTERPRETER: I just need the last part,
19 Counsel? I didn't catch that.
20  MR. CUMMINGS: I can't give you advice
21 during this deposition.
22  THE WITNESS: Yes, I'm confused because I'm
23 being showed Jenny's time sheet, which is not mine.
24 And I'm confused as to why they're showing me her
25 time sheet.

**Page 64**

1 BY MR. GOLDBERG:
2  Q.  And this is the reason why I'm trying to get
3 clarification that the only time sheets that are
4 germane to this lawsuit are the ones that are signed
5 by Ms. Cruz.
6  None of the other time sheets, whether it be
7 by Jenny, Ms. Murphy, or anybody else are relevant to
8 this lawsuit; correct?
9  A.  That is correct. I understand.
10  Q.  Thank you.
11  There was discussion about the time sheet
12 from June 13th through June 19th where Ms. Cruz
13 testified that this was a corrected time sheet that
14 was had by and signed for by Anna on behalf of the
15 patient; correct?
16  A.  Yes.
17  Q.  You testified that there was text messages
18 between you and Diana concerning your claims that you
19 were not properly paid; correct?
20  A.  Yes.
21  Q.  Are those text messages still available on
22 your phone?
23  A.  Yes. And I'd like to add that I also sent
24 some of those to my lawyer.
25  Q.  Some of them or all of them, ma'am?

**Page 65**

1  A.  Some because others were deleted.
2  Q.  You made the comment that Diana Ramirez
3 acknowledged payroll errors and that she was going to
4 address them with Liz.
5  Do you recall that?
6  A.  She said that she would send that to
7 payroll, that there were issues with payroll, that
8 they had changed the --
9  THE INTERPRETER: I'm going to have to ask
10 Ms. Cruz to repeat that.
11  MR. GOLDBERG: Okay. Maybe if I just
12 rephrase the question.
13  THE INTERPRETER: No. She said that the
14 thing is if she doesn't stop, I can't catch all of
15 it, so I -- I mentioned --
16  MR. GOLDBERG: I apologize.
17  THE INTERPRETER: No, no. It's okay.
18  THE WITNESS: Diana had said that the hours
19 would be paid, that there were issues with payroll,
20 that there was no payroll personnel, that they were
21 changing offices.
22  They told us to wait for the payments, that
23 they were going to give them and to wait for some
24 time, that there was change in personnel, that the
25 payments were not made.

**Page 66**

1  They left us one week without pay. There
2 was three people working at that house at that time,
3 but the next day we were paid.
4  There was no pay that Friday. We were
5 actually paid that Saturday. And since then, it
6 became an issue. We -- since then, there were
7 irregular payments, and I wasn't paid.
8 BY MR. GOLDBERG:
9  Q.  So is it fair to say that Diana acknowledged
10 that there were issues in the payroll system at the
11 time or that there was specific errors on behalf of
12 Ms. Cruz's time sheets?
13  A.  She acknowledged there were issues with the
14 payment system. I was apart of this apparent type of
15 lottery in regard to payment. Some people were paid;
16 some people were not. And most people left the
17 agency because of that.
18  Q.  You testified that you did not know the
19 exact amount of wages or compensation that was not
20 paid to you that is due; correct?
21  A.  Yes. I can't recall.
22  During that time, yes, I had the exact
23 amounts, but right now it's been so long, I don't
24 have them.
25  Q.  Does a document exist that identifies the

Page 67

1  exact amount that is due to you?
2      A.  I don't know.  I sent the time sheets with
3  all my hours to my lawyer, and he has it.
4      Q.  Does a document exist or documents that
5  identify the specific dates that you believe that you
6  were not properly paid for?
7      A.  Yes.  I sent that, and they exist.  I sent
8  that to my lawyer when I was coming up with the --
9  with the lawsuit.
10      Q.  Just give me one second.  I believe that
11  we're concluded on my end.
12      MR. CUMMINGS:  Sorry.  No further questions
13  for me, and Ms. Cruz we will read.
14      MR. GOLDBERG:  And we will order a copy.
15      THE REPORTER:  Mr. Cummings, would you like
16  to order a copy of the transcript?
17      MR. CUMMINGS:  Not at this time.  Thank you.
18  But can I please have your email address?  I saw
19  something at B Reporting.
20      THE REPORTER:  Yeah.
21      (Deposition concluded at 12:56 p.m.)
22      (Deposition Exhibits A through D were marked
23  for identification by the court reporter after the
24  conclusion of the deposition.)
25

Page 68

1                     - - -
2              C E R T I F I C A T E
3                     - - -
4  UNITED STATES DISTRICT COURT        )
5  SOUTHERN DISTRICT OF FLORIDA        )
6
7      I hereby certify that I have read the
8  foregoing deposition by me given, and that the
9  statements contained herein are true and correct to the
10  best of my knowledge and belief, with the exception of
11  any corrections or notations made on the errata sheet,
12  if one was executed.
13
14      Dated this_____day of _____, 2023.
15
16
17
18
19
20  _____
21      CRUZ DAICELIS VALDIVIESO FIGUERA
22
23
24
25

Page 69

1              E R R A T A   S H E E T
2  IN RE: STATE OF FLORIDA V. JOSEPH TRAEGER
   DEPOSITION OF: CRUZ DAICELIS VALDIVIESO FIGUERA
3  TAKEN: June 6, 2023
4      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
   PAGE #  LINE #  CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  Please forward the original signed errata sheet to this
   office so that copies may be distributed to all
21  parties.
22  Under penalty of perjury, I declare that I have read my
   Zoom Deposition and that it is true and correct subject
23  to any changes in form or substance entered here.
24  DATE:
   SIGNATURE OF DEPONENT: _____
25

Page 70

1  UNITED STATES DISTRICT COURT        )
2  SOUTHERN DISTRICT OF FLORIDA        )
3
4
5      I, the undersigned authority, certify that
6  CRUZ DAICELIS VALDIVIESO FIGUERA, personally appeared
7  before me via Zoom on the 6th of June, 2023, and was
8  duly sworn.
9
10      WITNESS my hand and official seal this 13th
11  day of June, 2023.
12
13
14
15
16      HALEY DAWN WESTRA, RPR, CRR
        Reporter and Notary Public
17
18
19  Commission No. 638457
   Expires: October 24, 2026
20
21
22
23
24
25

Deposition of CRUZ DAICELIS VALDIVIESO FIGUERA

Page 71

```
 1              C E R T I F I C A T E

 2
 3   UNITED STATES DISTRICT COURT        )
     SOUTHERN DISTRICT OF FLORIDA        )
 4
 5        I, HALEY DAWN WESTRA, Reporter and Notary, in
     and for the State of Florida at large, do hereby
 6   certify that I was authorized to and did
     stenographically report the Zoom Deposition of CRUZ
 7   DAICELIS VALDIVIESO FIGUERA; that a review of the
     transcript was requested; and that the foregoing pages,
 8   numbered from 1 to 67, inclusive, are a true and
     correct transcription of my stenographic notes of said
 9   Zoom Deposition.

10        I further certify that said Zoom Deposition
     was taken at the time and place hereinabove set forth
11   and that the taking of said Zoom Deposition was
     commenced and completed as hereinabove set out.

12
          This Zoom Deposition occurred during the
13   COVID-19 pandemic, conducted using videoconference
     technology, and it is therefore subject to the
14   technological limitations of court reporting remotely.

15
          I further certify that I am not an attorney or
16   counsel of any of the parties, nor am I a relative or
     employee of any attorney or counsel of party connected
17   with the action, nor am I financially interested in the
     action.

18
          The foregoing certification of this transcript
19   does not apply to any reproduction of the same by any
     means unless under the direct control and/or direction
20   of the certifying reporter.

21        DATED this 13th day of June, 2023.

22
23
        _____
24        HALEY DAWN WESTRA, RPR, CRR
          STENOGRAPHIC REPORTER
25
```

Page 72

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2               CASE NO. 0:22-CV-61553-WPD

 3
     CRUZ VALDIVIESO FIGUERA,
 4
          Plaintiff,
 5
     vs.
 6
     All VIP CARE, INC., & LIZ
 7   VELAZQUEZ McKINNON,

 8        Defendants.
                               /
 9   _____

10

11

12

13   IN RE: DEPOSITION OF CRUZ DAICELIS VALDIVIESO FIGUERA
     TAKEN: June 6, 2023
14   DATE E-MAILED TO WITNESS:

15   TO:  CRUZ DAICELIS VALDIVIESO FIGUERA
          (Read through OPPOSING COUNSEL)
16
     The referenced transcript has been completed and awaits
17   reading and signing.

18
     The transcript is 67 pages and you should allow
19   yourself sufficient time.

20
     Thank You,
21
22   _____
23
24
25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:22-CV-61553-DIMITROULEAS/HUNT


CRUZ VALDIVIESO FIGUERA,

     Plaintiff,

vs.

ALL VIP CARE INC. AND
LIZ VELAZQUEZ MCKINNON,

     Defendants.
_____/


DEPOSITION OF DIANA RAMIREZ

TAKEN ON BEHALF OF THE PLAINTIFF

JUNE 7, 2023
10:00 A.M. TO 12:56 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23


REPORTED BY:
DANIELLE J. BRAELOW, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA





CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 2..5

**Page 2**

```
 1                APPEARANCES OF COUNSEL
 2  ON BEHALF OF THE PLAINTIFF:
 3       TOUSSAINT MARCUS CUMMINGS, ESQUIRE
         FAIR LAW FIRM
 4       135 SAN LORENZO AVENUE, SUITE 770
         CORAL GABLES, FL 33146-1878
 5       305-230-4884
         TOUSSAINT@FAIRLAWATTORNEY.COM
 6       (REMOTELY VIA ZOOM)
 7  ON BEHALF OF THE DEFENDANT:
 8       RANDY MARK GOLDBERG, ESQUIRE
         RANDY M. GOLDBERG & ASSOCIATES, PLLC
 9       151 NW 1ST AVENUE
         DELRAY BEACH, FL 33444-2611
10       754-224-0867
         RMGESQUIRE@GMAIL.COM
11       (REMOTELY VIA ZOOM)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                INDEX OF EXHIBITS
 2  EXHIBIT        DESCRIPTION              PAGE
    PLAINTIFF'S:
 3
       A     ALL VIP CARE APPLICATION        28
 4
       B     PATIENT CALENDAR                73
 5
       C     TEXT MESSAGES                  105
 6
       D     GOOGLE REVIEW                  117
 7
       E     PLAINTIFF STATEMENT            121
 8
       F     WITNESS STATEMENT              126
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX OF EXAMINATION
 2  WITNESS: DIANA RAMIREZ
                                            PAGE
 3  DIRECT EXAMINATION
         BY TOUSSAINT MARCUS CUMMINGS, ESQUIRE    5
 4
    CROSS EXAMINATION
 5       BY RANDY MARK GOLDBERG, ESQUIRE         131
 6  RE-DIRECT EXAMINATION
         BY TOUSSAINT MARCUS CUMMINGS, ESQUIRE   134
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1    VIDEOTAPED DEPOSITION OF DIANA RAMIREZ
 2    JUNE 7, 2023
 3        THE COURT REPORTER:  We are now on the record.
 4        MR. CUMMINGS:  Okay.  Am I ready to go?
 5        THE COURT REPORTER:  Yes.
 6        MR. CUMMINGS:  Did you already verify her
 7    identification?
 8        THE COURT REPORTER:  Yes.
 9    Thereupon:
10            DIANA RAMIREZ
11    was called as a witness, and after having been first
12    duly sworn, testified as follows:
13            DIRECT EXAMINATION
14    BY MR. CUMMINGS:
15        Q   Good morning, Ms. Ramirez. My name is
16    Toussaint Cummings. I'm the Attorney for Cruz
17    Valdivieso. And have you ever taken a deposition before?
18        A   No.
19        Q   Okay.  So, let me just give you some basic
20    rules of a deposition.  I'm sure that your Attorney
21    probably already explained some of them to you, but the
22    ones that I'm going to explain just have to be -- have
23    to deal with being respectful to the Court Reporter.
24        So, the Court Reporter is going to type down
25    everything that we're saying, all of my questions and
```

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                                    Pages 6..9

Page 6

1  then all of your answers. So, that means two things.
2       First, we cannot speak over each other. And
3  generally speaking, when you're having a conversation
4  with somebody, they might start saying something and you
5  assume you know where they're going.
6       So, you might just, you know, cut in or start
7  speaking or answering a question before it's done. But
8  in this particular circumstance, you have to allow me to
9  finish my question completely, so, that the Court
10 Reporter can write out a full question and then you can
11 provide your response, so that the Court Reporter can
12 write out your full response. Understood?
13      A   Understood.
14      Q   Okay. And the reason for that is that when
15 we're done, everything that our conversation is going to
16 be typed up in what's called a deposition transcript,
17 and it's going to have a clear question line, and then
18 it's going to have a clear answer line.
19      So, as we're talking over each other, that
20 creates problems for the Court Reporter and her
21 transcription. All right?
22      A   Understood.
23      Q   Second, you always have to provide a verbal
24 response because again, the Court Reporter is typing
25 down everything we say.

Page 7

1       So, if I ask you a question and you shake your
2  head, yes or no, the Court Reporter can't take down
3  ver -- you know, non-verbal responses. So, you always
4  have to provide a verbal response. Got it?
5       A   Okay. Understood.
6       Q   And then for that reason, you also can't say,
7  uh-huh or um-hum because that doesn't mean anything when
8  it's typed out, right. It looks like U-H-U-H or H-U-H
9  or something. But that's not the same as yes or no.
10      So, if any of those things happen, then what
11 I'll do is I'll just say, "Okay, Ms. Ramirez, I'm just
12 reminding you that you had to provide a verbal
13 response." And I'll ask the question again, so that we
14 have a clear question and answer line. Got it?
15      A   Got it.
16      Q   Okay. All right. Other than that, is there
17 any reason why you cannot take a deposition today?
18      A   No.
19      Q   All right.
20      A   No reason.
21      Q   All right. You're not under the influence of
22 any medications?
23      A   No medication, I don't smoke. I don't do
24 nothing.
25      Q   Okay. No problem. And finally, the most

Page 8

1  important thing as a witness, you understand that the
2  Court Reporter swore you in to tell the truth today? Got
3  it?
4       A   Absolutely, yes.
5       Q   All right. So, we're not in a Courtroom
6  setting. You're not in front of a Judge, and the Court
7  Reporter does administer the oath, so that you
8  understand that you are still providing testimony as a
9  Witness in this case, and all testimony has to be
10 truthful. Okay?
11      A   Correct.
12      Q   All right. So, let's get started. First,
13 what is your full name, if you have a middle name?
14      A   I don't have a middle name. My first name is
15 Diana. Last name is Ramirez with a Z at the end.
16      Q   What is your date of birth?
17      A   It's January 20th, 1970.
18      Q   What is your current address?
19      A   It's 942 Sumter Road West in West Palm Beach.
20 ZIP Code is 33415.
21      Q   Is Sumter spelled S-U-M-T-E-R?
22      A   That's correct, Road West.
23      Q   Sumter Road West?
24      A   Yes, because there's an east, but I'm on the
25 West.

Page 9

1       Q   Oh, okay. Sumter Road West. And then Palm
2  Beach. What was the ZIP Code again?
3       A   West Palm Beach. The ZIP Code is 33415.
4       Q   What is your current cell phone number?
5       A   It's (561) 255-6317.
6       Q   How long have you had that cell phone number?
7       A   Maybe like 10 years or over 10 years.
8       Q   Who is your current cell phone provider?
9       A   T-Mobile.
10      Q   How long have you had T-Mobile with that phone
11 number?
12      A   I'd say maybe like three years with T-Mobile.
13      Q   Any text messages that you would've sent to
14 Ms. Valdivieso Cruz, the Plaintiff in this case? Would
15 they have been coming and going from this phone number?
16      A   Well, there's two phones. This is my -- the
17 one I gave you is my personal phone. All caregivers and
18 clients have my personal phone. It's also on my
19 business card.
20      And I provide that home just in case, you
21 know, they need me for everything. If they can reach me
22 on my on-call phone, they can always reach me on my
23 personal phone.
24      Because sometimes, you know, I have other
25 calls on the on-call phone. The text messages is



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                                    Pages 10..13

**Page 10**

1  usually done on the on-call phone, not the phone I gave
2  you.
3  **Q   What is an on-call phone?**
4   A   It's a another cell phone that we have that we
5  call the on-call phone.
6  **Q   Is the On-call phone provided by All VIP to**
7  **you?**
8   A   Yes.
9  **Q   Does All VIP pay for the monthly subscription**
10  **for that phone?**
11   A   Yes, sir.
12  **Q   What is the number to the on-call phone?**
13   A   Area code is (954) 579-0618.
14  **Q   What's the provider for that phone?**
15   A   I think it's T-Mobile as well. Is it
16  Verizon -- I think it's Verizon. I'm sorry. Verizon. The
17  red phone is Verizon.
18  **Q   And did you say red phone?**
19   A   Yeah, it's a red cell phone.  We call it the
20  red phone.
21  **Q   Is it an iPhone?**
22   A   Yes, it is.
23  **Q   When do you primarily use the red on-call**
24  **phone for?**
25   A   Okay.  The red on-call phone is used to send

**Page 11**

1  the address and information of the clients.  We send all
2  the information to the caregivers.  It provides the
3  address, name, phone number, full schedule and once they
4  get that they need to respond, confirm.
5      So, all those text messages are on the phone.
6  So, like if they say, you know, if I see that they don't
7  respond, I call them, "Did you get the message and can
8  you, please confirm?"
9      And that's how we have proof that they got the
10  message that, you know, they can't say, "Oh, I didn't
11  receive it, you know, I don't know the address, you
12  know, I don't know the phone."
13  **Q   Okay.**
14   A   All the information is sent through that
15  phone.
16  **Q   Now, just let me be clear, when you -- all of**
17  **the information that you're talking about is going to**
18  **the client or is going to the Home Health Aid providers?**
19   A   Yeah.
20  **Q   To caregivers?**
21   A   To the Home Health.  Yes, that's correct.
22  **Q   How do you communicate with the patients?**
23   A   I call them, the -- if it is during business
24  hours, I call them on the office phone.  If it's not
25  during business hours, I call them -- usually I call

**Page 12**

1  them through my cell phone, you know, or it depends if
2  they, you know, call me on the red phone, which is the
3  on-call phone, I will return the call there, so they
4  know that I'm returning their call.  But most clients
5  have both numbers.
6  **Q   Understood.**
7   A   So, that way they can't say, "Oh, I tried
8  reaching you and the call didn't go through."  So, they
9  had my other number.
10  **Q   Understood.  How long have you been working**
11  **with All VIP?**
12   A   I'll be working -- I've been -- it's going to
13  be four years in July 9th, I'll be four years.
14  **Q   Where did you work before All VIP?**
15   A   I worked -- my last job was in International
16  Kids Zone.
17  **Q   What is that?**
18   A   It's after school and it's also a daycare.
19  **Q   What did you do there?**
20   A   I was an assistant teacher.
21  **Q   How long did you work for International Kids**
22  **Zone?**
23   A   I'd say like about three years.
24  **Q   Have you ever been convicted of any crimes**
25  **after the age --**

**Page 13**

1   A   Never.
2  **Q   -- of 18?**
3   A   Never in my life.
4  **Q   Have you ever been a Plaintiff in a lawsuit?**
5   A   Never.
6  **Q   Meaning, have you ever sued anybody yourself?**
7   A   The only thing that I can say that I've been
8  in Court that I had to, you know, testify was when some
9  girl scratched my car and the police officer saw her.
10      So, they told me if I wanted to, you know,
11  press charges and I said, yes.  That was the only time
12  that you know that I had to testify in Court.
13  **Q   How long ago was that?**
14   A   I'd say that was probably like 10 years around
15  there, I can't -- just estimating.
16  **Q   And you actually provided testimony in Court?**
17   A   Yeah, I actually, yes, I had to testify and
18  all the works Jury, there was a Jury as well.
19  **Q   And you didn't take a deposition before you**
20  **provided that testimony?**
21   A   What do you mean?  It was a State that took
22  the case and while he's the Attorney, the State Public
23  Defender.
24  **Q   Right.**
25   A   He just asked me questions and that's it.  I

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 14..17

Page 14

1  don't --
2      Q   Understood.  All right.  And have you ever
3  been sued by anybody before?
4      A   Never.
5      Q   What are -- what is your current title at All
6  VIP?
7      A   Administrator.
8      Q   Sorry, I'm sorry, I cut you off.  Let me just
9  ask the question.  I'll re-ask the question.  Hold on.
10  What is your current title at All VIP?
11      A   I'm the administrator.
12      Q   What title did you start with at All VIP four
13  years ago?
14      A   Coordinator.
15      Q   Have you had any other positions at All VIP
16  besides coordinator and administrator?
17      A   Those are the only two.
18      Q   When did you become an administrator for All
19  VIP?
20      A   I'd say maybe like in two -- the end of 2019,
21  around there.
22      Q   And is it fair to say that you started with
23  All VIP in the beginning of 2019 since you've been
24  working there for four years?
25      A   July 9th, if I'm not mistaken.

Page 15

1      Q   July 9th, 2019?
2      A   2019.
3      Q   You definitely started at All VIP before the
4  pandemic?
5      A   Yes.
6      Q   What were your duties as a coordinator for All
7  VIP?
8      A   I staffed clients with caregivers.  I also did
9  start of care.  I, you know, answered phones, entered
10  their hours in the system.
11      Q   When you say entered their hours, who are you
12  referring to?
13      A   Caregivers.  Sorry.
14      Q   No problem.  And what system are you referring
15  to?
16      A   Well, we had two diff -- couple of different
17  software.  When I started with, WellSky.
18      Q   Sorry, can you spell that for me?
19      A   WellSky, it's W-E-L-L and S-K-Y, WellSky.
20      Q   What does that program or application do?
21      A   It does the schedule, so we know who are we
22  scheduling.  We entered the caregiver's name into the
23  client's schedule, their hours and that's how they run
24  payroll.
25          Once all that is entered, they

Page 16

1  finalize and that's how they do payroll.
2      Q   And what was the other system you referred to?
3      A   The other one we started was Care Center, but
4  we were very, you know, we didn't work there with them
5  for a long time.  The one that we've been with after
6  that is HHA exchange.  We've been then with them for
7  quite a while after that.
8      Q   You also mentioned that you started Care as a
9  coordinator.  What did you mean by that?
10      A   Sorry?
11      Q   I think you -- when I asked you what your
12  duties were as a coordinator, you said that you started
13  Care.  What did you mean by that?
14      A   No staff, I'm sorry.  No, I said staffed --
15      Q   Staff the client.
16      A   Staffed the clients, yeah.
17      Q   With caregivers, right?
18      A   Yes.
19      Q   And then I thought you said you started Care.
20  You didn't say that?
21      A   No.
22      Q   No.  Okay.  All right.
23      A   No.
24      Q   Now, as an administrator, what do you do at
25  All VIP?

Page 17

1      A   As administrator, I do all that, but I, you
2  know, I have to take care of ev -- there's any issues,
3  any problems with the, you know, with the hours.
4          Got to fix errors, I got to go visit the
5  clients.  I call the clients to make sure, you know,
6  how's the caregiver working out, you know, making sure
7  everything's working properly, how it's supposed to.
8      Q   And are you in control of a certain regional
9  area that All VIP has?
10      A   Yes, I am the administrator for the Broward
11  County area here for All VIP Care.
12      Q   And are you presently located at an All VIP
13  office as you're taking this deposition?
14      A   Yes, I am.  I am at the Broward office.
15      Q   So, if you -- let's talk about the hiring
16  process for Caregivers.  How does a caregiver begin to
17  work with All VIP?
18      A   Okay.  Once they come in, they have to bring
19  all their, you know, paperwork, all their CEUs all their
20  certifications that includes a physical and a background
21  check.
22          If they don't have one, we will, you know, do
23  a form for them.  We'll fill it out and send them to
24  have one, you know, to have one done.  Once they're
25  here, they're not active unless they have all the

Page 18

1  paperwork and they have all the certifications and their
2  background, it's, you know, it's good to go.
3       Once they fill out the application, I go over
4  everything. You know, there's like 26, if I'm not
5  mistaken 26 pages in our application. I think there's
6  probably a little bit more now.
7       And I go through them and I say, if you don't
8  understand anything, you know, just let me know and I'll
9  explain to you. When they don't understand something,
10 you know, they ask me, can I explain to them because
11 there's a lot of initials and also signatures.
12      They're independent contractors, you know, let
13 them know what an independent contractor is. Most of
14 them, they already know.
15      Once we go over that, I let them know that
16 once they accept a case, you know, I'm -- excuse me,
17 sorry, I let them know how they need to be dressed when
18 they go to a client's room, they have to have their
19 scrubs done.
20      They have to, you know, be well dressed with
21 closed-toe shoes and be there on time. So, that's one
22 of the first things that we tell them to be there on
23 time and properly dressed.
24      And after that, you know, once they, you know,
25 they understand everything, the application, how they're

Page 19

1  supposed to be addressed, how once they accept a case,
2  if I tell them if you're -- if you can't make it, I --
3  there's an on-call phone after hours, you need to
4  immediately call me.
5       It doesn't matter what time you call me and
6  let me know, I cannot make it. I had an emergency that
7  gives me time to call the client and find another
8  Caregiver for that client. So, that communication,
9  that's the number one thing I tell them. It's very,
10 very important with All VIP Care.
11      Q   So, let me just go through some of the things
12 you said -- you mentioned CEUs. What does that stand
13 for?
14      A   Those are their certifications.
15      Q   Okay. And those certifications are
16 certifications that caregivers should already have
17 before they start practicing for All VIP or working with
18 all --
19      A   That's correct. Yeah, they go to office --
20      Q   -- got it. Okay. Those are all State
21 certifications?
22      A   Yes, they are. They have to be, yes. And we
23 verify them online to make sure.
24      Q   Does All VIP also conduct a background check
25 on the caregivers?

Page 20

1       A   That's correct.
2       Q   At what point in the process is the background
3  check conducted?
4       A   As soon as they walk in, they give us, you
5  know, all their CEUs and we're -- that's the first thing
6  we do, background check before they even, you know,
7  finish their application.
8       Q   How what components are there to the
9  background check, is there a credit check that goes into
10 that?
11      A   No, there's no credit checks.
12      Q   What are you looking for when a background
13 check --
14      A   Criminal.
15      Q   Does the State require that All VIP run a
16 background check on caregivers?
17      A   That's correct.
18      Q   Does the State --
19      MR. GOLDBERG:  Mr. Cummings, excuse one
20 second, just for clarification. Like we discussed
21 yesterday, you're referring to caregiver. Are we
22 referring that the caregiver is an HHA?
23      MR. CUMMINGS:  Well --
24      THE WITNESS:  Yes.
25      MR. CUMMINGS:  I mean, let me clarify that

Page 21

1  really quickly though.
2  BY MR. CUMMINGS:
3       Q   When you -- Ms. Ramirez, when you refer to a
4  caregiver, what specifically are you -- what types of
5  caregivers does All VIP work with?
6       A   They'll be HHAs, CNAs and then we also have
7  nurses, but they're -- that's what they call RNs.
8       Q   All right.
9       A   HHA will be --
10      Q   And so,
11      A   -- A home -- I'm sorry.
12      Q   No, go ahead.
13      A   And HHA is a Home Health Aide. CNA is a
14 Certified Nurse Assistant.
15      Q   And RN is a Registered Nurse?
16      A   That's correct.
17      Q   All VIP works with all three different types
18 of those caregivers?
19      A   That's correct.
20      Q   Okay. So, for right now, when we refer to
21 caregiver, I'm just going to refer generally to all
22 three, but at some point later in the deposition, I'll
23 ask you probably specifically about one or the other of
24 those types. Okay?
25      A   Okay.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 22..25

Page 22

1    Q   All right.  But as far as the background check
2  is concerned, or let me be more specific, as far as the
3  hiring process for caregivers is concerned, it's the
4  same whether the person is coming in as a HHA, a CNA or
5  an RN?
6    A   That's correct.  They all have to have
7  background checks, even myself.
8    Q   All right.  And do the caregivers all have the
9  same certifications no matter what, if they're HHA a
10  CR -- a CNA and RN?
11   A   No, they don't.  No, HHA would have, you know,
12  just her regular certifications that it's not a license,
13  it's just certificates, you know, that they took the
14  class and they took the training and it's 75 hours that
15  they need.  A Registered Nurse -- I mean, a CNA has her
16  license.
17   Q   Okay.
18   A   You'll be, you know, Certified Nurse
19  Assistant.
20   Q   Got it.  So, one thing I just want to remind
21  you of, Ms. Ramirez, is you have to allow me to finish
22  the question because --
23   A   I'm sorry.
24   Q   I already said you already started jumping
25  ahead because you, like I said --

Page 23

1    A   I'm sorry.
2    Q   No, don't worry about it.  Like, you know
3  where the question is going.  So, when I get to the end,
4  you're kind of cutting me off a little bit.
5    A   I'm sorry.
6    Q   All right.  So, just allow me to finish the
7  question.  Thank you.  Otherwise, the Court Reporter's
8  going to jump on us.  All right.
9    A   Okay.  I'm sorry.
10   Q   So, no problem.  Okay.  So, you also mentioned
11  the dress code is -- does the State require that
12  caregivers dress a certain way when they provide care in
13  a home?
14   A   I don't know about the State, but I know we as
15  a Home Health Agency and most of the Home Health Agency
16  requires the aide -- caregivers to wear their scrubs
17  and closed toe shoes.
18   Q   What's the purpose of that?
19   A   A lot of clients identifies them when they go
20  visit, you know, a client's home.
21   Q   And --
22   A   And it also repre -- sorry.
23   Q   Sorry, go ahead.  No, you're --
24   A   And it also represents, you know, that they
25  are, you know, caregivers and they represent the agency.

Page 24

1    Q   Okay.  Does All VIP provide a certain type of
2  scrub to the caregivers?
3    A   No, they could wear any scrub.  I usually tell
4  them you could wear any color as long as they're scrubs,
5  you know, they can buy it, whichever, don't they, like.
6    Q   Does All VIP sell scrubs?
7    A   No, we don't.
8    Q   Does All VIP tell caregivers where they can
9  buy scrubs?
10   A   No, I'm sorry, let me -- let -- can I go back
11  on that?
12   Q   Yeah, sure.  You do whatever you want.
13   A   Okay.  When they ask me, yes, I tell them, but
14  you -- most of them, they come already -- when they come
15  to apply, they have their scrubs.
16   Q   And is there any requirement that a home --
17  I'm sorry, a caregiver have a certain number set of
18  scrubs, like you need to have a different one for every
19  day of the week or no?
20   A   No, we don't tell them.
21   Q   All right.  And then you also mentioned that
22  there's an on-call phone for after hours.  Is that the
23  same as the red phone that we spoke about earlier?
24   A   Yes.
25   Q   And so --

Page 25

1
2    A   Yes, that's correct.
3    Q   If you tell the caregivers at the time of the
4  application signing about the process for make an on-
5  call -- I'm sorry, for calling in if they can't make
6  particular patient's schedule or something?
7    A   Yes, through the red phone, yes.
8    Q   Okay.  All right.  Now, do you speak Spanish?
9    A   Yes, I do.
10   Q   Does All VIP work with a large number of
11  Spanish speaking caregivers?
12   A   Yes, we do.  It's -- I think it's a balance.
13   Q   Balance between what?
14   A   English and Creole and Spanish.
15   Q   Do you speak Creole?
16   A   No, I don't.
17   Q   If Creole speaking caregiver comes into the
18  office, how is the application process explained to
19  them?
20   A   Okay.  They -- if they don't understand
21  English, they usually come with someone that understands
22  English.
23   Q   Are there any Creole speaking staff members in
24  your Broward office?
25   A   Yes, I have one Creole client.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 26..29

Page 26

1   Q   Client?
2   A   Yes, client I'm sorry.
3   Q   No, I'm not staff members.  Do you have any
4   Creoles --
5   A   Staff members.
6   Q   -- Staff members?
7   A   No, I don't.
8   Q   And the -- let me just -- you mentioned a
9   26-page application that caregivers fill out when they
10  first come in to apply for jobs, correct?
11  A   That's correct.
12  Q   Okay.  That 26 page application, what language
13  is it in
14  A   English.
15  Q   Is there a Spanish language version of that
16  application?
17  A   No, there's not.
18  Q   If a Spanish speaking caregiver comes in, how
19  do they fill out the application if they don't -- if
20  they don't read or write English?
21  A   Okay.  So, this is where I come in, everything
22  is explained to them.  The first page is very, you know,
23  they know how to name, address, you know, last, you
24  know, everything is self, like they know how to fill
25  that part out.

Page 27

1       Now, the part that they -- it's the reading
2   part that they have to initial, I explain to them each
3   paragraph.  Okay.  Where they have to initial because
4   they do tell me.  Okay.
5       I don't understand this part.  And that's why
6   I explained to them.  If they agree, then they initial
7   that step by step by step, I go through it all the way
8   to, you know, to the end after the first page.
9   Q   And, how long does it normally take when you
10  are sitting with a Spanish speaking caregiver to explain
11  the whole 26 application?
12  A   I say about an hour.
13  Q   If the caregiver reads and writes and
14  understands English, do you still provide input to them
15  during the application process?
16  A   Yes, if they are -- like, if they can't
17  understand a certain, you know, question from there,
18  then I explain to them authority.  But they usually
19  understand.
20  Q   Do you know who Cruz Valdivieso is?
21  A   Yes, I do.
22  Q   Did Cruz Valdivieso apply to work with All VIP
23  at the Broward office?
24  A   Yes, she came to the Broward office.
25  Q   Were you present the day that she came in to

Page 28

1   apply?
2   A   Yes, I was.
3   Q   Did you call --
4   A   I was the one that took --
5   Q   Okay.  Sorry, go ahead.
6   A   I'm sorry.  Yes, I was the one that helped
7   her.
8   Q   Okay.  And let me just show you what I'm going
9   to mark as Exhibit A for the deposition record.
10      (Thereupon, Plaintiff's Exhibit A was entered
11      into the record.)
12  BY MR. CUMMINGS:
13  Q   Okay.  Ms. Ramirez, can you see the document
14  I'm showing you on my screen now?
15  A   Yes, that's the application.  That's the first
16  part of the application.
17  Q   So, just for a deposition record, I'm now
18  introducing a 25-page document, and at the bottom it has
19  as Exhibit A, it has Bates stamp, All VIP 26 letter A,
20  and then 000001.
21      And this goes all the way down to Bates stamp,
22  the same Bates stamp.  But the --
23  A   That's the last page.
24  Q   Yeah, the last page says number 25.  Okay.  So,
25  is this the -- are these 25 pages the full application

Page 29

1   that you were referring to earlier?
2   A   Yes, it should have been 26.  Let me see.
3   Q   Yes, I mean --
4   A   It's probably another -- can you go up a
5   little?
6   Q   Yeah, this is the first page.
7   A   Okay.  I see.
8   Q   And then the second page that we're looking at
9   in this Exhibit A is this generally the start of a
10  different part of the application.
11  A   That's the second page.  And then it goes to
12  another -- it's employment history.
13  Q   Okay.
14  A   There's another employment history I think,
15  missing in there.
16  Q   So, you think there's just one page missing
17  somewhere here?
18  A   Yeah, I think it's an employment history.
19  Q   Okay.
20  A   It's like --
21  Q   Where -- sorry, go ahead.
22  A   Can you go to the -- that next page?
23  Q   Um-hum.
24  A   There you go.  No, that's the page.
25  Q   When you say that's the page, are you saying

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                          Pages 30..33

Page 30

1 there's a page missing somewhere in here or --
2    A  I thought there was another page missing, like
3 for employment history, but I saw it there.
4    Q  You did see it.  Okay.  Well, we can go
5 through these pages later, but do you think --
6    A  Okay.
7    Q  I know I haven't showed you all 25 pages, but
8 at this point up to page 4, have you seen any part of
9 the application that's missing?
10   A  Let's see if -- no, not the first part.  Not
11 the first part that I recall.
12   Q  Okay.  And then moving down to page 5, which
13 says acknowledge --
14   A  -- sorry, yeah --
15   Q  -- policy and procedure?
16   A  That's correct.
17   Q  Okay.  Would this sort of be considered like
18 the second part of the application?
19   A  Yes, because there's a few of them and also
20 reading parts, it doesn't have initials.
21   Q  Okay.  So, there are some pages that, where
22 there's no initial required?
23   A  Yeah, it is just for them to have that, you
24 know, so if they have any doubt, they have their copies.
25   Q  All right.

Page 31

1    A  Of what they had just finished signing.
2    Q  Is there any part of the application that
3 we're looking at that would be filled out by you?
4    A  Yes, where it says administrator.
5    Q  Okay.  What page would I find that on?
6    A  Can -- no, can you go up, after the initials,
7 up more?
8    Q  Well, when you say up, do you mean downward --
9 down?
10   A  No, like you're going just like that, upward.
11   Q  All right.  And let me just ask you a question
12 quickly, so, this -- when Ms. Cruz came in, everything
13 on this first page is all in English, but I think you
14 mentioned that all of the caregivers know what this
15 means.  How do you know that?
16   A  I have to explain to them this is a contract
17 and they cannot lie.  You know, they cannot give any
18 false information and it's a contract.
19   Q  When you joined All VIP, did this first page
20 already exist to Exhibit A?
21   A  When I first applied.  No because our
22 application is similar to that, but it didn't have that
23 because that's for independent contractor.  I'm not an
24 independent contractor.
25   Q  No, I'm asking a slightly different question,

Page 32

1 but what I'm saying is when you joined All VIP as an
2 employee, did this whole application package already
3 exist or did you create any parts?
4    A  No, it already existed.  I didn't create
5 anything.
6    Q  Okay.  And so, when Ms. Cruz Valdivieso came
7 in, you're saying that you explained what this first
8 page says to her and then you asked her to sign it?
9    A  I told her after everything is explained, she
10 signed it and she was sitting down, I remember the day
11 that she came in her blue -- navy blue scrubs, she came
12 and then I said, she says, can you explain to me, and
13 step-by-step I explained to her.
14       And if as -- if she agreed, she will initial
15 and she'll sign -- initial and she'll sign and then --
16   Q  Yeah, when you say step-by-step, so let's just
17 stick with the first page that we're looking at here,
18 which says All VIP Care and it has a stethoscope and the
19 shape of a heart.
20       Do you read the English parts directly into
21 Spanish or do you just give a general overview of like
22 what this says?
23   A  If it's not long like, you know, I explain to
24 them exactly how it's, I read it in English, I read it
25 in Spanish to them.

Page 33

1    Q  Okay.  So, meaning like if it says, "Dear
2 Independent Contractor", you'll say what then?
3    A  I'll tell them you're independent contractor,
4 that'll be you.  I'll explain to them the independent
5 contractor because like I said, there's two signatures
6 required independent contractor and me.
7       So, a lot -- a few of them get confused with
8 that signing part.  So, I tell them you'll be the
9 independent contractor.
10   Q  Right.  And when you said you explain what an
11 independent contractor is, what do you tell them an
12 independent contractor is?
13   A  Independent -- I let them know that, you know,
14 taxes are not withheld.  They are responsible to pay
15 their own taxes.
16       And if they -- let's say they're, you know, if
17 they decide to work in another agency, you know, they
18 are independent contractors.  They could apply in other
19 agencies.  A lot of the caregivers do that.
20   Q  Can you explain anything else about their
21 roles as independent contractors to them?
22   A  Everything that has pertains to independent
23 contractor is explained to them and like, I told you in
24 that sense.  So, most of them when they come in, they
25 know what it is because it is taught to them in the

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 34..37

Page 34

1  school.  And also they apply in other agencies and all
2  the agents -- huh?
3     Q   Yes.  Did Cruz Valdivieso say that she learned
4  what an independent contractor is during schooling or
5  during her training?
6     A   Yes, a lot of them they do know from school.
7     Q   Okay.
8     A   Yeah, they always come and tell me.  Yes, I
9  know, it was explained to us in school.
10    Q   Did Ms. Cruz Valdivieso say specifically, do
11 you remember her saying that she knows what an
12 independent contractor is?
13    A   Yes, because she had applied in all the
14 agencies.  She said, she had experience and that's why
15 the work history is required.  And also in the
16 background check, it lets me know what other agencies
17 she applied for.
18    Q   Now, when we move down to page 2 of the
19 employment application, do you read all of these parts,
20 like where it says section 1, section 2, section 3.  Do
21 you -- did you read that to Ms. Valdivieso in Spanish
22 also?
23    A   When you say section 1, section 2 and section
24 3, what?
25    Q   Well, I'm just looking under -- on page 2

Page 35

1  here, there's a -- I'll highlight it.  It says section
2  1, contact information and then section 2, desired
3  employment or contract.  So, I'm just referring to these
4  sections like do you --
5     A   Okay.
6     Q   Yeah.  How do you tell Ms. Cruz, you know,
7  what to fill in, in each one of these parts, since it's
8  in English?
9     A   Yeah, I told her to -- she says that, she went
10 to school in Venezuela and I told her, put in your --
11 all the school that you went to from HHA, it looks like
12 she didn't even put it there.
13    Q   Okay.  And what I'm trying to figure out is,
14 are you literally saying to her, okay.  In -- are you
15 saying to her in Spanish, put your last name here, put
16 your first name here.  Are you walking her through this
17 whole application in Spanish?
18    A   Yes.
19    Q   All right.  Now, moving down to page 5 where
20 we get into the Acknowledgement of Nurse Registry Policy
21 and Procedure would you agree that this starts - - the
22 application starts to become legal at this point?
23    A   Yes, that part.
24    Q   All right.  And so --
25    A   But the whole --

Page 36

1     Q   Go ahead.
2     A   The whole application will be the whole
3  contract because even the first page as you see it --
4  it's stating, you know, that it's a contract and any
5  false information, you know.
6     Q   Right.  And so, getting back to this page that
7  I'm showing you now, page 5 where it says
8  "Acknowledgement of Nurse Registry Policy and
9  Procedure."  For example, the first box says
10 confidentiality statement.
11        What I want to know is, do you read this
12 confidentiality statement verbatim in Spanish as a
13 translation?
14    A   I don't read the whole thing in Spanish to
15 them.  I summarize, you know, that part I summarize and
16 explain to them, you know, how -- what it says on each
17 one of them.
18    Q   Understood.  And then after you summarize, you
19 ask the person who's applying to initial?
20    A   Yeah, if she agrees to it.
21    Q   Okay.
22    A   If she -- doesn't agree, then she needs -- if
23 she doesn't agree, then we can't hire her.
24    Q   Understood.  All right.  And so, just to get
25 an idea, Ms. Cruz would've come in once you get to page

Page 37

1  5, you summarize the confidentiality statement and then
2  you say to her initial here if you agree?
3     A   Yes, if you agree initial.
4     Q   Okay.  Then you move down to the next box, tax
5  exempt status.  You summarize that in Spanish and then
6  say initial here if you agree?
7     A   Of course she doesn't agree, then she don't
8  sign it -- she don't initial it.
9     Q   Right.  I'm just trying to get the flow of how
10 it goes.  So, you ex -- you summarize each box in
11 Spanish and then have her initial, correct?
12    A   Yeah, and then she initials I said, you agree
13 initial.
14    Q   Okay.  Then you move to the next one and do
15 the same thing?
16    A   Yes.
17    Q   Okay.  And then that's on and on until all of
18 the initial one is done on the application.
19    A   And then -- I'm sorry, can you move.  Yeah,
20 that part where it says conduct -- code of conduct that
21 is explained, you know, one-by-one completely
22 performance, all that.
23    Q   Understood.  Okay.  Is there a part on the
24 application where it explains what you were saying about
25 calling in to give advanced notice, if the person is --

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                                   Pages 38..41

Page 38

1  if the caregiver will be out?
2      A   If there's a part there in the application?
3      Q   Yeah. I didn't know if you were just saying
4  you tell the caregiver that verbally or if it's actually
5  contained in the application --
6      A   -- no, I tell them verbally, this is something
7  that I tell them verbally.
8      Q   Okay. And just to remind you again,
9  Ms. Ramirez, please let me finish the question because
10  we're talking over each other a lot. Okay?
11     A   I'm sorry.
12     Q   All right. Okay. So, and you say you remember
13  when Ms. Valdivieso came into the office the day of?
14     A   I'm sorry?
15     Q   You remember the first day Ms. Valdivieso --
16  Ms. Cruz Valdivieso came into the office to apply?
17     A   Yes, and she came more than once.
18     Q   Why was that?
19     A   She always had, like questions -- wanted. She
20  was like desperate. "I need a case. I need a case."
21  so she didn't let us call her. She came to the office,
22  you know, "What do you guys have I need, you know, I
23  need a case. That means, I need you know, work."
24     Q   Now, the first time that Ms. Cruz Valdivieso
25  came into your Broward office, did she finish the whole

Page 39

1  application process at that time?
2      A   The entire application that they can't leave
3  without filling out the entire application.
4      Q   Right. And you said she came more than once.
5  I didn't know if you meant that she came more than once
6  to fill out to do the application?
7      A   No, just to ask for employment, you know, if
8  we have any cases, some of them do that. What cases do
9  you have available? That I can work, yeah. So, I've
10  met her many times.
11     Q   Understood. Now, when we look at page 15, I
12  see that there's a signature from authorized VIP
13  representative and it looks like the name is Janati
14  Perez. Who is that?
15     A   Yeah, Janati was the coordinator at that time.
16  She also knew we call her -- I'm sorry if I call her
17  Daisy because that's the name she gave us, you know,
18  that her name was Daisy and that she preferred to be
19  called Daisy.
20     Q   And when you say she, you're talking about
21  Cruz Valdivieso?
22     A   Yes, and I told her, is that your legal name
23  because it says Cruz. She says, I go by Daisy I'd
24  rather for you to call me Daisy.
25     Q   Understood. Now, my understanding was that

Page 40

1  you walked in Ms. Cruz through this application, but was
2  it in fact Ms. Perez that did the application with her?
3      A   No, she was -- Janati was with me, but she was
4  not explaining the application to her. Once the
5  application is filled out and she's explained, then once
6  Janati puts it in the system, she has the authority to
7  sign as well. But Janati was there as well when we were
8  doing the interview for Valdivieso. We were both there.
9      Q   Why isn't your name on it?
10     A   Because she had -- I was probably doing
11  something else and it's the same thing she could sign,
12  you know, she's authorized to sign.
13     Q   So, it doesn't matter if you sign or if Janati
14  signs this page?
15     A   Yeah, as long as we have -- yeah, as long as
16  we have, you know, we're authorized to do so.
17     Q   And what is the purpose of this Appendix A
18  page number 16?
19     A   You can go up.
20     Q   This one?
21     A   Oh, that's for RN, LPN and HHA. Just, you
22  know, if they were referred by someone.
23     Q   It says Appendix A, Independent Contractor
24  Payment Schedule?
25     A   Yes.

Page 41

1      Q   So, you're saying that this is about whether
2  or not -- is there information that's missing here?
3      A   No, that you'll be pertain -- where it says --
4  at the bottom where it says HHA, CNA, Homemaker and
5  Companion that says next to it says referral to facility
6  agency or Healthcare entity.
7      Q   Right. Yeah, there's nothing in those boxes.
8  So, it is something missing or --
9      A   Yes, she doesn't -- she didn't do private
10  hours.
11     Q   What does that mean private hours?
12     A   Like she didn't work with like a private case
13  that didn't have Medicaid.
14     Q   Ms. Valdivieso never provided services to
15  somebody that did not have Medicaid. Is that what
16  you're saying?
17     A   Yeah, she always, I think the only cases she
18  had, they were both Medicaid. Actually we considered
19  Mr. and Mrs. Izique that's two clients with Medicaid.
20  And another client that she had was also Medicaid.
21     Q   However, if clients have a different type of
22  insurance that's not Medicare or Medicaid, then it's
23  considered private hours?
24     A   Yes, if it's not yeah, Medicaid.
25     Q   And are client -- I'm sorry, are caregivers



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 42..45

Page 42

1  who have private hours paid on a different rate?
2      A    No, well it depends on the insurance.  Yes, it
3  does because Medicaid pays a certain amount and also a
4  private, but they're basically pay rate -- basically the
5  same for the caregivers.
6      Q    Who establishes the pay rate for the
7  caregivers, is it Medicaid -- I'm sorry.  Is it the
8  private insurer or is it All VIP?
9      A    If it's private you're saying or if it's
10  Medicaid?
11      Q    Yeah.  Well, let me ask a different question.
12  How much was Cruz Valdivieso being paid per hour?
13      A    13 at that time.
14      Q    And so, at the time when she first signed up
15  with All VIP, she was being paid $13 an hour?
16      A    Yes, it went up to $13 an hour that's correct.
17      Q    Okay.  Do All Home -- and Ms. Cruz Valdivieso
18  was working as a Home Health Aide for All VIP?
19      A    I'm sorry, I didn't get.
20      Q    Yeah.
21      A    Can you repeat the question?
22      Q    Ms. Cruz was working as a Home Health Aide for
23  All VIP?
24      A    Yes.
25      Q    Okay.  Do all Home Health Aides working for

Page 43

1  All VIP make $13 an hour?
2      A    Some don't make $13 an hour.  Right now
3  they're all making 15, you know, State mandatory, at
4  that time it wasn't State mandatory.  A lot of them were
5  making less, so that's why they were coming here because
6  we were paying more.
7      Q    Okay.  When did the State mandate that Home
8  Health Aides make $15 an hour?
9      A    October of last year.
10      Q    However, before October 2022, were Home Health
11  Aides able to negotiate their own rate with All
12  VIP?
13      A    Yeah, they always did that, yes.
14      Q    Okay.  And the $13 an hour that Cruz
15  Valdivieso was making, was that more or less than what
16  the average of was for Home Health Aides?
17      A    More.
18      Q    Why was she able to negotiate more?
19      A    Because she was doing two, husband and wife,
20  you know, at the same, you know, at the same home.  And
21  she said it was becoming -- it was difficult.  So, yeah,
22  that's what she was paid.
23      Q    And when you say husband and wife, you're
24  talking about the Izique case?
25      A    Yes, the Izique case.

Page 44

1      Q    Just for the record, the Izique is going to be
2  I-Z-I-Q-U-E.  So, now let's get into a different -- when
3  was her pay rate established on the same day that she
4  came in to fill out the application?
5      A    No, it's not -- it's not the -- on the same
6  day of the application.  It's when she is hired for a
7  case.
8      Q    Okay.
9      A    Because she could fill out the application and
10  the application can just be there and she could be with
11  our employment for, you know.
12      Q    Got it.  So, now let's talk about the next
13  step of the process a caregiver signs up -- I'm sorry,
14  caregiver fills out the application.  All VIP does the
15  background check, checks all their certifications.  Now,
16  how does the caregiver actually start to provide service
17  for All VIP's clients?
18      A    After everything, you know, is good to go,
19  then I will call her and I say, "Listen I have a case.
20  It's not too far from you."  I explained the case
21  completely, you know, like the Care plan of the client,
22  I explained to her -- I explained to her the hours and
23  if she agrees, then I send her a text with the client's
24  name, address, telephone number, schedule, pay rate, and
25  she would just have to, you know, text back confirm.

Page 45

1      Q    And does Ms. Cruz had the ability to reject
2  that offer?
3      A    Yes, if she didn't want the case, she you
4  know, she said, "I don't want the case.  Find me another
5  one."  Yes, of course we won't leave anyone if they
6  don't feel comfortable in a -- in that client's home.
7          And that's one of the things I tell them
8  before they are hired, you know, if you don't feel
9  comfortable in a client's home, you have to let me know
10  or we can, you know.
11      Q    How does All VIP find its clients to match
12  them with the caregivers?
13      A    Well, it usually we go by how the distance,
14  the distance experience the language Izique wanted a
15  Spanish caregiver.  Some clients prefer, you know can
16  they be central American, you know, they like, they want
17  to be specific, you know.
18      Q    Um-hum.
19      A    And we just match them like that.
20      Q    And how does All VIP find the patients in the
21  first place?
22      A    Okay.  Since we work with Medicaid, we work
23  with a lot of case managers.  Case managers will call
24  us, let us know, you know, we have a client, they give
25  us, you know, the address, all the information that we

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 46..49

Page 46

1  provide, you know, to the caregivers, the care plan and
2  all that.
3      And then they send us the authorization.  And
4  from there, you know, it's put into the system, schedule
5  is created and once the schedule is created, you know,
6  and we already chose the caregiver, but the caregiver,
7  it's enter into the client's schedule.
8      So, that's how, you know, we can know the
9  hours and payroll could be run.
10     Q   So, the care plan consists of the schedule for
11  the patient.  Is that correct?
12     A   No, the care plan explains to them what needs
13  to be done in the client's home.  Like if they have
14  personal care, they have companion, they have
15  homemaking, so everything is explained to them.
16     Q   And do you ever communicate with the Medicaid
17  case managers personally?
18     A   Yes, I do.  I have to.
19     Q   Okay.  That's part of your job?
20     A   Yes.
21     Q   All right.  So, you could be sitting down in
22  the office and then a Medicaid case manager will call
23  and say, "Hey, I have this patient that needs these
24  services."
25     A   Yes.

Page 47

1      Q   "And they need this schedule and can you
2  please find us a caregiver to work with them?"
3      A   That's correct.
4      Q   Okay.  So, the schedule is created by you and
5  the case manager or the case manager calls already with
6  a schedule in place?
7      A   Sometimes the case manager has like, she'll
8  give me the schedule, this is the schedule that the, you
9  know, the client wants and the client needs.
10     And then sometimes when I call the client, it
11  is totally different schedule than what the case manager
12  gave me.  So, that's why I always call the client, to,
13  you know, confirm --
14     Q   Okay.
15     A   -- all the information.
16     Q   And is there a contractual agreement between
17  All VIP and the client or All VIP and Medicaid?
18     A   No, it will be All VIP and with I'm talking --
19  I'm sorry.  You meant the client with -- if they have a
20  contract with us?
21     Q   Right.
22     A   Yes.
23     Q   The patients, right?
24     A   Yes.
25     Q   Okay.

Page 48

1      A   They -- um-hum.
2      Q   Is there a separate application that patients
3  fill out when they have -- when they are working with
4  All VIP?
5      A   Okay.  It's called the start of care.  Okay.
6  When I call them, I ask them, you know, let the plan of
7  care, what is it that you're, you know, the client
8  needs.
9      Do they need bathing every day?  Do they need
10  to be fed?  Are they bedridden or, you know, wheelchair,
11  all those questions.  That's the health plan.
12     And then we go with the other plan, which is
13  the hurricane preparedness in case there's a hurricane.
14  Do you need a caregiver during or do you need to be
15  registering a special needs shelter?
16     The other plan is, which is a client -- that's
17  the contract client's agreement, which is if the
18  caregiver drives them, you know, any place like for a
19  Doctor's appointment or anything happens to them, they
20  cannot sue, you know, the aide or the company.
21     Because they requested, you know, for the aide
22  to take them, you know, to do errands or for doctor's
23  appointments.  That's part of client service agreement.
24     Q   Sorry, the -- besides the phone call that you
25  make to the client for the start of care, does the

Page 49

1  patient also sign a document before Care is administered
2  to them through VIP?
3      A   Document and like the application that -- I
4  don't understand what other --
5      Q   Yeah, just --
6      A   What other application.  No problem --
7      Q   No.  Talking about specifically for the
8  patient, let's say -- let's use an example for, one of
9  the Izique, let's say Cesar Izique.  Does Cesar Izique
10  have any written contract with All VIP?
11     A   Just the one I told you, the client service,
12  you know, the -- it's called the start of care where
13  they give me the doctor's information in case of, you
14  know, emergency numbers.
15     Like I had the sister, both sisters name and
16  phone number, all that, they have to give me is called
17  start of care that we have to go through and they -- and
18  I go through the questions over the phone, and then if
19  they --
20     Q   Okay.  Sorry.  And you fill out the start of
21  care information?
22     A   Yes, I fill out the start of care information
23  and I explained to them everything and if they agree,
24  then everything they, you know, they signed, I mailed it
25  to them.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 50..53

Page 50

1    Like this one was during -- say, during the
2 hurr -- the pandemic, I had it to mail it out to them.
3    **Q   Um-hum.**
4    A   If not, we -- I usually go to the client's
5 home and you know, meet them there and go through all
6 that with them.
7    **Q   And then you have the client sign the start of**
8 **care paperwork?**
9    A   The person that has -- the person that's in
10 charge because the clients couldn't sign.
11    **Q   Oh, you mean --**
12    A   It's a person in charge.
13    **Q   Okay.**
14    A   It has a POA.
15    **Q   Got it.  A Power of Attorney.  Right.  Okay.**
16 **And so, does the caregiver also have a contract with the**
17 **client.  So, let's say in this particular case, did**
18 **Ms. Cruz have a separate contract with the Izique?**
19    A   No, not that I know of.
20    **Q   Okay.  So, as far as contracts go, Ms. Cruz**
21 **has a contract with VIP, correct.  That's the 26-page**
22 **application we just looked at?**
23    A   That's correct.
24    **Q   And then separately, the patient or the client**
25 **has a contract with All VIP, correct?**

Page 52

1 able to do it, we tell them you have to clock in and
2 clock out on your phone.
3    There's going to be times that maybe you're
4 not going to have, you know, internet service or you
5 know, can be down.  We always require a time sheet no
6 matter what.
7    Even if you clock in or if you clock out, we
8 have, and it has to be signed by the client or the
9 person that's in charge of the cl -- you know, like they
10 seek us with the daughter.  There's always a time sheet
11 that needs to turn in.  He turn in on Mondays.
12    **Q   And where does that time sheet go?**
13    A   It goes into the client's document a file.
14    **Q   Does any time sheet have to be ultimately**
15 **submitted to Medicare or Medicaid?**
16    A   If they ask aspirate, we have to give it to
17 them.  That's why we keep it on file.  That's -- it's
18 very important to have those time sheets and, you know,
19 have them signed.
20    **Q   How does Medicare or Medicaid ultimately make**
21 **payment to All VIP, what does Medicaid need to --**
22 **does -- is there any document that Medicaid needs to be**
23 **able to make payment for service?**
24    A   That -- I'm not in charge of that part of
25 payroll, but -- so I cannot be like, give you like a

Page 51

1    A   Yes.
2    **Q   All right.  And then All VIP just puts those**
3 **two parties together, meaning the caregiver and the**
4 **patient?**
5    A   That's correct.
6    **Q   Okay.  All right.  Now, after -- who determines**
7 **the hours that a patient can be provided service?**
8    A   In this case is -- in this case, since it's
9 Medicaid, Medicaid gives the authorization.  If it's
10 private, well, it'll be the, you know, the private
11 client.
12    **Q   Are there times when the client wants more**
13 **service in terms of hours, but Medicaid can, says that**
14 **they can't have more?**
15    A   Yes, that happens a lot.
16    **Q   Now, when there is a Medicaid patient, such as**
17 **the Izique, how does billing work, does the caregiver**
18 **have to fill out a certain document that needs to be**
19 **submitted to Medicare?**
20    A   Okay.  This is how it works.  When they come
21 in, we teach them how to clock in and clock out on an
22 app that they have to download on their phone.  A lot of
23 them, you know, are not very computer, you know, savvy.
24    So, we have to go step-by-step to teach them,
25 you know, how it works.  Once that we know that they're

Page 53

1 correct answer if, you know, if they bill weekly or
2 monthly or every two weeks, I can't give you that
3 answer.
4    **Q   Okay.  Are you responsible for overseeing the**
5 **hours that are submitted by the caregivers?**
6    A   Yes, everything that has to do with the hours
7 of the client.  Yes.
8    **Q   So, in this particular case, going back to**
9 **Cruz Valdivieso when was she paired with the Izique?**
10    A   You need the exact date?
11    **Q   No, I just wanted to get an idea, like really**
12 **I was more so trying to find out if the application that**
13 **we looked at is correct.  It seems that she started with**
14 **All VIP on May 3rd, 2021.  That's when she filled out**
15 **her application.**
16    A   Yeah, but she didn't start -- she didn't start
17 that month, but that year, yes.
18    **Q   Okay.  And that's all I'm really trying to**
19 **figure out.  Not the exact date that she was --**
20    A   Okay.
21    **Q   -- paired with the Izique.  I just wanted to**
22 **know, you know, she signed her application with All VIP**
23 **and then about how long after that did she start working**
24 **with a first client --**
25    A   It was the same.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                     Pages 54..57

Page 54

1    Q   -- she was paired with?
2    A   Yeah, it was the same year. It was the same
3  year. Couple months, I say maybe.
4    Q   Were the Izique's the first clients that All
5  VIP paired Ms. Cruz with?
6    A   She had more than one client that was not her
7  first client.
8    Q   Do you remember her --
9    A   First client.
10   Q   Oh, go ahead.
11   A   Yes, I remember her first client. It was in
12  Pembroke Pines last name Alicia Soto. And I'm not
13  mistaken, Soto.
14   Q   Was Ms. Soto a Medicare patient?
15   A   Yeah, she was also on Medicaid, yes.
16   Q   Medicaid. Okay. Now, did Ms. Cruz have any
17  issues with her placement with Alicia Soto?
18   A   Well, according to the client's daughter that
19  they, you know, they really liked during the beginning,
20  but then because of the hours she was very cushy.
21       You know, I need more hours, I need hours, I
22  need hours, you need a call and ask for more hours. And
23  you know, that's, you know, the only thing that I got,
24  you know, from clients, not only the Soto's, but also
25  from the Izique's.

Page 55

1    Q   Okay. So, in Alicia Soto's case, Alicia Soto
2  was the patient and her daughter was her Power of
3  Attorney.
4    A   Yes, that's correct. The daughter was the
5  power of attorney.
6    Q   And you received a complaint from the daughter
7  that Ms. Cruz was being too pushy and asking them to
8  provide more hours for her?
9    A   Yes, that's correct.
10   Q   Okay. Around what time period did you start
11  receiving complaints about -- from Ms. Soto's daughter,
12  about Ms. Cruz?
13   A   I don't -- I think she was there just for a
14  couple months, but towards the end, right before, you
15  know, Daisy or Cruz decided she didn't -- she gave me
16  time to find somebody else for that client.
17   Q   Okay. Now, in Ms. Soto's case was Ms. Cruz
18  the only home health aide providing care for her from
19  All VIP?
20   A   For Soto, yes. For Soto, yes not for the
21  Izique's.
22   Q   And was -- let me be more specific. Was
23  Ms. Cruz the only caregiver providing services on behalf
24  of All VIP to Ms. Soto?
25   A   At that time, yes. We couldn't have two

Page 56

1  caregivers at that, you know, with one client. She did
2  all the hours.
3    Q   Okay. Why couldn't you have two caregivers
4  with one client?
5    A   Why should I? I mean --
6    Q   No, I don't mean at the same time, I don't
7  mean like from --
8    A   Oh.
9    Q   I don't mean from like, oh, from 9:00 to 4:00
10  you have, you know, Cruz and another caregiver. I mean,
11  like, if it was 09:00 to 04:00, did somebody else come
12  in from Florida --
13   A   No, no, no.
14   Q   -- Oh yeah. Got it. And the only thing I was
15  trying to clarify was, okay. I know Ms. Cruz is a home
16  health aide, but did somebody come later that might have
17  been a CNA or --
18   A   Oh, you mean like if she had -- oh yeah, I --
19  okay. I understand you now. Like if she had long hours
20  and then somebody, another caregiver that did another
21  shift.
22   Q   Right?
23   A   No, no this case wasn't like that.
24   Q   Okay.
25   A   The Izique case was, yeah.

Page 57

1    Q   Got it. Okay. After Ms. -- okay. Did
2  Ms. Cruz ever complain about not being paid her hours
3  properly when she gave care to Ms. Soto?
4    A   No, I'm sorry. Let me -- I'm sorry. Let me,
5  correct that. One day she, I guess the client called
6  her to ask if she can do respite hours. Respite hours
7  are extra hours that are given to the client.
8        If a family member needs to, you know, take a
9  vacation or needs to do something personal. Those are
10  extra hours that they're given to the -- to release the,
11  you know, the family member.
12   Q   Um-hum.
13   A   And she called me, she says, they called me
14  and they asked me if I can do these hours. And I told
15  them I'm able to do them. And I said, okay. But do not
16  start until I get the authorization.
17       And this was something that I constantly had
18  to tell her because she didn't understand that she just
19  went by what the clients, you know, told her.
20       So, I said no, the case manager might, you
21  know, tell her that she has certain hours approved, but
22  it doesn't mean that they are, you know, that's what I
23  have on my side. I have to go by the authorization.
24       I told her, "If you work more than those
25  hours, you're not going to get paid." I told her, "You

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 58..61

---

**Page 58**

1   work the hours that I tell you."  She goes, "Okay fine."
2   The next thing, "The daughter told me to stay, so you
3   owe me more hours because the daughter told me to stay."
4           And then I said, "Here we go again."  I told
5   her, "You're not allowed to work over the hours.  You're
6   not allowed to work overtime, I told you, unless we have
7   the authorization."
8           And so, I had to call the case manager, call
9   the family member.  Okay.  And explain to them what she
10  had done, that she worked like, I think it was like
11  maybe four extra hours.
12          And it took, it was -- it's a process.  And I
13  told her, now you're going to have to wait because now I
14  have to ask for another authorization to see if they
15  approved it.
16          Because according to the case -- to the case
17  manager, these were the hours that she had the case
18  manager told the, you know, the family member something
19  else.  It's not my fault.
20      Q   Right.
21      A   I go by what the authorization.  Well, I --
22  she didn't -- to her, it's like speaking to the wall.
23      Q   Okay.  So --
24      A   So, I said, now you, I told her she had to --
25      Q   Got it.  And so, just to make sense of what

**Page 59**

1   you're saying, Medicare or Medicaid is going to
2   authorize a certain number of hours that care can be
3   given to a ca -- a client, correct?
4       A   That's correct --
5       Q   Okay.
6       A   -- Your Counsel.
7       Q   And then sometimes the Power of Attorney in
8   this case, Alicia Soto's daughter said, "I need respite
9   hours," correct?
10      A   Yes.  To the case manager.
11      Q   To the case manager, right.  And I think
12  respite is going to be spelled for the record
13  R-E-S-P-I-T-E.  Is that right?
14      A   That's correct, Your Counsel.
15      Q   All right.  And so, the do -- what was -- do
16  you remember Alicia Soto's daughter's name?
17      A   Well, there was so many of them in here.  It's
18  the party --
19      Q   No, you don't -- you don't have to look at
20  anything if you don't remember.  That's fine -- that's
21  fine.
22      A   No, I don't.  I'm sorry.
23      Q   You don't remember.  Okay.  That's fine.  But
24  either way and what Ms. Soto's daughters was saying is
25  like, "I need my own time for myself, so I need -- I

**Page 60**

1   would like Cruz to work like four extra hours," for
2   example, right?
3       A   Yeah, she didn't say to work the four extra
4   hours.  She would tell, you know, she would tell them,
5   "Oh, I already got the case manager call me and she said
6   that I had such and such hours, you know."
7       Q   Okay.  You're saying Cruz would call you and
8   say that?
9       A   No, the family members of the client.
10      Q   Oh, the daughter would say that.  Okay.  The
11  daughter.
12      A   Yeah.  And then sh --
13      Q   Yeah.
14      A   I'm sorry.
15      Q   But -- no problem.  Sorry because I'm cutting
16  you off now.  But for All VIP's purposes, you only have
17  one authorization for a certain number of hours.  You
18  don't have a second authorization for these respite
19  hours that are being requested?
20      A   Yes, they -- the Medicaid will give us
21  authorization for respite hours, but if they say it's
22  10, it's 10.  They -- they're very specific.  They won't
23  say, 10 hours in two days.  No.  If it's 10 hours in one
24  day, then it's 10 hours in one day.
25      Q   Okay.

**Page 61**

1       A   You know, you can't split them.
2       Q   But either way, you have to get the
3   authorization first before the Home Health Aide works?
4       A   That's correct.  Your Counsel.
5       Q   And you're saying in this case -- in the
6   Soto's case, Ms. Cruz didn't wait for you to get the
7   authorization for the respite hour.  She just worked
8   them and then came to you after and said, "Pay me for
9   them now?"
10      A   Okay.  That's correct.  Your Counsel.
11      Q   Okay.  And then what you have to do is on your
12  end now, you have to go retroactively get the
13  authorization?
14      A   If they authorized.
15      Q   If they authorized it.  Okay.  Got it.  And
16  so, in this case, were you able to retroactively get the
17  authorization from Ms. Soto's respite hours?
18      A   It took a couple of months for them to
19  approve.
20      Q   When the authorization was finally approved,
21  was Ms. Cruz paid those extra hours?
22      A   Yes, I called her myself and I was like,
23  really happy, you know, I said, "Hey, listen, you know,
24  it was approved and those hours will be, you know, paid
25  in your next paycheck", once it was approved.  But at

---

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 62..65

---

**Page 62**

1  that time, this was going on with the Izique case. There
2  was an issue with their schedule.
3       Q   Okay. Got it. So, now let's talk about the --
4  well, let me ask you this. How many clients overall did
5  All VIP pair with Ms. Cruz?
6       A   After she was done with the Soto she had
7  Angela Melendez. And then she didn't really, like that
8  case, said she didn't really deal with that client. And
9  then that's when she started with the Izique's.
10      Q   After the Izique's, did Ms. Cruz work with any
11 other patients for All VIP?
12      A   Not that I can recall. Just Jolanda Izique,
13 Cesar Izique, the Soto's and Angela Melendez.
14      Q   Got it. Okay. Now, I'm just going to go
15 through the same thing with each one. So, let's start
16 with Angela Melendez, were there any -- did Ms. Cruz
17 complain about any payment issues with Angela Melendez?
18      A   With Angela Melendez, she had an issue because
19 she was putting hours that she didn't work.
20      Q   Okay. On her time sheet?
21      A   Yes.
22      Q   How do you know she did not work the hours?
23      A   Because I called the client because it wasn't
24 signed. And this client usually calls me. So, I called
25 the client to confirm if those hours were worked and

---

**Page 63**

1  because I had called it to tell her that all her
2  authorization was -- a couple of hours decreased.
3       So, I also wanted to tell her that. And then
4  she told me, well, she didn't work that day. And I
5  said, "What do you mean?" I said, she has it down here
6  that she worked on Friday, six hours.
7       And lucky she was there -- Cruz was there at
8  the home when I called. And then the client said, "Why
9  did you put that you worked on Friday? You know, you
10 didn't -- you didn't work." And then she quiet. I
11 heard her, she was like, the silent. And then she said,
12 "Oh, I didn't know, I put it down."
13      Q   So, you could hear a conversation going on
14 through the phone on the Melendez --
15      A   Um-hum.
16      Q   Between Melendez and Cruz?
17      A   Yes.
18      Q   Okay. And Ms. Melendez, did she have a Power
19 of Attorney or did you speak directly with her?
20      A   No, directly with her. She's okay to -- she
21 don't have no Power of Attorney.
22      Q   Okay. And was she also a Medicare or Medicaid
23 patient?
24      A   She was Medicaid, yes.
25      Q   Medicaid.

---

**Page 64**

1       A   And she's still our client.
2       Q   Now, how -- so, you're saying that All VIP had
3  a care plan for Ms. Melendez, correct?
4       A   That's correct.
5       Q   That care plan authorized certain hours for
6  Ms. Melendez to receive service?
7       A   That's correct.
8       Q   Ms. Cruz was placed on a schedule to provide
9  those hours to Ms. Melendez?
10      A   That's correct.
11      Q   And on one particular day or certain days, she
12 just did not appear and work the days on the schedule?
13      A   That's correct.
14      Q   But she still put on her time sheet that she
15 did work those days?
16      A   That's correct. She put them in the sheet,
17 worked.
18      Q   And the way that you found out was you called
19 Ms. Melendez to say, "Hey, Medicare is reducing your
20 hours of authorization." And at that time, Ms. Melendez
21 has informed you, "Oh, well Ms. Cruz has not been
22 working these hours."
23      A   No, that day that I went to confirm the time
24 sheet for that Friday.
25      Q   Okay.

---

**Page 65**

1       A   Yeah, and Ms. Cruz knew as well, but I called
2  the client, so the client don't tell her, oh, you have
3  to work it, you know.
4       Q   I see.
5       A   When I called --
6       Q   Yeah, sorry, go ahead.
7       A   But when I called the client, the client told
8  me, "Oh, I already knew. They already called me and I
9  already told Daisy." And I said, "You told Daisy as
10 well?" And she still went ahead and put down that she
11 worked and that's when she confronted her. The client
12 confronted her.
13      Q   I see. So, why did you have a suspicion that
14 Ms. Cruz had falsified a time sheet?
15      A   I had, you know why because I was already
16 watching her because I don't know if I should go into
17 this part or just --
18      Q   No, you should.
19      A   For you to --
20      Q   No, you should. Yeah, listen, because I'm
21 going to go into it anyway. So, I mean, because I want
22 to know why you had a -- I just want to know why you
23 thought the time sheet hours were not correct. So,
24 that's what we're getting?
25      A   Yeah.

---

Page 66

1    Q   Yeah.
2    A   Okay.  She was not clocking in and out and she
3  was -- she's supposed to clock in and out, so you know,
4  I always had to hear this excuse, oh, it doesn't work --
5  it doesn't work.
6        I said, "But every day it doesn't work." I
7  said, "There's on the Izique's I have all the caregivers
8  there and they're clocking in and clocking out."
9        So, at that time, Daisy she was very
10 frustrated because she told me she had a debt of a
11 $40,000 and she needed to work.  I said, "I understand,
12 but your hours are overlapping.  You -- how can you work
13 more than 24?
14       There's 24 hours in one day and you're putting
15 in more hours." I said, "You need to clock in and clock
16 out because this is going to cost issue with payroll."
17 Everything was explained to her, and you know, it is
18 just like she didn't understand.
19       She was just so -- she had so much stress
20 because of that debt that she had all that, that's all
21 she kept talking about.  And you know, I was trying --
22    Q   No, sorry, I'll let you continue.  Yeah.
23    A   So, when the caregiver that was there, okay.
24 There was a new caregiver that went in and told me,
25 well, she's -- she says, "I'm going to tell you the

Page 67

1  truth, she is leaving early when I -- you know, by the
2  time she's supposed to stay here, those hours when I
3  come in, she leaves before time."
4        So, when I started, you know, putting two and
5  two together, she was putting a lot of hours on her
6  time.  She was not clocking in.  Melendez was telling me
7  she was, you know, that, you know, she put hours that
8  she didn't work.
9        So, that's when we -- I started, you know,
10 doing a little bit of investigation on my side because
11 she kept complaining.  So, when I told her, I spoke to
12 the daughter and I said, the -- because the daughter was
13 also concerned, you know, "They're not paying me the
14 hours that I'm working."
15       And you know, and Izique's daughters were
16 like, "Oh my God, you know, she's going to leave and I
17 can't be without a caregiver and I need her because she
18 already."  You know, she had -- I don't know like the
19 word to use, but she bribed them, you know, like, oh,
20 you know.  "I'm going to leave if you don't take care of
21 this."
22       She was putting all the burden to the client
23 and I told her, "That's not the client's, you know,
24 business you need to call us.  They don't do payroll for
25 you." And I said, "You know, you can't give the client

Page 68

1  the stress." I told her.
2        And then, it came out to be, when I spoke to
3  one of the other daughters, she was putting all these
4  extra hours because some hours were being paid
5  privately.
6        And then it slipped on one of the daughters
7  that when, you know, spoke to me, she goes, "Oh, she was
8  not supposed to put those hours there.  Oh, I'm sorry.
9  Well, I need to speak to her.  I already told her, you
10 know, the hours that are private and the hours that are
11 with you."
12       And that's when everything had exploded, you
13 know, with the --
14    Q   Okay.  Now, when you're talking about the
15 daughters, you're talking about the Izique's daughters?
16    A   Yes, I had Anna and Susana.
17    Q   Okay.  And Anna's going to be Anna Marie
18 Roland.
19    A   Yeah, I have her as Izique.
20    Q   Izique.  Okay.  So, let me -- let's backtrack
21 a little bit because when you are talking, I think
22 you're kind of, you know what happened, but I don't,
23 so --
24    A   Okay.
25    Q   I think you are sort of like, combining

Page 69

1  everything together and I need to break it out a little
2  bit.
3    A   Okay.
4    Q   Let's talk about the debt.  When did Ms. Cruz
5  first start telling you about this $40,000 debt she had?
6    A   She's like a couple of months later that
7  she's -- when she was still with the Soto's.
8    Q   Okay.  But not like when she immediately came
9  in to apply for a job with All VIP, she just --
10   A   No, she didn't.
11   Q   Okay.
12   A   No, she didn't tell me that like that on the
13 first.
14   Q   And when she started mentioning the debt to
15 you, was this in-person in the office or was she telling
16 you over the phone, how did she communicate it?
17   A   She told me when she started.  Remember I told
18 you in the beginning that she used to come constantly,
19 you know, to see if we have any other cases or to bring
20 her time sheet.  That's when she told me over the phone
21 and on in-person, both.
22   Q   Did she say what -- did she say what the debt
23 was for?
24   A   Yes.
25   Q   What was it for?



Page 70

1     A   Dental work.

2     Q   All right.  And so, how often would she
3  complain about that $40,000 debt?

4     A   Every time that, you know, she have
5  overlapping in her hours, you know, and I'm very, you
6  know, when it comes down to the aides getting paid every
7  Friday, I'm very responsible with that.

8         I want them to get paid and to get paid for
9  what they work for.  Okay.  She was the only issue
10  because she was putting hours that she didn't work, so
11  it was overlapping.

12        I couldn't put any more hours in there.  So,
13  this is when you know, oh, she's, "Ah, I need to pay the
14  debt."  You know, "You guys are not paying me," you
15  know, "All my hours."  You know, that's when she started
16  getting a little bit frustrated.

17     Q   When you confronted Ms. Cruz about overlapping
18  hours, was her response that she did not put down
19  overlapping hours or she just said, "I have to pay my
20  debt?"

21     A   No, she said, "Oh, I worked it", like really
22  upset.  "I worked those hours and you need to pay me and
23  if you don't pay me, then I'm going to have the client's
24  family to pay me."  And she was doing that to the Mel --
25  to Ms. Melendez too.  She was threatening Melendez.

Page 71

1     Q   Okay.  Ms. Melendez was the second person that
2  All VIP paired --

3     A   Yes.

4     Q   -- Ms. Cruz with?

5     A   Yes.

6     Q   Okay.  And she -- Ms. Cruz worked with Ms.
7  Melendez for about how long, in months?

8     A   For a couple months, I'd say.  She was on --
9  I'd say maybe three months steady like that.  Maybe like
10  three months.

11     Q   Okay.  When did you start noticing issues with
12  the overlapping hours when Ms. Cruz was given care to
13  Ms. Melendez?

14     A   No, there was no overlapping with Melendez.  It
15  started off with the Izique's --

16     Q   With the Izique?

17     A   That's when everything started.

18     Q   Okay.  And when you say overlapping hours, you
19  were saying that the only way she could have overlapping
20  hours is if she was working with another patient for All
21  VIP, correct?

22     A   Well, she had three clients.  Remember she had
23  three clients, and when she decided to go full-time with
24  the Izique's she, you know, she didn't no longer work
25  with Melendez.  She --

Page 72

1     Q   By three clients, you mean, Cesar Izique,
2  Jolanda Izique and Ms. Melendez?

3     A   Um-hum.

4     Q   Just for the record, you have to say yes, but
5  that's, yeah.  So, I'm going to -- I'm just going to
6  repeat that question.

7         When you say Ms. Cruz had three clients, you
8  mean Cesar Izique, Jolanda Izique, and Ms. Melendez?

9     A   That's correct.

10     Q   Now, Cesar Izique and Jolanda Izique were in
11  the same household?

12     A   Cesar and Jolanda were in the same household.

13     Q   When Ms. -- do they have -- does Medicare
14  consider them as separate patients for authorization
15  purposes?

16     A   That's correct.

17     Q   So, when Ms. Cruz is providing care to the
18  Izique's, how is she supposed to bill that time because
19  isn't she there with them together at the same time?

20     A   Okay.  So, this is how it works.  She -- let's
21  say that Jolanda has, I think Jolanda had less hours.

22        So, let's say Jolanda had four hours, you
23  know, she worked there 9, 10, 11 to 12.  And then after
24  that she will work with Mr. Izique.  So, that's -- that
25  authorization is for that client.

Page 73

1         But she -- there was more than one aide there.

2  It was not just Ms. Cruz, there was also other aides,

3  two more aides there.  So, that's how it was --

4     Q   Same time.

5     A   -- split.

6     Q   At the same time?

7     A   At certain days of the time, yes like in the
8  morning one will be there.  I have to schedule one here.

9     Q   Okay.  Let me see if I can bring it up because
10  I think I have --

11     A   Because they had a lot of hours, she didn't
12  work the whole hours.

13     Q   Okay.  Let me do this.  I'm going to make what
14  I call Exhibit B.

15         (Thereupon, Plaintiff's Exhibit B was entered
16          into the record.)

17  BY MR. CUMMINGS:

18     Q   And let me see if this helps you explain what
19  I'm talking about because I already have a document.  If
20  not, then, you know, you can let me know.  Can you see
21  the document I'm showing you on my screen right now?

22     A   Yeah, that's the one I sent off, yes.

23     Q   Okay.  Got it.  All right.  So, if you can, I
24  guess just explain this to me.  So, at the first, let me
25  just explain what this is.



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 74..77

Page 74

1        I'm looking at a document, an Exhibit B that
2   says HHA Exchange and the top left-hand corner.  And in
3   the middle it says, Patient Calendar.
4        There's a patient name circle that says,
5   Izique A. Cesar.  And this is a eight page document and
6   it just says like a lot of green boxes that look like a
7   schedule.
8        So, Ms. Ramirez, looking at this first page,
9   can you please explain what I'm looking at here?
10   A   Okay.  Those are the hours.  If you see it
11   says 3 o'clock to 5 o'clock in the morning.
12   Q   On Friday, the first?
13   A   Yeah, if we're looking at Friday the first.
14   Q   Right, for July.
15   A   Let me find that one.  If you could go up a
16   little, please?
17   Q   Now, when you say -- yeah.  Okay.
18   A   Yeah, like that.
19   Q   All right.
20   A   Okay.  Because automatically -- the system
21   will automatically change the hours.  So, let's say if
22   I -- if it's a 24 hour case, right this one is divided
23   with Monica.  Monica did the night shift.  You see where
24   it says Monica Murphy?
25   Q   Yes.

Page 75

1   A   If I'm not mistaken, she went in, there was
2   times she went in at 8 o'clock and left at 05:00 in the
3   morning.
4   Q   Okay.
5   A   And then Valdivieso will come in at 09:00.
6   Q   So, let me just ask a couple of questions.  And
7   this might help when we look at the July patient
8   calendar for Cesar Izique because that's all, this is
9   for just Mr. Izique, correct?
10   A   Mr. and Mrs. Izique, yes.
11   Q   Okay.  Now, when I go back up one page to the
12   top, it's -- there's only one patient name though.  So,
13   for right now, we're just looking at the patient
14   calendar from Mr. Izique, right?
15   A   Yes, that's correct.
16   Q   Okay.  And then I see your name as the
17   coordinator.  So, does that mean that you are the one
18   that's coordinating the care between Medicare and the
19   patient?
20   A   That's correct.
21   Q   Okay.  Now, what I want to ask you about is
22   where it says last three authorizations and it says
23   Humana and Parenthesis, RGA.  What does that mean?
24   A   The Humana.
25   Q   Right.

Page 76

1   A   Or the RGA?
2   Q   Well, I know Humana's a Health insurance
3   agency, but are they the one that's administering the
4   Medicare policy?
5   A   Yeah.  If you see RGA, it will be like us, our
6   office, you know.  And then because Brower is BWD, it
7   automatically gives a code.  Humana is the insurance.
8   This is the authorization, and as you can see, it gives
9   you a service code.
10       The T1019 is personal care companion and
11   homemaking at the bottom where it says, Max, those are
12   units.  They're not counted as hours, they're counted as
13   units.
14   Q   Okay.  Got it.  And so, PCA stands for
15   Personal Care?
16   A   Yes.  PCA is personal care.
17   Q   CONP.  What does that stand for?
18   A   Companionship --
19   Q   Okay.  And then --
20   A   Companion.
21   Q   HMK?
22   A   It's Homemaking.
23   Q   Homemaking.  What services was Cruz Valdivieso
24   providing to Mr. Izique?
25   A   All of them.

Page 77

1   Q   All of them?
2   A   All the -- yeah, all caregivers have to do all
3   three.
4   Q   All three.  All right.  And now when we go
5   down, and so the max, you've mentioned max units, and
6   that says NA, but when we go over to the column that
7   says Max, what Medicaid authorized was 285 hours for
8   personal care?
9   A   Yeah, that's units.  Those are not hours.
10   Q   Oh, units.  Okay.  I see Units.
11   A   Yeah.
12   Q   Okay.  And then how do units break down in the
13   hours?
14   A   Four units, it's one hour.
15   Q   Four unit.  One hour.
16   A   And.
17   Q   Okay.  I see.  Okay.  Now -- and so now what
18   your job is because Mr. Izique has 24-hour care, you
19   have to determine which All VIP providers are going to
20   give this care on a rolling basis?
21   A   That's correct, Counsel.
22   Q   Okay.  And then you come up with -- so the
23   schedule that we're looking at with all of these green
24   boxes, you created that schedule?
25   A   Yeah, I create the schedule according to what

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 78..81

Page 78

1  the client -- the schedule that the client gives me. So,
2  if she wants them to start at 07:00, then at 07:00, you
3  know, it's the clients, it's according to what the
4  client needs are what they want.
5    Q   Understood. Okay. And so --.
6    A   I don't make up the schedule -- I'm sorry.
7    Q   Okay.
8    A   I don't make up.
9    Q   You don't make up the schedule. You just --
10  well, the client says, okay. I need somebody from this
11  hour to this hour and then you're not --
12   A   And then I --
13   Q   Sorry, go ahead.
14   A   To input -- and then my job is to input it in
15  the -- what you see right here.
16   Q   Let's look at Friday, July 1st here, this one
17  column. We see that Ms. Cruz, what does the S stand
18  for, the S here next to 03:00 to 05:00.
19   A   When it's billed. And when it's not billed,
20  it's the B stands for when it's billed hours --
21  services, I'm sorry.
22   Q   Services.
23   A   Services, and when you see the bill is when
24  it's the B is for when it's billed.
25   Q   Billed. Okay. And are you referring to

Page 79

1  something on your computer to get that answer?
2    A   No, because I have the paperwork right here,
3  the same thing you have.
4    Q   Okay. But how'd you just find out what
5  services meant?
6    A   What do you mean, how did I find out?
7    Q   Well, when I asked you first what estimate it
8  looked like, I thought you looked at something to find
9  out that it says --
10   A   No, I have my paperwork here. No, because
11  right now I'm working with two system and it's totally
12  different from -- I'm working still with HHA, but we're
13  switching to Caresmart. So, I have my -- with two
14  different settings now. Okay.
15   Q   But that --
16   A   Yeah, that service and when need for -- is for
17  billed.
18   Q   Okay. Got it. All right. So, what it means
19  is that Ms. Cruz provided the service from 03:00 to
20  05:00 and two hours were billed?
21   A   It'll show billed when you see a green like
22  that. So, you see when it's green like that?
23   Q   Um-hum.
24   A   I can see where it says -- it'll say Billed.
25   Q   Billed. Okay. Now, on this particular day,

Page 80

1    Friday, July 1st, it looks like Ms. Cruz was here from
2    03:00 to 05:00, 05:00 to 06:00, 06:00 to 08:00. And
3    then at 12 o'clock, a different caregiver came named,
4    Janilanda. Is that right?
5    A   Yeah, that's Jenny.
6    Q   Okay.
7    A   But if you go up, because you see it breaks it
8  down, she -- because if you put 8 o'clock, if she
9  started at -- Valdivieso, if she started at 6:00, you
10  said 06:00 to 08:00, you see.
11   Q   Right.
12   A   It doesn't mean that sh -- you know, she's
13  went in at 3 o'clock in the morning. I don't know if I
14  explained myself, if she went in at 6 o'clock at night,
15  the system automatically put the later time on the top.
16   Q   Well, where it says 03:00, does that mean --
17   A   At --
18   Q   3 o'clock in the morning?
19   A   3 o'clock in the morning, yes.
20   Q   3 O'clock in the morning. Okay. And then --
21   A   So, yeah.
22   Q   So, she would've got there at 3 o'clock in the
23  morning that day?
24   A   No, so that as you see how it, the bottom says
25  06:00, but you see on the top it says 3 o'clock in the

Page 81

1  morning --
2    Q   Right.
3    A   -- and at the bottom, you see it says 6.
4    Q   Right.
5    A   So she -- there was times she went in at
6  6 o'clock in the morning and there were other times that
7  she went in at 8 o'clock at night and will do 8, 9, 10,
8  all the way till 5 o'clock in the morning.
9    Q   Okay. So, are you saying on this particular
10  day that she -- let me ask you this, what time did
11  Ms. Cruz start providing service to the Izique -- Cesar
12  Izique on Friday July 1st?
13   A   Can you go up?
14   Q   Up.
15   A   Okay. No, the way you had the whole thing
16  where I can see the whole thing --
17   Q   Right.
18   A   There you go. So, she started in the morning,
19  06:00 to 08:00 in the morning, and then the au --
20  because these are divided into authorizations, 06:00 to
21  08:00, 05:00, she ended, she started at 06:00, ended at
22  05:00.
23   Q   Started at 6 --
24   A   And 6, then when you see 5, 6, 2, 3, 4, 5, she
25  did 5 hours starting at 06:00.



877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                                    Pages 82..85

Page 82

1    Q    But I don't get it, it seems to me that
2  she's -- so what's this 03:00 in the morning at the top
3  then what does that mean?
4    A    What do you mean, what does that mean?
5    Q    Well, I mean, you're saying she started at
6  06:00 in the morning then what does it mean then?
7    A    06:00 in the morning because it goes by
8  authorization 06:00 to 08:00, so were there two hours --
9    Q    Okay.
10   A    So, that means there's something, it rolled
11 over where's -- I need the other part of that one what
12 day was that, July.
13   Q    It says, I'm just looking --
14   A    The calendar -- if you see the calendar.
15   Q    Right.
16   A    That was July, so I need June because
17 sometimes when it's like if she goes in Thursday at
18 08:00 at night and she ends and she finishes the next
19 day, Friday at 05:00, it rolls over to the next day.
20   Q    I see what you're saying, so basically what
21 you're saying is, okay.  Like June 31st would've been
22 that Thursday before.
23   A    Yes, and then the hours after midnight it
24 rolls over to the following day.
25   Q    I see, okay.  So, basically she was there June

Page 83

1  31st at 3 o'clock in the morning.
2    A    No, so that means she was there probably
3  Thursday that's what I need for June, let me -- I have,
4  okay.  Let me see if I have it here.
5    Q    And I apologize there's no June 31st, there's
6  only June 30th.
7    A    June, the following.
8    Q    So, let's say Thursday was June 30th and 2022,
9  was she working on Thursday June 30th.
10   A    Okay.  Let me see give me one second, okay.
11 There you go, if you go to the bottom, I don't know if
12 you have it on yours, I don't know why it didn't go, but
13 if you go to -- I have the same calendar, if you have
14 this one it has the same hours.
15   Q    Just for the record, can you please just tell
16 me what you're showing me what's at the top?
17   A    It's the same thing, but it's the whole
18 calendar it shows that the time which she started, so
19 that way you can understand that 3 o'clock in the
20 morning and the 5 o'clock in the morning, you know, so
21 that way you can understand what time she started that.
22   Q    Okay.  Now, what hours did Jenny work on that
23 day on Friday, July 1st.
24   A    So, that means she probably did 9 to 5,
25 09:00 p.m. to 05:00 a.m.

Page 84

1    Q    Who did?
2    A    Daisy.
3    Q    What hours did Jenny work that day?
4    A    Jenny worked 08:00 a.m. to 12:00.
5    Q    Okay.  But that's -- so in one day there are
6  two different All VIP caregivers providing service to
7  Mr. Izique, right?
8    A    That's correct, and then a third when the
9  hours were when Daisy decided not to just do less hours
10 then a new caregiver came.
11   Q    And that was Monica?
12   A    No, because Daisy -- what happened is that's
13 why you see the calendar different Daisy, like at
14 5 o'clock in the morning, 09:00 to 05:00 or because
15 sometimes she covered Monica.
16        If Monica was out, then she did the Monica's
17 schedule, but that was not her regular schedule that
18 was -- this will kind of you see Murphy 5 o'clock in the
19 morning let me go into that one what month is that?
20   Q    I have this as going back up to the top of
21 Exhibit B, I have this as July 2022.
22   A    No, it says 11:15, right or no, is it July?
23   Q    July.  I see report date, but I don't know
24 what that means this says the care is being provided for
25 July so I don't.

Page 85

1    A    I just want to be in the same page as you so
2  that way I have both pages, you know, not just the first
3  there all the way to the bottom.
4    Q    All right.  Well --
5    A    I mean she did cover, she that's why you see
6  it like in -- you know, all like that, but that was not
7  her permanent case -- permanent hours, her permanent
8  hours were after Jenny.
9         After Jenny left, then she took the case and
10 after she left, approximately 9 o'clock that when Monica
11 came, Monica did 09:00 to 05:00 a.m.  That was Monica's
12 schedule 09:00 p.m. to 05:00 a.m.
13   Q    All right.  Do you have an example of Ms. Cruz
14 submitting overlapping hours?
15   A    I can't put them here because it's not going
16 to let me schedule it, you know, so you can't see the
17 overlapping because it's not going to be recorded.
18   Q    Right.
19   A    It's just going to --
20   Q    I don't mean -- yeah, I don't mean in the HHA
21 exchange sheet that we were just looking at in Exhibit
22 B, because you are inputting the hours for the
23 caregivers in HHA exchange, right?
24   A    That's correct.
25   Q    Okay.  And so, the time sheets would show



UNIVERSAL COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                                    Pages 86..89

Page 86

1  where overlapping hours are, right?
2      A   No, the system.
3      Q   Well --
4      A   The system will show because she was --
5  remember she was putting extra hours in her time sheet
6  saying that she worked those extra hours.  So, I was
7  going according to the authorization, and that's when
8  I'm like, "But no, I can't put those extra hours."
9        So, remember it was two clients, so I
10 constantly had to divide, tell the family member, your
11 dad had -- your mom had 71 hours or your dad has, you
12 know, 50 something hours.
13       So, you know, I constantly had to tell that
14 authorization is separate from your mom's authorization.
15 But what happened was the confusion came when she
16 started putting extra hours on her time sheet and then
17 that --
18     Q   Is the authorization given per month?
19     A   No, authorization usually it depends six
20 months to a year and it could change -- you know,
21 author -- the authorization was increased by a few hours
22 for the Izique's and that's when we decided to -- you
23 know, add another caregiver.
24     Q   How does All VIP get paid by Medicaid?
25     A   In what way like how, like so deposit or check

Page 87

1  or --
2      Q   No, that's a good question, but let me try to
3  break this down.  When a Medicare case manager calls you
4  and says, "I have this patient," at that time then a
5  care plan is created and the authorization is given for,
6  let's say, six months.
7        So, does Medicaid pay All VIP for six months
8  in advance or does Medicaid --
9      A   No.
10     Q   Okay.  Yeah, so explain what has to be
11 submitted to Medicaid or to Humana or whatever the
12 company is in order for All VIP to get paid.
13     A   That will be a good question for Liz to
14 answer, but as I'm aware an invoice is -- you know, it's
15 printed out and it is sent, you know, everything is done
16 electronically, so I'm pretty sure an invoice is sent to
17 Medicaid.
18     Q   Okay.  Understood.  And that invoice is based
19 on the hours that the caregivers are submitting through
20 their time sheets?
21     A   The hours that they actually worked that's
22 correct, not hours that are not, you know --
23     Q   Authorized.
24     A   Yes.
25     Q   Okay.  So, you don't deal with submitting

Page 88

1  invoices to Medicaid or to health or private health
2  providers?
3      A   I only billed a private one and I only have
4  one and that one is faxed, I do the invoice -- you know,
5  time sheet is sent and I print out the invoice and fax
6  it over.
7      Q   Okay.  And do the healthcare providers require
8  that the time sheet be provided with the invoice?
9      A   No, they have no access to the invoices no,
10 the care providers?
11     Q   No, not the care provider not like Ms. Cruz or
12 Jenny or whatever what I'm saying is the healthcare --
13     A   The care -- us, the healthcare provider, the
14 agency, okay.
15     Q   The agency, right like so the Medicaid do they
16 require that the caregiver's time sheets be submitted
17 with the invoice?
18     A   No, but they do require for us to keep it in
19 the client's file.
20     Q   Okay.  Because they may do an audit and they
21 might want to see it later.
22     A   Exactly.
23     Q   So, essentially whatever hours are submitted
24 in an invoice to Medicaid, they just take -- you know,
25 on face value that those are correct.

Page 89

1      A   Exactly.
2      Q   I see.  All right.  Now we talked about Ms.
3  Melendez, and that's when Ms. Cruz started complaining
4  about the debts and that's when you started noticing
5  issues with overlapping hours, or you only noticed that
6  she was overlapping hours with the Izique's?
7      A   No, I noticed her doing the overlapping hours.
8      Q   With which client --
9      A   She was like -- with the Izique.
10     Q   Just with the Izique?
11     A   Yes, and like I said, it was because she was
12 putting the hours, the private hours that she was doing
13 with them, putting them in the time sheet, and she was
14 making the math.
15       And the thing is that she made the time sheet
16 and then she'll make it like corrected, like, you know,
17 okay.  This is the according to the authorization, but
18 she still had in her head the hours that she had
19 privately, like she added all that "How much I'm going
20 to get paid."
21     Q   Let's talk about the --
22     A   And that's what she expected.
23     Q   Let's talk about the private hours when we say
24 private hours, did she have a separate arrangement with
25 the Izique's daughters that you pay me and then I'm just

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 90..93

Page 90

1  going to stay these extra hours and work, is that what
2  you mean?
3      A   I found out they're not allowed to do that, I
4  found out after the end of all this, after I told her,
5  "We don't owe you anything, everything shows that we
6  paid you all the hours."
7      And she said, "No, I work you owe me three
8  hours on this day you owe me" and I said, "But show me
9  where I said," and that's when she told me.
10     Q   That she was working private hours?
11     A   Yes.
12     Q   But when you say private hours, does that mean
13  that there's an insurance company involved --
14     A   No, that the daughter was paying out of her
15  pocket.
16     Q   Just paying out of pocket?
17     A   Yeah, her daughter was paying out of pocket
18  and they're not allowed to do that and it slipped and
19  it -- and I told the daughter.  She said that -- you
20  know, she's a little bit confused because, you know,
21  she's counting the private hours that she said that you
22  pay her extra like three hours extra.
23     And that's what she always complained about
24  three hours, you know, extra and she says it's because
25  you are giving her private hours.  She goes, "I told her

Page 91

1  that oh my gosh, she's not supposed to say that I told
2  her that not to write those hours on her time sheet.  I
3  already explained to her."
4      Q   Okay.  And so let me give an example, so we
5  are on the same page on -- you know, let's -- I'm just
6  going to make up a day, right?
7      July 5th Ms. Cruz is supposed, she's
8  authorized by Medicaid and through All VIP to work an
9  eight hour shift, right.  So, she works that eight hour
10  shift, so now she has on her time sheet eight hours that
11  she's supposed to be paid for, correct?
12     A   Yeah, eight hours if she -- yeah, the
13  authorization says eight hours, that's how much she
14  needs to get.
15     Q   But your understanding is that now she had a
16  separate side agreement with the Izique's daughter to
17  work private hours.  And so if she worked an extra three
18  hours, now she made a separate arrangement and she got
19  paid three hours by them.
20     Now you said she wasn't supposed to do that,
21  who says that she's not supposed to do that?
22     A   Well, in the contract she knows, and she knows
23  because I told her specifically you know, you -- and
24  plus the client is well known that they can't do that.
25     So, she knows it specifically because I told

Page 92

1  her before she started the case and she's on the
2  contract.  She knows because I explained it to her and
3  not only that, I told her verbally and she says, "It --
4  you know, it slipped.
5      Q   Right.
6      A   They had secretly and it just slipped.
7      Q   So, by the private work that was being done,
8  is that a violation of Ms. Cruz's contract with All VIP?
9      A   Yes.
10     Q   And then on the client's side, did the client
11  violate their con -- meaning via Izique's daughter, did
12  she violate her contract with All VIP?
13     A   Yes, well she -- yes, she knows that she's not
14  supposed to do private.  They know.
15     Q   Okay.  And then from a Medicaid standpoint, is
16  there a violation of any kind of state or federal laws
17  because of the private hours that were being worked?
18     A   The thing is, if she's hired somebody else
19  that's not from the agency that's a -- you know, they
20  can do whatever they want.
21     Q   I see.
22     A   So, if it's one of our -- you know, of -- you
23  know, one of our contractor because they're independent
24  contractor, then yes, because -- you know, they have to
25  let us know.

Page 93

1      Q   I see.  Got it.  Because essentially what
2  they're doing is they're cutting All VIP out of the
3  payment process, right.  If Ms. Cruz is working private
4  hours with the Izique's then All VIP doesn't get a cut
5  of that money.
6      A   And another thing that has to be is very
7  important if she's there privately and we don't know,
8  okay.  Let's suppose that -- you know, with us, she's
9  there eight to five, an example and the Izique's paying
10  her privately 03:00 to 08:00.
11     Okay.  03:00 in the morning to 08:00 and she's
12  doing that privately something happens to the client,
13  what are they going to say All VIP is responsible
14  because she's my caregiver you know, so that's -- you
15  knows, that's a liability --
16     Q   It a liability problem, there's a --
17     A   It's a liability -- I see her more as a
18  liability billing --
19     Q   Right.
20     A   Because if something happens, what is the case
21  manager going to say --
22     Q   Right.
23     A   Because those authorization hours in the night
24  because they couldn't use the hours however they like,
25  they could use it -- you know, whatever time and you

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 94..97

---

Page 94

1  know, the case manager's going to say, "Hey, you know
2  what happened here?"
3     Q   Right.
4     A   "What am I going to say, you know, but she
5  started at eight I don't know what happened, what she's
6  doing there at that time."
7     Q   Got it.  And so if a caregiver is providing
8  service during unauthorized times then whatever happens
9  is not going to be covered by All VIP's Insurance.
10    A   And not -- I'm pretty sure as well as, they
11 have to have their own liability as well the caregivers.
12    Q   Caregivers that they have their own liability.
13    A   Yeah.
14    Q   Okay.
15    A   Yeah, we do -- we have our liability, but they
16 have to have their own liability because they're
17 independent contractors.
18        Something happens, you know, the client cannot
19 sue her she has insurance.
20    Q   I understood.  So, let's say Ms. Cruz is
21 working during the unauthorized hours and something
22 happens to one of the Izique then the lawsuit should be
23 against Ms. Cruz and not All VIP.
24    A   That's correct.
25    Q   But what if Ms. Cruz is working authorized

Page 95

1  hours and something happens to one of Izique's because
2  she has her own insurance with the Izique's still just
3  sue -- Ms. Cruz anyway?
4     A   Yes, well -- yes, but we're still liable with
5  Medicaid because Medicaid is going to say, did you give
6  them those extra hours what happened here, they're going
7  to do a report.
8     Q   I see.  I understand.
9     A   No, matter what they're going to do a report
10 because it's according to authorizations, the hours.
11    Q   Okay.  Now let's talk about the pay because
12 I'm not sure you answered the question I asked before
13 when -- if Ms. Cruz is making $13 an hour, the amount
14 that she's paid is coming from the Medicaid
15 authorization?
16    A   That's correct.
17    Q   Okay.
18    A   Medicaid, yes.
19    Q   How does All VIP make a profit if they're
20 paying Ms. Cruz $13 an hour is medic -- is All VIP
21 billing Medicaid let's say $15 an hour or something.
22    A   Okay.  I see what you're saying I'm sorry, I
23 didn't quite understand the question.  Okay.  So, we
24 have Medicaid gives us a pay -- a certain amount pay
25 rate.  So, let's say right now an example, if Medicaid

Page 96

1  pays $20 to the agency an hour then from those $20 we
2  pay the caregiver.
3     Q   Understood.  Okay.
4     A   But at that time -- I'm sorry, at that time it
5  was less than $20, I'm just giving you an example.
6     Q   No, I get it that's the example, so like if
7  it's $20 and this cruise is getting 13, then All VIP is
8  getting the other $7 per hour.
9     A   Yeah, and at that time it was less, now it's
10 $20 I -- as I know it's $20 --
11    Q   Right.
12    A   So, that's why the caregivers are getting paid
13 15.
14    Q   15, and so then All VIP clears that the five
15 per hour for each caregiver?
16    A   That's correct.
17    Q   That's correct.  Okay.  All right.  And then,
18 does All VIP pay travel time for to the independent
19 contractors or to the caregivers?
20    A   No, travel time I explained to the -- that's
21 one of the things that we explained clearly to the
22 caregiver and also to the client.
23        If they want the caregiver to take the client
24 to a doctor's office or to do errands they know they
25 have to pay for the gas because Medicaid do not pay for

Page 97

1  gas --
2     Q   Okay.
3     A   They don't give us gas money.
4     Q   Do any private insurers pay for travel time
5  for caregivers?
6     A   Not that I know of, no.
7     Q   All right.  And so because of that then
8  independent contractors are told that you have to cover
9  all of your expenses?
10    A   Not that -- not if they have to take the
11 client somewhere you know, they have to make an
12 agreement you know, like I said, I call the family
13 member or whoever's in charge of client.
14        And I tell them if she has to go your know, to
15 the store or you know, you guys have to give her gas
16 money if it's around the corner you know, they just do
17 the favor they don't ask for forgive money.
18    Q   Right.  But, outside of the time that
19 authorized hours of being worked, let's say for example,
20 okay.  If Ms. Cruz has to be to the Izique house at
21 3 o'clock in the morning, she does not get paid for the
22 time from her house to the Izique's house that travels?
23    A   No, travel time.
24    Q   And no caregivers are paid for any travel
25 time --

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 98..101

Page 98

1    A    Travel time.
2    Q    -- to and from the patient's home?
3    A    No.
4    Q    Okay.  All right.  Because if you paid for
5    that travel time, then that would eat into the profit
6    that All VIP is making, correct?
7    A    Of course.
8        MR. GOLDBERG:  Object to form.
9    BY MR. CUMMINGS:
10   Q    Okay.
11   A    Yes.
12   Q    All right.  So, I think we covered Ms. Soto,
13   we covered Ms. Melendez, and then we covered the
14   Izique's and you said those were the only people that
15   she saw -- just give me a second.
16   A    Okay.  And when you're done, can I also say
17   something?
18   Q    No, you can go ahead and say it now.  Go ahead.
19   A    Okay.  This is what last day I spoke to Anna
20   Maria or both of them, they were both on -- they always
21   on two -- one three way, we always did it like a three
22   way.
23   Q    The Izique's daughters?
24   A    Yes, Anna and Susana, they told me that they
25   felt very bad and sorry for you know, for Daisy or for

Page 99

1    Cruz, that they felt very sorry that she went there
2    crying, saying that we didn't want to pay her.  And I
3    said, what do you mean I told her to go pick up the
4    check so she says, why wouldn't she go pick up the check
5    because she knew that she was wrong.
6        She was putting hours that -- you know, like I
7    said in the beginning so the Izique's told me that they
8    were going to pay her because she kept threatening them,
9    "You are going to pay me, you need to pay me." So, they
10   felt you know, oh, my gosh, she's going to leave I need
11   her for my parents, "You're going to pay me."
12       So, the Izique told me that they were going to
13   pay her $1,000, okay.  Then that they were going to
14   sue us so we can pay her the $1,000.  So, they gave --
15   the a Cruz a $1,000 when Cruz didn't want to go pick up
16   the check -- a paper check, you know, she didn't want to
17   pick it up so then --
18   Q    Go ahead.
19   A    Yeah, and I said -- and I told her, you know,
20   we -- it's not that we don't want to pay you, I told you
21   to go pick up a check because once we have to fix the
22   authorization, like I said with Soto, I told her you --
23   it doesn't, you don't get it Friday, like the next day I
24   told her.
25       So, she asked the Izique's to pay her she

Page 100

1    threatened also Melendez to pay her and I said pay her
2    what, and also to threaten to come, ask for her social
3    security, her ID, so she can testify in Court.
4        And she goes "I'm not going over there to
5    testify for what."
6    Q    Ms. Melendez said that?
7    A    Yes, Melendez told me.
8    Q    Okay.  Was --
9    A    That she did that.
10   Q    Was Ms. Cruz working private hours for
11   Ms. Melendez also?
12   A    No, she was not working private hours, but
13   she -- I don't know what she told her that to pay her
14   she never had private hours with Melendez.  Melendez
15   will never pay for private hours.
16   Q    So, Ms. Melendez was on -- I'm sorry, Cruz was
17   only doing authorized hours from Ms. Melendez, but
18   Ms. Melendez said that Cruz asked her to pay her
19   separately?
20   A    No yeah, she told her to ask -- she asked her
21   to pay her because the thing is that she kept saying
22   they owe me hours -- they owe me hours, those hours were
23   never old with Melendez --
24   Q    With Melendez.  Okay.
25   A    Everything had to do -- Yeah, everything had

Page 101

1    to do with her, but she covered, remember I was telling
2    you she worked Monday through Friday and that Monday
3    through Thursday, and she put down that she worked
4    Friday and she didn't work Friday.
5    Q    Understood.
6    A    But she kept telling her, "Pay me, pay me."
7    Q    Okay.  And so, basically you're saying that
8    Ms. Cruz was trying to extort money out of the
9    patients --
10   A    Yes.
11   Q    -- for hours that she did not work.
12   A    She works -- I don't know what private hours
13   she did she was -- I don't know --
14   Q    Okay.
15   A    -- I just know for the hours that -- you know,
16   she worked with us -- she was getting paid and she got
17   overpaid a couple of times, and I said, "You got
18   overpaid and, you know, and I just noticed on your
19   paycheck that you got overpaid I said, and you never
20   reported it."
21   Q    What -- how would some -- how would a
22   caregiver be overpaid?
23   A    Easily she was -- like she say, "I work this
24   hour" you know, and she didn't work it and we paid her
25   that's being overpaid.



877-291-3376
www.ucrinc.com

Page 102

1    She didn't -- you didn't, because that was the
2  reason she didn't clock in and clock out she was making
3  time sheet's all the time and putting hours that she
4  didn't work I said, you didn't work that day and why
5  did -- and you got paid for it.
6    Q.  Right.  How would she ever be able to overbill
7  if the authorization was already set?
8    A.  No, I think you're not understanding, okay.
9  So, let's say -- let's put an example like Melendez
10  because that's what happened with the Melendez.
11    She put on her time sheet that she worked
12  Monday through Friday suppose or Monday through Saturday
13  and Melendez authorization is Monday through Friday, she
14  was not clocking in.
15    And I told her, "If you don't clock in and
16  clock out, you're not going to get paid anymore, we're
17  going to stop the checks."  She put hours when I
18  confirmed she had put hours that she didn't work with
19  Melendez and she got paid for them.
20    So, when I went to confirm it with Melendez
21  because I was already getting very suspicious, she was
22  all over with her time sheet and the hours with the
23  Izique and Melendez and what she did with the Soto as
24  well, working hours that I didn't -- that were not
25  authorized.

Page 103

1    And I had her to call -- you know, to have him
2  authorized, so this was a constant thing, putting hours
3  over hours she was very confused of all the hours that
4  she was working so at that --
5    Q.  Sorry, that's my question because if you are
6  authorized in the hours, because you are the ki -- you
7  are speaking with Medicaid and you know that, you know,
8  whatever patient has this number of hours, you set those
9  hours on a schedule for Ms. Cruz, does it matter what
10  her time sheet says?
11    Because she can never go over the number of
12  hours that you have already told her or authorized,
13  right, so aren't you always just comparing what was
14  authorized to her time sheet and shouldn't it just be
15  cut off at a certain number of hours anyway?
16    A.  Yeah, I don't think you are understanding --
17  no, let's say not about the hours, about the days you
18  know, that she was supposed to work.  So, let's say like
19  for example Melendez didn't call me to tell me that she
20  was not going --
21    Q.  Absolutely.
22    A.  Cruz didn't call me to tell me that she was
23  not going we have a lot of clients I cannot -- like
24  every day call one by one.
25    Does she go, does she go that's why it's very

Page 104

1  important for them to clock in.  When this happened,
2  Melendez told me on Monday and she told me she fell this
3  what happened on August something she fell, I have a
4  statement here and I said what do you mean--
5    Q.  Is that 2022?
6    A.  Yeah, 2000 -- yes, it was August 8th, 2022.
7    Q.  And when Ms. Melendez fell, Ms. Cruz was
8  supposed to be working with her?
9    A.  I thought she was supposed to be there and she
10  said --
11    Q.  And she was not?
12    A.  And she was not.
13    Q.  I see.  And that's how you figured all of this
14  out.
15    A.  Everything I said, okay.  This is just a total
16  mess and when I -- yeah.
17    Q.  Okay.  And so, all right.  Now you filled in
18  the missing piece, and I think you explained this
19  before.  What was happening was Ms. Cruz was just not
20  showing up to work, but she was putting in on her time
21  sheet that she was there.
22    So, from your point of view the authorized
23  hours were being worked, it's just that she wasn't
24  working them because she just wasn't going.
25    A.  Yeah, she was not completing the whole hours

Page 105

1  even with the Izique's.
2    Q.  Okay.  And then --
3    A.  Even they liked her so much.
4    Q.  I see.  And then because she wasn't clocking
5  in and clocking out, there was no time record of real
6  time when she was actually there.  She was just given
7  time sheets and the time sheet said whatever hours she
8  wanted to put on it.
9    A.  Yes, she just did it by authorization and
10  that's why I constantly had to call the Izique's, the
11  daughter to confirm if she was there or if she wasn't
12  there.  And I also -- you know, asked the other
13  caregivers that were there as well, did she release --
14  you know, did she release you.
15    Q.  Okay.  Understood.  All right.  So, now let's
16  look at really quickly, I'm going to show you what I'm
17  marking as Exhibit C and this is text messages.
18    (Thereupon, Plaintiff's Exhibit C was entered
19    into the record.)
20  BY MR. CUMMINGS:
21    Q.  This is a four page document, the first page
22  says Daisy Valdivieso HHA from Thursday, August 4th at
23  12:44 p.m.  And then there's like a series of text
24  message conversations going over four pages.
25    Just for the record, this is Bates stamp



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                     Pages 106..109

Page 106

1  number VIP docs 2-4 and then going down to -7.  So, the
2  first thing I want to ask is, do you recognize the text
3  messages that I'm showing you, Ms. Ramirez?
4      A   Yes, I do.
5      Q   Okay.  Are these text messages between you and
6  Ms. Cruz?
7      A   That's correct.
8      Q   All right.  Are these screenshots from your
9  phone?
10     A   If I'm not mistaken this is from the on-call
11 phone.
12     Q   From the -- on the red on-call phone?
13     A   Yes.
14     Q   All right.  In that red on call phone, did you
15 have Ms. Cruz's Daisy Valdivieso HHA?
16     A   Yes, that's how we know if there are
17 caregivers on the phone.
18     Q   Okay.  Now, this is in Spanish, like I already
19 have a general understanding of what's going on here,
20 but could you please explain to me on this first page
21 what the message is that's being sent and received?
22         You don't have to translate it in Spanish for
23 me, I just want you to remember this conversation and
24 tell me what was happening here.
25     A   Okay.  I have the same one let me read it over

Page 107

1  here.
2      Q   And specifically I'm referring to the
3  conversation going from Thursday, August 4th to Monday,
4  August 8th.
5      A   Remember I was telling you about that -- to --
6  she picked up a check, a paper check you remember --
7      Q   What -- sorry.
8      A   Yeah, so she went to the West Palm Beach
9  office to pick up the paper check.
10     Q   Okay.  Now, what was -- what hours or what
11 patient was that check for?
12     A   I don't remember.
13     Q   And you said before -- you stated before that
14 caregivers get paid every Friday.
15     A   Every Friday.
16     Q   How much of a lapse is there between the
17 service they provide and the check that they're getting
18 on that Friday.  Like, if I work Monday through Friday,
19 that's not the -- that Friday I'm not getting paid for
20 that week, right?
21     A   The next Friday, yeah.
22     Q   It's the next week, so if I work Monday
23 through Friday this week, then you're --?
24     A   You're freezing up.
25     Q   Yeah, hello?

Page 108

1      A   You're freezing up.  Can you hear me?
2      Q   I can hear you, but I -- can you hear me now?
3      A   Yeah, I can hear you now, but you froze for a
4  second.
5      Q   I froze for a second.
6      A   I think it's my connection because it said
7  it's my connection.
8      Q   Okay.
9      A   Can you hear me?
10     Q   I can hear you.
11     A   Yeah.
12     Q   Okay.  Everything's back to the way it was, so
13 let me go back a little bit and just talk about the pay
14 schedule.
15         Basically what I was saying is if a caregiver
16 works Monday through Friday on week 1, they get paid
17 those hours at the end of Friday on week 2.  Is that
18 right?
19     A   That's correct if -- yes.
20     Q   Okay.
21     A   So, there were --
22     Q   Did Ms. Cruz have direct deposit?
23     A   Well, I think she did, but when it's hours
24 that are being like corrected, sometimes they send a
25 paper check, so she has to go paper check, yeah.

Page 109

1      Q   All right.  Now were there any times -- go
2  ahead.
3      A   I'm sorry, but I'm not -- I can't -- I don't
4  want to answer yes or no if she had direct deposit
5  because it's been quite a while, so I don't remember if
6  she did, so I don't want to give you a false, you know.
7      Q   Right.  Now in this particular case, why would
8  Ms. -- if we're looking at these text messages here, why
9  wouldn't Ms. Cruz have had to go to Palm Beach to pick
10 up a paper check?
11     A   Because that's where the checks come, it
12 doesn't come to the Broward office.  West Palm Beach
13 office is a corporate office that's where they receive
14 their paper checks.
15         And then what I do is on Monday morning I go
16 pick them up and I bring them here and then I call the
17 caregivers, come pick up your check.
18     Q   Okay. But some caregivers do have direct
19 deposit?
20     A   Yeah, most of them do.
21     Q   All right.  And based on the text message,
22 just that you're looking at here on page 1 of Exhibit C,
23 you don't know which check this or which services this
24 is for?
25     A   You mean for what date?



UNIVERSAL COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Page 110

1    Q   Well yeah, I mean do you know what the issue
2  was with why she was picking up a paper check?
3    A   Like I said, the corrected hours that she
4  actually worked.
5    Q   But do you know -- and but you don't know for
6  which clients?
7    A   Yeah, it has to be for the Izique's.
8    Q   How do you know that --
9    A   Because --
10   Q   How do you know that based on this text
11 message?
12   A   Because those were the hours that there was
13 constantly pronged with the overlapping she was putting
14 in hours that she was not supposed to, and she kept
15 claiming hours that was not in the authorization.
16   Q   Got it.  Now on Monday, August 8th that bottom
17 text message in green, I see that you're sending her a
18 message about Angela Melendez.  What is this in
19 reference to?
20   A   What I told you about that she was threatening
21 Angela and Angela called me Monday to tell me, you see
22 why it says Monday.  Angela had called me on Monday to
23 tell me that, you know, what was going on and also she
24 told me that Daisy or Cruz -- Ms. Cruz, moved in next
25 door to her.

Page 111

1       And she was a kind of afraid of, you know, her
2  because she kept threatening and she says, "Leave me
3  alone I have nothing to do with that."
4    Q   Right.
5    A   And that's when I sent her the text I said,
6  "You need to leave my client alone you, know, you need
7  to stop threatening her.  If I see that you keep, you
8  know, harassing her, I'm going to call the police." And
9  that's when everything stopped.
10   Q   Okay.  Now Monday, August 8th was the same day
11 that Ms. Melendez fell down also?
12   A   Yeah, it's the same day that she fell.
13   Q   And did you confront --
14   A   I don't know if that was the same day that she
15 fell, but she said Friday she wasn't there and she had
16 stuff coming and she fell.
17   Q   I see.  All right.  When you confronted Daisy
18 about not being at Ms. Melendez's when she fell, what
19 did Daisy say?
20   A   She didn't care.
21   Q   Did she say I was there or I didn't?
22   A   No, she didn't care, she was -- nothing she
23 didn't say anything, she didn't care.
24   Q   Okay.  And --
25   A   And was basically just arguing, you know, "I

Page 112

1  need to get paid, I need to get paid."  And that's when
2  I said, "You see on Fridays, go pick up your paper
3  check."
4    Q   Okay.  Moving down to page 2 is this a text
5  message from Ms. Ramirez -- I'm sorry, from Ms. Cruz to
6  you?
7    A   I don't remember this one, but let me -- I
8  don't remember this one let me see, does it show a date?
9    Q   I don't see a date on it.
10   A   Let me see.  Can I read it?
11   Q   Yeah, sorry I'm just going to make it bigger
12 for you.
13   A   Okay.  Thanks.  She is just repeating it is
14 it -- that's what it's repeating the $20 -- no, 20 hours
15 in my payment.
16       And no, it's the same text message, can you
17 bring it up a little, there you go.  Yes, that she's --
18 that's her always texting that those are not the only
19 texts I'm pretty sure there's other texts that it was
20 not on -- erased.
21   Q   Okay.  And what is Ms. Cruz telling you in
22 these text messages?
23   A   In that one she says, "You owe me 20 hours for
24 Izique's and four hours for Melendez."
25   Q   Okay.

Page 113

1    A   The bottom one is Melendez.
2    Q   Right.  And she's specifically saying from the
3  23rd to the 29th of May for the Izique's of 2022,
4  correct.  She's over 20 hours, okay.  Did you --
5    A   May 29th.
6    Q   Right.  Did you ever investigate those
7  particular hours to see if she was overbilling the time?
8    A   Your Honor -- your Counsel, everything is
9  like, I -- like I said, everything is according to
10 authorization, all the hours are input, you know,
11 according to authorization.
12       She knows, and I told her if you put -- if you
13 don't clock in and clock out and you don't send your
14 time sheets, how it's supposed to like, she'll say, "I
15 covered for this person."
16       Okay.  "If you cover for that person why
17 didn't you send your time sheet on time, I don't read
18 minds you know, you guys need to communicate with me."
19 Everything like I said, she covered for Monica, she
20 covered for Jenny, the other one that was in there for
21 Valdivieso and for Angela, it was the hours that she was
22 claiming that wasn't authorized that she didn't even
23 work.
24   Q   Why did you continue your contractual
25 relationship with Ms. Cruz if you were having all of



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023          Pages 114..117

Page 114

1  these problems with her?
2      A   That's because I wanted to take her out of the
3  case, but Izique preferred to go to the agency that she
4  was working, she says they didn't want to lose her.
5      Q   But at any time, even with Ms. Melendez,
6  couldn't --
7      A   I took her off Melendez.
8      Q   You took her off Melendez?
9      A   Yes.
10     Q   Okay.  And so how does All VIP end its
11 relationships with its caregivers do you just take them
12 off of everybody that they're assigned to or do you just
13 say to them, "Hey, listen we're not going to give you
14 any more work at all anymore."
15     A   Okay.  It depends, you know, how they've
16 ended, you know, with All VIP care like, for Daisy, she
17 was doing fraud.
18         So, right there, we're not going to hire her
19 she's -- in our system, she's inactive and it gives a
20 reason why.  Let's say, if a caregiver says, you know, I
21 don't want to work with you guys anymore, you know, I --
22 you know, some of them -- a lot of them don't say the
23 reason I -- we know they're independent contractors.
24         They apply another agency and that's fine
25 there's other caregivers that will do the case but with

Page 115

1  me -- with Daisy, no, we're not going to hire her any
2  longer, but because of Izique I told her, "I'm going to
3  take her out of the case."  "No, I really like her and I
4  want to keep her and blah, blah."
5         So, there you go she went with another agency,
6  she took them to another agency.
7      Q   Right.
8      A   And she's working.
9      Q   At the time when you kept having to remind Ms.
10 Cruz to punch in and punch out using her phone on the
11 app, and you got a hint that she was falsifying her time
12 sheets, why not just end the contractual relationship
13 between All VIP and her at that point?
14     A   Because remember I told you that in -- I
15 always had to confirm with the client.  Okay.  And I'll
16 say she cannot put these hours in because they're not
17 authorized.
18         So, we're going to pay her for the hours she
19 worked with, like with the -- with Melendez, she's --
20 she didn't work with Melendez anymore.
21     Q   Okay.
22     A   But with the Izique's it was the family they
23 wanted her so bad they wanted her, "No, we want her, we
24 just want to -- we'll explain it to her.  That's how
25 we'll help her with the clocking in the clocking out."

Page 116

1  They were willing to do anything to keep her.
2      Q   Well, can't you always end your con -- your
3  relationship with the client also, couldn't you end your
4  relationship with the Izique's?
5      A   Yeah, we could have, but she wanted us because
6  there was other aides there, so, you know, working there
7  and the other aides were happy, you know, working there
8  so, and she was happy with the other caregivers.
9      Q   Right.
10     A   But it was something with her, you know,
11 because she was acting really -- she always really, you
12 know, lovey-dovey with them and you know, try -- did
13 other things like trying to be, and the other aides
14 there told me, she's fake, you know, but I didn't, you
15 know, we don't go by what the other caregivers say, but.
16     Q   Understood.
17     A   The family member really liked her.
18     Q   Generally speaking I know that you said the
19 caregivers had to tell you if they were not going to be
20 available to work certain hours that were on their
21 schedule, correct?
22     A   Yes, they had to let us know.
23     Q   And that was so that you can find a substitute
24 for them to fill in those hours.
25     A   That's correct.

Page 117

1      Q   Another All VIP caregiver.
2      A   That's correct.
3      Q   Could the caregivers find their own
4  substitutes, like if Ms. Cruz wasn't going to work some
5  hours on her schedule, she could she just find anybody
6  else to fill in those hours for her?
7      A   No.
8      Q   No, what if it was All VI -- another, All VIP
9  caregiver could she arrange that on her own and just
10 have that person fill in?
11     A   No, not on her own, no.
12     Q   Okay.  She always had to tell you, correct?
13     A   That's correct, because we need to put it in
14 the system.
15     Q   Right.
16     A   Something happens, we know who's there.
17     Q   All right.  Okay.  And I want to -- have you
18 ever seen, I'm going to show you now, what I'm marking
19 as Exhibit D.
20         (Thereupon, Plaintiff's Exhibit D was entered
21         into the record.)
22 BY MR. CUMMINGS:
23     Q   Have you ever seen this Google post from Cesar
24 Izique?
25     A   Yes, and that's not him that's the daughter

Page 118

1  putting all that because Mr. Cesar doesn't speak English
2  and Mr. Cesar is -- he has Alzheimer's.
3      Q   Okay.  Did you see this Google post when it
4  actually went up on -- I guess, you know, Google?
5      A   Not -- I don't know when if I saw it, like
6  right away, I don't know exactly because I'm not in --
7  you know, looking at the reviews, but -- you know, I did
8  see it.
9      Q   How did you find out that this review existed?
10     A   How did I find out because Liz, the owner
11  replied.
12     Q   But how did that let you know that it was
13  there when Liz replied, did you get like a message or
14  something?
15     A   Yeah, Liz told me that they put a bad review.
16     Q   Okay.  Got it, now here the -- let's say it is
17  the daughter, let's say it's either Susana or Anna Marie
18  is saying that the HHAs were always complaining they
19  were not being paid by the agency that seems to be more
20  than one, like more than just Ms. Cruz.
21         Were there any other home health aide that
22  provided service to the Izique that complained that they
23  weren't being paid their hours?
24     A   If they were over -- if they overlap, but they
25  always got paid, let's say for any reason the system

Page 119

1  didn't pick up, you know, two hours, you know, it's not
2  us.
3         We put in the hours sometimes the system, you
4  know, kicks up one hour, two hours and then right away
5  we -- you know, they get paid on the following paycheck.
6      Q   When you say the system --
7      A   It's not that --
8      Q   Go ahead.
9      A   Yeah, it's not that they're not going to get
10  paid and they lost their or else that we wouldn't have
11  aides, you know, working with us at all.
12     Q   When you say the system, are you talking about
13  HHA exchange?
14     A   Yeah, HHA exchange, when we bill it's -- I'm
15  not going to -- it's happened, but right away it's
16  corrected.
17     Q   And when you say it's happened, you mean that
18  sometimes the system inputs the incorrect hours?
19     A   No, like it probably didn't pick up let's say
20  if I have 63 hours that's supposed, I put in 63 hours
21  and it says 63 hours, but the system might pick up, say
22  62 and then that hour.
23         So, we have to go back into, you know, back
24  into the system to see what happened and then if it's
25  one hour then we'll put it, you know, on their following

Page 120

1  paycheck.
2      Q   When you say the system --
3      A   But it barely happened.
4      Q   Okay.  When you say the system picks up, like
5  it's -- I'm, what I'm hearing is like, okay.  You as
6  Diana Ramirez, you input that Ms. Cruz worked 63 hours
7  but you're saying the system itself only registered 62?
8      A   It could happen, it -- not I'm saying that it
9  happens all the time, but it happened before.
10     Q   And that's not due to human error on your
11  part?
12     A   No.
13     Q   Okay.
14     A   It has nothing to do on my side, I've put in
15  the hours that's why we need time sheets.
16     Q   Okay.  And does HHA exchange acknowledge that
17  they have problems with their system registering hours
18  and Court?
19     A   Yeah, we report it, we automatically we call
20  support, but it's like I said rarely happens.
21     Q   Okay.  And did you ever speak to either Susana
22  or Anna Marie after this Google post was written?
23     A   No, after we -- you know, she said that -- you
24  know, she's no longer going to have services with us,
25  she did call me after we ended to tell me that why

Page 121

1  didn't I send, you know, Daisy you know, to work.  And I
2  said "Well, what do you -- I don't understand" I said,
3  "We're no longer, you know, you're no longer with All
4  VIP care."
5         And then she says, "Yeah, but I don't have
6  anybody Monday and Tuesday."  and I'm like, "Well, you
7  need to call your case manager and let them know to
8  change the authorization for the date that you started
9  with the other agency.  I can't help you right now."
10        I told her and that was the end of her.  Yeah,
11  she called me because I guess the authorization that was
12  sent out for the new agency didn't start right away.  It
13  was like -- it showed like it was still with us, but in
14  reality it wasn't with us.
15     Q   Okay.  All right.  Let me show you Exhibit E.
16        (Thereupon, Plaintiff's Exhibit E was entered
17        into the record.)
18  BY MR. CUMMINGS:
19     Q   And -- okay.  Do you recognize this document
20  this is a two page --
21     A   Yeah, I wrote it.
22     Q   -- document at the top it says statement for
23  Cruz about Valdivieso, and then on the bottom of page 2,
24  it has your signature, you wrote this document
25  statement?

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023          Pages 122..125

Page 122

1    A  Um-hum.

2    Q  Okay.  And you just had to provide a yes or

3  no, so let me ask the question again.

4    A  I'm sorry, yes.

5    Q  Okay.  You wrote this?

6    A  Yes, that's me writing.

7    Q  Okay.  On August 8th, 2022?

8    A  That is correct.

9    Q  Okay.  Why did you write this statement?

10    A  Because I have to write a statement of

11  everything that happens I have to keep a record, see I

12  have a record right here of just Stacy.  If something,

13  if an incident report happens, I have to have it because

14  of Medicaid they need to know what happened on that day,

15  at that time.

16     So, if you see here, I have a file just for

17  her every aide that has an incident like this needs --

18  we need to fill out a statement and it has to be put

19  into the client's profile and it's kept with us if

20  Medicaid comes, we have it right here.

21    Q  Understood.  And it just so happens that

22  August 8th, 2022 is around the same time that

23  Ms. Melendez complained about falling.

24    A  Yes.

25    Q  Is this statement that you're writing in

Page 123

1  response to Ms. Melendez call about falling?

2    A  Yeah, she's -- that's when I found out that

3  Daisy -- I'm sorry, Cruz didn't show up when she called

4  me on that day.

5    Q  Okay.

6    A  And she told me what was happening, so I had

7  her to write it down.

8    Q  Okay.  Got it.  And the very beginning says on

9  July 22nd, 2022 at 08:43 a.m. client's daughter texted

10  me saying that they were concerned the HHAs were not

11  getting paid, whose daughters are you talking about

12  here?

13    A  Izique's.

14    Q  Izique's.  Okay.  So, there was overlap

15  between the time that Ms. Cruz worked for the Izique's

16  and the Melendez --

17    A  No.

18    Q  -- Ms. Melendez?

19    A  No, remember I told you that she was working

20  the private hours that I wasn't aware of that's what she

21  was claiming, that she was not getting paid.  And that

22  Izique was telling me, you know, I have a concern, that

23  HHAs are not getting paid and there you go it was, and I

24  explained to her.

25    Q  What I'm trying to figure out is if you were

Page 124

1  getting a complaint from the Izique's on July 22nd that

2  means that Ms. Cruz was working with the Izique's at

3  that time, right?

4    A  Yeah, she was still -- yeah, I think that was

5  like almost the ending that week because I think that

6  same week.

7    Q  She was ending with who?

8    A  With All VIP care, she was going to another

9  agency.

10    Q  Okay.  But I thought on August -- in August

11  she was -- Ms. Cruz was still working with Ms. Melendez

12  August 20th, 2022?

13    A  No, she -- with Melendez, no, she didn't --

14  she was not showing up with Melendez.

15    Q  But she was being assigned to Melendez.

16    A  Yeah, she had Melendez and Izique's.  I don't

17  remember what date that Izique, but she ended first

18  with, Melendez and she was still working with Izique.

19    Q  All right.  And then was there another patient

20  named Gabriel Gonzalez that she worked with?

21    A  Yes, she did.  Yes, that was the first one

22  yeah, I totally forgot about him.

23    Q  Okay.  So --

24    A  Yeah, But that was --

25    Q  That was the first, that was before?

Page 125

1    A  Soto.

2    Q  Alicia Soto?

3    A  Yes, I totally forgot about him, yes.

4    Q  Were there any issues with Ms. Cruz's hours or

5  any complaints that you had about her service with

6  Mr. Gonzalez?

7    A  No, because that was the only client she had.

8    Q  At the time.

9    A  It was just -- yeah, at that time.

10    Q  At that time.  Okay.  So, was there any -- so

11  there was never any overlap between Mr. Gonzalez and

12  Ms. Soto?

13    A  No, because she only had that client and that

14  client had certain hours.

15    Q  And there was never any overlap between Soto

16  and Melendez?

17    A  Soto and Melendez, she wasn't working with

18  Soto and Melendez at the same time.

19    Q  Right.  That's what I'm trying to figure out,

20  okay.

21    A  Okay.  No.

22    Q  Okay.

23    A  She only had the neighbor at that time.

24    Q  Okay.  Got it, and so -- but she was working

25  with Melendez and the Izique's at the same time?

UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 126..129

Page 126

1    A    No, after Gabriel that's when she started with
2    Melendez and then with the Izique's.
3    Q    Okay.  I thought after Gabriel was Soto.
4    A    Yes, Soto, got -- Gabriel, Soto then Izique
5    with Melendez at the same time.
6    Q    Okay.
7    A    Melendez and Izique was at the same time
8    because she was not working the full hours with the
9    Izique.
10        She's just working part-time hours with the
11   Izique and 38 hours with -- 42 hours with Melendez.
12   Q    Okay.  We're on the same page now.  All right.
13   And then I'm just going to show you this one last
14   statement, which I'm marking as Exhibit F.
15       (Thereupon, Plaintiff's Exhibit F was entered
16       into the record.)
17   BY MR. CUMMINGS:
18   Q    Do you recognize -- wait a minute, I didn't
19   show it yet, okay.  It's not right, hold on, okay.  Can
20   you see the document I'm showing you on my screen now?
21   A    Yes.
22   Q    All right.  I'm making this Exhibit F for the
23   deposition record, which is the -- it says 11/15/2022 at
24   the top and it has your signature at the bottom.  Is
25   this your signature?

Page 127

1    A    Yes, it is.
2    Q    Okay.  Do you remember writing this statement?
3    A    Yes.
4    Q    Okay.  Why did you have to write this
5    statement?
6    A    Because I -- they ac -- the Attorney asked me
7    to write the statement, everything that happened, but in
8    a formal way, it's the same way.  It's the same thing
9    that I wrote in with the pen, but I had -- I typed it up
10   on that day.
11   Q    Okay.
12   A    And because I wanted to look more, you know.
13   Q    Professional.
14   A    Yeah.
15   Q    I got it.  No, I understand and this statement
16   that you're writing here was not necessarily in response
17   to a particular incident happening you were just
18   rewriting the previous statement and adding more
19   information?
20   A    Yeah, writing everything how ev -- what
21   happened, this whole situation.
22   Q    All right.  Okay.  I don't think there's
23   anything there that we haven't discussed.  All right.
24   And just for the record, this is Bates stamp document,
25   VIP docs 153.

Page 128

1        Okay.  Ms. Ramirez, is there anything else
2    that you want to add about Ms. Cruz's time with All VIP
3    that we have not discussed?
4    A    No, I think that I can remember everything,
5    everything said.
6    Q    Is there anything that I didn't ask you that
7    you thought I would?
8        MR. GOLDBERG:  Object to form.
9    A    No.
10   BY MR. CUMMINGS:
11   Q    And I think you've previously stated that you
12   don't directly deal with the billing to Medicare and
13   Medicaid.  Is that right?
14   A    That's correct.
15   Q    Do you know anything about All VIP's provider
16   number?
17   A    When you say provider number, you mean the
18   NPI, the tax ID.
19   Q    The NPI?
20   A    Yeah, I have it.
21   Q    Okay.  Well, I don't need it I'm just saying,
22   so All VIP --
23   A    Yeah.
24   Q    All VIP has an NPI, correct?
25   A    Yes, each office has NPI.

Page 129

1    Q    Each office meaning -- each All VIP office --
2    A    Each county.
3    Q    In each county has a different NPI number?
4    A    Yes.
5    Q    Got it.  Okay.  And does that NPI number have
6    to be included on billings to Medicare?
7    A    I can't answer that because I don't know.
8    Q    All right.
9    A    That's not my department.
10   Q    Understood.  And do the caregivers themselves
11   have their own NPI number?
12   A    No.
13   Q    Okay.  Do the caregivers have their own when
14   they get certified do they have a number that the state
15   issued?
16   A    Yes, not the state, but, you know, when we
17   enter them in the system, they have a code it says
18   caregiver code.
19   Q    Caregiver code.  Okay.  All right.  And you
20   don't understand how it does -- do you know if that code
21   that the caregivers have is somehow submitted to the
22   billing departments for Medicare or Medicaid?
23   A    I have no idea if that code is in there.  I
24   have no idea because I know in my -- in the private one,
25   it doesn't give out code.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023                    Pages 130..133

Page 130

1    It just gives out the name of the caregiver
2  because they don't know what the code is it's just --
3  that's just for us in the system when we need to search
4  them up.
5      Q   Got it. And the app that the caregivers were
6  supposed to be using to clock in and clock out, that was
7  a HHA exchange app on their phone?
8      A   That's correct.
9      Q   All right. Did they have to pay for that app?
10     A   No, Counsel they didn't have to pay for it.
11     Q   Did the providers have to pay for anything to
12  do their work besides their scrub -- well, let me put it
13  like the other way around. Did All VIP provide any type
14  of equipment that the caregivers needed to provide their
15  services?
16     A   When they needed gloves or, you know, the mask
17  out of courtesy we had, you know, extra, especially
18  because of the pandemic, we always had you know, gloves,
19  we give them a box, you know or a box of you know,
20  masks. But their independent contractor, but they need
21  to have their own supplies.
22     Q   All right. And, so there was like PPE,
23  personal protective equipment that was available in the
24  office for them to come pick up?
25     A   Yes.

Page 131

1      MR. CUMMINGS: All right. I have no further
2  questions, Mr. Goldberg.
3      MR. GOLDBERG: I just have a couple, sir.
4  Thank you.
5      MR. CUMMINGS: All right.
6          CROSS EXAMINATION
7  BY MR. GOLDBERG:
8      Q   Diana?
9      A   Yes.
10     Q   To the best of your knowledge, sorry, can you
11  hear me?
12     A   Yes, I can hear you clearly.
13     Q   Okay. Thank you. Diana, to the best of your
14  knowledge was Cruz paid for every hour that she worked
15  for clients in accordance with VIP's relationship with
16  that client?
17     A   Yes, Counsel.
18     Q   And how many time -- if you know, let me
19  rephrase this. Did you frequently have discussions with
20  Ms. Cruz about the HHA exchange program on her phone?
21     A   Yes, and that's why I told her to come in so
22  we can teach her how to do it.
23     Q   And did she comply with your request?
24     A   No.
25     Q   Now, the time sheets that we have spoken about

Page 132

1  during the deposition, are the time sheets a backup to
2  the HHA exchange program?
3      A   That is correct, Counsel.
4      Q   So, it's the time she's already checks and
5  balance to the accuracy of the HHA exchange, correct?
6      A   That's correct.
7      Q   How many times -- if you know, did Ms. Cruz,
8  complaint to you that she was not paid for the hours
9  that she worked?
10     A   When she started putting the private hours?
11     Q   And did you explain to her the difference in
12  private hours and the hours that were authorized by
13  VIP?
14     A   Counsel, the thing is that I didn't know she
15  was doing private hours, so I was confused of all the --
16  you know, the hours that she was claiming.
17         I said, "But why are you getting all these
18  hours when you have only this amount of hours
19  authorized." And that was her confusion.
20     Q   Now, just so I am clear, when did you learn
21  that Ms. Cruz was including her private hours in her
22  time sheets?
23     A   If I recall, it was almost close to when, the
24  Izique left because the daughter told me because the
25  daughter kept, she kept nagging the daughter, they owe

Page 133

1  me you know, because she was -- you know, all she did
2  was add hours altogether.
3         That's all she did and then she -- like,
4  she'll add how much that she needs to get paid, so the
5  only thing she will say, "You owe me this amount because
6  I worked this many hours."
7         So, when the daughter called me, she says,
8  "Well, Daisy's working these hours." And I said, "Hold
9  on, well that's not -- she's saying that we owe her
10  three hours."
11        And then she goes -- and she's putting in our
12  extra hours in there and that's when I found out because
13  the daughter told me, daughter told --
14     Q   Which daughter -- I apologize, miss --
15     A   If I'm not mistaken, I think it was Susana.
16     Q   Can you spell that name for me please?
17     A   It's like Susana, which is add an A at the --
18  instead of an E and A, S-U-S-A-N-A.
19     Q   Got it. Now, you testified earlier that if
20  the HHA such as Ms. Cruz was to be working private hours
21  that puts her in breach of her independent contractor
22  agreement with VIP?
23     A   Yes, I told Daisy and the daughter, but I
24  think they already kind of knew because that's when they
25  decided to leave.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023          Pages 134..137

Page 134

1    Q   Did you terminate Ms. Cruz -- I'm sorry, yes.
2  Did you terminate Ms. Cruz from VIP?
3    A   Yes, she no longer is active with us.
4    Q   And how was the -- who made that decision?
5    A   The owner, Liz and myself.
6    Q   And that decision was based upon Ms. Cruz
7  providing private hours to VIP clients, correct?
8    A   Exactly.  And as well as telling the client
9  that to switch over to the other agency that she was
10 working with.
11     MR. GOLDBERG:  No further questions
12 Mr. Cummings, thank you.
13     MR. CUMMINGS:  Okay.  I'm -- I don't -- just
14 one other question, Ms. Ramirez.
15          RE-DIRECT EXAMINATION
16 BY MR. CUMMINGS:
17     Q   Can you bill families directly without going
18 through the, let's say, Medicare or Medicaid?
19     A   Yes, Counsel, if they do a contract with us,
20 yes.
21     Q   Okay.  Then -- sorry, go ahead.
22     A   We bill and we send them an invoice.
23     Q   Okay.  And then that's not through any type of
24 insurer, it's just a contract directly between the
25 patient and All VIP?

Page 135

1    A   That's correct, because we do have private
2  clients.
3    Q   Right.  And then that situation, caregivers
4  are sent out and the schedule is made just the same way?
5    A   Yes, the only thing that this is just, you
6  know, it's private and that's the only difference just
7  the --
8    Q   Okay.  Under those circumstances, does the
9  caregiver negotiate a different rate of pay for hourly
10 pay for those private clients?
11     A   No, they don't really say this is how much it
12 pays and they agree and they then go.
13     Q   Okay.  But because there's no cap by Medicaid,
14 let's say, for example, $20 is All VIP charging more
15 money to the private clients than they do in other
16 situations?
17     A   No.
18     Q   Okay.
19     A   Because I have private because I have
20 contracts here that I can show you that it says $20 an
21 hour.
22     Q   All right.
23     MR. CUMMINGS:  Okay.  No, further questions.
24     MR. GOLDBERG:  We will read.
25     (Deposition concluded at 12:56 p.m.)

Page 136

1  (Reading and signing of the deposition by the
2  witness has been reserved.)

Page 137

1          CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF PALM BEACH
4
5    I, Danielle J. Braelow, Court Reporter and Notary
6  Public for the State of Florida, do hereby certify that
7  I was authorized to and did digitally report and
8  transcribe the foregoing proceedings, and that the
9  transcript is a true and complete record of my notes.
10     I further certify that I am not a relative,
11 employee, attorney or counsel of any of the parties, nor
12 am I a relative or employee of any of the parties'
13 attorneys or counsel connected with the action, nor am I
14 financially interested in the action.
15
16     Witness my hand this 21st day of June, 2023.
17
18
19
20  _____
21  DANIELLE J. BRAELOW, COURT REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
22
23
24
25

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Ramirez, Diana on 06/07/2023          Pages 138..140

## Page 138

```
 1              CERTIFICATE OF OATH
 2   STATE OF FLORIDA
 3   COUNTY OF PALM BEACH
 4
 5       I, Danielle J. Braelow, the undersigned authority,
 6   certify that Diana Ramirez appeared before me remotely
 7   pursuant to Florida Supreme Court Order AOSC20-23 and
 8   was duly sworn on the 7th day of June, 2023.
 9
        Witness my hand this 21st day of June, 2023.
10
11
12
13
14   DANIELLE J. BRAELOW, COURT REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
15   Commission No.: GG 926016
     Commission Exp: 10/24/2023
16
17
18
19
20
21
22
23
24
25
```

## Page 140

```
 1   Errata Sheet
 2
 3   NAME OF CASE: CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
 4   DATE OF DEPOSITION: 06/07/2023
 5   NAME OF WITNESS: Diana Ramirez
 6   Reason Codes:
 7       1. To clarify the record.
 8       2. To conform to the facts.
 9       3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25
```

## Page 139

```
 1   DATE:       June 20, 2023
     TO:         Diana Ramirez
 2   C/O
               Randy Mark Goldberg, Esquire
 3             Randy M. Goldberg & Associates, PLLC
               151 NW 1st Avenue
 4             Delray Beach, FL 33444-2611
 5   IN RE:    CRUZ VALDIVIESO FIGUERA vs. ALL VIP CARE INC.
               AND LIZ VELAZQUEZ MCKINNON
 6   CASE NO:   0:22-CV-61553-DIMITROULEAS/HUNT
 7
     Dear Ms. Ramirez,
 8
         Please take notice that on June 7, 2023, you gave
 9   your deposition in the above-referenced matter. At that
     time, you did not waive signature. It is now necessary
10   that you sign your deposition. You may do so by
     contacting your own attorney or the attorney who took
11   your deposition and make an appointment to do so at
     their office. You may also contact our office at the
12   below number, Monday - Friday, 9:00 AM - 5:00 PM, for
     further information and assistance.
13       If you do not read and sign your deposition within
     thirty (30) days, the original, which has already been
14   forwarded to the ordering attorney, may be filed with
     the Clerk of the Court.
15       If you wish to waive your signature, sign your name
     in the blank at the bottom of this letter and promptly
16   return it to us.
17   Very truly yours,
18   Danielle J. Braelow, Court Reporter
     Universal Court Reporting
19   (954)712-2600
20
     I do hereby waive my signature.
21
22
23   _____
     Diana Ramirez
24   Cc: via transcript:
               Randy Mark Goldberg, Esquire
25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:22-CV-61553-DIMITROULEAS/HUNT


CRUZ VALDIVIESO FIGUERA,

        Plaintiff,

vs.

ALL VIP CARE INC. AND
LIZ VELAZQUEZ MCKINNON,

        Defendant.
_____/


DEPOSITION OF LIZ VANESSA MCKINNON

TAKEN ON BEHALF OF THE PLAINTIFF

MAY 16, 2023
11:03 A.M TO 2:14 P.M

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23


REPORTED BY:
SULEYDIS VIDES, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA





CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                                    Pages 2..5

**Page 2**

| 1 | APPEARANCES OF COUNSEL |
| 2 | ON BEHALF OF THE PLAINTIFF: |
| 3 | TOUSSAINT CUMMINGS, ESQUIRE |
|   | FAIRLAW FIRM |
| 4 | 135 SAN LORENZO AVENUE, SUITE 770 |
|   | CORAL GABLES, FLORIDA 33146 |
| 5 | 305-230-4884 |
|   | TOUSSAINT@FAIRLAWATTORNEY.COM |
| 6 | (REMOTELY VIA ZOOM) |
| 7 | ON BEHALF OF THE DEFENDANT: |
| 8 | RANDY MARK GOLDBERG, ESQUIRE |
|   | RANDY M. GOLDBERG & ASSOCIATES, PLLC |
| 9 | 151 NORTHWEST 1ST AVENUE |
|   | DELRAY BEACH, FLORIDA 33444 |
| 10 | 754-224-0867 |
|   | RMGESQUIRE@GMAIL.COM |
| 11 | (REMOTELY VIA ZOOM) |

**Page 3**

| 1 | INDEX OF EXAMINATION |
| 2 | WITNESS:  LIZ VANESSA MCKINNON |
|   | PAGE |
| 3 | DIRECT EXAMINATION |
|   | BY TOUSSAINT CUMMINGS, ESQUIRE          6 |

**Page 4**

| | INDEX OF EXHIBITS | |
| --- | --- | --- |
| EXHIBIT | DESCRIPTION | PAGE |
| PLAINTIFF'S: | | |
| EXHIBIT A | NOTICE OF TAKING DEPOSITION | 9 |
| EXHIBIT B | PATIENT TIME SHEETS | 40 |
| EXHIBIT C | PATIENT CESAR GOOGLE POST REVIEW | 61 |
| EXHIBIT D | INDEPENDENT CONTRACTOR AGREEMENT AND SIGN UP DOCUMENTS | 67 |
| EXHIBIT E | ALL VIP PATIENT CALENDAR | 81 |
| EXHIBIT F | WEEKLY PAY STUBS | 98 |
| EXHIBIT G | 22-0808 STATEMENT OF DIANA RAMIREZ | 102 |

**Page 5**

1  VIDEOTAPED DEPOSITION OF LIZ VANESSA MCKINNON
2       MAY 16, 2023
3  Thereupon:
4       LIZ VANESSA MCKINNON
5  was called as a witness, and after having been first
6  duly sworn, testified as follows:
7       THE COURT REPORTER:  We are now on the record.
8  Today's date May 16th, 2023, and the time is
9  approximately 11:00 a.m.
10      We are here for the videotaped deposition
11  of Cruz Valdivieso Figuera versus All VIP Care,
12  Inc.
13      and Liz Velazquez McKinnon.  Case Number
14  022-CV-61553.  United States District Court
15  Southern District of Florida.
16      The Court Reporter is Suleydis Vides with
17  Universal Court Reporting.
18      Would all Counsels please introduce yourself
19  for the record?  I'm sorry, counsel you're muted.
20      MR. CUMMINGS:  I was muted.  Toussaint
21  Cummings on behalf of Plaintiff, Cruz Valdivieso
22  Figuera.
23      MR. GOLDBERG:  Randy Goldberg on behalf of
24  Defendants in this action.
25      THE COURT REPORTER:  Thank you.  Counselors,



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                                    Pages 6..9

Page 6

1   you might proceed.
2              DIRECT EXAMINATION
3   BY MR. CUMMINGS:
4      Q   Okay.  All right.  Good morning, Ms. McKinnon.
5      A   Good morning.
6      Q   All right.  My name is Toussaint Cummings, I'm
7   the Attorney representing Cruz Valdivieso and this is a
8   bit of a different type of a deposition.  Have you ever
9   taken a deposition before?
10     A   Don't think so.
11     Q   Okay.  And so you've never taken a deposition
12  before at all as far as you know?
13     A   As far as I recall, no.
14     Q   All right.  So, normally a deposition I would
15  be asking you questions in your own individual capacity.
16        Today you're here as Representative of All
17  VIP.  I'll just, you know, abbreviate the name All VIP,
18  the company.
19     A   Okay.
20     Q   Okay.  All right.  So, do you understand that
21  you are here representing -- you always have to be
22  respectful to the Court Reporter and that requires that
23  we only speak one at a time.
24        The reason being is because when I ask a
25  question, it gets printed up in a deposition transcript,

Page 7

1   like a little booklet.
2         So there'll be a question line, a question and
3   then there will be an answer line for the answer that
4   you provide on behalf of the company.  Okay?
5      A   Okay.
6      Q   Got it.  And so sometimes I may be asking you
7   a question and you may anticipate where the question was
8   going and then if you jump ahead, what happens is -- the
9   answer that you're providing and then we can't read it
10  smoothly in the transcript.
11        So if that happens, then I'll just ask you --
12  then I'll just remind you and then I'll repeat the
13  question so that we have a clear question and answer.
14  All right.
15     A   Okay.
16     Q   Okay.  Now you're not the only person that
17  does it, I do it sometimes also.  Sometimes I may
18  interrupt your answer and then when that happens, I'll
19  repeat the question for the same reason.
20     A   Okay.
21     Q   All right.  Second thing is, we always have to
22  provide a verbal response to any question that I ask. .
23        So for example, if you shake your head, like
24  yes or no or, you know, then the transcript or the Court
25  Reporter cannot pick up none verbal responses, so there

Page 8

1   will be no answer to write down.  So, please always
2   provide a yes, a verbal yes or no or whatever the answer
3   calls for it.  All right.
4      A   Okay.
5      Q   All right.  If there's a situation where that
6   happens, again I'll just repeat the question remind you
7   to please provide a verbal response.
8      A   Okay.
9      Q   And the third instance is when people are
10  answering questions and they say uh-huh or uh-uh because
11  that doesn't necessarily mean anything when it's written
12  down.  So, if you say uh-huh or uh-uh, then I'll just
13  remind you repeat the question and then continue moving
14  on.  Okay?
15     A   Got it.
16     Q   All right.  So, did you receive the deposition
17  notice for this deposition?
18     A   Think I received several.
19     Q   Okay.
20     A   So, yes.  The answer is yes.
21     Q   All right.  No problem.  Let me just show you
22  exactly what I'm talking about here.  All right.  I am
23  going to make this Exhibit 1 for the deposition record.
24        Okay.  And so, I think I said Exhibit, but
25  actually it should be Exhibit A.

Page 9

1         (Thereupon, Plaintiff's Exhibit A was entered
2          into the record.)
3   BY MR. CUMMINGS:
4      Q   So, you see the document I'm sharing my screen
5   right now Ms. McKinnon?
6      A   Yes.
7      Q   All right.  And have you seen this document
8   before?
9      A   Yes.
10     Q   All right.  The reason I'm showing this to you
11  is because not only does it have the date of today's
12  deposition, but there's a third page that shows what's
13  called the areas of inquiry which are questions or
14  topics that I'll be asking you about today.  Have you
15  seen this page before?
16     A   I saw it.
17     Q   Okay.  All right.  And so you understand that
18  the questions that I ask you today are generally going
19  to be related to the areas that are here, correct?
20     A   Yes.
21     Q   All right.  And are you prepared to answer
22  questions related to these topics?
23     A   Somewhat, I believe.
24     Q   Okay.  All right.  Did you speak to anybody in
25  preparation for this deposition?

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                              Pages 10..13

Page 10

1    A   Just -- I believe, just, you know, just
2  Randy, but, you know, it was basically that we had to
3  prepare --
4    Q   Hold on.  Without telling me what the
5  conversation was? --
6    A   No, that was it.  Just to prepare for this day.
7    Q   Yeah, exactly right.  Yeah.  So, you don't
8  have to tell me anything you ever say with your Attorney
9  because that violates the attorney-client privilege, but
10 in preparation for this deposition, you spoke with your
11 Attorney, Randy Goldberg?
12   A   Yes.
13   Q   And did you speak to anybody else that was not
14 an attorney, like, any employees or anybody else?
15   A   Yes.
16   Q   Okay.  All right.  Go ahead.
17   A   That would be Diana Ramirez because she also
18 is going to be deposed and that was it.  It was
19 basically to discuss that we're going to be deposed and
20 that's it.
21   Q   Okay.  No problem.  It's my understanding that
22 Ms. Ramirez no longer works with All VIP.  Is that
23 correct?
24   A   No, she's back.
25   Q   She's back.  Okay.  All right, works.  But

Page 11

1  there was a period of time when Ms. Ramirez was not
2  working for All VIP?
3    A   Yes, like several weeks.  She had a family
4  issue, but she's back.
5    Q   Okay.  And what is Ms. Ramirez's position with
6  All VIP?
7    A   She is the administrator for the Broward
8  office.
9    Q   Besides Ms. Ramirez, did you speak to any
10 other All VIP employees in preparation for the
11 deposition?
12   A   No, that was it.
13   Q   Got it.  Okay.  Is there any reason why you
14 cannot take a deposition today?
15   A   No, there's no reason why I cannot.
16   Q   All right.  So, let's get started.
17 Ms. McKinnon, are you an employee of All VIP?
18   A   I'm going to say yes because I run the office
19 as well.  Yes.
20   Q   What is your position with All VIP?
21   A   I am the administrator for the Palm Beach
22 Office or County or license.
23   Q   Previously you mentioned that Ms. Ramirez was
24 the administrator for the Broward office and now you're
25 saying you're the administrator for the Palm Beach

Page 12

1  office.  How many offices does All VIP have?
2    A   Let's see.  We have one in West Palm Beach, we
3  have an office in Port St. Lucie, we have an office in
4  Pahokee, we have an office in Miami and Broward.  Some
5  five perhaps.
6    Q   Okay.  And when you said that you're the Palm
7  Beach administrators, did you mean West Palm Beach?
8    A   Yes.  What happens is that each county has a
9  license, so you need to have an administrative for each
10 county.  So, I'm the administrator for the Palm Beach
11 office and license.
12   Q   How long have you been the administrator for
13 the Palm Beach office?
14   A   Since 2016.
15   Q   Are you a -- an owner of All VIP?
16   A   Yes, I am.
17   Q   Are you the only owner of All VIP?
18   A   That is correct.
19   Q   How long have you been the owner of All VIP?
20   A   Since 2016.
21   Q   Did All VIP exist before 2016?
22   A   No.
23   Q   All right.  And these pauses are just me
24 taking -- writing down notes.  Okay.  Just --
25   A   Okay.

Page 13

1    Q   Okay.  What services does All VIP provide?
2    A   We provide medical and non-medical services.
3    Q   What are the medical services that are
4  provided?
5    A   Nursing.  Just nursing, skilled nursing.
6    Q   And the nursing that's provided, do those
7  nurses visit clients in their home?
8    A   Yes.
9    Q   Do the nurses treat patients outside of their
10 homes?
11   A   Be more specific please?
12   Q   I'm not really sure how to ask the question
13 any differently.  What I guess I basically want to know
14 is, do the nurses that work for All VIP only provide
15 services in home for the clients?
16   A   No, they do not.
17   Q   Okay.  If the nurses are now working in homes,
18 what other types of services do they provide outside of
19 homes?
20   A   They can work for them at the hospital,
21 private pay, they can work for them -- they can travel
22 with the client.  They can also work in an assisted
23 living facility with the client.
24   Q   Okay.  And then you mentioned that there's
25 non-medical services, what types of non-medical services

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                          Pages 14..17

Page 14

1   does All VIP provide?
2       A   That includes personal care which is bathing,
3   dressing.  We provide transportation, we provide meal
4   preparation, homemaking, household duties, companionship
5   and the like.
6       Q   What types of All VIP employees provide the
7   non-medical services?
8       A   HHAs and CNAs.
9       Q   HHA stands for Home Health Aide?
10      A   Correct.
11      Q   And CNA stands for Certified Nursing
12  Assistant?
13      A   That's right.
14      Q   Does All VIP employee any other job positions
15  except for nurses, home health aides and certified
16  nursing assistants?
17      A   An RNs and LPNs and that's as far as we go.
18      Q   RN is going to be resident nurse?
19      A   The RN is going to be registered nurse --
20      Q   Registered nurse.
21      A   -- and then the LPN.
22      Q   And what is LPN stand for?
23      A   Licensed Practical something.  I don't
24  remember --
25      Q   Okay.

Page 15

1       A   -- but it's just, you know, it's a step down
2   from being a registered nurse.
3       Q   Got it.  Okay.  And a registered nurse would
4   be under the umbrella of medical services?
5       A   Correct because she can provide skilled
6   services.
7       Q   And a license -- let's assume that LPN stands
8   for licensed practical nurse.  Do they also fall under
9   medical services?
10      A   Oh, yes, they're allowed to.
11      Q   Okay.  All right.  Now you mentioned that
12  under non-medical services one of the types of services
13  companionship, what does companionship mean?
14      A   Talking to the client and, you know, many
15  clients sometimes are lonely or depressed.  So, they
16  talk.
17          They might talk about sports, they might talk
18  about history, anything, the country, you know, we have
19  lot of clients from Cuba, so they'll talk about a
20  country back in the day, their foods, you know, the
21  culture.  Just keeping them, you know, entertain, you
22  know, keeping their mind going.
23      Q   And as it relates to companionship, who
24  determines whether the client needs companionship
25  services?

Page 16

1       A   That all depends because, you know, I don't
2   know if you want to stay specific to this case or you
3   want me to go in general, you have to tell me.
4       Q   Okay.  No problem.  Let's speak generally for
5   right now.
6       A   Okay.
7       Q   Generally speaking, how does All VIP determine
8   if a client needs companionship services?
9       A   One way that we can do it is by the -- either
10  the administrator or the nurse goes out to the client's
11  home and does a care plan -- to do a care plan or the
12  client might just ask for it.
13          We have many clients that will call and say I
14  need companionship for my parent.  You know, I live in a
15  different state.
16          My mom is home alone all the time, she, you
17  know, so they might want companionship.  Sometimes even
18  playing dominoes or bingo cards in the home, that's
19  companionship.
20      Q   Okay.  And how is the order directed to the
21  home health aide or the certified nursing assistant that
22  they are only to be providing companionship services?
23      A   Again, that depends.  For example, I'm going
24  to use Medicaid now, Medicaid Long Term Care Program.
25  The Medicaid Long Term Care program, they have their own

Page 17

1   system where they do the evaluations.
2           After they perform a care plan and they do the
3   evaluation, they speak to the client's doctor, they will
4   send that to the agency, they will tell us what services
5   to provide.
6           Once they give us those instructions, then we
7   call our caregivers and we ask our caregivers, "Can you
8   perform these duties?"  They either say yes or they say
9   no, that's how it all begins.
10      Q   And when you mentioned the agency, you are
11  referring to All VIP?
12      A   That is correct.  In this case, yes.
13      Q   Right.  How does All VIP obtained its clients?
14      A   Well, I've been in the industry for a very
15  long time.  So, I've already established my resources,
16  word of word of mouth, marketing, advertisements, case
17  managers, you know, hospitals.
18      Q   Generally speaking, do clients reach out to
19  All VIP for their services?
20      A   Yes, they can.
21      Q   Does all VIP do any -- I know you mentioned
22  marketing, but do you do any, like, direct solicitation
23  of clients?
24      A   No.  We basically just print that out, you
25  know, through care.com or, you know, that type of --

UNIVERSAL
COURT REPORTING
THE FREE VIDEO COMPANY

877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                                    Pages 18..21

Page 18

1  that type of thing, A Place for Mom.
2         That's usually how we get our clients or
3  unless someone calls us and says to us "listen, you
4  know, we know someone who needs services, here's a
5  number, please call them".
6         That's -- then that's the only way I will
7  solicitate a client.  If someone will call me and say,
8  please call so and so, they need services.  Other than
9  that, we place our X.
10    Q   Once a potential client for All VIPs
11 identified, what process is there to actually have that
12 person become a client?
13    A   We do a care plan.  We do an assessment, we
14 discuss the pricing or the fee and then we start to look
15 for caregiver that is a good fit for the client.
16    Q   How do clients pay for All VIP services?
17    A   They either pay by credit card or check or the
18 insurance company pays.
19    Q   Okay.  So, in the first example you gave which
20 is credit card and check, then would that client be
21 considered a private client for All VIP?
22    A   It will be for the private clients.
23    Q   Are private clients generally paying more than
24 clients who pay -- who are having their services paid
25 through insurance?

Page 20

1         Once the caregiver sends us their timesheet,
2  which means we have to reimburse them for their
3  services, then we send that over to the insurance
4  company.
5         So as soon as a caregiver sends me her
6  timesheet, that's when we send it over to the insurance
7  company for payment.
8     Q   If there's a potential client for All VIP who
9  is going to use insurance to pay for services, is there
10 insurance information collected upfront?
11    A   Oh, yes, from the very beginning.
12    Q   And what All VIP verifies that the insurance
13 is valid, how quickly is a caregiver provided to that
14 person?
15    A   As soon as we can find someone, that can be a
16 day, that can be two days, that can be a week.  It all
17 depends on the needs and also the insurance company will
18 tell us too when to start to provide services.
19    Q   Do insurance companies limit the number of
20 visits that their clients have with All VIPs caregivers?
21    A   Yes, they do.
22    Q   Do the insurance companies define the scope of
23 services that will be -- that All VIP will be providing
24 to its clients?
25    A   Yes, they send over the care plan.

Page 19

1     A   Yes, I know.
2     Q   Okay.  What would the yes be, does it just
3  depend on the services that they're receiving?
4     A   It depends who's paying.  The VA pays very
5  well and most private clients don't pay that much.  So,
6  the answer to your question is, yes, I know.
7     Q   So, some of All VIPs clients are veterans?
8     A   That's correct.
9     Q   And if the client is a veteran, then sometimes
10 their -- All VIPs fees are being paid by the Veterans
11 Affairs Association?
12    A   That is correct.
13    Q   All right.  And then some clients who are not
14 paying through insurance are paying out of their own
15 pocket as far as you know?
16    A   Yes.  If the insurance doesn't pay, then
17 they're paying out of their own pocket.
18    Q   And when we talk about clients whose insurance
19 is paying for the service, then at what point does the
20 insurance company become involved in the payment
21 process?
22    A   Oh, from the very -- once we bill.  Once the
23 insurance company calls us and sends us the referral, we
24 accept the client and we staff the client with a
25 caregiver, then we begin to bill.

Page 21

1     Q   Do All VIP caregivers ever modify the
2  insurance plan without the carrier's consent or
3  knowledge?
4     A   The caregiver cannot do that.
5     Q   Do caregivers have the ability to ask the
6  insurance company to modify the care plan?
7     A   They definitely have the ability, but they do
8  not have the right and it's an appropriate for them to
9  do that.
10    Q   Are the caregivers informed that they cannot
11 modify care plans that are created by insurance
12 companies?
13    A   Oh, they won't inform, especially when they've
14 been working for many years as a caregiver because
15 pretty much all the agencies are the same and
16 furthermore, they get this big package when they come in
17 to apply.
18    Q   Come in to apply for All VIP?
19    A   That's correct.  And usually all the agencies
20 in town pretty much had the same rules.
21    Q   Who at All VIP and let's just stick with the
22 Palm Beach administrate, the Palm Beach office?
23    A   Okay.
24    Q   Who at the Palm Beach office is responsible
25 for assigning caregivers to patients?

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                          Pages 22..25

Page 22

1    A   The care coordinators.
2    Q   Are you a care coordinator at the Palm Beach
3  office?
4    A   I can be.
5    Q   Sometimes you slip into that role?
6    A   Sure.
7    Q   Is Diana Ramirez a care coordinator?
8    A   She can be.
9    Q   Who are the designated care coordinators at
10  the Palm Beach office?
11   A   Well, right now currently we have Cassandra,
12  we have Jisset, we have Analia, we have Astrid, we have
13  Madeline, we have Jonathan Torres, we have myself, we
14  have an Analia.
15   Q   Okay.  You mentioned quite a few people --
16   A   Yes.
17   Q   -- about how many care coordinators would you
18  say they are at the Palm Beach office?
19   A   We definitely have five and it could be up to
20  seven because, you know, we, you know, it's that thing
21  about other job duties has been acquired and with COVID-
22  19 and everything that's been going on, we have to be
23  prepared here.
24       So, employees here have to be prepared to, you
25  know, jump into, you know, into any role, you know.

Page 23

1    Q   Okay.
2    A   So, and so that's what we tend to do, is we
3  want to make sure that our client is staffed and that
4  are not home alone.
5    Q   How many employees does All VIP have in the
6  Palm Beach office?
7    A   Oh, geez.  In this office we probably have,
8  let's see.  There's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,
9  12, 13, 14, like, 15, 16.
10   Q   And are the majority of the employees at the
11  Palm Beach office consider care coordinators?
12   A   No.  Not the majority, no, but they pretty
13  much prepared to jump into that role if need be.
14   Q   Okay.  What other positions are there at the
15  Palm Beach office besides care coordinator?
16   A   Receptionist, office manager, alternate
17  administrator, the nurse.
18   Q   Is there an on-staff nurse, I mean, on-call
19  nurse at all times?
20   A   Well, if we do, we have two that we have, you
21  know, that we have, one is a doctor that, but role here
22  is -- has a nurse.
23   Q   And do the nurses that you're referring to,
24  one who's a doctor and I guess the other one as a nurse
25  working in the Palm Beach office, do they provide

Page 24

1  patient care?
2    A   One of them does and the patients and the, you
3  know, medication management, that type of thing.
4    Q   What does the other nurse or doctor do on-
5  staff?
6    A   They just check records just to make sure that
7  everything is it's in place, you know, and they went
8  meeting federal and state regulations.
9    Q   What is the name of that person that make sure
10  that All VIP is meeting state and federal regulations?
11   A   Well, besides myself because I'm the
12  administrator, so the state will first come to me,
13  they'll ask me, they'll come to me, then they'll go to
14  the nurse and that'll be Dr. Clark.
15   Q   What's the first name?
16   A   Dr. Clark, Diane Clark.
17   Q   Diane Clark.
18   A   Dr. Diane Clark.
19   Q   How long has she worked for All VIP?
20   A   I think she's been here, I'm going to say
21  maybe a year or so.
22   Q   Did Diane Clark work at All VIP at the same
23  time as Cruz Valdivieso?
24   A   I don't think so.  Not at least -- not at the
25  capacity, no.  I'm going to say no and again, we did --

Page 25

1  we, you know, Cruz was doing non-medical services, when
2  you provide medical services, you don't need a skilled
3  person involved.
4    Q   Okay.  Did any of the care coordinators that
5  you mentioned previously work at All VIP at the same
6  time as Cruz Valdivieso?
7    A   Yes, yeah.  Yes, but remember, they're in
8  different offices, but, yes.  So, I don't even know if
9  they know her personally, but, yes.
10   Q   Okay.  And when you say they're in different
11  offices, you mean different physical offices or you mean
12  the different umbrellas and --
13   A   Physical, no, physical offices were West Palm
14  Beach and Cruz was mainly, she was working for Broward
15  and they are in Deerfield Beach.
16   Q   Have you ever met Cruz Valdivieso?
17   A   I think I saw her in the office maybe once or
18  twice.
19   Q   And which office are you referring to?
20   A   West Palm Beach.
21   Q   What reason would Cruz Valdivieso have to be
22  at the West Palm Beach office?
23   A   She came in one day, something about her
24  paycheck, her earnings not being correct.  So, I wrote
25  her a check and that's how I recall seeing her.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                    Pages 26..29

Page 26

1    Q   As the owner of All VIP, are you always aware
2  of all of the home health aides that are working in all
3  of the offices?
4    A   If I would say always, I probably will be
5  lying, but I try my very best to be involved as much as
6  I can.
7    Q   Who is responsible for hiring decisions at the
8  Broward office?
9    A   Diana, Diana Ramirez.
10   Q   Are you Diana Ramirez's direct supervisor?
11   A   Yes.
12   Q   Do you have to approve all of Diana Ramirez's
13  hiring decisions?
14   A   No.  That will be micromanagement and I --
15  frankly, I don't have time for that.
16   Q   I understood.  Okay.  Does Diana Ramirez had
17  to have her -- if she chooses to employ a caregiver,
18  does that decision have to be run by anybody else?
19   A   No, she -- we have to follow state guidelines.
20  So, the state will tell us how to hire them.
21       So, she follows those instructions.  Now when
22  I do audits here, if I see that they hire someone that
23  we're not allowed to hire, then they will be hearing
24  from me-
25   Q   Okay.

Page 27

1    A   -- then I step in.
2    Q   Okay.  And the state guidelines that tell All
3  VIP how to higher caregivers are going to be the same
4  from county to county, correct?
5    A   That is correct.
6    Q   So, please just tell me what those state
7  guidelines basically say, what considerations does All
8  VIP have to take or what factors does All VIP have to
9  take into consideration when hiring a caregiver?
10   A   Okay.  First thing I remember, we are in
11  home -- we provide home care, so we are a nurse
12  registry.  For the nurse registry when we hire a
13  caregiver, she's going to be the client's employee.
14       This caregiver has to have a background check
15  within the 50 states.  So, that's a required and we
16  must.  So, we have to make sure she has and she needs to
17  be -- to do this every five years.
18       So, criminal background, she needs to have her
19  HIV, HIVA certificate, CEU, she must have a medication
20  management certificate.  It's kind of like an assistance
21  with medication management so she needs to know how to
22  remind the client how to take the meds and what
23  happened.  That's key.
24       She also needs to know about domestic violence
25  because as a caregiver, if she sees that in the home,

Page 28

1  she must report it.
2       Alzheimer's, if she's working with an
3  Alzheimer's client, she needs to know how to deal with
4  that.  So, that's -- those are the key CEU that they
5  must have.
6       When they come to apply and get on our roster,
7  they must have that plus CPR card and that needs to be
8  renewed every two years.
9       We also want them to have a professional
10  liability because God forbid something happens because,
11  you know, health care and people always sueing in health
12  care, that protects a caregiver especially when she's an
13  independent contractor.
14       So they should also have professional
15  liability.  There's also now, many insurance companies
16  now offer more protection for them from like a Worker's
17  Comp policy for them as well and that's optional for
18  them, but the most important thing, the CPR card, the
19  criminal background check and the CEUs that the state
20  when they come to audit the office they make sure that
21  these caregivers have.
22       Now in Palm Beach County, there's an extra
23  step.  Now the county wants the caregivers to register
24  with the county.  So, now the county also is involved
25  and who can be a caregiver, who cannot be caregiver.

Page 29

1  That's not happening in Broward thou.
2    Q   Okay.  When did on Palm Beach County start
3  that mandate?
4    A   Oh, gosh.  Maybe I think more than five years
5  ago.  It's been a while now, but it's only in Palm Beach
6  County.
7    Q   And you mentioned that All VIP requires its
8  caregivers to have professional liability insurance?
9    A   We do.  I mean, it's not a mandate, mandated,
10  but we do and it's for protection for the caregiver and
11  the client.
12   Q   How does All VIP verify that the caregiver has
13  professional liability insurance?
14   A   We ask them to provide the form, you know, the
15  certificate of insurance or we can purchase it for them,
16  you know, if they liked, this way we know for sure it's
17  legit.
18   Q   If All VIP does purchase professional
19  liability insurance for the caregiver, how is -- how
20  does the caregiver reimburse All VIP?
21   A   It all depends.  You know, sometimes they will
22  say to us, "You know, we don't have any money right now,
23  do you mind taking out of my earnings?" And so I did say
24  yes or no, it all depends, you know, how well we know
25  them or they'll give us a credit card information or



UNIVERSAL
COURT REPORTING
THE FREE VIDEO COMPANY

877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                              Pages 30..33

Page 30

1   they'll write us a check --
2       Q   Okay.
3       A   -- or they will give us a cash.
4       Q   Did Cruz Valdivieso come to All VIP already
5   having professional liability insurance?
6       A   That I wouldn't know, but I -- if, you know,
7   she would -- I don't know if she came, but she would
8   definitely would have to get one because that's
9   something we encourage them to do.  Again, we encourage
10  them to do it.
11      Q   Okay.
12      A   They are not, you know, they don't have to do
13  it and then at that point if they decide not to do it,
14  you know, we discussed with the client and it's up to
15  the client to agree if they want to keep them or if they
16  want us to replace the caregiver because again, it's up
17  to the client to make that decision.
18      Q   Would -- do you think Diane Ramirez would
19  better know if Cruz Valdivieso had professional
20  liability insurance?
21      A   Yes, she would be better to know.
22      Q   So, --
23          (Thereupon, a short discussion was held off
24          record.)
25          (Deposition resumed.)

Page 31

1   BY MR. CUMMINGS:
2       Q   Okay.  So Ms. McKinnon, I believe that your
3   question, the record stopped running in the middle of
4   your answer and essentially you were just explaining to
5   me how All VIP finds its caregivers.
6           So, you mentioned Craiglist, you said
7   something about going to reach now to medical schools
8   and if you could just kind of pick up where you left off
9   with your answers.
10      A   The medical schools.
11      Q   Okay.
12      A   We go to the medical schools and we asked them
13  to please refer over their top students and many times
14  client they'll send over caregivers as well.
15      Q   The clients already have --
16      A   Yeah, many times --
17      Q   Okay.
18      A   -- they'll refer caregivers over.
19      Q   And Cruz Valdivieso case, do you know how All
20  VIP came to contact her or who made contact with who
21  first?
22      A   No.  And that again, that would probably be a
23  good question for Diana Ramirez, I mean, I can guess
24  either the correct list or maybe the client referred
25  her, I mean, but that's just a guess.

Page 32

1       Q   And are -- does VIP, All VIP consider home
2   health aides to be domestic service employees?
3       A   That depends.  Can you be more specific?
4   That's too general for me.
5       Q   Right.  So, you previously mentioned that as
6   an administrator for All VIP you're responsible for, I
7   forget exactly how you worded it, but I think, you know,
8   monitoring state and federal regulations that apply to
9   the agency.
10      A   Um-hum.
11      Q   And so for the record that you said um-hum
12  there --
13      A   I'm sorry.
14      Q   -- so let me re-ask the question.
15      A   I didn't --
16      Q   No, it's fine.  Believe it's going to happen a
17  few times during the deposition, it happens.
18          Okay.  So, let me just repeat that question.
19  As an administrator for All VIP, you're responsible for
20  monitoring the state and federal regulations that apply
21  to the agency, correct?
22      A   Yes, I'm supposed to conduct audits and make
23  sure that we're following guidelines.
24      Q   Okay.  And as an administrator, are you aware
25  that there is a title, a legal title called the domestic

Page 33

1   service employee?
2       A   Never heard of it here in all my years in
3   homecare.  So, I -- we don't use it obviously.  I've
4   been doing this for many years in home health and we've
5   never used it.  So, I don't know.
6       Q   Are you familiar with the Fair Labor Standards
7   Act?
8       A   Yes, I am.  I have to be.
9       Q   Why is it?
10      A   Because as a nurse registry we have to make
11  sure that when we hire independent contractors, that we
12  treat them as such and when they walk into his office
13  and they apply, that they're aware that they're
14  independent contractors and that they're aware that they
15  are the employees of the client, not the agents.
16      Q   What is All VIPs relationship to its home
17  health aides?
18      A   We process the application, we interview them,
19  we make sure that they meet state and federal guidelines
20  and we pay them on a weekly basis or when the client
21  pays because many clients don't want to be bothered with
22  money with their caregivers.  That's too messy for them.
23      Q   And so does All VIPs serve as a middleman
24  between the caregiver and the client?
25      A   Yes and the insurance company.



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                        Pages 34..37

Page 34

1    Q   And you mentioned that you have to be familiar
2   with the FLSA to make sure that -- let's just stick with
3   home health aides in particular, are being treated as
4   independent contractors.  What did you mean by that?
5    A   Well, for instance when they come in, you
6   know, we give them all the information that they need to
7   know the independent contractors.
8        We also give them the option if they want to
9   go out and get their own tax ID number versus using
10  their -- Social Security Number.
11       We talked to them about overtime, we tell them
12  as an independent contractor they can work over 40
13  hours, but they are not entitled to overtime.
14       We also talked to them about holiday pay,
15  they're not entitled to that either.  However, if the
16  client wants to pay, how are they time, you know, time
17  and a half, what have you, that's okay, we can discuss
18  that with the client and we let them know that they are
19  the employees of the client.
20       We monitor the client services, when it comes
21  to them we just make sure that they are meeting federal
22  and state regulations because if we do not AHCA, the
23  state will close us down if not give us a hefty fine.
24   Q   And A-C-A is that what you're referring to?
25   A   A-H-C-A, AHCA.  I'm sorry.

Page 35

1    Q   A-H-C-A.
2    A   A-H-C-A, AHCA.
3    Q   What -- do you know what that stands for?
4    A   Agency of Health Care Administration.
5    Q   Okay.  Does that agency ACHA provide audits
6   or -- sorry, not provide.  Does that agency do audits of
7   All VIP?
8    A   They do.  They do inspection.  They do.  They
9   do inspection.  We just had one recently as a matter of
10  fact in the Palm Beach office.
11   Q   Okay.  And when you say inspections, what is
12  ACHA inspecting for?
13   A   They inspect the records, they inspect how we
14  get -- how we get our referrals, how we process those
15  referrals and then they check the caregivers that we
16  assigned to these clients, you know, that we refer to
17  work with the clients, they check their records to make
18  sure they are meeting state and federal guidelines.
19       Like they made sure that they have a good
20  criminal background check.  They made sure that they
21  have a CPR card that is not expired.
22       That they have the HIVA certificate.  That,
23  you know, that they know that they have Alzheimer's
24  certificate on file, domestic violence certificate on
25  file, so they check for those things.

Page 36

1        They check their application.  They make sure
2   that we are letting these caregivers know that they're
3   independent contractors.  They check.
4        They check for signatures.  They check that we
5   make sure that we discuss salary.  They check all of
6   that when they come to do the inspections.
7    Q   But normally ACHA is only going per All VIP
8   office, not to every single office for one inspection?
9    A   Exactly.  They go for one office.  So, for
10  Palm Beach County, it's for the license, they will come
11  to West Palm Beach.  For Broward County, they're going
12  to go to Deerfield Beach to do an inspection.
13   Q   Okay.  The -- is ACHA required to do an
14  inspection at any particular interval, like, is it like
15  once a year or its just random?
16   A   I think while in all my years they usually do
17  it, like, every two years usually.  After COVID-19
18  things changed a lot, you know, they don't come as often
19  as they used to, but they normally come, like, every two
20  years unannounced.
21   Q   Got it.  Going back to overtime, you mentioned
22  that All VIP home health aides are informed that they're
23  not entitled to overtime.  Is that correct?
24   A   That is very correct.
25   Q   How are they told that or what point in their

Page 37

1   employment are they told that?
2    A   They're told the moment they walk in and they
3   get their application.  In fact, one of the reasons
4   many clients come to us is because they appreciate the
5   fact that the independent contractors can work more than
6   40 hours.
7    Q   And when you say come to us, do you mean All
8   VIP in particular?
9    A   All VIP in particular or any nurse registry.
10  This was specifically through during COVID-19.  Many
11  clients did not want three or four caregivers coming
12  into their rooms, in and out.
13   Q   Okay.  So sometimes because of the
14  restrictions on hours some home health aides can only
15  work 40 hours and therefore clients have to be assigned
16  different caregivers?
17   A   Well, if we're talking about a home health
18  agency which is different than home nurse registry,
19  those home health agencies, they have to pay for all the
20  time after 40 hours and they can supervise their
21  caregivers, they -- then they must pay them, but a nurse
22  registry, we do not supervise the caregivers.  We
23  monitor our services with the client.  We work for the
24  client.
25       In that particular instance, an independent



Page 38

1  contractor can work 40 hours or more if the client
2  desires that.
3      Q   So, the client is always the one who
4  determines the number of hours that the caregivers
5  provide?
6      A   Yes and no, because remember, if it's private,
7  yes.  If it's insurance, if the insurance company has
8  paid for it, no.
9      Q   Understood.  Okay.  Got it.  So, the client is
10 paying out of pocket, they get to make the rules.
11     A   A client.
12     Q   A client does.
13     A   And many times that is when that -- when it's
14 a private client, there's a negotiation process.  The
15 client will either discuss it with the caregiver because
16 we will refer the caregiver to the client and at that
17 point when they need, they can also discuss salary, they
18 can discuss the hours, they can discuss the duties, the
19 tasks, all of that stuff without even the agency
20 involved.
21     Q   Interesting.  So, once All VIP assigns a
22 caregiver, let's say more specifically once All VIPs
23 assign a home health aide to a client, then the client
24 is essentially paying for the service to the caregiver?
25     A   No, it's up to the client, but most clients

Page 39

1  don't want to do that.  They have the option, of course,
2  but most clients don't want to do that because it
3  becomes too messy.  So, they don't want -- they don't
4  want to be involved with that.
5      So, they'll set up an account with us I say
6  with a credit card and they'll tell the agency charge,
7  you know, charge the credit card once a month or every
8  two weeks or weekly, what have you.
9      The caregiver was will let us know how they're
10 going to pay for services.  The client will also sign a
11 timesheet indicating that the caregiver did work those
12 hours, okay, you may pay her.
13     Q   Got it.  Okay.  So, stay tuned for a second.
14 So I'm going to show you an exhibit.  Okay.  Ms.
15 McKinnon, I'm now showing you what I'm marking as --
16     A   A timesheet.
17     Q   Oh, yeah.  I'm showing you what I'm marking as
18 Exhibit B for the deposition record.
19     (Thereupon, Plaintiff's Exhibit B was entered
20     into the record.)
21 BY MR. CUMMINGS:
22     Q   And you just mentioned that this is a
23 timesheet.  So, my first question to you was going to
24 be, do you recognized a document like this?
25     A   Yes.

Page 40

1      Q   Okay.  And how do you recognize this type of a
2  document?
3      A   Well, because it's the one we gave our
4  caregivers, it's the one that ACHA approved when I first
5  opened the business.
6      It's the one we've been using since 2016 and
7  that's our timesheet that we give to caregivers.
8      Q   You mentioned that the caregivers are supposed
9  to sign off on these timesheets.  Is that the-
10     A   That is correct.
11     Q   Is that the line at the bottom that says
12 client signature?
13     A   That is supposed to be a client signature on
14 the bottom approving the timesheet.
15     Q   Okay.  And who provides the timesheet to the
16 client, is it the caregiver?
17     A   That's right.
18     Q   Okay.
19     A   And the client is supposed to read it and if
20 they approve, the client has to prove.  They signed it.
21     Q   Now what I'm showing you is a 53 page document
22 and it has different timesheets.  These were provided by
23 your company, by All VIP.
24     I'm not sure if you're aware of that and that,
25 but that's why it has these numbers at the bottom of

Page 41

1  each page where it says VIP docs.
2      That's what we call a Bates stamp number.  So,
3  just for the record, for the deposition record I am
4  showing Ms. McKinnon the document that's Bate Stamp
5  Number 11, VIP docs Number 11, which is a timesheet.
6      Okay.  Now on these timesheets, let's just
7  stick to the first one I'm showing you here on Page 1.
8  I see on the left hand side there's a column filled
9  with, it looks like different activities.
10     Who marks off the activities that were being
11 performed for the client?
12     A   The caregiver.
13     Q   Got it.  And does the caregiver also put
14 the -- fill in the time in and time out portions of the
15 timesheet?
16     A   Yes.
17     Q   Is it fair to say that the caregiver is
18 responsible for filling out everything except the part
19 that says client signature on a timesheet?
20     A   That's very fair.
21     Q   Are there different timesheets for different
22 types of All VIP personnel, meaning, does a home health
23 care aide have a different list of activities than a
24 certified nursing assistant?
25     A   No, and there's no need.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                          Pages 42..45

Page 42

1    Q   Why is that?
2    A   Because in home care a CNA will not be working
3    normally with an RN.  A CNA is more for facilities, for
4    hospitals because they work under our RN.  In home care,
5    it's very rare to have a working under an RN.
6    Q   Okay.
7    A   And in hospital CNAs don't clean.  In a home
8    environment, yes, they do.  They have to do light
9    housekeeping.
10   Q   Understood.  Okay.  And so just to clarify
11   what you're saying, home health aides and CNAs will both
12   use the type of timesheet that we see here if they're
13   providing in-home care to a patient?
14   A   Yes, they will use the same timesheet.
15   Q   Are timesheets only used by people providing
16   non-medical services for All VIP?
17   A   That timesheet predominantly, yes.
18   Q   Who are timesheets ultimately turned into once
19   they're completed?
20   A   They send them to their office.  They can, you
21   know, in this case they will be sending it to Broward
22   office so they can be processed and they can get paid
23   and we can submit the invoice to the insurance company.
24   Q   Okay.  If it's insured that's paying for the
25   service, then it goes to the insurance company?

Page 43

1    A   The insurance company will get an invoice,
2    this will stay in the record, so if the insurance
3    company wants to come to the office and do an audit,
4    they can review.
5    Q   Well, what I'm trying to -- let me just take
6    this down for a second.  What I'm mainly asking what the
7    question is, you said that the timesheets will be
8    submitted to insurance companies, but not all patients
9    are paying through an insurance company, correct?
10   A   Yeah.  We don't, in this case for Medicaid we
11   do not send them the timesheets.  We only send them the
12   invoice.
13       The timesheet stayed in the clients file for
14   two reasons.  For the state ACHA when they come to do an
15   inspection, they might want to see that file and if the
16   insurance company wants to come in and conduct an audit.
17   So, those timesheet must stay in the clients file.
18   Q   Got it.  You mentioned that the caregivers
19   will e-mail the timesheet back into the office?
20   A   They can, but, you know, but more importantly
21   they're supposed to be clocking in and clocking out and
22   that's another state regulation.
23       In this case, Ms. Cruz never clocked in and
24   never clocked out.  Once they do that, there's no need
25   to be sending over the timesheets because that is

Page 44

1    registered automatically.
2    Q   How do home health aides like Ms. Cruz clock
3    in and out?
4    A   There is a software which we pay for.  In this
5    case is HHAexchange and it's approved by the state.
6    Q   Is HHAeXchange an application that would be on
7    somebody's phone?
8    A   Yes.
9    Q   Does that mean that all home health aides are
10   required to have a smartphone so that they can use the
11   HHA application?
12   A   They are required or they can use if the
13   client has a home phone, you know, a landline, they can
14   use that as well.
15   Q   So, home health aides also have the option of
16   calling a number to clock in and clock out?
17   A   That is correct.
18   Q   Through HHAeXchange?
19   A   Yes.
20   Q   When did you first become aware or when did
21   All VIP first become aware of issues with Ms. Cruz not
22   clocking in and out?
23   A   A long time ago and it was addressed to her.
24   Q   Did you, Ms. McKinnon ever personally speak to
25   Cruz Valdivieso about clocking in and clocking out?

Page 45

1    A   I sure did when she came into this office to
2    get a paycheck where she says that she wasn't paid
3    correctly and I reminded her to avoid those issues, to
4    please clock in and clock out.
5        Furthermore, because I'm not supposed to be
6    bossing her around, you know, because she's an
7    independent contractor, I made it very clear to her,
8    it's not my rule, it's the state, the federal
9    government, State and federal government and we have to
10   follow these guidelines.
11   Q   The incident that or the time that you were
12   talking about when you spoke to Ms. Cruz Valdivieso, is
13   that the same time when you said you would only really
14   met her once because she came in for a pay issue?
15   A   Yeah, I remember maybe seeing her maybe once
16   or twice, you know, I have over thousand caregiver, so
17   sometimes, you know, it's hard for me, you know, to
18   remember.
19       I didn't really have an, you know, I didn't
20   really have a relationship with her.  That was more
21   Diana Ramirez in that office and, you know, in Deerfield
22   Beach.
23       I did hear of her and because of the payroll,
24   you know, situation and of course, you know, when she --
25   when we ended, you know, when we took her off the

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                    Pages 46..49

Page 46
1  roster, when we had that situation, that's pretty much,
2  you know, when I was involved with her --
3      Q.  Okay.
4      A.  -- but I do recall seeing her here, I do
5  recall writing her manual check, I do recall speaking to
6  her.  That much I do recall.
7      Q.  When you say manual check, you mean actual
8  physical check that was given to her --
9      A.  Yeah.
10     Q.  -- instead of direct deposit?
11     A.  Yes.
12     Q.  Okay.  Just to go back a little bit.  Did Cruz
13 Valdivieso have the HHAeXchange application on her
14 phone?
15     A.  She should.
16     Q.  Would Diana Ramirez be a better person ask
17 that question to?
18     A.  She -- yes, she would be definitely, but, you
19 know, let me see if I can check here quickly, but yeah,
20 definitely Diana would be the one.
21        She definitely knew because I can tell by
22 checking the computer, I have her caregivér code, a
23 mobile ID number.  So, she was definitely informed and
24 she definitely downloaded the software on her
25 smartphone.

Page 47
1      Q.  Okay.  So, All VIP has a way to verify if a
2  caregiver had the software on their phone?
3      A.  Absolutely.
4      Q.  Okay.  And it's in a database that you just
5  refer to?
6      A.  Yes, an HHAeXchange.
7      Q.  Oh, I see.  Okay.  And does HHAeXchange, like
8  an online account that All VIP has?
9      A.  It's like a software that we, you know, that
10 we use and we pay for.  It can also be free, I mean, it
11 all depends, you know, what you sign up for because it
12 is state mandated.
13        So, therefore the state also pays for this
14 program and any agency that has a contract with Medicaid
15 needs to use this software.
16     Q.  At what point in the hiring process are
17 caregivers told that they will have to use HHAeXchange
18 to clock in and clock out?
19     A.  The very beginning.  Especially if they're
20 going to work for a Medicaid client.
21     Q.  Is there paperwork that or like onboarding
22 paperwork that caregivers are provided with that
23 explains the HHAeXchange process for clocking in and
24 clocking out?
25     A.  Yes, especially they need it.  Yes.  They can

Page 48
1  also come here to the office and we help them.  I also
2  send out -- through HHAeXchange I can send messages to
3  the caregivers.
4        I've said numerous times, messages to them, go
5  to YouTube, because there are tutorials on YouTube in
6  Spanish as well which this can help her tremendously.
7        So, we've covered this numerous times with the
8  caregivers, in English and Spanish.
9      Q.  Did Cruz Valdivieso ever complained that she
10 was having issues clocking in and clocking out through
11 HHAeXchange?
12     A.  Not to me, so I don't recall, she could have,
13 but again, I'm sorry, I cannot -- I don't recall.  Maybe
14 Diana Ramirez maybe, but I don't recall having that
15 conversation with her.
16     Q.  So, at what point -- how often are All VIP
17 home health aides paid by All VIP?
18     A.  That depends.  If they clock in and clock out
19 or submit their timesheets as they're supposed to, they
20 can get paid every Friday.
21        If not, they will get paid when the client
22 pays or the insurance company pays and we tell them that
23 as well.  They are independent contractors.
24     Q.  So, essentially does the client or the
25 insurance company paying for the services that they were

Page 49
1  given and then All VIP allocates that amount of money to
2  pay the caregiver?
3      A.  Yes, we bill, they send us the money and they
4  are usually pretty good.  They usually pay every week
5  and we send that over to the caregivers.  That's what
6  we're supposed to do.
7        We're supposed to pay the caregivers.  We're
8  getting that money so we can pay the caregivers so that
9  the client can continue receiving services.
10     Q.  Does All VIP -- does All VIPs profit come from
11 the difference in the service that's provided to the
12 caregiver and the amount that's actually charged to the
13 care -- I'm sorry, the other way around.
14        Does All VIPs profit come from the difference
15 in the service that's being provided to the patient and
16 the amount that All VIP charges for that service?
17     A.  Trying to see if I understand that.  Let's
18 see.  So, I'm going to make sure I answered this
19 question correctly.  I'm not sure if I understood.
20     Q.  Okay.  And so let me see if I can clarify a
21 little bit by giving a number example and I'll just used
22 fairly basic numbers for the point of an example.
23        So for -- let's say a home health aide is with
24 a client all day long and those services are being
25 charged at or I guess the value of those services is,

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                    Pages 50..53

Page 50

1   you know, $20 for the day.  Okay.
2         Does All VIP then send a bill for $30 to the
3   client?
4      A   All VIP care, it's kind of like a staffing
5   agency, that's how we, you know, I'm not sure if you
6   ever use a temp before in your office, you negotiate a
7   rate and that's what you bill and so that's what we do.
8   If the rate is $20 an hour and the aide is there, let's
9   say three hours, that's what we bill.
10        If the contract says that the aide is supposed
11  to be there four hours, but yet the aide only work
12  three, we still bill what the aide worked.
13     Q   All right.
14     A   So, again, we -- our profit and the way we do
15  business, run business just has a staffing company does.
16     Q   Okay.
17     A   And I hope I answered that correctly because
18  I'm still a little confused.
19     Q   No.  I get it.  I understand.  Okay.
20  Understood.  All right.  Are there ever situations where
21  a home health aide is providing services to patients,
22  but they are not being compensated for the services that
23  they're providing?
24     A   That's not the plan, mean, that's not supposed
25  to happen.  Usually, you know, if you work, you're

Page 51

1   entitled to get paid.
2      Q   Right.
3      A   What kind of reputation would I have in the
4   community if we will be -- if we behave in that fashion,
5   so.
6      Q   Right.  But are there situations where home
7   health aides, you know, fill out their timesheets, they
8   clock in and clock out correctly and once the time
9   sheets are submitted, they're waiting to be paid because
10  either the client didn't pay or the insurance company
11  did not pay?
12     A   That is correct.  On those two that you just
13  said there, those two reasons, yes, they may not get
14  paid and that is told to them in the beginning, they are
15  independent contractor.
16        So, you're going to get paid, there might be a
17  problem in your pay, don't expect to get paid like an
18  employee does at a company, you know.  It's different.
19        So, and we usually tell them, you know, we'll
20  call them up and we'll talk to them, you know, we don't
21  want them expecting a paycheck when they're not going to
22  receive one and we also call clients as well and we'll
23  also call the insurance provider if we need to, we also
24  let them know as well and sometimes even ACHA, the state
25  will get involved too if need be.

Page 52

1      Q   Okay.  And if a client does not pay for
2   services that have been rendered to them, what is ALL
3   VIPs role in trying to obtain payment from them?
4      A   Well we would try to help as much as possible,
5   but again, because they're independent contractors, they
6   will have to sue them in Court.
7      Q   Are the caregivers informed that they would
8   have to sue clients in Court if clients aren't paying?
9      A   Oh, yes.  And again like I said, you know,
10  these caregivers are not only -- they don't just
11  register one agency, they register with multiple
12  agencies and trust me, they all get the same
13  information.
14        So, let's just say for argument's sake that
15  All VIP Care neglected to tell them.  Well, guess what?
16  The other five agencies that they register with, one of
17  them told them.  So, maybe all four told them.
18        So, you know, a caregiver that has experience,
19  has been a caregiver for more than a year or three, 10
20  years is well versed.  She knows.
21     Q   If -- so, another example or another situation
22  does -- what does All VIP do when an insurance company
23  is not paying for a service that has been rendered by
24  caregiver?
25     A   Well, for insurance company we normally we

Page 53

1   will call them and many times there will be case
2   managers involved for the, you know, that represent the
3   insurance company.
4         So, we call the case manager and we'll speak
5   to the case manager and many times, you know, just by
6   calling the case manager, we'll get that resolved and
7   once that we get an authorization that insurance company
8   says we're going to pay you, we definitely pay the
9   caregiver --
10     Q   Okay.
11     A   -- because that money belongs to caregiver.
12     Q   Do caregivers -- are caregivers informed that
13  they may have to sue the insurance company for their
14  opinion?
15     A   No, they don't really have to -- they don't
16  have to sue the insurance company because the insurance
17  company will send the agency an authorization, you see.
18        So, once the agency has an authorization, the
19  agency can actually take that on with the insurance
20  company as long as we have an authorization.
21     Q   And the authorization is that essentially a
22  contract?
23     A   It's part of the contract.
24     Q   Okay.  But the authorization is approving the
25  amount of time and the type of service that the

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                                    Pages 54..57

Page 54

1  caregiver can give to the client?
2      A   That is correct.
3      Q   And so that's something that All VIP can
4  always wave back in front of the insured and say, okay,
5  this is what you authorize, this is what it was
6  provided, therefore provided this payment to the
7  caregiver.
8      A   That is correct and that's what the
9  authorization is all about, it's to ensure payment.
10     Q   Now, does the authorization ensure payment
11 only to the caregiver or also to All VIP?
12     A   It's also to All VIP Care plus the caregiver.
13     Q   When patients are making payment for caregiver
14 service, are they writing two separate checks, one for
15 the caregiver and one for All VIP?
16     A   No, because like I mentioned in the beginning,
17 patients don't want to do that, it's too messy for them.
18         Especially when -- remember that -- please
19 keep in mind that our clients were predominantly
20 seniors, they're 80, they are 90 years old, they do not
21 want to be involved with that.
22     Q   And so I understand what you're saying, they
23 don't want to be involved with the payment, but if they
24 are paying, then they have to be paying somehow.
25         So, what happens to their payment, how does it

Page 55

1  get split up and the portion for the caregiver gets sent
2  out to the caregiver, does All VIP taken all the money
3  and then cuts a check to the caregiver as a 1099
4  payment?
5      A   Normally, okay, we bill the client, the client
6  sends us a check for everything.  For our fee, plus the
7  caregivers rate and then we cut a check to the
8  caregiver.
9         There are times where the client can pay the
10 caregiver directly and that has happened, but it's not
11 very often that happens and then they will just pay the
12 caregiver directly and then they will send us whatever
13 they need to send the agency, but that doesn't happen
14 very often, clients do not want to engage with that,
15 they just don't.
16     Q   Are there ever a situations where a client
17 will give the caregiver the money for the caregiver
18 services and All VIPs fees?
19     A   Yes, but it's very rare.
20     Q   Okay.
21     A   Very rare.  Can it happen?  Of course, but
22 it's very rare.
23     Q   And then in that situation, the caregiver is
24 now responsible for taking the payment back to All VIP,
25 to wherever their home office is?

Page 56

1      A   No, they don't have to give us any payment,
2  they will just be -- they'll just be getting —
3  hopefully, they'll just be getting their share, but if a
4  client gives him a check that includes our fee then,
5  yes, they have to bring the check over to the office.
6      Q   Understood.  Okay.  As far as you know, is
7  there any allegation that Cruz Valdivieso kept any money
8  that was supposed to go to All VIP?
9      A   No.  I do know that she was getting paid.  It's
10 my understanding that the clients were paying her
11 privately as well which is against the contract that she
12 signed, but in any case, in any event, you know, the
13 clients liked her, they were happy with her.  That I
14 guess --
15     Q   Yeah.  Sorry.  Go ahead.
16     A   I guess that's what matters, you know, they
17 were happy and services as far as I was concerned with,
18 you know, they were being provided and that's what's
19 important, you know, at the end of the day.
20     Q   Right.  When you say Ms. Valdivieso was being
21 paid privately by the clients, what do you mean?
22     A   The client that were using her for extra
23 hours, they were utilizing the services beyond what the
24 insurance company authorized.
25         So she, I guess had this agreement with the

Page 57

1  family where she was working extra hours in the family,
2  we're paying her directly.
3         Again, you know, it's against the contract,
4  but, you know, like I said, clients were happy and we
5  just left it at that.
6      Q   Okay.  Now the clients that you're referring
7  to were Ms. Cruz was working extra hours, is this one
8  particular client or was this more than one client that
9  All VIP assigned Ms. Cruz to?
10     A   I think she had like three if I recall when I
11 was -- when I was looking into her case and what took
12 place.  I believe she had three clients.
13     Q   That she was working on authorized hours for?
14     A   No, just two because I believe there were a
15 couple if I'm correct, it was a couple and I believe
16 they were two.
17     Q   Okay.  And you're saying that the couple, each
18 were individual patients for All VIP?
19     A   That's correct.  They each had their
20 authorization through Medicaid.
21     Q   And I think in your previous statement, what
22 you were attempting to say was that All VIP had only
23 assigned Ms. Cruz Valdivieso to three client's total?
24     A   No, it's the -- well, it's not that just only.
25 When I was involved with her situation here at the



877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                    Pages 58..61

Page 58

1  office, I noticed she had three.
2       She could have been -- she could have been
3  assigned to more, but it all depends, because she's
4  working 50, 60 hours a week, I mean, there's just so
5  many clients that you can have in one week.
6    Q.  Okay.  Understood.  Is All VIP claiming that
7  Ms. Cruz Valdivieso was stealing time while she was
8  working for All VIP?
9    A.  I wouldn't say she was stealing time. I'm just
10  going to say that she, you know, she ignore her
11  contract.  She's not supposed to be working privately
12  for our clients.
13       When you refer an independent contractor to
14  the clients, they're not supposed to be working
15  privately for the client with our knowledge and that's
16  what she did.
17    Q.  Is that essentially like moonlighting?
18    A.  No.  That's -- no, that's not moonlighting.
19    Q.  Okay.  So when you say working privately for
20  the clients, that means specifically that she's working
21  hours that were not authorized by the insurance company?
22    A.  Not authorized by the insurance company, but
23  not -- but it is also a contract where it specifically
24  states that you're not allowed to do that because in
25  essence she's, you know, she's -- they are just not

Page 59

1  allowed to do that.  It goes against the values, it goes
2  against the contract, it goes against the business
3  model, you're not allowed to be working for the client
4  without the agency being aware of it and that's what she
5  was told.
6    Q.  Okay.  How did the agency become aware or how
7  did All VIP become aware that Ms. Valdivieso was
8  providing hours without authorization?
9    A.  I became aware to Diana Ramirez, she brought
10  it to my attention.
11    Q.  What did Ms. Ramirez tell you?
12    A.  She was working privately for the clients.
13    Q.  Okay.  And do you know how Ms. Ramirez found
14  that information out?
15    A.  No, I don't, but I, you know, I mean, I hate
16  to assume, but I -- probably, you know, in general when
17  we find out these things, usually because there was an
18  issue, you know, so there was an issue and when she
19  delved into it, that's when she discovered, but again,
20  that's something that perhaps she should answer so that
21  we can be accurate.
22    Q.  Okay.  But when you found out -- when
23  Ms. Ramirez told you that there was an issue with
24  Ms. Cruz providing an authorized hours, what was your
25  response?

Page 60

1    A.  I was, you know, I just said look, you know,
2  the client is happy, so let's just, let it be, you know.
3    Q.  At any point, did you become aware that the
4  clients themselves were making complaints against All
5  VIP?
6    A.  No, the only time I spoke -- perhaps I spoke
7  to one of them, maybe a daughter or something was when
8  she was calling it to discuss her pay or something, but
9  why would there be any complains when they were happy
10  with the caregiver, when they had her working extra
11  hours be on the Medicare authorization.
12       No, there is no complaint, it makes absolutely
13  no sense.
14    Q.  At any point did you become aware that
15  Ms. Cruz was making complaints against All VIP about her
16  payment?
17    A.  Yes, that we --
18    Q.  Okay.
19    A.  And that only with this client, but with
20  another client.
21    Q.  Okay.  So, let me just pull up a couple of
22  documents so we can be -- we can make sure we're talking
23  about the same clients.
24       Okay.  I'm now going to show you what I'm
25  marking as Exhibit C for the deposition record.

Page 61

1       (Thereupon, Plaintiff's Exhibit C was entered
2       into the record.)
3  BY MR. CUMMINGS:
4    Q.  Do you recognize the document that I'm showing
5  you on your screen Ms. McKinnon?
6    A.  Yes.
7    Q.  Okay.  And how do you recognize this document?
8    A.  Because I believe I'm the one that responded
9  to it and I saw it and that's not, you know, the client
10  did not do that, that was a family member and this came
11  because of Cruz and the reason why I said it's not true
12  is because the client never call here to complain about
13  services.
14    Q.  Okay.  How did you become aware of this Google
15  post being -- well, first, where did you see this Google
16  post?
17    A.  I saw it online in Google's review.
18    Q.  Okay.  Do you regularly monitor the Google
19  reviews for All VIP?
20    A.  Sometimes I do, sometimes.  Not always because
21  our record speaks for itself.  We have lots of client's,
22  lots of great reviews, so, you know, I -- but sometimes
23  I do because I want to make sure, you know, that my
24  staff is doing their job.  That's why I do it mostly, to
25  make sure that my staff, in house staff that they're


UNIVERSAL
COURT REPORTING
THE FREE VIDEO COMPANY

877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                              Pages 62..65

---

Page 62

1  doing their jobs.
2      Q   Did anybody direct you to look at this
3  particular Google posts or you just --
4      A   You know, I don't recall. I'm sorry. I have
5  way -- I have hundreds of clients, hundreds of
6  caregivers. This is a very busy business. So no, I
7  don't recall. I don't.
8      Q   Now looking at the name of the person who, you
9  know, the review is under, where it says Cesar ZK, was
10 Cesar ZK an All VIP client?
11     A   I believe he -- I believe, yes and he did not
12 write that review.
13     Q   Okay. How do you know?
14     A   Because I know. He's a senior, he's not going
15 to do that. It wasn't him.
16     Q   Okay. But did you ever receive any
17 information that somebody else wrote this review or you
18 just assume --
19     A   I don't recall receiving any information. I
20 don't. We can ask Diana Ramirez, but I just don't
21 recall.
22     Q   Okay. And so whether he wrote the review in
23 that or if it was a family member or somebody else,
24 looking at the content of it, it says that HHAs home
25 health aides were always complaining they were not being

Page 63

1  paid by the agency and threatened into stop delivering
2  services to the customer, patient.
3      What is -- do you have any idea of what Mr. ZK
4  or the post is referring to there?
5      A   First of all, Mr. ZK did not write that post
6  and second of all, it's referring to the caregiver
7  complaining to the clients order that she was not paid,
8  which it's -- that's what she was doing.
9      Q   Okay. And in this particular case, the
10 caregiver would have been Ms. Cruz?
11     A   That's correct.
12     Q   All right. Do you know why Ms. Cruz was
13 complaining that she was not being paid?
14     A   No.
15     Q   However, Ms. Cruz did come to the Palm Beach
16 office one time and complained to you that she was not
17 being paid, correct?
18     A   That is correct, maybe once or twice.
19     Q   Okay. And what was her specific complaint
20 when she came into the Palm Beach office about not being
21 paid?
22     A   That she didn't get paid or she didn't get
23 paid correctly. It was some -- again, I have over 1000
24 caregivers, you know, on my roster.
25     So, something about her not getting paid right

Page 64

1  or whatever and again, you know, I explained to her,
2  Cruz we have a system in place to avoid these issues,
3  please utilize the software, utilize the resources, you
4  know, that you have, you know. Use HHAeXchange to clock
5  in, clock out. That goes automatically to the payroll
6  and you won't have these issues.
7      Q   When you spoke with Ms. Cruz Valdivieso, did
8  you speak to her in English or Spanish?
9      A   Spanish.
10     Q   Okay. So, are you --
11     A   I think it was Spanish.
12     Q   Okay. Are you a fluent Spanish speaker?
13     A   --
14     Q   Okay. Well, just for the deposition record
15 you have to actually say yes, so.
16     A   Yes.
17     Q   Okay. Thank you. And do you also read in
18 Spanish?
19     A   I do read Spanish.
20     Q   Do you write in Spanish?
21     A   A little.
22     Q   Does All VIP provide any Spanish language
23 documents to its caregivers?
24     A   No, because it is not my responsibility to do
25 so, but they can and they have in the office if a

Page 65

1  caregiver will request they'll do it, you know, out of
2  the kindness, you know, of our heart, you know.
3      Sure. We're compassionate, we'll do it, but
4  normally, no and we're not -- we're not mandated to do
5  so.
6      Q   The independent contractor agreement that home
7  health aide sign, is that an English or Spanish?
8      A   Absolutely. And its in English this is the
9  US, it is in English.
10     Q   Do you know if Cruz Valdivieso ever informed
11 any All VIP employee that she did not understand the
12 independent contractor agreement?
13     A   No, she did not and when they have issue, if
14 they have an issue, we have bilingual staff here. Okay,
15 bilingual.
16     They will go into the conference room with
17 them and they will walk through the application with the
18 caregiver, but it is in English because that's the
19 requirement, English.
20     Q   The bilingual staff that you mentioned that
21 we'll go through documents, All VIP documents with
22 caregivers, are they only in Palm Beach or are they in
23 all of the offices?
24     A   They are in Palm Beach, they are in Deerfield
25 Beach, they are in Pahokee.

---

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                          Pages 66..69

Page 66

1    Q   When home health aides sign up to work for All
2    VIP, do they fill out the application online or do they
3    fill out the application in the office?
4        A   They could fill it out online and sometimes we
5    do that to make things easier for them because, you
6    know, if they don't work they don't get paid.
7            So, you know, just to make things easier for
8    them, but mostly they come to the office because we need
9    to meet you. We need to know who are we referring to a
10   client's home. These seniors are depending on us. So,
11   and we need to make that connection with the caregivers.
12           We need to make sure that they represent. So,
13   we need to you know --
14   Q   Okay.
15       A   So, they normally come to the office and
16   apply.
17       Q   Got it. And are caregivers told to come to
18   the Palm Beach office for employment, like onboarding or
19   they can go to any office?
20       A   They can go to any office they like.
21       Q   Okay. Do you know how Ms. Cruz Valdivieso
22   turned in her application for employment with All VIP?
23       A   No, I don't. I'm sorry.
24           (Thereupon, a short discussion was held off
25           record.)

Page 67

1            (Deposition resumed.)
2    BY MR. CUMMINGS:
3        Q   All right. So Ms. McKinnon, when we left off
4    we were talking about Google post that I was showing you
5    an Exhibit C and --
6        A   Yes.
7        Q   -- we were also talking about caregivers and
8    certain documents that they have to sign. So, let me
9    just show you some of the documents that I have.
10       A   Yes.
11       Q   I'm going to make this Exhibit D for the
12   deposition record, so.
13           (Thereupon, Plaintiff's Exhibit D was entered
14           into the record.)
15   BY MR. CUMMINGS:
16       Q   Okay. Now what I'm showing you is a 25 page
17   PDF document --
18       A   Okay.
19       Q   -- All VIP provided to us --
20       A   Okay.
21       Q   And based on what I'm scrolling through here,
22   starting at Page 1, do you recognize what types of
23   documents these are?
24       A   Yes.
25       Q   Okay. What types of documents are this that

Page 68

1    I'm showing --
2        A   That's the application when I first come here
3    to apply.
4        Q   Okay. Is this applications specifically for
5    home health aides?
6        A   Home health aides, CNAs, LPNs, RNs.
7        Q   And they're all required to fill out these
8    forms that I'm showing you in Exhibit D here?
9        A   According to my attorney, they are. When we
10   first help with the business, that's what he said.
11       Q   Okay. And as we -- as you mentioned earlier,
12   this document is only provided in English, correct?
13       A   That is correct.
14       Q   Or these documents I should say. All right.
15       A   Only in English.
16       Q   Okay. Now on the bottom of Page 15 of 25,
17   which has Bates Stamp Number, All VIP 26A150000150 --
18       A   Yes.
19       Q   -- Under signature or above signature of
20   authorized company representative, who is your Yanaris
21   or Yanaris Perez?
22       A   She used to work here in the Broward office
23   with Diana.
24       Q   Okay. And what was her title?
25       A   She would help -- she would be Diana Ramirez

Page 69

1    assistant, help her run that office.
2        Q   Why is Ms. Perez's name on the -- on
3    Ms. Cruz's sign on documents?
4        A   Because she processed her when she first came
5    in. That's the only reason she would have to process
6    her.
7            When Ms. Cruz came -- arrived to the office
8    I'm assuming in Deerfield Beach because that's where she
9    worked, she processed her, she interview her, she gave
10   me the application and by the way, Ms. Perez is
11   bilingual in English and Spanish and she parts the
12   application, so she signs it.
13       Q   Okay. Got it. And when -- so when you say
14   process, process basically means that Ms. Perez carried
15   out the interview process for Cruz Valdivieso?
16       A   That's correct. Yes.
17       Q   Okay. And going down to Appendix A, which
18   is page 16 of the document that I'm showing you in
19   Exhibit D --
20       A   Yes.
21       Q   -- what exactly is this independent contractor
22   payment schedule telling the potential or the new
23   employee?
24       A   That there -- this, you know, because we
25   negotiate sa -- rates. So, that's what they're supposed

Page 70

1  to when the salaries negotiated, they put there, it's
2  written and they really -- she should have -- Ms. Perez
3  should have put that a price, you know, whatever they
4  negotiate it, it should have been put there.
5       With Medicare we really can't negotiate much
6  because Medicare doesn't negotiate.
7    Q   Okay.
8    A   So, you know.
9    Q   And so - sorry.  So, in this particular
10  situation with Cruz Valdivieso, if she was negotiating
11  the price, where would that number be, would it be next
12  to HHA/CNA at the bottom?
13    A   That is correct.  That's exactly where it
14  should have been put right there.
15    Q   Okay.  And if this document is blank, then
16  does that mean that Ms. Valdivieso was not working under
17  a specific rate of pay that she was supposed to be
18  receiving?
19    A   You know, it's hard for me to tell because I
20  wasn't there and I don't know what Ms. Perez was
21  thinking, but as a manager and someone who runs the
22  office, this tells me that that Ms. Perez didn't follow
23  through, maybe she was being human that day she forgot
24  or maybe her and Cruz didn't come to agreement.  I don't
25  know, but was supposed to put a rate, was support to put

Page 71

1  something there whether it's a question mark.  Many times
2  when I would do this, I will put $10 to $15, you know, I
3  always put something.
4       So, that I can only tell you what I can, you
5  know, what they supposed to really be doing and why did
6  she leave it blank?  I don't know.  I wasn't there.  I
7  wasn't privy to that.  I didn't privy between her and
8  Ms. Cruz, but was supposed to put something there.  We're
9  not supposed to leave it blank.
10    Q   Okay.  Would Ms. Valdivieso start date be
11  considered the date that she signed these documents?
12    A   No.  But, you know, that's the day that pretty
13  that, you know, that she should, that she can definitely
14  start, but sometimes they start before, it all depends
15  on the client.  Sometimes the client brings them on, you
16  know, and sometimes they come from other agencies.
17       So, we don't want to interrupt services, so we
18  let them, you know, work before signing the contract,
19  but normally, they're supposed to come and fill out the
20  application and we talk to them.
21       We go over the duty, the client.  You know,
22  "Can you accept this assignment?"  Yes or no?  You know,
23  we go over everything and then we put them and then we
24  send them over to meet the client and then they begin
25  work.

Page 72

1    Q   Okay.
2    A   That's normally the process.
3    Q   Does All VIP know if you Yanaris Perez explain
4  the independent contractor agreement to Cruz Valdivieso
5  in Spanish?
6    A   I'm going to say, yes, because Ms. Cruz always
7  spoke to us in Spanish.
8    Q   This document that I'm looking at on Page 24
9  of 25, which has Bates Number 24, where -- this
10  says, "Waiver of professional liability insurance."  Does
11  this tell you that Ms. Cruz Valdivieso was waiving the
12  professional liability insurance or that she was not?
13    A   What this tells me is that me as a company, I
14  will be safe.  This tells me whether Ms. Cruz has
15  insurance or not.  This saves All VIP Care.  That's what
16  this document tells me because many times, you know,
17  they buy the professional liability and they forget to
18  renew their professional liability.
19       So, this document just tells me that as a
20  company, as a business I am safe.
21    Q   Okay.  Meaning that if the home health aide,
22  in this case Ms. Cruz does not have professional
23  liability insurance, that she's agreeing not to sue All
24  VIP if she gets sued?
25    A   If Ms. Cruz neglect to renew her policy, this

Page 73

1  tells everyone that she should not be suing me.
2    Q   Okay.  And are home health aides or let me put
3  it like this.  When people sign on to work with All VIP,
4  are they required to fill out this waiver of
5  professional liability insurance document?
6    A   They don't have to.  They don't have to sign
7  anything, but if they, you know.
8    Q   Go ahead.
9    A   If for example, she says I do not want to sign
10  a waiver of professional liability insurance, then we
11  tell her, well, then you must have, otherwise we cannot
12  put you on our roster and --
13    Q   Got it.
14    A   -- send and give you job sites.
15    Q   Okay.  Understood.  And then the last page in
16  this Exhibit D is the independent contractor
17  professional liability policy.
18       Does this document indicate to you that
19  Ms. Cruz did have professional liability insurance?
20    A   No, this document tells me that she's been
21  notified.
22    Q   Just as she's been notified that she should
23  have.
24    A   That is correct.  That she should have it and
25  that she needs to have it.  It's the best thing to do.



877-291-3376
www.ucrinc.com

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                    Pages 74..77

Page 74

1  It's good business practice.
2      Q   Is there any document that tells All VIP that
3  Ms. Cruz in fact have professional liability
4  insurance while she was working with All VIP?
5      A   I don't know because again, you know, she's in
6  a different office.  So, that would be a good question
7  for Diana Ramirez and it'd be a very good question for
8  her.
9      Q   Got it.  Is there any document within these 25
10  pages of Exhibit D that explains how much Ms. Valdivieso
11  Cruz was actually being paid when she was a home health
12  aide?
13      A   I will tell you that this document I did not
14  see that.  However, I will tell you that I spoke to her
15  about that because if she negotiated her rate, yes, she
16  did.
17          She was asking for much more than what we
18  normally pay someone at that time working for Medicaid.
19  So, she got more than what she was supposed to get and
20  that I opposed.
21      Q   Who did she -- who did Ms. Valdivieso Cruz
22  negotiate her rate with?
23      A   With me and she told the office in Deerfield
24  Beach and it was brought to my attention.
25      Q   Let me just bring that down for a second.  So,

Page 75

1  did she negotiated her rate with you before she was
2  actually brought on to be a home health aide with All
3  VIP?
4      A   I don't recall, I just remember.  The rate was
5  negotiated.
6      Q   How much did she negotiate her rate for?
7      A   13 an hour at that time.  At that time, she
8  negotiate 13 an hour.  You have to understand that at
9  that time -- and I'm just giving you extra information
10  here --
11      Q   Right.
12      A   -- The reimbursement for Medicaid and you
13  cannot negotiate Medicaid, negotiate with Medicare,
14  okay, was only $16 an hour and we negotiated with her 13
15  an hour.
16      Q   Okay.  Which mean -- which then meant that for
17  every hour service that Ms. Cruz worked, that All VIP
18  was only receiving $3 an hour?
19      A   That is correct.
20      Q   What is the normal rate at home health aides
21  working with Medicaid charge or negotiate?
22      A   Back then and again, it depends, it depends
23  for instance, they might get minimum wage or they might
24  get $9.
25          Normally in my area, Broward maybe 10 an hour,

Page 76

1  West Palm Beach a little bit more, it all depends.
2      Q   Why did All VIP negotiate $13 an hour with
3  Ms. Cruz in particular?
4      A   Because as independent contractor, she has
5  that right and she requested it.  She said she wasn't
6  going to work for less.  So, we negotiated a rate with
7  her.
8      Q   Was there any consideration made into her
9  previous experience?
10      A   No because Medicaid doesn't take that into
11  account.
12      Q   Okay.  Did you know who Ms. Cruz Valdivieso
13  was before she started working with All VIP?
14      A   No.
15      Q   Do you know if All VIP received a
16  recommendation to hire Ms. Cruz Valdivieso, does she
17  come under any special, with any special
18  recommendations?
19      A   I don't, but then Diana Ramirez she knows more
20  about this case then I do.
21      Q   Don't know.  Okay.  Are All VIP employees
22  required to wear a uniform when they provide care in the
23  house?
24      A   As an independent contractor, they are not
25  require to wear uniforms.  However, if the client

Page 77

1  requires them to wear uniform, the answer is yes.
2      Q   So, sometimes clients require the home health
3  aides to wear a uniform in their house?
4      A   Absolutely.  And sometimes the clients do not
5  want them wearing uniform.
6      Q   And for that reason does All VIP have some
7  type of uniform that home health aides can use?
8      A   If the client wants to wear uniform, we tell
9  the caregivers to, you know, just buy the regular scrubs
10  that the Walmart sells, you know.
11      Q   Okay.  Is there any clothing that All VIP has
12  that has its logo or name on it?
13      A   We do, but for in-house.  We don't have that
14  for our caregivers.  The independent contractors, no.
15      Q   Who sets the schedule for the caregivers?
16      A   That -- the schedule is set between two people
17  in this case and I'm going to be specific with this
18  case --
19      Q   Okay.
20      A   -- With this case, it's Humana, Humana Long
21  Term Care.  The case manager will meet with the client
22  and family members.
23          They do what we call an assessment, a care
24  plan.  They are the ones that schedule the schedule.  So,
25  I'm going to say the case manager and the family or the

Page 78

1  client, they are the ones that came up with the
2  schedule, not All VIP Care.  Case management and Humana
3  and the family, the client.
4      Q   Got it.  Okay.  And how was their schedule
5  then given to All VIP?
6      A   Humana would then send it an authorization and
7  they'll call us up and then we'll an intake and
8  they'll tell us exactly what they want and now because
9  of HHAeExchange, will be in the computer.
10     Q   Okay.  So, generally speaking or let's just
11 talk, like you said, let's talk about Cruz Valdivieso.
12 When you say Humana, which client had Humana, was it ZK
13 case?
14     A   Let's see real quick here.  He had Humana,
15 yes.  Well, he has Humana, yes.
16     Q   Mr. ZK had Humana.  Okay.  And you previously
17 mentioned that there was a couple, was it the ZK that
18 were a couple or was this a different --
19     A   I believe so --
20     Q   Okay.
21     A   -- they're the only ones that come to mind. At
22 this moment, they were a couple.
23     Q   And so would Humana have met with -- Humana
24 case manager had met with the ZKs prior to any All VIP
25 involvement with the ZKs?

Page 79

1      A   Yes.  They are supposed to, yes.  That's the
2  norm.
3      Q   And then the Humana case manager sends over a
4  schedule and an authorization and at that point All VIP
5  has to find the caregiver.  Is that correct?
6      A   That is correct.  Sometimes the clients bring
7  their caregivers and I don't know if that happened in
8  this case, I don't recall, but there'll be a good
9  question for Diana Ramirez.  She would know.
10     Q   Got it.  Okay.  And then does Humana have to
11 approve the caregiver after the authorization is given?
12     A   No.
13     Q   No.
14     A   No.
15     Q   Okay.  That's really just up to All VIP to
16 decide who the caregiver would be based on the hours
17 that are available and the service that needs to be
18 provided?
19     A   Well, the caregiver has to meet federal and
20 state regulations.  So, you know --
21     Q   Right.
22     A   -- Humana trusted us, I mean, I have a
23 contract with Humana where I'm going to follow State and
24 Federal regulations.  So, they trusted me that I'm going
25 to do my job.

Page 80

1      Q   Does Humana get involved at all with the
2  payment or the hourly rate that the home health aide is
3  being paid?
4      A   No, because Medicaid does not negotiate rate.
5  They're going to pay you what they're going to pay you
6  and you take it or not.
7      Q   Got it.  So, even though this is a Humana
8  plan, it's still being paid out by Medicaid?
9      A   That is correct.
10     Q   Okay.  In the case of Ms. Cruz Valdivieso, did
11 All VIP ever have to make contact with Humana?
12         (Thereupon, a short discussion was held off
13         record.)
14         (Deposition resumed.)
15 BY MR. CUMMINGS:
16     Q   So, yeah.  So, Ms. McKinnon, I believe the
17 question I was in the middle of asking you was, once
18 Humana and the client come up with the schedule, how is
19 that scheduled then relayed over to the home health
20 aide?
21     A   We call the aide and we tell them exactly what
22 the client needs.  We have a form, you know, client, you
23 know, the schedule is Monday through Friday from 09:00
24 to 05:00, you know, client need bathing, dressing, meal
25 preparation, medication reminders, you know, are you

Page 81

1  willing to do this?
2         Sometimes, you know, client needs -- client
3  and aide is willing to walk the dog, "Are you willing to
4  do this?"  Whatever it is and so, the aide will say yes
5  or no and then at that point that we send -- we call up
6  the client and we tell the client, "We find aide whose
7  accepting your case, would you like to interview or
8  should we just send her to start the case?"
9      Q   Okay.  All right.  So, now let me show you
10 what I'm going to mark as Exhibit E for the deposition
11 record.
12         (Thereupon, Plaintiff's Exhibit E was entered
13         into the record.)
14     A   Okay.
15 BY MR. CUMMINGS:
16     Q   Okay.  Can you see the document that I'm
17 showing you on the screen right now?
18     A   Oh, yes.
19     Q   All right.  This is an eight page document.
20     A   Okay.
21     Q   It also has Bate stamps numbers, it just says
22 VIP docs 155 I believe, all the way down to 162.  I'll
23 just go back to the first page and first, do you
24 recognize this document?
25     A   Of course.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                                    Pages 82..85

Page 82

1   Q   Okay. How do you recognize it?
2   A   Because it's HHAeXchange, it's what we use
3   every day.
4   Q   And you already explained what HHAeXchange is-
5   -
6   A   The home care software.
7   Q   Right. Exactly. You already explained that.
8   In this particular case we can see that the patient name
9   here is a ZK C -- Cesar ZK.
10      We see a coordinator is Diana Ramirez and then
11  when we look down on the schedule on this first pages
12  patient calendar, we can see that Friday, Saturday and
13  Sunday are blocked off and they have Ms. Valdivieso
14  Cruz's name. So, how would Ms. Valdivieso Cruz access
15  this calendar?
16      A   Through her smartphone. I also think it's
17  important to mention that what you see on the screen,
18  that information you see there is predominantly put in
19  there by Humana, the insurance company.
20      Q   And so the insurance company is regularly
21  updating the schedule that the patient is going to be
22  receiving care on?
23      A   They don't update the schedule. What they
24  update in there is the authorization --
25      Q   Okay.

Page 83

1   A   -- and the duties, the hours that we're going
2   to perform each duties per week.
3   Q   And so the times that are on the schedule,
4   those -- in the green boxes those are being inputted by
5   a Humana employee as far as you know?
6   A   Yes. Oh, I know.
7   Q   Okay. If those hours are definitely not being
8   inputted by All VIP employee?
9   A   The only thing we put in is down there what
10  you see in green, that H name, you know, the hours that
11  she's working, that is inputted by All VIP Care, that
12  green that you see there.
13      Q   Okay. But the parts that are in green are the
14  schedule as far as I'm concerned because it looks like
15  it's been --
16      A   It is, but --
17      Q   Say it again?
18      A   It is, but what you don't see because you can
19  open it up to see is that the authorization tells you
20  how many hours a week she's supposed to be working and
21  the duties.
22      Like T1019, she's supposed to be doing
23  personal care. And Humana will tell you there, of
24  course, you can't see it, but in there you click on it
25  and it will tell you how many hours you do on Monday or

Page 84

1   Friday or Saturday or Sunday a personal care, this
2   client also gets companion care and this client also get
3   homemaking services.
4   Q   Okay. So, --
5   A   So, Humana will know you are there.
6   Q   -- let's slow down for a second. So, it says
7   on this first page, last three authorizations in blue,
8   then we see a grid and the first column says contracts
9   and if we go over maybe about four columns, it says
10  discipline. So, are you referring to this column here?
11      A   That's correct. That --
12      Q   Okay.
13      A   -- and the next one, and the one next to it.
14      Q   Okay. So let me just stop for a second. What
15  is PCA stands for?
16      A   Personal care.
17      Q   Personal care. Okay. And then COMP?
18      A   Companion.
19      Q   Got it. And HMK is homemaker?
20      A   We're homemaking. Yes.
21      Q   Homemaking.
22      A   That's the same thing, homemaker, homemaking.
23      Q   For -- I noticed that Ms. Valdivieso Cruz's
24  name is not the only one that appears on the schedule.
25  There's also somebody named Landa Pena Yanni, do we

Page 85

1   know, is that All VIP employee?
2   A   At that time she was. I'm not sure she's
3   still with us. By the time she was.
4   Q   So, All VIP has different caregivers providing
5   services to the same patients sometimes?
6   A   That is correct.
7   Q   Depending on what their specific skill set is?
8   A   No, depending on the --
9   Q   No.
10      A   -- caregivers -- no, because once a caregiver
11  comes on board, they got the skills. This is depending
12  on who is willing to work the hours or take on that
13  sift.
14      Q   Excellent. Okay. Understood. Got it. Okay.
15  And so, Ms. Valdivieso Cruz theoretically should be able
16  to provide the personal care, the companion care and the
17  homemaker care?
18      A   Absolutely.
19      Q   The same with Ms. Pena, Landa Pena. It's just
20  who works the hours that authorized.
21      A   Yes.
22      Q   Is that correct? Okay. And the only thing
23  that All VIP is doing is assigning the slots that the
24  caregiver is going to work based on the hours that
25  Humana already authorized?

Page 86

1    A   Humana and the clients.  Remember --
2    Q   And the client.
3    A   -- this is not just Humana.  Humana is going
4  to operate based on their assessment with the client and
5  their family members.
6    Q   Okay.  Understood.  Now I'm looking at this
7  first sheet and we go over a few more columns to where
8  it says max.
9        Then we see numbers.  We see 285 for personal
10  care, 150 for Companion Care and what 710 for Homemaker,
11  what is that max column referring to?
12    A   That means the most they can do.  For his
13  case, he -- for personal care that the first one, he was
14  authorized from May 19th, 2022 to July 26th, 2022.
15        We were authorized to provide him five hours
16  of personal care every Monday through Friday and two
17  hours every Saturday and Sunday.  Member prefers
18  language Spanish.
19        Those are the instructions in the computer
20  that you cannot see that Humana specifically sent over.
21    Q   Okay.  Understood.  And the 285, what does
22  that referred to?
23    A   That's the unit's hours, you know, the most
24  that we can schedule because, you know --
25    Q   Yeah.

Page 87

1    A   Yeah.
2    Q   Okay.  So from May 19th, 2022 to July 26th,
3  2022, Mr. ZK was authorized for a total of 285 hours of
4  personal care?
5    A   During that timeframe, yes.
6    Q   Got it.  And then All VIP is just determining
7  which caregivers came to fulfill that -- those hours
8  based on the schedule they can work?
9    A   To say that we determine, it's not 100%
10  accurate because we refer the caregiver over to the
11  client and it's up to the client to decide if they want
12  to keep that caregiver or not and then, you know, and in
13  this case Diana Ramirez would know more because maybe
14  this aide was referred to us by the client, I'm not 100%
15  sure.
16        So, that will be an excellent question for
17  Diana.  However, my point here is that this is
18  determined, it's mutual parties involved here.
19        When we refer a client a caregiver over and
20  they stay with the case, it's because the client agree
21  to it, it's not because we say so in other words.
22    Q   Okay.  Right, I understand that part, but you
23  did mention that the green portions of this document
24  where the schedule is, so for example, where -- on the
25  Friday which is I think July 1st based on the calendar

Page 88

1  that I'm looking at here, it says S and then there's a
2  colon and then 300 to 500, What does that stand for?
3    A   That's military time.
4    Q   Right.  I got it.  So, I understand that, but
5  what does the S stand for?
6    A   The S is schedule.
7    Q   Schedule.  Okay.  And then what is V stands
8  for under that?
9    A   The visit.
10    Q   What does that mean?  What's the difference
11  between those two?
12    A   It's, I guess it's just a way the program was
13  written, you know, the software.  It's the visit.
14  It's -- in other words, it was confirmed.
15        That V tells me that we received -- when you
16  see it in green and the way you see it there, that tells
17  me that we -- that the visit was confirmed, that we --
18  either -- the caregiver either clocked in or clocked out
19  or that we received the timesheet and we confirm that
20  manually in the office and that's what that means.
21    Q   Okay.  And so what I'm looking at here this
22  patient calendar, is this a calendar that's created
23  before the services provided to the client or is it only
24  afterwards to confirm that these hours are actually
25  worked by the caregiver?

Page 89

1    A   They could possibly created immediately.  The
2  moment that we start services, they have to because
3  remember, we have to follow Medicaid guidelines.
4        It is this new EVVs compliance that we have to
5  comply with, this new rule.
6        So, when you provide services to Medicaid
7  clients, the caregiver has to clock in and clock out.
8  So, how can she clock in and clock out if we don't have
9  a schedule for?
10        So it has to be done immediately.  That's, you
11  know, that's the plan.  It has to be done immediately.
12  So when the caregiver arrives to the client's home, she
13  has the ability to clock in and clock out and she
14  conduct, you know, she clicks, you know, bathing,
15  dressing, whatever she did all the tasks that she
16  performed while she was with the client within that
17  timeframe, she registered that.
18    Q   And so, basically what I'm learning after --
19  let me ask you a question.  By looking at Page 2 of the
20  same patient calendar for Mr. ZK, does this page
21  indicate that Mr. ZK had multiple caregivers assigned by
22  All VIP?
23    A   Yes, he had multiple caregivers.
24    Q   And the patient had to approve all of these
25  caregivers?



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                        Pages 90..93

Page 90

1    A   That's correct.  And if they don't and if
2    they're not happy, they let us know immediately and we
3    work on it to change the situation and if we cannot meet
4    their expectations, then we call the case manager and
5    the case manager will refer this client to another
6    agency.
7        Q   Okay.  And when you say case manager, in this
8    case you mean the case manager for Humana?
9        A   That's correct.
10       Q   Right.  Okay.  And do home health aides use
11   this HHA patient schedule to confirm that they're being
12   paid the correct amount of money?
13       A   No, but it ties to their money because it's--
14   because they're saying they weren't.  So, that ties to
15   the payroll.
16       Q   Is there a way that a home health aide can log
17   hours through this home health exchange patient calendar
18   that they did not actually work?
19       A   They have to be in a home.  So, is PPS.  So, I
20   mean, they could I guess if they're in the parking lot,
21   I mean, they can, you know, and they get the signal
22   perhaps. If they're a block away, yeah, they can
23   perhaps, but it's really GPS and we can open it up and
24   we can see, we can see where they clocked in and clocked
25   out.

Page 91

1        So, let's say they clocked in or clocked out a
2    mile away then we know they're not with the client in
3    their homes doing, you know, performing the duties.
4        Q   And the GPS is tracking the phone?
5        A   It's tracking their location, where you are.
6        Q   Right, but through their phone, correct?
7        A   That's correct I guess.  Yeah.
8        Q   Okay.  Or do you know if HHAeXchange is just
9    tracking where the person is logged in, what if they are
10   on a computer in the client's home and login in that
11   way?
12       A   No, they cannot log in from the computer,
13   that's not my understanding.  No.  They have to do it
14   from either the landline phone number and remember that
15   phone number has to be in here, in their client file in
16   HHAeXchange.  So, they just can't call from any number,
17   you know, so --
18       Q   Okay.
19       A   -- and they have that cell phone, that cell
20   phone is tied to them.  So, whenever they clock in and
21   clock out from the smartphone, trust me, that GPS is
22   going to tell us where they are.
23       Q   Got it.  And looking back at Page 1 of Exhibit
24   D here, the home phone under Mr. ZK's name would be the
25   landline that's registered to the HHAeXchange?

Page 92

1        A   Yes.  I remember that's pretty much put in
2    through Humana.  So, that phone number --
3        Q   Right.
4        A   -- you see there, Humana puts it in.
5        Q   So, in that case, the home health care aide
6    would have to ask the patient, "Can I please use your
7    phone so that I can clock in and clock out at these
8    times?"
9        A   That is correct, but also the client should
10   know.  The clients also -- clients should be aware of
11   this.
12       Q   Does -- let me take this down.  Does All VIP
13   provide any cellular phones for its home health aides?
14       A   No, we do not.
15       Q   Does All VIP provide any laptops or computer
16   equipment to home health aides?
17       A   No, we do not.
18       Q   Does All VIP require its home health aides to
19   use any particular -- I thought I took this now.  Sorry
20   about that.  I thought that was down.  Let me repeat
21   that question.
22       Does home -- does All VIP provide any
23   equipment to home health aides that they are required to
24   use when administering patient care?
25       A   No, we do not require, unless of course, the

Page 93

1    insurance company requires that, but no, we do not.
2        Q   What types of equipment do home health aides
3    need to take with them to a patient's home to provide
4    the care that they provide?
5        A   If let's say for example we need to monitor
6    maybe the blood pressure of the client, the caregiver
7    will be told.
8        Many times the patient will have that
9    equipment in their home and they just help the client,
10   you know, put it on the wrist, you know, but that's
11   pretty much it, I mean, a caregiver -- again, remember
12   these are non- medical service.  So, they really don't
13   need equipment.
14       Q   Generally -- well, let's stick with -- no,
15   let's -- just generally speaking for home health aides,
16   how often do they have to come into any one of All VIPs
17   offices for any reason?
18       A   They don't have to come at all, just in the
19   beginning so we can make them.
20       Q   Once a home health aide is assigned to a
21   client by All VIP, it's just the home health aide's
22   responsibility to make their appointments, clock in and
23   clock out and I guess they get paid through what, mostly
24   direct deposit?
25       A   Mostly, yes.  We don't speak to them unless we



Page 94

1  have to. We keep communications open with the client,
2  not the caregiver.
3      Q   In each All VIP office, whose job is it to
4  keep communication with the clients?
5      A   The administrators or even the care
6  coordinators, it's always good -- it's always good to
7  monitor your services, you know, its good business
8  practice, you know. Common sense.
9      Q   How often does All VIP recommend that client
10  contact take place?
11     A   When it's necessary.
12     Q   The -- do the All VIP home health aides have a
13  contractual relationship with the client?
14     A   Contractual, I don't think so, unless you have
15  a specific question. I don't. Contractual, I don't
16  think so.
17     Q   Does All VIP patients have a contractual
18  relationship with All VIP. Is that right?
19     A   They do. They do because we have them sign a
20  contract. In fact, any agency they go to, they have to
21  sign a contract, it's not just All VIP. It's practice
22  in the business.
23     Q   Okay. And so the way it works is that, All
24  VIP has a contractual relationship with its caregivers,
25  like Cruz Valdivieso, correct?

Page 95

1      A   Correct.
2      Q   In the form of an independent contractor
3  agreement?.
4      A   Correct.
5      Q   Correct. And then All VIP also has a
6  contractual relationship with the patient in the form of
7  whatever that sound check looks like.
8      A   We don't have a contract with the client. We
9  have an obligation perhaps -- but, we don't have, you
10  know, I mean, we supposed to provide services. We have
11  a contract with the insurance company --
12     Q   Okay.
13     A   -- So, you know, and that's to provide
14  services, you know, to the clients.
15     Q   That's only in the case that the client has
16  insurance though.
17     A   Now we do have a contract with private clients
18  that will tell you. We go out there and when we have a
19  contract with private clients, they sign a contract,
20  so --
21     Q   Right.
22     A   -- but with Medicaid, no, it's different.
23     Q   Did all of the clients that Cruz Valdivieso
24  was assigned to, were they all have Medicare clients?
25     A   As far as I know, yes.

Page 96

1      Q   Is there a database that All VIP has that
2  shows the number of clients that Ms. Cruz Valdivieso was
3  assigned to?
4      A   There's a home care software, yes.
5      Q   Would that software also tell somebody how
6  many hours Ms. Cruz was designated to work for each of
7  the clients?
8      A   It tells you how many hours she worked.
9      Q   How many hours she work. Okay. Like actually
10  worked by clocking in and clocking out?
11     A   Or based on her timesheet and in this case
12  it's going to be based on her timesheet because she did
13  not clock in and clock out.
14     Q   Are you saying that Ms. Valdivieso Cruz never
15  clocked in and out using HHAeXchange?
16     A   Yeah, I'm going to say that. I'm 95% sure.
17     Q   Did Ms. Valdivieso Cruz provided an
18  explanation for why she was not clocking in and clocking
19  out?
20     A   To me, not really. I don't know if she --
21  again, that will be more Diana Ramirez. Me personally,
22  I know that when they, you know, when they start saying
23  stuff all, you know, knowing into the service or what
24  have you, I tell them no.
25         There's no excuses here because Medicaid

Page 97

1  guidelines are there to stay and we have to follow them
2  and I cannot have an excuse and so I end the
3  conversation immediately and I just tell them come here,
4  we'll, you know, we'll help you, download the software
5  in a smartphone, you know, we give them the link to
6  YouTube in Spanish, in her case will be Spanish, but,
7  you know, and that's it. So, she -- I know she was
8  talking numerous times.
9      Q   Okay. And was she at least told -- was she
10  told at least one time -- let me ask a more specific
11  question.
12         Was Ms. Valdivieso Cruz told by you at least
13  one time that she needed to download the HHAeXchange
14  software?
15     A   Yes, definitely. Definitely.
16     Q   And do -- but you don't remember what her
17  response to you was as to why she was not using it?
18     A   No and they usually, you know, general -- they
19  usually just say internet is not working or I don't know
20  how to use it, you know.
21     Q   All right. Now at some point -- oh, did
22  Ms. Valdivieso Cruz, was she paid through direct
23  deposit?
24     A   I believe she was direct deposit. I believe
25  she was.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                    Pages 98..101

Page 98

1    Q  Who would know that answer for sure?
2    A  I can check real quick here, I mean.  Diana,
3  but I believe she was, I can see if I can bring her up
4  real quick or if you have a pay stub, we can check from
5  that too.  It will have two Ds on the top.
6    Q  Let me show you an exhibit --
7    A  Little up.
8    Q  Hold on.  Let me show you Exhibit F.
9        (Thereupon, Plaintiff's Exhibit F was entered
10       into the record.)
11 BY MR. CUMMINGS:
12   Q  Okay.  I'm now showing you --
13   A  That is direct deposit.  You see the --
14   Q  Okay.
15   A  -- two Ds up there --
16   Q  Yeah.
17   A  -- She's direct deposit.
18   Q  Okay.  Let me just for the record explain what
19 we're looking at.  So, I'm now showing Ms. --
20       MR. CUMMINGS:  I'm sorry, Madam Court
21   Reporter.  Are we up to Exhibit E or Exhibit F?
22       MR. GOLDBERG:  Number F.  I mean, letter F.
23       THE WITNESS:  Yeah, I think F.
24       THE COURT REPORTER:  Sorry, I couldn't unmute
25   myself.  F.

Page 99

1        MR. CUMMINGS:  F.  Okay.  Got it.
2  BY MR. CUMMINGS:
3    Q  All right.  So exhibit F that I'm showing Ms.
4  McKinnon is just a document, weekly pay stubs.  This is
5  a 61 page document.
6        This also has a VIP Bates stamp at the bottom.
7  There's actually two Bates stamps, but this one, the
8  more prominent one is 92 and I think this goes all the
9  way down to 152, but anyway, looking at the very first
10 page one of 61, Ms. McKinnon, you said that this is a
11 direct deposit pay stub?
12   A  Yes.
13   Q  Okay.  And the pay stubs, let's just stick to
14 the first one that we're looking at here, does it show
15 how many hours Ms. Cruz Valdivieso work?
16   A  Yes.
17   Q  And would there be an earning section?
18   A  That -- yes.
19   Q  Okay.  And where it says, "Hours/units," that
20 means that for this particular week from -- yes, it
21 looks like December 20th, 2021 to December 26th, 2021,
22 Ms. Valdivieso worked 55 hours?
23   A  Yes, that's correct.
24   Q  Okay.  At a rate of $13 an hour?
25   A  That's correct.

Page 100

1    Q  Okay.  All right.  And did All VIP make gross
2  earnings of at least $500,000 in 2020?
3    A  I'm sorry, there's someone out there with
4  the -- cutting the grass.  Can you repeat that question?
5    Q  Yes.  Did All VIP make at least, gross
6  earnings of at least $500,000 in 2020?
7    A  I cannot say yes or no to that.
8    Q  Why is that?
9    A  I would have to -- because Medicaid has a bad
10 habit of not paying.  So, I would have to check to see
11 if that's true or not.
12   Q  Your answer might be the same, but I'm going
13 to go through and just ask for a couple other years
14 also.  All right.  Did All VIP made gross earnings of at
15 least $500,000 in 2021?
16   A  For this one client?
17   Q  No, just in general.
18   A  In general, all my clients?
19   Q  Right, exactly.  Yeah.
20   A  I hope so.
21   Q  Okay.  All right.  Is there a reason why you
22 would think that 2021 All VIP paid at least $500,000,
23 but you're not sure in 2020?
24   A  I am not sure because I'm thinking -- I'm
25 relating this to this client Cruz, but if you want me

Page 101

1  related in general, I can give you an answer.
2    Q  Oh, yeah.  No, it's not really in general, I
3  mean, specifically, but just in that -- for that one
4  client.
5    A  If this specifically to Cruz the answer is,
6  no, I do not know.  I would have to check.  I kind of
7  doubt it, I will get that much for this client.
8    Q  Right, but no, what I'm --
9    A  Especially --
10   Q  Yeah, no.  What I'm --
11   A  But in general --
12   Q  No.  In 2020, did All VIP including all of its
13 offices make $500,000 that year just in gross revenue?
14   A  Yes, I -- yes, we better.  Yes.
15   Q  Okay.  In 2021, did All VIP have gross
16 earnings of at least $500,000?
17   A  I hope so.  Yes.
18   Q  Okay.  And then 2022, did All VIP have gross
19 earnings of at least $500,000?
20   A  I don't know.  I haven't done my taxes.  I
21 don't think for 2022, so I wouldn't know, but I'm going
22 to say yes --
23   Q  Okay.
24   A  -- because, you know, my employees got page,
25 I'm going to say yes.  I would have to in order to

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023          Pages 102..105

Page 102

1  continue the business.
2       So, I'm going to say yes although I haven't --
3  we haven't file yet for '22.
4       Q   As the owner of All VIP, are you the person
5  responsible for filing taxes for All VIP?
6       A   That is -- yes. Yes, I am.
7       Q   And you're use -- All VIP hires an accountant
8  to help you with this status?
9       A   Yes. Yes, we do. I don't have to, but I do.
10      Q   Okay. All right. I understood. And did All
11 VIP file taxes in 2020?
12      A   Yes.
13      Q   Did All VIP file taxes in 2021?
14      A   Yes.
15      Q   Is your -- does your signature appear on the
16 text documents?
17      A   I believe they do.
18      Q   All right. Getting back specifically to Ms.
19 Cruz Valdivieso. Let me show you what I'm marking as
20 Exhibit G.
21          (Thereupon, Plaintiff's Exhibit G was entered
22          into the record.)
23      A   Okay.
24 BY MR. CUMMINGS:
25      Q   Okay. I'm now showing you a document which

Page 103

1  has -- this is a two page document which at the top says
2  statement for a Cruz Valdivieso and then at the bottom,
3  it's signed by Diana Ramirez on August 8th,
4  2022.
5          My first question is, have you ever seen this
6  document before?
7       A   I briefly saw it. I didn't pay too much
8  attention to it, but I did see it.
9       Q   Okay. And did you direct Ms. Ramirez to write
10 the statement?
11      A   I did not direct her. I probably asked her
12 for it. I'm not sure if the attorney or at the time we
13 probably asked her for -- to give a statement, to tell
14 us what happened --
15      Q   Got it.
16      A   -- So, that's why she wrote it. It was more
17 to document, in other words.
18      Q   Okay. So, what I'll do is, I'm not asking you
19 to read it out loud and I don't need you to read it to
20 me, I would like you to read it to yourself. I have
21 control of when it can go up and down and just let me
22 know when you're done.
23          Okay. If you need me to move up and down,
24 then let me know.
25          MR. GOLDBERG: Hey Toussaint, what's the bates

Page 104

1  number on that document?
2          MR. CUMMINGS: Yeah, good question. So, Page
3  1 is Bates 2, it says, "VIPdocs2-000002" and then
4  the second page is, "VIPdocs2-000003." So, it
5  looks like Bates Stamp 2 and 3.
6          MR. GOLDBERG: Yeah, a Bates number -- a Bates
7  docs two. All right. Thank you for clarifying
8  that, sir.
9          MR. CUMMINGS: No problem.
10 BY MR. CUMMINGS:
11      Q   Okay. I'm sorry about that Ms. McKinnon. But
12 please just read and let me know when you need me to
13 move up and down?
14      A   Okay. Next page, please. Okay.
15      Q   Okay. Did you have an opportunity to finish
16 reading the statement?
17      A   Yeah. Yes.
18      Q   Okay. And so, let me just ask you a few
19 questions about some of the things that have been made
20 in the statement.
21          First, do you have any personal knowledge of
22 the facts that Ms. Ramirez is writing in this statement?
23      A   Well, I --, you know, the ones that I know for
24 sure is that she wasn't clocking in and clocking out to
25 change, that she did call to state that she was missing

Page 105

1  money.
2          It was -- now I realized it was Diana who told
3  me that she was working those private hours with the
4  clients and that she was putting in those private hours
5  on the timesheet.
6          So, there was some kind of confusion going on.
7  So, that's, you know, pretty much what I write, what I
8  recall and also the other client, we had -- she kept
9  calling the other client. I think the other client was
10 her neighbor and she wanted the other client to call us
11 and to harass us about her pay. So, stuff like that,
12 you know, does refreshes my memory.
13      Q   Okay. All right. And so I want to just talk
14 about the private hours because we talked about that a
15 little bit before and when Ms. Ramirez says that
16 Ms. Cruz was putting in private hours, what does that
17 mean to you?
18      A   That means that she's working for the client
19 privately. She just, you know, the client and her made
20 agreement.
21      Q   And those hours were not authorized then by
22 Humana, let's say --
23      A   No.
24      Q   -- in the case of Mr. ZK?
25      A   No, they were not authorized by Humana.

CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023          Pages 106..109

Page 106

1    Q.  Okay.  And when a home health aide is working
2   hours that are outside of their authorization for the
3   insurance company authorization, then what is All VIP's
4   responsibility for compensating that home health aide?
5    A   They are not supposed to be doing that because
6   it's in the contract.  They are not supposed to be
7   working privately for a client that we referred them to.
8   They are supposed to call the agency.
9    Q.  Got it.  And what would All VIP consider
10  private hours?
11   A   The aide working for the client privately
12  without notifying the agency, whether it's the aide or
13  the client, but the aide --
14   Q.  What is - sorry.  Go ahead.
15   A   I'm sorry.
16   Q.  No.  I'm sorry.  Go ahead.
17   A   The aide is not supposed to be working for our
18  clients privately and they're not supposed to be taking
19  our clients elsewhere either or stealing our clients in
20  other words.
21   Q.  Okay.  Now when Humana authorizes – when
22  Humana authorizes hours and then the client agrees to a
23  schedule, if the home health aide, in this particular
24  case Ms. Cruz is working during those hours that the
25  client approved, are they still considered private

Page 107

1   hours?
2    A   Wait, I'm sorry.  Can you rephrase, can you
3   repeat that question?  I'm sorry.
4    Q.  Yeah, let me just give an example.  So for
5   example, let's say Humana approves, you know, however,
6   you know, 300 hours in a certain period and then the
7   client says, "Okay.  Well, I want to be seen Friday,
8   Saturday and Sunday" and then All VIP does not set the
9   home health data for particular Friday, Saturday and
10  Sunday, you know, let's just say it's the first, second
11  and third, happened to be Friday, Saturday and Sunday,
12  but the caregiver works those days, are they still
13  considered private hours that first, second and third
14  day of the week or of the month?
15   A   It all depends because if they work those
16  hours that we have authorization from Humana, they know
17  they're not private --
18   Q.  Okay.
19   A   -- that's Humana, you know.
20   Q.  Okay.  So, private hours are essentially just
21  any hours that are not on the patient calendar schedule
22  that we saw?
23   A   No, I would say private hours are hours, like,
24  in other words, if Humana gives his client 50 hours a
25  week, right, if aide work 60 hours a week with that

Page 108

1   client --
2    Q.  Got it.
3    A   -- that's private hours, 10 hours are private
4   hours.  That's usually how we know what's happening.
5    Q.  Got it.  Okay.  And so the extra 10 hours that
6   the home health aide is working, if they're getting paid
7   on the side by the client, let's say, "Privately," then
8   are they -- is the home health aide then in breach of
9   contract with All VIP?
10   A   Yes, because I like what you said, she's
11  getting paid on the side, under the table.  No, you're
12  not allowed to do that and yes, they are in breach of
13  contract, absolutely.
14   Q.  And so, the documents that we looked at before
15  Ms. Valdivieso Cruz's on boarding documents, do they
16  explain that that situation that we just talked about
17  with private hours and being paid privately by the
18  client are a breach of the contract with All VIP?
19   A   It's in the contract and not only it's in the
20  contract, but her been an aide for so long, X amount of
21  years and working for so many other agencies which I can
22  prove, tells me that she knows, bottom line, she's
23  aware.
24   Q.  Besides Mr. ZK, do you -- does All VIP have
25  other clients who Ms. Valdivieso Cruz apparently worked

Page 109

1   private hours for?
2    A   Not that I'm aware, only this couple.  She had
3   a good relationship with them and it's my understanding
4   also that she hired you, but I don't know if that's true
5   or not, but and that she had a good relationship with
6   them.
7    Q.  Okay.  And does All VIP claim that
8   Ms. Valdivieso took some of its clients?
9    A   She took these two for sure and she was trying
10  to take the third one and she called the office and
11  alerted us to it because they were neighbors, I guess,
12  yeah, neighbors, she was going over there and knocking
13  on her door and pretty much harassing the client and
14  demanding the client to leave All VIP care for X, Y and
15  Z reasons and then she went to the, you know, to a
16  secret family and she started problems with them and
17  that's why you see that that is you on Google review
18  because she went over there and she started to pop.
19   Q.  Now when you said that she took these two
20  clients, I thought you were referring to the ZKs, who
21  are the neighbors that you're referring to?
22   A   There is a neighbor that she has that she was
23  working for and I think it's in that letter, but let me
24  see if I see the name of that client here, was it
25  Menendez or something?

**Page 110**

1   Q   I'm pulling back up Exhibit --
2   A   Where was it? Let's see.
3   Q   -- G, the statement from Ms. Ramirez. Do you
4   know if the neighbor that you're referring -- the
5   neighbor of Ms. Cruz Valdivieso?
6   A   There it is, Angela Menendez. Do you see it
7   right there?
8   Q   Right.
9   A   That's her.
10  Q   Angela Menendez was Ms. Cruz's neighbor?
11  A   Yes, I believe so.
12  Q   Okay.
13  A   The neighbor and also a client of ours, I'm
14  just going to confirm just to make sure. I don't
15  really, you know, deal with the Broward office that
16  much, but I believe that she was our client and a
17  neighbor. There was a neighbor, but she was knocking on
18  her door.
19  Q   Okay. And that neighbor if it was Angela
20  Menendez, was also an All VIP client?
21  A   Correct. And Diana Ramirez will know more
22  about that.
23  Q   Does All VIP claim that Ms. Valdivieso Cruz
24  violated her non-compete agreement by taking Ms.
25  Menendez?

**Page 111**

1   A   She -- I don't think she took Ms. Menendez, I
2   don't think, but she did take the ZK, both of them. She
3   took them to another agency.
4   Q   Besides Cesar ZK and I guess his wife or
5   whoever the other client was --
6   A   Yeah, Yolanda, Yolanda I think.
7   Q   Okay. So Yolanda and Cesar ZK, does all the
8   IP claim that Ms. Valdivieso Cruz took any other of its
9   clients?
10  A   I don't recall any other, that would be a good
11  question for Diana. I just know that these two for
12  sure.
13  Q   And when All VIP says that Ms. Valdivieso Cruz
14  took these clients, what exactly is the allegation
15  there?
16  A   There's no allegation. She did it. She took
17  the two clients, I believe it was senior nannies. I
18  have it all written down somewhere.
19      She went and she took them to another agency
20  that they want to hear and they call the case manager at
21  Humana and Humana case manager transferred everything
22  over to the new agency.
23  Q   And what exactly -- what part of
24  Ms. Valdivieso Cruz's contract with All VIP that she
25  violated by doing that?

**Page 112**

1   A   She can't steal our clients. She can't take
2   our clients to someplace else. It's in there, you can't
3   do that.
4   Q   Do the clients have the ability to cut off
5   their contract with All VIP at any time?
6   A   That's right, they can.
7   Q   And why does All VIP think that Ms. Valdivieso
8   Cruz encouraged or I guess told the ZK's to go to
9   another agency rather than it just be the Zk's on
10  choice, personal choice?
11  A   You know, that's probably a good question for
12  Ms. Cruz, but she did do that. She went to the clients
13  and she started issues, just like she went to the other
14  client, Ms. Menendez I believe and she started telling
15  them stories and not only she do that, she also went to
16  the other caregivers on the case and started issues too.
17  She was the one that started everything.
18      She got the clients all upset. In fact, I
19  believe the client even paid her out of pocket. She got
20  the client so upset that I believe they, like I said,
21  they did a Google review, the negative Google review
22  which was terrible and then I believe they hire your
23  services.
24  Q   Right. But when you said that, let me just
25  break this down. That Ms. Valdivieso Cruz told clients

**Page 113**

1   to complain about All VIP, what is your basis of
2   information for that statement?
3   A   From what I hear from the clients and from the
4   caregivers.
5   Q   So are you saying that after the ZK's
6   transferred to another agency, that All VIP still had
7   contact with them?
8   A   With the clients?
9   Q   Right.
10  A   I don't think we have much contact with them,
11  but again, you know, Diana will be -- she would have
12  more contact with them then I would have, I don't
13  recall, maybe I did. I'm not sure if I did regarding
14  pay. I don't remember. I'm sorry.
15  Q   Okay. Now what I want to find out is did, you
16  know, the ZK's, Yolanda or Cesar personally tell you or
17  somebody else that Diana -- I'm sorry, that Ms. Cruz
18  Valdivieso told them to leave All VIP?
19  A   She -- not with me, but I guess, but she
20  definitely mentioned that to the other aides on the
21  case.
22      This is how we found out. She went to the
23  other aides on the case and she said to them, "Listen,
24  go register a Senior Nanny because we're taking this
25  case and if you want to come with us and you want to

Page 114

1  continue working here, call Senior Nannies."
2    Q   So, Senior Nannies is another agency?
3    A   Nurse registry, yes.
4    Q   Nurse registry in competition with All VIP?
5    A   Well, I guess you could call it competition,
6  but. Yeah, because they do the same thing we do.
7    Q   Okay. Had you heard of Senior Nannies before
8  Ms. Valdivieso Cruz started working with All VIP?
9    A   Sure, for Senior Nannies. They've been around
10 for a long time.
11   Q   Okay. And when you said other aides, you
12 meant home health aides working for All VIP told you
13 that Ms. Valdivieso Cruz was trying to get them to come
14 over to Senior Nannies?
15   A   To be specific and accurate, I'm talking about
16 caregivers on the same case as Ms. Cruz, on the same
17 case with the CKs.
18   Q   Would some of those caregivers that you're
19 referring to on that schedule that I showed you
20 earlier such as --
21   A   They could be. Yes, they should be.
22   Q   Did you speak to those caregivers personally?
23   A   I think I did. I think there was one that I
24 spoke to and I -- and the reason I say that is because I
25 remember saying to one of them and also I spoke to

Page 115

1  Diana. I remember saying to her, "Listen, you know, if
2  you're going to be stealing my clients, we're going to
3  remove you from the roster, you know, and you're in
4  breach of contract and I can't have," you know and she
5  said, I believe she, you know, she understood and I
6  believe she said she wasn't going to do that.
7    Q   That's a conversation that you personally had
8  with Ms. Valdivieso?
9    A   Right, that I have with one of them. With one
10 of them. With one of the aides. I just came --
11   Q   Oh, with one of the aides?
12   A   One of the aides that I had a conversation.
13   Q   One of the aides. Okay. Now did you --
14   A   And Diana, I also had the conversation with
15 Diana Rodriguez as well, I mean, Diana Ramirez as well.
16   I did not want to keep aide that was trying to
17 our clients. That were in breach of contract, I did not
18 want to keep them on the roster.
19   Q   Okay. Did All VIP have to terminate the
20 employment of any other home health aide that worked on
21 the same clients as Ms. Valdivieso Cruz due to this
22 stealing client's issue?
23   A   If they steal clients, we do terminate them.
24 We do. We remove them from the roster. In this case it
25 was very simple because the client left with the aide,

Page 116

1  but let's just suppose that the client doesn't leave,
2  what we do is we will allow this -- we will allow this
3  aide to remain with the client, but we won't give her
4  any new clients, if I'm making myself clear because --
5    Q   No, I understand.
6    A   -- remember, we do not order the independent
7  contractors, okay, we don't give them orders. Okay. But
8  -- so we have to focus on the client. If the client
9  tells me, "That's the aide I want," I have to give them
10 that aide.
11      The only time that I say no, this aide does
12 not work for this agency is when they do not meet
13 federal and state guidelines.
14   Q   Okay. Understood. And now just getting back
15 to how All VIP knows that Ms. Valdivieso Cruz stole the
16 ZK's away from All VIP, is that because another home
17 health aide say that they knew they had that information
18 or I just want to know how All VIP knows?
19   A   I think there's a number of things, in other
20 words, she behaved if I, you know, the fact that she
21 didn't take on the case.
22      The fact that Humana, Humana I believe
23 confirmed it, I'm not 100% sure on that, the fact that
24 the other aide spoke, the fact that the other clients
25 spoke, she also wanted to get the other client to also

Page 117

1  go to the other agency, so there were numerous reasons
2  why we came to that conclusion.
3    Q   Okay. All right. You're aware that All VIP
4  sued Ms. Valdivieso Cruz in State Court, correct?
5    A   That's right. There was - yes --
6    Q   Okay.
7    A   -- breach of contract.
8    Q   Right. Now without getting into any
9  conversations that you had with this attorney or your
10 previous attorney, why is All VIP -- I know you just
11 said breach of contract, but what one of the factual
12 reasons why All VIP is suing Ms. Valdivieso Cruz?
13   A   The factual reason is because she took my
14 client to another agency and she was trying to take
15 another client. In addition to that, she wanted to also
16 pay the caregiver on the case to the other agency, that
17 is factual, that is fact.
18   Q   Does All VIP claim that Ms. Valdivieso Cruz
19 owes it any money?
20   A   Say that again? I'm sorry.
21   Q   Does All VIP claim that Ms. Valdivieso Cruz
22 owes it any money?
23   A   To All VIP Care that she owes us money?
24   Q   Yes.
25   A   Oh, yeah. She owes us money because we lost



CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON
Mckinnon, Liz on 05/16/2023                    Pages 118..121

Page 118

1 breach of contract.
2     Q   How much money does Ms. Cruz owe All VIP?
3     A   We haven't come to that conclusion yet, but
4 she definitely owes us a lot of money.
5     Q   And when you say a lot, like could you
6 ballpark that, is it in the 1000s, 10s of 1000s, 100s of
7 1000s?
8     A   It's probably more than 30 grand.  She owes us
9 a lot of money.
10     Q   And did All VIP -- was All VIP aware that --
11 when did All VIP become aware that Ms. Valdivieso Cruz
12 allegedly stole its clients?
13     A   Pretty much immediately, you know, when --
14 pretty much immediately because I -- and again, Diana
15 Ramirez might know more on this, but, you know, I know I
16 heard something, "Oh Liz, that you're aware that, you
17 know, that Cruz is leaving and she's taking the clients,
18 you know," and, so that type of thing.
19     I think it was Diana who called, but I'm not
20 100% sure.
21     Q   Got it.  And what attempts did All VIP make to
22 get its clients back from Ms. Valdivieso Cruz?
23     A   I think that would be a question more for
24 Diana because -- but I think -- I'm not sure if -- the
25 clients, you know, remember, the clients left without

Page 119

1 really telling us that we're leaving, you know. it's not
2 like the client calls and say, "Hey, you know, I'm going
3 to leave because you didn't pay her, you know."
4     They -- what they did was, they called the
5 case manager.  So, it was -- and then I found out
6 through Diana and from the other aide on the case and
7 the other client that it was true.
8     Q   Okay.  And what -- is Ms. Valdivieso Cruz the
9 first home health aide that has allegedly taken clients
10 from All VIP?
11     A   No, she's not the first, but luckily for us,
12 we don't have that many to have that.
13     Q   Did All VIP file a lawsuit against any of the
14 other aides or caregivers that took clients from it?
15     A   If we need to, we will.
16     Q   But has it done as of this time besides
17 Ms. Valdivieso Cruz?
18     A   Yes.
19     Q   Did those other lawsuits against other
20 caregivers for stealing clients come before
21 Ms. Valdivieso Cruz's lawsuit or after?
22     A   Both, before and after, but again, we've been
23 very lucky that we don't have that many.
24     Q   Are All VIP intend to file a lawsuit against
25 Ms. Valdivieso Cruz before she filed her lawsuit over

Page 120

1 time?
2     A   Absolutely.  And why wasn't done, that's a
3 question for Mr. Michael Garcia.
4     Q   Michael Garcia, who's that?
5     A   He was the one that was supposed to file the
6 lawsuit.  It was probably sitting on his desk.
7     Q   Oh, you're talking about All VIPs previous
8 counsel?
9     A   Um-hum.
10     Q   Oh, okay.  All right.
11     A   Yes.
12     Q   Okay.  When did All VIP retain Mr. Michael
13 Garcia?
14     A   Long time ago.
15     Q   Was Ms. Valdivieso Cruz still on All VIPs
16 payroll at the time that Mr. Garcia was hired?
17     A   He was hired before she was, so.  I believe
18 she was.  He was already here anyway, so.
19     Q   Oh, I understand.  Okay.  He was just -- he
20 was All VIPs attorney?
21     A   Yeah, if we needed him, that's what we will
22 use.  Yeah --
23     Q   I see.  Okay.
24     A   -- So, he was already on board, you know.
25     Q   Right.  But when was he, I guess, you know,

Page 121

1 made aware of what was going on with Ms. Cruz, was she
2 still on payroll?
3     A   Immediately -- yeah.  No, I don't think so.
4 Immediately when we noticed that she stole out client
5 and she move over and I had factual information, I got
6 my people and I got my nose, I'm all documented, that's
7 when I call him and I say, "Hey, I need to file a suit."
8     Q   Okay.  Got it.  And --
9     A   Breach of contract.
10     Q   Was that before Ms. Valdivieso Cruz filed her
11 lawsuit for over time?
12     A   Absolutely, it was before.  I have e-mails to
13 prove it.
14     Q   Okay.  All right.  Are there any questions
15 that you thought I would ask you that I did not ask?
16     A   No, I think --
17     MR. GOLDBERG:  Object to the -- objection to
18 form.
19     MR. CUMMINGS:  I never got that objection
20 before, Counsel, but, okay.  I'm just --
21     MR. GOLDBERG:  Yeah.
22     MR. CUMMINGS:  -- is noted for the record
23 though.  I understood.
24     MR. GOLDBERG:  I appreciate that, sir.
25     MR. CUMMINGS:  What did you say?

Page 122

1        MR. GOLDBERG: I say I appreciate that, sir.
2        MR. CUMMINGS: Okay.
3    BY MR. CUMMINGS:
4        Q   Ms. McKinnon, you can still answer the
5    question if you have an answer to it.
6        A   No, I don't.
7        Q   Okay. All right. Is there anything else that
8    you want to add related to Ms. Valdivieso Cruz's
9    employment with All VIP?
10       A   Yeah, I think that I would add is that she's
11   1099 and she's not an employee and I don't know why
12   she's doing what she's doing and she was well informed
13   and so, you know, she's taking this platform in the
14   wrong way, completely in the wrong way.
15       MR. CUMMINGS: Okay. I have no further
16   question for you. I'm not sure if Mr. Goldberg
17   does.
18       MR. GOLDBERG: No question sir, form my side
19   of the table. Thank you for the opportunity. We're
20   going to read and we're going to print.
21       (Deposition concluded at 02:14 p.m.)
22       (Reading and signing of the deposition by the
23       witness has been reserved.)
24
25

Page 123

CERTIFICATE OF REPORTER
1
2    STATE OF FLORIDA
3    COUNTY OF MIAMI DADE
4
5        I, SULEYDIS VIDES, Court Reporter and Notary Public
6    for the State of Florida, do hereby certify that I was
7    authorized to and did digitally report and transcribe
8    the foregoing proceedings, and that the transcript is a
9    true and complete record of my notes.
10       I further certify that I am not a relative,
11   employee, attorney or counsel of any of the parties, nor
12   am I a relative or employee of any of the parties'
13   attorneys or counsel connected with the action, nor am I
14   financially interested in the action.
15
16       Witness my hand this 31st day of May, 2023.
17
18
19
20   SULEYDIS VIDES, COURT REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
21
22
23
24
25

Page 124

CERTIFICATE OF OATH
1
2    STATE OF FLORIDA
3    COUNTY OF MIAMI DADE
4
5        I, SULEYDIS VIDES, the undersigned authority,
6    certify that LIZ VANESSA MCKINNON, appeared before me
7    remotely pursuant to Florida Supreme Court Order AOSC20-
8    23 and was duly sworn on the 16th day of May, 2023.
9
        Witness my hand this 31st day of May, 2023.
10
11
12
13
14
     SULEYDIS VIDES, COURT REPORTER
15   NOTARY PUBLIC, STATE OF FLORIDA
     Commission No.: HH 373555
16   Commission Exp: MARCH 15, 2027
17
18
19
20
21
22
23
24
25

Page 125

1    DATE:     May 31, 2023
     TO:       Liz Vanessa Mckinnon
2    C/O
               Randy Mark Goldberg, Esquire
3              Randy M. Goldberg & Associates, PLLC
               151 Northwest 1st Avenue
4              Delray Beach, Florida 33444
     IN RE:    Cruz Valdivieso Figuera vs. All Vip Care Inc
5    and Liz Velazquez McKinnon
     CASE NO:  0:22-CV-61553-DIMITROULEAS/HUNT
6
7    Dear Ms. Mckinnon,
8
         Please take notice that on 05/16/2023, you gave
9    your deposition in the above-referenced matter. At that
     time, you did not waive signature. It is now necessary
10   that you sign your deposition. You may do so by
     contacting your own attorney or the attorney who took
11   your deposition and make an appointment to do so at
     their office. You may also contact our office at the
12   below number, Monday - Friday, 9:00 AM - 5:00 PM, for
     further information and assistance.
13       If you do not read and sign your deposition within
     thirty (30) days, the original, which has already been
14   forwarded to the ordering attorney, may be filed with
     the Clerk of the Court.
15       If you wish to waive your signature, sign your name
     in the blank at the bottom of this letter and promptly
16   return it to us.
17   Very truly yours,
     Suleydis Vides, Court Reporter
18   Universal Court Reporting
19   (954)712-2600
20
     I do hereby waive my signature.
21
22
23
     Liz Vanessa Mckinnon
24   Cc: via transcript:
                          Toussaint Cummings, Esquire
25

Page 126

```
 1   Errata Sheet

 2

 3   NAME OF CASE: CRUZ VALDIVIESO FIGUERA vs ALL VIP CARE INC. AND LIZ VELAZQUEZ MCKINNON

 4   DATE OF DEPOSITION: 05/16/2023

 5   NAME OF WITNESS: Liz Mckinnon

 6   Reason Codes:

 7       1. To clarify the record.

 8       2. To conform to the facts.

 9       3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25       _____
```

DATE: June. 24, 2023

STATE OF FLORIDA:

COUNTY OF: Broward.

REFERENCE: ALL VIP CARE, INC.

STATEMENT

I, Angela. G. Melendez RESIDING AT 3670 SW. 60 Ave, apt, Davie Fl 33314 GIVE THIS STATEMENT, VOLUNTARILY AND OF MY OWN FREE WILL. I HAVE NOT BEEN PROMISED ANYTHING FOR GIVING THIS STATEMENT, NOR HAVE I BEEN THREATEN OR PRESSURED INTO GIVING THIS STATEMENT. I SWEAR THAT THE FOLLOWING LISTED FACTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

I have been using ALL VIP Care for the last two years. I had Daisey known as Cruz Valdivieso she was my asistant for several different occasions + different times. she was working two jobs. She every wk would complain that she was owed hours, she from my apt to the office to try and straighten that out. She made the mistake of billing for 42 hrs when they reduced my hrs. from 42 to 38 hrs it was an honest mistake I pointed it out to her, but she must of forgotten for 2 ocasions. I recommended her for her apt next door to mine and she was accepted so she became my neighbor.

Page 1 of 2      witness initials




ISAAC A. RODRIGUEZ
MY COMMISSION # HH 365420
EXPIRES: February 22, 2027

When she decided to quit the agency ALL V.I.P. on Wed night she called me and informed me that she wouldn't be able from the Thursday on for she was quitting the agency and going to use another agency. So as I complain that she was leaving me She suggested that I move my services to another agency so I wouldn't lose her services and I said no.

_____

**(Use additional pages if necessary)**

I the undersigned Affiant acknowledge that the above representations are true and correct.

Sign: _Angela S. Melendez_

Print: _ANgela Melendez_          Dated: _Jun 24, 2023_

Address: _3670 SW 60th Ave_

_apt I DAvie FL 33714_

Email: ████████████████████

Phone: ████████████████████

**STATE OF FLORIDA**

**COUNTY OF** _Broward_

Sworn to or affirmed and subscribed before me by means of [X] physical presence or [ ] online notarization, this _24_ day of _June_ _____ by _Angela G. Melendez_

By: _____

Notary Public – State of Florida

ISAACA. RODRIGUEZ
MY COMMISSION # HH 365420
EXPIRES: February 22, 2027

Personally Known _____, or

Produced _FL DL_ _____ as Identification.

2 of 2

Select Year: 2022 ⇕ Go

# The 2022 Florida Statutes (including 2022 Special Session A and 2023 Special Session B)

<u>Title XXIX</u>
PUBLIC HEALTH

<u>Chapter 400</u>
NURSING HOMES AND RELATED HEALTH CARE FACILITIES

<u>View Entire Chapter</u>

**400.462   Definitions.**—As used in this part, the term:

(1) "Administrator" means a direct employee, as defined in subsection (9), who is a licensed physician, physician assistant, or registered nurse licensed to practice in this state or an individual having at least 1 year of supervisory or administrative experience in home health care or in a facility licensed under chapter 395, under part II of this chapter, or under part I of chapter 429.

(2) "Admission" means a decision by the home health agency, during or after an evaluation visit to the patient's home, that there is reasonable expectation that the patient's medical, nursing, and social needs for skilled care can be adequately met by the agency in the patient's place of residence. Admission includes completion of an agreement with the patient or the patient's legal representative to provide home health services as required in s. 400.487(1).

(3) "Advanced practice registered nurse" means a person licensed in this state to practice professional nursing and certified in advanced or specialized nursing practice, as defined in s. 464.003.

(4) "Agency" means the Agency for Health Care Administration.

(5) "Certified nursing assistant" means any person who has been issued a certificate under part II of chapter 464.

(6) "Client" means an elderly, handicapped, or convalescent individual who receives companion services or homemaker services in the individual's home or place of residence.

(7) "Companion" or "sitter" means a person who spends time with or cares for an elderly, handicapped, or convalescent individual and accompanies such individual on trips and outings and may prepare and serve meals to such individual. A companion may not provide hands-on personal care to a client.

(8) "Department" means the Department of Children and Families.

(9) "Direct employee" means an employee for whom one of the following entities pays withholding taxes: a home health agency; a management company that has a contract to manage the home health agency on a day-to-day basis; or an employee leasing company that has a contract with the home health agency to handle the payroll and payroll taxes for the home health agency.

(10) "Director of nursing" means a registered nurse who is a direct employee, as defined in subsection (9), of the agency and who is a graduate of an approved school of nursing and is licensed in this state; who has at least 1 year of supervisory experience as a registered nurse; and who is responsible for overseeing the professional nursing and home health aid delivery of services of the agency.

(11) "Fair market value" means the value in arms length transactions, consistent with the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwis in a position to generate business for the other party, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party, on the date of acquisition of the asset or at the



(12) "Home health agency" means a person that provides one or more home health services.

(13) "Home health agency personnel" means persons who are employed by or under contract with a home health agency and enter the home or place of residence of patients at any time in the course of their employment or contract.

(14) "Home health aide" means a person who is trained or qualified, as provided by rule, and who provides hands-on personal care, performs simple procedures as an extension of therapy or nursing services, assists in ambulation or exercises, assists in administering medications as permitted in rule and for which the person has received training established by the agency under this part, or performs tasks delegated to him or her under chapter 464.

(15) "Home health services" means health and medical services and medical supplies furnished to an individual in the individual's home or place of residence. The term includes the following:

(a) Nursing care.

(b) Physical, occupational, respiratory, or speech therapy.

(c) Home health aide services.

(d) Dietetics and nutrition practice and nutrition counseling.

(e) Medical supplies, restricted to drugs and biologicals prescribed by a physician.

(16) "Home infusion therapy" means the administration of intravenous pharmacological or nutritional products to a patient in his or her home.

(17) "Home infusion therapy provider" means a person that employs, contracts with, or refers a licensed professional who has received advanced training and experience in intravenous infusion therapy and who administers infusion therapy to a patient in the patient's home or place of residence.

(18) "Homemaker" means a person who performs household chores that include housekeeping, meal planning and preparation, shopping assistance, and routine household activities for an elderly, handicapped, or convalescent individual. A homemaker may not provide hands-on personal care to a client.

(19) "Immediate family member" means a husband or wife; a birth or adoptive parent, child, or sibling; a stepparent, stepchild, stepbrother, or stepsister; a father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law; a grandparent or grandchild; or a spouse of a grandparent or grandchild.

(20) "Medical director" means a physician who is a volunteer with, or who receives remuneration from, a home health agency.

(21) "Nurse registry" means any person that procures, offers, promises, or attempts to secure health-care-related contracts for registered nurses, licensed practical nurses, certified nursing assistants, home health aides, companions, or homemakers, who are compensated by fees as independent contractors, including, but not limited to, contracts for the provision of services to patients and contracts to provide private duty or staffing services to health care facilities licensed under chapter 395, this chapter, or chapter 429 or other business entities.

(22) "Patient" means any person who receives home health services in his or her home or place of residence.

(23) "Personal care" means assistance to a patient in the activities of daily living, such as dressing, bathing, eating, or personal hygiene, and assistance in physical transfer, ambulation, and in administering medications as permitted by rule.

(24) "Physician" means a person licensed under chapter 458, chapter 459, chapter 460, or chapter 461.

(25) "Physician assistant" means a person who is a graduate of an approved program or its equivalent, or meets standards approved by the boards, and is licensed to perform medical services delegated by the supervising physician, as defined in s. 458.347 or s. 459.022.

(26) "Remuneration" means any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind. However, if the term is used in any provision of law relating to health care providers, the term

does not apply to an item that has an individual value of up to $15, including, but not limited to, a plaque, a certificate, a trophy, or a novelty item that is intended solely for presentation or is customarily given away solely for promotional, recognition, or advertising purposes.

(27) "Satellite office" means a secondary office of a nurse registry established pursuant to s. 400.506(1) in the same health service planning district as a licensed nurse registry operational site.

(28) "Skilled care" means nursing services or therapeutic services required by law to be delivered by a health care professional who is licensed under part I of chapter 464; part I, part III, or part V of chapter 468; or chapter 486 and who is employed by or under contract with a licensed home health agency or is referred by a licensed nurse registry.

(29) "Staffing services" means services provided to a health care facility, school, or other business entity on a temporary or school-year basis pursuant to a written contract by licensed health care personnel and by certified nursing assistants and home health aides who are employed by, or work under the auspices of, a licensed home health agency or who are registered with a licensed nurse registry.

**History.**—s. 38, ch. 75-233; s. 2, ch. 81-318; ss. 62, 79, 83, ch. 83-181; s. 12, ch. 85-167; s. 1, ch. 87-123; s. 2, ch. 88-219; s. 1, ch. 88-323; s. 1, ch. 90-101; s. 31, ch. 90-306; s. 2, ch. 90-319; s. 25, ch. 91-57; s. 28, ch. 91-263; ss. 2, 23, ch. 93-214; s. 781, ch. 95-148; s. 56, ch. 95-228; s. 126, ch. 99-8; s. 1, ch. 99-332; ss. 102, 156, ch. 2000-318; s. 77, ch. 2000-349; s. 2, ch. 2005-243; s. 60, ch. 2006-197; s. 1, ch. 2008-246; s. 41, ch. 2012-160; s. 124, ch. 2014-19; s. 1, ch. 2015-66; s. 8, ch. 2016-145; s. 30, ch. 2018-106; s. 4, ch. 2020-9; s. 9, ch. 2020-156; s. 25, ch. 2021-51.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Select Year:   2022 ⌄   Go

# The 2022 Florida Statutes (including 2022 Special Session A and 2023 Special Session B)

Title XXIX                                  Chapter 400                                View Entire Chapter
PUBLIC HEALTH      NURSING HOMES AND RELATED HEALTH CARE FACILITIES

**400.506     Licensure of nurse registries; requirements; penalties.—**

(1)(a)   A nurse registry is exempt from the licensing requirements of a home health agency but must be licensed as a nurse registry. The requirements of part II of chapter 408 apply to the provision of services that require licensure pursuant to this section and ss. 400.509-400.518 and part II of chapter 408 and to entities licensed by or applying for such license from the Agency for Health Care Administration pursuant to this section and ss. 400.509-400.518. A license issued by the agency is required for the operation of a nurse registry. Each operational site of the nurse registry must be licensed, unless there is more than one site within the health service planning district for which a license is issued. In such case, each operational site within the health service planning district must be listed on the license.

(b)   A licensed nurse registry may operate a satellite office as defined in s. 400.462. The nurse registry operational site must administer all satellite offices. A satellite office may store supplies and records, register and process contractors, and conduct business by telephone as is done at other operational sites. Nurse registries may use signs and advertisements to notify the public of the location of a satellite office. All original records must be kept at the operational site.

(c)   A nurse registry must provide notice, in writing, to the agency at the state and area office levels, as required by agency rule, of a proposed change of address for an operational site or the opening of a satellite office. Before relocating an operational site or opening a satellite office, the nurse registry must submit evidence of its legal right to use the proposed property and evidence that the property is zoned for nurse registry use.

(2)   Each applicant for licensure and each licensee must comply with all provisions of part II of chapter 408 and this section.

(3)   In accordance with s. 408.805, an applicant or licensee shall pay a fee for each license application submitted under this section and ss. 400.509-400.518, part II of chapter 408, and applicable rules. The amount of the fee shall be established by rule and may not exceed $2,000 per biennium.

(4)   A licensee that provides, offers, or advertises to the public any service for which licensure is required under this section must include in such advertisement the license number issued to it by the Agency for Health Care Administration. The agency shall assess a fine of not less than $100 against a licensee that fails to include the license number when submitting the advertisement for publication, broadcast, or printing. The fine for a second or subsequent offense is $500.

(5)(a)   In addition to the requirements of s. 408.812, any person who owns, operates, or maintains an unlicensed nurse registry and who, after receiving notification from the agency, fails to cease operation and apply for a license under this part commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. Each day of continued operation is a separate offense.

(b)   If a nurse registry fails to cease operation after agency notification, the agency may impose a fine pursuant to s. 408.812.

(6)(a)   A nurse registry may refer for contract in private residences registered nurses and licensed practical nurses registered and licensed under part I of chapter 464, certified nursing assistants certified under part II of chapter 464, home health aides who present documented proof of successful completion of the training required by

rule of the agency and companions or homemakers for the purposes of providing those services authorized under s.
400.509(1). A licensed nurse registry shall ensure that each certified nursing assistant referred for contract by the nurse registry and each home health aide referred for contract by the nurse registry has presented credentials demonstrating that he or she is adequately trained to perform the tasks of a home health aide in the home setting. Each person referred by a nurse registry must provide current documentation that he or she is free from communicable diseases.

(b)   A certified nursing assistant or home health aide may be referred for a contract to provide care to a patient in his or her home only if that patient is under a physician's care. A certified nursing assistant or home health aide referred for contract in a private residence shall be limited to assisting a patient with bathing, dressing, toileting, grooming, eating, physical transfer, and those normal daily routines the patient could perform for himself or herself were he or she physically capable. A certified nursing assistant or home health aide may not provide medical or other health care services that require specialized training and that may be performed only by licensed health care professionals. The nurse registry shall obtain the name and address of the attending physician and send written notification to the physician within 48 hours after a contract is concluded that a certified nursing assistant or home health aide will be providing care for that patient.

(c)   When a certified nursing assistant or home health aide is referred to a patient's home by a nurse registry, the nurse registry shall advise the patient, the patient's family, or any other person acting on behalf of the patient at the time the contract for services is made that registered nurses are available to make visits to the patient's home for an additional cost.

(d)   A registered nurse, licensed practical nurse, certified nursing assistant, companion or homemaker, or home health aide referred for contract under this chapter by a nurse registry is deemed an independent contractor and not an employee of the nurse registry under any chapter regardless of the obligations imposed on a nurse registry under this chapter or chapter 408.

(e)   Upon referral of a registered nurse, licensed practical nurse, certified nursing assistant, companion or homemaker, or home health aide for contract in a private residence or facility, the nurse registry shall advise the patient, the patient's family, or any other person acting on behalf of the patient, at the time of the contract for services, that the caregiver referred by the nurse registry is an independent contractor and that the nurse registry may not monitor, supervise, manage, or train a caregiver referred for contract under this chapter.

(7)   A person who is referred by a nurse registry for contract in private residences and who is not a nurse licensed under part I of chapter 464 may perform only those services or care to clients that has been certified to perform or trained to perform as required by law or rules of the Agency for Health Care Administration or the Department of Business and Professional Regulation. Providing services beyond the scope authorized under this subsection constitutes the unauthorized practice of medicine or a violation of the Nurse Practice Act and is punishable as provided under chapter 458, chapter 459, or part I of chapter 464.

(8)   Each nurse registry must require every applicant for contract to complete an application form providing the following information:

(a)   The name, address, date of birth, and social security number of the applicant.

(b)   The educational background and employment history of the applicant.

(c)   The number and date of the applicable license or certification.

(d)   When appropriate, information concerning the renewal of the applicable license, registration, or certification.

(e)   Proof of completion of a continuing educational course on modes of transmission, infection control procedures, clinical management, and prevention of human immunodeficiency virus and acquired immune deficiency syndrome with an emphasis on appropriate behavior and attitude change. Such instruction shall include information on current Florida law and its effect on testing, confidentiality of test results, and treatment of patients and any protocols and procedures applicable to human immunodeficiency virus counseling and testing, reporting, offering HIV testing to pregnant women, and partner notification issues pursuant to ss. 381.004 and 384.25.

(9) Each nurse registry must comply with the background screening requirements in s. 400.512 for persons referred for contract. However, an initial screening may not be required for persons who have been continuously registered with the nurse registry since October 1, 2000.

(10) The nurse registry must maintain the application on file, and that file must be open to the inspection of the Agency for Health Care Administration. The nurse registry must maintain on file the name and address of the patient or client to whom nurse registry personnel are referred for contract and the amount of the fee received by the nurse registry. A nurse registry must maintain the file that includes the application and other applicable documentation for 3 years after the date of the last file entry of patient-related or client-related information.

(11) Nurse registries shall assist persons who would need assistance and sheltering during evacuations because of physical, mental, or sensory disabilities in registering with the appropriate local emergency management agency pursuant to s. 252.355.

(12) Each nurse registry shall prepare and maintain a comprehensive emergency management plan that is consistent with the criteria in this subsection and with the local special needs plan. The plan shall be updated annually. The plan shall include the means by which the nurse registry will continue to provide the same type and quantity of services to its patients who evacuate to special needs shelters which were being provided to those patients prior to evacuation. The plan shall specify how the nurse registry shall facilitate the provision of continuous care by persons referred for contract to persons who are registered pursuant to s. 252.355 during an emergency that interrupts the provision of care or services in private residences. Nurse registries may establish links to local emergency operations centers to determine a mechanism by which to approach specific areas within a disaster area in order for a provider to reach its clients. Nurse registries shall demonstrate a good faith effort to comply with the requirements of this subsection by documenting attempts of staff to follow procedures outlined in the nurse registry's comprehensive emergency management plan which support a finding that the provision of continuing care has been attempted for patients identified as needing care by the nurse registry and registered under s. 252.355 in the event of an emergency under this subsection.

(a) All persons referred for contract who care for persons registered pursuant to s. 252.355 must include in the patient record a description of how care will be continued during a disaster or emergency that interrupts the provision of care in the patient's home. It shall be the responsibility of the person referred for contract to ensure that continuous care is provided.

(b) Each nurse registry shall maintain a current prioritized list of patients in private residences who are registered pursuant to s. 252.355 and are under the care of persons referred for contract and who need continued services during an emergency. This list shall indicate, for each patient, if the client is to be transported to a special needs shelter and if the patient is receiving skilled nursing services. Nurse registries shall make this list available to county health departments and to local emergency management agencies upon request.

(c) Each person referred for contract who is caring for a patient who is registered pursuant to s. 252.355 shall provide a list of the patient's medication and equipment needs to the nurse registry. Each person referred for contract shall make this information available to county health departments and to local emergency management agencies upon request.

(d) Each person referred for contract shall not be required to continue to provide care to patients in emergency situations that are beyond the person's control and that make it impossible to provide services, such as when roads are impassable or when patients do not go to the location specified in their patient records.

(e) The comprehensive emergency management plan required by this subsection is subject to review and approval by the county health department. During its review, the county health department shall contact state and local health and medical stakeholders when necessary. The county health department shall complete its review to ensure that the plan complies with the criteria in the Agency for Health Care Administration rules within 90 days after receipt of the plan and shall either approve the plan or advise the nurse registry of necessary revisions. If a nurse registry fails to submit a plan or fails to submit requested information or revisions to the county health department within 30 days after written notification from the county health department, the county health department shall notify the Agency for Health Care Administration. The agency shall notify the nurse registry that

Case 0:25-cv-61534-WPD Document 66-1 Entered on FLSD Docket 07/31/2025 Page 125 of 144

its failure constitutes a deficiency, subject to a fine of $5,000 per occurrence. If the additional information is not provided, or revisions are not made as requested, the agency may impose the fine.

(f)   The Agency for Health Care Administration shall adopt rules establishing minimum criteria for the comprehensive emergency management plan and plan updates required by this subsection, with the concurrence of the Department of Health and in consultation with the Division of Emergency Management.

(13)   All persons referred for contract in private residences by a nurse registry must comply with the following requirements for a plan of treatment:

(a)   When, in accordance with the privileges and restrictions imposed upon a nurse under part I of chapter 464, the delivery of care to a patient is under the direction or supervision of a physician or when a physician is responsible for the medical care of the patient, a medical plan of treatment must be established for each patient receiving care or treatment provided by a licensed nurse in the home. The original medical plan of treatment must be timely signed by the physician, physician assistant, or advanced practice registered nurse, acting within his or her respective scope of practice, and reviewed in consultation with the licensed nurse at least every 2 months. Any additional order or change in orders must be obtained from the physician, physician assistant, or advanced practice registered nurse and reduced to writing and timely signed by the physician, physician assistant, or advanced practice registered nurse. The delivery of care under a medical plan of treatment must be substantiated by the appropriate nursing notes or documentation made by the nurse in compliance with nursing practices established under part I of chapter 464.

(b)   Whenever a medical plan of treatment is established for a patient, the initial medical plan of treatment, any amendment to the plan, additional order or change in orders, and copy of nursing notes must be filed in the office of the nurse registry.

(14)   The nurse registry must comply with the notice requirements of s. 408.810(5), relating to abuse reporting.

(15)(a)   The agency may deny, suspend, or revoke the license of a nurse registry and shall impose a fine of $5,000 against a nurse registry that:

1.   Provides services to residents in an assisted living facility for which the nurse registry does not receive fair market value remuneration.

2.   Provides staffing to an assisted living facility for which the nurse registry does not receive fair market value remuneration.

3.   Fails to provide the agency, upon request, with copies of all contracts with assisted living facilities which were executed within the last 5 years.

(b)   The agency shall also impose an administrative fine of $15,000 if the nurse registry refers nurses, certified nursing assistants, home health aides, or other staff without charge to a facility licensed under chapter 429 in return for patient referrals from the facility.

(c)   The proceeds of all fines collected under this subsection shall be deposited into the Health Care Trust Fund.

(16)   In addition to any other penalties imposed pursuant to this section or part, the agency may assess costs related to an investigation that results in a successful prosecution, excluding costs associated with an attorney's time.

(17)   The Agency for Health Care Administration shall adopt rules to implement this section and part II of chapter 408.

(18)   An administrator may manage only one nurse registry, except that an administrator may manage up to five registries if all five registries have identical controlling interests as defined in s. 408.803 and are located within one agency geographic service area or within an immediately contiguous county. An administrator shall designate, in writing, for each licensed entity, a qualified alternate administrator to serve during the administrator's absence.

(19)   A nurse registry may not monitor, supervise, manage, or train a registered nurse, licensed practical nurse, certified nursing assistant, companion or homemaker, or home health aide referred for contract under this chapter. In the event of a violation of this chapter or a violation of any other law of this state by a referred registered nurse, licensed practical nurse, certified nursing assistant, companion or homemaker, or home health aide, or a deficiency in credentials which comes to the attention of the nurse registry, the nurse registry shall advise the patient to terminate the referred person's contract, providing the reason for the suggested termination; cease

referring the person to other patients or facilities; and, if practice violations are involved, notify the licensing board. This section does not affect or negate any other obligations imposed on a nurse registry under chapter 408.

(20)   Records required to be filed under this chapter with the nurse registry as a repository of records must be kept in accordance with rules adopted by the agency. The nurse registry has no obligation to review or act upon such records except as specified in subsection (19).

History.—ss. 2, 4, ch. 90-101; s. 27, ch. 91-57; ss. 13, 23, ch. 93-214; s. 51, ch. 94-218; s. 1056, ch. 95-148; ss. 49, 71, ch. 98-171; s. 10, ch. 99-332; s. 14, ch. 2000-140; s. 21, ch. 2000-153; ss. 104, 161, ch. 2000-318; s. 80, ch. 2000-349; s. 25, ch. 2001-53; s. 2, ch. 2001-67; s. 148, ch. 2001-277; s. 48, ch. 2004-267; s. 1, ch. 2005-170; s. 1, ch. 2005-172; s. 8, ch. 2005-243; s. 23, ch. 2006-71; s. 79, ch. 2007-5; s. 80, ch. 2007-230; s. 103, ch. 2008-4; s. 2, ch. 2008-103; s. 9, ch. 2008-246; s. 7, ch. 2009-223; s. 7, ch. 2010-114; s. 277, ch. 2011-142; s. 12, ch. 2012-160; s. 2, ch. 2014-142; ss. 3, 4, ch. 2015-66; s. 52, ch. 2018-24; s. 32, ch. 2018-106; s. 13, ch. 2020-156.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

Select Year:  2022 ⌄   [ Go ]

# The 2022 Florida Statutes (including 2022 Special Session A and 2023 Special Session B)

| Title XXIX | Chapter 400 | View Entire Chapter |
|---|---|---|
| PUBLIC HEALTH | NURSING HOMES AND RELATED HEALTH CARE FACILITIES | |

**400.509    Registration of particular service providers exempt from licensure; certificate of registration; regulation of registrants.—**

(1)   Any person that provides companion services or homemaker services and does not provide a home health service to a person is exempt from licensure under this part. However, any person that provides companion services or homemaker services must register with the agency. A person under contract with the Agency for Persons with Disabilities which provides companion services only for persons with a developmental disability, as defined in s. 393.063, is exempt from registration.

(2)   The requirements of part II of chapter 408 apply to the provision of services that require registration or licensure pursuant to this section and part II of chapter 408 and entities registered by or applying for such registration from the Agency for Health Care Administration pursuant to this section. Each applicant for registration and each registrant must comply with all provisions of part II of chapter 408. Registration or a license issued by the agency is required for a person to provide companion services or homemaker services.

(3)   In accordance with s. 408.805, applicants and registrants shall pay fees for all registrations issued under this part, part II of chapter 408, and applicable rules. The amount of the fee shall be $50 per biennium.

(4)   Each registrant must obtain the employment or contract history of persons who are employed by or under contract with the person and who will have contact at any time with patients or clients in their homes by:

(a)   Requiring such persons to submit an employment or contractual history to the registrant; and

(b)   Verifying the employment or contractual history, unless through diligent efforts such verification is not possible. The agency shall prescribe by rule the minimum requirements for establishing that diligent efforts have been made.

There is no monetary liability on the part of, and no cause of action for damages arises against, a former employer of a prospective employee of or prospective independent contractor with a registrant who reasonably and in good faith communicates his or her honest opinions about the former employee's or contractor's job performance. This subsection does not affect the official immunity of an officer or employee of a public corporation.

(5)   A person that offers or advertises to the public a service for which registration is required must include in its advertisement the registration number issued by the Agency for Health Care Administration.

(6)   In addition to any other penalties imposed pursuant to this section or part, the agency may assess costs related to an investigation that results in a successful prosecution, excluding costs associated with an attorney's time.

(7)   The Agency for Health Care Administration shall adopt rules to administer this section and part II of chapter 408.

History.—ss. 2, 3, ch. 87-123; s. 3, ch. 88-219; s. 66, ch. 91-221; s. 30, ch. 91-263; ss. 6, 23, ch. 93-214; s. 787, ch. 95-148; s. 11, ch. 99-332; s. 162, ch. 2000-318; s. 81, ch. 2000-349; s. 15, ch. 2004-267; s. 81, ch. 2007-230; s. 13, ch. 2012-160; s. 14, ch. 2020-156.

Note.—Former s. 400.478.

Copyright © 1995-2023 The Florida Legislature • Privacy Statement • Contact Us

 **U.S. Department of Labor**
**Wage and Hour Division**



July 13, 2018

FIELD ASSISTANCE BULLETIN No. 2018-4

MEMORANDUM FOR:     Regional Administrators
                    Deputy Regional Administrators
                    Directors of Enforcement
                    District Directors

FROM:               Bryan Jarrett
                    Acting Administrator

SUBJECT:            Determining whether nurse or caregiver registries are employers of
                    the caregiver

This Field Assistance Bulletin (FAB) provides guidance to Wage and Hour Division (WHD) field
staff to help them determine whether home care, nurse, or caregiver registries (registries) are
employers under the Fair Labor Standards Act (FLSA).  A registry is an entity that typically
matches people who need caregiving services with caregivers who provide the services, usually
nurses, home health aides, personal care attendants, or home care workers with other titles
(collectively, caregivers).

Consistent with WHD's longstanding position, a registry that simply facilitates matches between
clients and caregivers—even if the registry also provides certain other services, such as payroll
services—is not an employer under the FLSA.  A registry that controls the terms and conditions of
the caregiver's employment activities may be an employer of the caregiver and therefore subject to
the requirements of the FLSA.  To ensure consistent enforcement, this FAB provides specific
examples of common registry business practices, which may, when the totality of factors is
analyzed, establish the existence of an employment relationship under the FLSA.

I.     **Background**

       A. **The Typical Home Care Registry Business Model**

WHD recognizes that the home care industry serves the important purpose of ensuring that seniors
and individuals with disabilities have the support they need to live and remain in their homes and
communities.  Generally, clients have three options for in-home care: directly and independently



hiring a caregiver, hiring a home care agency to provide the services, or obtaining a referral through caregiver registries.[1]

WHD has previously issued guidance concerning the FLSA's applicability to people who hire caregivers directly or employ caregivers through a home care agency.[2]  Unlike caregivers and certain home care agencies, a registry may not provide the actual home care services.  Instead, a registry typically provides matchmaking and referral services to the client by providing access to its database of qualified, pre-screened, and vetted caregivers.  A registry may confirm caregiver credentials, conduct background checks, contact professional references, and engage in other quality-control measures.  A registry also typically obtains information from the caregivers about the type of work they are willing to perform, their target compensation, their availability, and other personal preferences when working with clients.

A registry may also interview the client to learn, for instance, the amount and type of services the client needs, the client's budget, and the client's personal preferences.  After a client provides such information, the registry usually identifies previously screened caregivers who meet the requirements for the job and facilitates an introduction.  After the introduction, the caregiver and/or the client have no obligation to accept the referral.  The registry may refer numerous potential caregivers to a client.

A registry may act as the liaison between the caregiver and the client but does not typically negotiate the terms or conditions of the job on either party's behalf.  For some registries, when a client accepts one of the registry's referrals, the registry does not usually thereafter control the financial terms or conditions of the home care relationship.  Nor does the registry typically control, supervise, or provide training or equipment to the caregiver.  Rather, after the match occurs, it may be the client's responsibility to manage the care.  The client may determine, among other things, the type of care provided, the caregiver's rate of pay, and the caregiver's hours.  The client and the caregiver are free to change the terms and conditions of their relationship at any time.

In addition to providing matchmaking services, a registry may provide administrative services to the caregivers and clients.  These services include recordkeeping, invoicing, collecting and disbursing payments, and other administrative services that are ministerial in nature.  Most registries charge an administrative fee for the referral services and the ongoing administrative services.  Some registries require a lump-sum payment from the client for the referral.

---

[1] This FAB refers to "registries" for simplicity and to reflect common terms used in the industry.  The FLSA does not define the term "registry."  The title an entity uses does not determine whether it is obligated to comply with the FLSA; instead, the particular facts and circumstance outlined herein control.  Additionally, WHD does not recommend or prefer any business model of providing home care services, nor does it offer advice concerning how entities should choose to conduct business.  Rather, WHD is issuing this FAB to explain how it determines whether a registry is an employer of caregivers under the FLSA.

[2] Additional information is available at https://www.dol.gov/whd/homecare/.

2

## B. General Test for Employment Relationship under the FLSA

Whether an employment relationship exists under the FLSA depends on the "economic reality" of the circumstances.[3]  No single fact about the relationship may conclusively determine whether an employment relationship exists between a registry and a caregiver.[4]  Courts have provided several relevant considerations, including whether the potential employer determines the rate and method of payment, whether the potential employer has the power to hire and fire the worker, and whether the potential employer controls the worker's schedule or conditions of employment.[5]

## C. Existing Guidance on Home Care Registries

For more than 40 years, WHD has maintained that a registry that performs only referral and payroll services is not an employer of the caregivers whom it refers.  On the other hand, a registry that directs and controls the caregiver's work and sets the caregiver's rate of pay may be an employer of the caregiver.  WHD first provided such registry-specific guidance in a 1975 Opinion Letter.  The letter confirmed that:

> [T]he ordinary employment agency that refers a nurse to a potential employer is not an employer of the nurse. In such a case, the usual procedure is for the individual referred to contact the potential employer and contract directly with the potential employer as to compensation, hours, and other terms of work.

WHD Opinion Letter WH-350, 1975 WL 40973, at 1 (July 31, 1975) ("1975 Opinion Letter").  In that case, however, the entity did not follow this business model.  Rather, the entity "maintain[ed] a log of assignments showing the shifts worked," "establishe[d] the rate which will be charged," "exercise[d] control over the nurse's behavior and the work schedule," and "exercise[d] a form of discipline." *Id.*  WHD therefore concluded that the caregiver was the entity's employee. *Id.*

In 2013, WHD provided additional guidance for registries in the preamble to its regulations concerning domestic service employment.  Consistent with the 1975 Opinion Letter, the preamble provided analysis for the following hypothetical scenario:

> ABC Company advertises as a "registry" that provides potential direct care workers. The registry conducts a background screening and verifies credentials of potential workers and assists clients by locating direct care workers who may be

---

[3] *See, e.g., Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33 (1961) (citing *United States v. Silk,* 331 U.S. 704, 713 (1947)); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729 (1947); *Schultz v. Capital Int'l Sec., Inc.,* 466 F.3d 298, 304 (4th Cir. 2006) (citing *Henderson v. Inter-Chem Coal Co.,* 41 F.3d 567, 570 (10th Cir. 1994)).

[4] *See, e.g., Haybarger v. Lawrence Cty. Adult Prob. & Parole,* 667 F.3d 408, 418 (3d Cir. 2012) (citing *Herman v. RSR Sec. Servs.,* 172 F.3d 132, 139 (2d Cir. 1999)).

[5] *See, e.g., Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1312 (11th Cir. 2013) (citing *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1311 (5th Cir. 1976)); *Haybarger,* 667 F.3d at 418 (citing *Herman,* 172 F.3d at 139); *Baystate Alternative Staffing, Inc. v. Herman,* 163 F.3d 668, 675 (1st Cir. 1998) (citing *Bonnette v. Cal. Health & Welfare Agency,* 704 F.2d 1465, 1469-70 (9th Cir. 1983)); *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir. 1987) (citing *Pilgrim Equipment Co.,* 527 F.2d at 1311).

able to meet a client's needs. ABC Company informs Ann, a direct care worker, of the opportunity to work for a potential client. If Ann is interested in the opportunity, she is responsible for contacting the client for more information. Ann is not obligated to pursue this or any other opportunity presented, and she is not prohibited from registering with other referral services or from working directly with clients independent of ABC Company. The registry does not provide any equipment to Ann, and does not supervise or monitor any work Ann performs. ABC Company has no power to terminate Ann's employment with a client. ABC Company processes Ann's payroll checks according to information provided by clients, but does not set the pay rate.

...

In this scenario, Ann is likely not an employee of ABC Company. There is no permanency in the relationship between the registry and Ann. The registry does not provide any equipment or facilities, exercises no control over daily activities, and has no power to hire or fire. Ann is able to accept as many or as few clients as she wishes. The client sets the rate of pay and negotiates directly with Ann about which services will be provided. However, this does not mean that every "registry" will not be an employer. Rather, a fact-specific assessment must be conducted.

*Id.* Final Rule, Application of the Fair Labor Standards Act to Domestic Service, 78 FR 60,454, 60,484 (Oct. 1, 2013).

Although both the 1975 Opinion Letter and 2013 preamble provide relevant guidance, additional clarification concerning specific business practices of registries will further assist both WHD and the regulated community.

## II.    Determining Whether Caregiver Registries Are Employers Under the FLSA

Determining whether a registry is an employer of the caregiver under the FLSA requires a thorough analysis of the registry's business model and operations. It is a case-by-case analysis, and no one factor is dispositive. The discussion below addresses some common registry business practices that WHD analyzes during investigations to determine whether an employment relationship exists. It is not an exhaustive list; additional facts relating to the caregiver's relationship with the registry may be relevant to the analysis.

### A.  Conducting Background and Reference Checks

A registry often performs basic background checks of caregivers. These background checks typically include the collection of objective information concerning the caregiver, such as the caregiver's criminal history, credit report, licensing, and other credentials. A registry may also perform additional tailored background checks pursuant to either state or local laws. A registry's performance of such basic or legally required background checks by itself does not indicate that the registry is an employer of the caregiver.[6]

---

[6] Similarly, in <u>Administrator's Interpretation 2014-2</u>, WHD previously noted that compliance with mandatory requirements set by the Centers for Medicare and Medicaid Services is not an indicator of employer status.

If a registry's background screening evaluates additional subjective criteria, however, it may indicate that the registry (instead of the client) is selecting the caregiver. This may occur, for example, if a registry interviews a prospective caregiver to evaluate subjective factors that the registry values (such as whether the registry finds the caregiver likeable). The registry may also interview the caregiver's references to assess whether he or she would work well with a particular client. Such actions imply that a registry is pre-selecting caregivers for the client, rather than performing basic quality control and verification checks. In the typical registry business model, it is up to the client to perform such additional, subjective screening after receiving a referral from the registry. Such actions may indicate that the registry is the caregiver's employer.

## B. Hiring and Firing

A registry often informs its client that a potential caregiver meets the client's threshold parameters and preferences, and then introduces the two. The registry does not further participate in the hiring process. The client is free to accept or decline services from the referred caregiver. If the client hires the caregiver, the registry usually has no right to alter or terminate the terms and conditions of the caregiver's employment. As with hiring, the ultimate termination decision is the client's. A registry's inability to hire and fire employees indicates that the registry is not an employer of the caregiver.

A registry could, however, play a more active role in hiring or firing caregivers. A registry might, for example, interview or select a caregiver at the request of the client. A registry might also fire a caregiver for failing to comply with requirements and standards established by the industry, the client, or the law. In such circumstances, the registry may control the permanency of the relationship, and the caregiver may economically depend on the registry to obtain and/or keep his or her job. A registry's exercise of control over hiring or firing decisions indicates that the registry is an employer of the caregiver.

## C. Scheduling and Assigning Work

A registry commonly facilitates initial communication between the caregiver and the client. The caregiver and the client thereafter may independently determine the work schedules and assignments. A registry's lack of control over work schedules and assignments may indicate that a registry is not the caregiver's employer. Conversely, a registry's exercise of control over the caregiver's work schedules and assignments may indicate that the registry is an employer of the caregiver.

At times a registry may post to an online message board or send a text or email to all qualified caregivers asking them to contact a particular client if they are interested in working for the client. The registry may also narrow the offer to a subset of caregivers screened by objective criteria, such as those whose availability matches the needs of the client or who can work in a home with a smoker or pets. As yet another alternative, a registry may simply provide a client with access to its entire list of vetted caregivers or a list of caregivers who satisfy the client's criteria. In any of these scenarios, the registry is providing, not assigning, the work opportunities because it is matching the client with caregivers who meet the requisite qualifications. It is the caregiver's and client's

burden to pursue the opportunity and structure the terms of their working relationship going forward. Such communications from the registry, therefore, do not alone indicate the existence of an employment relationship.

A registry might, however, offer work assignments to a subset of caregivers based on the registry's own discretion and judgment. This may occur, for example, if a registry offers the assignment to a subset of caregivers whom the registry believes would do a better job or are more likeable. Some registries might even directly assign specific caregivers to individual clients. In either scenario, the registry may be exercising control over the caregiver, and the caregiver may economically depend on the registry's preferences and decisions. These factors may indicate the existence of an employment relationship.

### D. Controlling the Caregiver's Work

A registry does not plan and provide care for the client, but might seek information concerning the type of care the client needs for matching purposes. The caregiver may not receive any instruction from the registry about how to care for clients. After the referral, a registry may choose to not monitor or manage the caregiver's methods or work habits. The registry may not, for example, instruct caregivers how to provide caregiving services, monitor or supervise caregivers in clients' homes, or evaluate caregivers' performance. The absence of such control indicates that a registry is not an employer of the caregiver.

On the other hand, a registry may provide training and control the caregiver's services after making the referral. Control over the caregiver services indicates that the registry is an employer of the caregiver. Examples of such control include setting policies that require a caregiver to provide services in a particular manner; requiring a caregiver to accept jobs with specific clients; visiting the client's home to monitor a caregiver's behavior; conducting performance evaluations of the caregiver; setting policies for a caregiver's time off from work; requiring a caregiver to call only the registry, instead of the client, if the caregiver will be late or miss a shift; and disciplining a caregiver for his or her performance.

To be sure, there are other ways in which a registry may control a caregiver's behavior and additionally restrict the caregiver's ability to independently generate profit and loss—such as limiting the number of clients to whom a caregiver may provide services, limiting the caregiver's hours, prohibiting a caregiver from registering with other referral services, or prohibiting a caregiver from working directly with clients outside of the registry. The exercise of control over caregivers indicates the existence of an employment relationship.

### E. Setting the Pay Rate

A registry typically does not determine a caregiver's rate of pay. The client instead negotiates the rate of pay directly with the caregiver. In the alternative, Medicaid or another government program may determine the actual hourly wage rate if they are funding the services. Either scenario indicates that the registry is not determining the caregiver's rate of pay and, therefore, may indicate that the registry is not the caregiver's employer.

Oftentimes both the caregiver and the client will seek the registry's advice concerning appropriate pay rates. If the registry informs either the client or the caregiver about typical pay rates in the area to serve as a benchmark for negotiations, that does not indicate that the registry is the caregiver's employer. The registry is simply conveying market information that the parties may ultimately use, or ignore, as they deem fit. Similarly, a registry's action as a liaison that merely relays communications, offers, or counteroffers between the client and caregiver does not indicate that the registry is controlling the caregiver or acting as the caregiver's employer.

Of course, a registry's decision to effectively set a caregiver's rate of pay without the caregiver making the ultimate determination indicates that the registry is acting as the caregiver's employer. This may occur, for example, when a registry designates a set wage range, or when a registry offers tailored direction concerning what a caregiver should charge for specific services that a client needs (as opposed to merely informing him or her of the general market rates in the geographic vicinity). Such behavior indicates the existence of an employment relationship between the registry and caregiver.

### F.   Receiving Continuous Payments for Caregiver Services

A registry may charge clients a one-time, upfront fee for the service of matching a caregiver and client. It may likewise perform and charge fees for administrative or ministerial functions (like processing payroll or producing tax documents). Such charges do not indicate that the registry is the caregiver's employer.

A registry may instead choose to charge fees that fluctuate based on the number of hours that a caregiver works for the client. Such a registry may have an ongoing interest in the employment relationship, including in the number of hours the caregiver works and whether those hours are tracked accurately. The registry's fees are based on the ongoing caregiver relationship, not the registry's initial referral or administrative efforts. The caregiver's pay then depends, in part, on the amount the registry charges. Such charges, therefore, may indicate that the registry is the caregiver's employer.

### G.   Paying Wages

A registry often performs payroll-related functions for its clients. These functions include, for example, calculating the amount of wages owed based on the hours worked and the previously determined rate of pay, making the appropriate tax deductions, administering benefits that the caregiver has requested and for which the caregiver pays, and issuing a check or electronic deposit. If the client provides the funds directly or via an escrow account, the registry's performance of such payroll services does not indicate that the registry is the caregiver's employer.

A registry's direct payment of its own funds to the caregiver, however, may indicate that the registry is the caregiver's employer. This is true regardless of whether the registry typically receives reimbursement from the client because, in this situation, the registry may be effectively guaranteeing the payment even if the client does not ultimately pay. In such circumstances, the caregiver may be economically dependent on the registry, which indicates that the registry is the caregiver's employer.

7

### H. Tracking Caregiver Hours

A registry does not typically create and confirm records of a caregiver's hours worked. It may perform payroll services after the client or caregiver submits time records, as discussed above, but that does not indicate that the registry is the caregiver's employer. On the other hand, a registry's active creation and verification of time records may indicate that the registry may be, in fact, an employer of the caregiver. Tracking and independently verifying time worked is generally a form of supervision on which the caregiver depends to ensure proper payment. It therefore may indicate the existence of an employment relationship.

A registry might collect time sheets from caregivers or offer an electronic time verification system. A registry may also require the correct completion and submission of certain time sheets for purposes of payroll processing. These activities do not indicate that the registry is the caregiver's employer—as long as the client (not the registry) is the one actually verifying and adjusting the timekeeping information for accuracy.

### I. Purchasing Equipment and Supplies

A registry typically invests in office space, payroll software, timekeeping systems, and other products to operate its businesses. A registry may also provide caregivers with an option to purchase discounted equipment or supplies from either the registry or a third party. These actions, alone, do not indicate that a registry is a caregiver's employer. But in some cases a registry may purchase equipment and supplies directly for a caregiver, or direct the caregiver to purchase specified equipment and supplies. The registry may also invest in a caregiver's training or pay for his or her licenses, insurance, or medical supplies. Unlike investments in office space or payroll systems, investments in the tools necessary for the caregiver to perform his or her services may indicate that the registry is acting as the caregiver's employer, instead of simply a referral service.

### J. Receiving EINs or 1099s

Some caregivers may acquire an Employer Identification Number (EIN) issued by the Internal Revenue Service (IRS). State law requires most caregivers to obtain some type of liability insurance and may also impose bonding requirements. A registry may similarly require an EIN, insurance, or a bond in accordance with the law. These requirements are not relevant to determining whether a caregiver is an employee for FLSA purposes. Calling a caregiver an "independent contractor" or issuing him or her an IRS 1099 form does not preclude the caregiver from being an employee for FLSA purposes.

### III.    Conclusion

WHD will consider the totality of the circumstances to evaluate whether an employment relationship exists between a registry and a caregiver. Because the analysis does not depend on any single factor, and because caregiver registries operate in a variety of ways, WHD will evaluate all factors (including the practices discussed above) to reach appropriate conclusions in each case.

Please contact the FLSA/Child Labor Branch at (202) 693-0067 with any questions.

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA.

ALL VIP CARE, INC.,                                          CASE NO.:

       Plaintiff,

vs.

CRUZ VALDIVIESO FIGUERA,

       Defendant.

_____/

## COMPLAINT

Plaintiff, ALL VIP CARE, INC. ("ALL VIP") hereby sues Defendant, CRUZ VALDIVIESO

FIGUERA ("Contractor") and alleges that it is entitled to relief on the following facts:

### PARTIES, VENUE AND JURISDICTION

1.     This is an action for damages in excess of $30,000.00, exclusive of interest, costs

and attorney's fees.

2.     At all times material hereto, ALL VIP is a Florida For-Profit Corporation with its

principal place of business located in Palm Beach County, Florida and authorized to do business in

the State of Florida.

3.     At all time material hereto, Contractor resides in Broward County, Florida.

4.     Venue is proper in Broward County because it is where the Defendant resides.

### GENERAL ALLEGATIONS

5.     ALL VIP is a licensed Nurse Registry in the State of Florida and does business

in Broward and Palm Beach Counties.

6.     ALL VIP has various business associations, independent contractors, relationships

and clients that are critical to ALL VIP's business model to run a profitable business.

 MICHAEL GARCIA, PA



7.      Contractor was an independent contractor that had a Contract with ALL VIP.

8.      Contractor was a Home Health Aide that provided services to the ALL VIP's clients.

9.      As an independent contractor of ALL VIP, Contractor had access and given knowledge of ALL VIP's pricing structure, trade secret and confidential information.

10.     Due to Contractor's knowledge of ALL VIP's pricing structure, trade secret and confidential information, she has now illegally taken advantage of said information for her benefit by taking clients of ALL VIP.

**COUNT-I**
**BREACH OF CONTRACT**

ALL VIP hereby re-alleges paragraphs 1 through 10 as if fully set forth herein and further alleges as follows:

11.     On May 3, 2021, Contractor signed a Contract with non-compete provision with ALL VIP ("Contract"). *A true and correct copy of the Contract is attached hereto as Exhibit "A"*

12.     In violation of the Non-Compete provision, Contractor has contacted and taken a client of ALL VIP.

13.     Contractor has solicited business from ALL VIP's clients that are critical to ALL VIP's business model and running a profitable business.

14.     Contractor has misappropriated ALL VIP's pricing structure, trade secret and confidential information to divert business opportunities and customers from ALL VIP.

15.     Contractor's actions listed above have materially breached the Non-Compete provision and Contract.

16.     Contractor's actions also breach the Statement of Commitment and Code of Conduct sections of the Contract.

17.     Due to Contractor's material breach, ALL VIP has been damaged in excess of

MICHAEL GARCIA, PA

$30,000.00.

18.     All conditions precedent to bringing this action have occurred, have been performed or have been waived.

19.     ALL VIP has been caused to retain undersigned counsel to represent it in this action and are obligated to pay the reasonable attorney's fees and costs.

20.     ALL VIP is entitled for said attorney's fees and costs pursuant to § 542.335, *Fla. Stat.* and the terms of the Contract.

WHEREFORE, Plaintiff, ALL VIP CARE, INC., demands judgment against Defendant, CRUZ VALDIVIESO FIGUERA damages, plus attorney's fees, interest, costs, and for another relief as the Court deems proper and just.

### COUNT-II
### ENFORCEMENT OF RESTRICTIVE
### COVENANTS PURSUANT TO § 542.335, FLA.
### STAT.

ALL VIP hereby re-alleges paragraphs 1 through 10 as if fully set forth herein and further alleges as follows:

21.     This is an action pursuant to § 542.335, *Fla. Stat.*

22.     On May 3, 2021, Contractor signed a Contract that contained non-compete provision with ALL VIP. *See Exhibit A.*

23.     ALL VIP seeks to enforce the restrictive covenant in non-compete to protect its legitimate business interest of pricing structure, trade secret, confidential information, vendor information and specific geographic location of Broward and Palm Beach County.

24.     In violation of the Non-Compete agreement, Contractor poached one of ALL VIP's client.

25.     Contractor has misappropriated ALL VIP's pricing structure, trade secret and confidential information by approaching ALL VIP's clients.

MICHAEL GARCIA, PA

26.     Contractor has solicited business from ALL VIP's clients that is critical to ALL VIP's business model and running a profitable business.

27.     Contractor has misappropriated ALL VIP's pricing structure, trade secret and confidential information to divert business opportunities and customers from ALL VIP to herself.

28.     Defendant's actions listed above have materially breached the Non-Competeprovision and Contract.

29.     Due to Contractor's material breach, ALL VIP has been damaged and will continued to incur damages, if the Court does not enter an Order to prevent Contractor from misappropriating ALL VIP's pricing structure, trade secret and confidential information to divert business opportunities and customers from ALL VIP; and preventing Contractor from working for ALL VIP's current and former clients.

30.     All conditions precedent to bringing this action have occurred, have been performed or have been waived.

31.     ALL VIP has been caused to retain undersigned counsel to represent it in this action and is obligated to pay the reasonable attorney's fees and costs.

32.     ALL VIP is entitled to said attorney's fees and costs pursuant to § 542.335, *Fla. Stat.* and the terms of the Contract.

WHEREFORE, Plaintiff, ALL VIP CARE, INC. demands this Court enter an Order preventing Defendant, CRUZ VALDIVIESO FIGUERA, from misappropriating ALL VIP's pricing structure, trade secret and confidential information to divert business opportunities and customers from ALL VIP; and preventing Contractor from working for ALL VIP's current and former clients, plus an award of attorney's fees, interest, costs, and for such other relief as the Court deems proper and just.

MICHAEL GARCIA, PA

## COUNT III-TORTIOUS INTERFERENCE

ALL VIP hereby re-alleges paragraphs 1 through 10 as if fully set forth herein and further alleges as follows:

33.    ALL VIP had a contract with certain client in which ALL VIP agreed to provide Home Health Aides to the clients, in exchange the clients agreed to pay ALL VIP an hourly rate for services.

34.    Contractor was aware of ALL VIP's contract with the clients because Contractor was assigned by ALL VIP to provide Home Health Aide services to the client.

35.    Contractor intentionally and unjustifiably interfered with ALL VIP's contract by approaching the clients from ALL VIP.

36.    As a result of Contractor's intentional and unjustified interference, ALL VIP has been damaged in excess of $30,000.00.

WHEREFORE, Plaintiff, ALL VIP CARE, INC, demands judgment against Defendant, CRUZ VALDIVIESO FIGUERA, for the damages, plus costs, and for such other relief asthe Court deems proper and just.

**MICHAEL GARCIA, PA.**
888 SE 3rd Avenue, Suite 400-D
Fort Lauderdale, FL 33316
Telephone: (954) 703-6202
E-Mail: Legal@garciapa.com

By:  */s/ Michael Garcia*
Michael Garcia
Florida Bar No. 93749
E-Mail: Michael@garciapa.com

By:  */s/ Nicole Stambaugh*
Nicole Stambaugh
Florida Bar No. 44158
E-Mail: Nicole@Sgx-Law.com

MICHAEL GARCIA, PA

Filing # 165664021 E-Filed 01/28/2023 06:17:34 AM

IN THE CIRCUIT COURT FOR THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
**CASE NO: CACE-22-014991**

**ALL VIP CARE, INC.,**

                    Plaintiff,

vs.

**CRUZ VALDIVIESO FIGUERA,**

                    Defendants.

                                              /

## NOTICE OF VOLUNTARY DISMISSAL

The Plaintiff files this Notice of Voluntary Dismissal without Prejudice of this present action, due to the fact that Federal Judge William P. Dimirtouleas, under Case 0:22-CV-61553-WJD, of the Southern District of Florida, on January 5, 2023, ordered that the same and similar claims set forth in this state action are approved to be counterclaims in the above cited federal case. [DE-36]. On January 28, 2023, the Defendant filed such counterclaims in the above federal case.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading which was filed with the Clerk of the Court and was provided to: **Brian H. Pollack, Esquire**; Fairlaw Firm, 135 San Lorenzo Avenue, #770, Coral Gables, FL 33146, Brian@fairlawattorney.com, and all attorneys listed on and via the ECM System on **January 28, 2023**.

                                */s/ RANDY M. GOLDBERG, ESQUIRE*
                                Florida Healthcare Law Firm
                                FBN: 045187
                                151 NW 1st Avenue
                                Delray Beach, FL 33444
                                754-224-0867
                                RMGEsquire@gmail.com
                                RandyMGoldberg@gmail.com



IN THE CIRCUIT COURT FOR THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
**CASE NO: CACE-21-014991**

ALL VIP CARE, INC.,

                    Plaintiff,

vs.

CRUZ VALDIVIESO FIGUERA,

                    Defendants.

_____/

## JOINT STIPULATION FOR SUBSTITUTION OF COUNSEL

       IT IS HEREBY STIPULATED AND AGREED that Michael Garcia, Esquire, of Michael

Garcia, P.A. will withdraw as counsel for the PLAINTIFF, and that Randy M. Goldberg,

Esquire, of the Florida Healthcare Law Firm, will be substituted as counsel for the PLAINTIFF.

### Consent to Change of Counsel

       I, Liz Velazquez McKinnon, individually and as President of Defendant All VIP Care,
Inc, requested and consent to the above change of counsel on my behalf and on behalf of All VIP
Care, Inc.

By:_____            Dated: 12/18/2022
Liz Velazquez McKinnon

By:_____            */s/ Randy M. Goldberg, Esquire*
Michael Garcia, Esquire                 Florida Healthcare Law Firm
Michael Garcia, P.A                   151 NW 1st Avenue
100 SE 6th Street                     Delray Beach, FL 33444
Fort Lauderdale, FL 33301           Phone: (754) 224-0867
Migarcia11204@yahoo.com          RMGEsquire@gmail.com
Florida Bar No. 93749               FBN: 045187

### CERTIFICATE OF SERVICE

l

I hereby certify that a copy of this pleading which was filed with the Clerk of the Court and was provided to: **Brian H. Pollack, Esquire**; Fairlaw Firm, 135 San Lorenzo Avenue, #770, Coral Gables, FL 33146, Brian@fairlawattorney.com, and all attorneys listed on and via the ECM System on **December** *19*, **2022**.

**/s/ RANDY M. GOLDBERG, ESQUIRE**
Florida Healthcare Law Firm
FBN: 045187
151 NW 1st Avenue
Delray Beach, FL 33444
754-224-0867
RMGEsquire@gmail.com
Randy@Randygoldberglaw.com