1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3           CASE NO. 0:22-CV-61553-WPD

4

5     CRUZ VALDIVIESO FIGUERA,

6               Plaintiff,

7       vs.

8     ALL VIP CARE, INC., & LIZ
      VELAZQUEZ McKINNON,
9
                Defendants.
10    _____/

11

12

13        DEPOSITION OF CRUZ DAICELIS VALDIVIESO FIGUERA

14             (Videoconference)

15               June 6, 2023
                 11:01 a.m.
16

17

18

19

20

21
      Stenographically Reported By:
22    HALEY DAWN WESTRA, RPR, CRR
      Reporter and Notary Public
23    BAILEY ENTIN REPORTING, LLC
      Fort Lauderdale Office
24    Phone - 954-745-9511

25

```
 1     APPEARANCES:

 2

       On behalf of the Plaintiff:
 3
             FLORIDA HEALTHCARE LAW FIRM
 4           BY:  Mr. Randy M. Goldberg, Esq.
             151 NW 1st Avenue
 5           Delray Beach, Florida  33444
             randy@randygoldberglaw.com, 754-224-0867
 6

 7     On behalf of the Defendants:

 8           FAIRLAW FIRM
             BY:  Mr. Toussaint Marcus Cummings, Esq.
 9           135 San Lorenzo Avenue, Suite 770
             Coral Gables, Florida  33146
10           toussaint@fairlawattorney.com, 305-230-4884

11

12     Also Present: Ms. Katherine Klejman, Interpreter

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

INDEX

WITNESS                                    PAGE
CRUZ DAICELIS VALDIVIESO FIGUERA
      EXAMINATION BY MR. GOLDBERG        4
      EXAMINATION BY MR. CUMMINGS        45
      FURTHER EXAMINATION BY MR. GOLDBERG   62


                    - - -

         E X H I B I T S
                    - - -


EXHIBIT          DESCRIPTION          PAGE
Exh. A   Agreement and Signup Documents    29
Exh. B   Patient time sheets              35
Exh. C   Patient Calendar (All VIP)       67
Exh. D   Weekly Pay Stubs                 67

Page 4

     The following videoconference Zoom deposition
was taken before HALEY DAWN WESTRA, Stenographic
Reporter, in and for the State of Florida at Large,
in the above cause.
                    - - -

         KATHERINE KLEJMAN,
an interpreter herein, having been first duly sworn
by the Certified Reporter to translate from English
to Spanish and Spanish to English to the best of
their ability translated as follows:

     CRUZ DAICELIS VALDIVIESO FIGUERA,
a witness herein, having been first duly sworn by the
Certified Reporter to speak the truth and nothing but
the truth, was examined and testified as follows:

              EXAMINATION
BY MR. GOLDBERG:
     Q.  Good morning, Cruz.  My name is Randy
Goldberg, and I represent All VIP Care and Liz
McKinnon.
     Today is your deposition regarding this
lawsuit that you filed against All VIP Care.
     A.  Okay.

Page 5

     Q.  And we have a court reporter here -- I'm
sorry.
     We have a court reporter here who is going
to take down your testimony, so it's important that
every answer you give be verbal, such as "yes," "no,"
or whatever the response is.  She cannot take down
body movements or motions.
     A.  Okay.
     Q.  Thank you.
     Are you under any medication or alcoholic
beverages or any drugs that would prevent you from
giving your deposition today?
     A.  No.
     Q.  If at any time during the deposition today
you need to take a break, a restroom break, or for
whatever reason, we will be happy to temporarily
adjourn the deposition to allow you to take such a
break.  Okay?
     A.  Okay.
     Q.  The only condition I would ask is that a
break not be taken in between a question being asked
and you providing your answer.
     We would just ask that a question be asked
and answered before a break is taken.  Okay?
     A.  Okay.

Page 6

     Q.  If at any time I ask you a question that you
do not understand or is confusing to you, I want you
to please ask me to restate the question, and I will
be happy to.  Okay?
     A.  Okay.
     Q.  For the record, what is your full name?
     A.  For the record, Cruz Daicelis Valdivieso.
Cruz Valdivieso.
     Q.  And what about the name Figuera?
     A.  Figuera is my second last name.
     Q.  Okay.  But that's part of your formal name;
correct?
     A.  Yes, correct.
     Q.  As we discussed earlier, and you had no
objection to it, I'm going to just refer to you as
Cruz today; is that okay?
     A.  Perfect.
     Q.  Are you known by any nicknames?
     A.  Daisy.
     Q.  Thank you for that.
     Where do you currently reside?
     A.  ████████████████████████████
████████████████████████████████
████████████████████
     Q.  And when did you graduate high school?

Deposition of CRUZ DAICELIS VALDIVIESO FIGUERA        CRUZ VALDIVIESO FIGUERA v. ALL VIP CARE, INC., & LIZ VELAZQUEZ McKINNON

Page 7

1  A.  I didn't graduate.  I didn't finish high
2  school.
3     Q.  What is your cell phone number?
4     A.  ████████.
5     Q.  And who is your cell phone provider?
6     A.  ████
7     Q.  And what is your email address?
8     A.  ████████████
9
10    Q.  Thank you.
11       Do you have a personal website?
12    A.  No.
13    Q.  Are you presently married?
14    A.  Yes.
15    Q.  And do you have any children?
16    A.  Yes.
17    Q.  Have you ever been convicted of a crime
18 since you turned 18 years of age?
19    A.  Never.
20    Q.  Are you a party to any other litigation at
21 this time?
22    A.  Sorry.  I didn't understand the question.
23    Q.  Are you a plaintiff or a defendant in any
24 other lawsuit that is going on at this time?
25    A.  No.

Page 8

1     Q.  Have you ever been a party to any other
2  lawsuit about besides current lawsuit?
3     A.  Yes.
4     Q.  And what was that lawsuit?
5     A.  It was an accident at a park.
6     Q.  So aside from this accident in a park, were
7  there any other lawsuits that you've been a party to?
8     A.  No.
9     Q.  Are you -- have you ever been a party to any
10 administrative complaints or filings with any
11 governmental agency?
12    A.  No.
13    Q.  Have you ever filed any workers'
14 compensation claims?
15    A.  No.
16    Q.  Are you currently employed?
17    A.  Yes.
18    Q.  And who are you currently employed with?
19    A.  With Sininani, S-I-N-I-N-A-N-I.
20    Q.  Sininani?
21    A.  The agency is called Sininani.
22       MR. GOLDBERG:  Okay.  Can you spell that for
23 me?  I didn't catch that, Madam Interpreter.
24       THE VIDEOGRAPHER:  Yes.  The way I caught
25 it...

Page 9

1       THE WITNESS:  S-I-N-I-N-A-N-I.
2  BY MR. GOLDBERG:
3     Q.  And what does this company do?
4     A.  This company takes care of people with
5  disabilities.
6     Q.  Okay.  Is Ms. Cruz reading these answers off
7  of some document in front of her?
8     A.  No.  I have a paper where I'm writing down
9  how to spell things.
10    Q.  I appreciate that.  Thank you for clarifying
11 that.
12       What role do you serve with Sininani?
13    A.  My job is a caretaker.
14    Q.  Are you working as a home health aide?
15    A.  Yes.
16    Q.  Do you own a business?
17    A.  No.
18    Q.  Do you work for yourself?
19    A.  I'm an independent contractor.
20    Q.  And what does an independent contractor mean
21 to you, Cruz?
22    A.  That I make my own schedule.
23    Q.  What else?
24       MR. CUMMINGS:  Objection to form.
25       THE WITNESS:  I didn't understand the

Page 10

1  question.
2  BY MR. GOLDBERG:
3     Q.  Understood.
4        You stated that you work as an independent
5  contractor for Sininani.  Am I correct in that?
6     A.  Yes.
7     Q.  And what does it mean by you being an
8  independent contractor with Sininani?
9        MR. CUMMINGS:  Objection to form.
10       THE WITNESS:  I am an independent worker,
11 and I make -- I create my own schedule.  I decide if
12 I can work or I can't work that day.
13 BY MR. GOLDBERG:
14    Q.  Who decided your salary with Sininani?
15    A.  They place the salary, and then if it's
16 convenient for me, then I take it.
17    Q.  Understood.  Thank you.
18       Do you have a written contract with
19 Sininani?
20    A.  Yes.
21    Q.  Are you a member of any professional
22 associations or clubs?
23    A.  No.
24    Q.  Do you have a Facebook account?
25    A.  Yes.

Page 11

1  Q.  And what is your Facebook name or handle?
2  A.  My Facebook name is Daicelis.
3  Q.  Can you spell --
4  A.  And my username I forgot.
5  Q.  Okay.  Can you spell Daicelis for me,
6  please?
7  A.  D-A-I-C-L-I-S [sic].
8  Q.  D-A-I --
9  MR. GOLDBERG:  The rest of it, Madam
10 Interpreter?
11 THE INTERPRETER:  Yeah.  So she -- there's a
