UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:22-CV-61553-DIMITROULEAS/HUNT

CRUZ VALDIVIESO FIGUERA,

    Plaintiff,

vs.

ALL VIP CARE INC. AND LIZ
VELAZQUEZ MCKINNON,

    Defendants.
_____/

## **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Cruz Valdivieso Figuera, through undersigned counsel and pursuant to Fed. R. Civ. P. 56, requests that the Court enter partial summary judgment in her favor and against All VIP Care Inc., and Liz Velazquez McKinnon (collectively "All VIP" or "Defendants"). The undisputed facts cited in this motion are contained in Plaintiff's Statement of Material Facts, cited as "[SMF ¶ ___]", which has been filed separately.

## **I. INTRODUCTION**

All VIP Care, Inc. ("All VIP") is a nurse registry. [SMF ¶ 1]. Cruz Valdivieso Figuera worked as a home health aide for All VIP. [SMF ¶¶ 2,3]. The Defendants considered Ms. Valdivieso an independent contractor and did not pay her overtime wages. [SMF ¶ 4]. However, based on the undisputed facts presented below, All VIP treated Ms. Valdivieso as an "employee" under the Fair Labor Standards Act (FLSA). Therefore, Ms. Valdivieso moves this Court for partial summary judgment on the issue of her status as an employee of the Defendants.

The argument portion of this Motion for Partial Summary Judgment is divided into four sections. Section A explains that All VIP's state law affirmative defense is preempted by federal law, and this Court must analyze Ms. Valdivieso's employment status under the FLSA. Section B explains that Ms. Valdivieso is entitled to individual coverage under the FLSA because she participated in interstate commerce while working for All VIP. Section C comprises the heart of this motion by thoroughly examining the six-factor "economic reality" test used in the Eleventh Circuit, which conclusively establishes that Ms. Valdivieso was an employee. And Section D explains that All VIP owner, Liz McKinnon, is individually liable as an "employer" under the FLSA. [SMF ¶ 5].

## II. ARGUMENTS

### A. The Supremacy Clause Precludes Any Defense That All VIP Care, Inc. Could Not Employ Ms. Valdivieso Because it is a Nurse Registry Under Florida Law.

The Defendants' First Affirmative Defense is that they properly classified Ms. Valdivieso as an independent contractor and they could not have employed her because All VIP Care Inc. is a nurse registry under Florida law. [ECF No. 37 at 5-7]. This "nurse registry" affirmative defense is preempted by federal law and cannot absolve All VIP from liability under the FLSA.

When state and federal laws conflict, "federal law trumps state law; that was always clear." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). The FLSA is a federal law. 29 U.S.C. §201, *et. seq.* Therefore, "in determining who are 'employees' under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947). As

binding precedent, *Walling* precludes this Court (or even a jury) from considering whether All VIP was in compliance with Florida law in classifying Ms. Valdivieso as an independent contractor.

All VIP's purported defense of following state law has been raised by at least one other nurse registry in Florida, and the argument was repudiated in federal court on the basis of preemption. The defendant in *Solis v. A+ Nursetemps, Inc.*, 2013 WL 1395863, (M.D. Fla. Apr. 5, 2013) was a licensed nurse registry under Florida law. *Id.* at *2. The District Court considered the same Florida statutes advanced by All VIP (in particular Fla. Stat. §400.506), and explained that "legal designations in other statutes do not affect the determination of a worker's status under the FLSA. Thus, a worker may be an independent contractor under other laws or for purposes of contractual relationships, yet still meet the definition of an employee under the FLSA." *Id.* at *4. The District Court relied on the "economic realities test" to determine whether a worker is an employee covered by the FLSA, and ultimately concluded that the plaintiff nurses were employees of the nurse registry. *Id.* at *5-7. This Court must similarly find All VIP's first affirmative defense to be preempted by the FLSA, and analyze Ms. Valdivieso's employment status under the "economic realities" standard discussed in *Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013).

