UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:22-CV-61553-DIMITROULEAS/HUNT

CRUZ VALDIVIESO FIGUERA,

    Plaintiff,

vs.

ALL VIP CARE INC. AND LIZ
VELAZQUEZ MCKINNON,

    Defendants.
_____/

**PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Cruz Valdivieso Figuera ("Cruz"), through undersigned counsel and pursuant to Fed. R. Civ. P. 56, responds to the Defendants' Amended Motion for Summary Judgment (the "Motion") [ECF No. 57], and separately files Plaintiff's Statement of Material Facts in support of the arguments made within this Response. The Statement of Material Facts is referred to in this Response as "[SMF ¶ #]." The Defendants are collectively referred to as "Defendants" or "VIP".

**A. Cruz's Claims Under the Fair Labor Standards Act (FLSA)**

    I. VIP's State Law Affirmative Defense is Preempted by Federal Law.

The Defendants' first affirmative defense is that they properly classified Cruz as an independent contractor and they could not have employed her because VIP is a nurse registry under Florida law. [ECF No. 37 at 5-7]. This "nurse registry" affirmative defense has already been preempted by federal law, which is why VIP presented limited argument about it.

When state and federal laws conflict, "federal law trumps state law; that was always clear." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). The FLSA is a federal law. 29 U.S.C. §201, *et. seq.* Therefore, "in determining who are 'employees' under the

Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947). As binding precedent, *Walling* precludes this Court (or even a jury) from considering whether VIP was in compliance with Florida law in classifying Cruz as an independent contractor.

VIP's purported defense of following state law has been raised by at least one other nurse registry in Florida, and the argument was repudiated in federal court on the basis of preemption. The defendant in *Solis v. A+ Nursetemps, Inc.*, 2013 WL 1395863, (M.D. Fla. Apr. 5, 2013) was a licensed nurse registry under Florida law. *Id.* at *2. The District Court considered the same Florida statutes advanced by VIP (in particular Fla. Stat. §400.506), and explained that "legal designations in other statutes do not affect the determination of a worker's status under the FLSA. Thus, a worker may be an independent contractor under other laws or for purposes of contractual relationships, yet still meet the definition of an employee under the FLSA." *Id.* at *4. The District Court relied on the "economic realities" test to determine whether a worker is an employee covered by the FLSA, and ultimately concluded that the plaintiff nurses were employees of the nurse registry. *Id.* at *5-7.

*Solis* shows that the FLSA is not concerned about how Florida's laws classify home health aides. Therefore, this Court must find VIP's first affirmative defense to be preempted by the FLSA, and analyze Cruz's employment status under the "economic realities" standard discussed in *Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013).

<u>II. VIP attempts to use factors that cannot be considered under the FLSA's economic realities test, but Cruz is clearly an "employee" when the correct *Scantland* factors are used.</u>

### *a. The FLSA's economic realities test focuses on economic dependence.*

In *Scantland*, *supra*, the Eleventh Circuit Court of Appeals articulated the following six factors to be considered under the "economic realities test" in analyzing whether a worker is an

employee or an independent contractor *under the FLSA*: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; (6) the extent to which the service rendered is an integral part of the alleged employer's business. 721 F.3d. at 1311-12. The Eleventh Circuit concluded this discussion stating "the overarching focus of the inquiry is economic dependence." *Id.* "Ultimately, in considering economic dependence, the court focuses on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.' *Id.* (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301–02 (5th Cir.1975)).

> It is dependence that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit.

*Usery*, 527 F.2d at 1311-12.

### b. There are three tests to determine if someone is an independent contractor or an employee, and only one applies to the FLSA. VIP asks this Court to improperly consider factors that apply to the other two tests.

While *Scantland's* test provides the factors this Court needs to consider, the Defendants cite two inapposite cases for the proposition that the "parties' intent" is also determinative of the economic reality between Cruz and VIP. [ECF No. 57 at 6]. From that misleading proposition, VIP then attempts to operate outside of *Scantland's* six factors and make the independent contractor agreement, and Cruz's belief that she was an independent contractor, relevant considerations in

this Court's analysis. However, those facts are not relevant to her employment status under the FLSA's framework and this Court should not consider them.

