UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:22-CV-61553-DIMITROULEAS/HUNT

CRUZ VALDIVIESO FIGUERA,

    Plaintiff,

vs.

ALL VIP CARE INC. AND LIZ
VELAZQUEZ MCKINNON,

    Defendants.
_____/

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF RESPONSE TO DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Cruz Valdivieso Figuera, files this Statement of Material Facts in support of her Response to Defendant's Amended Motion for Summary Judgment ("Motion"). Plaintiff's Exhibits are labeled as follows:

- Ex. A, McKinnon Corporate Representative Deposition ("CR Depo.") p.00:00.[1] [2]
- Ex. B, Ramirez Depo.
- Ex. C, Cruz Depo.
- Ex. D, Plaintiff's timesheet;
- Ex. E, Cesar Izique Patient Calendar, p.0;
- Ex. F, Defendant McKinnon's Answer to Plaintiff's Interrogatories, p.0;
- Ex. G, Declaration of Ana Maria Rowland at ¶ 0;
- Ex. H, Declaration of Cruz Valdivieso Figuera at ¶ 0.

---

[1] The colon (:) in the deposition designations separates the page and line numbers. For example, p.50:12-24 means page 50, lines 12 to 24. And, pp.50:1-52:3 means page 50, line 1 to page 52, line 3.

[2] The depositions of Liz McKinnon, Diana Ramirez, and Cruz Valdivieso Figuera have already been filed as exhibits to Defendants' Motion. However, they were all filed as one attachment under ECF No. 58-1 and they are also "mini-transcripts" with four depositions pages appearing on one sheet. For example, ECF No. 58-1 at 21 represents pages 3 to 6 of Cruz's deposition. Therefore, Plaintiff cannot easily refer to the transcripts as exhibits in the CM/ECF record as required by Southern District of Florida Local Rule 56.1(b)(1)(B). Doing so would require Plaintiff to reference the ECF number which does not cite to a specific page number of the depositions, but instead four different page numbers. Plaintiff made the transcripts exhibits her Statement of Material Facts to address this problem.

1. Undisputed.

2. Disputed. Home health aides are not licensed; they receive certificates after 75 hours of training. Ex. B, Ramirez Depo. p.22:8-16.

3. Undisputed. However, McKinnon is also the chief executive officer (CEO) of VIP. Ex. F, Defendants' McKinnon's Answer to Plaintiff's Interrogatories p.2.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Undisputed.

8. Disputed. While Cruz stated she is an independent contractor, later on in the same deposition she stated she did not know what the legal definition of an independent contractor is. Ex. C, Cruz Depo. p.45:23-25.

9. Undisputed.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Disputed. The terms "payor"[3] and "allowable reimbursement amount" were never used or defined in any deposition of any witness, and are not defined in VIP's Motion. Plaintiff is unfamiliar with those terms and cannot stipulate to their use for purposes of this fact. Disputed that Cruz was not to be paid on a regular weekly payment schedule. VIP's Independent Contractor Agreement (ICA) contains a "Payment for Services" section that explains caregivers will be paid every other Friday. ICA [ECF No. 37 at 33].

15. Disputed. Cruz was not required to receive authorization from anybody. Instead, VIP receives authorization from Medicaid for the number of hours and type of service the caregiver can provide. Ex. A, CR Depo.pp.53:12-54:2; Ex. B, Ramirez Depo. pp.45:20-46, p.51:6-11.

16. Disputed. Cruz had a contract with VIP, and separately, VIP has contracts with its clients.

---

[3] VIP uses the term "payor" throughout its Motion and Statement of Material Facts. This term is apparently being used as a term of art but it is undefined and Plaintiff does not stipulate to its use. Plaintiff asserts a standing dispute to this term wherever it appears. However, Plaintiff assumes "payor" refers to Medicaid and will operate on that assumption for stipulations throughout this Statement of Material Facts.

      Cruz does not have contracts with VIP's clients. Ex. B, Ramirez Depo. pp.47:16-51:5.

