```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      FORT LAUDERDALE DIVISION
                       CASE NO. 22-cv-61553-WPD
 3

 4   CRUZ VALDIVIESO FIGUERA,              Fort Lauderdale, Florida

 5             PLAINTIFF,                  October 30, 2023

 6        vs.                             9:02 a.m. - 4:53 p.m.

 7   ALL VIP CARE, INC., AND LIZ VELAZQUEZ Volume 1
     MCKINNON,
 8
               DEFENDANT.                  Pages 1 to 266
 9   _____

10                            JURY TRIAL
              BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
11                     UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   FOR THE PLAINTIFF:     FAIRLAW FIRM
                            BRIAN H. POLLOCK, ESQ.
14                          135 San Lorenzo Avenue
                            Suite 770
15                          Coral Gables, Florida 33146

16   FOR THE DEFENDANT:     RANDY M. GOLDBERG & ASSOCIATES, PLLC
                            RANDY M. GOLDBERG, ESQ.
17                          151 NW 1st Ave
                            Delray Beach, Florida 33444
18
     STENOGRAPHICALLY REPORTED BY:
19
                            LAURA E. MELTON, RMR, CRR, FPR
20                          Official Court Reporter
                            United States District Court
21                          400 North Miami Avenue
                            Miami, Florida 33128
22

23

24

25
```

```
 1                       E X A M I N A T I O N S
 2
      Witness                                                 Page
 3
              OPENING STATEMENT BY MR. POLLOCK                  98
 4            OPENING STATEMENT BY MR. GOLDBERG                110

 5

 6    ANNA MARIA ROWLAND
              DIRECT EXAMINATION BY MR. POLLOCK               117
 7            CROSS-EXAMINATION BY MR. GOLDBERG               137
              REDIRECT EXAMINATION BY MR. POLLOCK             149
 8    LIZ MCKINNON
              DIRECT EXAMINATION BY MR. POLLOCK               153
 9

10                       E X H I B I T S

11                       JOINT EXHIBITS

12    Exhibit                                                 Page
      1-14                                                    126
13

14
                         PLAINTIFF EXHIBITS
15
      4                                                       174
16

17

18                       DEFENDANT EXHIBITS

19    Exhibit                                                 Page

20
                              NONE
21

22

23

24

25
```

1          (Call to the Order of the Court.)

2              THE COURT:  Figuera vs. All VIP Care, Inc.

3              Counsel, announce their appearances for the record.

4              MR. POLLOCK:  Good morning, Your Honor.  Brian Pollock

5    and Luna Alvey for the plaintiff, Ms. Valdivieso, who is

6    walking over from parking.  So she should be here momentarily.

7              Thank you, Your Honor.

8              MR. GOLDBERG:  Good morning, Your Honor.

9    Randy Goldberg on behalf of All VIP Care and Ms. McKinnon, who

10   is the young lady sitting -- seated to my right, Your Honor.

11             THE COURT:  All right.  Both sides ready for trial?

12             MR. POLLOCK:  Yes, Your Honor.

13             THE COURT:  And how long should I tell the jury to

14   expect this case is going to last?

15             MR. POLLOCK:  I mean, I think, Your Honor, that -- I'm

16   hopeful that we can be done tomorrow.  Maybe either give it to

17   the jury tomorrow, or possibly Wednesday morning.  I'm going to

18   probably have my client testify tomorrow, just because we have

19   an interpreter, and so back into -- back into that.

20             And then I've got a witness coming down from Jupiter,

21   so she will probably testify at the end of the day.  So -- and

22   then I probably have one more witness and then I'm done.

23             THE COURT:  So what do you think, Mr. Pollock, tell the

24   jury two or three days?

25             MR. POLLOCK:  Yes.

1          MR. GOLDBERG:  I concur, Your Honor.

2          THE COURT:  Mr. Goldberg agrees.  Okay.

3          I was looking over the proposed jury instructions.  I

4   don't allow jurors to ask questions, so I won't be giving that

5   instruction.

6          Anything else before we bring in the jury?  I think

7   we've got 19 jurors.

8          MR. POLLOCK:  Okay.  You know, I filed a motion in

9   limine with respect to the nurse registry issue.  I don't want

10   to interrupt Mr. Goldberg's opening, so can I just have a

11   standing on that, Your Honor?  That way I don't have to object

12   when he mentions any kind of nurse -- if an issue of nurse

13   registry comes up, I don't want to have to interrupt him.

14          THE COURT:  Mr. Goldberg, what's your position on that?

15          MR. GOLDBERG:  Your Honor, the whole concept in

16   reference to the nurse registry is the heart and soul of this

17   case.  My client operates a business from the onset in

18   accordance with Florida state law, and she is a licensed nurse

19   registry.  To bar that from coming before the Court is -- is

20   catastrophic to my client's position and her defenses in this

21   case.

22          THE COURT:  I may very -- I may very well

23   catastrophically rule against you in this case, so -- but I

24   didn't grant the motion in limine, so you can talk about it in

25   your opening statement.

1          And the question that Mr. Pollock has is:  Does he have

2     to stand up and object and interrupt your opening statement, or

3     can he have a standing objection?

4          So that's what I'm asking your position on.  Do you

5     want him to object to preserve the issue of -- for appeal, or

6     should I rule against him and allow that defense in?

7          MR. GOLDBERG:  Your Honor, we would respectfully take

8     the position that the whole concept of nurse registry is part

9     of our opening and is part of our case -- our defense and our

10    case in chief against Ms. Figuera in the counterclaims.

11         THE COURT:  All right.  So I guess I'm not being clear

12    in my question to you, Mr. Goldberg.

13         What Mr. Pollock is saying is, can he have a standing

14    objection, which means that you can go ahead and talk about

15    that in your opening statement, but he's not going to object to

16    it in front of the jury.  But it's going to be as if he had

17    objected to it in front of the jury so that you can't argue on

18    appeal that he waived any objection to it by not objecting

19    during your opening statement.

20         Or do you want to object to his having a standing

21    objection to it?

22         MR. GOLDBERG:  Your Honor, I misunderstood what the

23    Court's question was.  We will agree to the standing objection

24    so it's preserved for the purposes of plaintiff's appeal, if

25    necessary.

1          THE COURT:  Okay.

2          MR. GOLDBERG:  Thank you, Your Honor.

3          MR. POLLOCK:  Thank you, Your Honor.

4          THE COURT:  Anything further before we bring in the

5   jury?

6          MR. POLLOCK:  Your Honor --

7          MR. GOLDBERG:  Go ahead.  Mr. Pollock.

8          MR. POLLOCK:  I interrupted you.  Go ahead.

9          MR. GOLDBERG:  Your Honor, we had a couple of things we

10  wanted to address before the Court, but I believe this can wait

11  until after the jury selection is completed.  It has to do with

12  a Rule 35 ore tenus motion and -- I'm sorry -- Rule 32 ore

13  tenus motion about a deposition for -- of a witness.  And we

14  can reserve on that until later.

15         We also filed an amended proposed jury verdict form

16  that Mr. Pollock has objected to.  And, again, that's something

17  else to be addressed probably later --

18         THE COURT:  We will do that during the charge

19  conference.

20         MR. GOLDBERG:  Sir?

21         THE COURT:  We will decide what the verdict form is

22  going to be during the charge conference, near or at the end of

23  the case.

24         MR. GOLDBERG:  Yes, Your Honor.

25         MR. POLLOCK:  Judge, just from a -- I guess, from a

1    case management standpoint, I will probably put the individual

2    defendant on first.  So do you want us to just go through, or

3    will the defendants be recalling her, I guess, from a

4    management standpoint?

5         THE COURT:  It's up to you guys.  If you want to agree

6    that -- I mean, if Mr. Goldberg wants to agree to do his direct

7    and cross during your side of the case, fine.  If he wants to,

8    you know, reserve that and recall Ms. Figuera --

9         MR. GOLDBERG:  McKinnon, Your Honor.

10        THE COURT:  -- Ms. McKinnon on his side of the case,

11   then he can do that too.

12        MR. GOLDBERG:  Your Honor, if the plaintiff has no

13   objection, I have no problem doing the cross-examination and

14   rolling that into my direct, as long as there is no objection

15   to that issue by Mr. Pollock.

16        THE COURT:  Okay.  Well, seems like there isn't.

17        MR. POLLOCK:  Yeah, I think that makes sense.  And the

18   same thing, you know, when I get to Ms. Ramirez, I think,

19   you know, it's fine.  That way we don't have -- the jury starts

20   rolling their eyes, or, "Why is somebody coming back up again"

21   to kind of retread, possibly, some old grounds?

22        So that makes sense to me.

23        MR. GOLDBERG:  For judicial economy, Your Honor, I

24   think it's the wise play in this case.

25        THE COURT:  Okay.

 1          MR. POLLOCK:  And we're going to seat six -- we're

 2    going to seat, what, six and two, or six and three?

 3          THE COURT:  We're going to seat eight.

 4          MR. POLLOCK:  Okay.  So we're going to seat eight.

 5          THE COURT:  In other words, there aren't any

 6    alternates.  All eight will deliberate.

 7          MR. POLLOCK:  That was going to be my follow-up

 8    question, sir.

 9          THE COURT:  We'll have five in the first row, seven in

10    the second row, seven in the third row, all going right to

11    left.

12          Anything further before we bring in the jury?

13          MR. GOLDBERG:  Not from the defense, Your Honor.

14          MR. POLLOCK:  No, Your Honor.  I just may have to redo

15    my chart.  I thought we were going to do six -- I thought we

16    were going to do six, seven, and seven, but I guess we don't

17    have the numbers to do that because I guess we've got 19.

18          THE COURT:  Right.  We were thinking we were going to

19    have 20.

20          MR. POLLOCK:  Yeah.

21          THE COURT:  If we had 20, we would have done --

22          MR. POLLOCK:  Can we just keep six in the front, Judge,

23    just because I have a chart written up?  I don't know if that's

24    going to make a difference for anything else.

25          THE COURT:  If I hadn't done my chart with five in the

1    front, I would say yes.

2          MR. POLLOCK:  Fair enough.

3          THE COURT:  Let's go bring in the jury.

4          MR. POLLOCK:  Fair enough, Judge.

5          I just want to get my client in here.

6      (The jury entered the courtroom at 9:09 a.m.)

7          THE COURT:  Mr. Osborn, you are going to be in the

8    front row, closest to me.  This way, in the first seat in the

9    front row, closest to me.  And then we will have Ms. Fote,

10   Mr. Peters, Ms. Scott, and Ms. Perez-Martinez in the front row.

11         And then we are going to skip some seats, and in the

12   second row, closest to me, will be Ms. Floyd.  Be careful going

13   into the second row; sometimes people trip in the second row.

14         And then we will have Mr. Baig, Ms. Albano, Ms. Rogger,

15   Ms. Snyder, Ms. Mallard.  And the last person in the second row

16   is Ms. Benitez.

17         In the third row, closest to me, is Ms. Estroff.  And

18   be careful when you go into the third row; sometimes people

19   trip going into the third row.

20         And if we could swear the panel.

21         COURTROOM DEPUTY:  Please stand and raise your right

22   hand.

23         You and each of you do solemnly swear or affirm that

24   you will well and truthfully answer all questions propounded to

25   you, touching upon your qualifications to serve as a juror in

1    this case before the court?

2           Do you all take this solemn oath?

3           THE JURY:  Yes.

4           COURTROOM DEPUTY:  They have been sworn, Your Honor.

5           THE COURT:  Okay.  Please be seated.

6           Good morning, everybody.  I'm Bill Dimitrouleas.

7    Welcome to the United States District Court for the Southern

8    District of Florida.  We are here today to try a civil case.

9    And based on the little that I know about the case, we're going

10   to be able to finish the case this week without any trouble;

11   probably take two or three, maybe four days.  You never know

12   how long a jury is going to deliberate, so you never know how

13   long a case is going to take.

14          I think this is everybody's second week of jury

15   service; is that correct?

16          JURORS:  (Nod heads.)

17          THE COURT:  Did anybody get called in last week for

18   service?  If so, please raise your hand.  I don't see any

19   hands.  So clearly, this is everybody's first opportunity to

20   serve as a juror during this two-week period.

21          Let me ask you a few questions about your

22   qualifications to serve as jurors.  Is there anyone here who is

23   not a United States citizen?  If you're not a United States

24   citizen, please raise your hand.

25          Don't see any hands.

 1               Anybody here that's under the age of 18?  If so, please

 2     raise your hand.

 3               Don't see any hands.

 4               Is there anybody here who is not a registered voter?

 5     If you're not a registered voter, please raise your hand.

 6               Don't see any hands.

 7               Is there anybody here who has been convicted of a

 8     felony and not restored to your civil rights?  If so, please

 9     raise your hand.

10               Don't see any hands.

11               Is there anybody here that has any pending criminal

12     cases against them?  If so, please raise your hand.

13               Don't see any hands.

14               So looks to me like everybody here is qualified to sit

15     as a juror in this particular case.

16               Let's talk a little bit about scheduling.  We should be

17     able to select a jury this morning without any trouble and get

18     into the trial of -- we will hear opening statements, maybe

19     even get to hear some testimony this morning.  We will take a

20     break for lunch, come back after lunch, and work until about

21     5:00.

22               The only time we ever work past 5:00 is if we have a

23     witness on the stand who's flown in from out of state, and by

24     finishing their testimony, they could fly back home that night.

25     And the other instance where we would work past 5:00 is if the

 1   jury was deliberating and all eight jurors wants to continue

 2   their deliberations, then we would continue to deliberate as

 3   long as all eight jurors wanted to continue their

 4   deliberations.  If one or more of the jurors gets tired or

 5   hungry and wants to go home, then we would recess the

 6   deliberations until the next morning.

 7           So those are the only two situations, typically, where

 8   we would work past 5:00.

 9           And again, we will come back tomorrow around 9:00,

10   resume the trial, and continue on that schedule until we finish

11   the trial.  So that kind of gives you an idea of what to expect

12   scheduling-wise, should you be selected as a juror in this

13   case.

14           Now, I said eight jurors.  We only have to have six

15   jurors to decide a civil case in federal court.

16           Before I was lucky enough to get this job, I was a

17   state court judge.  And in state court, at least back then,

18   25 years ago -- and it may probably be the same now -- is

19   you -- you would pick six jurors and you would pick one or two

20   alternates in case somebody got sick during the trial.  And

21   they typically -- particularly in a short civil trial like

22   this, nobody gets sick.

23           So at the end of the trial, I would excuse the

24   alternates and the six jurors would retire to consider their

25   verdict.  And usually, the alternates had paid attention, got

1    interested in the case, and I thought they were disappointed

2    that they weren't able to decide the case.

3           Well, federal court is a little different.  In federal

4    court, you can have more than six jurors deliberate.  So

5    however many jurors are left at the end of the case, usually

6    all eight, will deliberate the case.  So there aren't going to

7    be any alternates in the case.

8           Let me take a few moments to introduce to you some of

9    the court personnel that we're going to be working with during

10   the trial.  You have met Jermaine Creary, who is the court

11   clerk, and he is being assisted today by Mickey Casada.  And

12   they're in charge of courtroom evidence and how to, you know,

13   give evidence and instructions to the jury.

14          We have a court reporter here today, Laura Melton.  And

15   Laura is taking down everything that I'm saying and will take

16   down everything that is said during the course of this trial in

17   this courtroom, including your answers to the questions during

18   jury selection.  So if you would, please speak up nice and

19   loudly and clearly so that Ms. Melton can get your answers

20   down.

21          We have a court security office with us today,

22   Terry Grant.  He's in charge of courtroom security and decorum.

23   If you have any problems of a personal nature, please address

24   it to Terry's attention and he will bring it to my attention,

25   if it's appropriate.

1          Now, this case is Cruz Valdivieso Figuera vs. All VIP

2    Care, Incorporated and Liz Velázquez McKinnon.  And as I

3    mentioned, it is a civil case.

4          And representing the plaintiff in this case is Brian

5    Pollock.  And, Mr. Pollock, if you could introduce your client.

6          MR. POLLOCK:  Good morning, Your Honor.  May it please

7    the Court.  Brian Pollock.

8          To my left is Cruz Valdivieso.  We will also hear her

9    referred to as "Daisy."  To Daisy's left is my associate

10   attorney, Luna Alvey, and Luna will be assisting me with the

11   trial today.

12         The other person in the courtroom is her husband,

13   David Flores, but he is not going to be testifying.

14         THE COURT:  All right.  The defense counsel is Randy

15   Goldberg.

16         Mr. Goldberg, if you could introduce your client.

17         MR. GOLDBERG:  Thank you, Your Honor.

18         Good morning, everybody.  Randy Goldberg, and I'm

19   representing All VIP Care and its owner, Liz McKinnon, who is

20   the young lady to my right.

21         THE COURT:  Does anybody know any of the parties, the

22   lawyers, or any of the court personnel?  If so, please raise

23   your hand.

24         Don't see any hands.

25         In a moment, I'm going to ask the attorneys to read a

1    list of possible witnesses who might testify.  If you happen to

2    know any of those witnesses, please let us know so we can check

3    into it to see if that would affect your ability to be a fair

4    and impartial juror.

5         The mere fact that you might know a witness would not

6    automatically disqualify you from serving as a juror.  If it

7    did, we couldn't pick jurors in small communities all over the

8    United States.  But usually, when we pick a jury out of all the

9    registered voters in Broward County, we're able to find eight

10   people that don't know anybody involved in the case at all.

11        And along those lines, does anybody know any of the

12   fellow jurors in the case?  If show, please raise your hands.

13        Don't see any hands.  Sometimes I get two hands that go

14   up.  But not often because, again, we're picking juries out of

15   all the registered voters.  I had one jury years ago where I

16   had a husband and wife serve on the same jury, so it can

17   happen.

18        If it turns out that you don't recognize any of the

19   witnesses' names, but when a witness comes in you say, "Gee, I

20   do know that person, just raise your hand and let us know and

21   we will check into whether that would affect your ability to

22   continue to be a fair and impartial juror in this case.

23        Mr. Pollock, if you could read a list of possible

24   witnesses who might testify.

25        MR. POLLOCK:  Thank you, Your Honor.

1          For the plaintiff's side of the case, it would be

2    Ms. Valdivieso, Ms. McKinnon, Diana Ramirez, and Anna Marie

3    Rowland.  Those would be the plaintiff's witnesses.  I think

4    there may be one more from the defense.

5          THE COURT:  Mr. Goldberg, any additional witnesses?

6          MR. GOLDBERG:  The only additional witness, Your Honor,

7    will be Angela Melendez.

8          THE COURT:  Any of those names ring a bell with

9    anybody?  If so, please raise your hand.

10          Don't see any hands.

11          Okay.  So what I'm going to do at this point is I'm

12   going to give you some background information about picking a

13   jury in general, and specifically about picking a jury in a

14   civil case.  Then I'm going to ask you to give us some

15   background information about yourselves in the form of your

16   answers to a series of questions that I will ask everybody.

17          And I will start with Mr. Osborn in a minute, and we'll

18   give you a handheld microphone.  And we're just going to pass

19   the microphone around until everybody's had a chance to answer

20   all of the questions.  And if you would, stand when you use the

21   microphone.  For some reason, it seems like we can hear you

22   better if you're standing with the microphone.

23          After we get that background information from you, I'm

24   going to turn it over to the attorneys, give them a brief

25   opportunity to ask you some questions.  And when all of the

1    questioning is done, the lawyers and I will get together and we

2    will select the eight jurors who will serve on this particular

3    case.

4         Now, this part of the case is known as voir dire

5    examination.  And voir dire examination is for the purpose of

6    determining if your decision in this case would in any way be

7    influenced by opinions which you now hold, or by some personal

8    experience or special knowledge which you may have concerning

9    the subject matter to be tried.

10        The object of voir dire examination is to obtain eight

11   persons who will impartially try the issues of this case, based

12   upon the evidence presented in the courtroom without being

13   influenced by any other factor.  Now, please understand that

14   this questioning is not for the purpose of prying into your

15   affairs for personal reasons, but is only for the purpose of

16   obtaining a fair and impartial jury.

17        Now, as I mentioned, when all the questioning is done,

18   the lawyers and I will get together and select the jury.  And

19   the way that woks is kind of a process of elimination because

20   the attorneys have an opportunity to challenge or excuse

21   prospective jurors.  And during that challenging process, each

22   side has a certain number of peremptory challenges.  And by

23   that, I mean that each side can challenge and ask that you be

24   excused, and they don't even have to give a reason.  But they

25   only have a limited number of those peremptory challenges.

1          Additionally, each side has an unlimited number of

2     challenges for cause.  And by that, I mean that each side can

3     challenge you and ask that you be excused, but in that

4     situation, they have to give a reason and I have to agree with

5     that reason.  Now, if you're excused by either side for either

6     reason, please do not feel that your honesty or integrity is

7     being questioned, because it is not.

8          Again, this case is Cruz Valdivieso Figuera vs. All VIP

9     Care, Inc. and Liz Velázquez McKinnon.  And I'm going to be

10    hearing this case for the first time, and based on the little

11    that I know about this case, Ms. Valdivieso, the plaintiff, is

12    alleging that she was denied overtime pay, correct pay, from

13    her employers, All VIP Care, Inc. and Liz Velázquez McKinnon.

14         And the defendants have filed a counterclaim saying

15    that Ms. Valdivieso Figuera broke her contract with them and

16    owes them money.  And you're going to be deciding those issues

17    in this particular case.

18         The Plaintiff's case is based on a federal law, the

19    Fair Labor Standard Act case, which has to do with overtime pay

20    in general, and the counterclaim has to do with state law, a

21    breach of contract, and other state law claims that will be

22    explained to you at the end of the case.

23         Now, you've heard a little bit about the -- what the

24    case is all about.  Does anybody know anything about this case,

25    either through your own personal knowledge, rumor, or by

1 discussion with anyone else?  If you know anything about the

2 case, please raise your hand.

3   Don't see any hands.

4   Has anybody read or heard anything about the case in

5 any of the news media?  If so, please raise your hand.

6   Don't see any hands.

7   Does anybody have a state of mind with reference to the

8 allegations in this case which would in any way prevent you

9 from acting with impartiality?  If so, please raise your hand.

10   Don't see any hands.

11   Does anybody have any physical defects, hearing, sight

12 or otherwise, which would render you incapable of performing

13 your duties as a juror in this case?  If so, please raise your

14 hand.

15   Don't see any hands.

16   Does anybody have any bias or prejudice, either for or

17 against the plaintiff or for or against the defendants?  If so,

18 please raise your hands.

19   Don't see any hands.

20   If you're selected as a juror in this case, you will

21 render a fair and impartial verdict based upon the evidence

22 presented in the courtroom and the laws that pertain to this

23 particular case as instructed by the court.  If you can't do

24 that, please raise your hand.

25   Don't see any hands.

1          And does anybody have any other reason why you couldn't

2   give this case your undivided attention or render a fair and

3   impartial verdict?  If so, please raise your hand.

4          Don't see any hands.

5          And by that, I mean a sick child at home, a real estate

6   closing that's coming up within the next few days, or prepaid

7   tickets where you're flying out of town this week.

8          Okay.  I have a hand there from Ms. Estroff.  Tell me

9   what your situation is, ma'am.

10          A JUROR:  I'm moving this weekend, Friday, Saturday,

11   Sunday, Monday, as well as being out of town.  So I figured I'd

12   mention that, just in case.

13          THE COURT:  All right.  So you're available through

14   Thursday?

15          A JUROR:  Yes.

16          THE COURT:  All right.  And, again, I think the case

17   should be over with by then, but we've got eight jurors, so if

18   you had to leave on Friday, we would just continue with seven.

19   Okay?

20          Anybody else has something going on this week that

21   would prevent them from paying attention and being a good

22   juror?  If so, please raise your hand.

23          Seems -- looks like you got half a hand up there,

24   Ms. Scott.

25          A JUROR:  It's most likely not a big deal, but I am --

```
1              THE COURT:  I got to --

2              A PROSPECTIVE JUROR:  It's most likely not a major

3    deal, but I'm -- I lost my father a couple weeks ago, so I'm

4    still -- my mother and I are still working through getting his

5    affairs in order.

6              THE COURT:  All right.

7              A JUROR:  I apologize.  I don't know if that will --

8              THE COURT:  Well, do you think that you could pay

9    attention to the testimony here and be a good juror, or do you

10   think your mind is going to be someplace else?

11             A JUROR:  I should be fine, but again, it's --

12             THE COURT:  Well, the lawyers can take that into

13   account and decide whether they want to select you, Ms. Scott.

14   I appreciate you mentioning that, and I'm sorry for your loss.

15             Anybody else got something going on that we should know

16   about their ability to be a fair juror?  If so, please raise

17   your hand.

18             Don't see any hands.

19             Okay.  All right.  So I am going to go ahead and start

20   with Mr. Osborn.  If you could stand up.

21             And, Mr. Osborn, whereabouts in Broward County do you

22   live?

23             A PROSPECTIVE JUROR:  Davie.

24             THE COURT:  And about how long have you lived in South

25   Florida?
```

1                A PROSPECTIVE JUROR:  My entire life.

2                THE COURT:  What type of work do you do?

3                A PROSPECTIVE JUROR:  Recently retired public school

4      principal, and right now I'm a consultant for educational

5      companies with new principals.

6                THE COURT:  What school did you preside over?

7                A PROSPECTIVE JUROR:  It was in Miami-Dade County

8      Public Schools.  There was a few of them.  So from Greynolds

9      Park Elementary.  Then I opened a K-8 center, David Lawrence

10     K-8 Center, which is on the grounds of -- adjacent to FIU

11     North.  I was there for about 15 years.

12               Then I moved over to John F. Kennedy Middle School,

13     which is a biomedical magnet school.  And finally, over to

14     Sable Palm Elementary in North Miami Beach.

15               So basically, all of my experience has been in the

16     north part of the county.

17               THE COURT:  How about your marital status?

18               A PROSPECTIVE JUROR:  Married.

19               THE COURT:  And what does your spouse do?

20               A PROSPECTIVE JUROR:  She's a claims supervisor for

21     Florida Intracoastal Underwriters, and she deals with a lot of,

22     you know, defense -- you know, insurance defense or -- depends

23     on what the -- the actual client is.

24               THE COURT:  Do you think her job would affect your

25     ability to be fair in this case?

1          A PROSPECTIVE JUROR:  I mean, you know, she does share

2     certain things, but I could be fair.

3          THE COURT:  How about children?  Do you have any

4     children?

5          A PROSPECTIVE JUROR:  I do.  I have one son who is an

6     attorney, and he works here in Fort Lauderdale.  He is with the

7     firm Rosenberg Cummings.  And my other son is a risk consultant

8     for Chubb Insurance, and he goes around and assesses the risk

9     in high-end homes from Miami to Palm Beach for Chubb.

10          THE COURT:  Your son that's an attorney, what type of

11     law does he practice?

12          A PROSPECTIVE JUROR:  He does civil.  He does criminal.

13     He does real estate.  Family law.  So he just finished his

14     first year, so he kind of does whatever they tell him to do in

15     the firm.

16          THE COURT:  Have you ever been involved in a lawsuit,

17     sued somebody, or been sued by somebody?

18          A PROSPECTIVE JUROR:  No.  But I have been a witness to

19     a few cases.

20          THE COURT:  Tell me about your witness experience.

21          A PROSPECTIVE JUROR:  So when the school system was

22     sued, I was called in to -- for the defense of the school board

23     for my knowledge of the case.  I have been called as a witness

24     for issues dealing with a parent who felt their child was

25     bullied.  Things like that.  I have been an expert witness for

1    issues concerning due process for children, depending on the

2    situation.

3         So that's pretty much it.

4         THE COURT:  Have you ever been involved in disputes

5    regarding wages, overtime wages or any other wages, either

6    wages that were owed to you or that -- wages that were owed to

7    somebody else?

8         A PROSPECTIVE JUROR:  No.  I was -- I would like to

9    have been because, as a school principal, you're on call

10   24 hours.  So a lot of times during hurricane season, we had to

11   take over -- we were shelter managers.  But we never got paid

12   for that overtime except for one time, which was months later.

13   So -- but it's part of the job.  That's what we were told.

14        THE COURT:  Anything about that experience that would

15   affect your ability to be fair in this case?

16        A PROSPECTIVE JUROR:  No.

17        THE COURT:  And do you have any hobbies?

18        A PROSPECTIVE JUROR:  Yeah.  I do a lot of exercise.  I

19   read.  And I guess that's pretty much it.  Just kind of try to

20   stay healthy and be there for the family.

21        THE COURT:  Thank you, sir.  If you will pass the

22   microphone over there to -- I can't read my writing --

23   Ms. Fote.

24        A PROSPECTIVE JUROR:  "Fote."

25        THE COURT:  "Fote."

1              And whereabouts in Broward County do you live?

2              A PROSPECTIVE JUROR:  Weston.

3              THE COURT:  And how long have you lived in South

4    Florida?

5              A PROSPECTIVE JUROR:  My whole life.

6              THE COURT:  What type of work do you do?

7              A PROSPECTIVE JUROR:  Retired.

8              THE COURT:  And what did you used to do?

9              A PROSPECTIVE JUROR:  Math teacher.

10             THE COURT:  How about your marital status?

11             A PROSPECTIVE JUROR:  Married.

12             THE COURT:  What does your spouse do?

13             A PROSPECTIVE JUROR:  He has a school uniform business

14   in North Miami.

15             THE COURT:  Do you have any children?

16             A PROSPECTIVE JUROR:  Two.

17             THE COURT:  Old enough to work?

18             A PROSPECTIVE JUROR:  Both.  Yes.

19             THE COURT:  What do they do?

20             A PROSPECTIVE JUROR:  My daughter is a food scientist,

21   and she's up in Rhode Island.  She's with a startup company.

22   It's like the Wawa of New England called Neon Marketplace.  So

23   she started them from the ground up.  She's been there a couple

24   of years now.

25             And my son is an architect who is now working with my

 1   husband in the business.  Because my husband got very sick, so

 2   he went in to take over for him, and he just stayed.  He lives

 3   in Miami.

 4           THE COURT:  Have you ever served on a jury before?

 5           A PROSPECTIVE JUROR:  Yes.

 6           THE COURT:  In state court or in federal court?

 7           A PROSPECTIVE JUROR:  Broward.

 8           THE COURT:  And was it a civil case or a criminal case?

 9           A PROSPECTIVE JUROR:  I guess it was civil.  I

10   don't -- I don't really know.  It was a --

11           THE COURT:  Did you --

12           A PROSPECTIVE JUROR:  I didn't really serve.  I got

13   called like this.

14           THE COURT:  You got this far?

15           A PROSPECTIVE JUROR:  Yeah, I got this far and then

16   they dismissed me.

17           THE COURT:  Okay.  How about lawsuits (indicating)?

18   Have you ever been involved in a lawsuit, sued somebody, or

19   been sued?

20           A PROSPECTIVE JUROR:  There was one.  I was tutoring a

21   young lady, and her mom -- I was at her house, a tutor at their

22   houses, and her mom got -- there was an explosion.  Her mom was

23   barbecuing and the barbecue exploded on the mom and burned her.

24   And so there was a lawsuit having to do with that, and I was

25   called to witness what I heard or saw that day.

 1          THE COURT:  All right.  Other than being a witness in a

 2   lawsuit, have you ever yourself filed a lawsuit or been sued by

 3   anybody?

 4          A PROSPECTIVE JUROR:  No.

 5          THE COURT:  And how about wage disputes?  Have you ever

 6   had wage or overtime disputes involving your wages or wages

 7   that you were supposed to pay somebody?

 8          A PROSPECTIVE JUROR:  No.

 9          THE COURT:  And do you have any hobbies?

10          A PROSPECTIVE JUROR:  Yeah.  I garden.  Play tennis.

11   Cook.

12          THE COURT:  All right.  I forgot to ask Mr. Osborn a

13   question, if you could pass the microphone back to Mr. Osborn.

14          How about your jury service?  Have you ever served on a

15   jury before?

16          A PROSPECTIVE JUROR:  No, sir.

17          THE COURT:  That was my question.  So let's pass it on

18   over to Mr. Peters.

19          And whereabouts in Broward County do you live, sir?

20          A PROSPECTIVE JUROR:  I live in Hollywood.

21          THE COURT:  How long have you lived in South Florida?

22          A PROSPECTIVE JUROR:  My entire life.

23          THE COURT:  And what type of work do you do?

24          A PROSPECTIVE JUROR:  I am a student, a college

25   student.

```
 1              THE COURT:  And what are you studying?

 2              A PROSPECTIVE JUROR:  I study computer science.

 3              THE COURT:  How about your marital status?

 4              A PROSPECTIVE JUROR:  Not married.

 5              THE COURT:  Ever serve on a jury?

 6              A PROSPECTIVE JUROR:  No.

 7              THE COURT:  Been involved in a lawsuit?

 8              A PROSPECTIVE JUROR:  No.

 9              THE COURT:  How about a wage dispute?

10              A PROSPECTIVE JUROR:  No.

11              THE COURT:  And do you have any hobbies?

12              A PROSPECTIVE JUROR:  I like to play music and

13       skateboard.

14              THE COURT:  Thank you, sir.  If you could pass the

15       microphone over to Ms. Scott.

16              Whereabouts in Broward County do you live?

17              A PROSPECTIVE JUROR:  Plantation.

18              THE COURT:  And how long have you lived in South

19       Florida?

20              A PROSPECTIVE JUROR:  My entire life.

21              THE COURT:  And what type of work do you do?

22              A PROSPECTIVE JUROR:  I work at an insurance

23       underwriter.

24              THE COURT:  How about your marital status?

25              A PROSPECTIVE JUROR:  No, not married.
```

```
1              THE COURT:  Have you ever been a juror before?

2              A PROSPECTIVE JUROR:  I have gotten about this far.

3              THE COURT:  How about involved in a lawsuit?

4              A PROSPECTIVE JUROR:  No.

5              THE COURT:  How about involved in a wage dispute?

6              A PROSPECTIVE JUROR:  No.

7              THE COURT:  Do you have any hobbies?

8              A PROSPECTIVE JUROR:  Cooking, baking, exercising.

9              THE COURT:  Thank you, ma'am.  If you would pass the

10    microphone over there to Ms. Perez-Martinez.

11             Whereabouts in Broward County do you live?

12             A PROSPECTIVE JUROR:  Sorry.  Miramar, Florida.

13             THE COURT:  And how long have you lived in South

14    Florida?

15             A PROSPECTIVE JUROR:  All of my life, except for six

16    years when I lived in the Dominican Republic in high school.

17             THE COURT:  What type of work do you do?

18             A PROSPECTIVE JUROR:  I am an attorney.

19             THE COURT:  And what type of law do you practice?

20             A PROSPECTIVE JUROR:  I practice community association

21    defense.  I work for what we call a captured (phonetic) law

22    firm for CNA, so I basically defend insureds through CNAs,

23    directors, and officers policy.

24             THE COURT:  Anything about that experience that would

25    affect your ability to be fair in this case?
```

1           A PROSPECTIVE JUROR:  No.

2           THE COURT:  How about your marital status?

3           A PROSPECTIVE JUROR:  Married.

4           THE COURT:  And what does your spouse do?

5           A PROSPECTIVE JUROR:  He works in the parts department

6    of Audi of Pembroke Pines.

7           THE COURT:  Any children?

8           A PROSPECTIVE JUROR:  One 13-year-old --

9           THE COURT:  Ever --

10          A PROSPECTIVE JUROR:  -- with 13-year-old angst.

11          THE COURT:  Ever serve on a jury?

12          A PROSPECTIVE JUROR:  No.

13          THE COURT:  Been involved personally in a lawsuit?

14          A PROSPECTIVE JUROR:  No.

15          THE COURT:  How about a wage dispute?

16          A PROSPECTIVE JUROR:  Never.

17          THE COURT:  And do you have any hobbies?

18          A PROSPECTIVE JUROR:  Water coloring and cycling.

19          THE COURT:  Thank you, ma'am.  If you would pass the

20   microphone over there to Ms. Benitez.

21          Whereabouts in Broward County do you live?

22          A PROSPECTIVE JUROR:  Broward County.

23          THE COURT:  I'm sorry?

24          A PROSPECTIVE JUROR:  Broward County.

25          THE COURT:  And what city?

1            A PROSPECTIVE JUROR:  Fort Lauderdale.

2            THE COURT:  And how long have you lived in South

3    Florida?

4            A PROSPECTIVE JUROR:  Nine years.

5            THE COURT:  Where are you from originally?

6            A PROSPECTIVE JUROR:  Colombia.

7            THE COURT:  What type of work do you do?

8            A PROSPECTIVE JUROR:  I run a real estate investment.

9            THE COURT:  How about your marital status?

10           A PROSPECTIVE JUROR:  Married.

11           THE COURT:  What does your spouse do?

12           A PROSPECTIVE JUROR:  He runs a telecommunications

13   company in Brazil.

14           THE COURT:  Any children?

15           A PROSPECTIVE JUROR:  Two.

16           THE COURT:  Old enough to work?

17           A PROSPECTIVE JUROR:  Yes -- one is working, the other

18   one is studying.

19           THE COURT:  The one that's working, what does he or she

20   do?

21           A PROSPECTIVE JUROR:  She works in an investment fund

22   in Manhattan.

23           THE COURT:  Ever serve on a jury before?

24           A PROSPECTIVE JUROR:  They called me for a circuit

25   court, but I was dismissed.

```
 1            THE COURT:  But it involved a -- in a lawsuit?

 2            A PROSPECTIVE JUROR:  No.

 3            THE COURT:  How about a wage dispute?

 4            A PROSPECTIVE JUROR:  No.

 5            THE COURT:  And do you have any hobbies?

 6            A PROSPECTIVE JUROR:  Exercising and cooking.

 7            THE COURT:  Thank you, ma'am.  If we can move over to

 8    Ms. Mallard.

 9            Whereabouts in Broward County do you live?

10            A PROSPECTIVE JUROR:  Coral Springs.

11            THE COURT:  And how long have you lived in South

12    Florida?

13            A PROSPECTIVE JUROR:  18 years.

14            THE COURT:  What type of work do you do?

15            A PROSPECTIVE JUROR:  I manage construction projects.

16            THE COURT:  How about your marital status?

17            A PROSPECTIVE JUROR:  I lost my partner two years ago.

18            THE COURT:  Any children?

19            A PROSPECTIVE JUROR:  Three.

20            THE COURT:  Old enough to work?

21            A PROSPECTIVE JUROR:  Yes.

22            THE COURT:  What do they do?

23            A PROSPECTIVE JUROR:  Two -- technically two.  19 and

24    17.

25            THE COURT:  Are they working outside the home?
```

```
 1                A PROSPECTIVE JUROR:  No.

 2                THE COURT:  Ever serve on a jury?

 3                A PROSPECTIVE JUROR:  No, sir.

 4                THE COURT:  Been involved in a lawsuit?

 5                A PROSPECTIVE JUROR:  No, sir.

 6                THE COURT:  A wage dispute?

 7                A PROSPECTIVE JUROR:  No.

 8                THE COURT:  Any hobbies?

 9                A PROSPECTIVE JUROR:  Yes.  Cooking.  I work a lot, and

10    I like to exercise.

11                THE COURT:  Thank you, ma'am.  We will move over to

12    Ms. Snyder.

13                Whereabouts in Broward County do you live?

14                A PROSPECTIVE JUROR:  I just moved to Pompano Beach.

15                THE COURT:  And how long have you lived in South

16    Florida?

17                A PROSPECTIVE JUROR:  My entire life.

18                THE COURT:  What type of work do you do?

19                A PROSPECTIVE JUROR:  I am a Realtor and a residential

20    appraiser.

21                THE COURT:  Your marital status?

22                A PROSPECTIVE JUROR:  Single.

23                THE COURT:  Ever served on a jury?

24                A PROSPECTIVE JUROR:  No.

25                THE COURT:  Been involved in a lawsuit?
```

1                A PROSPECTIVE JUROR:  No.

2                THE COURT:  How about a wage dispute?

3                A PROSPECTIVE JUROR:  No.

4                THE COURT:  And do you have any hobbies?

5                A PROSPECTIVE JUROR:  I like to cook and do yoga.

6                THE COURT:  Thank you, ma'am.  We will move over to

7    Ms. Rogger.

8                Whereabouts in Broward County do you live?

9                A PROSPECTIVE JUROR:  Fort Lauderdale.

10               THE COURT:  And how long have you lived in South

11   Florida?

12               A PROSPECTIVE JUROR:  50 years.

13               THE COURT:  What type of work do you do?

14               A PROSPECTIVE JUROR:  I work in the Human Resources

15   Department of Bank of America.

16               THE COURT:  Your marital status?

17               A PROSPECTIVE JUROR:  Divorced.

18               THE COURT:  When you were married, what did your spouse

19   do?

20               A PROSPECTIVE JUROR:  Mortgage.

21               THE COURT:  Any children?

22               A PROSPECTIVE JUROR:  One.

23               THE COURT:  Old enough to work?

24               A PROSPECTIVE JUROR:  Yes.

25               THE COURT:  What does he or she do?

1              A PROSPECTIVE JUROR:  He manages a restaurant.

2              THE COURT:  Ever served on a jury?

3              A PROSPECTIVE JUROR:  Yes.

4              THE COURT:  In state or federal court?

5              A PROSPECTIVE JUROR:  State -- county.

6              THE COURT:  Civil or criminal case?

7              A PROSPECTIVE JUROR:  Civil.  Two.

8              THE COURT:  Two different ones?

9              A PROSPECTIVE JUROR:  (Nods head.)

10             THE COURT:  Did you reach verdicts in both of them?

11             A PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Were you the foreperson on either one?

13             A PROSPECTIVE JUROR:  No.

14             THE COURT:  Been involved in a lawsuit?

15             A PROSPECTIVE JUROR:  No.

16             THE COURT:  How about a wage dispute?

17             A PROSPECTIVE JUROR:  No.

18             THE COURT:  Any hobbies?

19             A PROSPECTIVE JUROR:  Reading and researching places to

20      retire.

21             THE COURT:  The fact that you work in HR and this has

22      to do with wages, is that going to affect your ability to be

23      fair?

24             A PROSPECTIVE JUROR:  (Shakes head.)  No, I don't

25      believe so.

```
 1                THE COURT:  Thank you, ma'am.  All right.  We will move
 2     over to Ms. Albano.
 3                Whereabouts in Broward County do you live?
 4                A PROSPECTIVE JUROR:  Davie.
 5                THE COURT:  And how long have you lived in South
 6     Florida?
 7                A PROSPECTIVE JUROR:  About 20 years.
 8                THE COURT:  What type of work do you do?
 9                A PROSPECTIVE JUROR:  I'm in risk management.
10                THE COURT:  How about your marital status?
11                A PROSPECTIVE JUROR:  Married.
12                THE COURT:  What does your spouse do?
13                A PROSPECTIVE JUROR:  He is the director of security at
14     Lehrman Day School.
15                THE COURT:  Any children?
16                A PROSPECTIVE JUROR:  No.
17                THE COURT:  Ever served on a jury?
18                A PROSPECTIVE JUROR:  No.
19                THE COURT:  Been involved in a lawsuit?
20                A PROSPECTIVE JUROR:  No.
21                THE COURT:  Any wage disputes?
22                A PROSPECTIVE JUROR:  With my work, yes.  I used to be
23     in our benefits department.  But it wasn't over time off.  It
24     was about actual true benefit deductions, not PTO.
25                THE COURT:  And anything about that experience that
```

```
 1    would affect your ability to be fair in this case?

 2            A PROSPECTIVE JUROR:  No.

 3            THE COURT:  And do you have any hobbies?

 4            A PROSPECTIVE JUROR:  Photography, reading, and

 5    cooking.

 6            THE COURT:  Thank you, ma'am.

 7            We will move over to Mr. -- is it Baig?

 8            A PROSPECTIVE JUROR:  Yes.

 9            THE COURT:  And whereabouts in Broward County do you

10    live?

11            A PROSPECTIVE JUROR:  Sunrise.

12            THE COURT:  And how long have you lived in South

13    Florida?

14            A PROSPECTIVE JUROR:  All my life.

15            THE COURT:  What type of work do you do?

16            A PROSPECTIVE JUROR:  I'm a student.

17            THE COURT:  And what are you studying?

18            A PROSPECTIVE JUROR:  Nursing.

19            THE STENOGRAPHER:  I'm sorry?

20            THE COURT:  Nursing?

21            A PROSPECTIVE JUROR:  Nursing.

22            THE COURT:  How about your marital status?

23            A PROSPECTIVE JUROR:  Single.

24            THE COURT:  Ever serve on a jury?

25            A PROSPECTIVE JUROR:  Nope.
```

```
 1              THE COURT:  Been involved in a lawsuit?

 2              A PROSPECTIVE JUROR:  Nope.

 3              THE COURT:  Been involved in a wage dispute?

 4              A PROSPECTIVE JUROR:  Nope.

 5              THE COURT:  And do you have any hobbies?

 6              A PROSPECTIVE JUROR:  Exercising.

 7              THE COURT:  I'm sorry?

 8              A PROSPECTIVE JUROR:  Working out.

 9              THE COURT:  Thank you, sir.  We will move to Ms. Floyd.

10              Whereabouts in Broward County do you live?

11              A PROSPECTIVE JUROR:  Tamarac.

12              THE COURT:  And how long have you lived in South

13   Florida?

14              A PROSPECTIVE JUROR:  All my life.

15              THE COURT:  What type of work do you do?

16              A PROSPECTIVE JUROR:  I work for the State of Florida

17   as a correctional probation officer.

18              THE COURT:  How about your marital status?

19              A PROSPECTIVE JUROR:  Single.

20              THE COURT:  Ever served on a jury?

21              A PROSPECTIVE JUROR:  No.

22              THE COURT:  Close friends -- no, that's -- that's my

23   criminal law question.

24              Been involved in a lawsuit?

25              A PROSPECTIVE JUROR:  No.
```

```
1              THE COURT:  Been involved in a wage dispute?

2              A PROSPECTIVE JUROR:  No.

3              THE COURT:  And do you have any hobbies?

4              A PROSPECTIVE JUROR:  Sleeping.

5              THE COURT:  Pass the microphone back there to

6    Ms. Estroff.

7              Whereabouts in Broward County do you live?

8              A PROSPECTIVE JUROR:  I live with my parents in Coconut

9    Creek.

10             THE COURT:  And how long have you lived in South

11   Florida?

12             A PROSPECTIVE JUROR:  My whole life.

13             THE COURT:  What type of work do you do?

14             A PROSPECTIVE JUROR:  I'm a teacher.

15             THE COURT:  How about your marital status?

16             A PROSPECTIVE JUROR:  Single.

17             THE COURT:  Ever serve on a jury?

18             A PROSPECTIVE JUROR:  No.

19             THE COURT:  Been involved in a lawsuit?

20             A PROSPECTIVE JUROR:  No.

21             THE COURT:  Been involved in a wage dispute?

22             A PROSPECTIVE JUROR:  No.

23             THE COURT:  And do you have any hobbies?

24             A PROSPECTIVE JUROR:  I'm a softball coach.

25             THE COURT:  Thank you.  We will move over to
```

1    Ms. Vera-Martinez.

2              Whereabouts in Broward County do you live?

3              A PROSPECTIVE JUROR:  I live in Coral Springs.

4              THE COURT:  How long have you lived in South Florida?

5              A PROSPECTIVE JUROR:  Nine years.

6              THE COURT:  Where are you from originally?

7              A PROSPECTIVE JUROR:  New York.

8              THE COURT:  What type of work do you?

9              A PROSPECTIVE JUROR:  I'm a speech therapist.  I work

10   in a private school, and I see kids privately from my own LLC

11   that I own.

12             THE COURT:  How about your marital status?

13             A PROSPECTIVE JUROR:  I'm married.

14             THE COURT:  And what does your spouse do?

15             A PROSPECTIVE JUROR:  He is a law enforcer.  He works

16   for the Department of Homeland Security.

17             THE COURT:  Any children?

18             A PROSPECTIVE JUROR:  Yes.

19             THE COURT:  How many?

20             A PROSPECTIVE JUROR:  One.

21             THE COURT:  Old enough to work?

22             A PROSPECTIVE JUROR:  No.  He is one years old.

23             THE COURT:  Ever serve on a jury?

24             A PROSPECTIVE JUROR:  No.

25             THE COURT:  Been involved in a lawsuit?

1           A PROSPECTIVE JUROR:  No.

2           THE COURT:  Been involved in a wage dispute?

3           A PROSPECTIVE JUROR:  I don't think it was a wage

4    dispute.  I recently had to talk to my boss in HR regarding my

5    pay because they were paying me less than what my contract

6    stated.

7           THE COURT:  All right.  And how about that experience

8    affecting your ability to be fair here?

9           A PROSPECTIVE JUROR:  I mean, whatever it says in the

10   contract is what -- I feel like the contract is the legal

11   status.  So it just depends on the what the contract states.

12          THE COURT:  I guess what I'm saying is:  Are you going

13   to sit there and say, "Well, I had a dispute with my boss" --

14          A PROSPECTIVE JUROR:  No, no, no, no.

15          THE COURT:  Two separate things?

16          A PROSPECTIVE JUROR:  Yes.

17          THE COURT:  All right.  And do you have any hobbies?

18          A PROSPECTIVE JUROR:  Exercising, and exploring

19   outdoors.

20          THE COURT:  Thank you, ma'am.  All right.  We will move

21   over to Ms. Robbins.

22          Whereabouts in Broward County do you live?

23          A PROSPECTIVE JUROR:  Fort Lauderdale.

24          THE COURT:  And how long lived in South Florida.

25          A PROSPECTIVE JUROR:  All my life.

```
 1                THE COURT:  What type of work do you do?

 2                A PROSPECTIVE JUROR:  Medical devices sales support.

 3                THE COURT:  Your marital status?

 4                A PROSPECTIVE JUROR:  Single.

 5                THE COURT:  Ever serve on a jury?

 6                A PROSPECTIVE JUROR:  Got this far.

 7                THE COURT:  Been involved in a lawsuit?

 8                A PROSPECTIVE JUROR:  A noncompete lawsuit.

 9                THE COURT:  And were you the plaintiff or the defendant

10    in the case?

11                A PROSPECTIVE JUROR:  I was the defendant.

12                THE COURT:  And anything about that experience that

13    would affect your ability to be fair here?

14                A PROSPECTIVE JUROR:  No.

15                THE COURT:  Have you ever been involved in a wage

16    dispute?

17                A PROSPECTIVE JUROR:  No.

18                THE COURT:  And how about hobbies?

19                A PROSPECTIVE JUROR:  Exercise, sleep, and cooking.

20                THE COURT:  Thank you, ma'am.

21                All right.  We will move over to Mr. Perez.

22                Whereabouts in Broward County do you live?

23                A PROSPECTIVE JUROR:  In Lauderdale Lakes.

24                THE COURT:  And how long have you lived in South

25    Florida?
```

```
 1              A PROSPECTIVE JUROR:  Five years.

 2              THE COURT:  Where are you from originally?

 3              A PROSPECTIVE JUROR:  Dominican Republic.

 4              THE COURT:  What type of work do you do?

 5              A PROSPECTIVE JUROR:  I'm a waiter in a restaurant.

 6              THE COURT:  How about your marital status?

 7              A PROSPECTIVE JUROR:  In a civil union.

 8              THE COURT:  I'm sorry?

 9              A PROSPECTIVE JUROR:  I'm in a civil union.

10              THE COURT:  And what does your spouse do?

11              A PROSPECTIVE JUROR:  He is an HR specialist

12   for -- specialist for --

13              THE COURT:  The fact that he is an HR specialist and

14   this has to do with wages, do you think that's going to affect

15   your ability to be fair?

16              A PROSPECTIVE JUROR:  No.

17              THE COURT:  Have you ever been involved in a lawsuit?

18              A PROSPECTIVE JUROR:  No.

19              THE COURT:  A wage dispute?

20              A PROSPECTIVE JUROR:  No.

21              THE COURT:  And do you have any hobbies?

22              A PROSPECTIVE JUROR:  Cooking and sleeping.

23              THE COURT:  Thank you, sir.

24              We will move over to Ms. Chavez.

25              Whereabouts in Broward County do you live?
```

 1          A PROSPECTIVE JUROR:  Deerfield Beach.

 2          THE COURT:  How long have you lived in South Florida?

 3          A PROSPECTIVE JUROR:  35 years.

 4          THE COURT:  What type of work do you do?

 5          A PROSPECTIVE JUROR:  I'm in the accounting department

 6     of an insurance agency.

 7          THE COURT:  How about your marital status?

 8          A PROSPECTIVE JUROR:  Married.

 9          THE COURT:  What does your spouse do?

10          A PROSPECTIVE JUROR:  He installs closets.

11          THE COURT:  Any children?

12          A PROSPECTIVE JUROR:  Two.

13          THE COURT:  Old enough to work?

14          A PROSPECTIVE JUROR:  One of them is a kitchen manager

15     at a Chipotle, and the other one is a stay-at-home mom.

16          THE COURT:  Ever serve on jury?

17          A PROSPECTIVE JUROR:  No.

18          THE COURT:  Been involved in a lawsuit?

19          A PROSPECTIVE JUROR:  No.

20          THE COURT:  Been involved in a wage dispute?

21          A PROSPECTIVE JUROR:  Does unemployment -- I was on

22     behalf of a nonprofit agency, and the employee was disputing

23     their termination.

24          THE COURT:  And do you think that would affect your

25     ability to be fair here?

```
 1              A PROSPECTIVE JUROR:  No.  It would not affect my
 2    ability.
 3              THE COURT:  And do you have any hobbies?
 4              A PROSPECTIVE JUROR:  Taking care of my family, my
 5    grandchild.
 6              THE COURT:  Thank you, ma'am.
 7              All right.  We will move over to Mr. McIntyre.
 8              Whereabouts in Broward County do you live?
 9              A PROSPECTIVE JUROR:  Tamarac.
10              THE COURT:  And how long have you lived in South
11    Florida?
12              A PROSPECTIVE JUROR:  My whole life.
13              THE COURT:  What type of work do you do?
14              A PROSPECTIVE JUROR:  Currently unemployed and job
15    searching.
16              THE COURT:  What did you used to do?
17              A PROSPECTIVE JUROR:  Actually, I've never worked a day
18    in my life, officially.
19              THE COURT:  That's a nice trick.
20              How about your marital status?
21              A PROSPECTIVE JUROR:  Single.
22              THE COURT:  Ever serve on a jury?
23              A PROSPECTIVE JUROR:  No.
24              THE COURT:  Been involved in a lawsuit?
25              A PROSPECTIVE JUROR:  Nope.
```

```
 1              THE COURT:  Wage dispute?

 2              A PROSPECTIVE JUROR:  No.

 3              THE COURT:  And do you have any hobbies?

 4              A PROSPECTIVE JUROR:  Gaming, occasional horror

 5    writing, and exercise/yoga.

 6              THE COURT:  Thank you, sir.

 7              And finally, we will move over to Mr. Priolo.

 8    Whereabouts in Broward County do you live?

 9              A PROSPECTIVE JUROR:  Coral Springs.

10              THE COURT:  And how long have you lived in South

11    Florida?

12              A PROSPECTIVE JUROR:  25 years.

13              THE COURT:  What type of work do you do?

14              A PROSPECTIVE JUROR:  I'm a retired federal agent.  I

15    was a postal inspector, and now I'm a federal contractor

16    working for General Dynamics, and we do Homeland Security

17    investigations.

18              THE COURT:  How about your marital status?

19              A PROSPECTIVE JUROR:  Married.

20              THE COURT:  And what does your spouse do?

21              A PROSPECTIVE JUROR:  She is a retired nurse, and she

22    was a school board employee.

23              THE COURT:  Every serve -- any children?

24              A PROSPECTIVE JUROR:  Three.

25              THE COURT:  Old enough to work?
```

 1          A PROSPECTIVE JUROR:  Yes.

 2          THE COURT:  What do they do?

 3          A PROSPECTIVE JUROR:  One is a prosecutor in Broward

 4     County, one is a supervisor for recruitment of cardiologists,

 5     and the other one is a self-employed delivery driver.

 6          THE COURT:  Every serve on jury?

 7          A PROSPECTIVE JUROR:  No.

 8          THE COURT:  Been involved in a lawsuit?

 9          A PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Tell me about that.

11          A PROSPECTIVE JUROR:  I was involved as a postal

12     inspector on shorting overtime pay for us.  It was a class

13     action suit against the postal service, which we lost.  My wife

14     started a lawsuit for overtime with the school board, and then

15     she pulled her lawsuit back, which never went to court.

16          I was sued by the postal police when I was working a

17     case on a murder that we illegally searched a lock, and that

18     was thrown out.  I was sued by a defendant who attempted to

19     commit murder in the post office and said that we falsely

20     arrested him in federal court.  It got thrown out by the

21     federal judge.

22          And a few accidents where, you know, one of my kids was

23     involved in an accident on my car insurance policies.

24          THE COURT:  Any of those experiences that would affect

25     your ability to be fair in this case?

1          A PROSPECTIVE JUROR:  I'm a little biased when it comes

2     to overtime, not being able to receive what I thought I was

3     able to receive or what my wife was able to receive.

4          THE COURT:  Do you think that bias would bleed over

5     into this case and affect your ability to be fair?

6          A PROSPECTIVE JUROR:  It might.  I couldn't say it

7     won't.  It might.

8          THE COURT:  And I take it that you've actually been a

9     witness in court before?

10         A PROSPECTIVE JUROR:  Yes.

11         THE COURT:  All right.  And, I mean, you know that

12    witnesses are sometimes cross-examined, sometimes are asked

13    tough questions on cross-examination.  The lawyers have an

14    ethical obligation to ask these questions.

15         Is there anything about that experience that would

16    affect your ability to be fair?  Are you going to be feeling

17    sorry for the witness or identifying with a witness or anything

18    like that?

19         A PROSPECTIVE JUROR:  No, I don't believe so.

20         THE COURT:  And do you have any hobbies?

21         A PROSPECTIVE JUROR:  Traveling, and hanging out with

22    my grandkids.

23         THE COURT:  Thank you, sir.

24         A few of you have served on juries in the past or at

25    least have gotten this far, and I think you understand that

1    there is a different between the role of the jury and the role

2    of the judge.  One of my jobs is to act as an umpire or

3    referee, there may be times during the trial that the lawyers

4    are going to disagree on some evidence or a procedure or one of

5    them may stand up and object.  If I sustain the objection to a

6    question, you ignore the answer.  If I overrule the objection

7    to the question, you will hear the answer.

8          And you are not to place any significance in whether

9    I'm sustaining or overruling objections.  The lawyers have an

10   ethical obligation to object if they think something

11   inappropriate is going on.

12         So that's one of my jobs.

13         Another one of my jobs is to get together with the

14   lawyers near the end of the case and go over the jury

15   instructions.  I will actually read you the law at the end of

16   the case, and I'll give you a copy of what I have read to you

17   so that you can take it back with you and refer to it during

18   your deliberations, during -- during the end of the case, when

19   you are deliberating.

20         So in that respect, I'm the judge of the law.  I'm

21   going to tell you what the law is.  You're going to be the

22   judges of the facts.  You're going to decide whether or not

23   either side has proven their case by a preponderance of the

24   evidence.  And just the way we're going to accept your

25   assessment of the fact when you come back either for the

1    plaintiff or for the defendants, we're going to accept that

2    verdict, you have to accept what I tell what the law is.  Does

3    everybody understand that?

4           I mean, you may go back there and scratch your head and

5    say, "Gee, that's a silly law.  I don't like the law."  The

6    jury room is not the place to change the law.  You can write

7    your Congressman or Congresswoman.  Maybe they will change the

8    law, but not in the jury room.

9           Does everybody understand that?  All right.

10          Those of you that have sat on juries in the past, did

11   anybody ever had a negative experience with the jury system?

12   Maybe something happened during the trial or you found out

13   something after the trial and you said to yourself, "Gee, I

14   hope I never serve on a jury again"?  Anybody have a negative

15   experience with their jury service?  If so, please raise your

16   hand.

17          Don't see any hands.

18          What else do I want to ask?  When we finish with the

19   jury selection process, I'm going to get together with the

20   lawyers and we will select the eight jurors.  And then I will

21   read off the names of the eight jurors that be going to be

22   serving on the case, and every once in a while one of the eight

23   jurors will raise their hand and say, "Gee, Judge.  I didn't

24   think I was going to get picked.  I can't be fair."

25          And then I will have to have Terry run to what, back

1    then, was the elevators and grab everybody and bring everybody

2    back and start all over again.  So it's kind of like speak now

3    or forever hold your peace.

4         Is there anybody that is saying to themselves right

5    now, "Gee, if the judge had just asked me this question, I

6    would tell him why I couldn't be fair," other than what we've

7    already talked about?  If so, please raise your hand.

8         Don't see any hands.

9         Speaking of the elevators, we had the flood in April;

10   that knocked out the elevators in the courthouse.  We haven't

11   had elevators since April.  So I appreciate everybody going up

12   the stairs and everything this morning.  At least the courtroom

13   is not on the fourth floor.

14        But there is a glimmer of hope.  The General Services

15   Administration, who is the federal landlord for all federal

16   buildings, told us a month ago that we'd have one elevator

17   working last week, and last week they said it was going to be

18   this week.  So we will see if Wednesday, one elevator -- it is

19   on this side of the building -- will be working.  So maybe

20   you'll get to ride in an elevator instead of having to go up

21   and down the stairs.  But, hopefully, you will be the last jury

22   that has to go up and down the stairs.

23        You are also under oath.  So is there anybody here that

24   maybe has heard somebody else's answer and it kind of triggered

25   in your mind that you want to add something to your answer or

1   change your answer?  Anybody need to modify or add anything to

2   their answers?  If so, please raise your hand.

3          All right.  I don't see any hands, so I think we're

4   ready to hear from the plaintiff in the case.

5          Mr. Pollock, you may inquire.

6          MR. POLLOCK:  Can I get a microphone, Your Honor, or do

7   you want me to do it from here?

8          THE COURT:  No.  You can have a portable mic.

9          MR. POLLOCK:  Thank you, ladies and gentlemen.

10         So my name is Brian Pollock.  And like a bunch of you,

11  you know, I -- I like working out, so I guess the elevator

12  factor, hopefully, will cancel out us having to sit during the

13  majority of the jury process and during the trial.

14         So I'm going to apologize in advance because I'm going

15  to single a couple of you out.  And if I don't talk to

16  everybody, let me apologize in advance.  The purpose of what

17  Judge Dimitrouleas has been asking and the purpose of my

18  questions is not to embarrass anybody.  It's not to ask a

19  question -- and I don't think I'm going to ask any that make

20  you feel uncomfortable, but it's just to allow us to get the

21  best jurors that we can to help decide our case.

22         And I'm not here to talk about what our case is about.

23  I'm here to talk about you, and what I want to try to do is get

24  to know some of you a little bit better based on kind of what

25  you told us about.

1            And, you know, Ms. Scott, I'm sorry what you are going

2     through.

3            And so with that, you know, I kind of want to start off

4     with a broad question.  I know we've got a lot of people who

5     work or who have worked in the school system, so I'd kind of

6     like to do it like this.  Does everybody -- does everybody

7     agree, and you can raise your hands, that, you know, if you

8     have a dispute, that you have a right to have that dispute

9     settled in court?

10           Does everybody kind of agree, with a show of hands,

11    that that's the right place to resolve a dispute?  Okay.

12           And I think that that's one of the phenomenal things

13    about our justice system, is, is that we can have Daisy come in

14    with her former employers and, you know, not get in an

15    argument.  They can come here and we can just resolve it and

16    have, you know, people from the community come in and make

17    those decisions.

18           And, you know, we're here to follow federal law, and so

19    federal law controls and -- you know, just like when we're

20    driving, right?  When we're driving, we've got a speed limit.

21    And with a show of hands, does everybody agree that you can get

22    a speeding ticket even if you didn't know what the speed limit

23    was?  Even if you didn't see it, you can still get a speeding

24    ticket.  Does everybody agree with that, with that concept?

25           I mean, sometimes, it stinks, but that's sometimes how

1   it is.  You didn't see the sign or you were checking or

2   changing a song or whatever it was.

3          And, you know, does everybody agree that you can also

4   get a speeding ticket, even if you are just keeping up with

5   traffic?  I mean, we're all driving on the highway.  You know,

6   I think the speed limit is probably a suggestion more than a

7   law out there, especially here in South Florida.  We all keep

8   up with traffic.  If you go 55, you get honked at on 95.

9          Everybody agree you can still get a ticket even if

10  you're going with the speed of traffic?  You can all agree with

11  that?  All right.

12         I'm going to stop with the arm exercises.

13         We're here to talk about the overtime laws and minimum

14  wage laws and the Fair Labor Standards Act.  Is there anybody

15  here -- I guess besides Mr. Priolo -- who has been involved

16  with the Fair Labor Standards Act?  I know you have.  That's

17  why I was singling you out.

18         And so, Mr. Osborn, it sounds like you were a principal

19  at several -- were they mostly elementary school down in Dade,

20  or were they also middle?

21         A PROSPECTIVE JUROR:  K-8.  It was K-8 and middle.

22         MR. POLLOCK:  Okay.  And did you -- did you ever have

23  any issues that came up with your staff at the school about

24  their pay or problems or questions with their pay that you had

25  to handle personally?

```
1              A PROSPECTIVE JUROR:  All the time.

2              MR. POLLOCK:  Were those issues that you had to handle

3    on your own, or were those that you had to kind of run up the

4    flagpole at Miami-Dade County schools to resolve?

5              A PROSPECTIVE JUROR:  Most of the time, since I

6    controlled the budget, there were issues in terms of hours

7    worked.  A lot of times, we were under UD (phonetic) contracts.

8    So, for example, if somebody comes in for an alarm that goes

9    off, they automatically get time and a half.

10             MR. POLLOCK:  Okay.

11             A PROSPECTIVE JUROR:  So it was my responsibility to

12   ensure that we had the money in the budget so the person got

13   paid.

14             MR. POLLOCK:  Thank you.

15             And I guess I'm going to ask you to pass the mic to

16   Ms. Fote.

17             And you were a retired math teacher.  You live in

18   Weston.  What school were you at?

19             A PROSPECTIVE JUROR:  I was always at private schools.

20             MR. POLLOCK:  Okay.

21             A PROSPECTIVE JUROR:  I was at Pope John Paul.  I was

22   at Boca Academy, which is now Pine Crest up in Boca.  And I was

23   at Miami Country Day down in Miami.

24             MR. POLLOCK:  Okay.  And you said that you taught math?

25             A PROSPECTIVE JUROR:  Yes.
```

1          MR. POLLOCK:  Okay.  Thank you.  And then I'm going to

2     ask you to pass to Mr. Peters.

3          And you're a comp sci student, you said?

4          A PROSPECTIVE JUROR:  Yes.

5          MR. POLLOCK:  Are you in school down here, or are you

6     studying remotely?

7          A PROSPECTIVE JUROR:  School down here.  NSU.

8          MR. POLLOCK:  Okay.  Great.

9          Have you had any jobs besides being a full-time

10    student?

11         A PROSPECTIVE JUROR:  No.

12         MR. POLLOCK:  Okay.  And then, I guess, what -- what's

13    your goal in -- you are studying to get a degree in comp sci,

14    or is that just an interest, or do you want to go into that as

15    a profession or what?

16         I put you on the spot.

17         A PROSPECTIVE JUROR:  Both.  For interest and to get

18    the degree.

19         MR. POLLOCK:  Okay.  Excellent.

20         How far along are you?

21         A PROSPECTIVE JUROR:  I'm a senior.

22         MR. POLLOCK:  Oh.

23         A PROSPECTIVE JUROR:  So my last year.

24         MR. POLLOCK:  Congratulations.  So I guess you're

25    starting to look now?

```
 1              A PROSPECTIVE JUROR:  Yeah.

 2              MR. POLLOCK:  The pressure is on.  Well, good luck.

 3              A PROSPECTIVE JUROR:  Thank you.

 4              MR. POLLOCK:  Ms. Scott, I'm going to bug you for a

 5    couple.  So you're an insurance underwriter?

 6              A PROSPECTIVE JUROR:  Yes.

 7              MR. POLLOCK:  Okay.  And what kind of insurance

 8    underwriting do you do?  What type of risk do you look at?

 9              A PROSPECTIVE JUROR:  I will say that I'm not an

10    underwriter myself, but we -- my department, we do the policy

11    issuance.

12              MR. POLLOCK:  Okay.

13              A PROSPECTIVE JUROR:  We mainly do commercial or

14    contractors, small businesses, things like that.

15              MR. POLLOCK:  So, kind of, what's your role since

16    you're in issuance of the policy?  Are you making sure that

17    everything is signed, or are you just in the processing and

18    sending department or --

19              A PROSPECTIVE JUROR:  Both.

20              MR. POLLOCK:  Okay.

21              A PROSPECTIVE JUROR:  We review all the documents, make

22    sure everything is in order, and we issue the policy.

23              MR. POLLOCK:  Okay.  Excellent.  Thank you.

24              Ms. Perez-Martinez.

25              A PROSPECTIVE JUROR:  Yes.
```

1          MR. POLLOCK:  And you're an attorney?

2          A PROSPECTIVE JUROR:  Yes.

3          MR. POLLOCK:  And what kind of practice do you have?

4          A PROSPECTIVE JUROR:  I'm board-certified in community

5    association and HOA law, and I do that almost exclusively.  I

6    have done personal injury.  And in prior life, I have been

7    practicing for so long, I have done medical malpractice and

8    nursing home law.

9          MR. POLLOCK:  Have you had any familiarity or any work

10   with the Fair Labor Standards Act?

11         A PROSPECTIVE JUROR:  No.

12         MR. POLLOCK:  Okay.  What about for restrictive

13   covenants not in a community association setting but, let's

14   say, with noncompetes and non-solicitations and those kind of

15   things?

16         A PROSPECTIVE JUROR:  Yes, but still in a community

17   association setting.  For example, where the management company

18   or the security company and the association have a contract,

19   there is a noncompete.  So if we fire the manager -- management

20   company, we can't take the management employee and hire them.

21         So I address those types of noncompete clauses where

22   the association is being sued for noncompete.

23         MR. POLLOCK:  Do you think that your experience in

24   being an advocate in a case involving a noncompete would

25   prevent you from being fair and impartial in this case?

1          A PROSPECTIVE JUROR:  It would not affect me.

2          MR. POLLOCK:  Okay.  Thank you.

3          If you could pass it behind you to -- I think it's

4    Ms. Benitez.

5          And let's see.  You're a -- you have a real estate

6    investment fund?

7          A PROSPECTIVE JUROR:  Well, yeah.  I have some real

8    estate investments.

9          MR. POLLOCK:  Real estate investments?

10         A PROSPECTIVE JUROR:  Yes.

11         MR. POLLOCK:  Okay.  And in your work in real estate

12   investments, do you have -- work with employees, or do you

13   mostly work with independent contractors?

14         A PROSPECTIVE JUROR:  No.  I just -- it's a personal --

15   small thing, but I used to be a lawyer in Colombia, and I was

16   the corporate counsel of the construction company of my family,

17   and now I have a -- a chair on the board of directors of the

18   company.  So I am related with that.

19         MR. POLLOCK:  Okay.  And for the projects -- or, I

20   guess, for the properties you have here, do you have your own

21   employees who take care of, let's say, fixing things?  Or do

22   you hire independent contractors who work for different people

23   to go ahead and fix things for you?

24         A PROSPECTIVE JUROR:  I hire contractors.

25         MR. POLLOCK:  Okay.  And the independent contractors,

1    they just work for you or they work for kind of a bunch of

2    people?

3              A PROSPECTIVE JUROR:  A bunch of people.

4              MR. POLLOCK:  Okay.  Thank you.

5              Ms. Mallard?

6              A PROSPECTIVE JUROR:  Yes.

7              MR. POLLOCK:  And you manage construction projects?

8              A PROSPECTIVE JUROR:  Yes, sir.

9              MR. POLLOCK:  Okay.  And in what role?

10             A PROSPECTIVE JUROR:  I'm an account executive.

11             MR. POLLOCK:  Okay.  So does that mean, to be an

12   account executive for a construction company?

13             A PROSPECTIVE JUROR:  So basically, customers that

14   handle residential and commercial properties, they come to me.

15   If they end up placing the order, I manage it from start to

16   finish.

17             MR. POLLOCK:  Okay.  Do you manage, I guess, finding

18   subs or contracting with subs or --

19             A PROSPECTIVE JUROR:  Well, I have the manufacturing

20   relationships, and then they come to me to get the -- like,

21   making -- bidding, pricing, special pricing, project pricing.

22   And then I actually stage it at the locations.

23             MR. POLLOCK:  Okay.  Understood.  So I'm trying

24   to -- in your role, do you deal with contracts a lot?

25             A PROSPECTIVE JUROR:  Yes.

1          MR. POLLOCK:  Do you read the contracts and make sure

2     that they're -- they look good to you before they go out?

3          A PROSPECTIVE JUROR:  They do, but we also give them to

4     the counsel.

5          MR. POLLOCK:  Okay.  So you take a first glance, but

6     you're not going to give the final say on it, "yes" or "no"?

7          A PROSPECTIVE JUROR:  Yes.  They give me the approval

8     that I can put our stamp on it or what I have to sign.

9          MR. POLLOCK:  Okay.  All right.  Thank you.  If you can

10    pass it to Ms. Snyder.

11         THE COURT:  Mr. Pollock, your time has elapsed.  If you

12    wanted to ask one more question, you can.

13         MR. POLLOCK:  Okay.

14         Ms. Snyder, have you ever worked in an -- outside of

15    real estate, have you ever worked in a job where you were paid

16    hourly?

17         A PROSPECTIVE JUROR:  Yes.

18         MR. POLLOCK:  Okay.  And in the job where you were paid

19    hourly, were you an employee or were you an independent

20    contractor?

21         A PROSPECTIVE JUROR:  I was an employee.

22         MR. POLLOCK:  Okay.  And were you in a job that would

23    have allowed you to get paid overtime if you worked it?

24         A PROSPECTIVE JUROR:  Yes.

25         MR. POLLOCK:  Okay.  I think that's it, Your Honor.

 1          THE COURT:  Okay.

 2          MR. POLLOCK:  Thank you, everybody, for your time, and

 3   sorry if I didn't get to you.  Maybe Mr. Goldberg will.

 4          THE COURT:  Mr. Goldberg, you may inquire.

 5          MR. GOLDBERG:  Thank you, Your Honor.  May I use the

 6   podium?

 7          THE COURT:  Sure.

 8          MR. GOLDBERG:  Good morning, everybody.  Again, my name

 9   is Randy Goldberg, and I'm representing All VIP Care and

10   Ms. Liz McKinnon.  I just have a couple of quick points.

11          Just by a show of hands, I don't want to, you know,

12   pick anybody out, does everybody -- does anybody here not

13   understand the difference between an employee and an

14   independent contractor?

15          Okay.  I don't see any hands, so that means everybody

16   here understands the concept between the two.  Am I correct in

17   that?  Thank you.

18          Counsel had mentioned repeatedly the FLSA, the Fair

19   Labor and Standards Act.  There are other laws that are at

20   issue in this case that you will be hearing witnesses testify

21   about and, more importantly, the judge will instruct you later

22   on before you begin deliberation.

23          By a show of hands, is there anybody here that cannot

24   give weight and understanding to all the laws that are at issue

25   in this case?  I see no hands, so I assume, by that, that

1   everybody is and capable and willing to give full -- their full

2   attention to all of the laws that are going to be mentioned in

3   this case; is that correct?  Thank you.

4          No further questions, Your Honor.

5          THE COURT:  All right.  We are going to take a

6   15-minute recess.  When you do come back in, I'm going to ask

7   that you take the same exact seat that you are in right now.

8   So maybe count down from the end to see -- or see who is

9   sitting next to you so you can get in the same seat.

10          During this break in the trial, and, if you're

11  selected, all the breaks in the trial, I am going to instruct

12  you:  Do not discuss the case.  Do not allow it to be discussed

13  in your presence.  If you bump into the lawyers or any of the

14  parties and they walk right by you, they don't even say "hi,"

15  they're not being rude.  They're just following the rules of

16  court, and that is that they are to have no contact with

17  prospective jurors now and jurors later on.

18          I mean, if you're walking down the hall and you walk by

19  a lawyer and you say, "Good morning," and he says, "Good

20  morning" back, and someone way down the hall can't hear what

21  you are saying and sees you talking, it just doesn't look

22  right.  So to avoid the appearance of impropriety, the lawyers

23  won't have any contact with you.  Again, don't hold it against

24  them.  They're not being rude, they're just following the rules

25  of court.

```
 1           So don't discuss the case.  Don't allow it to be

 2   discussed in your presence.  I'm going to ask that you be back

 3   out in the lobby in about 15 minutes.  And hopefully, at that

 4   time, we will have picked the eight jurors and they will stay,

 5   and the rest of you can go back home or go back to work.

 6           So we will see you back in about 15 minutes.

 7       (The jury exited the courtroom at 10:08 a.m.)

 8           THE COURT:  We're outside the presence of the jury.  If

 9   you want a few moments to confer, then we will do the

10   challenges outside the presence of the jury.

11           Let's take a five-minute recess for the court reporter

12   while you guys are deciding on your strategy.

13       (A recess was taken from 10:10 a.m. to 10:16 a.m.)

14           THE COURT:  Please be seated.

15           MR. POLLOCK:  Judge, the one thing I did remember is --

16   it's not a problem.  Just, I guess, for next time, if we can

17   just let the jurors know that there's a reason why we're not

18   talking to them and kind of acknowledging them in the hallways.

19           THE COURT:  I thought I told them that.

20           MR. POLLOCK:  Did we do that?

21           MR. GOLDBERG:  Yes.

22           MR. POLLOCK:  Okay.  Maybe I was spaced out.

23           MR. GOLDBERG:  The judge covered it.

24           THE COURT:  I told them you're not being rude, just

25   follow the rules of court.
```

```
 1              MR. POLLOCK:  I was focused on this.  I'm sorry, Judge.

 2              THE COURT:  All right.  So we're back on the record

 3    outside the presence of the jury.  Any challenges for cause?

 4              MR. GOLDBERG:  Your Honor, may I?

 5              THE COURT:  Any challenge for cause, Mr. Pollock?

 6              MR. POLLOCK:  No.

 7              THE COURT:  Mr. Goldberg?

 8              MR. GOLDBERG:  Yes, Your Honor.  Number 19, Rossario

 9    Priolo.  That's the gentleman who is a retired federal agent,

10    postal worker.  He made mention during the voir dire process

11    that he is biased in the overtime arena.

12              THE COURT:  Any objection, Mr. Pollock?

13              MR. POLLOCK:  No.

14              THE COURT:  Grant the challenge for cause on Juror

15    Number 19, Mr. Priolo.

16              Any other challenges for cause?

17              MR. GOLDBERG:  Not by the defense, Your Honor.

18              MR. POLLOCK:  None from the plaintiff.

19              THE COURT:  Any peremptory challenges through Juror

20    Number 8, Mrs. Albano, Mr. Pollock?

21              MR. POLLOCK:  We'll strike 5, Ms. Perez-Martinez.

22              THE COURT:  All right.  That puts us through Juror

23    Number 9, Ms. Rogger.

24              Mr. Goldberg?

25              MR. GOLDBERG:  Your Honor, am I being asked about
```

1   Number 1 through 8 or 9 down?

2          THE COURT:  In other words, right now, we have

3   eliminated 5.  So the 8 jurors we're looking at are 1 through

4   9.

5          MR. GOLDBERG:  Yes, Your Honor.  We have no peremptory

6   challenges as to 1 through 9.

7          THE COURT:  Mr. Pollock?

8          MR. POLLOCK:  We'll strike 4.

9          THE COURT:  Ms. Scott?

10          MR. POLLOCK:  Yes, Your Honor.

11          THE COURT:  All right.  That puts us through Juror

12   Number 10, Ms. Snyder.

13          Mr. Goldberg?

14          MR. GOLDBERG:  No, Your Honor.  No peremptory challenge

15   as to Ms. Snyder.

16          THE COURT:  Mr. Pollock?

17          MR. POLLOCK:  We will strike 1.

18          THE COURT:  Mr. Osborn.

19          All right.  That's the last peremptory strike for the

20   plaintiff.  That puts us through Juror Number 11, Mrs. Mallard.

21          Mr. Goldberg?

22          MR. GOLDBERG:  Yes, Your Honor.  We ask to strike

23   Ms. Mallard.

24          THE COURT:  All right.  That puts us over to Juror

25   Number 12, Mrs. Benitez.

1          Mr. Goldberg?

2          MR. GOLDBERG:  Yes, Your Honor.  We ask to strike

3   Ms. Benitez.

4          THE COURT:  All right.  That puts us over to Juror

5   Number 13, Ms. Estroff.

6          Mr. Goldberg?

7          MR. GOLDBERG:  No -- none, Your Honor.

8          THE COURT:  So if there's no back strikes, our panel

9   will be:  Juror Number 2, Mrs. Fote; Juror Number 3,

10  Mr. Peters; Juror Number 6, Mrs. Floyd; Juror Number 7,

11  Mr. Baig; Juror Number 8, Mrs. Albano; Juror Number 9,

12  Ms. Rogger; Juror Number 10, Ms. Snyder; and Juror Number 13,

13  Ms. Estroff.

14         Are those eight jurors acceptable to the plaintiff?

15         MR. POLLOCK:  Yes, Your Honor.

16         THE COURT:  To the defense?

17         MR. GOLDBERG:  Yes, Your Honor.

18         THE COURT:  All right.  So those will be our eight

19  jurors.

20         Let's bring in the jury.

21      (The prospective jurors entered the courtroom at

22      10:21 a.m.)

23         THE COURT:  All right.  We have all our jury back.

24         Did everyone follow the admonition not to discuss the

25  case or allow it to be discussed in your presence?  All right.

1           We selected the eight jurors that will serve on this

2      case.  If your name is not called, you are excused with the

3      Court's thanks, and if you could hand your badges to Terry on

4      the way out.  And I do need to ask you to continue to call in

5      in the unlikely event that you're needed on another case this

6      week.

7           But the eight jurors who will serve on the case and who

8      I will ask to remain in their seats are:  Mrs. Fote,

9      Mr. Peters, Ms. Floyd, Mr. Baig, Mrs. Albano, Ms. Rogger,

10     Ms. Snyder, and Ms. Estroff.  And if you eight jurors could

11     remain in your seats.  The other jurors are excused with the

12     Court's thanks.

13          Have a nice afternoon.

14       (The remaining prospective jurors exited the courtroom at

15       10:23 a.m.)

16          THE COURT:  All right.  We are going to rearrange

17     everybody a little bit.  Ms. Snyder, if you could move two

18     seats to your right.  Ms. Rogger, two seats to your right.

19     Ms. Albano, two seats to your right.  Mr. Baig, two seats to

20     your right.  And Ms. Floyd, two seats to your right.

21          Mr. Peters, if you could take the second seat in the

22     middle row.  And Ms. Fote, if you could take the last seat in

23     the row behind you.  Ms. Estroff, you can sit anywhere in the

24     back row that you would like.

25          If we could swear the jury.

```
 1            COURTROOM DEPUTY:  Please stand and raise your right
 2   hand.
 3            You and each of you do solemnly swear or affirm that
 4   you will well and truthfully try the issues herein in the case
 5   before the Court and a true verdict render according to the
 6   evidence and the law given to you by the Court?
 7            Do you all take this solemn oath?
 8            A PROSPECTIVE JUROR:  Yes.
 9            COURTROOM DEPUTY:  They have been sworn, Your Honor.
10            THE COURT:  All right.  Please be seated.
11            All right.  I'm going to give you some preliminary
12   instructions, and then we're going to take another short recess
13   so that Jermaine can show you the jury deliberation room.
14            I say "room" because we have two alternatives.  When
15   COVID-19 hit and we closed down the courthouse and we were
16   trying to reopen it, I had to decide what I was going to do
17   when I resumed criminal trials.  Because a criminal trial has
18   to have 12 jurors.  And in a criminal trial, you have to have
19   alternates because if somebody gets sick, you can't have less
20   than 12.  So typically, in a criminal trial, you'd have 14
21   jurors.  That's why we have kind of 14 seats in the box.
22            And the normal jury assembly room is right -- not jury
23   assembly room -- the jury deliberation room is right behind
24   you.  Go through that door, and it's right behind where you are
25   sitting there now.  You can fit 14 people in there, but it's
```

1    kind of close.  And with COVID and everything and, you know,

2    trying to have, you know, separation between people, I decided

3    to gut my law library and turn it into a jury deliberation

4    room.  So there is a bigger room for you guys to, you know, be

5    in during the trial and deliberate at the end of the trial.

6    It's farther away from the courtroom, and it doesn't have

7    bathrooms in it.

8          So if you decide that you want to use the bigger jury

9    deliberation room, you just have to go back and forth to the

10   old jury deliberation room that has the bathrooms in it.  But I

11   leave that up to you.

12         So once you are done with the preliminary instructions,

13   Jermaine will show you the two jury deliberation rooms.  And

14   you guys decide if you want the closer one, the smaller one

15   here, or the bigger one that's farther away.  I notice that

16   nobody is wearing masks today, but certainly you can wear a

17   mask if you want to.

18         If you notice, there are four air purifiers in the

19   courtroom.  They all have UV light in them that supposedly

20   kills the COVID-19 virus.  This is the only courtroom in

21   Fort Lauderdale that has more than one.  I've got four.  The

22   air filters that control all the airflow in the -- in the

23   courthouse are now MERV 13 filters.  They used to be MERV 8

24   before COVID-19.  We upgraded them to MERV 13.

25         So, you know, I think the concern about the pandemic

1    and COVID-19 is relaxed, but I just want to let you know that

2    we still are taking precautions to try to make the experience

3    as safe as we can for you.

4         Also, by allowing you to keep your cell phones during

5    the trial, I just ask that you have them on mute or off when

6    you're in the courtroom.  We will collect them, though, during

7    deliberations.  I don't allow cell phones in the jury

8    deliberation room because I don't want people to be tempted to

9    start googling information.  You have to decide the verdict

10   based on the law and the evidence that you hear, here in the

11   courtroom.  You can't supplement it with outside information

12   either before your deliberations or during your deliberations.

13        So for that reason, that you're not tempted to do that,

14   we'll collect the cell phones and give them back to you when

15   the deliberations are over with.

16        All right.  Members of the jury, now that you have been

17   sworn, I need to explain some basic principles about a civil

18   trial and your duty as jurors.  These are preliminary

19   instructions.  I'll give you more detailed instructions at the

20   end of the trial.

21        It's your duty to listen to the evidence, decide what

22   happened, and apply the law to the facts.  It's my job to

23   provide you with the law you must apply, and you must follow

24   the law, even if you disagree with it.  You must decide the

25   case only on the evidence presented in the courtroom.

1          Evidence comes in many forms.  It can be testimony

2     about what someone saw, heard, or smelled.  It can be an

3     exhibit or a photograph.  It can be someone's opinion.  Some

4     evidence may provide a fact indirectly.  Let's say a witness

5     saw wet grass outside and people walking into the courthouse

6     carrying wet umbrellas.  This may be indirect evidence that it

7     rained, even though the witness didn't personally see it rain.

8          Indirect evidence like this is also called

9     circumstantial evidence, simply a chain of circumstances that

10     likely proves a fact.  As far as the law is concerned, it makes

11     no difference whether evidence is direct or indirect.  You may

12     choose to believe or disbelieve either kind.  Your job is to

13     give each piece of evidence whatever weight you think it

14     deserves.  During the trial, you will hear certain things that

15     are not evidence, and you must not consider them.

16          First, the lawyers' statements and arguments aren't

17     evidence.  In their opening statements and closing arguments,

18     the lawyers will discuss the case.  Their remarks may help you

19     follow each side's arguments and presentation of evidence.  But

20     the remarks themselves aren't evidence and shouldn't play a

21     role in your deliberations.

22          Second, the lawyers' questions and objections aren't

23     evidence, only the witnesses' answers are evidence.  Don't

24     decide that something is true just because a lawyer's questions

25     suggested it is.  For example, a lawyer may ask a witness, "You

1   saw Mr. Jones hit his sister, didn't you?"  That question is

2   not evidence of what the witness saw or what Mr. Jones did

3   unless the witness agrees with it.

4          There are rules of evidence that control what the Court

5   can receive into evidence.  When a lawyer asks a witness a

6   question or presents an exhibit, the opposing lawyer may object

7   if he thinks the rules of evidence don't permit it.  If I

8   overrule the objection, then the witness may answer the

9   question or the Court may receive the exhibit.

10          If I sustain the objection, then the witness cannot

11   answer the question, and the Court cannot receive the exhibit.

12          When I sustain an objection to a question, you must

13   ignore the question and not guess what the answer might have

14   been.  Sometimes I may disallow evidence -- that is also called

15   striking evidence -- and order you to disregard or ignore it.

16   That means that you must not consider that evidence when you

17   are deciding the case.

18          I may allow some evidence for only a limited purpose.

19   When I instruct you that I have admitted an item of evidence

20   for a limited purpose, you must consider it for only that

21   purpose and no other.

22          To reach a verdict, you may have to decide which

23   testimony to believe and which testimony not to believe.  You

24   may believe everything a witness says, part of it, or none of

25   it.  When considering a witness's testimony, you may take into

1    account the witness's opportunity and ability to see, hear, or

2    know the things the witness is testifying about:  The witness's

3    memory; the witness's manner while testifying; any interest the

4    witness has in the outcome of the case; any bias or prejudice

5    the witness may have; any other evidence that contradicts the

6    witness's testimony; the reasonableness of the witness's

7    testimony in light of all of the evidence; and any other

8    factors affecting believability.

9        At the end of the trial, I will give you additional

10   guidelines for determining a witness's credibility.

11       This is a civil case.  To help you follow the evidence,

12   I will summarize the parties' positions.  The plaintiff, Cruz

13   Valdivieso, claims the defendants, All VIP Care, Inc. and Liz

14   Velázquez McKinnon, misclassified and paid her as an

15   independent contractor instead of properly classifying and

16   paying her as an employee.  As a result of this

17   misclassification, the plaintiff claims that she was not paid

18   overtime wages when she worked more than 40 hours in a workweek

19   in violation of the United States law known as the Fair Labor

20   Standards Act, or FLSA.

21       The plaintiff claims that she -- that the defendants

22   did not pay her at all for the time she worked from May 2022 to

23   July 27, 2022, violating the requirements that she receive at

24   least $7.25 per hour under the Fair Labor Standards Act.

25   Lastly, the plaintiff claims that although the defendant, All

1    VIP Care, Inc., agreed to pay her $13 for each hour worked,

2    they did not pay her at all for the hours she worked between

3    May 2021 and July 27th, 2022.

4            Is that supposed to be May 2021 or May 2022?

5            MR. POLLOCK:  '22.

6            THE COURT:  All right.  So that is a typo.  So let me

7    read that sentence again.

8            Lastly, the plaintiff claims that although the

9    defendant, All VIP Care, Inc., agreed to pay her $13 for each

10   hour worked, they did not pay her at all for the hours she

11   worked between May of 2022 and July 27th of 2022.

12           Defendants, All VIP Care, Inc. and its principal, Liz

13   Velázquez McKinnon, deny those claims and contend that the

14   defendants properly and correctly entered into an independent

15   contractor relationship with the plaintiff, who, as a licensed

16   home health aide, would provide home health aide services to

17   the -- All VIP Care's clients.

18           Accordingly, the defendants properly paid the plaintiff

19   correctly.  And in accordance with the terms and conditions of

20   the independent contractor agreement entered into by the

21   parties, wherein the plaintiff was paid for each hour that she

22   was authorized by the carriers to provide services to the

23   clients of All VIP Care.

24           All VIP Care, Inc. claims that the plaintiff materially

25   breached her independent contractor agreement with All VIP Care

1    Inc. by:  One, the plaintiff soliciting clients of All VIP

2    Care, Inc. to end their relationship with All VIP Care, Inc.,

3    and to follow the plaintiff to the plaintiff's new relationship

4    with another nurse registry.

5         And 2.  The plaintiff, during the contractually

6    detailed restrictive period directly or indirectly contacted

7    clients of All VIP Care, Inc. for the purpose of being employed

8    by, participating in, consult with, perform services for, or

9    otherwise be connected with any business, the same as or

10   similar to the business conducted by All VIP Care, Inc.

11        3.  Further, the plaintiff accepted assignments from a

12   client of All VIP Care, Inc. during the one-year

13   post-termination date of the relationship between the parties,

14   all of which are material breaches of the independent

15   contractor agreement.

16        Cruz Valdivieso Figuera denies that she materially

17   breached any agreement with All VIP Care, Inc.  She further

18   states that if she breached the agreement, she was allowed to

19   do so because All VIP Care, Inc. had already committed a

20   material breach of their agreement by not paying her all that

21   she was -- earned, and so relieved her of any responsibility or

22   requirement to comply with the restrictions it seeks to

23   enforce.

24        Cruz Valdivieso Figuera would further state that she

25   did not cause or request that anyone stop working with All VIP

1   Care, Inc., did not take any client information or confidences,

2   did not receive or share any protected information, and that

3   any client who did leave on his own or on her -- and that any

4   client who did -- left on his or her own accord and that All

5   VIP Care, Inc. did not suffer any damages.

6        Ms. Valdivieso Figuera has the burden of proving her

7   case by what the law calls a preponderance of the evidence.

8   That means Ms. Valdivieso Figuera must prove that, in light of

9   all of the evidence, what they claim is more likely true than

10  not.

11       So if you could put the evidence favoring Cruz

12  Valdivieso Figuera and the evidence favoring All VIP Care, Inc.

13  and Liz Velázquez McKinnon on opposite scales -- on opposite

14  sides of balancing scales, Cruz Velázquez Figuera needs to make

15  the scales tip to her side.

16       If Ms. Valdivieso Figuera fails to meet this burden,

17  you must find in favor of All VIP Care, Inc. and Liz Velázquez

18  McKinnon.

19       To determine whether any fact has been proved by a

20  preponderance of the evidence, you may, unless I instruct you

21  otherwise, consider the testimony of all the witnesses,

22  regardless of who called them, and all the exhibits that the

23  Court allowed, regardless of who produced them.  After

24  considering all of the evidence, if you decide a claim or a

25  fact is more likely true than not, then the claim or fact has

1   been proved by a preponderance of the evidence.

2        On certain issues called affirmative defenses, All VIP

3   Care, Inc. and Liz Velázquez McKinnon have the burden of

4   proving the elements of a defense by a preponderance of the

5   evidence.  I'll instruct you on the facts All VIP Care, Inc.

6   and Liz Velázquez McKinnon must prove for any affirmative

7   defense.

8        After considering all of the evidence, if you decide

9   that All VIP Care, Inc. and Liz Velázquez McKinnon have

10  successfully proven that the required facts are more likely

11  true than not, the affirmative defense is proved.

12       While serving on the jury, you may not talk with anyone

13  about anything related to the case.  You may tell people that

14  you are a juror, give them information about when you must be

15  in court, but you must not discuss anything about the case

16  itself with anyone.  You shouldn't even talk about the case

17  with each other until you begin your deliberations.

18       You want to make sure you've heard everything, all of

19  the evidence, the lawyers' closing arguments, and my

20  instructions on the law, before you begin deliberating.  You

21  should keep an open mind until the end of the case.  Premature

22  discussions may lead to a premature decision.

23       In this age of technology, I want to emphasize that in

24  addition to not talking face-to-face with anyone about the

25  case, you must not communicate with anyone about the case by

 1     any other means.  This includes emails, text messages, phone

 2     calls, and the internet, including social networking websites

 3     and apps such as Facebook, Instagram, Snapchat, YouTube, and

 4     Twitter.  You may not use any similar technology of social

 5     media, even if I haven't specifically mentioned it here.

 6            You must not provide any -- you must not provide any

 7     information about the case to anyone by any means whatsoever,

 8     and that includes posting information about the case, or what

 9     you are doing in the case, on any device or internet site,

10     including blogs, chat rooms, social websites, or any other

11     means.

12            You also shouldn't Google or search online or offline

13     for any information about the case, the parties or the law.

14     Don't read or listen to the news about this case, visit any

15     places related to this case, or research any fact, issue or law

16     related to this case.  The law forbids the jurors to talk with

17     anyone else about the case and forbids anyone to talk to the

18     jurors about it.  It's very important that you understand why

19     these rules exist and why they're so important.

20            You must base your decision only on the testimony and

21     other evidence presented in the courtroom.  It's not fair to

22     the parties if you base your decision in any way on information

23     you acquire outside the courtroom.

24            For example, the law often uses words and phrases in

25     special ways, so it's important that any definitions you hear

1      come only from me and not from any other source.  Only you

2      jurors can decide a verdict in this case.  The law sees only

3      you as fair, and only you have promised to be fair.  No one

4      else was so qualified.

5          If you wish, you may take notes to help you remember

6      what the witnesses said.  If you do take notes, please don't

7      share them with anyone until you go to the jury room to decide

8      the case.  Don't let note-taking distract you from carefully

9      listening to and observing the witnesses.

10         When you leave the courtroom, you should leave your

11     notes in the jury deliberation room.  Don't leave them out here

12     on your chairs.  Don't take them home with you.  They should be

13     left hidden from view in the jury deliberation room.

14         And whether or not you take notes, you should rely upon

15     your own memory of the testimony.  Your notes are there only to

16     help your memory, they're not entitled to greater weight than

17     your memory or impression about the testimony.

18         Let's walk through the trial.  First, each side may

19     make an opening statement, but they don't have to.  Remember,

20     an opening statement isn't evidence, and it's not supposed to

21     be argumentative.  It's just an outline of what the party

22     intends to prove.

23         Next, Cruz Valdivieso Figuera will present her

24     witnesses and ask them questions.  After she questions the

25     witnesses, All VIP Care, Inc. and Liz Velázquez McKinnon may

1    ask the witness questions.  This is called cross-examining the

2    witness.

3          Then, All VIP Care, Inc. and Liz Velázquez McKinnon

4    will present their witnesses, and Cruz Valdivieso Figuera may

5    cross-examine them.

6          You should base your decision on all the evidence,

7    regardless of which party presented it.

8          After all of the evidence is in, the parties' lawyers

9    will present their closing arguments to summarize and interpret

10   the evidence for you, and then I will give you instructions on

11   the law.  You will then go to the jury room to deliberate.

12         Now, you may say that there are languages other than

13   English used during the trial.  You must consider evidence

14   provided only through the official court interpreters or

15   translators.  It's important that all jurors consider the same

16   evidence.  So even if some of you know Spanish, you must accept

17   the English interpretation or translation provided and

18   disregard any different meaning.

19         All right.  So we're going to go ahead and take a

20   recess now.  During the recess, you will decide which jury

21   deliberation room you want to use, and Jermaine will give you

22   notebooks and pens or pencils for those of you that want to

23   take notes.  And I'm going to ask you that you be back in the

24   jury deliberation room, whichever one you choose, in about

25   15 minutes.

1          Remember my admonition not to discuss the case and

2     allow it to be discussed in your presence.  And we will see you

3     back in the jury deliberation room in about 15 minutes.

4          (The jury exited the courtroom at 10:44 a.m.)

5          THE COURT:  And if there is nothing else to come before

6     the Court, we will be in recess for 15 minutes.

7          (A recess was taken from 10:45 a.m. to 11:02 a.m.)

8          THE COURT:  Please be seated.

9          We're back on the record.  Counsel are present.  Before

10    we bring in the jury, looking at the jury instructions and the

11    verdict forms and -- have you -- do you all have an agreement

12    on liquidated damages or what's -- because I'm trying to figure

13    out if we're supposed to have the jury decide willfulness, if

14    they come back with a Fair Labor Standard Act verdict, whether

15    they determine willfulness to double the amount.

16         MR. POLLOCK:  We're not dealing with -- we only have a

17    two-year statute.

18         THE COURT:  Right.

19         MR. POLLOCK:  So I guess it's -- it's not the

20    willfulness, I guess.  If we had the three-year, it would be

21    the willfulness.  Otherwise, it's the defendant's burden to

22    show the objectively and subjectively reasonable and good faith

23    belief on the liquidateds.

24         THE COURT:  Right.  But is there going to be something

25    in the verdict form where the jury makes that finding, so I'm

1   going to be able to decide, if the jury comes back with a

2   verdict for plaintiff, whether I'm going to double it?

3        MR. POLLOCK:  We haven't put anything in there to ask

4   for an advisory.  So the answer is "no", if -- we hadn't put

5   anything in there.

6        THE COURT:  Well --

7        MR. POLLOCK:  If the Court wants, then, obviously, we

8   can...

9        THE COURT:  The reason I'm asking is it seems to me

10  that the state statute is relevant as to that issue.  And if

11  the jury is going to decide the Fair Labor Standard Act part of

12  it, then it would seem to me that the jury should decide the

13  issue as to whether or not the defense relied on whatever to

14  give me an advisory opinion as to whether I should double it.

15       MR. POLLOCK:  And for that reason, we didn't put it in

16  there, Your Honor, because it's a question of law to be

17  determined by the Court.  And so since it's not something

18  within the province of the jury, absent a claim for

19  three years, I don't -- it -- the jury doesn't need to know

20  about the nurse registry issue because it has nothing to do

21  with any decision that the jury would be called upon to make.

22       The Court, obviously, is in a different position and

23  wouldn't be swayed, you know, by the introduction of evidence

24  as it relates to nurse registry.

25       THE COURT:  Well, if it's irrelevant for the jury, and

1    I don't put in the nurse registry law to the jury, and that

2    evidence isn't in the record for the trial, how am I going to

3    rely on that evidence to say there was no state of mind that

4    would warrant a doubling of the verdict?

5         MR. POLLOCK:  Because reliance on state law, I don't

6    think as a matter of law, can act as an -- act as a reasonable

7    good faith belief that you're in compliance with a federal law.

8    And so, I think that's the standard; right?  It's whether there

9    has been a reasonable and good faith belief to determine what

10   the federal law under the Fair Labor Standards Act required,

11   and whether you had a -- and what you did to determine what

12   that law was.

13        THE COURT:  Well, I guess what I'm saying is, absent

14   you waiving the liquidated damages issue -- and I'd be

15   surprised if you would do that -- absent you waiving that, then

16   it seems to me that I would like to have an advisory opinion

17   from the jury as to whether or not they think that the state of

18   mind was such that, you know, they were relying on whatever in

19   what they were doing to help me decide whether the amount

20   should be doubled.

21        MR. POLLOCK:  I mean, we obviously -- we're not going

22   to waive liquidateds, as Your Honor would suspect.  I still

23   don't believe that from a legal standpoint -- and, you know,

24   the case law supports relying on state law to demonstrate good

25   faith compliance with the Fair Labor Standards Act.

```
 1          THE COURT:  Do you have a case saying that you can't
 2   rely on state law to -- to base your good faith reliance?  Or
 3   do you have the cases I'm familiar with saying that, you know,
 4   federal law trumps state law when it comes to the Fair Labor
 5   Standards Act?
 6          MR. POLLOCK:  Since the issue hadn't been raised by the
 7   defenses as a defense to liquidated damages, I haven't looked
 8   at it, but I can certainly go ahead and conduct that research
 9   and provide the Court with some citations for authority to
10   address that.
11          THE COURT:  And we can do that, you know, at or near
12   the charge conference.
13          MR. POLLOCK:  Well, I mean --
14          THE COURT:  But at this point, I'm letting in -- him to
15   talk about the state statute.
16          MR. POLLOCK:  I mean, I -- I could do some research,
17   but, I mean, my recollection of the law, and it is an
18   objectively reasonable and good faith belief, that you complied
19   with the Fair Labor Standards Act, not that you have complied
20   with some state statute, which isn't a defense, as a matter of
21   law, to compliance.
22          So -- because what their argument is, is, you know, I
23   relied on this state statute to avoid -- you know, in thinking
24   that I was in compliance with the federal statute.  But
25   under -- whether it's a criminal scenario, or a civil scenario
```

1    like this, I still don't think that reliance on a state statute

2    is objectively reasonable to determine whether you're in

3    compliance with federal law.  And, in fact, when you look at

4    federal law, which changed, I think, in 2015, and you look at

5    the nurse registry, even the website that they've got, they

6    still point you to the Fair Labor Standards Act and they still

7    point you to -- and I think the -- you know, so it's -- you

8    still have to look to the Fair Labor Standards Act for

9    considerations of employee versus employer.

10           THE COURT:  Well, again, you may very well, at the time

11   of the charge conference, come up with case law saying that the

12   reliance on state law is not a defense that would obviate the

13   necessity of the Court considering liquidated damages, and then

14   I could strike the testimony about the state law reliance.

15           But at this point, I'm letting it in.

16           MR. POLLOCK:  Understood.  My objection has been noted.

17           THE COURT:  Anything further before we bring the jury

18   in?

19           MR. GOLDBERG:  Your Honor, there is one issue I need to

20   bring before the Court's attention.  The Court may remember

21   that last week, we had a -- before this Court, we had a hearing

22   wherein the Court granted our motion to allow Angela Melendez,

23   a witness, to testify remotely via Zoom.

24           THE COURT:  Right.

25           MR. GOLDBERG:  Subsequently -- well, contemporaneous

1   with that order, counsel asked if we could take the deposition

2   of Ms. Melendez, and we -- and since this case was moved to the

3   back end of this docket, we had no objection to that.

4          That deposition took place on October 25th, last

5   Wednesday.  Ms. Melendez, as counsel saw, is -- is debilitated.

6   We were planning on doing the Zoom hearing -- I'm sorry -- her

7   attendance by Zoom.  But we are asking the Court, in part,

8   because the Zoom connection was weak -- she does not have

9   Wi-Fi.  We had to do the Zoom deposition by -- by portable

10  phone.  The transcript has been -- I'm sorry -- the deposition

11  has been transcribed.  We would ask that in accordance with

12  Rule 32 that Ms. Melendez be excused from having to appear and

13  having her deposition read into the record as her testimony.

14         Counsel was present.  It was his deposition.

15  He -- he -- he conducted his direct examination.  I crossed.

16  And counsel had the opportunity to redirect, if he chose -- if

17  he so desired to do so.

18         We would ask that, due to Ms. Melendez's infirmed

19  state -- and counsel saw her condition -- that she be allowed

20  to -- that her deposition be read into the record as her

21  testimony in this matter.

22         THE COURT:  Mr. Pollock?

23         MR. POLLOCK:  We oppose the motion, Judge.  We took the

24  deposition as a discovery deposition, which is what Your Honor

25  permitted, so that way Ms. Melendez could testify remotely.

1   There was --

2          THE COURT:  Let me ask you.  Is this a video deposition

3   or is this just a -- or just an audio deposition that you just

4   have a transcript?

5          MR. GOLDBERG:  I have the -- I have a written

6   transcript, Your Honor.

7          THE COURT:  So that's what you want to do, is just read

8   the transcript in?

9          MR. GOLDBERG:  Have it read into the record by somebody

10  who speaks better than I do.

11         THE COURT:  Mr. Pollock, rather than just have the

12  deposition read into the record, you want to object to it and

13  see whether he can get her to appear by Zoom and the jury see

14  her in a Zoom hearing?

15         MR. POLLOCK:  Well, that's not the only part,

16  Your Honor.  I took a direct examination of a -- of a witness.

17  I didn't cross her as I would in trial.  I was conducting it

18  for purposes of discovery.

19         And so my deposition -- my deposition of Ms. Melendez

20  was to discover the facts that she knows versus how I would

21  examine.  And I believe how -- you know, how I would examine

22  her at trial would be a lot different because she would be up

23  there and she would already have said what she did, and then I

24  would be able to cross-examine her testimony and --

25         THE COURT:  If she changes it.

 1          MR. POLLOCK:  I'm sorry?

 2          THE COURT:  To impeach her if she changed her

 3   testimony.

 4          MR. POLLOCK:  Well, I'm not even talking about

 5   impeaching.  I'm talking about how the -- how the questions are

 6   framed and the answers come out and how the questions are

 7   ordered.  Because --

 8          THE COURT:  All right.  You're objecting to it, so I

 9   will defer ruling on, and I will let you know whether I'm going

10   to let it in or not.

11          MR. GOLDBERG:  Thank you, Your Honor.

12          THE COURT:  Are you going to talk about it in your

13   opening statement?

14          MR. GOLDBERG:  I'm just going to make reference to

15   Ms. Melendez being a witness, Your Honor.  Not the issue of

16   deposition versus live appearance.

17          THE COURT:  Are you going to talk about what she said

18   in the deposition?

19          MR. GOLDBERG:  No.  I'm just going -- I'm just going to

20   basically make reference to what she will testify -- or what

21   her testimony will be.

22          THE COURT:  All right.  So you need a ruling before you

23   do the opening statements, so let me take a recess.

24      (A recess was taken from 11:12 a.m. to 11:23 a.m.)

25          THE COURT:  Back on the record.  Counsel are present.

1          I thought in the past that I had allowed discovery

2     depositions to be read into evidence where the witness was

3     unavailable.  But now, rereading Rule 32, Rule 32 seems to say

4     you can use that testimony when it's being offered against a

5     party.  And you're not offering it as being against the

6     defendants.  It's for the defendants.

7          So unless you can come up with some case saying that

8     you can use a Rule 32 deposition when a witness is unavailable

9     for the party that's seeking to introduce -- the introduction

10    of the deposition, I'm going to sustain the objection.  So...

11         MR. GOLDBERG:  Your Honor, may I be heard on that one

12    point?

13         THE COURT:  Sure.

14         MR. GOLDBERG:  Part of the deposition, a significant

15    part of it, has to do with my client's counterclaim for breach

16    of contract for the solicitation of Ms. Melendez to leave All

17    VIP Care as client.

18         THE COURT:  What part of her deposition are you saying

19    that you're introducing because it's against you?

20         MR. GOLDBERG:  Against us, Your Honor?

21         THE COURT:  Right.

22         MR. GOLDBERG:  I don't believe any of it is against my

23    client.

24         THE COURT:  That's the problem with Rule 32.  Because I

25    think that you can introduce a deposition when -- when it has

1    evidence that, you know, is -- is contrary to -- to what you're

2    arguing.  In other words, if -- if -- if -- well, I don't know

3    if I'm making sense.

4         I guess if there was information in the deposition that

5    was contrary to what Mr. Pollock's case was, that he could

6    introduce that part of the deposition, but I don't know that

7    you can.

8         So let's do this.  Let's stay away from talking about

9    her in your opening statement, and if I change my mind before

10   you get to your side of the case, we can revisit it or maybe

11   you'll get a better Zoom connection and you can call her as a

12   live witness via Zoom, like we originally were planning on

13   doing, and that obviates this whole issue.

14        MR. GOLDBERG:  Understood, Your Honor.  Thank you.

15        THE COURT:  Anything further before we bring the jury

16   out?

17        MR. POLLOCK:  Yes, Your Honor.  The Court asked whether

18   we had any case law on the issue of liquidated damages and

19   state versus federal law.

20        THE COURT:  Right.

21        MR. POLLOCK:  There is a case that Judge Seitz decided

22   last year, and it's called Paguaga,

23   P-A-G-U-A-G-A, vs. Pinnacle.  I have the Westlaw cite, which is

24   2022 Westlaw 326444.

25        THE COURT:  All right.  Let me take a recess and I will

1   go read the case.

2          MR. POLLOCK:  And she cites to Dybach, the 11th Circuit

3   case, so...

4          THE COURT:  We will take another recess.

5          MR. POLLOCK:  Thank you, Your Honor.

6      (A recess was taken from 11:27 a.m. to 11:33 a.m.)

7          THE COURT:  Please be seated.

8          We are back on the record.  Counsel are present.

9          I have got Paguaga vs. Pinnacle One Price Dry Cleaning

10   of Davie.  And what part of the opinion do you want me to look

11   at, Mr. Pollock?

12          MR. POLLOCK:  In the printed opinion, it's at Star 3.

13   It says, "The FLSA assigns to the judge," and that's where it

14   talks about --

15          THE COURT:  All right.  Let me read that.

16          I don't see anything in there saying they're relying on

17   state law.  It can't be considered as a subjective component of

18   the Dybach case.

19          MR. POLLOCK:  Right.  But as the objective component,

20   the objective component puts the onus -- has the Court

21   determine, as a matter of -- as a matter of fact whether the

22   employer inquired what the obligations were of the FLSA, and

23   then whether that inquiry was reasonable.  And here, with --

24   the evidence that the defense intends to put forth is that they

25   inquired of state law.  And this is a presumptive imposition of

1    liquidated damages.

2         And so when you look at Dybach, when you look at the

3    other South Florida Psychiatric case, what the 11th Circuit

4    talks about is you have to have an honest intention to

5    determine what the FLSA requires, and then that you are

6    attempting to comply with that.

7         THE COURT:  And I have no problem instructing the jury

8    on that and asking them to give me an advisory opinion.  The

9    problem I have is excluding this whole aspect of the state law

10   being contradictory to the FLSA may eliminate the defendant's

11   argument that they satisfied a subjective component of the

12   Dybach liquidated damages calculations.

13        MR. POLLOCK:  Well, that's why we moved in limine.

14   Because we think that that is proper to eliminate that because

15   it doesn't factor into the analysis that's to be conducted.

16        THE COURT:  And I denied the motion in limine.

17        MR. POLLOCK:  Understood.  And you said you

18   would -- and so here we're, again -- and the issue is what the

19   Court's saying is that from the -- the Court's saying that it's

20   considering, as objectively reasonable, looking to state law,

21   to find out a what the FLSA provides.  Because I think the

22   statutes can be --

23        THE COURT:  I'm not saying that.  I'm saying

24   that -- that the finder of fact, which, I guess, is me, in this

25   case, can look at both a subjective and an objective component.

1    And to me, it should be admissible what they subjectively were

2    trying to do; that they were subjectively relying on a state

3    statute, that they're between a rock and a hard place, and

4    they're relying on the state statute.  And, you know -- you

5    know, objectively, maybe it wasn't reasonable for them to rely

6    on the state statute, but subjectively, that's what they were

7    doing.

8         And to eliminate from the finder of fact's

9    consideration, or in this case, the finder of fact giving an

10   advisory opinion I'm not comfortable doing.  And that's the

11   reason that I denied the motion in limine, and that's the

12   reason I asked you earlier this morning if you wanted to waive

13   liquidated damages.  Because, to me, the state statute, if

14   it's relevant, is only relevant to the subjective component of

15   liquidated damages.

16        MR. POLLOCK:  But here, in looking at Dybach, what --

17   Dybach and Paguaga and the other more recent 11th Circuit

18   cases, the subjective component is having an honest intention

19   to ascertain what the FLSA requires.  And so --

20        THE COURT:  And if you had a case saying that, then I'd

21   be more comfortable eliminating this evidence.

22        MR. POLLOCK:  That's what Dybach says.  Dybach says,

23   "To satisfy the subjective good faith component, the employer

24   has the burden of proving that it had an honest intention to

25   ascertain what the act requires and to act in accordance with

1    it."

2           THE COURT:  No.  And what I'm saying is that Dybach

3    doesn't say that you have to have an honest intention to

4    ascertain what the federal law requires, and that, you know,

5    considering contrary local regulations or state laws is -- is

6    irrelevant.

7           MR. POLLOCK:  And that's because of the supremacy

8    clause that the federal laws take precedence over and control

9    over state law.  So that's why they said you have to look at --

10          THE COURT:  And that's why I didn't grant summary

11   judgment in this case as to the FLSA case, because of the

12   supremacy clause.  But when you come to liquidated damages,

13   that's a different issue to me.  Although almost always you are

14   going to grant liquidated damages in an FLSA case.  I don't

15   want to prevent a defendant from having the opportunity to

16   argue, either to me or in an advisory opinion to the jury, that

17   subjectively, they thought they were complying with the law.

18          MR. POLLOCK:  But I -- and I think it's the statement

19   complying with the law.  Because the requirement's what the

20   11th Circuit's made clear, because this is the defendant's

21   burden, is that they've got to show that they were trying to

22   comply, not just with the law but with the FLSA.  And by

23   looking to the state statute, there is nothing there that the

24   state statute is in compliance or not in compliance with the

25   FLSA.

1          THE COURT:  I think it's a tough sell to a jury to tell

2     the jury that, you know, trying to follow the law isn't good

3     enough; you have to follow the federal law.  And that if you

4     follow state law, too bad on you, that you should have followed

5     federal law.  And you can argue that to the jury and they can

6     give an advisory opinion that's persuasive, I guess, not

7     controlling on me.  And then I can decide, if you win the case,

8     whether liquidated damages, in total, should be doubled or a

9     percentage of the damages should be awarded.

10          MR. POLLOCK:  If Your Honor, may -- can I confer with

11    my client on this issue before we go any further?

12          THE COURT:  Sure.

13          MR. POLLOCK:  Can we take just a moment or two?

14          THE COURT:  Go ahead.

15          MR. POLLOCK:  Okay.

16       (Pause in proceedings.)

17          MR. POLLOCK:  Thank you, Your Honor.

18          After conferring with my client, we are going to

19    proceed with the potential to seek liquidated damages at the

20    end of the case.

21          THE COURT:  Anything further before we bring the jury

22    out?

23          MR. POLLOCK:  If that -- when we do get to the charge

24    conference, I may get -- I may propose an additional

25    instruction as related to this issue, but I guess we can cross

```
1    that bridge when we get to it.

2              THE COURT:  Sure.  Ready?

3              MR. GOLDBERG:  Your Honor, I didn't hear what counsel

4    said.

5              Are you proceeding with liquidated damages?

6              MR. POLLOCK:  Yes.

7              MR. GOLDBERG:  All right.  Thank you, Your Honor.

8              THE COURT:  Let's bring out the jury.

9         (The jury entered the courtroom at 11:47 a.m.)

10             THE COURT:  You can go around next time.  You don't

11   have to shimmy through there.

12             A JUROR:  I thought it would be easier.

13             THE COURT:  I think Ms. Floyd is in Seat Number 3.

14   Mr. Baig is in Seat Number 4.

15             A JUROR:  He's Number 4?

16             THE COURT:  Yeah, I think he's in 4.  And Ms. Albano is

17   in 5, Rogger is in 6, and Snyder is -- where is Ms. Floyd?

18             A JUROR:  (Indicating.)

19             THE COURT:  I think you're in 3.

20             A JUROR:  I'm in 3?

21             THE COURT:  I think Ms. Floyd's in 3.  I think you're

22   in 5, I think.  So we've got Fote, Peters, Floyd, Baig, Albano,

23   Snyder -- Rogger, Snyder and Estroff.  All right.

24             We have the jury back.

25             Did every follow my admonition not to discuss the case
```

1    or not allow it to be the discussed in your presence?

2         I apologize for the delay.  We were working on some

3    evidentiary matters so the trial will go smoother.  Hold that

4    against me, not against the lawyers.  They were here, ready,

5    willing, able to proceed.

6         We are ready for opening statements.

7         Mr. Pollock, you may proceed.

8                        OPENING STATEMENT

9         MR. POLLOCK:  Thank you, Your Honor.

10        Can I use the mic?  Actually, you know what?  I am

11   going to be over here.

12        I wanted to just start off by thanking everybody for

13   taking time out of your lives to help us and to actually decide

14   our case for us.  As Judge Dimitrouleas said, His Honor is

15   going to be here to decide issues of law and to kind of referee

16   what goes on as between evidence and the lawyers.  But as far

17   as deciding the case, that's -- that's going to be your job.

18   And, you know, it's -- it's time out of your lives, but it is a

19   great public service to be able to do that.

20        And so I just wanted to reintroduce myself.  My name is

21   Brian Pollock.  Daisy Valdivieso -- Cruz Valdivieso is sitting

22   at the table in the middle, and Luna Alvey is also an attorney

23   with my office at the table, and Daisy's husband is behind us.

24        And we're here because we've got a disagreement with a

25   former -- former employer.  And from the way we look at things,

1    and in our view of this case, our view of the facts, our view

2    of the law, this is a fairly straightforward case.

3         And we're here because Daisy's former employers didn't

4    pay her properly.  So they didn't pay her for about, let's say,

5    a week and a half of work, and at -- during the whole time she

6    was there, they never paid her overtime.

7         And at the end of this case, we're going to ask that

8    you award Daisy a judgment for what she's owed.  There's no

9    claim for pain and suffering.  There is no claim to make this a

10   bigger number than what it is.  She's just asking for what she

11   earned and what she's owed and what the evidence establishes

12   that she's entitled to -- to a judgment for.

13        And more specifically, you know, I will go through a

14   presentation, but Daisy is asking for not a lot of money

15   in -- in -- in the minimum wages.  It's probably a couple

16   hundred bucks in the contract wages that she was supposed to

17   get.  At $13 an hour, it's going to be less than $2,000.  And

18   for the overtime, you're going to see it's going to be around

19   about 10,000.  And I'll have exact numbers for you; and the

20   evidence will show you exactly what that is and how we get to

21   it.

22        You know, and the nice thing about our case, because

23   there's a lot of people who work for employers where there's no

24   time records for whatever reason, but here we do.  And you're

25   going to hear that, you know, one of the requirements for

1    Daisy's job was that she's supposed to fill out a time sheet.

2    She was required to do that as part of her job, and then she

3    would get paid by direct deposit.  And her time sheet would

4    show the hours she worked and the days that she worked, and her

5    time sheets -- excuse me -- her pay stubs would show that she

6    got paid by direct deposit for a certain number of hours each

7    week.

8            And you're going see that she worked overtime and she

9    worked a lot.  And nobody's going to dispute that Daisy worked

10   a lot of overtime.  And, you know, we're dealing with -- and

11   the evidence is going to show is that because they paid Daisy

12   as an independent contractor, you're going to hear they didn't

13   pay her overtime.  And you are going to hear what else they got

14   away with not paying when she worked more than 40 hours week.

15           And so I want to go through and first talk about the

16   claims that we brought under United States federal law, the

17   Fair Labor Standards Act, or the FLSA.  I kind of blow through

18   those because I use them a lot in my work; we all don't,

19   normally.  But I think you're going to learn a couple things

20   and see whether, you know -- whether we really know what an

21   independent contractor and an employee is, or whether the law

22   treats it a little bit differently than what we might think.

23           Can I get the HDMI?

24           COURTROOM DEPUTY:  Just plug in.

25           MR. POLLOCK:  Thank you.

1            So our first claim is that defendants owe Daisy minimum

2    wages as an employee under the Fair Labor Standards Act,

3    United States federal law, and that she's also owed overtime,

4    and that they breached their contract to pay her the wages that

5    she earned.

6            So the first two claims we lump together because those

7    are the claims, as you see, that are under United States

8    federal law, which deals with minimum wages and overtime.

9            And so the evidence is going to show that Daisy worked

10   for All VIP Care and Ms. McKinnon, and they provide medical and

11   nonmedical caregivers, whether it's nurses or registered nurses

12   or licensed professional nurses, LPNs and -- or home health

13   aides and certified nursing assistants, who provide nonmedical

14   care.

15           And it's a home health agency.  And what the evidence

16   is going to show is that both of them employed Ms. Valdivieso,

17   and that's going to be one of the questions for you to answer

18   at the end of the case.  Ms. McKinnon owns All VIP Care.

19   You're going to hear that we're suing her individually because

20   the law allows it, and that -- you're going to see checks that

21   she wrote and hear about how, you know, she's the one who

22   decided how much Ms. Valdivieso was going to get paid per hour

23   and how that's going to factor in as to whether you decide that

24   she's an employer under -- under the law.

25           And it's -- it's our position, and we expect you to

1    find at the end of the case, that the defendants actually hire

2    employees.  They call them independent contractors, and they

3    pay them as independent contractors, but what you're going to

4    hear is that, you know, that there is an application, that they

5    interview applicants, they conduct background checks.  They

6    then pay these nonmedical -- or aides or companions by the

7    hour, like Daisy.

8          She had to sign an exclusivity agreement that she could

9    only work for All VIP Care.  In fact, that's the other part of

10   the case that the defendants are going to tell you, that

11   they're suing Daisy, claiming that she stole clients.  And

12   you're going to hear about that, but they're also saying she is

13   an independent contractor.  And you're going to see if that

14   kind of meshes or doesn't mesh or doesn't make any sense.

15         You're going to hear, you know, how they assign

16   clients, how they tell her where to go.  They provide a plan of

17   care that talks about what Daisy is expected to do when she

18   goes to someone's home.  Whether it's cleaning, whether it's

19   bathing, whether it's cooking, or just sitting there and

20   talking to them as a companion.  And then Daisy is going to get

21   paid by direct deposit by the hour.

22         So at the end of this case, you know, because it's kind

23   of nice to have where we're heading to on this,

24   Judge Dimitrouleas is going to instruct you on the law.  And

25   His Honor is going to talk about different factors about how

1     you decide whether someone's an employee, as we believe, or is
2     an independent contractor, how they paid Daisy.  And so those
3     six factors deal with:  Control; how she was paid; whether
4     Daisy had an opportunity or a risk for loss, so if she could
5     use her ingenuity to make more money or if she could lose money
6     because she invested a lot in this new business venture; or
7     whether she was just an employee; whether she had to purchase
8     any supplies or who really spent the money to -- to get clients
9     and run the business; how Daisy offered her services, whether
10    she was offering services by advertising and going out and
11    marketing herself and trying to get clients; or whether she
12    just showed up for work; and what was -- what are the parties'
13    intent?

14          So what's the evidence going to show?  The evidence is
15    going to show that the defendants controlled everything, that
16    they controlled Daisy in her work, that they paid her hourly,
17    that she had no risk of losing any money, that they provided
18    everything she needed.  They advertised and marketed for
19    clients.  They gave her the time sheets, gave her the schedules
20    that she was supposed to work, the care plan.

21          They billed the insurance companies, or Medicare or
22    Medicaid, they collected the payment, and then they paid Daisy
23    hourly.  You are going to hear that she didn't work for anybody
24    other than All VIP.  In fact, you're going to hear that she
25    didn't work for anybody on the side, nobody paid her directly.

1    She just did her job, and that she wasn't getting paid.  And

2    that she decided to leave because she wasn't getting paid for

3    what she worked.

4          And so you're going to see schedules to show that

5    they -- the evidence will show that the defendants controlled

6    Daisy in her work.  They showed her when to work, because there

7    was a schedule.  Told her where to work; said "you need to be

8    at, you know, Mr. Izique's home at a certain time."  And then

9    they had these care plans that would say what had to be done.

10         Then you're going to see pay stubs, and these are going

11   to be in evidence -- or they're in evidence, and you're going

12   to see that Daisy was getting paid $13 an hour by direct

13   deposit.

14         You're going to hear that Daisy had no risk.  She

15   didn't make any significant investment.  If she had to buy

16   anything -- and this was during COVID, 2020 through 2022,

17   2021 -- she had to buy gloves and masks.  We're not talking

18   about the height of the pandemic.  We're talking about gloves

19   and masks because are you going into somebody's home, and

20   sometimes you had them, sometimes you needed them.

21         But then you are going to hear what Daisy spent, and

22   then you're going to hear everything else that the defendants

23   had to run their business and see who really had an investment,

24   who really had a risk or -- a risk of loss, whether Daisy had

25   an opportunity to make a lot more money because she could

 1    really be -- use her ingenuity and really get a great return

 2    for her hour, or whether she was -- she can only make $13 an

 3    hour, can only work so many hours in a day.  You can only get

 4    $13 an hour, couldn't hire anybody else.

 5         And so you're going to see that the defendants provided

 6    everything that Daisy need to work.  They provided the clients

 7    through advertising and marketing.  That they had a care plan

 8    where they went through and meet with the client, with their

 9    family members, do an assessment.  Figure out the pricing or

10    the fee, whether it's insurance or private pay.  Find a

11    caregiver, assign the caregiver.  Then they would go through

12    and do the billing.

13         Acquire the time sheets.  Submit the time sheets.

14    Collect the payments.  Verify that the time was actually

15    worked.  Then they'd collect payments from the insurance

16    companies or the families, and then they would pay Daisy and

17    the caregivers by direct deposit.  And there was a whole office

18    support staff, receptionist, an officer manager.  There were

19    multiple administrators.  They had a doctor and nurse, a whole

20    back office, versus Daisy.

21         And what the argument is, is that Daisy was an

22    independent contractor; and you're going to hear that's like

23    having her own business.  Did Daisy really have her own

24    business or was she an employee?

25         But they had, you know, computers and desks and

1   monitors and all of the software.  Daisy showed up maybe with

2   mask and gloves, a job where she was told to get paid by the

3   hour.

4           You are going to hear what Daisy did, and how what

5   Daisy did is really help out in the home, what we as adults do,

6   whether it's cooking or cleaning, helping somebody bathe or

7   shower, sit by them and be their companion.  And we will hear

8   Judge Dimitrouleas talk about whether there is a special skill

9   involved or not.

10          Daisy showed up for work, she followed her schedule,

11  and she was supposed to get paid.

12          You are going to hear about the 20 or so pages that the

13  defendants required Daisy to sign when she started working, and

14  one of those pages had an exclusivity agreement, a covenant not

15  to compete.  And they have sued Daisy because they're claiming

16  that she actually was competing.  They're saying that she

17  convinced a couple clients or tried to get them to leave.

18          And so the part of the analysis that you're going to

19  look at under the law is whether Daisy could work for other

20  people.  And according to the defendants, she couldn't.  So

21  you've got somebody who is paid by the hour, who can't work for

22  anybody else, who shows up where and when they're told, who

23  doesn't have their own clients, who doesn't contract with the

24  clients or patients that she's taking care of.  And their

25  defense is that she's an independent contractor.

1          And so what we're going to ask you to find at the end

2     of the case is that Daisy should have been paid as an employee,

3     and that she wasn't in business for herself.

4          And you're going to hear from Daisy about what she did

5     at work.  You're going to hear from the daughter of

6     Mr. and Mrs. Izique, one of the people -- these are a husband

7     and wife who Daisy took care of.  You're going to hear from

8     Ms. McKinnon, who owns All VIP, and you're going to hear from

9     her administrator in the Fort Lauderdale office and hear

10    everything that they did.  You are going to compare that with

11    what Daisy did, what Daisy was supposed to do, what she was

12    allowed to do.

13         And so our claims are these two under federal law.  And

14    then we've got the breach of contract claim.  And that claim is

15    that Daisy worked and didn't get paid for time that she worked.

16    You are going to hear that defendants billed for these hours,

17    but didn't pay Daisy.  So they -- there is no dispute that

18    Daisy was supposed to get $13 for every hour that she worked.

19         Her documents -- you don't have to take my word for it,

20    because what I say is not evidence.  But take a look at the

21    documents that are in evidence, and take look and see how many

22    hours did Daisy put down.  You're going to see how many hours

23    the defendants billed for, and then you're going to see the pay

24    stubs and see that they end, that Daisy doesn't get paid for

25    the last week of work, July 17th, through the -- excuse me --

 1    the 18th through the 24th.

 2              And then there is some time in May, May 5th and 6th,

 3    that Daisy didn't get paid for for working a couple of days.

 4              So, you know, what Daisy is going to claim is contract

 5    pay, 1,700 and-some-odd dollars, and we will walk you through

 6    the math.  And that's what she's going to ask for in her

 7    contract pay.

 8              And what else are you going to hear?  Well, the

 9    defendants are going to distract you.  They're going to say,

10    "Well, you know, we're suing Daisy.  She's a bad person.  Look,

11    look, she's trying to steal our clients."  But they're going to

12    say they -- they're going to have to prove that they fully

13    performed -- that All VIP did everything it was supposed to do

14    under its contract, that it paid Daisy not only just the $13 an

15    hour that it was supposed to pay, but also the minimum and

16    overtime wages that she earned, and that she stole one or more

17    of her clients.  And that if she did, that they suffered

18    damages as a result.

19              And so if you find that All VIP breached its contract,

20    it broke its agreement by not timely paying Daisy what she

21    earned, you're going to hear that she doesn't have to abide by

22    the noncompete.

23              And what you're also going to hear is that Daisy didn't

24    steal any clients.  She didn't cause any damages.  You're going

25    to hear that as well.  And you're going to hear from the

1    daughter of the Iziques, and she is going to tell you why her

2    mother and father stopped contracting with the defendants.  And

3    she's going to tell you it wasn't because Daisy coaxed them

4    into doing it.  She's going to tell you it's because she wasn't

5    happy with what was going on, that there was times when her

6    parents didn't have a caregiver, that All VIP couldn't provide

7    one; and for that reason, she needed to find a company that

8    could.

9           And so what you're also going to hear is you're going

10   to hear some talk about nurse registry.  That's a whole

11   separate situation.  The defendants are going to claim

12   we -- there is a defense for a nurse registry, you know, and

13   they're going to talk about Florida state law.  Our claims are

14   under the United States federal law, and you're going to decide

15   at the end of the case, if you decide that Daisy is owed

16   overtime or minimum wage, whether she should get twice that

17   amount.

18          And so when you hear about a nurse registry and you

19   think about whether that's Florida or federal law, remember

20   we're here under federal law, and the judge is going to

21   instruct you on what the difference is and what that means.

22          And so, what we ask you to do is to keep an open mind

23   during this entire process.  Look at the economic realities you

24   are going to hear about the situation.  Judge Dimitrouleas is

25   going to talk about how unlike, you know, in a federal case --

1   excuse me -- a federal criminal case or a state criminal case,

2   where you can waive your right to silence, there is no waiving

3   your rights under the Fair Labor Standards Act.  There's no

4   waiving your rights to overtime or minimum wage, that you can't

5   sign them away.

6        And that if you decide that Daisy was an employee,

7   because her whole livelihood depended on the work that she

8   earned, that you're going to decide how much money she's owed.

9   And so what we ask you is that you keep an open mind, that you

10  consider the evidence, and not -- not lawyer speak; right?  Not

11  the arguments from us, but what do the documents show you?

12  What does it prove?  What are the witnesses who you are going

13  to see and hear, what are they testifying to?  And make your

14  decision based on the evidence that you hear during this whole

15  trial.

16       And so I -- I appreciated your attention.  I will have

17  an opportunity to speak to you at the end of the case.  We are

18  going to try to get through it as soon as we can.  So I

19  appreciate your attention, and Daisy and Luna do as well.

20       Thank you.

21       THE COURT:  Mr. Goldberg.

22                    OPENING STATEMENT

23       MR. GOLDBERG:  Thank you, Your Honor.

24       Good afternoon, everybody.  Again, I'm Randy Goldberg

25  and I represent the defendants in this matter.  I don't have

1   any videos to show you or YouTube or whatever the new wave

2   things are.  All I'm here to do is tell you that the witnesses

3   and the evidence is going to refute the claims presented by

4   Mr. Pollock.

5         My client, the witnesses, Liz McKinnon, Diana Ramirez,

6   who you will be hearing from, she is the media supervisor for

7   Ms. Figuera, you are going to hear testimony and see evidence

8   that will explain the operational requirements and realities

9   that are set forth by Florida law as to the operational

10  mandates for nurse registries.  All VIP Care is a nurse

11  registry licensed, controlled, and operated under Florida state

12  law.

13        You're going to hear evidence and you're going to see

14  documentation whereby Ms. Figuera met with Ms. Ramirez, who is

15  fluent in Spanish, the documents were explained to her over a

16  great deal of time, and Ms. Figuera signed on as an independent

17  contractor.

18        I asked everybody earlier if they were aware of the

19  difference between an independent contractor and a W-2

20  employee.  Everybody acknowledged that they are, which is

21  wonderful, because that's -- that's an important key here in

22  this case.

23        The claims presented by Mr. Pollock on behalf of his

24  client are going to be refuted by the -- by the testimony and

25  the evidence that's going to be presented before you.

1          The creation of the independent contract relationship

2   between a home health aide, such as Ms. Figuera, and All VIP

3   Care is not a stand-alone or a unique relationship.  It's a

4   relationship that's mandated by state law.  Also, the clients

5   that are served by the nurse registry, All VIP Care --

6          MR. POLLOCK:  Objection, Your Honor.  Could we go

7   sidebar for a second?

8          THE COURT:  No.  You can make an objection, and I will

9   rule.

10          MR. POLLOCK:  I'm going to object that's a

11   mischaracterization of Florida law that it's a requirement.

12          THE COURT:  Okay.  I will tell the jury what the law is

13   at the end of the case.

14          What the attorneys say isn't the evidence, isn't the

15   law, but I allow wide latitude during opening statements.

16          You may continue, Mr. Goldberg.

17          MR. GOLDBERG:  Thank you, Your Honor.

18          The evidence is going to show, and the testimony is

19   going to show, that Ms. Figuera was paid for all the hours that

20   were authorized by Medicare -- I'm sorry -- by Medicaid, and

21   which she documented and worked.  You're going to hear

22   testimony as to the difference and the definition of what

23   authorized hours are and that the care plan that counsel

24   referenced is not something that is created or -- or drafted by

25   All VIP Care.  It comes from Medicaid and their care managers,

1    and that's important because that goes to the control element

2    that counsel represented.

3         You are also going to hear testimony that there was

4    solicitation of the VIP -- All VIP clients by Ms. Figuera,

5    trying to get them to go to another nurse registry, the one

6    that Ms. Figuera left All VIP Care for, and took -- and entered

7    into an independent contract relationship with them as well.

8    The -- in fact, one of the clients was so taken back and so

9    bothered by the efforts of Ms. Figuera, she had to block

10   Ms. Figuera's phone calls.

11        Counsel pointed out six factors that his client's

12   position is, creates the ambiance or creates the fact that

13   Ms. Figuera's relationship with All VIP Care was an

14   employee/employer relationship, when, in fact, when you -- when

15   you take the evidence as it's going to be presented to you, and

16   you apply those six standards, called the economic realities

17   test, and the judge will instruct you on that, that the

18   relationship was clearly, under federal law, that of an

19   independent contractor, not an employee.

20        Reference was made that Ms. Figuera's last paycheck,

21   what -- she was not paid for, for those hours.  You're going to

22   hear testimony from the patient, or as we refer to as a client,

23   that the reason that issue was unresolved and it is still

24   unresolved is because there was an articulable dispute between

25   the hours that were authorized, the hours that were worked by

1   Ms. Figuera.

2          And when Ms. Figuera was challenged on the difference

3   in hours by the client, the client told her to change it with

4   All VIP Care, and she never did.  She was given the opportunity

5   on numerous times.  So there are several hours that are still

6   out there because Ms. Figuera would not reconcile

7   those -- those pay -- I'm sorry -- the paycheck that would

8   coincide with the hours that were worked.

9          I have taken enough of your time.  All I ask on behalf

10  of All VIP Care and Ms. McKinnon is:  Listen, pay attention,

11  apply the facts to the law as you will be instructed.  And my

12  clients are confident that you are going to find for them in

13  this matter.

14         Thank you for your time.

15         THE COURT:  All right.  Members of the jury, we are

16  going to recess for lunch.  Remember my admonition not to

17  discuss the case or allow it to be discussed in your presence.

18  I'm going to ask you to be back at 1:30 and be back in the jury

19  deliberation room at 1:30.

20         So have a nice lunch.  We will see you back at 1:30.

21      (The jury exited the courtroom at 12:17 p.m.)

22         THE COURT:  And if there is nothing else to come before

23  the Court, we will be in recess until 1:30.

24         MR. GOLDBERG:  Thank you, Your Honor.  Is the courtroom

25  going to be locked and secured?

```
 1              COURTROOM DEPUTY:  Yes.

 2         (A recess was taken from 12:18 p.m. to 1:32 p.m.)

 3              THE COURT:  All right.  Back on the record.

 4              Counsel are present.

 5              Anything to come before the Court before we bring the

 6    jury in?

 7              MR. POLLOCK:  We're just waiting on Ms. Rowland.  She

 8    went to go park.  We're going to take her out of order.  She

 9    drove down from Jupiter, so she just went to go park.  She was

10    here, opening the courtroom, and then realized she didn't park

11    in the right place.

12              So she's walking back from the garage.  I don't

13    anticipate she is going to be too long.

14              THE COURT:  All right.

15              MR. POLLOCK:  We will probably get through

16    Ms. McKinnon, probably for the rest of the day, based on what

17    time it is.  And then we can kind of plow through tomorrow.  I

18    don't think we're going to take that long, the rest.

19              THE COURT:  Okay.  I was looking through Rule 32 over

20    the lunch break, and I think I had a senior moment when it came

21    to Rule 32, thinking that you could only introduce a deposition

22    if it was adverse to you, which doesn't make any sense.  Why

23    would you introduce a deposition that was adverse to you?

24              I think the correct interpretation of Rule 32 is you

25    can introduce a deposition if it's adverse to a party, which
```

1   would include you and include opposing counsel.  So I'm

2   assuming that this deposition is adverse to a party, and if she

3   can't testify by Zoom, it would seem to me that the basis for

4   Rule 32 applying would allow her testimony to be read over the

5   plaintiff's objection that they weren't prepared for the trial

6   testimony.  They were only prepared for a deposition --

7   discovery deposition.

8          Let's see if you can get her to testify live, and that

9   will obviate the whole issue.  If you can't, I'm inclined to

10  allow you to read her transcript.

11         MR. GOLDBERG:  I thank you, Your Honor.

12         And just so we're clear, on lunch break, I made

13  arrangements with the person to be there to help facilitate the

14  Zoom.  If it's unsuccessful, then I will restate my motion to

15  allow the deposition.

16         THE COURT:  Okay.

17         MR. GOLDBERG:  Thank you for that consideration,

18  Your Honor.

19         THE COURT:  Are we ready?

20         MR. POLLOCK:  Yes, Your Honor.

21         THE COURT:  All right.  Let's bring in the jury.

22         (The jury entered the courtroom at 1:37 p.m.)

23         THE COURT:  All right.  Did you follow my admonition

24  not to discuss the case or allow it to be discussed in your

25  presence?

```
 1              All right.  The plaintiff may call its first witness.
 2              MR. POLLOCK:  For our first witness, we're going to
 3      call Anna Rowland.
 4              COURTROOM DEPUTY:  Please remain standing, ma'am.
 5      Raise your right hand.
 6              Do you solemnly swear or affirm the testimony you are
 7      about to give is the truth, the whole truth, and nothing but
 8      the truth?
 9              THE WITNESS:  I do.
10              COURTROOM DEPUTY:  Please be seated and state and spell
11      your first and last name, for the record.
12              THE WITNESS:  My name is Anna Maria Rowland.
13              COURTROOM DEPUTY:  Spell the last name for me.
14              THE WITNESS:  R-O-W-L-A-N-D.
15      Thereupon:
16                          ANNA MARIA ROWLAND
17      having been sworn by the Courtroom Deputy, testified as
18      follows:
19                          DIRECT EXAMINATION
20      BY MR. POLLOCK:
21      Q.  Good afternoon, Ms. Rowland.  Thanks for coming down today.
22          Where did you drive down from?
23      A.  From Palm Beach Gardens, Florida.
24      Q.  And we're in a case involving Daisy Valdivieso.  How do you
25      know Daisy?
```

1    A.   She used to work for my -- taking caring of my parents.

2    Q.   And how did -- how did she end up taking care of your

3    parents?

4    A.   My parents have a long-term care program through Humana.

5    It's --I think, it's run by Broward, the City of Broward.  And

6    Humana, it provides a certain number of hours per week that

7    they -- I have a father and a mother, and they both were

8    getting hours from the Humana long-term care program to be able

9    to stay at home and stay out of a nursing home.

10        And so they -- those hours were given to an agency that

11   provides the -- I guess they're called home health care agents

12   that come to the house and provide service.

13   Q.   And who is the -- who was the service or the agency that

14   supplied Ms. Valdivieso to your home -- or to your parents'

15   home?

16   A.   It was VIP, All VIP Care.

17   Q.   For your parents, did you have any special requests for the

18   type of aid that All VIP provided?

19   A.   Yes.  Absolutely.  Fortunately, my father spoke a little

20   bit of English.  He has passed away since then.  My mom only

21   spoke Spanish, and she had -- was diagnosed with dementia.  And

22   so it was critical that the agency provided Spanish-speaking

23   people, just for her.  It was very important for her and for

24   the family, for my dad.

25   Q.   The -- was -- was Daisy the first aide or companion that

1   All VIP provided to your parents?

2   A.   That All VIP provided for my parents?  No, I don't believe

3   so.  We had a daycare during the day.  The hours were split;

4   day, which would be, like, from 9:00 until 5:00, and then

5   evening hours that were from 5:00 until the next morning, 5:00.

6   So they were -- I think the lady that was during the day, it

7   was also provided by All VIP Care.

8        And it was -- Jennie Landa (phonetic), I believe, was the

9   first person that they provided.

10  Q.   Did you have an issue with any of the aides that were

11  provided to your parents by All VIP of not being able to

12  communicate with your parents?

13  A.   Yes, we had -- when -- I think at the very, very beginning,

14  they sent a couple of people that were

15  nonspeaking -- non-English -- non-Spanish-speaking.  And also,

16  because the care involved was so difficult working with two

17  elderly people that were somewhat disabled and -- I mean, my

18  mom is blind, dementia.  My dad had Parkinson's.

19       So it -- a lot of the ladies would not want to stay very

20  long with the case.  So, you know, we always requested, if at

21  all possible, younger aides that could potentially stay,

22  you know, longer term-wise.  Because it -- just backtracking,

23  All VIP Care was not the first agency that my parents had had.

24  You know, it was -- as a matter of fact, it was, like, the

25  fourth agency.

1      So we -- we had to make sure that, you know, they -- they

2      could deal with dementia and Parkinson's persons.  And so we

3      requested that, you know, they would be able to do that.

4          Unfortunately, All VIP -- my parents had six-day coverage,

5      and All VIP provided just Monday through Friday.  We were not

6      able -- they were not able to cover weekends, which was,

7      you know, always a troubling point for the whole family and for

8      my parents.  While my dad was okay and he could sometimes cook

9      for my mom, you know, and, you know, kind of appease her so

10     that she wouldn't be so agitated due to the dementia, you know,

11     that got worse and worse as time went by.

12         So it was critical, the weekend care, and also the evening

13     care.  We had a -- I think two people covering the evening

14     hours, which was Monica, that we had requested to be onboarded

15     with All VIP Care, only because she was member -- a family

16     friend that -- from our country, that knew my parents' care

17     very closely.

18         So in a roundabout way, that's...

19  Q.  Okay.  I'm just going to break it down a little bit and ask

20     some -- some better questions.

21         As far as getting an aide from All VIP that didn't speak

22     Spanish, who did you reach out to when you had that?

23  A.  Diana.  Diana was their coordinator.  You know, with the

24     agencies they normally assigned a coordinator, someone that can

25     schedule the patient's time.  And so I would always call -- if

1  I didn't call them, it was my dad or my sister that was calling

2  Diana.

3  Q.  When you told Diana that, you know, that they had sent an

4  aide who didn't speak Spanish, did you ask her to send out an

5  aide who did speak Spanish so she could -- they could

6  communicate with your parents?

7  A.  Absolutely, yes.  Absolutely.

8  Q.  And did All VIP then send Ms. Valdivieso to care for your

9  parents?

10  A.  Yes.  I think that was -- they -- I think Ms. Valdivieso

11  started during the week and evenings, in the evenings, covering

12  for the evenings that Monica could not cover.  But then

13  gradually, I think, she -- we saw that -- I guess my sister and

14  I saw that she was very competent.  My dad saw the same thing,

15  that she was very competent.

16      So when the day lady stopped working or quit, then

17  Ms. Valdivieso took over those hours for my parents' care.  And

18  so, yeah, the -- but the weekends were the critical part for

19  us.  All of my siblings work and travel, and I myself, at that

20  time, just had a grandson that I wanted to visit in Virginia.

21  And originally, I could not move from the area because at any

22  point, you know, they would call -- my dad would call and say,

23  "Nobody showed up," or, "Nobody came."

24      Or he -- if the day lady had an emergency or something, she

25  would call me and say, you know, "I can't.  I'm -- I have to go

1    see my son.  He is in school.  Please reach out."  She would

2    have to call the agency, which she did, and then I would have

3    to call the agency and see if they had somebody available that

4    could care for my parents.  But normally, it was very hard.

5    Q.   And what you're describing is, basically, when there wasn't

6    an aide available, that you or your sister had to either take

7    care of or be on call to take care of your parents?

8    A.   Yes.  Step in, yes.

9    Q.   And when Daisy was there, what kind of things was she doing

10   for your parents?

11   A.   (Indicating.)

12   Q.   When Ms. Valdivieso was with your parents, what kind of

13   things would she do for them?

14   A.   Oh, my goodness.  She required to give them a shower early

15   in the morning.  Actually, very early in the morning, we -- we

16   had to set up a little pillbox next to my dad so that -- with a

17   certain time.  And so she would have to remind him, "You have

18   to take this pill."  You know, wake him up, say, "You have to

19   take your pill."  So -- and provide the water for him to take

20   it and watch that he take it, because sometimes he would throw

21   it on the floor or he wouldn't swallow it.  So -- especially

22   also with my mom.

23        So remind them that they need to take the medicine.  Then

24   prepare a meal, like either oatmeal or something that would

25   have -- you know, be able to feed them.  And we have

1   instructions on what time to feed them.  Because they liked to

2   sleep in late, you know, being elderly.  So -- but their -- we

3   had noticed that their stomach was not, you know -- it was, you

4   know, actually harmful for them to stay so long without food.

5        So we would have them eat oatmeal, like, around 7:30 in the

6   morning, and she would provide that.  And then she would cook

7   the meal for the lunch.  Shower them.  Clean their beds.

8   You know, help my mom go to the bathroom.  You know, make sure

9   that, you know, she was dressed and, you know, cleaned and

10  everything, you know, comb her hair.  She would even take the

11  time to do her nails and, you know, her toenails, which is

12  just -- you know, really, really a godsend to have health

13  agents -- very caring agents like Ms. Valdivieso.

14       And she would stay -- I mean, she would go over and beyond.

15  Sometimes if the evening lady, like Monica, would be late

16  because she was -- she had a different job during the day, she

17  would actually make sure that she stayed until she -- Monica

18  came in so that she could leave, you know, and leave

19  them -- not leave them alone and also make sure that -- my dad

20  was very strong-willed.  He had a little chair, and the

21  priority with them was not to fall, you know, so that they

22  would not end up in rehab or -- and then, you know, the

23  hospital.

24  Q.  And start that spiral?

25  A.  (Nods head.)

1    Q.   How would you describe Ms. Valdivieso as a caregiver for

2    your parents?

3    A.   Excellent.  Really, really excellent.  We -- like I said,

4    it was not the first agency that we had gone through, with All

5    VIP Care, and it was not the first HHA and -- that my parents

6    had had.  They had had very -- many, many of them.

7         And until Ms. Valdivieso, we could not find care like that.

8    She's very thorough, very conscientious.  You know, very

9    organized in detail to make sure that, you know, she would call

10   us and tell us, "Okay.  I have noticed this with your dad.

11   You know, please make sure you talk to the nurse, you know,

12   when they come," or, you know, "Make sure you talk to the

13   doctor," or, "Your mom has an infection going on, so please

14   address that with the doctors."so she was very, very caring,

15   which is what we really needed.

16   Q.   I mean, when Cruz was working at your parents' home, she

17   would be taking care of both of them at the same time?

18   A.   (Nods head.)  Yes.

19   Q.   And as you understand it, was she getting double paid for

20   taking care of two people at once, or what was your

21   understanding as to how that worked?

22   A.   I believe that it was just getting paid for one.  Yes.

23   Q.   And as far as time sheets, do you remember that there were

24   time sheets that Ms. Valdivieso would have to fill out to write

25   down the times that she was there caring for your parents?

1   A.   Yes.   Yes.   I -- I saw them a couple of times.   I was there

2   on weekends only.   The weekend that was -- we are six siblings,

3   and four of us rotate the care because the other ones don't

4   live in the -- in -- one does not live in the country, and the

5   other one did not live in the area.   So four of us were close

6   enough that we could rotate the care on weekends.

7        And so we -- what I remember from that time, I would see

8   the time sheet, and my dad would say, "This is the times.   You

9   need to fill it out for her."   And so I would sit down with my

10  dad and said, "Well, what" -- you know, make sure that she was

11  there.   And we knew she was there, because my parents could not

12  stay without any care.   My dad would have been the first one on

13  the phone calling me, "There is nobody here."

14       So my dad would make sure that all of the -- I think

15  he -- the time sheet also specified the work that they did

16  during the day.   So, you know, like bathing and preparing

17  meals, cleaning the area, you know, supporting them in every

18  way, really, so, you know, keeping companionship.   So many

19  details that go into the care of a person.

20       MR. POLLOCK:   Your Honor, the joint exhibits, do we

21  have to move them in or are they already in for the joint

22  exhibits?

23       THE COURT:   Why don't you list the exhibits that you're

24  jointly moving in.

25       MR. POLLOCK:   Exhibit 1 -- Joint Exhibit 1 is the All

1    VIP Care letter application.  Exhibit -- Joint Exhibit 2 is the

2    application for contractor employment.  Joint Exhibit 3 is the

3    independent contractor agreement.  Joint Exhibit 4 is the

4    acknowledgement of nurse registry policy and procedure.  Joint

5    Exhibit 5 is the home health aide/certified nursing assistant

6    job description.  Joint Exhibit 6 is affidavit of compliance

7    with background screening.  Joint Exhibit 7 is waiver of

8    professional -- excuse me -- is the independent contractor

9    professional liability policy.  Number 8 is the waiver of

10   professional liability insurance.  9 are the composite time

11   records.

12        Joint 10 is the composite pay records.  Joint 11 is the

13   HHA exchange patient calendar.  Joint 12 is defendant's

14   response to the RFPs.  Joint 13 is the -- All VIP's answers to

15   interrogatories.  And Joint 14 is Defendant McKinnon's answers

16   to plaintiff's interrogatories.

17        And I think that's it.

18        THE COURT:  Any objection to those 14 exhibit?

19        MR. GOLDBERG:  No, Your Honor.  Those are joint

20   exhibits.  No objection.

21        THE COURT:  Okay.  So those 14 exhibits will be

22   received.

23        (Plaintiff Exhibits 1-14 were received in evidence.)

24        MR. POLLOCK:  Thank you, Your Honor.

25   ///

1    BY MR. POLLOCK:

2    Q.  All right.  So Ms. Rowland, I'm going to show you pages 38

3    and 39 of Joint Exhibit Number 9.

4         COURTROOM DEPUTY:  Are you connected to the HDMI?

5         MR. POLLOCK:  Yes.

6    BY MR. POLLOCK:

7    Q.  All right.  Ms. Rowland, can you see what is on the screen?

8    A.  Yes.

9    Q.  We talked about these two time records from Joint

10   Exhibit 9, pages 38 and 39, and you talked about for your dad

11   and for your mom.

12   A.  Uh-huh.

13   Q.  Is that your signature at the bottom of these?

14   A.  Yes, it is.

15   Q.  And why would -- why did you sign these time records?

16   A.  Because I was there at that time that day --

17   Q.  Okay.

18   A.  -- she was doing the work.

19   Q.  And does your signature at the bottom indicate that

20   Ms. Valdivieso was putting down time that she actually worked

21   with your parents?

22   A.  Correct.

23   Q.  Is any of the handwriting, other than the signature at the

24   bottom, yours, where it has your name?

25   A.  No.  It's just my signature.

1  Q.  Was -- as far as you know, did you or your parents have a

2  contract directly that was in writing with Ms. Valdivieso?

3  A.  No.

4  Q.  Was the only contract or agreement that your parents had

5  with All VIP?

6  A.  The -- no.

7  Q.  Did they have --

8  A.  It's -- it's -- it's -- the contract is with Humana.

9  Q.  Okay.

10  A.  So Humana is the one -- I mean, if anything -- I mean, we

11  never saw any of the paperwork that went on between the agency

12  and the HHAs or between the agency and the -- Humana.  All

13  we -- I could see was -- if my dad walked into his Humana award

14  or benefits, he could see a claim that the agency had done to

15  the agency, you know?

16      So -- so that the agency -- you could tell that the agency

17  was sending or requesting, you know, hours and payment for

18  services rendered.  And -- but, you know, I -- I could not see

19  any contract.  I could not determine any contract or anything

20  like that.

21  Q.  Okay.

22  A.  That's all...

23  Q.  Did you find out at some point that Ms. Valdivieso was

24  leaving All VIP?

25  A.  It -- okay.  I don't understand the question because what

1   happened is that -- that -- yeah, okay.  Well, let me see.  Let

2   me understand this.

3       What happened is that we switched agencies.  We requested

4   Senior Nannies, and we asked that Ms. Valdivieso be on board

5   with Senior Nannies, and also Monica would be on board at

6   Senior Nannies so that we wouldn't lose the continuity of care

7   of my parents.  And Senior Nannies would provide the weekend

8   care, and they had staffing that spoke Spanish, that could

9   provide the weekend care.

10      So they were -- for me, they were not working with them for

11  a while.  They were so organized.  They were so -- they are so

12  organized there.  So, you know, very conscientious of who they

13  send and making sure that it's a good fit and a good match for

14  the family, and everything.

15      So if Ms. Valdivieso left, it's because we requested that

16  she be onboarded with...

17  Q.  Did she suggest or request that you leave -- or stop

18  working -- or your parents stop working with All VIP?

19  A.  No.  What happened is that my parents have a friend that

20  comes and gives them communion on Sundays, and this friend had

21  suggested Senior Nannies because they knew that they

22  were -- they didn't have any care.  You know, there was nobody

23  there.  So they -- I think, at that time, that lady had -- or

24  had a -- her mother, I think, with Senior Nannies.  So...

25  Q.  When you're saying that "they didn't have any care," you

1    are you referring to All VIP didn't have enough staff to

2    provide?

3    A.   Correct.  Yeah.  They -- they never did provide, you know,

4    weekend care, you know, it was toward the end, the very end,

5    that they started providing weekend care.  And -- but,

6    you know, it was because we had already told them, you know, we

7    provide -- Monica could not work.  But I think Ms. Valdivieso

8    was able to do -- fix her schedule that she could come

9    some -- on weekends.

10        And so, you know, that was a big relief for us.  But,

11    you know, it was just a little bit too late.  We had already

12    gone through so much with them, and we just decided, you know,

13    it was going to be with Senior Nannies now.

14    Q.   Was the lack of care that you -- or the lack of someone

15    helping your parents on the weekend becoming more and more of a

16    problem towards the end?

17    A.   Yes.

18    Q.   And why was that?

19    A.   Because we -- my mom had fallen several times on the

20    weekend, just when there was no care, you know, because nobody

21    was there.  And that was, you know, something that we told

22    Humana.  You know, we said, you know, "They're not providing

23    care.  The whole reason to have, you know, home health care is

24    to stay away from, you know, hospitals and to stay -- have

25    somebody there to provide care."

1       And so when I was unable to be there or my sister was

2   unable to be there, you know, it was -- they were on their own,

3   unfortunately.  And, you know, they -- they fell a couple of

4   times.  It was a big risk, you know, and we told Humana that,

5   you know, it was a big risk.

6       So that's why, you know, we decided to -- to move,

7   you know, from agencies -- change agencies.

8   Q.  And the request to have Ms. Valdivieso kind of work for

9   Senior Nannies, was that so that she could stay working your

10  parents?

11  A.  Yes, yes.  She knew the care.  She knew the -- you know,

12  all of the -- their day-to-day activities, their whole

13  condition, their -- you know, health condition and everything.

14  And with my mom's dementia, having somebody new was always,

15  you know, very -- very hard.  You know, she would have to adapt

16  to the person, and she would fight, and, you know, they would

17  have to understand, you know, dementia people are very hard

18  to -- to -- they're not so flexible.  They're very inflexible,

19  so it's very hard to deal with.

20      So Ms. Valdivieso was very good at that, you know,

21  making -- appeasing her, you know, especially with my dad,

22  you know, getting older and, you know, having a lot more issues

23  that, you know, he just would leave that to deal with -- just

24  Ms. Valdivieso worked with my mom.

25      And the other reason that we switched to Senior Nannies, it

1   was because of that -- the hours were not being kept properly.

2   You know, like, they would shorten the hours, and, you know,

3   they would, you know, say, "I don't have" -- you know, "I'm

4   only supposed to work until 2:00."  And it's like, why?

5   You know, you're supposed to be working until 5:00 or -- you

6   know, the day lady would work from 9:00 to 5:00, and then the

7   evening lady would work from 5:00 until 5:00 in the morning.

8   And then, you know, there would be a couple of hours that they

9   would be by themselves, like 6:00 to 7:00 in the morning, which

10  was, you know, the time that they were really asleep.  And we

11  didn't see any issue with them being by themselves at that

12  hour, when we knew that they would be asleep.

13      But the -- the critical part was, you know, just making

14  sure that they did get the coverage.  And I remember Jennie,

15  the day lady, saying, you know, "They did not give me all the

16  hours.  What am I supposed to do?"  So I would call Diana and

17  ask, you know, "What's happening?"  And then also, you know,

18  they would say, "I did not get paid."  Ms. Valdivieso would

19  say, "I did not get paid for the service that I provided,

20  you know, the -- a couple of weekends ago," or, you know,

21  "The -- my hours are not there."

22      You know, they're supposed to be working a certain amount

23  of hours, and their paycheck did not reflect that.  So...

24  Q.  And based on everything you just told us, did you decide to

25  go to Senior Nannies before Ms. Valdivieso left All VIP?  In

1    other words --

2    A.   Yes.

3    Q.   -- the decision to leave All VIP, that was done before

4    Ms. Valdivieso --

5    A.   Yes.

6    Q.   -- left?

7    A.   Yeah, we switched agencies in July, I believe -- is it

8    July?  July 27th, or something like that, of 2022.  Something

9    like that.  It was toward the end of a month that we decided so

10   that we could start the month, you know, with a new agency.

11   Q.   And during any of the time that Ms. Valdivieso worked for

12   your parents, did you -- or do you know if your parents ever

13   paid her directly for any of the care that she provided or for

14   providing extra care?

15   A.   Only after -- it was after we left VIP.  I remember going

16   to my parents' house that weekend and -- or that week, I'm

17   sorry -- and Ms. Valdivieso was -- my dad was telling me that

18   Ms. Valdivieso had been crying.  That he was concerned that she

19   was going to leave us, you know, and not provide care because

20   she had not been paid.

21        So I stepped in.  I talked to Daisy.  I said, "What's

22   happening?"  So she told me what had happened.  And so I talked

23   to Monica and Jennie, and I asked them if -- you know, "Did the

24   agency shorten your hours because, you know, you were -- we

25   were moving agencies?"  And they said, "Yes."  You know, they

1   did not get paid.

2       So my dad said we should do something for Ms. Valdivieso.

3   We don't want her to go -- walk away from the case, and,

4   you know, not provide, you know, enough care.

5       So we asked her to be patient while we were transitioning

6   to Senior Nannies.  Senior Nannies took a couple of days to

7   onboard them.  They onboarded Jennie, Monica, and

8   Daisy -- Ms. Valdivieso.  And so they -- Monica said that she

9   could wait for her, you know, payment to come.  I think she

10  never did get paid for that -- for -- I think she was shorted

11  $150 or something like that.  But the most was Ms. Valdivieso.

12  It was like $800, and my dad said, "She does not have a way to

13  pay her mortgage or her rent that -- the following month."

14      So I -- he said, you know, "Just talk to your brothers and

15  sisters, see if we can help her out."  So we -- we all tried to

16  pitch in.  I know my two brothers, my sister -- and my two

17  sisters pitched in to help, and my father also, to provide the

18  check for Ms. Valdivieso.

19  Q.  And then did you do anything to find out whether Humana

20  paid All VIP for the hours that they owed Ms. Valdivieso for?

21  A.  That's something that my dad asked me to check, and I

22  checked with Humana, and Humana said --

23          MR. GOLDBERG:  Objection, Your Honor.

24          THE COURT:  Sustained.

25  ///

1   BY MR. POLLOCK:

2   Q.  Was it your understanding that Humana paid -- or did not

3   pay for the hours that Ms. Valdivieso worked?

4        MR. GOLDBERG:  Objection, Your Honor.

5        THE COURT:  Sustained.

6   BY MR. POLLOCK:

7   Q.  The money that was paid to Ms. Valdivieso, what was that in

8   the nature of?  Was that a -- was that a payment that she was

9   supposed to keep?  Was that a loan?  Kind of what was the

10  agreement?

11  A.  It was a loan.

12  Q.  Did Jennie and Monica continue to work with your parents

13  through Senior Nannies?

14  A.  Yes, they did.

15  Q.  To your knowledge, did All VIP sue either Jennie or Monica?

16       MR. GOLDBERG:  Objection, Your Honor.  Relevancy.

17       THE COURT:  Hearsay.  So I'll sustain the objection.

18  BY MR. POLLOCK:

19  Q.  You said that for -- one of the issues that you had with

20  All VIP was that the hours were not kept properly.  What do you

21  mean by that?

22  A.  Like I say, they have some kind of -- after the time sheet,

23  because the time sheets, obviously, were not working, you know,

24  they were -- they didn't have enough records.  Diana said that

25  they were putting something in place where they could use their

1  phone to check -- clock in and clock out whenever they were,

2  you know, at work.

3       And they -- I -- I don't know how their system works.  I

4  don't know how it works.  All I could see was in their phone,

5  you know, where they were listed, Yolanda and Cesar, my

6  parents, and then the hours that they were supposed to work.

7  And they would say, like, if she was to work from 8:00 in the

8  morning until 5:00, her hours will show from 8:00 until 1:00,

9  and then just nothing until the next day.  And I'm like, "No,

10  they're supposed to work until 5:00.  What is going to happen

11  to those hours?"

12       And I assume, you know, that -- like, 1:00, they had to

13  leave.  But, you know, she stayed at work, you know, because,

14  you know, I would call Diana, and say, you know, "Can you

15  please make sure that the hours are there?  You know, fix the

16  program or fix whatever, make sure that you're following the

17  schedule that -- that -- you know, that my parents have for

18  care so that, you know, they -- the hours are there, you know,

19  so that they can work them, you know?  So...

20       MR. POLLOCK:  I think that's all have I have.  Thank

21  you.  Mr. Goldberg probably will have some questions for you.

22       THE COURT:  Cross-examination.

23       MR. GOLDBERG:  Thank you, Your Honor.

24  ///

25  ///

```
 1                      CROSS-EXAMINATION

 2   BY MR. GOLDBERG:

 3   Q.  Ms. Rowland, you testified that All VIP Care could not

 4   provide weekend coverage for your mother and father?

 5   A.  Yes, correct.

 6           MR. GOLDBERG:  Your Honor, may I approach?

 7           THE COURT:  Okay.

 8           MR. GOLDBERG:  Thank you.

 9   BY MR. GOLDBERG:

10   Q.  Ms. Rowland, I want to show you what's part of the exhibits

11   that were admitted as -- under the time sheets.  The one that

12   is dated the week of July 18th, 2022, to July 24th, 2022, what

13   days does that show coverage provided by All VIP Care?

14   A.  Yeah, I said toward the end they were providing the care.

15   Q.  Okay.

16   A.  But it was -- we had just -- after the fact.  I mean, we

17   had fought so much with them.  But even then, the app, like I

18   said, it was not working.  So going forward, it was going to be

19   a lot of struggle.

20   Q.  Ma'am, I didn't ask you about the app because the app has

21   nothing to do with what is written on this time sheet.

22   A.  Yeah, yeah.  Toward the end, yes, they did provide the

23   care.  Because she fixed her schedule so that she could be

24   available.

25   Q.  "She" being?
```

 1    A.   Ms. Valdivieso.

 2    Q.   Let me show you the time record for May 30th, 2022, through

 3    June 5th of 2022.  And this is signed by you on the bottom, I

 4    believe.

 5    A.   Okay.

 6    Q.   And that shows weekend coverage provided; correct?

 7    A.   Yeah.  There were some weekends that were fine, but most

 8    weekends were not.

 9    Q.   Okay.  Now, you mentioned earlier that Ms. Figuera provided

10    service to both your parents?

11    A.   Yes.

12    Q.   But that she was only paid for one of your parents' time?

13    A.   Well, yeah, I mean, it's -- it's very hard.  The way the

14    hours were broken is that my mom received most of the morning

15    care or the daycare, and my dad received the evening care.  But

16    she was actually -- I mean, it's not like, you know, she could

17    just work for my mom and not feed my dad.  You know what I

18    mean?

19         It's not --

20    Q.   No, I --

21    A.   If she's preparing a meal, she's just not going to prepare

22    the meal for one person.  She has to prepare the meal for two

23    people.  And if she's -- you know, if my dad is having trouble

24    dressing, she's just not going to ignore him; she had to help

25    him.

1       And that's what we kept telling the agency and Humana, both

2    of them, you know, that she was providing care for both of

3    them.

4    Q.   At the same time?

5    A.   At the same time.

6    Q.   Let me show you -- show you --

7          MR. GOLDBERG:  If I may approach, Your Honor.

8          THE COURT:  Okay.

9          MR. GOLDBERG:  Thank you.

10   BY MR. GOLDBERG:

11   Q.   -- these two time sheets, which is part of the compilation

12   that was brought -- accepted into evidence.

13       Time sheet for Cesar Izique for July 18th, 2022, through

14   July 4th of 2022.  And the same time sheet -- if I got the same

15   time sheet, but a time sheet in the name of your mother.

16   A.   Uh-huh.

17   Q.   And can you explain to me, then, why is it that on those

18   two time sheets, your parent -- I'm sorry -- Ms. Figuera was

19   billing out for both parties at the same time?

20         MR. POLLOCK:  Foundation and predicate, Your Honor.

21         THE COURT:  He can publish the document.  Overruled.

22         MR. POLLOCK:  As to the question, not the document.

23         MR. GOLDBERG:  I'm sorry.  I can't hear Mr. Pollock.

24         MR. POLLOCK:  I said foundation and predicate as to the

25   question, not the document.

1          THE COURT:  If she knows, she can answer.

2          Overruled.

3   A.   Okay.  So I don't understand.  You're saying why is she

4   billing twice?

5   BY MR. GOLDBERG:

6   Q.   Both your parents at the same time.  I understand by your

7   earlier testimony that --

8   A.   Uh-huh.

9   Q.   -- she billed for your mother between, oh, let's say, noon

10  and 5:00, and then your father from 5:00 until 9:00?

11  A.   Correct.

12  Q.   But here, she is billing for both the parents at the same

13  time?

14  A.   She provided the care.  She provided the care.

15  Q.   But you testified a few minutes ago -- may I --

16  A.   Yes.

17  Q.   -- that she provided care to both of your parents,

18  regardless of who she was billing for?

19  A.   Yeah.  That -- I mean, I cannot tell you.  I mean, it's

20  what the agency and Humana, you know, worked out.  I mean,

21  it's -- it's.

22  Q.   Isn't it true -- I'm sorry.  I didn't mean to interrupt

23  you.  I apologize.  The plan of care that Ms. Figuera or any

24  home health aide is to provide, who prepares that plan?

25  A.   The City.

1   Q.   Who?

2   A.   The -- Broward County.  It's the HHA, you know, manual or

3   whatever.  They provide the list of all the services that

4   they -- they're supposed to provide and their home health care.

5   Q.   But it's not by All VIP Care.  It's a governmental entity?

6   A.   I believe so, but I think all agencies have to comply with

7   that.

8   Q.   So --

9   A.   Yes.

10   Q.   -- in other words, your testimony is that a governmental

11   entity --

12   A.   Uh-huh.

13   Q.   -- prescribes the care -- the plan of care for the parent?

14   A.   You know, I don't know that that is the governmental,

15   you know --

16   Q.   Okay.

17   A.   When I see Humana and, you know, I pull out the -- the HHA

18   services, this is what they're supposed to do.

19   Q.   Okay.

20   A.   And when they do the assessment, the agency comes and does

21   an assessment.

22   Q.   What agency, ma'am?

23   A.   Any agency that -- All VIP Care, which they never did.  But

24   all the other agencies that would come to the house, Majestic,

25   Assisting Hands, Senior Nannies, their coordinator or the

1    manager would come and say, "Okay.  Let's see the plan of care

2    that you -- your parents require."  They would see the

3    parent -- my parents, you know, their condition, their

4    situation, you know, the home, what does -- you know,

5    everything about them so that they could do a plan of care.

6    Q.  So is it your testimony that All VIP never came out and did

7    a plan of care for your parents?

8    A.  No, they never did.

9    Q.  Okay.  Now, do you know if Medicare -- I'm sorry --

10   Medicaid establishes a plan of care?

11   A.  I think -- I believe so.  I'm not 100 percent sure.  I

12   don't know.

13   Q.  What about Humana, since you said your parents' services

14   were provided through Humana?

15   A.  They -- they -- well, Humana home health care -- the

16   long-term care, they -- I think on their website, they do have

17   a list of --

18   Q.  But you have firsthand knowledge who creates the primary

19   plan of care for a patient?

20   A.  I don't know.  I think it's the insurance -- perhaps the

21   family, with the -- with the agency, you know?  It's supposed

22   to provide that.  I don't know.

23   Q.  Okay.  I need you to be specific.  You are using the word

24   "agency," and that can fit many different, you know, people.

25        As to All VIP Care, you testified that they never did a

1   plan of care?

2   A.   No.

3   Q.   Where did the plan of care come from that Ms. Figuera

4   followed with your parents?

5   A.   We did it with her.

6   Q.   You being the family?

7   A.   Yes.

8   Q.   You did it with who?

9   A.   With Ms. -- VIP.   We had a -- like a spreadsheet of the

10   times that they were supposed to have lunch, the times that

11   they were supposed to have breakfast, the times that they were

12   supposed to have their pills and all of that, so that they

13   could follow that.   And whenever they were there, we would ask

14   them, you know, "You have to do this, you have to do that."

15   Part of that is, like, even doing laundry, you know,

16   when -- because they soil their beds, they soil themselves,

17   you know, all of that can't stay like that until the weekend

18   that we get there.   You know?   It's -- they have to wash it

19   during the day.

20        So we had a list of things that they -- we asked them to --

21   Q.   All right.   So the family --

22   A.   -- supply.

23   Q.   Is it fair to say that the family augmented the plan of

24   care that was put in place by somebody?

25   A.   I -- I guess so.   I guess, yeah, if there is -- there is

1    a -- I'm so sorry.  I wish I knew who put out that list that

2    they provided as of -- you know, what a home health aide is

3    supposed to include.  And I think -- I believe it was Humana

4    that they sent -- sent us that list.

5    Q.  Okay.  Thank you for that.

6        Do you know who authorizes the amount of hours that a home

7    health aide, like Ms. Figuera, can provide to people such as

8    your parents?

9    A.  I think it's -- Humana definitely sets the number of hours.

10   And I believe it's -- because we -- like, at the very

11   beginning, they were getting four hours each, and then toward

12   the end -- as their age progressed and their condition

13   get -- deteriorated, we had to go back and the -- Humana would

14   come and assess them every six months.  You know, where are we?

15   You know, what is your condition?  Has -- are things working

16   out?  Is the agency working?  Is -- you know, all of that, they

17   would come and assess that.

18       And they would say that -- would take that time to request

19   more hours if my dad -- you know, my mom had fallen a couple of

20   times.  My dad was -- could not move very well.  So they

21   would -- I don't know -- again, I don't know how they do it.

22   But the -- the aide -- they call -- they're called case

23   managers.  They would -- she would jot down all the

24   information, and then she would go, and I think she requested

25   it from the City.  I don't know.

1   Q.   Okay.  So to make sure I understand, because this is

2   important, Humana, in your case, because you have -- your

3   parents had insurance through Humana, Humana's case manager

4   comes out every six months?

5   A.   Uh-huh.

6   Q.   Does an evaluation?

7   A.   Uh-huh.

8   Q.   He or she will determine the amount of hours that an

9   agency, such as All VIP Care, can provide to your parents?

10  A.   Correct.

11  Q.   Now, in the same token, they come out every six months and

12  they adjust that based upon your observations and feedback from

13  the family, such as yourself?

14  A.   Correct.

15  Q.   So the amount of hours is not determined by All VIP Care,

16  is it?

17  A.   No.  No.

18  Q.   Thank you for clarifying that.

19       Now, I understand that Diana was your contact with --

20  A.   Yes.

21  Q.   -- All VIP Care?

22  A.   Yes.

23  Q.   Now, just so I'm clear, is that Diana Ramirez?

24  A.   I don't know her last name.

25  Q.   That's fine.

1   A.  It's been a long time.

2   Q.  That's fine.

3       In your discussions with her, did you ever ask for

4   documents to support your concerns?

5   A.  No.  Can you -- in what regards?

6   Q.  Well, any concerns that you shared with Diane, because she

7   was your contact person, did she ever -- did you ever request

8   documents as to the hours or the care that was being provided

9   to your parents?

10  A.  No.

11  Q.  Okay.

12  A.  I mean, if -- those hours come from Humana, so the agency

13  has to comply with whatever Humana provides.  Like, if Humana

14  provides, you know, 40 hours of care, but they're only

15  providing 36 hours, what happened to the four hours?  Those are

16  the things that we were concerned about.

17  Q.  I understand.  Well -- and did you ever request

18  documentation to reconcile --

19  A.  No.

20  Q.  -- those concerns?

21  A.  No, no, no.

22  Q.  Now, how much did your family give to Ms. Figuera?

23  A.  Ms. Figuera, that one time, the loan that my dad did was

24  for $800.

25  Q.  Was that loan ever paid back to you?

1   A.   Me specifically, no, because I was not -- you know, I did

2   not contribute.   It was just my brothers and sisters, and I

3   have to ask my brother to check and see.

4   Q.   Okay.  So you don't know if that loan was ever paid back?

5   A.   No.

6   Q.   And was there ever a promissory note that was executed --

7   A.   Yes.

8   Q.   -- with the loan?

9   A.   There was -- my dad had a document that said, you know, she

10  would pay this back.

11  Q.   Did your family ever gift Ms. Figuera anything?

12  A.   No.  Aside from a Christmas present, you know, like a

13  Christmas --

14  Q.   I understand.

15  A.   Just a little thing.

16  Q.   Understood.  Thank you for that clarification.

17       The -- did the family or -- I say the "family."  I mean,

18  your parents or yourself, because you seem to be very actively

19  involved with your parents' care.

20  A.   Yes.

21  Q.   Did you ever request that Ms. Figuera provide additional

22  hours above and beyond what she was scheduled for by All VIP

23  Care?

24  A.   No.

25  Q.   You mentioned earlier that your father had passed away.

```
 1   A.   Yes.

 2   Q.   I'm sorry about that.

 3   A.   Thank you.

 4   Q.   When did he pass?

 5   A.   July 4th of this year.

 6   Q.   July 4th of this year?

 7   A.   Yes.

 8   Q.   What about your mother?

 9   A.   She -- I moved my mother with me to Palm Beach Gardens

10   because, I mean, she couldn't live by herself.

11   Q.   I understand.

12        Did she move with you about the time of your father's

13   passing?

14   A.   Yes.

15   Q.   Are you receiving any care from Senior Nannies?

16   A.   Yes.

17   Q.   So Senior Nannies is providing the care, but at your house?

18   A.   Yes.

19   Q.   We hope Mom is doing well.

20   A.   Thank you.

21        MR. GOLDBERG:   I have no further questions.

22        Thank you for your time, ma'am.

23        THE COURT:   Redirect?

24   ///

25   ///
```

1                        REDIRECT EXAMINATION

2     BY MR. POLLOCK:

3     Q.   Ms. Rowland, I will try to be quick.

4          That last time record that you looked at with defense

5     counsel where it showed overlapping time between Ms. -- for

6     Ms. Valdivieso and between your parents the week of July 18th

7     to the 24th, had you seen that document before?

8     A.   Before --

9     Q.   Before today.

10    A.   Before today?  Well, I guess when we signed it, I would

11    have to see it.

12    Q.   And that's what I was going to get at.

13         Let me show you part of Joint Exhibit 9, pages 43 and 44.

14    These are the two records that you looked at with

15    Mr. Goldberg --

16    A.   (Nods head.)

17    Q.   -- the week of July 18th through the 24th.

18         Did you sign either of these?

19    A.   No.  That was my brother.

20    Q.   Okay.

21    A.   That's my brother, Julio.

22    Q.   So you hadn't seen these before?

23    A.   No.

24    Q.   Okay.

25    A.   Well, not before today.

1    Q.   Not before today.

2         And then Mr. Goldberg showed you the week of

3    May 3rd -- May 30th through June 5th to talk about weekend

4    care; right?

5         That was another one?

6    A.   (Nods head.)

7    Q.   Do you remember seeing that?

8    A.   Yeah.  I guess the -- the time that we did it, yes, uh-huh.

9    Q.   The time that you did it?  Okay.

10        And then you signed May 30th for your mom and your dad?

11   A.   Yes.

12   Q.   On these documents, was Ms. Valdivieso double paid?   In

13   other words, paid -- she was billing for the same hours for

14   each of your parents, or does it look like she was billing for

15   different hours?  And you can take a look.

16   A.   I thought that, I mean, because I -- I thought it was,

17   like, different hours, but I have no --

18   Q.   We can go through.  I will show you.

19        This is -- is that your mom, May 30th to June 5th?

20   A.   Yes:

21   Q.   12:00 to 5:00, 5:00 to 8:00?

22   A.   Yes.

23   Q.   And then we can go to the next page.

24   A.   Yes.

25   Q.   Different hours or same hours?

1   A.   Yes.   Different hours.   This is 5:00 to -- this is

2   5:00 p.m. through 11:00 a.m. -- or 5:00 a.m. to 11:00 a.m.

3   those are the hours that she's working.

4   Q.   And as far as the hours that she put on her time sheet,

5   that's one thing.   But what Ms. Valdivieso was actually paid by

6   All VIP, you wouldn't know which hours she was actually paid

7   for; right?

8   A.   No.

9            MR. POLLOCK:   Nothing further.

10           And I'm sorry about your dad.   I know we talked about

11   that before, but I'm sorry about that.   And thank you for

12   coming down and taking time out of your day.

13           THE COURT:   Thank you, ma'am.   You may step down.   You

14   are excused.

15           THE WITNESS:   Thank you.

16           THE COURT:   All right.   Members of the jury, we will

17   take a 15-minute recess.   Remember my admonition not to discuss

18   the case or allow it to be discussed in your presence.

19           We will see you back in the jury room in about

20   15 minutes.

21       (The jury exited the courtroom at 2:33 p.m.)

22           THE COURT:   And if there is nothing else to come before

23   the Court, we will be in recess for 15 minutes.

24       (A recess was taken from 2:33 p.m. to 2:52 p.m.)

25           THE COURT:   All right.   Please be seated.

```
 1              We are back on the record.  Counsel are present.

 2              Anything to come before the Court before we bring the

 3    jury in?

 4              MR. POLLOCK:  Not from the plaintiff, Judge.

 5              MR. GOLDBERG:  Not on behalf of the defense,

 6    Your Honor.

 7              THE COURT:  All right.  If we have all the jurors,

 8    let's bring them in.

 9          (The jury entered the courtroom at 2:53 p.m.)

10              THE COURT:  All right.  We have all the jurors.

11              Did everyone follow my admonition not to discuss the

12    case or allow the case to be discussed in your presence?

13              Mr. Pollock, you can call your next witness.

14              MR. POLLOCK:  The plaintiff calls Liz Velázquez

15    McKinnon.

16              COURTROOM DEPUTY:  Please remain standing and raise

17    your right hand.

18              Do you solemnly swear or affirm that the testimony you

19    are about to give is the truth, the whole truth, and nothing

20    but the truth?

21              THE WITNESS:  I do.

22              COURTROOM DEPUTY:  Please be seated.  State and spell

23    your first and last name, for the record.  6.

24    ///

25    ///
```

1          THE WITNESS:  Liz, L-I-Z, McKinnon, M-C-K-I-N-N-O-N.

2     Thereupon:

3                    LIZ MCKINNON,

4     having been sworn by the Courtroom Deputy, testified as

5     follows:

6                    DIRECT EXAMINATION

7     BY MR. POLLOCK:

8     Q.   Good afternoon, Ms. McKinnon.  My name is Brian Pollock.

9     We haven't met before other than, I guess --

10    A.   At deposition.

11    Q.   -- at the deposition --

12    A.   (Nods head.)

13    Q.   -- by Zoom a couple of days ago.

14         And you're the only owner of All VIP Care; is that right?

15    A.   That's correct.

16    Q.   And you started the company in 2016?

17    A.   That's correct.

18    Q.   And your company provides nursing and nonmedical services

19    which range from skilled nursing to unskilled; is that right?

20    A.   Yes.

21    Q.   And you're the only owner of All VIP; is that right?

22    A.   Yes.

23    Q.   And besides being the only owner, are you also the

24    administrator for the West Palm Beach office?

25    A.   That is correct.  I am the owner, but I also work the

 1   business.

 2   Q.   And you're an administrator because each county requires

 3   that there be an administrator in each of your offices; right?

 4   A.   Each license requires an administrator, yes.

 5   Q.   And you've got multiple offices?

 6   A.   I -- I do.

 7   Q.   How many offices do you have?

 8   A.   Well, we have -- we have Palm Beach.  And in Palm Beach

 9   County, we have two offices -- actually, we have three,

10   predominantly because of COVID-19.  So we have one in

11   Pahokee/Belle Glade area, West Palm Beach, and Port St. Lucie.

12   And then we have Broward County and we have Miami-Dade.

13   Q.   And then each of those offices has its own administrator;

14   right?

15   A.   Only for each license.  So Palm Beach has their own

16   administrator, Broward has their own administrator, and

17   Miami-Dade has their own administrator.

18   Q.   And then besides being the administrator for the West Palm

19   Beach office, are you also the direct supervisor for each of

20   the administrators for the Miami and Broward offices?

21   A.   They do report to me, yes.

22   Q.   In each of the offices that you just talked about, the

23   three in Palm Beach, Pahokee, Miami, Port St. Lucie, Broward,

24   are there staff in the office?

25   A.   I'm sorry?  Repeat it.

1   Q.   Are there staff in the office?

2   A.   Yes.

3   Q.   And those would be people who are in charge of scheduling

4   and billing, office support, those kinds of things?

5   A.   Yes.

6   Q.   The -- let's see.  The medical services, those have to be

7   provided by either a registered nurse or a licensed practical

8   nurse; is that correct?

9   A.   That is correct.

10  Q.   And the State of Florida issues licenses to your registered

11  nurses and -- licensed practical nurses and registered nurses.

12       Is that your understanding?

13  A.   If you apply for it, yes.

14  Q.   Okay.  Nonmedical services, are those provided by either

15  home health aides or certified nursing assistants?

16  A.   Yes.  And companions.

17  Q.   And companions.

18       These nonmedical services provided by a home health aide, a

19  CNA, or certified nurse assistant, or companion, those are

20  doing things like bathing, dressing, meal preparation,

21  homemaking, driving people --

22  A.   Transportation.

23  Q.   -- transportation, household duties, companionship

24  services; is that correct?

25  A.   Yes.  Meal preparation, medication reminders.

1    Q.   Right.   Because only a licensed medical professional can

2    administer or hand somebody their meds; right?

3    A.   Well, yes.   Yes.   It has to be a nurse.

4    Q.   Has to be a nurse.   So a home health aide or a CNA, they

5    can just remind somebody?

6    A.   They can do medication reminders.

7    Q.   And the things that the home health aides or the CNAs do or

8    the companions do or are expected to do for your clients are

9    what we, as adults, are normally expected to be able to do on

10   our own; right?

11   A.   Yes.   Normal daily activities.

12   Q.   And you hired Ms. -- or your company hired Ms. Valdivieso

13   as a home health aide to provide these nonmedical services?

14   A.   Well, we put them -- once they meet the credentials,

15   that -- we have to follow state and federal laws.   Once they

16   meet those credentials, we put them on a roster.

17   Q.   Okay.   Well, I mean, did you hire Ms. Valdivieso or not?

18   A.   Yes.   But it's not like -- it's a little different.   We put

19   them on a roster, and when an assignment comes up, we send out

20   a broadcast message.   And if they're interested, they call us

21   and they come in and we -- and we discuss the assignment.

22   Q.   Sort of like a staffing agency?

23   A.   Something like that, yes.

24   Q.   And you provide hourly employees to people, facilities, or

25   companies?

1   A.   If -- it could be hourly or it can be a visit.

2   Q.   And the visit would be paid by the hour?

3   A.   Correct.  Because that's the fee negotiation.  That's what

4   we negotiate.

5   Q.   And for Ms. Valdivieso, she never had a contract with any

6   of the patients who you put her with, did she?

7   A.   She had -- the contract is between the agency.  So she does

8   not have a contract with the client.

9   Q.   Okay.  So there was never -- so just so we're clear, there

10  was never a client between Ms. Valdivieso and Yolanda Izique?

11  A.   No, especially if the client has dementia.  That would

12  never happen.

13  Q.   There was never a contract between Ms. Valdivieso and Cesar

14  Izique?

15  A.   It's not supposed to.  That's not how it works, no.

16  Q.   There is no contract between Ms. Valdivieso and Ms. Soto?

17  A.   No.  That's not the way it works, no.

18  Q.   And there is no contract between Ms. Valdivieso and

19  Ms. Melendez?

20  A.   No.

21  Q.   Because that's not the way that it works, because what

22  you're doing is you're sending Ms. Valdivieso over to these

23  people who need assistance or companionship in their homes; is

24  that right?

25  A.   We send them over if she accepts the assignment.

1   Q.   Okay.

2   A.   And remember, too, clients can interview the caregiver at

3   any time, and we recommend that.  Clients and family members

4   can interview the caregiver.

5   Q.   Did you refer Ms. Valdivieso to enter into a contract with

6   any of these clients that we talked about?

7   A.   Yes.  But I think that Diana answered that -- Ramirez, she

8   would answer that better for you because that's the office that

9   actually gave her the assignment.

10   Q.   Okay.  I think we may be talking about different things.

11   You told me that Ms. Valdivieso didn't have a contract with

12   Ms. Soto --

13   A.   Right.

14   Q.   -- with Ms. Izique --

15   A.   Exactly.

16   Q.   -- Mr. Izique, or Ms. Melendez?

17   A.   That's -- that's the norm.  No, she did not.

18   Q.   And so you -- is it fair to say that you didn't refer

19   her -- the company didn't refer Daisy to have a contract with

20   any of these people?  Like, that wasn't your expectation, that

21   she was going to enter into a contract with any of these

22   clients?

23   A.   No, and it shouldn't be hers either because she's

24   registered with other agencies.  So she knows that she is not

25   going to have a contract with any clients.

1   Q.  Well, while she was working with you, you were -- she was

2   only allowed to work with your company; right?

3   A.  No.  That's incorrect.  She can work with any company she

4   wants.  What she cannot do is take my clients to other

5   agencies.  That's what she cannot do.  But she's free to work

6   for whomever she wants to.

7   Q.  Gotcha.  And that's your understanding as to what

8   your -- the document said when Ms. Valdivieso was hired, was,

9   you're allowed to work with anybody else, you just can't take

10  our clients?

11  A.  That's pretty much true, yes.

12  Q.  Okay.  Now, as far as what your company does, what you do

13  is -- the first thing you need to do is get clients?

14  A.  I'm sorry?

15  Q.  You need to get clients?

16  A.  Yes.  That would be a good idea.

17  Q.  And your company -- you and your company are a hundred

18  percent responsible for getting clients, right?  That's not

19  Ms. Valdivieso's responsibility?

20  A.  No.  It is -- it is our responsibility to go out and

21  market.

22  Q.  And so you paid for marketing.  You spend money on

23  advertising.  You spend money to get potential clients?

24  A.  We -- in the beginning, yes, but not anymore.

25  Q.  I mean, you're registered through care.com and A Place For

1   Mom?

2   A.   Yes, but let's not forget that when I opened my business in

3   2016, I had been doing home care since 2007.  I have been in

4   health care since 1989.  So I already established my reputation

5   and my referral source in the community.

6   Q.   But still, you supplemented that by spending money to get

7   leads through care.com?

8   A.   Sometimes.

9   Q.   As well as aplaceformom.com?

10  A.   Sometimes.  We don't anymore.

11  Q.   All right.  And that wasn't one of Ms. Valdivieso's

12  responsibilities.  Her responsibilities were just to go and

13  take care of the clients?

14  A.   That is correct.  That's the assignment she accepted.

15  Q.   Now, in order for you to work with a client who is paid for

16  by an insurance company, you have to get approved by that

17  insurance company; right?

18  A.   Well, let's see if I understand this correctly.  Think of

19  me as a middle person.  So the state and the federal

20  government, they fund the Medicaid program; right?  So the

21  insurance company, they bid.  So let's use Humana, for an

22  example.  They want the bid with the state, so now Humana has a

23  program, the long-term care Medicaid.  So they need to provide

24  services to these clients, Medicaid enrollees; right?

25       So what they do is then they go out and they find people

1    like myself, a home health care agency.  So then they contract

2    with me so that I -- they will call me up and they will say,

3    "Hey, we have a client who has dementia.  She's going to need

4    50 hours a week, X, Y, and Z.  Can you provide the services in

5    Palm Beach County?"  I either say "yes" or "no."

6         Then I have to follow those guidelines.

7    Q.   Before you get there, you have to get approved by the

8    insurance company?

9    A.   Oh, yeah.  We have to go through credentialing because

10   otherwise, we wouldn't be able to -- they wouldn't be able to

11   call us.

12   Q.   And in order to become credentialed, you've got to make

13   sure that your records are kept a certain way, that you're able

14   to bill in a certain way, that you're able to verify billings

15   and time spent in a certain way.  That's part of the

16   credentialing process, is it not?

17   A.   Well, yes, yes.  And you have to realize that the main

18   reason they do that is to avoid fraud.  Because there is a lot

19   of fraud going on.

20   Q.   Sure.  And that's -- I mean, because that's ultimately

21   fraud on the insurance company, which is fraud on the federal

22   government; is that right?

23   A.   Fraud is fraud.

24   Q.   And so in order to even get clients through Humana, you

25   first have to get credentialed?

 1   A.   That is correct.

 2   Q.   And then after you get credentialed, then you can start

 3   receiving clients from Humana?

 4   A.   That is correct.

 5   Q.   And so once you get a client, the next step for you is go

 6   ahead and verify that All VIP is on their insurance plan?

 7   A.   When I get a client, it's -- the insurance company takes

 8   care of all of that.  I'm not sure if I understand your

 9   question correctly, but the insurance company verifies

10   everything.  And then we get the referral and we have -- and

11   then we staff the client.

12        So the insurance company, they meet with the family, and --

13   I mean, they do a treatment plan.  I mean, they do all the

14   work, and then they send it to us so that we can staff the case

15   and get a good caregiver.

16   Q.   Well, don't you have clients who come and -- do they just

17   contact All VIP and say, "Hey, you know, I need somebody"?

18   A.   Clients?

19   Q.   Yeah, and they're not --

20   A.   From the community?

21   Q.   Yes.

22   A.   Sure.  That's called private clients.

23   Q.   Well, you also have clients, besides private client, who

24   are clients that pay out of their pocket or family pays out of

25   their pocket.

1    A.   Private clients.   Private clients pay out of pocket.

2    Q.   Then you also have clients who contact -- or their families

3    contact All VIP and say, "Hey, I have insurance.   I need a

4    caregiver"?

5    A.   Uh-huh.   Okay.

6    Q.   Right?

7    A.   Yes.

8    Q.   And in that situation, once a client calls or their family

9    calls and said, "Hey, we need a caregiver," your next step is

10   to verify that All VIP is on their insurance plan?

11   A.   If they're private clients, they don't need, really, an

12   insurance company.   That's why I'm trying to -- I just want to

13   be sure I understand you.

14        When we -- private clients normally, for us, means they're

15   going to pay out of pocket.   And if you're going to pay out of

16   pocket, then I don't have to worry about an insurance company.

17        So I'm -- if you could just direct me --

18   Q.   Okay.

19   A.   -- which -- where am I going?

20   Q.   I talked about private clients.

21   A.   Right.

22   Q.   Then I talked -- I just started talking about a client who

23   has insurance.

24   A.   Okay.

25   Q.   And so --

1   A.   That's commercial.  So clients with commercial insurance, I

2   will be billing that insurance policy.

3   Q.   Okay.  And my question to you is:  The first step for you

4   is to make sure that All VIP is on their insurance plan, it's

5   an approved provider; isn't that right?

6   A.   Yes and no, because I can always do a letter of agreement

7   with the insurance company.  So I don't have to be on --

8   you know, on their list of providers.  I could -- I can -- the

9   client could refer me over to the insurance company, and if I

10  don't have a contract with the insurance company, the insurance

11  company can call me and we can develop a letter of agreement,

12  which we refer to as an LOA.

13  Q.   And then the insurance company goes ahead and gives you a

14  plan of care?

15  A.   Depends.  The only one that really does that, usually, is

16  the Medicaid long-term care program.  Usually.  Usually.

17  Q.   And the clients that Daisy worked with, those were Medicaid

18  clients?

19  A.   That is correct.  Medicaid long-term care.

20  Q.   And so the clients that Daisy worked with for you, they all

21  have plans of care; is that not right?

22  A.   They -- they -- I believe they call it a treatment plan,

23  yes.

24  Q.   And so, in the beginning, what All VIP does is it tries to

25  figure out how it's going to get paid, whether it's from a

1  private client pay or Medicaid or an insurance policy; right?

2  A.  Well, I mean, if we're going to take a client and we're

3  going to stay in business, I need to make sure that we know

4  how -- who we are going to bill and how we're going to get paid

5  because I have to pay the caregivers.  Like, I have to pay the

6  staff.

7      So, yes, that's -- that's part, you know, of the whole

8  setup of business operations.

9  Q.  And then, once you get the client, do you have nurses on

10 staff or a doctor who reviews the plan of care?

11 A.  Well, you know, it all depends.  Because most of the cases

12 are nonmedical cases.  So when you have nonmedical cases, you

13 really don't need a doctor on staff.  All VIP Care, we do have

14 one because we want to provide better services to our clients.

15 But you don't have to have one.

16     So in this particular case that we are here today to

17 discuss, I -- I really just needed a nurse to do -- you know,

18 to just make sure that the start of care is being carried out,

19 and a home health aide.

20 Q.  And didn't you need somebody to meet with the family

21 initially and do an assessment?

22 A.  Yes.  That -- that's very helpful.  Because we -- we -- in

23 health care, we have to document.

24 Q.  Right.  Because in health care, what they say is, "If it

25 wasn't written, it wasn't done"; right?

1    A.   Exactly.

2    Q.   And what you get is you get the client from the insurance

3    company, they send over the schedule and an authorization, and

4    it's up to All VIP to find the caregiver; right?

5    A.   That's correct.

6    Q.   And so we've got the -- the clients or their families that

7    pay on their own, those are private pay?

8    A.   Yes.

9    Q.   And in those situations, All VIP is 100 percent responsible

10   for billing the families and collecting the money; is that

11   true?

12   A.   Yes.

13   Q.   Ms. Valdivieso did not work with any private pay clients,

14   did she?

15   A.   Not to my knowledge, although she was paid -- although --

16   this is what was discussed in the office -- she was working

17   privately for the clients as well.

18   Q.   Okay.

19   A.   But we let it be because the client's family members, they

20   were very happy with her.  So we didn't want to disrupt the

21   service, especially during COVID-19.

22   Q.   Is there a check that we're going to see in this case where

23   a private client paid Ms. Valdivieso for anything other than a

24   loan?

25   A.   I'm sorry.  Repeat that again.

1    Q.   Is there a check that we're going to see in this case where

2    a private client paid Ms. Valdivieso for anything other than a

3    loan?

4              MR. GOLDBERG:   Objection.   Calls for speculation.

5              THE COURT:   If she knows.   Overruled.

6    A.   I -- to my knowledge, you might not see one, but that

7    doesn't mean it did not happen.

8    BY MR. POLLOCK:

9    Q.   Okay.   And so other than talking in the office, is that the

10   basis for what you're talking about, that that's the extent of

11   the claim that Ms. Valdivieso worked on the side?

12   A.   It just wasn't talk in the office.   We're professionals,

13   and I have been doing this for a very long time.   When a

14   caregiver submits a time sheet that is completely incorrect, we

15   sit down and we start to discuss.   It was at that moment that

16   we realized -- in calling the aide and calling the family

17   members, that we realized that she was working privately and

18   that she made a mistake when she submitted her time sheets.

19        She was getting paid privately.

20   Q.   At which moment?   You said, "It was at that moment."   Which

21   moment are you talking about?

22   A.   I don't recall the exact moment.   You might get a

23   better -- a more specific time frame from Diana Ramirez.

24   Q.   And you said something that was curious, which was that,

25   you know, "We let it go for continuity of care."

1    A.   Yes.   And also because it was COVID-19.   My -- we received

2    a lot of clients during that period that did not want two,

3    three, five aides in and out of their homes.   They did not want

4    that, and we are patient-focused.

5    Q.   Which client did Ms. Valdivieso work for on the side?

6    A.   I don't know if she worked for anybody on the side.   I just

7    know that she was doing private hours for the Iziques.

8    Q.   For the Iziques?

9    A.   Yes.

10   Q.   And you were here for Ms. Rowland, who said that that never

11   happened; right?

12   A.   I'm not sure she said that, Counselor.

13   Q.   Now, even if Ms. Valdivieso was paid by anybody for what

14   you're telling us, you also told us that it didn't matter to

15   the company; right?

16       You didn't care, you let it go?

17   A.   I didn't say it didn't matter, Counselor.   I'm sorry if

18   that's what you understood.   What I said was -- what I really

19   meant to say is that we weren't going to make a big deal about

20   it.   We weren't going to, you know, stop her from doing it.   We

21   weren't going to make a big deal.   We let it go because we felt

22   it was the right thing to do for the patient and their family.

23   Q.   Now, is it true that most of your clients are either paid

24   by insurance or from the government?

25   A.   Predominantly, yes.   Medicaid, long-term care, at the

1   moment.

2   Q.   And while Ms. Valdivieso worked for your company, same

3   thing, most of your clients, most of your income, was through

4   insurance or Medicaid clients; is that true?

5   A.   I'm sorry.  Repeat the question, please.

6   Q.   Sure.

7        While Daisy worked for you, you said, "Currently, most of

8   our clients are either insurance or Medicaid."

9   A.   (Nods head.)

10  Q.   And I said, "Well, was it the same when Daisy worked for

11  you, that most of your clients were insurance or Medicaid?"

12  A.   Yes.

13  Q.   And for insurance or Medicaid, in order to bill Medicaid,

14  whoever is billing has to -- has to have its own kind of

15  credentialing; right?

16  A.   Yes.  And -- yes.

17  Q.   And the specific credential that you need in order to bill

18  an entity that's paid for by Medicaid is an NPN, national

19  provider number; right?

20  A.   The company, yes.  Uh-huh.

21  Q.   So in order for someone to work and get paid through

22  Medicaid, it needs to to have an NPN?

23  A.   It depends.  A company can have -- can do that, or an

24  individual can do it.

25  Q.   And in our case, it was your company that had the NPN, not

1    Daisy?

2    A.   That is correct.

3    Q.   And so Daisy could never just submit her hours directly to

4    an insurance company or directly to Medicaid because she didn't

5    have an NPN; is that right?

6    A.   She could have.  If she would have signed up with the PDO

7    program that Humana offers, then, yes, she could have done

8    that.

9    Q.   But as far as you know, for all the hours that Daisy worked

10   for you --

11   A.   No.

12   Q.   -- she never had an NPN?

13   A.   That's not what they chose.

14   Q.   Well, that's not how you signed her up either; right?  You

15   signed her up where you would be doing the billing, and you

16   would be doing the collecting?

17   A.   Right, because that's what we agreed to.

18   Q.   Now, when you hired Ms. Valdivieso, the agreement was that

19   your company was going to pay her by the hour; is that correct?

20   A.   Yes.  Because it's -- it's by the hour.

21            MR. POLLOCK:  Can I get the HDMI?

22            COURTROOM DEPUTY:  It's on.

23   BY MR. POLLOCK:

24   Q.   As far as Daisy is concerned, as long as she -- as long as

25   she worked, she was expected -- she should have gotten paid for

 1   the time that she worked; is that right?

 2   A.   Yes.

 3   Q.   And so there was really -- you would agree with me there

 4   was really no way for Daisy to lose money by working for you,

 5   because if she worked, she was going to get paid by the hour?

 6   A.   That is correct.  If you submit a time sheet, or you clock

 7   in and clock out, per state regulation, you get paid.

 8   Q.   And her responsibility was just to show up and do the work,

 9   do you agree?

10   A.   I -- I mean, I hope so, yes.

11   Q.   Okay.  Everything that I put up on the screen, you agree

12   with, do you not?

13   A.   Let's see.

14        "All VIP contracts directly with the clients," what do you

15   mean by that?

16   Q.   Well, you have the arrangement with the client when you go

17   out and do the assessment, when you agree with them how much

18   they're going to get paid; right?

19   A.   Private clients, not Medicaid.

20   Q.   That's the only thing that you would change?

21   A.   Yeah.  I mean, and -- I mean, yes.  I mean, I'm --

22   Q.   Okay.

23   A.   Here, you have, "All VIP contracts directly with the

24   clients."  Yes, we do that with Medicaid -- I mean with private

25   clients.  We definitely go out and have a contract with them.

1    The Medicaid clients, we have to provide services per the

2    insurance company.  That information is sent to us.  We put it

3    in our files, and then we submit it over to the caregiver

4    that's going to accept the job.

5    Q.  Okay.  The clients that we're talking about, whether you

6    had a contract with them or you didn't have a contract with

7    them, you considered them your clients, did you not?

8    A.  Yes, I do.  I do.  My clients/patients.

9    Q.  And wasn't it you who decided that Ms. Valdivieso was going

10   to get $13 an hour?

11   A.  No.  Let's clarify that.  We -- that was discussed.  At

12   that moment, at that time, usually for Medicaid -- for Humana,

13   let's say -- Humana was paying 16 an hour.  And so those

14   caregivers were being paid in the community -- not just All VIP

15   Care, in the community -- they were being offered between 10 to

16   $12 an hour.

17        So she came in and we said to her, "We have this

18   assignment," and we went through the whole -- you know, through

19   everything, and we told her that that -- that that paid $12 an

20   hour because it's Medicaid.  We explained everything to them.

21   And she came back and she said, no, that she didn't want to get

22   paid 12, that she would do it for 13.

23        So then we when discussed it in the office, I was called

24   in, and I said, "Okay."

25   Q.  And so, again, you were the one who decided that it was

1    okay to pay Ms. Valdivieso $13 an hour for her work?

2    A.  I authorized it.  I said okay.  I approved it.

3    Q.  Okay.  And were you the one who would approve payroll every

4    week?

5    A.  Yes.  But, you know -- yes, I guess.  But, you know, the

6    payroll, it's run through the system.  We have a software that

7    runs the payroll.

8    Q.  And then somebody has to approve it, and that someone would

9    be you?

10   A.  Yes.  You can say that, yes.

11   Q.  And besides approving payroll every week for everyone who

12   worked for you, including Ms. Valdivieso, you also handwrote

13   her a check when her hourly pay was wrong; is that true?

14   A.   When there was -- when there was a situation with

15   her -- with her check, yes.  She would come in, and I would

16   write her a check.

17           MR. POLLOCK:  Your Honor, can I show this to the

18   witness and not to the jury?

19           THE COURT:  Okay.

20   BY MR. POLLOCK:

21   Q.  I'm going to show you what's been marked as Plaintiff's

22   Exhibit 4.

23   A.  Yes.

24   Q.  Do you recognize this document?

25   A.  Yes.

1    Q.   Is this a check that you signed, Number 2414, dated

2    July 22, 2022?

3    A.   Yes.   That's my signature.

4    Q.   Is it your company's practice to make and keep copies of

5    these checks?

6    A.   Yes, we do.   We do.

7    Q.   Okay.   And is this a true and accurate copy of the check

8    that you wrote to Ms. Valdivieso for part of her payroll?

9    A.   It looks like it, yes.

10           MR. POLLOCK:   Your Honor, I would like to move

11   Exhibit 4 into evidence.   Plaintiff's Exhibit 4.

12           MR. GOLDBERG:   No objection, Your Honor.

13           THE COURT:   Plaintiff's 4 will be received.

14        (Plaintiff Exhibit 4 was received in evidence.)

15           MR. POLLOCK:   Can we publish this to the jury?

16           THE COURT:   Okay.

17   BY MR. POLLOCK:

18   Q.   And so this is a check for $897 that you wrote for payroll

19   to Ms. Valdivieso on July 22 of 2022; is that correct?

20   A.   Yes.

21   Q.   Why did you write this check?

22   A.   Because there was an error.   She either -- usually, it's

23   one or two things.   They don't send me the time sheet, they

24   don't clock in or clock out, or there was an error with the

25   time sheet they submitted; so, therefore, it didn't process the

1   payroll -- the normal payroll.

2       So once they realized that they didn't get paid or if the

3   office calls them, they come in and we sit down and we discuss

4   what's going on.  And then if they need to get paid, we write

5   them a check because we want them to be able to make it to the

6   patient's home.  We don't want then to tell us, "Oh, I didn't

7   have gas money."

8   Q.  And so --

9   A.  So we write them a check.

10  Q.  And you mentioned a bunch of scenarios.  Do you know which

11  one is the reason why you wrote this check for $897 to

12  Ms. Valdivieso?

13  A.  There was an issue with her submitting time sheets.

14  Q.  And what was the issue with her submitting time sheets?

15  A.  The times that she was putting in.  It was -- she went over

16  with one client.  And then with the other client, you know, she

17  wasn't doing it correctly.  She -- she was writing time sheets

18  that she was with two clients at the same time.  Medicaid

19  guidelines do not allow you to work or submit an invoice, a

20  time sheet that you're with -- that you're working with two

21  people during the same time.  It's referred to as

22  double-dipping in our industry.  It's not allowed.

23  Q.  Okay.  And so -- because I want to look -- let's look into

24  this.  You said that because she went over for one client, and

25  because she was working for two clients at the same time --

1    A.   Right.

2    Q.   -- during the time period before July 22 of 2022, that's

3    why the check didn't process?  Did I get that right?

4    A.   It was an issue during that time.  I don't know how far

5    back, but there was an issue during that time.  That's why she

6    did not get her normal check in her direct deposit that she

7    preferred.

8         Because, again, the caregivers have a choice.  I can write

9    them a check every week.  If they want a check like this, can I

10   do it every week for them.  If they want direct deposit, we

11   will do that too.  If they want a credit card, we will do that

12   too.  We work with them.  They tell us how they want to get

13   paid, and we try to accommodate them.

14        There was an issue.  When this happened, there was an

15   issue.

16   Q.   All right.  And you've mentioned several issues.  I'm just

17   trying to figure out:  What was the issue that led to your

18   handwriting a check to Ms. Valdivieso for $897 on July 22 of

19   last year?

20   A.   Okay.  She submitted a time sheet for one that she -- she

21   put in that she -- that she worked hours that she did not work.

22   And then for the other clients, she -- the time sheet that she

23   submitted, really, she put down that she was working for the

24   two of them at the same time, which, in essence, would have

25   meant that she was making $26 an hour and not 13.

1   Q.   Okay.  So what you're telling us is, during the payroll

2   period before July 22 of last year, Ms. Valdivieso had a time

3   sheet where she billed too many hours for one client, and that

4   she was billing simultaneously for Mr. and Mrs. Izique.

5        Is that -- did I get that correct?

6   A.   What I am telling you is that she did it.  How far back she

7   did it, I'm -- I don't know the time frame.  But she -- but it

8   was done.  She was doing it.

9   Q.   I haven't gotten to the "when" yet.  I'm just saying it

10  happened before this pay period, because July 22 --

11  A.   Right.  It happened before that pay period, yes.

12  Q.   It had to happen before that pay -- we agree?

13  A.   Yes.

14  Q.   Okay.  And so what your lawyer showed Ms. Rowland before

15  were time records where Ms. Valdivieso worked -- put down that

16  she had worked the same hours for Mr. and Mrs. Izique.  Is that

17  the time records that you're referring to where she was, quote,

18  "double-billing," to use your words, or double-dipping?

19  A.   The time sheet that my lawyer showed Ms. Anna, yes.  Those

20  time sheets were -- they were not good.

21  Q.   Okay.  And were those --

22  A.   There was a problem.

23  Q.   Was that the reason why you had to issue this handwritten

24  check?  Because you mentioned that she was working for two

25  clients, the Iziques, at the same time, that she was

1    double-dipping.  And I'm trying to figure out:  Is that the pay

2    period we're talking about, the one that your lawyer showed us?

3    A.  I'm not sure.  That -- again, you know, that's -- I just

4    know what happened throughout the course.  I'm not really good

5    on the dates.  I think Diana Ramirez will be able to better

6    answer that than myself.

7    Q.  Because, I mean, $897, we're talking about, like, 69 hours;

8    right?

9    A.  (Nods head.)  Could be.  I -- if I do the quick math, I

10   will say "yes."  But...

11   Q.  We can do it together, if you want.

12       We can look at 897 and divide that by $13 an hour, and we

13   get 69 hours.

14       Is the math correct?

15   A.  Per the calculator, yes.

16   Q.  Okay.  And this pay -- this payroll check doesn't say when

17   it's for, does it?

18   A.  No, it does not.

19   Q.  And the pay records that your lawyer showed to Ms. Rowland,

20   where Ms. Valdivieso's time was the same, were for (indicating)

21   July 18th to 24.

22       Do you see that?

23   A.  I do.  But we do have more records.

24   Q.  Okay.  And as we sit here today, you can't tell me which

25   records were the ones that caused this check, can you?

1   A.   That is correct.  Because if -- I cannot tell you with

2   certainty, you know?  So, no, I can't.

3   Q.   And is this the record you're talking about where

4   Ms. Valdivieso billed for too many hours the week of July 11th

5   through the 16th?

6   A.   I'm not sure, because you are only showing me one.  I have

7   to see the whole picture.  I have to see all the time sheets

8   she submitted.

9   Q.   Your lawyer will show you that.

10       Because on this one, this shows, what, 38 hours?

11  A.   I -- I don't know.

12  Q.   Why don't you take a moment and add them up.  We can do it

13  together.

14       We got an eight.  We got an eight.  One, two, three,

15  four -- five eights.  That's, what, 42?  If we have -- five

16  eights is 40, and then we add two hours at the end, 4:00 to

17  6:00 p.m.; right?

18       That's what we're talking about?

19  A.   Well, if it's 42, that could be a problem.

20  Q.   Okay.

21  A.   Because I do recall that for Ms. Melendez, her hours were

22  reduced.

23  Q.   And so what you did was, instead of paying her for, let's

24  say, 38 hours, you just didn't pay her for any?

25  A.   No.  She got paid, she got paid.  But here is the thing.

1    When -- when there was an issue with Angela Melendez's time

2    sheet with -- with Ms. Cruz, we called the client, and we said

3    to the client, "Why is the aide submitting, let's say, 42 hours

4    a week when she's only supposed to be" -- and again, I'm not

5    100 percent sure -- "let's say, 38 hours a week or 36,"

6    whatever it was.

7         And we asked the clients, "Did she work 42 hours?"  The

8    client said, "No."  And the client said that the client told

9    her, "You need to fix it and resubmit to the agency."

10   Q.  But the client -- Ms. Melendez, she's not the type of

11   person who would sign a time sheet if it were incorrect, would

12   she?

13   A.  I'm sorry?

14   Q.  Ms. Melendez, she's not the type of person who would sign a

15   time sheet if it were incorrect, would she?

16        MR. GOLDBERG:  Objection, Your Honor.  Calls for

17   speculation.

18        THE COURT:  I'll allow it.

19   A.  Well, I -- you know, I hope that when the clients -- and

20   this is something that we do, talk to them from time to time --

21   that when they sign a time sheet, that they're signing

22   something that is actually true.

23        Because this time sheet, it's a legal document.

24   BY MR. POLLOCK:

25   Q.  Okay.

1  A.  But they're seniors.  So, you know, do I expect them to

2  count and, you know, really pay attention?  Many times

3  (shakes head), it's just too much for them.  So...

4      But hopefully, you know, the client signed what she

5  believed was true.

6  Q.  Because the -- what we have here is the last time

7  Ms. Melendez signed.  And there she has 38 hours on that time

8  sheet.  Do you see it?

9  A.  Well, I see a time sheet.  I'm not counting the hours --

10  Q.  Okay.

11  A.  -- but I do see it.

12  Q.  So let's do that.

13      I kind of like quick math, so 9 1/2 and 9 1/2 -- that's 19.

14  9 1/2 and 9 1/2 is another 19.  Two 19s is 38.

15      So that time sheet is 38, isn't it?

16  A.  Per your math, yes.

17  Q.  I mean, 12:00 to 9:30 p.m. is nine hours, do you agree?

18  A.  Okay.

19  Q.  And that happened four times?

20  A.  Okay.

21  Q.  So if we have 9 1/2 and 9 1/2, that's 19.

22  A.  Okay.

23  Q.  Do you agree with my math?

24  A.  Sure.

25  Q.  Let's come back to that.

1        I'm going to show you what's in evidence as Joint

2   Exhibit 3, which is the independent contractor agreement that

3   Ms. Valdivieso signed.

4   A.   Okay.

5   Q.   Have you seen this document before?

6   A.   I have.

7   Q.   I mean, you have not -- you wouldn't have made this

8   document a requirement of your business if you had not read it

9   and understood it; is that true?

10  A.   Well, yes, but it wasn't just me.  It was that --

11  the -- the health care consultant and the attorneys who wrote

12  the document, and then the State comes in and approves it.

13  Q.   So asking about you:  Would you have made this document a

14  requirement of your business if you had not read it and

15  understood it?

16  A.   I would not make this document part of my business if the

17  health care consultant didn't give it to me, it didn't approve,

18  the attorneys that wrote it didn't approve, and the State

19  didn't approve.  Because the State has to approve.

20  Q.   Well, this was a form document that you got that was

21  created in 2014, wasn't it?

22  A.   Well, it could have been.  I don't know when they created

23  it, but the health care consultant brought it in.

24  Q.   Okay.  So you paid somebody to bring it in, and then you

25  used it?

1  A.   Yes.   Because the State approved it.   We go through initial

2  process with the state.   They come in and they review

3  everything.   They review the application that we even give to

4  the caregivers when they're going to come in and apply.

5  Q.   And when the state comes in and reviews it,

6  what's -- they're looking at it to make sure it complies with

7  state law, aren't they?

8  A.   State and federal.

9  Q.   How do you know?

10  A.   Because I'm there.

11  Q.   How do you know why they're looking at it under state and

12  federal law as opposed to just what their jurisdiction is,

13  which is state law?

14  A.   No.   It has to be state and federal because we have to be

15  very careful who we hire.   We can't just hire anybody.   We

16  can't -- we have to make sure that they are citizens or they

17  have -- they have a green card that they can work in the U.S.

18  And they have to have a criminal background check.   So there

19  are things that we must make sure that we abide.

20  Q.   Okay.   But, again, this is a document that, as far as what

21  it says, it's not something that was created for you.   This was

22  created in 2014, do you agree?

23  A.   I do agree that it wasn't created for me.   This is created

24  for the -- the nurse registry business model.   And the State

25  has approved it.

1   Q.  And you understand that the law changed with respect to

2   companions in 2015?

3   A.  How did it change?

4   Q.  Well, are you aware that companions became entitled to

5   overtime in 2015?

6   A.  Not in the nurse registry business model, no.

7        MR. GOLDBERG:  Objection.

8   BY MR. POLLOCK:

9   Q.  At least not in your knowledge?

10  A.  No.  No.  I do know.

11       MR. GOLDBERG:  Companions are not before the Court

12  here.  The issue --

13       THE COURT:  You have to speak into the microphone.

14       MR. GOLDBERG:  I apologize.

15       Your Honor, we have an objection to this line of

16  questioning.  What a companion is or isn't is not germane to

17  this case.  This case has to do with a licensed home health

18  aide working for a licensed nurse registry under the terms of

19  the independent contractor agreement.

20       THE COURT:  I will allow some latitude.  Overruled.

21       MR. POLLOCK:  Thank you, Your Honor.

22  BY MR. POLLOCK:

23  Q.  Now, again, can you give me a "yes" or "no"?  Would you

24  have made this document a requirement of your business if you

25  had not read it and understood it?

1    A.   Yes, I guess.  It's -- yes, because it's definitely not a

2    no.  But if you just want me to say "yes," yes.

3    Q.   I thought you were going to say "no," that you wouldn't

4    have made it if you hadn't read it and understood it.

5    A.   No, because it's -- again, you keep asking me the same

6    question over and over and over again.  I told you how I came

7    to the conclusion that I accepted this document.

8    Q.   Did you read it before you started --

9    A.   Of course, I read it.  I read it with the health consultant

10   and when the State comes in.

11   Q.   Okay.  And what you said was this was created with lawyers,

12   but you didn't hire lawyers to do it?

13   A.   No.

14   Q.   It was your understanding that the health care consulting

15   company hired lawyers?

16   A.   That is correct.

17   Q.   But you know nothing about those lawyers, you don't know

18   when it was created, or you didn't know what they looked at;

19   true statement?

20   A.   I trust the health consultant, that she did -- that she

21   knows exactly what she's doing.

22   Q.   But as far as who the lawyers, or what they looked at, or

23   what their credentials are, or even what state they're from,

24   you have no idea about any of that information; isn't that

25   true?

1   A.   Counselor, I said that I've been in health care since 1989.

2   I've been in nurse -- I've been in home care since 2007.  I

3   have experience.

4   Q.  Okay.

5   A.   This document is good.

6   Q.  Okay.  And I didn't ask about your experience.  I asked

7   about the lawyers, and you keep avoiding my answer [sic] and I

8   don't understand why.

9           MR. GOLDBERG:  Objection.

10          MR. POLLOCK:  I would like an answer to my question.

11          MR. GOLDBERG:  Argumentative with the witness.

12          THE COURT:  Sustained.

13  BY MR. POLLOCK:

14  Q.  Okay.  Isn't it true that you don't know anything about the

15  lawyers who prepared this document, where they're from, what

16  their credentials are, or whether they're even in the state of

17  Florida?

18          MR. GOLDBERG:  Objection.

19  A.   No, I do not know.

20          MR. GOLDBERG:  Asked and answered.

21          THE COURT:  She answered it.  Overruled.

22  BY MR. POLLOCK:

23  Q.  Now, this is a document that, before Ms. Valdivieso came to

24  you, that your company had used over a hundred times; isn't

25  that true?

1   A.   I'm sorry?  Say that again.

2   Q.   This is a document that, before Ms. Valdivieso even walked

3   in the door to the office, that your company had used over a

4   hundred times?

5   A.   That is correct.

6   Q.   And did you use it over 200 times before she came in?

7   A.   Oh, I -- I didn't count, but we definitely used it.

8   Q.   I mean, you have got over a thousand caregivers on your

9   registry now, don't you?

10   A.   I'm sorry.  I did not count.  I have other things that are

11   more important.  Counting, no, I did not count.  I'm sorry.

12   Q.   Oh.  In your deposition, which was taken on May 16th of

13   2023, my associate at the time asked you, "Okay.  What was her

14   specific complaint when she came into the Palm Beach office

15   about not being paid?"  And your answer at that time, at page

16   63, was, "That she didn't get paid or she didn't get paid

17   correctly.  It was some -- again, I have over a thousand

18   caregivers, you know, on my roster."

19      So do you agree that you have over a thousand caregivers on

20   your roster?

21   A.   Oh, yes.

22   Q.   Okay.

23   A.   Yes, absolutely.  And every day, we get more that come in

24   and apply.

25   Q.   And we see Ms. Valdivieso's information at the top.  Am I

1   correct that this is the -- the agreement that was a

2   requirement for Ms. Valdivieso to sign to come and work for you

3   and your company?

4   A.   It is part of the application process, yes.

5   Q.   Let's look at page 2.

6        You see the paragraph dealing with civil rights

7   requirements?

8   A.   Okay.

9   Q.   Do you see it?

10  A.   The bottom here?  The civil rights requirements?

11  Q.   Yes.

12  A.   Yes, I see it.

13  Q.   And your position in this case, or with respect to

14  Ms. Valdivieso, is that she was an independent contractor and

15  not your employee.

16       Am I correct in that understanding?

17  A.   That is correct.  She's not an employee.

18  Q.   Okay.  And then, when your company entered into this

19  agreement with Ms. Valdivieso, it contracted with her to comply

20  with the requirements of Chapter 760.

21       Do you see that?

22  A.   I see it says it there.

23  Q.   And you understand that Chapter 760 of the Florida Statutes

24  involve the civil rights requirements?

25  A.   Okay.

1   Q.   We see where it says, "The provisions of Florida Statutes

2   concerning civil rights and antidiscrimination laws," when it's

3   talking about Chapter 760.

4        Do you see that?

5   A.   Okay.  I see it.

6   Q.   And you understand, because you've used this document

7   hundreds every times, that the protections against

8   discrimination and retaliation through Chapter 760 of Florida

9   Statutes apply to employees and not to independent contractors,

10   don't you?

11   A.   Can you say that again?

12   Q.   Sure.

13        I said you understand that the protections against

14   discrimination and retaliation, so the civil rights and

15   antidiscrimination laws of Chapter 760, Florida Statutes, those

16   apply to employees and not independent contractors?

17        You understand that, don't you?

18   A.   I'm not sure.

19   Q.   Okay.  And so then your company goes on and it talks about

20   that it's going to comply with Title 7 of the Civil Rights Act

21   of 1964; Section 504, the Rehabilitation Act of 1973; and the

22   Age Discrimination Act of 1975, and all requirements imposed

23   thereto.

24        Do you see that?

25   A.   I do.

1    Q.   It says, "No person shall be discriminated against."  You

2    see that?

3    A.   Yes.

4    Q.   And it talks about the company is an equal opportunity

5    employer.

6    A.   Uh-huh.

7    Q.   And it's not going to make any decisions -- it's not going

8    to make decisions without regard to race, color, religion,

9    national origin, handicap, marital status, or any other legally

10   protected status, do you see that?

11   A.   I do.

12   Q.   And you understand that these protections, like those given

13   by Chapter 760 of the Florida Statutes, are given to employees,

14   and that your company was giving these protections to

15   Ms. Valdivieso?

16   A.   Yes.

17   Q.   Okay.  Then there is also the covenant not to compete, and

18   that's at page 4 of Joint Exhibit 3.

19        Do you see that on your screen?

20   A.   Yes.

21   Q.   And the covenant not to compete means that -- well, your

22   document says that during the agreement, so while

23   Ms. Valdivieso worked for you, and for a period of one year

24   afterwards, she can't contact a client or work with a client in

25   the same industry, can she?

1  A.   That's -- that's correct.

2  Q.   And so even though Ms. Valdivieso was working with a client

3  on the side, according to you, you let that slide even though

4  it was prohibited by your agreement; isn't that true?

5  A.   That is true.  Because it was during COVID-19, and I

6  thought that we had made the right decision for the client.

7  Q.   Ms. Valdivieso start -- signed this document in May of '21.

8  Do you see that?

9  A.   I do.

10 Q.   Okay.  By that time, we were no longer homebound, and we

11 were over a year out of the pandemic, weren't we?

12 A.   We were still having issues.

13 Q.   As far as your company and Ms. Valdivieso, that

14 relationship, your company was responsible for billing and

15 collecting payment from the insurance companies; is that true?

16 A.   Yes.  That's -- that's the norm.  That's the way it's set

17 up.

18 Q.   And if there was a problem with the time that

19 Ms. Valdivieso submitted for payment, then that was something

20 that was between you and Ms. Valdivieso; is that true?

21 A.   That is true.  And then she comes in and she speaks and we

22 meet.

23 Q.   Okay.  Now, we talked about that All VIP is your business.

24 And is it true that working at All VIP is your full-time job?

25 A.   Yes.

1    Q.   And it's your primary source of income?

2    A.   Yes.

3    Q.   And you would agree with me that businesses are responsible

4    for complying with all of the laws, state and federal?

5    A.   And city, yes.

6    Q.   And, you know, businesses are required to pay their share

7    of taxes, are they not?

8    A.   Yes.

9    Q.   And you're responsible for making sure that your company

10   pays the correct amount of taxes, because it's ultimately

11   yours; right?

12   A.   Yes.  I believe the accountant tells me to pay.

13   Q.   Okay.  And you know, as an employer, that you have to pay

14   employment taxes for the people you pay as employees; right?

15   A.   I do pay taxes on that, yes, for the W-2s.

16   Q.   And you have to contribute to the social security and the

17   payroll taxes for the employees?

18   A.   For the W-2s, yes.

19   Q.   For the people that you pay as W-2s; correct?

20   A.   That's correct.

21   Q.   Okay.  And then All VIP also has to pay its share of

22   Medicare through the payroll taxes it pays to the government

23   for those people whom it pays the W-2?

24   A.   The W-2, yes.

25           THE COURT:  Mr. Pollock, let me go ahead and interrupt

1   you, if I could.  We're going to go ahead and take a ten-minute

2   recess.  Remember my admonition not to discuss the case or

3   allow it to be discussed in your presence.  We will see you

4   back in the jury room in about ten minutes.

5        (The jury exited the courtroom at 3:52 p.m.)

6        THE COURT:  Sorry to interrupt, but one of the jurors

7   had to go to the bathroom.

8        MR. POLLOCK:  When I saw that -- your CRD run up there,

9   I figured that was the sign somebody needed a comfort break.

10        THE COURT:  I don't know if you got promoted or

11   demoted.

12        MR. POLLOCK:  CSO.  Sorry.

13        THE COURT:  We will take a ten-minute recess.

14        (A recess was taken from 3:53 p.m. to 4:05 p.m.)

15        THE COURT:  Please be seated.

16        All right.  Back on the record.  Counsel are present.

17        Ms. McKinnon, if you want to resume the stand.

18        Anything to come before the Court before we bring in

19   the jury?

20        MR. GOLDBERG:  No, Your Honor.

21        MR. POLLOCK:  No, Your Honor.

22        THE COURT:  All right.  If we have all the jurors,

23   let's bring them in.

24        (The jury entered the courtroom at 4:06 p.m.)

25        THE COURT:  And we have all the jury back.

 1          Did everyone follow my admonition not to discuss the

 2     case or allow it to be discussed in your presence?

 3          Mr. Pollock, you may continue.

 4          MR. POLLOCK:   Thank you, Your Honor.

 5     BY MR. POLLOCK:

 6     Q.   Ms. McKinnon, did you tell us earlier that at All VIP, you

 7     don't do a care plan?

 8     A.   No.  We do do care plans.

 9     Q.   Okay.  And so you do care plans for clients, you do

10     assessments and you discuss pricing, and then you look for a

11     caregiver for that particular -- for each particular client.

12          Is that the process?

13     A.   We do, yes.

14     Q.   Okay.  So is the care plan different than the plan of care?

15     A.   No, it's the same thing, pretty much.

16     Q.   So the insurance company provides one, and then you do your

17     own?

18     A.   We do.

19     Q.   Okay.  And then what Ms. Valdivieso is responsible for

20     doing is she's got to carry out what you set forth in your care

21     plan?

22     A.   It's really what -- the care manager for Humana, they're

23     the ones that tell us.

24     Q.   They tell you -- go ahead.

25     A.   I'm sorry.

1  Q.  They tell you, and then you said you do a care plan?

2  A.  (Nods head.)

3  Q.  Right?

4  A.  Yes.  Because we have to go out and meet the client.  We

5  have to go out and meet the client and -- and see what's going

6  on in the home, and -- and get to meet them.  And then we have

7  an idea what they need, and then we go back to the office and

8  we discuss that with the coordinators.

9      And we say:  The client needs X, Y, and Z.  Please find her

10  a suitable caregiver that can meet those needs.

11  Q.  And so that's where your company comes in, is you find a

12  caregiver, who you decide can meet the needs for each

13  particular client; right?

14  A.  Well, that's why we do the care plan.

15  Q.  And then just to clarify something that will come up

16  probably later, Angela Melendez is one of the clients that

17  Ms. Valdivieso worked for?

18  A.  Yes.

19  Q.  Or helped -- was a companion for -- or was an aide for?

20  A.  Home health aide.  Home health aide.

21  Q.  Okay.  She was a home health aide.  A home health aide

22  is -- they provide all the services we talked about, you know,

23  that we kind of do for ourselves now that somebody, because of

24  age or infirmity, can't do for themselves?

25  A.  Bathing, dressing, meal preparation, transportation,

1   laundry, that type of thing.

2   Q.   Okay.  And Ms. Melendez is still a client of yours with

3   All VIP?

4   A.   Yes.

5   Q.   Okay.  And she's been a continuous client since before and

6   after Ms. Valdivieso?

7   A.   I don't know about before, but I certainly know she still

8   is a client.

9   Q.   Okay.  So nothing that Ms. Valdivieso said or did caused

10   Ms. Melendez to leave your company.

11        Is that a true statement?

12   A.   No.  Ms. Melendez told her that she wasn't leaving, that

13   she was very happy with All VIP Care.

14   Q.   So my statement is correct, that nothing that Ms. Melendez

15   said or did -- excuse me.  Let me start over.

16        It's a true statement that nothing Ms. Valdivieso said or

17   did caused Ms. Melendez to leave All VIP?

18   A.   Correct.  She wasn't successful.

19   Q.   And so because Ms. Valdivieso wasn't successful, in your

20   words, your company didn't lose a client; is that true?

21   A.   We did not lose Ms. Melendez.  That is true.

22   Q.   So whatever Ms. Valdivieso may have said or did didn't

23   really cause your company any damages, would you agree?

24   A.   In regards to Ms. Melendez, I agree.

25   Q.   Now, before we took a quick break, you were agreeing with

1  me -- we were talking about taxes and paying payroll taxes and

2  Medicare for the W-2 employees.

3      Do you remember talking about those kind of things?

4  A.  Yes.

5  Q.  And you pay certain people, like Ms. Diana Ramirez, as

6  employees; is that true?

7  A.  She's an employee.  That is true.

8  Q.  And those are generally the people who are in the office?

9  A.  That is true.

10  Q.  And you don't pay any of your caregivers as employees, is

11  that a fair statement?

12  A.  Say that again.  I'm sorry.

13  Q.  Sure.

14      You don't -- you don't pay any of your caregivers, any of

15  your home health aides or CNAs, as employees; isn't that true?

16  A.  As a W-2?  No.

17  Q.  Okay.  And that goes -- that holds true for any of the

18  thousand caregivers that you have on your roster; is that

19  correct?

20  A.  1099s are paid as 1099s.

21  Q.  1099 is a tax document, is it not?

22  A.  They're referred to as independent contractors in my field.

23  1099s are independent contractors.

24  Q.  Well, independent contractors get 1099s, but whether

25  somebody is an independent contractor or is an employee is

1   something we are here to decide, aren't we?

2   A.   Yes.

3   Q.   And you know that you have to pay employees at least a

4   minimum wage; is that true?

5   A.   Yes.

6   Q.   And you know that you have to pay employees who are

7   entitled to overtime wages the overtime page that they earn?

8   A.   That's correct.

9   Q.   And you also know that besides having to pay at least a

10   minimum wage and overtime when earned, that you have to pay

11   workers' compensation premiums based on the wages you pay to

12   employees; right?

13   A.   That's the law.

14   Q.   And you also have to pay employment taxes; right?

15   A.   Yes.

16   Q.   And those are for employees?

17   A.   W-2s, yes.

18   Q.   And so the less that you have to pay in workers'

19   compensation premiums or overtime or taxes, is money that goes

20   directly into your pocket; isn't that right?

21   A.   Well, that's -- that's somewhat incorrect.  Because

22   if -- if I had to pay them, I -- I will do it.  But, again,

23   it's a nurse registry, and my business model dictates that I

24   only hire caregivers that are 1099.

25        I'm following the law.

1    Q.   Right.  Because under your model, when you pay people as

2    independent contractors, it's less you've got to pay to the

3    government or to an insurance company or to --

4    A.   Well, fight with the government about that.  I'm following

5    the law.

6    Q.   Well, I guess we will decide that, won't we?  Because

7    otherwise, the money that should have gone to the government or

8    my client or the workers' compensation insurance goes to your

9    pocket, doesn't it?

10   A.   No.  And you're incorrect because -- you're twisting it.

11   And no.

12   Q.   No?  Because --

13   A.   No.

14   Q.   -- if you're paying workers' compensation premiums, that

15   comes off the profits that your company makes, doesn't it?

16   Because you'd have to pay more, you'd have a bigger expense; is

17   that true?

18   A.   It may be a bigger expense, but it doesn't have to be.

19   Q.   It doesn't --

20   A.   Because, Counsel, when you're a business person, okay, and

21   you do your business plan, okay, and you're going to hire

22   people, it means you have revenue coming in, okay?  You're not

23   going to hire people if you can't pay them -- if you can't

24   afford to pay them.

25        So if my business calls for me to hire W-2s, and I have to

1   hire a thousand, I'm going to have the revenue for that.  It's

2   not going to bother me.  But, again, this is a nurse registry,

3   okay?  I am supposed to hire 1099s.  I don't do it because in

4   my mind I'm thinking, "Well, gee, I don't have to pay the

5   government any taxes."

6        That's not why it's done.

7   Q.  But the money that you're not paying in taxes, you're

8   pocketing, isn't it -- aren't you?

9        I mean, it goes to your profit.

10  A.  It definitely goes to the profit.  And guess what?  That

11  profit helps run the business.  For instance, for COVID-19,

12  when -- when many, many caregivers didn't have supplies, we

13  went out and we bought those supplies.  We took care of our

14  clients.  When clients don't have money to pay rent, All VIP

15  Care steps in.

16       So, you know...

17  Q.  Ms. Valdivieso didn't work for you during COVID.  She

18  started working -- at least she signed the contract in May of

19  '21; right?

20  A.  We still had COVID during that time.

21  Q.  I mean, I know COVID was around, but we didn't have a

22  shutdown; right?

23  A.  To -- my point is that I am not doing something bad, okay?

24  I am doing what I'm supposed to be doing.  That's the point

25  where I am trying to get at here today.

1  Q.  And my point is:  For every dollar that you're not paying

2  in overtime, or you're not paying in workers' compensation

3  premiums, or you're not paying in taxes, that's just profit to

4  your company, isn't it?

5  A.  That's profit to the business, and the business needs

6  revenue in order to run and provide good services.

7  Q.  And you're the biggest beneficiary, or the only

8  beneficiary, of the profit from your company; isn't that true?

9  A.  Well --

10  Q.  Because you're the only owner.

11  A.  I'm the only owner, but it doesn't mean that I don't

12  treat -- that I don't treat my staff well.

13  Q.  I think we talked about this a little bit earlier.  I want

14  to go into it in a little bit more detail.

15      Would you bill an insurance company, like Humana, for a

16  Medicaid patient for an -- for hours that were not actually

17  worked by a caregiver?

18  A.  If -- if those hours are not worked, we -- we do not bill.

19  We're not supposed to bill.  Any of the billers are not

20  supposed to bill for hours that are not worked.

21  Q.  And your company is not supposed to bill for hours that a

22  caregiver didn't work; isn't that true?

23  A.  Wait.  Can you repeat that?

24  Q.  Sure.

25      Your company --

1   A.   Uh-huh.

2   Q.   -- is not supposed to bill an insurance company for hours

3   that a caregiver didn't work, for phantom hours?

4   A.   That the caregivers did not work, we're not supposed to

5   bill.   That the caregiver did not work.

6   Q.   I mean, for example, if Ms. Valdivieso's -- if

7   Ms. Johnson's time sheet said 20 hours, you're not allowed to

8   bill Humana or Medicaid for 25 hours.

9        Do you agree?

10  A.   That is correct.

11  Q.   And that would be some kind of insurance or Medicaid fraud,

12  wouldn't it?

13  A.   That's right.

14  Q.   And so you're careful to not bill more hours than are

15  actually worked by your caregivers.

16       Do you agree?

17  A.   Yes.

18  Q.   And is it true that you only bill for the time that your

19  caregivers actually worked?

20  A.   That's the way it's supposed to be, yes.

21  Q.   Okay.   The last payment that we saw for Ms. Valdivieso was

22  the check that you wrote on July 22 of 2022; right?

23  A.   Okay.   We're back to the check.

24  Q.   That's the check.

25  A.   (Nods head.)

1   Q.   And the way that your company works is you pay for -- you

2   pay a week late, not --

3   A.   A week late?

4   Q.   Well, whatever I worked through this Friday, you're going

5   to pay me next Friday.

6   A.   Right.   That's great.   They get paid every Friday, weekly.

7   Usually, most companies pay every two weeks.

8   Q.   And so you pay weekly, but you pay the week after the time

9   was worked?

10  A.   Because they have to work the week so they can get paid,

11  yes.

12  Q.   Well, that, and you have to process the payroll --

13  A.   (Nods head.)

14  Q.   -- and do the check.   I'm not saying there is anything

15  wrong with that.   I'm just saying, from a timing perspective,

16  it's not like somebody works till 5:00 on Friday, and you hand

17  them a check for the work that was done that week.

18  A.   I can.   And it's been done.

19  Q.   Sure.   You can handwrite the check?

20  A.   Yes.

21  Q.   But that's not what happened with Ms. --

22  A.   I can handwrite the checks or I can have that money

23  transferred into their account.

24  Q.   But that's not what happened with Ms. Valdivieso?

25  A.   No, it did not happen with her on this specific occasion.

```
1   Q.  Well, on any occasion, you never wrote her a check the same

2   week that she worked; isn't that right?

3   A.  I don't think I did.

4   Q.  I'm going to show you what's in evidence as Plaintiff's --

5   excuse me -- in Joint Exhibit 10.  I'm at page 33 of that,

6   which is a pay stub for direct deposit made to Ms. Valdivieso

7   on July 22, 2022, for the week -- for the week prior earnings.

8        Do you see that?

9   A.  I see it.

10  Q.  Okay.  And Ms. Valdivieso was paid, through payroll,

11  35 hours.

12  A.  Okay.

13  Q.  Is that correct?

14  A.  Yes.

15  Q.  And then we also had the check for $897 that she was paid

16  for other time for which you couldn't tell us.

17       Also correct?

18  A.  Yes.  There was a check that I wrote for $897, yes.

19  Q.  Ms. Valdivieso continued to work for you after July 17th of

20  2022, did she not?

21  A.  Maybe.  I'm not a hundred percent sure.  That -- again,

22  that is something Diana Ramirez will be better fit to answer

23  because she works through that office, you know?  So I -- so I

24  couldn't tell you the exact date that she stopped working.

25  Q.  Well, Ms. Valdivieso would have submitted time records to
```

1   your company for --

2   A.   To the Broward office, yes.

3   Q.   And you testified as the corporate representative for

4   All VIP as the person with the most knowledge, did you not?

5   A.   I have knowledge.

6   Q.   Okay.

7   A.   (Nods head.)

8   Q.   And after Ms. Valdivieso complained to you about not being

9   paid properly, you handwrote her that additional check?

10   A.   After I spoke to the office, yes.

11   Q.   And that was Plaintiff's 4 for also July 22?

12   A.   July 22, 2022.

13   Q.   I think you talked about this with my associate attorney

14   during your deposition, but -- I'm showing you Joint

15   Exhibit 11, which is an HHA exchange patient calendar.  And

16   this is a composite exhibit.  It has records for Mr. Izique and

17   Mrs.  Izique.

18   A.   Okay.

19   Q.   You're familiar with these HHA calendars, are you not?

20   A.   I am.

21   Q.   And there's letters in these calendars which have some

22   significance.

23   A.   Okay.

24   Q.   And you explained that "S" --

25   A.   Yeah.

1    Q.   -- is the schedule that's supposed to be worked, and then

2    "B" is for whether it was billed, and "Y" is a yes; is that

3    correct?

4    A.   That's correct.

5    Q.   And the "V" is the time, and that means that you validated

6    that the time was worked; is that correct?

7    A.   That means it was -- that we received the time sheet, it

8    was processed, and an invoice was generated and it was -- it

9    was also sent to the insurance company.

10   Q.   Is that the validation process?

11   A.   Yes.

12   Q.   I mean, and that's kind of the workflow; right?  It's

13   scheduled, then you review the time sheets and they're

14   validated, and then you bill it?

15   A.   Yes.

16   Q.   Okay.  So, then -- and this is for the month of July of

17   '22.

18        Do you see that?

19   A.   Yes.

20   Q.   And we have the days of the week for July?  And then we get

21   to July 18th.

22        Do you see that?

23   A.   Yes.

24   Q.   Okay.  And so if you look in here, there is time that's

25   worked by Ms. Valdivieso (indicating), right, all the way

1    through the 24th.

2         Do you see that?

3    A.   Yes.

4    Q.   Okay.  And then we go to the next page, and there is

5    additional that she's worked on the 25th.

6         Do you see that?

7    A.   Yes, I see that.

8    Q.   Okay.  Then we go to Mr. Izique -- excuse me --

9    Mrs. Izique.  Same thing.  We can look at the 18th, and there

10   is time worked by Ms. Valdivieso; the 18th, the 19th, 20, 21,

11   22, 23, 24, and into 25.

12        Do you see that?

13   A.   Yes.

14   Q.   Okay.  I'm showing it as 25.

15        And when you look at these times that were worked by

16   Ms. Valdivieso for Mrs. Izique the week of the 18th, 1:00 to

17   2:00 a.m., 2:00 to 3:00 a.m., 4:00 to 9:00 a.m. --

18   A.   Uh-huh.

19   Q.   -- 2:00 to 4:00 a.m.; right?

20   A.   (Nods head.)

21   Q.   That's a "yes"?

22   A.   Yes, I see that.

23   Q.   Okay.  Great.

24        And when you look at Mr. Izique, the times are different.

25   You see 4:00 to 7:00 a.m., 9:00 to 11:00 a.m., 6:00 to

1   8:00 a.m.

2       They're different times, aren't they?

3   A.   That is correct.  That's what you see there, yes.

4   Q.   Okay.  So Ms. Valdivieso wasn't billing -- wasn't

5   double-dipping, as you said earlier; right?  At least according

6   to your billing records; is that true?

7   A.   According to this, but that was one of the issues.

8   That's -- that was a problem that we were having because it

9   turned out that she was actually working for the two of them at

10  the same time, although this does not reflect that.

11      And if you -- and you heard Ms. Anna here say it today,

12  that she was working for the two of them at the same time.

13  Because if she was going to cook a meal for one, she had to

14  cook the meal for two.  And so we were having this situation.

15  We were saying, "There is no way she was there at 4:00 in the

16  morning."

17      But anyway, that's the conversation we had in the office,

18  and -- and the situation that we dealt with on the

19  administrative side.  That, you know -- so...

20  Q.   So you're saying there was no way that she was working the

21  hours that she was?

22  A.   (Shakes head.)  No.  I don't think so.  I'm sorry.

23  Q.   Well, then why did you bill them -- why did you bill them

24  to Humana?

25  A.   Because I didn't bill this.  This is the Broward office.

1   Q.  Well --

2   A.  Okay?

3        But when I sat down with the office and we had our

4   conversations when there was a big problem with her pay, and I

5   sat down with my office, that's when everybody started talking

6   and, you know -- and Diana will testify -- Diana Ramirez will

7   testify that when she called the family, she got -- you know,

8   she got some information.  And then when she spoke to the aide,

9   she got other information.

10        And so we kind of put everything together, and then we

11   started -- we just started to wonder and we started to

12   question, and I started to question.  But I wasn't there, and

13   neither were you, and this is why the State now wants these

14   caregivers to clock in and clock out.  Because when they clock

15   in and they clock out, there is no guessing.  They're there.

16        MR. POLLOCK:  Your Honor, I'm going to move to strike

17   that as nonresponsive.  My question was:  You billed these

18   hours?  And then we had that diatribe.

19        THE COURT:  Okay.  If you can answer "yes" or "no," and

20   then you can explain your answer after you answer "yes" or

21   "no."

22        But the motion to strike is denied.

23        MR. POLLOCK:  All right.

24   BY MR. POLLOCK:

25   Q.  So my question to you, if you can answer with a "yes" or

 1   "no," is:  Your company billed these hours that are reflected

 2   on this calendar that your company produced and that's at Joint

 3   Exhibit 11; is that true?

 4   A.   Yes.  We billed those hours.

 5   Q.   Okay.  And so the hours that you billed for Mr. Izique,

 6   let's go through them for the week of the 18th, okay?

 7        So we've got two hours on the 18th.  We've got one on the

 8   19th.  We've got four the next day; right?  So we've got two,

 9   one, four, and then four the next day.

10        That's two.  So you've got two, one, four, two.  And then

11   we've got five hours.  We've got another five hours.  And

12   another five hours; right?

13        You see those?

14   A.   Yes, I do.

15   Q.   So we've got 15 hours and another -- another nine hours.

16   So we've got, like, 24 hours this week.  Right?

17        You see those?

18   A.   Yes, I see it.

19   Q.   And then we've got hours that Ms. Valdivieso -- that you

20   billed for Ms. Valdivieso working the following day, on the

21   25th; right?

22   A.   Yes.

23   Q.   So that's another two.  So that's a total of 26 hours that

24   Ms. Valdivieso -- that you billed for her working with

25   Mr. Izique from July 18th through the 25th.

1    A.   Yes.

2    Q.   And for the 26 hours, there is no corresponding pay stub to

3    reflect that you paid Ms. Valdivieso for any of those hours;

4    isn't that true?

5    A.   For that week?

6    Q.   Yes.

7    A.   I don't think I have a pay stub, no.

8    Q.   And no pay stubs means no pay; right?

9    A.   That is a good -- yeah.  Yes.  That could be a "yes."

10   Q.   Then we get to Mrs. Izique.  And for the week of the 25th,

11   four hours.  Four hours.  Five hours.  Five hours.  Five hours.

12   You've got ten hours.  Five hours.  Three hours, and another

13   four.  So we've got a total of 40 hours for Mrs. Izique.

14        Do you see those?

15   A.   Yes, I do.

16   Q.   And again, Ms. Valdivieso -- even though you billed Humana

17   for 40 hours for Ms. -- Mrs. Izique, Ms. Valdivieso never got

18   paid for any of that time either, did she?

19   A.   I don't think she -- I don't think she got paid.  I believe

20   she was told to come in because there was an issue.

21   Q.   So you are telling us that we're here in a federal lawsuit

22   in a federal court in Fort Lauderdale, but you told her to come

23   in?

24   A.   I believe that the office told her to come into the office

25   because the time sheets that she submitted were incorrect.

1   Q.   Okay.  And let's take a look at her time sheets.  Because

2   you've got -- for Mr. Izique, we've got him at 26 hours that

3   she worked, and for Mrs. Izique, you had her at 40 hours.

4        And let's look at Ms. Valdivieso's time sheets for these

5   weeks.

6   A.   Okay.

7   Q.   Okay.  So I have the time records for Mr. Izique that you

8   billed for.  Let's look at those against the time records that

9   Ms. Valdivieso wrote up.

10       Which they should match, right, if they were validated?

11  A.   They should.

12  Q.   I mean, and there should never be a circumstance where the

13  time records that Ms. Valdivieso handwrote are less than what

14  you billed for; right?

15       They should be exactly equal?

16  A.   They should be correct.

17  Q.   Not only correct; meaning they should be equal?

18  A.   Well, if they're equal, they are correct.

19  Q.   And if they're not equal, they're not correct?

20  A.   That would my -- yes.

21  Q.   And it may be okay, from a legal standpoint, to bill less

22  than what Ms. Valdivieso worked, but it's certainly not okay to

23  bill more; right?

24  A.   That's right.  You can bill less if they worked less.

25  Q.   But you can never bill more?

1   A.   If they didn't work it, no.

2   Q.   So when we look at what Ms. Valdivieso billed for

3   Mr. Izique, she billed, let's say -- two hours, one hour, four

4   hours, three hours, five hours, five hours, and another five

5   hours.  So she billed about 28 hours.

6        Do you see that?

7   A.   Yes, I see the schedule.

8   Q.   Okay.  And for Mr. Izique, you billed 26 hours.

9        Do you remember that?

10  A.   Okay.

11  Q.   You just happened to bill different hours than what

12  Ms. Valdivieso put down?

13  A.   I don't know why they would do that, except that maybe

14  they're humans and they made a mistake.

15       But they're not supposed to do that.

16  Q.   14 different entries, those are mistakes?

17  A.   What do you mean "14 different entries"?

18  Q.   Well, we have 14 different time entries between the 18th

19  and the 24th.

20  A.   I'm confused.  I'm sorry.

21  Q.   Well --

22  A.   If we're only going to stick to Cruz, I'm -- from 9:00 to

23  11:00, I see 9:00 to 11:00 there.  Is this -- are we on the

24  right client?  And Tuesday --

25  Q.   These are your records.

1    A.    Yes.

2    Q.    This is Mr. Izique.

3    A.    Right.

4    Q.    And what we looked at were --

5    A.    July 18th.

6    Q.    -- the same time period?

7    A.    Uh-huh.  Okay.  July 18th.

8    Q.    Hold on.  Let me get to July 18th because I'm not there.

9    A.    Okay.  So 9:00 a.m. to 11:00 a.m., is that correct?  Is

10   that what you read, 9:00 a.m. to 11:00, or was that something

11   different?

12   Q.    Uh-huh.  That's there.

13   A.    Okay.  So that one is correct; right?  Two hours.

14   Q.    The next one is correct, from 4:00 a.m. to 5:00 a.m.

15   A.    So one hour.  Okay.  And then the next one, the 20th, from

16   4:00 -- is that 4:000 a.m. to 8:00 a.m.?

17   Q.    Yes.

18   A.    For two eight (phonetic), okay.

19         And then the next one, 9:00 to 12:00.

20   Q.    Uh-huh.

21   A.    Let me see.

22   Q.    9:00 to 12:00, and then we have 3:00 to 8:00.

23   A.    Okay.

24   Q.    7:00 to 12:00?

25   A.    And -- okay.  7:00 to 12:00.  You got that.  3:00 to 8:00.

1    And then the next one, she says she worked from 7:00 to 11:00.

2    Q.   And then we have another five hours; right?

3    A.   And then 11:00 to 4:00.

4    Q.   And then the next day --

5    A.   Okay.  That's -- that's -- that's the 25th.  And

6    that's -- I don't see the time sheet for that one.

7    Q.   So if there is no time sheet that either your office

8    provided or that we were able to find, how is that there?

9    A.   I don't know.  You -- then that would be a good question

10   for Diana Ramirez.  Because it doesn't -- because they're the

11   ones that collect the time sheets from the aide.

12   Q.   And going to -- well, they collect the time sheets, but

13   then you're responsible, as the license holder, to make sure

14   that these are correct; isn't that true?

15   A.   Well, I am responsible for -- as an administrator, I'm

16   responsible for the Palm Beach office.  Diana Ramirez, as an

17   administrator, is responsibile for Broward County.  Yes, I am

18   the owner, and, of course, I'm going to be responsible for all

19   of my clients and my staff.  But there is a reason why I have

20   staff, and that office is supposed to make sure that when they

21   approved this, the aide, they have a time sheet, or that aide

22   clocks in and clocks out, or the client confirmed that, yes,

23   they worked.

24   Q.   And it's your name that's applied for the NPN; right?

25   A.   I'm sorry?

1   Q.   Your name is the one who applied for the NPN.  You signed

2   for the --

3   A.   For the NPI.

4   Q.   -- NPI?

5   A.   That's correct.

6   Q.   And so you're ultimately responsible for all the billing

7   that goes through to Humana for Medicaid; right?

8   A.   I am ultimately responsible as a guarantor, yes.

9   Q.   Yes.  So it's your ultimate responsibility to make sure

10  that you're not billing for more than what Ms. Valdivieso

11  actually worked; isn't that true?

12  A.   Well, yes.  I mean, yes.  But, you know, I -- I have a

13  staff.  You know, I can't do everyone's job.  But, yes, I am

14  responsible because I have to monitor these things.  But,

15  again, I have a staff, and they have a job -- they have a job

16  description and they have their duties to do.

17  Q.   And then we get to Mrs. Izique's time records and the

18  billing that you submitted, or your company submitted to

19  Humana --

20  A.   Uh-huh.

21  Q.   -- for her -- for Daisy's last week of work; right?

22  A.   Okay.

23  Q.   And these should match up as well?

24  A.   Yes, they should.

25        THE COURT:  Mr. Pollock, I don't understand.  The time

1   cards through go through the 24th, but the billing records go

2   through the 25th.

3           MR. POLLOCK:  Correct.

4           THE COURT:  So there is seven days on the time cards

5   and eight days on the billing records?

6           MR. POLLOCK:  Yes.  In addition -- I will get to the

7   next part too.

8   BY MR. POLLOCK:

9   Q.  In Ms. -- in Mrs. Izique's records, we talked about how

10  your company billed for 40 hours for time that Ms. Valdivieso

11  spent with her from the 18th through the 25th; right?

12          Do you remember talking about that?

13  A.  I guess.  I'm -- I'm not 100 percent sure.

14  Q.  I mean, we can add it up again, if you want.

15  A.  No.  No.  That's fine.  I just want to make sure that we

16  understand this here.

17  Q.  Okay.

18  A.  This only represents seven days.  Every week only

19  represents seven days.  You do not have a time sheet for the

20  25th.  I don't know why you don't have that here.

21  Q.  Well --

22  A.  You only have seven days here.

23  Q.  You say I don't have a time sheet, but you're the one who

24  billed it.  So I think you're supposed to have a time sheet for

25  this; right?

1    A.   That is correct.  I should have a time sheet.

2    Q.   But we don't, do we?

3    A.   You don't, but I don't know if I don't.  That's

4    something -- I need to go now and speak to my administrator at

5    the Broward office and ask her why you don't have a time sheet

6    for the 25th.

7    Q.   I think that ship sailed a long time ago, because we're

8    here at trial.

9    A.   No.

10   Q.   We're not going to talk about evidence that was not

11   produced during the discovery.

12        MR. GOLDBERG:  Objection, Your Honor.  Argumentative.

13        THE COURT:  Next question.

14   BY MR. POLLOCK:

15   Q.   So let's talk about what we've got here.

16        So what we talked about was that your company billed

17   between the 18th, all the way through to the 25th, 40 hours for

18   the time that Ms. Valdivieso spent with Mrs. Izique.  And then

19   we look on the right, which is the time card which your lawyer

20   brought up to Ms. Rowland, which I brought up to you, which

21   paralleled the same times that Ms. Valdivieso billed for both

22   Mr. and Mrs. Izique, which was about, I'd say, 26 hours; right?

23   A.   26, 28, something like that.  It was --

24   Q.   And so based on the time records that you got, you

25   overbilled for Mrs. Izique by about 14 hours.  Wouldn't you

1   agree with me?

2   A.   No, I do not agree with you.

3   Q.   Okay.  What's wrong with that question?

4   A.   No.  Because if -- we can only -- you see where it's green?

5   When it's green, it means that we can bill; that it's okay.

6   This is -- this is also not only operated by the agency, this

7   is also operated by the MCO; and in this case, Humana.  If

8   we're not allowed to bill, it's going to turn pink.

9   Q.   Oh.  You're the one who -- who collects schedule; right?

10  You're the one who sets the schedule?

11  A.   I don't collect schedules for everyone.

12  Q.   Okay.

13  A.   I have a staff that collects the schedules.

14  Q.   Your company sets the schedule; is that not true?

15  A.   We don't set it.  We follow it.

16  Q.   Fine.  You follow the schedule.

17       And then the next step was -- what you told me was you

18  verified -- or your company verifies that the time was worked

19  because you had a time record for that.

20  A.   The time sheets.

21  Q.   Right.

22  A.   Yes.

23  Q.   You told me that.

24       And then after you verified, the next step in the process

25  was to bill it.  Those are the steps you told me; right?

1    A.   Right.   Then they can bill.

2    Q.   And then so for each of these entries which equates to

3    40 hours it was a -- it was scheduled, it was verified, and it

4    was billed; is that not true?

5    A.   It should be that way.

6    Q.   Correct, because it was submitted and billed.

7         So what we have is your company overbilling for Mrs. Izique

8    for 40 hours; isn't that true?

9    A.   No.   I'm not going to say that's true because I don't see

10   how you get 40 hours that we overbilled.   Where are you getting

11   the 40 hours we overbilled?   It would turn pink.   This schedule

12   here would turn pink and we wouldn't be allowed to overbill.

13   Q.   Well, I don't know if you're understanding me.   Because

14   what Mrs. Valdivieso input -- wrote down for Mrs. Izique was

15   that she had worked 26 hours.

16   A.   That could -- that could be true.   I think -- I believe it

17   was anywhere between 26 and 28.   Again, I don't remember a

18   hundred percent.

19   Q.   But your billing entries are for 40, and they're all green.

20   Isn't that what it shows?

21   A.   Well, you mean for the whole total?

22   Q.   From the 18th --

23   A.   Then maybe that's what he was approved.   I -- but I'm

24   trying to --

25   Q.   Through the 25th, you had 40 hours.

1    A.   If we billed 40 hours, that's what we were allowed to bill.

2    Q.   And you didn't pay Mrs. Valdivieso for any of it; isn't

3    that true?

4    A.   For that week, I don't think she was paid.  She was told to

5    come to the office.  There was a -- there was a big issue with

6    her time sheets.

7    Q.   Well, sure.  Her time sheets showed 26 hours and you're

8    billing 40.  That would be a big issue --

9    A.   No.  The big issue --

10   Q.   -- because if that's correct -- excuse me.

11   A.   No.  The big issue --

12   Q.   Excuse me.

13   A.   No.

14   Q.   If that's correct --

15        THE COURT:  Let's not talk at the same time, please.

16   The court reporter can only take down one person talking at

17   time, so don't talk over each other.

18   BY MR. POLLOCK:

19   Q.   It would be a big issue because if Ms. Valdivieso's time

20   sheet is correct, you've overbilled by about 14 hours; isn't

21   that true?  And that's the issue.

22   A.   No.  That -- no.

23   Q.   Or the issue is you just didn't pay Ms. Valdivieso for all

24   the hours you billed to Medicare -- or Medicaid?

25   A.   No.  The issue was that she was -- she was stating that she

1   was working hours that, in reality, she was not working; so she

2   was asked to come to the office to speak to us about it.

3   Q.  And so a year and a half later, you never paid her for any

4   of those hours?

5   A.  Just -- I believe just for that one week.  But she was told

6   to come to the office.  And at that moment, you know,

7   she -- she -- I'm not sure why she didn't want to come.  But we

8   were going to have a sit-down with her because we had

9   information that we wanted to discuss with her.

10  Q.  So you never sent her an email.  You never sent her a text.

11  You never sent her a check.  You just never paid her?

12  A.  I did not pay her.  But any -- regards to the texts and the

13  emails and all that other stuff, again, that is the Broward

14  office, and that is something you need to discuss with

15  Diana Ramirez.

16  Q.  So it's somebody else's fault, not yours?

17  A.  It's not that it's not my fault.  Please don't take it that

18  way.  That's why I have a staff.  That's their job.  It is

19  Diana Ramirez's job.  It's their duties.  That Broward office

20  has their duties.

21  Q.  And so we talked about the 26 hours that Ms. Valdivieso

22  billed for Mrs. Izique, the 26 hours that she billed for

23  Mr. Izique.  That gets us to, like, 52 hours.

24      But she wasn't done working that week.  She also worked for

25  Ms. Melendez, didn't she?  She worked those 38 hours for

1    Ms. Melendez on top of that; right?

2    A.    That is correct.

3    Q.    And she didn't get paid for the hours she worked for

4    Ms. Melendez?

5    A.    No.  Again, there was an issue with the way she was

6    submitting her time sheets.  There was an issue, and she was

7    asked to come in to speak to the office.

8    Q.    Ms. Melendez signed off on that because it was 38 hours,

9    which is the exact amount that Ms. Melendez was authorized to

10   get.  What's the issue?

11   A.    The issue was that she was submitting for hours that she

12   really wasn't working, and she was asked to come into the

13   office to speak to us.

14   Q.    So --

15   A.    In addition to that, she got angry, and then she went over

16   to the clients and she started bad-mouthing the company, and

17   she started trying to get them to go to another agency.  And

18   that's how Senior Nannies got involved, and that's why the

19   clients moved over to Senior Nanny and she went with them.  And

20   at that point is when we decided that we were going to file for

21   breach of contract.

22   Q.    So after you let Ms. Valdivieso, what you said, work on the

23   side, after you don't pay her for a week of work for working

24   for three different clients for 90 hours, you decide you're

25   going to sue her for breach of contract?

1   A.   Breach of contract.

2   Q.   Even though you didn't sue the other two All VIP

3   caregivers --

4          MR. GOLDBERG:  Objection, Your Honor.  Relevancy.

5   BY MR. POLLOCK:

6   Q.   -- who work for --

7          MR. GOLDBERG:  Objection.

8          THE COURT:  There's an objection.  You have to stop

9   talking so I can hear the objection.

10          MR. GOLDBERG:  Objection, Your Honor.  What happened or

11   didn't happen with other contractors to the nurse registry of

12   Ms. McKinnon is irrelevant to the case at bar, Your Honor.

13          THE COURT:  Overruled.

14   BY MR. POLLOCK:

15   Q.   So there were two other caregivers for the Iziques who

16   moved to Senior Nannies, and you never sued them, did you?

17   A.   We called them.  I called them.  I specifically called

18   them.  And they told me, no, that they did not go to Senior

19   Nannies.  They said that they did go to apply.  In fact, they

20   even called the office -- Senior Nannies called the office in

21   Broward to get their employee file.

22          And when I had a conversation with the other two

23   caregivers, they said, no, that they were not going to leave.

24   So...

25   Q.   And you heard Ms. Rowland tell you that they continued --

1   A.   That's what she said.

2   Q.   -- working for her parents?

3   A.   That's what she said.  But the caregivers told us no.

4   Q.   So we can either believe you or we can not believe you;

5   right?

6   A.   Well, I hope you believe me, because I am here telling you

7   the truth.  I -- I -- and I hope Ms. Anna -- Ms. Anna was

8   saying the same thing.  I hope she was saying the truth.

9        MR. POLLOCK:  Nothing further at this time, Judge.

10  Thank you.

11       THE COURT:  All right.  I think this is a good spot to

12  take a break.  We are going to go ahead and recess for the

13  afternoon.  Remember my admonition not to discuss the case or

14  allow it to be discussed in your presence.

15       We will see you back tomorrow at 9:00.

16       So have a nice evening.

17     (The jury exited the courtroom at 4:52 p.m.)

18       THE COURT:  If there is nothing to come before the

19  Court, we will be in recess until 9:00 tomorrow.

20       MR. GOLDBERG:  Thank you, Your Honor.

21       MR. POLLOCK:  Your Honor, do you want a printed exhibit

22  book when we are done?  Or how do you want us to submit?

23       THE COURT:  Yeah, a printed exhibit book would be nice.

24       MR. POLLOCK:  I've got a Joint 1 and I have a

25  Plaintiff's 1, so I am ready to go on that.

1          THE COURT:  Okay.

2          MR. POLLOCK:  Do you want me to leave it with Court now

3   or --

4          THE COURT:  Sure.

5          MR. POLLOCK:  I know we have -- Joints are admitted,

6   and I know we have one from the plaintiffs.  It just saves me

7   my workout of carrying this stuff up and down the stairs.

8          THE COURT:  I think that makes sense.

9        (These proceedings adjourned at 4:53 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4     I hereby certify that the foregoing is an accurate

 5     transcription of the proceedings in the above-entitled matter.

 6

 7
       DATE:  01-12-2024        /s/Laura Melton
 8                              LAURA E. MELTON, RMR, CRR, FPR
                                Official Court Reporter
 9                              United States District Court
                                Southern District of Florida
10                              400 North Miami Avenue
                                Miami, Florida 33128
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

$12 [2]_ - 1:172:16_,
1:172:19

$13 [11]_ - 1:75:1_, 1:75:9
_, 1:99:17_, 1:104:12_,
1:105:2_, 1:105:4_, 1:107:18
_, 1:108:14_, 1:172:10_,
1:173:1_, 1:178:12

$150 [1]_ - 1:134:11

$2,000 [1]_ - 1:99:17

$26 [1]_ - 1:176:25

$7.25 [1]_ - 1:74:24

$800 [2]_ - 1:134:12_,
1:146:24

$897 [6]_ - 1:174:18_,
1:175:11_, 1:176:18_,
1:178:7_, 1:204:15_,
1:204:18

## '

'21 [2]_ - 1:191:7_,
1:200:19

'22 [2]_ - 1:75:5_, 1:206:17

## 1

1 [8]_ - 1:66:1_, 1:66:3_,
1:66:6_, 1:66:17_, 1:125:25
_, 1:225:24_, 1:225:25

1,700 [1]_ - 1:108:5

1-14 [1]_ - 1:126:23

1/2 [6]_ - 1:181:13_,
1:181:14_, 1:181:21

10 [5]_ - 1:66:12_, 1:67:12
_, 1:126:12_, 1:172:15_,
1:204:5

10,000 [1]_ - 1:99:19

100 [4]_ - 1:142:11_,
1:166:9_, 1:180:5_, 1:217:13

1099 [2]_ - 1:197:21_,
1:198:24

1099s [5]_ - 1:197:20_,
1:197:23_, 1:197:24_,
1:200:3

10:08 [1]_ - 1:64:7

10:10 [1]_ - 1:64:13

10:16 [1]_ - 1:64:13

10:21 [1]_ - 1:67:22

10:23 [1]_ - 1:68:15

10:44 [1]_ - 1:82:4

10:45 [1]_ - 1:82:7

11 [4]_ - 1:66:20_, 1:126:12

_, 1:205:15_, 1:210:3

11:00 [9]_ - 1:151:2_,
1:207:25_, 1:213:23_,
1:214:9_, 1:214:10_, 1:215:1
_, 1:215:3

11:02 [1]_ - 1:82:7

11:12 [1]_ - 1:89:24

11:23 [1]_ - 1:89:24

11:27 [1]_ - 1:92:6

11:33 [1]_ - 1:92:6

11:47 [1]_ - 1:97:9

11th [5]_ - 1:92:2_, 1:93:3
_, 1:94:17_, 1:95:20_,
1:179:4

12 [5]_ - 1:66:25_, 1:69:18
_, 1:69:20_, 1:126:13_,
1:172:22

12:00 [6]_ - 1:150:21_,
1:181:17_, 1:214:19_,
1:214:22_, 1:214:24_,
1:214:25

12:17 [1]_ - 1:114:21

12:18 [1]_ - 1:115:2

13 [7]_ - 1:67:5_, 1:67:12_,
1:70:23_, 1:70:24_, 1:126:14
_, 1:172:22_, 1:176:25

13-year-old [2]_ - 1:30:8
_, 1:30:10

14 [11]_ - 1:69:20_, 1:69:21
_, 1:69:25_, 1:126:15_,
1:126:18_, 1:126:21_,
1:213:16_, 1:213:17_,
1:213:18_, 1:218:25_,
1:221:20

15 [9]_ - 1:22:11_, 1:64:3_,
1:64:6_, 1:81:25_, 1:82:3_,
1:82:6_, 1:151:20_, 1:151:23
_, 1:210:15

15-minute [2]_ - 1:63:6_,
1:151:17

16 [1]_ - 1:172:13

16th [2]_ - 1:179:5_,
1:187:12

17 [1]_ - 1:32:24

17th [2]_ - 1:107:25_,
1:204:19

18 [2]_ - 1:11:1_, 1:32:13

18th [20]_ - 1:108:1_,
1:137:12_, 1:139:13_,
1:149:6_, 1:149:17_,
1:178:21_, 1:206:21_,
1:207:9_, 1:207:10_,
1:207:16_, 1:210:6_, 1:210:7
_, 1:210:25_, 1:213:18_,
1:214:5_, 1:214:7_, 1:214:8

_, 1:217:11_, 1:218:17_,
1:220:22

19 [8]_ - 1:4:7_, 1:8:17_,
1:32:23_, 1:65:8_, 1:65:15_,
1:181:13_, 1:181:14_,
1:181:21

1964 [1]_ - 1:189:21

1973 [1]_ - 1:189:21

1975 [1]_ - 1:189:22

1989 [2]_ - 1:160:4_,
1:186:1

19s [1]_ - 1:181:14

19th [2]_ - 1:207:10_,
1:210:8

1:00 [3]_ - 1:136:8_,
1:136:12_, 1:207:16

1:30 [4]_ - 1:114:18_,
1:114:19_, 1:114:20_,
1:114:23

1:32 [1]_ - 1:115:2

1:37 [1]_ - 1:116:22

## 2

2 [4]_ - 1:67:9_, 1:76:5_,
1:126:1_, 1:188:5

20 [6]_ - 1:8:19_, 1:8:21_,
1:36:7_, 1:106:12_, 1:202:7
_, 1:207:10

200 [1]_ - 1:187:6

2007 [2]_ - 1:160:3_,
1:186:2

2014 [2]_ - 1:182:21_,
1:183:22

2015 [3]_ - 1:86:4_,
1:184:2_, 1:184:5

2016 [2]_ - 1:153:16_,
1:160:3

2020 [1]_ - 1:104:16

2021 [3]_ - 1:75:3_, 1:75:4
_, 1:104:17

2022 [22]_ - 1:74:22_,
1:74:23_, 1:75:3_, 1:75:4_,
1:75:11_, 1:91:24_, 1:104:16
_, 1:133:8_, 1:137:12_,
1:138:2_, 1:138:3_, 1:139:13
_, 1:139:14_, 1:174:2_,
1:174:19_, 1:176:2_,
1:202:22_, 1:204:7_,
1:204:20_, 1:205:12

2023 [1]_ - 1:187:13

20th [1]_ - 1:214:15

21 [1]_ - 1:207:10

22 [11]_ - 1:174:2_,

1:174:19_, 1:176:2_,
1:176:18_, 1:177:2_,
1:177:10_, 1:202:22_,
1:204:7_, 1:205:11_,
1:205:12_, 1:207:11

23 [1]_ - 1:207:11

24 [4]_ - 1:24:10_, 1:178:21
_, 1:207:11_, 1:210:16

2414 [1]_ - 1:174:1

24th [7]_ - 1:108:1_,
1:137:12_, 1:149:7_,
1:149:17_, 1:207:1_,
1:213:19_, 1:217:1

25 [5]_ - 1:12:18_, 1:46:12
_, 1:202:8_, 1:207:11_,
1:207:14

25th [12]_ - 1:87:4_,
1:207:5_, 1:210:21_,
1:210:25_, 1:211:10_,
1:215:5_, 1:217:2_, 1:217:11
_, 1:217:20_, 1:218:6_,
1:218:17_, 1:220:25

26 [11]_ - 1:210:23_,
1:211:2_, 1:212:2_, 1:213:8
_, 1:218:22_, 1:218:23_,
1:220:15_, 1:220:17_,
1:221:7_, 1:222:21_,
1:222:22

27 [1]_ - 1:74:23

27th [3]_ - 1:75:3_, 1:75:11
_, 1:133:8

28 [3]_ - 1:213:5_, 1:218:23
_, 1:220:17

2:00 [4]_ - 1:132:4_,
1:207:17_, 1:207:19

2:33 [2]_ - 1:151:21_,
1:151:24

2:52 [1]_ - 1:151:24

2:53 [1]_ - 1:152:9

## 3

3 [10]_ - 1:67:9_, 1:76:11_,
1:92:12_, 1:97:13_, 1:97:19
_, 1:97:20_, 1:97:21_,
1:126:2_, 1:182:2_, 1:190:18

30th [4]_ - 1:138:2_,
1:150:3_, 1:150:10_,
1:150:19

32 [10]_ - 1:6:12_, 1:87:12_,
1:90:3_, 1:90:8_, 1:90:24_,
1:115:19_, 1:115:21_,
1:115:24_, 1:116:4

326444 [1]_ - 1:91:24

33 [1]_ - 1:204:5

35 [3]_ - 1:6:12_, 1:44:3_,

1:204:11

36 [2]– - 1:146:15–, 1:180:5

38 [10]– - 1:127:2–, 1:127:10–, 1:179:10–, 1:179:24–, 1:180:5–, 1:181:7 –, 1:181:14–, 1:181:15–, 1:222:25–, 1:223:8

39 [2]– - 1:127:3–, 1:127:10

3:00 [3]– - 1:207:17–, 1:214:22–, 1:214:25

3:52 [1]– - 1:193:5

3:53 [1]– - 1:193:14

3rd [1]– - 1:150:3

---

## 4

4 [12]– - 1:66:8–, 1:97:14–, 1:97:15–, 1:97:16–, 1:126:3 –, 1:173:22–, 1:174:11–, 1:174:13–, 1:174:14–, 1:190:18–, 1:205:11

40 [17]– - 1:74:18–, 1:100:14–, 1:146:14–, 1:179:16–, 1:211:13–, 1:211:17–, 1:212:3–, 1:217:10–, 1:218:17–, 1:220:3–, 1:220:8–, 1:220:10 –, 1:220:11–, 1:220:19–, 1:220:25–, 1:221:1–, 1:221:8

42 [4]– - 1:179:15–, 1:179:19–, 1:180:3–, 1:180:7

43 [1]– - 1:149:13

44 [1]– - 1:149:13

4:00 [8]– - 1:179:16–, 1:207:17–, 1:207:19–, 1:207:25–, 1:208:15–, 1:214:14–, 1:214:16–, 1:215:3

4:000 [1]– - 1:214:16

4:05 [1]– - 1:193:14

4:06 [1]– - 1:193:24

4:52 [1]– - 1:225:17

4:53 [1]– - 1:226:9

4th [3]– - 1:139:14–, 1:148:5–, 1:148:6

---

## 5

5 [5]– - 1:65:21–, 1:66:3–, 1:97:17–, 1:97:22–, 1:126:5

50 [2]– - 1:34:12–, 1:161:4

504 [1]– - 1:189:21

52 [1]– - 1:222:23

55 [1]– - 1:54:8

5:00 [22]– - 1:11:21–, 1:11:22–, 1:11:25–, 1:12:8–, 1:119:4–, 1:119:5–, 1:132:5 –, 1:132:6–, 1:132:7–, 1:136:8–, 1:136:10–, 1:140:10–, 1:150:21–, 1:151:1–, 1:151:2–, 1:203:16 –, 1:214:14

5th [4]– - 1:108:2–, 1:138:3 –, 1:150:3–, 1:150:19

---

## 6

6 [4]– - 1:67:10–, 1:97:17–, 1:126:6–, 1:152:23

63 [1]– - 1:187:16

69 [2]– - 1:178:7–, 1:178:13

6:00 [3]– - 1:132:9–, 1:179:17–, 1:207:25

6th [1]– - 1:108:2

---

## 7

7 [3]– - 1:67:10–, 1:126:7–, 1:189:20

760 [1]– - 1:188:20–, 1:188:23–, 1:189:3–, 1:189:8 –, 1:189:15–, 1:190:13

7:00 [5]– - 1:132:9–, 1:207:25–, 1:214:24–, 1:214:25–, 1:215:1

7:30 [1]– - 1:123:5

---

## 8

8 [6]– - 1:65:20–, 1:66:1–, 1:66:3–, 1:67:11–, 1:70:23–, 1:126:9

897 [1]– - 1:178:12

8:00 [7]– - 1:136:7–, 1:136:8–, 1:150:21–, 1:208:1 –, 1:214:16–, 1:214:22–, 1:214:25

---

## 9

9 [15]– - 1:65:23–, 1:66:1–, 1:66:4–, 1:66:6–, 1:67:11–, 1:126:10–, 1:127:3–, 1:127:10–, 1:149:13–, 1:181:13–, 1:181:14–, 1:181:21

90 [1]– - 1:223:24

95 [1]– - 1:54:8

9:00 [14]– - 1:12:9–, 1:119:4–, 1:132:6–, 1:140:10 –, 1:207:17–, 1:207:25–, 1:213:22–, 1:213:23–, 1:214:9–, 1:214:10–, 1:214:19–, 1:214:22–, 1:225:15–, 1:225:19

9:09 [1]– - 1:9:6

9:30 [1]– - 1:181:17

---

## A

a.m [31]– - 1:9:6–, 1:64:7–, 1:64:13–, 1:67:22–, 1:68:15 –, 1:82:4–, 1:82:7–, 1:89:24–, 1:92:6–, 1:97:9–, 1:151:2–, 1:207:17–, 1:207:19–, 1:207:25–, 1:208:1–, 1:214:9 –, 1:214:10–, 1:214:14–, 1:214:16

abide [2]– - 1:108:21–, 1:183:19

ability [17]– - 1:15:3–, 1:15:21–, 1:21:16–, 1:22:25 –, 1:24:15–, 1:29:25–, 1:35:22–, 1:37:1–, 1:41:8–, 1:42:13–, 1:43:15–, 1:44:25 –, 1:45:2–, 1:47:25–, 1:48:5–, 1:48:16–, 1:74:1

able [26]– - 1:10:10–, 1:11:17–, 1:13:2–, 1:15:9–, 1:48:2–, 1:48:3–, 1:83:1–, 1:88:24–, 1:98:5–, 1:98:19–, 1:118:8–, 1:119:11–, 1:120:3 –, 1:120:6–, 1:122:25–, 1:130:8–, 1:156:9–, 1:161:10 –, 1:161:13–, 1:161:14–, 1:175:5–, 1:178:5–, 1:215:8

absent [3]– - 1:83:18–, 1:84:13–, 1:84:15

absolutely [4]– - 1:118:19 –, 1:121:7–, 1:187:23

Academy [1]– - 1:55:22

accept [5]– - 1:49:24–, 1:50:1–, 1:50:2–, 1:81:16–, 1:172:4

acceptable [1]– - 1:67:14

accepted [4]– - 1:76:11–, 1:139:12–, 1:160:14–, 1:185:7

accepts [1]– - 1:157:25

accident [1]– - 1:47:23

accidents [1]– - 1:47:22

accommodate [1]– - 1:176:13

accord [1]– - 1:77:4

accordance [4]– - 1:4:18 –, 1:75:19–, 1:87:11–,

–, 1:207:17–, 1:207:25–,

according [5]– - 1:69:5–, 1:106:20–, 1:191:3–, 1:208:5 –, 1:208:7

accordingly [1]– - 1:75:18

account [5]– - 1:21:13–, 1:60:10–, 1:60:12–, 1:74:1–, 1:203:23

accountant [1]– - 1:192:12

accounting [1]– - 1:44:5

accurate [1]– - 1:174:7

acknowledged [1]– - 1:111:20

acknowledgement [1]– - 1:126:4

acknowledging [1]– - 1:64:18

acquire [2]– - 1:79:23–, 1:105:13

Act [21]– - 1:18:19–, 1:54:14–, 1:54:16–, 1:58:10 –, 1:62:19–, 1:74:20–, 1:74:24–, 1:82:14–, 1:83:11 –, 1:84:10–, 1:84:25–, 1:85:5 –, 1:85:19–, 1:86:6–, 1:86:8–, 1:100:17–, 1:101:2–, 1:110:3 –, 1:189:20–, 1:189:21–, 1:189:22

act [5]– - 1:49:2–, 1:84:6–, 1:94:25

acting [1]– - 1:19:9

action [1]– - 1:47:13

actively [1]– - 1:147:18

activities [2]– - 1:131:12–, 1:156:11

actual [2]– - 1:22:23–, 1:36:24

adapt [1]– - 1:131:15

add [5]– - 1:51:25–, 1:52:1 –, 1:179:12–, 1:179:16–, 1:217:14

addition [3]– - 1:78:24–, 1:217:6–, 1:223:15

additional [7]– - 1:16:5–, 1:16:6–, 1:74:9–, 1:96:24–, 1:147:21–, 1:205:9–, 1:207:5

additionally [1]– - 1:18:1

address [5]– - 1:6:10–, 1:13:23–, 1:58:21–, 1:85:10 –, 1:124:14

addressed [1]– - 1:6:17

adjacent [1]– - 1:22:10

adjourned [1]– - 1:226:9

adjust [1]_ - 1:145:12

administer [1]_ - 1:156:2

Administration [1]_ - 1:51:15

administrative [1]_ - 1:208:19

administrator [13]_ - 1:107:9_, 1:153:24_, 1:154:2 _, 1:154:3_, 1:154:4_, 1:154:13_, 1:154:16_, 1:154:17_, 1:154:18_, 1:215:15_, 1:215:17_, 1:218:4

administrators [2]_ - 1:105:19_, 1:154:20

admissible [1]_ - 1:94:1

admitted [3]_ - 1:73:19_, 1:137:11_, 1:226:5

admonition [10]_ - 1:67:24_, 1:82:1_, 1:97:25_, 1:114:16_, 1:116:23_, 1:151:17_, 1:152:11_, 1:193:2_, 1:194:1_, 1:225:13

adults [2]_ - 1:106:5_, 1:156:9

advance [2]_ - 1:52:14_, 1:52:16

adverse [4]_ - 1:115:22_, 1:115:23_, 1:115:25_, 1:116:2

advertised [1]_ - 1:103:18

advertising [3]_ - 1:103:10_, 1:105:7_, 1:159:23

advisory [7]_ - 1:83:4_, 1:83:14_, 1:84:16_, 1:93:8_, 1:94:10_, 1:95:16_, 1:96:6

advocate [1]_ - 1:58:24

affairs [2]_ - 1:17:15_, 1:21:5

affect [15]_ - 1:15:3_, 1:15:21_, 1:22:24_, 1:24:15 _, 1:29:25_, 1:35:22_, 1:37:1 _, 1:42:13_, 1:43:14_, 1:44:24_, 1:45:1_, 1:47:24_, 1:48:5_, 1:48:16_, 1:59:1

affecting [2]_ - 1:41:8_, 1:74:8

affidavit [1]_ - 1:126:6

affirm [4]_ - 1:9:23_, 1:69:3_, 1:117:6_, 1:152:18

afford [1]_ - 1:199:24

afternoon [5]_ - 1:68:13_, 1:110:24_, 1:117:21_, 1:153:8_, 1:225:13

afterwards [1]_ - 1:190:24

age [4]_ - 1:11:1_, 1:78:23 _, 1:144:12_, 1:195:24

Age [1]_ - 1:189:22

agencies [10]_ - 1:120:24 _, 1:129:3_, 1:131:7_, 1:133:7_, 1:133:25_, 1:141:6 _, 1:141:24_, 1:158:24_, 1:159:5

agency [35]_ - 1:44:6_, 1:44:22_, 1:101:15_, 1:118:10_, 1:118:13_, 1:118:22_, 1:119:23_, 1:119:25_, 1:122:2_, 1:122:3 _, 1:124:4_, 1:128:11_, 1:128:12_, 1:128:14_, 1:128:15_, 1:128:16_, 1:133:10_, 1:133:24_, 1:139:1_, 1:140:20_, 1:141:20_, 1:141:22_, 1:141:23_, 1:142:21_, 1:142:24_, 1:144:16_, 1:145:9_, 1:146:12_, 1:156:22_, 1:157:7_, 1:161:1 _, 1:180:9_, 1:219:6_, 1:223:17

agent [2]_ - 1:46:14_, 1:65:9

agents [3]_ - 1:118:11_, 1:123:13

agitated [1]_ - 1:120:10

ago [9]_ - 1:12:18_, 1:15:15_, 1:21:3_, 1:32:17_, 1:51:16_, 1:132:20_, 1:140:15_, 1:153:13_, 1:218:7

agree [28]_ - 1:5:23_, 1:7:5 _, 1:7:6_, 1:18:4_, 1:53:7_, 1:53:10_, 1:53:21_, 1:53:24 _, 1:54:3_, 1:54:9_, 1:54:10_, 1:171:3_, 1:171:9_, 1:171:11 _, 1:171:17_, 1:177:12_, 1:181:17_, 1:181:23_, 1:183:22_, 1:183:23_, 1:187:19_, 1:192:3_, 1:196:23_, 1:196:24_, 1:202:9_, 1:202:16_, 1:219:1 _, 1:219:2

agreed [3]_ - 1:75:1_, 1:75:9_, 1:170:17

agreeing [1]_ - 1:196:25

agreement [22]_ - 1:75:20 _, 1:75:25_, 1:76:15_, 1:76:17_, 1:76:18_, 1:76:20 _, 1:82:11_, 1:102:8_, 1:106:14_, 1:108:20_, 1:126:3_, 1:128:4_, 1:135:10

_, 1:164:6_, 1:164:11_, 1:170:18_, 1:182:2_, 1:184:19_, 1:188:1_, 1:188:19_, 1:190:22_, 1:191:4

agrees [2]_ - 1:4:2_, 1:73:3

ahead [14]_ - 1:5:14_, 1:6:7_, 1:6:8_, 1:21:19_, 1:59:23_, 1:81:19_, 1:85:8_, 1:96:14_, 1:162:6_, 1:164:13 _, 1:192:25_, 1:193:1_, 1:194:24_, 1:225:12

aid [1]_ - 1:118:18

aide [28]_ - 1:75:16_, 1:112:2_, 1:118:25_, 1:120:21_, 1:121:4_, 1:121:5 _, 1:122:6_, 1:140:24_, 1:144:2_, 1:144:7_, 1:144:22 _, 1:155:18_, 1:156:4_, 1:156:13_, 1:165:19_, 1:167:16_, 1:180:3_, 1:184:18_, 1:195:19_, 1:195:20_, 1:195:21_, 1:209:8_, 1:215:11_, 1:215:21

aide/certified [1]_ - 1:126:5

aides [8]_ - 1:101:13_, 1:102:6_, 1:119:10_, 1:119:21_, 1:155:15_, 1:156:7_, 1:168:3_, 1:197:15

air [2]_ - 1:70:18_, 1:70:22

airflow [1]_ - 1:70:22

alarm [1]_ - 1:55:8

Albano [8]_ - 1:9:14_, 1:36:2_, 1:65:20_, 1:67:11_, 1:68:9_, 1:68:19_, 1:97:16_, 1:97:22

all.. [1]_ - 1:128:22

allegations [1]_ - 1:19:8

alleging [1]_ - 1:18:12

allow [25]_ - 1:4:4_, 1:5:6_, 1:52:20_, 1:63:12_, 1:64:1_, 1:67:25_, 1:71:7_, 1:73:18_, 1:82:2_, 1:86:22_, 1:98:1_, 1:112:15_, 1:114:17_, 1:116:4_, 1:116:10_, 1:116:15_, 1:116:24_, 1:151:18_, 1:152:12_, 1:175:19_, 1:180:18_, 1:184:20_, 1:193:3_, 1:194:2 _, 1:225:14

allowed [13]_ - 1:61:23_, 1:76:18_, 1:77:23_, 1:87:19 _, 1:90:1_, 1:107:12_, 1:159:2_, 1:159:9_, 1:175:22

_, 1:202:7_, 1:219:8_, 1:220:12_, 1:221:1

allowing [1]_ - 1:71:4

allows [1]_ - 1:101:20

almost [2]_ - 1:58:5_, 1:95:13

alone [2]_ - 1:112:3_, 1:123:19

alternates [6]_ - 1:8:6_, 1:12:20_, 1:12:24_, 1:12:25 _, 1:13:7_, 1:69:19

alternatives [1]_ - 1:69:14

Alvey [3]_ - 1:3:5_, 1:14:10 _, 1:98:22

ambiance [1]_ - 1:113:12

amended [1]_ - 1:6:15

America [1]_ - 1:34:15

amount [9]_ - 1:82:15_, 1:84:19_, 1:109:17_, 1:132:22_, 1:144:6_, 1:145:8 _, 1:145:15_, 1:192:10_, 1:223:9

analysis [2]_ - 1:93:15_, 1:106:18

and-some-odd [1]_ - 1:108:5

Angela [4]_ - 1:16:7_, 1:86:22_, 1:180:1_, 1:195:16

angry [1]_ - 1:223:15

angst [1]_ - 1:30:10

Anna [7]_ - 1:16:2_, 1:117:3_, 1:117:12_, 1:177:19_, 1:208:11_, 1:225:7

ANNA [1]_ - 1:117:16

announce [1]_ - 1:3:3

answer [23]_ - 1:9:24_, 1:16:19_, 1:49:6_, 1:49:7_, 1:51:24_, 1:51:25_, 1:52:1_, 1:73:8_, 1:73:11_, 1:73:13_, 1:83:4_, 1:101:17_, 1:140:1 _, 1:158:8_, 1:178:6_, 1:186:7_, 1:186:10_, 1:187:15_, 1:204:22_, 1:209:19_, 1:209:20_, 1:209:25

answered [3]_ - 1:158:7_, 1:186:20_, 1:186:21

answers [8]_ - 1:13:17_, 1:13:19_, 1:16:16_, 1:52:2_, 1:72:23_, 1:89:6_, 1:126:14 _, 1:126:15

anticipate [1]_ - 1:115:13

antidiscrimination [2]_ -

1:189:2_, 1:189:15
anyway [1]_ - 1:208:17
aplaceformom.com [1]
_ - 1:160:9
apologize [6]_ - 1:21:7_,
1:52:14_, 1:52:16_, 1:98:2_,
1:140:23_, 1:184:14
app [3]_ - 1:137:17_,
1:137:20
appeal [3]_ - 1:5:5_,
1:5:18_, 1:5:24
appear [2]_ - 1:87:12_,
88:13
appearance [2]_ -
1:63:22_, 1:89:16
appearances [1]_ - 1:3:3
appease [1]_ - 1:120:9
appeasing [1]_ - 1:131:21
applicants [1]_ - 1:102:5
application [5]_ - 1:102:4
_, 1:126:1_, 1:126:2_,
1:183:3_, 1:188:4
applied [2]_ - 1:215:24_,
1:216:1
apply [10]_ - 1:71:22_,
1:71:23_, 1:113:16_,
1:114:11_, 1:155:13_,
1:183:4_, 1:187:24_, 1:189:9
_, 1:189:16_, 1:224:19
applying [1]_ - 1:116:4
appraiser [1]_ - 1:33:20
appreciate [3]_ - 1:21:14
_, 1:51:11_, 1:110:19
appreciated [1]_ -
1:110:16
approach [2]_ - 1:137:6_,
1:139:7
appropriate [1]_ - 1:13:25
approval [1]_ - 1:61:7
approve [6]_ - 1:173:3_,
1:173:8_, 1:182:17_,
1:182:18_, 1:182:19
approved [8]_ - 1:160:16
_, 1:161:7_, 1:164:5_,
1:173:2_, 1:183:1_, 1:183:25
_, 1:215:21_, 1:220:23
approves [1]_ - 1:182:12
approving [1]_ - 1:173:11
apps [1]_ - 1:79:3
April [2]_ - 1:51:9_, 1:51:11
architect [1]_ - 1:25:25
area [4]_ - 1:121:21_,
1:125:5_, 1:125:17_,

1:154:11
arena [1]_ - 1:65:11
argue [3]_ - 1:5:17_,
1:95:16_, 1:96:5
arguing [1]_ - 1:91:2
argument [4]_ - 1:53:15_,
1:85:22_, 1:93:11_, 1:105:21
argumentative [1]_ -
1:80:21_, 1:186:11_,
1:218:12
arguments [6]_ - 1:72:16
_, 1:72:17_, 1:72:19_,
1:78:19_, 1:81:9_, 1:110:11
arm [1]_ - 1:54:12
arrangement [1]_ -
1:171:16
arrangements [1]_ -
1:116:13
arrested [1]_ - 1:47:20
articulable [1]_ - 1:113:24
ascertain [3]_ - 1:94:19_,
1:94:25_, 1:95:4
aside [1]_ - 1:147:12
asleep [2]_ - 1:132:10_,
1:132:12
aspect [1]_ - 1:93:9
assembly [2]_ - 1:69:22_,
1:69:23
assess [2]_ - 1:144:14_,
1:144:17
assesses [1]_ - 1:23:8
assessment [6]_ -
1:49:25_, 1:105:9_, 1:141:20
_, 1:141:21_, 1:165:21_,
1:171:17
assessments [1]_ -
1:194:10
assign [2]_ - 1:102:15_,
1:105:11
assigned [1]_ - 1:120:24
assignment [6]_ -
1:156:19_, 1:156:21_,
1:157:25_, 1:158:9_,
1:160:14_, 1:172:18
assignments [1]_ -
1:76:11
assigns [1]_ - 1:92:13
assistance [1]_ -
1:157:23
assistant [2]_ - 1:126:5_,
1:155:19
assistants [2]_ - 1:101:13
_, 1:155:15

assisted [1]_ - 1:13:11
Assisting [1]_ - 1:141:25
assisting [1]_ - 1:14:10
associate [3]_ - 1:14:9_,
1:187:13_, 1:205:13
association [6]_ - 1:29:20
_, 1:58:5_, 1:58:13_, 1:58:17
_, 1:58:18_, 1:58:22
assume [2]_ - 1:62:25_,
1:136:12
assuming [1]_ - 1:116:2
attempted [1]_ - 1:47:18
attempting [1]_ - 1:93:6
attendance [1]_ - 1:87:7
attention [12]_ - 1:12:25_,
1:13:24_, 1:20:2_, 1:20:21_,
1:21:9_, 1:63:2_, 1:86:20_,
1:110:16_, 1:110:19_,
1:114:10_, 1:181:2
attorney [7]_ - 1:14:10_,
1:23:6_, 1:23:10_, 1:29:18_,
1:58:1_, 1:98:22_, 1:205:13
attorneys [6]_ - 1:14:25_,
1:16:24_, 1:17:20_, 1:112:14
_, 1:182:11_, 1:182:18
Audi [1]_ - 1:30:6
audio [1]_ - 1:88:3
augmented [1]_ -
1:143:23
authority [1]_ - 1:85:9
authorization [1]_ -
1:166:3
authorized [6]_ - 1:75:22
_, 1:112:20_, 1:112:23_,
1:113:25_, 1:173:2_, 1:223:9
authorizes [1]_ - 1:144:6
automatically [2]_ -
1:15:6_, 1:55:9
available [4]_ - 1:20:13_,
1:122:3_, 1:122:6_, 1:137:24
avoid [3]_ - 1:63:22_,
1:85:23_, 1:161:18
avoiding [1]_ - 1:186:7
award [2]_ - 1:99:8_,
1:128:13
awarded [1]_ - 1:96:9
aware [2]_ - 1:111:18_,
1:184:4

              B

background [6]_ -
1:16:12_, 1:16:15_, 1:16:23

_, 1:102:5_, 1:126:7_,
1:183:18
backtracking [1]_ -
1:119:22
bad [4]_ - 1:96:4_,
1:108:10_, 1:200:23_,
1:223:16
bad-mouthing [1]_ -
1:223:16
badges [1]_ - 1:68:3
Baig [7]_ - 1:9:14_, 1:37:7
_, 1:67:11_, 1:68:9_, 1:68:19
_, 1:97:14_, 1:97:22
baking [1]_ - 1:29:8
balancing [1]_ - 1:77:14
Bank [1]_ - 1:34:15
bar [2]_ - 1:4:19_, 1:224:12
barbecue [1]_ - 1:26:23
barbecuing [1]_ - 1:26:23
base [4]_ - 1:79:20_,
1:79:22_, 1:81:6_, 1:85:2
based [13]_ - 1:10:9_,
1:17:11_, 1:18:10_, 1:18:18
_, 1:19:21_, 1:52:24_,
1:71:10_, 1:110:14_,
1:115:16_, 1:132:24_,
1:145:12_, 1:198:11_,
1:218:24
basic [1]_ - 1:71:17
basis [2]_ - 1:116:3_,
1:167:10
bathe [1]_ - 1:106:6
bathing [4]_ - 1:102:19_,
1:125:16_, 1:155:20_,
1:195:25
bathroom [1]_ - 1:123:8_,
1:193:7
bathrooms [2]_ - 1:70:7_,
1:70:10
Beach [16]_ - 1:22:14_,
1:23:9_, 1:33:14_, 1:44:1_,
1:117:23_, 1:148:9_,
1:153:24_, 1:154:8_,
1:154:11_, 1:154:15_,
1:154:19_, 1:154:23_,
1:161:5_, 1:187:14_,
1:215:16
became [1]_ - 1:184:4
become [1]_ - 1:161:12
becoming [1]_ - 1:130:15
beds [2]_ - 1:123:7_,
1:143:16
begin [3]_ - 1:62:22_,
1:78:17_, 1:78:20

beginning [4]_ - 1:119:13 _, 1:144:11_, 1:159:24_, 1:164:24

behalf [5]_ - 1:3:9_, 1:44:22_, 1:111:23_, 1:114:9 _, 1:152:5

behind [5]_ - 1:59:3_, 1:68:23_, 1:69:23_, 1:69:24 _, 1:98:23

belief [4]_ - 1:82:23_, 1:84:7_, 1:84:9_, 1:85:18

believability [1]_ - 1:74:8

bell [1]_ - 1:16:8

beneficiary [2]_ - 1:201:7 _, 1:201:8

benefit [1]_ - 1:36:24

benefits [2]_ - 1:36:23_, 1:128:14

Benitez [5]_ - 1:9:16_, 1:30:20_, 1:59:4_, 1:66:25_, 1:67:3

best [1]_ - 1:52:21

better [10]_ - 1:16:22_, 1:52:24_, 1:88:10_, 1:91:11 _, 1:120:20_, 1:158:8_, 1:165:14_, 1:167:23_, 1:178:5_, 1:204:22

between [27]_ - 1:49:1_, 1:62:13_, 1:62:16_, 1:70:2_, 1:75:2_, 1:75:11_, 1:76:13_, 1:94:3_, 1:98:16_, 1:111:19 _, 1:112:2_, 1:113:24_, 1:128:11_, 1:128:12_, 1:140:9_, 1:149:5_, 1:149:6 _, 1:157:7_, 1:157:10_, 1:157:13_, 1:157:16_, 1:157:18_, 1:172:15_, 1:191:20_, 1:213:18_, 1:218:17_, 1:220:17

beyond [2]_ - 1:123:14_, 1:147:22

bias [3]_ - 1:19:16_, 1:48:4 _, 1:74:4

biased [2]_ - 1:48:1_, 1:65:11

bid [2]_ - 1:160:21_, 1:160:22

bidding [1]_ - 1:60:21

big [12]_ - 1:20:25_, 1:130:10_, 1:131:4_, 1:131:5 _, 1:168:19_, 1:168:21_, 1:209:4_, 1:221:5_, 1:221:8 _, 1:221:9_, 1:221:11_, 1:221:19

bigger [6]_ - 1:70:4_,

1:70:8_, 1:70:15_, 1:99:10_, 1:199:16_, 1:199:18

biggest [1]_ - 1:201:7

Bill [1]_ - 1:10:6

bill [28]_ - 1:161:14_, 1:165:4_, 1:169:13_, 1:169:17_, 1:201:15_, 1:201:18_, 1:201:19_, 1:201:20_, 1:201:21_, 1:202:2_, 1:202:5_, 1:202:8 _, 1:202:14_, 1:202:18_, 1:206:14_, 1:208:23_, 1:208:25_, 1:212:21_, 1:212:23_, 1:212:24_, 1:212:25_, 1:213:11_, 1:219:5_, 1:219:8_, 1:219:25 _, 1:220:1_, 1:221:1

billed [30]_ - 1:103:21_, 1:107:16_, 1:107:23_, 1:140:9_, 1:177:3_, 1:179:4 _, 1:206:2_, 1:209:17_, 1:210:1_, 1:210:4_, 1:210:5 _, 1:210:20_, 1:210:24_, 1:211:16_, 1:212:8_, 1:212:14_, 1:213:2_, 1:213:3 _, 1:213:5_, 1:213:8_, 1:217:10_, 1:217:24_, 1:218:16_, 1:218:21_, 1:220:4_, 1:220:6_, 1:221:1 _, 1:221:24_, 1:222:22

billers [1]_ - 1:201:19

billing [24]_ - 1:105:12_, 1:139:19_, 1:140:4_, 1:140:12_, 1:140:18_, 1:150:13_, 1:150:14_, 1:155:4_, 1:164:2_, 1:166:10 _, 1:169:14_, 1:170:15_, 1:177:4_, 1:177:18_, 1:191:14_, 1:208:4_, 1:208:6 _, 1:216:6_, 1:216:10_, 1:216:18_, 1:217:1_, 1:217:5 _, 1:220:19_, 1:221:8

billings [1]_ - 1:161:14

biomedical [1]_ - 1:22:13

bit [10]_ - 1:11:16_, 1:18:23 _, 1:52:24_, 1:68:17_, 1:100:22_, 1:118:20_, 1:120:19_, 1:130:11_, 1:201:13_, 1:201:14

bleed [1]_ - 1:48:4

blind [1]_ - 1:119:18

block [1]_ - 1:113:9

blogs [1]_ - 1:79:10

blow [1]_ - 1:100:17

board [7]_ - 1:23:22_, 1:46:22_, 1:47:14_, 1:58:4_, 1:59:17_, 1:129:4_, 1:129:5

board-certified [1]_ - 1:58:4

Boca [2]_ - 1:55:22

book [2]_ - 1:225:22_, 1:225:23

boss [2]_ - 1:41:4_, 1:41:13

bother [1]_ - 1:200:2

bothered [1]_ - 1:113:9

bottom [5]_ - 1:127:13_, 1:127:19_, 1:127:24_, 1:138:3_, 1:188:10

bought [1]_ - 1:200:13

box [1]_ - 1:69:21

Brazil [1]_ - 1:31:13

breach [7]_ - 1:18:21_, 1:76:20_, 1:90:15_, 1:107:14 _, 1:223:21_, 1:223:25_, 1:224:1

breached [5]_ - 1:75:25_, 1:76:17_, 1:76:18_, 1:101:4 _, 1:108:19

breaches [1]_ - 1:76:14

break [8]_ - 1:11:20_, 1:63:10_, 1:115:20_, 1:116:12_, 1:120:19_, 1:193:9_, 1:196:25_, 1:225:12

breakfast [1]_ - 1:143:11

breaks [1]_ - 1:63:11

Brian [6]_ - 1:3:4_, 1:14:4_, 1:14:7_, 1:52:10_, 1:98:21_, 1:153:8

bridge [1]_ - 1:97:1

brief [1]_ - 1:16:24

bring [20]_ - 1:4:6_, 1:6:4_, 1:8:12_, 1:9:3_, 1:13:24_, 1:51:1_, 1:67:20_, 1:82:10_, 1:86:17_, 1:86:20_, 1:91:15 _, 1:96:21_, 1:97:8_, 1:115:5 _, 1:116:21_, 1:152:2_, 1:152:8_, 1:182:24_, 1:193:18_, 1:193:23

broad [1]_ - 1:53:4

broadcast [1]_ - 1:156:20

broke [2]_ - 1:18:15_, 1:108:20

broken [1]_ - 1:138:14

brother [3]_ - 1:147:3_, 1:149:19_, 1:149:21

brothers [3]_ - 1:134:14_, 1:134:16_, 1:147:2

brought [5]_ - 1:100:16_, 1:139:12_, 1:182:23_,

1:218:20

Broward [38]_ - 1:15:9_, 1:21:21_, 1:25:1_, 1:26:7_, 1:27:19_, 1:28:16_, 1:29:11 _, 1:30:21_, 1:30:22_, 1:30:24_, 1:32:9_, 1:33:13_, 1:34:8_, 1:36:3_, 1:37:9_, 1:38:10_, 1:39:7_, 1:40:2_, 1:41:22_, 1:42:22_, 1:43:25 _, 1:45:8_, 1:46:8_, 1:47:3_, 1:118:5_, 1:141:2_, 1:154:12 _, 1:154:16_, 1:154:20_, 1:154:23_, 1:205:2_, 1:208:25_, 1:215:17_, 1:218:5_, 1:222:13_, 1:222:19_, 1:224:21

bucks [1]_ - 1:99:16

budget [2]_ - 1:55:6_, 1:55:12

bug [1]_ - 1:57:4

building [1]_ - 1:51:19

buildings [1]_ - 1:51:16

bullied [1]_ - 1:23:25

bump [1]_ - 1:63:13

bunch [4]_ - 1:52:10_, 1:60:1_, 1:60:3_, 1:175:10

burden [6]_ - 1:77:6_, 1:77:16_, 1:78:3_, 1:82:21_, 1:94:24_, 1:95:21

burned [1]_ - 1:26:23

business [29]_ - 1:4:17_, 1:25:13_, 1:26:1_, 1:76:9_, 1:76:10_, 1:103:6_, 1:103:9 _, 1:104:23_, 1:105:23_, 1:105:24_, 1:107:3_, 1:154:1 _, 1:160:2_, 1:165:3_, 1:165:8_, 1:182:8_, 1:182:14 _, 1:182:16_, 1:183:24_, 1:184:6_, 1:184:24_, 1:191:23_, 1:198:23_, 1:199:20_, 1:199:21_, 1:199:25_, 1:200:11_, 1:201:5

businesses [3]_ - 1:57:14 _, 1:192:3_, 1:192:6

but. [1]_ - 1:178:10

buy [2]_ - 1:104:15_, 1:104:17

BY [28]_ - 1:117:20_, 1:127:1_, 1:127:6_, 1:135:1 _, 1:135:6_, 1:135:18_, 1:137:2_, 1:137:9_, 1:139:10 _, 1:140:5_, 1:149:2_, 1:153:7_, 1:167:8_, 1:170:23, 1:173:20_, 1:174:17_, 1:180:24, 1:184:8

_, 1:184:22_, 1:186:13_, 1:186:22_, 1:194:5_, 1:209:24_, 1:217:8_, 1:218:14_, 1:221:18, 1:224:5 _, 1:224:14

## C

calculations [1]_ - 1:93:12

calculator [1]_ - 1:178:15

calendar [3]_ - 1:126:13_, 1:205:15_, 1:210:2

calendars [2]_ - 1:205:19 _, 1:205:21

can.. [1]_ - 1:83:8

cancel [1]_ - 1:52:12

cannot [7]_ - 1:62:23_, 1:73:10_, 1:73:11_, 1:140:19 _, 1:159:4_, 1:159:5_, 1:179:1

capable [1]_ - 1:63:1

captured [1]_ - 1:29:21

car [1]_ - 1:47:23

card [3]_ - 1:176:11_, 1:183:17_, 1:218:19

cardiologists [1]_ - 1:47:4

cards [2]_ - 1:217:1_, 1:217:4

care [110]_ - 1:45:4_, 1:59:21_, 1:101:14_, 1:102:17_, 1:103:20_, 1:104:9_, 1:105:7_, 1:106:24 _, 1:107:7_, 1:112:23_, 1:112:25_, 1:118:2_, 1:118:4 _, 1:118:8_, 1:118:11_, 1:119:16_, 1:120:12_, 1:120:13_, 1:120:16_, 1:121:8_, 1:121:17_, 1:122:4 _, 1:122:7_, 1:124:7_, 1:124:17_, 1:124:20_, 1:125:3_, 1:125:6_, 1:125:12 _, 1:125:19_, 1:129:6_, 1:129:8_, 1:129:9_, 1:129:22 _, 1:129:25_, 1:130:4_, 1:130:5_, 1:130:14_, 1:130:20_, 1:130:23_, 1:130:25_, 1:131:11_, 1:133:13_, 1:133:14_, 1:133:19_, 1:134:4_, 1:136:18_, 1:137:14_, 1:137:23_, 1:138:15_, 1:139:2_, 1:140:14_, 1:140:17_, 1:140:23_, 1:141:4_, 1:141:13_, 1:142:1 _, 1:142:5_, 1:142:7_, 1:142:10_, 1:142:15_,

_, 1:142:16_, 1:142:19_, 1:143:1_, 1:143:3_, 1:143:24 _, 1:146:8_, 1:146:14_, 1:147:19_, 1:148:15_, 1:148:17_, 1:150:4_, 1:160:3 _, 1:160:4_, 1:160:13_, 1:160:23_, 1:161:1_, 1:162:8 _, 1:164:14_, 1:164:16_, 1:164:19_, 1:164:21_, 1:165:10_, 1:165:18_, 1:165:23_, 1:165:24_, 1:167:25_, 1:168:16_, 1:168:25_, 1:182:11_, 1:182:17_, 1:182:23_, 1:185:14_, 1:186:1_, 1:186:2 _, 1:194:7_, 1:194:8_, 1:194:9_, 1:194:14_, 1:194:20_, 1:194:22_, 1:195:1_, 1:195:14_, 1:200:13

Care [62]_ - 1:3:2_, 1:3:9_, 1:4:2_, 1:14:19_, 1:18:9_, 1:18:13_, 1:62:9_, 1:74:13_, 1:75:1_, 1:75:9_, 1:75:12_, 1:75:23_, 1:75:24_, 1:75:25 _, 1:76:2_, 1:76:7_, 1:76:10_, 1:76:12_, 1:76:17_, 1:76:19 _, 1:77:1_, 1:77:5_, 1:77:12_, 1:77:17_, 1:78:3_, 1:78:5_, 1:78:9_, 1:80:25_, 1:81:3_, 1:90:17_, 1:101:10_, 1:101:18_, 1:102:9_, 1:111:10_, 1:112:3_, 1:112:5 _, 1:112:25_, 1:113:6_, 1:113:13_, 1:114:4_, 1:114:10_, 1:118:16_, 1:119:7_, 1:119:23_, 1:120:15_, 1:124:5_, 1:126:1 _, 1:137:3_, 1:137:13_, 1:141:5_, 1:141:23_, 1:142:25_, 1:145:9_, 1:145:15_, 1:145:21_, 1:147:23_, 1:153:14_, 1:165:13_, 1:172:15_, 1:196:13_, 1:200:15

Care's [1]_ - 1:75:17

care.com [2]_ - 1:159:25 _, 1:160:7

careful [4]_ - 1:9:12_, 1:9:18_, 1:183:15_, 1:202:14

carefully [1]_ - 1:80:8

caregiver [19]_ - 1:105:11 _, 1:109:6_, 1:124:1_, 1:158:2_, 1:158:4_, 1:162:15 _, 1:163:4_, 1:163:9_, 1:166:4_, 1:167:14_, 1:172:3 _, 1:194:11_, 1:195:10_, 1:195:12_, 1:201:17_, 1:201:22_, 1:202:3_, 1:202:5

caregivers [22]_ - 1:101:11_, 1:105:17_, 1:165:5_, 1:172:14_, 1:176:8 _, 1:183:4_, 1:187:8_, 1:187:18_, 1:187:19_, 1:197:10_, 1:197:14_, 1:197:18_, 1:198:24_, 1:200:12_, 1:202:4_, 1:202:15_, 1:202:19_, 1:209:14_, 1:224:3_, 1:224:15_, 1:224:23_, 1:225:3

caring [4]_ - 1:118:1_, 1:123:13_, 1:124:14_, 1:124:25

carried [1]_ - 1:165:18

carriers [1]_ - 1:75:22

carry [1]_ - 1:194:20

carrying [2]_ - 1:72:6_, 1:226:7

Casada [1]_ - 1:13:11

case [174]_ - 1:3:14_, 1:4:17_, 1:4:21_, 1:4:23_, 1:5:9_, 1:5:10_, 1:6:23_, 1:7:1_, 1:7:7_, 1:7:10_, 1:7:24_, 1:10:1_, 1:10:8_, 1:10:9_, 1:10:10_, 1:10:13_, 1:11:15_, 1:12:13_, 1:12:15 _, 1:12:20_, 1:13:1_, 1:13:2_, 1:13:5_, 1:13:6_, 1:13:7_, 1:14:1_, 1:14:3_, 1:14:4_, 1:15:10_, 1:15:12_, 1:15:22 _, 1:16:1_, 1:16:14_, 1:17:3_, 1:17:4_, 1:17:6_, 1:17:11_, 1:18:8_, 1:18:10_, 1:18:11_, 1:18:17_, 1:18:18_, 1:18:19 _, 1:18:22_, 1:18:24_, 1:19:2 _, 1:19:4_, 1:19:8_, 1:19:13_, 1:19:20_, 1:19:23_, 1:20:2_, 1:20:12_, 1:20:16_, 1:22:25 _, 1:23:23_, 1:24:15_, 1:26:8 _, 1:29:25_, 1:35:6_, 1:37:1_, 1:42:10_, 1:47:17_, 1:47:25 _, 1:48:5_, 1:49:14_, 1:49:16 _, 1:49:18_, 1:49:23_, 1:50:22_, 1:52:4_, 1:52:21_, 1:52:22_, 1:58:24_, 1:58:25 _, 1:62:20_, 1:62:25_, 1:63:3 _, 1:63:12_, 1:64:1_, 1:67:25 _, 1:68:2_, 1:68:5_, 1:68:7_, 1:69:4_, 1:71:25_, 1:72:18_, 1:73:17_, 1:74:4_, 1:74:11_, 1:77:7_, 1:78:13_, 1:78:15_, 1:78:16_, 1:78:21_, 1:78:25 _, 1:79:7_, 1:79:8_, 1:79:9_, 1:79:13_, 1:79:14_, 1:79:15 _, 1:79:16_, 1:79:17_, 1:80:2 _, 1:80:8_, 1:82:1_, 1:84:24_, 1:85:1_, 1:86:11_, 1:87:2_,

_, 1:90:7_, 1:91:5_, 1:91:10_, 1:91:18_, 1:91:21_, 1:92:1_, 1:92:3_, 1:92:18_, 1:93:3_, 1:93:25_, 1:94:9_, 1:94:20_, 1:95:11_, 1:95:14_, 1:96:7_, 1:96:20_, 1:97:25_, 1:98:14 _, 1:98:17_, 1:99:1_, 1:99:2_, 1:99:7_, 1:99:22_, 1:101:18 _, 1:102:1_, 1:102:10_, 1:102:22_, 1:107:2_, 1:109:15_, 1:109:25_, 1:110:1_, 1:110:17_, 1:111:22_, 1:112:13_, 1:114:17_, 1:116:24_, 1:117:24_, 1:119:20_, 1:134:3_, 1:144:22_, 1:145:2 _, 1:145:3_, 1:151:18_, 1:152:12_, 1:162:14_, 1:165:16_, 1:166:22_, 1:167:1_, 1:169:25_, 1:184:17_, 1:188:13_, 1:193:2_, 1:194:2_, 1:219:7 _, 1:224:12_, 1:225:13

cases [7]_ - 1:11:12_, 1:23:19_, 1:85:3_, 1:94:18_, 1:165:11_, 1:165:12

catastrophic [1]_ - 1:4:20

catastrophically [1]_ - 1:4:23

caused [3]_ - 1:178:25_, 1:196:9_, 1:196:17

cell [3]_ - 1:71:4_, 1:71:7_, 1:71:14

center [1]_ - 1:22:9

Center [1]_ - 1:22:10

certain [13]_ - 1:17:22_, 1:23:2_, 1:72:14_, 1:78:2_, 1:100:6_, 1:104:8_, 1:118:6 _, 1:122:17_, 1:132:22_, 1:161:13_, 1:161:14_, 1:161:15_, 1:197:5

certainly [4]_ - 1:70:16_, 1:85:8_, 1:196:7_, 1:212:22

certainty [1]_ - 1:179:2

certified [4]_ - 1:58:4_, 1:101:13_, 1:155:15_, 1:155:19

Cesar [3]_ - 1:136:5_, 1:139:13_, 1:157:13

chain [1]_ - 1:72:9

chair [2]_ - 1:59:17_, 1:123:20

chairs [1]_ - 1:80:12

challenge [6]_ - 1:17:20_, 1:17:23_, 1:18:3_, 1:65:5_, 1:65:14_, 1:66:14

challenged [1]_ - 1:114:2

challenges [8]_ - 1:17:22 _, 1:17:25_, 1:18:2_, 1:64:10 _, 1:65:3_, 1:65:16_, 1:65:19 _, 1:66:6

challenging [1]_ - 1:17:21

chance [1]_ - 1:16:19

change [8]_ - 1:50:6_, 1:50:7_, 1:52:1_, 1:91:9_, 1:114:3_, 1:131:7_, 1:171:20 _, 1:184:3

changed [3]_ - 1:86:4_, 1:89:2_, 1:184:1

changes [1]_ - 1:88:25

changing [1]_ - 1:54:2

Chapter [6]_ - 1:188:20_, 1:188:23_, 1:189:3_, 1:189:8 _, 1:189:15_, 1:190:13

charge [8]_ - 1:6:18_, 1:6:22_, 1:13:12_, 1:13:22_, 1:85:12_, 1:86:11_, 1:96:23 _, 1:155:3

chart [3]_ - 1:8:15_, 1:8:23 _, 1:8:25

chat [1]_ - 1:79:10

Chavez [1]_ - 1:43:24

check [38]_ - 1:15:2_, 1:15:21_, 1:134:18_, 1:134:21_, 1:136:1_, 1:147:3 _, 1:166:22_, 1:167:1_, 1:173:13_, 1:173:15_, 1:173:16_, 1:174:1_, 1:174:7 _, 1:174:18_, 1:174:21_, 1:175:5_, 1:175:9_, 1:175:11 _, 1:176:3_, 1:176:6_, 1:176:9_, 1:176:18_, 1:177:24_, 1:178:16_, 1:178:25_, 1:183:18_, 1:202:22_, 1:202:23_, 1:202:24_, 1:203:14_, 1:203:17_, 1:203:19_, 1:204:1_, 1:204:15_, 1:204:18_, 1:205:9_, 1:222:11

checked [1]_ - 1:134:22

checking [1]_ - 1:54:1

checks [4]_ - 1:101:20_, 1:102:5_, 1:174:5_, 1:203:22

chief [1]_ - 1:5:10

child [2]_ - 1:20:5_, 1:23:24

children [12]_ - 1:23:3_, 1:23:4_, 1:24:1_, 1:25:15_, 1:30:7_, 1:31:14_, 1:32:18_, 1:34:21_, 1:36:15_, 1:40:17 _, 1:44:11_, 1:46:23

Chipotle [1]_ - 1:44:15

choice [1]_ - 1:176:8

choose [2]_ - 1:72:12_, 1:81:24

chose [2]_ - 1:87:16_, 1:170:13

Christmas [2]_ - 1:147:12 _, 1:147:13

Chubb [2]_ - 1:23:8_, 1:23:9

circuit [1]_ - 1:31:24

Circuit [3]_ - 1:92:2_, 1:93:3_, 1:94:17

Circuit's [1]_ - 1:95:20

circumstance [1]_ - 1:212:12

circumstances [1]_ - 1:72:9

circumstantial [1]_ - 1:72:9

citations [1]_ - 1:85:9

cite [1]_ - 1:91:23

cites [1]_ - 1:92:2

citizen [2]_ - 1:10:23_, 1:10:24

citizens [1]_ - 1:183:16

city [2]_ - 1:30:25_, 1:192:5

City [3]_ - 1:118:5_, 1:140:25_, 1:144:25

civil [21]_ - 1:10:8_, 1:11:8 _, 1:12:15_, 1:12:21_, 1:14:3 _, 1:16:14_, 1:23:12_, 1:26:8 _, 1:26:9_, 1:35:6_, 1:35:7_, 1:43:7_, 1:43:9_, 1:71:17_, 1:74:11_, 1:85:25_, 1:188:6 _, 1:188:10_, 1:188:24_, 1:189:2_, 1:189:14

Civil [1]_ - 1:189:20

claim [13]_ - 1:77:9_, 1:77:24_, 1:77:25_, 1:83:18 _, 1:99:9_, 1:101:1_, 1:107:14_, 1:108:4_, 1:109:11_, 1:128:14_, 1:167:11

claiming [2]_ - 1:102:11_, 1:106:15

claims [16]_ - 1:18:21_, 1:22:20_, 1:74:13_, 1:74:17 _, 1:74:21_, 1:74:25_, 1:75:8 _, 1:75:13_, 1:75:24_, 1:100:16_, 1:101:6_, 1:101:7 _, 1:107:13_, 1:109:13_, 1:111:3_, 1:111:23

clarification [1]_ -

1:147:16

clarify [2]_ - 1:172:11_, 1:195:15

clarifying [1]_ - 1:145:18

class [1]_ - 1:47:12

classifying [1]_ - 1:74:15

clause [2]_ - 1:95:8_, 1:95:12

clauses [1]_ - 1:58:21

clean [1]_ - 1:123:7

cleaned [1]_ - 1:123:9

cleaning [3]_ - 1:102:18_, 1:106:6_, 1:125:17

Cleaning [1]_ - 1:92:9

clear [5]_ - 1:5:11_, 1:95:20_, 1:116:12_, 1:145:23_, 1:157:9

clearly [3]_ - 1:10:19_, 1:13:19_, 1:113:18

clerk [1]_ - 1:13:11

client [67]_ - 1:3:18_, 1:4:17_, 1:9:5_, 1:14:5_, 1:14:16_, 1:22:23_, 1:76:12 _, 1:77:1_, 1:77:3_, 1:77:4_, 1:90:17_, 1:90:23_, 1:96:11 _, 1:96:18_, 1:105:8_, 1:111:5_, 1:111:24_, 1:113:22_, 1:114:3_, 1:157:8 _, 1:157:10_, 1:157:11_, 1:160:15_, 1:161:3_, 1:162:5 _, 1:162:7_, 1:162:11_, 1:162:23_, 1:163:8_, 1:163:22_, 1:164:9_, 1:165:1 _, 1:165:2_, 1:165:9_, 1:166:2_, 1:166:23_, 1:167:2 _, 1:168:5_, 1:171:16_, 1:175:16_, 1:175:24_, 1:177:3_, 1:180:2_, 1:180:3 _, 1:180:8_, 1:180:10_, 1:181:4_, 1:190:24_, 1:191:2 _, 1:191:6_, 1:194:11_, 1:195:4_, 1:195:5_, 1:195:9 _, 1:195:13_, 1:196:2_, 1:196:5_, 1:196:8_, 1:196:20 _, 1:199:8_, 1:213:24_, 1:215:22

client's [4]_ - 1:4:20_, 1:90:15_, 1:113:11_, 1:166:19

clients [82]_ - 1:75:17_, 1:75:23_, 1:76:1_, 1:76:7_, 1:102:11_, 1:102:16_, 1:103:8_, 1:103:11_, 1:103:19_, 1:105:6_, 1:106:17_, 1:106:23_, 1:106:24_, 1:108:11_,

1:108:17_, 1:108:24_, 1:112:4_, 1:113:4_, 1:113:8 _, 1:114:12_, 1:156:8_, 1:158:2_, 1:158:3_, 1:158:6 _, 1:158:22_, 1:158:25_, 1:159:4_, 1:159:10_, 1:159:13_, 1:159:15_, 1:159:18_, 1:159:23_, 1:160:13_, 1:160:24_, 1:161:24_, 1:162:3_, 1:162:16_, 1:162:18_, 1:162:22_, 1:162:23_, 1:162:24_, 1:163:1_, 1:163:2 _, 1:163:11_, 1:163:14_, 1:163:20_, 1:164:1_, 1:164:17_, 1:164:18_, 1:164:20_, 1:165:14_, 1:166:6_, 1:166:13_, 1:166:17_, 1:168:2_, 1:168:23_, 1:169:3_, 1:169:4 _, 1:169:8_, 1:169:11_, 1:171:14_, 1:171:19_, 1:171:24_, 1:171:25_, 1:172:1_, 1:172:5_, 1:172:7 _, 1:175:18_, 1:175:25_, 1:176:22_, 1:177:25_, 1:180:7_, 1:180:19_, 1:194:9 _, 1:195:16_, 1:200:14_, 1:215:19_, 1:223:16_, 1:223:19_, 1:223:24

clients/patients [1]_ - 1:172:8

clock [10]_ - 1:136:1_, 1:171:6_, 1:171:7_, 1:174:24 _, 1:209:14_, 1:209:15

clocks [2]_ - 1:215:22

close [3]_ - 1:38:22_, 1:70:1_, 1:125:5

closed [1]_ - 1:69:15

closely [1]_ - 1:120:17

closer [1]_ - 1:70:14

closest [4]_ - 1:9:8_, 1:9:9 _, 1:9:12_, 1:9:17

closets [1]_ - 1:44:10

closing [4]_ - 1:20:6_, 1:72:17_, 1:78:19_, 1:81:9

CNA [3]_ - 1:29:22_, 1:155:19_, 1:156:4

CNAs [3]_ - 1:29:22_, 1:156:7_, 1:197:15

coach [1]_ - 1:39:24

coaxed [1]_ - 1:109:3

Coconut [1]_ - 1:39:8

coincide [1]_ - 1:114:8

collect [7]_ - 1:71:6_, 1:71:14_, 1:105:14_,

1:105:15_, 1:215:11_, 1:215:12_, 1:219:11

collected [1]_ - 1:103:22

collecting [3]_ - 1:166:10 _, 1:170:16_, 1:191:15

collects [2]_ - 1:219:9_, 1:219:13

college [1]_ - 1:27:24

Colombia [2]_ - 1:31:6_, 1:59:15

color [1]_ - 1:190:8

coloring [1]_ - 1:30:18

comb [1]_ - 1:123:10

comfort [1]_ - 1:193:9

comfortable [2]_ - 1:94:10_, 1:94:21

coming [7]_ - 1:3:20_, 1:4:19_, 1:7:20_, 1:20:6_, 1:117:21_, 1:151:12_, 1:199:22

commercial [4]_ - 1:57:13 _, 1:60:14_, 1:164:1

commit [1]_ - 1:47:19

committed [1]_ - 1:76:19

communicate [3]_ - 1:78:25_, 1:119:12_, 1:121:6

communion [1]_ - 1:129:20

communities [1]_ - 1:15:7

community [9]_ - 1:29:20 _, 1:53:16_, 1:58:4_, 1:58:13 _, 1:58:16_, 1:160:5_, 1:162:20_, 1:172:14_, 1:172:15

comp [2]_ - 1:56:3_, 1:56:13

companies [6]_ - 1:22:5_, 1:103:21_, 1:105:16_, 1:156:25_, 1:191:15_, 1:203:7

companion [6]_ - 1:102:20_, 1:106:7_, 1:118:25_, 1:155:19_, 1:184:16_, 1:195:19

companions [7]_ - 1:102:6_, 1:155:16_, 1:155:17_, 1:156:8_, 1:184:2 _, 1:184:4_, 1:184:11

companionship [3]_ - 1:125:18_, 1:155:23_, 1:157:23

company [78]_ - 1:25:21_, 1:31:13_, 1:58:17_, 1:58:18

1:58:20_, 1:59:16_, 1:59:18_, 1:60:12_, 1:109:7 _, 1:153:16_, 1:153:18_, 1:156:12_, 1:158:19_, 1:159:2_, 1:159:3_, 1:159:12 _, 1:159:17_, 1:160:16_, 1:160:17_, 1:160:21_, 1:161:8_, 1:161:21_, 1:162:7 _, 1:162:9_, 1:162:12_, 1:163:12_, 1:163:16_, 1:164:7_, 1:164:9_, 1:164:10 _, 1:164:11_, 1:164:13_, 1:166:3_, 1:168:15_, 1:169:2 _, 1:169:20_, 1:169:23_, 1:169:25_, 1:170:4_, 1:170:19_, 1:172:2_, 1:185:15_, 1:186:24_, 1:187:3_, 1:188:3_, 1:188:18 _, 1:189:19_, 1:190:4_, 1:190:14_, 1:191:13_, 1:191:14_, 1:192:9_, 1:194:16_, 1:195:11_, 1:196:10_, 1:196:20_, 1:196:23_, 1:199:3_, 1:199:15_, 1:201:4_, 1:201:8 _, 1:201:15_, 1:201:21_, 1:201:25_, 1:202:2_, 1:203:1 _, 1:205:1_, 1:206:9_, 1:210:1_, 1:210:2_, 1:216:18 _, 1:217:10_, 1:218:16_, 1:219:14_, 1:219:18_, 1:220:7_, 1:223:16

company's [1]_ - 1:174:4

compare [1]_ - 1:107:10

compensation [5]_ - 1:198:11_, 1:198:19_, 1:199:8_, 1:199:14_, 1:201:2

compete [3]_ - 1:106:15_, 1:190:17_, 1:190:21

competent [2]_ - 1:121:14 _, 1:121:15

competing [1]_ - 1:106:16

compilation [1]_ - 1:139:11

complained [1]_ - 1:205:8

complaint [1]_ - 1:187:14

completed [1]_ - 1:6:11

completely [1]_ - 1:167:14

compliance [8]_ - 1:84:7 _, 1:84:25_, 1:85:21_, 1:85:24_, 1:86:3_, 1:95:24_, 1:126:6

complied [2]_ - 1:85:18_, 1:85:19

complies [1]_ - 1:183:6

comply [7]_ - 1:76:22_,

1:93:6_, 1:95:22_, 1:141:6_, 1:146:13_, 1:188:19_, 1:189:20

complying [3]_ - 1:95:17_, 1:95:19_, 1:192:4

component [8]_ - 1:92:17 _, 1:92:19_, 1:92:20_, 1:93:11_, 1:93:25_, 1:94:14 _, 1:94:18_, 1:94:23

composite [3]_ - 1:126:10 _, 1:126:12_, 1:205:16

computer [1]_ - 1:28:2

computers [1]_ - 1:105:25

concept [4]_ - 1:4:15_, 1:5:8_, 1:53:24_, 1:62:16

concern [1]_ - 1:70:25

concerned [4]_ - 1:72:10 _, 1:133:18_, 1:146:16_, 1:170:24

concerning [3]_ - 1:17:8_, 1:24:1_, 1:189:2

concerns [1]_ - 1:146:4_, 1:146:6_, 1:146:20

conclusion [1]_ - 1:185:7

concur [1]_ - 1:4:1

condition [6]_ - 1:87:19_, 1:131:13_, 1:142:3_, 1:144:12_, 1:144:15

conditions [1]_ - 1:75:19

conduct [2]_ - 1:85:8_, 1:102:5

conducted [3]_ - 1:76:10 _, 1:87:15_, 1:93:15

conducting [1]_ - 1:88:17

confer [2]_ - 1:64:9_, 1:96:10

conference [5]_ - 1:6:19_, 1:6:22_, 1:85:12_, 1:86:11_, 1:96:24

conferring [1]_ - 1:96:18

confidences [1]_ - 1:77:1

confident [1]_ - 1:114:12

confirmed [1]_ - 1:215:22

confused [1]_ - 1:213:20

congratulations [1]_ - 1:56:24

Congressman [1]_ - 1:50:7

Congresswoman [1]_ - 1:50:7

connected [2]_ - 1:76:9_, 1:127:4

connection [2]_ - 1:87:8_,

1:91:11

conscientious [2]_ - 1:124:8_, 1:129:12

consider [8]_ - 1:12:24_, 1:72:15_, 1:73:16_, 1:73:20 _, 1:77:21_, 1:81:13_, 1:81:15_, 1:110:10

consideration [2]_ - 1:94:9_, 1:116:17

considerations [1]_ - 1:86:9

considered [2]_ - 1:92:17 _, 1:172:7

considering [6]_ - 1:73:25 _, 1:77:24_, 1:78:8_, 1:86:13 _, 1:93:20_, 1:95:5

construction [4]_ - 1:32:15_, 1:59:16_, 1:60:7_, 1:60:12

consult [1]_ - 1:76:8

consultant [7]_ - 1:22:4_, 1:23:7_, 1:182:11_, 1:182:17 _, 1:182:23_, 1:185:9_, 1:185:20

consulting [1]_ - 1:185:14

contact [8]_ - 1:63:16_, 1:63:23_, 1:145:19_, 1:146:7 _, 1:162:17_, 1:163:2_, 1:163:3_, 1:190:24

contacted [1]_ - 1:76:6

contemporaneous [1]_ - 1:86:25

contend [1]_ - 1:75:13

continue [10]_ - 1:12:1_, 1:12:2_, 1:12:3_, 1:12:10_, 1:15:22_, 1:20:18_, 1:68:4_, 1:112:16_, 1:135:12_, 1:194:3

continued [2]_ - 1:204:19 _, 1:224:25

continuity [2]_ - 1:129:6_, 1:167:25

continuous [1]_ - 1:196:5

contract [43]_ - 1:18:15_, 1:18:21_, 1:41:5_, 1:41:10_, 1:41:11_, 1:58:18_, 1:90:16 _, 1:99:16_, 1:101:4_, 1:106:23_, 1:107:14_, 1:108:4_, 1:108:7_, 1:108:14 _, 1:108:19_, 1:112:1_, 1:113:7_, 1:128:2_, 1:128:4 _, 1:128:8_, 1:128:19_, 1:157:5_, 1:157:7_, 1:157:8 _, 1:157:13_, 1:157:16_, 1:157:18_, 1:158:5_, 1:158:11_, 1:158:19_,

1:158:21_, 1:158:25_, 1:161:1_, 1:164:10_, 1:171:25_, 1:172:6_, 1:200:18_, 1:223:21_, 1:223:25_, 1:224:1

contracted [1]_ - 1:188:19

contracting [2]_ - 1:60:18 _, 1:109:2

contractor [24]_ - 1:46:15 _, 1:61:20_, 1:62:14_, 1:74:15_, 1:75:15_, 1:75:20 _, 1:75:25_, 1:76:15_, 1:100:12_, 1:100:21_, 1:102:13_, 1:103:2_, 1:105:22_, 1:106:25_, 1:111:17_, 1:111:19_, 1:113:19_, 1:126:2_, 1:126:3 _, 1:126:8_, 1:182:2_, 1:184:19_, 1:188:14_, 1:197:25

contractors [14]_ - 1:57:14_, 1:59:13_, 1:59:22 _, 1:59:24_, 1:59:25_, 1:102:2_, 1:102:3_, 1:189:9 _, 1:189:16_, 1:197:22_, 1:197:23_, 1:197:24_, 1:199:2_, 1:224:11

contracts [5]_ - 1:55:7_, 1:60:24_, 1:61:1_, 1:171:14 _, 1:171:23

contractually [1]_ - 1:76:5

contradictory [1]_ - 1:93:10

contradicts [1]_ - 1:74:5

contrary [3]_ - 1:91:1_, 1:91:5_, 1:95:5

contribute [2]_ - 1:147:2_, 1:192:16

control [5]_ - 1:70:22_, 1:73:4_, 1:95:8_, 1:103:3_, 1:113:1

controlled [5]_ - 1:55:6_, 1:103:15_, 1:103:16_, 1:104:5_, 1:111:11

controlling [1]_ - 1:96:7

controls [1]_ - 1:53:19

conversation [2]_ - 1:208:17_, 1:224:22

conversations [1]_ - 1:209:4

convicted [1]_ - 1:11:7

convinced [1]_ - 1:106:17

cook [6]_ - 1:27:11_, 1:34:5_, 1:120:8_, 1:123:6_, 1:208:13_, 1:208:14

cooking [8]_ - 1:29:8_, 1:32:6_, 1:33:9_, 1:37:5_, 1:42:19_, 1:43:22_, 1:102:19 _, 1:106:6

coordinator [3]_ - 1:120:23_, 1:120:24_, 1:141:25

coordinators [1]_ - 1:195:8

copies [1]_ - 1:174:4

copy [2]_ - 1:49:16_, 1:174:7

Coral [3]_ - 1:32:10_, 1:40:3_, 1:46:9

corporate [2]_ - 1:59:16_, 1:205:3

correct [67]_ - 1:10:15_, 1:18:12_, 1:62:16_, 1:63:3_, 1:115:24_, 1:127:22_, 1:130:3_, 1:137:5_, 1:138:6 _, 1:140:11_, 1:145:10_, 1:145:14_, 1:153:15_, 1:153:17_, 1:153:25_, 1:155:8_, 1:155:9_, 1:155:24 _, 1:157:3_, 1:160:14_, 1:162:1_, 1:162:4_, 1:164:19 _, 1:166:5_, 1:170:2_, 1:170:19_, 1:177:6_, 1:174:19_, 1:177:5_, 1:178:14_, 1:179:1_, 1:185:16_, 1:187:5_, 1:188:1 _, 1:188:16_, 1:188:17_, 1:191:1_, 1:192:10_, 1:192:19_, 1:192:20_, 1:196:14_, 1:196:18_, 1:197:19_, 1:198:8_, 1:202:10_, 1:204:13_, 1:204:17_, 1:206:3_, 1:206:4 _, 1:206:6_, 1:208:3_, 1:212:16_, 1:212:17_, 1:212:18_, 1:212:19_, 1:214:9_, 1:214:13_, 1:214:14_, 1:215:14_, 1:216:5_, 1:217:3_, 1:218:1 _, 1:220:6_, 1:221:10_, 1:221:14_, 1:221:20_, 1:223:2

correctional [1]_ - 1:38:17

correctly [6]_ - 1:75:14_, 1:75:19_, 1:160:18_, 1:162:9 _, 1:175:17_, 1:187:17

corresponding [1]_ - 1:211:2

Counsel [1]_ - 1:199:20

counsel [22]_ - 1:3:3_, 1:14:14_, 1:59:16_, 1:61:4_,

1:62:18_, 1:82:9_, 1:87:1_, 1:87:5_, 1:87:14_, 1:87:16_, 1:87:19_, 1:89:25_, 1:92:8_, 1:97:3_, 1:112:23_, 1:113:2 _, 1:113:11_, 1:115:4_, 1:116:1_, 1:149:5_, 1:152:1 _, 1:193:16

Counselor [3]_ - 1:168:12 _, 1:168:17_, 1:186:1

count [5]_ - 1:63:8_, 1:181:2_, 1:187:7_, 1:187:10 _, 1:187:11

counterclaim [3]_ - 1:18:14_, 1:18:20_, 1:90:15

counterclaims [1]_ - 1:5:10

counting [2]_ - 1:181:9_, 1:187:11

Country [1]_ - 1:55:23

country [2]_ - 1:120:16_, 1:125:4

county [3]_ - 1:22:16_, 1:35:5_, 1:154:2

County [30]_ - 1:15:9_, 1:21:21_, 1:22:7_, 1:25:1_, 1:27:19_, 1:28:16_, 1:29:11 _, 1:30:21_, 1:30:22_, 1:30:24_, 1:32:9_, 1:33:13_, 1:34:8_, 1:36:3_, 1:37:9_, 1:38:10_, 1:39:7_, 1:40:2_, 1:41:22_, 1:42:22_, 1:43:25 _, 1:45:8_, 1:46:8_, 1:47:4_, 1:55:4_, 1:141:2_, 1:154:9_, 1:154:12_, 1:161:5_, 1:215:17

couple [18]_ - 1:6:9_, 1:21:3_, 1:25:23_, 1:52:15_, 1:57:5_, 1:62:10_, 1:99:15_, 1:100:19_, 1:106:17_, 1:108:3_, 1:119:14_, 1:125:1 _, 1:131:3_, 1:132:8_, 1:132:20_, 1:134:6_, 1:144:19_, 1:153:13

course [4]_ - 1:13:16_, 1:178:4_, 1:185:9_, 1:215:18

court [28]_ - 1:10:1_, 1:12:15_, 1:12:17_, 1:13:3_, 1:13:4_, 1:13:9_, 1:13:10_, 1:13:14_, 1:13:21_, 1:14:22 _, 1:19:23_, 1:26:6_, 1:31:25 _, 1:35:4_, 1:47:15_, 1:47:20 _, 1:48:9_, 1:53:9_, 1:63:16_, 1:63:25_, 1:64:11_, 1:64:25 _, 1:78:15_, 1:81:14_, 1:211:22_, 1:221:16

Court [31]_ - 1:3:1_, 1:4:19 _, 1:6:10_, 1:10:7_, 1:14:7_,

1:69:5_, 1:69:6_, 1:73:4_, 1:73:9_, 1:73:11_, 1:77:23_, 1:82:6_, 1:83:7_, 1:83:17_, 1:83:22_, 1:85:9_, 1:86:13_, 1:86:20_, 1:86:21_, 1:86:22 _, 1:87:7_, 1:91:17_, 1:92:20 _, 1:114:23_, 1:115:5_, 1:151:23_, 1:152:2_, 1:184:11_, 1:193:18_, 1:225:19_, 1:226:2

COURT [409]_ - 1:3:2_, 1:3:11_, 1:3:13_, 1:3:23_, 1:4:2_, 1:4:14_, 1:4:22_, 1:5:11_, 1:6:1_, 1:6:4_, 1:6:18_, 1:6:21_, 1:7:5_, 1:7:10_, 1:7:16_, 1:7:25_, 1:8:3_, 1:8:5_, 1:8:9_, 1:8:18 _, 1:8:21_, 1:8:25_, 1:9:3_, 1:9:7_, 1:10:5_, 1:10:17_, 1:14:14_, 1:14:21_, 1:16:5_, 1:16:8_, 1:20:13_, 1:20:16_, 1:21:1_, 1:21:6_, 1:21:8_, 1:21:12_, 1:21:24_, 1:22:2_, 1:22:6_, 1:22:17_, 1:22:19_, 1:22:24_, 1:23:3_, 1:23:10_, 1:23:16_, 1:23:20_, 1:24:4_, 1:24:14_, 1:24:17_, 1:24:21 _, 1:24:25_, 1:25:3_, 1:25:6_, 1:25:8_, 1:25:10_, 1:25:12_, 1:25:15_, 1:25:17_, 1:25:19 _, 1:26:4_, 1:26:6_, 1:26:8_, 1:26:11_, 1:26:14_, 1:26:17 _, 1:27:1_, 1:27:5_, 1:27:9_, 1:27:12_, 1:27:17_, 1:27:21 _, 1:27:23_, 1:28:1_, 1:28:3_, 1:28:5_, 1:28:7_, 1:28:9_, 1:28:11_, 1:28:14_, 1:28:18 _, 1:28:21_, 1:28:24_, 1:29:1 _, 1:29:3_, 1:29:5_, 1:29:7_, 1:29:9_, 1:29:13_, 1:29:17_, 1:29:19_, 1:29:24_, 1:30:2_, 1:30:4_, 1:30:7_, 1:30:9_, 1:30:11_, 1:30:13_, 1:30:15 _, 1:30:17_, 1:30:19_, 1:30:23_, 1:30:25_, 1:31:2_, 1:31:5_, 1:31:7_, 1:31:9_, 1:31:11_, 1:31:14_, 1:31:16 _, 1:31:19_, 1:31:23_, 1:32:1 _, 1:32:3_, 1:32:5_, 1:32:7_, 1:32:11_, 1:32:14_, 1:32:16 _, 1:32:18_, 1:32:20_, 1:32:22_, 1:32:25_, 1:33:2_, 1:33:4_, 1:33:6_, 1:33:8_, 1:33:11_, 1:33:15_, 1:33:18 _, 1:33:21_, 1:33:23_, 1:33:25_, 1:34:2_, 1:34:4_, 1:34:6_, 1:34:10_, 1:34:13_, 1:34:16_, 1:34:18_, 1:34:21 _, 1:34:23_, 1:34:25_, 1:35:2 _, 1:35:4_, 1:35:6_, 1:35:8_,

1:35:10_, 1:35:12_, 1:35:14 _, 1:35:16_, 1:35:18_, 1:35:21_, 1:36:1_, 1:36:5_, 1:36:8_, 1:36:10_, 1:36:12_, 1:36:15_, 1:36:17_, 1:36:19 _, 1:36:21_, 1:36:25_, 1:37:3 _, 1:37:6_, 1:37:9_, 1:37:12_, 1:37:15_, 1:37:17_, 1:37:20 _, 1:37:22_, 1:37:24_, 1:38:1 _, 1:38:3_, 1:38:5_, 1:38:7_, 1:38:9_, 1:38:12_, 1:38:15_, 1:38:18_, 1:38:20_, 1:38:22 _, 1:39:1_, 1:39:3_, 1:39:5_, 1:39:10_, 1:39:13_, 1:39:15 _, 1:39:17_, 1:39:19_, 1:39:21_, 1:39:23_, 1:39:25 _, 1:40:4_, 1:40:6_, 1:40:8_, 1:40:12_, 1:40:14_, 1:40:17 _, 1:40:19_, 1:40:21_, 1:40:23_, 1:40:25_, 1:41:2_, 1:41:7_, 1:41:12_, 1:41:15_, 1:41:17_, 1:41:20_, 1:41:24 _, 1:42:1_, 1:42:3_, 1:42:5_, 1:42:7_, 1:42:9_, 1:42:12_, 1:42:15_, 1:42:18_, 1:42:20 _, 1:42:24_, 1:43:2_, 1:43:4_, 1:43:6_, 1:43:8_, 1:43:10_, 1:43:13_, 1:43:17_, 1:43:19 _, 1:43:21_, 1:43:23_, 1:44:2 _, 1:44:4_, 1:44:7_, 1:44:9_, 1:44:11_, 1:44:13_, 1:44:16 _, 1:44:18_, 1:44:20_, 1:44:24_, 1:45:3_, 1:45:6_, 1:45:10_, 1:45:13_, 1:45:16 _, 1:45:19_, 1:45:22_, 1:45:24_, 1:46:1_, 1:46:3_, 1:46:6_, 1:46:10_, 1:46:13_, 1:46:18_, 1:46:20_, 1:46:23 _, 1:46:25_, 1:47:2_, 1:47:6_, 1:47:8_, 1:47:10_, 1:47:24_, 1:48:4_, 1:48:8_, 1:48:11_, 1:48:20_, 1:48:23_, 1:52:8_, 1:61:11_, 1:62:1_, 1:62:4_, 1:62:7_, 1:63:5_, 1:64:8_, 1:64:14_, 1:64:19_, 1:64:24 _, 1:65:2_, 1:65:5_, 1:65:7_, 1:65:12_, 1:65:14_, 1:65:19 _, 1:65:22_, 1:66:2_, 1:66:7_, 1:66:9_, 1:66:11_, 1:66:16_, 1:66:18_, 1:66:24_, 1:67:4_, 1:67:8_, 1:67:16_, 1:67:18_, 1:67:23_, 1:68:16_, 1:69:10 _, 1:75:6_, 1:82:5_, 1:82:8_, 1:82:18_, 1:82:24_, 1:83:6_, 1:83:9_, 1:83:25_, 1:84:13_, 1:85:1_, 1:85:11_, 1:85:14_, 1:86:10_, 1:86:17_, 1:86:24 _, 1:87:22_, 1:88:2_, 1:88:7_, 1:88:11_, 1:88:25_, 1:89:2_, 1:89:8_, 1:89:12_, 1:89:17_, 1:89:22_, 1:89:25_, 1:90:13

1:90:18_, 1:90:21_, 1:90:24_, 1:91:15_, 1:91:20 _, 1:91:25_, 1:92:4_, 1:92:7_, 1:92:15_, 1:93:7_, 1:93:16_, 1:93:23_, 1:94:20_, 1:95:2_, 1:95:10_, 1:96:1_, 1:96:12_, 1:96:14_, 1:96:21_, 1:97:2_, 1:97:8_, 1:97:10_, 1:97:13_, 1:97:16_, 1:97:19_, 1:97:21 _, 1:110:21_, 1:112:8_, 1:112:12_, 1:114:15_, 1:114:22_, 1:115:3_, 1:115:14_, 1:115:19_, 1:116:16_, 1:116:19_, 1:116:21_, 1:116:23_, 1:125:23_, 1:126:18_, 1:126:21_, 1:134:24_, 1:135:5_, 1:135:17_, 1:136:22_, 1:137:7_, 1:139:8 _, 1:139:21_, 1:140:1_, 1:148:23_, 1:151:13_, 1:151:16_, 1:151:22_, 1:151:25_, 1:152:7_, 1:152:10_, 1:167:5_, 1:173:19_, 1:174:13_, 1:174:16_, 1:180:18_, 1:184:13_, 1:184:20_, 1:186:12_, 1:186:21_, 1:192:25_, 1:193:6_, 1:193:10_, 1:193:13_, 1:193:15_, 1:193:22_, 1:193:25_, 1:209:19_, 1:216:25_, 1:217:4_, 1:218:13_, 1:221:15_, 1:224:8_, 1:224:13_, 1:225:11_, 1:225:18_, 1:225:23_, 1:226:1_, 1:226:4 _, 1:226:8

Court's [6]_ - 1:5:23_, 1:68:3_, 1:68:12_, 1:86:20_, 1:93:19

courthouse [4]_ - 1:51:10 _, 1:69:15_, 1:70:23_, 1:72:5

courtroom [31]_ - 1:9:6_, 1:13:12_, 1:13:17_, 1:13:22 _, 1:14:12_, 1:17:12_, 1:19:22_, 1:51:12_, 1:64:7_, 1:67:21_, 1:68:14_, 1:70:6_, 1:70:19_, 1:70:20_, 1:71:6_, 1:71:11_, 1:71:25_, 1:79:21 _, 1:79:23_, 1:80:10_, 1:82:4 _, 1:97:9_, 1:114:21_, 1:114:24_, 1:115:10_, 1:116:22_, 1:151:21_, 1:152:9_, 1:193:5_, 1:193:24 _, 1:225:17

Courtroom [2] - 1:117:17, 1:153:4

COURTROOM [13]_ -

1:9:21_, 1:10:4_, 1:69:1_, 1:69:9_, 1:100:24_, 1:115:1 _, 1:117:4_, 1:117:10_, 1:117:13_, 1:127:4_, 1:152:16_, 1:152:22_, 1:170:22

covenant [3]_ - 1:106:14_, 1:190:17_, 1:190:21

covenants [1]_ - 1:58:13

cover [2]_ - 1:120:6_, 1:121:12

coverage [5]_ - 1:120:4_, 1:132:14_, 1:137:4_, 1:137:13_, 1:138:6

covered [1]_ - 1:64:23

covering [2]_ - 1:120:13_, 1:121:11

COVID [5]_ - 1:70:1_, 1:104:16_, 1:200:17_, 1:200:20_, 1:200:21

COVID-19 [9]_ - 1:69:15 _, 1:70:20_, 1:70:24_, 1:71:1 _, 1:154:10_, 1:166:21_, 1:168:1_, 1:191:5_, 1:200:11

CRD [1]_ - 1:193:8

Creary [1]_ - 1:13:10

created [9]_ - 1:112:24_, 1:182:21_, 1:182:22_, 1:183:21_, 1:183:22_, 1:183:23_, 1:185:11_, 1:185:18

creates [3]_ - 1:113:12_, 1:142:18

creation [1]_ - 1:112:1

credential [1]_ - 1:169:17

credentialed [3]_ - 1:161:12_, 1:161:25_, 1:162:2

credentialing [3]_ - 1:161:9_, 1:161:16_, 1:169:15

credentials [4]_ - 1:156:14_, 1:156:16_, 1:185:23_, 1:186:16

credibility [1]_ - 1:74:10

credit [1]_ - 1:176:11

Creek [1]_ - 1:39:9

Crest [1]_ - 1:55:22

criminal [13]_ - 1:11:11_, 1:23:12_, 1:26:8_, 1:35:6_, 1:38:23_, 1:69:17_, 1:69:18 _, 1:69:20_, 1:85:25_, 1:110:1_, 1:183:18

critical [4]_ - 1:118:22_, 1:120:12_, 1:121:18_,

1:132:13

cross [10]_ - 1:7:7_, 1:7:13 _, 1:48:12_, 1:48:13_, 1:81:1 _, 1:81:5_, 1:88:17_, 1:88:24 _, 1:96:25_, 1:136:22

CROSS [1]_ - 1:137:1

cross-examination [3]_ - 1:7:13_, 1:48:13_, 1:136:22

CROSS-EXAMINATION [1]_ - 1:137:1

cross-examine [2]_ - 1:81:5_, 1:88:24

cross-examined [1]_ - 1:48:12

cross-examining [1]_ - 1:81:1

crossed [1]_ - 1:87:15

Cruz [14]_ - 1:14:1_, 1:14:8 _, 1:18:8_, 1:74:12_, 1:76:16 _, 1:76:24_, 1:77:11_, 1:77:14_, 1:80:23_, 1:81:4_, 1:98:21_, 1:124:16_, 1:180:2 _, 1:213:22

crying [1]_ - 1:133:18

CSO [1]_ - 1:193:12

Cummings [1]_ - 1:23:7

curious [1]_ - 1:167:24

customers [1]_ - 1:60:13

cycling [1]_ - 1:30:18

D

dad [29]_ - 1:118:24_, 1:119:18_, 1:120:8_, 1:121:1 _, 1:121:14_, 1:121:22_, 1:122:16_, 1:123:19_, 1:124:10_, 1:125:8_, 1:125:10_, 1:125:12_, 1:125:14_, 1:127:10_, 1:128:13_, 1:131:21_, 1:133:17_, 1:134:2_, 1:134:12_, 1:134:21_, 1:138:15_, 1:138:17_, 1:138:23_, 1:144:19_, 1:144:20_, 1:146:23_, 1:147:9_, 1:150:10_, 1:151:10

Dade [5]_ - 1:22:7_, 1:54:19_, 1:55:4_, 1:154:12 _, 1:154:17

daily [1]_ - 1:156:11

daisy [1]_ - 1:98:21

Daisy [70]_ - 1:14:9_, 1:53:13_, 1:99:8_, 1:99:14_,

1:100:9₋, 1:100:11₋, 1:101:1₋, 1:101:9₋, 1:102:7₋, 1:102:11₋, 1:102:17₋, 1:102:20₋, 1:103:2₋, 1:103:4₋, 1:103:9₋, 1:103:16₋, 1:103:22₋, 1:104:6₋, 1:104:12₋, 1:104:14₋, 1:104:21₋, 1:104:24₋, 1:105:6₋, 1:105:16₋, 1:105:20₋, 1:105:21₋, 1:105:23₋, 1:106:1₋, 1:106:4₋, 1:106:5₋, 1:106:10₋, 1:106:13₋, 1:106:15₋, 1:106:19₋, 1:107:2₋, 1:107:4₋, 1:107:7₋, 1:107:11₋, 1:107:15₋, 1:107:17₋, 1:107:18₋, 1:107:22₋, 1:107:24₋, 1:108:3₋, 1:108:4₋, 1:108:10₋, 1:108:14₋, 1:108:20₋, 1:108:23₋, 1:109:3₋, 1:109:15₋, 1:110:6₋, 1:110:19₋, 1:117:24₋, 1:117:25₋, 1:118:25₋, 1:122:9₋, 1:133:21₋, 1:134:8₋, 1:158:19₋, 1:164:17₋, 1:164:20₋, 1:169:7₋, 1:169:10₋, 1:170:1₋, 1:170:3₋, 1:170:9₋, 1:170:24₋, 1:171:4

Daisy's [5]₋ - 1:14:9₋, 1:98:23₋, 1:99:3₋, 1:100:1₋, 1:216:21

damages [19]₋ - 1:77:5₋, 1:82:12₋, 1:84:14₋, 1:85:7₋, 1:86:13₋, 1:91:18₋, 1:93:1₋, 1:93:12₋, 1:94:13₋, 1:94:15₋, 1:95:12₋, 1:95:14₋, 1:96:8₋, 1:96:9₋, 1:96:19₋, 1:97:5₋, 1:108:18₋, 1:108:24₋, 1:196:23

date [2]₋ - 1:76:13₋, 1:204:24

dated [2]₋ - 1:137:12₋, 1:174:1

dates [1]₋ - 1:178:5

daughter [3]₋ - 1:25:20₋, 1:107:5₋, 1:109:1

David [2]₋ - 1:14:13₋, 1:22:9

Davie [3] - 1:21:23₋, 1:36:4₋, 1:92:10

day-to-day [1]₋ - 1:131:12

daycare [2]₋ - 1:119:3₋, 1:138:15

days [14]₋ - 1:3:24₋, 1:10:11₋, 1:20:6₋, 1:100:4₋, 1:108:3₋, 1:134:6₋, 1:137:13₋, 1:153:13₋, 1:206:20₋,

1:217:4₋, 1:217:5₋, 1:217:18₋, 1:217:19₋, 1:217:22

deal [10]₋ - 1:20:25₋, 1:21:3₋, 1:60:24₋, 1:103:3₋, 1:111:16₋, 1:120:2₋, 1:131:19₋, 1:131:23₋, 1:168:19₋, 1:168:21

dealing [4]₋ - 1:23:24₋, 1:82:16₋, 1:100:10₋, 1:188:6

deals [2]₋ - 1:22:21₋, 1:101:8

dealt [1]₋ - 1:208:18

debilitated [1]₋ - 1:87:5

decide [38]₋ - 1:6:21₋, 1:12:15₋, 1:13:2₋, 1:21:13₋, 1:49:22₋, 1:52:21₋, 1:69:16₋, 1:70:8₋, 1:70:14₋, 1:71:9₋, 1:71:21₋, 1:71:24₋, 1:72:24₋, 1:73:22₋, 1:77:24₋, 1:78:8₋, 1:80:2₋, 1:80:7₋, 1:81:20₋, 1:82:13₋, 1:83:1₋, 1:83:11₋, 1:83:12₋, 1:84:19₋, 1:96:7₋, 1:98:13₋, 1:98:15₋, 1:101:23₋, 1:103:1₋, 1:109:14₋, 1:109:15₋, 1:110:6₋, 1:110:8₋, 1:132:24₋, 1:195:12₋, 1:198:1₋, 1:199:6₋, 1:223:24

decided [10]₋ - 1:70:2₋, 1:91:21₋, 1:101:22₋, 1:104:2₋, 1:130:12₋, 1:131:6₋, 1:133:9₋, 1:172:9₋, 1:172:25₋, 1:223:20

deciding [4]₋ - 1:18:16₋, 1:64:12₋, 1:73:17₋, 1:98:17

decision [9]₋ - 1:17:6₋, 1:78:22₋, 1:79:20₋, 1:79:22₋, 1:81:6₋, 1:83:21₋, 1:110:14₋, 1:133:3₋, 1:191:6

decisions [3] - 1:53:17₋, 1:190:7₋, 1:190:8

decorum [1]₋ - 1:13:22

deductions [1]₋ - 1:36:24

Deerfield [1]₋ - 1:44:1

defects [1]₋ - 1:19:11

defend [1]₋ - 1:29:22

Defendant [1]₋ 1:126:15

defendant [7]₋ - 1:7:2₋, 1:42:9₋, 1:42:11₋, 1:47:18₋, 1:74:25₋, 1:75:9₋, 1:95:15

defendant's [4]₋ - 1:82:21₋, 1:93:10₋, 1:95:20₋, 1:126:13

defendants [26]₋ - 1:7:3₋, 1:18:14₋, 1:19:17₋, 1:50:1₋, 1:74:13₋, 1:74:21₋, 1:75:12₋, 1:75:14₋, 1:75:18₋, 1:90:6

1:101:1₋, 1:102:1₋, 1:102:10₋, 1:103:15₋, 1:104:5₋, 1:104:22₋, 1:105:5₋, 1:106:13₋, 1:106:20₋, 1:107:16₋, 1:107:23₋, 1:108:9₋, 1:109:2₋, 1:109:11₋, 1:110:25

defense [23]₋ - 1:5:6₋, 1:5:9₋, 1:8:13₋, 1:14:14₋, 1:16:4₋, 1:22:22₋, 1:23:22₋, 1:29:21₋, 1:65:17₋, 1:67:16₋, 1:78:4₋, 1:78:7₋, 1:78:11₋, 1:83:13₋, 1:85:7₋, 1:85:20₋, 1:86:12₋, 1:92:24₋, 1:106:25₋, 1:109:12₋, 1:149:4₋, 1:152:5

defenses [3]₋ - 1:4:20₋, 1:78:2₋, 1:85:7

defer [1]₋ - 1:89:9

definitely [5]₋ - 1:144:9₋, 1:171:25₋, 1:185:1₋, 1:187:7₋, 1:200:10

definition [1]₋ - 1:112:22

definitions [1]₋ - 1:79:25

degree [2]₋ - 1:56:13₋, 1:56:18

delay [1]₋ - 1:98:2

deliberate [7]₋ - 1:8:6₋, 1:10:12₋, 1:12:2₋, 1:13:4₋, 1:13:6₋, 1:70:5₋, 1:81:11

deliberating [3]₋ - 1:12:1₋, 1:49:19₋, 1:78:20

deliberation [14]₋ - 1:62:22₋, 1:69:13₋, 1:69:23₋, 1:70:3₋, 1:70:9₋, 1:70:10₋, 1:70:13₋, 1:71:8₋, 1:80:11₋, 1:80:13₋, 1:81:21₋, 1:81:24₋, 1:82:3₋, 1:114:19

deliberations [10]₋ - 1:12:2₋, 1:12:4₋, 1:12:6₋, 1:49:18₋, 1:71:7₋, 1:71:12₋, 1:71:15₋, 1:72:21₋, 1:78:17

delivery [1]₋ - 1:47:5

dementia [8]₋ - 1:118:21₋, 1:119:18₋, 1:120:2₋, 1:120:10₋, 1:131:14₋, 1:131:17₋, 1:157:11₋, 1:161:3

demonstrate [1]₋ - 1:84:24

demoted [1]₋ - 1:193:11

denied [4]₋ - 1:18:12₋, 1:93:16₋, 1:94:11₋, 1:209:22

denies [1]₋ - 1:76:16

deny [1]₋ - 1:75:13

department [5]₋ - 1:30:5₋, 1:36:23₋, 1:44:5₋, 1:57:10₋, 1:57:18

Department [2]₋ - 1:34:15₋, 1:40:16

depended [1]₋ - 1:110:7

deposit [8]₋ - 1:100:3₋, 1:100:6₋, 1:102:21₋, 1:104:13₋, 1:105:17₋, 1:176:6₋, 1:176:10₋, 1:204:6

deposition [35]₋ - 1:6:13₋, 1:87:1₋, 1:87:4₋, 1:87:9₋, 1:87:10₋, 1:87:13₋, 1:87:14₋, 1:87:20₋, 1:87:24₋, 1:88:2₋, 1:88:3₋, 1:88:12₋, 1:88:19₋, 1:89:16₋, 1:89:18₋, 1:90:8₋, 1:90:10₋, 1:90:14₋, 1:90:18₋, 1:90:25₋, 1:91:4₋, 1:91:6₋, 1:115:21₋, 1:115:23₋, 1:115:25₋, 1:116:2₋, 1:116:6₋, 1:116:7₋, 1:116:15₋, 1:153:10₋, 1:153:11₋, 1:187:12₋, 1:205:14

depositions [1]₋ - 1:90:2

Deputy [2] - 1:117:17₋, 1:153:4

DEPUTY [13]₋ - 1:9:21₋, 1:10:4₋, 1:69:1₋, 1:69:9₋, 1:100:24₋, 1:115:1₋, 1:117:4₋, 1:117:10₋, 1:117:13₋, 1:127:4₋, 1:152:16₋, 1:152:22₋, 1:170:22

describe [1]₋ - 1:124:1

describing [1]₋ - 1:122:5

description [2]₋ - 1:126:6₋, 1:216:16

deserves [1]₋ - 1:72:14

desired [1]₋ - 1:87:17

desks [1]₋ - 1:105:25

detail [2]₋ - 1:124:9₋, 1:201:14

detailed [2]₋ - 1:71:19₋, 1:76:6

details [1]₋ - 1:125:19

deteriorated [1]₋ - 1:144:13

determine [9]₋ - 1:77:19₋, 1:82:15₋, 1:84:9₋, 1:84:11₋, 1:86:2₋, 1:92:21₋, 1:93:5₋, 1:128:19₋, 1:145:8

determined [2]₋ - 1:83:17₋, 1:145:15

determining [2]₋ - 1:17:6₋, 1:74:10

develop [1]₋ - 1:164:11

device [1]– 1:79:9

devices [1]– 1:42:2

diagnosed [1]– 1:118:21

Diana [22]– 1:16:2..., 1:111:5..., 1:120:23..., 1:121:2..., 1:121:3..., 1:132:16..., 1:135:24..., 1:136:14..., 1:145:19..., 1:145:23..., 1:158:7..., 1:167:23..., 1:178:5..., 1:197:5..., 1:204:22..., 1:209:6..., 1:215:10..., 1:215:16..., 1:222:15..., 1:222:19

Diane [1]– 1:146:6

diatribe [1]– 1:209:18

dictates [1]– 1:198:23

difference [7]– 1:8:24..., 1:62:13..., 1:72:11..., 1:109:21..., 1:111:19..., 1:112:22..., 1:114:2

different [26]– 1:13:3..., 1:35:8..., 1:49:1..., 1:59:22..., 1:81:18..., 1:83:22..., 1:88:22..., 1:95:13..., 1:102:25..., 1:123:16..., 1:142:24..., 1:150:15..., 1:150:17..., 1:150:25..., 1:151:1..., 1:156:18..., 1:158:10..., 1:194:14..., 1:207:24..., 1:208:2..., 1:213:11..., 1:213:16..., 1:213:17..., 1:213:18..., 1:214:11..., 1:223:24

differently [1]– 1:100:22

difficult [1]– 1:119:16

Dimitrouleas [6]– 1:10:6..., 1:52:17..., 1:98:14..., 1:102:24..., 1:106:8..., 1:109:24

dipping [4]– 1:175:22..., 1:177:18..., 1:178:1..., 1:208:5

dire [4]– 1:17:4..., 1:17:5..., 1:17:10..., 1:65:10

DIRECT [2]– 1:117:19..., 1:153:6

direct [15]– 1:7:6..., 1:7:14..., 1:72:11..., 1:87:15..., 1:88:16..., 1:100:3..., 1:100:6..., 1:102:21..., 1:104:12..., 1:105:17..., 1:154:19..., 1:163:17..., 1:176:6..., 1:176:10..., 1:204:6

directly [9]– 1:7:6:6..., 1:103:25..., 1:128:2..., 1:133:13..., 1:170:3..., 1:170:4..., 1:171:14..., 1:171:23...

director [1]– 1:36:13

directors [2]– 1:29:23..., 1:59:17

disabled [1]– 1:119:17

disagree [2]– 1:49:4..., 1:71:24

disagreement [1]– 1:98:24

disallow [1]– 1:73:14

disappointed [1]– 1:13:1

disbelieve [1]– 1:72:12

discover [1]– 1:88:20

discovery [5]– 1:87:24..., 1:88:18..., 1:90:1..., 1:116:7..., 1:218:11

discriminated [1]– 1:190:1

discrimination [2]– 1:189:8..., 1:189:14

Discrimination [1]– 1:189:22

discuss [22]– 1:63:12..., 1:64:1..., 1:67:24..., 1:72:18..., 1:78:15..., 1:82:1..., 1:97:25..., 1:114:17..., 1:116:24..., 1:151:17..., 1:152:11..., 1:156:21..., 1:165:17..., 1:167:15..., 1:175:3..., 1:193:2..., 1:194:1..., 1:194:10..., 1:195:8..., 1:222:9..., 1:222:14..., 1:225:13

discussed [15]– 1:63:12..., 1:64:2..., 1:67:25..., 1:82:2..., 1:98:1..., 1:114:17..., 1:116:24..., 1:151:18..., 1:152:12..., 1:166:16..., 1:172:11..., 1:172:23..., 1:193:3..., 1:194:2..., 1:225:14

discussion [1]– 1:19:1

discussions [2]– 1:78:22..., 1:146:3

dismissed [2]– 1:26:16..., 1:31:25

dispute [23]– 1:28:9..., 1:29:5..., 1:30:15..., 1:32:3..., 1:33:6..., 1:34:2..., 1:35:16..., 1:38:3..., 1:39:1..., 1:39:21..., 1:41:2..., 1:41:4..., 1:41:13..., 1:42:16..., 1:43:19..., 1:44:20..., 1:46:1..., 1:53:8..., 1:53:11..., 1:100:9..., 1:107:17..., 1:113:24

disputes [4]– 1:24:4...

disputing [1]– 1:44:22

disqualify [1]– 1:15:6

disregard [2]– 1:73:15..., 1:81:18

disrupt [1]– 1:166:20

distract [2]– 1:80:8..., 1:108:9

District [2]– 1:10:7..., 1:10:8

divide [1]– 1:178:12

divorced [1]– 1:34:17

docket [1]– 1:87:3

doctor [4]– 1:105:19..., 1:124:13..., 1:165:10..., 1:165:13

doctors."so [1]– 1:124:14

document [26]– 1:139:21..., 1:139:22..., 1:139:25..., 1:147:9..., 1:149:7..., 1:159:8..., 1:165:23..., 1:173:24..., 1:180:23..., 1:182:5..., 1:182:8..., 1:182:12..., 1:182:13..., 1:182:16..., 1:182:20..., 1:183:20..., 1:184:24..., 1:185:7..., 1:186:5..., 1:186:15..., 1:186:23..., 1:187:2..., 1:189:6..., 1:190:22..., 1:191:7..., 1:197:21

documentation [2]– 1:111:14..., 1:146:18

documented [1]– 1:112:21

documents [8]– 1:57:21..., 1:107:19..., 1:107:21..., 1:110:11..., 1:111:15..., 1:146:4..., 1:146:8..., 1:150:12

dollar [1]– 1:201:1

dollars [1]– 1:108:5

Dominican [2]– 1:29:16..., 1:43:3

done [20]– 1:3:16..., 1:3:22..., 1:8:21..., 1:8:25..., 1:17:1..., 1:17:17..., 1:58:6..., 1:58:7..., 1:70:12..., 1:104:9..., 1:128:14..., 1:133:3..., 1:165:25..., 1:170:7..., 1:177:8..., 1:200:6..., 1:203:17..., 1:203:18..., 1:222:24..., 1:225:22

door [2]– 1:69:24..., 1:187:3

double [10]– 1:82:15..., 1:83:2..., 1:83:14..., 1:124:19

double-billing [1]– 1:177:18

double-dipping [4]– 1:175:22..., 1:177:18..., 1:178:1..., 1:208:5

doubled [2]– 1:84:20..., 1:96:8

doubling [1]– 1:84:4

down [37]– 1:3:20..., 1:13:15..., 1:13:16..., 1:13:20..., 1:51:21..., 1:51:22..., 1:54:19..., 1:55:23..., 1:56:5..., 1:56:7..., 1:63:8..., 1:63:18..., 1:63:20..., 1:66:1..., 1:69:15..., 1:107:22..., 1:115:9..., 1:117:21..., 1:117:22..., 1:120:19..., 1:124:25..., 1:125:9..., 1:127:20..., 1:144:23..., 1:151:12..., 1:151:13..., 1:167:15..., 1:175:3..., 1:176:23..., 1:177:15..., 1:209:3..., 1:209:5..., 1:213:12..., 1:220:14..., 1:221:16..., 1:222:8..., 1:226:7

drafted [1]– 1:112:24

dressed [1]– 1:123:9

dressing [3]– 1:138:24..., 1:155:20..., 1:195:25

drive [1]– 1:117:22

driver [1]– 1:47:5

driving [4]– 1:53:20..., 1:54:5..., 1:155:21

drove [1]– 1:115:9

Dry [1]– 1:92:9

due [3]– 1:24:1..., 1:87:18..., 1:120:10

during [54]– 1:5:19..., 1:6:18..., 1:6:22..., 1:7:7..., 1:10:20..., 1:12:20..., 1:13:9..., 1:13:16..., 1:13:17..., 1:17:21..., 1:24:10..., 1:49:3..., 1:49:17..., 1:49:18..., 1:50:12..., 1:52:12..., 1:52:13..., 1:63:10..., 1:65:10..., 1:70:5..., 1:71:4..., 1:71:6..., 1:71:12..., 1:72:14..., 1:76:5..., 1:76:12..., 1:81:13..., 1:81:20..., 1:99:5..., 1:104:16..., 1:109:23..., 1:110:14..., 1:112:15..., 1:119:3..., 1:119:6..., 1:121:11..., 1:123:16..., 1:125:16..., 1:133:11..., 1:143:19..., 1:166:21..., 1:168:2..., 1:175:21..., 1:176:2..., 1:176:4..., 1:176:5..., 1:177:1..., 1:190:22..., 1:191:5

.., 1:200:17.., 1:200:20..,
1:205:14.., 1:218:11
duties [5].. - 1:19:13..,
1:155:23.., 1:216:16..,
1:222:19.., 1:222:20
duty [2].. - 1:71:18..,
1:71:21
Dybach [9].. - 1:92:2..,
1:92:18.., 1:93:2.., 1:93:12..,
1:94:16.., 1:94:17.., 1:94:22
.., 1:95:2
Dynamics [1].. - 1:46:16

**E**

early [2].. - 1:122:14..,
1:122:15
earn [1].. - 1:198:7
earned [7].. - 1:76:21..,
1:99:11.., 1:101:5.., 1:108:16
.., 1:108:21.., 1:110:8..,
1:198:10
earnings [1].. - 1:204:7
easier [1].. - 1:97:12
eat [1].. - 1:123:5
economic [2].. - 1:109:23
.., 1:113:16
economy [1].. - 1:7:23
educational [1].. - 1:22:4
efforts [1].. - 1:113:9
eight [24].. - 1:8:3.., 1:8:4..,
1:8:6.., 1:12:1.., 1:12:3..,
1:12:14.., 1:13:6.., 1:15:9..,
1:17:2.., 1:17:10.., 1:20:17..,
1:50:20.., 1:50:21.., 1:50:22
.., 1:64:4.., 1:67:14.., 1:67:18
.., 1:68:1.., 1:68:7.., 1:68:10..,
1:179:14.., 1:214:18..,
1:217:5
eights [2].. - 1:179:15..,
1:179:16
either [27].. - 1:3:16..,
1:18:5.., 1:18:25.., 1:19:16..,
1:24:5.., 1:35:12.., 1:49:23..,
1:49:25.., 1:71:12.., 1:72:12
.., 1:95:16.., 1:122:6..,
1:122:24.., 1:135:15..,
1:149:18.., 1:155:7..,
1:155:14.., 1:158:23..,
1:161:5.., 1:168:23.., 1:169:8
.., 1:170:14.., 1:174:22..,
1:211:18.., 1:215:7.., 1:225:4
elapsed [1].. - 1:61:11
elderly [2].. - 1:119:17..,
1:123:2
element [1].. - 1:113:1

elementary [1].. - 1:54:19
Elementary [2].. - 1:22:9
.., 1:22:14
elements [1].. - 1:78:4
elevator [4].. - 1:51:16..,
1:51:18.., 1:51:20.., 1:52:11
elevators [4].. - 1:51:1..,
1:51:9.., 1:51:10.., 1:51:11
eliminate [3].. - 1:93:10..,
1:93:14.., 1:94:8
eliminated [1].. - 1:66:3
eliminating [1].. - 1:94:21
elimination [1].. - 1:17:19
email [1].. - 1:222:10
emails [2].. - 1:79:1..,
1:222:13
embarrass [1].. - 1:52:18
emergency [1].. -
1:121:24
emphasize [1].. - 1:78:23
employed [3].. - 1:47:5..,
1:76:7.., 1:101:16
employee [22].. - 1:44:22
.., 1:46:22.., 1:58:20..,
1:61:19.., 1:61:21.., 1:62:13
.., 1:74:16.., 1:86:9..,
1:100:21.., 1:101:2.., 1:103:1
.., 1:103:7.., 1:105:24..,
1:107:2.., 1:110:6.., 1:111:20
.., 1:113:19.., 1:188:15..,
1:188:17.., 1:197:7..,
1:197:25.., 1:224:21
employee/employer [1]
.. - 1:113:14
employees [17].. -
1:59:12.., 1:59:21.., 1:102:2
.., 1:156:24.., 1:189:9..,
1:189:16.., 1:190:13..,
1:192:14.., 1:192:17..,
1:197:2.., 1:197:6.., 1:197:10
.., 1:197:15.., 1:198:3..,
1:198:6.., 1:198:12..,
1:198:16
employer [7].. - 1:86:9..,
1:92:22.., 1:94:23.., 1:98:25
.., 1:101:24.., 1:190:5..,
1:192:13
employers [4].. - 1:18:13
.., 1:53:14.., 1:99:3.., 1:99:23
employment [3].. -
1:126:2.., 1:192:14..,
1:198:14
end [37].. - 1:3:21.., 1:6:22
.., 1:12:23.., 1:13:5.., 1:18:22
.., 1:23:9.., 1:49:14.., 1:49:15

.., 1:49:18.., 1:60:15.., 1:63:8
.., 1:70:5.., 1:71:20.., 1:74:9..,
1:76:2.., 1:78:21.., 1:87:3..,
1:96:20.., 1:99:7.., 1:101:18
.., 1:102:1.., 1:102:22..,
1:107:1.., 1:107:24..,
1:109:15.., 1:110:17..,
1:112:13.., 1:118:2..,
1:123:22.., 1:130:4..,
1:130:16.., 1:133:9..,
1:137:14.., 1:137:22..,
1:144:12.., 1:179:16
enforce [1].. - 1:76:23
enforcer [1].. - 1:40:15
England [1].. - 1:25:22
English [4].. - 1:81:13..,
1:81:17.., 1:118:20..,
1:119:15
enrollees [1].. - 1:160:24
ensure [1].. - 1:55:12
enter [2].. - 1:158:5..,
1:158:21
entered [10].. - 1:9:6..,
1:67:21.., 1:75:14.., 1:75:20
.., 1:97:9.., 1:113:6..,
1:116:22.., 1:152:9..,
1:188:18.., 1:193:24
entire [5].. - 1:22:1..,
1:27:22.., 1:28:20.., 1:33:17
.., 1:109:23
entitled [4].. - 1:80:16..,
1:99:12.., 1:184:4.., 1:198:7
entity [3].. - 1:141:5..,
1:141:11.., 1:169:18
entries [5].. - 1:213:16..,
1:213:17.., 1:213:18..,
1:220:2.., 1:220:19
equal [5].. - 1:190:4..,
1:212:15.., 1:212:17..,
1:212:18.., 1:212:19
equates [1].. - 1:220:2
error [2].. - 1:174:22..,
1:174:24
especially [5].. - 1:54:7..,
1:122:21.., 1:131:21..,
1:157:11.., 1:166:21
essence [1].. - 1:176:24
established [1].. - 1:160:4
establishes [2].. - 1:99:11
.., 1:142:10
estate [8].. - 1:20:5..,
1:23:13.., 1:31:8.., 1:59:5..,
1:59:8.., 1:59:9.., 1:59:11..,
1:61:15
Estroff [8].. - 1:9:17..,

1:20:8.., 1:39:6.., 1:67:5..,
1:67:13.., 1:68:10.., 1:68:23
.., 1:97:23
ethical [2].. - 1:48:14..,
1:49:10
evaluation [1].. - 1:145:6
evening [7].. - 1:119:5..,
1:120:12.., 1:120:13..,
1:123:15.., 1:132:7..,
1:138:15.., 1:225:16
evenings [3].. - 1:121:11..,
1:121:12
event [1].. - 1:68:5
evidence [88].. - 1:13:12..,
1:13:13.., 1:17:12.., 1:19:21
.., 1:49:4.., 1:49:24.., 1:69:6..,
1:71:10.., 1:71:21.., 1:71:25
.., 1:72:1.., 1:72:4.., 1:72:6..,
1:72:8.., 1:72:9.., 1:72:11..,
1:72:13.., 1:72:15.., 1:72:17
.., 1:72:19.., 1:72:20..,
1:72:23.., 1:73:2.., 1:73:4..,
1:73:5.., 1:73:7.., 1:73:14..,
1:73:15.., 1:73:16.., 1:73:18
.., 1:73:19.., 1:74:5.., 1:74:7..,
1:74:11.., 1:77:7.., 1:77:9..,
1:77:11.., 1:77:12.., 1:77:20
.., 1:77:24.., 1:78:1.., 1:78:5..,
1:78:8.., 1:78:19.., 1:79:21..,
1:80:20.., 1:81:6.., 1:81:8..,
1:81:10.., 1:81:13.., 1:81:16
.., 1:83:23.., 1:84:2.., 1:84:3..,
1:90:2.., 1:91:1.., 1:92:24..,
1:94:21.., 1:98:16.., 1:99:11
.., 1:99:20.., 1:100:11..,
1:101:9.., 1:101:15..,
1:103:14.., 1:104:5..,
1:104:11.., 1:107:20..,
1:107:21.., 1:110:10..,
1:110:14.., 1:111:3.., 1:111:7
.., 1:111:13.., 1:111:25..,
1:112:14.., 1:112:18..,
1:113:15.., 1:126:23..,
1:139:12.., 1:174:11..,
1:174:14.., 1:182:1.., 1:204:4
.., 1:218:10
evidentiary [1].. - 1:98:3
exact [5].. - 1:63:7..,
1:99:19.., 1:167:22..,
1:204:24.., 1:223:9
exactly [5].. - 1:99:20..,
1:158:15.., 1:166:1..,
1:185:21.., 1:212:15
EXAMINATION [4].. -
1:117:19.., 1:137:1.., 1:149:1
.., 1:153:6
examination [8].. - 1:7:13
.., 1:17:5.., 1:17:10.., 1:48:13

_, 1:87:15_, 1:88:16_, 1:136:22

examine [4]_ - 1:81:5_, 1:88:21_, 1:88:24

examined [1]_ - 1:48:12

examining [1]_ - 1:81:1

example [6]_ - 1:55:8_, 1:58:17_, 1:72:25_, 1:79:24 _, 1:160:22_, 1:202:6

excellent [4]_ - 1:56:19_, 1:57:23_, 1:124:3

except [3]_ - 1:24:12_, 1:29:15_, 1:213:13

exchange [2]_ - 1:126:13 _, 1:205:15

excluding [1]_ - 1:93:9

exclusively [1]_ - 1:58:5

exclusivity [2]_ - 1:102:8_, 1:106:14

excuse [11]_ - 1:12:23_, 1:17:20_, 1:100:5_, 1:107:25 _, 1:110:1_, 1:126:8_, 1:196:15_, 1:204:5_, 1:207:8 _, 1:221:10_, 1:221:12

excused [7]_ - 1:17:24_, 1:18:3_, 1:18:5_, 1:68:2_, 1:68:11_, 1:87:12_, 1:151:14

executed [1]_ - 1:147:6

executive [2]_ - 1:60:10_, 1:60:12

exercise [3]_ - 1:24:18_, 1:33:10_, 1:42:19

exercise/yoga [1]_ - 1:46:5

exercises [1]_ - 1:54:12

exercising [4]_ - 1:29:8_, 1:32:6_, 1:38:6_, 1:41:18

exhibit [9]_ - 1:72:3_, 1:73:6_, 1:73:9_, 1:73:11_, 1:126:1_, 1:126:18_, 1:205:16_, 1:225:21_, 1:225:23

Exhibit [20]_ - 1:125:25_, 1:126:1_, 1:126:2_, 1:126:3 _, 1:126:5_, 1:126:6_, 1:126:7_, 1:127:3_, 1:127:10 _, 1:149:13_, 1:173:22_, 1:174:11_, 1:174:14_, 1:182:2_, 1:190:18_, 1:204:5 _, 1:205:15_, 1:210:3

exhibits [7]_ - 1:77:22_, 1:125:20_, 1:125:22_, 1:125:23_, 1:126:20_, 1:126:21_, 1:137:10

Exhibits [1]_ - 1:126:23

exist [1]_ - 1:79:19

exited [7]_ - 1:64:7_, 1:68:14_, 1:82:4_, 1:114:21 _, 1:151:21_, 1:193:5_, 1:225:17

expect [4]_ - 1:3:14_, 1:12:11_, 1:101:25_, 1:181:1

expectation [1]_ - 1:158:20

expected [4]_ - 1:102:17_, 1:156:8_, 1:156:9_, 1:170:25

expense [2]_ - 1:199:16_, 1:199:18

experience [15]_ - 1:17:8 _, 1:22:15_, 1:23:20_, 1:24:14_, 1:29:24_, 1:36:25 _, 1:41:7_, 1:42:12_, 1:48:15 _, 1:50:11_, 1:50:15_, 1:58:23_, 1:71:2_, 1:86:3_, 1:186:6

experiences [1]_ - 1:47:24

expert [1]_ - 1:23:25

explain [4]_ - 1:71:17_, 1:111:8_, 1:139:17_, 1:209:20

explained [4]_ - 1:18:22_, 1:111:15_, 1:172:20_, 1:205:24

exploded [1]_ - 1:26:23

exploring [1]_ - 1:41:18

explosion [1]_ - 1:26:22

extent [1]_ - 1:167:10

extra [1]_ - 1:133:14

eyes [1]_ - 1:7:20

F

face [2]_ - 1:78:24

face-to-face [1]_ - 1:78:24

Facebook [1]_ - 1:79:3

facilitate [1]_ - 1:116:13

facilities [1]_ - 1:156:24

fact [22]_ - 1:15:5_, 1:35:21 _, 1:43:13_, 1:49:25_, 1:72:4 _, 1:72:10_, 1:77:19_, 1:77:25_, 1:79:15_, 1:86:3_, 1:92:21_, 1:93:24_, 1:94:9_, 1:102:9_, 1:103:24_, 1:113:8 _, 1:113:12_, 1:113:14_, 1:119:24_, 1:137:16_, 1:224:19

fact's [1]_ - 1:94:8

factor [4]_ - 1:17:13_, 1:52:12_, 1:93:15_, 1:101:23

factors [4]_ - 1:74:8_, 1:102:25_, 1:103:3_, 1:113:11

facts [7]_ - 1:49:22_, 1:71:22_, 1:78:5_, 1:78:10_, 1:88:20_, 1:99:1_, 1:114:11

fails [1]_ - 1:77:16

fair [30]_ - 1:9:2_, 1:9:4_, 1:15:3_, 1:15:22_, 1:17:16_, 1:19:21_, 1:20:2_, 1:21:16_, 1:22:25_, 1:23:2_, 1:24:15_, 1:29:25_, 1:35:23_, 1:37:1_, 1:41:8_, 1:42:13_, 1:43:15_, 1:44:25_, 1:47:25_, 1:48:5_, 1:48:16_, 1:50:24_, 1:51:6_, 1:58:25_, 1:79:21_, 1:80:3_, 1:143:23_, 1:158:18_, 1:197:11

Fair [18]_ - 1:18:19_, 1:54:14_, 1:54:16_, 1:58:10 _, 1:62:18_, 1:74:19_, 1:74:24_, 1:82:14_, 1:83:11 _, 1:84:10_, 1:84:25_, 1:85:4 _, 1:85:19_, 1:86:6_, 1:86:8_, 1:100:17_, 1:101:2_, 1:110:3

fairly [1]_ - 1:99:2

faith [7]_ - 1:82:22_, 1:84:7 _, 1:84:9_, 1:84:25_, 1:85:2_, 1:85:18_, 1:94:23

fall [1]_ - 1:123:21

fallen [2]_ - 1:130:19_, 1:144:19

falsely [1]_ - 1:47:19

familiar [2]_ - 1:85:3_, 1:205:19

familiarity [1]_ - 1:58:9

families [4]_ - 1:105:16_, 1:163:2_, 1:166:6_, 1:166:10

family [27]_ - 1:23:13_, 1:24:20_, 1:45:4_, 1:59:16_, 1:105:9_, 1:118:24_, 1:120:7 _, 1:120:15_, 1:129:14_, 1:142:21_, 1:143:6_, 1:143:21_, 1:143:23_, 1:145:13_, 1:146:22_, 1:147:11_, 1:147:17_, 1:158:3_, 1:162:12_, 1:162:24_, 1:163:8_, 1:165:20_, 1:166:19_, 1:167:16_, 1:168:22_, 1:209:7

far [20]_ - 1:26:14_, 1:26:15 _, 1:29:2_, 1:42:6_, 1:48:25_, 1:56:20_, 1:72:10_, 1:98:16

factor [4]_ - ... 1:120:21_, 1:124:23_, 1:128:1_, 1:151:4_, 1:159:12 _, 1:170:9_, 1:170:24_, 1:176:4_, 1:177:6_, 1:183:20 _, 1:185:22_, 1:191:13

father [8]_ - 1:21:3_, 1:109:2_, 1:118:7_, 1:118:19 _, 1:134:17_, 1:137:4_, 1:140:10_, 1:147:25

father's [1]_ - 1:148:12

fault [2]_ - 1:222:16_, 1:222:17

favor [1]_ - 1:77:17

favoring [2]_ - 1:77:11_, 1:77:12

federal [45]_ - 1:12:15_, 1:13:3_, 1:18:18_, 1:26:6_, 1:35:4_, 1:46:14_, 1:46:15_, 1:47:20_, 1:47:21_, 1:51:15 _, 1:53:18_, 1:53:19_, 1:65:9 _, 1:84:7_, 1:84:10_, 1:85:4_, 1:85:24_, 1:86:3_, 1:86:4_, 1:91:19_, 1:95:4_, 1:95:8_, 1:96:3_, 1:96:5_, 1:100:16_, 1:101:3_, 1:101:8_, 1:107:13 _, 1:109:14_, 1:109:19_, 1:109:20_, 1:109:25_, 1:110:1_, 1:113:18_, 1:156:15_, 1:160:19_, 1:161:21_, 1:183:8_, 1:183:12_, 1:183:14_, 1:192:4_, 1:211:21_, 1:211:22

fee [2]_ - 1:105:10_, 1:157:3

feed [3]_ - 1:122:25_, 1:123:1_, 1:138:17

feedback [1]_ - 1:145:12

fell [1]_ - 1:131:3

fellow [1]_ - 1:15:12

felony [1]_ - 1:11:8

felt [2]_ - 1:23:24_, 1:168:21

few [9]_ - 1:10:21_, 1:13:8 _, 1:20:6_, 1:22:8_, 1:23:19_, 1:47:22_, 1:48:24_, 1:64:9_, 1:140:15

Fi [1]_ - 1:87:9

field [1]_ - 1:197:22

fight [2]_ - 1:131:16_, 1:199:4

Figuera [35]_ - 1:3:2_, 1:5:10_, 1:7:8_, 1:14:1_, 1:18:8_, 1:18:15_, 1:76:16_, 1:76:24_, 1:77:6_, 1:77:8_, 1:77:12_, 1:77:14_, 1:77:16

..., 1:80:23..., 1:81:4..., 1:111:7
..., 1:111:14..., 1:111:16...,
1:112:2..., 1:112:19..., 1:113:4
..., 1:113:6..., 1:113:9...,
1:114:1..., 1:114:2..., 1:114:6
..., 1:138:9..., 1:139:18...,
1:140:23..., 1:143:3..., 1:144:7
..., 1:146:22..., 1:146:23...,
1:147:11..., 1:147:21
Figuera's [3]... - 1:113:10...,
1:113:13..., 1:113:20
figure [5]... - 1:82:12...,
1:105:9..., 1:164:25...,
1:176:17..., 1:178:1
figured [2]... - 1:20:11...,
1:193:9
file [2]... - 1:223:20...,
1:224:21
filed [4]... - 1:4:8..., 1:6:15...,
1:18:14..., 1:27:2
files [1]... - 1:172:3
fill [3]... - 1:100:1..., 1:124:24
..., 1:125:9
filters [2]... - 1:70:22...,
1:70:23
final [1]... - 1:61:6
finally [2]... - 1:22:13...,
1:46:7
finder [3]... - 1:93:24...,
1:94:8..., 1:94:9
fine [8]... - 1:7:7..., 1:7:19...,
1:21:11..., 1:138:7..., 1:145:25
..., 1:146:2..., 1:217:15...,
1:219:16
finish [4]... - 1:10:10...,
1:12:10..., 1:50:18..., 1:60:16
finished [1]... - 1:23:13
finishing [1]... - 1:11:24
fire [1]... - 1:58:19
firm [3]... - 1:23:7..., 1:23:15
..., 1:29:22
first [25]... - 1:7:2..., 1:8:9...,
1:9:8..., 1:10:19..., 1:18:10...,
1:23:14..., 1:61:5..., 1:72:16...,
1:80:18..., 1:100:15..., 1:101:1
..., 1:101:6..., 1:117:1...,
1:117:2..., 1:117:11...,
1:118:25..., 1:119:9...,
1:119:23..., 1:124:4..., 1:124:5
..., 1:125:12..., 1:152:23...,
1:159:13..., 1:161:25...,
1:164:3
firsthand [1]... - 1:142:18
fit [4]... - 1:69:25..., 1:129:13
..., 1:142:24..., 1:204:22

FIU [1]... - 1:22:10
five [18]... - 1:8:9..., 1:8:25...,
1:43:1..., 1:64:11..., 1:168:3...,
1:179:15..., 1:210:11...,
1:210:12..., 1:211:11...,
1:211:12..., 1:213:4..., 1:215:2
five-minute [1]... - 1:64:11
fix [5]... - 1:59:23..., 1:130:8...,
1:136:15..., 1:136:16...,
1:180:9
fixed [1]... - 1:137:23
fixing [1]... - 1:59:21
flagpole [1]... - 1:55:4
flexible [1]... - 1:131:18
flood [1]... - 1:51:9
floor [2]... - 1:51:13...,
1:122:21
Flores [1]... - 1:14:13
Florida [39]... - 1:4:18...,
1:10:8, 1:21:25..., 1:22:21...,
1:25:4..., 1:27:21..., 1:28:19...,
1:29:12..., 1:29:14..., 1:31:3...,
1:32:12..., 1:33:16..., 1:34:11
..., 1:36:6..., 1:37:13..., 1:38:13
..., 1:38:16..., 1:39:11..., 1:40:4
..., 1:41:24..., 1:42:25..., 1:44:2
..., 1:45:11..., 1:46:11..., 1:54:7
..., 1:93:3..., 1:109:13...,
1:109:19..., 1:111:9...,
1:111:11..., 1:112:11...,
1:117:23..., 1:155:10...,
1:186:17..., 1:188:23...,
1:189:1..., 1:189:8..., 1:189:15
..., 1:190:13
flown [1]... - 1:11:23
Floyd [8]... - 1:9:12..., 1:38:9
..., 1:67:10..., 1:68:9..., 1:68:20
..., 1:97:13..., 1:97:17...,
1:97:22
Floyd's [1]... - 1:97:21
FLSA [13]... - 1:62:18...,
1:74:20..., 1:92:13..., 1:92:22
..., 1:93:5..., 1:93:10..., 1:93:21
..., 1:94:19..., 1:95:11...,
1:95:14..., 1:95:22..., 1:95:25
..., 1:100:17
fluent [1]... - 1:111:15
fly [1]... - 1:11:24
flying [1]... - 1:20:7
focused [2]... - 1:65:1...,
1:168:4
follow [20]... - 1:8:7...,
1:53:18..., 1:64:25..., 1:67:24
..., 1:71:23..., 1:72:19...,
1:74:11..., 1:76:3..., 1:96:2...,

1:96:3..., 1:96:4..., 1:97:25...,
1:116:23..., 1:143:13...,
1:152:11..., 1:156:15...,
1:161:6..., 1:194:1..., 1:219:15
..., 1:219:16
follow-up [1]... - 1:8:7
followed [3]... - 1:96:4...,
1:106:10..., 1:143:4
following [7]... - 1:63:15...,
1:63:24..., 1:134:13...,
1:136:16..., 1:198:25...,
1:199:4..., 1:210:20
follows [2]... - 1:117:18,
1:153:5
food [2]... - 1:25:20...,
1:123:4
forbids [2]... - 1:79:16...,
1:79:17
foreperson [1]... - 1:35:12
forever [1]... - 1:51:3
forget [1]... - 1:160:2
forgot [1]... - 1:27:12
form [5]... - 1:6:15..., 1:6:21
..., 1:16:15..., 1:82:25...,
1:182:20
former [4]... - 1:53:14...,
1:98:25..., 1:99:3
forms [2]... - 1:72:1...,
1:82:11
Fort [7]... - 1:23:6..., 1:31:1...,
1:34:9..., 1:41:23..., 1:70:21...,
1:107:9..., 1:211:22
forth [4]... - 1:70:9..., 1:92:24
..., 1:111:9..., 1:194:20
fortunately [1]... - 1:118:19
forward [1]... - 1:137:18
Fote [9]... - 1:9:9..., 1:24:23
..., 1:24:24..., 1:24:25...,
1:55:16..., 1:67:9..., 1:68:8...,
1:68:22..., 1:97:22
fought [1]... - 1:137:17
foundation [2]... - 1:139:20
..., 1:139:24
four [17]... - 1:10:11...,
1:70:18..., 1:70:21..., 1:125:3
..., 1:125:5..., 1:144:11...,
1:146:15..., 1:179:15...,
1:181:19..., 1:210:8..., 1:210:9
..., 1:210:10..., 1:211:11...,
1:211:13..., 1:213:3
fourth [2]... - 1:51:13...,
1:119:25
frame [2]... - 1:167:23...,
1:177:7

framed [1]... - 1:89:6
fraud [7]... - 1:161:18...,
1:161:19..., 1:161:21...,
1:161:23..., 1:202:11
free [1]... - 1:159:5
Friday [7]... - 1:20:10...,
1:20:18..., 1:120:5..., 1:203:4
..., 1:203:5..., 1:203:6...,
1:203:16
friend [3]... - 1:120:16...,
1:129:19..., 1:129:20
friends [1]... - 1:38:22
front [7]... - 1:5:16..., 1:5:17
..., 1:8:22..., 1:9:1..., 1:9:8...,
1:9:9..., 1:9:10
full [4]... - 1:56:9..., 1:63:1...,
1:191:24
full-time [2]... - 1:56:9...,
1:191:24
fully [1]... - 1:108:12
fund [3]... - 1:31:21..., 1:59:6
..., 1:160:20

G

gaming [1]... - 1:46:4
garage [1]... - 1:115:12
garden [1]... - 1:27:10
Gardens [2]... - 1:117:23...,
1:148:9
gas [1]... - 1:175:7
Gee [5]... - 1:15:19..., 1:50:5
..., 1:50:13..., 1:50:23..., 1:51:5
gee [1]... - 1:200:4
general [2]... - 1:16:13...,
1:18:20
General [2]... - 1:46:16...,
1:51:14
generally [1]... - 1:197:8
generated [1]... - 1:206:8
gentleman [1]... - 1:65:9
gentlemen [1]... - 1:52:9
germane [1]... - 1:184:16
gift [1]... - 1:147:11
given [5]... - 1:69:6...,
1:114:4..., 1:118:10...,
1:190:12..., 1:190:13
Glade [1]... - 1:154:11
glance [1]... - 1:61:5
glimmer [1]... - 1:51:14
gloves [3]... - 1:104:17...,
1:104:18..., 1:106:2

goal [1]_ - 1:56:13

godsend [1]_ - 1:123:12

GOLDBERG [81]_ - 1:3:8
_, 1:4:1_, 1:4:15_, 1:5:7_,
1:5:22_, 1:6:2_, 1:6:7_, 1:6:9
_, 1:6:20_, 1:6:24_, 1:7:9_,
1:7:12_, 1:7:23_, 1:8:13_,
1:14:17_, 1:16:6_, 1:62:5_,
1:62:8_, 1:64:21_, 1:64:23_,
1:65:4_, 1:65:8_, 1:65:17_,
1:65:25_, 1:66:5_, 1:66:14_,
1:66:22_, 1:67:2_, 1:67:7_,
1:67:17_, 1:86:19_, 1:86:25
_, 1:88:5_, 1:88:9_, 1:89:11_,
1:89:14_, 1:89:19_, 1:90:11
_, 1:90:14_, 1:90:20_,
1:90:22_, 1:91:14_, 1:97:3_,
1:97:7_, 1:110:23_, 1:112:17
_, 1:114:24_, 1:116:11_,
1:116:17_, 1:126:19_,
1:134:23_, 1:135:4_,
1:135:16_, 1:136:23_,
1:137:2_, 1:137:6_, 1:137:8
_, 1:137:9_, 1:139:7_,
1:139:9_, 1:139:10_,
1:139:23_, 1:140:5_,
1:148:21_, 1:152:5_, 1:167:4
_, 1:174:12_, 1:180:16_,
1:184:7_, 1:184:11_,
1:184:14_, 1:186:9_,
1:186:11_, 1:186:18_,
1:186:20_, 1:193:20_,
1:218:12_, 1:224:4_, 1:224:7
_, 1:224:10_, 1:225:20

Goldberg [24]_ - 1:3:9_,
1:4:2_, 1:4:14_, 1:5:12_,
1:7:6_, 1:14:15_, 1:14:16_,
1:14:18_, 1:16:5_, 1:62:3_,
1:62:4_, 1:62:9_, 1:65:7_,
1:65:24_, 1:66:13_, 1:66:21
_, 1:67:1_, 1:67:6_, 1:110:21
_, 1:110:24_, 1:112:16_,
1:136:21_, 1:149:15_,
1:150:2

Goldberg's [1]_ - 1:4:10

goodness [1]_ - 1:122:14

Google [1]_ - 1:79:12

googling [1]_ - 1:71:9

gotcha [1]_ - 1:159:7

government [8]_ -
1:160:20_, 1:161:22_,
1:168:24_, 1:192:22_,
1:199:3_, 1:199:4_, 1:199:7
_, 1:200:5

governmental [3]_ -
1:141:5_, 1:141:10_,
1:141:14

grab [1]_ - 1:51:1

gradually [1]_ - 1:121:13

grandchild [1]_ - 1:45:5

grandkids [1]_ - 1:48:22

grandson [1]_ - 1:121:20

Grant [1]_ - 1:13:22

grant [4]_ - 1:4:24_,
1:65:14_, 1:95:10_, 1:95:14

granted [1]_ - 1:86:22

grass [1]_ - 1:72:5

great [6]_ - 1:56:8_,
1:98:19_, 1:105:1_, 1:111:16
_, 1:203:6_, 1:207:23

greater [1]_ - 1:80:16

green [4]_ - 1:183:17_,
1:219:4_, 1:219:5_, 1:220:19

Greynolds [1]_ - 1:22:8

ground [1]_ - 1:25:23

grounds [2]_ - 1:7:21_,
1:22:10

guarantor [1]_ - 1:216:8

guess [36]_ - 1:5:11_,
1:6:25_, 1:7:3_, 1:8:16_,
1:8:17_, 1:24:19_, 1:26:9_,
1:41:12_, 1:52:11_, 1:54:15
_, 1:55:15_, 1:56:12_,
1:56:24_, 1:59:20_, 1:60:17
_, 1:64:16_, 1:73:13_,
1:82:19_, 1:82:20_, 1:84:13
_, 1:91:4_, 1:93:24_, 1:96:6_,
1:96:25_, 1:118:11_,
1:121:13_, 1:143:25_,
1:149:10_, 1:150:8_, 1:153:9
_, 1:173:5_, 1:185:1_,
1:199:6_, 1:200:10_,
1:217:13

guessing [1]_ - 1:209:15

guidelines [3]_ - 1:74:10_,
1:161:6_, 1:175:19

gut [1]_ - 1:70:3

guys [4]_ - 1:7:5_, 1:64:12
_, 1:70:4_, 1:70:14

H

hair [1]_ - 1:123:10

half [4]_ - 1:20:23_, 1:55:9
_, 1:99:5_, 1:222:3

hall [2]_ - 1:63:18_, 1:63:20

hallways [1]_ - 1:64:18

hand [30]_ - 1:9:22_,
1:10:18_, 1:10:24_, 1:11:2_,
1:11:5_, 1:11:9_, 1:11:12_,
1:14:23_, 1:15:20_, 1:16:9_,
1:19:2_, 1:19:5_, 1:19:9_,

1:19:14_, 1:19:24_, 1:20:3_,
1:20:8_, 1:20:22_, 1:20:23_,
1:21:17_, 1:50:16_, 1:50:23
_, 1:51:7_, 1:52:2_, 1:68:3_,
1:69:2_, 1:117:5_, 1:152:17
_, 1:156:2_, 1:203:16

handheld [1]_ - 1:16:18

handicap [1]_ - 1:190:9

handle [3]_ - 1:54:25_,
1:55:2_, 1:60:14

hands [30]_ - 1:10:19_,
1:10:25_, 1:11:3_, 1:11:6_,
1:11:10_, 1:11:13_, 1:14:24
_, 1:15:12_, 1:15:13_,
1:16:10_, 1:19:3_, 1:19:6_,
1:19:10_, 1:19:15_, 1:19:18
_, 1:19:19_, 1:19:25_, 1:20:4
_, 1:21:18_, 1:50:17_, 1:51:8
_, 1:52:3_, 1:53:7_, 1:53:10_,
1:53:21_, 1:62:11_, 1:62:15
_, 1:62:23_, 1:62:25

Hands [1]_ - 1:141:25

handwrite [2]_ - 1:203:19
_, 1:203:22

handwriting [2]_ -
1:127:23_, 1:176:18

handwritten [1]_ -
1:177:23

handwrote [3]_ - 1:173:12
_, 1:205:9_, 1:212:13

hanging [1]_ - 1:48:21

happy [3]_ - 1:109:5_,
1:166:20_, 1:196:13

hard [6]_ - 1:94:3_, 1:122:4
_, 1:131:15_, 1:131:17_,
1:131:19_, 1:138:13

harmful [1]_ - 1:123:4

HDMI [3]_ - 1:100:23_,
1:127:4_, 1:170:21

head [17]_ - 1:35:9_,
1:35:24_, 1:50:4_, 1:123:25
_, 1:124:18_, 1:149:16_,
1:150:6_, 1:153:12_, 1:169:9
_, 1:178:9_, 1:181:3_,
1:195:2_, 1:202:25_,
1:203:13_, 1:205:7_,
1:207:20_, 1:208:22

heading [1]_ - 1:102:23

heads [1]_ - 1:10:16

health [38]_ - 1:75:16_,
1:101:12_, 1:101:15_,
1:112:2_, 1:118:11_,
1:123:12_, 1:126:5_,
1:130:23_, 1:131:13_,
1:140:24_, 1:141:4_,
1:142:15_, 1:144:2_, 1:144:7

1:155:15_, 1:155:18_,
1:156:4_, 1:156:7_, 1:156:13
_, 1:160:4_, 1:161:1_,
1:165:19_, 1:165:23_,
1:165:24_, 1:182:11_,
1:182:17_, 1:182:23_,
1:184:17_, 1:185:9_,
1:185:14_, 1:185:20_,
1:186:1_, 1:195:20_,
1:195:21_, 1:197:15

healthy [1]_ - 1:24:20

hear [53]_ - 1:11:18_,
1:11:19_, 1:14:8_, 1:16:21_,
1:49:7_, 1:52:4_, 1:63:20_,
1:71:10_, 1:72:14_, 1:74:1_,
1:79:25_, 1:97:3_, 1:99:25_,
1:100:12_, 1:100:13_,
1:101:19_, 1:101:21_,
1:102:4_, 1:102:12_,
1:102:15_, 1:103:23_,
1:103:24_, 1:104:14_,
1:104:21_, 1:104:22_,
1:105:22_, 1:106:4_, 1:106:7
_, 1:106:12_, 1:107:4_,
1:107:5_, 1:107:7_, 1:107:8
_, 1:107:9_, 1:107:16_,
1:108:8_, 1:108:21_,
1:108:23_, 1:108:25_,
1:109:9_, 1:109:10_,
1:109:18_, 1:109:24_,
1:110:13_, 1:110:14_,
1:111:7_, 1:111:13_,
1:112:21_, 1:113:3_,
1:113:22_, 1:139:23_,
1:224:9

heard [9]_ - 1:18:23_,
1:19:4_, 1:26:25_, 1:51:24_,
1:72:2_, 1:78:18_, 1:90:11_,
1:208:11_, 1:224:25

hearing [7]_ - 1:18:10_,
1:19:11_, 1:62:20_, 1:86:21
_, 1:87:6_, 1:88:14_, 1:111:6

hearsay [1]_ - 1:135:17

heart [1]_ - 1:4:16

height [1]_ - 1:104:18

help [13]_ - 1:52:21_,
1:72:18_, 1:74:11_, 1:80:5_,
1:80:16_, 1:84:19_, 1:98:13
_, 1:106:5_, 1:116:13_,
1:123:8_, 1:134:15_,
1:134:17_, 1:138:24

helped [1]_ - 1:195:19

helpful [1]_ - 1:165:22

helping [2]_ - 1:106:6_,
1:130:15

helps [1]_ - 1:200:11

herein [1]_ - 1:69:4

herself [3]-- 1:103:11--, 1:107:3--, 1:148:10

HHA [6]-- 1:124:5--, 1:126:13--, 1:141:2--, 1:141:17--, 1:205:15--, 1:205:19

HHAs [1]-- 1:128:12

hi [1]-- 1:63:14

hidden [1]-- 1:80:13

high [2]-- 1:23:9--, 1:29:16

high-end [1]-- 1:23:9

highway [1]-- 1:54:5

hire [15]-- 1:58:20--, 1:59:22--, 1:59:24--, 1:102:1--, 1:105:4--, 1:156:17--, 1:183:15--, 1:185:12--, 1:198:24--, 1:199:21--, 1:199:23--, 1:199:25--, 1:200:1--, 1:200:3

hired [5]-- 1:156:12--, 1:159:8--, 1:170:18--, 1:185:15

hit [2]-- 1:69:15--, 1:73:1

HOA [1]-- 1:58:5

hobbies [19]-- 1:24:17--, 1:27:9--, 1:28:11--, 1:29:7--, 1:30:17--, 1:32:5--, 1:33:8--, 1:34:4--, 1:35:18--, 1:37:3--, 1:38:5--, 1:39:3--, 1:39:23--, 1:41:17--, 1:42:18--, 1:43:21--, 1:45:3--, 1:46:3--, 1:48:20

hold [5]-- 1:17:7--, 1:51:3--, 1:63:23--, 1:98:3--, 1:214:8

holder [1]-- 1:215:13

holds [1]-- 1:197:17

Hollywood [1]-- 1:27:20

home [48]-- 1:11:24--, 1:12:5--, 1:20:5--, 1:32:25--, 1:44:15--, 1:58:8--, 1:64:5--, 1:75:16--, 1:80:12--, 1:101:12--, 1:101:15--, 1:102:18--, 1:104:8--, 1:104:19--, 1:106:5--, 1:112:2--, 1:118:9--, 1:118:11--, 1:118:14--, 1:118:15--, 1:124:16--, 1:126:5--, 1:130:23--, 1:140:24--, 1:141:4--, 1:142:4--, 1:142:15--, 1:144:2--, 1:144:6--, 1:155:15--, 1:155:18--, 1:156:4--, 1:156:7--, 1:156:13--, 1:160:3--, 1:161:1--, 1:165:19--, 1:175:6--, 1:184:17--, 1:186:2--, 1:195:6--, 1:195:20--, 1:195:21--, 1:197:15

homebound [1]--

1:191:10

Homeland [2]-- 1:40:16--, 1:46:16

homemaking [1]-- 1:155:21

homes [3]-- 1:23:9--, 1:157:23--, 1:168:3

honest [4]-- 1:93:4--, 1:94:18--, 1:94:24--, 1:95:3

honesty [1]-- 1:18:6

honked [1]-- 1:54:8

Honor [97]-- 1:3:4--, 1:3:7--, 1:3:8--, 1:3:10--, 1:3:12--, 1:3:15--, 1:4:1--, 1:4:11--, 1:4:15--, 1:5:7--, 1:5:22--, 1:6:2--, 1:6:3--, 1:6:6--, 1:6:9--, 1:6:24--, 1:7:9--, 1:7:12--, 1:7:23--, 1:8:13--, 1:8:14--, 1:10:4--, 1:14:6--, 1:14:17--, 1:15:25--, 1:16:6--, 1:52:6--, 1:61:25--, 1:62:5--, 1:63:4--, 1:65:4--, 1:65:8--, 1:65:17--, 1:65:25--, 1:66:5--, 1:66:10--, 1:66:14--, 1:66:22--, 1:67:2--, 1:67:7--, 1:67:15--, 1:67:17--, 1:69:9--, 1:83:16--, 1:84:22--, 1:86:19--, 1:87:24--, 1:88:6--, 1:88:16--, 1:89:11--, 1:89:15--, 1:90:11--, 1:90:20--, 1:91:14--, 1:91:17--, 1:92:5--, 1:96:10--, 1:96:17--, 1:97:3--, 1:97:7--, 1:98:9--, 1:98:14--, 1:102:25--, 1:110:23--, 1:112:6--, 1:112:17--, 1:114:24--, 1:116:10--, 1:116:18--, 1:116:20--, 1:125:20--, 1:126:19--, 1:126:24--, 1:134:23--, 1:135:4--, 1:135:16--, 1:136:23--, 1:137:6--, 1:139:7--, 1:139:20--, 1:152:6--, 1:173:17--, 1:174:10--, 1:174:12--, 1:180:16--, 1:184:15--, 1:184:21--, 1:193:20--, 1:193:21--, 1:194:4--, 1:209:16--, 1:218:12--, 1:224:4--, 1:224:10--, 1:224:12--, 1:225:20--, 1:225:21

hope [8]-- 1:50:14--, 1:51:14--, 1:148:19--, 1:171:10--, 1:180:19--, 1:225:6--, 1:225:7--, 1:225:8

hopeful [1]-- 1:3:16

hopefully [4]-- 1:51:21--, 1:52:12--, 1:64:3--, 1:181:4

horror [1]-- 1:46:4

hospital [1]-- 1:123:23

hospitals [1]-- 1:130:24

hour [30]-- 1:74:24--, 1:75:1--, 1:75:10--, 1:75:21--, 1:99:17--, 1:101:22--, 1:102:7--, 1:102:21--, 1:104:12--, 1:105:2--, 1:105:3--, 1:105:4--, 1:106:3--, 1:106:21--, 1:107:18--, 1:108:15--, 1:132:12--, 1:157:2--, 1:170:19--, 1:170:20--, 1:171:5--, 1:172:10--, 1:172:13--, 1:172:16--, 1:172:20--, 1:173:1--, 1:176:25--, 1:178:12--, 1:213:3--, 1:214:15

hourly [7]-- 1:61:16--, 1:61:19--, 1:103:16--, 1:103:23--, 1:156:24--, 1:157:1--, 1:173:13

hours [158]-- 1:24:10--, 1:55:6--, 1:74:18--, 1:75:2--, 1:75:10--, 1:100:4--, 1:100:6--, 1:100:14--, 1:105:3--, 1:107:16--, 1:107:22--, 1:112:19--, 1:112:23--, 1:113:21--, 1:113:25--, 1:114:3--, 1:114:5--, 1:114:8--, 1:118:6--, 1:118:8--, 1:118:10--, 1:119:3--, 1:119:5--, 1:120:14--, 1:121:17--, 1:128:17--, 1:132:1--, 1:132:2--, 1:132:8--, 1:132:16--, 1:132:21--, 1:132:23--, 1:133:24--, 1:134:20--, 1:135:3--, 1:135:20--, 1:136:6--, 1:136:8--, 1:136:11--, 1:136:15--, 1:136:18--, 1:138:14--, 1:144:6--, 1:144:9--, 1:144:11--, 1:144:19--, 1:145:8--, 1:145:15--, 1:146:8--, 1:146:12--, 1:146:14--, 1:146:15--, 1:147:22--, 1:150:13--, 1:150:15--, 1:150:17--, 1:150:25--, 1:151:1--, 1:151:3--, 1:151:4--, 1:151:6--, 1:161:4--, 1:168:7--, 1:170:3--, 1:170:9--, 1:176:21--, 1:177:3--, 1:177:16--, 1:178:7--, 1:178:13--, 1:179:4--, 1:179:10--, 1:179:16--, 1:179:21--, 1:179:24--, 1:180:3--, 1:180:5--, 1:180:7--, 1:181:7--, 1:181:9--, 1:181:17--, 1:201:16--, 1:201:18--, 1:201:20--, 1:201:21--, 1:202:2--, 1:202:3--, 1:202:7--, 1:202:8--, 1:202:14--, 1:204:11--, 1:208:21--, 1:209:18--,

1:210:1--, 1:210:4--, 1:210:5--, 1:210:7--, 1:210:11--, 1:210:12--, 1:210:15--, 1:210:16--, 1:210:19--, 1:210:23--, 1:211:2--, 1:211:3--, 1:211:11--, 1:211:12--, 1:211:13--, 1:211:17--, 1:212:2--, 1:212:3--, 1:213:3--, 1:213:4--, 1:213:5--, 1:213:8--, 1:213:11--, 1:214:13--, 1:215:2--, 1:217:10--, 1:218:17--, 1:218:22--, 1:218:25--, 1:220:3--, 1:220:8--, 1:220:10--, 1:220:11--, 1:220:15--, 1:220:25--, 1:221:1--, 1:221:7--, 1:221:20--, 1:221:24--, 1:222:1--, 1:222:4--, 1:222:21--, 1:222:22--, 1:222:23--, 1:222:25--, 1:223:3--, 1:223:8--, 1:223:11--, 1:223:24

house [5]-- 1:26:21--, 1:118:12--, 1:133:16--, 1:141:24--, 1:148:17

household [1]-- 1:155:23

houses [1]-- 1:26:22

HR [4]-- 1:35:21--, 1:41:4--, 1:43:11--, 1:43:13

Human [1]-- 1:34:14

Humana [42]-- 1:118:4--, 1:118:6--, 1:118:8--, 1:128:8--, 1:128:10--, 1:128:12--, 1:128:13--, 1:130:22--, 1:131:4--, 1:134:19--, 1:134:22--, 1:135:2--, 1:139:1--, 1:140:20--, 1:141:17--, 1:142:13--, 1:142:14--, 1:142:15--, 1:144:3--, 1:144:9--, 1:144:13--, 1:145:2--, 1:145:3--, 1:146:12--, 1:146:13--, 1:160:21--, 1:160:22--, 1:161:24--, 1:162:3--, 1:170:7--, 1:172:12--, 1:172:13--, 1:194:22--, 1:201:15--, 1:202:8--, 1:208:24--, 1:211:16--, 1:216:7--, 1:216:19--, 1:219:7

Humana's [1]-- 1:145:3

humans [1]-- 1:213:14

hundred [6]-- 1:99:16--, 1:159:17--, 1:186:24--, 1:187:4--, 1:204:21--, 1:220:18

hundreds [1]-- 1:189:7

hungry [1]-- 1:12:5

hurricane [1]-- 1:24:10

husband [6]-- 1:14:12--,

1:15:16_, 1:26:1_, 1:98:23_, 1:107:6

**I**

idea [4]_ - 1:12:11_, 1:159:16_, 1:185:24_, 1:195:7

identifying [1]_ - 1:48:17

ignore [4]_ - 1:49:6_, 1:73:13_, 1:73:15_, 1:138:24

illegally [1]_ - 1:47:17

impartial [6]_ - 1:15:4_, 1:15:22_, 1:17:16_, 1:19:21_, 1:20:3_, 1:58:25

impartiality [1]_ - 1:19:9

impartially [1]_ - 1:17:11

impeach [1]_ - 1:89:2

impeaching [1]_ - 1:89:5

important [9]_ - 1:79:18_, 1:79:19_, 1:79:25_, 1:81:15_, 1:111:21_, 1:113:1_, 1:118:23_, 1:145:2_, 1:187:11

importantly [1]_ - 1:62:21

imposed [1]_ - 1:189:22

imposition [1]_ - 1:92:25

impression [1]_ - 1:80:17

impropriety [1]_ - 1:63:22

inappropriate [1]_ - 1:49:11

Inc [25]_ - 1:3:2_, 1:18:9_, 1:18:13_, 1:74:13_, 1:75:1_, 1:75:9_, 1:75:12_, 1:75:24_, 1:76:1_, 1:76:2_, 1:76:7_, 1:76:10_, 1:76:12_, 1:76:17_, 1:76:19_, 1:77:1_, 1:77:5_, 1:77:12_, 1:77:17_, 1:78:3_, 1:78:5_, 1:78:9_, 1:80:25_, 1:81:3

incapable [1]_ - 1:19:12

inclined [1]_ - 1:116:9

include [3]_ - 1:116:1_, 1:144:3

includes [2]_ - 1:79:1_, 1:79:8

including [4]_ - 1:13:17_, 1:79:2_, 1:79:10_, 1:173:12

income [2]_ - 1:169:3_, 1:192:1

Incorporated [1]_ - 1:14:2

incorrect [7]_ - 1:159:3_, 1:167:14_, 1:180:11_,

1:180:15_, 1:198:21_, 1:199:10_, 1:211:25

independent [35]_ - 1:59:13_, 1:59:22_, 1:59:25_, 1:61:19_, 1:62:14_, 1:74:15_, 1:75:14_, 1:75:20_, 1:75:25_, 1:76:14_, 1:100:12_, 1:100:21_, 1:102:2_, 1:102:3_, 1:102:13_, 1:103:2_, 1:105:22_, 1:106:25_, 1:111:16_, 1:111:19_, 1:112:1_, 1:113:7_, 1:113:19_, 1:126:3_, 1:126:8_, 1:182:2_, 1:184:19_, 1:188:14_, 1:189:9_, 1:189:16_, 1:197:22_, 1:197:23_, 1:197:24_, 1:197:25_, 1:199:2

indicate [1]_ - 1:127:19

indicating [5]_ - 1:26:17_, 1:97:18_, 1:122:11_, 1:178:20_, 1:206:25

indirect [3]_ - 1:72:6_, 1:72:8_, 1:72:11

indirectly [2]_ - 1:72:4_, 1:76:6

individual [2]_ - 1:7:1_, 1:169:24

individually [1]_ - 1:101:19

industry [2]_ - 1:175:22_, 1:190:25

infection [1]_ - 1:124:13

infirmed [1]_ - 1:87:18

infirmity [1]_ - 1:195:24

inflexible [1]_ - 1:131:18

influenced [2]_ - 1:17:7_, 1:17:13

information [20]_ - 1:16:12_, 1:16:15_, 1:16:23_, 1:71:9_, 1:71:11_, 1:77:1_, 1:77:2_, 1:78:14_, 1:79:7_, 1:79:8_, 1:79:13_, 1:79:22_, 1:91:4_, 1:144:24_, 1:172:2_, 1:185:24_, 1:187:25_, 1:209:8_, 1:209:9_, 1:222:9

ingenuity [2]_ - 1:103:5_, 1:105:1

initial [1]_ - 1:183:1

injury [1]_ - 1:58:6

input [1]_ - 1:220:14

inquire [2]_ - 1:52:5_, 1:62:4

inquired [2]_ - 1:92:22_, 1:92:25

inquiry [1]_ - 1:92:23

inspector [2]_ - 1:46:15_, 1:47:12

Instagram [1]_ - 1:79:3

installs [1]_ - 1:44:10

instance [2]_ - 1:11:25_, 1:200:11

instead [3]_ - 1:51:20_, 1:74:15_, 1:179:23

instruct [8]_ - 1:62:21_, 1:63:11_, 1:73:19_, 1:77:20_, 1:78:5_, 1:102:24_, 1:109:21_, 1:113:17

instructed [2]_ - 1:19:23_, 1:114:11

instructing [1]_ - 1:93:7

instruction [2]_ - 1:4:5_, 1:96:25

instructions [11]_ - 1:4:3_, 1:13:13_, 1:49:15_, 1:69:12_, 1:70:12_, 1:71:19_, 1:78:20_, 1:81:10_, 1:82:10_, 1:123:1

insurance [51]_ - 1:22:22_, 1:28:22_, 1:44:6_, 1:47:23_, 1:57:5_, 1:57:7_, 1:103:21_, 1:105:10_, 1:105:15_, 1:126:10_, 1:142:20_, 1:145:3_, 1:160:16_, 1:160:17_, 1:160:21_, 1:161:8_, 1:161:21_, 1:162:6_, 1:162:7_, 1:162:9_, 1:162:12_, 1:163:3_, 1:163:10_, 1:163:12_, 1:163:16_, 1:163:23_, 1:164:1_, 1:164:2_, 1:164:4_, 1:164:7_, 1:164:9_, 1:164:10_, 1:164:13_, 1:165:1_, 1:166:2_, 1:168:24_, 1:169:4_, 1:169:8_, 1:169:11_, 1:169:13_, 1:170:4_, 1:172:2_, 1:191:15_, 1:194:16_, 1:199:3_, 1:199:8_, 1:201:15_, 1:202:2_, 1:202:11_, 1:206:9

Insurance [1]_ - 1:23:8

insureds [1]_ - 1:29:22

integrity [1]_ - 1:18:6

intends [2]_ - 1:80:22_, 1:92:24

intent [1]_ - 1:103:13

intention [4]_ - 1:93:4_, 1:94:18_, 1:94:24_, 1:95:3

interest [3]_ - 1:56:14_, 1:56:17_, 1:74:3

interested [2]_ - 1:13:1_, 1:156:20

internet [2]_ - 1:79:2_, 1:79:9

interpret [1]_ - 1:81:9

interpretation [2]_ - 1:81:17_, 1:115:24

interpreter [1]_ - 1:3:19

interpreters [1]_ - 1:81:14

interrogatories [2]_ - 1:126:15_, 1:126:16

interrupt [6]_ - 1:4:10_, 1:4:13_, 1:5:2_, 1:140:22_, 1:192:25_, 1:193:6

interrupted [1]_ - 1:6:8

interview [3]_ - 1:102:5_, 1:158:2_, 1:158:4

Intracoastal [1]_ - 1:22:21

introduce [9]_ - 1:13:8_, 1:14:5_, 1:14:16_, 1:90:9_, 1:90:25_, 1:91:6_, 1:115:21_, 1:115:23_, 1:115:25

introducing [1]_ - 1:90:19

introduction [2]_ - 1:83:23_, 1:90:9

invested [1]_ - 1:103:6

investigations [1]_ - 1:46:17

investment [5]_ - 1:31:8_, 1:31:21_, 1:59:6_, 1:104:15_, 1:104:23

investments [3]_ - 1:59:8_, 1:59:9_, 1:59:12

invoice [2]_ - 1:175:19_, 1:206:8

involve [1]_ - 1:188:24

involved [35]_ - 1:15:10_, 1:23:16_, 1:24:4_, 1:26:18_, 1:28:7_, 1:29:3_, 1:29:5_, 1:30:13_, 1:32:1_, 1:33:4_, 1:33:25_, 1:35:14_, 1:36:19_, 1:38:1_, 1:38:3_, 1:38:24_, 1:39:1_, 1:39:19_, 1:39:21_, 1:40:25_, 1:41:2_, 1:42:7_, 1:42:15_, 1:43:17_, 1:44:18_, 1:44:20_, 1:45:24_, 1:47:8_, 1:47:11_, 1:47:23_, 1:54:15_, 1:106:9_, 1:119:16_, 1:147:19_, 1:223:18

involving [3]_ - 1:27:6_, 1:58:24_, 1:117:24

irrelevant [3]_ - 1:83:25_, 1:95:6_, 1:224:12

Island [1]_ - 1:25:21

issuance [2]_ - 1:57:11_, 1:57:16

issue [48]_ - 1:4:9_, 1:4:12 _, 1:5:5_, 1:7:15_, 1:57:22_, 1:62:20_, 1:62:24_, 1:79:15 _, 1:83:10_, 1:83:13_, 1:83:20_, 1:84:14_, 1:85:6_, 1:86:19_, 1:89:15_, 1:91:13 _, 1:91:18_, 1:93:18_, 1:95:13_, 1:96:11_, 1:96:25 _, 1:113:23_, 1:116:9_, 1:119:10_, 1:132:11_, 1:175:13_, 1:175:14_, 1:176:4_, 1:176:5_, 1:176:14 _, 1:176:15_, 1:176:17_, 1:177:23_, 1:180:1_, 1:184:12_, 1:211:20_, 1:221:5_, 1:221:8_, 1:221:9 _, 1:221:11_, 1:221:19_, 1:221:21_, 1:221:23_, 1:221:25_, 1:223:5_, 1:223:6 _, 1:223:10_, 1:223:11

issues [16]_ - 1:17:11_, 1:18:16_, 1:23:24_, 1:24:1_, 1:54:23_, 1:55:2_, 1:55:6_, 1:69:4_, 1:78:2_, 1:98:15_, 1:131:22_, 1:135:19_, 1:155:10_, 1:176:16_, 1:191:12_, 1:208:7

item [1]_ - 1:73:19

itself [1]_ - 1:78:16

Izique [32]_ - 1:107:6_, 1:139:13_, 1:157:10_, 1:157:14_, 1:158:14_, 1:158:16_, 1:177:4_, 1:177:16_, 1:205:16_, 1:205:17_, 1:207:8_, 1:207:9 _, 1:207:16_, 1:207:24_, 1:210:5_, 1:210:25_, 1:211:10_, 1:211:13_, 1:211:17_, 1:212:2_, 1:212:3 _, 1:212:7_, 1:213:3_, 1:213:8_, 1:214:2_, 1:218:18 _, 1:218:22_, 1:218:25_, 1:220:7_, 1:220:14_, 1:222:22_, 1:222:23

Izique's [3]_ - 1:104:8_, 1:216:17_, 1:217:9

Iziques [5]_ - 1:109:1_, 1:168:7_, 1:168:8_, 1:177:25 _, 1:224:15

─────────

J

─────────

Jennie [6]_ - 1:119:8_, 1:132:14_, 1:133:23_, 1:134:7_, 1:135:12_,

1:135:15

Jermaine [4]_ - 1:13:10_, 1:69:13_, 1:70:13_, 1:81:21

job [23]_ - 1:12:16_, 1:22:24_, 1:24:13_, 1:45:14 _, 1:61:15_, 1:61:18_, 1:61:22_, 1:71:22_, 1:72:12 _, 1:98:17_, 1:100:1_, 1:100:2_, 1:104:1_, 1:106:2 _, 1:123:16_, 1:126:6_, 1:172:4_, 1:191:24_, 1:216:13_, 1:216:15_, 1:222:18_, 1:222:19

jobs [4]_ - 1:49:2_, 1:49:12 _, 1:49:13_, 1:56:9

John [2]_ - 1:22:12_, 1:55:21

Johnson's [1]_ - 1:202:7

joint [7]_ - 1:125:20_, 1:125:21_, 1:126:12_, 1:126:13_, 1:126:14_, 1:126:19

Joint [17]_ - 1:125:25_, 1:126:1_, 1:126:2_, 1:126:3 _, 1:126:4_, 1:126:6_, 1:126:7_, 1:126:15_, 1:127:3 _, 1:127:9_, 1:149:13_, 1:182:1_, 1:190:18_, 1:204:5 _, 1:205:14_, 1:210:2_, 1:225:24

jointly [1]_ - 1:125:24

Joints [1]_ - 1:226:5

Jones [2]_ - 1:73:1_, 1:73:2

jot [1]_ - 1:144:23

judge [10]_ - 1:12:17_, 1:47:21_, 1:49:2_, 1:49:20_, 1:51:5_, 1:62:21_, 1:64:23_, 1:92:13_, 1:109:20_, 1:113:17

Judge [15]_ - 1:6:25_, 1:8:22_, 1:9:4_, 1:50:23_, 1:52:17_, 1:64:15_, 1:65:1_, 1:87:23_, 1:91:21_, 1:98:14 _, 1:102:24_, 1:106:8_, 1:109:24_, 1:152:4_, 1:225:9

judges [1]_ - 1:49:22

judgment [3]_ - 1:95:11_, 1:99:8_, 1:99:12

judicial [1]_ - 1:7:23

Julio [1]_ - 1:149:21

July [35]_ - 1:74:23_, 1:75:3_, 1:75:11_, 1:107:25 _, 1:133:7_, 1:133:8_, 1:137:12_, 1:139:13_, 1:139:14_, 1:148:5_, 1:148:6

_, 1:149:6_, 1:149:17_, 1:174:2_, 1:174:19_, 1:176:2 _, 1:176:18_, 1:177:2_, 1:177:10_, 1:178:21_, 1:179:4_, 1:202:22_, 1:204:7 _, 1:204:19_, 1:205:11_, 1:205:12_, 1:206:16_, 1:206:20_, 1:206:21_, 1:210:25_, 1:214:5_, 1:214:7 _, 1:214:8

June [3]_ - 1:138:3_, 1:150:3_, 1:150:19

Jupiter [2]_ - 1:3:20_, 1:115:9

juries [3]_ - 1:15:14_, 1:48:24_, 1:50:10

jurisdiction [1]_ - 1:183:12

JUROR [283]_ - 1:20:10_, 1:20:15_, 1:20:25_, 1:21:2_, 1:21:7_, 1:21:11, 1:21:23_, 1:22:1_, 1:22:3_, 1:22:7_, 1:22:18_, 1:22:20_, 1:23:1_, 1:23:5_, 1:23:12_, 1:23:18_, 1:23:21_, 1:24:8_, 1:24:16_, 1:24:18_, 1:24:24_, 1:25:2_, 1:25:5_, 1:25:7_, 1:25:9_, 1:25:11_, 1:25:13_, 1:25:16 _, 1:25:18_, 1:25:20_, 1:26:5 _, 1:26:7_, 1:26:9_, 1:26:12_, 1:26:15_, 1:26:20_, 1:27:4_, 1:27:8_, 1:27:10_, 1:27:16_, 1:27:20_, 1:27:22_, 1:27:24 _, 1:28:2_, 1:28:4_, 1:28:6_, 1:28:8_, 1:28:10_, 1:28:12_, 1:28:17_, 1:28:20_, 1:28:22 _, 1:28:25_, 1:29:2_, 1:29:4_, 1:29:6_, 1:29:8_, 1:29:12_, 1:29:15_, 1:29:18_, 1:29:20 _, 1:30:1_, 1:30:3_, 1:30:5_, 1:30:8_, 1:30:10_, 1:30:12_, 1:30:14_, 1:30:16_, 1:30:18 _, 1:30:22_, 1:30:24_, 1:31:1 _, 1:31:4_, 1:31:6_, 1:31:8_, 1:31:10_, 1:31:12_, 1:31:15 _, 1:31:17_, 1:31:21_, 1:31:24_, 1:32:2_, 1:32:4_, 1:32:6_, 1:32:10_, 1:32:13_, 1:32:15_, 1:32:17_, 1:32:19 _, 1:32:21_, 1:32:23_, 1:33:1 _, 1:33:3_, 1:33:5_, 1:33:7_, 1:33:9_, 1:33:14_, 1:33:17_, 1:33:19_, 1:33:22_, 1:33:24 _, 1:34:1_, 1:34:3_, 1:34:5_, 1:34:9_, 1:34:12_, 1:34:14_, 1:34:17_, 1:34:20_, 1:34:22 _, 1:34:24_, 1:35:1_, 1:35:3_, 1:35:5_, 1:35:7_, 1:35:9_, 1:35:11_, 1:35:13_, 1:35:15

_, 1:35:17_, 1:35:19_, 1:35:24_, 1:36:4_, 1:36:7_, 1:36:9_, 1:36:11_, 1:36:13_, 1:36:16_, 1:36:18_, 1:36:20 _, 1:36:22_, 1:37:2_, 1:37:4_, 1:37:8_, 1:37:11_, 1:37:14_, 1:37:16_, 1:37:18_, 1:37:21 _, 1:37:23_, 1:37:25_, 1:38:2 _, 1:38:4_, 1:38:6_, 1:38:8_, 1:38:11_, 1:38:14_, 1:38:16 _, 1:38:19_, 1:38:21_, 1:38:25_, 1:39:2_, 1:39:4_, 1:39:8_, 1:39:12_, 1:39:14_, 1:39:16_, 1:39:18_, 1:39:20 _, 1:39:22_, 1:39:24_, 1:40:3 _, 1:40:5_, 1:40:7_, 1:40:9_, 1:40:13_, 1:40:15_, 1:40:18 _, 1:40:20_, 1:40:22_, 1:40:24_, 1:41:1_, 1:41:3_, 1:41:9_, 1:41:14_, 1:41:16_, 1:41:18_, 1:41:23_, 1:41:25 _, 1:42:2_, 1:42:4_, 1:42:6_, 1:42:8_, 1:42:11_, 1:42:14_, 1:42:17_, 1:42:19_, 1:42:23 _, 1:43:1_, 1:43:3_, 1:43:5_, 1:43:7_, 1:43:9_, 1:43:11_, 1:43:16_, 1:43:18_, 1:43:20 _, 1:43:22_, 1:44:1_, 1:44:3_, 1:44:5_, 1:44:8_, 1:44:10_, 1:44:12_, 1:44:14_, 1:44:17 _, 1:44:19_, 1:44:21_, 1:45:1 _, 1:45:4_, 1:45:9_, 1:45:12_, 1:45:14_, 1:45:17_, 1:45:21 _, 1:45:23_, 1:45:25_, 1:46:2 _, 1:46:4_, 1:46:9_, 1:46:12_, 1:46:14_, 1:46:19_, 1:46:21 _, 1:46:24_, 1:47:1_, 1:47:3_, 1:47:7_, 1:47:9_, 1:47:11_, 1:48:1_, 1:48:6_, 1:48:10_, 1:48:19_, 1:48:21_, 1:54:21 _, 1:55:1_, 1:55:5_, 1:55:11_, 1:55:19_, 1:55:21_, 1:55:25 _, 1:56:4_, 1:56:7_, 1:56:11_, 1:56:17_, 1:56:21_, 1:56:23 _, 1:57:1_, 1:57:3_, 1:57:6_, 1:57:9_, 1:57:13_, 1:57:19_, 1:57:21_, 1:57:25_, 1:58:2_, 1:58:4_, 1:58:11_, 1:58:16_, 1:59:1_, 1:59:7_, 1:59:10_, 1:59:14_, 1:59:24_, 1:60:3_, 1:60:6_, 1:60:8_, 1:60:10_, 1:60:13_, 1:60:19_, 1:60:25 _, 1:61:3_, 1:61:7_, 1:61:17_, 1:61:21_, 1:61:24_, 1:69:8_, 1:97:12_, 1:97:15_, 1:97:18 _, 1:97:20

Juror [15]_ - 1:65:14_, 1:65:19_, 1:65:22_, 1:66:11 _, 1:66:20_, 1:66:24_, 1:67:4 _, 1:67:9_, 1:67:10_, 1:67:11

_, 1:67:12

juror [14]_ - 1:9:25_, 1:10:20_, 1:11:15_, 1:12:12 _, 1:15:4_, 1:15:6_, 1:15:22_, 1:19:13_, 1:19:20_, 1:20:22 _, 1:21:9_, 1:21:16_, 1:29:1_, 1:78:14

JURORS [1]_ - 1:10:16

jurors [45]_ - 1:4:4_, 1:4:7 _, 1:10:22_, 1:12:1_, 1:12:3_, 1:12:4_, 1:12:14_, 1:12:15_, 1:12:19_, 1:12:24_, 1:13:4_, 1:13:5_, 1:15:7_, 1:15:12_, 1:17:2_, 1:17:21_, 1:20:17_, 1:50:20_, 1:50:21_, 1:50:23 _, 1:52:21_, 1:63:17_, 1:64:4 _, 1:64:17_, 1:66:3_, 1:67:14 _, 1:67:19_, 1:67:21_, 1:68:1 _, 1:68:7_, 1:68:10_, 1:68:11 _, 1:68:14_, 1:69:18_, 1:69:21_, 1:71:18_, 1:79:16 _, 1:79:18_, 1:80:2_, 1:81:15 _, 1:152:7_, 1:152:10_, 1:193:6_, 1:193:22

JURY [1]_ - 1:10:3

jury [126]_ - 1:3:13_, 1:3:17 _, 1:3:24_, 1:4:3_, 1:4:6_, 1:5:16_, 1:5:17_, 1:6:5_, 1:6:11_, 1:6:15_, 1:7:19_, 1:8:12_, 1:9:3_, 1:9:6_, 1:10:12_, 1:10:14_, 1:11:17 _, 1:12:1_, 1:13:13_, 1:13:18 _, 1:15:8_, 1:15:15_, 1:15:16 _, 1:16:13_, 1:17:16_, 1:17:18_, 1:26:4_, 1:27:14_, 1:27:15_, 1:28:5_, 1:30:11_, 1:31:23_, 1:33:2_, 1:33:23_, 1:35:2_, 1:36:17_, 1:37:24_, 1:38:20_, 1:39:17_, 1:40:23 _, 1:42:5_, 1:44:16_, 1:45:22 _, 1:47:6_, 1:49:1_, 1:49:14_, 1:50:6_, 1:50:8_, 1:50:1_, 1:50:14_, 1:50:15_, 1:50:19 _, 1:51:21_, 1:52:13_, 1:64:7 _, 1:64:8_, 1:64:10_, 1:65:3_, 1:67:20_, 1:67:23_, 1:68:25 _, 1:69:13_, 1:69:22_, 1:69:23_, 1:70:3_, 1:70:8_, 1:70:10_, 1:70:13_, 1:71:7_, 1:71:16_, 1:78:12_, 1:80:7_, 1:80:11_, 1:80:13_, 1:81:11 _, 1:81:20_, 1:81:24_, 1:82:3 _, 1:82:4_, 1:82:10_, 1:82:13 _, 1:82:25_, 1:83:1_, 1:83:11 _, 1:83:12_, 1:83:18_, 1:83:19_, 1:83:21_, 1:83:25 _, 1:84:1_, 1:84:17_, 1:86:17 _, 1:88:13_, 1:91:15_, 1:93:7 _, 1:95:16_, 1:96:1_, 1:96:2_,

1:96:5_, 1:96:21_, 1:97:8_, 1:97:9_, 1:97:24_, 1:112:12 _, 1:114:15_, 1:114:18_, 1:114:21_, 1:115:6_, 1:116:21_, 1:116:22_, 1:151:16_, 1:151:19_, 1:151:21_, 1:152:3_, 1:152:9 _, 1:173:18_, 1:174:15_, 1:193:4_, 1:193:5_, 1:193:19 _, 1:193:24_, 1:193:25_, 1:225:17

justice [1]_ - 1:53:13

## K

K-8 [4]_ - 1:22:9_, 1:22:10 _, 1:54:21

keep [10]_ - 1:8:22_, 1:54:7 _, 1:71:4_, 1:78:21_, 1:109:22_, 1:110:9_, 1:135:9 _, 1:174:4_, 1:185:5_, 1:186:7

keeping [2]_ - 1:54:4_, 1:125:18

Kennedy [1]_ - 1:22:12

kept [4]_ - 1:132:1_, 1:135:20_, 1:139:1_, 1:161:13

key [1]_ - 1:111:21

kids [2]_ - 1:40:10_, 1:47:22

kills [1]_ - 1:70:20

kind [40]_ - 1:4:12_, 1:7:21 _, 1:12:11_, 1:17:19_, 1:23:14_, 1:24:19_, 1:51:2_, 1:51:24_, 1:52:24_, 1:53:3_, 1:53:5_, 1:53:10_, 1:55:3_, 1:57:7_, 1:57:15_, 1:58:3_, 1:58:14_, 1:60:1_, 1:64:18_, 1:69:21_, 1:70:1_, 1:72:12_, 1:98:15_, 1:100:17_, 1:102:14_, 1:102:22_, 1:115:17_, 1:120:9_, 1:122:9 _, 1:122:12_, 1:131:8_, 1:135:9_, 1:135:22_, 1:169:14_, 1:181:13_, 1:195:23_, 1:197:3_, 1:202:11_, 1:206:12_, 1:209:10

kinds [1]_ - 1:155:4

kitchen [1]_ - 1:44:14

knocked [1]_ - 1:51:10

know.. [1]_ - 1:200:16

knowledge [10]_ - 1:17:8 _, 1:18:25_, 1:23:23_, 1:135:15_, 1:142:18_, 1:166:15_, 1:167:6_, 1:184:9

_, 1:205:4_, 1:205:5

known [2]_ - 1:17:4_, 1:74:19

knows [5]_ - 1:88:20_, 1:140:1_, 1:158:24_, 1:167:5 _, 1:185:21

## L

Labor [18]_ - 1:18:19_, 1:54:14_, 1:54:16_, 1:58:10 _, 1:62:19_, 1:74:19_, 1:74:24_, 1:82:14_, 1:83:11 _, 1:84:10_, 1:84:25_, 1:85:4 _, 1:85:19_, 1:86:6_, 1:86:8_, 1:100:17_, 1:101:2_, 1:110:3

lack [2]_ - 1:130:14

ladies [2]_ - 1:52:9_, 1:119:19

lady [11]_ - 1:3:10_, 1:14:20_, 1:26:21_, 1:119:6 _, 1:121:16_, 1:121:24_, 1:123:15_, 1:129:23_, 1:132:6_, 1:132:7_, 1:132:15

Lakes [1]_ - 1:42:23

Landa [1]_ - 1:119:8

landlord [1]_ - 1:51:15

languages [1]_ - 1:81:12

last [24]_ - 1:3:14_, 1:9:15_, 1:10:17_, 1:51:17_, 1:51:21 _, 1:56:23_, 1:66:19_, 1:68:22_, 1:86:21_, 1:87:4_, 1:91:22_, 1:107:25_, 1:113:20_, 1:117:11_, 1:117:13_, 1:145:24_, 1:149:4_, 1:152:23_, 1:176:19_, 1:177:2_, 1:181:6 _, 1:202:21_, 1:216:21

lastly [2]_ - 1:74:25_, 1:75:8

late [5]_ - 1:123:2_, 1:123:15_, 1:130:11_, 1:203:2_, 1:203:3

latitude [2]_ - 1:112:15_, 1:184:20

Lauderdale [8]_ - 1:23:6_, 1:31:1_, 1:34:9_, 1:41:23_, 1:42:23_, 1:70:21_, 1:107:9 _, 1:211:22

laundry [2]_ - 1:143:15_, 1:196:1

Laura [2]_ - 1:13:14_, 1:13:15

law [103]_ - 1:4:18_, 1:18:18_, 1:18:20_, 1:18:21 _, 1:23:11_, 1:23:13_,

1:29:19_, 1:29:21_, 1:38:23 _, 1:40:15_, 1:49:15_, 1:49:20_, 1:49:21_, 1:50:2_, 1:50:5_, 1:50:6_, 1:50:8_, 1:53:18_, 1:53:19_, 1:54:7_, 1:58:5_, 1:58:8_, 1:69:6_, 1:70:3_, 1:71:10_, 1:71:22_, 1:71:23_, 1:71:24_, 1:72:10 _, 1:74:19_, 1:77:7_, 1:78:20 _, 1:79:13_, 1:79:15_, 1:79:16_, 1:79:24_, 1:80:2_, 1:81:11_, 1:83:16_, 1:84:1_, 1:84:5_, 1:84:6_, 1:84:7_, 1:84:10_, 1:84:12_, 1:84:24 _, 1:85:2_, 1:85:4_, 1:85:17_, 1:85:21_, 1:86:3_, 1:86:4_, 1:86:11_, 1:86:12_, 1:86:14 _, 1:91:18_, 1:91:19_, 1:92:17_, 1:92:25_, 1:93:9_, 1:93:20_, 1:95:4_, 1:95:9_, 1:95:17_, 1:95:19_, 1:95:22 _, 1:96:2_, 1:96:3_, 1:96:4_, 1:96:5_, 1:98:15_, 1:99:2_, 1:100:16_, 1:100:21_, 1:101:3_, 1:101:8_, 1:101:20 _, 1:101:24_, 1:102:24_, 1:106:19_, 1:107:13_, 1:109:13_, 1:109:14_, 1:109:19_, 1:109:20_, 1:111:9_, 1:111:12_, 1:112:4 _, 1:112:11_, 1:112:12_, 1:112:15_, 1:113:18_, 1:114:11_, 1:183:7_, 1:183:12_, 1:183:13_, 1:184:1_, 1:198:13_, 1:198:25_, 1:199:5

Lawrence [1]_ - 1:22:9

laws [12]_ - 1:19:22_, 1:54:13_, 1:54:14_, 1:62:19 _, 1:62:24_, 1:63:2_, 1:95:5_, 1:95:8_, 1:156:15_, 1:189:2 _, 1:189:15_, 1:192:4

lawsuit [26]_ - 1:23:16_, 1:26:18_, 1:26:24_, 1:27:2_, 1:28:7_, 1:29:3_, 1:30:13_, 1:32:1_, 1:33:4_, 1:33:25_, 1:35:14_, 1:36:19_, 1:38:1_, 1:38:24_, 1:39:19_, 1:40:25 _, 1:42:7_, 1:42:8_, 1:43:17_, 1:44:18_, 1:45:24_, 1:47:8_, 1:47:14_, 1:47:15_, 1:211:21

lawsuits [1]_ - 1:26:17

lawyer [12]_ - 1:59:15_, 1:63:19_, 1:72:25_, 1:73:5_, 1:73:6_, 1:110:10_, 1:177:14 _, 1:177:19_, 1:178:2_, 1:178:19_, 1:179:9_, 1:218:19

lawyer's [1]_ - 1:72:24

lawyers [22]_ - 1:14:22_, 1:17:1_, 1:17:18_, 1:21:12_, 1:48:13_, 1:49:3_, 1:49:9_, 1:49:14_, 1:50:20_, 1:63:13 _, 1:63:22_, 1:72:18_, 1:81:8 _, 1:98:4_, 1:98:16_, 1:185:11_, 1:185:12_, 1:185:15_, 1:185:17_, 1:185:22_, 1:186:7_, 1:186:15

lawyers' [3]_ - 1:72:16_, 1:72:22_, 1:78:19

lead [1]_ - 1:78:22

leads [1]_ - 1:160:7

learn [1]_ - 1:100:19

least [9]_ - 1:12:17_, 1:48:25_, 1:51:12_, 1:74:24 _, 1:184:9_, 1:198:3_, 1:198:9_, 1:200:18_, 1:208:5

leave [21]_ - 1:20:18_, 1:70:11_, 1:77:3_, 1:80:10_, 1:80:11_, 1:90:16_, 1:104:2 _, 1:106:17_, 1:123:18_, 1:123:19_, 1:129:17_, 1:131:23_, 1:133:3_, 1:133:19_, 1:136:13_, 1:196:10_, 1:196:17_, 1:224:23_, 1:226:2

leaving [2]_ - 1:128:24_, 1:196:12

led [1]_ - 1:176:17

left [11]_ - 1:8:11_, 1:13:5_, 1:14:8_, 1:14:9_, 1:77:4_, 1:80:13_, 1:113:6_, 1:129:15 _, 1:132:25_, 1:133:6_, 1:133:15

legal [4]_ - 1:41:10_, 1:84:23_, 1:180:23_, 1:212:21

legally [1]_ - 1:190:9

Lehrman [1]_ - 1:36:14

less [9]_ - 1:41:5_, 1:69:19 _, 1:99:17_, 1:198:18_, 1:199:2_, 1:212:13_, 1:212:21_, 1:212:24

letter [3]_ - 1:126:1_, 1:164:6_, 1:164:11

letters [1]_ - 1:205:21

letting [2]_ - 1:85:14_, 1:86:15

liability [2]_ - 1:126:9_, 1:126:10

library [1]_ - 1:70:3

license [3]_ - 1:154:4_, 1:154:15_, 1:215:13

licensed [9]_ - 1:4:18_, 1:75:15_, 1:101:12_, 1:111:11_, 1:155:7_, 1:155:11_, 1:156:1_, 1:184:17_, 1:184:18

licenses [1]_ - 1:155:10

life [13]_ - 1:22:1_, 1:25:5_, 1:27:22_, 1:28:20_, 1:29:15 _, 1:33:17_, 1:37:14_, 1:38:14_, 1:39:12_, 1:41:25 _, 1:45:12_, 1:45:18_, 1:58:6

light [3]_ - 1:70:19_, 1:74:7 _, 1:77:8

likely [6]_ - 1:20:25_, 1:21:2_, 1:72:10_, 1:77:9_, 1:77:25_, 1:78:10

limine [5]_ - 1:4:9_, 1:4:24 _, 1:93:13_, 1:93:16_, 1:94:11

limit [3]_ - 1:53:20_, 1:53:22_, 1:54:6

limited [3]_ - 1:17:25_, 1:73:18_, 1:73:20

line [1]_ - 1:184:15

lines [1]_ - 1:15:11

liquidated [14]_ - 1:82:12 _, 1:84:14_, 1:85:7_, 1:86:13 _, 1:91:18_, 1:93:1_, 1:93:12 _, 1:94:13_, 1:94:15_, 1:95:12_, 1:95:14_, 1:96:8_, 1:96:19_, 1:97:5

liquidateds [2]_ - 1:82:23 _, 1:84:22

list [9]_ - 1:15:1_, 1:15:23_, 1:125:23_, 1:141:3_, 1:142:17_, 1:143:20_, 1:144:1_, 1:144:4_, 1:164:8

listed [1]_ - 1:136:5

listen [3]_ - 1:71:21_, 1:79:14_, 1:114:10

listening [1]_ - 1:80:9

live [30]_ - 1:21:22_, 1:25:1 _, 1:27:19_, 1:27:20_, 1:28:16_, 1:29:11_, 1:30:21 _, 1:32:9_, 1:33:13_, 1:34:8_, 1:36:3_, 1:37:10_, 1:38:10_, 1:39:7_, 1:39:8_, 1:40:2_, 1:40:3_, 1:41:22_, 1:42:22_, 1:43:25_, 1:45:8_, 1:46:8_, 1:55:17_, 1:89:16_, 1:91:12 _, 1:116:8_, 1:125:4_, 1:125:5_, 1:148:10

lived [20]_ - 1:21:24_, 1:25:3_, 1:27:21_, 1:28:18_, 1:29:13_, 1:29:16_, 1:31:2_, 1:32:11_, 1:33:15_, 1:34:10

_, 1:36:5_, 1:37:12_, 1:38:12 _, 1:39:10_, 1:40:4_, 1:41:24 _, 1:42:24_, 1:44:2_, 1:45:10 _, 1:46:10

livelihood [1]_ - 1:110:7

lives [3]_ - 1:26:2_, 1:98:13 _, 1:98:18

Liz [17]_ - 1:14:2_, 1:14:19 _, 1:18:9_, 1:18:13_, 1:62:10 _, 1:74:13_, 1:75:12_, 1:77:13_, 1:77:17_, 1:78:3_, 1:78:6_, 1:78:9_, 1:80:25_, 1:81:3_, 1:111:5_, 1:152:14 _, 1:153:1

LIZ [2]_ - 1:153:1, 1:153:3

LLC [1]_ - 1:40:10

LOA [1]_ - 1:164:12

loan [8]_ - 1:135:9_, 1:135:11_, 1:146:23_, 1:146:25_, 1:147:4_, 1:147:8 _, 1:166:24_, 1:167:3

lobby [1]_ - 1:64:3

local [1]_ - 1:95:5

locations [1]_ - 1:60:22

lock [1]_ - 1:47:17

locked [1]_ - 1:114:25

long-term [7]_ - 1:118:4_, 1:118:8_, 1:142:16_, 1:160:23_, 1:164:16_, 1:164:19_, 1:168:25

look [35]_ - 1:56:25_, 1:57:8_, 1:61:2_, 1:63:21_, 1:86:3_, 1:86:4_, 1:86:8_, 1:92:10_, 1:93:2_, 1:93:25_, 1:95:9_, 1:98:25_, 1:106:19 _, 1:107:20_, 1:107:21_, 1:108:10_, 1:108:11_, 1:109:23_, 1:150:14_, 1:150:15_, 1:175:23_, 1:178:12_, 1:188:5_, 1:194:10_, 1:206:24_, 1:207:9_, 1:207:15_, 1:207:24_, 1:212:1_, 1:212:4 _, 1:212:8_, 1:213:2_, 1:218:19

looked [6]_ - 1:85:7_, 1:149:4_, 1:149:14_, 1:185:18_, 1:185:22_, 1:214:4

looking [9]_ - 1:4:3_, 1:66:3_, 1:82:10_, 1:93:20_, 1:94:16_, 1:95:23_, 1:115:19 _, 1:183:6_, 1:183:11

looks [3]_ - 1:11:14_, 1:20:23_, 1:174:9

lose [5]_ - 1:103:5_,

1:129:6_, 1:171:4_, 1:196:20 _, 1:196:21

losing [1]_ - 1:103:17

loss [3]_ - 1:21:14_, 1:103:4_, 1:104:24

lost [3]_ - 1:21:3_, 1:32:17 _, 1:47:13

loudly [1]_ - 1:13:19

LPNs [1]_ - 1:101:12

Lucie [2]_ - 1:154:11_, 1:154:23

luck [1]_ - 1:57:2

lucky [1]_ - 1:12:16

lump [1]_ - 1:101:6

Luna [5]_ - 1:3:5_, 1:14:10 _, 1:98:22_, 1:110:19

lunch [8]_ - 1:11:20_, 1:114:16_, 1:114:20_, 1:115:20_, 1:116:12_, 1:123:7_, 1:143:10

---

**M**

M-C-K-I-N-N-O-N [1]_ - 1:153:1

ma'am [16]_ - 1:20:9_, 1:29:9_, 1:30:19_, 1:32:7_, 1:33:11_, 1:34:6_, 1:36:1_, 1:37:6_, 1:41:20_, 1:42:20_, 1:45:6_, 1:117:4_, 1:137:20 _, 1:141:22_, 1:148:22_, 1:151:13

magnet [1]_ - 1:22:13

main [1]_ - 1:161:17

Majestic [1]_ - 1:141:24

major [1]_ - 1:21:2

majority [1]_ - 1:52:13

Mallard [5]_ - 1:9:15_, 1:32:8_, 1:60:5_, 1:66:20_, 1:66:23

malpractice [1]_ - 1:58:7

manage [4]_ - 1:32:15_, 1:60:7_, 1:60:15_, 1:60:17

management [6]_ - 1:7:1 _, 1:7:4_, 1:36:9_, 1:58:17_, 1:58:19_, 1:58:20

manager [6]_ - 1:44:14_, 1:58:19_, 1:105:18_, 1:142:1 _, 1:145:3_, 1:194:22

managers [3]_ - 1:24:11_, 1:112:25_, 1:144:23

manages [1]_ - 1:35:1

mandated [1]_ - 1:112:4

mandates [1]_ - 1:111:10

Manhattan [1]– - 1:31:22
manner [1]– - 1:74:3
manual [1]– - 1:141:2
manufacturing [1]– - 1:60:19
Maria [1]– - 1:117:12
MARIA [1] - 1:117:16
Marie [1]– - 1:16:2
marital [20]– - 1:22:17–, 1:25:10–, 1:28:3–, 1:28:24–, 1:30:2–, 1:31:9–, 1:32:16–, 1:33:21–, 1:34:16–, 1:36:10 –, 1:37:22–, 1:38:18–, 1:39:15–, 1:40:12–, 1:42:3–, 1:43:6–, 1:44:7–, 1:45:20–, 1:46:18–, 1:190:9
marked [1]– - 1:173:21
market [1]– - 1:159:21
marketed [1]– - 1:103:18
marketing [3]– - 1:103:11 –, 1:105:7–, 1:159:22
Marketplace [1]– - 1:25:22
married [11]– - 1:22:18–, 1:25:11–, 1:28:4–, 1:28:25–, 1:30:3–, 1:31:10–, 1:34:18–, 1:36:11–, 1:40:13–, 1:44:8–, 1:46:19
Martinez [5]– - 1:9:10–, 1:29:10–, 1:40:1–, 1:57:24–, 1:65:21
mask [2]– - 1:70:17–, 1:106:2
masks [3]– - 1:70:16–, 1:104:17–, 1:104:19
match [3]– - 1:129:13–, 1:212:10–, 1:216:23
material [2]– - 1:76:14–, 1:76:20
materially [2]– - 1:75:24–, 1:76:16
math [9]– - 1:25:9–, 1:55:17–, 1:55:24–, 1:108:6 –, 1:178:9–, 1:178:14–, 1:181:13–, 1:181:16–, 1:181:23
matter [11]– - 1:17:9–, 1:84:6–, 1:85:20–, 1:87:21–, 1:92:21–, 1:110:25–, 1:114:13–, 1:119:24–, 1:168:14–, 1:168:17
matters [1]– - 1:98:3
McIntyre [1]– - 1:45:7
MCKINNON [1] - 1:153:3

McKinnon [30]– - 1:3:9–, 1:7:9–, 1:7:10–, 1:14:2–, 1:14:19–, 1:16:2–, 1:18:9–, 1:18:13–, 1:62:10–, 1:74:14 –, 1:75:13–, 1:77:13–, 1:77:18–, 1:78:3–, 1:78:6–, 1:78:9–, 1:80:25–, 1:81:3–, 1:101:10–, 1:101:18–, 1:107:8–, 1:111:5–, 1:114:10 –, 1:115:16–, 1:152:15–, 1:153:1–, 1:153:8–, 1:193:17 –, 1:194:6–, 1:224:12
McKinnon's [1]– - 1:126:15
MCO [1]– - 1:219:7
meal [10]– - 1:122:24–, 1:123:7–, 1:138:21–, 1:138:22–, 1:155:20–, 1:155:25–, 1:195:25–, 1:208:13–, 1:208:14
meals [1]– - 1:125:17
mean [62]– - 1:3:15–, 1:7:6 –, 1:17:23–, 1:18:2–, 1:20:5–, 1:23:1–, 1:41:9–, 1:48:11–, 1:50:4–, 1:53:25–, 1:54:5–, 1:60:11–, 1:63:18–, 1:84:21 –, 1:85:13–, 1:85:16–, 1:85:17–, 1:119:17–, 1:123:14–, 1:124:16–, 1:128:10–, 1:135:21–, 1:137:16–, 1:138:13–, 1:138:16–, 1:138:18–, 1:140:19–, 1:140:20–, 1:140:22–, 1:146:12–, 1:147:17–, 1:148:10–, 1:150:16–, 1:156:17–, 1:159:25–, 1:161:20–, 1:162:13–, 1:165:2–, 1:167:7 –, 1:171:10–, 1:171:15–, 1:171:21–, 1:171:24–, 1:178:7–, 1:181:17–, 1:182:7 –, 1:187:8–, 1:200:9–, 1:200:21–, 1:201:11–, 1:202:6–, 1:206:12–, 1:212:12–, 1:213:17–, 1:216:12–, 1:217:14–, 1:220:21
meaning [2]– - 1:81:18–, 1:212:17
means [15]– - 1:5:14–, 1:62:15–, 1:73:16–, 1:77:8–, 1:79:1–, 1:79:7–, 1:79:11–, 1:109:21–, 1:163:14–, 1:190:21–, 1:199:22–, 1:206:5–, 1:206:7–, 1:211:8 –, 1:219:5
meant [2]– - 1:168:19–, 1:176:25

media [3]– - 1:19:5–, 1:79:5–, 1:111:6
Medicaid [31]– - 1:103:22 –, 1:112:20–, 1:112:25–, 1:142:10–, 1:160:20–, 1:160:23–, 1:160:24–, 1:164:16–, 1:164:17–, 1:164:19–, 1:165:1–, 1:168:25–, 1:169:4–, 1:169:8 –, 1:169:11–, 1:169:13–, 1:169:18–, 1:169:22–, 1:170:4–, 1:171:19–, 1:171:24–, 1:172:1–, 1:172:12–, 1:172:20–, 1:175:18–, 1:201:16–, 1:202:8–, 1:202:11–, 1:216:7 –, 1:221:24
medical [5]– - 1:42:2–, 1:58:7–, 1:101:10–, 1:155:6 –, 1:156:1
Medicare [6]– - 1:103:21–, 1:112:20–, 1:142:9–, 1:192:22–, 1:197:2–, 1:221:24
medication [2]– - 1:155:25–, 1:156:6
medicine [1]– - 1:122:23
meds [1]– - 1:156:2
meet [12]– - 1:77:16–, 1:105:8–, 1:156:14–, 1:156:16–, 1:162:12–, 1:165:20–, 1:191:22–, 1:195:4–, 1:195:5–, 1:195:6 –, 1:195:10–, 1:195:12
Melendez [28]– - 1:16:7–, 1:86:22–, 1:87:2–, 1:87:5–, 1:87:12–, 1:87:25–, 1:88:19 –, 1:89:15–, 1:90:16–, 1:157:19–, 1:158:16–, 1:179:21–, 1:180:10–, 1:180:14–, 1:181:7–, 1:195:16–, 1:196:2–, 1:196:10–, 1:196:12–, 1:196:14–, 1:196:17–, 1:196:21–, 1:196:24–, 1:222:25–, 1:223:1–, 1:223:4 –, 1:223:8–, 1:223:9
Melendez's [2]– - 1:87:18 –, 1:180:1
Melton [2]– - 1:13:14–, 1:13:19
member [1]– - 1:120:15
members [7]– - 1:71:16–, 1:105:9–, 1:114:15–, 1:151:16–, 1:158:3–, 1:166:19–, 1:167:17
memory [4]– - 1:74:3–,

1:80:15–, 1:80:16–, 1:80:17
mention [2]– - 1:20:12–, 1:65:10
mentioned [10]– - 1:14:3 –, 1:17:17–, 1:62:18–, 1:63:2 –, 1:79:5–, 1:138:9–, 1:147:25–, 1:175:10–, 1:176:16–, 1:177:24
mentioning [1]– - 1:21:14
mentions [1]– - 1:4:12
mere [1]– - 1:15:5
MERV [3]– - 1:70:23–, 1:70:24
mesh [1]– - 1:102:14
meshes [1]– - 1:102:14
message [1]– - 1:156:20
messages [1]– - 1:79:1
met [3]– - 1:13:10–, 1:111:14–, 1:153:9
Miami [12]– - 1:22:7–, 1:22:14–, 1:23:9–, 1:25:14–, 1:26:3–, 1:55:4–, 1:55:23–, 1:154:12–, 1:154:17–, 1:154:20–, 1:154:23
Miami-Dade [4]– - 1:22:7 –, 1:55:4–, 1:154:12–, 1:154:17
mic [3]– - 1:52:8–, 1:55:15 –, 1:98:10
Mickey [1]– - 1:13:11
microphone [12]– - 1:16:18–, 1:16:19–, 1:16:21 –, 1:16:22–, 1:24:22–, 1:27:13–, 1:28:15–, 1:29:10 –, 1:30:20–, 1:39:5–, 1:52:6–, 1:184:13
Middle [1]– - 1:22:12
middle [5]– - 1:54:20–, 1:54:21–, 1:68:22–, 1:98:22 –, 1:160:19
might [9]– - 1:15:1–, 1:15:5 –, 1:15:24–, 1:48:6–, 1:48:7–, 1:73:13–, 1:100:22–, 1:167:6 –, 1:167:22
mind [10]– - 1:19:7–, 1:21:10–, 1:51:25–, 1:78:21 –, 1:84:3–, 1:84:18–, 1:91:9–, 1:109:22–, 1:110:9–, 1:200:4
minimum [9]– - 1:54:13–, 1:99:15–, 1:101:1–, 1:101:8 –, 1:108:15–, 1:109:16–, 1:110:4–, 1:198:4–, 1:198:10
minute [4]– - 1:16:17–, 1:64:11–, 1:193:1–, 1:193:13
minutes [9]– - 1:64:3–,

1:64:6_, 1:81:25_, 1:82:3_, 1:82:6_, 1:140:15_, 1:151:20 _, 1:151:23_, 1:193:4

Miramar [1]_ - 1:29:12

mischaracterization [1] _ - 1:112:11

misclassification [1]_ - 1:74:17

misclassified [1]_ - 1:74:14

mistake [2]_ - 1:167:18_, 1:213:14

mistakes [1]_ - 1:213:16

misunderstood [1]_ - 1:5:22

model [4]_ - 1:183:24_, 1:184:6_, 1:198:23_, 1:199:1

modify [1]_ - 1:52:1

mom [19]_ - 1:26:21_, 1:26:22_, 1:26:23_, 1:44:15 _, 1:118:20_, 1:119:18_, 1:120:9_, 1:122:22_, 1:123:8 _, 1:124:13_, 1:127:11_, 1:130:19_, 1:131:24_, 1:138:14_, 1:138:17_, 1:144:19_, 1:150:10_, 1:150:19

Mom [2]_ - 1:148:19_, 1:160:1

mom's [1]_ - 1:131:14

moment [12]_ - 1:14:25_, 1:96:13_, 1:115:20_, 1:167:15_, 1:167:20_, 1:167:21_, 1:167:22_, 1:169:1_, 1:172:12_, 1:179:12_, 1:222:6

momentarily [1]_ - 1:3:6

moments [2]_ - 1:13:8_, 1:64:9

Monday [2]_ - 1:20:11_, 1:120:5

money [21]_ - 1:18:16_, 1:55:12_, 1:99:14_, 1:103:5 _, 1:103:8_, 1:103:17_, 1:104:25_, 1:110:8_, 1:135:7 _, 1:159:22_, 1:159:23_, 1:160:6_, 1:166:10_, 1:171:4 _, 1:175:7_, 1:198:19_, 1:199:7_, 1:200:7_, 1:200:14 _, 1:203:22

Monica [11]_ - 1:120:14_, 1:121:12_, 1:123:15_, 1:123:17_, 1:129:5_, 1:130:7 _, 1:133:23_, 1:134:7_, 1:134:8_, 1:135:12_, 1:135:15

monitor [1]_ - 1:216:14

monitors [1]_ - 1:106:1

month [5]_ - 1:51:16_, 1:133:9_, 1:133:10_, 1:134:13_, 1:206:16

months [4]_ - 1:24:12_, 1:144:14_, 1:145:4_, 1:145:11

morning [23]_ - 1:3:4_, 1:3:8_, 1:3:17_, 1:10:6_, 1:11:17_, 1:11:19_, 1:12:6_, 1:14:6_, 1:14:18_, 1:51:12_, 1:62:8_, 1:63:19_, 1:63:20_, 1:94:12_, 1:119:5_, 1:122:15 _, 1:123:6_, 1:132:7_, 1:132:9_, 1:136:8_, 1:138:14 _, 1:208:16

mortgage [2]_ - 1:34:20_, 1:134:13

most [14]_ - 1:20:25_, 1:21:2_, 1:55:5_, 1:134:11_, 1:138:7_, 1:138:14_, 1:165:11_, 1:168:23_, 1:169:3_, 1:169:7_, 1:169:11 _, 1:203:7_, 1:205:4

mostly [2]_ - 1:54:19_, 1:59:13

mother [9]_ - 1:21:4_, 1:109:2_, 1:118:7_, 1:129:24 _, 1:137:4_, 1:139:15_, 1:140:9_, 1:148:8_, 1:148:9

motion [10]_ - 1:4:8_, 1:4:24_, 1:6:12_, 1:6:13_, 1:86:22_, 1:87:23_, 1:93:16 _, 1:94:11_, 1:116:14_, 1:209:22

mouthing [1]_ - 1:223:16

move [20]_ - 1:32:7_, 1:33:11_, 1:34:6_, 1:36:1_, 1:37:7_, 1:38:9_, 1:39:25_, 1:41:20_, 1:42:21_, 1:43:24 _, 1:45:7_, 1:46:7_, 1:68:17_, 1:121:21_, 1:125:21_, 1:131:6_, 1:144:20_, 1:148:12_, 1:174:10_, 1:209:16

moved [7]_ - 1:22:12_, 1:33:14_, 1:87:2_, 1:93:13_, 1:148:9_, 1:223:19_, 1:224:16

moving [3]_ - 1:20:10_, 1:125:24_, 1:133:25

MR [255]_ - 1:3:4_, 1:3:8_, 1:3:12_, 1:3:15_, 1:3:25_, 1:4:1_, 1:4:8_, 1:4:15_, 1:5:7 _, 1:5:22_, 1:6:2_, 1:6:3_, 1:6:6_, 1:6:7_, 1:6:8_, 1:6:9_,

1:6:20_, 1:6:24_, 1:6:25_, 1:7:9_, 1:7:12_, 1:7:17_, 1:7:23_, 1:8:1_, 1:8:4_, 1:8:7 _, 1:8:13_, 1:8:14_, 1:8:20_, 1:8:22_, 1:9:2_, 1:9:4_, 1:14:6_, 1:14:17_, 1:15:25_, 1:16:6_, 1:52:6_, 1:52:9_, 1:54:22_, 1:55:2_, 1:55:10_, 1:55:14_, 1:55:20_, 1:55:24 _, 1:56:1_, 1:56:5_, 1:56:8_, 1:56:12_, 1:56:19_, 1:56:22 _, 1:56:24_, 1:57:2_, 1:57:4_, 1:57:7_, 1:57:12_, 1:57:15_, 1:57:20_, 1:57:23_, 1:58:1_, 1:58:3_, 1:58:9_, 1:58:12_, 1:58:23_, 1:59:2_, 1:59:9_, 1:59:11_, 1:59:19_, 1:59:25 _, 1:60:4_, 1:60:7_, 1:60:9_, 1:60:11_, 1:60:17_, 1:60:23 _, 1:61:1_, 1:61:5_, 1:61:9_, 1:61:13_, 1:61:18_, 1:61:22 _, 1:61:25_, 1:62:2_, 1:62:5_, 1:62:8_, 1:64:15_, 1:64:20_, 1:64:21_, 1:64:22_, 1:64:23 _, 1:65:1_, 1:65:4_, 1:65:6_, 1:65:8_, 1:65:13_, 1:65:17_, 1:65:18_, 1:65:21_, 1:65:25 _, 1:66:5_, 1:66:8_, 1:66:10_, 1:66:14_, 1:66:17_, 1:66:22 _, 1:67:2_, 1:67:7_, 1:67:15_, 1:67:17_, 1:75:5_, 1:82:16_, 1:82:19_, 1:83:3_, 1:83:7_, 1:83:15_, 1:84:5_, 1:84:21_, 1:85:6_, 1:85:13_, 1:85:16_, 1:86:16_, 1:86:19_, 1:86:25 _, 1:87:23_, 1:88:5_, 1:88:9_, 1:88:15_, 1:89:1_, 1:89:4_, 1:89:11_, 1:89:14_, 1:89:19 _, 1:90:11_, 1:90:14_, 1:90:20_, 1:90:22_, 1:91:14 _, 1:91:17_, 1:91:21_, 1:92:2_, 1:92:5_, 1:92:12_, 1:92:19 _, 1:93:13_, 1:93:17_, 1:94:16_, 1:94:22_, 1:95:7_, 1:95:18_, 1:96:10_, 1:96:13 _, 1:96:15_, 1:96:17_, 1:96:23_, 1:97:3_, 1:97:6_, 1:97:7_, 1:98:9_, 1:100:25_, 1:110:23_, 1:112:6_, 1:112:10_, 1:112:17_, 1:114:24_, 1:115:7_, 1:115:15_, 1:116:11_, 1:116:17_, 1:116:20_, 1:117:2_, 1:117:20_, 1:125:20_, 1:125:25_, 1:126:19_, 1:126:24_, 1:127:1_, 1:127:5_, 1:127:6 _, 1:134:23_, 1:135:1_, 1:135:4_, 1:135:6_, 1:135:16 _, 1:135:18_, 1:136:20_, 1:136:23_, 1:137:2_, 1:137:6

1:137:8_, 1:137:9_, 1:139:7_, 1:139:9_, 1:139:10 _, 1:139:20_, 1:139:22_, 1:139:23_, 1:139:24_, 1:140:5_, 1:148:21_, 1:149:2 _, 1:151:9_, 1:152:4_, 1:152:5_, 1:152:14_, 1:153:7 _, 1:167:4_, 1:167:8_, 1:170:21_, 1:170:23_, 1:173:17_, 1:173:20_, 1:174:10_, 1:174:12_, 1:174:15_, 1:174:17_, 1:180:16_, 1:180:24_, 1:184:7_, 1:184:8_, 1:184:11 _, 1:184:14_, 1:184:21_, 1:184:22_, 1:186:9_, 1:186:10_, 1:186:11_, 1:186:13_, 1:186:18_, 1:186:20_, 1:186:22_, 1:193:8_, 1:193:12_, 1:193:20_, 1:193:21_, 1:194:4_, 1:194:5_, 1:209:16 _, 1:209:23_, 1:209:24_, 1:217:3_, 1:217:6_, 1:217:8 _, 1:218:12_, 1:218:14_, 1:221:18_, 1:224:4_, 1:224:5 _, 1:224:7_, 1:224:10_, 1:224:14_, 1:225:9_, 1:225:20_, 1:225:21_, 1:225:24_, 1:226:2_, 1:226:5

multiple [2]_ - 1:105:19_, 1:154:5

murder [2]_ - 1:47:17_, 1:47:19

music [1]_ - 1:28:12

must [19]_ - 1:71:23_, 1:71:24_, 1:72:15_, 1:73:12 _, 1:73:16_, 1:73:20_, 1:77:8 _, 1:77:17_, 1:78:6_, 1:78:14 _, 1:78:15_, 1:78:25_, 1:79:6 _, 1:79:20_, 1:81:13_, 1:81:16_, 1:183:19

mute [1]_ - 1:71:5

## N

nails [1]_ - 1:123:11

name [14]_ - 1:52:10_, 1:62:8_, 1:68:2_, 1:98:20_, 1:117:11_, 1:117:12_, 1:117:13_, 1:127:24_, 1:139:15_, 1:145:24_, 1:152:23_, 1:153:8_, 1:215:24_, 1:216:1

names [3]_ - 1:15:19_, 1:16:8_, 1:50:21

Nannies [20]_ - 1:129:4_, 1:129:5_, 1:129:6_, 1:129:7

_..., 1:129:21_..., 1:129:24_...,
1:130:13_..., 1:131:9_...,
1:131:25_..., 1:132:25_...,
1:134:6_..., 1:135:13_...,
1:141:25_..., 1:148:15_...,
1:148:17_..., 1:223:18_...,
1:224:16_..., 1:224:19_...,
1:224:20

Nanny [1]_ - 1:223:19

national [2]_ - 1:169:18_...,
1:190:9

nature [2]_ - 1:13:23_...,
1:135:8

near [3]_ - 1:6:22_..., 1:49:14
_..., 1:85:11

necessary [1]_ - 1:5:25

necessity [1]_ - 1:86:13

need [29]_ - 1:52:1_...,
1:68:4_..., 1:71:17_..., 1:83:19_...,
1:86:19_..., 1:89:22_..., 1:104:7
_..., 1:105:6_..., 1:122:23_...,
1:125:9_..., 1:142:23_...,
1:157:23_..., 1:159:13_...,
1:159:15_..., 1:160:23_...,
1:161:3_..., 1:162:17_..., 1:163:3
_..., 1:163:9_..., 1:163:11_...,
1:165:3_..., 1:165:13_...,
1:165:20_..., 1:169:17_...,
1:175:4_..., 1:180:9_..., 1:195:7
_..., 1:218:4_..., 1:222:14

needed [7]_ - 1:68:5_...,
1:103:18_..., 1:104:20_...,
1:109:7_..., 1:124:15_...,
1:165:17_..., 1:193:9

needs [6]_ - 1:77:14_...,
1:169:22_..., 1:195:9_...,
1:195:10_..., 1:195:12_...,
1:201:5

negative [2]_ - 1:50:11_...,
1:50:14

negotiate [1]_ - 1:157:4

negotiation [1]_ - 1:157:3

Neon [1]_ - 1:25:22

networking [1]_ - 1:79:2

never [34]_ - 1:10:11_...,
1:10:12_..., 1:24:11_..., 1:30:16
_..., 1:45:17_..., 1:47:15_...,
1:50:14_..., 1:99:6_..., 1:114:4_...,
1:128:11_..., 1:130:3_...,
1:134:10_..., 1:141:23_...,
1:142:6_..., 1:142:8_..., 1:142:25
_..., 1:157:5_..., 1:157:9_...,
1:157:10_..., 1:157:12_...,
1:157:13_..., 1:168:10_...,
1:170:3_..., 1:170:12_..., 1:204:1
_..., 1:211:17_..., 1:212:12_...,
1:212:25_..., 1:222:3_...,

1:222:10_..., 1:222:11_...,
1:224:16

New [2]_ - 1:25:22_..., 1:40:7

new [6]_ - 1:22:5_..., 1:76:3_...,
1:103:6_..., 1:111:1_..., 1:131:14
_..., 1:133:10

news [2]_ - 1:19:5_...,
1:79:14

next [26]_ - 1:12:6_..., 1:20:6
_..., 1:63:9_..., 1:64:16_..., 1:80:23
_..., 1:97:10_..., 1:119:5_...,
1:122:16_..., 1:136:9_...,
1:150:23_..., 1:152:13_...,
1:162:5_..., 1:163:9_..., 1:203:5
_..., 1:207:4_..., 1:210:8_...,
1:210:9_..., 1:214:14_...,
1:214:15_..., 1:214:19_...,
1:215:1_..., 1:215:4_..., 1:217:7
_..., 1:218:13_..., 1:219:17_...,
1:219:24

nice [8]_ - 1:13:18_...,
1:45:19_..., 1:68:13_..., 1:99:22
_..., 1:102:23_..., 1:114:20_...,
1:225:16_..., 1:225:23

night [1]_ - 1:11:24

nine [4]_ - 1:31:4_..., 1:40:5_...,
1:181:17_..., 1:210:15

nobody [6]_ - 1:12:22_...,
1:70:16_..., 1:103:25_...,
1:125:13_..., 1:129:22_...,
1:130:20

Nobody [2]_ - 1:121:23

nobody's [1]_ - 1:100:9

non [3]_ - 1:58:14_...,
1:119:15

non-English [1]_ -
1:119:15

non-solicitations [1]_ -
1:58:14

non-Spanish-
speaking [1]_ - 1:119:15

noncompete [6]_ - 1:42:8
_..., 1:58:19_..., 1:58:21_...,
1:58:22_..., 1:58:24_..., 1:108:22

noncompetes [1]_ -
1:58:14

none [3]_ - 1:65:18_...,
1:67:7_..., 1:73:24

nonmedical [9]_ -
1:101:11_..., 1:101:13_...,
1:102:6_..., 1:153:18_...,
1:155:14_..., 1:155:18_...,
1:156:13_..., 1:165:12

nonprofit [1]_ - 1:44:22

nonresponsive [1]_ -

1:209:17

nonspeaking [1]_ -
1:119:15

noon [1]_ - 1:140:9

norm [2]_ - 1:158:17_...,
1:191:16

normal [4]_ - 1:69:22_...,
1:156:11_..., 1:175:1_..., 1:176:6

normally [5]_ - 1:100:19_...,
1:120:24_..., 1:122:4_..., 1:156:9
_..., 1:163:14

north [1]_ - 1:22:16

North [3]_ - 1:22:11_...,
1:22:14_..., 1:25:14

note [2]_ - 1:80:8_..., 1:147:6

note-taking [1]_ - 1:80:8

notebooks [1]_ - 1:81:22

noted [1]_ - 1:86:16

notes [6]_ - 1:80:5_..., 1:80:6
_..., 1:80:11_..., 1:80:14_...,
1:80:15_..., 1:81:23

nothing [16]_ - 1:82:5_...,
1:83:20_..., 1:95:23_..., 1:114:22
_..., 1:117:7_..., 1:136:9_...,
1:137:21_..., 1:151:9_...,
1:151:22_..., 1:152:19_...,
1:185:17_..., 1:196:9_...,
1:196:14_..., 1:196:16_...,
1:225:9_..., 1:225:18

notice [2]_ - 1:70:15_...,
1:70:18

noticed [2]_ - 1:123:3_...,
1:124:10

NPI [2]_ - 1:216:3_...,
1:216:4

NPN [7]_ - 1:169:18_...,
1:169:22_..., 1:169:25_...,
1:170:5_..., 1:170:12_...,
1:215:24_..., 1:216:1

NSU [1]_ - 1:56:7

number [8]_ - 1:17:22_...,
1:17:25_..., 1:18:1_..., 1:99:10_...,
1:100:6_..., 1:118:6_..., 1:144:9
_..., 1:169:19

Number [23]_ - 1:65:8_...,
1:65:15_..., 1:65:20_..., 1:65:23
_..., 1:66:1_..., 1:66:12_..., 1:66:20
_..., 1:66:25_..., 1:67:5_..., 1:67:9_...,
1:67:10_..., 1:67:11_..., 1:67:12
_..., 1:97:13_..., 1:97:14_...,
1:97:15_..., 1:126:9_..., 1:127:3
_..., 1:174:1

numbers [2]_ - 1:8:17_...,
1:99:19

numerous [1]_ - 1:114:5

nurse [35]_ - 1:4:9_..., 1:4:12
_..., 1:4:16_..., 1:4:18_..., 1:5:8_...,
1:46:21_..., 1:76:4_..., 1:83:20_...,
1:83:24_..., 1:84:1_..., 1:86:5_...,
1:105:19_..., 1:109:10_...,
1:109:12_..., 1:109:18_...,
1:111:10_..., 1:112:5_..., 1:113:5
_..., 1:124:11_..., 1:126:4_...,
1:155:7_..., 1:155:8_..., 1:155:19
_..., 1:156:3_..., 1:156:4_...,
1:165:17_..., 1:183:24_...,
1:184:6_..., 1:184:18_..., 1:186:2
_..., 1:198:23_..., 1:200:2_...,
1:224:11

nurses [7]_ - 1:101:11_...,
1:101:12_..., 1:155:11_...,
1:165:9

nursing [10]_ - 1:37:18_...,
1:37:20_..., 1:37:21_..., 1:58:8_...,
1:101:13_..., 1:118:9_..., 1:126:5
_..., 1:153:18_..., 1:153:19_...,
1:155:15

## O

oath [3]_ - 1:10:2_..., 1:51:23
_..., 1:69:7

oatmeal [2]_ - 1:122:24_...,
1:123:5

object [11]_ - 1:4:11_...,
1:5:2_..., 1:5:5_..., 1:5:15_...,
1:5:20_..., 1:17:10_..., 1:49:5_...,
1:49:10_..., 1:73:6_..., 1:88:12_...,
1:112:10

objected [2]_ - 1:5:17_...,
1:6:16

objecting [2]_ - 1:5:18_...,
1:89:8

objection [38]_ - 1:5:3_...,
1:5:14_..., 1:5:18_..., 1:5:21_...,
1:5:23_..., 1:7:13_..., 1:7:14_...,
1:49:5_..., 1:49:6_..., 1:65:12_...,
1:73:8_..., 1:73:10_..., 1:73:12_...,
1:86:16_..., 1:87:3_..., 1:90:10_...,
1:112:6_..., 1:112:8_..., 1:116:5
_..., 1:126:18_..., 1:126:20_...,
1:134:23_..., 1:135:4_...,
1:135:16_..., 1:135:17_...,
1:167:4_..., 1:174:12_...,
1:180:16_..., 1:184:7_...,
1:184:15_..., 1:186:9_...,
1:186:18_..., 1:218:12_...,
1:224:4_..., 1:224:7_..., 1:224:8
_..., 1:224:9_..., 1:224:10

objections [2]_ - 1:49:9_...,
1:72:22

objective [3]_ - 1:92:19_...,
1:92:20_..., 1:93:25

objectively [5]_ - 1:82:22 _, 1:85:18_, 1:86:2_, 1:93:20 _, 1:94:5

obligation [2]_ - 1:48:14_, 1:49:10

obligations [1]_ - 1:92:22

observations [1]_ - 1:145:12

observing [1]_ - 1:80:9

obtain [1]_ - 1:17:10

obtaining [1]_ - 1:17:16

obviate [2]_ - 1:86:12_, 1:116:9

obviates [1]_ - 1:91:13

obviously [4]_ - 1:83:7_, 1:83:22_, 1:84:21_, 1:135:23

occasion [2]_ - 1:203:25_, 1:204:1

occasional [1]_ - 1:46:4

October [1]_ - 1:87:4

odd [1]_ - 1:108:5

offered [3]_ - 1:90:4_, 1:103:9_, 1:172:15

offering [2]_ - 1:90:5_, 1:103:10

offers [1]_ - 1:170:7

office [43]_ - 1:13:21_, 1:47:19_, 1:98:23_, 1:105:17 _, 1:105:20_, 1:107:9_, 1:153:24_, 1:154:19_, 1:154:24_, 1:155:1_, 1:155:4 _, 1:158:8_, 1:166:16_, 1:167:9_, 1:167:12_, 1:172:23_, 1:175:3_, 1:187:3 _, 1:187:14_, 1:195:7_, 1:197:8_, 1:204:23_, 1:205:2 _, 1:205:10_, 1:208:17_, 1:208:25_, 1:209:3_, 1:209:5 _, 1:211:24_, 1:215:7_, 1:215:16_, 1:215:20_, 1:218:5_, 1:221:5_, 1:222:2 _, 1:222:6_, 1:222:14_, 1:222:19_, 1:223:7_, 1:223:13_, 1:224:20

officer [2]_ - 1:38:17_, 1:105:18

officers [1]_ - 1:29:23

offices [7]_ - 1:154:3_, 1:154:5_, 1:154:7_, 1:154:9 _, 1:154:13_, 1:154:20_, 1:154:22

official [1]_ - 1:81:14

officially [1]_ - 1:45:18

offline [1]_ - 1:79:12

often [2]_ - 1:15:14_, 1:79:24

old [10]_ - 1:7:21_, 1:25:17 _, 1:31:16_, 1:32:20_, 1:34:23_, 1:40:21_, 1:40:22 _, 1:44:13_, 1:46:25_, 1:70:10

older [1]_ - 1:131:22

onboard [1]_ - 1:134:7

onboarded [3]_ - 1:120:14_, 1:129:16_, 1:134:7

once [9]_ - 1:50:22_, 1:70:12_, 1:124:20_, 1:156:14_, 1:156:15_, 1:162:5_, 1:163:8_, 1:165:9 _, 1:175:2

One [1]_ - 1:92:9

one [105]_ - 1:3:22_, 1:12:4 _, 1:12:19_, 1:15:15_, 1:16:4 _, 1:23:5_, 1:24:12_, 1:26:20 _, 1:30:8_, 1:31:17_, 1:31:18 _, 1:31:19_, 1:34:22_, 1:35:12_, 1:40:20_, 1:40:22 _, 1:44:14_, 1:44:15_, 1:47:3 _, 1:47:4_, 1:47:5_, 1:47:22_, 1:49:2_, 1:49:4_, 1:49:12_, 1:49:13_, 1:50:22_, 1:51:16 _, 1:51:18_, 1:53:12_, 1:61:12_, 1:64:15_, 1:70:14 _, 1:70:15_, 1:70:21_, 1:76:1 _, 1:76:12_, 1:80:3_, 1:81:24 _, 1:86:19_, 1:90:11_, 1:99:25_, 1:101:17_, 1:101:21_, 1:106:14_, 1:107:6_, 1:108:16_, 1:109:7 _, 1:113:5_, 1:113:8_, 1:124:22_, 1:125:4_, 1:125:5 _, 1:125:12_, 1:128:10_, 1:135:19_, 1:137:11_, 1:138:12_, 1:138:22_, 1:146:23_, 1:150:5_, 1:151:5 _, 1:154:10_, 1:160:11_, 1:164:15_, 1:165:14_, 1:165:15_, 1:167:6_, 1:172:25_, 1:173:3_, 1:174:23_, 1:175:11_, 1:175:16_, 1:175:24_, 1:176:20_, 1:177:3_, 1:178:2 _, 1:179:6_, 1:179:10_, 1:179:14_, 1:190:23_, 1:193:6_, 1:194:16_, 1:195:16_, 1:208:7_, 1:208:13_, 1:210:7_, 1:210:9 _, 1:210:10_, 1:213:3_, 1:214:13_, 1:214:14_, 1:214:15_, 1:214:19_, 1:215:1_, 1:215:6_, 1:216:1 _, 1:217:23_, 1:219:9_,

1:219:10_, 1:221:16_, 1:222:5_, 1:226:6

one-year [1]_ - 1:76:12

ones [5]_ - 1:35:8_, 1:125:3_, 1:178:25_, 1:194:23_, 1:215:11

online [1]_ - 1:79:12

onset [1]_ - 1:4:17

onus [1]_ - 1:92:20

open [3]_ - 1:78:21_, 1:109:22_, 1:110:9

opened [2]_ - 1:22:9_, 1:160:2

opening [16]_ - 1:4:10_, 1:4:25_, 1:5:2_, 1:5:9_, 1:5:15_, 1:5:19_, 1:11:18_, 1:72:17_, 1:80:19_, 1:80:20 _, 1:89:13_, 1:89:23_, 1:91:9 _, 1:98:6_, 1:112:15_, 1:115:10

OPENING [2]_ - 1:98:8_, 1:110:22

operated [3]_ - 1:111:11_, 1:219:6_, 1:219:7

operates [1]_ - 1:4:17

operational [2]_ - 1:111:8 _, 1:111:9

operations [1]_ - 1:165:8

opinion [9]_ - 1:72:3_, 1:83:14_, 1:84:16_, 1:92:10 _, 1:92:12_, 1:93:8_, 1:94:10 _, 1:95:16_, 1:96:6

opinions [1]_ - 1:17:7

opportunity [11]_ - 1:10:19_, 1:16:25_, 1:17:20 _, 1:74:1_, 1:87:16_, 1:95:15 _, 1:103:4_, 1:104:25_, 1:110:17_, 1:114:4_, 1:190:4

oppose [1]_ - 1:87:23

opposed [1]_ - 1:183:12

opposing [2]_ - 1:73:6_, 1:116:1

opposite [2]_ - 1:77:13

Order [1]_ - 1:3:1

order [13]_ - 1:21:5_, 1:57:22_, 1:60:15_, 1:73:15 _, 1:87:1_, 1:115:8_, 1:160:15_, 1:161:12_, 1:161:24_, 1:169:13_, 1:169:17_, 1:169:21_, 1:201:6

ordered [1]_ - 1:89:7

ore [2]_ - 1:6:12

organized [3]_ - 1:124:9_,

1:129:11_, 1:129:12

origin [1]_ - 1:190:9

originally [5]_ - 1:31:5_, 1:40:6_, 1:43:2_, 1:91:12_, 1:121:21

Osborn [8]_ - 1:9:7_, 1:16:17_, 1:21:20_, 1:21:21 _, 1:27:12_, 1:27:13_, 1:54:18_, 1:66:18

otherwise [6]_ - 1:19:12_, 1:76:9_, 1:77:21_, 1:82:21_, 1:161:10_, 1:199:7

ourselves [1]_ - 1:195:23

outcome [1]_ - 1:74:4

outdoors [1]_ - 1:41:19

outline [1]_ - 1:80:21

outside [8]_ - 1:32:25_, 1:61:14_, 1:64:8_, 1:64:10_, 1:65:3_, 1:71:11_, 1:72:5_, 1:79:23

overbill [1]_ - 1:220:12

overbilled [4]_ - 1:218:25 _, 1:220:10_, 1:220:11_, 1:221:20

overbilling [1]_ - 1:220:7

overlapping [1]_ - 1:149:5

overrule [2]_ - 1:49:6_, 1:73:8

overruled [6]_ - 1:139:21 _, 1:140:2_, 1:167:5_, 1:184:20_, 1:186:21_, 1:224:13

overruling [1]_ - 1:49:9

overtime [28]_ - 1:18:12_, 1:18:19_, 1:24:5_, 1:24:12_, 1:27:6_, 1:47:12_, 1:47:14_, 1:48:2_, 1:54:13_, 1:61:23_, 1:65:11_, 1:74:18_, 1:99:6_, 1:99:18_, 1:100:8_, 1:100:10 _, 1:100:13_, 1:101:3_, 1:101:8_, 1:108:16_, 1:109:16_, 1:110:4_, 1:184:5 _, 1:198:7_, 1:198:10_, 1:198:19_, 1:201:2

owe [1]_ - 1:101:1

owed [8]_ - 1:24:6_, 1:99:8 _, 1:99:11_, 1:101:3_, 1:109:15_, 1:110:8_, 1:134:20

owes [1]_ - 1:18:16

own [20]_ - 1:18:25_, 1:40:10_, 1:40:11_, 1:55:3_, 1:59:20_, 1:77:3_, 1:77:4_, 1:80:15_, 1:105:23_, 1:106:23_, 1:131:2_,

1:154:13_, 1:154:15_,
1:154:16_, 1:154:17_,
1:156:10_, 1:166:7_,
1:169:14_, 1:194:17

owner [8]_ - 1:14:19_,
1:153:14_, 1:153:21_,
1:153:23_, 1:153:25_,
1:201:10_, 1:201:11_,
1:215:18

owns [2]_ - 1:101:18_,
1:107:8

---
P
---

p.m [17]_ - 1:114:21_,
1:115:2_, 1:116:22_, 1:151:2
_, 1:151:21_, 1:151:24_,
1:152:9_, 1:179:17_,
1:181:17_, 1:193:5_,
1:193:14_, 1:193:24_,
1:225:17_, 1:226:9

page [7]_ - 1:150:23_,
1:187:15_, 1:188:5_,
1:190:18_, 1:198:7_, 1:204:5
_, 1:207:4

pages [5]_ - 1:106:12_,
1:106:14_, 1:127:2_,
1:127:10_, 1:149:13

Paguaga [3]_ - 1:91:22_,
1:92:9_, 1:94:17

PAGUAGA [1]_ - 1:91:23

Pahokee [1]_ - 1:154:23

Pahokee/Belle [1]_ -
1:154:11

paid [94]_ - 1:12:25_,
1:24:11_, 1:55:13_, 1:61:15
_, 1:61:18_, 1:61:23_,
1:74:14_, 1:74:17_, 1:75:18
_, 1:75:21_, 1:99:6_, 1:100:3
_, 1:100:6_, 1:100:11_,
1:101:22_, 1:102:21_,
1:103:2_, 1:103:3_, 1:103:16
_, 1:103:22_, 1:103:25_,
1:104:1_, 1:104:2_, 1:104:12
_, 1:106:2_, 1:106:11_,
1:106:21_, 1:107:2_,
1:107:15_, 1:107:24_,
1:108:3_, 1:108:14_,
1:112:19_, 1:113:21_,
1:124:19_, 1:124:22_,
1:132:18_, 1:132:19_,
1:133:13_, 1:133:20_,
1:134:1_, 1:134:10_,
1:134:20_, 1:135:2_, 1:135:7
_, 1:138:12_, 1:146:25_,
1:147:4_, 1:150:12_,
1:150:13_, 1:151:5_, 1:151:6
_, 1:157:2_, 1:159:22_,

1:160:15_, 1:164:25_,
1:165:4_, 1:166:15_,
1:166:23_, 1:167:2_,
1:167:19_, 1:168:13_,
1:168:23_, 1:169:18_,
1:169:21_, 1:170:25_,
1:171:5_, 1:171:7_, 1:171:18
_, 1:172:14_, 1:172:19_,
1:172:22_, 1:175:2_, 1:175:4
_, 1:176:13_, 1:179:25_,
1:182:24_, 1:187:15_,
1:187:16_, 1:197:20_,
1:203:6_, 1:203:10_,
1:204:10_, 1:204:15_,
1:205:9_, 1:211:3_, 1:211:18
_, 1:211:19_, 1:221:4_,
1:222:3_, 1:222:11_, 1:223:3

pain [1]_ - 1:99:9

Palm [14]_ - 1:22:14_,
1:23:9_, 1:117:23_, 1:148:9
_, 1:153:24_, 1:154:8_,
1:154:11_, 1:154:15_,
1:154:18_, 1:154:23_,
1:161:5_, 1:187:14_,
1:215:16

pandemic [3]_ - 1:70:25_,
1:104:18_, 1:191:11

panel [2]_ - 1:9:20_, 1:67:8

paperwork [1]_ - 1:128:11

paragraph [1]_ - 1:188:6

paralleled [1]_ - 1:218:21

parent [4]_ - 1:23:24_,
1:139:18_, 1:141:13_,
1:142:3

parents [52]_ - 1:39:8_,
1:109:6_, 1:118:1_, 1:118:3
_, 1:118:4_, 1:118:17_,
1:119:1_, 1:119:2_, 1:119:11
_, 1:119:12_, 1:119:23_,
1:120:4_, 1:120:8_, 1:121:6
_, 1:121:9_, 1:122:4_,
1:122:7_, 1:122:10_,
1:122:12_, 1:124:2_, 1:124:5
_, 1:124:25_, 1:125:11_,
1:127:21_, 1:128:1_, 1:128:4
_, 1:129:7_, 1:129:18_,
1:129:19_, 1:130:15_,
1:131:10_, 1:133:12_,
1:135:12_, 1:136:6_,
1:136:17_, 1:138:10_,
1:140:6_, 1:140:12_,
1:140:17_, 1:142:2_, 1:142:3
_, 1:142:7_, 1:143:4_,
1:144:8_, 1:145:3_, 1:145:9
_, 1:146:9_, 1:147:18_,
1:149:6_, 1:150:14_, 1:225:2

parents' [8]_ - 1:118:14_,
1:120:16_, 1:121:17_,

1:124:16_, 1:133:16_,
1:138:12_, 1:142:13_,
1:147:19

Park [1]_ - 1:22:9

park [3]_ - 1:115:8_,
1:115:9_, 1:115:10

parking [1]_ - 1:3:6

Parkinson's [2]_ -
1:119:18_, 1:120:2

part [29]_ - 1:5:8_, 1:5:9_,
1:17:4_, 1:22:16_, 1:24:13_,
1:73:24_, 1:83:11_, 1:87:7_,
1:88:15_, 1:90:14_, 1:90:15
_, 1:90:18_, 1:91:6_, 1:92:10
_, 1:100:2_, 1:102:9_,
1:106:18_, 1:121:18_,
1:132:13_, 1:137:10_,
1:139:11_, 1:143:15_,
1:149:13_, 1:161:15_,
1:165:7_, 1:174:8_, 1:182:16
_, 1:188:4_, 1:217:7

participating [1]_ - 1:76:8

particular [8]_ - 1:11:15_,
1:17:2_, 1:18:17_, 1:19:23_,
1:165:16_, 1:194:11_,
1:195:13

particularly [1]_ - 1:12:21

parties [7]_ - 1:14:21_,
1:63:14_, 1:75:21_, 1:76:13
_, 1:79:13_, 1:79:22_,
1:139:19

parties' [3]_ - 1:74:12_,
1:81:8_, 1:103:12

partner [1]_ - 1:32:17

parts [1]_ - 1:30:5

party [6]_ - 1:80:21_,
1:81:7_, 1:90:5_, 1:90:9_,
1:115:25_, 1:116:2

pass [13]_ - 1:16:18_,
1:24:21_, 1:27:13_, 1:27:17
_, 1:28:14_, 1:29:9_, 1:30:19
_, 1:39:5_, 1:55:15_, 1:56:2
_, 1:59:3_, 1:61:10_, 1:148:4

passed [2]_ - 1:118:20_,
1:147:25

passing [1]_ - 1:148:13

past [6]_ - 1:11:22_,
1:11:25_, 1:12:8_, 1:48:24_,
1:50:10_, 1:90:1

patient [8]_ - 1:113:22_,
1:126:13_, 1:134:5_,
1:142:19_, 1:168:4_,
1:168:22_, 1:201:16_,
1:205:15

patient's [2]_ - 1:120:25_,
1:175:6

patient-focused [1]_ -
1:168:4

patients [2]_ - 1:106:24_,
1:157:6

Paul [1]_ - 1:55:21

Pause [1]_ - 1:96:16

pay [97]_ - 1:18:12_,
1:18:19_, 1:21:8_, 1:27:7_,
1:41:5_, 1:47:12_, 1:54:24_,
1:74:22_, 1:75:1_, 1:75:2_,
1:75:9_, 1:75:10_, 1:99:4_,
1:100:5_, 1:100:13_, 1:101:4
_, 1:102:3_, 1:102:6_,
1:104:10_, 1:105:10_,
1:105:16_, 1:107:17_,
1:107:23_, 1:108:5_, 1:108:7
_, 1:108:15_, 1:114:7_,
1:114:10_, 1:126:12_,
1:134:13_, 1:135:3_,
1:147:10_, 1:162:24_,
1:163:1_, 1:163:15_, 1:165:1
_, 1:165:5_, 1:166:7_,
1:166:13_, 1:170:19_,
1:173:1_, 1:173:13_,
1:177:10_, 1:177:11_,
1:177:12_, 1:178:1_,
1:178:16_, 1:178:19_,
1:179:24_, 1:181:2_, 1:192:6
_, 1:192:12_, 1:192:13_,
1:192:14_, 1:192:15_,
1:192:19_, 1:192:21_,
1:197:5_, 1:197:10_,
1:197:14_, 1:198:3_, 1:198:6
_, 1:198:9_, 1:198:10_,
1:198:11_, 1:198:14_,
1:198:18_, 1:198:22_,
1:199:1_, 1:199:2_, 1:199:16
_, 1:199:23_, 1:199:24_,
1:200:4_, 1:200:14_, 1:203:1
_, 1:203:2_, 1:203:5_,
1:203:7_, 1:203:8_, 1:204:6
_, 1:209:4_, 1:211:2_,
1:211:7_, 1:211:8_, 1:221:2
_, 1:221:23_, 1:222:12_,
1:223:23

paycheck [3]_ - 1:113:20
_, 1:114:7_, 1:132:23

paying [14]_ - 1:20:21_,
1:41:5_, 1:74:16_, 1:76:20_,
1:100:14_, 1:108:20_,
1:172:13_, 1:179:23_,
1:197:1_, 1:199:14_, 1:200:7
_, 1:201:1_, 1:201:2_,
1:201:3

payment [7]_ - 1:103:22_,
1:128:17_, 1:134:9_, 1:135:8
_, 1:191:15_, 1:191:19_,
1:202:21

payments [2]_ - 1:105:14 _, 1:105:15

payroll [15]_ - 1:173:3_, 1:173:6_, 1:173:7_, 1:173:11 _, 1:174:8_, 1:174:18_, 1:175:1_, 1:177:1_, 1:178:16 _, 1:192:17_, 1:192:22_, 1:197:1_, 1:203:12_, 1:204:10

pays [4]_ - 1:162:24_, 1:192:10_, 1:192:22_, 1:192:23

PDO [1]_ - 1:170:6

peace [1]_ - 1:51:3

Pembroke [1]_ - 1:30:6

pencils [1]_ - 1:81:22

pending [1]_ - 1:11:11

pens [1]_ - 1:81:22

people [40]_ - 1:9:13_, 1:9:18_, 1:15:10_, 1:53:4_, 1:53:16_, 1:59:22_, 1:60:2_, 1:60:3_, 1:69:25_, 1:70:2_, 1:71:8_, 1:72:5_, 1:78:13_, 1:99:23_, 1:106:20_, 1:107:6 _, 1:118:23_, 1:119:14_, 1:119:17_, 1:120:13_, 1:124:20_, 1:131:17_, 1:138:23_, 1:142:24_, 1:144:7_, 1:155:3_, 1:155:21 _, 1:156:24_, 1:157:23_, 1:158:20_, 1:160:25_, 1:175:21_, 1:192:14_, 1:192:19_, 1:192:23_, 1:197:5_, 1:197:8_, 1:199:1 _, 1:199:22_, 1:199:23

per [7]_ - 1:74:24_, 1:101:22_, 1:118:6_, 1:171:7 _, 1:172:1_, 1:178:15_, 1:181:16

percent [7]_ - 1:142:11_, 1:159:18_, 1:166:9_, 1:180:5 _, 1:204:21_, 1:217:13_, 1:220:18

percentage [1]_ - 1:96:9

peremptory [6]_ - 1:17:22 _, 1:17:25_, 1:65:19_, 1:66:5 _, 1:66:14_, 1:66:19

Perez [5]_ - 1:9:10_, 1:29:10_, 1:42:21_, 1:57:24 _, 1:65:21

Perez-Martinez [4]_ - 1:9:10_, 1:29:10_, 1:57:24_, 1:65:21

perform [1]_ - 1:76:8

performed [1]_ - 1:108:13

performing [1]_ - 1:19:12

perhaps [1]_ - 1:142:20

period [10]_ - 1:10:20_, 1:76:6_, 1:168:2_, 1:176:2_, 1:177:2_, 1:177:10_, 1:177:11_, 1:178:2_, 1:190:23_, 1:214:6

permit [1]_ - 1:73:7

permitted [1]_ - 1:87:25

person [18]_ - 1:9:15_, 1:14:12_, 1:15:20_, 1:55:12 _, 1:108:10_, 1:116:13_, 1:119:9_, 1:125:19_, 1:131:16_, 1:138:22_, 1:146:7_, 1:160:19_, 1:180:11_, 1:180:14_, 1:190:1_, 1:199:20_, 1:205:4 _, 1:221:16

personal [6]_ - 1:13:23_, 1:17:7_, 1:17:15_, 1:18:25_, 1:58:6_, 1:59:14

personally [3]_ - 1:30:13_, 1:54:25_, 1:72:7

personnel [1]_ - 1:13:9_, 1:14:22

persons [2]_ - 1:17:11_, 1:120:2

perspective [1]_ - 1:203:15

persuasive [1]_ - 1:96:6

pertain [1]_ - 1:19:22

Peters [7]_ - 1:9:10_, 1:27:18_, 1:56:2_, 1:67:10_, 1:68:9_, 1:68:21_, 1:97:22

phantom [1]_ - 1:202:3

phenomenal [1]_ - 1:53:12

phone [6]_ - 1:79:1_, 1:87:10_, 1:113:10_, 1:125:13_, 1:136:1_, 1:136:4

phones [3]_ - 1:71:4_, 1:71:7_, 1:71:14

phonetic [4]_ - 1:29:21_, 1:55:7_, 1:119:8_, 1:214:18

photograph [1]_ - 1:72:3

photography [1]_ - 1:37:4

phrases [1]_ - 1:79:24

physical [1]_ - 1:19:11

pick [5]_ - 1:12:19_, 1:15:7 _, 1:15:8_, 1:62:12

picked [2]_ - 1:50:24_, 1:64:4

picking [3]_ - 1:15:14_, 1:16:12_, 1:16:13

picture [1]_ - 1:179:7

piece [1]_ - 1:72:13

pill [2]_ - 1:122:18_, 1:122:19

pillbox [1]_ - 1:122:16

pills [1]_ - 1:143:12

Pine [1]_ - 1:55:22

Pines [1]_ - 1:30:6

pink [3]_ - 1:219:8_, 1:220:11_, 1:220:12

pinnacle [1]_ - 1:91:23

Pinnacle [1]_ - 1:92:9

pitch [1]_ - 1:134:16

pitched [1]_ - 1:134:17

place [8]_ - 1:49:8_, 1:50:6 _, 1:53:11_, 1:87:4_, 1:94:3_, 1:115:11_, 1:135:25_, 1:143:24

Place [1]_ - 1:159:25

places [2]_ - 1:35:19_, 1:79:15

placing [1]_ - 1:60:15

plaintiff [28]_ - 1:3:5_, 1:7:12_, 1:14:4_, 1:18:11_, 1:19:17_, 1:42:9_, 1:50:1_, 1:52:4_, 1:65:18_, 1:66:20_, 1:67:14_, 1:74:12_, 1:74:17 _, 1:74:21_, 1:74:25_, 1:75:8 _, 1:75:15_, 1:75:18_, 1:75:21_, 1:75:24_, 1:76:1_, 1:76:3_, 1:76:5_, 1:76:11_, 1:83:2_, 1:117:1_, 1:152:4_, 1:152:14

Plaintiff [2]_ - 1:126:23_, 1:174:14

Plaintiff's [7]_ - 1:18:18_, 1:173:21_, 1:174:11_, 1:174:13_, 1:204:4_, 1:205:11_, 1:225:25

plaintiff's [6]_ - 1:5:24_, 1:6:1_, 1:16:3_, 1:76:3_, 1:116:5_, 1:126:16

plaintiffs [1]_ - 1:226:6

plan [29]_ - 1:102:16_, 1:103:20_, 1:105:7_, 1:112:23_, 1:140:23_, 1:140:24_, 1:141:13_, 1:142:1_, 1:142:5_, 1:142:7 _, 1:142:10_, 1:142:19_, 1:143:1_, 1:143:3_, 1:143:23 _, 1:162:6_, 1:162:13_, 1:163:10_, 1:164:4_, 1:164:14_, 1:164:22_, 1:165:10_, 1:194:7_, 1:194:14_, 1:194:21_, 1:195:1_, 1:195:14_,

1:199:21

planning [2]_ - 1:87:6_, 1:91:12

plans [4]_ - 1:104:9_, 1:164:21_, 1:194:8_, 1:194:9

Plantation [1]_ - 1:28:17

play [4]_ - 1:7:24_, 1:27:10 _, 1:28:12_, 1:72:20

plow [1]_ - 1:115:17

plug [1]_ - 1:100:24

pocket [7]_ - 1:162:24_, 1:162:25_, 1:163:1_, 1:163:15_, 1:163:16_, 1:198:20_, 1:199:9

pocketing [1]_ - 1:200:8

podium [1]_ - 1:62:6

point [13]_ - 1:16:11_, 1:85:14_, 1:86:6_, 1:86:7_, 1:86:15_, 1:90:12_, 1:120:7 _, 1:121:22_, 1:128:23_, 1:200:23_, 1:200:24_, 1:201:1_, 1:223:20

pointed [1]_ - 1:113:11

points [2]_ - 1:62:10

police [1]_ - 1:47:16

policies [1]_ - 1:47:23

policy [8]_ - 1:29:23_, 1:57:10_, 1:57:16_, 1:57:22 _, 1:126:4_, 1:126:9_, 1:164:2_, 1:165:1

POLLOCK [174]_ - 1:3:4_, 1:3:12_, 1:3:15_, 1:3:25_, 1:4:8_, 1:6:3_, 1:6:6_, 1:6:8_, 1:6:25_, 1:7:17_, 1:8:1_, 1:8:4_, 1:8:7_, 1:8:14_, 1:8:20 _, 1:8:22_, 1:9:2_, 1:9:4_, 1:14:6_, 1:15:25_, 1:52:6_, 1:52:9_, 1:54:22_, 1:55:2_, 1:55:10_, 1:55:14_, 1:55:20 _, 1:55:24_, 1:56:1_, 1:56:5_, 1:56:8_, 1:56:12_, 1:56:19_, 1:56:22_, 1:56:24_, 1:57:2_, 1:57:4_, 1:57:7_, 1:57:12_, 1:57:15_, 1:57:20_, 1:57:23 _, 1:58:1_, 1:58:3_, 1:58:9_, 1:58:12_, 1:58:23_, 1:59:2_, 1:59:9_, 1:59:11_, 1:59:19_, 1:59:25_, 1:60:4_, 1:60:7_, 1:60:9_, 1:60:11_, 1:60:17_, 1:60:23_, 1:61:1_, 1:61:5_, 1:61:9_, 1:61:13_, 1:61:18_, 1:61:22_, 1:61:25_, 1:62:2_, 1:64:15_, 1:64:20_, 1:64:22 _, 1:65:1_, 1:65:6_, 1:65:13_, 1:65:18_, 1:65:21_, 1:66:8_, 1:66:10_, 1:66:17_, 1:67:15

_, 1:75:5_, 1:82:16_, 1:82:19
_, 1:83:3_, 1:83:7_, 1:83:15_,
1:84:5_, 1:84:21_, 1:85:6_,
1:85:13_, 1:85:16_, 1:86:16
_, 1:87:23_, 1:88:15_, 1:89:1
_, 1:89:4_, 1:91:17_, 1:91:21
_, 1:92:2_, 1:92:5_, 1:92:12_,
1:92:19_, 1:93:13_, 1:93:17
_, 1:94:16_, 1:94:22_, 1:95:7
_, 1:95:18_, 1:96:10_,
1:96:13_, 1:96:15_, 1:96:17
_, 1:96:23_, 1:97:6_, 1:98:9_,
1:100:25_, 1:112:6_,
1:112:10_, 1:115:7_,
1:115:15_, 1:116:20_,
1:117:2_, 1:117:20_,
1:125:20_, 1:125:25_,
1:126:24_, 1:127:1_, 1:127:5
_, 1:127:6_, 1:135:1_,
1:135:6_, 1:135:18_,
1:136:20_, 1:139:20_,
1:139:22_, 1:139:24_,
1:149:2_, 1:151:9_, 1:152:4
_, 1:152:14_, 1:153:7_,
1:167:8_, 1:170:21_,
1:170:23_, 1:173:17,
1:173:20_, 1:174:10_,
1:174:15_, 1:174:17_,
1:180:24, 1:184:8_, 1:184:21
_, 1:184:22_, 1:186:10_,
1:186:13_, 1:186:22_,
1:193:8_, 1:193:12_,
1:193:21_, 1:194:4_, 1:194:5
_, 1:209:16_, 1:209:23_,
1:209:24_, 1:217:3_, 1:217:6
_, 1:217:8_, 1:218:14_,
1:221:18, 1:224:5_, 1:224:14
_, 1:225:9_, 1:225:21_,
1:225:24_, 1:226:2_, 1:226:5

Pollock [32]_ - 1:3:4_,
1:3:23_, 1:5:1_, 1:5:13_,
1:6:7_, 1:6:16_, 1:7:15_,
1:14:5_, 1:14:7_, 1:15:23_,
1:52:5_, 1:52:10_, 1:61:11_,
1:65:5_, 1:65:12_, 1:65:20_,
1:66:7_, 1:66:16_, 1:87:22_,
1:88:11_, 1:92:11_, 1:98:7_,
1:98:21_, 1:111:4_, 1:111:23
_, 1:139:23_, 1:152:13_,
1:153:8_, 1:192:25_, 1:194:3
_, 1:216:25

Pollock's [1]_ - 1:91:5

Pompano [1]_ - 1:33:14

Pope [1]_ - 1:55:21

Port [2]_ - 1:154:11_,
1:154:23

portable [2]_ - 1:52:8_,
1:87:9

position [8]_ - 1:4:14_,

1:4:20_, 1:5:4_, 1:5:8_,
1:83:22_, 1:101:25_,
1:113:12_, 1:188:13

positions [1]_ - 1:74:12

possible [3]_ - 1:15:1_,
1:15:23_, 1:119:21

possibly [2]_ - 1:3:17_,
1:7:21

post [2]_ - 1:47:19_,
1:76:13

post-termination [1]_ -
1:76:13

postal [5]_ - 1:46:15_,
1:47:11_, 1:47:13_, 1:47:16
_, 1:65:10

posting [1]_ - 1:79:8

potential [2]_ - 1:96:19_,
1:159:23

potentially [1]_ - 1:119:21

practical [2]_ - 1:155:7_,
1:155:11

practice [5]_ - 1:23:11_,
1:29:19_, 1:29:20_, 1:58:3_,
1:174:4

practicing [1]_ - 1:58:7

precautions [1]_ - 1:71:2

precedence [1]_ - 1:95:8

predicate [2]_ - 1:139:20
_, 1:139:24

predominantly [2]_ -
1:154:10_, 1:168:25

preferred [1]_ - 1:176:7

prejudice [2]_ - 1:19:16_,
1:74:4

preliminary [3]_ - 1:69:11
_, 1:70:12_, 1:71:18

premature [2]_ - 1:78:21
_, 1:78:22

premiums [4]_ - 1:198:11
_, 1:198:19_, 1:199:14_,
1:201:3

prepaid [1]_ - 1:20:6

preparation [3]_ -
1:155:20_, 1:155:25_,
1:195:25

prepare [3]_ - 1:122:24_,
1:138:21_, 1:138:22

prepared [3]_ - 1:116:5_,
1:116:6_, 1:186:15

prepares [1]_ - 1:140:24

preparing [2]_ - 1:125:16
_, 1:138:21

preponderance [5]_ -

1:49:23_, 1:77:7_, 1:77:20_,
1:78:1_, 1:78:4

prescribes [1]_ - 1:141:13

presence [15]_ - 1:63:13_,
1:64:2_, 1:64:8_, 1:64:10_,
1:65:3_, 1:67:25_, 1:82:2_,
1:98:1_, 1:114:17_, 1:116:25
_, 1:151:18_, 1:152:12_,
1:193:3_, 1:194:2_, 1:225:14

present [11]_ - 1:80:23_,
1:81:4_, 1:81:9_, 1:82:9_,
1:87:14_, 1:89:25_, 1:92:8_,
1:115:4_, 1:147:12_, 1:152:1
_, 1:193:16

presentation [2]_ -
1:72:19_, 1:99:14

presented [9]_ - 1:17:12_,
1:19:22_, 1:71:25_, 1:79:21
_, 1:81:7_, 1:111:3_,
1:111:23_, 1:111:25_,
1:113:15

presents [1]_ - 1:73:6

preserve [1]_ - 1:5:5

preserved [1]_ - 1:5:24

preside [1]_ - 1:22:6

pressure [1]_ - 1:57:2

presumptive [1]_ -
1:92:25

pretty [4]_ - 1:24:3_,
1:24:19_, 1:159:11_,
1:194:15

prevent [4]_ - 1:19:8_,
1:20:21_, 1:58:25_, 1:95:15

Price [1]_ - 1:92:9

pricing [5]_ - 1:60:21_,
1:105:9_, 1:194:10

primary [2]_ - 1:142:18_,
1:192:1

principal [4]_ - 1:22:4_,
1:24:9_, 1:54:18_, 1:75:12

principals [1]_ - 1:22:5

principles [1]_ - 1:71:17

printed [3]_ - 1:92:12_,
1:225:21_, 1:225:23

Priolo [4]_ - 1:46:7_,
1:54:15_, 1:65:9_, 1:65:15

priority [1]_ - 1:123:21

private [18]_ - 1:40:10_,
1:55:19_, 1:105:10_,
1:162:22_, 1:162:23_,
1:163:1_, 1:163:11_,
1:163:14_, 1:163:20_,
1:165:1_, 1:166:7_, 1:166:13
_, 1:166:23_, 1:167:2_,
1:168:7_, 1:171:19_,

1:171:24

privately [4]_ - 1:40:10_,
1:166:17_, 1:167:17_,
1:167:19

probation [1]_ - 1:38:17

problem [11]_ - 1:7:13_,
1:64:16_, 1:90:24_, 1:93:7_,
1:93:9_, 1:130:16_, 1:177:22
_, 1:179:19_, 1:191:18_,
1:208:8_, 1:209:4

problems [2]_ - 1:13:23_,
1:54:24

procedure [2]_ - 1:49:4_,
1:126:4

proceed [3]_ - 1:96:19_,
1:98:5_, 1:98:7

proceeding [1]_ - 1:97:5

proceedings [2]_ -
1:96:16_, 1:226:9

process [16]_ - 1:17:19_,
1:17:21_, 1:24:1_, 1:50:19_,
1:52:13_, 1:65:10_, 1:109:23
_, 1:161:16_, 1:174:25_,
1:176:3_, 1:183:2_, 1:188:4
_, 1:194:12_, 1:203:12_,
1:206:10_, 1:219:24

processed [1]_ - 1:206:8

processing [1]_ - 1:57:17

produced [3]_ - 1:77:23_,
1:210:2_, 1:218:11

profession [1]_ - 1:56:15

professional [5]_ -
1:101:12_, 1:126:8_, 1:126:9
_, 1:126:10_, 1:156:1

professionals [1]_ -
1:167:12

profit [6]_ - 1:200:9_,
1:200:10_, 1:200:11_,
1:201:3_, 1:201:5_, 1:201:8

profits [1]_ - 1:199:15

program [7]_ - 1:118:4_,
1:118:8_, 1:136:16_,
1:160:20_, 1:160:23_,
1:164:16_, 1:170:7

progressed [1]_ -
1:144:12

prohibited [1]_ - 1:191:4

project [1]_ - 1:60:21

projects [3]_ - 1:32:15_,
1:59:19_, 1:60:7

promised [1]_ - 1:80:3

promissory [1]_ - 1:147:6

promoted [1]_ - 1:193:10

proper [1]_ - 1:93:14

properly [7]– - 1:74:15–, 1:75:14–, 1:75:18–, 1:99:4–, 1:132:1–, 1:135:20–, 1:205:9

properties [2]– - 1:59:20–, 1:60:14

propose [1]– - 1:96:24

proposed [2]– - 1:4:3–, 1:6:15

propounded [1]– - 1:9:24

prosecutor [1]– - 1:47:3

prospective [4]– - 1:17:21–, 1:63:17–, 1:67:21–, 1:68:14

PROSPECTIVE [274]– - 1:21:2, 1:21:23–, 1:22:1–, 1:22:3–, 1:22:7–, 1:22:18–, 1:22:20–, 1:23:1–, 1:23:5–, 1:23:12–, 1:23:18–, 1:23:21–, 1:24:8–, 1:24:16–, 1:24:18–, 1:24:24–, 1:25:2–, 1:25:5–, 1:25:7–, 1:25:9–, 1:25:11–, 1:25:13–, 1:25:16–, 1:25:18–, 1:25:20–, 1:26:5–, 1:26:7–, 1:26:9–, 1:26:12–, 1:26:15–, 1:26:20–, 1:27:4–, 1:27:8–, 1:27:10–, 1:27:16–, 1:27:20–, 1:27:22–, 1:27:24–, 1:28:2–, 1:28:4–, 1:28:6–, 1:28:8–, 1:28:10–, 1:28:12–, 1:28:17–, 1:28:20–, 1:28:22–, 1:28:25–, 1:29:2–, 1:29:4–, 1:29:6–, 1:29:8–, 1:29:12–, 1:29:15–, 1:29:18–, 1:29:20–, 1:30:1–, 1:30:3–, 1:30:5–, 1:30:8–, 1:30:10–, 1:30:12–, 1:30:14–, 1:30:16–, 1:30:18–, 1:30:22–, 1:30:24–, 1:31:1–, 1:31:4–, 1:31:6–, 1:31:8–, 1:31:10–, 1:31:12–, 1:31:15–, 1:31:17–, 1:31:21–, 1:31:24–, 1:32:2–, 1:32:4–, 1:32:6–, 1:32:10–, 1:32:13–, 1:32:15–, 1:32:17–, 1:32:19–, 1:32:21–, 1:32:23–, 1:33:1–, 1:33:3–, 1:33:5–, 1:33:7–, 1:33:9–, 1:33:14–, 1:33:17–, 1:33:19–, 1:33:22–, 1:33:24–, 1:34:1–, 1:34:3–, 1:34:5–, 1:34:9–, 1:34:12–, 1:34:14–, 1:34:17–, 1:34:20–, 1:34:22–, 1:34:24–, 1:35:1–, 1:35:3–, 1:35:5–, 1:35:7–, 1:35:9–, 1:35:11–, 1:35:13–, 1:35:15–, 1:35:17–, 1:35:19–, 1:35:24–, 1:36:4–, 1:36:7–, 1:36:9–, 1:36:11–, 1:36:13–, 1:36:16–, 1:36:18–, 1:36:20–, 1:36:22–, 1:37:2–, 1:37:4–, 1:37:8–, 1:37:11–, 1:37:14–,

1:37:16–, 1:37:18–, 1:37:21–, 1:37:23–, 1:37:25–, 1:38:2–, 1:38:4–, 1:38:6–, 1:38:8–, 1:38:11–, 1:38:14–, 1:38:16–, 1:38:19–, 1:38:21–, 1:38:25–, 1:39:2–, 1:39:4–, 1:39:8–, 1:39:12–, 1:39:14–, 1:39:16–, 1:39:18–, 1:39:20–, 1:39:22–, 1:39:24–, 1:40:3–, 1:40:5–, 1:40:7–, 1:40:9–, 1:40:13–, 1:40:15–, 1:40:18–, 1:40:20–, 1:40:22–, 1:40:24–, 1:41:1–, 1:41:3–, 1:41:9–, 1:41:14–, 1:41:16–, 1:41:18–, 1:41:23–, 1:41:25–, 1:42:2–, 1:42:4–, 1:42:6–, 1:42:8–, 1:42:11–, 1:42:14–, 1:42:17–, 1:42:19–, 1:42:23–, 1:43:1–, 1:43:3–, 1:43:5–, 1:43:7–, 1:43:9–, 1:43:11–, 1:43:16–, 1:43:18–, 1:43:20–, 1:43:22–, 1:44:1–, 1:44:3–, 1:44:5–, 1:44:8–, 1:44:10–, 1:44:12–, 1:44:14–, 1:44:17–, 1:44:19–, 1:44:21–, 1:45:1–, 1:45:4–, 1:45:9–, 1:45:12–, 1:45:14–, 1:45:17–, 1:45:21–, 1:45:23–, 1:45:25–, 1:46:2–, 1:46:4–, 1:46:9–, 1:46:12–, 1:46:14–, 1:46:19–, 1:46:21–, 1:46:24–, 1:47:1–, 1:47:3–, 1:47:7–, 1:47:9–, 1:47:11–, 1:48:1–, 1:48:6–, 1:48:10–, 1:48:19–, 1:48:21–, 1:54:21–, 1:55:1–, 1:55:5–, 1:55:11–, 1:55:19–, 1:55:21–, 1:55:25–, 1:56:4–, 1:56:7–, 1:56:11–, 1:56:17–, 1:56:21–, 1:56:23–, 1:57:1–, 1:57:3–, 1:57:6–, 1:57:9–, 1:57:13–, 1:57:19–, 1:57:21–, 1:57:25–, 1:58:2–, 1:58:4–, 1:58:11–, 1:58:16–, 1:59:1–, 1:59:7–, 1:59:10–, 1:59:14–, 1:59:24–, 1:60:3–, 1:60:6–, 1:60:8–, 1:60:10–, 1:60:13–, 1:60:19–, 1:60:25–, 1:61:3–, 1:61:7–, 1:61:17–, 1:61:21–, 1:61:24–, 1:69:8

protected [2]– - 1:77:2–, 1:190:10

protections [4]– - 1:189:7–, 1:189:13–, 1:190:12–, 1:190:14

prove [5]– - 1:77:8–, 1:78:6–, 1:80:22–, 1:108:12–, 1:110:12

proved [3]– - 1:77:19–, 1:78:1–, 1:78:11

proven [2]– - 1:49:23–,

1:78:10

proves [1]– - 1:72:10

provide [40]– - 1:71:23–, 1:72:4–, 1:75:16–, 1:75:22–, 1:79:6–, 1:85:9–, 1:101:10–, 1:101:13–, 1:102:16–, 1:109:6–, 1:118:12–, 1:122:19–, 1:123:6–, 1:129:7–, 1:129:9–, 1:130:2–, 1:130:3–, 1:130:7–, 1:130:25–, 1:133:19–, 1:134:4–, 1:134:17–, 1:137:4–, 1:137:22–, 1:140:24–, 1:141:3–, 1:141:4–, 1:142:22–, 1:144:7–, 1:145:9–, 1:147:21–, 1:156:13–, 1:156:24–, 1:160:23–, 1:161:4–, 1:165:14–, 1:172:1–, 1:195:22–, 1:201:6

provided [28]– - 1:81:14–, 1:81:17–, 1:103:17–, 1:105:5–, 1:105:6–, 1:118:18–, 1:118:22–, 1:119:1–, 1:119:2–, 1:119:7–, 1:119:9–, 1:119:11–, 1:120:5–, 1:132:19–, 1:133:13–, 1:137:13–, 1:138:6–, 1:138:9–, 1:140:14–, 1:140:17–, 1:142:14–, 1:144:2–, 1:146:8–, 1:155:7–, 1:155:14–, 1:155:18–, 1:215:8

provider [4]– - 1:164:5–, 1:169:19

providers [1]– - 1:164:8

provides [7]– - 1:93:21–, 1:118:6–, 1:118:11–, 1:146:13–, 1:146:14–, 1:153:18–, 1:194:16

providing [7]– - 1:130:5–, 1:130:22–, 1:133:14–, 1:137:14–, 1:139:2–, 1:146:15–, 1:148:17

province [1]– - 1:83:18

proving [3]– - 1:77:6–, 1:78:4–, 1:94:24

provisions [1]– - 1:189:1

prying [1]– - 1:17:14

Psychiatric [1]– - 1:93:3

PTO [1]– - 1:36:24

public [2]– - 1:22:3–, 1:98:19

Public [1]– - 1:22:8

publish [2]– - 1:139:21–, 1:174:15

pull [1]– - 1:141:17

pulled [1]– - 1:47:15

purchase [1]– - 1:103:7

purifiers [1]– - 1:70:18

purpose [9]– - 1:17:5–, 1:17:14–, 1:17:15–, 1:52:16–, 1:52:17–, 1:73:18–, 1:73:20–, 1:73:21–, 1:76:7

purposes [2]– - 1:5:24–, 1:88:18

put [24]– - 1:7:1–, 1:56:16–, 1:61:8–, 1:77:11–, 1:83:3–, 1:83:4–, 1:83:15–, 1:84:1–, 1:92:24–, 1:107:22–, 1:143:24–, 1:144:1–, 1:151:4–, 1:156:14–, 1:156:16–, 1:156:18–, 1:157:6–, 1:171:11–, 1:172:2–, 1:176:21–, 1:176:23–, 1:177:15–, 1:209:10–, 1:213:12

puts [6]– - 1:65:22–, 1:66:11–, 1:66:20–, 1:66:24–, 1:67:4–, 1:92:20

putting [3]– - 1:127:20–, 1:135:25–, 1:175:15

---

Q

qualifications [2]– - 1:9:25–, 1:10:22

qualified [2]– - 1:11:14–, 1:80:4

questioned [1]– - 1:18:7

questioning [4]– - 1:17:1–, 1:17:14–, 1:17:17–, 1:184:16

questions [23]– - 1:4:4–, 1:9:24–, 1:10:21–, 1:13:17–, 1:16:16–, 1:16:20–, 1:16:25–, 1:48:13–, 1:48:14–, 1:52:18–, 1:54:24–, 1:63:4–, 1:72:22–, 1:72:24–, 1:80:24–, 1:81:1–, 1:89:5–, 1:89:6–, 1:101:17–, 1:120:20–, 1:136:21–, 1:148:21

quick [5]– - 1:62:10–, 1:149:3–, 1:178:9–, 1:181:13–, 1:196:25

quit [1]– - 1:121:16

quote [1]– - 1:177:17

---

R

R-O-W-L-A-N-D [1]– - 1:117:14

race [1]– - 1:190:8

rain [1]– - 1:72:7

rained [1] - 1:72:7

raise [28] - 1:9:21, 1:10:18, 1:10:24, 1:11:2, 1:11:5, 1:11:9, 1:11:12, 1:14:22, 1:15:12, 1:15:20, 1:16:9, 1:19:2, 1:19:5, 1:19:9, 1:19:13, 1:19:18, 1:19:24, 1:20:3, 1:20:22, 1:21:16, 1:50:15, 1:50:23, 1:51:7, 1:52:2, 1:53:7, 1:69:1, 1:117:5, 1:152:16

raised [1] - 1:85:6

Ramirez [14] - 1:7:18, 1:16:2, 1:111:5, 1:111:14, 1:145:23, 1:158:7, 1:167:23, 1:178:5, 1:197:5, 1:204:22, 1:209:6, 1:215:10, 1:215:16, 1:222:15

Ramirez's [1] - 1:222:19

Randy [5] - 1:3:9, 1:14:14, 1:14:18, 1:62:9, 1:110:24

range [1] - 1:153:19

rather [1] - 1:88:11

reach [4] - 1:35:10, 1:73:22, 1:120:22, 1:122:1

read [29] - 1:14:25, 1:15:23, 1:19:4, 1:24:19, 1:24:22, 1:49:15, 1:49:16, 1:50:21, 1:61:1, 1:75:7, 1:79:14, 1:87:13, 1:87:20, 1:88:7, 1:88:9, 1:88:12, 1:90:2, 1:92:1, 1:92:15, 1:116:4, 1:116:10, 1:182:8, 1:182:14, 1:184:25, 1:185:4, 1:185:8, 1:185:9, 1:214:10

reading [2] - 1:35:19, 1:37:4

ready [7] - 1:3:11, 1:52:4, 1:97:2, 1:98:4, 1:98:6, 1:116:19, 1:225:25

real [8] - 1:20:5, 1:23:13, 1:31:8, 1:59:5, 1:59:7, 1:59:9, 1:59:11, 1:61:15

realities [3] - 1:109:23, 1:111:8, 1:113:16

reality [1] - 1:222:1

realize [1] - 1:161:17

realized [4] - 1:115:10, 1:167:16, 1:167:17, 1:175:2

really [30] - 1:26:10, 1:26:12, 1:100:20, 1:103:8, 1:104:23, 1:104:24,

1:105:1, 1:105:23, 1:106:5, 1:123:12, 1:124:3, 1:124:15, 1:125:18, 1:132:10, 1:163:11, 1:164:15, 1:165:13, 1:165:17, 1:168:18, 1:171:3, 1:171:4, 1:176:23, 1:178:4, 1:181:2, 1:194:22, 1:196:23, 1:223:12

Realtor [1] - 1:33:19

rearrange [1] - 1:68:16

reason [21] - 1:16:21, 1:17:24, 1:18:4, 1:18:5, 1:18:6, 1:20:1, 1:64:17, 1:71:13, 1:83:9, 1:83:15, 1:94:11, 1:94:12, 1:99:24, 1:109:7, 1:113:23, 1:130:23, 1:131:25, 1:161:18, 1:175:11, 1:177:23, 1:215:19

reasonable [8] - 1:82:22, 1:84:6, 1:84:9, 1:85:18, 1:86:2, 1:92:23, 1:93:20, 1:94:5

reasonableness [1] - 1:74:6

reasons [1] - 1:17:15

recalling [1] - 1:7:3

receive [8] - 1:48:2, 1:48:3, 1:73:5, 1:73:9, 1:73:11, 1:74:23, 1:77:2

received [8] - 1:126:22, 1:126:23, 1:138:14, 1:138:15, 1:168:1, 1:174:13, 1:174:14, 1:206:7

receiving [2] - 1:148:15, 1:162:3

recent [1] - 1:94:17

recently [2] - 1:22:3, 1:41:4

receptionist [1] - 1:105:18

recess [25] - 1:12:5, 1:63:6, 1:64:11, 1:64:13, 1:69:12, 1:81:20, 1:82:6, 1:82:7, 1:89:23, 1:89:24, 1:91:25, 1:92:4, 1:92:6, 1:114:16, 1:114:23, 1:115:2, 1:151:17, 1:151:23, 1:151:24, 1:193:2, 1:193:13, 1:193:14, 1:225:12, 1:225:19

recognize [2] - 1:15:18, 1:173:24

recollection [1] - 1:85:17

recommend [1] - 1:158:3

reconcile [2] - 1:114:6, 1:146:18

record [19] - 1:3:3, 1:65:2, 1:82:9, 1:84:2, 1:87:13, 1:87:20, 1:88:9, 1:88:12, 1:89:25, 1:92:8, 1:115:3, 1:117:11, 1:138:2, 1:149:4, 1:152:1, 1:152:23, 1:179:3, 1:193:16, 1:219:19

records [25] - 1:99:24, 1:126:11, 1:126:12, 1:127:9, 1:127:15, 1:135:24, 1:149:14, 1:161:13, 1:177:15, 1:177:17, 1:178:19, 1:178:23, 1:178:25, 1:204:25, 1:205:16, 1:208:6, 1:212:7, 1:212:8, 1:212:13, 1:213:25, 1:216:17, 1:217:1, 1:217:5, 1:217:9, 1:218:24

recruitment [1] - 1:47:4

redirect [2] - 1:87:16, 1:148:23

REDIRECT [1] - 1:149:1

redo [1] - 1:8:14

reduced [1] - 1:179:22

refer [7] - 1:49:17, 1:113:22, 1:158:5, 1:158:18, 1:158:19, 1:164:9, 1:164:12

referee [2] - 1:49:3, 1:98:15

reference [5] - 1:4:16, 1:19:7, 1:89:14, 1:89:20, 1:113:20

referenced [1] - 1:112:24

referral [2] - 1:160:5, 1:162:10

referred [3] - 1:14:9, 1:175:21, 1:197:22

referring [2] - 1:130:1, 1:177:17

reflect [3] - 1:132:23, 1:208:10, 1:211:3

reflected [1] - 1:210:1

refute [1] - 1:111:3

refuted [1] - 1:111:24

regard [1] - 1:190:8

regarding [2] - 1:24:5,

1:41:4

regardless [4] - 1:77:22, 1:77:23, 1:81:7, 1:140:18

regards [3] - 1:146:5, 1:196:24, 1:222:12

registered [10] - 1:11:4, 1:11:5, 1:15:9, 1:15:15, 1:101:11, 1:155:7, 1:155:10, 1:155:11, 1:158:24, 1:159:25

registries [1] - 1:111:10

registry [24] - 1:4:9, 1:4:13, 1:4:16, 1:4:19, 1:5:8, 1:76:4, 1:83:20, 1:83:24, 1:84:1, 1:86:5, 1:109:10, 1:109:12, 1:109:18, 1:111:11, 1:112:5, 1:113:5, 1:126:4, 1:183:24, 1:184:6, 1:184:18, 1:187:9, 1:198:23, 1:200:2, 1:224:11

regulation [1] - 1:171:7

regulations [1] - 1:95:5

rehab [1] - 1:123:22

Rehabilitation [1] - 1:189:21

reintroduce [1] - 1:98:20

related [5] - 1:59:18, 1:78:13, 1:79:15, 1:79:16, 1:96:25

relates [1] - 1:83:24

relationship [12] - 1:75:15, 1:76:2, 1:76:3, 1:76:13, 1:112:1, 1:112:3, 1:112:4, 1:113:7, 1:113:13, 1:113:14, 1:113:18, 1:191:14

relationships [1] - 1:60:20

relaxed [1] - 1:71:1

relevancy [2] - 1:135:16, 1:224:4

relevant [3] - 1:83:10, 1:94:14

reliance [5] - 1:84:5, 1:85:2, 1:86:1, 1:86:12, 1:86:14

relied [2] - 1:83:13, 1:85:23

relief [1] - 1:130:10

relieved [1] - 1:76:21

religion [1] - 1:190:8

rely [4] - 1:80:14, 1:84:3

258

_, 1:85:2_, 1:94:5

relying [5]_ - 1:84:18_,
1:84:24_, 1:92:16_, 1:94:2_,
1:94:4

remain [4]_ - 1:68:8_,
1:68:11_, 1:117:4_, 1:152:16

remaining [1]_ - 1:68:14

remarks [2]_ - 1:72:18_,
1:72:20

remember [20]_ - 1:64:15
_, 1:80:5_, 1:80:19_, 1:82:1_,
1:86:20_, 1:109:19_,
1:114:16_, 1:124:23_,
1:125:7_, 1:132:14_,
1:133:15_, 1:150:7_,
1:151:17_, 1:158:2_, 1:193:2
_, 1:197:3_, 1:213:9_,
1:217:12_, 1:220:17_,
1:225:13

remind [3]_ - 1:122:17_,
1:122:23_, 1:156:5

reminders [2]_ - 1:155:25
_, 1:156:6

remotely [3]_ - 1:56:6_,
1:86:23_, 1:87:25

render [4]_ - 1:19:12_,
1:19:21_, 1:20:2_, 1:69:5

rendered [1]_ - 1:128:18

rent [2]_ - 1:134:13_,
1:200:14

reopen [1]_ - 1:69:16

repeat [4]_ - 1:154:25_,
1:166:25_, 1:169:5_,
1:201:23

repeatedly [1]_ - 1:62:18

report [1]_ - 1:154:21

reporter [3]_ - 1:13:14_,
1:64:11_, 1:221:16

represent [1]_ - 1:110:25

representative [1]_ -
1:205:3

represented [1]_ -
1:113:2

representing [3]_ - 1:14:4
_, 1:14:19_, 1:62:9

represents [2]_ -
1:217:18_, 1:217:19

Republic [2]_ - 1:29:16_,
1:43:3

reputation [1]_ - 1:160:4

request [7]_ - 1:76:25_,
1:129:17_, 1:131:8_,
1:144:18_, 1:146:7_,
1:146:17_, 1:147:21

requested [6]_ - 1:119:20
_, 1:120:3_, 1:120:14_,
1:129:3_, 1:129:15_,
1:144:24

requesting [1]_ - 1:128:17

requests [1]_ - 1:118:17

require [1]_ - 1:142:2

required [6]_ - 1:78:10_,
1:84:10_, 1:100:2_, 1:106:13
_, 1:122:14_, 1:192:6

requirement [6]_ -
1:76:22_, 1:112:11_, 1:182:8
_, 1:182:14_, 1:184:24_,
1:188:2

requirement's [1]_ -
1:95:19

requirements [8]_ -
1:74:23_, 1:99:25_, 1:111:8
_, 1:188:7_, 1:188:10_,
1:188:20_, 1:188:24_,
1:189:22

requires [6]_ - 1:93:5_,
1:94:19_, 1:94:25_, 1:95:4_,
1:154:2_, 1:154:4

rereading [1]_ - 1:90:3

research [3]_ - 1:79:15_,
1:85:8_, 1:85:16

researching [1]_ -
1:35:19

reserve [1]_ - 1:6:14_,
1:7:8

residential [2]_ - 1:33:19_,
1:60:14

resolve [3]_ - 1:53:11_,
1:53:15_, 1:55:4

Resources [1]_ - 1:34:14

respect [4]_ - 1:4:9_,
1:49:20_, 1:184:1_, 1:188:13

respectfully [1]_ - 1:5:7

response [1]_ - 1:126:14

responsibile [1]_ -
1:215:17

responsibilities [2]_ -
1:160:12

responsibility [6]_ -
1:55:11_, 1:76:21_, 1:159:19
_, 1:159:20_, 1:171:8_,
1:216:9

responsible [13]_ -
1:159:18_, 1:166:9_,
1:191:14_, 1:192:3_, 1:192:9
_, 1:194:19_, 1:215:13_,
1:215:15_, 1:215:16_,
1:215:18_, 1:216:6_, 1:216:8
_, 1:216:14

rest [3]_ - 1:64:5_,
1:115:16_, 1:115:18

restate [1]_ - 1:116:14

restaurant [2]_ - 1:35:1_,
1:43:5

restored [1]_ - 1:11:8

restrictions [1]_ - 1:76:22

restrictive [2]_ - 1:58:12_,
1:76:6

resubmit [1]_ - 1:180:9

result [2]_ - 1:74:16_,
1:108:18

resume [2]_ - 1:12:10_,
1:193:17

resumed [1]_ - 1:69:17

retaliation [2]_ - 1:189:8_,
1:189:14

retire [1]_ - 1:12:24_,
1:35:20

retired [6]_ - 1:22:3_,
1:25:7_, 1:46:14_, 1:46:21_,
1:55:17_, 1:65:9

retread [1]_ - 1:7:21

return [1]_ - 1:105:1

revenue [3]_ - 1:199:22_,
1:200:1_, 1:201:6

review [4]_ - 1:57:21_,
1:183:2_, 1:183:3_, 1:206:13

reviews [2]_ - 1:165:10_,
1:183:5

revisit [1]_ - 1:91:10

RFPs [1]_ - 1:126:14

Rhode [1]_ - 1:25:21

ride [1]_ - 1:51:20

Rights [1]_ - 1:189:20

rights [8]_ - 1:11:8_,
1:110:3_, 1:110:4_, 1:188:6
_, 1:188:10_, 1:188:24_,
1:189:2_, 1:189:14

ring [1]_ - 1:16:8

risk [11]_ - 1:23:7_, 1:23:8_,
1:36:9_, 1:57:8_, 1:103:4_,
1:103:17_, 1:104:14_,
1:104:24_, 1:131:4_, 1:131:5

Robbins [1]_ - 1:41:21

rock [1]_ - 1:94:3

Rogger [8]_ - 1:9:14_,
1:34:7_, 1:65:23_, 1:67:12_,
1:68:9_, 1:68:18_, 1:97:17_,
1:97:23

role [6]_ - 1:49:1_, 1:57:15
_, 1:60:9_, 1:60:24_, 1:72:21

rolling [2]_ - 1:7:14_,

1:7:20

room [22]_ - 1:50:6_,
1:50:8_, 1:69:13_, 1:69:14_,
1:69:22_, 1:69:23_, 1:70:4_,
1:70:9_, 1:70:10_, 1:71:8_,
1:80:7_, 1:80:11_, 1:80:13_,
1:81:11_, 1:81:21_, 1:81:24
_, 1:82:3_, 1:114:19_,
1:151:19_, 1:193:4

rooms [2]_ - 1:70:13_,
1:79:10

Rosenberg [1]_ - 1:23:7

Rossario [1]_ - 1:65:8

roster [5]_ - 1:156:16_,
1:156:19_, 1:187:18_,
1:187:20_, 1:197:18

rotate [2]_ - 1:125:3_,
1:125:6

roundabout [1]_ -
1:120:18

row [16]_ - 1:8:9_, 1:8:10_,
1:9:8_, 1:9:9_, 1:9:10_,
1:9:12_, 1:9:13_, 1:9:15_,
1:9:17_, 1:9:18_, 1:9:19_,
1:68:22_, 1:68:23_, 1:68:24

ROWLAND [1]_ -
1:117:16

Rowland [15]_ - 1:16:3_,
1:115:7_, 1:117:3_, 1:117:12
_, 1:117:21_, 1:127:2_,
1:127:7_, 1:137:3_, 1:137:10
_, 1:149:3_, 1:168:10_,
1:177:14_, 1:178:19_,
1:218:20_, 1:224:25

rude [3]_ - 1:63:15_,
1:63:24_, 1:64:24

rule [3]_ - 1:4:23_, 1:5:6_,
1:112:9

Rule [11]_ - 1:6:12_,
1:87:12_, 1:90:3_, 1:90:8_,
1:90:24_, 1:115:19_,
1:115:21_, 1:115:24_,
1:116:4

rules [6]_ - 1:63:15_,
1:63:24_, 1:64:25_, 1:73:4_,
1:73:7_, 1:79:19

ruling [1]_ - 1:89:9_,
1:89:22

rumor [1]_ - 1:18:25

run [10]_ - 1:31:8_, 1:50:25
_, 1:55:3_, 1:103:9_,
1:104:23_, 1:118:5_, 1:173:6
_, 1:193:8_, 1:200:11_,
1:201:6

runs [2]_ - 1:31:12_,
1:173:7

## S

Sable [1]_ - 1:22:14

safe [1]_ - 1:71:3

sailed [1]_ - 1:218:7

sales [1]_ - 1:42:2

sat [3]_ - 1:50:10_, 1:209:3 _, 1:209:5

satisfied [1]_ - 1:93:11

satisfy [1]_ - 1:94:23

Saturday [1]_ - 1:20:10

saves [1]_ - 1:226:6

saw [14]_ - 1:26:25_, 1:72:2_, 1:72:5_, 1:73:1_, 1:73:2_, 1:87:5_, 1:87:19_, 1:121:13_, 1:121:14_, 1:125:1_, 1:128:11_, 1:193:8 _, 1:202:21

scales [3]_ - 1:77:13_, 1:77:14_, 1:77:15

scenario [2]_ - 1:85:25

scenarios [1]_ - 1:175:10

schedule [15]_ - 1:12:10_, 1:104:7_, 1:106:10_, 1:120:25_, 1:130:8_, 1:136:17_, 1:137:23_, 1:166:3_, 1:206:1_, 1:213:7 _, 1:219:9_, 1:219:10_, 1:219:14_, 1:219:16_, 1:220:11

scheduled [3]_ - 1:147:22 _, 1:206:13_, 1:220:3

schedules [4]_ - 1:103:19 _, 1:104:4_, 1:219:11_, 1:219:13

scheduling [3]_ - 1:11:16 _, 1:12:12_, 1:155:3

scheduling-wise [1]_ - 1:12:12

school [18]_ - 1:22:3_, 1:22:6_, 1:22:13_, 1:23:21_, 1:23:22_, 1:24:9_, 1:25:13_, 1:29:16_, 1:40:10_, 1:46:22 _, 1:47:14_, 1:53:5_, 1:54:19 _, 1:54:23_, 1:55:18_, 1:56:5 _, 1:56:7_, 1:122:1

School [2]_ - 1:22:12_, 1:36:14

schools [2]_ - 1:55:4_, 1:55:19

Schools [1]_ - 1:22:8

sci [2]_ - 1:56:3_, 1:56:13

science [1]_ - 1:28:2

scientist [1]_ - 1:25:20

Scott [7]_ - 1:9:10_, 1:20:24_, 1:21:13_, 1:28:15 _, 1:53:1_, 1:57:4_, 1:66:9

scratch [1]_ - 1:50:4

screen [3]_ - 1:127:7_, 1:171:11_, 1:190:19

screening [1]_ - 1:126:7

search [1]_ - 1:79:12

searched [1]_ - 1:47:17

searching [1]_ - 1:45:15

season [1]_ - 1:24:10

seat [9]_ - 1:8:1_, 1:8:2_, 1:8:3_, 1:8:4_, 1:9:8_, 1:63:7 _, 1:63:9_, 1:68:21_, 1:68:22

Seat [2]_ - 1:97:13_, 1:97:14

seated [10]_ - 1:3:10_, 1:10:5_, 1:64:14_, 1:69:10_, 1:82:8_, 1:92:7_, 1:117:10_, 1:151:25_, 1:152:22_, 1:193:15

seats [9]_ - 1:9:11_, 1:68:8 _, 1:68:11_, 1:68:18_, 1:68:19_, 1:68:20_, 1:69:21

second [9]_ - 1:8:10_, 1:9:12_, 1:9:13_, 1:9:15_, 1:10:14_, 1:68:21_, 1:72:22 _, 1:112:7

Section [1]_ - 1:189:21

secured [1]_ - 1:114:25

security [5]_ - 1:13:21_, 1:13:22_, 1:36:13_, 1:58:18 _, 1:192:16

Security [2]_ - 1:40:16_, 1:46:16

see [125]_ - 1:10:18_, 1:10:25_, 1:11:3_, 1:11:6_, 1:11:10_, 1:11:13_, 1:14:24 _, 1:15:3_, 1:15:13_, 1:16:10 _, 1:19:3_, 1:19:6_, 1:19:10_, 1:19:15_, 1:19:19_, 1:19:25 _, 1:20:4_, 1:21:18_, 1:40:10 _, 1:50:17_, 1:51:8_, 1:51:18 _, 1:52:3_, 1:53:23_, 1:54:1_, 1:59:5_, 1:62:15_, 1:62:25_, 1:63:8_, 1:64:6_, 1:72:7_, 1:74:1_, 1:82:2_, 1:88:13_, 1:92:16_, 1:99:18_, 1:100:8 _, 1:100:20_, 1:101:7_, 1:101:20_, 1:102:13_, 1:104:4_, 1:104:10_, 1:104:12_, 1:104:23_, 1:105:5_, 1:107:21_, 1:107:22_, 1:107:23_, 1:107:24_, 1:110:13_, 1:111:7_, 1:111:13_,

1:114:20_, 1:116:8_, 1:122:1 _, 1:122:3_, 1:125:7_, 1:127:7_, 1:128:13_, 1:128:14_, 1:128:18_, 1:129:1_, 1:132:11_, 1:134:15_, 1:136:4_, 1:141:17_, 1:142:1_, 1:142:2 _, 1:147:3_, 1:149:11_, 1:151:19_, 1:155:6_, 1:160:18_, 1:166:22_, 1:167:1_, 1:167:6_, 1:171:13 _, 1:178:22_, 1:179:7_, 1:181:8_, 1:181:9_, 1:181:11 _, 1:187:25_, 1:188:6_, 1:188:9_, 1:188:12_, 1:188:21_, 1:188:22_, 1:189:1_, 1:189:4_, 1:189:5 _, 1:189:24_, 1:190:2_, 1:190:10_, 1:190:19_, 1:191:8_, 1:193:3_, 1:195:5 _, 1:204:8_, 1:204:9_, 1:206:18_, 1:206:22_, 1:207:2_, 1:207:6_, 1:207:7 _, 1:207:12_, 1:207:22_, 1:207:25_, 1:208:3_, 1:210:13_, 1:210:17_, 1:210:18_, 1:211:14_, 1:213:6_, 1:213:7_, 1:213:23 _, 1:214:21_, 1:215:6_, 1:219:4_, 1:220:9_, 1:225:15

seeing [1]_ - 1:150:7

seek [1]_ - 1:96:19

seeking [1]_ - 1:90:9

seeks [1]_ - 1:76:22

seem [1]_ - 1:83:12_, 1:116:3_, 1:147:18

sees [2]_ - 1:63:21_, 1:80:2

Seitz [1]_ - 1:91:21

select [5]_ - 1:11:17_, 1:17:2_, 1:17:18_, 1:21:13_, 1:50:20

selected [4]_ - 1:12:12_, 1:19:20_, 1:63:11_, 1:68:1

selection [3]_ - 1:6:11_, 1:13:18_, 1:50:19

self [1]_ - 1:47:5

self-employed [1]_ - 1:47:5

sell [1]_ - 1:96:1

send [8]_ - 1:121:4_, 1:121:8_, 1:129:13_, 1:156:19_, 1:157:25_, 1:162:14_, 1:166:3_, 1:174:23

sending [3]_ - 1:57:18_, 1:128:17_, 1:157:22

Senior [21]_ - 1:129:4_, 1:129:5_, 1:129:6_, 1:129:7 _, 1:129:21_, 1:129:24_, 1:130:13_, 1:131:9_, 1:131:25_, 1:132:25_, 1:134:6_, 1:135:13_, 1:141:25_, 1:148:15_, 1:148:17_, 1:223:18_, 1:223:19_, 1:224:16_, 1:224:18_, 1:224:20

senior [1]_ - 1:56:21_, 1:115:20

seniors [1]_ - 1:181:1

sense [6]_ - 1:7:17_, 1:7:22_, 1:91:3_, 1:102:14_, 1:115:22_, 1:226:8

sent [9]_ - 1:119:14_, 1:121:3_, 1:144:4_, 1:172:2 _, 1:206:9_, 1:222:10_, 1:222:11

sentence [1]_ - 1:75:7

separate [2]_ - 1:41:15_, 1:109:11

separation [1]_ - 1:70:2

series [21]_ - 1:16:16

serve [21]_ - 1:9:25_, 1:10:20_, 1:10:22_, 1:15:16 _, 1:17:2_, 1:26:12_, 1:28:5_, 1:30:11_, 1:31:23_, 1:33:2_, 1:37:24_, 1:39:17_, 1:40:23 _, 1:42:5_, 1:44:16_, 1:45:22 _, 1:46:23_, 1:47:6_, 1:50:14 _, 1:68:1_, 1:68:7

served [8]_ - 1:26:4_, 1:27:14_, 1:33:23_, 1:35:2_, 1:36:17_, 1:38:20_, 1:48:24 _, 1:112:5

service [11]_ - 1:10:15_, 1:10:18_, 1:27:14_, 1:47:13 _, 1:50:15_, 1:98:19_, 1:118:12_, 1:118:13_, 1:132:19_, 1:138:10_, 1:166:21

services [21]_ - 1:75:16_, 1:75:22_, 1:76:8_, 1:103:9_, 1:103:10_, 1:128:18_, 1:141:3_, 1:141:18_, 1:142:13_, 1:153:18_, 1:155:6_, 1:155:14_, 1:155:18_, 1:155:24_, 1:156:13_, 1:160:24_, 1:161:4_, 1:165:14_, 1:172:1 _, 1:195:22_, 1:201:6

Services [1]_ - 1:51:14

serving [3]_ - 1:15:6_, 1:50:22_, 1:78:12

set [5]_ - 1:111:9_, 1:122:16_, 1:191:16_, 1:194:20_, 1:219:15

sets [3]_ - 1:144:9_, 1:219:10_, 1:219:14

setting [2]_ - 1:58:13_, 1:58:17

settled [1]_ - 1:53:9

setup [1]_ - 1:165:8

seven [9]_ - 1:8:9_, 1:8:10 _, 1:8:16_, 1:20:18_, 1:217:4 _, 1:217:18_, 1:217:19_, 1:217:22

several [4]_ - 1:54:19_, 1:114:5_, 1:130:19_, 1:176:16

shakes [1]_ - 1:181:3

Shakes [2]_ - 1:35:24_, 1:208:22

shall [1]_ - 1:190:1

share [5]_ - 1:23:1_, 1:77:2 _, 1:80:7_, 1:192:6_, 1:192:21

shared [1]_ - 1:146:6

sheet [39]_ - 1:100:1_, 1:100:3_, 1:125:8_, 1:125:15 _, 1:135:22_, 1:137:21_, 1:139:13_, 1:139:14_, 1:139:15_, 1:151:4_, 1:167:14_, 1:171:6_, 1:174:23_, 1:174:25_, 1:175:20_, 1:176:20_, 1:176:22_, 1:177:3_, 1:177:19_, 1:180:2_, 1:180:11_, 1:180:15_, 1:180:21_, 1:180:23_, 1:181:8_, 1:181:9_, 1:181:15 _, 1:202:7_, 1:206:7_, 1:215:6_, 1:215:7_, 1:215:21 _, 1:217:19_, 1:217:23_, 1:217:24_, 1:218:1_, 1:218:5 _, 1:221:20

sheets [26]_ - 1:100:5_, 1:103:19_, 1:105:13_, 1:124:23_, 1:124:24_, 1:135:23_, 1:137:11_, 1:139:11_, 1:139:18_, 1:167:18_, 1:175:13_, 1:175:14_, 1:175:17_, 1:177:20_, 1:179:7_, 1:206:13_, 1:211:25_, 1:212:1_, 1:212:4_, 1:215:11 _, 1:215:12_, 1:219:20_, 1:221:6_, 1:221:7_, 1:223:6

shelter [1]_ - 1:24:11

shimmy [1]_ - 1:97:11

ship [1]_ - 1:218:7

short [2]_ - 1:12:21_, 1:69:12

shorted [1]_ - 1:134:10

shorten [2]_ - 1:132:2_, 1:133:24

shorting [1]_ - 1:47:12

show [38]_ - 1:15:12_, 1:53:10_, 1:53:21_, 1:62:11 _, 1:62:23_, 1:69:13_, 1:70:13_, 1:82:22_, 1:95:21 _, 1:99:20_, 1:100:4_, 1:100:5_, 1:100:11_, 1:101:9 _, 1:101:16_, 1:103:14_, 1:103:15_, 1:104:4_, 1:104:5 _, 1:110:11_, 1:111:1_, 1:112:18_, 1:112:19_, 1:127:2_, 1:136:8_, 1:137:10 _, 1:137:13_, 1:138:2_, 1:139:6_, 1:149:13_, 1:150:18_, 1:171:8_, 1:173:17_, 1:173:21_, 1:179:9_, 1:182:1_, 1:204:4

showed [12]_ - 1:103:12_, 1:104:6_, 1:106:1_, 1:106:10 _, 1:121:23_, 1:149:5_, 1:150:2_, 1:177:14_, 1:177:19_, 1:178:2_, 1:178:19_, 1:221:7

shower [3]_ - 1:106:7_, 1:122:14_, 1:123:7

showing [3]_ - 1:179:6_, 1:205:14_, 1:207:14

shows [4]_ - 1:106:22_, 1:138:6_, 1:179:10_, 1:220:20

shutdown [1]_ - 1:200:22

siblings [2]_ - 1:121:19_, 1:125:2

sic [1]_ - 1:186:7

sick [5]_ - 1:12:20_, 1:12:22_, 1:20:5_, 1:26:1_, 1:69:19

side [20]_ - 1:7:7_, 1:7:10_, 1:16:1_, 1:17:22_, 1:17:23_, 1:18:1_, 1:18:2_, 1:18:5_, 1:49:23_, 1:51:19_, 1:77:15 _, 1:80:18_, 1:91:10_, 1:103:25_, 1:167:11_, 1:168:5_, 1:168:6_, 1:191:3 _, 1:208:19_, 1:223:23

side's [1]_ - 1:72:19

sidebar [1]_ - 1:112:7

sides [2]_ - 1:3:11_, 1:77:14

sight [1]_ - 1:19:11

sign [12]_ - 1:54:1_, 1:61:8 _, 1:102:8_, 1:106:13_, 1:110:5_, 1:127:15_, 1:149:18_, 1:180:11_, 1:180:14_, 1:180:21_, 1:188:2_, 1:193:9

signature [5]_ - 1:127:13 _, 1:127:19_, 1:127:23_, 1:127:25_, 1:174:3

signed [16]_ - 1:57:17_, 1:111:16_, 1:138:3_, 1:149:10_, 1:150:10_, 1:170:6_, 1:170:14_, 1:170:15_, 1:174:1_, 1:181:4 _, 1:181:7_, 1:182:3_, 1:191:7_, 1:200:18_, 1:216:1 _, 1:223:8

significance [2]_ - 1:49:8 _, 1:205:22

significant [1]_ - 1:90:14_, 1:104:15

signing [1]_ - 1:180:21

silence [1]_ - 1:110:2

silly [1]_ - 1:50:5

similar [2]_ - 1:76:10_, 1:79:4

simply [1]_ - 1:72:9

simultaneously [1]_ - 1:177:4

single [7]_ - 1:33:22_, 1:37:23_, 1:38:19_, 1:39:16 _, 1:42:4_, 1:45:21_, 1:52:15

singling [1]_ - 1:54:17

sister [6]_ - 1:73:1_, 1:121:1_, 1:121:13_, 1:122:6 _, 1:131:1_, 1:134:16

sisters [3]_ - 1:134:15_, 1:134:17_, 1:147:2

sit [10]_ - 1:11:14_, 1:41:13 _, 1:52:12_, 1:68:23_, 1:106:7_, 1:125:9_, 1:167:15 _, 1:175:3_, 1:178:24_, 1:222:8

sit-down [1]_ - 1:222:8

site [1]_ - 1:79:9

sitting [5]_ - 1:3:10_, 1:63:9_, 1:69:25_, 1:98:21_, 1:102:19

situation [10]_ - 1:18:4_, 1:20:9_, 1:24:2_, 1:109:11_, 1:109:24_, 1:142:4_, 1:163:8 _, 1:173:14_, 1:208:14_, 1:208:18

situations [2]_ - 1:12:7_, 1:166:9

six [19]_ - 1:8:1_, 1:8:2_, 1:8:15_, 1:8:16_, 1:8:22_, 1:12:14_, 1:12:19_, 1:12:24 _, 1:13:4_, 1:29:15_, 1:103:3 _, 1:113:11_, 1:113:16_, 1:120:4_, 1:125:2_, 1:144:14 _, 1:145:4_, 1:145:11

six-day [1]_ - 1:120:4

skateboard [1]_ - 1:28:13

skill [1]_ - 1:106:8

skilled [1]_ - 1:153:19

skip [1]_ - 1:9:11

sleep [2]_ - 1:42:19_, 1:123:2

sleeping [2]_ - 1:39:4_, 1:43:22

slide [1]_ - 1:191:3

small [3]_ - 1:15:7_, 1:57:14_, 1:59:15

smaller [1]_ - 1:70:14

smelled [1]_ - 1:72:2

smoother [1]_ - 1:98:3

Snapchat [1]_ - 1:79:3

Snyder [12]_ - 1:9:15, 1:33:12_, 1:61:10_, 1:61:14 _, 1:66:12_, 1:66:15_, 1:67:12_, 1:68:10_, 1:68:17 _, 1:97:17_, 1:97:23

so.. [8]_ - 1:90:10_, 1:92:3 _, 1:129:24_, 1:132:23_, 1:136:19_, 1:181:3_, 1:208:19_, 1:224:24

social [4]_ - 1:79:2_, 1:79:4_, 1:79:10_, 1:192:16

softball [1]_ - 1:39:24

software [2]_ - 1:106:1_, 1:173:6

soil [1]_ - 1:143:16

solemn [2]_ - 1:10:2_, 1:69:7

solemnly [4]_ - 1:9:23_, 1:69:3_, 1:117:6_, 1:152:18

solicitation [1]_ - 1:90:16 _, 1:113:4

solicitations [1]_ - 1:58:14

soliciting [1]_ - 1:76:1

someone [6]_ - 1:63:20_, 1:72:2_, 1:120:24_, 1:130:14 _, 1:169:21_, 1:173:8

someplace [1]_ - 1:21:10

sometimes [15]_ - 1:9:13 _, 1:9:18_, 1:15:13_, 1:48:12

_, 1:53:25_, 1:73:14_, 1:104:20_, 1:120:8_, 1:122:20_, 1:123:15_, 1:160:8_, 1:160:10

somewhat [2]_ - 1:119:17_, 1:198:21

son [5]_ - 1:23:5_, 1:23:7_, 1:23:10_, 1:25:25_, 1:122:1

song [1]_ - 1:54:2

soon [1]_ - 1:110:18

sorry [41]_ - 1:6:12_, 1:21:14_, 1:29:12_, 1:30:23_, 1:37:19_, 1:38:7_, 1:43:8_, 1:48:17_, 1:53:1_, 1:62:3_, 1:65:1_, 1:87:6_, 1:87:10_, 1:89:1_, 1:112:20_, 1:114:7_, 1:133:17_, 1:139:18_, 1:139:23_, 1:140:22_, 1:142:9_, 1:144:1_, 1:148:2_, 1:151:10_, 1:151:11_, 1:154:25_, 1:159:14_, 1:166:25_, 1:168:17_, 1:169:5_, 1:180:13_, 1:187:1_, 1:187:10_, 1:187:11_, 1:193:6_, 1:193:12_, 1:194:25_, 1:197:12_, 1:208:22_, 1:213:20_, 1:215:25

sort [1]_ - 1:156:22

Soto [2]_ - 1:157:16_, 1:158:12

soul [1]_ - 1:4:16

sounds [1]_ - 1:54:18

source [3]_ - 1:80:1_, 1:160:5_, 1:192:1

South [21]_ - 1:21:24_, 1:25:3_, 1:27:21_, 1:28:18_, 1:29:13_, 1:31:2_, 1:32:11_, 1:33:15_, 1:34:10_, 1:36:5_, 1:37:12_, 1:38:12_, 1:39:10_, 1:40:4_, 1:41:24_, 1:42:24_, 1:44:2_, 1:45:10_, 1:46:10_, 1:54:7_, 1:93:3

Southern [1]_ - 1:10:7

spaced [1]_ - 1:64:22

Spanish [9]_ - 1:81:16_, 1:111:15_, 1:118:21_, 1:118:22_, 1:119:15_, 1:120:22_, 1:121:4_, 1:121:5_, 1:129:8

Spanish-speaking [1]_ - 1:118:22

speaking [3]_ - 1:51:9_, 1:118:22_, 1:119:15

speaks [2]_ - 1:88:10_, 1:191:21

special [5]_ - 1:17:8_, 1:60:21_, 1:79:25_, 1:106:8_, 1:118:17

specialist [3]_ - 1:43:11_, 1:43:12_, 1:43:13

specific [5]_ - 1:142:23_, 1:167:23_, 1:169:17_, 1:187:14_, 1:203:25

specifically [5]_ - 1:16:13_, 1:79:5_, 1:99:13_, 1:147:1_, 1:224:17

specified [1]_ - 1:125:15

speculation [2]_ - 1:167:4_, 1:180:17

speech [1]_ - 1:40:9

speed [4]_ - 1:53:20_, 1:53:22_, 1:54:6_, 1:54:10

speeding [3]_ - 1:53:22_, 1:53:23_, 1:54:4

spell [3]_ - 1:117:10_, 1:117:13_, 1:152:22

spend [2]_ - 1:159:22_, 1:159:23

spending [1]_ - 1:160:6

spent [5]_ - 1:103:8_, 1:104:21_, 1:161:15_, 1:217:11_, 1:218:18

spiral [1]_ - 1:123:24

split [1]_ - 1:119:3

spot [2]_ - 1:56:16_, 1:225:11

spouse [10]_ - 1:22:19_, 1:25:12_, 1:30:4_, 1:31:11_, 1:34:18_, 1:36:12_, 1:40:14_, 1:43:10_, 1:44:9_, 1:46:20

spreadsheet [1]_ - 1:143:9

Springs [3]_ - 1:32:10_, 1:40:3_, 1:46:9

St [2]_ - 1:154:11_, 1:154:23

staff [17]_ - 1:54:23_, 1:105:18_, 1:130:1_, 1:154:24_, 1:155:1_, 1:162:11_, 1:162:14_, 1:165:6_, 1:165:10_, 1:165:13_, 1:201:12_, 1:215:19_, 1:215:20_, 1:216:13_, 1:216:15_, 1:219:13_, 1:222:18

staffing [2]_ - 1:129:8_, 1:156:22

stage [1]_ - 1:60:22

stairs [4]_ - 1:51:12_,

1:51:21_, 1:51:22_, 1:226:7

stamp [1]_ - 1:61:8

stand [9]_ - 1:5:2_, 1:9:21_, 1:11:23_, 1:16:20_, 1:21:20_, 1:49:5_, 1:69:1_, 1:112:3_, 1:193:17

stand-alone [1]_ - 1:112:3

Standard [3]_ - 1:18:19_, 1:82:14_, 1:83:11

standard [1]_ - 1:84:8

standards [1]_ - 1:113:16

Standards [15]_ - 1:54:14_, 1:54:16_, 1:58:10_, 1:62:19_, 1:74:20_, 1:74:24_, 1:84:10_, 1:84:25_, 1:85:5_, 1:85:19_, 1:86:6_, 1:86:8_, 1:100:17_, 1:101:2_, 1:110:3

standing [8]_ - 1:4:11_, 1:5:3_, 1:5:13_, 1:5:20_, 1:5:23_, 1:16:22_, 1:117:4_, 1:152:16

standpoint [4]_ - 1:7:1_, 1:7:4_, 1:84:23_, 1:212:21

Star [1]_ - 1:92:12

start [14]_ - 1:16:17_, 1:21:19_, 1:51:2_, 1:53:3_, 1:60:15_, 1:71:9_, 1:98:12_, 1:123:24_, 1:133:10_, 1:162:2_, 1:165:18_, 1:167:15_, 1:191:7_, 1:196:15

started [16]_ - 1:25:23_, 1:47:14_, 1:106:13_, 1:121:11_, 1:130:5_, 1:153:16_, 1:163:22_, 1:185:8_, 1:200:18_, 1:209:5_, 1:209:11_, 1:209:12_, 1:223:16_, 1:223:17

starting [1]_ - 1:56:25

starts [1]_ - 1:7:19

startup [1]_ - 1:25:21

state [59]_ - 1:4:18_, 1:11:23_, 1:12:17_, 1:18:20_, 1:18:21_, 1:19:7_, 1:26:6_, 1:35:4_, 1:35:5_, 1:76:24_, 1:83:10_, 1:84:3_, 1:84:5_, 1:84:17_, 1:84:24_, 1:85:2_, 1:85:4_, 1:85:15_, 1:85:20_, 1:85:23_, 1:86:1_, 1:86:12_, 1:86:14_, 1:87:19_, 1:91:19_, 1:92:17_, 1:92:25_, 1:93:9_, 1:93:20_, 1:94:2_, 1:94:4_, 1:94:6_, 1:94:13_, 1:95:5_, 1:95:9_, 1:95:23_, 1:95:24_, 1:96:4_, 1:109:13_, 1:110:1

1:111:11_, 1:112:4_, 1:117:10_, 1:152:22_, 1:156:15_, 1:160:19_, 1:160:22_, 1:171:7_, 1:183:2_, 1:183:5_, 1:183:7_, 1:183:8_, 1:183:11_, 1:183:13_, 1:183:14_, 1:185:23_, 1:186:16_, 1:192:4

State [9]_ - 1:38:16_, 1:155:10_, 1:182:12_, 1:182:18_, 1:182:19_, 1:183:1_, 1:183:24_, 1:185:10_, 1:209:13

STATEMENT [2]_ - 1:98:8_, 1:110:22

statement [14]_ - 1:4:25_, 1:5:2_, 1:5:15_, 1:5:19_, 1:80:19_, 1:80:20_, 1:89:13_, 1:91:9_, 1:95:18_, 1:185:19_, 1:196:11_, 1:196:14_, 1:196:16_, 1:197:11

statements [6]_ - 1:11:18_, 1:72:16_, 1:72:17_, 1:89:23_, 1:98:6_, 1:112:15

states [2]_ - 1:41:11_, 1:76:18

States [9]_ - 1:10:7_, 1:10:23_, 1:15:8_, 1:74:9_, 1:100:16_, 1:101:3_, 1:101:7_, 1:109:14

stating [1]_ - 1:221:25

status [22]_ - 1:22:17_, 1:25:10_, 1:28:3_, 1:28:24_, 1:30:2_, 1:31:9_, 1:32:16_, 1:33:21_, 1:34:16_, 1:36:10_, 1:37:22_, 1:38:18_, 1:39:15_, 1:40:12_, 1:41:11_, 1:42:3_, 1:43:6_, 1:44:7_, 1:45:20_, 1:46:18_, 1:190:9_, 1:190:10

statute [13]_ - 1:82:17_, 1:83:10_, 1:85:15_, 1:85:20_, 1:85:23_, 1:85:24_, 1:86:1_, 1:94:3_, 1:94:4_, 1:94:6_, 1:94:13_, 1:95:23_, 1:95:24

Statutes [5]_ - 1:188:23_, 1:189:1_, 1:189:9_, 1:189:15_, 1:190:13

statutes [1]_ - 1:93:22

stay [16]_ - 1:24:20_, 1:44:15_, 1:64:4_, 1:91:8_, 1:118:9_, 1:119:19_, 1:119:21_, 1:123:4_, 1:123:14_, 1:125:12_, 1:130:24_, 1:131:9_, 1:143:17_, 1:165:3

stay-at-home [1]- - 1:44:15

stayed [3]- - 1:26:2_, 1:123:17_, 1:136:13

steal [2]- - 1:108:11_, 1:108:24

STENOGRAPHER [1]- - 1:37:19

step [7]- - 1:122:8_, 1:151:13_, 1:162:5_, 1:163:9_, 1:164:3_, 1:219:17_, 1:219:24

stepped [1]- - 1:133:21

steps [2]- - 1:200:15_, 1:219:25

stick [1]- - 1:213:22

still [18]- - 1:21:4_, 1:53:23_, 1:54:9_, 1:58:16_, 1:71:2_, 1:84:22_, 1:86:1_, 1:86:6_, 1:86:8_, 1:113:23_, 1:114:5_, 1:160:6_, 1:191:12_, 1:196:2_, 1:196:7_, 1:200:20

stinks [1]- - 1:53:25

stole [2]- - 1:102:11_, 1:108:16

stomach [1]- - 1:123:3

stop [6]- - 1:54:12_, 1:76:25_, 1:129:17_, 1:129:18_, 1:168:20_, 1:224:8

stopped [3]- - 1:109:2_, 1:121:16_, 1:204:24

straightforward [1]- - 1:99:2

strategy [1]- - 1:64:12

strike [9]- - 1:65:21_, 1:66:8_, 1:66:17_, 1:66:19_, 1:66:22_, 1:67:2_, 1:86:14_, 1:209:16_, 1:209:22

strikes [1]- - 1:67:8

striking [1]- - 1:73:15

strong [1]- - 1:123:20

strong-willed [1]- - 1:123:20

struggle [1]- - 1:137:19

stub [3]- - 1:204:6_, 1:211:2_, 1:211:7

stubs [4]- - 1:100:5_, 1:104:10_, 1:107:24_, 1:211:8

student [5]- - 1:27:24_, 1:27:25_, 1:37:16_, 1:56:3_, 1:56:10

study [1]- - 1:28:2

studying [5]- - 1:28:1_, 1:31:18_, 1:37:17_, 1:56:6_, 1:56:13

stuff [2]- - 1:222:13_, 1:226:7

subject [1]- - 1:17:9

subjective [6]- - 1:92:17_, 1:93:11_, 1:93:25_, 1:94:14_, 1:94:18_, 1:94:23

subjectively [5]- - 1:82:22_, 1:94:1_, 1:94:2_, 1:94:6_, 1:95:17

submit [6]- - 1:105:13_, 1:170:3_, 1:171:6_, 1:172:3_, 1:175:19_, 1:225:22

submits [1]- - 1:167:14

submitted [11]- - 1:167:18_, 1:174:25_, 1:176:20_, 1:176:23_, 1:179:8_, 1:191:19_, 1:204:25_, 1:211:25_, 1:216:18_, 1:220:6

submitting [5]- - 1:175:13_, 1:175:14_, 1:180:3_, 1:223:6_, 1:223:11

subs [2]- - 1:60:18

subsequently [1]- - 1:86:25

successful [2]- - 1:196:18_, 1:196:19

successfully [1]- - 1:78:10

sue [1]- - 1:135:15_, 1:223:25_, 1:224:2

sued [11]- - 1:23:17_, 1:23:22_, 1:26:18_, 1:26:19_, 1:27:2_, 1:47:16_, 1:47:18_, 1:58:22_, 1:106:15_, 1:224:16

suffer [1]- - 1:77:5

suffered [1]- - 1:108:17

suffering [1]- - 1:99:9

suggest [1]- - 1:129:17

suggested [2]- - 1:72:25_, 1:129:21

suggestion [1]- - 1:54:6

suing [3]- - 1:101:19_, 1:102:11_, 1:108:10

suit [1]- - 1:47:13

suitable [1]- - 1:195:10

summarize [2]- - 1:74:12_, 1:81:9

summary [1]- - 1:95:10

Sunday [1]- - 1:20:11

Sundays [1]- - 1:129:20

sunrise [1]- - 1:37:11

supervisor [4]- - 1:22:20_, 1:47:4_, 1:111:6_, 1:154:19

supplement [1]- - 1:71:11

supplemented [1]- - 1:160:6

supplied [1]- - 1:118:14

supplies [3]- - 1:103:8_, 1:200:12_, 1:200:13

supply [1]- - 1:143:22

support [4]- - 1:42:2_, 1:105:18_, 1:146:4_, 1:155:4

supporting [1]- - 1:125:17

supports [1]- - 1:84:24

supposed [40]- - 1:27:7_, 1:75:4_, 1:80:20_, 1:82:13_, 1:99:16_, 1:100:1_, 1:103:20_, 1:106:11_, 1:107:11_, 1:107:18_, 1:108:13_, 1:108:15_, 1:132:4_, 1:132:5_, 1:132:16_, 1:132:22_, 1:135:9_, 1:136:6_, 1:136:10_, 1:141:4_, 1:141:18_, 1:142:21_, 1:143:10_, 1:143:11_, 1:143:12_, 1:144:3_, 1:157:15_, 1:180:4_, 1:200:3_, 1:200:24_, 1:201:19_, 1:201:20_, 1:201:21_, 1:202:2_, 1:202:4_, 1:202:20_, 1:206:1_, 1:213:15_, 1:215:20_, 1:217:24

supposedly [1]- - 1:70:19

supremacy [2]- - 1:95:7_, 1:95:12

surprised [1]- - 1:84:15

suspect [1]- - 1:84:22

sustain [5]- - 1:49:5_, 1:73:10_, 1:73:12_, 1:90:10_, 1:135:17

sustained [3]- - 1:134:24_, 1:135:5_, 1:186:12

sustaining [1]- - 1:49:9

swallow [1]- - 1:122:21

swayed [1]- - 1:83:23

swear [6]- - 1:9:20_, 1:9:23_, 1:68:25_, 1:69:3_, 1:117:6_, 1:152:18

switched [3]- - 1:129:3_, 1:131:25_, 1:133:7

sworn [5]- - 1:10:4_,

1:69:9_, 1:71:17, 1:117:17, 1:153:4

system [6]- - 1:23:21_, 1:50:11_, 1:53:5_, 1:53:13_, 1:136:3_, 1:173:6

---

T

table [2]- - 1:98:22_, 1:98:23

talks [5]- - 1:92:14_, 1:93:4_, 1:102:17_, 1:189:19_, 1:190:4

Tamarac [2]- - 1:38:11_, 1:45:9

taught [1]- - 1:55:24

tax [1]- - 1:197:21

taxes [13]- - 1:192:7_, 1:192:10_, 1:192:14_, 1:192:15_, 1:192:17_, 1:192:22_, 1:197:1_, 1:198:14_, 1:198:19_, 1:200:5_, 1:200:7_, 1:201:3

teacher [3]- - 1:25:9_, 1:39:14_, 1:55:17

technically [1]- - 1:32:23

technology [2]- - 1:78:23_, 1:79:4

telecommunications [1]- - 1:31:12

tempted [2]- - 1:71:8_, 1:71:13

ten [4]- - 1:193:1_, 1:193:4_, 1:193:13_, 1:211:12

ten-minute [2]- - 1:193:1_, 1:193:13

tennis [1]- - 1:27:10

tenus [2]- - 1:6:12_, 1:6:13

term [8]- - 1:118:4_, 1:118:8_, 1:119:22_, 1:142:16_, 1:160:23_, 1:164:16_, 1:164:19_, 1:168:25

term-wise [1]- - 1:119:22

termination [2]- - 1:44:23_, 1:76:13

terms [3]- - 1:55:6_, 1:75:19_, 1:184:18

Terry [3]- - 1:13:22_, 1:50:25_, 1:68:3

Terry's [1]- - 1:13:24

test [1]- - 1:113:17

testified [6]- - 1:117:17_, 1:137:3_, 1:140:15_, 1:142:25, 1:153:4_, 1:205:3

testify [12]_ - 1:3:18_, 1:3:21_, 1:15:1_, 1:15:24_, 1:62:20_, 1:86:23_, 1:87:25_, 1:89:20_, 1:116:3_, 1:116:8_, 1:209:6_, 1:209:7

testifying [4]_ - 1:14:13_, 1:74:2_, 1:74:3_, 1:110:13

testimony [33]_ - 1:11:19 _, 1:11:24_, 1:21:9_, 1:72:1_, 1:73:23_, 1:73:25_, 1:74:6_, 1:74:7_, 1:77:21_, 1:79:20_, 1:80:15_, 1:80:17_, 1:86:14 _, 1:87:13_, 1:87:21_, 1:88:24_, 1:89:3_, 1:89:21_, 1:90:4_, 1:111:7_, 1:111:24 _, 1:112:18_, 1:112:22_, 1:113:3_, 1:113:22_, 1:116:4 _, 1:116:6_, 1:117:6_, 1:140:7_, 1:141:10_, 1:142:6 _, 1:152:18

text [2]_ - 1:79:1_, 1:222:10

texts [1]_ - 1:222:12

thanking [1]_ - 1:98:12

that's.. [1]_ - 1:120:18

THE [417]_ - 1:3:2_, 1:3:11 _, 1:3:13_, 1:3:23_, 1:4:2_, 1:4:14_, 1:4:22_, 1:5:11_, 1:6:1_, 1:6:4_, 1:6:18_, 1:6:21_, 1:7:5_, 1:7:10_, 1:7:16_, 1:7:25_, 1:8:3_, 1:8:5_, 1:8:9_, 1:8:18_, 1:8:21_, 1:8:25_, 1:9:3_, 1:9:7_, 1:10:3_, 1:10:5_, 1:10:17_, 1:14:14_, 1:14:21 _, 1:16:5_, 1:16:8_, 1:20:13_, 1:20:16, 1:21:1_, 1:21:6_, 1:21:8_, 1:21:12_, 1:21:24_, 1:22:2_, 1:22:6_, 1:22:17_, 1:22:19_, 1:22:24_, 1:23:3_, 1:23:10_, 1:23:16_, 1:23:20 _, 1:24:4_, 1:24:14_, 1:24:17 _, 1:24:21_, 1:24:25_, 1:25:3 _, 1:25:6_, 1:25:8_, 1:25:10_, 1:25:12_, 1:25:15_, 1:25:17 _, 1:25:19_, 1:26:4_, 1:26:6_, 1:26:8_, 1:26:11_, 1:26:14_, 1:26:17_, 1:27:1_, 1:27:5_, 1:27:9_, 1:27:12_, 1:27:17_, 1:27:21_, 1:27:23_, 1:28:1_, 1:28:3_, 1:28:5_, 1:28:7_, 1:28:9_, 1:28:11_, 1:28:14_, 1:28:18_, 1:28:21_, 1:28:24 _, 1:29:1_, 1:29:3_, 1:29:5_, 1:29:7_, 1:29:9_, 1:29:13_, 1:29:17_, 1:29:19_, 1:29:24 _, 1:30:2_, 1:30:4_, 1:30:7_, 1:30:9_, 1:30:11_, 1:30:13_, 1:30:15_, 1:30:17_, 1:30:19 _, 1:30:23_, 1:30:25_, 1:31:2

, 1:31:5_, 1:31:7_, 1:31:9_, 1:31:11_, 1:31:14_, 1:31:16 _, 1:31:19_, 1:31:23_, 1:32:1 _, 1:32:3_, 1:32:5_, 1:32:7_, 1:32:11_, 1:32:14_, 1:32:16 _, 1:32:18_, 1:32:20_, 1:32:22_, 1:32:25_, 1:33:2_, 1:33:4_, 1:33:6_, 1:33:8_, 1:33:11_, 1:33:15_, 1:33:18 _, 1:33:21_, 1:33:23_, 1:33:25_, 1:34:2_, 1:34:4_, 1:34:6_, 1:34:10_, 1:34:13_, 1:34:16_, 1:34:18_, 1:34:21 _, 1:34:23_, 1:34:25_, 1:35:2 _, 1:35:4_, 1:35:6_, 1:35:8_, 1:35:10_, 1:35:12_, 1:35:14 _, 1:35:16_, 1:35:18_, 1:35:21_, 1:36:1_, 1:36:5_, 1:36:8_, 1:36:10_, 1:36:12_, 1:36:15_, 1:36:17_, 1:36:19 _, 1:36:21_, 1:36:25_, 1:37:3 _, 1:37:6_, 1:37:9_, 1:37:12_, 1:37:15_, 1:37:17_, 1:37:19 _, 1:37:20_, 1:37:22_, 1:37:24_, 1:38:1_, 1:38:3_, 1:38:5_, 1:38:7_, 1:38:9_, 1:38:12_, 1:38:15_, 1:38:18 _, 1:38:20_, 1:38:22_, 1:39:1 _, 1:39:3_, 1:39:5_, 1:39:10_, 1:39:13_, 1:39:15_, 1:39:17 _, 1:39:19_, 1:39:21_, 1:39:23_, 1:39:25_, 1:40:4_, 1:40:6_, 1:40:8_, 1:40:12_, 1:40:14_, 1:40:17_, 1:40:19 _, 1:40:21_, 1:40:23_, 1:40:25_, 1:41:2_, 1:41:7_, 1:41:12_, 1:41:15_, 1:41:17 _, 1:41:20_, 1:41:24_, 1:42:1 _, 1:42:3_, 1:42:5_, 1:42:7_, 1:42:9_, 1:42:12_, 1:42:15_, 1:42:18_, 1:42:20_, 1:42:24 _, 1:43:2_, 1:43:4_, 1:43:6_, 1:43:8_, 1:43:10_, 1:43:13_, 1:43:17_, 1:43:19_, 1:43:21 _, 1:43:23_, 1:44:2_, 1:44:4_, 1:44:7_, 1:44:9_, 1:44:11_, 1:44:13_, 1:44:16_, 1:44:18 _, 1:44:20_, 1:44:24_, 1:45:3 _, 1:45:6_, 1:45:10_, 1:45:13 _, 1:45:16_, 1:45:19_, 1:45:22_, 1:45:24_, 1:46:1_, 1:46:3_, 1:46:6_, 1:46:10_, 1:46:13_, 1:46:18_, 1:46:20 _, 1:46:23_, 1:46:25_, 1:47:2 _, 1:47:6_, 1:47:8_, 1:47:10_, 1:47:24_, 1:48:4_, 1:48:8_, 1:48:11_, 1:48:20_, 1:48:23 _, 1:52:8_, 1:61:11_, 1:62:1_, 1:62:4_, 1:62:7_, 1:63:5_, 1:64:8_, 1:64:14_, 1:64:19_, 1:64:24_, 1:65:2_, 1:65:5_,

, 1:65:7_, 1:65:12_, 1:65:14_, 1:65:19_, 1:65:22_, 1:66:2_, 1:66:7_, 1:66:9_, 1:66:11_, 1:66:16_, 1:66:18_, 1:66:24 _, 1:67:4_, 1:67:8_, 1:67:16_, 1:67:18_, 1:67:23_, 1:68:16 _, 1:69:10_, 1:75:6_, 1:82:5_, 1:82:8_, 1:82:18_, 1:82:24_, 1:83:6_, 1:83:9_, 1:83:25_, 1:84:13_, 1:85:1_, 1:85:11_, 1:85:14_, 1:86:10_, 1:86:17 _, 1:86:24_, 1:87:22_, 1:88:2 _, 1:88:7_, 1:88:11_, 1:88:25 _, 1:89:2_, 1:89:8_, 1:89:12_, 1:89:17_, 1:89:22_, 1:89:25 _, 1:90:13_, 1:90:18_, 1:90:21_, 1:90:24_, 1:91:15 _, 1:91:20_, 1:91:25_, 1:92:4 _, 1:92:7_, 1:92:15_, 1:93:7_, 1:93:16_, 1:93:23_, 1:94:20 _, 1:95:2_, 1:95:10_, 1:96:1_, 1:96:12_, 1:96:14_, 1:96:21 _, 1:97:2_, 1:97:8_, 1:97:10_, 1:97:13_, 1:97:16_, 1:97:19 _, 1:97:21_, 1:110:21_, 1:112:8_, 1:112:12_, 1:114:15_, 1:114:22_, 1:115:3_, 1:115:14_, 1:115:19_, 1:116:16_, 1:116:19_, 1:116:21_, 1:116:23_, 1:117:9_, 1:117:12_, 1:117:14_, 1:125:23_, 1:126:18_, 1:126:21_, 1:134:24_, 1:135:5_, 1:135:17_, 1:136:22_, 1:137:7_, 1:139:8 _, 1:139:21_, 1:140:1_, 1:148:23_, 1:151:13_, 1:151:15_, 1:151:16_, 1:151:22_, 1:151:25_, 1:152:7_, 1:152:10_, 1:152:21_, 1:153:1_, 1:167:5 _, 1:173:19_, 1:174:13_, 1:174:16_, 1:180:18_, 1:184:13_, 1:184:20_, 1:186:12_, 1:186:21_, 1:192:25_, 1:193:6_, 1:193:10_, 1:193:13_, 1:193:15_, 1:193:22_, 1:193:25_, 1:209:19_, 1:216:25_, 1:217:4_, 1:218:13_, 1:221:15_, 1:224:8_, 1:224:13_, 1:225:11_, 1:225:18_, 1:225:23_, 1:226:1_, 1:226:4 _, 1:226:8

themselves [6]_ - 1:51:4 _, 1:72:20_, 1:132:9_, 1:132:11_, 1:143:16_, 1:195:24

therapist [1]_ - 1:40:9

therefore [1]_ - 1:174:25

thereto [1]_ - 1:189:23

Thereupon [2] - 1:117:15, 1:153:2

they've [2]_ - 1:86:5_, 1:95:21

thinking [4]_ - 1:8:18_, 1:85:23_, 1:115:21_, 1:200:4

thinks [1]_ - 1:73:7

third [4]_ - 1:8:10_, 1:9:17 _, 1:9:18_, 1:9:19

thorough [1]_ - 1:124:8

thousand [5]_ - 1:187:8_, 1:187:17_, 1:187:19_, 1:197:18_, 1:200:1

three [14]_ - 1:3:24_, 1:8:2 _, 1:10:11_, 1:32:19_, 1:46:24_, 1:82:20_, 1:83:19 _, 1:154:9_, 1:154:23_, 1:168:3_, 1:179:14_, 1:211:12_, 1:213:4_, 1:223:24

three-year [1]_ - 1:82:20

throughout [1]_ - 1:178:4

throw [1]_ - 1:122:20

thrown [2]_ - 1:47:18_, 1:47:20

Thursday [1]_ - 1:20:14

ticket [4]_ - 1:53:22_, 1:53:24_, 1:54:4_, 1:54:9

tickets [1]_ - 1:20:7

timely [1]_ - 1:108:20

timing [1]_ - 1:203:15

tip [1]_ - 1:77:15

tired [1]_ - 1:12:4

Title [1]_ - 1:189:20

today [15]_ - 1:10:8_, 1:13:11_, 1:13:14_, 1:13:21 _, 1:14:11_, 1:70:16_, 1:117:21_, 1:149:9_, 1:149:10_, 1:149:25_, 1:150:1_, 1:165:16_, 1:178:24_, 1:200:25_, 1:208:11

toenails [1]_ - 1:123:11

together [8]_ - 1:17:1_, 1:17:18_, 1:49:13_, 1:50:19 _, 1:101:6_, 1:178:11_, 1:179:13_, 1:209:10

token [1]_ - 1:145:11

tomorrow [7]_ - 1:3:16_, 1:3:17_, 1:3:18_, 1:12:9_,

1:115:17_, 1:225:15_, 1:225:19

took [9]_ - 1:87:4_, 1:87:23 _, 1:88:16_, 1:107:7_, 1:113:6_, 1:121:17_, 1:134:6 _, 1:196:25_, 1:200:13

top [2]_ - 1:187:25_, 1:223:1

total [4]_ - 1:96:8_, 1:210:23_, 1:211:13_, 1:220:21

touching [1]_ - 1:9:25

tough [2]_ - 1:48:13_, 1:96:1

toward [5]_ - 1:130:4_, 1:133:9_, 1:137:14_, 1:137:22_, 1:144:11

towards [1]_ - 1:130:16

town [2]_ - 1:20:7_, 1:20:11

traffic [3]_ - 1:54:5_, 1:54:8 _, 1:54:10

transcribed [1]_ - 1:87:11

transcript [5]_ - 1:87:10_, 1:88:4_, 1:88:6_, 1:88:8_, 1:116:10

transferred [1]_ - 1:203:23

transitioning [1]_ - 1:134:5

translation [1]_ - 1:81:17

translators [1]_ - 1:81:15

transportation [3]_ - 1:155:22_, 1:155:23_, 1:195:25

travel [1]_ - 1:121:19

traveling [1]_ - 1:48:21

treat [2]_ - 1:201:12

treatment [2]_ - 1:162:13 _, 1:164:22

treats [1]_ - 1:100:22

trial [35]_ - 1:3:11_, 1:11:18 _, 1:12:10_, 1:12:11_, 1:12:20_, 1:12:21_, 1:12:23 _, 1:13:10_, 1:13:16_, 1:14:11_, 1:49:3_, 1:50:12_, 1:50:13_, 1:52:13_, 1:63:10 _, 1:63:11_, 1:69:17_, 1:69:18_, 1:69:20_, 1:70:5_, 1:71:5_, 1:71:18_, 1:71:20_, 1:72:14_, 1:74:9_, 1:80:18_, 1:81:13_, 1:84:2_, 1:88:17_, 1:88:22_, 1:98:3_, 1:110:15 _, 1:116:5_, 1:218:8

trials [1]_ - 1:69:17

trick [1]_ - 1:45:19

tried [3]_ - 1:17:9_, 1:106:17_, 1:134:15

tries [1]_ - 1:164:24

triggered [1]_ - 1:51:24

trip [2]_ - 1:9:13_, 1:9:19

trouble [3]_ - 1:10:10_, 1:11:17_, 1:138:23

troubling [1]_ - 1:120:7

true [52]_ - 1:36:24_, 1:69:5 _, 1:72:24_, 1:77:9_, 1:77:25 _, 1:78:11_, 1:140:22_, 1:159:11_, 1:166:11_, 1:168:23_, 1:169:4_, 1:173:13_, 1:174:7_, 1:180:22_, 1:181:5_, 1:182:9 _, 1:185:19_, 1:185:25_, 1:186:14_, 1:186:25_, 1:191:4_, 1:191:5_, 1:191:15 _, 1:191:20_, 1:191:21_, 1:191:24_, 1:196:11_, 1:196:16_, 1:196:20_, 1:196:21_, 1:197:6_, 1:197:7 _, 1:197:9_, 1:197:15_, 1:197:17_, 1:198:4_, 1:199:17_, 1:201:8_, 1:201:22_, 1:202:18_, 1:208:6_, 1:210:3_, 1:211:4 _, 1:215:14_, 1:216:11_, 1:219:14_, 1:220:4_, 1:220:8 _, 1:220:9_, 1:220:16_, 1:221:3_, 1:221:21

trumps [1]_ - 1:85:4

trust [1]_ - 1:185:20

truth [8]_ - 1:117:7_, 1:117:8, 1:152:19, 1:152:20 _, 1:225:7_, 1:225:8

truthfully [2]_ - 1:9:24_, 1:69:4

try [9]_ - 1:10:8_, 1:17:11_, 1:24:19_, 1:52:23_, 1:69:4_, 1:71:2_, 1:110:18_, 1:149:3 _, 1:176:13

trying [16]_ - 1:60:23_, 1:69:16_, 1:70:2_, 1:82:12_, 1:94:2_, 1:95:21_, 1:96:2_, 1:103:11_, 1:108:11_, 1:113:5_, 1:163:12_, 1:176:17_, 1:178:1_, 1:200:25_, 1:220:24_, 1:223:17

Tuesday [1]_ - 1:213:24

turn [5]_ - 1:16:24_, 1:70:3 _, 1:219:8_, 1:220:11_, 1:220:12

turned [1]_ - 1:208:9

turns [1]_ - 1:15:18

tutor [1]_ - 1:26:21

tutoring [1]_ - 1:26:20

twice [2]_ - 1:109:16_, 1:140:4

twisting [1]_ - 1:199:10

Twitter [1]_ - 1:79:4

two [65]_ - 1:3:24_, 1:8:2_, 1:10:11_, 1:10:20_, 1:12:7_, 1:12:19_, 1:15:13_, 1:25:16 _, 1:31:15_, 1:32:17_, 1:32:23_, 1:35:7_, 1:35:8_, 1:41:15_, 1:44:12_, 1:62:16 _, 1:68:17_, 1:68:18_, 1:68:19_, 1:68:20_, 1:69:14 _, 1:70:13_, 1:82:17_, 1:96:13_, 1:101:6_, 1:107:13 _, 1:119:16_, 1:120:13_, 1:124:20_, 1:127:9_, 1:134:16_, 1:138:22_, 1:139:11_, 1:139:18_, 1:149:14_, 1:154:9_, 1:168:2 _, 1:174:23_, 1:175:18_, 1:175:20_, 1:175:25_, 1:176:24_, 1:177:24_, 1:179:14_, 1:179:16_, 1:181:14_, 1:203:7_, 1:208:9 _, 1:208:12_, 1:208:14_, 1:210:7_, 1:210:8_, 1:210:10 _, 1:210:23_, 1:213:3_, 1:214:13_, 1:214:18_, 1:224:2_, 1:224:15_, 1:224:22

two-week [1]_ - 1:10:20

two-year [1]_ - 1:82:17

type [26]_ - 1:22:2_, 1:23:10_, 1:25:6_, 1:27:23_, 1:28:21_, 1:29:17_, 1:29:19 _, 1:31:7_, 1:32:14_, 1:33:18 _, 1:34:13_, 1:36:8_, 1:37:15 _, 1:38:15_, 1:39:13_, 1:40:8 _, 1:42:1_, 1:43:4_, 1:44:4_, 1:45:13_, 1:46:13_, 1:57:8_, 1:118:18_, 1:180:10_, 1:180:14_, 1:196:1

types [1]_ - 1:58:21

typically [3]_ - 1:12:7_, 1:12:21_, 1:69:20

typo [1]_ - 1:75:6

## U

U.S [1]_ - 1:183:17

UD [1]_ - 1:55:7

ultimate [1]_ - 1:216:9

ultimately [4]_ - 1:161:20

_, 1:192:10_, 1:216:6_, 1:216:8

umbrellas [1]_ - 1:72:6

umpire [1]_ - 1:49:2

unable [2]_ - 1:131:1_, 1:131:2

unavailable [2]_ - 1:90:3 _, 1:90:8

uncomfortable [1]_ - 1:52:20

under [23]_ - 1:11:1_, 1:51:23_, 1:55:7_, 1:74:24_, 1:84:10_, 1:85:25_, 1:100:16 _, 1:101:2_, 1:101:7_, 1:101:24_, 1:106:19_, 1:107:13_, 1:108:14_, 1:109:14_, 1:109:20_, 1:110:3_, 1:111:11_, 1:113:18_, 1:137:11_, 1:183:11_, 1:184:18_, 1:199:1

understood [10]_ - 1:60:23_, 1:86:16_, 1:91:14 _, 1:93:17_, 1:147:16_, 1:168:18_, 1:182:9_, 1:182:15_, 1:184:25_, 1:185:4

underwriter [3]_ - 1:28:23 _, 1:57:5_, 1:57:10

Underwriters [1]_ - 1:22:21

underwriting [1]_ - 1:57:8

undivided [1]_ - 1:20:2

unemployed [1]_ - 1:45:14

unemployment [1]_ - 1:44:21

unfortunately [2]_ - 1:120:4_, 1:131:3

uniform [1]_ - 1:25:13

union [2]_ - 1:43:7_, 1:43:9

unique [1]_ - 1:112:3

United [9]_ - 1:10:7_, 1:10:23_, 1:15:8_, 1:74:19_, 1:100:16_, 1:101:3_, 1:101:7 _, 1:109:14

unless [3]_ - 1:73:3_, 1:77:20_, 1:90:7

unlike [1]_ - 1:109:25

unlikely [1]_ - 1:68:5

unlimited [1]_ - 1:18:1

unresolved [2]_ - 1:113:23_, 1:113:24

unskilled [1]_ - 1:153:19

unsuccessful [1]₋ - 1:116:14

up [54]₋ - 1:4:13₋, 1:5:2₋, 1:7:5₋, 1:7:20₋, 1:8:7₋, 1:8:23₋, 1:13:18₋, 1:15:14₋, 1:20:6₋, 1:20:23₋, 1:21:20₋, 1:25:21₋, 1:25:23₋, 1:49:5₋, 1:51:11₋, 1:51:20₋, 1:51:22 ₋, 1:54:4₋, 1:54:8₋, 1:54:23₋, 1:55:3₋, 1:55:22₋, 1:60:15₋, 1:70:11₋, 1:86:11₋, 1:88:22 ₋, 1:90:7₋, 1:103:12₋, 1:106:1₋, 1:106:10₋, 1:106:22₋, 1:118:2₋, 1:121:23₋, 1:122:16₋, 1:122:18₋, 1:123:22₋, 1:156:19₋, 1:161:2₋, 1:166:4 ₋, 1:170:6₋, 1:170:14₋, 1:170:15₋, 1:171:8₋, 1:171:11₋, 1:179:12₋, 1:191:17₋, 1:193:8₋, 1:195:15₋, 1:212:9₋, 1:216:23₋, 1:217:14₋, 1:218:20₋, 1:226:7

upgraded [1]₋ - 1:70:24

uses [1]₋ - 1:79:24

UV [1]₋ - 1:70:19

## V

Valdivieso [137]₋ - 1:3:5₋, 1:14:1₋, 1:14:8₋, 1:16:2₋, 1:18:8₋, 1:18:11₋, 1:18:15₋, 1:74:13₋, 1:76:16₋, 1:76:24 ₋, 1:77:6₋, 1:77:8₋, 1:77:12₋, 1:77:16₋, 1:80:23₋, 1:81:4₋, 1:98:21₋, 1:101:16₋, 1:101:22₋, 1:117:24₋, 1:118:14₋, 1:121:8₋, 1:121:10₋, 1:121:17₋, 1:122:12₋, 1:123:13₋, 1:124:1₋, 1:124:7₋, 1:124:24 ₋, 1:127:20₋, 1:128:2₋, 1:128:23₋, 1:129:4₋, 1:129:15₋, 1:130:7₋, 1:131:8 ₋, 1:131:20₋, 1:131:24₋, 1:132:18₋, 1:132:25₋, 1:133:4₋, 1:133:11₋, 1:133:17₋, 1:133:18₋, 1:134:2₋, 1:134:8₋, 1:134:11 ₋, 1:134:18₋, 1:134:20₋, 1:135:3₋, 1:135:7₋, 1:138:1 ₋, 1:149:6₋, 1:150:12₋, 1:151:5₋, 1:156:12₋, 1:156:17₋, 1:157:5₋, 1:157:10₋, 1:157:13₋, 1:157:16₋, 1:157:18₋, 1:157:22₋, 1:158:5₋, 1:158:11₋, 1:159:8₋,

1:166:13₋, 1:166:23₋, 1:167:2₋, 1:167:11₋, 1:168:5 ₋, 1:168:13₋, 1:169:2₋, 1:170:18₋, 1:172:9₋, 1:173:1 ₋, 1:173:12₋, 1:174:8₋, 1:174:19₋, 1:175:12₋, 1:176:18₋, 1:177:2₋, 1:177:15₋, 1:179:4₋, 1:182:3 ₋, 1:186:23₋, 1:187:2₋, 1:188:2₋, 1:188:14₋, 1:188:19₋, 1:190:15₋, 1:190:23₋, 1:191:2₋, 1:191:7 ₋, 1:191:13₋, 1:191:19₋, 1:191:20₋, 1:194:19₋, 1:195:17₋, 1:196:6₋, 1:196:9 ₋, 1:196:16₋, 1:196:19₋, 1:196:22₋, 1:200:17₋, 1:202:21₋, 1:203:24₋, 1:204:6₋, 1:204:10₋, 1:204:19₋, 1:204:25₋, 1:205:8₋, 1:206:25₋, 1:207:10₋, 1:207:16₋, 1:208:4₋, 1:210:19₋, 1:210:20₋, 1:210:24₋, 1:211:3₋, 1:211:16₋, 1:211:17₋, 1:212:9₋, 1:212:13₋, 1:212:22₋, 1:213:2₋, 1:213:12₋, 1:216:10₋, 1:217:10₋, 1:218:18₋, 1:218:21₋, 1:220:14₋, 1:221:2₋, 1:221:23₋, 1:222:21₋, 1:223:22

Valdivieso's [7]₋ - 1:159:19₋, 1:160:11₋, 1:178:20₋, 1:187:25₋, 1:202:6₋, 1:212:4₋, 1:221:19

validated [3]₋ - 1:206:5₋, 1:206:14₋, 1:212:10

validation [1]₋ - 1:206:10

Velázquez [14]₋ - 1:14:2₋, 1:18:9₋, 1:18:13₋, 1:74:14₋, 1:75:13₋, 1:77:13₋, 1:77:14 ₋, 1:77:17₋, 1:78:3₋, 1:78:6₋, 1:78:9₋, 1:80:25₋, 1:81:3₋, 1:152:14

venture [1]₋ - 1:103:6

Vera [1]₋ - 1:40:1

Vera-Martinez [1]₋ - 1:40:1

verdict [15]₋ - 1:6:15₋, 1:6:21₋, 1:12:25₋, 1:19:21₋, 1:20:3₋, 1:50:2₋, 1:69:5₋, 1:71:9₋, 1:73:22₋, 1:80:2₋, 1:82:11₋, 1:82:14₋, 1:82:25 ₋, 1:83:2₋, 1:84:4

verdicts [1]₋ - 1:35:10

verified [3]₋ - 1:219:18₋,

1:219:24₋, 1:220:3

verifies [2]₋ - 1:162:9₋, 1:219:18

verify [4]₋ - 1:105:14₋, 1:161:14₋, 1:162:6₋, 1:163:10

versus [5]₋ - 1:86:9₋, 1:88:20₋, 1:89:16₋, 1:91:19 ₋, 1:105:20

via [2]₋ - 1:86:23₋, 1:91:12

video [1]₋ - 1:88:2

videos [1]₋ - 1:111:1

view [4]₋ - 1:80:13₋, 1:99:1

violating [1]₋ - 1:74:23

violation [1]₋ - 1:74:19

VIP [111]₋ - 1:3:2₋, 1:3:9₋, 1:14:1₋, 1:14:19₋, 1:18:8₋, 1:18:13₋, 1:62:9₋, 1:74:13₋, 1:75:1₋, 1:75:9₋, 1:75:12₋, 1:75:17₋, 1:75:23₋, 1:75:24 ₋, 1:75:25₋, 1:76:1₋, 1:76:2₋, 1:76:7₋, 1:76:10₋, 1:76:12₋, 1:76:17₋, 1:76:19₋, 1:76:25 ₋, 1:77:5₋, 1:77:12₋, 1:77:17 ₋, 1:78:2₋, 1:78:5₋, 1:78:9₋, 1:80:25₋, 1:81:3₋, 1:90:17₋, 1:101:10₋, 1:101:18₋, 1:102:9₋, 1:103:24₋, 1:107:8 ₋, 1:108:13₋, 1:108:19₋, 1:109:6₋, 1:111:10₋, 1:112:2 ₋, 1:112:5₋, 1:112:25₋, 1:113:4₋, 1:113:6₋, 1:113:13 ₋, 1:114:4₋, 1:114:10₋, 1:116:16₋, 1:118:18₋, 1:119:1₋, 1:119:2₋, 1:119:7 ₋, 1:119:11₋, 1:119:23₋, 1:120:4₋, 1:120:5₋, 1:120:15 ₋, 1:120:21₋, 1:121:8₋, 1:124:5₋, 1:126:1₋, 1:128:5 ₋, 1:128:24₋, 1:129:18₋, 1:130:1₋, 1:132:25₋, 1:133:3 ₋, 1:133:15₋, 1:134:20₋, 1:135:15₋, 1:135:20₋, 1:137:3₋, 1:137:13₋, 1:141:5 ₋, 1:141:23₋, 1:142:6₋, 1:142:25₋, 1:143:9₋, 1:145:9 ₋, 1:145:15₋, 1:145:21₋, 1:147:22₋, 1:151:6₋, 1:153:14₋, 1:153:21₋, 1:162:6₋, 1:162:17₋, 1:163:3 ₋, 1:163:10₋, 1:164:4₋, 1:164:24₋, 1:165:13₋, 1:166:4₋, 1:166:9₋, 1:171:14 ₋, 1:171:23₋, 1:172:14₋, 1:191:23₋, 1:191:24₋, 1:192:21₋, 1:194:6₋, 1:196:3 ₋, 1:196:13₋, 1:196:17₋, 1:200:14₋, 1:205:4₋, 1:224:2

VIP's [1]₋ - 1:126:14

Virginia [1]₋ - 1:121:20

virus [1]₋ - 1:70:20

visit [4]₋ - 1:79:14₋, 1:121:20₋, 1:157:1₋, 1:157:2

voir [4]₋ - 1:17:4₋, 1:17:5₋, 1:17:10₋, 1:65:10

voter [2]₋ - 1:11:4₋, 1:11:5

voters [2]₋ - 1:15:9₋, 1:15:15

vs [5]₋ - 1:3:2₋, 1:14:1₋, 1:18:8₋, 1:91:23₋, 1:92:9

## W

W-2 [5]₋ - 1:111:19₋, 1:192:23₋, 1:192:24₋, 1:197:2₋, 1:197:16

W-2s [5]₋ - 1:192:15₋, 1:192:18₋, 1:192:19₋, 1:198:17₋, 1:199:25

wage [24]₋ - 1:27:5₋, 1:27:6₋, 1:28:9₋, 1:29:5₋, 1:30:15₋, 1:32:3₋, 1:33:6₋, 1:34:2₋, 1:35:16₋, 1:36:21₋, 1:38:3₋, 1:39:1₋, 1:39:21₋, 1:41:2₋, 1:41:3₋, 1:42:15₋, 1:43:19₋, 1:44:20₋, 1:46:1₋, 1:54:14₋, 1:109:16₋, 1:110:4 ₋, 1:198:4₋, 1:198:10

wages [18]₋ - 1:24:5₋, 1:24:6₋, 1:27:6₋, 1:35:22₋, 1:43:14₋, 1:74:18₋, 1:99:15 ₋, 1:99:16₋, 1:101:2₋, 1:101:4₋, 1:101:8₋, 1:108:16 ₋, 1:198:7₋, 1:198:11

wait [3]₋ - 1:6:10₋, 1:134:9 ₋, 1:201:23

waiter [1]₋ - 1:43:5

waiting [1]₋ - 1:115:7

waive [3]₋ - 1:84:22₋, 1:94:12₋, 1:110:2

waived [1]₋ - 1:5:18

waiver [2]₋ - 1:126:7₋, 1:126:9

waiving [4]₋ - 1:84:14₋, 1:84:15₋, 1:110:2₋, 1:110:4

wake [1]₋ - 1:122:18

walk [5]₋ - 1:63:14₋, 1:63:18₋, 1:80:18₋, 1:108:5 ₋, 1:134:3

walked [2]₋ - 1:128:13₋, 1:187:2

walking [4]₋ - 1:3:6₋, 1:63:18₋, 1:72:5₋, 1:115:12

wants [8]– - 1:7:6–, 1:7:7–, 1:12:1–, 1:12:5–, 1:83:7–, 1:159:4–, 1:159:6–, 1:209:13

warrant [1]– - 1:84:4

wash [1]– - 1:143:18

watch [1]– - 1:122:20

water [2]– - 1:30:18–, 1:122:19

wave [1]– - 1:111:1

Wawa [1]– - 1:25:22

ways [1]– - 1:79:25

weak [1]– - 1:87:8

wear [1]– - 1:70:16

wearing [1]– - 1:70:16

website [2]– - 1:86:5–, 1:142:16

websites [2]– - 1:79:2–, 1:79:10

Wednesday [3]– - 1:3:17 –, 1:51:18–, 1:87:5

week [50]– - 1:10:10–, 1:10:14–, 1:10:17–, 1:10:20 –, 1:20:7–, 1:20:20–, 1:51:17 –, 1:51:18–, 1:68:6–, 1:86:21 –, 1:99:5–, 1:100:7–, 1:100:14–, 1:107:25–, 1:118:6–, 1:121:11–, 1:133:16–, 1:137:12–, 1:149:6–, 1:149:17–, 1:150:2 –, 1:161:4–, 1:173:4–, 1:173:11–, 1:176:9–, 1:176:10–, 1:179:4–, 1:180:4 –, 1:180:5–, 1:203:2–, 1:203:3–, 1:203:8–, 1:203:10 –, 1:203:17–, 1:204:2–, 1:204:7–, 1:206:20–, 1:207:16–, 1:210:6–, 1:210:16–, 1:211:5–, 1:211:10–, 1:216:21–, 1:217:18–, 1:221:4–, 1:222:5 –, 1:222:24–, 1:223:23

weekend [14]– - 1:20:10–, 1:120:12–, 1:125:2–, 1:129:7 –, 1:129:9–, 1:130:4–, 1:130:5–, 1:130:15–, 1:130:20–, 1:133:16–, 1:137:4–, 1:138:6–, 1:143:17 –, 1:150:3

weekends [8]– - 1:120:6–, 1:121:18–, 1:125:2–, 1:125:6 –, 1:130:9–, 1:132:20–, 1:138:7–, 1:138:8

weekly [2]– - 1:203:6–, 1:203:8

weeks [3]– - 1:21:3–, 1:203:7–, 1:212:5

weight [3]– - 1:62:24–, 1:72:13–, 1:80:16

welcome [1]– - 1:10:7

West [3]– - 1:153:24–, 1:154:11–, 1:154:18

Westlaw [2]– - 1:91:23–, 1:91:24

Weston [2]– - 1:25:2–, 1:55:18

wet [2]– - 1:72:5–, 1:72:6

whatsoever [1]– - 1:79:7

whereabouts [19]– - 1:21:21–, 1:25:1–, 1:27:19–, 1:28:16–, 1:29:11–, 1:30:21 –, 1:32:9–, 1:33:13–, 1:34:8–, 1:36:3–, 1:37:9–, 1:38:10–, 1:39:7–, 1:40:2–, 1:41:22–, 1:42:22–, 1:43:25–, 1:45:8–, 1:46:8

whereby [1]– - 1:111:14

wherein [2]– - 1:75:21–, 1:86:22

whichever [1]– - 1:81:24

whole [23]– - 1:4:15–, 1:5:8 –, 1:25:5–, 1:39:12–, 1:45:12 –, 1:91:13–, 1:93:9–, 1:99:5–, 1:105:17–, 1:105:19–, 1:109:10–, 1:110:7–, 1:110:14–, 1:116:9–, 1:117:7 –, 1:120:7–, 1:130:23–, 1:131:12, 1:152:19–, 1:165:7 –, 1:172:18–, 1:179:7–, 1:220:21

Wi [1]– - 1:87:9

Wi-Fi [1]– - 1:87:9

wide [1]– - 1:112:15

wife [4]– - 1:15:16–, 1:47:13–, 1:48:3–, 1:107:7

willed [1]– - 1:123:20

willfulness [4]– - 1:82:13–, 1:82:15–, 1:82:20–, 1:82:21

willing [2]– - 1:63:1–, 1:98:5

win [1]– - 1:96:7

wise [3]– - 1:7:24–, 1:12:12 –, 1:119:22

wish [2]– - 1:80:5–, 1:144:1

with.. [1]– - 1:129:16

WITNESS [6]– - 1:117:9 –, 1:117:12–, 1:117:14–, 1:151:15–, 1:152:21–, 1:153:1

witness [41]– - 1:3:20–, 1:3:22–, 1:6:13–, 1:11:23–,

1:15:5–, 1:15:19–, 1:16:6–, 1:23:18–, 1:23:20–, 1:23:23 –, 1:23:25–, 1:26:25–, 1:27:1 –, 1:48:9–, 1:48:17–, 1:72:4–, 1:72:7–, 1:72:25–, 1:73:2–, 1:73:3–, 1:73:5–, 1:73:8–, 1:73:10–, 1:73:24–, 1:74:2–, 1:74:4–, 1:74:5–, 1:81:1–, 1:81:2–, 1:86:23–, 1:88:16–, 1:89:15–, 1:90:2–, 1:90:8–, 1:91:12–, 1:117:1–, 1:117:2 –, 1:152:13–, 1:173:18–, 1:186:11

witness's [7]– - 1:73:25–, 1:74:1–, 1:74:2–, 1:74:3–, 1:74:6–, 1:74:10

witnesses [16]– - 1:15:1–, 1:15:2–, 1:15:24–, 1:16:3–, 1:16:5–, 1:48:12–, 1:62:20–, 1:77:21–, 1:80:6–, 1:80:9–, 1:80:24–, 1:80:25–, 1:81:4–, 1:110:12–, 1:111:2–, 1:111:5

witnesses' [2]– - 1:15:19 –, 1:72:23

woks [1]– - 1:17:19

wonder [1]– - 1:209:11

wonderful [1]– - 1:111:21

word [2]– - 1:107:19–, 1:142:23

words [9]– - 1:8:5–, 1:66:2 –, 1:79:24–, 1:91:2–, 1:133:1 –, 1:141:10–, 1:150:13–, 1:177:18–, 1:196:20

worker [1]– - 1:65:10

workers' [5]– - 1:198:11–, 1:198:18–, 1:199:8–, 1:199:14–, 1:201:2

workflow [1]– - 1:206:12

workout [1]– - 1:226:7

works [12]– - 1:23:6–, 1:30:5–, 1:31:21–, 1:40:15–, 1:136:3–, 1:136:4–, 1:157:15 –, 1:157:17–, 1:157:21–, 1:203:1–, 1:203:16–, 1:204:23

workweek [1]– - 1:74:18

worry [1]– - 1:163:16

worse [2]– - 1:120:11

write [7]– - 1:50:6–, 1:124:24–, 1:173:16–, 1:174:21–, 1:175:4–, 1:175:9 –, 1:176:8

writing [4]– - 1:24:22–, 1:46:5–, 1:128:2–, 1:175:17

written [1]– - 1:8:23–, 1:88:5–, 1:137:21–, 1:165:25

wrote [11]– - 1:101:21–, 1:174:8–, 1:174:18–, 1:175:11–, 1:182:11–, 1:182:18–, 1:202:22–, 1:204:1–, 1:204:18–, 1:212:9 –, 1:220:14

## Y

year [13]– - 1:23:14–, 1:56:23–, 1:76:12–, 1:82:17 –, 1:82:20–, 1:91:22–, 1:148:5–, 1:148:6–, 1:176:19 –, 1:177:2–, 1:190:23–, 1:191:11–, 1:222:3

years [16]– - 1:12:18–, 1:15:15–, 1:22:11–, 1:25:24 –, 1:29:16–, 1:31:4–, 1:32:13 –, 1:32:17–, 1:34:12–, 1:36:7 –, 1:40:5–, 1:40:22–, 1:43:1–, 1:44:3–, 1:46:12–, 1:83:19

yoga [1]– - 1:34:5

Yolanda [2]– - 1:136:5–, 1:157:10

York [1]– - 1:40:7

young [3]– - 1:3:10–, 1:14:20–, 1:26:21

younger [1]– - 1:119:21

yourself [4]– - 1:27:2–, 1:50:13–, 1:145:13–, 1:147:18

yourselves [1]– - 1:16:15

YouTube [2]– - 1:79:3–, 1:111:1

## Z

Zoom [12]– - 1:86:23–, 1:87:6–, 1:87:7–, 1:87:8–, 1:87:9–, 1:88:13–, 1:88:14–, 1:91:11–, 1:91:12–, 1:116:3 –, 1:116:14–, 1:153:13