```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                     FORT LAUDERDALE DIVISION
                       CASE NO. 22-cv-61553-WPD
 3

 4   CRUZ VALDIVIESO FIGUERA,              Fort Lauderdale, Florida

 5                PLAINTIFF,               October 31, 2023

 6         vs.                            9:03 a.m. - 4:50 p.m.

 7   ALL VIP CARE, INC., AND LIZ VELAZQUEZ Volume 2
     MCKINNON,
 8
                  DEFENDANT.              Pages 1 to 198
 9   _____

10                          JURY TRIAL
            BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   FOR THE PLAINTIFF:    FAIRLAW FIRM
                           BRIAN H. POLLOCK, ESQ.
14                         135 San Lorenzo Avenue
                           Suite 770
15                         Coral Gables, Florida 33146

16   FOR THE DEFENDANT:    RANDY M. GOLDBERG & ASSOCIATES, PLLC
                           RANDY M. GOLDBERG, ESQ.
17                         151 NW 1st Ave
                           Delray Beach, Florida 33444
18
     STENOGRAPHICALLY REPORTED BY:
19
                           LAURA E. MELTON, RMR, CRR, FPR
20                         Official Court Reporter
                           United States District Court
21                         400 North Miami Avenue
                           Miami, Florida 33128
22

23

24

25
```

```
 1                    E X A M I N A T I O N S
 2      Witness                                              Page
 3      LIZ MCKINNON
               CROSS-EXAMINATION BY MR. GOLDBERG                9
 4             REDIRECT EXAMINATION BY MR. POLLOCK             49
               RECROSS-EXAMINATION BY MR. GOLDBERG             71
 5      ANGELA MELENDEZ
               DIRECT EXAMINATION BY MR. GOLDBERG             86
 6             CROSS-EXAMINATION BY MR. POLLOCK               88
               PROFFER DIRECT EXAMINATION BY MR. GOLDBERG     89
 7             PROFFER CROSS-EXAMINATION  BY MR. POLLOCK      92
        CRUZ VALDIVIESO FIGUERA
 8             DIRECT EXAMINATION BY MR. POLLOCK              95
               CROSS-EXAMINATION BY MR. GOLDBERG            116
 9             REDIRECT EXAMINATION BY MR. POLLOCK          162

10
                         E X H I B I T S
11
                       PLAINTIFF EXHIBITS
12
        Exhibit                                              Page
13
                              NONE
14

15                     DEFENDANT EXHIBITS

16      Exhibit                                              Page

17
                              NONE
18

19

20

21

22

23

24

25
```

1          (Call to the Order of the Court.)

2              THE COURT:  Please be seated.

3              Back on the record.  Counsel are present.

4              Anything to come before the Court before I bring the

5      jury in?

6              MR. GOLDBERG:  Yes, Your Honor.

7              Well, I will need to renew my Rule 32 motion to allow

8      the deposition of Ms. Angela Melendez.  It was to be read into

9      the record.  Originally, counsel and I had attempted to

10     schedule for her to appear via Zoom for today about 1:00.

11             However, as the Court is well aware, this case is

12     progressing a little slower than expected, and keeping

13     Ms. Melendez in the standby mode is very upsetting to her,

14     along with --

15             THE COURT:  Well, just tell her -- tell her to be there

16     at 1:00, and we will break the trial and she can testify at

17     1:00.

18             MR. GOLDBERG:  I understand that, Your Honor.  But

19     speaking with counsel, that's going to be disruptive to his --

20             THE COURT:  All right.  So let me ask Mr. Pollock.

21             Would you rather the deposition be read, or would you

22     rather the plaintiff's case be disrupted and the witness

23     testify by Zoom at 1:00?

24             MR. POLLOCK:  I'm fine with disrupting it, Your Honor.

25     I think when we talk about what Ms. Melendez is going to

1    testify about, which we haven't addressed, I think there is two

2    areas, one of which, I think, has been rendered irrelevant, and

3    I don't think that that testimony should be elicited for the

4    jury, which leaves one area of inquiry.  And we can do

5    it -- and I don't have a problem if we address it that way.

6         In particular, the two areas that I understand it that

7    Ms. Melendez is going to talk about based on her deposition

8    was:  One, she's going to testify she was harassed by my client

9    to switch agencies; and the other is that she -- my client put

10   down 42 instead of 38 hours one week, and that she said she

11   wasn't going to sign until my client changed it.  She changed

12   it, and then Ms. Melendez signed the time sheet.

13        As it relates to the first issue, I don't think that

14   that -- what my client said or didn't say is relevant because

15   of the testimony from Ms. McKinnon that Ms. Melendez never

16   left, and that as a result of Ms. Melendez not leaving All VIP,

17   that they suffered no damages.  And so I don't think that that

18   area of inquiry is relevant anymore, leaving us to the second.

19   And if that's the case --

20        THE COURT:  Well, are there other clients that the

21   defendant is going to be able to argue left and caused them

22   damages?

23        MR. POLLOCK:  The other clients that they argue left

24   were the Iziques, and we already heard from Ms. Rowland on that

25   issue.

1        THE COURT:  So what damages are the defendants going to

2    be able to argue because of the breach of the covenant not to

3    compete?

4        MR. GOLDBERG:  Your Honor, there are no damages

5    suffered because Ms. Melendez did not leave, however, the

6    actions of the plaintiff as to Ms. Melendez supports my

7    client's position that the Iziques were also solicited to

8    leave.

9        And when we take the testimony of the plaintiff, it's

10   going to -- it's going to wrap up both actions of the plaintiff

11   that she did engage in an active course of solicitation of the

12   clients.  It also addresses the fact that there was

13   a -- disputes in the time records presented by the plaintiff in

14   regards to this case.

15       And as the Court heard yesterday, there was an

16   extensive exchange between plaintiff's counsel and my client as

17   to time records and the defects that were at issue.

18       THE COURT:  Well, my question had to do with the first

19   aspect of her testimony, that she was solicited to leave but

20   she didn't leave.  And if Ms. Rowland said that her parents

21   didn't get solicited until they left on their own accord, what

22   are your damages for the counterclaim about breaching the

23   contract by getting former clients to leave, costing VIP and

24   Ms. McKinnon money?

25       MR. GOLDBERG:  Well, again, Your Honor, there is no

1    damages because Ms. Melendez did not leave.  But --

2         THE COURT:  Well, if there is no damages, where is the

3    cause of action for the breach of contract?

4         MR. GOLDBERG:  Because of the solicitation of the

5    Iziques despite what Ms. Rowland testified to yesterday.  We

6    believe that --

7         THE COURT:  Well, what testimony are you going to have

8    that the Iziques were solicited to leave?

9         MR. GOLDBERG:  We have testimony --

10        THE COURT:  I mean, Ms. Rowland said that that didn't

11   happen.  The Iziques aren't going to testify.  So who is going

12   to testify that they were solicited to leave by Ms. Valdivieso?

13        MR. GOLDBERG:  We believe that the cross-examination of

14   Ms. Figuera is going to support that there was a solicitation.

15        THE COURT:  Okay.  Well, I guess if that happens, then

16   you can ask me to recall the witness and try to solicit it a

17   second time through the Zoom testimony.

18        But it seems to me that you're going to lose the breach

19   of contract count, so I don't know that we need to be putting

20   in 404(b) evidence when there is no evidence for it to

21   corroborate.

22        As to the second aspect, it seems to me that that's

23   relevance, so I go back to my initial question of Mr. Pollock.

24        Do you want to break up your plaintiff's case, or do

25   you want to have him read the deposition aspects that are

1    relevant as to that testimony?

2        MR. POLLOCK:  And I don't know which portions of the

3    transcript we're talking about, because it was kind of all

4    over --

5        THE COURT:  They will read, and when he reads a

6    question, if you object, then I will rule on the objection.

7    And if I overrule the objection, he will read the answer.  And

8    if I sustain the objection, he'll go to his next question.

9        MR. POLLOCK:  I mean, my concern isn't for my client

10   breaking up the case.  It's -- I've got a translator who's

11   coming.  So, you know, there is just the cost of having a

12   translator sit by while, you know, they do that.  For

13   Ms. Melendez, she's at home.  So it's more of a question of

14   just sending somebody to her home tomorrow morning and having

15   her testify by Zoom then.

16       THE COURT:  All right.  I understand you're proposing a

17   third option.  But my question is:  If you're given the option

18   of --

19       MR. POLLOCK:  I will break up my case.

20       THE COURT:  Okay.  So arrange for her to testify at

21   1:00.

22       MR. GOLDBERG:  Thank you, Your Honor.

23       THE COURT:  Anything further before I bring the jury

24   in?

25       MR. POLLOCK:  With respect to her testimony, do you

1    want me to contemporaneously object on the relevance issue on

2    testimony that relates to solicitation?  Because it doesn't

3    tend to prove a fact -- it doesn't tend to prove a fact or

4    disprove a fact in issue when there's no damages related.  So

5    that would be irrelevant testimony.  I can object

6    contemporaneously, or we can limit the deposition or the trial

7    testimony to --

8              THE COURT:  No.

9              MR. POLLOCK:  -- the issues in dispute.

10             THE COURT:  I'm limiting it.  If he reads a question

11    that you think is a violation of the limine, then object and

12    say that's contrary to the Court's prior ruling.

13             MR. POLLOCK:  Understood.

14             THE COURT:  Anything further before we bring the jury

15    in?

16             MR. GOLDBERG:  Not on behalf of the defense,

17    Your Honor.

18             MR. POLLOCK:  Nothing from the plaintiff.

19             THE COURT:  All right.  If we have all the jurors,

20    let's bring them out.

21             Ms. McKinnon, if you can resume the stand.

22             MR. POLLOCK:  Your Honor, if we end up with an early

23    break for lunch, just -- I'm trying to figure out a translator

24    to sit around.  I was going to have her come at 11:00, but I

25    don't know if that's going to make the most sense for timing.

```
1              THE COURT:  Yeah.  What time do you want to break?
2              COURT SECURITY OFFICER:  All rise.
3              MR. POLLOCK:  I was going to do it after, like at 2:00,
4       which would be after...
5              THE COURT:  Okay.
6         (The jury entered the courtroom at 9:12 a.m.)
7              THE COURT:  All right.  We have the jury back.
8              Did everyone follow my admonition not to discuss the
9       case or not to allow it to be discussed in your presence?
10             All right.  Mr. Goldberg, you may inquire.
11             MR. GOLDBERG:  Thank you, Your Honor.
12             Good morning, everybody.
13                          CROSS-EXAMINATION
14      BY MR. GOLDBERG:
15      Q.  Ms. McKinnon, yesterday during your direct examination by
16      Mr. Pollock, there was --
17             COURTROOM DEPUTY:  Counsel, if you could --
18      BY MR. GOLDBERG:
19      Q.  -- discussion, and the statement was made that --
20             THE COURT:  Speak into the microphone.
21             MR. GOLDBERG:  Oh, I apologize.
22             COURTROOM DEPUTY:  Yes, sir.
23             MR. GOLDBERG:  Can you hear me better, sir?
24             COURTROOM DEPUTY:  (Nods head.)
25             MR. GOLDBERG:  Thank you.
```

1   BY MR. GOLDBERG:

2   Q.  Yesterday, there was discussion between Mr. Pollock and you

3   during your direct testimony whereby the expression "show up

4   and do the work" was used?

5   A.  That's -- that's correct.

6   Q.  Okay.  What does that statement mean?

7   A.  It means that, you know, to me, I felt like do the work

8   and -- show up and do the work.  It was -- to me, I felt like

9   he was -- that he was saying that we were telling the

10  caregivers what to do.

11  Q.  All right.  How do -- explain to us what determines what

12  the caregivers -- in this case, Ms. Figuera, a home health

13  aide -- does?

14  A.  Well, it's -- in this -- in this particular case, it starts

15  with Humana case managers.  They go out and they do the

16  assessment.  Then they call us and they tell us what needs to

17  be done.  And then we -- we put that together in a care plan,

18  and that is -- then the coordinator calls the caregiver and

19  tells the caregiver, "This is what the case manager and the

20  family would like you to perform.  These are the duties."

21        And it's on the time sheet.

22  Q.  Okay.  So Humana comes out, does an assessment.  They

23  establish a treatment plan or a care plan?

24  A.  Yes.

25  Q.  Okay.  You take that plan, and then you contact the client

1   and the client's family --

2   A.   Yes.

3   Q.   -- and then you basically supplement what Humana has set

4   down to be the care plan to be implemented?

5   A.   Yes.  That is correct.

6   Q.   Does anything that is done at All VIP Care negate or modify

7   what the care plan from Humana is?

8   A.   No.  We -- we're not allowed to do that.

9   Q.   So anything that you do is in the -- what you referenced

10  yesterday as a care plan that's created by All VIP, that is

11  just to supplement the care plan by Humana?

12  A.   Yes.

13  Q.   Does anybody at All VIP tell the health home aide -- the

14  home health aide, like Ms. Figuera, how to do the job?

15  A.   No.  And if we do discuss that with the caregivers, it's

16  because a client or the case manager at the insurance company

17  will call us.

18  Q.   And what will they tell you?

19  A.   They will say -- they will say things such as, "The

20  medication reminders have to be done in the morning or the

21  evening," or they will say things like, "Please tell the

22  caregiver that she cannot be on her cell phone."

23       Just little things like that.

24  Q.   So, additionally, the issue was raised about the COVID

25  crisis.

1   A.   Yes.

2   Q.   When the COVID crisis took place, and I believe it began in

3   January of 2020, and basically ran its course for about

4   18 months, and then -- but it's still an issue in some circles;

5   is that correct?

6   A.   That's correct.

7   Q.   Is it true that most of the susceptible group was the

8   elderly?

9   A.   Yes.

10  Q.   And did the elderly -- were there specific requests by the

11  client that related to the COVID issue?

12  A.   Yes.

13  Q.   Can you explain to us what those were?

14  A.   Their main concern was:  How many caregivers are going to

15  be entering my home?  They did not want three, five different

16  caregivers entering their home.  That was a big fear for them.

17  Q.   And how did you address that request?

18  A.   Well, you know, we -- as a nurse registry, we're able

19  to -- to help them -- to help them.  Because we can give an

20  assignment to a caregiver for 40, 50, 60 hours a week, even a

21  live-in.  We can do that.

22  Q.   But you can only do that when it's authorized by Humana or

23  by Medicaid?

24  A.   Yes.  That's one way, yes.

25  Q.   What's the other way?

1    A.   Private pay.

2    Q.   Okay.  Explain to us what you mean by "private pay."

3    A.   That the insurance company is not paying; that the client

4    is paying themselves, out of their pocket.

5    Q.   Do you have clients that are clients of yours for the

6    Medicaid coverage and who also have a private pay relationship?

7    A.   Yes.  Sometimes we do, yes.

8    Q.   Okay.  Explain to us how you would do that.

9    A.   Well, when -- when Humana says, for instance, "This client

10   is only authorized 50 hours a week," but the family feels that

11   they need more hours.  So the family member will call us and

12   say, you know, "Medicaid is only going to pay for 50 hours a

13   week, but we need 70 hours a week.  Can we pay the

14   caregiver -- can we pay you so that we can have a caregiver

15   here on Saturdays, Sundays, holidays, whenever?"

16        And we say, "Yes," and then we -- we give them a contract.

17   We give the client a contract that we're going to charge them,

18   say, $18 an hour, and we also tell the client how much the

19   caregiver is going to earn.

20        So everyone knows exactly what's going on.

21   Q.   Now, this was part of the accommodation that you provided

22   during the COVID crisis?

23   A.   Yes.

24   Q.   So you allowed the -- the independent contractor aide, such

25   as Ms. Figuera, to work these additional hours under private

1   pay?

2   A.   Yes, I did allow it.  And it was done, you know, you can

3   say behind my back, but when we discovered it, because of

4   the -- the issues with the time sheets, I -- I told the office,

5   "Let's just let it be."  I just thought it was the best thing

6   to do.

7   Q.   Now, you also mentioned yesterday that you provided masks

8   and gloves, when you could, to the clients.

9   A.   To the clients and the aides.

10  Q.   Okay.  Explain to us what you meant by that comment.

11  A.   When I said that we provided gloves and --

12  Q.   (Nods head.)

13  A.   I think I -- I think I brought that up because that was

14  part of what we -- it's -- took off -- you know, if -- if the

15  company is making revenue, if there is a profit, we -- we take

16  that money and we buy medical supplies, especially when it's

17  needed.  So when COVID-19 came about, it was just crazy.  So we

18  went out and we got gear.

19      Because we took in a lot of COVID-19 clients.  Hospitals

20  would call us and ask if we can take these clients, and we

21  said, "Yes."  And to do that, we had to make sure that

22  our -- that the caregivers were going to be protected as well.

23  So we made sure that we had the equipment necessary in the

24  office, and we didn't -- and it wasn't an argument of who

25  should buy it and who shouldn't buy it.  We just made sure that

1    things got done.

2    Q.   Aside from the COVID period, does All VIP provide any

3    gloves, masks or any equipment to the home health aide?

4    A.   No.  Generally speaking, no.

5    Q.   So the only time that they did provide these gloves and

6    masks was during the COVID crisis?

7    A.   Yes.  It was a crisis.

8    Q.   Do you still have clients that are fearful of COVID?

9    A.   Yes.

10   Q.   But the home health aide has to supply their own masks and

11   gloves now?

12   A.   Yes.

13   Q.   Mr. Pollock raised the issue yesterday, on the independent

14   contractor agreement, a section that referenced Florida Statute

15   760, which is the Florida Civil Rights Act --

16   A.   (Nods head.)

17   Q.   -- and the federal Title 7 protections, which, again, speak

18   to discrimination.  And those two -- those two statutes speak

19   to employees and not independent contractors.

20   A.   Right.  But I think it's -- it's -- it's a good thing to be

21   able not to discriminate.  I think it's best business practice.

22   I think it's the way that we should live and the way that we

23   should run our business.  We should not discriminate because --

24   regardless if they're independent contractors.

25        When they come into -- to the office, sometimes they just

1   walk off the street and they come in to apply.  We don't want

2   to discriminate them, so we -- we give them the application and

3   we process them.

4   Q.  And --

5   A.  And, you know -- and I'm also a minority business owner, so

6   I kind of, like, relate.  And discrimination should not be

7   allowed, and I want no part of it.

8       And in addition to that, you know, Medicaid is a joint

9   program where the State and the federal government puts money

10  into this program.  And anytime you accept federal money,

11  you're not allowed to discriminate.

12  Q.  So this was additional protection that you contractually

13  offered to the independent contractors as well as the employees

14  that work for All VIP Care?

15  A.  Yes.  I just think it's the right thing to do.  I think

16  it's integrity.

17  Q.  You testified that there were issues with the last paycheck

18  of Ms. Figuera; is that correct?

19  A.  Yes.

20  Q.  In fact, you and Mr. Pollock spent a great deal

21  of yesterday afternoon discussing those issues?

22  A.  Yes.

23  Q.  And you testified, correct me if I'm wrong, that because

24  there was a dispute as to the hours that Ms. Figuera worked,

25  that you told her to, "Come to the office and we will address

1    the time sheet issue"; is that correct?

2    A.   That is correct.

3    Q.   And Ms. Figuera did not take you up on that offer, did she?

4    A.   No, she did not.

5    Q.   Mr. Pollock also showed us a check, I believe it was

6    Plaintiff's Exhibit 4, in the amount of $897.

7         Do you remember that?

8    A.   Yes, I do.

9    Q.   And that was a check that you handwrote to Ms. Figuera?

10   A.   Yes.

11   Q.   And was that check -- I believe you testified that that

12   check was a result of a time -- a time sheet issue, and that

13   when Ms. Figuera came to you with that -- when I say "you," I

14   mean to All VIP -- she came to All VIP, it was looked at, you

15   looked at it with it her, you reconciled it, and you

16   subsequently cut her the check for $897; is that correct?

17   A.   That is correct.  I believe that was the amount she was

18   missing.

19   Q.   Now -- so when you asked Ms. Figuera to come in when there

20   was a dispute as to the -- her time in her last paycheck, she

21   refused to come in?

22   A.   True.

23   Q.   So when you asked her to come in, you were just continuing

24   the normal way that you address payroll discrepancies with your

25   clients?

1   A.   Yes.

2   Q.   Mr. Pollock also raised the argument that because you treat

3   your home health aides, like Ms. Figuera, as a independent

4   contractor and not an employee, that financially benefitted

5   All VIP Care; is that correct?

6   A.   Not -- not in the way that he put it.  No, it's not.

7   Q.   Okay.  Please explain to me, as a -- as a businesswoman,

8   you know, how do you manage and reconcile your -- your costs

9   versus your liabilities versus your assets in the way you run

10   your business.

11        MR. POLLOCK:  Objection, Your Honor.  I think we

12   addressed this pretrial.

13        THE COURT:  Overruled.

14   BY MR. GOLDBERG:

15   Q.   You may answer the question.

16   A.   Okay.  That cost -- that profit, you know, we -- we could

17   pass that on to the clients.  We can pass that on to the staff.

18   We can donate to the community.  I mean, there are many things

19   that we could do.

20   Q.   Okay.  Let me rephrase the question.  I think I lost you on

21   that, and I apologize.

22        As a business owner, if -- you have certain established

23   costs in the operation of your business; correct?

24   A.   That is correct.

25   Q.   Okay.  And you have a budget that has an intended bottom

1   line; is that correct?

2   A.   Yes.

3   Q.   Now, taking Mr. Pollock's, you know, thought process, that

4   by you having Ms. Figuera as an independent contractor, as

5   opposed to an employee, you made more money.

6   A.   No.

7   Q.   Okay.  If -- if Ms. Figuera and all the other home health

8   aides, that have a relationship with All VIP Care as

9   independent contractors, was an employee, your employee expense

10  would go up; correct?

11  A.   Maybe.  Yes.

12  Q.   Okay.  How would you, as a business owner, address the fact

13  that your employee operational expenses have increased?

14          MR. POLLOCK:  Objection.  Hypothetical.

15          THE COURT:  Overruled.

16  A.   I would readjust the budget.

17  BY MR. GOLDBERG:

18  Q.   Okay.  And how would you do that?

19  A.   Well, then I would re -- I -- I would -- expense versus

20  profit.  I mean, I would -- I would go back and -- and maybe

21  not hire many W-2s or -- or engage in taking on more

22  caregivers, more assignments from the insurance company.

23          But we would definitely look at the bottom line.  I

24  mean -- the budget.

25  Q.   Now, going with that philosophy, you're not allowed to

1   increase the cost to the consumer --

2   A.   No.

3   Q.   -- the customer, which is the insurance company and

4   Medicaid?

5   A.   No.  Medicaid does not allow that, no.  They tell us what

6   they are going to pay, and that's it.

7   Q.   All right.  So you can't adjust the budget that way.

8   A.   No.

9   Q.   But you would have to adjust the budget, then, by -- excuse

10  me -- then, by either limiting the amount of employees?

11  A.   W-2s, yes, for sure.

12  Q.   Would you also have to address their salaries?

13  A.   Yes.

14  Q.   So, in other words, if there were additional costs to

15  All VIP Care, there are ways that you would adjust that to

16  offset whatever additional expenses there are?

17  A.   That is correct.

18  Q.   And that's based upon your experience as a business owner?

19  A.   Yes.

20  Q.   The -- yesterday, Mr. Pollock put up on the screen, for

21  everybody to see, this HHAeXchange app; is that correct?

22  A.   Yes.  The schedule, yes.

23  Q.   Now, I remember there was discussion about the green

24  portion of the screen.

25  A.   Uh-huh, yes.

1   Q.   And the green portions of the screen represented what,

2   ma'am?

3   A.   It represents that we're good, that we were going to bill

4   correctly, that those hours are authorized, that we're good.

5   Q.   Okay.  So that -- that screen included what the authorized

6   hours are?

7   A.   Yes.

8   Q.   Now, I want you to hold that thought.  I want to talk about

9   the HHAeXchange mobile app program.  What is that application?

10  A.   It's a new application that was developed so that we can --

11  you know, so that we can function better, so that the

12  caregivers can -- they know their schedule, and they will be

13  able to get to the client's house, clock in.

14       When they're there, they can also check in, or they can

15  just click, you know, when they do bathing or dressing or

16  ambulation.  Whatever they're doing throughout the day, they

17  can keep track of that on their phone.

18  Q.   They also clocked out when they're done?

19  A.   That's correct.  And not only do I see that, you know,

20  that -- the home care, but also the MCO, which is Humana, in

21  this case, they can also see that.

22  Q.   So this application was in effect when Ms. Figuera was an

23  independent contractor aide for All VIP?

24  A.   Yes.

25  Q.   Was Ms. Figuera trained on that program?

1   A.   She was told about the program, and there is also tutorials

2   on YouTube that we refer them to.  And she also provided us

3   with her mobile ID number.

4   Q.   Now, what is the mobile ID number?

5   A.   That means that she's allowed to go into the program, and

6   she will be linked to All VIP Care, the agency.

7   Q.   Now, let's go back to the green entries on the screen.

8   There was a line that had the schedule.

9   A.   Yes.

10  Q.   In other words, let's say from 3:00 in the afternoon to

11  6:00 p.m.

12  A.   Yes.

13  Q.   Now, the entry for what the caregiver, the HHA -- I'm

14  sorry -- home health aide, if they had the mobile app, that

15  would have the exact time that they clocked in and they clocked

16  out?

17  A.   Yes.  And location, which is key.  It's -- it's critical.

18  Because it tells the MCO, when they go in to verify, that the

19  caregiver was actually where she was supposed to be.

20  Q.   Now, there's also the availability of entries of the type

21  of care that was provided to the patient on that particular

22  day?

23  A.   Correct, which will match their treatment plan that they

24  approved.

25  Q.   Now, going back to the green screen -- well, the green

1    section of the calendar, all the types that were -- that

2    Ms. Figuera was scheduled for was exactly what was referenced

3    in that block; is that correct?

4    A.  Yes.

5    Q.  But I believe you testified that Ms. Figuera was not using

6    the mobile app?

7    A.  No, she was not.

8    Q.  Okay.  Now -- so who made those entries?

9    A.  The office, manually, once we received the time sheet from

10   the caregiver.

11   Q.  Okay.  Now, also, on the green screen, there was -- I did

12   not see, and correct me if I'm wrong, any entries as far as the

13   tasks that the caregiver, the home health aide, provided to the

14   individual patient.

15   A.  No.  Not in that screen, no.

16   Q.  Okay.  Is that because she did not use the mobile app?

17   A.  That's because she didn't use the mobile app, that is

18   correct.

19   Q.  Okay.  Thank you.

20       One more question with the mobile app:  Does the mobile app

21   give you, as the administrator, and give people like Diana

22   Ramirez, her immediate supervisor, the opportunity to do a

23   checks-and-balance against the handwritten time sheets?

24   A.  Yes.

25   Q.  And does that help resolve any disputes as to time records?

1    A.   Oh, absolutely.

2    Q.   And this app is by -- on a mobile phone, not -- doesn't

3    require Wi-Fi?

4    A.   It -- it does.  Internet?  Yes.

5    Q.   But it also works on your -- I guess it's -- now it's 5G or

6    4G?

7    A.   Yes, yes, yes.

8    Q.   So you don't need Wi-Fi to use the app?

9    A.   No.  I mean -- no.

10   Q.   An issue was -- an accusation was raised yesterday that you

11   bill Humana incorrectly.

12        Do you recall that?

13   A.   Yes.

14   Q.   Is that a true statement?

15   A.   No, it is not.

16   Q.   So your testimony is that you bill Humana, or whatever the

17   carrier is, correctly?

18   A.   Yes.

19   Q.   Have you ever received a audit or a letter of concern from

20   Humana or Medicaid --

21        MR. POLLOCK:  Objection.  Hearsay.

22   BY MR. GOLDBERG:

23   Q.   -- about your practices?

24        THE COURT:  I will allow it for the fact of what was

25   said, not the truth of the matter asserted.

```
 1              MR. GOLDBERG:  I'm sorry, Your Honor?

 2              THE COURT:  She can answer the question.

 3              MR. GOLDBERG:  Thank you, Your Honor.

 4    BY MR. GOLDBERG:

 5    Q.   Please answer the question.

 6    A.   I'm sorry.  Can you repeat the question?

 7    Q.   Certainly.

 8         Have you ever been -- received an investigative audit or

 9    letter of concern from Humana or Medicaid as to your billing

10    practices?

11    A.   Never.

12    Q.   How long have you been providing health care-related

13    services to clients and patients?

14    A.   In this arena, since 2007.

15    Q.   Okay.  When you say "this arena," what do you mean?

16    A.   Home care.

17    Q.   Were you ever a home care provider?

18    A.   I was.

19    Q.   So you did the same job that Ms. Figuera did?

20    A.   I did.

21    Q.   That's how you started out?

22    A.   I did.  A long, long time ago.

23    Q.   Is All VIP Care a licensed nurse registry?

24    A.   Yes, we are.

25    Q.   Okay.
```

1           MR. POLLOCK:  Objection, Your Honor.

2           THE COURT:  Overruled.

3           MR. POLLOCK:  Can I have a standing on this, or do you

4    want me to object every time, Counsel?

5           THE COURT:  You can have a standing objection.

6           MR. POLLOCK:  All right.  Thanks, Judge.

7           THE COURT:  Thank you.

8    BY MR. GOLDBERG:

9    Q.  The -- explain to us what a -- and we've used this term

10   throughout this trial.  What is a nurse registry?

11   A.  A nurse registry, it's part of the home health care, I

12   guess, business plan umbrella, perhaps.  A nurse registry is

13   allowed to hire and only hire independent contractors.  And,

14   therefore, the patient, in a way, can -- can save more -- can

15   save revenue, and it allows -- it allows us to go out and

16   interview and -- and process applicants, but the applicants

17   have to have knowledge.

18         You have to have your knowledge.  You cannot just be -- you

19   know, you can't just graduate.  You know, you have to have

20   experience.  You have to know how to do your job.  So we

21   process you and we vet, you know, the applicants.  And we can

22   refer them to the clients.

23         So that's what a nurse registry does.  We refer caregivers

24   to the clients.

25   Q.  Let me interrupt you for a second.

1     This nurse registry business that you -- that you

2     mentioned, is this mandated or -- and/or controlled by the

3     State of Florida?

4     A.   The State of Florida does -- does control it.  I mean...

5     Q.   Can you explain to me how, please?

6     A.   Because they're the ones that write the law, and they tell

7     us what we can do and what we cannot do.  For instance, we are

8     not allowed to hire caregivers that have no experience.  We are

9     not allowed to train you or supervise you because we're

10    supposed to hire independent contractors that have experience,

11    that you know what you're doing, you know your job.

12    Q.   So the creation of a nurse registry is mandated by state

13    law?

14    A.   Yes.

15    Q.   Are you licensed by the state of Florida as a nurse

16    registry?

17    A.   Yes.  Yes.  And they come every two years, and they check

18    our records, and they make sure that we're doing what we need

19    to be doing.  And they renew the license.

20    Q.   And you've been licensed since 2016?

21    A.   That is correct.

22    Q.   Has your license continuously been renewed by the state of

23    Florida?

24    A.   Yes, yes.

25    Q.   What is the primary population of your clients?

1    A.   The elderly.  If that's --

2    Q.   Now, the -- is it just because they're elderly, or is it

3    because they have other issues?

4    A.   Well, it's usually -- you know -- it's -- the elderly, it's

5    usually the ones that really are needing help.

6    They're -- they're sicker and, you know, they're at the

7    end-stage of life, if you will.  So it's the elderly

8    population.  They're the majority of our clients.

9    Q.   The -- you mentioned that you're only allowed to hire home

10   health aides as independent contractors, not employees.

11   A.   We have to hire them as independent contractors.

12   Q.   Is that mandated by state law?

13   A.   Yes.

14        MR. POLLOCK:  Objection.  Qualifications.

15        THE COURT:  I will allow her to testify to her

16   understanding.  Overruled.

17   BY MR. GOLDBERG:

18   Q.   So it's your understanding that state law mandates that you

19   hire only independent contractors, and not employees, to serve

20   as home health aides?

21   A.   Yes.  I only have to hire independent contractors.

22   Q.   Okay.  How is this independent contractor relationship

23   documented or memorialized?

24   A.   I'm sorry.  Repeat the question again.

25   Q.   Let me rephrase the question.

1          You mentioned earlier that when somebody comes -- walks

2    into your office and wants to be a home health aide --

3    A.   Right.

4    Q.   -- you give them, I believe you said, an application to

5    join the registry.

6    A.   That's -- that's because the State mandates that.  The

7    state wants an application.

8    Q.   And what does that application tell you?

9    A.   The State wants to see that, you know --

10          MR. POLLOCK:  Objection.  Objection as to "State wants

11   to see," Your Honor.

12          THE COURT:  Sustained.

13   BY MR. GOLDBERG:

14   Q.   Okay.  What is recorded on this application?

15   A.   They want to see they're, you know --

16   Q.   Okay.  Forget what they want to see.

17   A.   I'm sorry.

18   Q.   What --

19   A.   The application has to have the name, the address, the

20   social security number, education history, employment history,

21   stuff like that.

22          MR. GOLDBERG:  May I approach, Your Honor?

23          THE COURT:  Okay.

24          MR. GOLDBERG:  Thank you.

25   ///

1   BY MR. GOLDBERG:

2   Q.  Ms. McKinnon, I'm going to show you what's been accepted

3   into evidence as Joint Exhibit Number 2.

4   A.  Okay.

5   Q.  Do you recognize that document?

6   A.  Yes.

7   Q.  What is that document?

8   A.  It's the application for the contractors.

9   Q.  And is that the application that was completed by

10  Ms. Figuera?

11  A.  Yes.

12  Q.  And what does that application contain?

13  A.  Contact information for the independent contractor, the

14  position, when she -- when she's able to start.  Is she

15  currently employed?  Education, and any employment contractual

16  history.  Additional information such as is she able to -- is

17  she eligible to work in the United States?  And is she able to

18  work nights, weekends?  Is she able to accept a live-in

19  assignment?  When can she start?  Does she have any preference?

20  Has she ever been convicted of a crime?

21      And has any -- and regarding her license or certification.

22  Q.  Now, the information that's contained on that form, it's

23  your understanding that those -- that information is required

24  by Florida State law in administering a nurse registry?

25  A.  Yes.

1   Q.  Now, you also, on that application, talked about certain

2   preferences, any requirements that the home health aide --

3   potential home health aide has, or their availability to

4   provide services; is that correct?

5   A.  That's correct.

6   Q.  Now, does that information go into your analysis as -- when

7   you suggest a potential patient to be hooked up with a

8   potential home health aide?

9   A.  It goes into consideration, yes.

10  Q.  I'm going to show you what's been marked as Joint Exhibit

11  Number 3, which is titled, "Independent Contractor Agreement."

12  Do you recognize this document?

13  A.  Yes.

14  Q.  And explain to us what that document is.

15  A.  This document, it's -- when they come in, we give them this

16  document and we explain to them that they're independent

17  contractors.  As an independent contractor, there needs to be

18  an agreement from both sides.  So -- and we put it in writing.

19      And so, here, we mark down your title, if you're a

20  registered nurse or if you're an LPN or if you're a home health

21  aide.  And then we go on to discuss the -- the pay.  And

22  it's -- and we put it in here and what they -- what the

23  independent contractor wants as a salary, you know, and what we

24  can offer and what we came to, the agreement.

25      And that's all done in this paper -- in this document.

1   Q.  What -- I apologize for stepping on you.

2        MR. GOLDBERG:  I apologize, Madam Court Reporter.

3   BY MR. GOLDBERG:

4   Q.  You mentioned that what -- you came to an agreement for

5   salary?

6   A.  That's correct.  It would -- we have to both agree.

7   Q.  I'm sorry.  What?

8   A.  We both have to agree.  The independent contractor has to

9   agree to the assignment, not just a salary that they want to

10  earn, but the duties that they're going to perform.  They have

11  to agree.

12  Q.  We're going to come back to the assignment issue, but right

13  now, I'm interested in the salary.  So you have a negotiation

14  with the potential home health aide as to what you're going to

15  pay them?

16  A.  That's correct.  We discuss salary.

17  Q.  Now, speaking in this particular case, what did Ms. Figuera

18  agree to?

19  A.  She -- she asked for $13 an hour.

20  Q.  What -- what was your normal rate of pay for independent

21  contract home health aides at the time?

22  A.  At that time, it was between 10 to 12, because Humana, at

23  that time, was only paying 16 an hour.

24  Q.  Okay.  So was it your testimony that you and

25  Ms. Figuera -- I say "you" -- All VIP Care negotiated her

1    salary to be $13 an hour?

2    A.  Yes.  We -- we approved it.

3    Q.  And I believe on that independent contract, did Ms. Figuera

4    check the box that she wants to be a home health aide on page

5    1?

6    A.  She -- that's correct.  Home health aide.

7    Q.  So there is no dispute that she signed the agreement that

8    she wants to be a home health aide with the nurse registry of

9    All VIP Care under the terms and conditions of that independent

10   contractor agreement?

11   A.  That is true.

12   Q.  Okay.  I want to present to you what's been marked as Joint

13   Exhibit 4.

14       Do you recognize that document?

15   A.  Yes.

16   Q.  What is the name of that document?

17   A.  This is the acknowledgement of the nurse registry policies

18   and procedures.

19   Q.  And what is the purpose of that document?

20   A.  This is -- the purpose of this document is, you know,

21   basically for the home -- for the caregiver, you know, to

22   understand the policies and procedures of the nurse registry,

23   and -- and to behave in a professional manner.

24   Q.  Now, in that document, is there a provision that talks

25   about the solicitation of clients of All VIP Care away from All

1    VIP Care?

2    A.   Yes.  It does.

3    Q.   Okay.  Do you have that section in front of you?

4    A.   I think it's the exact end of the contract.

5    Q.   Do you have that?

6    A.   Yes.

7    Q.   Can you read that into the record, please.

8    A.   Hold on.  I want to make sure I get the right one.

9         The -- the application for contract review?

10   Q.   I believe it's under section marked as "Covenant not to

11   compete."

12   A.   That's -- that's another section over here.  Okay.  Yup.

13   That's another section.

14        "During the term of my contract with the nurse registry,

15   and for a period of at least one year thereafter, I will not

16   contract a nurse registry client directly or indirectly, either

17   for his/her own account or otherwise to be employed by,

18   participate in, consult with, perform services for, or

19   otherwise be connected with any business the same as or similar

20   to the business conducted by the nurse registry.

21        "I agree to notify the nurse registry in the event that a

22   client attempts to arrange for services directly with me.  I

23   agree not to accept assignments from any clients of the nurse

24   registry for a period of at least one year following my

25   separation of the nurse registry and our termination of my

```
 1    contract -- contract.
 2        "In the event of a breach, a direct -- a direct breach, and
 3    failure to comply with this section, the nurse registry shall
 4    be entitled to obtain an injunction restraining the commitment
 5    or continuance of the breach, as well as any other legal or
 6    ethical remedies as permitted by law."
 7    Q.   Did Ms. Figuera breach that provision of the contract?
 8    A.   Yes, she did.
 9    Q.   How did she do that?
10    A.   She went to the client.  She went to two clients, and she
11    went to them to complain.  And she wanted to convince them to
12    leave the agency.  Not only did she do that with the two
13    clients, but she also did that with the caregivers on the staff
14    as well.
15    Q.   Now, you heard testimony by Ms. Rowland yesterday that they
16    made an independent decision to change nurse registries from
17    All VIP Care to Senior Nannies.
18    A.   Ms. Rowland, you know, made that decision because Ms. Cruz
19    convinced her.  She went there -- she went over there
20    complaining about the agency.
21    Q.   Now --
22        MR. POLLOCK:  Objection.  Move to strike as
23    nonresponsive.
24        THE COURT:  Sustained.  Ignore the last answer.
25    ///
```

1   BY MR. GOLDBERG:

2   Q.   Did the Iziques, Mr. and Mrs. Izique, transition their

3   relationship from All VIP Care to Senior Nannies?

4   A.   Yes, they did, another nurse registry.

5   Q.   Now, were you ever -- the fact that they went to another

6   nurse registry, is not the issue, is it?

7   A.   Well, it -- yes and no.  I mean...

8   Q.   Okay.  Well, let's stick with the "no" right now.

9   A.   (Nods head.)

10  Q.   The fact that Ms. Figuera also went to Senior Nannies --

11  A.   She did.

12  Q.   -- and became a home health aide for the Iziques during

13  this one-year period --

14  A.   Correct.

15  Q.   -- in fact, continuing until today, is that a breach of

16  that agreement?

17  A.   Yes, it is.

18  Q.   Now, is it your understanding that Ms. Figuera also

19  attempted to solicit other clients of All VIP Care to leave?

20         MR. POLLOCK:  Objection.  Hearsay.

21         THE COURT:  Sustained.

22  BY MR. GOLDBERG:

23  Q.   Don't answer that.

24         Let me have those documents back.

25  A.   (Tendering document.)

1   Q.   Thank you.

2   A.   Sure.

3   Q.   Was Ms. Figuera provided with a job description for a home

4   health aide?

5   A.   Yes.

6   Q.   Does the job description mirror the duties and

7   responsibilities as set forth in Florida law?

8   A.   Yes.

9        MR. POLLOCK:   Objection.

10       THE COURT:   I will allow her to testify to her

11   understanding in that.

12   BY MR. GOLDBERG:

13   Q.   Explain to us, please, what exactly a nurse registry like

14   All VIP Care does in relation to the home health -- the

15   independent contractor, home health aide, and the clients.

16   There has been a lot of discussion about that, but I just need

17   a clear understanding from you.

18   A.   Well, I mean, I'm just trying to think where to begin

19   because -- the main reason -- the main reason that the nurse

20   registry business model exists is to really save revenue for

21   the client.   And at the same time, it allows the caregiver to

22   work more hours.   So -- but with the nurse registry, the client

23   really is the employer.

24   Q.   How is that, ma'am?

25   A.   Because they're the ones that technically hire the

1   caregiver.  It's not us.  They hire their own caregivers, and

2   they have the power to terminate the caregiver.

3   Q.  Is it fair to say that the nurse registry is somewhat like

4   a broker?  You introduce a client to a potential home health

5   aide, and it's up to the client and the home health aide if

6   they're going to have a relationship?

7   A.  Yes.

8   Q.  Does the home health aide, like Ms. Figuera, have the

9   right, as an independent contractor, to not accept a client

10  that you introduce them to?

11  A.  Yes.  They have the right.

12  Q.  And the client has the same right to not accept the

13  potential home health aide?

14  A.  Correct.

15  Q.  And the decision is up -- I believe you said the decision

16  is going to be up to the client and up to the home health aide

17  whether they're going to have a relationship?

18  A.  Yes.  And many clients will set up interviews.

19  Q.  What do you mean?

20  A.  They will say, "I want to meet -- send me three or four.  I

21  want to meet different candidates, caregivers."  And they will

22  interview them.  And not only will the client interview the

23  caregivers, but also the family members as well.

24  Q.  Who has the right to terminate the relationship that --

25  between the caregiver, like Ms. Figuera, and the client?

1    A.   The client.  The only time that we would terminate anything

2    is if that caregiver has committed a crime.  The State will

3    send us a notification, and once we get that notification from

4    the State, we have to terminate the caregiver from our roster,

5    meaning we can never refer this caregiver out to a client's

6    home.

7         So at that point, we will call the client.  And if the

8    client still wants to keep the caregiver, then we have to

9    call -- in this case, call the insurance company and ask the

10   MCO to find the client another provider.

11   Q.   A "provider" being?

12   A.   Another agency or someone else.  They can do a PDO program,

13   something else.

14   Q.   So no matter how -- based on what you're telling us,

15   if -- if there was a breakdown in a relationship between the

16   home health aide and All VIP, and that home health aide is

17   providing services to, let's say, Mrs. Jones, it's not up

18   to -- you cannot terminate that -- that relationship.  That

19   relationship can only be terminated by the client?

20   A.   That is correct.

21   Q.   Unless there is a violation of state law or criminal

22   charges?

23   A.   (Nods head.)  Exactly.

24   Q.   And then you -- what do you do if you learn of problems or

25   violations with the -- with the home health aide?  What do you

1    do as far as informing the client?

2    A.   I call the client and I tell the client that the caregiver

3    no longer meets the state -- state and/or federal requirements

4    and, therefore, we need to remove her, and if we can please

5    send other caregivers for her to interview.  So the client

6    would -- will lead us.  The client will either say yes or no.

7    Many times, the client will say yes.  Clients don't want

8    caregivers that -- you know, that committed a crime.

9    Q.   And that -- those actions that you just described, are

10   those mandated anywhere?

11   A.   Yes.

12   Q.   Where?

13   A.   Well, in the policies and procedures and --

14          MR. POLLOCK:  Objection.

15          MR. GOLDBERG:  I'm sorry.  Hold on.

16          There is an objection?

17          MR. POLLOCK:  Withdrawn.

18   BY MR. GOLDBERG:

19   Q.   Where is this mandate memorialized?

20   A.   Well, in the terms how -- if the State notifies us that a

21   caregiver has committed a crime --

22          MR. POLLOCK:  Objection, Your Honor.  She first

23   referenced policies and procedures, and now she's referencing

24   something else.

25          THE COURT:  Overruled.

1   BY MR. GOLDBERG:

2   Q.  You just explained to us certain actions that you would

3   take, or that a client wishes to take with a caregiver.

4   A.  Right.

5   Q.  Now, what you explained to the jury about what you can do,

6   what you can't do, are those requirements that are set down by

7   state law?

8   A.  Yes.  We -- we -- we behave in a certain way because those

9   are the requirements we receive from the State.

10  Q.  You testified earlier, and correct me if I'm wrong, that

11  it's the insurance company and Medicaid that determine the

12  amount of hours that a home health aide, like Ms. Figuera, will

13  work?

14  A.  That is correct.

15  Q.  Can you -- can you, as a nurse registry, vary those hours?

16  A.  No, we cannot.

17  Q.  But you testified earlier that you -- you can allow

18  additional private pay for that particular home health aide and

19  client, if you choose to do so?

20  A.  Yes.  That is correct.

21  Q.  And you have done that in the past during the COVID crisis?

22  A.  Yes, we did.

23  Q.  Did you ever approve Ms. Figuera from engaging that private

24  pay relationship?

25  A.  No.  No.

1   Q.   Were you ever requested to extend that courtesy to

2   Ms. Figuera or the Iziques?

3            MR. POLLOCK:   Hearsay.

4            THE COURT:   Overruled.

5   A.   No, I was not requested.

6   BY MR. GOLDBERG:

7   Q.   Florida State law, to your understanding, does not allow

8   you, as a nurse registry, to monitor, supervise, manage, or

9   train a home health aide like Ms. Figuera; correct?

10           MR. POLLOCK:   Objection.   Mischaracterization of law.

11  We can look at the statute, Your Honor.

12           THE COURT:   Okay.   I will allow her to testify as to

13  her understanding.   What she says isn't the law, but she can

14  testify to her understanding.

15  A.   That is correct.   And it's a -- and it's a statute, and

16  it's something that the private care association from the nurse

17  registry have discussed.   There is a statute.

18  BY MR. GOLDBERG:

19  Q.   If you're not allowed to train a home health aide, how do

20  they -- how do they know what to do, what not to do?

21  A.   It's -- we're only allowed to hire caregivers that have

22  experience.

23  Q.   Okay.   Is there any requirement that they be certified and

24  licensed as a home health aide?

25  A.   Yes, they have -- they have to go to school.   They have to

1   at least -- for the nurse registry, they at least have to have

2   40 hours of some kind of medical school.

3   Q.  And what about CPR training?

4   A.  Right, and that's part of that.  They have to have the CPR,

5   and that needs to be renewed every two years.  They also have

6   to have a physical.  They -- you know, the physical has to

7   state that they're free from infectious diseases, you know,

8   that they can work.

9        So the CEUs, the CPR card.  They have to have a good

10  criminal background.

11  Q.  What about -- what about training in bloodborne pathogens?

12  A.  That is part of it, and that's called the HIV/AIDS.

13  Q.  Now, if a nurse registry, like All VIP Care, is not allowed

14  to teach this to the home health aides, who does, if you know?

15  A.  The medical school.  And they -- and they will -- and they

16  have to bring us the certification from the medical school.

17  Q.  And that -- a copy of that certification is part of the

18  application package?

19  A.  That is correct.

20       MR. GOLDBERG:  Allow me one second, Your Honor.

21  BY MR. GOLDBERG:

22  Q.  You testified that Ms. Figuera was earning $13 an hour

23  because that's the price she negotiated for her time?

24  A.  Correct.

25  Q.  You also testified earlier that at the time that

1    Ms. Figuera was -- had a relationship with All VIP Care, you

2    were paid $16 an hour by Medicaid?

3    A.   That's correct.

4    Q.   So is it safe to say that the gross profit that All VIP

5    Care saw for the services provided by Ms. Figuera was $3 an

6    hour?

7    A.   Yes.  That is correct.

8    Q.   Now, based on your experience of owning and operating a

9    nurse registry since 2016, and having over -- I believe it's

10   500 home health aides, like Ms. Figuera, that are contracted as

11   independent contractors, do you know what your operational

12   costs to administer All VIP Care is when you break it down to

13   per hour for the services provided by a home health aide?

14          MR. POLLOCK:  Objection, Your Honor.  We have a ruling

15   on this issue.

16          THE COURT:  Overruled.  I will allow it.

17          MR. GOLDBERG:  Overruled.  Thank you, Your Honor.

18   BY MR. GOLDBERG:

19   Q.   You can answer the question.

20   A.   If I know the projected -- I'm sorry.  Can you repeat that

21   last part?

22   Q.   Yes.

23          If your gross profit per hour for Ms. Figuera, as she was

24   making $13 an hour and you were paid $16 an hour, based on your

25   experience, do you know what your -- your administrative costs

1    per hour are calculated at for administering your company?

2    A.   Yes.  We normally -- what we do with those $3 is that we

3    will take $1 and, say, apply it to administrative fees or

4    something.  So -- but to better answer this question,

5    what -- when you are providing services to the Medicaid

6    population, the -- you have to service -- it's -- it's by

7    quantity.

8         So in order for us to accept clients that we can only

9    profit $3 an hour, you have to have lots of Medicaid clients in

10   order to really be able, you know, to have a profit and not to

11   go bankrupt.

12        So -- because with $3 an hour, I mean, there is just so

13   much you can do.

14   Q.   Now --

15   A.   So...

16   Q.   -- you mentioned that approximately a dollar an hour is

17   dedicated to the administrative costs of running All VIP Care.

18   A.   (Nods head.)

19   Q.   So is it fair to say, based upon your experience, that

20   there is a net profit of $2 per hour?

21   A.   Yes.  That's -- that's pretty fair.

22   Q.   How would you calculate your lost profits in a case where

23   you claim that the Iziques were solicited and left All VIP

24   Care, and went to Senior Nannies, based upon the $2-an-hour net

25   profit?

1  A.  How do I qualify that?  Well, what we normally do is --

2  that case had two clients.  And so let's say that case

3  generated, like, 90 hours a week of care.  So what we do is,

4  you know, we start to think about, well, the clients could have

5  lived, let's say, 10 years.  So we take -- we take those

6  10 years, plus the profit, and we -- and we multiply it.  Plus

7  we subtract the administrative costs.

8      So we come to an idea how much money we actually lost.

9  Q.  Thank you.

10      Your -- the independent contract agreement has restrictive

11  covenants in it; correct?

12  A.  Yes.

13  Q.  And, in fact, you read into the record one of the

14  restrictive covenants as to anti-solicitation?

15  A.  Right.

16  Q.  And it's your position that Ms. Figuera breached that?

17  A.  Yes.

18  Q.  Now, what is the reason for these restrictive covenants

19  that you have put into your contract?

20  A.  Well, in health care, it's necessary.

21  Q.  Why is that?

22  A.  So -- because there is a -- it's -- they -- because they

23  steal clients.  And for some crazy reason, this happens in

24  health care.  And if you're going to be losing your clients,

25  then what's going to happen to your business?

1      So -- so the smart thing to do, the best thing to do, best

2  business practice in health care is to have a noncompete.

3  Q.  Now, what about the concern that you raised about

4  preventing unscrupulous home health aides from harming clients?

5  A.  Yes.  We -- because, you know -- we have been doing this

6  for a long time, but we need to make sure that we protect the

7  elderly because they're very vulnerable.  We can't have the

8  elderly -- the caregivers going to the elderly and asking them

9  for money or anything.  We -- we just -- we have to make sure

10  that we protect them.

11  Q.  Okay.  Is it fair to say that your concern for the elderly

12  being harmed by unscrupulous home health aides is a legitimate

13  business interest of All VIP Care?

14  A.  Yes, at this time.

15         MR. POLLOCK:  Objection.  Relevance, Your Honor.

16         THE COURT:  Overruled.

17  BY MR. GOLDBERG:

18  Q.  Is it also your position that the financial stability of

19  All VIP Care is also a legitimate business interest of All VIP

20  Care?

21  A.  Yes.

22  Q.  Who is Ms. Figuera's immediate supervisor?

23  A.  Her clients.  There is no immediate supervisor for her at

24  All VIP Care.

25  Q.  Okay.  Well -- okay.  If there is no supervisor, of course,

1   you can't supervise, like you testified about.

2   A.   (Shakes head.)

3   Q.   Who is basically overseeing the payroll records of a home

4   health aide such as Ms. Figuera?

5   A.   The Broward office, because they're the ones that collect

6   the information and they put that information in the computer

7   system.

8   Q.   So the people at the Broward office, their job is limited

9   to just capturing the time records, which should be by paper,

10   and by -- and proper entries into the HHAeXchange, which

11   we -- you testified Ms. Figuera was not doing, and facilitating

12   payroll?

13   A.   Yes.

14   Q.   Who would that person be for Broward?

15   A.   Diana Ramirez, and who -- and her helper, because she does

16   have someone in the office that helps her.

17           MR. GOLDBERG:  No further questions, Your Honor.

18           THE COURT:  Redirect?

19           MR. POLLOCK:  Your Honor, can we go sidebar real quick?

20   I don't want to do this in front of the jury.

21           THE COURT:  Okay.

22       (Conference at bench.)

23           MR. POLLOCK:  I waited for the entirety of the

24   examination of Mrs. McKinnon for questioning that would relate

25   to the issue of the fee.  The only testimony that was elicited

1    in regards to the nurse registry statute was on the issue of

2    liability, which I think the Court already indicated that is

3    not a legal defense, in our position, to deny.  It's not one of

4    the factors to be considered whether someone is an independent

5    contractor or an employee.

6            We would request that that -- the jury be advised of

7    the limitation on that testimony or a mistrial be declared,

8    because it's patently unfair that we filed a motion in limine

9    on this issue and the Court indicated that it would be

10   admissible for the limited issue of good faith.

11           And defendant, in meeting the burden of good faith for

12   the jury, the jury is advised on the purpose for which that

13   testimony was elicited.  We've contemporaneously objected, and

14   now it's patently unfair to have a trial where the jury could

15   be misled.

16           THE COURT:  The defense hasn't rested yet.  When they

17   rest, you can make Rule 50 motions and we can talk about this

18   on the charge conference.  But I think the objection is

19   premature, so I will overrule it.

20           MR. POLLOCK:  Okay.  Thank you.

21           MR. GOLDBERG:  Thank you, Your Honor.

22       (Conference at bench concluded.)

23                          REDIRECT EXAMINATION

24   BY MR. POLLOCK:

25   Q.  Ms. McKinnon, I'm going to start off with the check that

1   you wrote to Ms. Figuera for $897.  You -- you told your lawyer

2   that this was a time sheet issue.  What was that time sheet

3   issue?

4       If you could, be specific for the jury as far as which time

5   sheet we're talking about, or time sheets.

6   A.  I believe it was for week -- 7/17-week.  But if you look at

7   the -- that 897, I believe that was money she was missing.  She

8   got paid; however, she called the office and she stated she was

9   paid incorrectly.

10  Q.  Okay.  And she was paid incorrectly for which weeks?

11  Because we saw the week ending 7/17, when Ms. Figuera was paid

12  by payroll for 35 hours.  I can put it up if you want.  But she

13  was paid for 35 hours by payroll check on -- excuse me -- by

14  direct deposit on July 22.

15      So I'm trying to find out:  Which are the time sheet issues

16  that we're talking about for the hours that were reflected in

17  the 897?  So you're talking about it's just limited to the week

18  of 7/17, or there were other weeks that we're talking about?

19  A.  No, it's only limited to one week, is my understanding.

20  Q.  Okay.

21  A.  She -- when I wrote that check, if I recall correctly,

22  because it was some time ago, the 897, she got paid

23  incorrectly.  And so she was missing revenue.  So the money

24  that she was missing was $897, and she came in and I wrote her

25  a check.

1   Q.   There was other hours that Ms. Valdivieso was also

2   indicating she wasn't paid for, which are 16 hours in May,

3   May 5th and 6th for working with Ms. Soto.

4         You know about that; right?

5   A.   No.  That's -- no.  I do not know about that.

6   Q.   Okay.

7   A.   Because as far as I'm concerned, she was completely paid.

8   Q.   As far as you were concerned.  But you understood that

9   Ms. Valdivieso was claiming that there were two days that she

10  wasn't paid in May for working with Ms. Soto, another client of

11  yours; right?

12  A.   No.

13  Q.   Okay.  You never knew anything about that?

14  A.   No.

15  Q.   And how many hours were missing from Ms. Valdivieso's time

16  for the week of July -- ending in July 17th that you had to pay

17  her by check?

18  A.   I don't recall specifically.  I just know that, at that

19  time when we gave her the check for $897, that's what she was

20  missing.

21  Q.   Okay.

22  A.   And she agreed.

23         MR. POLLOCK:  Can I get the HDMI, please?

24  BY MR. POLLOCK:

25  Q.   Okay.  So the first week -- the first check that

1   Ms. Valdivieso got was for 35 hours?

2   A.  That is correct.

3         THE COURT:  Did you want that published to the jury?

4         MR. POLLOCK:  Please, Your Honor.  It's Joint

5   Exhibit 10.

6         THE COURT:  Okay.

7         MR. POLLOCK:  And I'm at page 33.

8   BY MR. POLLOCK:

9   Q.  So you've got 35 hours that you paid her for; right?

10  A.  That is correct.

11  Q.  And then the other check was for 897, which we said was for

12  69 hours; right?

13  A.  I know that the 897, at that time, was the money she was

14  missing.

15  Q.  Right.  And I asked you about how many hours that was.  And

16  you calculated --

17  A.  I don't recall.  I'm sorry.

18  Q.  Sure.  We can calculate it again, if you want.  We went

19  through it with the calculator, and we went 897 divided by 13.

20  We can do that.

21        THE COURT:  You don't have to do that.  It was 69.

22  BY MR. POLLOCK:

23  Q.  And so that's -- that's a total of 104 hours that she was

24  paid that week.

25  A.  It's a lot of hours, yes.

1    Q.   She worked a lot of hours; right?

2    A.   Exactly.  And that's one of the reasons I wanted her have

3    her come in, because we were going to discuss those 104 hours.

4    Q.   And because if that was overtime, that would cost your

5    company a lot of money; right?  It would be --

6    A.   That's correct, but it's not overtime.  And she knew that.

7    Q.   I know you may not like my questions, but can you please

8    wait for me to finish asking them before you answer?

9    A.   I'm sorry.

10   Q.   Thank you.

11       So what I said was, and I know you may not like it, but

12   44 hours would be a lot of overtime; right?

13   A.   I'm sorry?

14   Q.   44 hours would be a lot of overtime --

15   A.   44?

16   Q.   -- that you would have to pay?

17   A.   Yes.  Yes, I guess.

18   Q.   And so, again, when we look at how many hours

19   Ms. Valdivieso worked, you know, what you're saying is if we

20   add up how many hours she worked with Mr. Izique, with

21   Ms. Melendez, and with Mrs. Izique, that would be a total of

22   104 hours, just for one week?

23   A.   I believe so.  Yes.

24   Q.   Okay.  Okay.  Then we talked -- then you talked with your

25   lawyer about how -- that the coordinator tells the caregiver

1    what duties they are to perform based on the assessment.

2         That was your testimony?

3    A.   The coordinators do discuss that, because that's how -- you

4    know, they tell the coordinators -- they tell the caregivers,

5    "I have this client.  She lives in Broward County.  This client

6    would like an aide to be there from 9:00 to 11:00.  The client

7    has animals.  Are you allergic to animals?"  This is what the

8    MCO of the clients wants, and they go through the whole list.

9         So that's what they do.  That's the conversation the

10   coordinator has with the caregiver.  And at the end of that

11   conversation, the coordinator asks the caregiver, "Will you

12   accept this assignment?"  And salary is also mentioned.

13   Q.   Okay.  So the caregiver asks the -- in this case, it would

14   be Daisy -- "Can you do this?"

15   A.   What?

16   Q.   The caregiver -- the coordinator would ask Daisy, "Can you

17   do this assignment?"

18   A.   Right.  They --

19   Q.   And Daisy would either say, "Yes, I can do it," or, "No, I

20   can't"?

21   A.   Exactly.

22   Q.   And then the coordinator wouldn't just get the care plan

23   from Humana.  They'd also interview the family, and/or the

24   patient, find out what their needs are; right?

25   A.   Yes.  We -- we should be meeting and speaking to our

1    clients, yes.

2    Q.  Well, I agree.  And then what you do is you take the care

3    plan and your own assessment, and then you create your own care

4    plan, and that's what you tell Ms. Valdivieso what she's

5    supposed to do; am I correct?  "Yes" or "no"?

6    A.  No -- no.  We're not telling her what to do.  We're telling

7    her what the client wants.  Let's make that clear, please.  We

8    are telling the caregiver what the client's needs are, and then

9    we're asking you, "Are you willing to accept this assignment?"

10   Q.  And if Ms. Valdivieso -- if Cruz isn't -- if Daisy is not

11   doing what the client wants her to do, then the client's going

12   to call you and complain.  She's going to call your office;

13   right?

14   A.  She's going to call us, and hopefully she will also be

15   calling the case manager at the MCO.

16   Q.  And if they want a different caregiver, then they're going

17   to -- they're going to call your office and say, "We're not

18   happy with Daisy.  Can you send us somebody else"; is that

19   true?

20   A.  That's correct.  That's what we're there for.  We are there

21   to monitor and to help them.  We're the middle person, the

22   broker, if you will.

23   Q.  Sure.  And so you're the one who places Daisy with the

24   client, and if the client wants them to leave, you're the one

25   who would pull Daisy away; fair?

1   A.   Let's -- let's make that more clear.  I don't place.  I

2   refer.

3   Q.   Okay.

4   A.   And if that caregiver stays working for the client, it's

5   because the client hired the caregiver.

6   Q.   And we talked yesterday how there is no contract between

7   Daisy and the client; right?

8   A.   No, there is not.  Not that I am aware of, no.

9   Q.   And you understand that under Florida law, right, the nurse

10   registry statutes talk about that a nurse registry refers a

11   caregiver for a contract with either a client or an

12   institution; right?  You know that, don't you?

13   A.   The caregiver does the contract with the agency.

14   Q.   Okay.  But what -- I understand that's how your operation

15   works, but --

16   A.   No.  That's how it works.

17   Q.   That's what Florida law says?

18   A.   That's how it works.  I --

19   Q.   You don't know what Florida law says, do you?

20   A.   Well, if -- as far as I'm concerned, I believe I do.  I get

21   renewed every two years, so I -- I -- I can only assume that

22   I'm doing something right, that I'm following the law.

23        Because let me tell you, the State will penalize me.

24   Q.   The State doesn't have an overtime statute, does it?

25   A.   The nurse registry is -- we do not pay overtime.

 1  Q.  I understand you don't.  But I was talking about Florida.

 2      You understand -- you know that Florida doesn't have a

 3  state overtime statute, don't you?

 4      Or do you not know?

 5  A.  I -- if you're talking about general, I -- I -- I don't

 6  know.  But I just know what I have to do has -- running --

 7  running a nurse registry on a day-to-day basis, that's what I'm

 8  concerned about.

 9  Q.  What I'd like to do is I would like to read to you a

10  section of Florida Statute 400.506 --

11  A.  Okay.

12  Q.  -- 6(d), which talks about what a nurse registry does.

13  A.  Okay.

14  Q.  It says, "A nurse, registered nurse, licensed practical

15  nurse, certified nursing assistant, companion, or homemaker or

16  health aide referred for contract under this chapter by a nurse

17  registry is deemed an independent contractor and not an

18  employee of the nurse registry under any chapter, regardless of

19  the obligation imposed on a nurse registry under this chapter

20  or Chapter 408."

21      And so my question to you is:  How are you a nurse registry

22  if you don't refer Ms. Valdivieso for a contract with a client?

23  A.  Because they have the contract with us.  I don't know the

24  semantics here, but the contract is with the agency.

25  Q.  And so under Florida law, if the contract is with the

1    agency and not the client, then you're not a nurse registry,

2    are you?

3    A.   No, I'm sorry.  I completely disagree with what you're

4    saying.  But --

5    Q.   And you're disagreeing with what I'm saying, but am I

6    correct that you have no legal training?

7    A.   That I have no legal training?

8    Q.   Yes.

9    A.   You mean, like, I didn't go to law school?

10   Q.   Correct.

11   A.   No, I did not.  That doesn't mean that -- that I don't

12   know -- you know, have knowledge of the law.

13   Q.   Now, you said that hiring independent contractors wouldn't

14   cost your company more.

15        Is that what your testimony is?

16   A.   Hiring an independent contractor should not cost us more in

17   what sense?  I mean, I -- I'm not sure of --

18   Q.   That was your testimony to your lawyer, so I'm just trying

19   to figure out if that is still your testimony.  Because

20   yesterday, you talked about all of the additional expenses that

21   you incur with your employees versus your independent

22   contractors.

23        So I'm trying to figure out if your testimony is

24   independent contractors are more, or they cost us the same as

25   an employee.

 1   A.   I believe you brought it up.  To me, hiring a -- processing

 2   the caregivers versus hiring W-2s, I don't see it like I'm

 3   better off with W-2 versus independent contractors.  I don't

 4   see it that way.

 5   Q.   You don't see it that way?  You don't see --

 6   A.   No.

 7   Q.   -- that it's cheaper if you don't have to pay overtime?

 8   It's not cheaper for you?

 9   A.   No, I don't see it that way.  Because --

10   Q.   And, you know, overtime isn't just paying $13 an hour.  It

11   would be paying Ms. Valdivieso time and a half, which would be

12   19.50 an hour.  You don't see paying $13 an hour is better for

13   your company than paying 19.50 for overtime hours?

14   A.   No, I don't.  And I don't see what you're seeing because --

15   maybe I see the whole picture, maybe, because I've been doing

16   this for so long and I -- I know the advantages of a nurse

17   registry and what we can offer the community.

18        Perhaps that's why I don't see it the way you see it.

19   Q.   And you don't see it as an advantage that you don't have to

20   pay workers' compensation premiums for employees, but you don't

21   have to pay them for independent contractors?  That's not a

22   benefit to your company, that you get to pay less?

23   A.   I don't have to do that, but that's the law.  So for you to

24   beat up on me on that, you're -- you're incorrect.  I'm only

25   following the law.

```
 1   Q.   Well, you think you're following the law.
 2   A.   No, I am following the law.  Because independent
 3   contractors, I do not have to pay workers' comp.
 4   Q.   And you're saying that you wouldn't have increased
 5   expenses, even though you'd have to pay additional taxes, you'd
 6   have to pay workers' compensation premiums, and you'd have to
 7   pay time and a half for overtime?
 8        Those wouldn't be additional expenses that your company
 9   would have to pay if you paid Ms. Valdivieso as an employee?
10   A.   There is no issues with that.  I have absolutely no issues.
11   I am just following the business plan of the nurse registry.
12   Q.   And what you said is, is that if your expenses went up,
13   you'd have to adjust your -- this is a quote -- you'd have to
14   "adjust the budget by limiting the number of W-2s to account
15   for the additional costs"?
16   A.   That is correct.  I would have to adjust the budget.  If
17   I'm running a business, I have to make sure that I have a good
18   budget.
19   Q.   Right.  Because -- and you said you'd have to adjust the
20   budget by limiting the number of W-2s.  And that's --
21   A.   Correct.
22   Q.   -- because the W-2s, when you pay somebody as an employee,
23   you've got to pay all these additional expenses that you don't
24   have with an independent contractor; isn't that true?
25        "Yes" or "no"?
```

1   A.   No, because I'm not doing it the way you're making it

2   sound.   That's not how I run the business.

3   Q.   You don't pay taxes for people you pay as W-2s?

4   A.   No, they do.   They pay the taxes to the government.   I send

5   them a 1099 at the end of the year, and it's their

6   responsibility to file their taxes and pay any taxes owed to

7   the government.

8   Q.   Right.   That's for the people who you pay as independent

9   contractors.   They have the whole burden of paying all the

10  taxes; right?

11       That's what you're talking about?

12  A.   Counsel, are you aware that --

13  Q.   "Yes" or "no," please.

14  A.   Repeat the question.

15  Q.   I said what you were talking about was that Ms. Valdivieso,

16  who you paid as -- as an independent contractor, she had to

17  shoulder the burden of paying all the taxes.   That's what

18  you're talking about; is that true?

19       "Yes" or "no"?

20  A.   She has to pay taxes per --

21  Q.   And as an independent contractor, she would have to pay all

22  the taxes; isn't that true?

23  A.   What do you mean "all the taxes"?

24  Q.   Well, when you're an employer and you have an employee, you

25  pay 17 1/2 percent of the -- in taxes, and then the employee

1   pays 17 1/2 percent in taxes.

2        Isn't that how it works?

3   A.   Maybe.  I'm not sure.  I just know I just pay -- my

4   accountant pays the taxes.

5   Q.   Okay.  You're not sure that you pay -- you pay your

6   employer share of payroll taxes?

7   A.   No, I know I pay taxes.  I just don't know how much I pay.

8   Q.   Okay.

9   A.   That is the accountant's job.  But, you know, I'm -- he

10  pays that.  But I do know that for the W-2s, I have to file

11  certain guidelines per the law, and I do.  And for the 1099s, I

12  also have certain guidelines that I have to follow.

13       Now, please keep in mind that clients don't have to get

14  services -- receive services from a nurse registry.  Caregivers

15  do not have to work for a nurse registry.  They can easily go

16  to a home health care agency.  Those agencies operate a little

17  different.

18  Q.   You said the accountant pays the taxes --

19       THE COURT:  Mr. Pollock, let me go ahead and interrupt

20  you.

21       We are going to go take a 15-minute recess.  Remember

22  my admonition not to discuss the case or allow it to be

23  discussed in your presence.  We will see you back in the jury

24  room in 15 minutes.

25       (The jury exited the courtroom at 10:29 a.m.)

1        THE COURT:  Again, one of the jurors had to go to the

2    bathroom.

3        And we will be in recess for 15 minutes.

4    (A recess was taken from 10:29 a.m. to 10:50 a.m.)

5        THE COURT:  Please be seated.

6        Back on the record.  Counsel are present.

7        Anything to come before the Court before I bring the

8    jury in?

9        MR. POLLOCK:  Not from the plaintiff.

10       MR. GOLDBERG:  Not on behalf of defense, Your Honor.

11       THE COURT:  All right.  If we have everybody here,

12   let's bring them in.

13       (The jury entered the courtroom at 10:51 a.m.)

14       THE COURT:  All right.  We have all the jury back.

15       Did everyone follow my admonition not to discuss the

16   case or allow it to be discussed in your presence?

17       Mr. Pollock, you may continue.

18       MR. POLLOCK:  Thank you, Your Honor.

19   BY MR. POLLOCK:

20   Q.  You talked with your lawyer about the HHAeXchange

21   application, but you'd agree with me that Ms. Valdivieso never

22   used that app, did she?

23   A.  I don't think she ever did, no.

24   Q.  Okay.  And so you talked about how there could be mobile

25   log-ins and log-outs in locations, but there would be none of

1   that information.  And so what -- the billing that you were

2   supposed to do at your company was going to be totally based on

3   the handwritten time sheets that Ms. Valdivieso turned in; is

4   that correct?

5   A.   Yes.  The time sheet -- the -- once they get the time

6   sheet, they will confirm the schedule in the computer, and that

7   generates a payroll.

8   Q.   And there is no document that you or your lawyers can show

9   us to reflect that any time that was submitted by

10  Ms. Valdivieso was inaccurate; is that true?

11  A.   You mean for -- from the time sheets?

12  Q.   Yeah.  There is no document that you can show us, or that

13  your lawyer can point us to, to -- so the jury can understand

14  why you believe her time sheets weren't accurate.

15       You don't have a document like that, do you?

16  A.   I do have one that came to my attention that I wanted to

17  discuss with her.

18  Q.   Which one was that?

19  A.   That was -- I have it in my notes.

20  Q.   Okay.  So that's one document out of the entire time that

21  Ms. Valdivieso worked there.  For which week was that?

22  A.   Again, it's in my note, and I don't recall exactly.  But I

23  have it in my notes.  But --

24  Q.   And is that the last week that Ms. Valdivieso worked and

25  never got paid for the 90 or so hours that she was there, or is

```
 1   it some other week that you're talking about?
 2   A.   It could be.  I'm not a hundred percent sure.  I'm sorry.
 3   Q.   Okay.  And so what you're telling the jury is, is that
 4   Ms. Valdivieso just never called you back and instead had to go
 5   get a loan from your clients in order to pay her rent?
 6   A.   No, I'm not telling you that, Jury.
 7        In fact, she's not allowed to be asking my clients,
 8   seniors, for any money.  That is inappropriate.
 9   Q.   And Ms. Valdivieso stopped working for you because you
10   stopped paying her;; isn't that true?
11   A.   Repeat the question, please.
12   Q.   Sure.  Ms. Valdivieso stopped working for you because you
13   stopped paying her; isn't that true?
14   A.   No.  That is not true.
15   Q.   Why did she leave?
16   A.   That's something you're going to have to ask her, because
17   she --
18   Q.   Okay.  So we should believe whatever she says as the reason
19   why she left, is what you're telling us?
20   A.   Well, she's the one that left --
21   Q.   Okay.
22   A.   -- so you would have to get it from her why she left.
23   Q.   Okay.
24   A.   I -- I didn't fire her.  The clients didn't fire her.  So
25   you would have to ask her why did she leave.
```

1    Q.   And if Ms. Valdivieso's testimony is, "I left because I

2    wasn't getting paid," then we can just believe that?

3    A.   I guess.  She's the one who left.

4         Again, I -- I cannot explain to you -- I cannot tell you

5    why she left.

6    Q.   You also said that the only time you can fire a caregiver

7    is if they have committed a crime.  But that's not true, is it?

8    A.   That is true.  If they commit a crime, we can definitely

9    remove them from our roster and call the client and never refer

10   them again to a client.

11   Q.   Right.  But that's not the only reason why you would stop

12   working a caregiver, is it?

13   A.   No.  It's not the only reason, but it's definitely one of

14   the main reasons.

15   Q.   I mean, it would have to be a crime that would relate to

16   the provision of care and the safety of others; right?

17   A.   It depends.  If -- if -- if they steal from the client, and

18   that's reported, and -- and a caregiver is arrested, then we

19   can't use them anymore.

20   Q.   Sure.  But there is other reasons, because what you told

21   your lawyer was that the only reason was if they committed a

22   crime.

23        So I wanted to make sure whether I heard you correctly.

24   A.   I'm not sure if I used the word "only."  If I did, I'm

25   sorry.  But that's one of the main reasons, perhaps.

1    Q.   Well, another reason would be for, let's say, improper

2    timekeeping.  Another would be if they didn't show up or were

3    leaving early; right?  Those would all be reasons why, wouldn't

4    they?

5    A.   No.  We wouldn't fire them if they -- say, they submitted a

6    time sheet that was incorrect.

7    Q.   But if they kept doing it over and over again, you would,

8    wouldn't you?

9    A.   Well, if they kept doing it over again, we would have to

10   definitely do something because it's fraud.

11   Q.   Right.

12   A.   And what happens is when you commit fraud, you know, I can

13   lose the contract with the State -- not only lose the contract

14   with the State, but Medicaid can take away my license -- my

15   provider ID number to bill Medicaid.

16   Q.   And same thing with just not showing up.  I mean, you're

17   not going to continue to employ somebody who does not show up

18   to the client, would you?

19   A.   No.  Because that wouldn't benefit the client.

20   Q.   And --

21   A.   So we would remove them -- it's not employment.  We would

22   remove them from our roster, and we would not refer them

23   to -- to our clients.

24   Q.   And there's no emails, there's no text messages you can

25   show us where Ms. Valdivieso was counselled or talked about for

1    having time sheets that were incorrect; is that true?

2    A.   I'm not sure.  I mean, I don't recall from my -- from my

3    point of view, from me, personally.  I don't recall.  Perhaps

4    that's a good question for Diana Ramirez, because she really

5    had a relationship with that office in Broward County, and I

6    know she knows a lot more about the time sheet situations with

7    Ms. Cruz.

8    Q.   Right.  The one time sheet that you're talking about,

9    that's what we're talking about, the one time sheet?

10   A.   I did -- I have one.  I have one that I was concerned

11   about.

12   Q.   Okay.

13   A.   Yes.  I have one.

14   Q.   And your contract, it doesn't say anything about COVID,

15   about whether you're going to allow or disallow somebody to

16   work additional hours for a client in 2022; is that correct?

17   A.   No.

18   Q.   There's no carveout?

19   A.   No, because COVID came later on.  So...

20   Q.   COVID --

21   A.   So we -- you know...

22   Q.   COVID was in March of 2020, and we were locked down for

23   about three months.

24   A.   No --

25   Q.   And then by about December, things started to normalize

1    with travel in 2020; right?  It didn't come out after.  It came

2    about before, didn't it?

3    A.   Well, what I'm trying to say is that when we originally did

4    the contracts, COVID wasn't really an issue then.

5    Q.   Right.  But with Ms. Valdivieso, she signed her contract in

6    May of 2021.  Am I correct in that?  Do we need to look at it?

7    A.   That -- okay.  In 2021, that contract that she signed did

8    not change.  That did not change.  That contract did not

9    change.  They were given other documentations when COVID came

10   around that the State approved that we were able to give to the

11   caregivers to sign and read regarding COVID-19.

12       In fact, now there is a CEU that caregivers are taking as

13   well for COVID-19.

14   Q.   Right.  But the documents that you're talking about have

15   nothing to do with Ms. Valdivieso because she didn't sign them;

16   isn't that right?

17   A.   The application has nothing to do with COVID-19, if that's

18   what you're asking me.

19   Q.   No.  You said that there are additional documents that you

20   had caregivers sign related to COVID-19.  But when we looked

21   through the application packet that Ms. Valdivieso signed, it

22   didn't have those documents, did it?

23   A.   I didn't see it, but there is a -- one page that we started

24   giving to the caregivers.  I'm not sure when that came about.

25   Again, that's a question for Diana Ramirez.  You need to ask

1   her.  There is a -- one-form page for COVID-19 that not only

2   does -- the caregiver signs and reads, but also we have one for

3   the clients as well.

4   Q.   And as far as, you know, things that Ms. Ramirez would know

5   versus things that you would know, you're the one in the best

6   position to talk about your company's claim for lost profits;

7   right?

8   A.   Yes.  I would say "yes."

9   Q.   Okay.  And -- let's see.

10       And you're the one who's going to testify about the damages

11  that you're claiming in this lawsuit; is that true?

12  A.   I could, yes.

13  Q.   Okay.  And you're not going to tell us what those damages

14  are, are you?

15  A.   I -- I'd rather really be prepared for that.  I haven't

16  really sat down and -- and put the numbers together.

17  Q.   No problem.

18       And as far as Ms. Valdivieso's interactions with Mr. Izique

19  or Mrs. Izique or Ms. Rowland, is it true that you were not

20  present for any of those interactions?

21  A.   That is true.  I was not present.

22           MR. POLLOCK:  I have nothing further.

23           THE COURT:  Anything further, Mr. Goldberg?

24           MR. GOLDBERG:  Yes, Your Honor.

25  ///

1                        RECROSS-EXAMINATION

2    BY MR. GOLDBERG:

3    Q.  Ms. McKinnon, there was discussion about when counsel read

4    into the record one of the statutes that governs nurse

5    registries about a contract between the client and the home

6    health aide.

7          Do you remember that?

8    A.  Yes, I do.

9    Q.  And basically, the -- the statute that he referred to and

10   cited and read into the record does not require a written

11   contract, does it?

12   A.  No.

13   Q.  But does a contract exist between the client and the home

14   health aide when both of them agree to the relationship of the

15   home health aide providing services to the client?

16   A.  Yes.  When -- yes, it does.  In fact, when they meet and

17   they both agree, you know, forming that relationship, and the

18   caregiver is going to perform those duties for the client and

19   they both agree to it, sometimes they change things.  And they

20   will even call us and they will call Humana, the Medicaid

21   agency, and -- and they can even accommodate.

22         So there is that agreement there between the caregiver and

23   the client.

24   Q.  As to the issue of damages, you previously testified as to

25   how you calculate damages, which would be the $2 an hour, which

1   is your net profits --

2   A.  (Nods head.)

3   Q.  -- times the hours that were lost?

4   A.  Times how many years the client could have lived.

5   So -- so, you know, we take all of that into consideration.

6   Q.  So using that calculation, you have $2 an hour times

7   approximately 50 hours a week?

8   A.  It was a little more than that.  It was a little more --

9       MR. POLLOCK:  I'm going to object, Your Honor.  Leading

10   and outside the scope.  This should have been covered on --

11       THE COURT:  I think you opened the door.  Overruled.

12       MR. GOLDBERG:  Thank you, Your Honor.

13   BY MR. GOLDBERG:

14   Q.  So it would be $2 an hour times the -- the average hours

15   that were worked on behalf of the Iziques, which I believe you

16   testified was about 50 hours a week?

17   A.  It was more than 50 a week.

18   Q.  Okay.  But for the argument of this presentation, and for

19   our claims for damages, it would be 50 hours a week.

20   A.  Okay.

21   Q.  And the determination -- I'm sorry -- the relationship

22   between All VIP Care and the Iziques ended July 25th of 2022;

23   is that correct?

24   A.  That sounds correct, yes.

25   Q.  And today is October 31st of 2023?

1    A.   Yes.

2    Q.   So if we take the 50 -- we take the 50 times the 2, that's

3    $100; is that correct?

4    A.   Times every week, yes.

5    Q.   So that's $5,200 for the year, plus we have

6    another -- we've got another four months, so another

7    120 days -- or another 16 weeks.

8         Would that be correct?

9    A.   From 20 -- yes.

10   Q.   So we have another $3,200, which brings -- which brings

11   your claim for damages for the -- the solicitation of the

12   Iziques to $8,400.

13   A.   Okay.

14   Q.   Is that correct?

15   A.   It sounds right.

16   Q.   Is that what -- is that what you claim?

17   A.   Well, it's because it was more than 50 hours a week.  So

18   that's why -- but we used 50 hours a week for argument's sake.

19   So, yes, we're going in the right direction.

20   Q.   Okay.  Well, if 50 hours -- my understanding was -- if my

21   understanding is correct, then, it's more than 50 hours a week.

22   A.   It's more than 50.

23   Q.   What number -- what is the average weeks -- I'm sorry.

24        What is the average number of hours that Ms. Figuera

25   provided the Iziques?

1    A.   I think -- well, she was getting paid 104 hours a week, and

2    I think Melendez only was -- was authorized --

3    Q.   Not Melendez.

4    A.   I know, but I'm subtracting it, though.

5    Q.   Okay.

6    A.   38 hours.  So it's 104 minus 38.  So whatever that is.

7    Q.   104 minus 38?

8    A.   38.  So...

9    Q.   That would be -- that would be -- oh, my God.

10        THE COURT:  66.

11        MR. GOLDBERG:  66, Your Honor?  Thank you.

12    A.   Something like that.

13    BY MR. GOLDBERG:

14    Q.   66 hours?

15    A.   Something like that.

16    Q.   So 66 hours a week.

17        So if we take the 66 times the 2, that's $132 a week that

18    you lost in net profits.  Times that by the 64 -- not 64 -- I'm

19    sorry -- yeah, 64 weeks.  Is 196 weeks all -- that can't be

20    correct.

21        I apologize.  That's why I didn't go to medical school.

22    A.   But if -- if I may interject.  Let's not forget that those

23    are the hours she put in.  However, there were more hours that

24    the other caregiver was working that I also lost those hours

25    because she convinced the other caregiver to go with them to

1  Senior Nannies.

2           MR. POLLOCK:  Object.  Outside the scope --

3           THE COURT:  Sustained.

4           MR. POLLOCK:  -- of that question.  Move to strike.

5           THE COURT:  Ignore the last answer.

6  BY MR. GOLDBERG:

7  Q.  So your claim for damages is $10,000?

8  A.  Around there.  It could be more.

9  Q.  I cannot have it "around there."  I need a number.

10  A.  Well, because now that, you know, I'm thinking about it

11  clearly, I believe that for the Iziques, the total amount of

12  hours -- I believe one had, like, 77 hours a week, and then the

13  other one -- I -- I have to go to my records, because when

14  I --

15  Q.  Okay.

16  A.  I want to make sure it's correct.

17  Q.  I understand.

18      But based upon your understanding as it is today -- because

19  once you leave the stand, you're done testifying -- that it's

20  $10,000 in damages that you're claiming?

21  A.  (Nods head.)  It's -- it's -- it's probably more.  It's

22  more than 10,000.

23  Q.  Probably more, but as it relates directly to the Iziques

24  and Ms. Figuera, it's $10,000?

25  A.  Okay.

1              MR. GOLDBERG:  No further questions, Your Honor.

2              THE COURT:  Thank you, ma'am.  You may step down.

3              MR. POLLOCK:  Could I get a brief recross?

4              THE COURT:  I don't allow recross.

5              MR. POLLOCK:  Since -- just to address some issues --

6              THE COURT:  You can step down.

7              MR. POLLOCK:  -- because we didn't get -- I didn't get

8      a number in my examination, which was finally elicited on this.

9              So I just wanted to ask maybe a couple -- two questions

10     on it, Your Honor.  That's --

11             THE COURT:  I don't allow recross.  Call your next

12     witness.

13             MR. POLLOCK:  We moved the interpreter, based on what

14     we talked about, based on -- so my interpreter will be ready by

15     2:00.

16             THE COURT:  Okay.

17             MR. POLLOCK:  And that's who we've got is

18     Ms. Valdivieso.

19             THE COURT:  Okay.

20             MR. POLLOCK:  So...

21             THE COURT:  Members of the jury, let me ask you to go

22     into the jury room for a few moments.

23         (The jury exited the courtroom at 11:09 a.m.)

24             THE COURT:  All right.  So all you have left is the

25     plaintiff?

1          MR. POLLOCK:  Correct.

2          THE COURT:  All right.  Then what was the -- what does

3     the defense have left today?

4          MR. GOLDBERG:  Your Honor, we're doing the Zoom of our

5     witness, Angela Melendez.  And then we were going to call Diana

6     Ramirez tomorrow morning as our only left witness.

7          THE COURT:  Ms. Ramirez isn't available today?

8          MR. GOLDBERG:  She was here earlier, but based upon the

9     discussion with counsel, we believed that it was going to

10     take -- Ms. Ramirez would not get on the stand until tomorrow

11     because Ms. -- the plaintiff is probably going to be taking a

12     little bit of time, Your Honor.

13          MR. POLLOCK:  I mean, I figured -- I mean, I -- we're

14     done.  Once we get Ms. Valdivieso, we're done.  So, I mean,

15     however long that takes.  I try not to belabor it too bad.  So

16     I figured, you know, maybe an hour direct and then -- hour and

17     a half, just because we have an interpreter.

18          So we probably could use her this afternoon.  She is in

19     Fort Lauderdale.  She could probably come.

20          THE COURT:  Well, I'm just wondering how long -- if the

21     Zoom call works at 1:00, how long is that going to take?

22          MR. GOLDBERG:  Your Honor, I -- I don't believe direct

23     is going to take more than a half hour.

24          THE COURT:  And refresh my recollection.  There were

25     two issues that she was going to testify about, and I think I

1   have eliminated one of them.  So what's the one issue she's

2   going to testify about?

3          MR. GOLDBERG:  My understanding -- and I wanted

4   clarification on this, so I appreciate Your Honor bringing it

5   to the table.  There were two -- the two issues are the

6   solicitation by Ms. Figuera, and secondly, the time sheet

7   disputes with the company -- the -- All VIP, that she -- that

8   Ms. Melendez had observed and addressed Ms. Figuera on.  So --

9          THE COURT:  So what's the relevance of her saying that

10  Ms. Figuera solicited her?

11         MR. GOLDBERG:  Well, again, Your Honor, the fact that a

12  solicitation occurred, but there was no -- there is no monetary

13  damages because she chose to stay.

14         However, the solicitation did occur, and it supports my

15  client's position that the solicitation is consistent with what

16  occurred with the Iziques.

17         THE COURT:  Well, what's the circumstantial evidence

18  that the Iziques were solicited?

19         MR. GOLDBERG:  Well, that's going to be based upon the

20  cross-examination of Ms. Figuera, and the -- and the testimony

21  of Diana Ramirez.

22         THE COURT:  So what do you anticipate Ms. Ramirez or

23  Ms. Figuera to say that's going to indicate that Ms. Figuera

24  solicited the husband and wife to go to the other company?

25         MR. GOLDBERG:  Basically, the conversations that

1  Ms. -- that Ms. Melendez had with Ms. Figuera.  And --

2        THE COURT:  So because Ms. Melendez is going to say

3  that Ms. Figuera tried to get her to go, you're asking the jury

4  to speculate that Ms. Figuera did the same thing with the other

5  company?

6        MR. GOLDBERG:  Not to speculate, Your Honor, but just

7  supportive of the -- circumstantially supportive that this did

8  occur.  The testimony of Ms. Melendez is very powerful as it

9  comes to the solicitation issue.

10        THE COURT:  Well, I thought I ruled earlier that I

11  wasn't going to allow the solicitation testimony from

12  Ms. Melendez unless and until there was some indication, now

13  you are saying from either the plaintiff or the other employee,

14  that there was a solicitation of the husband and wife.  And I

15  don't see that there is going to be any solid indication of

16  that, other than conjecture.

17        So my ruling earlier was that Ms. Melendez couldn't

18  testify to the solicitation, but that if after you call -- if

19  after one of the other two witnesses testified there was

20  circumstantial evidence that the Iziques have been solicited,

21  then I would allow you to recall Ms. Melendez.

22        MR. GOLDBERG:  Yes, Your Honor.  That was your earlier

23  ruling, and that's why I believe the testimony -- direct

24  testimony from Ms. Melendez is going to be no longer than,

25  you know, half hour or so.  Probably less.

1          THE COURT:  But -- but if we eliminate the solicitation

2     testimony, what's left that she's going to testify to?

3          MR. GOLDBERG:  The fact that she basically caught some

4     payroll documentation errors that were -- that occurred by

5     Ms. Figuera.

6          THE COURT:  Are there documents that she's going to be

7     shown and introduced, or is she just going to testify from

8     memory that she caught some errors?

9          MR. GOLDBERG:  Well, Your Honor, there's both.  There's

10    her testimony from memory, because that was a big dispute that

11    occurred between Ms. Melendez and Ms. Figuera, number one.

12         Number two, the documents that support that are in the

13    joint exhibit --

14         THE COURT:  What exhibits are those?

15         MR. POLLOCK:  It's in a defense exhibit.

16         What -- Your Honor, what she's going to -- you know,

17    what she's going to say is that Ms. Valdivieso, on one time

18    sheet, wrote down 42 hours, because that's how much she was

19    traditionally authorized to work, but that her authorization

20    changed.  And so Ms. Valdivieso was only allowed to put down

21    38 hours, and that Ms. Melendez did not sign the time sheet

22    until it reflected 38 hours.  Otherwise, she's going to testify

23    that Ms. Valdivieso worked with her the hours that were put

24    down.

25         The document --

1           THE COURT:  I just don't think that's going to take a

2     half an hour on direct.  So I don't want to bring the jury back

3     at 1:00 and we're done at 1:15, and then I've got to wait until

4     2:00 for the interpreter to show up.

5           MR. GOLDBERG:  Understood, Your Honor.  Again --

6           THE COURT:  If we can move the interpreter up earlier,

7     then maybe we can put Ms. Ramirez on this afternoon instead of

8     waiting until tomorrow.  I don't want to break now until 1:00,

9     at 1:00 the jury comes back, we have problems with the Zoom,

10    and the Zoom doesn't go forward.  Then we've got to read the

11    testimony, and we do that.  And at 1:30, we're breaking again

12    until 2:00.  And then at 2:00, you know, maybe it doesn't take

13    that long and we got to break early at 4:00 for Ms. Ramirez to

14    come back tomorrow.

15          It's breaking up the trial too much for the jury.

16          MR. POLLOCK:  And I'm --

17          MR. GOLDBERG:  Your Honor, I can reach out to

18    Ms. Ramirez --

19          MR. POLLOCK:  The interpreter is --

20          MR. GOLDBERG:  -- and have her come back earlier today.

21          MR. POLLOCK:  The interpreter will be here at 1:00.

22    So, you know, I don't know how Your Honor wants to handle that,

23    but, you know, we're ready to go with Ms. Valdivieso at 1:00.

24          THE COURT:  So can we move Ms. Melendez to, like,

25    12:30, 12:45?

```
1              MR. GOLDBERG:  Your Honor, it's very difficult --

2              THE COURT:  All right.  So we will make it 1:00.  But

3    if she's not ready to go at 1:00, then I don't know that I'm

4    going to -- I'm going to wait.

5              MR. GOLDBERG:  Understood, Your Honor.  Understood.

6              THE COURT:  So maybe make the interpreter 1:15.

7              MR. POLLOCK:  15 minutes is what it is.  I mean,

8    you know, I'd rather have the interpreter here than wait and

9    delay the trial, so that way we get through this.

10             THE COURT:  Maybe have Ms. Ramirez available at 3:30?

11             MR. GOLDBERG:  Will do, Your Honor.

12             THE COURT:  So we will bring the jury out.  We will

13   recess until 1:00, I guess.

14             MR. GOLDBERG:  Understood, Your Honor.

15             THE COURT:  All right.  Let's bring out the jury.

16             MR. POLLOCK:  Is there any housekeeping, Your Honor, we

17   can do as far as jury instructions or verdict form or anything

18   while we're waiting, just to kind of use some time, or would

19   you rather do that at the end of the case?

20             THE COURT:  I think it's hard to do that at this point.

21             MR. POLLOCK:  Yeah, right.  I agree.  I'm just trying

22   to not have dead time.

23             THE COURT:  Right.

24             MR. POLLOCK:  I don't know that we can eliminate

25   anything at this point.
```

```
 1            (The jury entered the courtroom at 11:18 a.m.)

 2            THE COURT:  All right.  We have the jury back.

 3            Did everyone follow my admonition not to discuss the

 4    case or allow it to be discussed in your presence?

 5            All right.  Having to work out some logistics on the

 6    availability of witnesses' testimony, so we're going to go

 7    ahead and have to recess early for lunch.  Remember my

 8    admonition not to discuss the case or allow it to be discussed

 9    in your presence.  I'm going to ask you to be back at 1:00.

10            So have a nice lunch, and we will see you back at 1:00.

11            (The jury exited the courtroom at 11:19 a.m.)

12            THE COURT:  If there is nothing else to come before the

13    Court, we will be in recess until 1:00.

14            (A recess was taken from 11:19 a.m. to 1:00 p.m.)

15            THE COURT:  Please be seated.

16            All right.  Back on the record.  Counsel are present.

17            Anything to come before the Court before I bring the

18    jury in?

19            MR. POLLOCK:  Not from the plaintiff, Judge.

20            MR. GOLDBERG:  Not on the defendant's side, Your Honor.

21            THE COURT:  All right.  Let's see if we can get the

22    witness on board, and then we will bring jury in.

23            MR. GOLDBERG:  My -- my agent is at the house with her

24    right now, and he's -- has signed on.

25            COURTROOM DEPUTY:  I'm letting them in right now.
```

1          MR. GOLDBERG:  Thank you, ma'am.

2          COURTROOM DEPUTY:  Uh-huh.

3          MR. POLLOCK:  Judge, before we get in the presence of

4    the -- well, I guess -- Randy, she doesn't have any documents

5    with her; right?

6          MR. GOLDBERG:  No.

7          MR. POLLOCK:  Okay.

8          COURTROOM DEPUTY:  What's the witness's name?

9          MR. GOLDBERG:  Angela Melendez, ma'am.

10          COURTROOM DEPUTY:  Ms. Melendez, can you hear us?

11          Ms. Melendez, can you hear us?

12          Do you have the -- can you text your agent?  They're on

13    mute.  Maybe they --

14          MR. GOLDBERG:  Yes, ma'am.  I am doing that right now.

15          COURTROOM DEPUTY:  Maybe they're trying --

16          AGENT:  Hello?

17          COURTROOM DEPUTY:  Yes.  Can you hear us?

18          AGENT:  Yes, we can hear you.

19          COURTROOM DEPUTY:  Okay.  Thank you.

20          THE COURT:  Are we going to have a picture?

21          COURTROOM DEPUTY:  Let's see.  I don't know what

22    they --

23          AGENT:  Can you see us now?

24          THE COURT:  Yes.  Yes, we just need to have the camera

25    on Ms. Melendez.

```
1              AGENT:  Yes.  Doing it now.

2              Is that any better?  Can you see her?

3              THE COURT:  Yes, that works.

4              AGENT:  Hello?

5              THE COURT:  Yes, that works.  Can you hear?

6              AGENT:  Okay.

7              THE COURT:  All right.  Let's bring in the jury.

8         (The jury entered the courtroom at 1:05 p.m.)

9              THE COURT:  All right.  We have all the jury back.

10             Did everyone follow my admonition not to discuss the

11   case or allow it to be discussed in your presence?

12             All right.  I think the next witness we're going to

13   call out of order, and she's going to appear by Zoom.

14             Mr. Goldberg, you may call your first witness.

15             MR. GOLDBERG:  Thank you, Your Honor.  All VIP Care

16   calls Angela Melendez, Your Honor, who is present on the Zoom

17   screen.

18             THE COURT:  All right.  If we can swear in

19   Ms. Melendez.

20             COURTROOM DEPUTY:  Please raise your right hand.

21             Do you solemnly swear and/or affirm that the testimony

22   you are about to give in this cause is the truth, the whole

23   truth, and nothing but the truth, so help you God?

24             THE WITNESS:  Yes.

25             THE COURT:  You can put your hand down.
```

```
 1              And Mr. Goldberg, you may proceed.

 2              MR. GOLDBERG:  Thank you, Your Honor.

 3   Thereupon:

 4                        ANGELA MELENDEZ

 5   having been sworn by the Courtroom Deputy, testified as

 6   follows:

 7                      DIRECT EXAMINATION

 8   BY MR. GOLDBERG:

 9   Q.   Good afternoon, Ms. Melendez.  For the record --

10   A.   Good afternoon.

11   Q.   Thank you.

12        For the record, please state your full name.

13   A.   Angela G. Melendez.

14   Q.   Okay, Ms. Melendez.  And are you at your apartment in

15   Davie, Florida?

16   A.   Am I what?

17   Q.   Are you at your apartment in Davie, Florida?

18   A.   Yes.

19   Q.   Okay.  Ms. Melendez, can you please describe for us the

20   relationship that you had with Ms. Figuera and yourself?

21   A.   Well, she was my caregiver, and we were friends, neighbors.

22   Q.   Okay.  Is she still your caregiver?

23   A.   No.

24   Q.   Okay.  I want to direct your attention, Ms. Melendez, to

25   a -- to a time that occurred towards the end of July of 2022
```

1   regarding a time sheet dispute that you had with Figuera.

2        Do you recall that?

3   A.   Time sheet?

4   Q.   The time sheet that --

5   A.   Yes.

6   Q.   Go ahead.  I'm sorry.

7   A.   You're talking about those four hours that she put down?

8   Q.   Well, I need for you to tell me what we're talking about

9   as -- regarding the time sheet -- the time sheet dispute.

10  A.   Well, I don't know too much about it.  All I know is that

11  the insurance took four hours from my time, and when she filled

12  out the papers, she forgot and she put them down.  And I

13  reminded her and told her to -- to fix it.  But I don't know if

14  she did.

15  Q.   And when you addressed that issue with Ms. Figuera, what

16  was her response to you, if you recall?

17        MR. POLLOCK:  Objection.  Hearsay.

18        THE COURT:  Overruled.

19  A.   She said, yeah, she was going to take care of it.

20  BY MR. GOLDBERG:

21  Q.   And you -- do you know if she did or she didn't?

22  A.   No, I have no -- no way of knowing.  Because she didn't do

23  it here.  She -- she was always in a hurry.

24  Q.   I'm sorry, Ms. Figuera -- I'm sorry, Ms. Melendez.  What

25  did you say?

1   A.   No.   She didn't do it here because she was in a hurry.

2   Q.   Okay.   Thank you very much for that answer.

3        MR. GOLDBERG:   No further questions.

4        THE COURT:   Mr. Pollock?

5        MR. POLLOCK:   Real briefly.

6                    CROSS-EXAMINATION

7   BY MR. POLLOCK:

8   Q.   Ms. Melendez, my name is Brian Pollock, and I represent

9   Daisy.   The four hours that we're talking about, do you believe

10  that was just a mistake by Daisy?

11  A.   Yes.   I know it was a mistake.

12  Q.   Okay.

13  A.   Because she was working so much, so many hours, she was so

14  tired, that it could slip her mind.   And I told her, and she

15  said she was going to fix it.   She might have forgotten after

16  that.

17        MR. POLLOCK:   I'm not going to bother you with any more

18  questions, and we appreciate your time.

19        THE COURT:   Redirect?

20        MR. GOLDBERG:   No redirect, Your Honor.   Thank you.

21        THE COURT:   All right.   Just hold on, Ms. Melendez.

22        Let me ask the members of the jury to go into the jury

23  room for a few moments.

24        (The jury exited the courtroom at 1:10 p.m.)

25        THE COURT:   What I'm suggesting is we can proffer,

1    outside the presence of the jury, what her testimony would be

2    regarding the other issue so that if I change my mind and allow

3    that defense, then we can just read back the testimony rather

4    than try to inconvenience Ms. Melendez again to come back on

5    the Zoom.

6              MR. GOLDBERG:  That's well appreciated, Your Honor.

7    Thank you.

8              THE COURT:  So you want to just go ahead and briefly

9    proffer her -- ask her a few questions about it?

10             MR. GOLDBERG:  Yes, Your Honor.  Thank you.

11                       PROFFER DIRECT EXAMINATION

12   BY MR. GOLDBERG:

13   Q.  Ms. Melendez?

14   A.  Yes.

15   Q.  Hi.  It's Randy Goldberg again.  I have a few additional

16   questions that I would like to ask you, if I may.

17   A.  Okay.

18   Q.  Okay.  The relationship that you had with Ms. Figuera, was

19   it a -- a good relationship?

20   A.  I thought it was.

21   Q.  In fact, you helped her get the apartment right next to you

22   in Davie; is that correct?

23   A.  Yes.  I -- I -- I recommended her to the owner.

24   Q.  And as a result of that recommendation, Ms. Figuera moved

25   in next door?

1    A.   Yes.

2    Q.   Towards the end of your relationship with Ms. Figuera, did

3    there come a time that she asked you to end the relationship

4    with All VIP Care and to go to another nurse registry?

5              MR. POLLOCK:   Objection.

6              THE COURT:   I'm going to allow some latitude, given the

7    elderly age.   Go ahead.

8              MR. GOLDBERG:   Thank you.

9    BY MR. GOLDBERG:

10   Q.   Ms. Figuera -- I'm sorry.

11        Ms. Melendez, can you hear me?

12   A.   Yes.

13   Q.   Okay.   Towards the end of your relationship with

14   Ms. Figuera, did Ms. Figuera ask you to end your relationship

15   with All VIP and transfer it to Senior Nannies?

16   A.   I don't remember her saying "Senior Nannies," but I

17   remember her telling me to -- that I would help her and that I

18   wasn't helping her.   She was very upset.

19        And I told her that was not my problem.   I didn't have a

20   problem with VIP.

21   Q.   What was Ms. Figuera upset about?

22   A.   Well, from day one, since I met her, she started talking

23   about how they always held her check -- her -- her check,

24   you know, like -- like, it was never on time.   And she wasn't

25   the only one.   There were other girls that had problems there.

 1      But I always told her to be patient, that, you know, maybe

 2  they -- they would just show the funds, and they were juggling.

 3  But it got to the point where she -- she just lost her temper.

 4  Q.  And --

 5  A.  And she -- she got very aggressive.

 6  Q.  What do you mean "she got aggressive"?

 7  A.  Yeah.  Like, when you're very angry.

 8  Q.  And what happened as a result of -- as you put it -- her

 9  aggression?

10  A.  I blocked her.  I don't talk to her.

11  Q.  What do you mean you "blocked her"?

12  A.  My daughter told me not to open the door.

13  Q.  Okay.  I want to -- I apologize for stepping on you.  I

14  want to make sure I understand this.

15      You're stating -- your statement is that Ms. Figuera became

16  angry and aggressive because you would not leave All VIP Care?

17  A.  Yes, because she kept saying I wasn't helping her.  And I

18  told her my insurance is not the same as their insurance, and I

19  have nothing to do with that, and I can't do that.  I'm fine.

20  I'm not moving from where I am.  My case manager is not the

21  same one that you have over there with her -- with them.

22      But she kept insisting, and then it just got to the point

23  where I -- I don't want to talk to her.  I blocked her.

24  Q.  When you say you "blocked her," do you mean on your cell

25  phone?

```
 1   A.   Yes.  My daughter told me not to open the door to her.
 2   Q.   Since the time that you blocked Ms. Figuera and would not
 3   open the door to her, how was your -- do you still have a
 4   relationship with her?
 5   A.   No.  We haven't had it for months.
 6          MR. GOLDBERG:  Thank you for your time, Ms. Melendez.
 7          THE COURT:  Mr. Pollock?
 8          MR. GOLDBERG:  I appreciate it.
 9          THE WITNESS:  You're welcome.
10                    PROFFER CROSS-EXAMINATION
11   BY MR. POLLOCK:
12   Q.   Ms. Melendez, I'm going to be really brief.  Are you still
13   a client of All VIP?
14   A.   Yes.
15   Q.   Did you ever leave VIP because of anything that Daisy said
16   or did?
17   A.   No.
18   Q.   And was the reason why Daisy told you she was leaving All
19   VIP because she was not getting paid by them?
20   A.   Yes.  She kept accusing them of holding her money.
21          MR. POLLOCK:  Nothing further.
22   A.   Keeping her money.
23          THE COURT:  Anything further?
24          MR. GOLDBERG:  No redirect, Your Honor.
25          Thank you Ms. Melendez.
```

1          THE COURT:  Thank you, Ms. Melendez.  I appreciate

2     your --

3          MR. POLLOCK:  Thank you for your time.

4          THE COURT:  -- being with us today.  Have a good day.

5          THE WITNESS:  Thank you.

6          THE COURT:  All right.  Let's -- are we going to bring

7     in the interpreter now?

8          MR. POLLOCK:  Yes, Your Honor.

9          THE COURT:  All right.  Do we have a stipulation that

10     the interpreter's a qualified interpreter?

11          MR. GOLDBERG:  No objection, Your Honor.

12          THE COURT:  Okay.  So the interpreter can go ahead and

13     set up however she wants to set up, and we can bring in the

14     jury.

15          MR. POLLOCK:  I think we're looking at somebody's

16     screen on here that we may not --

17          COURTROOM DEPUTY:  Oh, it's probably mine.  Thank you.

18          MR. POLLOCK:  Before the jury comes in.

19          COURTROOM DEPUTY:  I appreciate it.  I thank you so

20     much, Counselor.  Thank you.  Thank you.  I forgot I was

21     sharing my screen.  I forgot.

22          Are you going to be using HDMI?

23          MR. POLLOCK:  I'm going to use HDMI.

24          COURTROOM DEPUTY:  Okay.  Let me plug back into that.

25     Thank you.

```
 1              THE INTERPRETER:  Excuse me.  Am I going that way?
 2              THE COURT:  Sure.  You can stand next to her or you can
 3     use the equipment, whatever you feel comfortable doing.
 4              COURTROOM DEPUTY:  Ma'am, you can -- actually, you can
 5     stand next -- or -- and there is also equipment to sit in the
 6     chair.
 7              Are you familiar with --
 8              THE INTERPRETER:  I haven't been in this courthouse.
 9              I'm relatively familiar with it.
10              COURTROOM DEPUTY:  Okay.  You can use it.
11          (The jury entered the courtroom at 1:18 p.m.)
12              THE COURT:  All right.  We have the jury back.
13              Did everyone follow my admonition not to discuss the
14     case or allow it to be discussed in your presence?
15              All right.  Mr. Pollock, you may call your next
16     witness.
17              MR. POLLOCK:  For our next witness, we call
18     Ms. Valdivieso, the plaintiff in the case.
19              THE INTERPRETER:  Do you have the other mic --
20              COURTROOM DEPUTY:  That's all we have that's over
21     there.  But there is the piece for her, if you just want to
22     test it really quick.
23              THE COURT:  There is a switch where you talk to the
24     witness or you speak out loud.  You have to switch it back and
25     forth.
```

1           (Inaudible discussion.)

2                THE COURT:  Swear in the witness.

3                COURTROOM DEPUTY:  Please raise your right hand.

4                Do you solemnly swear and/or affirm that the testimony

5      you are about to give in this cause will be the truth, the

6      whole truth, and nothing but the truth, so help you God?

7                THE WITNESS:  I do.

8                COURTROOM DEPUTY:  The court reporter is not hearing

9      you.  How about this?

10               THE INTERPRETER:  Thank you.  My apologies, Your Honor.

11     Thereupon:

12                         CRUZ VALDIVIESO FIGUERA

13     having been sworn by the Courtroom Deputy, testified as

14     follows:

15                          DIRECT EXAMINATION

16     BY MR. POLLOCK:

17     Q.  Good afternoon.  Daisy, can you please introduce yourself

18     to our jury.

19     A.  My name is Cruz Valdivieso.

20     Q.  Do you have a second last name?

21     A.  Valdivieso Figuera.

22     Q.  And what's your middle name?

23     A.  Diaseles (phonetic).

24     Q.  Do you go by "Daisy"?

25     A.  Daisy.  It's shorter.

```
 1   Q.   Daisy, where in Broward do you live, in what city?

 2   A.   I did not hear the question.

 3   Q.   Sure.  What city do you live in?

 4   A.   Here in Broward.

 5   Q.   In what city?

 6   A.   Davies.

 7   Q.   Where are you from?

 8   A.   Venezuela.

 9   Q.   When did you come to the United States for good?

10   A.   In 2016.

11   Q.   Okay.  Did you have to leave and come back?

12   A.   I did not hear.

13   Q.   Did you have to leave and come back, or did you stay

14   permanently in 2016?

15   A.   Yes.  I got out and I returned.

16   Q.   When did you return?

17   A.   January 10th of '17.

18   Q.   Are you here in the United States legally?

19   A.   Yes.

20   Q.   Are you married?

21   A.   Yes.

22   Q.   Is your husband the gentleman who was sitting in the

23   courtroom throughout?

24   A.   Yes.

25   Q.   And he had to leave for a doctor's appointment?
```

1    A.   Excuse me?

2    Q.   He had to leave for an appointment?

3    A.   He has a medical appointment at 1:00.

4    Q.   Okay.  Are you a -- do you work as a home health aide?

5    A.   Yes.

6    Q.   Since when?

7    A.   Since 2021.

8    Q.   Was your first job as a home health aide with All VIP or

9    had you worked elsewhere?

10   A.   My first -- my first job was with VIP.

11   Q.   Did you have to complete any schooling to be a home health

12   aide?

13   A.   Yes.  I got a certification from a school in Miami.

14   Q.   Can you tell everybody why you wanted to be a home health

15   aide?

16   A.   Yes.

17   Q.   Why?

18   A.   Well, I do this job because this is a vocation that I have

19   towards older people.  This is a job that not everyone does.

20   And I love it because, through me, people get help with

21   feeding, going to the bathroom, with their personal hygiene.

22   And this is something that requires a vocation.  Not everyone

23   does it.

24   Q.   How did you learn that All VIP was hiring?

25   A.   Through a female friend.

1   Q.   And where did you go to apply for work with the defendants?

2        THE INTERPRETER:   Counsel, my apologies.   Is this civil

3   or is it criminal?

4        MR. POLLOCK:   Civil.

5        THE INTERPRETER:   Thank you so much, sir.

6   A.   I went to request job in Boca Raton to the VIP agency.

7   BY MR. POLLOCK:

8   Q.   Who did you meet with there?

9   A.   I wanted to do it in person because I did not know how to

10  do it electronically.

11  Q.   And who did you meet with there?   Do you know their names?

12  A.   Well, I was assisted by a young lady.   I explained to her

13  that I did not know how to read English, how to speak English,

14  or how to write in English, and I wrote that very clear.   And

15  they said, "Don't worry about it.   We have many patients who

16  speak Spanish, and you're going to be able to work with us."

17       Later, I said to her, "This is a long contract," and then

18  she said, "Don't worry.   I can tell you where you have to sign,

19  where you have to write."   And I wanted to work, so we did it

20  like that.

21       And she told me what to do, like the date, my name, and

22  everything.   And I did it like that because, of course, I

23  wanted to work.

24  Q.   Do you know the name of the lady who helped you?

25  A.   I don't remember, because that was in 2000 -- in 2001, and

 1    I had no more contact with her.  She had me do that and --

 2    well, I began with the company.

 3    Q.   You said 2001.  Do you mean 2021?

 4    A.   Yes, 2021.  I think it was in May 2021.

 5    Q.   Were you able to read what was on the application or any

 6    documents that you signed?

 7    A.   I didn't understand the question very well.

 8    Q.   Sure.  The documents that you were given to sign for your

 9    application and any agreement, were you able to read those?

10    A.   No, because I don't know how to read in English.

11    Q.   Do you remember around what time of day you were in the

12    office to -- to apply?

13    A.   Excuse me?  I didn't understand you.

14    Q.   Sure.  Do you remember around what time of day it was when

15    you went to go apply at All VIP?

16    A.   Yes.  Yes, approximately.

17    Q.   Approximately when?

18    A.   It was 10:00 in the morning.

19    Q.   Now, was it Ms. Ramirez who translated the documents for

20    you, or was it someone else?

21    A.   No.  No one.  No one translated anything to me.

22    Q.   Did someone show you where to sign and where to initial and

23    where to put your name?

24    A.   Yes.  The lady who was helping me fill out the contract.

25    Q.   And about how long did it take for this lady to go through

1   the -- all the documents with you?

2   A.  It was approximately 20 minutes.  It was relatively fast.

3   She did it fast because she had other things to do.

4   Q.  What do you -- what do you mean "she had other things to

5   do"?

6   A.  I didn't understand.

7   Q.  Sure.  You said that she went through the application fast

8   because she had other things to do.  What makes you say she had

9   other things to do?

10   A.  She was with another client filling out another contract.

11        MR. POLLOCK:  Can I get the ELMO, please?

12   BY MR. POLLOCK:

13   Q.  I'm going to show you what's in evidence as Joint

14   Exhibit 2.

15        MR. POLLOCK:  Sorry.  HDMI.

16   BY MR. POLLOCK:

17   Q.  We were talking about the application for contract or

18   employment with the registry.  Is this the application that you

19   completed when you went to All VIP?

20   A.  Yes.

21   Q.  And so in about those 20 minutes, the lady at All VIP ran

22   you through documents that included this seven-page document;

23   is that right?

24   A.  Yes.

25   Q.  And why did you complete and sign this contract --

1    application for contract or employment with the registry?

2    A.   I signed it because I was looking for a job.

3    Q.   Did you also sign this document that's in evidence as Joint

4    Exhibit 3, the independent contractor agreement?

5    A.   Yes.

6    Q.   Was this one of the documents that the lady translated to

7    you in those 20 minutes?

8    A.   Not at all.  At no time did she do any translation.

9    Q.   Is the lady's name at the bottom who translated for you,

10   Ms. Perez?

11   A.   Yes.

12   Q.   And why did you sign this document when you applied for

13   work at All VIP?

14   A.   Because if I didn't sign the document, I wouldn't be

15   getting a job.  And at all time didn't -- did I think that they

16   were going to do something bad to me, that it was going to

17   affect me.

18   Q.   Did you understand the documents that they asked you to

19   sign?

20   A.   If I read the document that they gave me to sign?

21   Q.   Correct.

22   A.   No, because I don't know how to read in English.

23   Q.   And after you signed these documents, did they give you

24   copies so you can take them home?

25        (Witness answering in Spanish to interpreter.)

1          THE COURT:  That's too long of an answer.  You have to

2     break your answers down.  It's too hard on the interpreter for

3     you to talk that long.

4     A.   When I began having that contract, when I noticed these

5     things, that I was not getting paid, then I called the manager,

6     Diana Ramirez, regarding the hours and what happened to the

7     hours that I did not get paid.

8          And then there was a contact with the owner of the agency.

9     Liz called me and then she -- she acted very rude.  She

10    insulted me.  She called me a thief.  She was telling me that I

11    stole clients from her, that she was not going to pay me.

12         And I am just wondering why is she still calling me, in

13    court, a thief?  I haven't stolen anything from her.

14    BY MR. POLLOCK:

15    Q.   Understood.

16         MR. GOLDBERG:  Your Honor, we ask that the statement be

17    stricken as unresponsive to the question.

18         THE COURT:  Denied.

19         But try to break down your answer.  If you go too

20    long -- in the future, give shorter answers.

21         THE WITNESS:  Okay.

22         THE COURT:  I don't mean that your whole answer has to

23    be short, just that -- give an answer, let her translate,

24    continue your answer, let her translate.

25         THE WITNESS:  Okay.

1    BY MR. POLLOCK:

2    Q.   So, Daisy, in these twenty minutes Ms. Perez translated for

3    you, first, the application which was seven pages, and then

4    they also translated for you this independent contractor

5    agreement for another six pages -- did I get that right?

6    A.   At no time did she do any translation.

7    Q.   Okay.  Did you also have to sign this acknowledgment of

8    nurse registry policy and procedure that's in evidence as Joint

9    Exhibit 4 that's five pages?

10   A.   Yes.

11   Q.   What about the 3-page home health aide/certified nursing

12   assistant job description that's in evidence as Joint

13   Exhibit 5?  Was that also part of what you were supposed to

14   initial and sign in these 20 minutes?

15   A.   Yes.

16   Q.   And how did you know where to initial and sign each of

17   these documents?

18   A.   Because we were at a table, and I would ask her and she

19   would tell me, "Look, here is where the initials go.  Here is

20   where the date goes."

21   Q.   When did you start working for the defendants?

22   A.   I began with VIP in May -- on 5 -- no, in May.

23        May 3rd of '21, I think.

24   Q.   And did the defendants give you the option of being paid as

25   an employee or an independent contractor when you started?

1   A.   I was always their employee.

2   Q.   When -- during the entire time that you were working for

3   the defendants, did you work for anyone other than the clients

4   they told you to work for?

5   A.   No.

6   Q.   And while you were working for All VIP, did you have time

7   to work for clients on the side?

8   A.   No.

9   Q.   Did any of the clients of All VIP pay you directly?

10  A.   No.

11  Q.   Now, when you started with All VIP, did you bring your own

12  patients with you?

13  A.   No.  Never.

14  Q.   Who found and provided you with the patients when you

15  started working for the defendants?

16  A.   What is the question?

17  Q.   Sure.

18       Who found and provided you with the patients when you were

19  working for All VIP?

20  A.   That was sent always by message, that Diana Ramirez would

21  always send me the members.  She would tell me, "Look, we have

22  a patient here for 48 hours."  You would confirm to her, and

23  then you would begin to work.

24  Q.   As far as working, did you have your own scrubs, like what

25  you're wearing now?

1   A.   I would buy my own scrubs.

2   Q.   Okay.

3   A.   They would always demand that you go with -- in uniform.

4   Q.   And these scrubs that you bought, you're able to wear them

5   for any company that you're working for because they don't have

6   a name or a logo on it; right?

7   A.   I could wear any -- any uniform with VIP.

8   Q.   Was that a requirement from the State of Florida, that you

9   wear a uniform, or was that All VIP's requirement?

10   A.   It's a required -- or a requirement of the company that we

11   have to be within uniform.

12   Q.   Masks and gloves, are those things that you had to buy, or

13   did VIP provide them, or did the patients provide them, or

14   someone else?

15        THE INTERPRETER:  Counsel, my apologies.  What were the

16   first two words that you used?

17        MR. POLLOCK:  Sorry.  Masks and gloves.

18        THE INTERPRETER:  Okay.  Thank you, sir.

19   A.   Okay.  During the time of the pandemic at VIP, I was asking

20   Diana Ramirez what happened with the gloves, because there was

21   a patient that was in critical condition and I had no gloves.

22   The man's -- the lady's husband, Humana was providing gloves

23   for him, but she didn't -- she didn't want to give us -- give

24   it to us.  I was telling Diana, "What happened to the gloves?

25   They were never sent to us."

1       We did not get gloves or masks at all.

2    BY MR. POLLOCK:

3    Q.  Are those the only things that you needed to do your work,

4    gloves and masks?

5    A.  Yes.  That was something essential for the pandemic.  That

6    was what we were needing at the time.

7    Q.  Did All VIP provide with you everything else?

8    A.  No.

9    Q.  All right.  Let me ask you this way:  Did they provide you

10   the clients?

11   A.  If they were promising the clients to me?  They were giving

12   me the jobs.

13   Q.  Okay.  Did they tell you what needed to be done for the

14   clients?

15   A.  Yes.

16   Q.  Did they tell you the schedule that were you going to work?

17   A.  Yes.

18   Q.  Did they tell you where each client was?

19   A.  Yes.

20   Q.  Did they tell you how many hours a week -- a week you could

21   work for each client?

22   A.  The ones that I wanted.  All of the ones that I wanted.

23   Q.  So could you work more than what All VIP was offering you?

24   A.  They -- if a patient had 50 hours, that's what they were

25   offering me.  I would have to take it; otherwise, I would have

1    to give it to another person.

2    Q.   If you couldn't work on a day that you were assigned to

3    work, would you find someone to fill in for you or would the

4    defendants assign a replacement?

5    A.   No.  They would look for their employees.

6    Q.   And if they assigned to you work 50 hours, could you only

7    show up for 35 hours for All VIP and not have a problem?

8          THE INTERPRETER:  Interpreter is asking for repetition.

9          MR. POLLOCK:  She is asking to you repeat your answer.

10   A.   And so the clients that they would give me would normally

11   require more hours than what I worked.  I would work day and

12   night, and I would take the hours.  I liked to work.

13   BY MR. POLLOCK:

14   Q.   What happens if you didn't work the hours that you were

15   scheduled to work?

16   A.   They would take away the patient from me.

17   Q.   And were you getting paid $13 for every hour that you

18   worked at All VIP; is that right?

19   A.   $13, yes.

20   Q.   And how did you get that money?  Was it a paper check or

21   direct deposit?

22   A.   No, it was an automatic payment.  The payment would arrive

23   automatically every Friday.  Every Friday, they would pay me.

24   But I always had a lot of problems with the payment because the

25   payment would always be delayed.  And I would tell Diana, "I'm

1   not leaving the company because I like the fact that I'm

2   getting paid quickly, but what is happening that I'm not

3   getting paid?"

4   Q.  What were you told?

5   A.  I -- I wasn't -- this was the problem that I was having

6   with her, that she was not paying me.  And I went to Ms. Liz.

7   I had to go to West Palm Beach to know what was happening with

8   the payment that I wasn't getting.  And then Ms. Liz, I spoke

9   to her, and as always, she acted very rude to me.  She

10  mistreated me.  And she sent the check -- I mean, the check, I

11  had to pick it up through -- through a slot.

12  Q.  When you say she was rude and mistreated you, what did you

13  mean?

14  A.  She would always say, "We have problems with payroll," and

15  then she would say to me, "Wait, because I know the law.  If I

16  don't want to pay you, then I don't pay."

17  Q.  Okay.  At All VIP, did you asked to be assigned to certain

18  kinds of clients?

19  A.  Yes.  I had my clients assigned by them.

20  Q.  And what kind of clients did you ask for?

21  A.  Not the ones who would appear.

22  Q.  Did you ask for clients that spoke English or Spanish or

23  both?

24  A.  Only Spanish.  I would ask for them in Spanish -- who would

25  speak Spanish.  I don't speak English.

1   Q.   And the first client that All VIP sent you to, can you tell

2   us about that experience?

3   A.   Yes.  I had an experience -- the first day of work with

4   VIP, they sent me to Boca Raton.  That lady spoke in English,

5   and she had already contacted Liz and she said that she did not

6   want anybody who speaks Spanish because her mom would only

7   speak English.

8        When I showed up in the house --

9        THE INTERPRETER:  Let me just clarify.

10  A.   When I showed up in the house, I was assisted by a Haitian

11  lady.  The daughter called the lady and she had said that

12  another person was sent in Spanish.  The lady arrived

13  immediately and she called Mrs. Liz, and she told her why is it

14  that she is still sending her personnel in Spanish?  That her

15  mom did not speak Spanish, that her mom spoke English.

16       Ms. Liz asked the lady to please put me on the phone.  I

17  took the phone, and Ms. Liz told me, "Get out of that house.

18  Get out of that house.  You don't have a reason to be there."

19       Then I called Diana Ramirez because I was in tears, because

20  that was my first day of job and my first day at -- at work,

21  and the treatment that I got from the lady was that one, from

22  Ms. Liz.  So I said to Diana Ramirez, "Who is the lady who

23  insulted me?  Who is it?"  And she goes, "No, that's the owner

24  of the company.  But don't worry because, from now on, the

25  whole contract is going to be with me."

1    BY MR. POLLOCK:

2    Q.   Okay.  Did you next work with the Iziques?

3         THE INTERPRETER:  With who?

4    BY MR. POLLOCK:

5    Q.   Did you next work with Mr. and Mrs. Izique?

6    A.   Yes.

7    Q.   And when you worked for Mr. and Mrs. Izique, did you put

8    down more hours than you were scheduled to work?

9    A.   No.  The hours that I worked were the hours that I would

10   put in in the sheets that they were giving me.

11        There, I assisted two patients, and I was getting paid for

12   one patient.

13   Q.   Can you explain what you mean by that?

14   A.   It was a married couple.  This was a married couple, the

15   Iziques, and I was working for both Yolanda and Cesar, and I

16   was only getting paid for Cesar, not for Yolanda.  And I began

17   to say, "Well, we are taking care of two patients, and I'm

18   getting paid for one."  So Diana would say to then divide the

19   hours, to do certain number of hours for Yolanda and a number

20   of hours for Cesar.  But then we would get paid the same.

21   Q.   I mean, because they were both in the house while were you

22   getting paid for one of them; right?

23        They were both in the house when you were only getting paid

24   for one of them at a time?

25   A.   Yes.  It was a married couple that never got separated

1   until Cesar died.

2   Q.   The time that you worked, did you keep track of your time?

3   A.   The time that I worked?

4   Q.   Yeah.  Did you write it down?

5   A.   Yes.

6   Q.   And did you write it down on the time sheets that

7   were -- that are in evidence at Joint Exhibit 9?

8   A.   Yes.

9   Q.   It looks like we've had about 44 of them.

10      Who provided you with the form for these time sheets?

11  A.   Diana Ramirez.

12  Q.   And did you -- what were you supposed to check off or fill

13  in?

14  A.   What we were doing, the daily assignments, when we would

15  clean, the help that we gave.

16  Q.   And were you supposed to mark that down?

17  A.   Yes.  That was requested from us.

18  Q.   And then were you supposed to sign the time sheet to show

19  that it was worked and accurate?

20  A.   Yes.

21  Q.   And were you required to complete one time sheet for each

22  week for each patient?

23  A.   Yes.

24  Q.   Who did you turn the time sheets in to?

25  A.   To Diana Ramirez.

1  Q.  And before you could turn them in, did the patient or the

2  patient's family member have to sign, as well, to confirm that

3  the hours put down were the hours worked?

4  A.  Yes, correct.

5  Q.  Now, did All VIP pay you for the time that you worked for

6  them?

7  A.  They -- the last weeks, they did not pay me.  But I always

8  had problems with them in terms of payment.  They were not

9  punctual.  There would always be a delay.  Three days,

10 five days, always.

11     And I would tell the family members, "We did not get paid.

12 Please call Diana because maybe she will be able to talk to you

13 about this."  Because the thing is that Diana really was not

14 assisting us.  It was really through a family member.  We were

15 not able to get in touch.

16 Q.  I'm going to show you the -- your time record from May 5th

17 and 6th for Alicia Soto.  Do you recognize this document?  It's

18 part of Joint Exhibit 9, which is your time records.

19 A.  Uh-huh.

20 Q.  Whose handwriting is on the right side of this page?

21 A.  Mine.

22 Q.  And did somebody else write the times under Thursday and

23 Friday?

24 A.  No, because that was another one that they didn't pay me,

25 which was with Alicia Soto.  I was available, I did this shift,

1    and I wasn't paid.

2    Q.   How many hours were you not paid for?

3    A.   16 hours there, with Alicia Soto.

4    Q.   Your last week of work, July 18th through the 24th, were

5    you paid for that week by the defendants?

6    A.   No.

7    Q.   Was your last day of work July 24th?

8    A.   Uh-huh.

9    Q.   Is that a "yes"?

10   A.   No.  They didn't pay me.

11   Q.   Okay.  And was your last day of work July 24th?

12   A.   Yes.

13   Q.   Did you ask why you didn't get paid for your last week of

14   work?

15   A.   Ms. Liz, in a rude way, will tell me, "You are a thief.  I

16   am not going to pay you," and she would hang up on me.

17   Q.   Ms. McKinnon said that, "We tried to call you to talk about

18   that check."  Did she ever try to call you about picking up

19   your last paycheck?

20   A.   She has never had the intention to pay me.  She has never

21   called me.  In fact, we are in these courts because of the

22   payment.  It's been a year that she has not paid me.

23   Q.   Do you know how many hours Ms. McKinnon or the defendants

24   owe you for?

25   A.   She owes me for overtime, 9,337.27, and for my week, 1,726.

1       I'm sorry.  I have the number 9,428, and 1,768.  Her excuse

2    that she always uses is that I'm a thief and she's not going to

3    pay me.

4    Q.   Now, the time that you're owed for overtime is based -- is

5    that based on the time sheets that you submitted?

6    A.   Yes.

7    Q.   And did you look at -- and you calculated this based on

8    $6.50 for each overtime hour?

9    A.   Yes.

10   Q.   And so the time that you're talking about, is about -- if

11   we do the math -- 1,450 or so hours [sic] of overtime; is that

12   right?

13   A.   Yes.

14   Q.   And the wages that you're owed under the contract, that's

15   $1,768, which is about 136 hours that you're owed.

16       Is that also correct?

17   A.   Uh-huh, correct.

18   Q.   The payments that you got from All VIP, were they made out

19   to you or were they made out to a company that you own?

20   A.   The payments that she was giving me at the beginning were

21   directly, and then she gave me a check.  But then later there

22   was -- that was a disaster.  It was very regular I didn't get

23   paid.

24   Q.   And there was a check that Ms. McKinnon wrote to you for

25   $897 on July 22nd, of 2022.

1       Why did she write you that check?

2   A.   And that was a result of a payment -- I'm sorry.  I did not

3   understand the question.

4   Q.   Sure.

5        There was a check that Ms. McKinnon wrote to you for $897,

6   and it's dated July 22nd of last year.

7   A.   Ms. Liz?

8   Q.   Yes.  Why did she write you that check?

9   A.   She gave me that check for one week of work, but the prior

10  hours she did not pay me.

11  Q.   Are you asking the jury to award you any more than the

12  money that you've earned?

13  A.   No.  I want what is fair, what is owed to me.

14           MR. POLLOCK:  Nothing further, Your Honor.

15           THE COURT:  All right.  Members of the jury, we are

16  going to take a 15-minute recess.  Remember my admonition not

17  to discuss the case or allow it to be discussed in your

18  presence.

19           We will see you back in the jury room in about

20  15 minutes.

21       (The jury exited the courtroom at 2:19 p.m.)

22           THE COURT:  If there is nothing else to come before the

23  Court, we will be in recess for 15 minutes.

24       (A recess was taken from 2:20 p.m. to 2:43 p.m.)

25           THE COURT:  Please be seated.

1          Back on the record.  Counsel are present.

2          Anything to come before the Court before I bring the

3     jury in?

4          MR. POLLOCK:  No, Your Honor.

5          MR. GOLDBERG:  None on the defense side, Your Honor.

6          THE COURT:  All right.  If we have all the jurors,

7     let's bring them in.

8           (The jury entered the courtroom at 2:44 p.m.)

9          THE COURT:  All right.  We have all the jury back.

10          Did everyone follow my admonition not to discuss the

11     case or allow it to be discussed in your presence?

12          All right.  I think we're ready for cross-examination.

13          Mr. Goldberg.

14          MR. GOLDBERG:  Thank you, Your Honor.

15                         CROSS-EXAMINATION

16     BY MR. GOLDBERG:

17     Q.  Good afternoon, Ms. Figuera.  My name is Randy Goldberg,

18     and I represent All VIP Care and Ms. McKinnon.

19          Ms. Figuera, just so I'm clear, you had a working

20     relationship with All VIP Care from May 3rd, 2021, until

21     July 25th of 2022?

22     A.  Yes.

23     Q.  Thank you.

24          You testified on direct examination that you did not read

25     the application, the independent contractor agreement, or the

1   policies and procedures for the nurse registry; is that

2   correct?

3   A.   Could you repeat the question, please?

4   Q.   Certainly.

5        It is your testimony that you did not read the application

6   for engagement of a contract with All VIP Care?

7   A.   That I did not read the contract?

8   Q.   No.  You did not read the application, ma'am.

9   A.   No.  I did not read the application because the application

10  is totally in English and I do not read English.

11  Q.   Did you fill in the blanks in the application?

12  A.   The lady who helped me at VIP, and she was also helping

13  people there, she told me, "Don't worry, I will help you."  And

14  she told me, "I will help you to do" -- she helped me, what to

15  do with the initials, where to put the date, where to put the

16  signature.

17       And we did it fast because she was also helping other

18  people.

19  Q.   And originally, you said you did not know the name of this

20  woman; correct?

21  A.   No.  Because I went to apply, she assisted me, and that was

22  it.

23  Q.   So you did not know her name?

24  A.   Well, if she said it to me at the time, well, I don't

25  remember.

1   Q.   But later on, you testified that it was Ms. Perez who

2   assisted you.

3   A.   Mrs. -- you said the name of the lady -- Hill (phonetic)?

4   On the contract that came out here, that I signed, her name is

5   there.

6   Q.   But you do not have any independent recollection who -- of

7   who that person was?

8   A.   No.  I mean, she was in the office.  I went to apply there,

9   where many people applied at that moment.  And I think that

10  when you are looking for a job, you're not really interested in

11  getting to know the identity of the person.  You're interested

12  in going to work, and that's it.

13  Q.   But you did recall specifically that you were there at

14  10:00 in the morning?

15  A.   I -- I perfectly remember the time, of course.  Certainly.

16  Q.   The -- it's your testimony, also, that you did not read the

17  contract, the independent contractor agreement, or the

18  acknowledgment of the nurse registry's policies and procedures;

19  correct?

20  A.   I cannot, really, because it's in English, simply because

21  of that.  And I was looking for a job.

22  Q.   So you basically listened to somebody you didn't know to

23  just fill in the blanks so you could get a job?

24  A.   Of course.  The lady is an employee of the company and she

25  gave me the contract.  She gave me the sheets, and I told her,

1    "I do not speak English."  And she said, "Don't worry, I will

2    help you."  And it was like that.

3    Q.   Now, it's your testimony that that person was not Ms. Diana

4    Ramirez?

5    A.   Not at all.

6    Q.   We -- and were you provided with copies of these documents

7    after you had signed them?

8    A.   No.  At no time did they give me that contract.  They gave

9    me a copy of that contract, once I started this trial.

10   Q.   So it's your testimony that from May 3rd, 2021, up until

11   that -- this case started, you did not -- you did not have a

12   copy of the agreement and the collateral documents, the

13   application and the policy and procedures?

14   A.   No.  I did not have any of that.

15        No, they did not give me all the documents.  In fact, they

16   held on to the documents that I presented to them.  The one for

17   the -- the certification for the 72 hours, they kept all those

18   documents.

19        And, in fact, with the contract, I insisted until they gave

20   me the contract that I had signed with them.

21   Q.   You testified that your first relationship with the nurse

22   registry was with All VIP Care beginning in May of 2021; is

23   that correct?

24             THE INTERPRETER:  Counsel, do you mind repeating the

25   question, if you don't mind?

1          MR. GOLDBERG:  Certainly, ma'am.

2          THE INTERPRETER:  Thank you.

3     BY MR. GOLDBERG:

4     Q.  It was your testimony that your first relationship with a

5     nurse registry as a home health aide was with All VIP Care back

6     in May of 2021; is that correct?

7          THE INTERPRETER:  Thank you, sir.

8     A.  Yes.

9     BY MR. GOLDBERG:

10    Q.  When did you become certified as a home health aide by the

11    State of Florida?

12    A.  I think it was on the 18th of September of 2018.

13    Q.  So it's your testimony that you became certified as a home

14    health aide September 18th of 2018, and you did not engage in a

15    relationship with a nurse registry until May 3rd of 2021?

16    A.  No.  Because I was dedicated to babysitting, to taking care

17    of children; and later I was dedicated to caring for

18    grandparents.

19    Q.  Are you familiar with the nurse registry called Super Home

20    Health?

21    A.  Yes, perfectly.

22    Q.  And isn't it true that you established a relationship as a

23    home health aide with them October 6th of 2020?

24    A.  I did not understand the question.

25    Q.  Certainly.  I will repeat it, ma'am.

1       Isn't it true that on October 6th, 2000 -- I'm

2    sorry -- 2020, that you established a relationship with Super

3    Home Health as a home health aide?

4    A.   I don't remember that date.  I remember that the date that

5    I started with VIP was some -- 5/3/2021.  That's the one I

6    remember.

7    Q.   But you don't remember engaging with -- in a relationship

8    that I described with Super Home Health back in October of

9    2020?

10   A.   No.  Not at all.

11        MR. GOLDBERG:  May I --

12   BY MR. GOLDBERG:

13   Q.   Before I do that, are you familiar with the Florida

14   department that is called the Agency for Home -- for -- I'm

15   sorry -- the Agency for Health Care Administration, which is

16   commonly referred to as AHCA?

17        THE INTERPRETER:  AHCA is the abbreviation?

18        MR. GOLDBERG:  AHCA, A-H-C-A.  That's the common term

19   for them.

20        THE INTERPRETER:  Thank you, sir.

21   A.   No.

22   BY MR. GOLDBERG:

23   Q.   Isn't it true that AHCA is the agency that issued you your

24   license as a home health aide?

25        MR. POLLOCK:  Objection.  "License."

```
 1              THE COURT:  Overruled.

 2              THE INTERPRETER:  Okay.

 3              THE COURT:  Now you can answer.

 4   A.  I don't know whether he is trying to confuse me with the

 5   Department of Florida, but I just know that I went to a school

 6   and I obtained -- I went to school for 72 hours and I obtained

 7   a certification as an HHA.

 8   BY MR. GOLDBERG:

 9   Q.  Ms. Figuera, nobody is trying to confuse you.  We're just

10   trying to ask questions to get to the truth.

11        Now, so you attended a school and then you received a

12   certification as a home health aide; is that correct?

13   A.  Yes, that's correct.

14   Q.  And it's your testimony that, despite receiving this

15   certification, you -- from AHCA, you do not know who AHCA is?

16              MR. POLLOCK:  Objection.  Facts not in evidence.

17              THE COURT:  Overruled.

18   A.  No.

19   BY MR. GOLDBERG:

20   Q.  And you do not recall who Super Health Home -- I'm

21   sorry -- Super Home Health is?

22   A.  I think it has to do with health, but through this, I did a

23   certification.  And with that certification, I work, and with

24   that is what I live.

25   Q.  I understand that, ma'am.  But I'm trying to understand,
```

1    because your testimony was that your relationship with All VIP

2    Care was your first relationship with a nurse registry as a

3    home health aide.

4            MR. POLLOCK:  Asked and answered.

5            THE COURT:  Sustained.

6    BY MR. GOLDBERG:

7    Q.   Okay.  But it's your -- it's your testimony that you don't

8    know who Super Health is, even though AHCA reflects that you

9    worked for them --

10           MR. POLLOCK:  Objection.  Facts not in evidence.

11           THE COURT:  Facts not in evidence.  This is

12   cross-examination.  He can cross-examine on it, but she's

13   already answered that question.

14           MR. GOLDBERG:  Understood, Your Honor.  Thank you.

15   BY MR. GOLDBERG:

16   Q.   You've met with -- when did you first meet with Diana

17   Ramirez?

18   A.   The same day -- the next day after the application, I was

19   given the Boca Raton case.

20   Q.   And isn't it true that Ms. Ramirez is fluent in Spanish?

21   A.   She speaks it perfectly fluently.

22   Q.   And did you have the opportunity to sit down and discuss

23   the application for engagement of relationship with All VIP

24   Care, the independent contract agreement, and the

25   acknowledgment of the policies and procedures of the nurse

1   registry with her?

2   A.   Never, ever.  With the -- the relationship with Diana

3   Ramirez was -- we really had no contact with her.  It was

4   always through the phone.  We were trying to contact her, and

5   it was always a recording that we would find.  The contact that

6   we had with her was through the family.

7        So Diana Ramirez would never answer the phone.  She would

8   never sit with us.  And to be able to talk to us, there was

9   never a supervisor who would talk to us.  So -- and it was

10  just -- this was a case of the payment, and we never got paid.

11  Q.   The question, Ms. Figuera, was:  Did you discuss the

12  application to establish the relationship with the nurse

13  registry, All VIP Care, the independent contractor agreement,

14  and the acknowledgment of the nurse registry's policies and

15  procedures?

16       Did you discuss those with Diana Ramirez?

17  A.   No.

18  Q.   Regardless of your testimony that you never read it or

19  understood the agreements and the documents that I mentioned,

20  you still initialled those and signed those; correct?

21  A.   It's correct.  Diana Ramirez -- but Diana Ramirez was not

22  the one who helped me fill out those documents.

23  Q.   It was Ms. Perez; is that correct?

24  A.   I don't remember her name right now.  It was a young lady

25  who assisted me.  I don't remember her name, but it was not

1   Diana Ramirez.

2   Q.   Did this young lady speak English or did she speak with you

3   in Spanish?

4   A.   She spoke English and Spanish, that lady, yes.

5   Q.   Was it fluent Spanish?

6   A.   That lady who -- yes.

7   Q.   Did you freely and voluntarily initial those documents and

8   sign the documents?

9   A.   Of course, because I was looking for a job, and the

10   requirement to be able to get into that job was by signing the

11   document.  And when I saw the document in English, I told her,

12   "I don't know how to do this because it is all in English."

13   And she said to me, "Don't worry, I will help you.  Here you're

14   going to put the date, here you're going to put the initials,

15   and here you're going to put the name."

16        And she was also with another lady that she was helping.

17   There were other people who were doing that at that moment.

18   Q.   The question, Ms. Figuera, was:  Did you sign and initial

19   these documents freely and voluntarily?

20   A.   Yes.

21   Q.   Am I correct in that once you completed and signed the

22   application with the registry, the independent contractor

23   agreement, and the acknowledgment of nurse registry policies

24   and procedures, you established your independent contract

25   relationship with All VIP Care?

1  A.  Yes.

2  Q.  So it's your testimony today that you did create an

3  independent contractor relationship with All VIP Care?

4  A.  I am not an independent contractor.  I'm an employee of VIP

5  Care.

6  Q.  Let me direct your -- wait.

7      Do you recall, back on June 6th of this year, you giving a

8  deposition to my office regarding this case?

9  A.  I remember that there was a deposition where I was asked if

10  I was an independent contractor.  The attorney insisted so much

11  that I said "yes."  But I am not an independent contractor.  My

12  wages are paid by Ms. Liz, who has not paid me.

13  Q.  During this deposition, you were represented by an

14  attorney.  In fact, Mr. Pollock's associate, Mr. Cummings; is

15  that correct?

16         THE INTERPRETER:  Cummings?

17         MR. GOLDBERG:  Cummings.

18  A.  Yes, it's correct.

19  BY MR. GOLDBERG:

20  Q.  I want to focus your attention back to page 33 of that

21  deposition, and specifically lines 13 through 17.

22      I asked you:

23      "QUESTION:  So your testimony is that you were an

24  independent contractor with VIP" --

25         THE INTERPRETER:  Counsel, my apologies.  The

1    interpreter does not have that document on the screen.  Can you

2    put it on the screen?

3             MR. GOLDBERG:  I can't.

4             THE INTERPRETER:  Never mind.  That's okay.  If you can

5    just fragment the statement.

6             MR. GOLDBERG:  Certainly.

7             THE INTERPRETER:  Thank you, sir.

8             MR. GOLDBERG:  I am referring to the deposition that

9    was taken on June 6th, 2023, that began at 11:01 a.m.

10   BY MR. GOLDBERG:

11   Q.  I am directing everyone's attention to page 33, lines 13

12   through 17.  The question I asked of you was:

13        "QUESTION:  So your testimony is that you were an

14   independent contractor with VIP?"

15   A.  Well, now I am a protagonist, thanks to VIP.  At that

16   moment, before, I had not been in court.  I had not gone to a

17   deposition, so I got confused and I said what I thought the

18   contract said.  But I did -- I did know that I had been

19   hired -- that I was -- I identified myself as an employee of

20   VIP because I was an employee of VIP.

21   Q.  Your answer during the deposition to the question that I

22   just read into the record was that:

23        "ANSWER:  I am an independent contractor."

24        I then asked -- I'm sorry.  Go ahead, ma'am.

25   A.  I think, then, because of making me a protagonist here,

1    that regardless -- I mean, what -- of what I said in that

2    deposition, I did not know what it was that I was answering.

3    Q.   My subsequent question in that deposition, on line 16, was:

4         "QUESTION:  With VIP?"

5         And your response was:

6         "ANSWER:  Yes."

7         Is it your testimony today that when this deposition was

8    taken, which was taken under oath, you raised your right hand

9    and swore to tell the truth, as you have done today, those

10   answers were not correct?

11   A.   It's correct.

12   Q.   What is correct, ma'am?

13   A.   At the moment in which I did that deposition, in which I

14   said that I was a contractor, I did not know at that moment

15   that I was a contractor employee.

16   Q.   And how did you come up with that assumption, that you are

17   a contractor employee?

18   A.   I do not have a company of my own in which I am looking for

19   clients to be able to get paid.  No, I depend on VIP for

20   clients.  I depend on VIP to get paid.  So, therefore, I'm an

21   employee.

22   Q.   I asked you in deposition -- and I'm asking you again:

23        "QUESTION:  What does it mean to you to be an independent

24   contractor with a nurse registry like All VIP Care?"

25        What does it mean to you, ma'am?

1   A.   I am an employee of VIP Care.  An independent contractor is

2   the one that has their own company who looks for her own

3   clients.  I don't have that.  I cannot talk to the insurance.

4   I cannot talk to the managers or anything like that.

5   Q.   Nowhere in your deposition, Ms. Figuera, do you mention

6   being your own company or anything about what you just stated.

7   However, when I asked you those questions, "What does it mean

8   to be an independent contractor with a nurse registry like All

9   VIP Care," you stated in your deposition:

10       "ANSWER:  One, to create my own schedule."

11       And that's on page 9, line 20 through 21.

12       "ANSWER:  Second, is" -- your response was -- "that I have

13   the right to decide if I want to work or not work each day."

14       And that's on page 10, line 10 through 12.

15       There is more, but I want to give the interpreter the

16   opportunity to share this information with you, Ms. Figuera.

17       MR. POLLOCK:  It's improper impeachment.  It's not a

18   verbatim.

19       MR. GOLDBERG:  Sir?

20       THE COURT:  Sustained.

21       MR. GOLDBERG:  I can read the verbatim language into

22   the record.  However, for the purposes of expediting the

23   testimony of this witness on cross --

24       THE COURT:  Ask another question.

25   ///

1    BY MR. GOLDBERG:

2    Q.   The third response that you made in the deposition, when

3    you were asked the question, "What does it mean for you as an

4    independent contractor with nurse registry like All VIP Care,"

5    your third response to me --

6         MR. POLLOCK:   Objection.   It's not the question.

7         THE COURT:   Improper impeachment.   Sustain the

8    objection.

9         You can ask her a question, and then you can ask her if

10   she's made a contradictory statement in the past.   And if she

11   denies it, then you can read the statement.

12        MR. GOLDBERG:   Understood, Your Honor.

13   BY MR. GOLDBERG:

14   Q.   Ms. Figuera, do you deny the first two statements that I

15   recited from the deposition that you made --

16        MR. POLLOCK:   Objection.

17   BY MR. GOLDBERG:

18   Q.   Do you deny those?

19        MR. POLLOCK:   Those are stricken.   You sustained those

20   objections.

21        THE COURT:   Mr. Pollock wants you to ask them again.

22        MR. GOLDBERG:   Understood, Your Honor.   Thank you.   I

23   apologize for the confusion on my end.

24   BY MR. GOLDBERG:

25   Q.   Ms. Figuera, do you deny that you made the comment during

1   deposition as to what it meant to you to be an independent

2   contractor with All VIP Care, that you can create your own

3   schedule?

4   A.   I don't create my own schedule.  This is something that

5   I -- I do not have my own company.  I do not have my own

6   clients.  And that -- that is not how I work.  They give me the

7   schedule.  If I don't accept that job, then I don't get

8   clients.  I don't have -- I don't have a job with them.

9        So I am not an independent contractor.  I depend on them.

10  Q.   Again, I ask:  Did you deny making the statement that, "I

11  get to create my own schedule"?

12  A.   I do not create my own schedule.  At the deposition, I was

13  not clear.  And the gentleman insisted, just like he is doing

14  right now, and I answered because he insisted that I was an

15  independent contractor.

16       But I repeat, I made a mistake.  I am not an independent

17  contractor.

18  Q.   Are you -- are you denying that you made the statement,

19  ma'am?

20       MR. POLLOCK:  It's improper impeachment.  This is

21  improper impeachment.  I don't want to say it in front of the

22  jury, but I think I can show the Court as to why --

23       THE COURT:  It's improper impeachment, but she's

24  already admitted she made a mistake.  She's admitted the prior

25  inconsistent statement, so let's move on.

```
 1            MR. GOLDBERG:  Yes, Your Honor.

 2   BY MR. GOLDBERG:

 3   Q.  On page 10, line 10 through 12 of your deposition, you

 4   stated to the effect that you have the right to decide if you

 5   want to work or not work each day.

 6       Do you deny making that statement in your deposition?

 7            MR. POLLOCK:  This is more improper impeachment.

 8            THE COURT:  It's improper impeachment.  I sustain the

 9   objection.

10            THE INTERPRETER:  Sorry, Your Honor.  I'm telling the

11   witness not to answer.  Thank you.

12   BY MR. GOLDBERG:

13   Q.  It is your claim, then, that despite acknowledging you were

14   an independent contractor in your deposition, your testimony

15   today is that you were not an independent contractor?  You were

16   a contractor employee?

17   A.  I'm an employee.

18            MR. GOLDBERG:  I'm sorry, ma'am?

19            THE INTERPRETER:  "I'm an employee."

20   BY MR. GOLDBERG:

21   Q.  What training did you take to become a certified home

22   health aide?

23   A.  I went to school and I was taught how to work.

24   Q.  What were you taught, ma'am?

25   A.  A teacher.
```

1   Q.   What were you taught?

2   A.   How to assist a patient.  Besides, there was this person --

3   you also have to have common sense, what it is that you're

4   going to help him, help him with the bathroom --

5        THE INTERPRETER:  Let me clarify.  The interpreter will

6   clarify.

7   A.   To help him go to the bathroom, to help him with his food,

8   with his nutrition.  That is something basic.

9   BY MR. GOLDBERG:

10  Q.   Did -- you never were provided any training by anyone at

11  All VIP, were you?

12  A.   Never.  Never.

13  Q.   Do you know if all the training that you received was

14  required by state law?

15  A.   I don't know, but I worked with that certificate, and the

16  company has -- is qualified to be able to have the curriculum

17  and see whether the person is qualified to be able to assist

18  the patient.

19  Q.   I'm confused.  The question was that:  If you know, was all

20  the training that you received to do the job as a home health

21  aide in compliance with Florida law?

22  A.   Yes.  It has to be, because I -- I went to school for that

23  certification.  And besides that, the company has to check as

24  to whether I am qualified to be able to do that.

25  Q.   Who decides what the duties of a home health aide are with

1    any particular patient?

2    A.   The company that hires me.

3    Q.   Are you talking about, in this case, All VIP Care?

4    A.   Yes.  It was the company that gave me employment.

5    Q.   Do you know where these conditions or duties come from?

6    A.   The agency tells you all the duties and what the patient

7    needs.  The manager tells you.  In that case, that was Diana

8    Ramirez.  She tells you all -- what the patient needs, and that

9    you're going to do.

10   Q.   Do you know where Diana Ramirez obtains this information

11   from?

12   A.   I don't know.

13   Q.   Do you get to modify the way the care is given?

14   A.   What is the question?

15   Q.   As the home health aide, when you're given this treatment

16   plan by Diana Ramirez, isn't it true that you're the one that

17   decides how you're going to apply these services to the

18   patient?

19   A.   No.  No.

20   Q.   And you, in your deposition, on page 22, line 2 through 5,

21   when you were asked a similar question, your response was:

22        "ANSWER:  As the home health aide, I get to decide the

23   scope of the services that I am willing to provide to these

24   patients."

25        Do you recall making that statement?

1  A.  Diana Ramirez tells you what it is to -- what has to be

2  done with the patient.  I am not the one to decide what it is

3  to do with the patient.  But if the patient makes pee-pee, I am

4  there to be able to clean all of that.

5  Q.  Again, the -- the question was:  Do you recall making the

6  statement that I read into the record back on your deposition?

7  A.  I don't remember.

8  Q.  As a home health aide with All VIP Care, do you have to

9  accept every client as a patient -- I'm sorry -- every proposed

10  client that's introduced to you by All VIP Care, do you have to

11  accept that person as a patient?

12  A.  I take the patient -- I take the patient that they assign

13  to me.

14  Q.  Do they assign a patient to you, or do they introduce you

15  to a patient, and you and the patient decide if you are going

16  to be a -- have an agreement and be a good fit together?

17  A.  No.  They send you directly to the patient.  Like, they

18  say, "I have a patient in Pembroke Pines."  Then they tell you

19  the number of hours.  If I don't -- I don't have a job -- I

20  don't have work, then I take the patient.

21  Q.  Can you deny taking that patient?

22  A.  Excuse me?

23  Q.  When you're given the opportunity to meet with and take on

24  a new patient, if you do not accept that patient -- I

25  apologize.

1       Do you have the right not to accept that patient?

2   A.   If I were -- if I were to reject him, then I won't get that

3   patient at all.   That would be forbidden completely.

4   Q.   What do you mean "would be forbidden completely"?

5   A.   Patients can come up and other cases may come up, but if I

6   call, then they won't give me those because I have rejected one

7   case.

8   Q.   Has that ever happened to you?

9   A.   Yes.   Yes.

10   Q.   Can you explain the circumstances when that has happened,

11   that you have been denied other patients or other

12   opportunities?

13   A.   Well, I had that experience.   Diana -- Ms. Ramirez wanted

14   to remove me from that case.   It is just that the family

15   opposed, and they said that they did not want another person,

16   just me.

17   Q.   Did Diana Ramirez tell you that she wanted to remove you

18   from the Izique home?

19   A.   Yes.   She wanted to send me to another case.

20   Q.   Why?

21   A.   I don't know.

22   Q.   But isn't it true that Diana Ramirez did not remove you

23   because she cannot without the approval and consent of the

24   patients?

25   A.   The family members spoke to her and told her, at that

1    moment, that her parents were very happy with my services, and

2    that they did not want another HHA due to the fact that her

3    mother had dementia and she got along with me very well.  And

4    that could affect her a little more in terms of getting to

5    know, every day, a different person.  That she was already

6    accustomed to me, she was already used to me.

7        And from that time on, then the retaliation began with my

8    payment.  They would -- they wouldn't pay my hours.  They would

9    take hours from me, like five hours, ten hours, and they

10   wouldn't pay me.  From that moment on, they were not complying

11   with my payments.

12   Q.  And when did this problem with your payments start?

13   A.  From the time that they tried -- from the time that I began

14   with the Iziques -- I'm sorry.  I'm sorry.

15       The problem with the payment began from the time I started

16   in the company.  So it was at the beginning when she tried to

17   remove me from that case, and the problem really maximized when

18   that happened.  Because I was looking at my account, and at the

19   beginning, she was taking hours from me, in terms of payment,

20   like 10 hours, 15 hours, 16 hours.

21       But then later, I would go to the bank, and my account was

22   completely blank.

23   Q.  Based upon your answer, when did this, again, problem with

24   the Iziques begin?

25   A.  I didn't understand the question.

1    Q.   You testified that when Ms. Ramirez wanted to remove you

2    from the Izique home, that you started to experience a lot of

3    payroll problems at the hand of Ms. Ramirez; is that correct?

4    A.   No.  False.  I think -- I don't know what is happening now.

5    Ms. Liz is, like, lying.  I don't know what is going on.  I

6    don't have to be saying lie after lie over here.

7         THE COURT:  He is asking when it started.  Just answer

8    the question.

9         When did it start, that you weren't getting paid right?

10   A.   My problem began always with the company when it comes to

11   payment.

12   BY MR. GOLDBERG:

13   Q.   You testified, though, that the problem with the payroll

14   disputes got much worse when Ms. Ramirez tried to remove you or

15   wanted to remove you from the Izique home.

16        When did that occur?

17   A.   It didn't start like that.  It always happened, but it

18   maximized when the family supported me.  And that is when it

19   began that they wanted to remove me.

20   Q.   And when --

21   A.   The hours.

22   Q.   And when did that occur?

23   A.   The absence of payment began to get worse in May.

24   Q.   May of 2022?

25   A.   Yes.  Correct.

1   Q.   I asked you the question -- I need an answer, ma'am, to the

2   question:   Do you -- do you have to accept a position with any

3   specific client that's offered to you?

4   A.   If I don't accept it -- I am working for that company, but

5   if I don't accept it, then next time they will say to me, "No,

6   she doesn't need a job."  And then, "We have this patient,

7   let's look for someone else," and then they will set me aside

8   and they will give another person a job.

9   Q.   In your deposition, when you were asked this question, you

10  responded on page 28, line 3 through 5, that you have the right

11  to accept or deny any proposed work with any client.

12       Do you recall making that statement?

13  A.   No.

14  Q.   You do not recall making that statement in the deposition?

15  A.   I don't remember.

16  Q.   Do you recall making the statement which is recorded on

17  page 27 of the deposition --

18       MR. POLLOCK:  Objection.  Improper impeachment.  There

19  hasn't been a question asked.

20       MR. GOLDBERG:  It's part of the same question,

21  Your Honor.  I'm trying to break it into pieces.

22       THE COURT:  Well, why don't you give me a copy of the

23  deposition so can I see what you're reading from so I can

24  decide whether you're impeaching her properly or not.

25       MR. GOLDBERG:  Absolutely, Your Honor.  May I --

 1           MR. POLLOCK:  I have a paper copy so he can use yours.

 2           MR. GOLDBERG:  It's okay.

 3           (Tendering document.)

 4       Your Honor, the pink flags are flagging several of the

 5   pages referenced in my cross-examination.

 6           THE COURT:  What page and line are we on now?

 7           MR. GOLDBERG:  Right now, Your Honor, I'm referring to

 8   page 27, lines 12 through 14.  And they are highlighted, sir.

 9       May I inquire, Your Honor?

10           THE COURT:  Let me read it first.

11           MR. GOLDBERG:  Yes, sir.

12           THE COURT:  Ms. Figuera, did you have the right to

13   accept or not accept hours?

14           THE WITNESS:  They gave me -- they give me the hours

15   that they say the patient has.  If a patient has 50 hours, they

16   give you the 50 hours, and that's it.  You take it or leave it.

17           THE COURT:  Okay.  Here is what we're going to do,

18   Ms. Figuera.  When you're asked a question, try to answer it

19   "yes" or "no," and then can you explain your answer.

20           THE WITNESS:  Okay.

21           THE COURT:  So, again, as an HHA, did you have the

22   right to accept or not accept the hours that Diana gave you?

23           THE WITNESS:  I accepted the hours that Diana gave me.

24           THE COURT:  And so your answer would be "yes"?

25           THE WITNESS:  Yes.

 1          THE COURT:  And so there is no impeachment there

 2   because it's the same as what her answer was before.

 3          So ask her the question.  If she does -- if she denies

 4   it, then ask her if she said anything differently.  And if she

 5   says "no" or she doesn't remember, then you can read the

 6   question and answer.

 7          MR. GOLDBERG:  Thank you, Your Honor.

 8   BY MR. GOLDBERG:

 9   Q.  Ms. Figuera -- I'm sorry.  "Figuera."  I apologize.

10          Ms. Figuera, who can terminate the relationship between

11   yourself and a patient/client?

12   A.  What is the question?

13   Q.  Who can terminate the relationship between a home health

14   aide, such as yourself and a patient?

15   A.  The agency.

16   Q.  What about the client?

17   A.  Between both of them, they can determine the relationship

18   between a patient and the HHA.

19   Q.  That wasn't the question, ma'am.

20          The question was:  Who can terminate the relationship

21   between the home health aide, such as yourself, and the client

22   that you are providing services to?

23          THE COURT:  That wasn't the question.

24          The question was:  How about the client?

25   ///

1    BY MR. GOLDBERG:

2    Q.   How about the client?  Can they terminate the relationship?

3    A.   They can determine that, just like the Iziques.  They

4    determined that I would stay with them.

5    Q.   Can a client terminate the relationship?

6    A.   Yes.

7    Q.   Can you -- as the home health aide, can you terminate your

8    relationship?

9    A.   I also can do it.  If I don't want to work, then I don't

10   work.  I quit.

11   Q.   Do you quit the patient or you quit the agency?

12   A.   No.  I call the agency.  I tell them, "Look, this case, I

13   don't like it.  I don't want it."  And they -- they remove me

14   from that case and then they get another person.

15   Q.   Do they give you another client?

16   A.   Excuse me?

17   Q.   Will the agency, in this case All VIP Care, will they give

18   you the opportunity for another patient to provide care for?

19   A.   Yes, of course.

20   Q.   You've never received a performance evaluation from All VIP

21   Care, have you?

22        THE INTERPRETER:  You never -- "you never saw" or "you

23   never received"?

24        MR. GOLDBERG:  No.  You never received a performance

25   evaluation.

1          THE INTERPRETER:  A performance evaluation.

2     A.   Never.  They send you to work -- they never supervise you.

3     They never answer the phone by -- what they care about is for

4     you to go to work, and they don't assist you as a worker.

5     BY MR. GOLDBERG:

6     Q.   So you're testifying now that they don't supervise you; is

7     that correct?

8     A.   They don't supervise us.

9     Q.   Do they manage -- I'm sorry.

10         Do they direct how you provide the care to the patients?

11    A.   Never.

12    Q.   Were you ever provided equipment by All VIP Care to perform

13    the services of a home health aide?

14    A.   Never.  They never gave me anything.

15    Q.   Did All VIP Care ever forbid you or prevent you from taking

16    on any other income-producing opportunities?

17    A.   Never.  They never called me, not even for the money that

18    they owe me.

19    Q.   That was not the question, ma'am.  Let me rephrase the

20    question.

21         Did All -- All VIP Care ever prevent you or stop you from

22    taking on any other jobs or employment opportunities or

23    contractor opportunities?

24    A.   No.

25    Q.   When you came to All VIP Care on May -- I believe it was

1   May 3rd, 2021, how was your salary of $13 an hour determined?

2   A.   My salary was $13 an hour.

3   Q.   Who determined that, ma'am?

4   A.   The agency.   The people who were there.

5   Q.   You did not have any negotiation about a salary?

6   A.   Never.

7   Q.   For the tax year 2021 and 2022, did you receive a 1099 form

8   from All VIP Care nurse registry?

9            MR. POLLOCK:   Hearsay.

10            THE COURT:   Overruled.   Overruled.

11            You can answer.

12   A.   No.

13   BY MR. GOLDBERG:

14   Q.   Did you pay taxes in the year 2021 and 2022 for -- I'm

15   sorry.

16            THE INTERPRETER:   Sorry, Counsel.   Go ahead.

17            MR. POLLOCK:   Objection.   Relevance.

18            THE COURT:   Overruled.

19   BY MR. GOLDBERG:

20   Q.   Did you pay taxes for the -- income taxes for the year 2021

21   and 2022 based on your employ -- your relationship with All VIP

22   Care?

23   A.   I pay my taxes independently.

24   Q.   Do you have a 1099 form for those two years from All VIP

25   Care?

1   A.   No.

2   Q.   Then how do you know how much to pay in taxes?

3   A.   With my bank account.   My -- my income.

4   Q.   And is that income paid as an independent contractor or is

5   it paid as a W-2 employee?

6   A.   As an employee.

7   Q.   And did you receive W-2 forms from All VIP -- All VIP Care

8   for the years 2021 and 2022?

9   A.   I didn't receive.

10   Q.   Then how did you pay taxes for 2021 and 2022?

11   A.   The accountant who does my accounting with the insurance --

12   with my wages, that's how I pay my taxes.

13        MR. GOLDBERG:   I'm sorry.   May I have that answer

14   again, ma'am?

15        THE INTERPRETER:   "With the account -- the accountant

16   that I" -- do you mind -- I will let her repeat it, if you

17   don't mind.

18        MR. GOLDBERG:   Yes, please.

19   A.   The accountant who does my accounting with my income and

20   with my health insurance, with that, I did my taxes.

21        I do not need that letter.

22   BY MR. GOLDBERG:

23   Q.   Did -- but you testified -- I want to make sure I

24   understand this.   You did not receive a 1099, nor did you

25   receive a W-2 form for tax year 2021 and tax year 2022, which

1   covers the entire period that you had a relationship with

2   All VIP Care; is that correct?

3   A.   Correct.

4   Q.   You testified that you had to buy your own scrubs; correct?

5   A.   Correct.

6   Q.   And isn't it true that it's a client's decision on what

7   clothing a home health aide, such as yourself, wears when

8   they're providing services?

9   A.   That is something that the company demands from us.  You

10  have to go in uniform.  In fact, you cannot go to work with

11  normal clothes.

12  Q.   And is that a company policy?

13  A.   Yes.

14  Q.   And where is that policy about clothing memorialized?

15  A.   I don't know.  They have to know that.

16  Q.   But, ma'am, the question is:  Do you know that?

17  A.   The question is:  Where is that policy -- where is that

18  policy regarding the uniform?

19  Q.   Yes, ma'am.

20  A.   I don't know where that is -- where that is based, but that

21  was something that the manager said, that I had to have the

22  uniform.

23  Q.   What manager, ma'am?

24  A.   Mrs. Diana Ramirez.  Mrs. Liz can also know about that, as

25  owner of her company.

1   Q.  Isn't it true, Ms. Figuera, that on numerous patients and

2   patients/clients that several home health aides may share the

3   authorized time for treatment?

4   A.  You're telling me that it could be several of us complying

5   with -- I didn't understand the question.

6   Q.  I will rephrase it.

7       There is a set amount of hours designated from Medicaid or

8   Humana to provide, hypothetically, Mrs. Jones with 50 hours of

9   care a week.  And that 50 hours does not have to be filled just

10  by you.  It could be filled by two, three, or more home health

11  aides; is that correct?

12  A.  I used to do 65 hours by myself.

13      THE COURT:  That didn't answer the question.  Answer

14  "yes" or "no," and then you can explain the answer.

15  A.  Yes.

16  BY MR. GOLDBERG:

17  Q.  So if you have a limitation of hours, there are other home

18  health aides that have been approved by the client that could

19  provide services to those clients?

20  A.  Yes.

21  Q.  Thank you for that clarification.

22      How many times did you go to the West Palm Beach office to

23  address time sheet problems?

24  A.  I went once.  And I wasn't assisted because they were

25  having lunch.

1   Q.  And that's the time that you went to pick up the check for

2   $897, once the time sheet conflict was resolved; correct?

3   A.  No.  That was not that time.

4        The first time that I went, that they were having lunch, it

5   was with the manager, Diana Ramirez.  I don't know who was in

6   that office -- in that Boca Raton office.  Later, they didn't

7   pay me, and in order to add -- to do that evil act to me, they

8   had me go to West Palm Beach when I live in Davis [sic].  It

9   took me two hours to go to West Palm Beach to an office that I

10  did not know -- did not know, because they did not even want to

11  give me that address.  I obtained the address through the

12  Iziques' daughter -- the Iziques' daughter because they did not

13  want to give me the address for me to arrive at the West Palm

14  Beach office.

15       Once I arrived in that office, they were having lunch, and

16  they -- they closed that window of -- on me, and they told me

17  to wait until 2:00 in the afternoon.  Later, Ms. Liz, she went

18  to the window and she threw the check at me.  That was two

19  times; one in Boca Raton, and the other one in West Palm Beach.

20       Nothing -- there was no conversation about anything with

21  me.

22  Q.  So your testimony -- you're testifying that Ms. McKinnon

23  threw a check at you?

24  A.  She threw that check through that slot of that payment

25  corresponding to one week of work.

```
 1    Q.  So she didn't throw it, she put it through the slot?

 2    A.  I -- I don't know how you want to take it, but that's how I

 3    felt it.  I was highly mistreated at that moment in that

 4    office.

 5    Q.  The amounts that you claim that you're owed is $1,768 for

 6    time that you were not paid for; is that correct?

 7    A.  The week of work plus the overtime.  It's 9,468.

 8    Q.  I'm not asking about the overtime, Ms. Figuera.  I want to

 9    keep everything factually specific.

10    A.  The question that you asked about the money, 1,768 is

11    correct.

12    Q.  So you've been paid for all of the hours that you worked as

13    a home health aide for All VIP Care?

14    A.  The hours have not been paid to me.

15    Q.  I understand that, ma'am.  That's what we're trying to

16    clarify.

17            MR. GOLDBERG:  No.  No.  Please, ma'am.

18    BY MR. GOLDBERG:

19    Q.  The $1,768, that's what you're claiming that All VIP owes

20    you for times that you submitted time sheets for and that you

21    have not been paid?

22    A.  Yes.  Correct.

23    Q.  And is it true that all those hours were generated during

24    your last pay week?

25    A.  I have other hours that are dragging that they haven't
```

1   paid.

2   Q.  My question to you, Ms. Figuera, is:  Are these -- the

3   $1,768, are these hours all generated during your final pay

4   cycle?

5   A.  Yes.

6   Q.  And isn't it true that when the time sheets were submitted,

7   a dispute arose, or a discrepancy arose, and you were asked to

8   come to the office so that the time sheets could be discussed

9   and addressed with you?

10  A.  No.  I wasn't ever asked.

11      We already -- we already have a year I haven't been paid,

12  and that is a reason why I am here.

13  Q.  So we're here for the 1,768 that you feel that you are due,

14  even though the company has testified that they said, "Come in,

15  we'll sit down, we'll address this and resolve this issue"?

16          MR. POLLOCK:  Argumentative.

17          THE COURT:  Sustained.

18  BY MR. GOLDBERG:

19  Q.  You testified repeatedly that there were delays in getting

20  paid, at times, during your relationship with All VIP; is that

21  correct?

22  A.  It's correct.  It's just that I am not the company.  They

23  have that problem, and they haven't called me to pay me.  And

24  it's been a year, and that's why I'm here.

25  Q.  The question, Ms. Figuera, was:  You've testified

1    throughout this case that throughout your relationship with

2    All VIP, there were delays in getting you paid; is that

3    correct?

4           THE COURT:  She answered yes.  Ask another question.

5           MR. GOLDBERG:  I didn't pick up on that, Your Honor.  I

6    apologize.

7           THE COURT:  She said yes and she explained her answer.

8           MR. GOLDBERG:  I apologize.  I didn't pick up on that.

9           THE COURT:  Okay.

10   BY MR. GOLDBERG:

11   Q.  Because -- you testified All VIP Care never restricted you

12   from any other employment opportunities or independent

13   contractor opportunities.

14        Do you recall testifying to that this afternoon?

15   A.  No.

16   Q.  You don't recall testifying to that earlier?

17          THE COURT:  All right.  The jury will rely on their own

18   recollection as to what she did or didn't testify to.

19          MR. GOLDBERG:  Understand, Your Honor.  Thank you.

20   BY MR. GOLDBERG:

21   Q.  Are you familiar with the HHA mobile application -- I'm

22   sorry -- the HHAeXchange mobile application?

23   A.  No.

24   Q.  That application has never been explained to you or

25   presented to you?

1    A.   No.

2    Q.   Is this the first time you are hearing about that mobile

3    application exchange?

4    A.   Yeah, it's the first time.  Yes.

5    Q.   So it's your testimony that Diana Ramirez never addressed

6    the HHA mobile app exchange with you?

7    A.   Never.  Never.  She was rather giving me more sheets to do

8    the hours.  I'm sorry.  I work for another company.  And from

9    the beginning, I have had an application with -- with them to

10   be able to put -- to mark my hours.

11        THE INTERPRETER:  One second.

12   A.   To be able to punch in and out.

13   BY MR. GOLDBERG:

14   Q.   What company is that?

15   A.   Senior Nannies.

16   Q.   I'm glad you mentioned Senior Nannies.

17        When did you first discuss Senior Nannies with the Iziques?

18   A.   Never.

19   Q.   You never discussed that with them?

20        MR. POLLOCK:  Asked and answered.

21        THE COURT:  Sustained.

22   BY MR. GOLDBERG:

23   Q.   What agency did you establish a relationship with after you

24   left All VIP Care?

25   A.   With Senior Nannies -- with Senior Nannies.  I work with

1    that company.

2    Q.  And are you still with them?

3    A.  Yes.  They pay me overtime.

4        Overtime, holidays.

5    Q.  And when did you first make application with Senior

6    Nannies?

7    A.  I finished with VIP in July, and I went with Senior Nannies

8    in August.

9    Q.  And was that your first time that you engaged in a

10   relationship with Senior Nannies?

11   A.  Yes.

12           MR. GOLDBERG:  May I approach the witness, Your Honor?

13           THE COURT:  Okay.

14   BY MR. GOLDBERG:

15   Q.  Ms. Figuera, I'm going to present with you a document --

16           MR. POLLOCK:  I'm going to object to this, Your Honor.

17   This is not a document in evidence.  Hasn't been produced in

18   discovery.  I don't know what we're going to talk about it.

19           THE COURT:  If it's impeachment, he doesn't have to.

20           MR. POLLOCK:  It should be produced in discovery.  I

21   think there is an order in limine preventing documents not

22   timely produced in the document.

23           THE COURT:  If it's impeachment, he can do that.

24           MR. GOLDBERG:  It's strictly for impeachment purposes,

25   Your Honor.

1          MR. POLLOCK:  Without being -- but there is an order in

2    limine indicating the documents not timely produced under

3    Rule 26 can't be used for any purpose in trial.

4          THE COURT:  I don't think that applies to impeachment.

5    BY MR. GOLDBERG:

6    Q.  So it's your testimony, Ms. Figuera, that your first

7    interaction with Senior Nannies was in August 2022?

8          THE COURT:  Why don't you ask her when she applied to

9    Senior Nannies.

10         MR. GOLDBERG:  I'm sorry, sir?

11         THE COURT:  Instead of the first interaction, how about

12   when she applied to Senior Nannies?

13         MR. GOLDBERG:  I was -- okay.

14   BY MR. GOLDBERG:

15   Q.  So August 2022 is your testimony --

16         THE COURT:  Ask her when she first applied to Senior

17   Nannies.

18   BY MR. GOLDBERG:

19   Q.  When did you first apply to Senior Nannies?

20   A.  I applied -- I applied in August.  I don't remember the

21   date.  I think it was on the 28th of August.  I don't remember

22   the date.  I don't have it on me.

23   Q.  Okay.  Thank you.

24         I'm going to show you a document that's titled --

25         MR. POLLOCK:  Your Honor, this wasn't even -- this

1  document wasn't even listed on their exhibit list.

2       THE COURT:  It doesn't have to be if it's impeachment.

3       MR. POLLOCK:  So you get to ambush at trial with a

4  document I have never seen before and hasn't been produced?

5       THE COURT:  If it's an impeachment, yeah.  I don't know

6  if he's going to be able to produce it.  He may refresh

7  recollection from it.

8       MR. POLLOCK:  But it -- refreshing recollection is one

9  thing, but reading from it --

10      THE COURT:  He hasn't read from it yet.  He hasn't

11 moved it into evidence.

12      MR. POLLOCK:  Understood.

13 BY MR. GOLDBERG:

14 Q.  This document is titled, "Senior Nannies Home Care

15 Services" --

16      MR. POLLOCK:  Your Honor, the title of the document.

17      THE COURT:  Sustained.

18      Ask her if she recognizes the document, and then either

19 refresh her recollection from it or try to introduce it, but

20 don't read from it.

21      MR. GOLDBERG:  Understood, Your Honor.

22 BY MR. GOLDBERG:

23 Q.  Do you recognize that document?

24 A.  All these -- this is not my address.  Here is my name, here

25 is my --

```
 1             THE INTERPRETER:  Let me just clarify.

 2   A.  Here is my email address, yes, but not the address.

 3   BY MR. GOLDBERG:

 4   Q.  That's your old address, though, isn't it?

 5             MR. POLLOCK:  Your Honor, it's improper --

 6   A.  Yes.

 7             MR. POLLOCK:  -- impeachment on a document.

 8             THE COURT:  He asked her if she recognized it, and

 9   she's volunteering stuff.

10             So answer the question.  Do you recognize the document?

11             THE WITNESS:  No.

12   BY MR. GOLDBERG:

13   Q.  Please turn to the last page.  Do you recognize the

14   signature on this document?

15             MR. POLLOCK:  Your Honor, it's improper impeachment.

16   She's [sic] asking if she recognizes the signature, and we're

17   talking about -- she said she doesn't recognize the document.

18             THE COURT:  Maybe she will recognize the signature.

19   Let's see what her answer is.

20             MR. POLLOCK:  Fair enough.

21   BY MR. GOLDBERG:

22   Q.  Do you recognize that signature, ma'am?

23   A.  No.

24   Q.  What is the date on that document right below the

25   signature?
```

 1          MR. POLLOCK:  Objection, Your Honor.  He is trying to

 2   back door something in for a document she doesn't recognize.

 3          THE COURT:  Sustaining the objection.

 4          She doesn't recognize the document.  You're not going

 5   to be able to refresh her recollection from it.  It's not going

 6   to come into evidence.

 7          You got someone from Senior Nannies that wants to come

 8   in and testify and introduce the document?

 9          MR. GOLDBERG:  I'm sorry.  What -- did you catch what

10   she said?

11          THE INTERPRETER:  No.  Because they're having a

12   conversation, I didn't want to interrupt.  My apologies.

13          MR. GOLDBERG:  Can you repeat what you just said?

14          MR. POLLOCK:  No.  Your Honor, that's --

15          THE COURT:  There was no answer -- there was no

16   question pending.

17   BY MR. GOLDBERG:

18   Q.  You testified that you applied to Senior Nannies in August

19   of 2022; is that correct?

20   A.  Yes.

21   Q.  And I believe you testified it was August 28th, or

22   approximately August 28th?

23   A.  I don't have the exact date, but the attorney showed

24   something that is not even my signature.

25          MR. POLLOCK:  Your Honor -- okay.

```
 1              THE COURT:  Next question.

 2    BY MR. GOLDBERG:

 3    Q.  When you went to Senior Nannies, what was the rate of pay

 4    that they paid -- they agreed to pay you?

 5              MR. POLLOCK:  Relevance.

 6              THE COURT:  Sustained.

 7    BY MR. GOLDBERG:

 8    Q.  When you went to Senior Nannies, isn't it true that they

 9    did not pay you overtime?

10              THE COURT:  I mean, she's already answered that

11    question.  I guess she can answer it again.

12    A.  The question, you said?

13    BY MR. GOLDBERG:

14    Q.  Is:  When you went to work for Senior Nannies, they did not

15    pay you overtime, did they?

16    A.  They pay me overtime.  They pay me.

17              MR. GOLDBERG:  May I approach the witness, Your Honor?

18              THE COURT:  With what?

19              MR. GOLDBERG:  With a paycheck stub from Senior Nannies

20    for the pay period of 7/25 through 8/7/2022 --

21              MR. POLLOCK:  Your Honor --

22              MR. GOLDBERG:  -- that reflects that there was no

23    overtime paid.

24              THE COURT:  Let me see.

25              MR. GOLDBERG:  May I approach, Your Honor?
```

```
 1              THE COURT:  Yeah, let me see --

 2              MR. POLLOCK:  Again, I object to all of this as being

 3    ambushed at trial, which is the purpose of discovery.

 4              THE COURT:  Don't make speaking objections.

 5              You can ask her if she recognizes it.

 6              MR. GOLDBERG:  Thank you, Your Honor.

 7              May I approach?

 8              THE COURT:  Sure.

 9    BY MR. GOLDBERG:

10    Q.  Ms. Figuera, do you recognize this document?

11    A.  No.

12    Q.  Is that your name on the document, on the paycheck?

13              THE COURT:  She says she doesn't recognize it.  Let's

14    move on.

15    A.  Senior Nannies doesn't pay me in check.

16    BY MR. GOLDBERG:

17    Q.  Is it not true that you applied to Senior Nannies on

18    February 28th of 2022?

19    A.  Yes.  But the problem here is not Senior Nannies.  I had

20    worked already at VIP.  Here the problem is with VIP.

21    Q.  That wasn't the question, ma'am.  The question was --

22              THE COURT:  She answered "yes."  If you want to move to

23    strike the rest of her answer, you can do that.  But the answer

24    was "yes," so let's move on.

25              MR. GOLDBERG:  Yes, Your Honor.
```

1    BY MR. GOLDBERG:

2    Q.   And isn't it true that Senior Nannies was paying you $17 an

3    hour?

4           MR. POLLOCK:   Relevance.

5           THE COURT:   Sustained.

6    BY MR. GOLDBERG:

7    Q.   Did you take a loan from the Izique family?

8    A.   They lent me some money at the moment in which VIP wasn't

9    paying, so they lent me to pay my rent.  And now I have been

10   paying -- now that I'm working with Senior Nannies, I have been

11   paying them.

12   Q.   Did you solicit the Iziques to leave All VIP Care and go to

13   Senior Nannies?

14   A.   Never.  No.

15   Q.   Even --

16   A.   No.  They have always kept this thesis that I am a thief.

17   They have said that repeatedly in this court.  They left

18   because they wanted.  I don't have a company.

19   Q.   You established a relationship with Senior Nannies in

20   February of 2022; correct?

21   A.   Could you repeat the question, please?

22   Q.   You established a relationship with Senior Nannies in

23   February of 2022; correct?

24   A.   Yes.

25   Q.   And it's your testimony that, despite the numerous nurse

1   registries out and about, that coincidentally, the Iziques

2   stumbled across the same agency that you established a

3   relationship with months before?

4   A.   The Iziques are with this company, but I don't have the

5   right or the authorization to take the Iziques anywhere.  If I

6   had my own company, I would take all patients from VIP because

7   VIP does not pay.

8   Q.   So when you say your own company, what are you referring

9   to, ma'am?

10   A.   If I had a company, I would take any client that has been

11   badly assisted by them.

12   Q.   So you have some serious heartburn with All VIP Care?

13        THE INTERPRETER:  Sorry, Counsel.  "You have some

14   serious" what?

15        MR. GOLDBERG:  Heartburn or angst.

16   A.   What is the question?

17   BY MR. GOLDBERG:

18   Q.   You have serious angst or anger against All VIP Care?

19   A.   Of course.  I stopped eating because of VIP.

20   Q.   And you want to hurt them any way you can; is that correct?

21        MR. POLLOCK:  Argumentative.

22        THE COURT:  Sustain.  Sustained.  Sustained.

23        Next question.

24   BY MR. GOLDBERG:

25   Q.   Are you being paid overtime by Senior Nannies?

1        MR. POLLOCK:  Asked and answered.

2        THE COURT:  You have asked that twice.  She's answered

3  it twice.

4        MR. GOLDBERG:  Understood, Your Honor.

5        No further questions.

6        THE COURT:  Redirect?

7                    REDIRECT EXAMINATION

8  BY MR. POLLOCK:

9  Q.  Daisy, I know we have been going a long time today.  You

10  worked until what time this morning?

11  A.  What is the question?

12  Q.  What time did you work until this morning?

13  A.  Until 6:00 in the morning.

14  Q.  And just to be clear, we didn't see a time record for

15  July 25th of 2022, that you filled out.

16      Did you work on July 25th of 2022?

17  A.  Yes.

18  Q.  You worked on July 25th, even though we don't have a time

19  sheet?

20  A.  I think that -- I think the 24th was my last day.  I don't

21  remember well.

22  Q.  And the lawyer for All VIP asked you if you had your own

23  equipment, but do you need equipment to do your job as a home

24  health aide for All VIP?

25  A.  Yes.  Sometimes I was needing gloves.

1  Q.  And were those the gloves that were provided either by

2  All VIP or Humana?

3  A.  VIP never gave gloves.  Humana gives a box of gloves, I

4  think, that -- monthly.  And we work with gloves every day.

5  Q.  Was that the only thing you had to buy?

6  A.  Yes.

7          MR. POLLOCK:  Nothing further.  Thank you.

8          THE COURT:  All right.  Members of the jury, we are

9  going to go ahead and recess for the afternoon.  Remember my

10  admonition not to discuss the case or allow it to be discussed

11  in your presence.

12          We will see you back tomorrow at 9:00.

13      (The jury exited the courtroom at 4:40 p.m.)

14          THE COURT:  If there is nothing else to come before the

15  Court, we will be in recess until 9:00 tomorrow.

16          MR. POLLOCK:  Plaintiff rests.  I don't know if you

17  want to put that on.

18          THE COURT:  You can do that in front of the jury

19  tomorrow at 9:00, but let's go ahead and do the Rule 50 motions

20  at this point.

21          Mr. Goldberg?

22          MR. GOLDBERG:  Your Honor, we would ask the Court enter

23  a --

24          THE COURT:  Speak into the microphone.

25          MR. GOLDBERG:  Oh, I apologize.

1           Your Honor, we would ask that the Court -- well, we do

2    have one more witness, Your Honor, Ms. Diana Ramirez.

3           THE COURT:  You can do a Rule 50 at the close of the

4    plaintiff's case, if you want to.

5           MR. GOLDBERG:  Okay.  That's right.

6           But she was identified by counsel.  That's why I

7    was --

8           THE COURT:  He just rested.

9           MR. GOLDBERG:  Oh, I didn't hear that part.  I

10   apologize, Your Honor.

11          THE COURT:  It's okay.

12          MR. GOLDBERG:  We would ask that the Court enter a

13   dismissal, as the plaintiff has failed to establish the

14   necessary prima facie case for this case to go to a jury.

15          THE COURT:  I think the plaintiff has set forth a prima

16   facie case.  The only question I have is:  Are we still talking

17   about minimum wage claims in this case?

18          MR. POLLOCK:  No, Your Honor.

19          THE COURT:  All right.  So we will take -- if there's

20   any reference to them in the jury instructions or the verdict

21   form, we will take that out.

22          And if there's nothing else to come before the Court --

23          MR. POLLOCK:  Well, actually, Your Honor, there is,

24   because the minimum wage relates to the -- would relate to that

25   last week of work for which she wasn't paid.  So there would be

1    a minimum wage claim for that week.

2          So there is --

3          THE COURT:  You're just going to ask for 7 or $8 an

4    hour?  You're not going to ask for $13 an hour?  You're not

5    going to ask for overtime, if it's over 40 hours?

6          MR. POLLOCK:  We are, but with respect to the

7    liquidation issue, we get the 13 and then we get the extra 7

8    and a quarter, if the Court were to liquidate it.  And then, I

9    mean, it's probably not a lot of money, but I don't know that

10   it adds a bunch, and I don't know that we need the jury to

11   decide it.

12         But I -- I guess we can -- I can talk to my client and

13   see whether it makes sense for a couple hundred bucks, because

14   that's really what it's going to be.  If she was paid 13, and

15   the minimum wage is 7.25, and we're probably looking at less

16   than a thousand dollars.

17         THE COURT:  But don't you also have a claim that she

18   didn't get paid for two days in May of '21?

19         MR. POLLOCK:  Yes.

20         THE COURT:  And don't you have a breach of contract

21   claim?

22         MR. POLLOCK:  We do.

23         THE COURT:  So why is it that May of '21 and the July

24   of '22 --

25         MR. POLLOCK:  It would be all of that.  It would be for

1     those weeks, Your Honor.

2          THE COURT:  That would be encompassed in the breach of

3     contract.  And then if the July of '22-week went over 40 hours,

4     then that would be encompassed in the time and a half overtime.

5          So I'm having a tough time understanding how minimum

6     wage is anything other than confusing for the jury.

7          MR. POLLOCK:  I mean, it would relate to the issue of

8     liquidated damages.  And so if she wasn't paid anything, then

9     she's not paid at least a minimum wage.  And, therefore, if the

10    Court found that the defendants didn't carry their burden, then

11    she would be able to get the liquidated amount, 40 hours, at

12    the 7.25 rate.

13         THE COURT:  All right.  Well --

14         MR. POLLOCK:  So the Court -- and what I think you're

15    talking about is not having the jury to decide that issue, but

16    preserving it for the Court on the liquidation issues so as not

17    to confuse the jury.

18         THE COURT:  Well, I think I'm going to ask the jury for

19    an advisory opinion on liquidated damages.  But you can

20    certainly argue to the jury, in deciding whether or not the

21    defendants were operating in good faith, they could consider

22    the fact that they -- according to your interpretation of the

23    evidence -- didn't even pay her for the last week.  And that

24    certainly is something you can argue to the jury.

25         I don't know that it needs to be coupled with a minimum

1   wage explanation.

2        MR. POLLOCK:  And that's kind of where I'm getting at,

3   is --

4        THE COURT:  All right.  So talk to your client and we

5   will see.

6        MR. POLLOCK:  I think that it -- it relates to the

7   issue of liquidated damages because the 7.25 would be subsumed

8   within the $13 an hour.  But if the Court were to -- if the

9   jury were to give an advisory opinion that the defendants

10  didn't carry their burden, then for the contract hours,

11  Ms. Valdivieso would be entitled to the $13.  And if the

12  defendants didn't carry their burden and avoid the imposition

13  of liquidated damages, then she would also get the additional

14  7.25 based on that.  So there would be a benefit to her by

15  doing it.

16       THE COURT:  Well, I mean, I don't know that you get to

17  double count on that.  I don't know that you get the $13 for

18  breach of contract, and then you get 14.50 for liquidated

19  damages on minimum wage.

20       So maybe the difference -- what you're talking about is

21  the difference between $13 and 14.50.  A buck fifty an hour.

22       MR. POLLOCK:  No, Your Honor.  What I'm talking about

23  is if we -- if the jury finds that there was a breach of

24  contract for -- let's talk about an hour -- at $13, and the

25  jury finds that the defendants didn't carry their burden, what

1    Ms. Valdivieso should be entitled to recover is the $13 under

2    the contract claim.  And then, because these aren't exclusive

3    remedies, she would also be entitled to 7.25.

4         So her recovery for that one hour, if liquidated

5    damages were imposed, would be the $13 contract, 7.25

6    liquidated damages.  So it would be a total of $20.25.

7         THE COURT:  I don't agree with that.

8         MR. POLLOCK:  Well --

9         THE COURT:  I don't think you get to double count.  For

10   the same hour, I don't think you get the 7.25 minimum wage and

11   the $13 contract.  I think the 7.25 is subsumed within the $13

12   contract.  So if she gets the $13 for breach of contract, it's

13   more than the minimum wage, so I think it moots the minimum

14   wage.

15        MR. POLLOCK:  It's subsumed within it; I agree with

16   Your Honor.  But then the issue of liquidated damages, she gets

17   liquidated damages based on the 7.25, which is in addition to.

18   Because the failure to pay minimum wage, by not paying a wage

19   at all, is a violation of the statute.

20        And so you get the $13, I would agree, on the breach of

21   contract --

22        THE COURT:  But you're saying that you add the 7.25 on

23   top of the 13, as opposed to the 7.25 on top of the 7.25?

24        MR. POLLOCK:  Yes.

25        THE COURT:  So give me some case law saying that.  Good

1    luck finding it.

2           MR. POLLOCK:  It's called pure gap time wages, and I

3    can provide the Court with that case law.

4           THE COURT:  Give me a case on it tomorrow, and I will

5    leave the minimum wage in it.  I think it's going to be

6    confusing to the jury, but I have had confusing instructions to

7    the jury before and they've been able to sort through them.

8           MR. POLLOCK:  And you want the defendants to propose

9    instructions on the -- or the parties to propose instructions

10   on the good faith defense?

11          So liquidated damages?  Because I don't think that

12   was --

13          THE COURT:  Yeah, I think we need something along those

14   lines.

15          MR. POLLOCK:  Or on the verdict form, I think.  Because

16   it's in the instructions, but I don't think it's in the verdict

17   form.

18          Actually, it's not in the jury instructions because

19   it's not part of the pattern.  So we probably need an

20   instruction and an issue on the verdict form because it's not

21   part of the patterns.

22          THE COURT:  Okay.  Just email them to me.  We will

23   include them or discuss them during the charge conference.

24          MR. GOLDBERG:  Your Honor, how much time are we each

25   going to have for closing tomorrow?

1          THE COURT:  Well, it depends on how much time you ask

2     for, whether it's reasonable.  If it's reasonable, I'm going to

3     give you as much time as you want.  Whatever I give the

4     plaintiff, I'm going to give the defendant.  The plaintiff gets

5     to split it between opening and closing.  So...

6          MR. POLLOCK:  Is there a limit on how to split it?

7          THE COURT:  You have to at least take half for the

8     first part.  You can't back-load the rebuttal.

9          MR. POLLOCK:  Okay.  Fair enough.

10          THE COURT:  Anything else?

11          MR. POLLOCK:  It's more generous than most.

12          MR. GOLDBERG:  Nothing from the defense, Your Honor.

13          THE COURT:  All right.  We will be in recess.

14     (These proceedings concluded at 4:50 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3

 4    I hereby certify that the foregoing is an accurate

 5    transcription of the proceedings in the above-entitled matter.

 6

 7
      DATE:  01-12-2024          /s/Laura Melton
 8                               LAURA E. MELTON, RMR, CRR, FPR
                                 Official Court Reporter
 9                               United States District Court
                                 Southern District of Florida
10                               400 North Miami Avenue
                                 Miami, Florida 33128
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

$1,768 [4]– - 1:114:15..,
1:149:5.., 1:149:19.., 1:150:3
$10,000 [3]– - 1:75:7..,
1:75:20.., 1:75:24
$100 [1]– - 1:73:3
$13 [22]– - 1:32:19.., 1:33:1
.., 1:43:22.., 1:44:24..,
1:59:10.., 1:59:12.., 1:107:17
.., 1:107:19.., 1:144:1..,
1:144:2.., 1:165:4.., 1:167:8
.., 1:167:11.., 1:167:17..,
1:167:21.., 1:167:24..,
1:168:1.., 1:168:5.., 1:168:11
.., 1:168:12.., 1:168:20
$132 [1]– - 1:74:17
$16 [2]– - 1:44:2.., 1:44:24
$17 [1]– - 1:160:2
$18 [1]– - 1:13:18
$20.25 [1]– - 1:168:6
$3,200 [1]– - 1:73:10
$5,200 [1]– - 1:73:5
$6.50 [1]– - 1:114:8
$8,400 [1]– - 1:73:12
$897 [8]– - 1:17:6..,
1:17:16.., 1:50:1.., 1:50:24..,
1:51:19.., 1:114:25.., 1:115:5
.., 1:148:2

**'**

'17 [1]– - 1:96:17
'21 [3]– - 1:103:23..,
1:165:18.., 1:165:23
'22 [1]– - 1:165:24
'22-week [1]– - 1:166:3

**1**

1 [2]– - 1:33:5.., 1:45:3
1,450 [1]– - 1:114:11
1,726 [1]– - 1:113:25
1,768 [3]– - 1:114:1..,
1:149:10.., 1:150:13
1/2 [2]– - 1:61:25.., 1:62:1
10 [9]– - 1:32:22.., 1:46:5..,
1:46:6, 1:52:5.., 1:129:14..,
1:132:3.., 1:137:20
10,000 [1]– - 1:75:22
104 [6]– - 1:52:23.., 1:53:3
.., 1:53:22.., 1:74:1.., 1:74:6..,
1:74:7
1099 [4]– - 1:61:5..,

1:144:7.., 1:144:24..,
1:145:24
1099s [1]– - 1:62:11
10:00 [2]– - 1:99:18..,
1:118:14
10:29 [1]– - 1:62:25..,
1:63:4
10:50 [1]– - 1:63:4
10:51 [1]– - 1:63:13
10th [1]– - 1:96:17
11:00 [2]– - 1:8:24.., 1:54:6
11:01 [1]– - 1:127:9
11:09 [1]– - 1:76:23
11:18 [1]– - 1:83:1
11:19 [2]– - 1:83:11..,
1:83:14
12 [4]– - 1:32:22.., 1:129:14
.., 1:132:3.., 1:140:8
120 [1]– - 1:73:7
12:30 [1]– - 1:81:25
12:45 [1]– - 1:81:25
13 [6]– - 1:52:19.., 1:126:21
.., 1:127:11.., 1:165:7..,
1:165:14.., 1:168:23
136 [1]– - 1:114:15
14 [1]– - 1:140:8
14.50 [2]– - 1:167:18..,
1:167:21
15 [6]– - 1:62:24.., 1:63:3..,
1:82:7.., 1:115:20.., 1:115:23
.., 1:137:20
15-minute [2]– - 1:62:21..,
1:115:16
16 [6]– - 1:32:23.., 1:51:2..,
1:73:7.., 1:113:3.., 1:128:3..,
1:137:20
17 [2]– - 1:61:25.., 1:62:1..,
1:126:21.., 1:127:12
17th [1]– - 1:51:16
18 [1]– - 1:12:4
18th [3]– - 1:113:4..,
1:120:12.., 1:120:14
19.50 [2]– - 1:59:12..,
1:59:13
196 [1]– - 1:74:19
1:00 [19]– - 1:3:10.., 1:3:16
.., 1:3:17.., 1:3:23.., 1:7:21..,
1:77:21.., 1:81:3.., 1:81:8..,
1:81:9.., 1:81:21.., 1:81:23..,
1:82:2.., 1:82:3.., 1:82:13..,
1:83:9.., 1:83:10.., 1:83:13..,
1:83:14.., 1:97:3
1:05 [1]– - 1:85:8

1:10 [1]– - 1:88:24
1:15 [2]– - 1:81:3.., 1:82:6
1:18 [1]– - 1:94:11
1:30 [1]– - 1:81:11

**2**

2 [9]– - 1:30:3.., 1:45:20..,
1:71:25.., 1:72:6.., 1:72:14..,
1:73:2.., 1:74:17.., 1:100:14
.., 1:134:20
2-an-hour [1]– - 1:45:24
20 [6]– - 1:73:9.., 1:100:2..,
1:100:21.., 1:101:7..,
1:103:14.., 1:129:11
2000 [2]– - 1:98:25..,
1:121:1
2001 [2]– - 1:98:25..,
1:99:3
2007 [1]– - 1:25:14
2016 [4]– - 1:27:20..,
1:44:9.., 1:96:10.., 1:96:14
2018 [2]– - 1:120:12..,
1:120:14
2020 [6]– - 1:12:3..,
1:68:22.., 1:69:1.., 1:120:23
.., 1:121:2.., 1:121:9
2021 [18]– - 1:69:6..,
1:69:7.., 1:97:7.., 1:99:3..,
1:99:4.., 1:116:20.., 1:119:10
.., 1:119:22.., 1:120:6..,
1:120:15.., 1:144:1.., 1:144:7
.., 1:144:14.., 1:144:20..,
1:145:8.., 1:145:10..,
1:145:25
2022 [20]– - 1:68:16..,
1:72:22.., 1:86:25.., 1:114:25
.., 1:116:21.., 1:138:24..,
1:144:7.., 1:144:14..,
1:144:21.., 1:145:8..,
1:145:10.., 1:145:25..,
1:154:7.., 1:154:15..,
1:157:19.., 1:159:18..,
1:160:20.., 1:160:23..,
1:162:15.., 1:162:16
2023 [2]– - 1:72:25..,
1:127:9
21 [1]– - 1:129:11
22 [2]– - 1:50:14.., 1:134:20
22nd [2]– - 1:114:25..,
1:115:6
24th [4]– - 1:113:4..,
1:113:7.., 1:113:11..,
1:162:20
25th [5]– - 1:72:22..,

1:116:21, 1:162:15..,
1:162:16.., 1:162:18
26 [1]– - 1:154:3
27 [2]– - 1:139:17.., 1:140:8
28 [1]– - 1:139:10
28th [4]– - 1:154:21..,
1:157:21.., 1:157:22..,
1:159:18
2:00 [6]– - 1:9:3.., 1:76:15
.., 1:81:4.., 1:81:12..,
1:148:17
2:19 [1]– - 1:115:21
2:20 [1]– - 1:115:24
2:43 [1]– - 1:115:24
2:44 [1]– - 1:116:8

**3**

3 [7]– - 1:31:11.., 1:44:5..,
1:45:2.., 1:45:9.., 1:45:12..,
1:101:4.., 1:139:10
3-page [1]– - 1:103:11
31st [1]– - 1:72:25
32 [1]– - 1:3:7
33 [3]– - 1:52:7.., 1:126:20
.., 1:127:11
35 [5]– - 1:50:12.., 1:50:13
.., 1:52:1.., 1:52:9.., 1:107:7
38 [7]– - 1:4:10.., 1:74:6..,
1:74:7.., 1:74:8.., 1:80:21..,
1:80:22
3:00 [1]– - 1:22:10
3:30 [1]– - 1:82:10
3rd [5]– - 1:103:23..,
1:116:20.., 1:119:10..,
1:120:15.., 1:144:1

**4**

4 [4]– - 1:17:6.., 1:33:13..,
1:103:9
40 [5]– - 1:12:20.., 1:43:2..,
1:165:5.., 1:166:3.., 1:166:11
400.506 [1]– - 1:57:10
404(b [1]– - 1:6:20
408 [1]– - 1:57:20
42 [2]– - 1:4:10.., 1:80:18
44 [4]– - 1:53:12.., 1:53:14
.., 1:53:15.., 1:111:9
48 [1]– - 1:104:22
4:00 [1]– - 1:81:13
4:40 [1]– - 1:163:13
4:50 [1]– - 1:170:14

**4G** [1] - 1:24:6

---

**5**

**5** [4] - 1:103:13, 1:103:22, 1:134:20, 1:139:10
**5/3/2021** [1] - 1:121:5
**50** [23] - 1:12:20, 1:13:10, 1:13:12, 1:49:17, 1:72:7, 1:72:16, 1:72:17, 1:72:19, 1:73:2, 1:73:17, 1:73:18, 1:73:20, 1:73:21, 1:73:22, 1:106:24, 1:107:6, 1:140:15, 1:140:16, 1:147:8, 1:147:9, 1:163:19, 1:164:3
**500** [1] - 1:44:10
**5G** [1] - 1:24:5
**5th** [2] - 1:51:3, 1:112:16

---

**6**

**6(d** [1] - 1:57:12
**60** [1] - 1:12:20
**64** [3] - 1:74:18, 1:74:19
**65** [1] - 1:147:12
**66** [5] - 1:74:10, 1:74:11, 1:74:14, 1:74:16, 1:74:17
**69** [2] - 1:52:12, 1:52:21
**6:00** [2] - 1:22:11, 1:162:13
**6th** [6] - 1:51:3, 1:112:17, 1:120:23, 1:121:1, 1:126:7, 1:127:9

---

**7**

**7** [3] - 1:15:17, 1:165:3, 1:165:7
**7.25** [12] - 1:165:15, 1:166:12, 1:167:7, 1:167:14, 1:168:3, 1:168:5, 1:168:10, 1:168:11, 1:168:17, 1:168:22, 1:168:23
**7/17** [2] - 1:50:11, 1:50:18
**7/17-week** [1] - 1:50:6
**7/25** [1] - 1:158:20
**70** [1] - 1:13:13
**72** [2] - 1:119:17, 1:122:6
**760** [1] - 1:15:15
**77** [1] - 1:75:12

---

**8**

**8** [1] - 1:165:3
**8/7/2022** [1] - 1:158:20
**897** [6] - 1:50:7, 1:50:17, 1:50:22, 1:52:11, 1:52:13, 1:52:19

---

**9**

**9** [3] - 1:111:7, 1:112:18, 1:129:11
**9,337.27** [1] - 1:113:25
**9,428** [1] - 1:114:1
**9,468** [1] - 1:149:7
**90** [2] - 1:46:3, 1:64:25
**9:00** [4] - 1:54:6, 1:163:12, 1:163:15, 1:163:19
**9:12** [1] - 1:9:6

---

**A**

**A-H-C-A** [1] - 1:121:18
**a.m** [10] - 1:9:6, 1:62:25, 1:63:4, 1:63:13, 1:76:23, 1:83:1, 1:83:11, 1:83:14, 1:127:9
**abbreviation** [1] - 1:121:17
**able** [30] - 1:4:21, 1:5:2, 1:12:18, 1:15:21, 1:21:13, 1:30:14, 1:30:16, 1:30:17, 1:30:18, 1:45:10, 1:69:10, 1:98:16, 1:99:5, 1:99:9, 1:105:4, 1:112:12, 1:112:15, 1:124:8, 1:125:10, 1:128:19, 1:133:16, 1:133:17, 1:133:24, 1:135:4, 1:152:10, 1:152:12, 1:155:6, 1:157:5, 1:166:11, 1:169:7
**absence** [1] - 1:138:23
**absolutely** [3] - 1:24:1, 1:60:10, 1:139:25
**accept** [21] - 1:16:10, 1:30:18, 1:34:23, 1:38:9, 1:38:12, 1:45:8, 1:54:12, 1:55:9, 1:131:7, 1:135:9, 1:135:11, 1:135:24, 1:136:1, 1:139:2, 1:139:4, 1:139:5, 1:139:11, 1:140:13, 1:140:22
**accepted** [2] - 1:30:2, 1:140:23

**accommodate** [1] - 1:71:21
**accommodation** [1] - 1:13:21
**accord** [1] - 1:5:21
**according** [1] - 1:166:22
**account** [6] - 1:34:17, 1:60:14, 1:137:18, 1:137:21, 1:145:3, 1:145:15
**accountant** [5] - 1:62:4, 1:62:18, 1:145:11, 1:145:15, 1:145:19
**accountant's** [1] - 1:62:9
**accounting** [2] - 1:145:11, 1:145:19
**accurate** [2] - 1:64:14, 1:111:19
**accusation** [1] - 1:24:10
**accusing** [1] - 1:92:20
**accustomed** [1] - 1:137:6
**acknowledgement** [1] - 1:33:17
**acknowledging** [1] - 1:132:13
**acknowledgment** [5] - 1:103:7, 1:118:18, 1:123:25, 1:124:14, 1:125:23
**Act** [1] - 1:15:15
**act** [1] - 1:148:7
**acted** [2] - 1:102:9, 1:108:9
**action** [1] - 1:6:3
**actions** [4] - 1:5:6, 1:5:10, 1:40:9, 1:41:2
**active** [1] - 1:5:11
**add** [3] - 1:53:20, 1:148:7, 1:168:22
**addition** [2] - 1:16:8, 1:168:17
**additional** [15] - 1:13:25, 1:16:12, 1:20:14, 1:20:16, 1:30:16, 1:41:18, 1:58:20, 1:60:5, 1:60:8, 1:60:15, 1:60:23, 1:68:16, 1:69:19, 1:89:15, 1:167:13
**additionally** [1] - 1:11:24
**address** [17] - 1:4:5, 1:12:17, 1:16:25, 1:17:24, 1:19:12, 1:20:12, 1:29:19, 1:76:5, 1:147:23

**, 1:148:11, 1:148:13, 1:150:15, 1:155:24, 1:156:2, 1:156:4
**addressed** [6] - 1:4:1, 1:18:12, 1:78:8, 1:87:15, 1:150:9, 1:152:5
**addresses** [1] - 1:5:12
**adds** [1] - 1:165:10
**adjust** [7] - 1:20:7, 1:20:9, 1:20:15, 1:60:13, 1:60:14, 1:60:16, 1:60:19
**administer** [1] - 1:44:12
**administering** [2] - 1:30:24, 1:45:1
**Administration** [1] - 1:121:15
**administrative** [4] - 1:44:25, 1:45:3, 1:45:17, 1:46:7
**administrator** [1] - 1:23:21
**admissible** [1] - 1:49:10
**admitted** [2] - 1:131:24
**admonition** [10] - 1:9:8, 1:62:22, 1:63:15, 1:83:3, 1:83:8, 1:85:10, 1:94:13, 1:115:16, 1:116:10, 1:163:10
**advantage** [1] - 1:59:19
**advantages** [1] - 1:59:16
**advised** [2] - 1:49:6, 1:49:12
**advisory** [2] - 1:166:19, 1:167:9
**affect** [2] - 1:101:17, 1:137:4
**affirm** [2] - 1:85:21, 1:95:4
**after..** [1] - 1:9:4
**afternoon** [11] - 1:16:21, 1:22:10, 1:77:18, 1:81:7, 1:86:9, 1:86:10, 1:95:17, 1:116:17, 1:148:17, 1:151:14, 1:163:9
**age** [1] - 1:90:7
**agencies** [2] - 1:4:9, 1:62:16
**agency** [20] - 1:22:6, 1:35:12, 1:35:20, 1:39:12, 1:56:13, 1:57:24, 1:58:1, 1:62:16, 1:71:21, 1:98:6, 1:102:8, 1:121:23, 1:134:6, 1:141:15, 1:142:11, 1:142:12, 1:142:17, 1:144:4,

1:152:23..., 1:161:2
Agency [2]... - 1:121:14...,
1:121:15
agent [2]... - 1:83:23...,
1:84:12
AGENT [6]... - 1:84:16...,
1:84:18..., 1:84:23..., 1:85:1...,
1:85:4..., 1:85:6
aggression [1]... - 1:91:9
aggressive [3]... - 1:91:5...,
1:91:6..., 1:91:16
ago [2]... - 1:25:22...,
1:50:22
agree [16]... - 1:32:6...,
1:32:8..., 1:32:9..., 1:32:11...,
1:32:18..., 1:34:21..., 1:34:23
..., 1:55:2..., 1:63:21..., 1:71:14
..., 1:71:17..., 1:71:19...,
1:82:21..., 1:168:7..., 1:168:15
..., 1:168:20
agreed [2]... - 1:51:22...,
1:158:4
agreement [19]... - 1:15:14
..., 1:31:18..., 1:31:24..., 1:32:4
..., 1:33:7..., 1:33:10..., 1:36:16
..., 1:46:10..., 1:71:22..., 1:99:9
..., 1:101:4..., 1:103:5...,
1:116:25..., 1:118:17...,
1:119:12..., 1:123:24...,
1:124:13..., 1:125:23...,
1:135:16
Agreement [1]... - 1:31:11
agreements [1]... -
1:124:19
AHCA [7]... - 1:121:16...,
1:121:17..., 1:121:18...,
1:121:23..., 1:122:15...,
1:123:8
ahead [10]... - 1:62:19...,
1:83:7..., 1:87:6..., 1:89:8...,
1:90:7..., 1:93:12..., 1:127:24
..., 1:144:16..., 1:163:9...,
1:163:19
aide [66]... - 1:10:13...,
1:11:13..., 1:11:14..., 1:13:24
..., 1:15:3..., 1:15:10..., 1:21:23
..., 1:22:14..., 1:23:13..., 1:29:2
..., 1:31:2..., 1:31:3..., 1:31:8...,
1:31:21..., 1:32:14..., 1:33:4...,
1:33:6..., 1:33:8..., 1:36:12...,
1:37:4..., 1:37:15..., 1:38:5...,
1:38:8..., 1:38:13..., 1:38:16...,
1:39:16..., 1:39:25..., 1:41:12
..., 1:41:18..., 1:42:9..., 1:42:19
..., 1:42:24..., 1:44:13..., 1:48:4
..., 1:54:6..., 1:57:16, 1:71:6...,
1:71:14..., 1:71:15..., 1:97:4...,

1:97:8..., 1:97:12..., 1:97:15...,
1:120:5..., 1:120:10...,
1:120:14..., 1:120:23...,
1:121:3..., 1:121:24...,
1:122:12..., 1:123:3...,
1:132:22..., 1:133:21...,
1:133:25..., 1:134:15...,
1:134:22..., 1:135:8...,
1:141:14..., 1:141:21...,
1:142:7..., 1:143:13..., 1:146:7
..., 1:149:13..., 1:162:24
aide/certified [1]... -
1:103:11
aides [13]... - 1:14:9...,
1:18:3..., 1:19:8..., 1:28:10...,
1:28:20..., 1:32:21..., 1:43:14
..., 1:44:10..., 1:47:4..., 1:47:12
..., 1:147:2..., 1:147:11...,
1:147:18
Alicia [3]... - 1:112:17...,
1:112:25..., 1:113:3
allergic [1]... - 1:54:7
allow [28]... - 1:3:7..., 1:9:9...,
1:14:2..., 1:20:5..., 1:24:24...,
1:28:15..., 1:37:10..., 1:41:17
..., 1:42:7..., 1:42:12..., 1:43:20
..., 1:44:16..., 1:62:22...,
1:63:16..., 1:68:15..., 1:76:4...,
1:76:11..., 1:79:11..., 1:79:21
..., 1:83:4..., 1:83:8..., 1:85:11...,
1:89:2..., 1:90:6..., 1:94:14...,
1:115:17..., 1:116:11...,
1:163:10
allowed [15]... - 1:11:8...,
1:13:24..., 1:16:7..., 1:16:11...,
1:19:25..., 1:22:5..., 1:26:13...,
1:27:8..., 1:27:9..., 1:28:9...,
1:42:19..., 1:42:21..., 1:43:13
..., 1:65:7..., 1:80:20
allows [3]... - 1:26:15...,
1:37:21
ambulation [1]... - 1:21:16
ambush [1]... - 1:155:3
ambushed [1]... - 1:159:3
amount [7]... - 1:17:6...,
1:17:17..., 1:20:10..., 1:41:12
..., 1:75:11..., 1:147:7...,
1:166:11
amounts [1]... - 1:149:5
analysis [1]... - 1:31:6
ANGELA [1]... - 1:86:4
Angela [5]... - 1:3:8...,
1:77:5..., 1:84:9..., 1:85:16...,
1:86:13
anger [1]... - 1:161:18
angry [2]... - 1:91:7...,

1:91:16
angst [2]... - 1:161:15...,
1:161:18
animals [2]... - 1:54:7
ANSWER [5]... - 1:127:23
..., 1:128:6..., 1:129:10...,
1:129:12..., 1:134:22
answer [42]... - 1:7:7...,
1:18:15..., 1:25:2..., 1:25:5...,
1:35:24..., 1:36:23..., 1:44:19
..., 1:45:4..., 1:53:8..., 1:75:5...,
1:88:2..., 1:102:1..., 1:102:19
..., 1:102:22..., 1:102:23...,
1:102:24..., 1:107:9..., 1:122:3
..., 1:124:7..., 1:127:21...,
1:132:11..., 1:137:23...,
1:138:7..., 1:139:1..., 1:140:18
..., 1:140:19..., 1:140:24...,
1:141:2..., 1:141:6..., 1:143:3
..., 1:144:11..., 1:145:13...,
1:147:13..., 1:147:14...,
1:151:7..., 1:156:10...,
1:156:19..., 1:157:15...,
1:158:11..., 1:159:23
answered [9]... - 1:123:4...,
1:123:13..., 1:131:14...,
1:151:4..., 1:152:20...,
1:158:10..., 1:159:22...,
1:162:1..., 1:162:2
answering [2]... - 1:101:25
..., 1:128:2
answers [3]... - 1:102:2...,
1:102:20..., 1:128:10
anti [1]... - 1:46:14
anti-solicitation [1]... -
1:46:14
anticipate [1]... - 1:78:22
anytime [1]... - 1:16:10
apartment [3]... - 1:86:14...,
1:86:17..., 1:89:21
apologies [5]... - 1:95:10...,
1:98:2..., 1:105:15..., 1:126:25
..., 1:157:12
apologize [13]... - 1:9:21...,
1:18:21..., 1:32:1..., 1:32:2...,
1:74:21..., 1:91:13..., 1:130:23
..., 1:135:25..., 1:141:9...,
1:151:6..., 1:151:8..., 1:163:25
..., 1:164:10
app [12]... - 1:20:21..., 1:21:9
..., 1:22:14..., 1:23:6..., 1:23:16
..., 1:23:17..., 1:23:20..., 1:24:2
..., 1:24:8..., 1:63:22..., 1:152:6
appear [3]... - 1:3:10...,
1:85:13..., 1:108:21
applicants [3]... - 1:26:16...,

1:26:21
application [42]... - 1:16:2
..., 1:21:9..., 1:21:10..., 1:21:22
..., 1:29:4..., 1:29:7..., 1:29:8...,
1:29:14..., 1:29:19..., 1:30:8...,
1:30:9..., 1:30:12..., 1:31:1...,
1:34:9..., 1:43:18..., 1:63:21...,
1:69:17..., 1:69:21..., 1:99:5...,
1:99:9..., 1:100:7..., 1:100:17
..., 1:100:18..., 1:101:1...,
1:103:3..., 1:116:25..., 1:117:5
..., 1:117:8..., 1:117:9...,
1:117:11..., 1:119:13...,
1:123:18..., 1:123:23...,
1:124:12..., 1:125:22...,
1:151:21..., 1:151:22...,
1:151:24..., 1:152:3..., 1:152:9
..., 1:153:5
applied [9]... - 1:101:12...,
1:118:9..., 1:154:8..., 1:154:12
..., 1:154:16..., 1:154:20...,
1:157:18..., 1:159:17
applies [1]... - 1:154:4
apply [9]... - 1:16:1..., 1:45:3
..., 1:98:1..., 1:99:12..., 1:99:15
..., 1:117:21..., 1:118:8...,
1:134:17..., 1:154:19
appointment [3]... -
1:96:25..., 1:97:2..., 1:97:3
appreciate [5]... - 1:78:4...,
1:88:18..., 1:92:8..., 1:93:1...,
1:93:19
appreciated [1]... - 1:89:6
approach [5]... - 1:29:22...,
1:153:12..., 1:158:17...,
1:158:25..., 1:159:7
approval [1]... - 1:136:23
approve [1]... - 1:41:23
approved [4]... - 1:22:24...,
1:33:2..., 1:69:10..., 1:147:18
area [2]... - 1:4:4..., 1:4:18
areas [2]... - 1:4:2..., 1:4:6
arena [2]... - 1:25:14...,
1:25:15
argue [5]... - 1:4:21...,
1:4:23..., 1:5:2..., 1:166:20...,
1:166:24
argument [3]... - 1:14:24...,
1:18:2..., 1:72:18
argument's [1]... - 1:73:18
argumentative [2]... -
1:150:16, 1:161:21
arose [2]... - 1:150:7
arrange [2]... - 1:7:20...,
1:34:22

arrested [1]– 1:66:18
arrive [2]– 1:107:22–,
1:148:13
arrived [2]– 1:109:12–,
1:148:15
aside [2]– 1:15:2–,
1:39:7
aspect [2]– 1:5:19–,
1:6:22
aspects [1]– 1:6:25
asserted [1]– 1:24:25
assessment [4]–
1:10:16–, 1:10:22–, 1:54:1–,
1:55:3
assets [1]– 1:18:9
assign [3]– 1:107:4–,
1:135:12–, 1:135:14
assigned [4]– 1:107:2–,
1:107:6–, 1:108:17–,
1:108:19
assignment [7]– 1:12:20
–, 1:30:19–, 1:32:9–, 1:32:12
–, 1:54:12–, 1:54:17–, 1:55:9
assignments [3]–
1:19:22–, 1:34:23–, 1:111:14
assist [3]– 1:133:2–,
1:133:17–, 1:143:4
assistant [2]– 1:57:15–,
1:103:12
assisted [8]– 1:98:12–,
1:109:10–, 1:110:11–,
1:117:21–, 1:118:2–,
1:124:25–, 1:147:24–,
1:161:11
assisting [1]– 1:112:14
associate [1]– 1:126:14
association [1]– 1:42:16
assume [1]– 1:56:21
assumption [1]–
1:128:16
attempted [2]– 1:3:9–,
1:36:19
attempts [1]– 1:34:22
attended [1]– 1:122:11
attention [4]– 1:64:16–,
1:86:24–, 1:126:20–,
1:127:11
attorney [3]– 1:126:10–,
1:126:14–, 1:157:23
audit [2]– 1:24:19–,
1:25:8
August [8]– 1:153:8–,
1:154:7–, 1:154:15–,

**B**

babysitting [1]–
1:120:16
back-load [1]– 1:170:8
background [1]–
1:43:10
bad [2]– 1:77:15–,
1:101:16
badly [1]– 1:161:11
balance [1]– 1:23:23
bank [2]– 1:137:21–,
1:145:3
bankrupt [1]– 1:45:11
based [22]– 1:4:7–,
1:20:18–, 1:39:14–, 1:44:8–,
1:44:24–, 1:45:19–, 1:45:24
–, 1:54:1–, 1:64:2–, 1:75:18–,
1:76:13–, 1:76:14–, 1:77:8–,
1:78:19–, 1:114:4–, 1:114:5
–, 1:114:7–, 1:137:23–,
1:144:21–, 1:146:20–,
1:167:14–, 1:168:17
basic [1]– 1:133:8
basis [1]– 1:57:7
bathing [1]– 1:21:15
bathroom [4]– 1:63:2–,
1:97:21–, 1:133:4–, 1:133:7
Beach [6]– 1:108:7–,
1:147:22–, 1:148:8–, 1:148:9
–, 1:148:14–, 1:148:19
beat [1]– 1:59:24

became [3]– 1:36:12–,
1:91:15–, 1:120:13
become [2]– 1:120:10–,
1:132:21
began [12]– 1:12:2–,
1:99:2–, 1:102:4–, 1:103:22
–, 1:110:16–, 1:127:9–,
1:137:7–, 1:137:13–,
1:137:15–, 1:138:10–,
1:138:19–, 1:138:23
begin [3]– 1:37:18–,
1:104:23–, 1:137:24
beginning [5]– 1:114:20
–, 1:119:22–, 1:137:16–,
1:137:19–, 1:152:9
behalf [3]– 1:8:16–,
1:63:10–, 1:72:15
behave [2]– 1:33:23–,
1:41:8
behind [1]– 1:14:3
belabor [1]– 1:77:15
below [1]– 1:156:24
bench [2]– 1:48:22–,
1:49:22
benefit [3]– 1:59:22–,
1:67:19–, 1:167:14
benefitted [1]– 1:18:4
best [5]– 1:14:5–, 1:15:21
–, 1:47:1–, 1:70:5
better [6]– 1:9:23–,
1:21:11–, 1:45:4–, 1:59:3–,
1:59:12–, 1:85:2
between [18]– 1:5:16–,
1:10:2–, 1:32:22–, 1:38:25–,
1:39:15–, 1:56:6–, 1:71:5–,
1:71:13–, 1:71:22–, 1:72:22
–, 1:80:11–, 1:141:10–,
1:141:13–, 1:141:17–,
1:141:18–, 1:141:21–,
1:167:21–, 1:170:5
big [2]– 1:12:16–, 1:80:10
bill [4]– 1:21:3–, 1:24:11–,
1:24:16–, 1:67:15
billing [2]– 1:25:9–, 1:64:1
bit [1]– 1:77:12
blank [1]– 1:137:22
blanks [2]– 1:117:11–,
1:118:23
block [1]– 1:23:3
blocked [5]– 1:91:10–,
1:91:11–, 1:91:23–, 1:91:24
–, 1:92:2
bloodborne [1]– 1:43:11
board [1]– 1:83:22

Boca [5]– 1:98:6–,
1:109:4–, 1:123:19–, 1:148:6
–, 1:148:19
bother [1]– 1:88:17
bottom [3]– 1:18:25–,
1:19:23–, 1:101:9
bought [1]– 1:105:4
box [2]– 1:33:4–, 1:163:3
breach [14]– 1:5:2–, 1:6:3
–, 1:6:18–, 1:35:2–, 1:35:5–,
1:35:7–, 1:36:15–, 1:165:20
–, 1:166:2–, 1:167:18–,
1:167:23–, 1:168:12–,
1:168:20
breached [1]– 1:46:16
breaching [1]– 1:5:22
break [11]– 1:3:16–,
1:6:24–, 1:7:19–, 1:8:23–,
1:9:1–, 1:44:12–, 1:81:8–,
1:81:13–, 1:102:2–, 1:102:19
–, 1:139:21
breakdown [1]– 1:39:15
breaking [3]– 1:7:10–,
1:81:11–, 1:81:15
Brian [1]– 1:88:8
brief [2]– 1:76:3–, 1:92:12
briefly [1]– 1:88:5–,
1:89:8
bring [18]– 1:3:4–, 1:7:23
–, 1:8:14–, 1:8:20–, 1:43:16–,
1:63:7–, 1:63:12–, 1:81:2–,
1:82:12–, 1:82:15–, 1:83:17
–, 1:83:22–, 1:85:7–, 1:93:6–,
1:93:13–, 1:104:11–, 1:116:2
–, 1:116:7
bringing [1]– 1:78:4
brings [1]– 1:73:10
broker [2]– 1:38:4–,
1:55:22
brought [2]– 1:14:13–,
1:59:1
Broward [7]– 1:48:5–,
1:48:8–, 1:48:14–, 1:54:5–,
1:68:5–, 1:96:1–, 1:96:4
buck [1]– 1:167:21
bucks [1]– 1:165:13
budget [9]– 1:18:25–,
1:19:16–, 1:19:24–, 1:20:7–,
1:20:9–, 1:60:14–, 1:60:16–,
1:60:18–, 1:60:20
bunch [1]– 1:165:10
burden [7]– 1:49:11–,
1:61:9–, 1:61:17–, 1:166:10
–, 1:167:10–, 1:167:12–,

1:167:25
business [20]_ - 1:15:21_, 1:15:23_, 1:16:5_, 1:18:10_, 1:18:22_, 1:18:23_, 1:19:12_, 1:20:18_, 1:26:12_, 1:27:1_, 1:34:19_, 1:34:20_, 1:37:20_, 1:46:25_, 1:47:2_, 1:47:13_, 1:47:19_, 1:60:11_, 1:60:17_, 1:61:2
businesswoman [1]_ - 1:18:7
buy [7]_ - 1:14:16_, 1:14:25_, 1:105:1_, 1:105:12_, 1:146:4_, 1:163:5
BY [100]_ - 1:9:14, 1:9:18_, 1:10:1_, 1:18:14_, 1:19:17, 1:24:22, 1:25:4_, 1:26:8_, 1:28:17_, 1:29:13_, 1:30:1, 1:32:3_, 1:36:1_, 1:36:22_, 1:37:12_, 1:40:18_, 1:41:1_, 1:42:6_, 1:42:18_, 1:43:21_, 1:44:18_, 1:47:17_, 1:49:24_, 1:51:24_, 1:52:8_, 1:52:22_, 1:63:19_, 1:71:2_, 1:72:13_, 1:74:13_, 1:75:6_, 1:86:8_, 1:87:20_, 1:88:7_, 1:89:12_, 1:90:9_, 1:92:11_, 1:95:16_, 1:98:7, 1:100:12_, 1:100:16_, 1:102:14_, 1:103:1_, 1:106:2_, 1:107:13_, 1:110:1, 1:110:4_, 1:116:16_, 1:120:3_, 1:120:9_, 1:121:12_, 1:121:22_, 1:122:8_, 1:122:19_, 1:123:6_, 1:123:15_, 1:126:19_, 1:127:10_, 1:130:1_, 1:130:13_, 1:130:17_, 1:130:24_, 1:132:2_, 1:132:12_, 1:132:20_, 1:133:9_, 1:138:12_, 1:141:8_, 1:142:1_, 1:143:5_, 1:144:13_, 1:144:19_, 1:145:22_, 1:147:16_, 1:149:18_, 1:150:18_, 1:151:10_, 1:151:20_, 1:152:13_, 1:152:22_, 1:153:14_, 1:154:5, 1:154:14_, 1:154:18_, 1:155:13_, 1:155:22_, 1:156:3_, 1:156:12_, 1:156:21_, 1:157:17_, 1:158:2_, 1:158:7_, 1:158:13_, 1:159:9_, 1:159:16_, 1:160:1_, 1:160:6_, 1:161:17_, 1:161:24_, 1:162:8

**C**

calculate [3]_ - 1:45:22_,

1:52:18_, 1:71:25
calculated [3]_ - 1:45:1_, 1:52:16_, 1:114:7
calculation [1]_ - 1:72:6
calculator [1]_ - 1:52:19
calendar [1]_ - 1:23:1
camera [1]_ - 1:84:24
candidates [1]_ - 1:38:21
cannot [13]_ - 1:11:22_, 1:26:18_, 1:27:7_, 1:39:18_, 1:41:16_, 1:46:4_, 1:75:9_, 1:118:20_, 1:129:3_, 1:129:4_, 1:136:23_, 1:146:10
capturing [1]_ - 1:48:9
card [1]_ - 1:43:9
care [30]_ - 1:10:17_, 1:10:23_, 1:11:4_, 1:11:7_, 1:11:10_, 1:11:11_, 1:21:20_, 1:22:21_, 1:25:12_, 1:25:16_, 1:25:17_, 1:26:11_, 1:42:16_, 1:46:3_, 1:46:20_, 1:46:24_, 1:47:2_, 1:54:22_, 1:55:2_, 1:55:3_, 1:62:16_, 1:66:16_, 1:87:19_, 1:110:17_, 1:120:16_, 1:134:13_, 1:142:18_, 1:143:3_, 1:143:10_, 1:147:9
Care [67]_ - 1:11:6_, 1:16:14_, 1:18:5_, 1:19:8_, 1:20:15_, 1:22:6_, 1:25:23_, 1:32:25_, 1:33:9_, 1:33:25_, 1:34:1_, 1:35:17_, 1:36:3_, 1:36:19_, 1:37:14_, 1:43:13_, 1:44:1_, 1:44:5_, 1:44:12_, 1:45:17_, 1:45:24_, 1:47:13_, 1:47:19_, 1:47:20_, 1:47:24_, 1:72:22_, 1:85:15_, 1:90:4_, 1:91:16_, 1:116:18_, 1:116:20_, 1:117:6_, 1:119:22_, 1:120:5_, 1:121:15_, 1:123:2_, 1:123:24_, 1:124:13_, 1:125:25_, 1:126:3_, 1:126:5_, 1:128:24_, 1:129:1_, 1:129:9_, 1:130:4_, 1:131:2_, 1:134:3_, 1:135:8_, 1:135:10_, 1:142:17_, 1:142:21_, 1:143:12_, 1:143:15_, 1:143:21_, 1:143:25_, 1:144:8_, 1:144:22_, 1:144:25_, 1:145:7_, 1:146:2_, 1:149:13_, 1:151:11_, 1:152:24_, 1:155:14_, 1:160:12_, 1:161:12_, 1:161:18
care-related [1]_ - 1:25:12

caregiver [44]_ - 1:10:18_, 1:10:19_, 1:11:22_, 1:12:20_, 1:13:14_, 1:13:19_, 1:22:13_, 1:22:19_, 1:23:10_, 1:23:13_, 1:33:21_, 1:37:21_, 1:38:1_, 1:38:2_, 1:38:25_, 1:39:2_, 1:39:4_, 1:39:5_, 1:39:8_, 1:40:2_, 1:40:21_, 1:41:3_, 1:53:25_, 1:54:10_, 1:54:11_, 1:54:13_, 1:54:16_, 1:55:8_, 1:55:16_, 1:56:4_, 1:56:5_, 1:56:11_, 1:56:13_, 1:66:6_, 1:66:12_, 1:66:18_, 1:70:2_, 1:71:18_, 1:71:22_, 1:74:24_, 1:74:25_, 1:86:21_, 1:86:22
caregivers [25]_ - 1:10:10_, 1:10:12_, 1:11:15_, 1:12:14_, 1:12:16_, 1:14:22_, 1:19:22_, 1:21:12_, 1:26:23_, 1:27:8_, 1:35:13_, 1:38:1_, 1:38:21_, 1:38:23_, 1:40:5_, 1:40:8_, 1:42:21_, 1:47:8_, 1:54:4_, 1:59:2_, 1:62:14_, 1:69:11_, 1:69:12_, 1:69:20_, 1:69:24
caring [1]_ - 1:120:17
carrier [1]_ - 1:24:17
carry [4]_ - 1:166:10_, 1:167:10_, 1:167:12_, 1:167:25
carveout [1]_ - 1:68:18
case [55]_ - 1:3:11_, 1:3:22_, 1:4:19_, 1:5:14_, 1:6:24_, 1:7:10_, 1:7:19_, 1:9:9_, 1:10:12_, 1:10:14_, 1:10:15_, 1:10:19_, 1:11:16_, 1:21:21_, 1:32:17_, 1:39:9_, 1:45:22_, 1:46:2_, 1:54:13_, 1:55:15_, 1:62:22_, 1:63:16_, 1:82:19_, 1:83:4_, 1:83:8_, 1:85:11_, 1:91:20_, 1:94:14_, 1:94:18_, 1:115:17_, 1:116:11_, 1:119:11_, 1:123:19_, 1:124:10_, 1:126:8_, 1:134:3_, 1:134:7_, 1:136:7_, 1:136:14_, 1:136:19_, 1:137:17_, 1:142:12_, 1:142:14_, 1:142:17_, 1:151:1_, 1:163:10_, 1:164:4_, 1:164:14_, 1:164:16_, 1:164:17_, 1:168:25_, 1:169:3_, 1:169:4
cases [1]_ - 1:136:5
catch [1]_ - 1:157:9
caught [2]_ - 1:80:3_, 1:80:8

caused [1]_ - 1:4:21
cell [2]_ - 1:11:22_, 1:91:24
certain [8]_ - 1:18:22_, 1:31:1_, 1:41:2_, 1:41:8_, 1:62:11_, 1:62:12_, 1:108:17_, 1:110:19
certainly [8]_ - 1:25:7_, 1:117:4_, 1:118:15_, 1:120:1_, 1:120:25_, 1:127:6_, 1:166:20_, 1:166:24
certificate [1]_ - 1:133:15
certification [11]_ - 1:30:21_, 1:43:16_, 1:43:17_, 1:97:13_, 1:119:17_, 1:122:7_, 1:122:12_, 1:122:15_, 1:122:23_, 1:133:23
certified [5]_ - 1:42:23_, 1:57:15_, 1:120:10_, 1:120:13_, 1:132:21
Cesar [4]_ - 1:110:15_, 1:110:16_, 1:110:20_, 1:111:1
CEU [1]_ - 1:69:12
CEUs [1]_ - 1:43:9
chair [1]_ - 1:94:6
change [6]_ - 1:35:16_, 1:69:8_, 1:69:9_, 1:71:19_, 1:89:2
changed [3]_ - 1:4:11_, 1:80:20
chapter [3]_ - 1:57:16_, 1:57:18_, 1:57:19
Chapter [1]_ - 1:57:20
charge [3]_ - 1:13:17_, 1:49:18_, 1:169:23
charges [1]_ - 1:39:22
cheaper [2]_ - 1:59:7_, 1:59:8
check [35]_ - 1:17:5_, 1:17:9_, 1:17:11_, 1:17:12_, 1:17:16_, 1:21:14_, 1:27:17_, 1:33:4_, 1:49:25_, 1:50:13_, 1:50:21_, 1:50:25_, 1:51:17_, 1:51:19_, 1:51:25_, 1:52:11_, 1:90:23_, 1:107:20_, 1:108:10_, 1:111:12_, 1:113:18_, 1:114:21_, 1:114:24_, 1:115:1_, 1:115:5_, 1:115:8_, 1:115:9_, 1:133:23_, 1:148:1_, 1:148:18_, 1:148:23_, 1:148:24_, 1:159:15
checks [1]_ - 1:23:23

checks-and-balance [1]_- 1:23:23

children [1]_- 1:120:17

choose [1]_- 1:41:19

chose [1]_- 1:78:13

circles [1]_- 1:12:4

circumstances [1]_- 1:136:10

circumstantial [2]_- 1:78:17_, 1:79:20

circumstantially [1]_- 1:79:7

cited [1]_- 1:71:10

city [3]_- 1:96:1_, 1:96:3_, 1:96:5

civil [2]_- 1:98:2_, 1:98:4

Civil [1]_- 1:15:15

claim [11]_- 1:45:23_, 1:70:6_, 1:73:11_, 1:73:16_, 1:75:7_, 1:132:13_, 1:149:5 _, 1:165:1_, 1:165:17_, 1:165:21_, 1:168:2

claiming [4]_- 1:51:9_, 1:70:11_, 1:75:20_, 1:149:19

claims [2]_- 1:72:19_, 1:164:17

clarification [2]_- 1:78:4 _, 1:147:21

clarify [5]_- 1:109:9_, 1:133:5_, 1:133:6_, 1:149:16 _, 1:156:1

clean [2]_- 1:111:15_, 1:135:4

clear [7]_- 1:37:17_, 1:55:7_, 1:56:1_, 1:98:14_, 1:116:19_, 1:131:13_, 1:162:14

clearly [1]_- 1:75:11

click [1]_- 1:21:15

client [83]_- 1:4:8_, 1:4:9_, 1:4:11_, 1:4:14_, 1:5:16_, 1:7:9_, 1:10:25_, 1:11:16_, 1:12:11_, 1:13:3_, 1:13:9_, 1:13:17_, 1:13:18_, 1:34:16 _, 1:34:22_, 1:35:10_, 1:37:21_, 1:37:22_, 1:38:4_, 1:38:5_, 1:38:9_, 1:38:12_, 1:38:16_, 1:38:22_, 1:38:25 _, 1:39:1_, 1:39:7_, 1:39:8_, 1:39:10_, 1:39:19_, 1:40:1_, 1:40:2_, 1:40:5_, 1:40:6_, 1:40:7_, 1:41:3_, 1:41:19_, 1:51:10_, 1:54:5_, 1:56:4_, 1:55:7_, 1:55:11_, 1:55:24_, 1:56:4_, 1:56:5_, 1:56:7_,

1:56:11_, 1:57:22_, 1:58:1_, 1:66:9_, 1:66:10_, 1:66:17_, 1:67:18_, 1:67:19_, 1:68:16 _, 1:71:5_, 1:71:13_, 1:71:15 _, 1:71:18_, 1:71:23_, 1:72:4 _, 1:92:13_, 1:100:10_, 1:106:18_, 1:106:21_, 1:109:1_, 1:135:9_, 1:135:10 _, 1:139:3_, 1:139:11_, 1:141:16_, 1:141:21_, 1:141:24_, 1:142:2_, 1:142:5 _, 1:142:15_, 1:147:18_, 1:161:10_, 1:165:12_, 1:167:4

client's [8]_- 1:5:7_, 1:11:1_, 1:21:13_, 1:39:5_, 1:55:8_, 1:55:11_, 1:78:15_, 1:146:6

clients [60]_- 1:4:20_, 1:4:23_, 1:5:12_, 1:5:23_, 1:13:5_, 1:14:8_, 1:14:9_, 1:14:19_, 1:14:20_, 1:15:8_, 1:17:25_, 1:18:17_, 1:25:13 _, 1:26:22_, 1:26:24_, 1:27:25_, 1:28:8_, 1:33:25_, 1:34:23_, 1:35:10_, 1:35:13 _, 1:36:19_, 1:37:15_, 1:38:18_, 1:40:7_, 1:45:8_, 1:45:9_, 1:46:2_, 1:46:4_, 1:46:23_, 1:46:24_, 1:47:4_, 1:47:23_, 1:54:8_, 1:55:1_, 1:62:13_, 1:65:5_, 1:65:7_, 1:65:24_, 1:67:23_, 1:70:3_, 1:102:11_, 1:104:3_, 1:104:7 _, 1:104:9_, 1:106:10_, 1:106:11_, 1:106:14_, 1:107:10_, 1:108:18_, 1:108:19_, 1:108:20_, 1:108:22_, 1:128:19_, 1:128:20_, 1:129:3_, 1:131:6 _, 1:131:8_, 1:147:19

clock [1]_- 1:21:13

clocked [3]_- 1:21:18_, 1:22:15

close [1]_- 1:164:3

closed [1]_- 1:148:16

closing [2]_- 1:169:25_, 1:170:5

clothes [1]_- 1:146:11

clothing [2]_- 1:146:7_, 1:146:14

coincidentally [1]_- 1:161:1

collateral [1]_- 1:119:12

collect [1]_- 1:48:5

comfortable [1]_- 1:94:3

coming [1]_- 1:7:11

comment [2]_- 1:14:10_, 1:130:25

commit [2]_- 1:66:8_, 1:67:12

commitment [1]_- 1:35:4

committed [5]_- 1:39:2_, 1:40:8_, 1:40:21_, 1:66:7_, 1:66:21

common [2]_- 1:121:18_, 1:133:3

commonly [1]_- 1:121:16

community [2]_- 1:18:18 _, 1:59:17

comp [1]_- 1:60:3

companion [1]_- 1:57:15

company [48]_- 1:11:16_, 1:13:3_, 1:14:15_, 1:19:22_, 1:20:3_, 1:39:9_, 1:41:11_, 1:45:1_, 1:53:5_, 1:58:14_, 1:59:13_, 1:59:22_, 1:60:8_, 1:64:2_, 1:78:7_, 1:78:24_, 1:79:5_, 1:99:2_, 1:105:5_, 1:105:10_, 1:108:1_, 1:109:24_, 1:114:19_, 1:118:24_, 1:128:18_, 1:129:2_, 1:129:6_, 1:131:5 _, 1:133:16_, 1:133:23_, 1:134:2_, 1:134:4_, 1:137:16 _, 1:138:10_, 1:139:4_, 1:146:9_, 1:146:12_, 1:146:25_, 1:150:14_, 1:150:22_, 1:152:8_, 1:152:14_, 1:153:1_, 1:160:18_, 1:161:4_, 1:161:6 _, 1:161:8_, 1:161:10

company's [1]_- 1:70:6

compensation [2]_- 1:59:20_, 1:60:6

compete [2]_- 1:5:3_, 1:34:11

complain [2]_- 1:35:11_, 1:55:12

complaining [1]_- 1:35:20

complete [3]_- 1:97:11_, 1:100:25_, 1:111:21

completed [3]_- 1:30:9_, 1:100:19_, 1:125:21

completely [5]_- 1:51:7_, 1:58:3_, 1:136:3_, 1:136:4_, 1:137:22

compliance [1]_- 1:133:21

comply [1]_- 1:35:3

complying [2]_- 1:137:10

1:147:4

computer [2]_- 1:48:6_, 1:64:6

concern [6]_- 1:7:9_, 1:12:14_, 1:24:19_, 1:25:9_, 1:47:3_, 1:47:11

concerned [5]_- 1:51:7_, 1:51:8_, 1:56:20_, 1:57:8_, 1:68:10

concluded [2]_- 1:49:22 _, 1:170:14

condition [1]_- 1:105:21

conditions [3]_- 1:33:9_, 1:134:5

conducted [1]_- 1:34:20

Conference [2]_- 1:48:22_, 1:49:22

conference [2]_- 1:49:18 _, 1:169:23

confirm [3]_- 1:64:6_, 1:104:22_, 1:112:2

conflict [1]_- 1:148:2

confuse [3]_- 1:122:4_, 1:122:9_, 1:166:17

confused [2]_- 1:127:17_, 1:133:19

confusing [3]_- 1:166:6_, 1:169:6

confusion [1]_- 1:130:23

conjecture [1]_- 1:79:16

connected [1]_- 1:34:19

consent [1]_- 1:136:23

consider [1]_- 1:166:21

consideration [2]_- 1:31:9_, 1:72:5

considered [1]_- 1:49:4

consistent [1]_- 1:78:15

consult [1]_- 1:34:18

consumer [1]_- 1:20:1

contact [7]_- 1:10:25_, 1:30:13_, 1:99:1_, 1:102:8_, 1:124:3_, 1:124:4_, 1:124:5

contacted [1]_- 1:109:5

contain [1]_- 1:30:12

contained [1]_- 1:30:22

contemporaneously [3] _- 1:8:1_, 1:8:6_, 1:49:13

continuance [1]_- 1:35:5

continue [3]_- 1:63:17_, 1:67:17_, 1:102:24

continuing [2]_- 1:17:23 _, 1:36:15

continuously [1]₋ - 1:27:22

contract [65]₋ - 1:5:23₋, 1:6:3₋, 1:6:19₋, 1:13:16₋, 1:13:17₋, 1:32:21₋, 1:33:3₋, 1:34:4₋, 1:34:9₋, 1:34:14₋, 1:34:16₋, 1:35:1₋, 1:35:7₋, 1:46:10₋, 1:46:19₋, 1:56:6₋, 1:56:11₋, 1:56:13₋, 1:57:16₋, 1:57:22₋, 1:57:23₋, 1:57:24₋, 1:57:25₋, 1:67:13₋, 1:68:14₋, 1:69:5₋, 1:69:7₋, 1:69:8₋, 1:71:5₋, 1:71:11₋, 1:71:13₋, 1:98:17₋, 1:99:24₋, 1:100:10₋, 1:100:17₋, 1:100:25₋, 1:101:1₋, 1:102:4₋, 1:109:25₋, 1:114:14₋, 1:117:6₋, 1:117:7₋, 1:118:4₋, 1:118:17₋, 1:118:25₋, 1:119:8₋, 1:119:9₋, 1:119:19₋, 1:119:20₋, 1:123:24₋, 1:125:24₋, 1:127:18₋, 1:165:20₋, 1:166:3₋, 1:167:10₋, 1:167:18₋, 1:167:24₋, 1:168:2₋, 1:168:5₋, 1:168:11₋, 1:168:12₋, 1:168:21

contracted [1]₋ - 1:44:10

contractor [50]₋ - 1:13:24₋, 1:15:14₋, 1:18:4₋, 1:19:4₋, 1:21:23₋, 1:28:22₋, 1:30:13₋, 1:31:17₋, 1:31:23₋, 1:32:8₋, 1:33:10₋, 1:37:15₋, 1:38:9₋, 1:49:5₋, 1:57:17₋, 1:58:16₋, 1:60:24₋, 1:61:16₋, 1:61:21₋, 1:101:4₋, 1:103:4₋, 1:103:25₋, 1:116:25₋, 1:118:17₋, 1:124:13₋, 1:125:22₋, 1:126:3₋, 1:126:4₋, 1:126:10₋, 1:126:11₋, 1:126:24₋, 1:127:14₋, 1:127:23₋, 1:128:14₋, 1:128:15₋, 1:128:17₋, 1:128:24₋, 1:129:1₋, 1:129:8₋, 1:130:4₋, 1:131:2₋, 1:131:9₋, 1:131:15₋, 1:131:17₋, 1:132:14₋, 1:132:15₋, 1:132:16₋, 1:143:23₋, 1:145:4₋, 1:151:13

Contractor [1]₋ - 1:31:11

contractors [20]₋ - 1:15:19₋, 1:15:24₋, 1:16:13₋, 1:19:9₋, 1:26:13₋, 1:27:10₋, 1:28:10₋, 1:28:11₋, 1:28:19₋, 1:28:21₋, 1:30:8₋, 1:31:17₋, 1:44:11₋, 1:58:13₋, 1:58:22₋, 1:58:24₋, 1:59:3₋, 1:59:21₋, 1:60:3₋, 1:61:9

contracts [1]₋ - 1:69:4

contractual [1]₋ - 1:30:15

contractually [1]₋ - 1:16:12

contradictory [1]₋ - 1:130:10

contrary [1]₋ - 1:8:12

control [1]₋ - 1:27:4

controlled [1]₋ - 1:27:2

conversation [4]₋ - 1:54:9₋, 1:54:11₋, 1:148:20₋, 1:157:12

conversations [1]₋ - 1:78:25

convicted [1]₋ - 1:30:20

convince [1]₋ - 1:35:11

convinced [2]₋ - 1:35:19₋, 1:74:25

coordinator [6]₋ - 1:10:18₋, 1:53:25₋, 1:54:10₋, 1:54:11₋, 1:54:16₋, 1:54:22

coordinators [2]₋ - 1:54:3₋, 1:54:4

copies [2]₋ - 1:101:24₋, 1:119:6

copy [5]₋ - 1:43:17₋, 1:119:9₋, 1:119:12₋, 1:139:22₋, 1:140:1

correct [102]₋ - 1:10:5₋, 1:11:5₋, 1:12:5₋, 1:12:6₋, 1:16:18₋, 1:16:23₋, 1:17:1₋, 1:17:2₋, 1:17:16₋, 1:17:17₋, 1:18:5₋, 1:18:23₋, 1:18:24₋, 1:19:1₋, 1:19:10₋, 1:20:17₋, 1:20:21₋, 1:21:19₋, 1:22:23₋, 1:23:3₋, 1:23:12₋, 1:23:18₋, 1:27:21₋, 1:31:4₋, 1:31:5₋, 1:32:6₋, 1:32:16₋, 1:33:6₋, 1:36:14₋, 1:38:14₋, 1:39:20₋, 1:41:10₋, 1:41:14₋, 1:41:20₋, 1:42:9₋, 1:42:15₋, 1:43:19₋, 1:43:24₋, 1:44:3₋, 1:44:7₋, 1:46:11₋, 1:52:2₋, 1:52:10₋, 1:53:6₋, 1:55:5₋, 1:55:20₋, 1:58:6₋, 1:58:10₋, 1:60:16₋, 1:60:21₋, 1:64:4₋, 1:68:16₋, 1:69:6₋, 1:72:23₋, 1:72:24₋, 1:73:3₋, 1:73:8₋, 1:73:14₋, 1:73:21₋, 1:74:20₋, 1:75:16₋, 1:77:1₋, 1:89:22₋, 1:101:21₋, 1:112:4₋, 1:114:16₋, 1:114:17₋, 1:117:2₋, 1:117:20₋, 1:118:19₋, 1:119:23₋, 1:120:6₋, 1:122:12₋, 1:122:13₋, 1:124:20₋,

1:124:21₋, 1:124:23₋, 1:125:21₋, 1:126:15₋, 1:126:18₋, 1:128:10₋, 1:128:11₋, 1:128:12₋, 1:138:3₋, 1:138:25₋, 1:143:7₋, 1:146:2₋, 1:146:3₋, 1:146:4₋, 1:146:5₋, 1:147:11₋, 1:148:2₋, 1:149:6₋, 1:149:11₋, 1:149:22₋, 1:150:21₋, 1:150:22₋, 1:151:3₋, 1:157:19₋, 1:160:20₋, 1:160:23₋, 1:161:20

correctly [4]₋ - 1:21:4₋, 1:24:17₋, 1:50:21₋, 1:66:23

corresponding [1]₋ - 1:148:25

corroborate [1]₋ - 1:6:21

cost [7]₋ - 1:7:11₋, 1:18:16₋, 1:20:1₋, 1:53:4₋, 1:58:14₋, 1:58:16₋, 1:58:24

costing [1]₋ - 1:5:23

costs [8]₋ - 1:18:8₋, 1:18:23₋, 1:20:14₋, 1:44:12₋, 1:44:25₋, 1:45:17₋, 1:46:7₋, 1:60:15

counsel [16]₋ - 1:3:3₋, 1:3:9₋, 1:3:19₋, 1:5:16₋, 1:9:17₋, 1:61:12₋, 1:63:6₋, 1:71:3₋, 1:77:9₋, 1:83:16₋, 1:98:2₋, 1:105:15₋, 1:116:1₋, 1:119:24₋, 1:126:25₋, 1:164:6

Counsel [3]₋ - 1:26:4₋, 1:144:16₋, 1:161:13

counselled [1]₋ - 1:67:25

Counselor [1]₋ - 1:93:20

count [3]₋ - 1:6:19₋, 1:167:17₋, 1:168:9

counterclaim [1]₋ - 1:5:22

County [2]₋ - 1:54:5₋, 1:68:5

couple [5]₋ - 1:76:9₋, 1:110:14₋, 1:110:25₋, 1:165:13

coupled [1]₋ - 1:166:25

course [9]₋ - 1:5:11₋, 1:12:3₋, 1:47:25₋, 1:98:22₋, 1:118:15₋, 1:118:24₋, 1:125:9₋, 1:142:19₋, 1:161:19

court [4]₋ - 1:95:8₋, 1:102:13₋, 1:127:16₋, 1:160:17

Court [24]₋ - 1:3:1₋, 1:3:4₋,

3:11₋, 1:5:15₋, 1:32:2₋, 1:49:2₋, 1:49:9₋, 1:63:7₋, 1:83:13₋, 1:83:17₋, 1:115:23₋, 1:116:2₋, 1:131:22₋, 1:163:15₋, 1:163:22₋, 1:164:1₋, 1:164:12₋, 1:164:22₋, 1:165:8₋, 1:166:10₋, 1:166:14₋, 1:166:16₋, 1:167:8₋, 1:169:3

COURT [213]₋ - 1:3:2₋, 1:3:15₋, 1:3:20₋, 1:4:20₋, 1:5:1₋, 1:5:18₋, 1:6:2₋, 1:6:7₋, 1:6:10₋, 1:6:15₋, 1:7:5₋, 1:7:16₋, 1:7:20₋, 1:7:23₋, 1:8:8₋, 1:8:10₋, 1:8:14₋, 1:8:19₋, 1:9:1₋, 1:9:2₋, 1:9:5₋, 1:9:7₋, 1:9:20₋, 1:18:13₋, 1:19:15₋, 1:24:24₋, 1:25:2₋, 1:26:2₋, 1:26:5₋, 1:26:7₋, 1:28:15₋, 1:29:12₋, 1:29:23₋, 1:35:24₋, 1:36:21₋, 1:37:10₋, 1:40:25₋, 1:42:4₋, 1:42:12₋, 1:44:16₋, 1:47:16₋, 1:48:18₋, 1:48:21₋, 1:49:16₋, 1:52:3₋, 1:52:6₋, 1:52:21₋, 1:62:19₋, 1:63:1₋, 1:63:5₋, 1:63:11₋, 1:63:14₋, 1:70:23₋, 1:72:11₋, 1:74:10₋, 1:75:3₋, 1:75:5₋, 1:76:2₋, 1:76:16₋, 1:76:19₋, 1:76:21₋, 1:76:24₋, 1:77:2₋, 1:77:7₋, 1:77:20₋, 1:77:24₋, 1:78:9₋, 1:78:17₋, 1:78:22₋, 1:79:2₋, 1:79:10₋, 1:80:1₋, 1:80:6₋, 1:80:14₋, 1:81:1₋, 1:81:6₋, 1:81:24₋, 1:82:2₋, 1:82:6₋, 1:82:10₋, 1:82:12₋, 1:82:15₋, 1:82:20₋, 1:82:23₋, 1:83:2₋, 1:83:12₋, 1:83:15₋, 1:83:21₋, 1:84:20₋, 1:84:24₋, 1:85:3₋, 1:85:5₋, 1:85:7₋, 1:85:9₋, 1:85:18₋, 1:85:25₋, 1:87:18₋, 1:88:4₋, 1:88:19₋, 1:88:21₋, 1:88:25₋, 1:89:8₋, 1:90:6₋, 1:92:7₋, 1:92:23₋, 1:93:1₋, 1:93:4₋, 1:93:6₋, 1:93:9₋, 1:93:12₋, 1:94:2₋, 1:94:12₋, 1:94:23₋, 1:95:2₋, 1:102:1₋, 1:102:18₋, 1:102:22₋, 1:115:15₋, 1:115:22₋, 1:115:25₋, 1:116:6₋, 1:116:9₋, 1:122:1₋, 1:122:3₋, 1:122:17₋, 1:123:5₋, 1:123:11₋, 1:129:20₋, 1:129:24₋, 1:130:7₋, 1:130:21₋, 1:131:23₋, 1:132:8₋, 1:138:7₋, 1:139:22₋, 1:140:6₋, 1:140:10₋, 1:140:12₋,

1:140:17_, 1:140:21_, 1:140:24_, 1:141:1_, 1:141:23_, 1:144:10_, 1:144:18_, 1:147:13_, 1:150:17_, 1:151:4_, 1:151:7 _, 1:151:9_, 1:151:17_, 1:152:21_, 1:153:13_, 1:153:19_, 1:153:23_, 1:154:4_, 1:154:8_, 1:154:11 _, 1:154:16_, 1:155:2_, 1:155:5_, 1:155:10_, 1:155:17_, 1:156:8_, 1:156:18_, 1:157:3_, 1:157:15_, 1:158:1_, 1:158:6 _, 1:158:10_, 1:158:18_, 1:158:24_, 1:159:1_, 1:159:4 _, 1:159:8_, 1:159:13_, 1:159:22_, 1:160:5_, 1:161:22_, 1:162:2_, 1:162:6 _, 1:163:8_, 1:163:14_, 1:163:18_, 1:163:24_, 1:164:3_, 1:164:8_, 1:164:11 _, 1:164:15_, 1:164:19_, 1:165:3_, 1:165:17_, 1:165:20_, 1:165:23_, 1:166:2, 1:166:13_, 1:166:18 _, 1:167:4_, 1:167:16_, 1:168:7_, 1:168:9_, 1:168:22 _, 1:168:25_, 1:169:4_, 1:169:13_, 1:169:22_, 1:170:1_, 1:170:7_, 1:170:10 _, 1:170:13

Court's [1]_ - 1:8:12

courtesy [1]_ - 1:42:1

courthouse [1]_ - 1:94:8

Courtroom [2] - 1:86:5, 1:95:13

courtroom [13]_ - 1:9:6_, 1:62:25_, 1:63:13_, 1:76:23 _, 1:83:1_, 1:83:11_, 1:85:8_, 1:88:24_, 1:94:11_, 1:96:23 _, 1:115:21_, 1:116:8_, 1:163:13

COURTROOM [20]_ - 1:9:17_, 1:9:22_, 1:9:24_, 1:83:25_, 1:84:2_, 1:84:8_, 1:84:10_, 1:84:15_, 1:84:17 _, 1:84:19_, 1:84:21_, 1:85:20_, 1:93:17_, 1:93:19 _, 1:93:24_, 1:94:4_, 1:94:10 _, 1:94:20_, 1:95:3_, 1:95:8

courts [1]_ - 1:113:21

Covenant [1]_ - 1:34:10

covenant [1]_ - 1:5:2

covenants [3]_ - 1:46:11 _, 1:46:14_, 1:46:18

coverage [1]_ - 1:13:6

covered [1]_ - 1:72:10

covers [1]_ - 1:146:1

COVID [14]_ - 1:11:24_, 1:12:2_, 1:12:11_, 1:13:22_, 1:15:2_, 1:15:6_, 1:15:8_, 1:41:21_, 1:68:14_, 1:68:19 _, 1:68:20_, 1:68:22_, 1:69:4 _, 1:69:9

COVID-19 [7]_ - 1:14:17 _, 1:14:19_, 1:69:11_, 1:69:13_, 1:69:17_, 1:69:20 _, 1:70:1

CPR [3]_ - 1:43:3_, 1:43:4 _, 1:43:9

crazy [2]_ - 1:14:17_, 1:46:23

create [7]_ - 1:55:3_, 1:126:2_, 1:129:10_, 1:131:2 _, 1:131:4_, 1:131:11_, 1:131:12

created [1]_ - 1:11:10

creation [1]_ - 1:27:12

crime [8]_ - 1:30:20_, 1:39:2_, 1:40:8_, 1:40:21_, 1:66:7_, 1:66:8_, 1:66:15_, 1:66:22

criminal [3]_ - 1:39:21_, 1:43:10_, 1:98:3

crisis [6]_ - 1:11:25_, 1:12:2_, 1:13:22_, 1:15:6_, 1:15:7_, 1:41:21

critical [2]_ - 1:22:17_, 1:105:21

CROSS [4]_ - 1:9:13_, 1:88:6, 1:92:10_, 1:116:15

cross [7]_ - 1:6:13_, 1:78:20_, 1:116:12_, 1:123:12_, 1:129:23_, 1:140:5

CROSS-EXAMINATION [4]_ - 1:9:13_, 1:88:6, 1:92:10_, 1:116:15

cross-examination [5]_ - 1:6:13_, 1:78:20_, 1:116:12 _, 1:123:12_, 1:140:5

cross-examine [1]_ - 1:123:12

CRUZ [1] - 1:95:12

Cruz [4]_ - 1:35:18_, 1:55:10_, 1:68:7_, 1:95:19

Cummings [3]_ - 1:126:14_, 1:126:16_, 1:126:17

curriculum [1]_ - 1:133:16

customer [1]_ - 1:20:3

cut [1]_ - 1:17:16

cycle [1]_ - 1:150:4

D

daily [1]_ - 1:111:14

Daisy [18]_ - 1:54:14_, 1:54:16_, 1:54:19_, 1:55:10 _, 1:55:18_, 1:55:23_, 1:55:25_, 1:56:7_, 1:88:9_, 1:88:10_, 1:92:15_, 1:92:18 _, 1:95:17_, 1:95:24_, 1:95:25_, 1:96:1_, 1:103:2_, 1:162:9

damages [27]_ - 1:4:17_, 1:4:22_, 1:5:1_, 1:5:4_, 1:5:22_, 1:6:1_, 1:6:2_, 1:8:4 _, 1:70:10_, 1:70:13_, 1:71:24_, 1:71:25_, 1:72:19 _, 1:73:11_, 1:75:7_, 1:75:20 _, 1:78:13_, 1:166:8_, 1:166:19_, 1:167:7_, 1:167:13_, 1:167:19_, 1:168:5_, 1:168:6_, 1:168:16 _, 1:168:17_, 1:169:11

date [10]_ - 1:98:21_, 1:103:20_, 1:117:15_, 1:121:4_, 1:125:14_, 1:154:21_, 1:154:22_, 1:156:24_, 1:157:23

dated [1]_ - 1:115:6

daughter [5]_ - 1:91:12_, 1:92:1_, 1:109:11_, 1:148:12

Davie [3]_ - 1:86:15_, 1:86:17_, 1:89:22

Davies [1]_ - 1:96:6

Davis [1]_ - 1:148:8

day-to-day [1]_ - 1:57:7

days [5]_ - 1:51:9_, 1:73:7 _, 1:112:9_, 1:112:10_, 1:165:18

dead [1]_ - 1:82:22

deal [1]_ - 1:16:20

December [1]_ - 1:68:25

decide [8]_ - 1:129:13_, 1:132:4_, 1:134:22_, 1:135:2 _, 1:135:15_, 1:139:24_, 1:165:11_, 1:166:15

decides [2]_ - 1:133:25_, 1:134:17

deciding [1]_ - 1:166:20

decision [5]_ - 1:35:16_, 1:35:18_, 1:38:15_, 1:146:6

declared [1]_ - 1:49:7

dedicated [3]_ - 1:45:17_,

1:120:16_, 1:120:17

deemed [1]_ - 1:57:17

defects [1]_ - 1:5:17

defendant [3]_ - 1:4:21_, 1:49:11_, 1:170:4

defendant's [1]_ - 1:83:20

defendants [15]_ - 1:5:1_, 1:98:1_, 1:103:21_, 1:103:24 _, 1:104:3_, 1:104:15_, 1:107:4_, 1:113:5_, 1:113:23 _, 1:166:10_, 1:166:21_, 1:167:9_, 1:167:12_, 1:167:25_, 1:169:8

defense [10]_ - 1:8:16_, 1:49:3_, 1:49:16_, 1:63:10_, 1:77:3_, 1:80:15_, 1:89:3_, 1:116:5_, 1:169:10_, 1:170:12

definitely [4]_ - 1:19:23_, 1:66:8_, 1:66:13_, 1:67:10

delay [2]_ - 1:82:9_, 1:112:9

delayed [1]_ - 1:107:25

delays [2]_ - 1:150:19_, 1:151:2

demand [1]_ - 1:105:3

demands [1]_ - 1:146:9

dementia [1]_ - 1:137:3

denied [2]_ - 1:102:18_, 1:136:11

denies [2]_ - 1:130:11_, 1:141:3

deny [8]_ - 1:49:3_, 1:130:14_, 1:130:18_, 1:130:25_, 1:131:10_, 1:132:6_, 1:135:21_, 1:139:11

denying [1]_ - 1:131:18

department [1]_ - 1:121:14

Department [1]_ - 1:122:5

deposit [2]_ - 1:50:14_, 1:107:21

deposition [32]_ - 1:3:8_, 1:3:21_, 1:4:7_, 1:6:25_, 1:8:6_, 1:126:8_, 1:126:9_, 1:126:13_, 1:126:21_, 1:127:8_, 1:127:17_, 1:127:21_, 1:128:2_, 1:128:3 _, 1:128:7_, 1:128:13_, 1:128:22_, 1:129:5_, 1:129:9 _, 1:130:2_, 1:130:15_, 1:131:1_, 1:131:12_, 1:132:3 _, 1:132:6_, 1:132:14_,

1:134:20_, 1:135:6_, 1:139:9
_, 1:139:14_, 1:139:17_,
1:139:23

DEPUTY [20]_ - 1:9:17_,
1:9:22_, 1:9:24_, 1:83:25_,
1:84:2_, 1:84:8_, 1:84:10_,
1:84:15_, 1:84:17_, 1:84:19
_, 1:84:21_, 1:85:20_,
1:93:17_, 1:93:19_, 1:93:24
_, 1:94:4_, 1:94:10_, 1:94:20
_, 1:95:3_, 1:95:8

Deputy [2]_ - 1:86:5,
1:95:13

describe [1]_ - 1:86:19

described [2]_ - 1:40:9_,
1:121:8

description [3]_ - 1:37:3_,
1:37:6_, 1:103:12

designated [1]_ - 1:147:7

despite [4]_ - 1:6:5_,
1:122:14_, 1:132:13_,
1:160:25

determination [1]_ -
1:72:21

determine [3]_ - 1:41:11_,
1:141:17_, 1:142:3

determined [3]_ - 1:142:4
_, 1:144:1_, 1:144:3

determines [1]_ - 1:10:11

developed [1]_ - 1:21:10

Diana [39]_ - 1:23:21_,
1:48:15_, 1:68:4_, 1:69:25_,
1:77:5_, 1:78:21_, 1:102:6_,
1:104:20_, 1:105:20_,
1:105:24_, 1:107:25_,
1:109:19_, 1:109:22_,
1:110:18_, 1:111:11_,
1:111:25_, 1:112:12_,
1:112:13_, 1:119:3_,
1:123:16_, 1:124:2_, 1:124:7
_, 1:124:16_, 1:124:21_,
1:125:1_, 1:134:7_, 1:134:10
_, 1:134:16_, 1:135:1_,
1:136:13_, 1:136:17_,
1:136:22_, 1:140:22_,
1:140:23_, 1:146:24_,
1:148:5_, 1:152:5_, 1:164:2

diaseles [1]_ - 1:95:23

died [1]_ - 1:111:1

difference [2]_ - 1:167:20
_, 1:167:21

different [5]_ - 1:12:15_,
1:38:21_, 1:55:16_, 1:62:17
_, 1:137:5

differently [1]_ - 1:141:4

difficult [1]_ - 1:82:1

direct [14]_ - 1:9:15_,
1:10:3_, 1:35:2_, 1:50:14_,
1:77:16_, 1:77:22_, 1:79:23
_, 1:81:2_, 1:86:24_,
1:107:21_, 1:116:24_,
1:126:6_, 1:143:10

DIRECT [3] - 1:86:7_,
1:89:11_, 1:95:15

directing [1]_ - 1:127:11

direction [1]_ - 1:73:19

directly [6]_ - 1:34:16_,
1:34:22_, 1:75:23_, 1:104:9
_, 1:114:21_, 1:135:17

disagree [1]_ - 1:58:3

disagreeing [1]_ - 1:58:5

disallow [1]_ - 1:68:15

disaster [1]_ - 1:114:22

discovered [1]_ - 1:14:3

discovery [3]_ - 1:153:18
_, 1:153:20_, 1:159:3

discrepancies [1]_ -
1:17:24

discrepancy [1]_ -
1:150:7

discriminate [4]_ -
1:15:21_, 1:15:23_, 1:16:2_,
1:16:11

discrimination [2]_ -
1:15:18_, 1:16:6

discuss [21]_ - 1:9:8_,
1:11:15_, 1:31:21_, 1:32:16
_, 1:53:3_, 1:54:3_, 1:62:22_,
1:63:15_, 1:64:17_, 1:83:3_,
1:83:8_, 1:85:10_, 1:94:13_,
1:115:17_, 1:116:10_,
1:123:22_, 1:124:11_,
1:124:16_, 1:152:17_,
1:163:10_, 1:169:23

discussed [13]_ - 1:9:9_,
1:42:17_, 1:62:23_, 1:63:16
_, 1:83:4_, 1:83:8_, 1:85:11_,
1:94:14_, 1:115:17_,
1:116:11_, 1:150:8_,
1:152:19_, 1:163:10

discussing [1]_ - 1:16:21

discussion [7]_ - 1:9:19_,
1:10:2_, 1:20:23_, 1:37:16_,
1:71:3_, 1:77:9_, 1:95:1

diseases [1]_ - 1:43:7

dismissal [1]_ - 1:164:13

disprove [1]_ - 1:8:4

dispute [8]_ - 1:8:9_,
1:16:24_, 1:17:20_, 1:33:7_,
1:80:10_, 1:87:1_, 1:87:9_,
1:150:7

disputes [4]_ - 1:5:13_,
1:23:25_, 1:78:7_, 1:138:14

disrupted [1]_ - 1:3:22

disrupting [1]_ - 1:3:24

disruptive [1]_ - 1:3:19

divide [1]_ - 1:110:18

divided [1]_ - 1:52:19

doctor's [1]_ - 1:96:25

document [48]_ - 1:30:5_,
1:30:7_, 1:31:12_, 1:31:14_,
1:31:15_, 1:31:16_, 1:31:25
_, 1:33:14_, 1:33:16_,
1:33:19_, 1:33:20_, 1:33:24
_, 1:36:25_, 1:64:8_, 1:64:12
_, 1:64:15_, 1:64:20_,
1:80:25_, 1:100:22_, 1:101:3
_, 1:101:12_, 1:101:14_,
1:101:20_, 1:112:17_,
1:125:11_, 1:127:1_, 1:140:3
_, 1:153:15_, 1:153:17_,
1:153:22_, 1:154:24_,
1:155:1_, 1:155:4_, 1:155:14
_, 1:155:16_, 1:155:18_,
1:155:23_, 1:156:7_,
1:156:10_, 1:156:14_,
1:156:17_, 1:156:24_,
1:157:2_, 1:157:4_, 1:157:8
_, 1:159:10_, 1:159:12

documentation [1]_ -
1:80:4

documentations [1]_ -
1:69:9

documented [1]_ -
1:28:23

documents [28]_ -
1:36:24_, 1:69:14_, 1:69:19
_, 1:69:22_, 1:80:6_, 1:80:12
_, 1:84:4_, 1:99:6_, 1:99:8_,
1:99:19_, 1:100:1_, 1:100:22
_, 1:101:6_, 1:101:18_,
1:101:23_, 1:103:17_,
1:116:9_, 1:119:12_,
1:119:15_, 1:119:16_,
1:119:18_, 1:124:19_,
1:124:22_, 1:125:7_, 1:125:8
_, 1:125:19_, 1:153:21_,
1:154:2

dollar [1]_ - 1:45:16

dollars [1]_ - 1:165:16

donate [1]_ - 1:18:18

done [15]_ - 1:10:17_,
1:11:6_, 1:11:20_, 1:14:2_,
1:15:1_, 1:21:18_, 1:31:25_,
1:41:21_, 1:75:19_, 1:77:14
_, 1:81:3_, 1:106:13_,
1:128:9_, 1:135:2

door [6]_ - 1:72:11_,
1:89:25_, 1:91:12_, 1:92:1_,
1:92:3_, 1:157:2

double [2]_ - 1:167:17_,
1:168:9

down [24]_ - 1:4:10_,
1:11:4_, 1:31:19_, 1:41:6_,
1:44:12_, 1:68:22_, 1:70:16
_, 1:76:2_, 1:76:6_, 1:80:18_,
1:80:20_, 1:80:24_, 1:85:25
_, 1:87:7_, 1:87:12_, 1:102:2
_, 1:102:19_, 1:110:8_,
1:111:4_, 1:111:6_, 1:111:16
_, 1:112:3_, 1:123:22_,
1:150:15

dragging [1]_ - 1:149:25

dressing [1]_ - 1:21:15

due [2]_ - 1:137:2_,
1:150:13

during [16]_ - 1:9:15_,
1:10:3_, 1:13:22_, 1:15:6_,
1:34:14_, 1:36:12_, 1:41:21
_, 1:104:2_, 1:105:19_,
1:126:13_, 1:127:21_,
1:130:25_, 1:149:23_,
1:150:3_, 1:150:20_,
1:169:23

duties [8]_ - 1:10:20_,
1:32:10_, 1:37:6_, 1:54:1_,
1:71:18_, 1:133:25_, 1:134:5
_, 1:134:6

E

early [4]_ - 1:8:22_, 1:67:3
_, 1:81:13_, 1:83:7

earn [2]_ - 1:13:19_,
1:32:10

earned [1]_ - 1:115:12

earning [1]_ - 1:43:22

easily [1]_ - 1:62:15

eating [1]_ - 1:161:19

education [2]_ - 1:29:20_,
1:30:15

effect [2]_ - 1:21:22_,
1:132:4

either [8]_ - 1:20:10_,
1:34:16_, 1:40:6_, 1:54:19_,
1:56:11_, 1:79:13_, 1:155:18
_, 1:163:1

elderly [11]_ - 1:12:8_,
1:12:10_, 1:28:1_, 1:28:2_,
1:28:4_, 1:28:7_, 1:47:7_,
1:47:8_, 1:47:11_, 1:90:7

electronically [1]_ -
1:98:10

elicited [4]– 1:4:3.., 1:48:25.., 1:49:13.., 1:76:8

eligible [1].– 1:30:17

eliminate [2].– 1:80:1.., 1:82:24

eliminated [1].– 1:78:1

ELMO [1].– 1:100:11

elsewhere [1].– 1:97:9

email [2].– 1:156:2.., 1:169:22

emails [1].– 1:67:24

employ [2].– 1:67:17.., 1:144:21

employed [2].– 1:30:15.., 1:34:17

employee [28].– 1:18:4.., 1:19:5.., 1:19:9.., 1:19:13.., 1:49:5.., 1:57:18.., 1:58:25.., 1:60:9.., 1:60:22.., 1:61:24.., 1:61:25.., 1:79:13.., 1:103:25.., 1:104:1.., 1:118:24.., 1:126:4.., 1:127:19.., 1:127:20.., 1:128:15.., 1:128:17.., 1:128:21.., 1:129:1.., 1:132:16.., 1:132:17.., 1:132:19.., 1:145:5.., 1:145:6

employees [8].– 1:15:19.., 1:16:13.., 1:20:10.., 1:28:10.., 1:28:19.., 1:58:21.., 1:59:20.., 1:107:5

employer [3].– 1:37:23.., 1:61:24.., 1:62:6

employment [8].– 1:29:20.., 1:30:15.., 1:67:21.., 1:100:18.., 1:101:1.., 1:134:4.., 1:143:22.., 1:151:12

encompassed [2].– 1:166:2.., 1:166:4

end [12].– 1:8:22.., 1:28:7.., 1:34:4.., 1:54:10.., 1:61:5.., 1:82:19.., 1:86:25.., 1:90:2.., 1:90:3.., 1:90:13.., 1:90:14.., 1:130:23

end-stage [1].– 1:28:7

ended [1].– 1:72:22

ending [2].– 1:50:11.., 1:51:16

engage [3].– 1:5:11.., 1:19:21.., 1:120:14

engaged [1].– 1:153:9

engagement [2].– 1:117:6.., 1:123:23

engaging [2].– 1:41:23..,

1:121:7

English [18].– 1:98:13.., 1:98:14.., 1:99:10.., 1:101:22.., 1:108:22.., 1:108:25.., 1:109:4.., 1:109:7.., 1:109:15.., 1:117:10.., 1:118:20.., 1:119:1.., 1:125:2.., 1:125:4.., 1:125:11.., 1:125:12

enter [2].– 1:163:22.., 1:164:12

entered [6].– 1:9:6.., 1:63:13.., 1:83:1.., 1:85:8.., 1:94:11.., 1:116:8

entering [2].– 1:12:15.., 1:12:16

entire [3].– 1:64:20.., 1:104:2.., 1:146:1

entirety [1].– 1:48:23

entitled [4].– 1:35:4.., 1:167:11.., 1:168:1.., 1:168:3

entries [5].– 1:22:7.., 1:22:20.., 1:23:8.., 1:23:12.., 1:48:10

entry [1].– 1:22:13

equipment [7].– 1:14:23.., 1:15:3.., 1:94:3.., 1:94:5.., 1:143:12.., 1:162:23

errors [2].– 1:80:4.., 1:80:8

especially [1].– 1:14:16

essential [1].– 1:106:5

establish [4].– 1:10:23.., 1:124:12.., 1:152:23.., 1:164:13

established [7].– 1:18:22.., 1:120:22.., 1:121:2.., 1:125:24.., 1:160:19.., 1:160:22.., 1:161:2

ethical [1].– 1:35:6

evaluation [3].– 1:142:20.., 1:142:25.., 1:143:1

evening [1].– 1:11:21

event [2].– 1:34:21.., 1:35:2

evidence [17].– 1:6:20.., 1:30:3.., 1:78:17.., 1:79:20.., 1:100:13.., 1:101:3.., 1:103:8.., 1:103:12.., 1:111:7.., 1:122:16.., 1:123:10.., 1:123:11.., 1:153:17.., 1:155:11.., 1:157:6.., 1:166:23

evil [1].– 1:148:7

exact [3].– 1:22:15.., 1:34:4.., 1:157:23

exactly [7].– 1:13:20.., 1:23:2.., 1:37:13.., 1:39:23.., 1:53:2.., 1:54:21.., 1:64:22

EXAMINATION [10].– 1:9:13.., 1:49:23.., 1:71:1.., 1:86:7.., 1:88:6.., 1:89:11.., 1:92:10.., 1:95:15.., 1:116:15.., 1:162:7

examination [9].– 1:6:13.., 1:9:15.., 1:48:24.., 1:76:8.., 1:78:20.., 1:116:12.., 1:116:24.., 1:123:12.., 1:140:5

examine [1].– 1:123:12

exchange [3].– 1:5:16.., 1:152:3.., 1:152:6

exclusive [1].– 1:168:2

excuse [8].– 1:20:9.., 1:50:13.., 1:94:1.., 1:97:1.., 1:99:13.., 1:114:1.., 1:135:22.., 1:142:16

exhibit [3].– 1:80:13.., 1:80:15.., 1:155:1

Exhibit [11].– 1:17:6.., 1:30:3.., 1:31:10.., 1:33:13, 1:52:5.., 1:100:14.., 1:101:4.., 1:103:9.., 1:103:13.., 1:111:7.., 1:112:18

exhibits [1].– 1:80:14

exist [1].– 1:71:13

exists [1].– 1:37:20

exited [6].– 1:62:25.., 1:76:23.., 1:83:11.., 1:88:24.., 1:115:21.., 1:163:13

expected [1].– 1:3:12

expediting [1].– 1:129:22

expense [2].– 1:19:9.., 1:19:19

expenses [7].– 1:19:13.., 1:20:16.., 1:58:20.., 1:60:5.., 1:60:8.., 1:60:12.., 1:60:23

experience [12].– 1:20:18.., 1:26:20.., 1:27:8.., 1:27:10.., 1:42:22.., 1:44:8.., 1:44:25.., 1:45:19.., 1:109:2.., 1:109:3.., 1:136:13.., 1:138:2

explain [16].– 1:10:11.., 1:12:13.., 1:13:2.., 1:13:8.., 1:14:10.., 1:18:7.., 1:26:9.., 1:27:5.., 1:31:14.., 1:31:16.., 1:37:13.., 1:66:4.., 1:110:13.., 1:136:10.., 1:140:19.., 1:147:14

explained [5].– 1:41:2..,

1:41:5.., 1:98:12.., 1:151:7.., 1:151:24

explanation [1].– 1:167:1

expression [1].– 1:10:3

extend [1].– 1:42:1

extensive [1].– 1:5:16

extra [1].– 1:165:7

F

facie [2].– 1:164:14.., 1:164:16

facilitating [1].– 1:48:11

fact [25].– 1:5:12.., 1:8:3.., 1:8:4.., 1:16:20.., 1:19:12.., 1:24:24.., 1:36:5.., 1:36:10.., 1:36:15.., 1:46:13.., 1:65:7.., 1:69:12.., 1:71:16.., 1:78:11.., 1:80:3.., 1:89:21.., 1:108:1.., 1:113:21.., 1:119:15.., 1:119:19.., 1:126:14.., 1:137:2.., 1:146:10.., 1:166:22

factors [1].– 1:49:4

facts [3].– 1:122:16.., 1:123:10.., 1:123:11

factually [1].– 1:149:9

failed [1].– 1:164:13

failure [2].– 1:35:3.., 1:68:18

fair [8].– 1:38:3.., 1:45:19.., 1:45:21.., 1:47:11.., 1:55:25.., 1:115:13.., 1:156:20.., 1:170:9

faith [4].– 1:49:10.., 1:49:11.., 1:166:21.., 1:169:10

false [1].– 1:138:4

familiar [5].– 1:94:7.., 1:94:9.., 1:120:19.., 1:121:13.., 1:151:21

family [14].– 1:10:20.., 1:11:1.., 1:13:10.., 1:13:11.., 1:38:23.., 1:54:23.., 1:112:2.., 1:112:11.., 1:112:14.., 1:124:6.., 1:136:14.., 1:136:25.., 1:138:18.., 1:160:7

far [10].– 1:23:12.., 1:40:1.., 1:50:4.., 1:51:7.., 1:51:8.., 1:56:20.., 1:70:4.., 1:70:18.., 1:82:17.., 1:104:24

fast [4].– 1:100:2.., 1:100:3.., 1:100:7.., 1:117:17

fear [1].– 1:12:16

fearful [1]_ - 1:15:8

February [3]_ - 1:159:18_, 1:160:20_, 1:160:23

federal [4]_ - 1:15:17_, 1:16:9_, 1:16:10_, 1:40:3

fee [1]_ - 1:48:25

feeding [1]_ - 1:97:21

fees [1]_ - 1:45:3

felt [3]_ - 1:10:7_, 1:10:8_, 1:149:3

female [1]_ - 1:97:25

few [4]_ - 1:76:22_, 1:88:23 _, 1:89:9_, 1:89:15

Fi [2]_ - 1:24:3_, 1:24:8

fifty [1]_ - 1:167:21

Figuera [90]_ - 1:6:14_, 1:10:12_, 1:11:14_, 1:13:25 _, 1:16:18_, 1:16:24_, 1:17:3 _, 1:17:9_, 1:17:13_, 1:17:19 _, 1:18:3_, 1:19:4_, 1:19:7_, 1:21:22_, 1:21:25_, 1:23:2_, 1:23:5_, 1:25:19_, 1:30:10_, 1:32:17_, 1:32:25_, 1:33:3_, 1:35:7_, 1:36:10_, 1:36:18_, 1:37:3_, 1:38:8_, 1:38:25_, 1:41:12_, 1:41:23_, 1:42:2_, 1:42:9_, 1:43:22_, 1:44:1_, 1:44:5_, 1:44:10_, 1:44:23_, 1:46:16_, 1:48:4_, 1:48:11_, 1:50:1_, 1:50:11_, 1:73:24_, 1:75:24_, 1:78:6_, 1:78:8_, 1:78:10_, 1:78:20_, 1:78:23 _, 1:79:1_, 1:79:3_, 1:79:4_, 1:80:5_, 1:80:11_, 1:86:20_, 1:87:1_, 1:87:15_, 1:87:24_, 1:89:18_, 1:89:24_, 1:90:2_, 1:90:10_, 1:90:14_, 1:90:21 _, 1:91:15_, 1:92:2_, 1:95:21 _, 1:116:17_, 1:116:19_, 1:122:9_, 1:124:11_, 1:125:18_, 1:129:5_, 1:129:16_, 1:130:14_, 1:130:25_, 1:140:12_, 1:140:18_, 1:141:9_, 1:141:10_, 1:147:1_, 1:149:8 _, 1:150:2_, 1:150:25_, 1:153:15_, 1:154:6_, 1:159:10

FIGUERA [1] - 1:95:12

Figuera's [1]_ - 1:47:22

figure [3]_ - 1:8:23_, 1:58:19_, 1:58:23

figured [2]_ - 1:77:13_, 1:77:16

file [2]_ - 1:61:6_, 1:62:10

filed [1]_ - 1:49:8

fill [6]_ - 1:99:24_, 1:107:3_, 1:111:12_, 1:117:11_, 1:118:23_, 1:124:22

filled [4]_ - 1:87:11_, 1:147:9_, 1:147:10_, 1:162:15

filling [1]_ - 1:100:10

final [1]_ - 1:150:3

finally [1]_ - 1:76:8

financial [1]_ - 1:47:18

financially [1]_ - 1:18:4

fine [2]_ - 1:3:24_, 1:91:19

finish [1]_ - 1:53:8

finished [1]_ - 1:153:7

fire [4]_ - 1:65:24_, 1:66:6_, 1:67:5

first [32]_ - 1:4:13_, 1:5:18 _, 1:40:22_, 1:51:25_, 1:85:14_, 1:97:8_, 1:97:10_, 1:103:3_, 1:105:16_, 1:109:1 _, 1:109:3_, 1:109:20_, 1:119:21_, 1:120:4_, 1:123:2 _, 1:123:16_, 1:130:14_, 1:140:10_, 1:148:4_, 1:152:2 _, 1:152:4_, 1:152:17_, 1:153:5_, 1:153:9_, 1:154:6 _, 1:154:11_, 1:154:16_, 1:154:19_, 1:170:8

fit [1]_ - 1:135:16

five [4]_ - 1:12:15_, 1:103:9 _, 1:112:10_, 1:137:9

fix [2]_ - 1:87:13_, 1:88:15

flagging [1]_ - 1:140:4

flags [1]_ - 1:140:4

Florida [23]_ - 1:15:14_, 1:15:15_, 1:27:3_, 1:27:4_, 1:27:15_, 1:27:23_, 1:30:24 _, 1:37:7_, 1:42:7_, 1:56:9_, 1:56:17_, 1:56:19_, 1:57:1_, 1:57:2_, 1:57:10_, 1:57:25_, 1:86:15_, 1:86:17_, 1:105:8 _, 1:120:11_, 1:121:13_, 1:122:5_, 1:133:21

fluent [2]_ - 1:123:20_, 1:125:5

fluently [1]_ - 1:123:21

focus [1]_ - 1:126:20

follow [7]_ - 1:9:8_, 1:62:12_, 1:63:15_, 1:83:3_, 1:85:10_, 1:94:13_, 1:116:10

following [6]_ - 1:34:24_, 1:56:22_, 1:59:25_, 1:60:1_, 1:60:2_, 1:60:11

follows [2]_ - 1:86:6,

1:95:14

food [1]_ - 1:133:7

forbid [1]_ - 1:143:15

forbidden [2]_ - 1:136:3_, 1:136:4

forget [2]_ - 1:29:16_, 1:74:22

forgot [2]_ - 1:87:12_, 1:93:20_, 1:93:21

forgotten [1]_ - 1:88:15

form [11]_ - 1:30:22_, 1:70:1_, 1:82:17_, 1:111:10 _, 1:144:7_, 1:144:24_, 1:145:25_, 1:164:21_, 1:169:15_, 1:169:17_, 1:169:20

former [1]_ - 1:5:23

forming [1]_ - 1:71:17

forms [1]_ - 1:145:7

Fort [1]_ - 1:77:19

forth [3]_ - 1:37:7_, 1:94:25 _, 1:164:15

forward [1]_ - 1:81:10

four [5]_ - 1:38:20_, 1:73:6 _, 1:87:7_, 1:87:11_, 1:88:9

fragment [1]_ - 1:127:5

fraud [2]_ - 1:67:10_, 1:67:12

free [1]_ - 1:43:7

freely [2]_ - 1:125:7_, 1:125:19

Friday [3]_ - 1:107:23_, 1:112:23

friend [1]_ - 1:97:25

friends [1]_ - 1:86:21

front [4]_ - 1:34:3_, 1:48:20 _, 1:131:21_, 1:163:18

full [1]_ - 1:86:12

function [1]_ - 1:21:11

funds [1]_ - 1:91:2

future [1]_ - 1:102:20

## G

gap [1]_ - 1:169:2

gear [1]_ - 1:14:18

general [1]_ - 1:57:5

generally [1]_ - 1:15:4

generated [3]_ - 1:46:3_, 1:149:23_, 1:150:3

generates [1]_ - 1:64:7

generous [1]_ - 1:170:11

gentleman [2]_ - 1:96:22 _, 1:131:13

girls [1]_ - 1:90:25

given [8]_ - 1:7:17_, 1:69:9 _, 1:90:6_, 1:99:8_, 1:123:19 _, 1:134:13_, 1:134:15_, 1:135:23

glad [1]_ - 1:152:16

gloves [18]_ - 1:14:8_, 1:14:11_, 1:15:3_, 1:15:5_, 1:15:11_, 1:105:12_, 1:105:17_, 1:105:20_, 1:105:21_, 1:105:22_, 1:105:24_, 1:106:1_, 1:106:4 _, 1:162:25_, 1:163:1_, 1:163:3_, 1:163:4

God [3]_ - 1:74:9_, 1:85:23 _, 1:95:6

GOLDBERG [197]_ - 1:3:6_, 1:3:18_, 1:5:4_, 1:5:25_, 1:6:4_, 1:6:9_, 1:6:13_, 1:7:22_, 1:8:16_, 1:9:11_, 1:9:14_, 1:9:18_, 1:9:21_, 1:9:23_, 1:9:25_, 1:10:1_, 1:18:14_, 1:19:17_, 1:24:22_, 1:25:1_, 1:25:3_, 1:25:4_, 1:26:8_, 1:28:17_, 1:29:13_, 1:29:22_, 1:29:24 _, 1:30:1_, 1:32:2_, 1:32:3_, 1:36:1_, 1:36:22_, 1:37:12_, 1:40:15_, 1:40:18_, 1:41:1_, 1:42:6_, 1:42:18_, 1:43:20_, 1:43:21_, 1:44:17_, 1:44:18 _, 1:47:17_, 1:48:17_, 1:49:21_, 1:63:10_, 1:70:24 _, 1:71:2_, 1:72:12_, 1:72:13 _, 1:74:11_, 1:74:13_, 1:75:6 _, 1:76:1_, 1:77:4_, 1:77:8_, 1:77:22_, 1:78:3_, 1:78:11_, 1:78:19_, 1:78:25_, 1:79:6_, 1:79:22_, 1:80:3_, 1:80:9_, 1:81:5_, 1:81:17_, 1:81:20_, 1:82:1_, 1:82:5_, 1:82:11_, 1:82:14_, 1:83:20_, 1:83:23 _, 1:84:1_, 1:84:6_, 1:84:9_, 1:84:14_, 1:85:15_, 1:86:2_, 1:86:8_, 1:87:20_, 1:88:3_, 1:88:20_, 1:89:6_, 1:89:10_, 1:89:12_, 1:90:8_, 1:90:9_, 1:92:6_, 1:92:8_, 1:92:24_, 1:93:11_, 1:102:16_, 1:116:5 _, 1:116:14_, 1:116:16_, 1:120:1_, 1:120:3_, 1:120:9 _, 1:121:11_, 1:121:12_, 1:121:18_, 1:121:22_, 1:122:8_, 1:122:19_, 1:123:6 _, 1:123:14_, 1:123:15_, 1:126:17_, 1:126:19_, 1:127:3_, 1:127:6_, 1:127:8

_, 1:127:10_, 1:129:19_, 1:129:21_, 1:130:1_, 1:130:12_, 1:130:13_, 1:130:17_, 1:130:22_, 1:130:24_, 1:132:1_, 1:132:2 _, 1:132:12_, 1:132:18_, 1:132:20_, 1:133:9_, 1:138:12_, 1:139:20_, 1:139:25_, 1:140:2_, 1:140:7 _, 1:140:11_, 1:141:7_, 1:141:8_, 1:142:1_, 1:142:24 _, 1:143:5_, 1:144:13_, 1:144:19_, 1:145:13_, 1:145:18_, 1:145:22_, 1:147:16_, 1:149:17_, 1:149:18_, 1:150:18_, 1:151:5_, 1:151:8_, 1:151:10 _, 1:151:19_, 1:151:20_, 1:152:13_, 1:152:22_, 1:153:12_, 1:153:14_, 1:153:24_, 1:154:5_, 1:154:10_, 1:154:13, 1:154:14_, 1:154:18_, 1:155:13_, 1:155:21_, 1:155:22_, 1:156:3_, 1:156:12_, 1:156:21_, 1:157:9_, 1:157:13_, 1:157:17_, 1:158:2_, 1:158:7 _, 1:158:13_, 1:158:17_, 1:158:19_, 1:158:22_, 1:158:25_, 1:159:6_, 1:159:9 _, 1:159:16_, 1:159:25_, 1:160:1_, 1:160:6_, 1:161:15 _, 1:161:17_, 1:161:24_, 1:162:4_, 1:163:22_, 1:163:25_, 1:164:5_, 1:164:9 _, 1:164:12_, 1:169:24_, 1:170:12

Goldberg [8]_ - 1:9:10_, 1:70:23_, 1:85:14_, 1:86:1_, 1:89:15_, 1:116:13_, 1:116:17_, 1:163:21

government [3]_ - 1:16:9 _, 1:61:4_, 1:61:7

governs [1]_ - 1:71:4

graduate [1]_ - 1:26:19

grandparents [1]_ - 1:120:18

great [1]_ - 1:16:20

green [6]_ - 1:20:23_, 1:21:1_, 1:22:7_, 1:22:25_, 1:23:11

gross [2]_ - 1:44:4_, 1:44:23

group [1]_ - 1:12:7

guess [9]_ - 1:6:15_, 1:24:5_, 1:26:12_, 1:53:17_, 1:66:3_, 1:82:13_, 1:84:4_,

_, 1:158:11_, 1:165:12

guidelines [2]_ - 1:62:11_, 1:62:12

## H

Haitian [1]_ - 1:109:10

half [8]_ - 1:59:11_, 1:60:7 _, 1:77:17_, 1:77:23_, 1:79:25_, 1:81:2_, 1:166:4_, 1:170:7

hand [5]_ - 1:85:20_, 1:85:25_, 1:95:3_, 1:128:8_, 1:138:3

handle [1]_ - 1:81:22

handwriting [1]_ - 1:112:20

handwritten [2]_ - 1:23:23 _, 1:64:3

handwrote [1]_ - 1:17:9

hang [1]_ - 1:113:16

happy [2]_ - 1:55:18_, 1:137:1

harassed [1]_ - 1:4:8

hard [2]_ - 1:82:20_, 1:102:2

harmed [1]_ - 1:47:12

harming [1]_ - 1:47:4

HDMI [4]_ - 1:51:23_, 1:93:22_, 1:93:23_, 1:100:15

head [9]_ - 1:9:24_, 1:14:12_, 1:15:16_, 1:36:9_, 1:39:23_, 1:45:18_, 1:48:2_, 1:72:2_, 1:75:21

Health [7]_ - 1:120:20_, 1:121:3_, 1:121:8_, 1:121:15 _, 1:122:20_, 1:122:21_, 1:123:8

health [85]_ - 1:10:12_, 1:11:13_, 1:11:14_, 1:15:3_, 1:15:10_, 1:18:3_, 1:19:7_, 1:22:14_, 1:23:13_, 1:25:12 _, 1:26:11_, 1:28:10_, 1:28:20_, 1:29:2_, 1:31:2_, 1:31:3_, 1:31:8_, 1:31:20_, 1:32:14_, 1:32:21_, 1:33:4_, 1:33:6_, 1:33:8_, 1:36:12_, 1:37:4_, 1:37:14_, 1:37:15_, 1:38:4_, 1:38:5_, 1:38:8_, 1:38:13_, 1:38:16_, 1:39:16 _, 1:39:25_, 1:41:12_, 1:41:18_, 1:42:9_, 1:42:19_, 1:42:24_, 1:43:14_, 1:44:10 _, 1:44:13_, 1:46:20_, 1:46:24_, 1:47:2_, 1:47:4_, 1:47:12_, 1:48:4_, 1:57:16_,

_, 1:62:16, 1:71:6_, 1:71:14_, 1:71:15_, 1:97:4_, 1:97:8_, 1:97:11_, 1:97:14_, 1:103:11 _, 1:120:5_, 1:120:10_, 1:120:14_, 1:120:23_, 1:121:3_, 1:121:24_, 1:122:12_, 1:122:22_, 1:123:3_, 1:132:22_, 1:133:20_, 1:133:25_, 1:134:15_, 1:134:22_, 1:135:8_, 1:141:13_, 1:141:21_, 1:142:7_, 1:143:13_, 1:145:20_, 1:146:7_, 1:147:2_, 1:147:10 _, 1:147:18_, 1:149:13_, 1:162:24

hear [10]_ - 1:9:23_, 1:84:10_, 1:84:11_, 1:84:17 _, 1:84:18_, 1:85:5_, 1:90:11 _, 1:96:2_, 1:96:12_, 1:164:9

heard [4]_ - 1:4:24_, 1:5:15_, 1:35:15_, 1:66:23

hearing [2]_ - 1:95:8_, 1:152:2

hearsay [5]_ - 1:24:21_, 1:36:20_, 1:42:3_, 1:87:17_, 1:144:9

heartburn [2]_ - 1:161:12 _, 1:161:15

held [2]_ - 1:90:23_, 1:119:16

hello [2]_ - 1:84:16_, 1:85:4

help [18]_ - 1:12:19_, 1:23:25_, 1:28:5_, 1:55:21_, 1:85:23_, 1:90:17_, 1:95:6_, 1:97:20_, 1:111:15_, 1:117:13_, 1:117:14_, 1:119:2_, 1:125:13_, 1:133:4 _, 1:133:7

helped [5]_ - 1:89:21_, 1:98:24_, 1:117:12_, 1:117:14_, 1:124:22

helper [1]_ - 1:48:15

helping [6]_ - 1:90:18_, 1:91:17_, 1:99:24_, 1:117:12 _, 1:117:17_, 1:125:16

helps [1]_ - 1:48:16

HHA [7]_ - 1:22:13_, 1:122:7_, 1:137:2_, 1:140:21 _, 1:141:18_, 1:151:21_, 1:152:6

HHAeXchange [5]_ - 1:20:21_, 1:21:9_, 1:48:10_, 1:63:20_, 1:151:22

hi [1]_ - 1:89:15

highlighted [1]_ - 1:140:8

highly [1]_ - 1:149:3

Hill [1]_ - 1:118:3

hire [12]_ - 1:19:21_, 1:26:13_, 1:27:8_, 1:27:10_, 1:28:9_, 1:28:11_, 1:28:19_, 1:28:21_, 1:37:25_, 1:38:1_, 1:42:21

hired [2]_ - 1:56:5_, 1:127:19

hires [1]_ - 1:134:2

hiring [5]_ - 1:58:13_, 1:58:16_, 1:59:1_, 1:59:2_, 1:97:24

his/her [1]_ - 1:34:17

history [3]_ - 1:29:20_, 1:30:16

HIV/AIDS [1]_ - 1:43:12

hold [4]_ - 1:21:8_, 1:34:8_, 1:40:15_, 1:88:21

holding [1]_ - 1:92:20

holidays [2]_ - 1:13:15_, 1:153:4

home [91]_ - 1:7:13_, 1:7:14_, 1:10:12_, 1:11:13_, 1:11:14_, 1:12:15_, 1:12:16 _, 1:15:3_, 1:15:10_, 1:18:3_, 1:19:7_, 1:21:20_, 1:22:14_, 1:23:13_, 1:25:16_, 1:25:17 _, 1:26:11_, 1:28:9_, 1:28:20 _, 1:29:2_, 1:31:2_, 1:31:3_, 1:31:8_, 1:31:20_, 1:32:14_, 1:32:21_, 1:33:4_, 1:33:6_, 1:33:8_, 1:33:21_, 1:36:12_, 1:37:3_, 1:37:14_, 1:37:15_, 1:38:4_, 1:38:5_, 1:38:8_, 1:38:13_, 1:38:16_, 1:39:6_, 1:39:16_, 1:39:25_, 1:41:12 _, 1:41:18_, 1:42:9_, 1:42:19 _, 1:42:24_, 1:43:14_, 1:44:10_, 1:44:13_, 1:47:4_, 1:47:12_, 1:48:3_, 1:62:16_, 1:71:5_, 1:71:13_, 1:71:15_, 1:97:4_, 1:97:8_, 1:97:11_, 1:97:14_, 1:101:24_, 1:103:11_, 1:120:5_, 1:120:10_, 1:120:13_, 1:120:23_, 1:121:3_, 1:121:24_, 1:122:12_, 1:123:3_, 1:132:21_, 1:133:20_, 1:133:25_, 1:134:15_, 1:134:22_, 1:135:8_, 1:136:18_, 1:138:2 _, 1:138:15_, 1:141:13_, 1:141:21_, 1:142:7_, 1:143:13_, 1:146:7_, 1:147:2 _, 1:147:10_, 1:147:17_,

1:149:13_, 1:162:23

Home [7]_ - 1:120:19_, 1:121:3_, 1:121:8_, 1:121:14 _, 1:122:20_, 1:122:21_, 1:155:14

homemaker [1]_ - 1:57:15

Honor [107]_ - 1:3:6_, 1:3:18_, 1:3:24_, 1:5:4_, 1:5:25_, 1:7:22_, 1:8:17_, 1:8:22_, 1:9:11_, 1:18:11_, 1:25:1_, 1:25:3_, 1:26:1_, 1:29:11_, 1:29:22_, 1:40:22 _, 1:42:11_, 1:43:20_, 1:44:14_, 1:44:17_, 1:47:15 _, 1:48:17_, 1:48:19_, 1:49:21_, 1:52:4_, 1:63:10_, 1:63:18_, 1:70:24_, 1:72:9_, 1:72:12_, 1:74:11_, 1:76:1_, 1:76:10_, 1:77:4_, 1:77:12_, 1:77:22_, 1:78:4_, 1:78:11_, 1:79:6_, 1:79:22_, 1:80:9_, 1:80:16_, 1:81:5_, 1:81:17_, 1:81:22_, 1:82:1_, 1:82:5_, 1:82:11_, 1:82:14_, 1:82:16 _, 1:83:20_, 1:85:15_, 1:85:16_, 1:86:2_, 1:88:20_, 1:89:6_, 1:89:10_, 1:92:24_, 1:93:8_, 1:93:11_, 1:95:10_, 1:102:16_, 1:115:14_, 1:116:4_, 1:116:5_, 1:116:14 _, 1:123:14_, 1:130:12_, 1:130:22_, 1:132:1_, 1:132:10_, 1:139:21_, 1:139:25_, 1:140:4_, 1:140:7 _, 1:140:9_, 1:141:7_, 1:151:5_, 1:151:19_, 1:153:12_, 1:153:16_, 1:153:25_, 1:154:25_, 1:155:16_, 1:155:21_, 1:156:5_, 1:156:15_, 1:157:1 _, 1:157:14_, 1:157:25_, 1:158:17_, 1:158:21_, 1:158:25_, 1:159:6_, 1:159:25_, 1:162:4_, 1:163:22_, 1:164:1_, 1:164:2 _, 1:164:10_, 1:164:18_, 1:164:23_, 1:166:1_, 1:167:22_, 1:168:16_, 1:169:24_, 1:170:12

hooked [1]_ - 1:31:7

hopefully [1]_ - 1:55:14

hospitals [1]_ - 1:14:19

hour [39]_ - 1:13:18_, 1:32:19_, 1:32:23_, 1:33:1_, 1:43:22_, 1:44:2_, 1:44:6_, 1:44:13_, 1:44:23_, 1:44:24 _, 1:45:1_, 1:45:9_, 1:45:12_, 1:45:16_, 1:45:20_, 1:59:10

1:59:12_, 1:71:25_, 1:72:6 _, 1:72:14_, 1:77:16_, 1:77:23_, 1:79:25_, 1:81:2_, 1:107:17_, 1:114:8_, 1:144:1 _, 1:144:2_, 1:160:3_, 1:165:4_, 1:167:8_, 1:167:21 _, 1:167:24_, 1:168:4_, 1:168:10

hours [123]_ - 1:4:10_, 1:12:20_, 1:13:10_, 1:13:11 _, 1:13:12_, 1:13:13_, 1:13:25_, 1:16:24_, 1:21:4_, 1:21:6_, 1:37:22_, 1:41:12_, 1:41:15_, 1:43:2_, 1:46:3_, 1:50:12_, 1:50:13_, 1:50:16 _, 1:51:1_, 1:51:2_, 1:51:15_, 1:52:1_, 1:52:9_, 1:52:12_, 1:52:15_, 1:52:23_, 1:52:25 _, 1:53:1_, 1:53:3_, 1:53:12_, 1:53:14_, 1:53:18_, 1:53:20 _, 1:53:22_, 1:59:13_, 1:64:25_, 1:68:16_, 1:72:3_, 1:72:7_, 1:72:14_, 1:72:16_, 1:72:19_, 1:73:17_, 1:73:18 _, 1:73:20_, 1:73:21_, 1:73:24_, 1:74:1_, 1:74:6_, 1:74:14_, 1:74:16_, 1:74:23 _, 1:74:24_, 1:75:12_, 1:80:18_, 1:80:21_, 1:80:22 _, 1:80:23_, 1:87:7_, 1:87:11 _, 1:88:9_, 1:88:13_, 1:102:6 _, 1:102:7_, 1:104:22_, 1:106:20_, 1:106:24_, 1:107:6_, 1:107:7_, 1:107:11 _, 1:107:12_, 1:107:14_, 1:110:8_, 1:110:9_, 1:110:19 _, 1:110:20_, 1:112:3_, 1:113:2_, 1:113:3_, 1:113:23 _, 1:114:11_, 1:114:15_, 1:115:10_, 1:119:17_, 1:122:6_, 1:135:19_, 1:137:8 _, 1:137:9_, 1:137:19_, 1:137:20_, 1:138:21_, 1:140:13_, 1:140:14_, 1:140:15_, 1:140:16_, 1:140:22_, 1:140:23_, 1:147:7_, 1:147:8_, 1:147:9 _, 1:147:12_, 1:147:17_, 1:148:9_, 1:149:12_, 1:149:14_, 1:149:23_, 1:149:25_, 1:150:3_, 1:152:8 _, 1:152:10_, 1:165:5_, 1:166:3_, 1:166:11_, 1:167:10

house [8]_ - 1:21:13_, 1:83:23_, 1:109:8_, 1:109:10 _, 1:109:17_, 1:109:18_, 1:110:21_, 1:110:23

housekeeping [1]_ - 1:82:16

Humana [19]_ - 1:10:15_, 1:10:22_, 1:11:3_, 1:11:7_, 1:11:11_, 1:12:22_, 1:13:9_, 1:21:20_, 1:24:11_, 1:24:16 _, 1:24:20_, 1:25:9_, 1:32:22 _, 1:54:23_, 1:71:20_, 1:105:22_, 1:147:8_, 1:163:2 _, 1:163:3

hundred [2]_ - 1:65:2_, 1:165:13

hurry [2]_ - 1:87:23_, 1:88:1

hurt [1]_ - 1:161:20

husband [4]_ - 1:78:24_, 1:79:14_, 1:96:22_, 1:105:22

hygiene [1]_ - 1:97:21

hypothetical [1]_ - 1:19:14

hypothetically [1]_ - 1:147:8

---

I

ID [3]_ - 1:22:3_, 1:22:4_, 1:67:15

idea [1]_ - 1:46:8

identified [2]_ - 1:127:19_, 1:164:6

identity [1]_ - 1:118:11

ignore [2]_ - 1:35:24_, 1:75:5

immediate [3]_ - 1:23:22 _, 1:47:22_, 1:47:23

immediately [1]_ - 1:109:13

impeaching [1]_ - 1:139:24

impeachment [17]_ - 1:129:17_, 1:130:7_, 1:131:20_, 1:131:21_, 1:131:23_, 1:132:7_, 1:132:8 _, 1:139:18_, 1:141:1_, 1:153:19_, 1:153:23_, 1:153:24_, 1:154:4_, 1:155:2 _, 1:155:5_, 1:156:7_, 1:156:15

implemented [1]_ - 1:11:4

imposed [2]_ - 1:57:19_, 1:168:5

imposition [1]_ - 1:167:12

improper [11]_ - 1:67:1_, 1:129:17_, 1:130:7_, 1:131:20_, 1:131:21_, 1:131:23_, 1:132:7_, 1:132:8

1:139:18_, 1:156:5_, 1:156:15

inaccurate [1]_ - 1:64:10

inappropriate [1]_ - 1:65:8

Inaudible [1]_ - 1:95:1

include [1]_ - 1:169:23

included [2]_ - 1:21:5_, 1:100:22

income [5]_ - 1:143:16_, 1:144:20_, 1:145:3_, 1:145:4 _, 1:145:19

income-producing [1]_ - 1:143:16

inconsistent [1]_ - 1:131:25

inconvenience [1]_ - 1:89:4

incorrect [3]_ - 1:59:24_, 1:67:6_, 1:68:1

incorrectly [4]_ - 1:24:11_, 1:50:9_, 1:50:10_, 1:50:23

increase [1]_ - 1:20:1

increased [2]_ - 1:19:13_, 1:60:4

incur [1]_ - 1:58:21

independent [71]_ - 1:13:24_, 1:15:13_, 1:15:19 _, 1:15:24_, 1:16:13_, 1:18:3 _, 1:19:4_, 1:19:9_, 1:21:23_, 1:26:13_, 1:27:10_, 1:28:10 _, 1:28:11_, 1:28:19_, 1:28:21_, 1:28:22_, 1:30:13 _, 1:31:16_, 1:31:17_, 1:31:23_, 1:32:8_, 1:32:20_, 1:33:3_, 1:33:9_, 1:35:16_, 1:37:15_, 1:38:9_, 1:44:11_, 1:46:10_, 1:49:4_, 1:57:17_, 1:58:13_, 1:58:16_, 1:58:21 _, 1:58:24_, 1:59:3_, 1:59:21 _, 1:60:2_, 1:60:24_, 1:61:8_, 1:61:16_, 1:61:21_, 1:101:4 _, 1:103:4_, 1:103:25_, 1:116:25_, 1:118:6_, 1:118:17_, 1:123:24_, 1:124:13_, 1:125:22_, 1:125:24_, 1:126:3_, 1:126:4 _, 1:126:10_, 1:126:11_, 1:126:24_, 1:127:14_, 1:127:23_, 1:128:23_, 1:129:1_, 1:129:8_, 1:130:4 _, 1:131:1_, 1:131:9_, 1:131:15_, 1:131:16_, 1:132:14_, 1:132:15_, 1:145:4_, 1:151:12

Independent [1]_ -

1:31:11
independently [1] - 1:144:23
indicate [1] - 1:78:23
indicated [2] - 1:49:2, 1:49:9
indicating [2] - 1:51:2, 1:154:2
indication [2] - 1:79:12, 1:79:15
indirectly [1] - 1:34:16
individual [1] - 1:23:14
infectious [1] - 1:43:7
information [10] - 1:30:13, 1:30:16, 1:30:22, 1:30:23, 1:31:6, 1:48:6, 1:64:1, 1:129:16, 1:134:10
informing [1] - 1:40:1
initial [6] - 1:6:23, 1:99:22, 1:103:14, 1:103:16, 1:125:7, 1:125:18
initialled [1] - 1:124:20
initials [3] - 1:103:19, 1:117:15, 1:125:14
injunction [1] - 1:35:4
inquire [2] - 1:9:10, 1:40:9
inquiry [2] - 1:4:4, 1:4:18
insisted [4] - 1:119:19, 1:126:10, 1:131:13, 1:131:14
insisting [1] - 1:91:22
instance [2] - 1:13:9, 1:27:7
instead [4] - 1:4:10, 1:65:4, 1:81:7, 1:154:11
institution [1] - 1:56:12
instruction [1] - 1:169:20
instructions [7] - 1:82:17, 1:164:20, 1:169:6, 1:169:9, 1:169:16, 1:169:18
insulted [2] - 1:102:10, 1:109:23
insurance [12] - 1:11:16, 1:13:3, 1:19:22, 1:20:3, 1:39:9, 1:41:11, 1:87:11, 1:91:18, 1:129:3, 1:145:11, 1:145:20
integrity [1] - 1:16:16
intended [1] - 1:18:25
intention [1] - 1:113:20

interaction [2] - 1:154:7, 1:154:11
interactions [2] - 1:70:18, 1:70:20
interest [1] - 1:47:13, 1:47:19
interested [3] - 1:32:13, 1:118:10, 1:118:11
interject [1] - 1:74:22
internet [1] - 1:24:4
interpretation [1] - 1:166:22
INTERPRETER [32] - 1:94:1, 1:94:8, 1:94:19, 1:95:10, 1:98:2, 1:98:5, 1:105:15, 1:105:18, 1:107:8, 1:109:9, 1:110:3, 1:119:24, 1:120:2, 1:120:7, 1:121:17, 1:121:20, 1:122:2, 1:126:16, 1:126:25, 1:127:4, 1:127:7, 1:132:10, 1:132:19, 1:133:5, 1:142:22, 1:143:1, 1:144:16, 1:145:15, 1:152:11, 1:156:1, 1:157:11, 1:161:13
interpreter [18] - 1:76:13, 1:76:14, 1:77:17, 1:81:4, 1:81:6, 1:81:19, 1:81:21, 1:82:6, 1:82:8, 1:93:7, 1:93:10, 1:93:12, 1:101:25, 1:102:2, 1:107:8, 1:127:1, 1:129:15, 1:133:5
interpreter's [1] - 1:93:10
interrupt [3] - 1:26:25, 1:62:19, 1:157:12
interview [1] - 1:26:16, 1:38:22, 1:40:5, 1:54:23
interviews [1] - 1:38:18
introduce [6] - 1:38:4, 1:38:10, 1:95:17, 1:135:14, 1:155:19, 1:157:8
introduced [2] - 1:80:7, 1:135:10
investigative [1] - 1:25:8
irrelevant [2] - 1:4:2, 1:8:5
issue [34] - 1:4:13, 1:4:25, 1:5:17, 1:8:1, 1:8:4, 1:11:24, 1:12:4, 1:12:11, 1:15:13, 1:17:1, 1:17:12, 1:24:10, 1:32:12, 1:36:6, 1:44:15, 1:48:25, 1:49:1, 1:49:9, 1:49:10,

1:50:2, 1:50:3, 1:69:4, 1:71:24, 1:78:1, 1:79:9, 1:87:15, 1:89:2, 1:150:15, 1:165:7, 1:166:7, 1:166:15, 1:167:7, 1:168:16, 1:169:20
issued [1] - 1:121:23
issues [12] - 1:8:9, 1:14:4, 1:16:17, 1:16:21, 1:28:3, 1:50:15, 1:60:10, 1:76:5, 1:77:25, 1:78:5, 1:166:16
Izique [11] - 1:36:2, 1:53:20, 1:53:21, 1:70:18, 1:70:19, 1:110:5, 1:110:7, 1:136:18, 1:138:2, 1:138:15, 1:160:7
Iziques [28] - 1:4:24, 1:5:7, 1:6:5, 1:6:8, 1:6:11, 1:36:2, 1:36:12, 1:42:2, 1:45:23, 1:72:15, 1:72:22, 1:73:12, 1:73:25, 1:75:11, 1:75:23, 1:78:16, 1:78:18, 1:79:20, 1:110:2, 1:110:15, 1:137:14, 1:137:24, 1:142:3, 1:152:17, 1:160:12, 1:161:1, 1:161:4, 1:161:5
Izique's [2] - 1:148:12

J

January [2] - 1:12:3, 1:96:17
job [29] - 1:11:14, 1:25:19, 1:26:20, 1:27:11, 1:37:3, 1:37:6, 1:48:8, 1:62:9, 1:97:8, 1:97:10, 1:97:18, 1:97:19, 1:98:6, 1:101:2, 1:101:15, 1:103:12, 1:109:20, 1:118:10, 1:118:21, 1:118:23, 1:125:9, 1:125:10, 1:131:7, 1:131:8, 1:133:20, 1:135:19, 1:139:6, 1:139:8, 1:162:23
jobs [2] - 1:106:12, 1:143:22
join [1] - 1:29:5
joint [2] - 1:16:8, 1:80:13
Joint [10] - 1:30:3, 1:31:10, 1:33:12, 1:52:4, 1:100:13, 1:101:3, 1:103:8, 1:103:12, 1:111:7, 1:112:18
Jones [2] - 1:39:17, 1:147:8

Judge [3] - 1:26:6, 1:83:19, 1:84:3
juggling [1] - 1:91:2
July [17] - 1:50:14, 1:51:16, 1:72:22, 1:86:25, 1:113:4, 1:113:7, 1:113:11, 1:114:25, 1:115:6, 1:116:21, 1:153:7, 1:162:15, 1:162:16, 1:162:18, 1:165:23, 1:166:3
June [2] - 1:126:7, 1:127:9
jurors [3] - 1:8:19, 1:63:1, 1:116:6
Jury [1] - 1:65:6
jury [75] - 1:3:5, 1:4:4, 1:7:23, 1:8:14, 1:9:6, 1:9:7, 1:41:5, 1:48:20, 1:49:6, 1:49:12, 1:49:14, 1:50:4, 1:52:3, 1:62:23, 1:62:25, 1:63:8, 1:63:13, 1:63:14, 1:64:13, 1:65:3, 1:76:21, 1:76:22, 1:76:23, 1:79:3, 1:81:2, 1:81:9, 1:81:15, 1:82:12, 1:82:15, 1:82:17, 1:83:1, 1:83:2, 1:83:11, 1:83:18, 1:83:22, 1:85:7, 1:85:8, 1:85:9, 1:88:22, 1:88:24, 1:89:1, 1:93:14, 1:93:18, 1:94:11, 1:94:12, 1:95:18, 1:115:11, 1:115:15, 1:115:19, 1:115:21, 1:116:3, 1:116:8, 1:116:9, 1:131:22, 1:151:17, 1:163:8, 1:163:13, 1:163:18, 1:164:14, 1:164:20, 1:165:10, 1:166:6, 1:166:15, 1:166:17, 1:166:18, 1:166:20, 1:166:24, 1:167:9, 1:167:23, 1:167:25, 1:169:6, 1:169:7, 1:169:18

K

keep [5] - 1:21:17, 1:39:8, 1:62:13, 1:111:2, 1:149:9
keeping [2] - 1:3:12, 1:92:22
kept [7] - 1:67:7, 1:67:9, 1:91:17, 1:91:22, 1:92:20, 1:119:17, 1:160:16
key [1] - 1:22:17
kind [6] - 1:7:3, 1:16:6,

1:43:2_, 1:82:18_, 1:108:20
_, 1:167:2

kinds [1]_ - 1:108:18

know.. [1]_ - 1:68:21

knowing [1]_ - 1:87:22

knowledge [3]_ - 1:26:17
_, 1:26:18_, 1:58:12

knows [2]_ - 1:13:20_,
1:68:6

## L

lady [21]_ - 1:98:12_,
1:98:24_, 1:99:24_, 1:99:25
_, 1:100:21_, 1:101:6_,
1:109:4_, 1:109:11_,
1:109:12_, 1:109:16_,
1:109:21_, 1:109:22_,
1:117:12_, 1:118:3_,
1:118:24_, 1:124:24_,
1:125:2_, 1:125:4_, 1:125:6
_, 1:125:16

lady's [2]_ - 1:101:9_,
1:105:22

language [1]_ - 1:129:21

last [19]_ - 1:16:17_,
1:17:20_, 1:35:24_, 1:44:21
_, 1:64:24_, 1:75:5_, 1:95:20
_, 1:112:7_, 1:113:4_,
1:113:7_, 1:113:11_,
1:113:13_, 1:113:19_,
1:115:6_, 1:149:24_,
1:156:13_, 1:162:20_,
1:164:25_, 1:166:23

latitude [1]_ - 1:90:6

Lauderdale [1]_ - 1:77:19

law [29]_ - 1:27:6_, 1:27:13
_, 1:28:12_, 1:28:18_,
1:30:24_, 1:35:6_, 1:37:7_,
1:39:21_, 1:41:7_, 1:42:7_,
1:42:10_, 1:42:13_, 1:56:9_,
1:56:17_, 1:56:19_, 1:56:22
_, 1:57:25_, 1:58:9_, 1:58:12
_, 1:59:23_, 1:59:25_, 1:60:1
_, 1:60:2_, 1:62:11_,
1:108:15_, 1:133:14_,
1:133:21_, 1:168:25_,
1:169:3

lawsuit [1]_ - 1:70:11

lawyer [7]_ - 1:50:1_,
1:53:25_, 1:58:18_, 1:63:20
_, 1:64:13_, 1:66:21_,
1:162:22

lawyers [1]_ - 1:64:8

lead [1]_ - 1:40:6

leading [1]_ - 1:72:9

learn [2]_ - 1:39:24_,
1:97:24

least [6]_ - 1:34:15_,
1:34:24_, 1:43:1_, 1:166:9_,
1:170:7

leave [23]_ - 1:5:5_, 1:5:8_,
1:5:19_, 1:5:20_, 1:5:23_,
1:6:1_, 1:6:8_, 1:6:12_,
1:35:12_, 1:36:19_, 1:55:24
_, 1:65:15_, 1:65:25_,
1:75:19_, 1:91:16_, 1:92:15
_, 1:96:11_, 1:96:13_,
1:96:25_, 1:97:2_, 1:140:16
_, 1:160:12_, 1:169:5

leaves [1]_ - 1:4:4

leaving [5]_ - 1:4:16_,
1:4:18_, 1:67:3_, 1:92:18_,
1:108:1

left [17]_ - 1:4:16_, 1:4:21_,
1:4:23_, 1:5:21_, 1:45:23_,
1:65:19_, 1:65:20_, 1:65:22
_, 1:66:1_, 1:66:3_, 1:66:5_,
1:76:24_, 1:77:3_, 1:77:6_,
1:80:2_, 1:152:24_, 1:160:17

legal [4]_ - 1:35:5_, 1:49:3
_, 1:58:6_, 1:58:7

legally [1]_ - 1:96:18

legitimate [2]_ - 1:47:12_,
1:47:19

lent [1]_ - 1:160:8_, 1:160:9

less [3]_ - 1:59:22_,
1:79:25_, 1:165:15

letter [3]_ - 1:24:19_,
1:25:9_, 1:145:21

letting [1]_ - 1:83:25

liabilities [1]_ - 1:18:9

liability [1]_ - 1:49:2

license [6]_ - 1:27:19_,
1:27:22_, 1:30:21_, 1:67:14
_, 1:121:24_, 1:121:25

licensed [5]_ - 1:25:23_,
1:27:15_, 1:27:20_, 1:42:24
_, 1:57:14

lie [2]_ - 1:138:6

life [1]_ - 1:28:7

limine [4]_ - 1:8:11_,
1:49:8_, 1:153:21_, 1:154:2

limit [2]_ - 1:8:6_, 1:170:6

limitation [2]_ - 1:49:7_,
1:147:17

limited [4]_ - 1:48:8_,
1:49:10_, 1:50:17_, 1:50:19

limiting [4]_ - 1:8:10_,
1:20:10_, 1:60:14_, 1:60:20

line [10]_ - 1:19:1_, 1:19:23
_, 1:22:8_, 1:128:3_,
1:129:11_, 1:129:14_,
1:132:3_, 1:134:20_,
1:139:10_, 1:140:6

lines [4]_ - 1:126:21_,
1:127:11_, 1:140:8_,
1:169:14

linked [1]_ - 1:22:6

liquidate [1]_ - 1:165:8

liquidated [11]_ - 1:166:8
_, 1:166:11_, 1:166:19_,
1:167:7_, 1:167:13_,
1:167:18_, 1:168:4_, 1:168:6
_, 1:168:16_, 1:168:17_,
1:169:11

liquidation [2]_ - 1:165:7_,
1:166:16

list [1]_ - 1:54:8_, 1:155:1

listed [1]_ - 1:155:1

listened [1]_ - 1:118:22

live [7]_ - 1:12:21_, 1:15:22
_, 1:30:18_, 1:96:1_, 1:96:3_,
1:122:24_, 1:148:8

live-in [2]_ - 1:12:21_,
1:30:18

lived [2]_ - 1:46:5_, 1:72:4

lives [1]_ - 1:54:5

Liz [14]_ - 1:102:9_, 1:108:6
_, 1:108:8_, 1:109:5_,
1:109:13_, 1:109:16_,
1:109:17_, 1:109:22_,
1:113:15_, 1:115:7_,
1:126:12_, 1:138:5_,
1:146:24_, 1:148:17

load [1]_ - 1:170:8

loan [2]_ - 1:65:5_, 1:160:7

location [1]_ - 1:22:17

locations [1]_ - 1:63:25

locked [1]_ - 1:68:22

log [2]_ - 1:63:25

log-ins [1]_ - 1:63:25

log-outs [1]_ - 1:63:25

logistics [1]_ - 1:83:5

logo [1]_ - 1:105:6

look [8]_ - 1:19:23_,
1:42:11_, 1:50:6_, 1:53:18_,
1:69:6_, 1:107:5_, 1:114:7_,
1:139:7

Look [3]_ - 1:103:19_,
1:104:21_, 1:142:12

looked [3]_ - 1:17:14_,
1:17:15_, 1:69:20

looking [8]_ - 1:93:15_,
1:101:2_, 1:118:10_,
1:118:21_, 1:125:9_,
1:128:18_, 1:137:18_,
1:165:15

looks [2]_ - 1:111:9_,
1:129:2

lose [3]_ - 1:6:18_, 1:67:13

losing [1]_ - 1:46:24

lost [8]_ - 1:18:20_, 1:45:22
_, 1:46:8_, 1:70:6_, 1:72:3_,
1:74:18_, 1:74:24_, 1:91:3

loud [1]_ - 1:94:24

love [1]_ - 1:97:20

LPN [1]_ - 1:31:20

luck [1]_ - 1:169:1

lunch [6]_ - 1:8:23_, 1:83:7
_, 1:83:10_, 1:147:25_,
1:148:4_, 1:148:15

lying [1]_ - 1:138:5

## M

ma'am [30]_ - 1:21:2_,
1:37:24_, 1:76:2_, 1:84:1_,
1:84:9_, 1:84:14_, 1:94:4_,
1:117:8_, 1:120:1_, 1:120:25
_, 1:122:25_, 1:127:24_,
1:128:12_, 1:128:25_,
1:131:19_, 1:132:18_,
1:132:24_, 1:139:1_,
1:141:19_, 1:143:19_,
1:144:3_, 1:145:14_,
1:146:16_, 1:146:19_,
1:146:23_, 1:149:15_,
1:149:17_, 1:156:22_,
1:159:21_, 1:161:9

Madam [1]_ - 1:32:2

main [5]_ - 1:12:14_,
1:37:19_, 1:66:14_, 1:66:25

majority [1]_ - 1:28:8

man's [1]_ - 1:105:22

manage [3]_ - 1:18:8_,
1:42:8_, 1:143:9

manager [9]_ - 1:10:19_,
1:11:16_, 1:55:15_, 1:91:20
_, 1:102:5_, 1:134:7_,
1:146:21_, 1:146:23_,
1:148:5

managers [2]_ - 1:10:15_,
1:129:4

mandate [1]_ - 1:40:19

mandated [4]_ - 1:27:2_,
1:27:12_, 1:28:12_, 1:40:10

mandates [2]_ - 1:28:18_,

1:29:6

manner [1]_- 1:33:23

manually [1]_- 1:23:9

March [1]_- 1:68:22

mark [3]_- 1:31:19_, 1:111:16_, 1:152:10

marked [3]_- 1:31:10_, 1:33:12_, 1:34:10

married [4]_- 1:96:20_, 1:110:14_, 1:110:25

masks [8]_- 1:14:7_, 1:15:3_, 1:15:6_, 1:15:10_, 1:105:12_, 1:105:17_, 1:106:1_, 1:106:4

match [1]_- 1:22:23

math [1]_- 1:114:11

matter [2]_- 1:24:25_, 1:39:14

maximized [2]_- 1:137:17_, 1:138:18

McKinnon [14]_- 1:4:15_, 1:5:24_, 1:8:21_, 1:9:15_, 1:30:2_, 1:48:24_, 1:49:25_, 1:71:3_, 1:113:17_, 1:113:23 _, 1:114:24_, 1:115:5_, 1:116:18_, 1:148:22

MCO [5]_- 1:21:20_, 1:22:18_, 1:39:10_, 1:54:8_, 1:55:15

mean [46]_- 1:6:10_, 1:7:9 _, 1:10:6_, 1:13:2_, 1:17:14_, 1:18:18_, 1:19:20_, 1:19:24 _, 1:24:9_, 1:25:15_, 1:37:18 _, 1:38:19_, 1:45:12_, 1:58:9 _, 1:58:11_, 1:58:17_, 1:61:23_, 1:64:11_, 1:66:15 _, 1:67:16_, 1:68:2_, 1:77:13 _, 1:77:14_, 1:82:7_, 1:91:6_, 1:91:11_, 1:91:24_, 1:99:3_, 1:100:4_, 1:102:22_, 1:108:10_, 1:108:13_, 1:110:13_, 1:110:21_, 1:118:8_, 1:128:1_, 1:128:23 _, 1:128:25_, 1:129:7_, 1:130:3_, 1:136:4_, 1:158:10 _, 1:165:9_, 1:166:7_, 1:167:16

mean.. [2]_- 1:27:4_, 1:36:7

meaning [1]_- 1:39:5

means [2]_- 1:10:7_, 1:22:5

meant [2]_- 1:14:10_, 1:131:1

Medicaid [16]_- 1:12:23_, 1:13:6_, 1:13:12_, 1:16:8_,

1:20:4_, 1:20:5_, 1:24:20_, 1:25:9_, 1:41:11_, 1:44:2_, 1:45:5_, 1:45:9_, 1:67:14_, 1:67:15_, 1:71:20_, 1:147:7

medical [6]_- 1:14:16_, 1:43:2_, 1:43:15_, 1:43:16_, 1:74:21_, 1:97:3

medication [1]_- 1:11:20

meet [7]_- 1:38:20_, 1:38:21_, 1:71:16_, 1:98:8_, 1:98:11_, 1:123:16_, 1:135:23

meeting [2]_- 1:49:11_, 1:54:25

meets [1]_- 1:40:3

Melendez [47]_- 1:3:8_, 1:3:13_, 1:3:25_, 1:4:7_, 1:4:12_, 1:4:15_, 1:4:16_, 1:5:5_, 1:5:6_, 1:6:1_, 1:7:13 _, 1:53:21_, 1:74:2_, 1:74:3_, 1:77:5_, 1:78:8_, 1:79:1_, 1:79:2_, 1:79:8_, 1:79:12_, 1:79:17_, 1:79:21_, 1:79:24 _, 1:80:11_, 1:80:21_, 1:81:24_, 1:84:9_, 1:84:10_, 1:84:11_, 1:84:25_, 1:85:16 _, 1:85:19_, 1:86:9_, 1:86:13 _, 1:86:14_, 1:86:19_, 1:86:24_, 1:87:24_, 1:88:8_, 1:88:21_, 1:89:4_, 1:89:13_, 1:90:11_, 1:92:6_, 1:92:12_, 1:92:25_, 1:93:1

MELENDEZ [1]_- 1:86:4

member [3]_- 1:13:11_, 1:112:2_, 1:112:14

members [8]_- 1:38:23_, 1:76:21_, 1:88:22_, 1:104:21 _, 1:112:11_, 1:115:15_, 1:136:25_, 1:163:8

memorialized [3]_- 1:28:23_, 1:40:19_, 1:146:14

memory [2]_- 1:80:8_, 1:80:10

mention [1]_- 1:129:5

mentioned [9]_- 1:14:7_, 1:27:2_, 1:28:9_, 1:29:1_, 1:32:4_, 1:45:16_, 1:54:12_, 1:124:19_, 1:152:16

message [1]_- 1:104:20

messages [1]_- 1:67:24

met [2]_- 1:90:22_, 1:123:16

Miami [1]_- 1:97:13

mic [1]_- 1:94:19

microphone [2]_- 1:9:20 _, 1:163:24

middle [2]_- 1:55:21_, 1:95:22

might [1]_- 1:88:15

mind [8]_- 1:62:13_, 1:88:14_, 1:89:2_, 1:119:24 _, 1:119:25_, 1:127:4_, 1:145:16_, 1:145:17

mine [2]_- 1:93:17_, 1:112:21

minimum [13]_- 1:164:17 _, 1:164:24_, 1:165:1_, 1:165:15_, 1:166:5_, 1:166:9 _, 1:166:25_, 1:167:19_, 1:168:10_, 1:168:13_, 1:168:18_, 1:169:5

minority [1]_- 1:16:5

minus [2]_- 1:74:6_, 1:74:7

minutes [10]_- 1:62:24_, 1:63:3_, 1:82:7_, 1:100:2_, 1:100:21_, 1:101:7_, 1:103:2 _, 1:103:14_, 1:115:20_, 1:115:23

mirror [1]_- 1:37:6

mischaracterization [1] _- 1:42:10

misled [1]_- 1:49:15

missing [7]_- 1:17:18_, 1:50:7_, 1:50:23_, 1:50:24_, 1:51:15_, 1:51:20_, 1:52:14

mistake [4]_- 1:88:10_, 1:88:11_, 1:131:16_, 1:131:24

mistreated [3]_- 1:108:10 _, 1:108:12_, 1:149:3

mistrial [1]_- 1:49:7

mobile [15]_- 1:21:9_, 1:22:3_, 1:22:4_, 1:22:14_, 1:23:6_, 1:23:16_, 1:23:17_, 1:23:20_, 1:24:2_, 1:63:24_, 1:151:21_, 1:151:22_, 1:152:2_, 1:152:6

mode [1]_- 1:3:13

model [1]_- 1:37:20

modify [2]_- 1:11:6_, 1:134:13

mom [3]_- 1:109:6_, 1:109:15

moment [9]_- 1:118:9_, 1:125:17_, 1:127:16_, 1:128:13_, 1:128:14_, 1:137:1_, 1:137:10_, 1:149:3 _, 1:160:8

moments [2]_- 1:76:22_, 1:88:23

monetary [1]_- 1:78:12

money [20]_- 1:5:24_, 1:14:16_, 1:16:9_, 1:16:10_, 1:19:5_, 1:46:8_, 1:47:9_, 1:50:7_, 1:50:23_, 1:52:13_, 1:53:5_, 1:65:8_, 1:92:20_, 1:92:22_, 1:107:20_, 1:115:12_, 1:143:17_, 1:149:10_, 1:160:8_, 1:165:9

monitor [2]_- 1:42:8_, 1:55:21

monthly [1]_- 1:163:4

months [5]_- 1:12:4_, 1:68:23_, 1:73:6_, 1:92:5_, 1:161:3

moots [1]_- 1:168:13

morning [9]_- 1:7:14_, 1:9:12_, 1:11:20_, 1:77:6_, 1:99:18_, 1:118:14_, 1:162:10_, 1:162:12_, 1:162:13

most [3]_- 1:8:25_, 1:12:7 _, 1:170:11

mother [1]_- 1:137:3

motion [2]_- 1:3:7_, 1:49:8

motions [2]_- 1:49:17_, 1:163:19

move [8]_- 1:35:22_, 1:75:4_, 1:81:6_, 1:81:24_, 1:131:25_, 1:159:14_, 1:159:22_, 1:159:24

moved [3]_- 1:76:13_, 1:89:24_, 1:155:11

moving [1]_- 1:91:20

MR [352]_- 1:3:6_, 1:3:18_, 1:3:24_, 1:4:23_, 1:5:4_, 1:5:25_, 1:6:4_, 1:6:9_, 1:6:13_, 1:7:2_, 1:7:9_, 1:7:19_, 1:7:22_, 1:7:25_, 1:8:9_, 1:8:13_, 1:8:16_, 1:8:18_, 1:8:22_, 1:9:3_, 1:9:11_, 1:9:14_, 1:9:18_, 1:9:21_, 1:9:23_, 1:9:25_, 1:10:1_, 1:18:11_, 1:18:14_, 1:19:14_, 1:19:17_, 1:24:21_, 1:24:22_, 1:25:1_, 1:25:3_, 1:25:4_, 1:26:1_, 1:26:3_, 1:26:6_, 1:26:8_, 1:28:14_, 1:28:17_, 1:29:10_, 1:29:13_, 1:29:22_, 1:29:24_, 1:30:1_, 1:32:2_, 1:32:3_, 1:35:22_, 1:36:1_, 1:36:20_, 1:36:22_, 1:37:9_, 1:37:12_, 1:40:14_, 1:40:15_, 1:40:17_, 1:40:18_, 1:40:22_, 1:41:1_, 1:42:3_, 1:42:6_, 1:42:10_, 1:42:18_,

1:43:20₋, 1:43:21₋, 1:44:14₋, 1:44:17₋, 1:44:18₋, 1:47:15₋, 1:47:17₋, 1:48:17₋, 1:48:19₋, 1:48:23₋, 1:49:20₋, 1:49:21₋, 1:49:24₋, 1:51:23₋, 1:51:24₋, 1:52:4₋, 1:52:7₋, 1:52:8₋, 1:52:22₋, 1:63:9₋, 1:63:10₋, 1:63:18₋, 1:63:19₋, 1:70:22₋, 1:70:24₋, 1:71:2₋, 1:72:9₋, 1:72:12₋, 1:72:13₋, 1:74:11₋, 1:74:13₋, 1:75:2₋, 1:75:4₋, 1:75:6₋, 1:76:1₋, 1:76:3₋, 1:76:5₋, 1:76:7₋, 1:76:13₋, 1:76:17₋, 1:76:20₋, 1:77:1₋, 1:77:4₋, 1:77:8₋, 1:77:13₋, 1:77:22₋, 1:78:3₋, 1:78:11₋, 1:78:19₋, 1:78:25₋, 1:79:6₋, 1:79:22₋, 1:80:3₋, 1:80:9₋, 1:80:15₋, 1:81:5₋, 1:81:16₋, 1:81:17₋, 1:81:19₋, 1:81:20₋, 1:81:21₋, 1:82:1₋, 1:82:5₋, 1:82:7₋, 1:82:11₋, 1:82:14₋, 1:82:16₋, 1:82:21₋, 1:82:24₋, 1:83:19₋, 1:83:20₋, 1:83:23₋, 1:84:1₋, 1:84:3₋, 1:84:6₋, 1:84:7₋, 1:84:9₋, 1:84:14₋, 1:85:15₋, 1:86:2₋, 1:86:8₋, 1:87:17₋, 1:87:20₋, 1:88:3₋, 1:88:5₋, 1:88:7₋, 1:88:17₋, 1:88:20₋, 1:89:6₋, 1:89:10₋, 1:89:12₋, 1:90:5₋, 1:90:8₋, 1:90:9₋, 1:92:6₋, 1:92:8₋, 1:92:11₋, 1:92:21₋, 1:92:24₋, 1:93:3₋, 1:93:8₋, 1:93:11₋, 1:93:15₋, 1:93:18₋, 1:93:23₋, 1:94:17₋, 1:95:16₋, 1:98:4₋, 1:98:7₋, 1:100:11, 1:100:12₋, 1:100:15₋, 1:100:16₋, 1:102:14₋, 1:102:16₋, 1:103:1₋, 1:105:17₋, 1:106:2₋, 1:107:9₋, 1:107:13₋, 1:110:1, 1:110:4₋, 1:115:14₋, 1:116:4₋, 1:116:5₋, 1:116:14₋, 1:116:16₋, 1:120:1₋, 1:120:3₋, 1:120:9₋, 1:121:11₋, 1:121:12₋, 1:121:18₋, 1:121:22₋, 1:121:25₋, 1:122:8₋, 1:122:16₋, 1:122:19₋, 1:123:4₋, 1:123:6₋, 1:123:10₋, 1:123:14₋, 1:123:15₋, 1:126:17₋, 1:126:19₋, 1:127:3₋, 1:127:6₋, 1:127:8₋, 1:127:10₋, 1:129:17₋, 1:129:19₋, 1:129:21₋, 1:130:1₋, 1:130:6₋, 1:130:12₋, 1:130:13₋, 1:130:16₋, 1:130:17₋, 1:130:19₋, 1:130:22₋, 1:130:24₋, 1:131:20₋,

1:132:1₋, 1:132:2₋, 1:132:7₋, 1:132:12₋, 1:132:18₋, 1:132:20₋, 1:133:9₋, 1:138:12₋, 1:139:18₋, 1:139:20₋, 1:139:25₋, 1:140:1₋, 1:140:2₋, 1:140:7₋, 1:140:11₋, 1:141:7₋, 1:141:8₋, 1:142:1₋, 1:142:24₋, 1:143:5₋, 1:144:9₋, 1:144:13₋, 1:144:17₋, 1:144:19₋, 1:145:13₋, 1:145:18₋, 1:145:22₋, 1:147:16₋, 1:149:17₋, 1:149:18₋, 1:150:16₋, 1:150:18₋, 1:151:5₋, 1:151:8₋, 1:151:10₋, 1:151:19₋, 1:151:20₋, 1:152:13₋, 1:152:20₋, 1:152:22₋, 1:153:12₋, 1:153:14₋, 1:153:16₋, 1:153:20₋, 1:153:24₋, 1:154:1₋, 1:154:5₋, 1:154:10₋, 1:154:13, 1:154:14₋, 1:154:18₋, 1:154:25₋, 1:155:3₋, 1:155:8₋, 1:155:12₋, 1:155:13₋, 1:155:16₋, 1:155:21₋, 1:155:22₋, 1:156:3₋, 1:156:5₋, 1:156:7₋, 1:156:12₋, 1:156:15₋, 1:156:20₋, 1:156:21₋, 1:157:1₋, 1:157:9₋, 1:157:13₋, 1:157:14₋, 1:157:17₋, 1:157:25₋, 1:158:2₋, 1:158:5₋, 1:158:7₋, 1:158:13₋, 1:158:17₋, 1:158:19₋, 1:158:21₋, 1:158:22₋, 1:158:25₋, 1:159:2₋, 1:159:6₋, 1:159:9₋, 1:159:16₋, 1:159:25₋, 1:160:1₋, 1:160:4₋, 1:160:6₋, 1:161:15₋, 1:161:17₋, 1:161:21₋, 1:161:24₋, 1:162:1₋, 1:162:4₋, 1:162:8₋, 1:163:7₋, 1:163:16₋, 1:163:22₋, 1:163:25₋, 1:164:5₋, 1:164:9₋, 1:164:12₋, 1:164:18₋, 1:164:23₋, 1:165:6₋, 1:165:19₋, 1:165:22₋, 1:165:25₋, 1:166:7₋, 1:166:14₋, 1:167:2₋, 1:167:6₋, 1:167:22₋, 1:168:8₋, 1:168:15₋, 1:168:24₋, 1:169:2₋, 1:169:8₋, 1:169:15₋, 1:169:24₋, 1:170:6₋, 1:170:9₋, 1:170:11₋, 1:170:12

multiply [1]₋ - 1:46:6
mute [1]₋ - 1:84:13

# N

name [23]₋ - 1:29:19₋, 1:33:16₋, 1:84:8₋, 1:86:12₋, 1:88:8₋, 1:95:19₋, 1:95:20₋, 1:95:22₋, 1:98:21₋, 1:98:24₋, 1:99:23₋, 1:101:9₋, 1:105:6₋, 1:116:17₋, 1:117:19₋, 1:117:23₋, 1:118:3₋, 1:118:4₋, 1:124:24₋, 1:124:25₋, 1:125:15₋, 1:155:24₋, 1:159:12
names [1]₋ - 1:98:11
Nannies [36]₋ - 1:35:17₋, 1:36:3₋, 1:36:10₋, 1:45:24₋, 1:75:1₋, 1:90:15₋, 1:90:16₋, 1:152:15₋, 1:152:16₋, 1:152:17₋, 1:152:25₋, 1:153:6₋, 1:153:7₋, 1:153:10₋, 1:154:7₋, 1:154:9₋, 1:154:12₋, 1:154:17₋, 1:154:19₋, 1:155:14₋, 1:157:7₋, 1:157:18₋, 1:158:3₋, 1:158:8₋, 1:158:14₋, 1:158:19₋, 1:159:15₋, 1:159:17₋, 1:159:19₋, 1:160:2₋, 1:160:10₋, 1:160:13₋, 1:160:19₋, 1:160:22₋, 1:161:25
necessary [3]₋ - 1:14:23₋, 1:46:20₋, 1:164:14
need [21]₋ - 1:3:7₋, 1:6:19₋, 1:13:11₋, 1:13:13₋, 1:24:8₋, 1:27:18₋, 1:37:16₋, 1:40:4₋, 1:47:6₋, 1:69:6₋, 1:69:25₋, 1:75:9₋, 1:84:24₋, 1:87:8₋, 1:139:1₋, 1:139:6₋, 1:145:21₋, 1:162:23₋, 1:165:10₋, 1:169:13₋, 1:169:19
needed [3]₋ - 1:14:17₋, 1:106:3₋, 1:106:13
needing [3]₋ - 1:28:5₋, 1:106:6₋, 1:162:25
needs [8]₋ - 1:10:16₋, 1:31:17₋, 1:43:5₋, 1:54:24₋, 1:55:8₋, 1:134:7₋, 1:134:8₋, 1:166:25
negate [1]₋ - 1:11:6
negotiated [2]₋ - 1:32:25₋, 1:43:23
negotiation [2]₋ - 1:32:13₋, 1:144:5
neighbors [1]₋ - 1:86:21
net [4]₋ - 1:45:20₋, 1:45:24₋, 1:72:1₋, 1:74:18
never [48]₋ - 1:4:15₋, 1:25:11₋, 1:39:5₋, 1:51:13₋,

1:63:21₋, 1:64:25₋, 1:65:4₋, 1:66:9₋, 1:90:24₋, 1:104:13₋, 1:105:25₋, 1:110:25₋, 1:113:20₋, 1:124:2₋, 1:124:7₋, 1:124:8₋, 1:124:9₋, 1:124:10₋, 1:124:18₋, 1:127:4₋, 1:133:10₋, 1:133:12₋, 1:142:20₋, 1:142:22₋, 1:142:23₋, 1:142:24₋, 1:143:2₋, 1:143:3₋, 1:143:11₋, 1:143:14₋, 1:143:17₋, 1:144:6₋, 1:151:11₋, 1:151:24₋, 1:152:5₋, 1:152:7₋, 1:152:18₋, 1:152:19₋, 1:155:4₋, 1:160:14₋, 1:163:3
new [2]₋ - 1:21:10₋, 1:135:24
next [15]₋ - 1:7:8₋, 1:76:11₋, 1:85:12₋, 1:89:21₋, 1:89:25₋, 1:94:2₋, 1:94:5₋, 1:94:15₋, 1:94:17₋, 1:110:2₋, 1:110:5₋, 1:123:18₋, 1:139:5₋, 1:158:1₋, 1:161:23
nice [1]₋ - 1:83:10
night [1]₋ - 1:107:12
nights [1]₋ - 1:30:18
nobody [1]₋ - 1:122:9
noncompete [1]₋ - 1:47:2
none [2]₋ - 1:63:25₋, 1:116:5
nonresponsive [1]₋ - 1:35:23
normal [3]₋ - 1:17:24₋, 1:32:20₋, 1:146:11
normalize [1]₋ - 1:68:25
normally [3]₋ - 1:45:2₋, 1:46:1₋, 1:107:10
note [1]₋ - 1:64:22
notes [2]₋ - 1:64:19₋, 1:64:23
nothing [16]₋ - 1:8:18₋, 1:69:15₋, 1:69:17₋, 1:70:22₋, 1:83:12₋, 1:85:23₋, 1:91:19₋, 1:92:21₋, 1:95:6₋, 1:115:14₋, 1:115:22₋, 1:148:20₋, 1:163:7₋, 1:163:14₋, 1:164:22₋, 1:170:12
noticed [1]₋ - 1:102:4
notification [2]₋ - 1:39:3
notifies [1]₋ - 1:40:20
notify [1]₋ - 1:34:21
nowhere [1]₋ - 1:129:5
number [15]₋ - 1:22:3₋,

1:22:4_, 1:29:20_, 1:60:14_, 1:60:20_, 1:67:15_, 1:73:23 _, 1:73:24_, 1:75:9_, 1:76:8_, 1:80:11_, 1:110:19_, 1:114:1 _, 1:135:19

Number [3]_ - 1:30:3_, 1:31:11_, 1:80:12

numbers [1]_ - 1:70:16

numerous [2]_ - 1:147:1_, 1:160:25

nurse [71]_ - 1:12:18_, 1:25:23_, 1:26:10_, 1:26:11 _, 1:26:12_, 1:26:23_, 1:27:1 _, 1:27:12_, 1:27:15_, 1:30:24_, 1:31:20_, 1:33:8_, 1:33:17_, 1:33:22_, 1:34:14 _, 1:34:16_, 1:34:20_, 1:34:21_, 1:34:23_, 1:34:25 _, 1:35:3_, 1:35:16_, 1:36:4_, 1:36:6_, 1:37:13_, 1:37:19_, 1:37:22_, 1:38:3_, 1:41:15_, 1:42:8_, 1:42:16_, 1:43:1_, 1:43:13_, 1:44:9_, 1:49:1_, 1:56:9_, 1:56:10_, 1:56:25_, 1:57:7_, 1:57:12_, 1:57:14_, 1:57:15_, 1:57:16_, 1:57:18 _, 1:57:19_, 1:57:21_, 1:58:1 _, 1:59:16_, 1:60:11_, 1:62:14_, 1:62:15_, 1:71:4_, 1:90:4_, 1:103:8_, 1:117:1_, 1:118:18_, 1:119:21_, 1:120:5_, 1:120:15_, 1:120:19_, 1:123:2_, 1:123:25_, 1:124:12_, 1:124:14_, 1:125:23_, 1:128:24_, 1:129:8_, 1:130:4 _, 1:144:8_, 1:160:25

nursing [2]_ - 1:57:15_, 1:103:11

nutrition [1]_ - 1:133:8

O

oath [1]_ - 1:128:8

object [9]_ - 1:7:6_, 1:8:1_, 1:8:5_, 1:8:11_, 1:26:4_, 1:72:9_, 1:75:2_, 1:153:16_, 1:159:2

objected [1]_ - 1:49:13

objection [35]_ - 1:7:6_, 1:7:7_, 1:7:8_, 1:18:11_, 1:19:14_, 1:24:21_, 1:26:1_, 1:26:5_, 1:28:14_, 1:29:10_, 1:35:22_, 1:36:20_, 1:37:9_, 1:40:14_, 1:40:16_, 1:40:22 _, 1:42:10_, 1:44:14_, 1:47:15_, 1:49:18_, 1:87:17 _, 1:90:5_, 1:93:11_,

1:121:25_, 1:122:16_, 1:123:10_, 1:130:6_, 1:130:8 _, 1:130:16_, 1:132:9_, 1:139:18_, 1:144:17_, 1:157:1_, 1:157:3

objections [2]_ - 1:130:20 _, 1:159:4

obligation [1]_ - 1:57:19

observed [1]_ - 1:78:8

obtain [1]_ - 1:35:4

obtained [3]_ - 1:122:6_, 1:148:11

obtains [1]_ - 1:134:10

occur [4]_ - 1:78:14_, 1:79:8_, 1:138:16_, 1:138:22

occurred [5]_ - 1:78:12_, 1:78:16_, 1:80:4_, 1:80:11_, 1:86:25

October [4]_ - 1:72:25_, 1:120:23_, 1:121:1_, 1:121:8

offer [3]_ - 1:17:3_, 1:31:24 _, 1:59:17

offered [2]_ - 1:16:13_, 1:39:3

offering [2]_ - 1:106:23_, 1:106:25

office [24]_ - 1:14:4_, 1:14:24_, 1:15:25_, 1:16:25 _, 1:23:9_, 1:29:2_, 1:48:5_, 1:48:8_, 1:48:16_, 1:50:8_, 1:55:12_, 1:55:17_, 1:68:5_, 1:99:12_, 1:118:8_, 1:126:8 _, 1:147:22_, 1:148:6_, 1:148:9_, 1:148:14_, 1:148:15_, 1:149:4_, 1:150:8

OFFICER [1]_ - 1:9:2

offset [1]_ - 1:20:16

old [1]_ - 1:156:4

older [1]_ - 1:97:19

once [10]_ - 1:23:9_, 1:39:3 _, 1:64:5_, 1:75:19_, 1:77:14 _, 1:119:9_, 1:125:21_, 1:147:24_, 1:148:2_, 1:148:15

one [73]_ - 1:4:2_, 1:4:4_, 1:4:8_, 1:4:10_, 1:12:24_, 1:23:20_, 1:34:8_, 1:34:15_, 1:34:24_, 1:36:13_, 1:43:20 _, 1:46:13_, 1:49:3_, 1:50:19 _, 1:53:2_, 1:53:22_, 1:55:23 _, 1:55:24_, 1:63:1_, 1:64:16 _, 1:64:18_, 1:64:20_, 1:65:20_, 1:66:3_, 1:66:13_, 1:66:25_, 1:68:8_, 1:68:9_, 1:68:10_, 1:68:13_, 1:69:23 _, 1:70:1_, 1:70:2_, 1:70:5_,

1:70:10_, 1:71:4_, 1:75:12_, 1:75:13_, 1:78:1_, 1:79:19_, 1:80:11_, 1:80:17_, 1:90:22 _, 1:90:25_, 1:91:21_, 1:99:21_, 1:101:6_, 1:109:21 _, 1:110:12_, 1:110:18_, 1:110:22_, 1:110:24_, 1:111:21_, 1:112:24_, 1:115:9_, 1:119:16_, 1:121:5 _, 1:124:22_, 1:129:2_, 1:129:10_, 1:134:16_, 1:135:2_, 1:136:6_, 1:148:19 _, 1:148:25_, 1:152:11_, 1:155:8_, 1:164:2_, 1:168:4

one-form [1]_ - 1:70:1

one-year [1]_ - 1:36:13

ones [7]_ - 1:27:6_, 1:28:5 _, 1:37:25_, 1:48:5_, 1:106:22_, 1:108:21

open [3]_ - 1:91:12_, 1:92:1_, 1:92:3

opened [1]_ - 1:72:11

opening [1]_ - 1:170:5

operate [1]_ - 1:62:16

operating [2]_ - 1:44:8_, 1:166:21

operation [2]_ - 1:18:23_, 1:56:14

operational [2]_ - 1:19:13 _, 1:44:11

opinion [2]_ - 1:166:19_, 1:167:9

opportunities [6]_ - 1:136:12_, 1:143:16_, 1:143:22_, 1:143:23_, 1:151:12_, 1:151:13

opportunity [5]_ - 1:23:22 _, 1:123:22_, 1:129:16_, 1:135:23_, 1:142:18

opposed [3]_ - 1:19:5_, 1:136:15_, 1:168:23

option [3]_ - 1:7:17_, 1:103:24

Order [1]_ - 1:3:1

order [7]_ - 1:45:8_, 1:45:10_, 1:65:5_, 1:85:13_, 1:148:7_, 1:153:21_, 1:154:1

originally [3]_ - 1:3:9_, 1:69:3_, 1:117:19

otherwise [4]_ - 1:34:17_, 1:34:19_, 1:80:22_, 1:106:25

outs [1]_ - 1:63:25

outside [3]_ - 1:72:10_, 1:75:2_, 1:89:1

overrule [2]_ - 1:7:7_,

1:49:19

overruled [16]_ - 1:18:13_, 1:19:15_, 1:26:2_, 1:28:16_, 1:40:25_, 1:42:4_, 1:44:16_, 1:44:17_, 1:47:16_, 1:72:11 _, 1:87:18_, 1:122:1_, 1:122:17_, 1:144:10_, 1:144:18

overseeing [1]_ - 1:48:3

overtime [26]_ - 1:53:4_, 1:53:6_, 1:53:12_, 1:53:14_, 1:56:24_, 1:56:25_, 1:57:3_, 1:59:7_, 1:59:10_, 1:59:13_, 1:60:7_, 1:113:25_, 1:114:4 _, 1:114:8_, 1:114:11_, 1:149:7_, 1:149:8_, 1:153:3 _, 1:153:4_, 1:158:9_, 1:158:15_, 1:158:16_, 1:158:23_, 1:161:25_, 1:165:5_, 1:166:4

owe [2]_ - 1:113:24_, 1:143:18

owed [6]_ - 1:61:6_, 1:114:4_, 1:114:14_, 1:114:15_, 1:115:13_, 1:149:5

owes [2]_ - 1:113:25_, 1:149:19

own [26]_ - 1:5:21_, 1:15:10_, 1:34:17_, 1:38:1_, 1:55:3_, 1:104:11_, 1:104:24 _, 1:105:1_, 1:114:19_, 1:128:18_, 1:129:2_, 1:129:6 _, 1:129:10_, 1:131:2_, 1:131:4_, 1:131:5_, 1:131:11 _, 1:131:12_, 1:146:4_, 1:151:17_, 1:161:6_, 1:161:8 _, 1:162:22

owner [8]_ - 1:16:5_, 1:18:22_, 1:19:12_, 1:20:18 _, 1:89:23_, 1:102:8_, 1:109:23_, 1:146:25

owning [1]_ - 1:44:8

P

p.m [11]_ - 1:22:11_, 1:83:14_, 1:85:8_, 1:88:24_, 1:94:11_, 1:115:21_, 1:115:24_, 1:116:8_, 1:163:13_, 1:170:14

package [1]_ - 1:43:18

packet [1]_ - 1:69:21

page [17]_ - 1:33:4_, 1:52:7_, 1:69:23_, 1:70:1_, 1:100:22_, 1:112:20_, 1:126:20_, 1:127:11_,

1:129:11.., 1:129:14..,
1:132:3.., 1:134:20..,
1:139:10.., 1:139:17..,
1:140:6.., 1:140:8.., 1:156:13

pages [4].. - 1:103:3..,
1:103:5.., 1:103:9.., 1:140:5

paid [62].. - 1:44:2..,
1:44:24.., 1:50:8.., 1:50:9..,
1:50:10.., 1:50:11.., 1:50:13
.., 1:50:22.., 1:51:2.., 1:51:7..,
1:51:10.., 1:52:9.., 1:52:24..,
1:60:9.., 1:61:16.., 1:64:25..,
1:66:2.., 1:74:1.., 1:92:19..,
1:102:5.., 1:102:7.., 1:103:24
.., 1:107:17.., 1:108:2..,
1:108:3.., 1:110:11..,
1:110:16.., 1:110:18..,
1:110:20.., 1:110:22..,
1:110:23.., 1:112:11..,
1:113:1.., 1:113:2.., 1:113:5
.., 1:113:13.., 1:113:22..,
1:114:23.., 1:124:10..,
1:126:12.., 1:128:19..,
1:128:20.., 1:138:9.., 1:145:4
.., 1:145:5.., 1:149:6..,
1:149:12.., 1:149:14..,
1:149:21.., 1:150:1..,
1:150:11.., 1:150:20..,
1:151:2.., 1:158:4.., 1:158:23
.., 1:161:25.., 1:164:25..,
1:165:14.., 1:165:18..,
1:166:8.., 1:166:9

Palm [6].. - 1:108:7..,
1:147:22.., 1:148:8.., 1:148:9
.., 1:148:13.., 1:148:19

pandemic [2].. - 1:105:19
.., 1:106:5

paper [4].. - 1:31:25..,
1:48:9.., 1:107:20.., 1:140:1

papers [1].. - 1:87:12

parents [2].. - 1:5:20..,
1:137:1

part [15].. - 1:13:21..,
1:14:14.., 1:16:7.., 1:26:11..,
1:43:4.., 1:43:12.., 1:43:17..,
1:44:21.., 1:103:13..,
1:112:18.., 1:139:20..,
1:164:9.., 1:169:19..,
1:169:21.., 1:170:8

participate [1].. - 1:34:18

particular [6].. - 1:4:6..,
1:10:14.., 1:22:21.., 1:32:17
.., 1:41:18.., 1:134:1

parties [1].. - 1:169:9

pass [2].. - 1:18:17

past [2].. - 1:41:21..,
1:130:10

patently [2].. - 1:49:8..,
1:49:14

pathogens [1].. - 1:43:11

patient [44].. - 1:22:21..,
1:23:14.., 1:26:14.., 1:31:7..,
1:54:24.., 1:91:1.., 1:104:22
.., 1:105:21.., 1:106:24..,
1:107:16.., 1:110:12..,
1:111:22.., 1:112:1.., 1:133:2
.., 1:133:18.., 1:134:1..,
1:134:6.., 1:134:8.., 1:134:18
.., 1:135:2.., 1:135:3..,
1:135:9.., 1:135:11..,
1:135:12.., 1:135:14..,
1:135:15.., 1:135:17..,
1:135:18.., 1:135:20..,
1:135:21.., 1:135:24..,
1:136:1.., 1:136:3.., 1:139:6
.., 1:140:15.., 1:141:14..,
1:141:18.., 1:142:11..,
1:142:18

patient's [1].. - 1:112:2

patient/client [1].. -
1:141:11

patients [15].. - 1:25:13..,
1:98:15.., 1:104:12..,
1:104:14.., 1:104:18..,
1:105:13.., 1:110:11..,
1:110:17.., 1:134:24..,
1:136:5.., 1:136:11..,
1:136:24.., 1:143:10..,
1:147:1.., 1:161:6

patients/clients [1].. -
1:147:2

pattern [1].. - 1:169:19

patterns [1].. - 1:169:21

pay [79].. - 1:13:1.., 1:13:2
.., 1:13:6.., 1:13:12.., 1:13:13
.., 1:13:14.., 1:14:1.., 1:20:6..,
1:31:21.., 1:32:15.., 1:32:20
.., 1:41:18.., 1:41:24..,
1:51:16.., 1:53:16.., 1:56:25
.., 1:59:7.., 1:59:20.., 1:59:21
.., 1:59:22.., 1:60:3.., 1:60:5..,
1:60:6.., 1:60:7.., 1:60:9..,
1:60:22.., 1:60:23.., 1:61:3..,
1:61:4.., 1:61:6.., 1:61:8..,
1:61:20.., 1:61:21.., 1:61:25
.., 1:62:3.., 1:62:5.., 1:62:7..,
1:65:5.., 1:102:11.., 1:104:9
.., 1:107:23.., 1:108:16..,
1:112:5.., 1:112:7.., 1:112:24
.., 1:113:10.., 1:113:16..,
1:113:20.., 1:114:3..,
1:115:10.., 1:137:8..,
1:137:10.., 1:144:14..,
1:144:20.., 1:144:23..,
1:145:2.., 1:145:10..,

1:145:12.., 1:148:7..,
1:149:24.., 1:150:3..,
1:150:23.., 1:153:3.., 1:158:3
.., 1:158:4.., 1:158:9..,
1:158:15.., 1:158:16..,
1:158:20.., 1:159:15..,
1:160:9.., 1:161:7.., 1:166:23
.., 1:168:18

paycheck [5].. - 1:16:17..,
1:17:20.., 1:113:19..,
1:158:19.., 1:159:12

paying [17].. - 1:13:3..,
1:13:4.., 1:32:23.., 1:59:10..,
1:59:11.., 1:59:12.., 1:59:13
.., 1:61:9.., 1:61:17.., 1:65:10
.., 1:65:13.., 1:108:6..,
1:160:2.., 1:160:9.., 1:160:10
.., 1:160:11.., 1:168:18

payment [15].. - 1:107:22
.., 1:107:24.., 1:107:25..,
1:108:8.., 1:112:8.., 1:113:22
.., 1:115:2.., 1:124:10..,
1:137:8.., 1:137:15..,
1:137:19.., 1:138:11..,
1:138:23.., 1:148:24

payments [4].. - 1:114:18
.., 1:114:20.., 1:137:11..,
1:137:12

payroll [11].. - 1:17:24..,
1:48:3.., 1:48:12.., 1:50:12..,
1:50:13.., 1:62:6.., 1:64:7..,
1:80:4.., 1:108:14.., 1:138:3
.., 1:138:13

pays [4].. - 1:62:1.., 1:62:4
.., 1:62:10.., 1:62:18

PDO [1].. - 1:39:12

pee [2].. - 1:135:3

pee-pee [1].. - 1:135:3

Pembroke [1].. - 1:135:18

penalize [1].. - 1:56:23

pending [1].. - 1:157:16

people [6].. - 1:23:21..,
1:48:8.., 1:61:3.., 1:61:8..,
1:97:19.., 1:97:20.., 1:117:13
.., 1:117:18.., 1:118:9..,
1:125:17.., 1:144:4

per [6].. - 1:44:13.., 1:44:23
.., 1:45:1.., 1:45:20.., 1:61:20
.., 1:62:11

percent [3].. - 1:61:25..,
1:62:1.., 1:65:2

Perez [4].. - 1:101:10..,
1:103:2.., 1:118:1.., 1:124:23

perfectly [3].. - 1:118:15..,
1:120:21.., 1:123:21

perform [6].. - 1:10:20..,

1:32:10.., 1:34:18.., 1:54:1..,
1:71:18.., 1:143:12

performance [3].. -
1:142:20.., 1:142:24..,
1:143:1

perhaps [4].. - 1:26:12..,
1:59:18.., 1:66:25.., 1:68:3

period [6].. - 1:15:2..,
1:34:15.., 1:34:24.., 1:36:13
.., 1:146:1.., 1:158:20

permanently [1].. -
1:96:14

permitted [1].. - 1:35:6

person [15].. - 1:48:14..,
1:55:21.., 1:98:9.., 1:107:1..,
1:109:12.., 1:118:7..,
1:118:11.., 1:119:3.., 1:133:2
.., 1:133:17.., 1:135:11..,
1:136:15.., 1:137:5.., 1:139:8
.., 1:142:14

personal [1].. - 1:97:21

personally [1].. - 1:68:3

personnel [1].. - 1:109:14

philosophy [1].. - 1:19:25

phone [9].. - 1:11:22..,
1:21:17.., 1:24:2.., 1:91:25..,
1:109:16.., 1:109:17..,
1:124:4.., 1:124:7.., 1:143:3

phonetic [1].. - 1:118:3

phonetic) [1].. - 1:95:23

physical [2].. - 1:43:6

pick [4].. - 1:108:11..,
1:148:1.., 1:151:5.., 1:151:8

picking [1].. - 1:113:18

picture [2].. - 1:59:15..,
1:84:20

piece [1].. - 1:94:21

pieces [1].. - 1:139:21

Pines [1].. - 1:135:18

pink [1].. - 1:140:4

place [2].. - 1:12:2.., 1:56:1

places [1].. - 1:55:23

plaintiff [16].. - 1:5:6..,
1:5:9.., 1:5:10.., 1:5:13..,
1:8:18.., 1:63:9.., 1:76:25..,
1:77:11.., 1:79:13.., 1:83:19
.., 1:94:18.., 1:163:16..,
1:164:13.., 1:164:15..,
1:170:4

Plaintiff's [1].. - 1:17:6

plaintiff's [4].. - 1:3:22..,
1:5:16.., 1:6:24.., 1:164:4

plan [15].. - 1:10:17..,
1:10:23.., 1:10:25.., 1:11:4..,

1:11:7_, 1:11:10_, 1:11:11_, 1:22:23_, 1:26:12_, 1:54:22_, 1:55:3_, 1:55:4_, 1:60:11_, 1:134:16

plug [1]_ - 1:93:24

plus [4]_ - 1:46:6_, 1:73:5_, 1:149:7

pocket [1]_ - 1:13:4

point [8]_ - 1:39:7_, 1:64:13_, 1:68:3_, 1:82:20_, 1:82:25_, 1:91:3_, 1:91:22_, 1:163:20

policies [9]_ - 1:33:17_, 1:33:22_, 1:40:13_, 1:40:23_, 1:117:1_, 1:118:18_, 1:123:25_, 1:124:14_, 1:125:23

policy [6]_ - 1:103:8_, 1:119:13_, 1:146:12_, 1:146:14_, 1:146:17_, 1:146:18

Pollock [16]_ - 1:3:20_, 1:6:23_, 1:9:16_, 1:10:2_, 1:15:13_, 1:16:20_, 1:17:5_, 1:18:2_, 1:20:20_, 1:62:19_, 1:63:17_, 1:88:4_, 1:88:8_, 1:92:7_, 1:94:15_, 1:130:21

POLLOCK [155]_ - 1:3:24_, 1:4:23_, 1:7:2_, 1:7:9_, 1:7:19_, 1:7:25_, 1:8:9_, 1:8:13_, 1:8:18_, 1:8:22_, 1:9:3_, 1:18:11_, 1:19:14_, 1:24:21_, 1:26:1_, 1:26:3_, 1:26:6_, 1:28:14_, 1:29:10_, 1:35:22_, 1:36:20_, 1:37:9_, 1:40:14_, 1:40:17_, 1:40:22_, 1:42:3_, 1:42:10_, 1:44:14_, 1:47:15_, 1:48:19_, 1:48:23_, 1:49:20_, 1:49:24_, 1:51:23_, 1:51:24_, 1:52:4_, 1:52:7_, 1:52:8_, 1:52:22_, 1:63:9_, 1:63:18_, 1:63:19_, 1:70:22_, 1:72:9_, 1:75:2_, 1:75:4_, 1:76:3_, 1:76:5_, 1:76:7_, 1:76:13_, 1:76:17_, 1:76:20_, 1:77:1_, 1:77:13_, 1:80:15_, 1:81:16_, 1:81:19_, 1:81:21_, 1:82:7_, 1:82:16_, 1:82:21_, 1:82:24_, 1:83:19_, 1:84:3_, 1:84:7_, 1:87:17_, 1:88:5_, 1:88:7_, 1:88:17_, 1:90:5_, 1:92:11_, 1:92:21_, 1:93:3_, 1:93:8_, 1:93:15_, 1:93:18_, 1:93:23_, 1:94:17_, 1:95:16_, 1:98:4_, 1:98:7_, 1:100:11, 1:100:12_, 1:100:15_, 1:100:16_, 1:102:14_, 1:103:1_, 1:105:17_, 1:106:2

1:107:9_, 1:107:13_, 1:110:1, 1:110:4_, 1:115:14_, 1:116:4_, 1:121:25_, 1:122:16_, 1:123:4_, 1:123:10_, 1:129:17_, 1:130:6_, 1:130:16_, 1:130:19_, 1:131:20_, 1:132:7_, 1:139:18_, 1:140:1_, 1:144:9_, 1:144:17_, 1:150:16_, 1:152:20_, 1:153:16_, 1:153:20_, 1:154:1_, 1:154:25_, 1:155:3_, 1:155:8_, 1:155:12_, 1:155:16_, 1:156:5_, 1:156:7_, 1:156:15_, 1:156:20_, 1:157:1_, 1:157:14_, 1:157:25_, 1:158:5_, 1:158:21_, 1:159:2_, 1:160:4_, 1:161:21_, 1:162:1_, 1:162:8_, 1:163:7_, 1:163:16_, 1:164:18_, 1:164:23_, 1:165:6_, 1:165:19_, 1:165:22_, 1:165:25_, 1:166:7_, 1:166:14_, 1:167:2_, 1:167:6_, 1:167:22_, 1:168:8_, 1:168:15_, 1:168:24_, 1:169:2_, 1:169:8_, 1:169:15_, 1:170:6_, 1:170:9_, 1:170:11

Pollock's [2]_ - 1:19:3_, 1:126:14

population [3]_ - 1:27:25_, 1:28:8_, 1:45:6

portion [1]_ - 1:20:24

portions [2]_ - 1:7:2_, 1:21:1

position [8]_ - 1:5:7_, 1:30:14_, 1:46:16_, 1:47:18_, 1:49:3_, 1:70:6_, 1:78:15_, 1:139:2

potential [6]_ - 1:31:3_, 1:31:7_, 1:31:8_, 1:32:14_, 1:38:4_, 1:38:13

power [1]_ - 1:38:2

powerful [1]_ - 1:79:8

practical [1]_ - 1:57:14

practice [2]_ - 1:15:21_, 1:47:2

practices [2]_ - 1:24:23_, 1:25:10

preference [1]_ - 1:30:19

preferences [1]_ - 1:31:2

premature [1]_ - 1:49:19

premiums [2]_ - 1:59:20_, 1:60:6

prepared [1]_ - 1:70:15

presence [12]_ - 1:9:9_, 1:62:23_, 1:63:16_, 1:83:4_, 1:83:9_, 1:84:3_, 1:85:11_, 1:89:1_, 1:94:14_, 1:115:18_, 1:116:11_, 1:163:11

present [9]_ - 1:3:3_, 1:33:12_, 1:63:6_, 1:70:20_, 1:70:21_, 1:83:16_, 1:85:16_, 1:116:1_, 1:153:15

presentation [1]_ - 1:72:18

presented [3]_ - 1:5:13_, 1:119:16_, 1:151:25

preserving [1]_ - 1:166:16

pretrial [1]_ - 1:18:12

pretty [1]_ - 1:45:21

prevent [2]_ - 1:143:15_, 1:143:21

preventing [2]_ - 1:47:4_, 1:153:21

previously [1]_ - 1:71:24

price [1]_ - 1:43:23

prima [2]_ - 1:164:14_, 1:164:15

primary [1]_ - 1:27:25

private [7]_ - 1:13:1_, 1:13:2_, 1:13:6_, 1:13:25_, 1:41:18_, 1:41:23_, 1:42:16

problem [15]_ - 1:4:5_, 1:70:17_, 1:90:19_, 1:90:20_, 1:107:7_, 1:108:5_, 1:137:12_, 1:137:15_, 1:137:17_, 1:137:23_, 1:138:10_, 1:138:13_, 1:150:23_, 1:159:19_, 1:159:20

problems [8]_ - 1:39:24_, 1:81:9_, 1:90:25_, 1:107:24_, 1:108:14_, 1:112:8_, 1:138:3_, 1:147:23

procedure [1]_ - 1:103:8

procedures [10]_ - 1:33:18_, 1:33:22_, 1:40:13_, 1:40:23_, 1:117:1_, 1:118:18_, 1:119:13_, 1:123:25_, 1:124:15_, 1:125:24

proceed [1]_ - 1:86:1

proceedings [1]_ - 1:70:14

process [4]_ - 1:16:3_, 1:19:3_, 1:26:16_, 1:26:21

processing [1]_ - 1:59:1

produce [1]_ - 1:155:6

produced [5]_ - 1:153:17_, 1:153:20_, 1:153:22_, 1:154:2_, 1:155:4

producing [1]_ - 1:143:16

professional [1]_ - 1:33:23

proffer [1]_ - 1:88:25_, 1:89:9

PROFFER [2]_ - 1:89:11, 1:92:10

profit [10]_ - 1:14:15_, 1:18:16_, 1:19:20_, 1:44:4_, 1:44:23_, 1:45:9_, 1:45:10_, 1:45:20_, 1:45:25_, 1:46:6

profits [4]_ - 1:45:22_, 1:70:6_, 1:72:1_, 1:74:18

program [7]_ - 1:16:9_, 1:16:10_, 1:21:9_, 1:21:25_, 1:22:1_, 1:22:5_, 1:39:12

progressing [1]_ - 1:3:12

projected [1]_ - 1:44:20

promising [1]_ - 1:106:11

proper [1]_ - 1:48:10

properly [1]_ - 1:139:24

propose [2]_ - 1:169:8_, 1:169:9

proposed [2]_ - 1:135:9_, 1:139:11

proposing [1]_ - 1:7:16

protagonist [2]_ - 1:127:15_, 1:127:25

protect [2]_ - 1:47:6_, 1:47:10

protected [1]_ - 1:14:22

protection [1]_ - 1:16:12

protections [1]_ - 1:15:17

prove [2]_ - 1:8:3

provide [13]_ - 1:15:2_, 1:15:5_, 1:31:4_, 1:105:13_, 1:106:7_, 1:106:9_, 1:134:23_, 1:142:18_, 1:143:10_, 1:147:8_, 1:147:19_, 1:169:3

provided [17]_ - 1:13:21_, 1:14:7_, 1:14:11_, 1:22:2_, 1:22:21_, 1:23:13_, 1:37:3_, 1:44:5_, 1:44:13_, 1:73:25_, 1:104:14_, 1:104:18_, 1:111:10_, 1:119:6_, 1:133:10_, 1:143:12_, 1:163:1

provider [4]_ - 1:25:17_, 1:39:10_, 1:39:11_, 1:67:15

providing [7]_ - 1:25:12_, 1:39:17_, 1:45:5_, 1:71:15_,

1:105:22_, 1:141:22_,
1:146:8

provision [3]_ - 1:33:24_,
1:35:7_, 1:66:16

published [1]_ - 1:52:3

pull [1]_ - 1:55:25

punch [1]_ - 1:152:12

punctual [1]_ - 1:112:9

pure [1]_ - 1:169:2

purpose [5]_ - 1:33:19_,
1:33:20_, 1:49:12_, 1:154:3
_, 1:159:3

purposes [2]_ - 1:129:22
_, 1:153:24

put [32]_ - 1:4:9_, 1:10:17_,
1:18:6_, 1:20:20_, 1:31:18_,
1:31:22_, 1:46:19_, 1:48:6_,
1:50:12_, 1:70:16_, 1:74:23
_, 1:80:20_, 1:80:23_, 1:81:7
_, 1:85:25_, 1:87:7_, 1:87:12
_, 1:91:8_, 1:99:23_,
1:109:16_, 1:110:7_,
1:110:10_, 1:112:3_,
1:117:15_, 1:125:14_,
1:125:15_, 1:127:2_, 1:149:1
_, 1:152:10_, 1:163:17

puts [1]_ - 1:16:9

putting [1]_ - 1:6:19

### Q

qualifications [1]_ -
1:28:14

qualified [4]_ - 1:93:10_,
1:133:16_, 1:133:17_,
1:133:24

qualify [1]_ - 1:46:1

quantity [1]_ - 1:45:7

quarter [1]_ - 1:165:8

QUESTION [4]_ -
1:126:23_, 1:127:13_,
1:128:4_, 1:128:23

questioning [1]_ - 1:48:24

questions [11]_ - 1:48:17
_, 1:53:7_, 1:76:1_, 1:76:9_,
1:88:3_, 1:88:18_, 1:89:9_,
1:89:16_, 1:122:10_, 1:129:7
_, 1:162:5

quick [2]_ - 1:48:19_,
1:94:22

quickly [1]_ - 1:108:2

quit [3]_ - 1:142:10_,
1:142:11

quote [1]_ - 1:60:13

### R

raise [2]_ - 1:85:20_,
1:95:3

raised [6]_ - 1:11:24_,
1:15:13_, 1:18:2_, 1:24:10_,
1:47:3_, 1:128:8

Ramirez [45]_ - 1:23:22_,
1:48:15_, 1:68:4_, 1:69:25_,
1:70:4_, 1:77:6_, 1:77:7_,
1:77:10_, 1:78:21_, 1:78:22
_, 1:81:7_, 1:81:13_, 1:81:18
_, 1:82:10_, 1:99:19_,
1:102:6_, 1:104:20_,
1:105:20_, 1:109:19_,
1:109:22_, 1:111:11_,
1:111:25_, 1:119:4_,
1:123:17_, 1:123:20_,
1:124:3_, 1:124:7_, 1:124:16
_, 1:124:21_, 1:125:1_,
1:134:8_, 1:134:10_,
1:134:16_, 1:135:1_,
1:136:13_, 1:136:17_,
1:136:22_, 1:138:1_, 1:138:3
_, 1:138:14_, 1:146:24_,
1:148:5_, 1:152:5_, 1:164:2

ran [2]_ - 1:12:3_, 1:100:21

Randy [3]_ - 1:84:4_,
1:89:15_, 1:116:17

rate [3]_ - 1:32:20_,
1:158:3_, 1:166:12

rather [7]_ - 1:3:21_,
1:3:22_, 1:70:15_, 1:82:8_,
1:82:19_, 1:89:3_, 1:152:7

Raton [5]_ - 1:98:6_,
1:109:4_, 1:123:19_, 1:148:6
_, 1:148:19

re [1]_ - 1:19:19

reach [1]_ - 1:81:17

read [35]_ - 1:3:8_, 1:3:21_,
1:6:25_, 1:7:5_, 1:7:7_,
1:34:7_, 1:46:13_, 1:57:9_,
1:69:11_, 1:71:3_, 1:71:10_,
1:81:10_, 1:89:3_, 1:98:13_,
1:99:5_, 1:99:9_, 1:99:10_,
1:101:20_, 1:101:22_,
1:116:24_, 1:117:5_, 1:117:7
_, 1:117:8_, 1:117:9_,
1:117:10_, 1:118:16_,
1:124:18_, 1:127:22_,
1:129:21_, 1:130:11_,
1:135:6_, 1:140:10_, 1:141:5
_, 1:155:10_, 1:155:20

reading [2]_ - 1:139:23_,
1:155:9

readjust [1]_ - 1:19:16

reads [3]_ - 1:7:5_, 1:8:10

_, 1:70:2

ready [4]_ - 1:76:14_,
1:81:23_, 1:82:3_, 1:116:12

real [2]_ - 1:48:19_, 1:88:5

really [17]_ - 1:28:5_,
1:37:20_, 1:37:23_, 1:45:10
_, 1:68:4_, 1:69:4_, 1:70:15_,
1:70:16_, 1:92:12_, 1:94:22
_, 1:112:13_, 1:112:14_,
1:118:10_, 1:118:20_,
1:124:3_, 1:137:17_,
1:165:14

reason [12]_ - 1:37:19_,
1:46:18_, 1:46:23_, 1:65:18
_, 1:66:11_, 1:66:13_,
1:66:21_, 1:67:1_, 1:92:18_,
1:109:18_, 1:150:12

reasonable [2]_ - 1:170:2

reasons [5]_ - 1:53:2_,
1:66:14_, 1:66:20_, 1:66:25
_, 1:67:3

rebuttal [1]_ - 1:170:8

receive [7]_ - 1:41:9_,
1:62:14_, 1:144:7_, 1:145:7
_, 1:145:9_, 1:145:24_,
1:145:25

received [9]_ - 1:23:9_,
1:24:19_, 1:25:8_, 1:122:11
_, 1:133:13_, 1:133:20_,
1:142:20_, 1:142:23_,
1:142:24

receiving [1]_ - 1:122:14

recess [13]_ - 1:62:21_,
1:63:3_, 1:63:4_, 1:82:13_,
1:83:7_, 1:83:13_, 1:83:14_,
1:115:16_, 1:115:23_,
1:115:24_, 1:163:9_,
1:163:15_, 1:170:13

recited [1]_ - 1:130:15

recognize [14]_ - 1:30:5_,
1:31:12_, 1:33:14_, 1:112:17
_, 1:155:23_, 1:156:10_,
1:156:13_, 1:156:17_,
1:156:18_, 1:156:22_,
1:157:2_, 1:157:4_, 1:159:10
_, 1:159:13

recognized [1]_ - 1:156:8

recognizes [3]_ -
1:155:18_, 1:156:16_,
1:159:5

recollection [7]_ - 1:77:24
_, 1:118:6_, 1:151:18_,
1:155:7_, 1:155:8_, 1:155:19
_, 1:157:5

recommendation [1]_ -
1:89:24

recommended [1]_ -
1:89:23

reconcile [1]_ - 1:18:8

reconciled [1]_ - 1:17:15

record [16]_ - 1:3:3_, 1:3:9_,
1:34:7_, 1:46:13_, 1:63:6_,
1:71:4_, 1:71:10_, 1:83:16_,
1:86:9_, 1:86:12_, 1:112:16
_, 1:116:1_, 1:127:22_,
1:129:22_, 1:135:6_,
1:162:14

recorded [2]_ - 1:29:14_,
1:139:16

recording [1]_ - 1:124:5

records [8]_ - 1:5:13_,
1:5:17_, 1:23:25_, 1:27:18_,
1:48:3_, 1:48:9_, 1:75:13_,
1:112:18

recover [1]_ - 1:168:1

recovery [1]_ - 1:168:4

recross [3]_ - 1:76:3_,
1:76:4_, 1:76:11

RECROSS [1]_ - 1:71:1

RECROSS-
EXAMINATION [1]_ -
1:71:1

redirect [5]_ - 1:48:18_,
1:88:19_, 1:88:20_, 1:92:24
_, 1:162:6

REDIRECT [2]_ - 1:49:23
_, 1:162:7

refer [8]_ - 1:22:2_, 1:26:22
_, 1:26:23_, 1:39:5_, 1:56:2_,
1:57:22_, 1:66:9_, 1:67:22

reference [1]_ - 1:164:20

referenced [5]_ - 1:11:9_,
1:15:14_, 1:23:2_, 1:40:23_,
1:140:5

referencing [1]_ - 1:40:23

referred [3]_ - 1:57:16_,
1:71:9_, 1:121:16

referring [3]_ - 1:127:8_,
1:140:7_, 1:161:8

refers [1]_ - 1:56:10

reflect [1]_ - 1:64:9

reflected [2]_ - 1:50:16_,
1:80:22

reflects [2]_ - 1:123:8_,
1:158:22

refresh [4]_ - 1:77:24_,
1:155:6_, 1:155:19_, 1:157:5

refreshing [1]_ - 1:155:8

refused [1]_ - 1:17:21

regarding [8]_ - 1:30:21_, 1:69:11_, 1:87:1_, 1:87:9_, 1:89:2_, 1:102:6_, 1:126:8_, 1:146:18

regardless [4]_ - 1:15:24 _, 1:57:18_, 1:124:18_, 1:128:1

regards [2]_ - 1:5:14_, 1:49:1

registered [2]_ - 1:31:20_, 1:57:14

registries [3]_ - 1:35:16_, 1:71:5_, 1:161:1

registry [66]_ - 1:12:18_, 1:25:23_, 1:26:10_, 1:26:11 _, 1:26:12_, 1:26:23_, 1:27:1 _, 1:27:12_, 1:27:16_, 1:29:5 _, 1:30:24_, 1:33:8_, 1:33:17 _, 1:33:22_, 1:34:14_, 1:34:16_, 1:34:20_, 1:34:21 _, 1:34:24_, 1:34:25_, 1:35:3 _, 1:36:4_, 1:36:6_, 1:37:13_, 1:37:20_, 1:37:22_, 1:38:3_, 1:41:15_, 1:42:8_, 1:42:17_, 1:43:1_, 1:43:13_, 1:44:9_, 1:49:1_, 1:56:10_, 1:56:25_, 1:57:7_, 1:57:12_, 1:57:17_, 1:57:18_, 1:57:19_, 1:57:21 _, 1:58:1_, 1:59:17_, 1:60:11 _, 1:62:14_, 1:62:15_, 1:90:4 _, 1:100:18_, 1:101:1_, 1:103:8_, 1:117:1_, 1:119:22 _, 1:120:5_, 1:120:15_, 1:120:19_, 1:123:2_, 1:124:1 _, 1:124:13_, 1:125:22_, 1:125:23_, 1:128:24_, 1:129:8_, 1:130:4_, 1:144:8

registry's [2]_ - 1:118:18_, 1:124:14

regular [1]_ - 1:114:22

reject [1]_ - 1:136:2

rejected [1]_ - 1:136:6

relate [5]_ - 1:16:6_, 1:48:24_, 1:66:15_, 1:164:24 _, 1:166:7

related [4]_ - 1:8:4_, 1:12:11_, 1:25:12_, 1:69:20

relates [5]_ - 1:4:13_, 1:8:2_, 1:75:23_, 1:164:24_, 1:167:6

relation [1]_ - 1:37:14

relationship [54]_ - 1:13:6 _, 1:19:8_, 1:28:22_, 1:36:3_, 1:38:6_, 1:38:17_, 1:38:24_, 1:39:15_, 1:39:18_, 1:39:19 _, 1:41:24_, 1:44:1_, 1:68:5_, 1:71:14_, 1:71:17_, 1:72:21

_, 1:86:20_, 1:89:18_, 1:89:19_, 1:90:2_, 1:90:3_, 1:90:13_, 1:90:14_, 1:92:4_, 1:116:20_, 1:119:21_, 1:120:4_, 1:120:15_, 1:120:22_, 1:121:2_, 1:121:7 _, 1:123:1_, 1:123:2_, 1:123:23_, 1:124:2_, 1:124:12_, 1:125:25_, 1:126:3_, 1:141:10_, 1:141:13_, 1:141:17_, 1:141:20_, 1:142:2_, 1:142:5 _, 1:142:8_, 1:144:21_, 1:146:1_, 1:150:20_, 1:151:1 _, 1:152:23_, 1:153:10_, 1:160:19_, 1:160:22_, 1:161:3

relatively [2]_ - 1:94:9_, 1:100:2

relevance [7]_ - 1:6:23_, 1:8:1_, 1:47:15_, 1:78:9_, 1:144:17_, 1:158:5_, 1:160:4

relevant [3]_ - 1:4:14_, 1:4:18_, 1:7:1

rely [1]_ - 1:151:17

remedies [2]_ - 1:35:6_, 1:168:3

remember [27]_ - 1:17:7_, 1:20:23_, 1:62:21_, 1:71:7_, 1:83:7_, 1:90:16_, 1:90:17_, 1:98:25_, 1:99:11_, 1:99:14 _, 1:115:16_, 1:117:25_, 1:118:15_, 1:121:4_, 1:121:6 _, 1:121:7_, 1:124:24_, 1:124:25_, 1:126:9_, 1:135:7 _, 1:139:15_, 1:141:5_, 1:154:20_, 1:154:21_, 1:162:21_, 1:163:9

reminded [1]_ - 1:87:13

reminders [1]_ - 1:11:20

remove [13]_ - 1:40:4_, 1:66:9_, 1:67:21_, 1:67:22_, 1:136:14_, 1:136:17_, 1:136:22_, 1:137:17_, 1:138:1_, 1:138:14_, 1:138:15_, 1:138:19_, 1:142:13

rendered [1]_ - 1:4:2

renew [2]_ - 1:3:7_, 1:27:19

renewed [3]_ - 1:27:22_, 1:43:5_, 1:56:21

rent [2]_ - 1:65:5_, 1:160:9

repeat [12]_ - 1:25:6_, 1:28:24_, 1:44:20_, 1:61:14 _, 1:65:11_, 1:107:9_, 1:117:3_, 1:120:25_,

1:131:16_, 1:145:16_, 1:157:13_, 1:160:21

repeatedly [2]_ - 1:150:19 _, 1:160:17

repeating [1]_ - 1:119:24

repetition [1]_ - 1:107:8

rephrase [4]_ - 1:18:20_, 1:28:25_, 1:143:19_, 1:147:6

replacement [1]_ - 1:107:4

reported [1]_ - 1:66:18

reporter [1]_ - 1:95:8

Reporter [1]_ - 1:32:2

represent [2]_ - 1:88:8_, 1:116:18

represented [1]_ - 1:21:1 _, 1:126:13

represents [1]_ - 1:21:3

request [3]_ - 1:12:17_, 1:49:6_, 1:98:6

requested [3]_ - 1:42:1_, 1:42:5_, 1:111:17

requests [1]_ - 1:12:10

require [3]_ - 1:24:3_, 1:71:10_, 1:107:11

required [4]_ - 1:30:23_, 1:105:10_, 1:111:21_, 1:133:14

requirement [5]_ - 1:42:23_, 1:105:8_, 1:105:9 _, 1:105:10_, 1:125:10

requirements [4]_ - 1:31:2_, 1:40:3_, 1:41:6_, 1:41:9

requires [1]_ - 1:97:22

resolve [2]_ - 1:23:25_, 1:150:15

resolved [1]_ - 1:148:2

respect [2]_ - 1:7:25_, 1:165:6

responded [1]_ - 1:139:10

response [6]_ - 1:87:16_, 1:128:5_, 1:129:12_, 1:130:2 _, 1:130:5_, 1:134:21

responsibilities [1]_ - 1:37:7

responsibility [1]_ - 1:61:6

rest [2]_ - 1:49:17_, 1:159:23

rested [2]_ - 1:49:16_, 1:164:8

restraining [1]_ - 1:35:4

restricted [1]_ - 1:151:11

restrictive [3]_ - 1:46:10_, 1:46:14_, 1:46:18

rests [5]_ - 1:163:16

result [4]_ - 1:4:16_, 1:17:12_, 1:89:24_, 1:91:8_, 1:115:2

resume [1]_ - 1:8:21

retaliation [1]_ - 1:137:7

return [1]_ - 1:96:16

returned [1]_ - 1:96:15

revenue [4]_ - 1:14:15_, 1:26:15_, 1:37:20_, 1:50:23

review [1]_ - 1:34:9

Rights [1]_ - 1:15:15

rise [1]_ - 1:9:2

room [4]_ - 1:62:24_, 1:76:22_, 1:88:23_, 1:115:19

roster [3]_ - 1:39:4_, 1:66:9_, 1:67:22

Rowland [7]_ - 1:4:24_, 1:5:20_, 1:6:5_, 1:6:10_, 1:35:15_, 1:35:18_, 1:70:19

rude [4]_ - 1:102:9_, 1:108:9_, 1:108:12_, 1:113:15

Rule [5]_ - 1:3:7_, 1:49:17 _, 1:154:3_, 1:163:19_, 1:164:3

rule [1]_ - 1:7:6

ruled [1]_ - 1:79:10

ruling [4]_ - 1:8:12_, 1:44:14_, 1:79:17_, 1:79:23

run [3]_ - 1:15:23_, 1:18:9_, 1:61:2

running [4]_ - 1:45:17_, 1:57:6_, 1:57:7_, 1:60:17

**S**

safe [1]_ - 1:44:4

safety [1]_ - 1:66:16

sake [1]_ - 1:73:18

salaries [1]_ - 1:20:12

salary [10]_ - 1:31:23_, 1:32:5_, 1:32:9_, 1:32:13_, 1:32:16_, 1:33:5_, 1:54:12_, 1:144:1_, 1:144:2_, 1:144:5

sat [1]_ - 1:70:16

Saturdays [1]_ - 1:13:15

save [3]_ - 1:26:14_, 1:26:15_, 1:37:20

saw [4]– - 1:44:5..., 1:50:11
..., 1:125:11..., 1:142:22

schedule [12]– - 1:3:10...,
1:20:22..., 1:21:12..., 1:22:8...,
1:64:6..., 1:106:16..., 1:129:10
..., 1:131:3..., 1:131:4...,
1:131:7..., 1:131:11...,
1:131:12

scheduled [3]– - 1:23:2...,
1:107:15..., 1:110:8

school [12]– - 1:42:25...,
1:43:2..., 1:43:15..., 1:43:16...,
1:58:9..., 1:74:21..., 1:97:13...,
1:122:5..., 1:122:6..., 1:122:11
..., 1:132:23..., 1:133:22

schooling [1]– - 1:97:11

scope [3]– - 1:72:10...,
1:75:2..., 1:134:23

screen [13]– - 1:20:20...,
1:20:24..., 1:21:1..., 1:21:5...,
1:22:7..., 1:22:25..., 1:23:11...,
1:23:15..., 1:85:17..., 1:93:16
..., 1:93:21..., 1:127:1...,
1:127:2

scrubs [4]– - 1:104:24...,
1:105:1..., 1:105:4..., 1:146:4

seated [4]– - 1:3:2...,
1:63:5..., 1:83:15..., 1:115:25

second [8]– - 1:4:18...,
1:6:17..., 1:6:22..., 1:26:25...,
1:43:20..., 1:95:20..., 1:129:12
..., 1:152:11

secondly [1]– - 1:78:6

section [8]– - 1:15:14...,
1:23:1..., 1:34:3..., 1:34:10...,
1:34:12..., 1:34:13..., 1:35:3...,
1:57:10

SECURITY [1]– - 1:9:2

security [1]– - 1:29:20

see [38]– - 1:20:21...,
1:21:19..., 1:21:21..., 1:23:12
..., 1:29:9..., 1:29:11..., 1:29:15
..., 1:29:16..., 1:59:2..., 1:59:4...,
1:59:5..., 1:59:9..., 1:59:12...,
1:59:14..., 1:59:15..., 1:59:18
..., 1:59:19..., 1:62:23...,
1:69:23..., 1:70:9..., 1:79:15...,
1:83:10..., 1:83:21..., 1:84:21
..., 1:84:23..., 1:85:2...,
1:115:19..., 1:133:17...,
1:139:23..., 1:156:19...,
1:158:24..., 1:159:1...,
1:162:14..., 1:163:12...,
1:165:13..., 1:167:5

seeing [1]– - 1:59:14

semantics [1]– - 1:57:24

send [9]– - 1:38:20...,
1:39:3..., 1:40:5..., 1:55:18...,
1:61:4..., 1:104:21..., 1:135:17
..., 1:136:19..., 1:143:2

sending [2]– - 1:7:14...,
1:109:14

Senior [36]– - 1:35:17...,
1:36:3..., 1:36:10..., 1:45:24...,
1:75:1..., 1:90:15..., 1:90:16...,
1:152:15..., 1:152:16...,
1:152:17..., 1:152:25...,
1:153:5..., 1:153:7..., 1:153:10
..., 1:154:7..., 1:154:9...,
1:154:12..., 1:154:16...,
1:154:19..., 1:155:14...,
1:157:7..., 1:157:18..., 1:158:3
..., 1:158:8..., 1:158:14...,
1:158:19..., 1:159:15...,
1:159:17..., 1:159:19...,
1:160:2..., 1:160:10...,
1:160:13..., 1:160:19...,
1:160:22..., 1:161:25

seniors [1]– - 1:65:8

sense [4]– - 1:8:25...,
1:58:17..., 1:133:3..., 1:165:13

sent [6]– - 1:104:20...,
1:105:25..., 1:108:10...,
1:109:1..., 1:109:4..., 1:109:12

separated [1]– - 1:110:25

separation [1]– - 1:34:25

September [2]– -
1:120:12..., 1:120:14

serious [3]– - 1:161:12...,
1:161:14..., 1:161:18

serve [1]– - 1:28:19

service [1]– - 1:45:6

Services [1]– - 1:155:15

services [18]– - 1:25:13...,
1:31:4..., 1:34:18..., 1:34:22...,
1:39:17..., 1:44:5..., 1:44:13...,
1:45:5..., 1:62:14..., 1:71:15...,
1:134:17..., 1:134:23...,
1:137:1..., 1:141:22...,
1:143:13..., 1:146:8...,
1:147:19

set [9]– - 1:11:3..., 1:37:7...,
1:38:18..., 1:41:6..., 1:93:13...,
1:139:7..., 1:147:7..., 1:164:15

seven [2]– - 1:100:22...,
1:103:3

seven-page [1]– -
1:100:22

several [3]– - 1:140:4...,
1:147:2..., 1:147:4

Shakes [1]– - 1:48:2

shall [1]– - 1:35:3

share [3]– - 1:62:6...,
1:129:16..., 1:147:2

sharing [1]– - 1:93:21

sheet [28]– - 1:4:12...,
1:10:21..., 1:17:1..., 1:17:12...,
1:23:9..., 1:50:2..., 1:50:5...,
1:50:15..., 1:64:5..., 1:64:6...,
1:67:6..., 1:68:6..., 1:68:8...,
1:68:9..., 1:78:6..., 1:80:18...,
1:80:21..., 1:87:1..., 1:87:3...,
1:87:4..., 1:87:9..., 1:111:18...,
1:111:21..., 1:147:23...,
1:148:2..., 1:162:19

sheets [17]– - 1:14:4...,
1:23:23..., 1:50:5..., 1:64:3...,
1:64:11..., 1:64:14..., 1:68:1...,
1:110:10..., 1:111:6...,
1:111:10..., 1:111:24...,
1:114:5..., 1:118:25...,
1:149:20..., 1:150:6..., 1:150:8
..., 1:152:7

shift [1]– - 1:112:25

short [1]– - 1:102:23

shorter [2]– - 1:95:25...,
1:102:20

shoulder [1]– - 1:61:17

show [18]– - 1:10:3...,
1:10:8..., 1:30:2..., 1:31:10...,
1:64:8..., 1:64:12..., 1:67:2...,
1:67:17..., 1:67:25..., 1:81:4...,
1:91:2..., 1:99:22..., 1:100:13
..., 1:107:7..., 1:111:18...,
1:112:16..., 1:131:22...,
1:154:24

showed [4]– - 1:17:5...,
1:109:8..., 1:109:10...,
1:157:23

showing [1]– - 1:67:16

shown [1]– - 1:80:7

sic [2]– - 1:114:11...,
1:156:16

sic] [1]– - 1:148:8

sicker [1]– - 1:28:6

side [4]– - 1:83:20...,
1:104:7..., 1:112:20..., 1:116:5

sidebar [1]– - 1:48:19

sides [1]– - 1:31:18

sign [21]– - 1:4:11...,
1:69:11..., 1:69:15..., 1:69:20
..., 1:80:21..., 1:98:18..., 1:99:8
..., 1:99:22..., 1:100:25...,
1:101:3..., 1:101:12...,
1:101:14..., 1:101:19...,
1:101:20..., 1:103:7...,

1:103:14..., 1:103:16...,
1:111:18..., 1:112:2..., 1:125:8
..., 1:125:18

signature [7]– - 1:117:16
..., 1:156:14..., 1:156:16...,
1:156:18..., 1:156:22...,
1:156:25..., 1:157:24

signed [14]– - 1:4:12...,
1:33:7..., 1:69:5..., 1:69:7...,
1:69:21..., 1:83:24..., 1:99:6...,
1:101:2..., 1:101:23..., 1:118:4
..., 1:119:7..., 1:119:20...,
1:124:20..., 1:125:21

signing [1]– - 1:125:10

signs [1]– - 1:70:2

similar [2]– - 1:34:19...,
1:134:21

simply [1]– - 1:118:20

sit [6]– - 1:7:12..., 1:8:24...,
1:94:5..., 1:123:22..., 1:124:8
..., 1:150:15

sitting [1]– - 1:96:22

situations [1]– - 1:68:6

six [1]– - 1:103:5

slip [1]– - 1:88:14

slot [3]– - 1:108:11...,
1:148:24..., 1:149:1

slower [1]– - 1:3:12

smart [1]– - 1:47:1

so.. [5]– - 1:45:15..., 1:68:19
..., 1:74:8..., 1:76:20..., 1:170:5

social [1]– - 1:29:20

solemnly [2]– - 1:85:21...,
1:95:4

solicit [3]– - 1:6:16...,
1:36:19..., 1:160:12

solicitation [16]– - 1:5:11
..., 1:6:4..., 1:6:14..., 1:8:2...,
1:33:25..., 1:46:14..., 1:73:11
..., 1:78:6..., 1:78:12..., 1:78:14
..., 1:78:15..., 1:79:9..., 1:79:11
..., 1:79:14..., 1:79:18..., 1:80:1

solicited [10]– - 1:5:7...,
1:5:19..., 1:5:21..., 1:6:8...,
1:6:12..., 1:45:23..., 1:78:10...,
1:78:18..., 1:78:24..., 1:79:20

solid [1]– - 1:79:15

someone [9]– - 1:39:12...,
1:48:16..., 1:49:4..., 1:99:20...,
1:99:22..., 1:105:14..., 1:107:3
..., 1:139:7..., 1:157:7

sometimes [4]– - 1:13:7...,
1:15:25..., 1:71:19..., 1:162:25

somewhat [1]– - 1:38:3

sorry [44]₋ - 1:22:14₋, 1:25:1₋, 1:25:6₋, 1:28:24₋, 1:29:17₋, 1:32:7₋, 1:40:15₋, 1:44:20₋, 1:52:17₋, 1:53:9₋, 1:53:13₋, 1:58:3₋, 1:65:2₋, 1:66:25₋, 1:72:21₋, 1:73:23₋, 1:74:19₋, 1:87:6₋, 1:87:24₋, 1:90:10₋, 1:100:15₋, 1:105:17₋, 1:114:1₋, 1:115:2₋, 1:121:2₋, 1:121:15₋, 1:122:21₋, 1:127:24₋, 1:132:10₋, 1:132:18₋, 1:135:9₋, 1:137:14₋, 1:141:9₋, 1:143:9₋, 1:144:15₋, 1:144:16₋, 1:145:13₋, 1:151:22₋, 1:152:8₋, 1:154:10₋, 1:157:9₋, 1:161:13

sort [1]₋ - 1:169:7

Soto [5]₋ - 1:51:3₋, 1:51:10₋, 1:112:17₋, 1:112:25₋, 1:113:3

sound [1]₋ - 1:61:2

sounds [2]₋ - 1:72:24₋, 1:73:15

Spanish [14]₋ - 1:98:16₋, 1:101:25₋, 1:108:22₋, 1:108:24₋, 1:108:25₋, 1:109:6₋, 1:109:12₋, 1:109:14₋, 1:109:15₋, 1:123:20₋, 1:125:3₋, 1:125:4₋, 1:125:5

speaking [5]₋ - 1:3:19₋, 1:15:4₋, 1:32:17₋, 1:54:25₋, 1:59:4

speaks [2]₋ - 1:109:6₋, 1:123:21

specific [4]₋ - 1:12:10₋, 1:50:4₋, 1:139:3₋, 1:149:9

specifically [3]₋ - 1:51:18₋, 1:118:13₋, 1:126:21

speculate [2]₋ - 1:79:4₋, 1:79:6

spent [1]₋ - 1:16:20

split [2]₋ - 1:170:5₋, 1:170:6

stability [1]₋ - 1:47:18

staff [2]₋ - 1:18:17₋, 1:35:13

stage [1]₋ - 1:28:7

stand [5]₋ - 1:8:21₋, 1:75:19₋, 1:77:10₋, 1:94:2₋, 1:94:5

standby [1]₋ - 1:3:13

standing [2]₋ - 1:26:3₋, 1:26:5

start [8]₋ - 1:30:14₋, 1:30:19₋, 1:46:4₋, 1:49:25₋, 1:103:21₋, 1:137:12₋, 1:138:9₋, 1:138:17

started [13]₋ - 1:25:21₋, 1:68:25₋, 1:69:23₋, 1:90:22₋, 1:103:25₋, 1:104:11₋, 1:104:15₋, 1:119:9₋, 1:119:11₋, 1:121:5₋, 1:137:15₋, 1:138:2₋, 1:138:7

starts [1]₋ - 1:10:14

State [19]₋ - 1:16:9₋, 1:27:3₋, 1:27:4₋, 1:29:6₋, 1:29:9₋, 1:29:10₋, 1:30:24₋, 1:39:2₋, 1:39:4₋, 1:40:20₋, 1:41:9₋, 1:42:7₋, 1:56:23₋, 1:56:24₋, 1:67:13₋, 1:67:14₋, 1:69:10₋, 1:105:8₋, 1:120:11

state [14]₋ - 1:27:12₋, 1:27:15₋, 1:27:22₋, 1:28:12₋, 1:28:18₋, 1:29:7₋, 1:39:21₋, 1:40:3₋, 1:41:7₋, 1:43:7₋, 1:57:3₋, 1:86:12₋, 1:133:14

statement [17]₋ - 1:9:19₋, 1:10:6₋, 1:24:14₋, 1:91:15₋, 1:102:16₋, 1:127:5₋, 1:130:10₋, 1:130:11₋, 1:131:10₋, 1:131:18₋, 1:131:25₋, 1:132:6₋, 1:134:25₋, 1:135:6₋, 1:139:12₋, 1:139:14₋, 1:139:16

statements [1]₋ - 1:130:14

States [3]₋ - 1:30:17₋, 1:96:9₋, 1:96:18

stating [1]₋ - 1:91:15

Statute [2]₋ - 1:15:14₋, 1:57:10

statute [8]₋ - 1:42:11₋, 1:42:15₋, 1:42:17₋, 1:49:1₋, 1:56:24₋, 1:57:3₋, 1:71:9₋, 1:168:19

statutes [3]₋ - 1:15:18₋, 1:56:10₋, 1:71:4

stay [3]₋ - 1:78:13₋, 1:96:13₋, 1:142:4

stays [1]₋ - 1:56:4

steal [2]₋ - 1:46:23₋, 1:66:17

step [2]₋ - 1:76:2₋, 1:76:6

stepping [2]₋ - 1:32:1₋, 1:91:13

stick [1]₋ - 1:36:8

still [12]₋ - 1:12:4₋, 1:15:8₋,

1:39:8₋, 1:58:19₋, 1:86:22₋, 1:92:3₋, 1:92:12₋, 1:102:12₋, 1:109:14₋, 1:124:20₋, 1:153:2₋, 1:164:16

stipulation [1]₋ - 1:93:9

stole [1]₋ - 1:102:11

stolen [1]₋ - 1:102:13

stop [2]₋ - 1:66:11₋, 1:143:21

stopped [5]₋ - 1:65:9₋, 1:65:10₋, 1:65:12₋, 1:65:13₋, 1:161:19

street [1]₋ - 1:16:1

stricken [2]₋ - 1:102:17₋, 1:130:19

strictly [1]₋ - 1:153:24

strike [3]₋ - 1:35:22₋, 1:75:4₋, 1:159:23

stub [1]₋ - 1:158:19

stuff [2]₋ - 1:29:21₋, 1:156:9

stumbled [1]₋ - 1:161:2

submitted [5]₋ - 1:64:9₋, 1:67:5₋, 1:114:5₋, 1:149:20₋, 1:150:6

subsequent [1]₋ - 1:128:3

subsequently [1]₋ - 1:17:16

subsumed [3]₋ - 1:167:7₋, 1:168:11₋, 1:168:15

subtract [1]₋ - 1:46:7

subtracting [1]₋ - 1:74:4

suffered [2]₋ - 1:4:17₋, 1:5:5

suggest [1]₋ - 1:31:7

suggesting [1]₋ - 1:88:25

Sundays [1]₋ - 1:13:15

Super [6]₋ - 1:120:19₋, 1:121:2₋, 1:121:8₋, 1:122:20₋, 1:122:21₋, 1:123:8

supervise [6]₋ - 1:27:9₋, 1:42:8₋, 1:48:1₋, 1:143:2₋, 1:143:6₋, 1:143:8

supervisor [5]₋ - 1:23:22₋, 1:47:22₋, 1:47:23₋, 1:47:25₋, 1:124:9

supplement [2]₋ - 1:11:3₋, 1:11:11

supplies [1]₋ - 1:14:16

supply [1]₋ - 1:15:10

support [2]₋ - 1:6:14₋, 1:80:12

supported [1]₋ - 1:138:18

supportive [2]₋ - 1:79:7

supports [2]₋ - 1:5:6₋, 1:78:14

supposed [8]₋ - 1:22:19₋, 1:27:10₋, 1:55:5₋, 1:64:2₋, 1:103:13₋, 1:111:12₋, 1:111:16₋, 1:111:18

susceptible [1]₋ - 1:12:7

sustain [4]₋ - 1:7:8₋, 1:130:7₋, 1:132:8₋, 1:161:22

sustained [14]₋ - 1:29:12₋, 1:35:24₋, 1:36:21₋, 1:75:3₋, 1:123:5₋, 1:129:20₋, 1:130:19₋, 1:150:17₋, 1:152:21₋, 1:155:17₋, 1:158:6₋, 1:160:5₋, 1:161:22

sustaining [1]₋ - 1:157:3

swear [4]₋ - 1:85:18₋, 1:85:21₋, 1:95:2₋, 1:95:4

switch [3]₋ - 1:4:9₋, 1:94:23₋, 1:94:24

swore [1]₋ - 1:128:9

sworn [2]₋ - 1:86:5, 1:95:13

system [1]₋ - 1:48:7

**T**

table [2]₋ - 1:78:5₋, 1:103:18

talks [2]₋ - 1:33:24₋, 1:57:12

tasks [1]₋ - 1:23:13

taught [3]₋ - 1:132:23₋, 1:132:24₋, 1:133:1

tax [3]₋ - 1:144:7₋, 1:145:25

taxes [24]₋ - 1:60:5₋, 1:61:3₋, 1:61:4₋, 1:61:6₋, 1:61:10₋, 1:61:17₋, 1:61:20₋, 1:61:22₋, 1:61:23₋, 1:61:25₋, 1:62:1₋, 1:62:4₋, 1:62:6₋, 1:62:7₋, 1:62:18₋, 1:144:14₋, 1:144:20₋, 1:144:23₋, 1:145:2₋, 1:145:10₋, 1:145:12₋, 1:145:20

teach [1]₋ - 1:43:14

teacher [1]₋ - 1:132:25

tears [1]₋ - 1:109:19

technically [1]₋ - 1:37:25

temper [1]₋ - 1:91:3

ten [1]₋ - 1:137:9

tend [2]₋ - 1:8:3

Tendering [2]_ - 1:36:25_, 1:140:3

term [3]_ - 1:26:9_, 1:34:14 _, 1:121:18

terminate [11]_ - 1:38:2_, 1:38:24_, 1:39:1_, 1:39:4_, 1:39:18_, 1:141:10_, 1:141:13_, 1:141:20_, 1:142:2_, 1:142:5_, 1:142:7

terminated [1]_ - 1:39:19

termination [1]_ - 1:34:25

terms [5]_ - 1:33:9_, 1:40:20_, 1:112:8_, 1:137:4 _, 1:137:19

test [1]_ - 1:94:22

testified [29]_ - 1:6:5_, 1:16:17_, 1:16:23_, 1:17:11 _, 1:23:5_, 1:41:10_, 1:41:17 _, 1:43:22_, 1:43:25_, 1:48:1 _, 1:48:11_, 1:71:24_, 1:72:16_, 1:79:19, 1:86:5, 1:95:13_, 1:116:24_, 1:118:1 _, 1:119:21_, 1:138:1_, 1:138:13_, 1:145:23_, 1:146:4_, 1:150:14_, 1:150:19_, 1:150:25_, 1:151:11_, 1:157:18_, 1:157:21

testify [21]_ - 1:3:16_, 1:3:23_, 1:4:1_, 1:4:8_, 1:6:11_, 1:6:12_, 1:7:15_, 1:7:20_, 1:28:15_, 1:37:10_, 1:42:12_, 1:42:14_, 1:70:10 _, 1:77:25_, 1:78:2_, 1:79:18 _, 1:80:2_, 1:80:7_, 1:80:22_, 1:151:18_, 1:157:8

testifying [5]_ - 1:75:19_, 1:143:6_, 1:148:22_, 1:151:14_, 1:151:16

testimony [59]_ - 1:4:3_, 1:4:15_, 1:5:9_, 1:5:19_, 1:6:7_, 1:6:9_, 1:6:17_, 1:7:1 _, 1:7:25_, 1:8:2_, 1:8:5_, 1:8:7_, 1:10:3_, 1:24:16_, 1:32:24_, 1:35:15_, 1:48:25 _, 1:49:7_, 1:49:13_, 1:54:2_, 1:58:15_, 1:58:18_, 1:58:19 _, 1:58:23_, 1:66:1_, 1:78:20 _, 1:79:8_, 1:79:11_, 1:79:23 _, 1:79:24_, 1:80:2_, 1:80:10 _, 1:81:11_, 1:83:6_, 1:85:21 _, 1:89:1_, 1:89:3_, 1:95:4_, 1:117:5_, 1:118:16_, 1:119:3 _, 1:119:10_, 1:120:4_, 1:120:13_, 1:122:14_, 1:123:1_, 1:123:7_, 1:124:18 _, 1:126:2_, 1:126:23_, 1:127:13_, 1:128:7_,

1:129:23_, 1:132:14_, 1:148:22_, 1:152:5_, 1:154:6 _, 1:154:15_, 1:160:25

text [2]_ - 1:67:24_, 1:84:12

THE [255]_ - 1:3:2_, 1:3:15 _, 1:3:20_, 1:4:20_, 1:5:1_, 1:5:18_, 1:6:2_, 1:6:7_, 1:6:10_, 1:6:15_, 1:7:5_, 1:7:16_, 1:7:20_, 1:7:23_, 1:8:8_, 1:8:10_, 1:8:14_, 1:8:19_, 1:9:1_, 1:9:5_, 1:9:7 _, 1:9:20_, 1:18:13_, 1:19:15 _, 1:24:24_, 1:25:2_, 1:26:2_, 1:26:5_, 1:26:7_, 1:28:15_, 1:29:12_, 1:29:23_, 1:35:24 _, 1:36:21_, 1:37:10_, 1:40:25_, 1:42:4_, 1:42:12_, 1:44:16_, 1:47:16_, 1:48:18 _, 1:48:21_, 1:49:16_, 1:52:3 _, 1:52:6_, 1:52:21_, 1:62:19 _, 1:63:1_, 1:63:5_, 1:63:11_, 1:63:14_, 1:70:23_, 1:72:11 _, 1:74:10_, 1:75:3_, 1:75:5_, 1:76:2_, 1:76:4_, 1:76:6_, 1:76:11_, 1:76:16_, 1:76:19 _, 1:76:21_, 1:76:24_, 1:77:2 _, 1:77:7_, 1:77:20_, 1:77:24 _, 1:78:9_, 1:78:17_, 1:78:22 _, 1:79:2_, 1:79:10_, 1:80:1_, 1:80:6_, 1:80:14_, 1:81:1_, 1:81:6_, 1:81:24_, 1:82:2_, 1:82:6_, 1:82:10_, 1:82:12_, 1:82:15_, 1:82:20_, 1:82:23 _, 1:83:2_, 1:83:12_, 1:83:15 _, 1:83:21_, 1:84:20_, 1:84:24_, 1:85:3_, 1:85:5_, 1:85:7_, 1:85:9_, 1:85:18_, 1:85:24_, 1:85:25_, 1:87:18 _, 1:88:4_, 1:88:19_, 1:88:21 _, 1:88:25_, 1:89:8_, 1:90:6_, 1:92:7_, 1:92:9_, 1:92:23_, 1:93:1_, 1:93:4_, 1:93:5_, 1:93:6_, 1:93:9_, 1:93:12_, 1:94:1_, 1:94:2_, 1:94:8_, 1:94:12_, 1:94:19_, 1:94:23 _, 1:95:2_, 1:95:7_, 1:95:10_, 1:98:2_, 1:98:5_, 1:102:1_, 1:102:18_, 1:102:21_, 1:102:22_, 1:102:25_, 1:105:15_, 1:105:18_, 1:107:8_, 1:109:9_, 1:110:3 _, 1:115:15_, 1:115:22_, 1:115:25_, 1:116:6_, 1:116:9 _, 1:119:24_, 1:120:2_, 1:120:7_, 1:121:17_, 1:121:20_, 1:122:1_, 1:122:2 _, 1:122:3_, 1:122:17_, 1:123:5_, 1:123:11_, 1:126:16_, 1:126:25_, 1:127:4_, 1:127:7_, 1:129:20

_, 1:129:24_, 1:130:7_, 1:130:21_, 1:131:23_, 1:132:8_, 1:132:10_, 1:132:19_, 1:133:5_, 1:138:7 _, 1:139:22_, 1:140:6_, 1:140:10_, 1:140:12_, 1:140:14_, 1:140:17_, 1:140:20_, 1:140:21_, 1:140:23_, 1:140:24_, 1:140:25_, 1:141:1_, 1:141:23_, 1:142:22_, 1:143:1_, 1:144:10_, 1:144:16_, 1:144:18_, 1:145:15_, 1:147:13_, 1:150:17_, 1:151:4_, 1:151:7 _, 1:151:9_, 1:151:17_, 1:152:11_, 1:152:21_, 1:153:13_, 1:153:19_, 1:153:23_, 1:154:4_, 1:154:8 _, 1:154:11_, 1:154:16_, 1:155:2_, 1:155:5_, 1:155:10 _, 1:155:17_, 1:156:1_, 1:156:8_, 1:156:11_, 1:156:18_, 1:157:3_, 1:157:11_, 1:157:15_, 1:158:1_, 1:158:6_, 1:158:10 _, 1:158:18_, 1:158:24_, 1:159:1_, 1:159:4_, 1:159:8 _, 1:159:13_, 1:159:22_, 1:160:5_, 1:161:13_, 1:161:22_, 1:162:2_, 1:162:6 _, 1:163:8_, 1:163:14_, 1:163:18_, 1:163:24_, 1:164:3_, 1:164:8_, 1:164:11 _, 1:164:15_, 1:164:19_, 1:165:3_, 1:165:17_, 1:165:20_, 1:165:23_, 1:166:2, 1:166:13_, 1:166:18 _, 1:167:4_, 1:167:16_, 1:168:7_, 1:168:9_, 1:168:22 _, 1:168:25_, 1:169:4_, 1:169:13_, 1:169:22_, 1:170:1_, 1:170:7_, 1:170:10 _, 1:170:13

themself [1]_ - 1:13:4

thereafter [1]_ - 1:34:15

therefore [4]_ - 1:26:14_, 1:40:4_, 1:128:20_, 1:166:9

Thereupon [2] - 1:86:3, 1:95:11

thesis [1]_ - 1:160:16

they've [1]_ - 1:169:7

thief [5]_ - 1:102:10_, 1:102:13_, 1:113:15_, 1:114:2_, 1:160:16

thinking [1]_ - 1:75:10

third [3]_ - 1:7:17_, 1:130:2 _, 1:130:5

thousand [1]_ - 1:165:16

three [5]_ - 1:12:15_, 1:38:20_, 1:68:23_, 1:112:9 _, 1:147:10

threw [3]_ - 1:148:18_, 1:148:23_, 1:148:24

throughout [5]_ - 1:21:16 _, 1:26:10_, 1:96:23_, 1:151:1

throw [1]_ - 1:149:1

Thursday [1]_ - 1:112:22

timekeeping [1]_ - 1:67:2

timely [2]_ - 1:153:22_, 1:154:2

timing [1]_ - 1:8:25

tired [1]_ - 1:88:14

title [2]_ - 1:31:19_, 1:155:16

Title [1]_ - 1:15:17

titled [3]_ - 1:31:11_, 1:154:24_, 1:155:14

today [13]_ - 1:3:10_, 1:36:15_, 1:72:25_, 1:75:18 _, 1:77:3_, 1:77:7_, 1:81:20_, 1:93:4_, 1:126:2_, 1:128:7_, 1:128:9_, 1:132:15_, 1:162:9

together [3]_ - 1:10:17_, 1:70:16_, 1:135:16

tomorrow [10]_ - 1:7:14_, 1:77:6_, 1:77:10_, 1:81:8_, 1:81:14_, 1:163:12_, 1:163:15_, 1:163:19_, 1:169:4_, 1:169:25

took [6]_ - 1:12:2_, 1:14:14 _, 1:14:19_, 1:87:11_, 1:109:17_, 1:148:9

top [2]_ - 1:168:23

total [4]_ - 1:52:23_, 1:53:21_, 1:75:11_, 1:168:6

totally [2]_ - 1:64:2_, 1:117:10

touch [1]_ - 1:112:15

tough [1]_ - 1:166:5

towards [4]_ - 1:86:25_, 1:90:2_, 1:90:13_, 1:97:19

track [1]_ - 1:21:17_, 1:111:2

traditionally [1]_ - 1:80:19

train [3]_ - 1:27:9_, 1:42:9 _, 1:42:19

trained [1]_ - 1:21:25

training [8]_ - 1:43:3_, 1:43:11_, 1:58:6_, 1:58:7_,

1:132:21_, 1:133:10_,
1:133:13_, 1:133:20

transcript [1]_ - 1:7:3

transfer [1]_ - 1:90:15

transition [1]_ - 1:36:2

translate [2]_ - 1:102:23_,
1:102:24

translated [6]_ - 1:99:19_,
1:99:21_, 1:101:6_, 1:101:9
_, 1:103:2_, 1:103:4

translation [2]_ - 1:101:8
_, 1:103:6

translator [3]_ - 1:7:10_,
1:7:12_, 1:8:23

travel [1]_ - 1:69:1

treat [1]_ - 1:18:2

treatment [5]_ - 1:10:23_,
1:22:23_, 1:109:21_,
1:134:15_, 1:147:3

trial [10]_ - 1:3:16_, 1:8:6_,
1:26:10_, 1:49:14_, 1:81:15
_, 1:82:9_, 1:119:9_, 1:154:3
_, 1:155:3_, 1:159:3

tried [5]_ - 1:79:3_,
1:113:17_, 1:137:13_,
1:137:16_, 1:138:14

true [31]_ - 1:12:7_, 1:17:22
_, 1:24:14_, 1:33:11_,
1:55:19_, 1:60:24_, 1:61:18
_, 1:61:22_, 1:64:10_,
1:65:10_, 1:65:13_, 1:65:14
_, 1:66:7_, 1:66:8_, 1:68:1_,
1:70:11_, 1:70:19_, 1:70:21
_, 1:120:22_, 1:121:1_,
1:121:23_, 1:123:20_,
1:134:16_, 1:136:22_,
1:146:6_, 1:147:1_, 1:149:23
_, 1:150:6_, 1:158:8_,
1:159:17_, 1:160:2

truth [9]_ - 1:24:25, 1:85:22
_, 1:85:23, 1:95:5_, 1:95:6_,
1:122:10_, 1:128:9

try [7]_ - 1:6:16_, 1:77:15_,
1:89:4_, 1:102:19_, 1:113:18
_, 1:140:18_, 1:155:19

trying [16]_ - 1:8:23_,
1:37:18_, 1:50:15_, 1:58:18
_, 1:58:23_, 1:69:3_, 1:82:21
_, 1:84:15_, 1:122:4_,
1:122:9_, 1:122:10_,
1:122:25_, 1:124:4_,
1:139:21_, 1:149:15_,
1:157:1

turn [3]_ - 1:111:24_,
1:112:1_, 1:156:13

turned [1]_ - 1:64:3

tutorials [1]_ - 1:22:1

twenty [1]_ - 1:103:2

twice [2]_ - 1:162:2_,
1:162:3

two [26]_ - 1:4:1_, 1:4:6_,
1:15:18_, 1:27:17_, 1:35:10
_, 1:35:12_, 1:43:5_, 1:46:2_,
1:51:9_, 1:56:21_, 1:76:9_,
1:77:25_, 1:78:5_, 1:79:19_,
1:80:12_, 1:105:16_,
1:110:11_, 1:110:17_,
1:130:14_, 1:144:24_,
1:147:10_, 1:148:9_,
1:148:18_, 1:165:18

type [1]_ - 1:22:20

types [1]_ - 1:23:1

**U**

umbrella [1]_ - 1:26:12

under [13]_ - 1:13:25_,
1:33:9_, 1:34:10_, 1:56:9_,
1:57:16_, 1:57:18_, 1:57:19
_, 1:57:25_, 1:112:22_,
1:114:14_, 1:128:8_, 1:154:2
_, 1:168:1

understood [14]_ - 1:8:13
_, 1:51:8_, 1:81:5_, 1:82:5_,
1:82:14_, 1:102:15_,
1:123:14_, 1:124:19_,
1:130:12_, 1:130:22_,
1:155:12_, 1:155:21_,
1:162:4

unfair [2]_ - 1:49:8_,
1:49:14

uniform [7]_ - 1:105:3_,
1:105:7_, 1:105:9_, 1:105:11
_, 1:146:10_, 1:146:18_,
1:146:22

United [3]_ - 1:30:17_,
1:96:9_, 1:96:18

unless [2]_ - 1:39:21_,
1:79:12

unresponsive [1]_ -
1:102:17

unscrupulous [2]_ -
1:47:4_, 1:47:12

up [44]_ - 1:5:10_, 1:6:24_,
1:7:10_, 1:7:19_, 1:8:22_,
1:10:3_, 1:10:8_, 1:14:13_,
1:17:3_, 1:19:10_, 1:20:20_,
1:31:7_, 1:38:5_, 1:38:15_,
1:38:16_, 1:38:18_, 1:39:17
_, 1:50:12_, 1:53:20_, 1:59:1
_, 1:59:24_, 1:60:12_, 1:67:2
_, 1:67:16_, 1:67:17_, 1:81:4
_, 1:81:6_, 1:81:15_, 1:93:13

_, 1:107:7_, 1:108:11_,
1:109:8_, 1:109:10_,
1:113:16_, 1:113:18_,
1:119:10_, 1:128:16_,
1:136:5_, 1:148:1_, 1:151:5
_, 1:151:8

upset [2]_ - 1:90:18_,
1:90:21

upsetting [1]_ - 1:3:13

uses [1]_ - 1:114:2

**V**

Valdivieso [34]_ - 1:6:12_,
1:51:1_, 1:51:9_, 1:52:1_,
1:53:19_, 1:55:4_, 1:55:10_,
1:57:22_, 1:59:11_, 1:60:9_,
1:61:15_, 1:63:21_, 1:64:3_,
1:64:10_, 1:64:21_, 1:64:24
_, 1:65:4_, 1:65:9_, 1:65:12_,
1:67:25_, 1:69:5_, 1:69:15_,
1:69:21_, 1:76:18_, 1:77:14
_, 1:80:17_, 1:80:20_,
1:80:23_, 1:81:23_, 1:94:18
_, 1:95:19_, 1:95:21_,
1:167:11_, 1:168:1

VALDIVIESO [1]_ -
1:95:12

Valdivieso's [3]_ -
1:51:15_, 1:66:1_, 1:70:18

vary [1]_ - 1:41:15

Venezuela [1]_ - 1:96:8

verbatim [2]_ - 1:129:18_,
1:129:21

verdict [5]_ - 1:82:17_,
1:164:20_, 1:169:15_,
1:169:16_, 1:169:20

verify [1]_ - 1:22:18

versus [7]_ - 1:18:9_,
1:19:19_, 1:58:21_, 1:59:2_,
1:59:3_, 1:70:5

vet [1]_ - 1:26:21

via [1]_ - 1:3:10

view [1]_ - 1:68:3

violation [3]_ - 1:8:11_,
1:39:21_, 1:168:19

violations [1]_ - 1:39:25

VIP [131]_ - 1:4:16_, 1:5:23
_, 1:11:6_, 1:11:10_, 1:11:13
_, 1:15:2_, 1:16:14_, 1:17:14
_, 1:18:5_, 1:19:8_, 1:20:15_,
1:21:23_, 1:22:6_, 1:25:23_,
1:32:25_, 1:33:9_, 1:33:25_,
1:34:1_, 1:35:7_, 1:36:3_,
1:36:19_, 1:37:14_, 1:39:16
_, 1:43:13_, 1:44:1_, 1:44:4_,

1:44:12_, 1:45:17_, 1:45:23
_, 1:47:13_, 1:47:19_,
1:47:24_, 1:72:22_, 1:78:7_,
1:85:15_, 1:90:4_, 1:90:15_,
1:90:20_, 1:91:16_, 1:92:13
_, 1:92:15_, 1:92:19_, 1:97:8
_, 1:97:10_, 1:97:24_, 1:98:6
_, 1:99:15_, 1:100:19_,
1:100:21_, 1:101:13_,
1:103:22_, 1:104:6_, 1:104:9
_, 1:104:11_, 1:104:19_,
1:105:7_, 1:105:13_,
1:105:19_, 1:106:7_,
1:106:23_, 1:107:7_,
1:107:18_, 1:108:17_,
1:109:1_, 1:109:4_, 1:112:5
_, 1:114:18_, 1:116:18_,
1:116:20_, 1:117:6_,
1:117:12_, 1:119:22_,
1:120:5_, 1:121:5_, 1:123:1
_, 1:123:23_, 1:124:13_,
1:125:25_, 1:126:3_, 1:126:4
_, 1:126:24_, 1:127:14_,
1:127:15_, 1:127:20_,
1:128:4_, 1:128:19_,
1:128:20_, 1:128:24_,
1:129:1_, 1:129:9_, 1:130:4
_, 1:131:2_, 1:133:11_,
1:134:3_, 1:135:8_, 1:135:10
_, 1:142:17_, 1:142:20_,
1:143:12_, 1:143:15_,
1:143:21_, 1:143:25_,
1:144:8_, 1:144:21_,
1:144:24_, 1:145:7_, 1:146:2
_, 1:149:13_, 1:149:19_,
1:150:20_, 1:151:2_,
1:151:11_, 1:152:24_,
1:153:7_, 1:159:20_, 1:160:8
_, 1:160:12_, 1:161:6_,
1:161:7_, 1:161:12_,
1:161:18_, 1:161:19_,
1:162:22_, 1:162:24_,
1:163:2_, 1:163:3

VIP's [1]_ - 1:105:9

vocation [2]_ - 1:97:18_,
1:97:22

voluntarily [2]_ - 1:125:7_,
1:125:19

volunteering [1]_ -
1:156:9

vulnerable [1]_ - 1:47:7

**W**

W-2 [4]_ - 1:59:3_, 1:145:5
_, 1:145:7_, 1:145:25

W-2s [8]_ - 1:19:21_,
1:20:11_, 1:59:2_, 1:60:14_,
1:60:20_, 1:60:22_, 1:61:3_,

1:62:10
wage [14]_ - 1:164:17_,
1:164:24_, 1:165:1_,
1:165:15_, 1:166:6_, 1:166:9
_, 1:167:1_, 1:167:19_,
1:168:10_, 1:168:13_,
1:168:14_, 1:168:18_,
1:169:5
wages [4]_ - 1:114:14_,
1:126:12_, 1:145:12_,
1:169:2
Wait [1]_ - 1:108:15
wait [6]_ - 1:53:8_, 1:81:3_,
1:82:4_, 1:82:8_, 1:126:6_,
1:148:17
waited [1]_ - 1:48:23
waiting [2]_ - 1:81:8_,
1:82:18
walk [1]_ - 1:16:1
walks [1]_ - 1:29:1
wants [16]_ - 1:29:2_,
1:29:7_, 1:29:9_, 1:29:10_,
1:31:23_, 1:33:4_, 1:33:8_,
1:39:8_, 1:54:8_, 1:55:7_,
1:55:11_, 1:55:24_, 1:81:22
_, 1:93:13_, 1:130:21_,
1:157:7
ways [1]_ - 1:20:15
wear [3]_ - 1:105:4_,
1:105:7_, 1:105:9
wearing [1]_ - 1:104:25
wears [1]_ - 1:146:7
week [44]_ - 1:4:10_,
1:12:20_, 1:13:10_, 1:13:13
_, 1:46:3_, 1:50:6_, 1:50:11_,
1:50:17_, 1:50:19_, 1:51:16
_, 1:51:25_, 1:52:24_,
1:53:22_, 1:64:21_, 1:64:24
_, 1:65:1_, 1:72:7_, 1:72:16_,
1:72:17_, 1:72:19_, 1:73:4_,
1:73:17_, 1:73:18_, 1:73:21
_, 1:74:1_, 1:74:16_, 1:74:17
_, 1:75:12_, 1:106:20_,
1:111:22_, 1:113:4_, 1:113:5
_, 1:113:13_, 1:113:25_,
1:115:9_, 1:147:9_, 1:148:25
_, 1:149:7_, 1:149:24_,
1:164:25_, 1:165:1_,
1:166:23
weekends [1]_ - 1:30:18
weeks [8]_ - 1:50:10_,
1:50:18_, 1:73:7_, 1:73:23_,
1:74:19_, 1:112:7_, 1:166:1
welcome [1]_ - 1:92:9
West [6]_ - 1:108:7_,
1:147:22_, 1:148:8_, 1:148:9

_, 1:148:13_, 1:148:19
whereby [1]_ - 1:10:3
whole [7]_ - 1:54:8_,
1:59:15_, 1:61:9, 1:85:22_,
1:95:6_, 1:102:22_, 1:109:25
Wi [2]_ - 1:24:3_, 1:24:8
Wi-Fi [2]_ - 1:24:3_, 1:24:8
wife [2]_ - 1:78:24_,
1:79:14
willing [2]_ - 1:55:9_,
1:134:23
window [2]_ - 1:148:16_,
1:148:18
wishes [1]_ - 1:41:3
withdrawn [1]_ - 1:40:17
witness [17]_ - 1:3:22_,
1:6:16_, 1:76:12_, 1:77:5_,
1:77:6_, 1:83:22_, 1:85:12_,
1:85:14_, 1:94:16_, 1:94:17
_, 1:94:24_, 1:95:2_,
1:129:23_, 1:132:11_,
1:153:12_, 1:158:17_,
1:164:2
WITNESS [11]_ - 1:85:24
_, 1:92:9_, 1:93:5_, 1:95:7_,
1:102:21_, 1:102:25_,
1:140:14_, 1:140:20_,
1:140:23_, 1:140:25_,
1:156:11
Witness [1]_ - 1:101:25
witness's [1]_ - 1:84:8
witnesses [1]_ - 1:79:19
witnesses' [1]_ - 1:83:6
woman [1]_ - 1:117:20
wondering [2]_ - 1:77:20
_, 1:102:12
word [1]_ - 1:66:24
words [3]_ - 1:20:14_,
1:22:10_, 1:105:16
worker [1]_ - 1:143:4
workers' [3]_ - 1:59:20_,
1:60:3_, 1:60:6
works [8]_ - 1:24:5_,
1:56:15_, 1:56:16_, 1:56:18
_, 1:62:2_, 1:77:21_, 1:85:3_,
1:85:5
worry [6]_ - 1:98:15_,
1:98:18_, 1:109:24_,
1:117:13_, 1:119:1_,
1:125:13
worse [2]_ - 1:138:14_,
1:138:23
wrap [1]_ - 1:5:10
write [8]_ - 1:27:6_, 1:98:14

_, 1:98:19_, 1:111:4_,
1:111:6_, 1:112:22_, 1:115:1
_, 1:115:8
writing [1]_ - 1:31:18
written [1]_ - 1:71:10
wrote [7]_ - 1:50:1_,
1:50:21_, 1:50:24_, 1:80:18
_, 1:98:14_, 1:114:24_,
1:115:5

Y

year [15]_ - 1:34:15_,
1:34:24_, 1:36:13_, 1:61:5_,
1:73:5_, 1:113:22_, 1:115:6
_, 1:126:7_, 1:144:7_,
1:144:14_, 1:144:20_,
1:145:25_, 1:150:11_,
1:150:24
years [8]_ - 1:27:17_,
1:43:5_, 1:46:5_, 1:46:6_,
1:56:21_, 1:72:4_, 1:144:24
_, 1:145:8
yesterday [13]_ - 1:5:15_,
1:6:5_, 1:9:15_, 1:10:2_,
1:11:10_, 1:14:7_, 1:15:13_,
1:16:21_, 1:20:20_, 1:24:10
_, 1:35:15_, 1:56:6_, 1:58:20
Yolanda [3]_ - 1:110:15_,
1:110:16_, 1:110:19
young [3]_ - 1:98:12_,
1:124:24_, 1:125:2
yourself [6]_ - 1:86:20_,
1:95:17_, 1:141:11_,
1:141:14_, 1:141:21_,
1:146:7
YouTube [1]_ - 1:22:2
yup [1]_ - 1:34:12

Z

Zoom [11]_ - 1:3:10_,
1:3:23_, 1:6:17_, 1:7:15_,
1:77:4_, 1:77:21_, 1:81:9_,
1:81:10_, 1:85:13_, 1:85:16
_, 1:89:5