12 missing letter there, but I have it from the
13 beginning.
14 It's D-A-I-C-E-L-I-S.
15 MR. GOLDBERG:  Thank you for that.
16 BY MR. GOLDBERG:
17 Q.  What about Twitter account?
18 A.  No, I don't have a Twitter account.
19 Q.  A neighborhood app account?
20 A.  No.
21 Q.  Instagram?
22 A.  I have it, but I don't use it.
23 Q.  What is her handle on Instagram?
24 A.  I forgot.
25 Q.  What about TikTok?

Page 12

1  A.  No.
2  Q.  Okay.  How are you -- well, strike that.
3  Besides Sininani and All VIP, have you
4  worked as a home health aide for any other agency?
5  A.  No.
6  Q.  When you were working with All VIP --
7  MR. GOLDBERG:  And just for clarification,
8  I'm just going to refer to "All VIP Care" as "VIP,"
9  if that's okay with you, Mr. Cummings?
10 MR. CUMMINGS:  Yeah.  No -- excuse me.
11 No objection to that.
12 MR. GOLDBERG:  Thank you.
13 BY MR. GOLDBERG:
14 Q.  When you were working for VIP, were you
15 working for any other nurse registries?
16 A.  No.
17 Q.  So the only time that you've worked as a
18 home health aide has been VIP and/or Sininani; is
19 that correct?
20 A.  Yes.
21 Q.  Thank you.
22 Is Sininani a nurse registry?
23 A.  I don't know.
24 Q.  You are licensed as a home health aide with
25 the state of Florida; correct?

Page 13

1  A.  Yes.
2  Q.  What about as a certified nursing assistant?
3  Are you certified with the state of Florida?
4  A.  Yes.
5  Q.  Do you hold any other certifications from
6  the state of Florida or licenses?
7  MR. GOLDBERG:  I'm sorry.  Madam
8  Interpreter.
9  THE INTERPRETER:  No, no.  I caught that.
10 I'm sorry.
11 THE WITNESS:  No, just that.
12 MR. CUMMINGS:  I apologize, Mr. Goldberg.
13 Your second question before was, was she
14 licensed as a certified nursing assistant?
15 MR. GOLDBERG:  Yes, sir.
16 MR. CUMMINGS:  Okay.  Thank you.
17 MR. GOLDBERG:  Are we good, Mr. Cummings?
18 MR. CUMMINGS:  Yeah, I didn't know if
19 I caught the exact terminology.  I just wanted to
20 make sure.  That's fine.  Thanks.
21 MR. GOLDBERG:  No, no.  Good.  I want to
22 make sure we're all on the same page here.
23 THE WITNESS:  Okay.
24 BY MR. GOLDBERG:
25 Q.  Cruz, do you know what a nurse registry is?

Page 14

1  A.  Yes.
2  Q.  Okay.  What is a nurse registry?
3  A.  It's a registry in which you register with
4  the state as, in this case, Sininani to be an
5  auxiliary for a nurse or a nurse.
6  Q.  Your testimony now is that Sininani is a
7  nurse registry?
8  A.  Yes.  In the beginning, when you asked me if
9  Sininani was a nurse registry, I was a bit confused,
10 but yes.
11 Q.  No problem.  That's why I want to clarify.
12 I don't want any confusion.
13 Do you know if VIP is a nurse registry?
14 A.  I started working for VIP as a caretaker or
15 aide, and I had an HHA license, which is you get
16 certified by a school as a nurse aide.
17 Q.  Okay.  Now, for clarification, you're using
18 the term "caretaker," and then we're using the term
19 "HHA," which I believe, Cruz, means "home health
20 aide"; is that correct?
21 THE INTERPRETER:  Yeah, let me clarify
22 because when I hear the word in Spanish --
23 interpreter clarifying here -- when I hear the word
24 "cuidadora" is -- I'm taking it as caretaker.  I'm
25 not --

Page 15

1    MR. GOLDBERG: Okay.
2    THE INTERPRETER: It could be "aide"; it
3 could be "caretaker," but let me double-check that
4 with the witness. One second.
5    MR. GOLDBERG: Please do, ma'am.
6    THE INTERPRETER: So because there's a mixup
7 here on the words, I think it's best to just use
8 "HHA," which is "home health aide," if that's okay
9 because --
10    MR. GOLDBERG: That is absolutely --
11    THE INTERPRETER: -- there's a mixup on the
12 Spanish words with "taking care" and being an
13 assistant.
14    So I think it'll -- for the record, it's
15 going to be helpful that way.
16    MR. GOLDBERG: Okay.
17    MR. CUMMINGS: And I'm sorry. Just to
18 clarify, Madam Interpreter.
19    Did Ms. Cruz say that her use of the term --
20 how do you pronounce cui- -- how do you pronounce it
21 "cuidadora"?
22    THE INTERPRETER: Yeah, so "cuidadora,"
23 for me, and my brain just went to caretaker --
24    MR. CUMMINGS: Caretaker?
25    THE INTERPRETER: -- like taking care of

Page 16

1 someone.
2    But I know the medical -- like, we're
3 getting specific with the terminology. I'm trying to
4 keep it exactly to what it is.
5    So now that I know HHA is home health aide,
6 it's -- I mean, "aide" and "cuidadora" are both also
7 the same word.
8    MR. CUMMINGS: Got it.
9    And when you asked her to clarify, what did
10 she say?
11    THE INTERPRETER: She said she doesn't know
12 because she doesn't know English. She -- because I
13 was saying, "In English, when they ask you, you know,
14 like, how do you say it in English?"
15    MR. CUMMINGS: Right.
16    THE INTERPRETER: "Do you say 'caretaker' or
17 do you said 'aide?'"
18    And she said she doesn't know because she
19 doesn't speak English.
20    So I'm just trying to, yeah, keep it simple
21 for all of us. So maybe just keep it as "aide."
22    MR. CUMMINGS: Okay. Got it.
23    So when she says "cuidadora," we're going to
24 translate that to "aide" now?
25    THE INTERPRETER: Yeah. I think it's easier

Page 17

1 because it's becoming confusing, I think, for the
2 record.
3    MR. CUMMINGS: Okay.
4    THE INTERPRETER: If that's okay. I don't
5 know. I -- I --
6    MR. CUMMINGS: Yeah, I mean, for our
7 purposes, it does have a specific meaning, but I'm
8 not -- you know, I'm going to let Mr. Goldberg
9 conduct his deposition.
10    I just wanted to know what she said because
11 I wasn't sure if you were giving me a -- giving a
12 direct translation of what my client said.
13    THE INTERPRETER: Oh, yeah, I'm giving a
14 direct translation, but if there's two different
15 meanings to one word, which could happen sometimes in
16 Spanish --
17    MR. CUMMINGS: Right.
18    THE INTERPRETER: -- I just want to make
19 sure I pick the right word in English to use.
20    MR. CUMMINGS: Okay. Understood.
21    MR. GOLDBERG: Okay. I don't want to beat a
22 dead horse by any stretch of the imagination, but
23 Mr. Cummings is right. It's important that we
24 understand that home health aide is what Ms. -- what
25 Ms. Cruz is performing services as.

Page 18

1    So when the term "caretaker" has been
2 referenced, where we actually mean home health aide,
3 or HHA, are we all in agreement with that?
4    THE INTERPRETER: Yeah, let's --
5    MR. CUMMINGS: So, I mean, I think for the
6 purposes of the deposition, I don't care as much, but
7 as a -- you know, as a legal term of art,
8 Mr. Goldberg, you understand why I -- we understand
9 why this is important.
10    So I just don't want it to seem that she --
11 and also I don't want to coach here if she's not --
12 we're not translating, so I don't know if she
13 understands what I'm saying.
14    But I don't want it to -- I think maybe you
15 have to ask more questions to see her understanding
16 of it --
17    MR. GOLDBERG: I --
18    MR. CUMMINGS: -- is the legal definition,
19 right.
20    MR. GOLDBERG: I plan to ask a couple of
21 qualifying questions.
22    MR. CUMMINGS: Yeah, yeah. I figured.
23 That's why I said I'm just going to let you conduct
24 your deposition.
25    I don't know if I'm prepared to say that

Page 19

1  when she uses the term "cuidadora" that that means
2  "home health aide," though.  That's like a legal
3  definition.
4        I'm not prepared to say that.  But if for
5  the purposes of the deposition, fine, you know.
6        MR. GOLDBERG:  Okay.  Let me -- Madam
7  Interpreter, I want to ask a couple of questions to
8  qualify this is if I may.
9        THE INTERPRETER:  Yeah.
10 BY MR. GOLDBERG:
11       Q.  Ms. Cruz, you are a certified home health
12 aide with the state of Florida; correct?
13       A.  Yes.
14       Q.  You are not a certified caretaker by the
15 state of Florida, are you?
16       A.  I don't understand the question.
17       Q.  To the best of your knowledge, you do not
18 have a certification from the state of Florida that
19 certifies you as a, quote/unquote, "caretaker";
20 correct?
21       A.  Yes, I got a certification at a school, and
22 I'm guessing that that school should be certified
23 with the state of Florida.
24       Q.  No, ma'am.  I -- let me restate the
25 question.

Page 20

1        Cruz has a certification by the state of
2  Florida as a home health aide; correct?
3        A.  Yes.