**B.   Ms. Valdivieso is Entitled to Individual FLSA Coverage Under 29 C.F.R. §552.99.**

The text of the FLSA specifically states, "That Congress further finds that the employment of persons in domestic service in households affects commerce." 29 U.S.C. §202. Thus, the plain language of the FLSA – and its interpretive guidance – confirm that home health aides like Ms. Valdivieso are entitled to individual FLSA coverage:

> The term domestic service employment means services of a household nature performed by an employee in or about a private home (permanent or temporary). The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, **home health aides**, personal care aides, and chauffeurs of automobiles for family use. [*Emphasis added*.]

29 C.F.R. §552.3; *also see Torres v. Nature Coast Home Care LLC*, 2016 WL 5870217, at *1 n.1 (M.D. Fla. Oct. 7, 2016) ("After January 1, 2015, the labor regulations were amended to the extent that all home health aides became eligible for overtime regardless of the amount of time they spent performing domestic services.").

As a home health aide, Ms. Valdivieso was a domestic service employee *per se* because of the services she provided to Defendants' clients. *See* 29 C.F.R. §552.3 and *Torres*, *supra*. All VIP provides medical and non-medical services to its clients, who are mainly 80 to 90 years old. [SMF ¶¶ 6,7]. These services are provided by nurses, home health aides (HHAs), and certified nursing assistants (CNAs), whom ALL VIP collectively refers to as "caregivers." [SMF ¶ 8]. As an HHA, Ms. Valdivieso's work fell under the non-medical category, which includes personal care services such as bathing, dressing, transportation, meal preparation, homemaking, household duties, and companionship. [SMF ¶¶ 9,10,11,12].

The evidence establishes that Ms. Valdivieso performed the majority of the activities that qualify her as a HHA entitled to individual coverage under the FLSA. All VIP required its HHAs to complete timesheets with a checklist of the activities they performed each shift. [SMF ¶¶ 13,14]. Ms. Valdivieso's timesheets show that she engaged in activities such as assisting clients with dressing, shampooing hair, brushing teeth and dentures, assisting with toileting, meal preparation, changing bed linens, doctor's appointments, going shopping, doing laundry, vacuuming and dusting, assisting with walking and transferring, assisting with self-administration of medications,

and assistance with mail. [SMF ¶ 14]. All VIP administrator Diana Ramirez coordinates patient care with insurance companies for clients on Medicare, which results in the creation of a "patient calendar". [SMF ¶¶ 15, 16]. The patient calendar shows Ms. Valdivieso provided personal care, homemaking, and companionship services to one of All VIP's clients. [SMF ¶¶ 17,18].

Under similar facts, Courts regularly find that HHAs are entitled to individual coverage as domestic service employees. For example, in *Romero v. Diaz-Fox*, this Court determined that the plaintiff was a "domestic service employee engaged in commerce" and reasoned as follows:

> Under the Department of Labor regulations governing domestic service, domestic service employees in households affect commerce because they (1) handle goods such as soaps, mops, detergents, and vacuum cleaners that have moved in or were produced for interstate commerce and (2) because they free members of the household to themselves engage in activities in interstate commerce.

*Romero v. Diaz-Fox*, 2021 WL 3619677, at *3 (S.D. Fla. Aug. 16, 2021); *accord Mason v. Pathfinders for Indep., Inc.*, 2022 WL 1092238, at *6 (M.D. Fla. Apr. 12, 2022) ("Plaintiff's work as a caretaker required her to help consumers with activities such as housekeeping, grocery shopping, and money management. In carrying out such tasks, Plaintiff certainly used at least some goods 'moved in or produced for' interstate commerce and helped to 'free members of the household' to engage in activities in interstate commerce."); *Guevara v. Lafise Corp.*, 2022 WL 3975097, at *2 (S.D. Fla. Sept. 1, 2022) (finding individual coverage applied to plaintiff under 29 C.F.R. §552.99 because he washed house windows, cleaned vehicles, and cleaned and shined boats, among other domestic service job responsibilities); *accord Carmack v. Park Cities Healthcare, LLC*, 321 F. Supp. 3d 689, 699 (N.D. Tex. 2018) (plaintiff entitled to individual coverage when job duties included "dressing, grooming, feeding, bathing, toileting, and transfer to and from bed."); *see also Dixon v. Open Hands Nurseing Agency*, LLC, , 2018 WL 5995127, at *6 (D.S.C. 2018) (plaintiff raised genuine issue of