The first case cited by VIP, *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488 (11th Cir. 1993), involved a computer programmer who sued her employer for violating the Employee Retirement Income Security Act (ERISA), and the Age Discrimination in Employment Act (ADEA). The lower court granted summary judgment to the defendant finding that several of the programmer's claims could only be brought by an employee, but she was an independent contractor. *Id.* at 1492. The Eleventh Circuit Court of Appeals reversed because facts were in dispute about the degree of control and supervision exercised by the employer over the programmer. *Id.* at 1493-94. The Court of Appeals explained that federal courts have developed three tests for distinguishing an independent contractor from an employee: (1) a traditional common law test based on principles of agency, used under an ERISA analysis; (2) the FLSA's "economic realities" test, which is unique because the FLSA incorporates a broad definition of the term "employ"; and (3) a hybrid approach that fuses the two, which is used in employment discrimination cases under Title VII. *Id.* at 1495. However, even under the agency law analysis, the Court of Appeals noted the "employment status of an individual for the purposes of ERISA is not determined by the label used in the contract between the parties." *Id.* at 1492. Meaning that an independent contractor agreement is a relevant consideration under ERISA, not the FLSA.

The second case cited by VIP, *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958 (11th Cir. 2015), involved a surgeon who sued a hospital district for age discrimination and retaliation under the ADEA and the Florida Civil Rights Act (FCRA). Again, the Eleventh Circuit explained the three different tests to determine a person's employment status. *Id.* at 961. This time, however, the Court of Appeals affirmed summary judgment because the doctor was considered an independent contractor when applying either the common-law agency test or the hybrid test under

the ADEA. *Id.* at 962. It was relevant under those two non-FLSA tests that the doctor signed an independent contractor agreement, but the most important factor was the doctor's ability to control the manner in which he provided his services. *Id.* at 962-3.

*Daughtery* and *Ashkenazi* are not FLSA cases, and they do not employ the FLSA's economic realities test. Contrary to VIP's assertion, the written agreement between the parties is not probative of the parties' intent under the FLSA. [ECF No. 57 at 6]. Employers routinely attempt to graft additional factors onto the *Scantland* test, thereby muddying the analysis to have fact-finders consider if workers signed an independent contractor agreement, filed 1099s, or even called themselves independent contractors. *See e.g. Harrell v. Diamond A Ent., Inc.*, 992 F. Supp. 1343 (M.D. Fla. 1997) (pre-*Scantland* case rejecting employer's proposal to add five factors to the FLSA economic reality analysis). But workers' mental states in thinking of themselves as independent contractors, or even taking actions in furtherance of being independent contractors are not determinative of their actual statuses under the FLSA. *See Harrell,* 992 F. Supp. at 1353 (M.D. Fla. 1997) (court declined to consider the "intent of the parties," the "way in which the parties characterize themselves for tax purposes," or "the extent to which the putative employer provided employment benefits" when ruling on Defendant's motion for partial summary judgment to determine whether Plaintiff was an independent contractor or employee because the label attached to the employment relationship is not dispositive of the economic reality of the relationship); *Gordilis v. Ocean Drive Limousines, Inc.*, 2014 WL 2214289, at *3 (S.D. Fla. May 28, 2014) ("District courts have found that the label workers used with respect to the IRS is irrelevant in considering whether the person was an independent contractor."); *Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1349 (N.D. Ga. 2011) (finding Plaintiffs to be employees even though they elected to be treated as independent contractors and held themselves out to the IRS as independent contractors); *accord Baker v. Barnard Const. Co. Inc.*, 860 F. Supp. 766, 772 (D.N.M. 1994), aff'd sub nom. *Baker v.*

*Flint Eng'g & Const. Co.*, 137 F.3d 1436 (10th Cir. 1998) ("The Court also finds the fact that the Plaintiffs knew they were treated as independent contractors, and the fact they listed themselves as such on their tax forms, to be of little, if any, relevance.").

All of the citations in the previous paragraph are FLSA cases; not ERISA, ADEA, or Title VII cases that use different tests to determine employment status. The "economic realities" test is different from the "common-law agency" and "hybrid" tests because the FLSA intends to grant protections to a wide swath of workers. *Harrell*, 992 F. Supp. at 1348 ("The [FLSA's] 'suffer or permit to work' standard derives from state child-labor laws and has been called the broadest definition of employee that has ever been included in one act. Courts look not to the common law definition of employment, but rather to the economic reality of whether the putative employee is economically dependent upon the alleged employer.") (internal citations and quotations omitted). Therefore, the FLSA and Eleventh Circuit jurisprudence require this Court to reject irrelevant considerations such as Cruz's written agreement with VIP, other "on-boarding documents", Cruz's 1099 tax forms, or her statement that she was an independent contractor.