17. Undisputed.
18. Undisputed. However, VIP provides the timesheet to the caregivers, and has been providing timesheets to caregivers since they opened in 2016. Ex. A, CR Depo.pp.39:13-40:7.
19. Undisputed. However, the deposition cite in VIP's Statement of Material Facts does not prove this point.
20. Undisputed.
21. Undisputed.
22. Undisputed.
23. Disputed. While Cruz may have the *ability* to ask the insurance company to modify the care plan, she does not have the *right* to ask the insurance company to modify it because VIP prevents her from doing so. Ex. A, CR Depo. p.21:1-20.
24. Disputed. All of the VIP clients that Cruz served had their services paid by Medicaid through their insurance companies. Ex. B, Ramirez Depo. p.41:11-24. VIP distinguishes between clients who pay for their care directly out-of-pocket versus those whose care is funded through insurance. Ex. B, Ramirez Depo. p.90:10-17. If a VIP caregiver services a client that pays out-of-pocket, then she is doing "private hours." Ex. B, Ramirez Depo. p.41:7-10. VIP incorrectly referenced a part of McKinnon's testimony where she generally explains that clients who pay out of pocket for "private hours" find it easier to set up an account with VIP using their own credit card. Ex. A, CR Depo.pp.38:3-39:12. But because Cruz only serviced Medicaid clients, they never had the option to pay her directly.
25. Disputed. The insurance company defines the scope of services the caregiver will provide to the client through the "care plan." Ex. A, CR Depo. p.20:22-25. All VIP forbids caregivers from asking insurance companies to modify a client's care plan, and the caregivers are informed of this restriction when they apply for the job. Ex. A, CR Depo. p.21:1-17; Ex. B, Ramirez Depo. pp. 45:20-46:15.
26. Disputed. VIP provides medical and non-medical services to its clients. Ex. A, CR Depo. p.13:1-2. Cruz is a home health aide (HHA). Ex. B, Ramirez Depo. p.42:22-24. As an HHA, Cruz is in VIP's non-medical services division. Ex. A, CR Depo. p.14:6-10. Nurses

are in the medical services division, and they provide service outside of client's homes in places like hospitals and assisted living facilities. Ex. A, CR Depo. p.13:3-23. Cruz is not a nurse so she never provided services outside of client's homes.

27. Undisputed.
28. Undisputed.
29. Undisputed.
30. Undisputed.
31. Disputed. VIP can terminate an HHA for various reasons as stated in its Independent Contractor Agreement ("ICA"). The ICA contains a "Statement of Commitment", which is a bulleted list detailing VIP's policies and the adverse employment actions that will be taken against caregivers for violating the policies. ICA [ECF No. 37 at pp.28-29]. It threatens termination if caregivers fail to notify VIP they cannot arrive on time for an assignment, for bringing someone with them to a client's home, or for habitual tardiness. ICA [ECF No. 37 at pp.28-29]. Under the "Receipt of Information" section, the ICA explicitly states "failure to comply with nurse registry policy is grounds for termination of my contract with the nurse registry." ICA [ECF No. 37 at p.28].
32. Disputed. A typical nurse registry using independent contractors merely functions as a matchmaking service between its clients and the caregivers. U.S. Dept. of Labor Field Assistance Bulletin (FAB) [ECF No. 58-1 at 128]. Under that scheme, the *caregiver* contacts the *client* and then both parties determine the caregiver's rate of pay and the caregiver's hours. FAB [ECF No. 58-1 at 129-30]. Importantly, both parties are free to change the terms and conditions of their relationship at any time without the registry's input. FAB [ECF No. 58-1 at 129-30]. But VIP makes initial contact with clients and creates a contract with them. Ex. B, Ramirez Depo. p.48:2-23. VIP also contacts the clients' Medicaid case managers to obtain the care plan. Ex. B, Ramirez Depo. p.46:10-20. VIP negotiates how much to pay the caregivers. Ex. B, Ramirez Depo. pp.42:6-43:22. VIP then sends caregivers a preset schedule of assigned hours to work. Ramirez sends caregivers the client's contact information with a predetermined schedule and pay rate. Ex. B, Ramirez Depo. p.44:12-25; pp.77:17-78:15. VIP's contract states in the "Scheduled Visits" section, that caregivers must "provide services to the clients exactly as they are assigned." ICA [ECF No. 37 at p.29]. Therefore, VIP does not just serve as a middleman.