4        Q.  Ms. Cruz does not have a certification title
5  as "caretaker"; correct?
6        A.  My certification does say "taking care of"
7  because that's what I do, is taking care of patients.
8        Q.  But the certification is certifying Cruz as
9  a home health aide; correct?
10       A.  Yes.
11       Q.  When the term "caretaker" has been used in
12 this deposition up until this point, was Cruz meaning
13 to state that she is a home health aide?
14       A.  Yes.
15       Q.  You were employed by VIP as a home health
16 aide; correct?
17       A.  Yes.
18       Q.  And you are employed by Sininani as a home
19 health aide correct?
20       A.  Yes.
21       Q.  All right.  I think we got that clarified.
22       How does a nurse registry work, Ms. Cruz?
23       A.  I don't know.
24       Q.  What is the relationship, if you know,
25 between a nurse registry and the registry's patients

Page 21

1  or clients?
2        A.  I don't know.
3        Q.  What is the relationship between a nurse
4  registry and home health aides, such as yourself,
5  Ms. Cruz?
6        A.  In the nurse registry, you're certified by
7  the state.  And as HHA, you did a course in order to
8  work.
9        Q.  And your relationship with the nurse
10 registry is what?
11       A.  The agency that I work with.
12       Q.  I understand.  Thank you.
13       What are your duties as a home health aide?
14       A.  I do everything that is asked of me, mostly
15 for the quality and betterment of patients.  I take
16 care of cleaning for them and giving them food.
17       Q.  Who determines what your duties for a home
18 health aide are for a patient or client?
19       A.  When you're hired by the agency, you're
20 given the different conditions under which the
21 patient is founded.
22       So, for example, if the person has
23 Alzheimer's, needs to be bathed in bed, needs to be
24 fed, needs their clothes washed, and then you decide
25 whether you want to take this patient on or not or

Page 22

1  just to just be there for company.
2        Q.  So you as the home health aide get to decide
3  the scope of the services that you are willing to
4  provide to these patients; correct?
5        A.  Correct.
6        Q.  Who do you work for as a home health aide,
7  the patient or the nurse registry?
8        A.  I would say I work for both because I work
9  with the patient, and the company pays me.
10       Q.  And what does the company -- when you say
11 "company," you're referring to the nurse registry;
12 correct?
13       A.  That is correct.
14       Q.  Who terminate -- who can terminate the
15 relationship between the home health aide and the
16 patient?
17       A.  Myself.  I determine if I want to continue
18 or not.
19       Q.  And does the patient have the right to end
20 the relationship between the patient and the home
21 health aide as well?
22       A.  Yes, they also have the right.  They decide
23 if they want to be with that person or not.
24       Q.  "That person" being the home health aide;
25 correct?

Page 23

A.  Yes.

Q.  What responsibilities, if you know, does the home health agency have over a -- I'm sorry.  Let me strike that.

What responsibilities does the nurse registry have in overseeing the duties of a home health aide such as yourself, Ms. Cruz?

MR. CUMMINGS:  Objection to the form.

THE WITNESS:  They have managers and supervisors, and they -- they communicate with the families, and then the family can also report how well or how not well we do our jobs.

BY MR. GOLDBERG:

Q.  Who is Diana Ramirez?

A.  Diana Ramirez was the VIP manager.

Q.  Was she your direct contact at VIP?

A.  Yes.

Q.  Who is Liz McKinnon?

A.  I met her over the phone.  By the way, a very rude person.

Q.  And who is your supervisor over at Sininani?

A.  Dina Ramirez, D-I-N-A, Ramirez.

Q.  Thank you.

Did you ever receive a performance review or evaluation from Diana Ramirez?

Page 24

THE INTERPRETER:  The interpreter is just going to request clarification on two names that are very similar, so one second.

THE WITNESS:  So Dina, D-I-N-A, Ramirez was -- was for Sininani; and we had Diana, D-A-Y-A-N-A [sic], for VIP.

And with her, I never got a response from her.  Whenever I called, she said I don't have enough hours and never gave me a response and said, "Call Liz."

MR. GOLDBERG:  Thank you for that clarification as to Diana versus Dina.

BY MR. GOLDBERG:

Q.  In response to what was just stated, did Ms. Cruz -- Ms. Cruz, did you ask Diana for any additional hours?

A.  No.  She -- no, never.

My hours worked were the same hours given by the agency.  But when it came to payment, the payment always came with less hours.

So I would tell Diana about the lack of hours, and she would say, "Next week.  We will give them to you next week."

And when the week came by, I wouldn't get paid, and I noticed the payment would come in with

Page 25

less hours.  They took out hours.

Q.  We'll come back to that issue in a little bit.

Going back to the question.

Have you ever -- have you ever received any performance evaluations from Diana Ramirez, Liz McKinnon, or any other persons at VIP?

A.  From neither of them.

Q.  What training was provided to you by VIP in your performance of duties as an HHA?

A.  There wasn't any.

Q.  Is it correct that -- all of your training as a home health aide, was that pursuant to Florida law?

MR. CUMMINGS:  Objection to form.

THE WITNESS:  (No verbal response.)

BY MR. GOLDBERG:

Q.  Ms. Cruz, are you going to answer that question?

A.  I didn't understand the question.  I heard "Florida law," and that's all I heard.

Q.  No problem.  We'll strike that question.

Did anybody at VIP ever tell you how to perform the services that you provided to any of VIP's patients?

Page 26

A.  Never.

Q.  What equipment did VIP provide you in the performance of your services to the patients?

A.  Nothing.  I strongly asked for gloves and masks, but they didn't provide me with anything.

Q.  Did you provide your own gloves and masks?

A.  I had to purchase my own.

Even at that time, during the pandemic, I had a very contaminated patient, and I was told -- I called Diana, and I was told that the agency wouldn't provide gloves, that I had to purchase them on my own.

THE INTERPRETER:  Interpreter is going to add something else that I didn't catch from Ms. Valdivieso.  One second.

Okay.  I can't clarify the exact medical term for a second, but it's a type of -- when you're in bed for too long.

So that patient was not only contaminated but had a lot of, I'm guessing, sores.  So I just wanted to add that to that statement.

MR. GOLDBERG:  Thank you for that clarification, Madam Interpreter.

THE INTERPRETER:  You're welcome.  Thank you.

Page 27

BY MR. GOLDBERG:

Q. Who determined the amount of hours that you worked for the patients of VIP?

THE INTERPRETER: I didn't catch the first part of the question, Counsel.

MR. GOLDBERG: Certainly.

BY MR. GOLDBERG:

Q. Ms. Cruz, who determined the amount of hours that you provided service to each of the VIP patients?

A. Diana.

Q. And you as the HHA had the right to accept or not accept those hours; correct?

A. Yes.

Q. Did anybody at VIP ever prevent you from having any other employment or contractual relationships?

A. No.

Q. How was your rate of pay determined for each patient, Ms. Cruz?

A. They would send a case that would -- that would read -- the case would read "There's a Mr. Perez, and this pays $13 an hour"; it would say how many hours, and you would accept it or decide not to accept it.

Page 28

And if they didn't have someone else, they would just send you directly for that job.

Q. But you had the right to refuse to accept that particular job; correct?

A. Yes.

Q. Is it true that if you are caring for several patients of VIP at one time, that you could be earning different hourly rates per patient?

A. The rate is the same. It would depend if it was on a weekend. Because it would be a bit more on the weekends. But the rate would be the same of $13 an hour.

Q. Give me a second here.

Did you ever ask anyone at VIP for additional hours or additional clients?

A. No.

Q. You started your relationship with VIP on or about May 3rd, 2021; correct?

A. Yes.

Q. And your relationship ended in about July of 2022; correct?

A. Yes.

Q. Why did that relationship end?

A. They didn't pay me.

Q. So is it your testimony that you ended the

Page 29

relationship, or did VIP end the relationship?