material fact in alleging that he qualified for individual coverage by opening interstate mail, handling and administering medications and medical supplies, manufactured in other states, and making calls to insurance companies and vendors located out of state). As such, this Court properly determines that Ms. Valdivieso was entitled to individual FLSA coverage while working as a domestic service employee for Defendants based on the above facts and case law.

### C. Ms. Valdivieso was an Employee of All VIP.

Determination of employment status is a question of law for the court. *Anterior v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996); *Brouwer v. Metro. Dade Cnty.*, 139 F.3d 817, 818 (11th Cir. 1998) (citing *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997)). This Court properly determines that All VIP employed Ms. Valdivieso because the material facts are not in dispute.

The FLSA defines an "employee" as "any person acting directly or indirectly in the interest of an employer in relation to an employee" and "any individual employed by an employer." 29 U.S.C. §§203(d), 203(e)(1). The FLSA further defines "employ" as to "suffer or permit to work". *Id.* at §293(g). Courts traditionally adopt a broad definition of "employee" to effectuate the FLSA's remedial purpose. *Robles v. RFJD Holding Co., Inc.*, 2013 WL 2422625, at *3 (S.D. Fla. 2013)(Rosenbaum, J.)(citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976).) According to the Eleventh Circuit Court of Appeals, "[w]hether an individual falls within this definition does not depend on technical or isolated factors but rather on the circumstances of the whole activity." *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008) (quoting *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir. 1973)).

In *Scantland*, the Eleventh Circuit Court of Appeals articulated the following six factors to be considered under the "economic realities test" in analyzing whether a worker is an employee or

an independent contractor:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship;
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

721 F.3d. at 1311-12. The Eleventh Circuit concluded this discussion by pointing out that "the overarching focus of the inquiry is economic dependence." *Id.* "Ultimately, in considering economic dependence, the court focuses on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.' *Id.* (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301–02 (5th Cir.1975)).

> It is dependence that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit.

*Usery*, 527 F.2d at 1311-12. The evidence establishes that All VIP misclassified Ms. Valdivieso as an independent contractor under this framework. Ms. Valdivieso relied exclusively on All VIP for her livelihood, it controlled significant aspects of her work, and, therefore, Ms. Valdivieso was not in business for herself. Federal courts routinely determine that caregivers in similar roles as Ms. Valdivieso are employees due to the restrictive nature of the work they perform for agencies in the same line of work as All VIP. *See Mason v. Pathfinders for Indep., Inc.*, 2022 WL 1092238 (M.D. Fla. Apr. 12, 2022) (finding live-in companion to be employee of home care agency under *Scantland*'s economic realities test); *Hughes v. Fam. Life Care, Inc.*, 117 F. Supp. 3d 1365 (N.D. Fla. 2015) (finding

certified nursing assistant to be an employee of nurse registry under *Scantland*); *Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x 182 (5th Cir. 2014) (caregivers in group home found to be employees under economic reality test used in Fifth Circuit).

(1)    *All VIP controlled Ms. Valdivieso in her work.*

In *Scantland*, *supra*, the Eleventh Circuit Court of Appeals determined that a group of cable technicians were misclassified as independent contractors. When analyzing this first factor in the economic realities test, the court found the employer "controlled what jobs plaintiffs did, how much they were paid, how many hours they worked, how many days they worked, their daily work schedule, whether they could work for others, whether they could earn additional income from customers, and closely monitored the quality of their work." *Id.* at 1315. Specifically, the technicians would receive a "route" that detailed their work assignments for the day, they could not sell their own services, they could be disciplined for not adhering to company policies, and they had to inform their supervisors in advance of taking time off. *Id.* at 1314-15. Additionally, the technicians could not subcontract their work to any technicians that did not work for the employer. *Id.* at 1314.