### ***c. Cruz is an employee under Scantland's six-factor economic realities test.***

VIP misclassified Cruz as an independent contractor under the FLSA's framework. Federal courts routinely determine that caregivers in similar roles as Cruz are employees due to the restrictive nature of the work they perform for agencies in the same line of work as VIP. *See Mason v. Pathfinders for Indep., Inc.*, 2022 WL 1092238 (M.D. Fla. Apr. 12, 2022) (finding live-in companion to be employee of home care agency under *Scantland*'s economic realities test); *Hughes v. Fam. Life Care, Inc.*, 117 F. Supp. 3d 1365 (N.D. Fla. 2015) (finding certified nursing assistant to be an employee of nurse registry under *Scantland*); *Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x 182 (5th Cir. 2014) (caregivers in group home found to be employees under economic reality test used in Fifth Circuit). Notably, VIP did not cite to any case where caregivers were found to be

independent contractors. As such, *Scantland's* six factors show that Cruz was VIP's employee as analyzed below.

  (1)  <u>*VIP controlled Cruz in her work.*</u>

In *Scantland*, *supra*, the Eleventh Circuit Court of Appeals determined that a group of cable technicians were misclassified as independent contractors. When analyzing this first factor in the economic realities test, the court found the employer "controlled what jobs plaintiffs did, how much they were paid, how many hours they worked, how many days they worked, their daily work schedule, whether they could work for others, whether they could earn additional income from customers, and closely monitored the quality of their work." *Id.* at 1315. Specifically, the technicians would receive a "route" that detailed their work assignments for the day, they could not sell their own services, they could be disciplined for not adhering to company policies, and they had to inform their supervisors in advance of taking time off. *Id.* at 1314-15. Additionally, the technicians could not subcontract their work to any technicians that did not work for the employer. *Id.* at 1314.

VIP controlled the nature and degree of Cruz's work in the same manner as the employer in *Scantland*. Just like the "route" detailing the cable technicians' work assignments, VIP told Cruz which days and hours she had to work by assigning her shifts on a patient calendar. [SMF ¶ 70, 71]. VIP administrator Diana Ramirez coordinated a schedule according to clients' preferences, and then assigned caregivers to work that schedule on a rolling basis. [SMF ¶¶ 72, 73]. Furthermore, VIP's contract states, "I acknowledge that I will provide services to clients exactly as they are assigned." [SMF ¶ 32]. VIP required Cruz to submit a weekly timesheet reflecting the hours she worked. [SMF ¶¶ 18, 74]. The timesheet identified the tasks that Cruz was to perform, and VIP required her to identify the tasks she performed each shift with their clients. [SMF ¶ 75].

The timesheets were also used to determine how much money VIP would pay Cruz, which indicates her status as an hourly employee.[1] [SMF ¶ 76].

Aside from controlling when and where Cruz would service its clients, VIP also controlled *how* Cruz serviced its clients. VIP receives a "care plan" from insurance companies that defines the scope of services provided to each client. [SMF ¶ 25]. While caregivers can theoretically modify the care plan, VIP does not allow its caregivers to do so per its contract. [SMF ¶ 25]. As a result, Cruz's ability to provide health care services was limited to the scope of services provided by VIP.

VIP totally constrained the manner in which Cruz performed services for their clients and levied consequences if its policies were not followed. VIP's independent contractor agreement contains a "Statement of Commitment", which is a list of dos, don'ts, and punishments the caregivers must abide by. [SMF ¶ 31]. Among other things, Cruz was required to wear identification during assignment; was required to notify the nurse registry if she could not make an assignment and the failure to do so was grounds for termination; she was required to complete and submit all documentation per VIP policy or her pay could be withheld; she could not make or accept personal phone calls at a client's home, nor could she accept money or gifts from the clients. [SMF ¶ 31]. Ramirez emphasized that caregivers have to be "well-dressed with closed-toe shoes and be there on time", and that communicating emergency absences was "very, very important with VIP Care." [SMF ¶ 77]. Cruz also could not sub-contract her services for VIP's clients to another home health aide of her choice, even if the substitute worker was a VIP caregiver. [SMF ¶ 78]. VIP puzzlingly argues that they did not have the power to fire their caregivers, yet their