- 4 -

Instead, just like an employer, VIP "directs and controls the caregiver's work and sets the caregiver's rate of pay…". FAB [ECF No. 58-1 at 130].

33. Undisputed.
34. Undisputed.
35. Undisputed.
36. Undisputed.
37. Undisputed.
38. Undisputed.
39. Undisputed.
40. Undisputed.
41. Disputed. HHAs are not licensed. *See* Response to No. 2.
42. Undisputed.
43. Disputed. VIP has a dress code as they require HHAs to wear scrubs and closed toe shoes. Ex. B, Ramirez Depo. p.23:10-17. The comparison that VIP makes with uniforms of other contractors is unsupported by the citation to Ramirez's deposition at page 24.
44. Undisputed.
45. Undisputed.
46. Disputed. Cruz's response that VIP never asked anything of her has to be viewed in the context of the preceding questions. The questions were related to Cruz's understanding of VIP's English language contract since she only speaks Spanish. Ex. C, Cruz Depo. p.30:6-22. As such, Cruz's response is ambiguous as to what she means by VIP never asked anything of her.
47. Disputed. McKinnon's cited deposition testimony does not stand for the proposition being offered in this fact. One cannot jump to the conclusion that VIP never provided home services or care for any client because McKinnon stated VIP serves as a middleman between the client and the caregiver.
48. Undisputed.
49. Undisputed.
50. Undisputed.
51. Undisputed.
52. Disputed. Each of Cruz's timesheets reflect the amount of time she provided service to

clients. Ex. C, Cruz Depo. pp.34:22-35:6.

53. Disputed. Cruz's timesheets were signed by her patients. Ex. C, Cruz Depo. p.35:7-9.
54. Undisputed.
55. Undisputed.
56. Undisputed.
57. Undisputed that Cruz works for Senior Nannies. Disputed that she currently works as an independent contractor as she stated she does not know the legal definition. Ex. C, Cruz Depo. p.45:23-25.
58. Undisputed.
59. Undisputed that VIP filed its action based on the allegations in its Broward complaint.
60. Undisputed, but not verified by Plaintiff.
61. Disputed. Cruz did not threaten Melendez. Ex. H, Declaration of Cruz Valdivieso Figuera at ¶ 9. Melendez's statement does not say Cruz threatened her. [ECF No. 58-1 at 117-18].
62. Undisputed.
63. Disputed as to the order of events. The Iziques switched to Senior Nannies, and then requested Cruz as a home health aide there. Ex. G, Declaration of Ana Maria Rowland at ¶¶ 16-18.
64. Undisputed.
65. Disputed. Cruz did not state the Iziques left to follow her to a new job. Instead, the Iziques' statement, as relayed to Cruz, was they were "leaving VIP also." Ex. C, Cruz Depo. p.42:24. Cruz then stated the Iziques went to Senior Nannies and requested her. Ex. C, Cruz Depo. p.43:3-4.
66. Disputed. Cruz never attempted to have Melendez move to another agency. Ex. H, Declaration of Cruz Valdivieso Figuera at ¶ 11.
67. Disputed. Cruz did not "take" two VIP clients, the Iziques, to her new job at Senior Nannies. Instead, the Iziques' daughter, Ana Maria Rowland, and a Humana case manager, chose Senior Nannies as a new agency for her parents. Ex. G, Declaration of Ana Maria Rowland at ¶ 16. Cruz also never told Rowland or the Iziques to switch to Senior Nannies. Ex. G, Declaration of Ana Maria Rowland at ¶ 18. After the Iziques moved to the Senior Nannies, Rowland asked the new agency to hire Cruz and two other

VIP caregivers. Ex. G, Declaration of Ana Maria Rowland at ¶ 17. Disputed that Cruz attempted to take a third client, Angela Melendez. *See* Response to No. 66.