THE INTERPRETER: Interpreter is requesting a repetition because I didn't catch all of the information.

THE WITNESS: I ended the relationship with them due to payment.

BY MR. GOLDBERG:

Q. We'll come back to the nonpayment allegation in a little bit.

I want to focus your attention to Exhibit A. I sent a copy to Madam Court Reporter and to Mr. Toussaint.

Exhibit A is a composite exhibit with Bates name -- Bates-numbered All VIP 26 A 1 through 25.

MR. GOLDBERG: Is it possible, Madam Court Reporter, for this to be uploaded? I am very computer illiterate, and I apologize for that.

(Discussion off the record.)

BY MR. GOLDBERG:

Q. Ms. Cruz, I want you to look over this composite document, which coincidentally is an exhibit from a previous deposition that Mr. Cummings took.

It is my Exhibit A, which is your onboarding documents when your relationship with VPI began.

Page 30

Please look over these documents, ma'am, and let me know when you are done with that.

THE INTERPRETER: Interpreter caught that, but again, reminding witness to keep sentences short. It's impossible to catch all of it.

THE WITNESS: These documents, I signed them, but I never understood what the documents said. They were all in English and never in Spanish, and I told them that I only spoke Spanish.

BY MR. GOLDBERG:

Q. So is it your testimony that you signed these documents without reading and/or understanding the content of these documents?

A. I told Diana that I didn't speak Spanish, and I -- I signed these documents, but I never understood what they meant.

Q. So the entire 14 months that you had a relationship with VIP, you never understood these documents?

A. No. No. And it never mattered until now.

Q. Why did it not matter until now?

A. Because they never asked anything of me.

Q. Yet you performed under the terms of these documents; is that correct?

MR. CUMMINGS: Objection to form.

Page 31

1   THE WITNESS:  Yes.
2   BY MR. GOLDBERG:
3      Q.  And you were compensated for your services
4   as an HHA under the terms of these documents;
5   correct?
6      A.  Yes.
7      Q.  And you never had or requested anybody to
8   interpret what these documents that you signed meant?
9      A.  They said that they sent -- they gave this
10  to everyone they admitted as HHA, that -- the fact
11  that I didn't know understand English didn't matter,
12  but I myself added to this document that I didn't
13  speak English.
14     Q.  And who is the person or the persons that
15  they include?
16     A.  The people that hired me, Diana.
17     Q.  Nonetheless, the signatures and initials
18  that appear on this composite exhibit, those are your
19  signature and initials; correct?
20     A.  Yes.
21     MR. GOLDBERG:  We can take this one down,
22  Madam Court Reporter.
23     THE INTERPRETER:  Interpreter would like to
24  request a short break, if that's okay.
25     MR. GOLDBERG:  No objection here.

Page 32

1   Do you want to take 10 minutes?
2      THE INTERPRETER:  Yes, that would be fine.
3      MR. CUMMINGS:  Just for ease of time, can we
4   just come back at 11:15?
5      MR. GOLDBERG:  11:15?
6      MR. CUMMINGS:  Yeah, because it's 11:04 now,
7   so I mean, yeah, okay.
8      MR. GOLDBERG:  11:15 it is.
9      THE INTERPRETER:  Yes, that's fine.
10     (Recess taken from 11:04 a.m. to 11:14 a.m.)
11  BY MR. GOLDBERG:
12     Q.  Ms. Cruz, notwithstanding that you testified
13  that you did not understand the documents that you
14  signed with VIP, do you acknowledge that you were an
15  independent contractor with VIP?
16     A.  I don't know.
17     Q.  What don't you know, ma'am?
18     A.  That I don't know if I'm an independent
19  contractor with them.
20     Q.  You were paid for and received copies of
21  paycheck stubs; correct?
22     A.  My payments were automatic.
23     Q.  You received copies of paycheck stubs;
24  correct?
25     A.  I never received a copy from them.  I have

Page 33

1   copies from the bank.
2      Q.  Did you file tax returns for the years 2021
3   and 2022?
4      A.  Yes.
5      Q.  And you received a 1099 tax form from VIP?
6      A.  Yes.
7      Q.  And those tax forms identified you as an
8   independent contractor; correct?
9      A.  Yes.
10     Q.  Is it still your testimony that you do not
11  know if you're an independent contractor or not?
12     A.  I got confused with the question, yes.
13     Q.  So your testimony is that you were an
14  independent contractor with VIP?
15     A.  I am an independent contractor.
16     Q.  With VIP?
17     A.  Yes.
18     Q.  What were the names of the patients that you
19  provided care for during your tenure with VIP?
20     THE INTERPRETER:  Interpreter is going to
21  request the third person.
22     THE WITNESS:  The first was Gabrielle -- no, the
23  first person -- no, the first patient was Gabrielle
24  Gonzalez; the second patient was Angela Melendez; and
25  the third patient was Cesar, and last name is

Page 34

1   I-Z-I-Q-U-E; his wife, Yolanda, last name Izique,
2   I-Z-I-Q-U-E.
3   BY MR. GOLDBERG:
4      Q.  Okay.  So we have Gonzalez, Melendez, and
5   Izique; correct?
6      A.  Uh-huh.  And, sorry, also Alicia Soto,
7   S-O-T-O.
8      Q.  Did you provide care as a home health aide
9   for all of these four patients at the same time or at
10  different times?
11     A.  I worked with Cesar, Izique, and Yolanda
12  Izique at the same time, and then also with Angela
13  Melendez.  All three of them in the same day.
14     Q.  And what about Gonzalez and Soto?
15     A.  Gabrielle Gonzalez passed away, and then I
16  was assigned to Alicia Soto on her case.
17     Then I had Cesar and Yolanda as fixed work,
18  fixed patients.  And then I was given Angela as fixed
19  as well.  All three of them, the same day with
20  different times.
21     Q.  Okay.  Thank you for clarifying that.
22     Did you complete a time sheet for each
23  patient, for each -- let me rephrase that.  Excuse
24  me.
25     For each patient, did you complete a visit

Page 35

1  schedule or time sheet?
2  A.  Time sheet for each patient.
3  Q.  And does each of those time sheets reflect
4  the amount of time that you provided service as an
5  HHA to each of these patients?
6  A.  Yes.
7  Q.  And each of these time sheets is signed by
8  yourself; correct?
9  A.  By myself and the patients.
10  Q.  Now I want to direct your attention to
11  Exhibit B which, again was provided to your counsel
12  and Madam Court Reporter, which is composite exhibit
13  of time sheets with -- I apologize -- with the Bates
14  numbering of VIP.Docs 11 through and including 63.
15      Do you recognize these documents, Ms. Cruz?
16  A.  Yes.
17  Q.  What are these documents, ma'am?
18  A.  This was the document where we would be able
19  to establish the amount of hours worked with the
20  patient and the amount of hours worked.
21  Q.  Do -- are these the complete time records
22  that you generated during your tenure with VIP?
23  A.  Yes.  Yes, you would place all the hours
24  there.
25  Q.  And do these -- does this composite exhibit

Page 36

1  reflect all of the time sheets that you generated
2  during your tenure with VIP?
3  A.  Yes.
4  Q.  And you were to be paid your $13 an hour
5  based on these time sheets; correct?
6  A.  Correct, yes.
7  Q.  Now, is it your testimony that you have not
8  been paid for all of the hours reflected on these
9  time sheets?
10  A.  Yes.
11  Q.  How many hours do you believe that you have
12  not been paid for pursuant to the time sheets and to
13  the payments that were made to you?
14  A.  Right now, at this moment, I can't recall,
15  but they owe me hours.
16  Q.  How many hours do they owe you, ma'am?
17  MR. CUMMINGS:  Objection to form.
18  THE WITNESS:  I don't recall.
19  THE INTERPRETER:  Counsel Cummings, I didn't
20  catch that.  You said "Objection to form"?
21  MR. CUMMINGS:  Right.  Yeah.
22  BY MR. GOLDBERG:
23  Q.  Ms. Cruz, did you provide any services to
24  any VIP clients that are not documented on these time
25  records?

Page 37

1  A.  Never.
2  Q.  Allow me one second, please.
3      Ms. Cruz, are you familiar with the HHA
4  exchange calendaring program?
5  THE INTERPRETER:  Counsel, I didn't catch
6  the word after "exchange."
7  MR. GOLDBERG:  Calendaring.
8      Let me rephrase that.  Let me rephrase that.
9  THE INTERPRETER:  Yes.  Thank you.
10  MR. GOLDBERG:  I apologize.  I'm trying to
11  make things easy for interpretation, but sometimes,
12  I guess, I complicate it even more.