All VIP controlled the nature and degree of Ms. Valdivieso's work in the same manner as the employer in *Scantland*. Just like the "route" detailing the cable technicians' work assignments, All VIP told Ms. Valdivieso which days and hours she had to work by assigning her shifts on a patient calendar. [SMF ¶ 15, 16]. All VIP administrator Diana Ramirez coordinated a schedule according to clients' preferences, and then assigned caregivers to work that schedule on a rolling basis. [SMF ¶¶ 19, 20]. Furthermore, All VIP's contract states, "I acknowledge that I will provide services to clients exactly as they are assigned." [SMF ¶ 21]. As mentioned in Section B above, All

VIP required Ms. Valdivieso to submit a weekly timesheet reflecting the hours she worked. [SMF ¶ 13]. The timesheet identified the tasks that Ms. Valdivieso was to perform, and All VIP required her to identify the tasks she performed each shift with their clients. [SMF ¶ 14]. The timesheets were also used to determine how much money All VIP would pay Ms. Valdivieso, which indicates her status as an hourly employee.[1] [SMF ¶ 22].

Aside from controlling when and where Ms. Valdivieso would service its clients, All VIP also controlled *how* Ms. Valdivieso serviced its clients. All VIP receives a "care plan" from insurance companies that defines the scope of services provided to each client. [SMF ¶ 23]. While caregivers can theoretically modify the care plan, All VIP does not allow its caregivers to do so per its contract. [SMF ¶ 24]. As a result, Ms. Valdivieso's ability to provide health care services was limited to the scope of services provided by All VIP.

All VIP totally constrained the manner in which Ms. Valdvieso performed services for its clients and levied consequences if its policies were not followed. All VIP's independent contractor agreement contains a "Statement of Commitment", which is a list of dos, don'ts, and punishments the caregivers must abide by. [SMF ¶ 25]. Among other things, Ms. Valdivieso was required to wear identification during assignment; was required to notify the nurse registry if she could not make an assignment and the failure to do so was grounds for termination; she was required to complete and submit all documentation per All VIP policy or her pay could be withheld; she could not make or accept personal phone calls at a client's home, nor could she accept money or gifts

---

[1] *Solis v. A+ Nursetemps, Inc.*, *supra*, decided a few months before *Scantland*, found health care workers of a nurse registry were employees entitled to overtime after analyzing various economic reality factors established in Eleventh Circuit decisions. One of the factors was whether time records were maintained, which the *Solis* court weighed in favor of employee status because "[w]hile the nurses keep their own time records, they are paid by the hour, and such records are turned in to and maintained by Nursetemps … for the purpose of calculating the nurses' pay. Stated another way, the nurses are not paid a flat rate or piece rate per shift. They are hourly employees." *Id.* at *6.

from the clients. [SMF ¶ 25]. Ms. Ramirez emphasized that caregivers have to be "well-dressed with closed-toe shoes and be there on time", and that communicating emergency absences was "very, very important with All VIP Care." [SMF ¶ 26]. Ms. Valdivieso also could not sub-contract her services for All VIP's clients to another home health aide of her choice, even if the substitute worker was an All VIP caregiver. [SMF ¶ 27].

In analyzing this "control" factor, the *Scantland* court found in favor of employee status because the technicians had to inform their supervisors when they would be taking time off and they could be fired for violating company policies. *Scantland* at 1314-15. The *Scantland* court also found that the cable technicians were employees under the control factor because although they could use other technicians to help them do work, they could only rely on helpers already engaged by the company. *Id.* In this case, Ms. Valdivieso could not even unilaterally solicit help from other All VIP home health aides, or enlist the help of aides who were not pre-approved by All VIP, which is a more rigid requirement than the employer's policies in *Scantland*.