---

[1] *Solis v. A+ Nursetemps, Inc.*, *supra*, decided a few months before *Scantland*, found health care workers of a nurse registry were employees entitled to overtime after analyzing various economic reality factors established in Eleventh Circuit decisions. One of the factors was whether time records were maintained, which the *Solis* court weighed in favor of employee status because "[w]hile the nurses keep their own time records, they are paid by the hour, and such records are turned in to and maintained by Nursetemps … for the purpose of calculating the nurses' pay. Stated another way, the nurses are not paid a flat rate or piece rate per shift. They are hourly employees." *Id.* at *6.

contract with Cruz spells out numerous ways she could be terminated for not following their policies. [SMF ¶ 31].

In analyzing this "control" factor, the *Scantland* court found in favor of employee status because the technicians had to inform their supervisors when they would be taking time off and they could be fired for violating company policies. *Scantland* at 1314-15. The *Scantland* court also found that the cable technicians were employees under the control factor because although they could use other technicians to help them do work, they could only rely on helpers already engaged by the company. *Id.* In this case, Cruz could not even unilaterally solicit help from other VIP home health aides, or enlist the help of aides who were not pre-approved by VIP, which is a more rigid requirement than the employer's policies in *Scantland*.

The above analysis demonstrates that VIP controlled Cruz's work to such an extent that she did not operate as a separate economic entity. It does not matter that Cruz had the ability to reject a client offered by VIP [SMF ¶¶ 21,22] because VIP still controlled her work once she agreed to service a client. *See Hughes v. Fam. Life Care, Inc*. at 1370-71 (certified nursing assistant found to be controlled by nurse registry under first *Scantland* factor although plaintiff could refuse the work offered without consequence). It also does not matter that VIP did not train Cruz because the cable technicians in *Scantland* were found to be employees even though they did receive training. *Scantland* at 1318.

(2) *Cruz had no opportunity for loss and could not increase her income by managing herself or her schedule.*

The second factor considers the alleged employee's opportunity for profit or loss depending upon her managerial skill. *Scantland*, 721 F.3d at 1316. The relevant inquiry is whether Cruz's opportunity for profit or loss depended more on VIP's work orders and her technical skill rather than her own managerial skill. *Hughes v. Fam. Life Care, Inc.*, 117 F. Supp. 3d at 1371.

VIP paid Cruz $13 an hour for her shift work. [SMF ¶ 13]. Cruz could not schedule herself to be more proficient since she could only assist one patient at a time and could only be in one location at a time per the patient calendar VIP disseminated. [SMF ¶ 79]. These facts indicate that Cruz was VIP's employee since she had "no opportunity for additional income or profit through the exercise of managerial skill or increased efficiency in the manner or means of accomplishing the work." *Solis*, 2013 WL 1395863 at *7 (nurses paid by the hour had no opportunity for profit or loss through the exercise of their managerial skill); *see also Hughes*, 117 F. Supp. 3d at 1371 (finding a certified nursing assistant had no opportunity for profit or loss because she was paid hourly).

Cruz also could not utilize her labor to earn additional income from VIP's clients like the cable technicians. *Scantland* at 1314 ("Plaintiffs could not sell non-BHN services to customers and could not work for other companies, either because they were told they could not do so or because the schedule Knight imposed prevented them from doing so."). VIP's contract contains a non-compete clause that prohibits caregivers from attempting to arrange direct services with the employers' clients. [SMF ¶ 80]. McKinnon and Ramirez explicitly stated that caregivers could not work "private" hours; meaning they could not service clients at any time that was not scheduled by VIP. [SMF ¶ 81]. The above facts demonstrate that Cruz could not use any managerial skills to earn more money, and therefore she was not operating her own business.

(3)  <u>*Cruz made no appreciable investment to work for VIP.*</u>

The third factor considers the alleged employee's investment in equipment or materials required for her task, or her employment of workers. *Scantland* at 1317. "This factor contemplates whether the alleged employee's work-related expenditures detracted from her economic dependence on the alleged employer." *Mason*, 2022 WL 1092238, at *4.