68. Disputed. Defendants suffered no monetary damages because Cruz did not cause the Iziques to leave VIP. *See* Response to No. 67. Also, Cruz did not cause Angela Melendez to leave VIP. *See* Response to No. 66.

69. Disputed. The Google review because does not mention Cruz's name. Ex. A, CR Depo. p. 62:22-63:11; Ex. B, Ramirez Depo. pp. 118:3-11. Cruz was not the only HHA that VIP assigned to the Iziques. Ex. G, Declaration of Ana Maria Rowland at ¶ 9; Ex. B, Ramirez Depo. pp.78:16-84:10; Ex. C, Cruz Depo. p.51:6-12; Ex. E, Cesar Izique Patient Calendar, p.1.

## Additional Facts

70. Ramirez coordinates patient care with insurance companies for clients on Medicare, which results in the creation of a "patient calendar". Ex. B, Ramirez Depo. pp.74:1-78:15.

71. The patient calendar details the shifts that VIP assigns to its caregivers and explains the services they will provide to the clients. Ex. E, Cesar Izique Patient Calendar, p.1.

72. Ramirez ascertains the days and hours that VIP clients need care, and then assigns work shifts to different caregivers on the client's schedule. Ex. B, Ramirez Depo. pp.77:17-78:15; Ex. C, Valdivieso Depo. p.24:14-20; p.27:2-11.

73. VIP assigned Plaintiff Valdivieso and another caregiver named Jenny (Yenny) Landa Peña to provide care to client Cesar Izique in consecutive shifts on Friday, July 1, 2022. Ex. B, Ramirez Depo. pp.78:16-84:10; Ex. C, Valdivieso Depo. p.51:6-12; Ex. E, Cesar Izique Patient Calendar, p.1.

74. VIP provides timesheets to caregivers that have to be turned in to the office on a weekly basis. Ex. A, CR Depo. pp. 39:13-42:23; Ex. B, Ramirez Depo. pp.51:16-52:11.

75. The timesheets have a list of 39 activities the caregivers can check off to show which ones they performed with the clients. Ex. D, Plaintiff's timesheets.

76. VIP used the timesheets submitted by the caregivers to process their payments. Ex. A, CR Depo. p. 42:10-23.

77. VIP explains its expectations of the caregivers at the time of hiring. Ex. B, Ramirez Depo. pp.17:15-19:10.

78. VIP does not allow caregivers to send or take anyone with them to provide services in a client's home; not even another VIP caregiver. ICA. [ECF No. 37 at p.28]; Ex. B, Ramirez Depo. pp.116:18-117:14.
79. The patient calendar details the shifts that VIP assigns to its caregivers and explains the services they will provide to the clients. Ex. E, Cesar Izique Patient Calendar, p.1.
80. Caregivers cannot arrange to work with VIP's clients during the term of the contract and for at least one year thereafter. ICA. ECF No. 37 at p.29.
81. It is a violation of VIP's contract for caregivers to work for the client without the agency being aware. Ex. A, CR Depo. pp. 58:6-59:5; Ex. B, Ramirez Depo. pp.89:23-93:15.
82. Cruz received her HHA certification at a school certified by Florida. Ex. C, Cruz Depo. p.19:11-23.
83. Non-medical services are provided by HHAs and CNAs. Ex. A, CR Depo. p.14:6-13.
84. Non-medical services are personal care services such as bathing, dressing, transportation, meal preparation, homemaking, household duties, and companionship. Ex. A, CR Depo. pp.13:24-14:5.
85. HHAs and CNAs also provide assistance with ambulation so the client can move within or outside the residence; assistance with shaving and with oral, hair, skin, and nail care; assistance with toileting; cleaning the bathroom, straightening the sleeping and living areas, and washing dishes or laundry. ICA [ECF No. 37 at pp. 42-43]; Ex. C, Cruz Depo. pp.21:13-22:1.
86. Companionship services require HHAs to keep clients mentally engaged to alleviate loneliness and depression through various activities ranging from conversation to playing card games. Ex. A, CR Depo. p. 15:11-22.
87. Medical services are "skilled", in comparison to non-medical services that do not require a skilled person. Ex. A, CR Depo. p.13:1-5; p.15:3-6; pp.24:9-25:3.
88. Cruz began working for VIP on May 3, 2021, and stopped working for them in July 2022. Ex. C, Cruz Depo. p.28:17-22.
89. Cruz worked as an HHA to at least four patients simultaneously and consecutively until her employment with VIP ended. Ex. C, Cruz Depo. pp.33:18-34:20.
90. The "Suspension and Termination" clause of the independent contractor agreement contemplates employment with caregivers "for successive one (1) year terms, unless sooner