13  BY MR. GOLDBERG:
14  Q.  Ms. Cruz, are you familiar with the HHA
15  exchange program?
16  A.  Do I know the HHA exchange program?  No.
17  Q.  You're not familiar with it?
18  A.  No.
19  Q.  Is it fair to say, then, that you have never
20  used this program?
21  A.  I don't understand.  I don't know.
22  Q.  Was there ever a program that VIP asked you
23  to download onto your cell phone?
24  A.  No.
25  Q.  When you first learned that there were

Page 38

1  some --
2  MR. GOLDBERG:  We can take down the
3  exhibits, Madam Court Reporter.  Thank you.
4  BY MR. GOLDBERG:
5  Q.  Madam -- I'm sorry.
6      Ms. Cruz, when you observed or believed that
7  there was a pay discrepancy between the hours that
8  you provided services as a home health aide to one of
9  the patients, did you address this concern with
10  anybody at VIP?
11  A.  No.
12  Q.  I am confused.  Allow me to try to clarify.
13      You never noticed that there was a
14  discrepancy between the hours that you submitted for
15  payment and the amount of pay that you received from
16  VIP?
17  A.  I didn't understand the question.
18  Q.  You testified that you believe that VIP did
19  not pay you for all of the hours that you were
20  entitled to be paid for; is that correct?
21  A.  Yes.
22  Q.  When you noticed this discrepancy, did you
23  bring it to anybody at VIP's attention, such as Diana
24  Ramirez?
25  A.  Always when I notice irregularities with the

Page 39

payment, I told Diana, and she didn't pay attention to me.

**Q. So it's your testimony that at no time did VIP cut you an additional check or draft to cover the discrepancy in the payments?**

A. One time VIP did pay, and I had to go all the way over to West Palm Beach for a check that week.

I did not receive payment. It was a 2-hour drive to get that check. And I was mistreated at the office.

**Q. How were you mistreated?**

A. When I got there at 1:00 p.m. and I had to leave work without barely any gas left, I was received and told that they were going to lunch, and they closed the door on my face until 2:00 p.m., and that's how long I waited to get a check.

**Q. Did that check reconcile the payroll discrepancy that you were concerned about?**

A. No. That was just one week's pay. The -- there was still pay regularities left. They only paid for one week.

**Q. But you testified earlier you do not know how many hours are in dispute; correct?**

A. I can't recall. It's been one year since,

Page 40

and I can't recall the exact number of hours.

**Q. Do you know which patient these hours in dispute are in regards to?**

A. Yes. Cesar -- Cesar and Yolanda Izique, Angela Melendez, and Alicia Soto.

**Q. Do you know what time frames these discrepancies occurred within?**

THE INTERPRETER: Interpreter requests clarification. When you say "time frame," Counsel, do you mean month or...

MR. GOLDBERG: When these discrepancies arose, such as a month --

THE INTERPRETER: Can you give me the months?

MR. GOLDBERG: -- or period --

THE INTERPRETER: Oh, yeah, a period of time.

MR. GOLDBERG: The period of time. I apologize.

THE INTERPRETER: No, no. It's okay. I'm just -- in Spanish, I'm trying to -- thank you.

THE WITNESS: No. This was -- not right now. This was so long ago, but it's all documented. The lawyer has it.

I don't know the exact time frame.

Page 41

BY MR. GOLDBERG:

**Q. When did you begin work with Sininani?**

A. I started work with Sininani around August, I believe. August, yes. August.

**Q. Of 2022?**

A. 2021, I think.

**Q. So you worked for Sininani and VIP at the same time?**

A. No. I can't recall the exact date, but I remember it was August I ended work with VIP, and I started work with Sininani.

**Q. Thank you for that clarification.**

**When you went to work for Sininani, did any of VIP's clients that you've identified follow you over to Sininani?**

A. Yes, they switched, and I already had an application with Sininani.

**Q. Who? Which clients switched?**

A. Cesar and Yolanda Izique.

**Q. What about Soto or the Melendez?**

A. No.

**Q. You stated you already had an application in place. What do you mean?**

A. After I left VIP, I applied for Sininani, and that's where I'm currently working.

Page 42

**Q. How did Izique learn that you were going to work for Sininani?**

THE INTERPRETER: Counsel, can you repeat the first question? I didn't hear the first word.

MR. GOLDBERG: I apologize.

BY MR. GOLDBERG:

**Q. How did the Iziques -- or again, I apologize if I'm messing up their names -- learn that you were going to take employment -- or establish a relationship with Sininani?**

THE INTERPRETER: And to clarify, you mean Izique?

MR. GOLDBERG: Izique, yes.

THE INTERPRETER: Interpreter is requesting pause. So one second.

THE WITNESS: They had -- I had a really good working relationship with them, a very nice relationship, and I told them I had to leave due to the nonpayment.

The relationship -- the relationship that I had with the family was great. They liked my work. I wanted to continue with them, but the agency was not paying me.

They said, "We are leaving VIP also, then, because if they don't pay you, then they're not going

Page 43

1  to pay the next people that come and work with us."
2       I left and then applied to a different
3  agency; and then 15 days afterwards, they arrived and
4  requested me. They are my patients currently.
5  BY MR. GOLDBERG:
6       Q. And did you have this discussion with,
7  again, Izique while you were still employed -- I'm
8  sorry, while you still had a relationship with VIP?
9       A. They supported me the entire time because
10 their daughter was always present, and her
11 daughter -- their daughter was also in touch with
12 Diana and knew of the circumstances of me not being
13 paid.
14      She tried to help fix the hours with Diana,
15 but that didn't happen.
16      Q. So these conversations took place while you
17 were still an independent contractor with VIP;
18 correct?
19      A. Yes, always. I never wanted to leave VIP
20 because I appreciated that they spoke my language,
21 but it was due to the fact that I was not getting
22 paid that I decided to leave.
23      Q. Who at VIP spoke your language?
24      A. Diana, Evelyn, all of them. They picked up
25 in Spanish, but they -- they knew of my constant

Page 44

1  worries about the payment, but it just wasn't
2  resolved.
3       Q. So your testimony earlier that you were
4  forced to sign this engage -- these engagement
5  documents, Exhibit A, and nobody could explain them
6  to you, you're now testifying that Diana and others
7  spoke Spanish --
8       MR. CUMMINGS: Objection.
9  BY MR. GOLDBERG:
10      Q. -- and read you the proposal; correct?
11      MR. CUMMINGS: Objection to form.
12      THE INTERPRETER: I didn't catch the last
13 part, but I caught the beginning. So one second,
14 Counsel, for the first part of the question.
15      What was the last part? I didn't catch
16 that, the last part of the question, Counsel
17 Goldberg, after others -- Diana and others spoke
18 Spanish, and I didn't catch the last part.
19      MR. GOLDBERG: "But they were available for
20 you to discuss this onboarding independent agreement
21 with; correct?"
22      THE WITNESS: They never discussed it,
23 and I always asked. They said, "Just sign. Everyone
24 starts the job like that."
25

Page 45

1  BY MR. GOLDBERG:
2       Q. Give me a couple seconds here, please.
3       I believe we're close to wrapping up.
4       When you resigned, according to your
5  testimony, you resigned; you were not fired
6  from VI -- from your relationship with VIP; correct?
7       A. If they don't pay me, what am I going do?
8  I had to leave.
9       Q. Did VIP ever inform you that they were going
10 to be filing a lawsuit against you for breach of your
11 contract with them?
12      A. No. I can't recall.
13      Q. Give me a second here. I think we're just
14 about done.
15      I believe we're done on my end.
16      Mr. Cummings?
17      MR. CUMMINGS: Yeah I'll do a quick -- well,
18 I don't know how quick it will be, but I'll do some
19 follow-up.
20
21          EXAMINATION
22 BY MR. CUMMINGS:
23      Q. So, Ms. Cruz, do you know what the legal
24 definition of an "independent contractor" is?
25      A. No.

Page 46

1       Q. You do you know what the legal definition of
2  a "nurse registry" is?
3       A. No.
4       Q. Do you know what the legal definition of a
5  "home health aide" is?