The above analysis demonstrates that All VIP controlled Ms. Valdivieso's work to such an extent that she did not operate as a separate economic entity. It does not matter that Ms. Valdivieso had the ability to reject a client offered by All VIP [SMF ¶ 28] because All VIP still controlled her work once she agreed to service a client. *See Hughes v. Fam. Life Care, Inc.* at 1370-71 (certified nursing assistant found to be controlled by nurse registry under first *Scantland* factor although plaintiff could refuse the work offered without consequence).

(2) *Ms. Valdivieso had no opportunity for loss and could not increase her income by managing herself or her schedule.*

The second factor considers the alleged employee's opportunity for profit or loss depending upon her managerial skill. *Scantland*, 721 F.3d at 1316. The relevant inquiry is whether Ms.

Valdiveiso's opportunity for profit or loss depended more on All VIP's work orders and her technical skill rather than her own managerial skill. *Hughes v. Fam. Life Care, Inc.*, 117 F. Supp. 3d at 1371.

All VIP paid Ms. Valdivieso $13 an hour for her shift work. [SMF ¶ 29]. Ms. Valdivieso could not schedule herself to be more proficient since she could only assist one patient at a time and could only be in one location at a time per the patient calendar All VIP disseminated. [SMF ¶ 16]. These facts indicate that Ms. Valdivieso was All VIP's employee since she had "no opportunity for additional income or profit through the exercise of managerial skill or increased efficiency in the manner or means of accomplishing the work." *Solis*, 2013 WL 1395863 at *7 (nurses paid by the hour had no opportunity for profit or loss through the exercise of their managerial skill); *see also Hughes*, 117 F. Supp. 3d at 1371 (finding a certified nursing assistant had no opportunity for profit or loss because she was paid hourly).

Ms. Valdiveiso also could not utilize her labor to earn additional income from All VIP's clients like the cable technicians. *Scantland* at 1314 ("Plaintiffs could not sell non-BHN services to customers and could not work for other companies, either because they were told they could not do so or because the schedule Knight imposed prevented them from doing so."). All VIP's contract contains a non-compete clause that prohibits caregivers from attempting to arrange direct services with the employers' clients. [SMF ¶ 30]. Ms. McKinnon and Ms. Ramirez explicitly stated that caregivers could not work "private" hours; meaning they could not service clients at any time that was not scheduled by All VIP. [SMF ¶ 31]. The above facts demonstrate that Ms. Valdivieso could not use any managerial skills to earn more money, and therefore she was not operating her own business.

(3)     *Ms. Valdivieso made no appreciable investment to work for All VIP.*

The third factor considers the alleged employee's investment in equipment or materials required for her task, or her employment of workers. *Scantland* at 1317. "This factor contemplates whether the alleged employee's work-related expenditures detracted from her economic dependence on the alleged employer." *Mason*, 2022 WL 1092238, at *4.

All VIP did not provide Ms. Valdivieso with any equipment to service their clients. [SMF ¶ 32]. Instead, Ms. Valdivieso had to buy her own scrubs and personal protective equipment, such as gloves and masks. [SMF ¶¶ 33, 34]. On the other hand, All VIP contracts with Medicaid or directly with its clients to provide services, and All VIP maintains several local offices with personnel staff throughout Florida. [SMF ¶¶ 35, 36, 37]. Also, as mentioned above under the "control" factor, All VIP prevented Ms. Valdivieso from subcontracting her services to other workers. [SMF ¶ 27].