VIP did not provide Cruz with any equipment to service their clients. [SMF ¶¶ 35]. Instead, Cruz had to buy her own scrubs and personal protective equipment, such as gloves and

masks. [SMF ¶ 36]. On the other hand, VIP contracts with Medicaid or directly with its clients to provide services, and VIP maintains several local offices with personnel staff throughout Florida. [SMF ¶¶ 108,109]. Also, as mentioned above under the "control" factor, VIP prevented Cruz from subcontracting her services to other workers. [SMF ¶ 78].

This factor weighs in favor of employee status because Cruz's work-related expenditures did not detract from her economic dependence on VIP. The equipment she purchased (gloves, masks, and scrubs) are not expensive and can generally be re-used or purchased in bulk such that they are not continuing expenses. In comparison, Cruz had to rely on VIP's office infrastructure to provide her with clients, schedules to work, and submit timesheets in order to be paid. *See Chapman*, 562 F. App'x at 185 (finding caregivers to be employees of healthcare provider under Fifth Circuit economic reality test because, *inter alia*, the "plaintiffs' only investment in the business was the purchase of their uniforms. ASUI, on the other hand, contracted with the state to provide the services; operated a dayhab facility for the clients' day time use; and maintained a central office headquarters. Any lack of supervision by ASUI as to how [plaintiffs] should go about cooking and cleaning does not transform the plaintiffs into independent contractors.").

   (4)  <u>Working as a Home Health Aide is not a "special skill."</u>

The fourth factor considers whether the service rendered requires a special skill. *Scantland* at 1318. "A lack of specialization indicates that an individual is an employee, not an independent contractor…. Finally, even if an individual has specialized skills, that is not indicative of independent contractor status where the individual does not use those skills in an independent fashion." *Molina v. S. Fla. Exp. Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1286 (M.D. Fla. 2006) (internal citations and quotations omitted).

Although Cruz is a certified HHA [SMF ¶ 82], she only provided domestic services to VIP's clients such as personal care, homemaking, and companionship. [SMF ¶¶ 83-86]. These are not

specialized skills as anybody could perform them, and Cruz did not use those skills in an independent fashion because her work was proscribed by the myriad of policies articulated in VIP's "Statement of Commitment". [SMF ¶ 31]. In fact, VIP implicitly acknowledged that non-medical services, provided by HHAs like Cruz, do not require "skilled" personnel. [SMF ¶ 87]. Therefore, this factor favors employment status.

      (5)      *Cruz worked for VIP for over a year, indicating permanence.*

The fifth factor considers the degree of permanency and duration of the working relationship. *Scantland* at 1318. Courts generally find in favor of employee status when the employment contract is for automatically renewing periods of time. *See Scantland* at 1318 (cable technicians' contracts were for year terms, automatically renewed, and were terminable only with thirty days' notice); *also see Solis*, 2013 WL 1395863, at *7 (majority of nurses accepted work assignments on a regular basis for a year or more); *Hughes*, 117 F. Supp. 3d at 1373 (employment contract renews automatically on a monthly basis and certified nursing assistant regularly accepted assignments).

Cruz worked for VIP from May 3, 2021 until July of 2022. [SMF ¶ 88]. During that time, she regularly accepted assignments from VIP to provide care to their clients. [SMF ¶ 89]. VIP's independent contractor agreement explicitly stated that her work was to be provided in successive one (1) year terms. [SMF ¶ 90]. Indeed, her employment automatically renewed on May 3, 2022 as she continued working through July of that year. Cruz's employment only ended because VIP failed to properly pay her and she was forced to stop working for them. [SMF ¶ 91]. Therefore, the working relationship with VIP indicates permanence under this factor, and the duration was only limited to a little more than one year because she was not timely paid for her services, which is the subject of the breach of contract claim at Count III of her Complaint. [ECF No. 2 at 7]. This factor also favors employment status.

(6) *Cruz was an integral and indispensable part of VIP's business.*

This factor considers the extent to which the service rendered is an integral part of the alleged employer's business. *Scantland* at 1319. In *Scantland*, the Eleventh Circuit Court of Appeals found the work performed by the cable technicians comprised the majority of the defendant's business, and the company treated them as employees to maintain quality control. *Id.* Therefore, the technicians' integral role in the company was considered the "usual path of an employee." *Id.* In the home health care context, courts routinely find this factor strongly favors employee status because caregivers comprise the entirety of the employer's business. *Solis*, 2013 WL 1395863, at *7 ("The work performed by the nurses is more than an integral part of Nursetemps' business, it is the whole of Nursetemps' business."); *Hughes*, 117 F. Supp. 3d at 1373 (defendant in the business of home health care and certified nursing assistants were the whole of the business); *Mason*, 2022 WL 1092238, at *5 ("As a home healthcare company, Defendants cannot reasonably dispute that Plaintiff's services as a support living coach and personal support staff member were integral parts of Defendants' business. Brown acknowledged that workers in those positions provide the primary service offered by Pathfinders.").