terminated …".  ICA  [ECF No. 37 at p. 35].

91. Cruz stopped working for VIP because they did noy pay her. Ex. C, Cruz Depo. pp.28:23-29:6.

92. VIP provides home care. Ex. A, CR Depo. p. 27:10-13.

93. The majority of VIP's clients are elderly people from 80 to 90 years old. Ex. A, CR Depo. p. 54:18-21.

94. VIP refers to its nurses, home health aides (HHAs), and certified nursing assistants (CNAs) as "caregivers." Ex. B, Ramirez Depo. p.21:3-25.

95. Ana Marie Rowland is the daughter of Cesar and Yoland Izique. Ex. G Declaration of Ana Maria Rowland at ¶ 4.

96. Rowland had power of attorney in matters related to her parents' caregiving services. Ex. G, Declaration of Ana Maria Rowland at ¶ 5.

97. Rowland had the following problems: VIP could not always provide coverage for the Iziques; VIP did not always send Spanish speaking care-givers, and Ramirez ignored her phone calls. Ex. G, Declaration of Ana Maria Rowland at ¶¶ 10-13.

98. Clients can terminate their contract with VIP at any time. Ex. A, CR Depo. p.112:4-6.

99. McKinnon heard from other people that Cruz told clients to complaint about VIP. Ex. A, CR Depo. pp.112:24 -113:4.

100. McKinnon heard from other HHAs that Cruz told the Iziques to leave VIP. Ex. A, CR Depo. pp.113:15-115:15.

101. The Iziques allegedly told Ramirez they were sorry for Cruz. Ex. B, Ramirez Depo. pp.98:23-99:5.

102. The Iziques allegedly told Ramirez they paid Cruz because she was threatening them. Ex. B, Ramirez Depo. pp.99:6-17.

103. McKinnon "believes" the Iziques left VIP because Cruz encouraged them to do so but cannot say for sure. Ex. A, CR Depo. p.112:7-23.

104. Cruz did not suggest that Melendez leave VIP. [ECF No. 58-1 at 2]; Ex. H, Declaration of Cruz Figuera at ¶ 11.

105. Cruz did not take Melendez to another agency. Ex. A, CR Depo. pp.110:23-11:3.

106. Melendez did not switch to Senior Nannies. Ex. C, Cruz Depo. p.41:13-21.

107. Cruz's alleged suggestion did not cause Melendez to leave VIP. [ECF No. 58-1 at 118].

108. VIP has offices in West Palm Beach, Port St. Lucie, Pahokee, Miami, and Broward Counties; each office has an administrator. Ex. A, CR Depo. pp.11:23-12:11.
109. The Palm Beach office employs staff in the following five (5) positions: receptionist, office manager, alternate administrator, care coordinator, and nurse. Ex. A, CR Depo. p.23:5-17.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically on August 2, 2023 with the Clerk of Court using the CM/ECF filing system.

*s/*Toussaint Cummings, Esq.
Toussaint Cummings, Esq. (119877)
toussaint@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue
Suite 770
Coral Gables, FL 33146
Tel:    305.230.4884
*Counsel for Plaintiff*