6       A. I don't know. That's why the agencies hire
7  us.
8       THE REPORTER: Did you say, "I don't know.
9  The agencies hire us"?
10      THE INTERPRETER: "I don't know. That's why
11 the agencies hire us." Yes.
12 BY MR. CUMMINGS:
13      Q. How did you first hear about All VIP?
14      A. It was recommended by a friend. She gave me
15 the number. I called. They asked for all the
16 documents that -- that were needed to apply, the
17 certifications. I went. I applied. And they gave
18 me work.
19      Q. Do you know who you spoke to when you called
20 before you started working with All VIP?
21      A. I can't recall her name.
22      Q. The woman that you spoke with before you
23 started working with All VIP, did she speak Spanish?
24      A. Yes, she spoke Spanish.
25      Q. Do you remember if that woman --

Page 47

1   A.  The Spanish she spoke was very minimal, very
2   little Spanish.
3       Q.  And can you say for sure that the woman you
4   spoke to when you first called All VIP was not Diana
5   Ramirez?
6       A.  No, it wasn't Diana Ramirez; it was another
7   woman that helped me fill out the application.
8       Q.  Which office did that woman who you first
9   spoke to work in?
10      A.  Boca Raton.
11      Q.  Which VIP office did you work out of?
12      A.  Boca Raton.
13      Q.  Which VIP office was Diana Ramirez located
14  in -- sorry, located in?
15      A.  Boca Raton.
16      Q.  When did you tell Diana Ramirez that you did
17  not speak English?
18      A.  Since the first time I was given a case that
19  was in Boca Raton, I was sent, and the people I was
20  sent with only spoke -- only spoke English, and Liz
21  intervened and got me out of there.
22      Q.  Mr. Goldberg, the attorney for VIP,
23  previously showed you what he marked as Exhibit A,
24  and I'm going to show you that document again.
25      Where did you fill this document out?

Page 48

1       A.  In Boca Raton.
2       Q.  Did you fill out your employment agreement
3   with VIP at their Boca Raton office?
4       A.  Yes.
5       Q.  Was anybody present with you when you were
6   filling out the agreement?
7       A.  Yes.  The girl that was giving me all the
8   documentation to fill out.
9       When I was filling out, I told her I didn't
10  understand.  She said, "This is where you put your
11  name.  This is where you put this."
12      Q.  That girl that you're referring to, was she
13  speaking to you in English or Spanish?
14      A.  She spoke to me in English and with the
15  translator program into Spanish.
16      Q.  What translator program are you referring
17  to?
18      A.  I have a translation program on my phone.
19  I can't recall the name.  I can't pronounce it.
20      Q.  Please explain to me how this process went.
21      Did you type in words from the application
22  and then translate them over into -- from English to
23  Spanish, or did you -- sorry.  Let me -- scratch that
24  whole question.
25      Who was using the translator program, you or

Page 49

1   the woman that worked at VIP?
2       A.  I used it.  I was using the translation --
3   the translation program.
4       Q.  Did you use the translation program to
5   translate what she was saying to you?
6       A.  Yes.
7       Q.  Did you -- did the program record her voice,
8   or were you typing in what she was saying?
9       A.  It was recording her voice.
10      Q.  Did you -- so looking at this employment
11  agreement in Exhibit A, we can see that it has about
12  one, two, three, four, five, six, seven, eight, nine,
13  ten, eleven -- it's about 25 pages, which is the
14  whole of Exhibit A.
15      Did you type all of the words from this
16  25-page document into your translation program?
17      A.  Yes.  Because no, she would say, "Here.
18  Here are the initials," so I would just translate the
19  beginning, and then the rest was all the same.
20      Q.  So the -- sorry.  Go ahead.
21      A.  Because it was all signature, name, and --
22  it was all "Sign here.  Name here.  Last name here.
23  And signature" throughout the whole document.
24      Q.  Moving over to Exhibit B.
25      You were previously showed these time sheets

Page 50

1   earlier in the deposition.  Do you remember that?
2       A.  Yes.
3       Q.  Does your handwriting appear anywhere on
4   this first time sheet that I'm showing you in Exhibit
5   B?
6       A.  Yes.  Of course.
7       Q.  Where can I find your handwriting on this
8   time sheet?
9       A.  In the hours -- wait a second.  This isn't
10  mine.  It's someone else's.
11      This is Jenny's.  We work together.
12      Q.  What do you mean by that?  This is not your
13  time sheet; this is another person's time sheet who
14  was working with VIP?
15      A.  Exactly.  Exactly.  This is not my time
16  sheet.  This is my coworker Jenny Landa's time sheet.
17  This is not my time sheet.
18      Q.  And just for the record, I'm referring to
19  page 1 of Exhibit B, which is a time sheet from the
20  week of June 13, 2022, through June 17, 2022.
21      Ms. Cruz, do you know where this time sheet
22  for Jenny Landa came from?
23      THE INTERPRETER:  Counsel, I didn't catch
24  the last part of the question.  Can you repeat it?
25      MR. CUMMINGS:  Yeah, I'm just asking her

Page 51

does she know where this time sheet that we're looking at here came from, the picture of it.
THE WITNESS: I don't know. I don't know how that document arrived. It's not mine.
BY MR. CUMMINGS:
**Q. Did Jenny Landa also work as a home health aide with the Iziques?**
A. Yes, she was working with the Iziques.
**Q. At the same time as you or before you?**
A. She was working the morning shift, and I was working the night shift. When I was coming in, she was leaving.
**Q. Moving down to page 2 of Exhibit B, I'll make this a little bigger, is -- do you recognize the handwriting on this time sheet?**
**And for the record, this is from June 13th, 2022, to June 19, 2022?**
A. Yes, I filled that out with the Iziques' daughter. She spoke with Diana to clarify the discrepancy with the hours; they still didn't pay for those hours.
**Q. What part of this time sheet shows me your handwriting?**
A. The lower part, the bottom part.
**Q. Right now I'm focused on the top. Can you see where the name "Daisy" is?**

Page 52

A. Yes. On the top left of my screen is "Daisy," yes.
**Q. Is that your handwriting, the word "Daisy"?**
A. No. The bottom is where you can find my handwriting. This is a copy of the corrected hours by Diana, hours that weren't paid.
**Q. For this particular week? Are you saying that these hours written in here are not your handwriting?**
A. Because these are the hours that Diana corrected, and there were issues with the schedule.
She did this. I signed it. And these hours were never paid.
**Q. Okay. So, Ms. Cruz, I'm going to need you to listen to my question very carefully because you're answering a different question from what I'm asking you.**
**The question that I'm asking you requires a yes-or-no answer.**
**Do you see where the hours are on this time sheet?**
A. The hours were placed on the bottom. I can't see the total of hours.
**Q. Okay. All right. On your screen right now, do you see a document at the top where it says "6/13"?**

Page 53

A. Yes. I see the top, but I don't see the bottom, which is where there's the total hours shown.
**Q. Yes, because I'm not asking you about the bottom.**
**And for some reason, I think that you're assuming that I'm going to ask you something that I'm not asking you.**
MR. GOLDBERG: Object to form.
BY MR. CUMMINGS:
**Q. And so I would please -- please just answer the question that I'm asking you.**
**Okay. The handwriting at the top of this page, is any of it your handwriting?**
A. No.
**Q. Do you know whose handwriting it is?**
A. Anna Maria.
**Q. Who is Anna Maria?**
A. The daughter of the couple.
**Q. Okay. And by "the couple," you mean the Iziques?**
A. (No verbal response.)
**Q. "Yes"? Anna Maria is the daughter of the Iziques?**

Page 54

A. Yes.
**Q. Did Anna Maria always fill out the hours on your time sheets?**
A. No.
**Q. It just so happens that on this particular time, on page 2 of Exhibit B, that Anna Maria filled out these hours; is that correct?**
A. Yes.
**Q. Now, moving down to the bottom of this same document, on page 2 of Exhibit B, do you see your handwriting anywhere?**
A. Yes.
**Q. Okay. And where is your handwriting?**
A. Where you see "Cruz Valdivieso HHA."