This factor weighs in favor of employee status because Ms. Valdivieso's work-related expenditures did not detract from her economic dependence on All VIP. The equipment she purchased (gloves, masks, and scrubs) are not expensive and can generally be re-used or purchased in bulk such that they are not continuing expenses. In comparison, Ms. Valdivieso had to rely on All VIP's office infrastructure to provide her with clients, schedules to work, and submit timesheets in order to be paid. *See Chapman*, 562 F. App'x at 185 (finding caregivers to be employees of healthcare provider under Fifth Circuit economic reality test because, *inter alia*, the "plaintiffs' only investment in the business was the purchase of their uniforms. ASUI, on the other hand, contracted with the state to provide the services; operated a dayhab facility for the clients' day time use; and maintained a central office headquarters.").

(4)     *Working as a Home Health Aide is not a "special skill."*

The fourth factor considers whether the service rendered requires a special skill. *Scantland* at 1318. "A lack of specialization indicates that an individual is an employee, not an independent contractor…. Finally, even if an individual has specialized skills, that is not indicative of independent contractor status where the individual does not use those skills in an independent fashion." *Molina v. S. Fla. Exp. Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1286 (M.D. Fla. 2006) (internal citations and quotations omitted).

Although Ms. Valdivieso is a licensed HHA [SMF ¶ 38], she only provided domestic services to All VIP's clients such as personal care, homemaking, and companionship. [SMF ¶¶ 9-12]. These are not specialized skills as anybody could perform them, and Ms. Valdivieso did not use those skills in an independent fashion because her work was proscribed by the myriad of policies articulated in All VIP's "Statement of Commitment". [SMF ¶ 25]. In fact, All VIP implicitly acknowledged that non-medical services, provided by HHAs like Valdivieso, do not require "skilled" personnel. [SMF ¶ 39]. Therefore, this factor favors employment status.

(5)     *Ms. Valdivieso worked for All VIP for over a year, indicating permanence.*

The fifth factor considers the degree of permanency and duration of the working relationship. *Scantland* at 1318. Courts generally find in favor of employee status when the employment contract is for automatically renewing periods of time. *See Scantland* at 1318 (cable technicians' contracts were for year terms, automatically renewed, and were terminable only with thirty days' notice); *also see Solis*, 2013 WL 1395863, at *7 (majority of nurses accepted work assignments on a regular basis for a year or more); *Hughes*, 117 F. Supp. 3d at 1373 (employment contract renews automatically on a monthly basis and certified nursing assistant regularly accepted

assignments).

Ms. Valdivieso worked for All VIP from May 3, 2021 until July of 2022. [SMF ¶ 40]. During that time, she regularly accepted assignments from All VIP to provide care to their clients. [SMF ¶ 41]. All VIP's independent contractor agreement explicitly stated that her work was to be provided in successive one (1) year terms. [SMF ¶ 42]. Indeed, her employment automatically renewed on May 3, 2022 as she continued working through July of that year. Ms. Valdivieso's employment only ended because All VIP failed to properly pay her and she was forced to stop working for them. [SMF ¶ 27]. Therefore, the working relationship with All VIP indicates permanence under this factor, and the duration was only limited to a little more than one year because she was not timely paid for her services, which is the subject of the breach of contract claim at Count III of her Complaint. [ECF No. 2 at 7]. This factor also favors employment status.

(6) *Ms. Valdivieso was an integral and indispensable part of All VIP's business.*

This factor considers the extent to which the service rendered is an integral part of the alleged employer's business. *Scantland* at 1319. In *Scantland*, the Eleventh Circuit Court of Appeals found the work performed by the cable technicians comprised the majority of the defendant's business, and the company treated them as employees to maintain quality control. *Id.* Therefore, the technicians' integral role in the company was considered the "usual path of an employee." *Id.* In the home health care context, courts routinely find this factor strongly favors employee status because caregivers comprise the entirety of the employer's business. *Solis*, 2013 WL 1395863, at *7 ("The work performed by the nurses is more than an integral part of Nursetemps' business, it is the whole of Nursetemps' business."); *Hughes*, 117 F. Supp. 3d at 1373 (defendant in the business of home health care and certified nursing assistants were the whole of the business); *Mason*, 2022 WL

1092238, at *5 ("As a home healthcare company, Defendants cannot reasonably dispute that Plaintiff's services as a support living coach and personal support staff member were integral parts of Defendants' business. Ms. Brown acknowledged that workers in those positions provide the primary service offered by Pathfinders.").