As a nurse registry, VIP provides home care. [SMF ¶ 92]. The entirety of VIP's business is to provide medical and non-medical services to elderly clients. [SMF ¶¶ 26, 93]. Those services are provided by nurses, certified nursing assistants, and home health aides. [SMF ¶ 94]. As a home health aide, Cruz participated in performing the work that comprises the most integral part of VIP's business - in the same manner as the caregivers in *Solis*, *Hughes*, and *Mason*. As such, this factor also demonstrates that Cruz was an employee of VIP.

**B.     Cruz Concedes that She Cannot Carry Her Burden on the FLSA Retaliation Claim.**

A prima facie case of FLSA retaliation requires Cruz to show: (1) she engaged in activity protected under the FLSA; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection exists between the employee's activity and the adverse action. *See Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000). Cruz can meet the first and third elements, but she would be unable to prove the second element, which requires an analysis of whether VIP's responsive legal action: (1) was filed for a retaliatory motive, and (2) lacks legal basis in fact or law. *Munroe v. PartsBase, Inc.*, 2009 WL 413721, at *8 (S.D. Fla. Feb. 18, 2009) (explaining that baseless claims or lawsuits designed to deter plaintiffs from seeking legal redress constitute impermissible adverse retaliatory actions); *accord Darveau v. Detecon, Inc.*, 515 F.3d 334, 341 (4th Cir. 2008). However, Cruz does not concede that she was an independent contractor as VIP argues. Cruz unequivocally maintains that she was VIP's employee.

**C.    VIP is Not Entitled to Summary Judgment on Breach of Contract because their Supporting Evidence is in Dispute, Not Admissible, or Not Competent.**

VIP cannot establish the second and third elements of their breach of contract claim – material breach or damages. The main evidence VIP presented to support their allegations is directly disputed. Also, in many instances, VIP overstated witness testimony to reach improper conclusions. And, in other instances, VIP cited to inadmissible hearsay that cannot be considered at summary judgment.

<u>I. Cruz never told the Iziques to leave VIP.</u>

VIP accuses Cruz of "soliciting Y.I. and C.I. to join her new independent contractor arrangement with another nurse registry."[2] [ECF No. 57 at 19]. However, the Iziques moved to

---

[2] Y.I. and C.I. are the initials for Mr. and Mrs. Izique. They are referred to as the "Iziques" in this Response. McKinnon's deposition refers to them as the "ZK's" because the court reporter was not provided with the spelling of their surnames.

Senior Nannies[3] for reasons unrelated to Cruz. The Iziques' daughter, Ana Marie Rowland, had power of attorney for her parents in matters related to their caregiving services. [SMF ¶¶ 95,96]. Rowland had problems with VIP's administration, and she, along with a Humana case manager, decided to choose Senior Nannies as a new agency for her parents. [SMF ¶¶ 67,97]. Importantly, Rowland stated that Cruz never told the Iziques to switch to Senior Nannies. [SMF ¶ 67].

VIP attempts to support their accusations of Cruz's solicitation by mischaracterizing deposition testimony. In deposition, Cruz was asked if any of VIP's clients "followed" her to Senior Nannies, and she replied the Iziques "switched" after she already applied to work with the new agency. [SMF ¶ 63]. Neither the question nor the answer lead to the conclusion that Cruz solicited the Iziques to do anything within the restrictive period of one year after her termination from VIP. Based on Rowland's and Cruz's testimony, the proper takeaway is that Cruz and the Iziques independently moved to Senior Nannies, with no cause or effect to be inferred.