**Q. Now, you were also explaining that the hours for this particular week were incorrect.**
**Is that what you were trying to tell me before?**
THE INTERPRETER: Can the interpreter request of Counsel Cummings to tell the witness, or I will, for the -- that please keep the sentences short so that I'm able to catch everything. I only caught the beginning, if that's okay.
MR. CUMMINGS: Yeah, you can instruct her. That's fine.

Page 55

BY MR. CUMMINGS:

Q.   Okay.  So now -- go ahead, because you have to interpret.  Go ahead.  Sorry.

A.   Anna Maria helped because she would speak to Diana.  They -- they fixed the schedules.  The hours were correct, but they are were still not paid.

And then when the hours were finally corrected, they said they're going to pay, "just go ahead and send the time sheet," but even though the hours were corrected, Diana still didn't pay for those hours.  I didn't get paid for those hours.

Q.   Are you referring specifically to the hours for this week of June 13, 2022, to June 19, 2022?

A.   No, not just those.  I look at that, and I can remember a little bit, but I can't recall the exact dates.

Q.   Right.

So you're just speaking generally that you were not paid for all of your hours, not about this particular time sheet; is that right?

A.   Correct.

Q.   Previously, VIP's attorney asked you if these were all of the time sheets for all of the time that you worked at VIP.

Do you remember that?

Page 56

A.   Yes.

Q.   And now how do you know that all 53 pages of this Exhibit B document are all of the hours that you worked for VIP?

A.   I can't see all of the Exhibit B you're referring to.  I can't recall that now.  I can't recall.

If I'm able to see all of the pages, then, yes, but I have nothing here with me.

Q.   And have you ever seen all 53 pages of this document before?

A.   No.  I saw the pages after I left, when VIP sent all the documents and all the clauses.

Q.   Before this deposition today, have you ever seen all 53 pages of the document that I am currently showing you on your screen, which is marked as Exhibit B?

A.   Is Exhibit B the time sheets that we filled out with the hours?

Q.   Exhibit B is what I am showing you on your screen right now.

A.   Okay.  Perfect.  Yes.

Q.   What are you answering "yes" to?

A.   That if that is the exhibit that you're asking me, then I do recognize it.

Page 57

Q.   How do you recognize it?

A.   Because those were the papers we filled out in order to get payment each week.

Q.   Yeah.

Do you realize that this particular document that I'm showing you right now has 53 pages?

A.   No.

Q.   But previously, when Mr. Goldberg asked you if these were all of your time sheets, you said yes; is that correct?

A.   Yes, they're talking about this -- I'm going to have to --

MR. CUMMINGS:  You know what?  Scratch it.  Scratch the question and answer.  Let me do this.

BY MR. CUMMINGS:

Q.   On page 1, this is not your time sheet; correct?

A.   These are the -- these are the time sheets that we were -- we would fill out with our hours.

This is not my time sheet.  This is Jenny Landa's time sheet.

Q.   Okay.  On page 3 of this document, is this your time sheet?

You have to let the interpreter finish the interpretation.

Page 58

So I'm going to ask the question again.

On page 3, is this your time sheet?

A.   No, it's not mine.

Q.   On page 5 of Exhibit B, is this your time sheet?

A.   No.

Q.   So all of the time sheets that make up this document do not belong to you; is that right?

A.   No.  In this document, no.

Q.   And can you say that every time sheet that you ever filled out for VIP is contained within this document at Exhibit B?

A.   No.

Q.   If you had to guess, how many time sheets do you think you filled out when you worked for All VIP?

A.   I can't recall.  There were many.  I can't recall.

Q.   Would you say it was more than 20?

A.   Of course.  I was with them for over 2 years.

Q.   Would you say it was more than 100?

A.   I don't know.  I don't know.

Q.   Did you work for All VIP every week over those 2 years?

A.   Yes.  Almost 2 years.

Deposition of CRUZ DAICELIS VALDIVIESO FIGUERA          CRUZ VALDIVIESO FIGUERA v. ALL VIP CARE, INC., & LIZ VELAZQUEZ McKINNON

Page 59

1  Q.  And did you fill out a separate time sheet
2  for every patient that you saw?
3  A.  Yes.
4  Q.  And sometimes you saw more than one patient
5  in one day?
6  A.  Yes.  Two patients a day.
7  Q.  And you worked how many days a week for All
8  VIP?
9  A.  I worked all week, about 84 hours plus,
10  100 hours.
11  Q.  When you say "all week," how many days are
12  you referring to?
13  A.  Monday through Sunday.
14  Q.  When did you first --
15  A.  Sorry.  Monday through Saturday.
16  Q.  Okay.  When did you first realize that you
17  were not being paid properly by All VIP?
18  A.  Since I started working for VIP, there had
19  been irregular payments.
20  And then I spoke to Diana, and payments
21  started to come in more on time afterwards.
22  The -- there were some issues with payroll.
23  I don't know what happened with payroll.  Then they
24  just didn't start paying every week.
25  Q.  How did you discover that your payments were

Page 60

1  irregular?
2  A.  Since the beginning, there had been issues
3  with payment.  I would tell Diana, and she would say,
4  "I'll deposit," and she would deposit -- they would
5  deposit, but then each week, it was the same issue.
6  Then it came to a point where I wasn't
7  getting paid.  I complained, but there was no
8  payment.
9  THE INTERPRETER:  Interpreter would like to
10  request a short break if that's okay.
11  MR. CUMMINGS:  Okay.  How long do you need?
12  When do you want to come back?
13  THE INTERPRETER:  Is 10:00 okay?
14  MR. CUMMINGS:  You want to come back at
15  12:40?
16  THE INTERPRETER:  Yes, okay.
17  MR. CUMMINGS:  Okay.  Could you please just
18  let me client know that she can cut her camera and
19  microphone off?
20  THE INTERPRETER:  Yes.
21  (Recess taken from 12:28 p.m. to 12:39 p.m.)
22  BY MR. CUMMINGS:
23  Q.  Did you realize you were not paid correctly
24  because the hours on your time sheet did not match
25  the paychecks you were receiving?

Page 61

1  A.  (No verbal response.)
2  MR. CUMMINGS:  I guess, Interpreter, can you
3  please repeat the question to her so we can get the
4  response?
5  THE WITNESS:  Correct.
6  BY MR. CUMMINGS:
7  Q.  Who did you complain to when the hours on
8  your time sheet did not match the money you received
9  in your paycheck?
10  A.  For the manager, Diana Ramirez, she said
11  she, "I sent the hours to Liz.  I don't understand
12  why they haven't paid them yet."
13  Q.  Okay.  So Diana Ramirez acknowledged that
14  your pay was incorrect sometimes?
15  A.  Yes.
16  Q.  How would Diana Ramirez acknowledge that
17  your pay was incorrect?  Was that through email?  Was
18  that verbally or through text?
19  A.  Text and verbal.
20  Q.  When you had a verbal conversation with
21  Diana Ramirez about incorrect paychecks, was it over
22  the phone or in the office?
23  A.  Phone and text.
24  Q.  How many times did you complain about
25  receiving incorrect payment over the 2 years that you

Page 62

1  worked with VIP?
2  A.  I always complained about the -- the payment
3  inconsistencies, but these were affirmed in March.
4  And in April, when the -- the payments
5  became even more irregular and more inconsistent.
6  Q.  Are you referring to March and April of
7  2022?
8  A.  Yes.
9  Q.  And to this day, you have not received all
10  the money that you're owed for the incorrect
11  payments?
12  A.  I haven't received -- I haven't received the
13  money owed for all the incorrect payments.
14  Q.  Okay.  No further questions.
15
16  FURTHER EXAMINATION
17  BY MR. GOLDBERG:
18  Q.  Okay.  I'll try to make this as brief as
19  possible.
20  Going back to -- and we don't need to bring
21  it up, but Exhibit B, which was the time sheets,
22  Ms. Cruz, is it true that the only time sheets that
23  apply to your claims in this lawsuit are the ones
24  that you signed for; correct?
25  A.  That confuses me.  The talk about exhibit

Page 63

1 this, Exhibit B confuses me.
2     I would like to know if I have a
3 representative representing me during this
4 deposition.
5     MR. GOLDBERG:  Mr. Cummings, do you want to
6 acknowledge that?
7     MR. CUMMINGS:  I'm sorry.  I actually didn't
8 catch everything she said.
9     She said she was confused about -- could you