All VIP styles itself as an elderly home health care service. [SMF ¶ 44]. The entirety of All VIP's business is to provide medical and non-medical services to elderly clients. [SMF ¶¶ 6,7]. Those services are provided by nurses, certified nursing assistants, and home health aides. [SMF ¶¶ 6, 7, 8]. As a home health aide, Ms. Valdivieso participated in performing the work that comprises the most integral part of All VIP's business - in the same manner as the caregivers in *Solis*, *Hughes*, and *Mason*. As such, this factor also demonstrates that Ms. Valdivieso was an employee of All VIP.

### D. Defendant, Liz Velazquez McKinnon, Is Liable to Ms. Valdivieso as an "Employer" Under the FLSA.

The FLSA creates a private right of action against any employer who violates its minimum-wage or overtime provisions. 29 U.S.C. § 216(b); *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013). Therefore, a plaintiff may sue an individual employer or multiple employers because the FLSA contemplates that several simultaneous employers may be responsible for compliance with its provisions. *Kendrick v. Eagle Int'l Grp., LLC*, 2009 WL 3855227, at *3 (S.D. Fla. Nov. 17, 2009). "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Patel v. Wargo,* 803 F.2d 632, 637–38 (11th Cir. 1986) (quoting *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983)).

"Federal courts look to the economic reality of the relationship between the parties in order

to determine whether an individual FLSA defendant is an 'employer' subject to FLSA liability." *Mendoza v. Disc. C.V. Joint Rack & Pinion Rebuilding, Inc.*, 101 F. Supp. 3d 1282, 1290 (S.D. Fla. 2015) (finding sole owner and president individually liable). In the Eleventh Circuit, a separate four-factor economic reality test is used to determine liability by evaluating whether the individual: (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.[2] *Id.* This test looks at the totality of the circumstances, so no single factor is dispositive and any relevant evidence may be examined on the issue of individual liability. *Id.*

As a matter of economic reality, the individual defendant in *Mendoza* was found liable for FLSA violations because he was the sole owner and president of the corporation, signed checks on its behalf, had authority over day-to-day operations, maintained financial control over the corporation, hired and fired employees, controlled hours of operation, and negotiated employee pay. *Id.*

Ms. McKinnon is individually liable under the economic realities test for conducting the same activities as the *Mendoza* defendant and more. For starters, Ms. McKinnon has been the only owner of All VIP since its inception in 2016. [SMF ¶ 5]. She is the corporation's CEO, and is responsible for oversight and administration of all payroll obligations. [SMF ¶¶ 45, 46]. She is also responsible for filing taxes on behalf of the corporation. [SMF ¶ 47]. All VIP has several offices

---

[2] There is some authority that an alternate "disjunctive rule" to determine individual liability exists in the Eleventh Circuit. The disjunctive rule refers to the test articulated in *Patel* that requires an examination of whether an individual was "involved in the day-to-day operation of the company" or had "some direct responsibility for the supervision of the employee" to be found personally liable. 803 F.2d at 638. *See Santos v. Cuba Tropical, Inc.*, 829 F. Supp. 2d 1304, 1311 (S.D. Fla. 2011) for a thorough explanation of the disjunctive rule and the "alternative test". While *Mendoza*, *supra*, states the four-factor economic-reality test is the Eleventh Circuit standard, *Moreira v. Americlean Bldg. Maint., Inc.*, 2016 WL 739657 (S.D. Fla. Feb. 25, 2016) recognizes the disjunctive rule as the test in the Eleventh Circuit. However, Liz McKinnon is individually liable under either test as the undisputed facts in this section demonstrate.