Cruz was also asked how the Iziques learned she was going to work for Senior Nannies, and replied she told them she was leaving because VIP was not paying her. [SMF ¶ 64]. In response, the Iziques apparently said they would also leave VIP. [SMF ¶ 65]. Cruz then stated the Iziques switched to Senior Nannies and requested her, so she is currently their caregiver. [SMF ¶ 65]. Again, no cause and effect can be attributed to these statements because the Iziques merely left VIP with no explicit prompting from Cruz. This testimony is also consistent with Rowland's statement that she requested Cruz as a caregiver for her parents after they switched to Senior Nannies. [SMF ¶ 67]. Finally, the Defendants allege Cruz failed to notify VIP that the Iziques wanted to leave their agency. [ECF No. 57 at 19]. But the Defendants point to no specific term of their contract explaining why this failure to report the Iziques' intent was a material breach. VIP

---

[3] Cruz used a Spanish interpreter during her deposition, and misspelled the name of the nurse registry, Senior Nannies. The name is spelled "Sininani" in her deposition.

clients are free to leave the nurse registry at any time they choose [SMF ¶ 98]. Therefore, it cannot be a breach of the contract to report clients for what they have the right to do, which is leave VIP.

McKinnon testified that Cruz "took" the Iziques from VIP. [SMF ¶ 63, 67]. However, she has no personal knowledge of any client-stealing. When asked how she knew that Cruz told clients to complain about VIP, McKinnon replied that is "what I hear from the clients and from the caregivers." [SMF ¶ 99]. That is inadmissible hearsay that cannot be considered by this Court. *Macuba v. Deboer*, 193 F.3d 1316, 1322–23 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits that support or oppose summary judgment motions shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence. This rule also applies to testimony given on deposition.") (internal citations and quotations omitted). When asked how she knew Cruz told the Iziques to leave VIP, McKinnon said she learned that information from other home health aides. [SMF ¶ 100]. This is also inadmissible hearsay.

Similarly, VIP attempts to prove that Cruz solicited the Iziques with testimony from Diana Ramirez that is rife with hearsay. In deposition, Ramirez also repeated statements of which she had no personal knowledge. She constantly stated the Iziques "told" her their thoughts about Cruz, and even "told" her what Cruz said. [SMF ¶¶ 101,102]. Therefore, VIP is offering double hearsay – statements purportedly made by Cruz (declarant A) to the Iziques (declarant B) told to Ramirez – to prove that Cruz solicited VIP's clients.

VIP offered no competent or admissible evidence that Cruz solicited the Iziques. Instead, their evidence is equally susceptible of the conclusion that the Iziques chose to leave VIP of their own volition, as Rowland stated in her declaration. Finally, McKinnon admitted she cannot say if

Cruz encouraged the Iziques to go to another agency or if they made a personal decision to leave VIP. [SMF ¶ 103].

### II. Cruz never told Angela Melendez to leave VIP.

VIP presented a sworn statement from its client, Angela Melendez,[4] who stated Cruz "suggested" she move to another agency. [ECF No. 58-1 at 118]. However, Cruz never suggested that Melendez leave VIP. [SMF ¶ 66]. Thus, there is a disputed issue of material fact precluding summary judgment about Cruz breaching VIP's contract by soliciting Melendez.

VIP completely fabricated a fact when it stated Cruz "acknowledges that she solicited" Angela Melendez. [ECF No. 57 at 19]. VIP points the reader to Cruz's deposition for this "acknowledgment." [SMF ¶ 67]. She was asked if Melendez switched to Senior Nannies, and Cruz said "No". [SMF ¶ 106]. It is impossible to understand how VIP leaps to the conclusion that Cruz attempted to "take" Melendez from that question and answer. Cruz was never asked if she tried to convince Melendez to follow her to a new job, and she offered no information on that point. At no point in her deposition did Cruz acknowledge soliciting or attempting to solicit Melendez.

The breach of contract claim also fails on the damages element because Melendez stated Cruz did not cause her to leave VIP. [SMF ¶ 107]. Furthermore, McKinnon stated Cruz did not take Melendez from VIP. [SMF ¶ 105]. Therefore, VIP suffered no damages. *See e.g. Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1343 (S.D. Fla. 2004) ("Moreover, damages for lost profits, like all contractual damages, must flow from the breach.").