10 repeat it, Madam Interpreter?
11     THE INTERPRETER:  "That confuses me.  The
12 exhibit this, exhibit that, Exhibit B confuses me.
13 I'd like to know, do I have a representative here for
14 me during this deposition."
15     MR. CUMMINGS:  Oh, okay.  Yeah, I'm your
16 attorney, Ms. Cruz, so I'm the representative here.
17     I can't give you advice in the deposition.
18     THE INTERPRETER:  I just need the last part,
19 Counsel?  I didn't catch that.
20     MR. CUMMINGS:  I can't give you advice
21 during this deposition.
22     THE WITNESS:  Yes, I'm confused because I'm
23 being showed Jenny's time sheet, which is not mine.
24 And I'm confused as to why they're showing me her
25 time sheet.

Page 64

1 BY MR. GOLDBERG:
2     Q.  And this is the reason why I'm trying to get
3 clarification that the only time sheets that are
4 germane to this lawsuit are the ones that are signed
5 by Ms. Cruz.
6     None of the other time sheets, whether it be
7 by Jenny, Ms. Murphy, or anybody else are relevant to
8 this lawsuit; correct?
9     A.  That is correct.  I understand.
10     Q.  Thank you.
11     There was discussion about the time sheet
12 from June 13th through June 19th where Ms. Cruz
13 testified that this was a corrected time sheet that
14 was had by and signed for by Anna on behalf of the
15 patient; correct?
16     A.  Yes.
17     Q.  You testified that there was text messages
18 between you and Diana concerning your claims that you
19 were not properly paid; correct?
20     A.  Yes.
21     Q.  Are those text messages still available on
22 your phone?
23     A.  Yes.  And I'd like to add that I also sent
24 some of those to my lawyer.
25     Q.  Some of them or all of them, ma'am?

Page 65

1     A.  Some because others were deleted.
2     Q.  You made the comment that Diana Ramirez
3 acknowledged payroll errors and that she was going to
4 address them with Liz.
5     Do you recall that?
6     A.  She said that she would send that to
7 payroll, that there were issues with payroll, that
8 they had changed the --
9     THE INTERPRETER:  I'm going to have to ask
10 Ms. Cruz to repeat that.
11     MR. GOLDBERG:  Okay.  Maybe if I just
12 rephrase the question.
13     THE INTERPRETER:  No.  She said that the
14 thing is if she doesn't stop, I can't catch all of
15 it, so I -- I mentioned --
16     MR. GOLDBERG:  I apologize.
17     THE INTERPRETER:  No, no.  It's okay.
18     THE WITNESS:  Diana had said that the hours
19 would be paid, that there were issues with payroll,
20 that there was no payroll personnel, that they were
21 changing offices.
22     They told us to wait for the payments, that
23 they were going to give them and to wait for some
24 time, that there was change in personnel, that the
25 payments were not made.

Page 66

1     They left us one week without pay.  There
2 was three people working at that house at that time,
3 but the next day we were paid.
4     There was no pay that Friday.  We were
5 actually paid that Saturday.  And since then, it
6 became an issue.  We -- since then, there were
7 irregular payments, and I wasn't paid.
8 BY MR. GOLDBERG:
9     Q.  So is it fair to say that Diana acknowledged
10 that there were issues in the payroll system at the
11 time or that there was specific errors on behalf of
12 Ms. Cruz's time sheets?
13     A.  She acknowledged there were issues with the
14 payment system.  I was apart of this apparent type of
15 lottery in regard to payment.  Some people were paid;
16 some people were not.  And most people left the
17 agency because of that.
18     Q.  You testified that you did not know the
19 exact amount of wages or compensation that was not
20 paid to you that is due; correct?
21     A.  Yes.  I can't recall.
22     During that time, yes, I had the exact
23 amounts, but right now it's been so long, I don't
24 have them.
25     Q.  Does a document exist that identifies the

Page 67

1  exact amount that is due to you?

2      A.  I don't know.  I sent the time sheets with

3  all my hours to my lawyer, and he has it.

4      Q.  Does a document exist or documents that

5  identify the specific dates that you believe that you

6  were not properly paid for?

7      A.  Yes.  I sent that, and they exist.  I sent

8  that to my lawyer when I was coming up with the --

9  with the lawsuit.

10      Q.  Just give me one second.  I believe that

11  we're concluded on my end.

12          MR. CUMMINGS:  Sorry.  No further questions

13  for me, and Ms. Cruz we will read.

14          MR. GOLDBERG:  And we will order a copy.

15          THE REPORTER:  Mr. Cummings, would you like

16  to order a copy of the transcript?

17          MR. CUMMINGS:  Not at this time.  Thank you.

18  But can I please have your email address?  I saw

19  something at B Reporting.

20          THE REPORTER:  Yeah.

21          (Deposition concluded at 12:56 p.m.)

22          (Deposition Exhibits A through D were marked

23  for identification by the court reporter after the

24  conclusion of the deposition.)

25

Page 68

1              - - -

2          C E R T I F I C A T E

3              - - -

4  UNITED STATES DISTRICT COURT         )

5  SOUTHERN DISTRICT OF FLORIDA         )

6

7      I hereby certify that I have read the

8  foregoing deposition by me given, and that the

9  statements contained herein are true and correct to the

10  best of my knowledge and belief, with the exception of

11  any corrections or notations made on the errata sheet,

12  if one was executed.

13

14      Dated this_____day of _____, 2023.

15

16

17

18

19

20  _____

21      CRUZ DAICELIS VALDIVIESO FIGUERA

22

23

24

25

Page 69

E R R A T A   S H E E T

1

2  IN RE: STATE OF FLORIDA V. JOSEPH TRAEGER
   DEPOSITION OF: CRUZ DAICELIS VALDIVIESO FIGUERA

3  TAKEN: June 6, 2023

4      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
   PAGE #   LINE #   CHANGE         REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20  Please forward the original signed errata sheet to this
    office so that copies may be distributed to all

21  parties.

22  Under penalty of perjury, I declare that I have read my
    Zoom Deposition and that it is true and correct subject

23  to any changes in form or substance entered here.

24  DATE:

25  SIGNATURE OF DEPONENT:_____

Page 70

1  UNITED STATES DISTRICT COURT         )

2  SOUTHERN DISTRICT OF FLORIDA         )

3

4

5      I, the undersigned authority, certify that

6  CRUZ DAICELIS VALDIVIESO FIGUERA, personally appeared

7  before me via Zoom on the 6th of June, 2023, and was

8  duly sworn.

9

10      WITNESS my hand and official seal this 13th

11  day of June, 2023.

12

13

14

15      _____

16      HALEY DAWN WESTRA, RPR, CRR
       Reporter and Notary Public

17

18      Commission No. 638457

19      Expires: October 24, 2026

20

21

22

23

24

25

Page 71

C E R T I F I C A T E

UNITED STATES DISTRICT COURT        )
SOUTHERN DISTRICT OF FLORIDA        )

I, HALEY DAWN WESTRA, Reporter and Notary, in and for the State of Florida at large, do hereby certify that I was authorized to and did stenographically report the Zoom Deposition of CRUZ DAICELIS VALDIVIESO FIGUERA; that a review of the transcript was requested; and that the foregoing pages, numbered from 1 to 67, inclusive, are a true and correct transcription of my stenographic notes of said Zoom Deposition.

I further certify that said Zoom Deposition was taken at the time and place hereinabove set forth and that the taking of said Zoom Deposition was commenced and completed as hereinabove set out.

This Zoom Deposition occurred during the COVID-19 pandemic, conducted using videoconference technology, and it is therefore subject to the technological limitations of court reporting remotely.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

DATED this 13th day of June, 2023.


_____
HALEY DAWN WESTRA, RPR, CRR
STENOGRAPHIC REPORTER

Page 72

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:22-CV-61553-WPD

CRUZ VALDIVIESO FIGUERA,

        Plaintiff,

vs.

All VIP CARE, INC., & LIZ
VELAZQUEZ McKINNON,

        Defendants.
_____/


IN RE: DEPOSITION OF CRUZ DAICELIS VALDIVIESO FIGUERA
TAKEN: June 6, 2023
DATE E-MAILED TO WITNESS:

TO:   CRUZ DAICELIS VALDIVIESO FIGUERA
        (Read through OPPOSING COUNSEL)

The referenced transcript has been completed and awaits reading and signing.

The transcript is 67 pages and you should allow yourself sufficient time.

Thank You,

_____