throughout Florida, and each office is required to have a licensed administrator. [SMF ¶¶ 48, 49]. Ms. McKinnon has been the licensed administrator of All VIP's Palm Beach County office since 2016. [SMF ¶ 51]. As the administrator, she is responsible for making sure the office meets state and federal guidelines. [SMF ¶ 52]. An administrator is also responsible for visiting clients, monitoring services provided by caregivers, and handling problems that occur in the office. [SMF ¶ 54]. Ms. McKinnon considers herself an employee of All VIP because she runs the office. [SMF ¶ 50]. She is also one of the care coordinators at the Palm Beach office; care coordinators are responsible for assigning caregivers to All VIP's clients. [SMF ¶¶ 55, 56]. Therefore, Ms. McKinnon serves in two of the Palm Beach office's five positions with her dual roles as administrator and care coordinator. [SMF ¶¶ 51, 55, 57].

Ms. McKinnon also participates in the process of hiring caregivers. In her deposition, Ms. McKinnon explained that she fills out parts of the employment contract related to the rate of pay that caregivers will receive when they are hired. [SMF ¶58]. Aside from her management of the Palm Beach office, Ms. McKinnon is also the direct supervisor of Diana Ramirez, the Broward County office administrator. [SMF ¶¶ 53, 59]. While she does not micromanage Ms. Ramirez's hiring decisions, Ms. McKinnon does conduct audits of other offices to make sure All VIP is hiring caregivers with proper credentials. [SMF ¶ 60]. In fact, McKinnon is so involved in the day-to-day operations of the corporation that she monitors its Google reviews and periodically responds to posts by All VIP's clients. [SMF ¶¶ 61, 62]. Ms. McKinnon stated that she monitors the Google reviews to make sure that her staff is "doing their jobs". [SMF ¶ 63].

Ms. McKinnon also had personal interaction with Ms. Valdivieso. At one point during her employment, Ms. Valdivieso visited the Palm Beach office to complain about not being paid

properly and Ms. McKinnon wrote her a check to address the situation. [SMF ¶¶ 64, 65]. Finally, Ms. McKinnon and Ms. Ramirez made the joint decision to terminate Ms. Valdivieso's employment. [SMF ¶66].

The undisputed facts demonstrate that Ms. McKinnon is a corporate officer with operational control over All VIP. Viewed within the context of the economic reality of her relationship with the corporation, Ms. McKinnon is no different from the individual defendant in *Mendoza*, *supra*. Ms. McKinnon is similarly liable under *Patel*'s disjunctive test as she is clearly involved in the day-to-day operations of All VIP. Therefore, she must be held personally liable along with All VIP as an employer who violated the FLSA in regards to Ms. Valdivieso.

### III. CONCLUSION

This Court must grant Ms. Valdivieso's motion for partial summary judgment and find that she was an employee of All VIP, the corporate Defendant, and Liz McKinnon, the individual Defendant. All VIP's claim that it had to classify Ms. Valdivieso as an independent contractor under Florida law is preempted by the FLSA. An analysis of the undisputed facts - the majority of which evidence was provided by the Defendants through exhibits and depositions - shows that Ms. Valdivieso is entitled to individual coverage under the FLSA, that ALL VIP employed her under the Eleventh Circuit's six-factor economic realities test, and that Liz McKinnon is individually liable under any test used in this Circuit. As many of the cases cited above demonstrate, home health care agencies and nurse registries can have "employees" under the FLSA, and Ms. Valdivieso was such an employee.

*[Certificate of Service on following page]*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically on July 20, 2023 with the Clerk of Court using the CM/ECF filing system.

s/Toussaint Cummings, Esq.
Toussaint Cummings, Esq. (119877)
toussaint@fairlawattorney.com
Brian H. Pollock, Esq. (174742)
brian@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue
Suite 770
Coral Gables, FL 33146
Tel:    305.230.4884
*Counsel for Plaintiff*