### III. There is no evidence that Cruz divulged confidential information.

VIP also stated that Cruz "divulged confidential information to Y.I, C.I. and A.G.M., and acknowledged that she would complain to VIP clients about the payment and work hours process

---

[4] Angela Melendez is referred to as A.G.M. throughout VIP's Motion for Summary Judgment.

of VIP." [ECF No. 57 at 19]. Due to the conjunctive nature of the sentence, it is unclear whether VIP is alleging that Cruz divulged confidential information *by* complaining to clients about non-payment and work hours, or if VIP is alleging separate incidents where Cruz breached the contract. Assuming the former, VIP does not explain what terms of the contract Cruz breached. Instead, VIP continues mischaracterizing witness testimony to prove a point unrelated to a breach.

VIP's Statement of Material Facts says Cruz "threatened" Melendez to pay her directly because all VIP owed her money. [SMF ¶ 61]. To support this allegation, VIP cites to the statement Melendez drafted in her own handwriting, but she never mentions this threat anywhere. [SMF SMF ¶ 62]. Here again, we see VIP blatantly fabricating evidence, which has nothing to do with the original point of confidential information being divulged. VIP also cites to a place in Ramirez's deposition where Cruz purportedly made the threat. [SMF ¶ 61]. Ramirez's deposition testimony is less than credible considering Melendez never mentioned this threat in her own statement. Despite the credibility concern, VIP never explained what confidential information was divulged by the threat. And, even if this dubious threat breached the contract, VIP has no damages because Cruz did not cause Melendez to leave the agency. [SMF ¶¶ 105, 106, 107, 108]. *See Air Caledonie Int'l, supra.*

Next, VIP attempts to demonstrate a breach because Cruz complained to clients that she was owed hours and not being paid. [SMF ¶¶ 62,64]. VIP does not explain how complaining to clients about not being paid breaches their contract. And more importantly, VIP does not explain what confidential information was divulged. There is nothing for Cruz to dispute regarding this allegation. However, if the Court finds the complaints are a material breach, then there are no damages because Cruz did not cause Melendez to leave VIP [SMF ¶¶ 104, 105, 106, 107], and the Iziques parted ways with VIP for reasons unrelated to Cruz's complaints. [SMF ¶¶ 67, 97]. *See Air Caledonie Int'l, supra.*

VIP did not suffer reputational damage for those same reasons. The Google review referenced by VIP is not in the summary judgment record so this Court cannot verify the accuracy of any statements made in it. Even if the review was in the record, it contains hearsay that is inadmissible. *See Macuba v. Deboer*, *supra*. If the Court considers the hearsay, VIP has not explained what direct harm resulted from the Google review such that their reputation was damaged. *See Air Caledonie Int'l*, *supra*; *see also K3 Enterprises, Inc. v. Sasowski*, 2022 WL 17987272, at *2 (S.D. Fla. Sept. 8, 2022) ("[F]or many contracts, reputational harm is not a type of injury that arises naturally or flows from breach.) (internal quotations and citations omitted); *see also Harter v. Ohio Sec. Ins. Co.*, 2020 WL 6384159, at *1 (M.D. Fla. Sept. 1, 2020 (noting that consequential damages may be recoverable in a breach of contract action if the damages were contemplated by the parties and can be proven with reasonable certainty). Finally, the Google review does not specifically mention Cruz's name, but instead it generally references home health aides that complained about not being paid by VIP. [SMF ¶ 69].

### **III. CONCLUSION**

This Court must deny VIP's Amended Motion for Summary Judgment and find that Cruz was their employee. It is clear that VIP controlled nearly every aspect of the working arrangement with Cruz after analyzing the *Scantland* factors. VIP's attempt to position itself as a neutral matchmaker falls flat because the agency involved itself in every aspect of the client-caregiver relationship. All Cruz had to do was show up to the client's house to provide a service. As many of the cited cases demonstrate, home health care agencies and nurse registries can have "employees" under the FLSA, and Cruz was such an employee. VIP also cannot prevail on its breach of contract claim because it never explained what specific terms were violated, and the majority of its evidence cannot be considered for summary judgment purposes. Finally, VIP suffered no damages because the Iziques chose to leave and Melendez chose to stay; Cruz had no influence on their decisions.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically on August 2, 2023 with the Clerk of Court using the CM/ECF filing system.

> s/Toussaint Cummings, Esq.
> Toussaint Cummings, Esq. (119877)
> toussaint@fairlawattorney.com
> FAIRLAW FIRM
> 135 San Lorenzo Avenue
> Suite 770
> Coral Gables, FL 33146
> Tel:    305.230.4884
> *Counsel for Plaintiff*